Richard J. Cooper
Lisa M. Schweitzer
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LATAM Airlines Group S.A., *et al.*, | Case No. 20-11254 |
| Debtors.[1] | Joint Administration Pending |

**DECLARATION OF RAMIRO ALFONSIN BALZA IN SUPPORT OF FIRST DAY**
**MOTIONS AND APPLICATIONS IN COMPLIANCE WITH LOCAL RULE 1007-2**

I, Ramiro Alfonsín Balza, hereby declare under penalty of perjury, pursuant to

section 1746 of Title 28 of the United States Code, as follows:

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96 9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96 6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98 0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76 9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street, Miami, FL 33131.

1.      I am the Chief Financial Officer of LATAM Airlines Group S.A.

("LATAM Parent"), a corporation organized under the laws of Chile.  I have been the Chief

Financial Officer of LATAM Parent for the last four years, after working for more than twenty

years in investment banking and in senior finance positions in the power utility sector.  I am

generally familiar with the day-to-day operations and affairs, books and records of LATAM

Parent and its affiliates that have, together with the LATAM Parent, filed their voluntary

petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy

Code"),[2] in the United States Bankruptcy Court for the Southern District of New York (the

"Court").  LATAM Parent and its affiliates that are seeking Chapter 11 protection are

collectively referred to herein as the "Debtors."[3]  Concurrently herewith, the Debtors have filed a

motion seeking joint administration of their chapter 11 cases (the "Chapter 11 Cases") pursuant

to Bankruptcy Rule 1015(b).

2.      LATAM is Latin America's leading airline group, with a history

extending back ninety years, and boasting one of the largest route networks in the world.

LATAM is the fourteenth-largest airline group in the world, measured by passengers carried, and

the most important carrier in Latin America.  We carry more passengers in the region than any

other carrier.  In fact, 40% of passengers traveling within the region traveled with LATAM in

2019.  LATAM has also been recognized as one of the most punctual airline groups.[4]  In 2019,

LATAM employed approximately 42,000 people worldwide, and it also operated approximately

---

[2]      LATAM Parent, and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as
"LATAM".

[3]      Certain LATAM affiliates have not sought chapter 11 protection and are not Debtors in these Chapter 11
Cases.  They include, without limitation Brazilian affiliates Tam S.A., Tam Linhas Aéreas S.A. and Aerolinhas
Brasileiras S.A.; Argentinian affiliate Lan Argentina S.A.; and Paraguayan affiliate Transportes Aereos del
Mercosur.

[4]      This award was granted in 2018 and 2019 by the Official Airline Guide in the mega-airlines category, and
by Cirium, an independent data and analytics brand that is a part of Relx Plc., in 2019 in the global category.

1,400 flights per day, transported seventy-four million passengers per year and 900,000 tons of cargo per year.

3.      Prior to flight disruptions occasioned by the COVID-19 pandemic, LATAM offered passenger transportation services to 145 different destinations in twenty-six countries, including domestic flights in Argentina, Brazil, Chile, Colombia, Ecuador and Perú and international services within Latin America as well as to the United States, Europe,  the Caribbean, Oceania, Asia and Africa.  LATAM has a total fleet of 340 aircraft,[5] and in 2019, LATAM generated over $10 billion in revenues and over $1 billion of operating cash flow after investments.  While the majority of LATAM's revenues have traditionally come from its passenger airline services, LATAM integrates its passenger network with exclusive cargo destinations to offer cargo-related services to 151 destinations in twenty-nine countries. LATAM's cargo business is continuing to provide essential goods and services to customers in need.  LATAM is the only airline group in the Americas and one of only three airline groups worldwide to be a part of the Dow Jones Sustainability 'World' Index.  In 2019, it was recognized by the index for sustainable practices, based on economic, social and environmental criteria, for the sixth consecutive year.

4.      Latin America is comprised of a diverse set of countries with separate aeronautical regulators, route rights, employment legislation, corporate legislation and tax regulation.  Unlike many other airlines, LATAM is a group of airlines with different Air Operator Certificates operating under the unified brand "LATAM."  Under this structure, LATAM has access to six domestic markets and flies from South America to five continents.

---

[5]      This number comprises both aircraft operated by LATAM and a small number that are leased to third-parties.

Other than LATAM Parent, all of the Debtors are direct or indirect subsidiaries of LATAM

Parent.  Attached as **Schedule 1** is a chart summarizing the Debtors' corporate structure.

5.      Today, LATAM Parent is a publicly traded company incorporated in

Chile.  LATAM is primarily involved in the transportation of passengers and cargo.  LATAM is

the largest passenger airline group in South America and one of the largest airline groups in the

world in terms of network connections and, as such, integrates South America into the globalized

economy.

6.      Over the past years, LATAM has made key strategic decisions that have

enabled it to experience meaningful growth and increased balance sheet strength.  Specifically,

LATAM has reduced its operating costs while also expanding and improving its operations,

while deleveraging and strengthening its balance sheet.  Ultimately, the company has achieved

four consecutive years of net profits and, in last three years, generated over $1 billion of

operating cash flow after investments every year.

7.      Despite this recent track record of success, as discussed in more detail

below, the Debtors' Chapter 11 filings are precipitated by the unprecedented impact caused by

the COVID-19 pandemic.  The effects of the pandemic have led to a dramatic reduction in

worldwide air travel, including an approximate 95% reduction in LATAM's passenger service,

which comprises the vast majority of LATAM's operating revenue.  Although the Debtors

believe the fundamentals of their business remain strong, and that LATAM is poised to continue

its success as South America's leading airline once air travel returns to historical norms, these

Chapter 11 Cases are necessary to protect the Debtors' assets and to administer and manage the

Debtors' existing obligations.

8.      To minimize the adverse effects of filing for bankruptcy protection on their businesses, customers and employees, the Debtors have filed motions requesting various types of "first day" relief (collectively, the "<u>First Day Motions</u>").[6]  The First Day Motions seek relief intended to allow the Debtors to perform and meet the obligations necessary to continue to operate their businesses and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto) and, based on my knowledge and experience, believe that each First Day Motion (i) is necessary to enable the Debtors to operate in Chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in ultimately achieving a successful reorganization of the Debtors; and (iii) best serves the Debtors' estates and creditors' interests.  In addition, the Debtors also intend to file shortly certain motions that will be heard at a subsequent hearing date to be established by the Court (the "<u>Second Day Motions</u>").  Among other things, these Second Day Motions will address the retention of the Debtors' professionals.  While further details will be provided in the Second Day Motions themselves, certain supporting facts are set forth herein.

9.      I submit this declaration (this "<u>First Day Declaration</u>"), in support of the First Day Motions and pursuant to 28 U.S.C. § 1746, as well as rule 1007 of the Bankruptcy Rules and rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by members of the Debtors' management, their other personnel and their professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors'

---

[6]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in each of the First Day Motions.

operations and financial condition and the airline industry as a whole.  To the extent that the

Debtors learn that any information provided herein is materially inaccurate, the Debtors will act

promptly to notify the Court and other parties; however, I believe all information herein to be

true to the best of my knowledge, information and belief.  I am authorized to submit this First

Day Declaration on behalf of the Debtors and if called upon to testify, I could and would testify

competently to the facts set forth herein.

10.     Section I of this First Day Declaration describes LATAM's business and

current operations.  Section II describes the Debtors' corporate structure.  Section III summarizes

the Debtors' current fleet structure.  Section IV provides an overview of the Debtors' prepetition

capital structure and indebtedness.  Section V describes the events leading to the filing of these

Chapter 11 Cases.  Section VI summaries the relief requested in each First Day Motion, and the

facts supporting those requests.

## I.    LATAM'S BUSINESS

### A.    *LATAM's History*

11.     The Chilean government originally founded LAN Airlines S.A. in 1929

("LAN").  LAN was Chile's flagship air carrier and a founding member of the International Air

Transport Association ("IATA").  In 1989, the Chilean government sold 51% of its stake in LAN

to private investors and Scandinavian Airlines System.  By 1994, 98.7% of LAN's shares were

acquired by its largest shareholders, including the Cueto Group (as defined below) and other

stakeholders.  In 1997, LAN's shares began trading on the New York Stock Exchange, making it

the first Latin American airline listed on the New York Stock Exchange.

12.     In the decades after its privatization, LAN established different affiliate air

carriers and significantly expanded the group's operations in Latin America beyond Chile,

beginning with service to Perú in 1999, Ecuador in 2003, Argentina in 2005, and Colombia in 2010.

13.     In 1976, Transportes Aéreos Regionais was founded with its headquarters in São Paulo and was eventually renamed Tam S.A. ("TAM").  TAM's operating entity is Tam Linhas Aéreas S.A. ("LATAM Airlines Brazil" and together with TAM, "TAM Brazil").  TAM Brazil quickly became the leading airline in Brazil.  In 1993, TAM Brazil launched Brazil's first ever frequent flyer program.  TAM Brazil operated its first international flight to the United States in 1998 and soon after it began offering flights to major European cities in Germany, Italy, France, Spain and England.  TAM Brazil also expanded within Latin America, including initiating service to Paraguay in 1996 and to Chile in 2004.  TAM Brazil's shares were listed on the Brazilian Stock Exchange in 2005 and on the New York Stock Exchange in 2006.

14.     LATAM Parent is a holding company formed through the business combination of LAN and TAM in 2012 (the "Business Combination").  In connection with this transaction, LAN Airlines S.A. was renamed LATAM Airlines Group S.A.  Prior to the Business Combination, both Brazil and Chile experienced years of economic growth, resulting in an increase in air travel and competition among airlines.  TAM Brazil, once Brazil's leading airline, in particular was experiencing significant competition from rivals offering less expensive fares.

15.     As a result of the Business Combination, LATAM became the world's second largest airline by market value in 2012.

**B.     LATAM's Route Network**

16.     As of December 31, 2019, LATAM provided scheduled passenger service to seventeen destinations in Chile, twenty destinations in Perú, six destinations in Ecuador, thirteen destinations in Argentina, fourteen destinations in Colombia, forty-five destinations in Brazil, ten destinations in other Latin American countries and the Caribbean, seven destinations

in North America (including New York), seven destinations in Europe, four destinations in Australasia, one destination in Asia and one destination in Africa.

17.     As of December 31, 2019, LATAM, through various code-sharing agreements, also offered service to sixty-six destinations in North America, sixty-seven destinations in Europe, fifteen destinations in Australasia, twenty-two destinations in Asia and seven destinations in Africa.[7]   LATAM is the only airline group in South America with a domestic presence in six markets as well as intra-regional and long-haul operations to five continents.   For the year ended December 31, 2019, the audited consolidated financial statements of LATAM reflected total operating revenue of $10.1 billion and net income of $195.6 million.   As of December 31, 2019, LATAM's audited consolidated financial statements reflected assets totaling approximately $21 billion and liabilities totaling approximately $17.9 billion.

### C.     LATAM's Passenger Operations

18.     In 2019, LATAM's passenger airline operations provided safe and efficient service to more than seventy-four million passengers flying to approximately 145 destinations in twenty-six countries.   For two consecutive years, LATAM has held the title of the most punctual airline group in the world for the mega-airline category, and in recent years has also been recognized by passengers with several awards, including the Best Airline in South America.[8]   LATAM Parent's subsidiaries in Chile and Perú are the largest domestic operators in their respective countries and, as of December 2019, had 57% and 63% market share, respectively.   Similarly, LATAM Parent's subsidiaries in Brazil, Argentina, Colombia and

---

[7]     For additional detail on the code share agreements and other interline contracts, please see Section VI.C herein.

[8]     As noted above, the Official Airline Guide as well as Cirium awarded LATAM the title of most punctual airline.   LATAM was awarded the title of Best Airline in South America by the Skytrax World Airline Awards, and the "Best Global Airline of South America" by the APEX Passenger Choice awards.

Ecuador are the second largest domestic operators in their respective countries. In addition to

providing intra-country service to domestic passengers, the domestic routes of each LATAM

affiliate play a vital role in transporting passengers to international airports for connecting

service to destinations abroad.

19.     Prior to the COVID-19 pandemic, LATAM operated four regularly

scheduled routes out of John F. Kennedy International Airport in New York ("JFK"). Flights out

of JFK provided service to (i) Guayaquil, Ecuador, (ii) Lima, Perú, (iii) Santiago, Chile and

(iv) São Paulo, Brazil.[9] In 2019, LATAM transported more than 345,000 passengers to and from

JFK and over 2.835 million passengers to and from the United States.

20.     In February 2020, in connection with LATAM's landmark deal with Delta

Air Lines, Inc. ("Delta"), which, as described in more detail herein, involved Delta purchasing a

minority stake in LATAM, LATAM relocated its operations at JFK from terminal eight to

terminal four, where LATAM will be able to provide smoother connections to its passengers. In

connection with its operations in New York, LATAM rents space from the Port Authority of

New York and New Jersey and Third Avenue Tower Owner LLC.

21.     LATAM's international routes allow for travel throughout Latin America,

Europe, the Caribbean, Oceania, Africa, Asia and the United States—including flights to and

from New York City, Los Angeles, Miami, Orlando, and Boston. LATAM's frequent flyer

program, LATAM Pass[tm], in which more than thirty-three million of LATAM's customers

participate, is the leading frequent flyer program in South America and the fourth largest in the

world. Customers in the program earn miles based on the price paid for the ticket, class of ticket

purchased and elite level. Customers also can earn miles by using the services of outside

---

[9]     As of April 23, 2020, LATAM has re-commenced certain passenger flights to Miami, but it has not yet
recommenced flights to New York.

partners in the program.  LATAM Pass<sup>tm</sup> members also can accrue and redeem miles for flights

on other airlines with whom LATAM has bilateral commercial agreements, notably including

Delta since April 2020.

### D.     LATAM's Cargo Operations

22.     In addition to passenger operations, LATAM operates a large and

profitable cargo operation, which as of year-end 2019, provided service to approximately 151

destinations in twenty-nine countries.  Notably, Lan Cargo S.A. ("Lan Cargo"), one of

LATAM's primary cargo entities, is headquartered in Miami, Florida.  These operations utilize

belly space on passenger flights and eleven dedicated freighter aircraft, allowing for the transport

of 900,000 tons of cargo in 2019.  The United States is the main market for LATAM's cargo

traffic to and from Latin America, and in 2019 LATAM transported more than 53,000 tons of

cargo to and from JFK alone.  For its cargo operations, LATAM utilizes passenger flights to and

from New York, Los Angeles, Miami, Orlando and Boston, as well as a dedicated freighter

service to Chicago.  LATAM also transports cargo to and from London, Barcelona, Milan, Paris,

Lisbon, Frankfurt, Madrid, Amsterdam, Brussels and throughout Latin America.

23.     In 2019, cargo revenues accounted for approximately 11% of LATAM's

revenue.  Notably, the impact of COVID-19 on worldwide air travel largely has spared cargo

operations, which continue to be a robust and profitable business for the Debtors, delivering

goods to customers in New York, the United States and throughout the world.  Indeed, in

response to the COVID-19 pandemic, LATAM has undertaken additional chartered cargo routes,

including to transport much needed medical supplies from locations around the world, including

Shanghai, China and New Delhi, India.

### E.   *Revenues by Point of Sale*

24.     Revenue from the passenger business primarily consists of ticket sales, along with ancillary revenue associated with, for example, passenger baggage fees, lounge passes and/or in-flight purchases.  Passenger revenue comprised approximately 89% of LATAM's revenue in 2019, while cargo revenues accounted for approximately 11% of LATAM's revenue.  The network that LATAM has in Latin America connects the region with the world, allowing LATAM to benefit from diversified revenue streams.  Out of the $10.1 billion in revenues that LATAM generated in 2019, over $1 billion was generated in the United States (10% of total revenues), making it the third most relevant country in revenues by point of sale after Brazil (38%) and Chile (16%), and higher than the revenues generated in Perú (8%), Europe (7%), Argentina (6%), Colombia (4%) and Ecuador (2%).  The remaining 9% of revenues comes from other countries that we serve with our global network.

### F.   *LATAM's Recent Years*

25.     Over the past decade, LATAM has experienced increasing economic growth and continued to expand its operations throughout the world.  Indeed, since 2010, LATAM more than doubled its operating revenue, topping $10 billion in 2019.  Part of LATAM's recent growth was due to a transformation plan put in place in 2016, when Brazil faced an economic recession and other countries in South America experienced low economic growth.  The plan focused on enhancing operational and financial performance while reducing debt.  Specifically, the objectives were to (i) establish a cost structure that would allow LATAM to compete effectively, (ii) establish disciplined investment practices, (iii) improve cash flow and (iv) reduce debt.

26.     LATAM has continued to make important strides in this transformation plan.  In 2019 alone, LATAM established twenty-six new routes, transported a record seventy-

four million passengers, established a framework to even further reduce its fleet commitments for the next three years by more than $1 billion, and announced a new framework agreement and codeshare partnership with Delta, in order to provide greater connectivity to the United States and the rest of the world.

27.     Furthermore, LATAM has continued focusing on its two key pillars: operations and passenger experience.  *First,* regarding operations, LATAM has improved its network, especially from hubs in Santiago, Lima and São Paulo.  LATAM has also increased the reliability of its operations and, as a result, in 2019, 86% of LATAM flights were on time, securing LATAM the title of the most punctual airline group in the world for the mega-airline category.[10]  *Second*, regarding passenger experience, in 2019 LATAM invested in its passengers as never before by (i) launching a unified frequent flyer program under the LATAM Pass[tm] brand and thereby becoming the fourth largest frequent flyer program in the world and (ii) introducing aircraft with new cabins designed to offer industry-leading on-board experience to better serve passenger needs.  In 2019, LATAM was honored to be recognized with several awards acknowledging our meaningful efforts to increase passenger experience, including, among others, "Best Airline in South America" in the Skytrax World Airline Awards, and the "Best Global Airline of South America" by the APEX Passenger Choice awards.

28.     We are proud of what we have accomplished in the past years.  Since 2015, we were able to increase available seat kilometers (or ASKs, used to measure an airline's carrying capacity) by approximately 11%, increase passengers carried from sixty-eight million to seventy-four million per year and increase our operational margin from 5% to 7%.  We also delivered improved financial results, achieving four consecutive years of net profits, a significant

---

[10]     As noted, this award was granted by the Official Airline Guide as well as Cirium, an independent data and analytics brand that is a part of Relx Plc.

achievement after seeing net losses in the three prior years. Finally, we have maintained consistent financial discipline and, in the last three years, generated over $1 billion of operating cash flow after investments in every year. Financial debt between 2015 and 2019 decreased by approximately $2 billion with leverage, defined as Net Debt divided by EBITDA, dropping from 5.8x to 4.0x. This, combined with an important reduction in our capital fleet commitments from $9.7 billion in 2015 to $3.4 billion in 2019, significantly strengthened our financial position by the end of 2019.

### G.   *Competitive Strengths*

29.     We believe we have a number of competitive strengths. First, LATAM is a leading airline group in South America, with an unparalleled network in the region and to the rest of the world. In addition, we have a geographically diversified revenue base, including both passenger and cargo operations. Our loyalty program is highly recognized and the fourth largest in the world. Furthermore, we have a modern and efficient fleet. Lastly, LATAM has a strong brand teamed with key global strategic alliances.

## II.   THE DEBTORS' CORPORATE STRUCTURE

30.     The Debtors include LATAM Parent and twenty-eight of its direct or indirect subsidiaries. Among the Debtors are five of LATAM's eight main passenger airline entities: (i) LATAM Parent, (ii) Transporte Aéreo S.A. ("Transporte Aéreo"); (iii) LATAM Airlines Perú S.A. ("LATAM Airlines Perú");[11] (iv) LATAM-Airlines Ecuador S.A. ("LATAM

---

[11]     As part of a broader recapitalization of LATAM Parent, on May 20, 2020, LATAM Parent agreed to purchase 15% of the equity interests in LATAM Airlines Perú from a minority shareholder for a total amount of $6,450,000 in partial settlements of an existing amended option agreement dated as of May 15, 2018.

Airlines Ecuador"); and (v) Aerovías de Integración Regional, Aires S.A. ("LATAM Airlines Colombia").[12]

31.    LATAM regularly employed approximately 42,000 employees, 52% of whom work in Brazil, 25% in Chile, 10% in Perú, 5% in Argentina, 4% in Colombia, 2% in Ecuador, and 2% in the rest of the world.  The Debtors' workforce consists of approximately 17,000 wage earners as of April 1, 2020.  Approximately 96% of the Debtors' employees are based in five countries: Chile (56%), Perú (22%), Colombia (8%), the United States (6%), and Ecuador (4%).  The remaining 4% (approximately 7% of the Debtors' total payroll obligations) are employed in the Debtors' branches in other countries including Argentina, Australia, Brazil, Spain, the United Kingdom, Italy, Mexico, New Zealand and Uruguay.

32.    The Debtors also include two of LATAM's three cargo airline entities: (i) Lan Cargo, a company incorporated in Chile, (ii) Línea Aérea Carguera de Colombia S.A., a company incorporated in Colombia ("Lanco").[13]  Lan Cargo has significant operations in the United States, including its employment of over 100 employees that are based there.  Each of these affiliates also relies on services, including maintenance and storage, provided by a group of affiliated entities based in the United States.  Notably, the majority of the Debtors' employees in the United States support the company's cargo business.

---

[12]    LATAM's remaining three main passenger airline entities are (i) LATAM Airlines Brazil; (ii) LAN Argentina S.A. ("LATAM Airlines Argentina") and (iii) Transportes Aéreos del Mercosur S.A. ("LATAM Airlines Paraguay"), none of which are Debtors in these cases.

[13]    LATAM's third major cargo airline entity, Aerolinhas Brasileiras S.A., a company incorporated in Brazil ("ABSA" and, together with Lan Cargo and Lanco, the "Cargo Affiliates"), is not a Debtor in these Chapter 11 Cases.  Additionally, while LATAM's cargo airline entities perform mainly cargo operations, they may also support non-cargo operations and LATAM's cargo operations rely on services provided by other entities within the group. For example, cargo is often shipped using the belly space of passenger flights.

33.     In the United States, LATAM employs nearly 1,000 employees.  LATAM also relies on the services of 100 additional individuals in New York, whose services are provided through a third-party staffing agency.[14]

34.     LATAM Parent's board of directors (the "Board") is currently comprised of nine directors: (i) Ignacio Cueto, Chairman; (ii) Enrique Cueto, Vice Chairman; (iii) Giles Agutter; (iv) Nicolás Eblen; (v) Patrick Horn; (vi) Eduardo Novoa; (vii) Enrique Ostalé; (viii) Henri Philippe Reichstul; and (ix) Sonia Villalobos.  LATAM Parent's senior management team includes Roberto Alvo, Chief Executive Officer; Hernan Pasman, Chief Operation Officer; Paulo Miranda, Chief Customer Officer; Michael Rutter, Chief Commercial Officer; Emilio del Real, VP of Human Resources; Juan Carlos Menció, VP of Legal; and myself, as Chief Financial Officer.[15]

35.     Certain LATAM affiliates have not filed petitions for relief and are not a part of these Chapter 11 Cases (collectively, the "Non-Debtor Affiliates").  The Non-Debtor Affiliates include affiliates incorporated in (i) Brazil, including LATAM Airlines Brazil, TAM and ABSA, (ii) Argentina, including LATAM Airlines Argentina, and (iii) Paraguay, including LATAM Airlines Paraguay.[16]  Therefore, certain key operating entities have been excluded from these proceedings.  Importantly, and regardless of whether or not an operating entity has been included in the Chapter 11 Cases, LATAM is actively working to ensure that all necessary steps are taken to continue its global operations in the ordinary course, through the relief to be sought in these Chapter 11 Cases.

---

[14]     As of March 2020, on a monthly basis, LATAM paid its employees and individuals employed through staffing agencies based in the United States on an aggregate basis over $6 million.

[15]     Pursuant to Local Rule 1007-2(a)(4), **Schedule 11** lists out additional information regarding LATAM Parent's senior management, including the tenure of each of the existing senior management and a brief summary of their relevant responsibilities and experience.

[16]     In addition, the Non-Debtor Affiliates include all of the LATAM SPVs (as defined below) formed for the purpose of purchasing various aircraft equipment.  This list of Non-Debtor Affiliates is non-exhaustive.

36.    The continuation of LATAM's extensive pan-Latin American network relies on continued operations in these countries and, therefore, the company places a high priority on the operations there.  LATAM's Non-Debtor Affiliates in Brazil are of particular importance to the group, given the size of their operations and customer base.  Given that the Brazilian affiliates have less financial obligations, in that they have a smaller leased and financed fleet (where most of their fleet is leased from LATAM Parent) and less direct debt obligations, they are not currently included in these cases, and are in ongoing discussions with the government regarding financial support.  However, as the situation evolves, including if economic conditions do not improve and/or ongoing discussions with the government do not prove to be fruitful, circumstances may change and it could become necessary or advisable for the Debtors' Brazilian affiliates to seek relief in a formal proceeding.

## III.    THE DEBTORS' FLEET STRUCTURE

37.    The Debtors' fleet comprises 320 aircraft, including aircraft from the Airbus A320 family and long-haul passenger planes including the Boeing 767-300ER, the Boeing 787-8, the Boeing 787-9, the Boeing 777-300ER, and the Airbus A350-900.[17]  The fleet consists of passenger aircraft as well as twelve dedicated B767 cargo freight aircraft (eleven of which are operated by the Debtors).  On average, LATAM's fleet is approximately nine years old.

38.    The Debtors' fleet consists of thirty-five owned aircraft[18] as well as 187 aircraft financed under finance leases and ninety-eight aircraft leased under operating leases.  In addition, there are twenty aircraft leased or financed directly by Brazilian Non-Debtor Affiliates. The finance leases are with entities located in the Cayman Islands and Delaware (the "SPVs"),

---

[17]    There are twenty additional aircraft in the fleet of Non-Debtor Affiliates.
[18]    Including nine unencumbered aircraft.

some of which are owned by LATAM Parent.  The SPVs typically lease the planes to LATAM

Parent, which then subleases the aircraft to the other operating entities, including certain of the

Debtors.

| Fleet Composition | LATAM | Debtors |
|-------------------|------:|--------:|
| Owned | 35 | 35 |
| Finance Leases | 195 | 187 |
| Operating Leases | 110 | 98 |
| **Total** | **340** | **320** |

39.      The Debtors also have operating leases whereby the Debtors lease aircraft

from third parties.  Prior to various negotiated deferrals discussed below, the Debtors paid

approximately $44 million each month in rent for aircraft under operating leases.  The third-party

lessors include, among others, AerCap Holdings N.V., Aircastle Holding Corporation Limited

and Avolon Aerospace Leasing Ltd.  Since the adoption of IFRS 16[19] in 2019, third-party leases

are recognized on the balance sheet as liabilities.  As of March 31, 2020, the Debtors had $2.9

billion in aircraft related lease liabilities.

40.      Additionally, LATAM Parent has existing agreements to purchase certain

aircraft from Airbus S.E. ("Airbus") and The Boeing Company ("Boeing"), including forty-four

aircraft from Airbus that are scheduled to be delivered between 2020 through 2026, six B787-9

aircraft from Boeing to be delivered between 2021 and 2023 and one B777 freighter from

Boeing scheduled for delivery in 2024.

41.      As discussed below, given the current economic climate and projections

concerning anticipated passenger demand in the wake of the COVID-19 pandemic, the Debtors

are likely to have a surplus of aircraft in their fleet, and will seek to enter into negotiations with

---

[19]      IFRS 16 refers to the International Financial Reporting Standard promulgated by the Internal Accounting
Standard Board in January 2016, which has been in effect since 2019.

aircraft sellers, lenders and lessors to remedy that surplus, and the Debtors are considering various alternatives with respect to the restructuring of their lease and the rejection of certain existing leases.[20]

## IV.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

42.    To support their operations and obligations, the Debtors have a complex capital structure, which includes a secured revolving credit facility, a series of local unsecured bank loans, two series of unsecured international bonds, five series of domestic Chilean bonds, and a series of financings related to the acquisition of the Debtors' fleet.[21]  As noted below, certain of these facilities require payment from New York-based bank accounts.  In connection with these obligations and its other operations, as of May 22, 2020, the Debtors maintained over $393 million in cash and investments in bank accounts mostly located in New York, New York and Non-Debtor Affiliates have additional cash and investments of $187 million also mostly located in New York, New York.[22]  As of May 22, 2020, the Debtors have an overall cash position of $707 million and the Non-Debtor Affiliates have an overall cash position $621 million.

---

[20]    By agreement dated as of May 25, 2020, LATAM and Delta terminated the aircraft sale and purchase agreement (the "Aircraft Purchase Agreement"), dated as of November 6, 2019, pursuant to which Delta had committed to purchase four A350 airplanes from LATAM.  In exchange for termination of the Aircraft Purchase Agreement, Delta agreed to pay LATAM $62,000,000.  Delta further agreed to not to exercise termination rights, if any, that it may have under the Framework Agreement or JV Agreement in the event that LATAM were to file for chapter 11, provided LATAM would seek and obtain Bankruptcy Court authorization to assume the Framework Agreement and JV Agreement (the "Assumption Commitment") within certain timeframes.  LATAM's affiliates that are party to the JV Agreement also entered into individual joinder agreements, agreeing to and accepting the terms of the Assumption Commitment.

[21]    The debt described below in connection with the owned fleet is in addition to the lease obligations discussed *supra* in section IV.E.

[22]    Notably, with respect to the eleven planes leased to third-parties, LATAM receives payment for such leases in a Citibank account located in New York, New York.

43.    As of the Petition Date, LATAM has a total of $7,570 million in financial

debt obligations, $457 million of which is contracted by LATAM Airlines Brazil, a Non-Debtor

Affiliate.

| Debt Structure (US$ Mn) | LATAM | The Debtors |
|---|---|---|
| Revolving Credit Facility | 600 | 600 |
| Local Unsecured Bank Loans | 416 | 215 |
| Unsecured International Bonds | 1,500 | 1,500 |
| Chilean Unsecured Bonds | 491 | 491 |
| Fleet Financing | 4,423 | 4,168 |
| Pre-Delivery Payments Facility | 139 | 139 |
| **Total** | **7,570** | **7,113** |

A.    *Revolving Credit Facility*

44.    Pursuant to that certain Credit and Guaranty Agreement dated as of March

29, 2016 (as may be amended, restated, supplemented or otherwise modified from time to time,

the "RCF Credit Agreement") by and among, for LATAM, LATAM Parent, acting through its

Florida branch, as borrower, and non-Debtor LATAM Airlines Brazil, Transporte Aéreo, Lan

Cargo, Tordo Aircraft Leasing Trust, Quetro Aircraft Leasing Trust and Caiquen Leasing LLC[23]

as guarantors (collectively, the "RCF Guarantors" and together with LATAM, the "RCF

Obligors"), and a syndicate of lenders (the "RCF Lenders"), Citibank N.A. ("Citibank") as

administrative agent, Wilmington Trust Company, as collateral agent ("Wilmington"), Banco

Citibank S.A as Brazilian collateral agent ("Banco Citibank" and together with Wilmington, the

"RCF Collateral Agents" and the RCF Collateral Agents together with Citibank, the "RCF

Agents"), the RCF Lenders provided a revolving credit facility of up to $600 million.  Pursuant

to the Collateral Documents (as defined in the RCF Credit Agreement), the RCF Obligors

granted to the RCF Collateral Agents, for the benefit of the RCF Lenders, a lien on certain

---

[23]    Tordo Aircraft Leasing Trust, Quetro Aircraft Leasing Trust and Caiquen Leasing LLC are wholly owned
LATAM SPVs and Non-Debtor Affiliates.

aircraft, engines and spare parts in the United States, Chile and Brazil (the "RCF Collateral").[24]

The RCF Credit Agreement is New York law governed and provides for jurisdiction in the

Southern District of New York.  LATAM Parent drew approximately $505 million on the RCF

Credit Agreement in March 2020, followed by approximately $95 million in April 2020.  The

total amount outstanding as of the Petition Date is $600 million, such that the commitments

under the RCF Credit Agreement are fully drawn.

### B.    Chilean Unsecured Bank Loans

45.    LATAM Parent is the borrower under two long-term local unsecured bank

loans, one with BTG Pactual Chile S.A. (the "BTG Unsecured Bank Loan") issued in September

2018 and maturing in September 2021 and one with Itaú Corpbanca (the "Itaú Unsecured Bank

Loan") issued in September 2015 and maturing in September 2020.  In addition, LATAM Parent

is the borrower under a series of short term local unsecured bank loans provided by ScotiaBank

Chile S.A., Banco del Estado de Chile, HSBC Bank (Chile), and Itaú Corpbanca (the "Short

Term Bank Loans") maturing from May 2020 until September 2020.

46.    As of the Petition Date, there are $59.4 million[25] outstanding under the

BTG Unsecured Bank Loan, $9.9 million[26] outstanding under the Itaú Unsecured Bank Loan and

$146 million outstanding under the Short Term Bank Loans.

### C.    Unsecured International Bonds.

47.    LATAM 2024 Bonds.  Pursuant to the indenture dated April 11, 2017, by

and among Debtor LATAM Finance Limited ("LATAM Finance") as issuer, LATAM Parent as

---

[24]    As of the Petition Date, the RCF Collateral includes twenty-six aircraft, fifteen engines and certain spare
parts located in the United States, Brazil and Chile.

[25]    *Unidades de Fomento* ("UF") is the daily indexed Chilean peso-denominated monetary unit that takes into
account the effect of the Chilean inflation rate.  As used herein, conversion from UF assumes that one UF is
equivalent to 28,716 Chilean Pesos, one U.S. Dollar is equivalent to 802 Chilean Pesos, thus one UF is equivalent to
38.8 U.S. Dollars. The loan is denominated in UF as UF 1,660,000.

[26]    The loan was denominated in UF as UF 275,304.

guarantor and the Bank of New York Mellon Corporation ("<u>BNYM</u>") as Trustee, Registrar

Transfer Agent and Paying Agent, LATAM Finance sold 6.875% senior, unsecured notes due

April 2024 in principal amount of $700 million (the "<u>LATAM 2024 Bonds</u>").  The LATAM

2024 Bonds are governed by New York law and require payment of any interest or principal be

made via a wire or check drawn on a bank in New York City.  In addition, parties to the LATAM

2024 Bonds submit to the jurisdiction of Manhattan federal courts.  As of the Petition Date, the

outstanding principal amount of the LATAM 2024 Bonds was approximately $700 million plus

unliquidated amounts including interest, fees, expenses, charges and other obligations.[27]  As of

the Petition Date, the LATAM 2024 bonds are held by a variety of holders, including several

institutions that on information and belief are based in New York.

      48.    <u>LATAM 2026 Bonds</u>.  Pursuant to the indenture dated February 11, 2019,

by and among Debtor LATAM Finance as issuer, LATAM Parent as guarantor and BNYM as

Trustee Registrar, Transfer Agent and Paying Agent, LATAM Finance sold 7% senior,

unsecured notes due March 2026 in principal amount of $800 million (the "<u>LATAM 2026</u>

<u>Bonds</u>").[28]  The LATAM 2026 Bonds are governed by New York law and require payment of

any interest or principal be made via a wire or check drawn on a bank in New York City.  In

addition, parties to the LATAM 2026 Bonds submit to the jurisdiction of federal courts in the

Borough of Manhattan.  As of the Petition Date the principal amount of the LATAM 2026 Bonds

was approximately $800 million plus unliquidated amounts including interest, fees, expenses,

charges and other obligations.[29]  As of the Petition Date, the LATAM 2026 Bonds are held by a

---

[27]    Reflects the nominal value.
[28]    In February 2019, LATAM first issued $600 million of the LATAM 2026 Bonds but then re-opened the issuance in June 2019 and issued an additional $200 million of the LATAM 2026 Bonds.
[29]    Reflects the nominal value.

variety of holders, including, on information and belief, several institutions based in New York

such as MetLife Inc.

### D.    *Chilean Unsecured Bonds.*

49.    On August 17, 2017,[30] LATAM Parent, as issuer, sold Chilean bonds on

the Santiago Stock Exchange in an aggregate principal amount of approximately $311.5 million

(the "Local Bonds").[31]    The Local Bonds originally consisted of four series (the "Series A Local

Bonds", the "Series B Local Bonds", the "Series C Local Bonds", and the "Series D Local

Bonds").    On July 6, 2019, LATAM Parent issued an additional series of the Local Bonds (the

"Series E Local Bonds") for an aggregate principal amount of approximately $179.0 million.[32]

The Local Bonds are Chilean law-governed.

50.    The Series A Local Bonds mature on June 1, 2028, and, as of the Petition

Date, the principal nominal amount of the Series A Local Bonds was $89.5 million[33] plus

unliquidated amounts including interest, fees, expenses, charges and other obligations.    The

Series B Local Bonds mature on January 1, 2028, and, as of the Petition Date, the principal

nominal amount of the Series B Local Bonds was $89.5 million[34] plus unliquidated amounts

including interest, fees, expenses, charges and other obligations.    The Series C Local Bonds

mature on June 1, 2022, and, as of the Petition Date, the principal nominal amount of the Series

C Local Bonds was $66.2 million[35] plus unliquidated amounts including interest, fees, expenses,

charges and other obligations.    The Series D Local Bonds mature on January 1, 2028, and, as of

the Petition Date, the principal nominal amount of the Series D Local Bonds was $66.2 million[36]

---

[30]    The bond line subscription was July 26, 2017.
[31]    The Local Bonds were issued in UF in an aggregate principal amount of approximately UF 9,000,000.
[32]    The bond line subscription was July 26, 2017.
[33]    Denominated in UF as UF 2,500,000.
[34]    Denominated in UF as UF 2,500,000.
[35]    Denominated in UF as UF 1,850,000.
[36]    Denominated in UF as UF 1,850,000.

plus unliquidated amounts including interest, fees, expenses, charges and other obligations.  The

Series E Local Bonds mature in April 2029, and as of the Petition Date, the principal nominal

amount outstanding under the Series E Local Bonds was $179.0 million[37] plus unliquidated

amounts including interest, fees, expenses, charges and other obligations.

### E.   The Debtors' Fleet Leasing and Financing

51.   As discussed above, the Debtors' fleet comprises owned aircraft as well as

aircraft under finance leases and operating leases.  The aircraft subject to finance leases are

generally owned by SPVs, the majority of which are non-affiliates of LATAM Parent.  The

initial lessee of the leased aircraft is typically LATAM Parent.  With respect to the fleet subject

to these finance leases, in order to finance the purchase of aircraft, the SPVs may enter into long-

term loan or bond arrangements via enhanced equipment trust certificates (the "EETC

Facilities"), arrangements guaranteed by the U.S. Export-Import Bank (the "EX-IM Facilities"),

arrangements guaranteed by certain Export Credit Agencies (the "ECA Facilities") and

arrangements with commercial lenders (the "Aircraft Bank Loans" and together with the EETC

Facilities, EX-IM Facilities, and ECA Facilities, the "SPV Financings").

52.   Each of the SPV borrowers under the EETC Facilities are wholly-owned

subsidiaries of LATAM Parent incorporated in the Cayman Islands.  All borrowers under the

EX-IM Facilities are SPVs incorporated in Delaware with no LATAM ownership, and, similarly,

all borrowers under the ECA Facilities are SPVs incorporated in the Cayman Islands with no

LATAM ownership.  The borrowers under the Aircraft Bank Loans typically are wholly-owned

LATAM SPVs incorporated in Delaware and the Cayman Islands, although there are additional

---

[37]     Denominated in UF as UF 5,000,000.

borrowers under these facilities that are SPVs with no LATAM ownership, each of which is incorporated in the Cayman Islands.

53.    In these SPV Financings, the SPV generally pledges its owned aircraft to secure the applicable financing arrangement. The SPV Financings are secured by 171 aircraft owned by the SPVs and, as of the Petition Date, the principal amount outstanding under the SPV Financings was approximately $3.3 billion. The SPV Financings have varying maturity dates ranging from as early as May 2020 up through December 2028.

54.    Tax Leases. There are sixteen aircraft subject to aircraft tax leasing structures through instruments styled as Japanese Operating Leases with Call Option ("JOLCO") (the "Tax Leases"). LATAM is not a borrower under these facilities. These aircraft, however, are leased directly to LATAM Parent and are subleased to and primarily operated by other Debtor affiliates or Brazilian Non-Debtor Affiliates. As of the Petition Date, there were $594 million[38] outstanding under the Tax Leases.

55.    Spare Engine Facilities. LATAM has a committed credit facility from Credit Agricole Corporate and Investment Bank for up to $275 million secured by spare engines. As of the Petition Date, the outstanding amount is $273.2 million with a total of forty-one spare engines pledged as collateral. In addition, LATAM has a finance lease in place with RRPF Engine Leasing Limited and Rolls-Royce & Partners Finance Limited for the leasing of an engine model Trent XWB. As of the Petition Date, the outstanding amount is $18.5 million.

56.    Pre-Delivery Payment Facility. Pursuant to aircraft purchase agreements with Airbus and Boeing, LATAM has made certain deposits in relation to future aircraft deliveries ("Pre-Delivery Payments"). Pursuant to a Facility Agreement dated as of June 5,

---

[38]    This number does not include other amounts that may be claimed in the event of termination as such amounts are not accounted for as financial debt.

2019, by and among Banco Santander S.A. ("Santander") as lender, Piquero Leasing Limited (a

LATAM SPV incorporated in the Cayman Islands) ("Piquero") as borrower and LATAM Parent

as guarantor (the "Pre-Delivery Payment Facility"), Santander has financed the Pre-Delivery

Payments for twenty Airbus aircraft to be delivered in the future.  The Pre-Delivery Payments

are secured with a first priority lien over LATAM's rights under the purchase agreement and a

first priority Cayman share charge agreement over the total issued share capital of Piquero.  As

of the Petition Date, there was approximately $139 million outstanding under the Pre-Delivery

Payment Facility, out of a total of $175 million paid to Airbus as deposits for the twenty aircraft.

Pre-Delivery Payments to Boeing amount to $122 million and are not subject to any financing

arrangements.

| Manufacturer's PDP (US$ Mn) | PDP Deposits | LATAM Cash | Santander Financed |
|---|---|---|---|
| Airbus | 175 | 35 | 139 |
| Boeing | 122 | 122 | |
| **Total** | **297** | **157** | **139** |

### F.    Letters of Credit

57.    In the ordinary course of business, LATAM obtains letters of credit, with

an unsecured obligations to reimburse the issuer if the letter is drawn, to guarantee its

performance to a number of counterparties including governments and other administrative

agencies, airports, airport authorities and lessors.  Most of the letters of credit are denominated in

U.S. dollars.  The letters of credit are issued by various banks, including Citibank and Bank of

America.  As of the Petition Date, the Debtors had letters of credit outstanding of approximately

$345 million, of which approximately $160 million was issued by Banco de Crédito del Perú

issued to guarantee certain potential obligations owed in favor of the Peruvian government

agency responsible for customs and taxation.  Many of the remaining letters of credit relate to

obligations owed to aircraft lessors.

### G.    Equity

58.    LATAM Parent's largest shareholder is the Cueto family, which holds 21.46% of LATAM Parent's shares through a series of companies (collectively, the "Cueto Group"),[39] and which includes Ignacio Cueto and Enrique Cueto, who serve respectively as the Chairman and Vice Chairman of the board of LATAM Parent.  As of April 30, 2020, the Cueto Group beneficially owned 21.46% of LATAM Parent's common shares.

59.    The second largest shareholder of LATAM Parent is Delta, which, as of April 30, 2020, holds approximately 19.99% of LATAM Parent's common shares.  In December 2019, Delta acquired its equity stake pursuant to a tender offer, the aggregate value of which was approximately $1.9 billion.  The transaction was memorialized pursuant to a Framework Agreement between LATAM Parent and Delta.  This agreement recognized the significance of LATAM's footprint in South America and also contemplated certain codeshare and joint venture agreements with LATAM Parent's subsidiaries, which further built the connections between the two companies, ultimately to the benefit of the customers of each of LATAM and Delta.[40]  Thus, this landmark agreement was not only an investment in LATAM but also a commercial joint venture intended to unlock growth opportunities for both airlines that would significantly expand travel options for their customers.  In May 2020, Delta and LATAM signed a Trans-American Joint Venture Agreement that, once regulatory approvals are granted, will combine the routes of the two airlines between North and South America.  Through this agreement, LATAM continues

---

[39]    These companies include Costa Verde Aeronáutica S.A., Costa Verde Aeronáutica SpA, Costa Verde Aeronáutica Tres SpA, Inversiones Nueva Costa Verde Aeronáutica Ltda., Inversiones Priesca Dos y Cía. Ltda., Inversiones Caravia Dos y Cía. Ltda., Inversiones El Fano Dos y Cía. Ltda., Inversiones La Espasa Dos S.A. and Inversiones La Espasa Dos y Cía. Ltda.

[40]    The Debtors' existing codesharing and other critical airline agreements are discussed more thoroughly below.

to look to the future and ensure the best possible customer experience to support the long-term sustainability of the group.

60.    As of April 30, 2020, Chilean pension funds held 15.26% of LATAM Parent's common stock.[41]  Notably, these pensions funds have also heavily invested in LATAM through their acquisition of certain of the company's outstanding bonds.  The investment by these pension funds, which hold assets invested for the ultimate benefit of many thousands of Chilean residents, underscores the importance of LATAM in the Chilean and broader global economy.

61.    As of April 30, 2020, Qatar Airways Investments (UK) Ltd. held approximately 10% of LATAM Parent.  The three other major shareholder groups are: (i) Andes SpA, Inversiones Andres II SpA, Inversiones PIA SpA and Comercial las Vertientes SpA (collectively, the "Eblen Group") (ii) Axxion S.A. and Inversiones HS SpA (the "Bethia Group") and (iii) TEP Chile S.A. (the "Amaro Group"), which became a major shareholder as a result of the Business Combination.  As of April 30, 2020, the Eblen Group held 4.56% of common shares, the Bethia Group held 4.23% of common shares and the Amaro Group held 1.98% of common shares.

62.    As of April 30, 2020, other minority investors held 18.69% of the shares of LATAM Parent in the form of common shares.  As of April 30, 2020, there were over 1,000 record holders of the common shares.

63.    Since 1997, LATAM Parent's common shares have traded in the United States in the form of American Depositary Shares ("ADSs"), initially issued by BNYM as Depositary.  In October 2011, LATAM's Depositary bank changed to JP Morgan Chase Bank,

---

[41]    This percentage is subject to normal, minor fluctuations.

N.A.  LATAM's ADSs trade on the New York Stock Exchange.  As of April 30, 2020, 3.82% of

LATAM Parent's capital stock was held in the form of ADSs.[42]  As of the Petition Date,

LATAM's ADSs are held by a variety of holders, including, on information and belief, several

institutions based in New York such as Blackrock and Goldman Sachs Group, Inc.

## V.   EVENTS LEADING TO THE CHAPTER 11 FILING

64.   At the beginning of 2020, LATAM was financially and operationally one

of the strongest groups in Latin America and poised to continue its upward trajectory, projecting

growth in all of its passenger segments, as well as its cargo business.  Unfortunately, like so

many businesses around the world, the unprecedented effects of the COVID-19 global pandemic

have significantly affected LATAM's operations and its business plan.

65.   On March 11, 2020, the World Health Organization declared the

widespread outbreak of the novel COVID-19 a global pandemic.  Over the intervening weeks,

countries around the world, including each of those in which the Debtors have their primary

operations, announced severe travel restrictions and/or outright closure of their borders.  The

impact on the airline industry was almost instantaneous.  By April 1, 2020, IATA estimated that

customers living in countries with severe travel restrictions accounted for 98% of global

passenger revenue, and that more than 8,500 passenger aircraft—two-thirds of the world's

overall fleet—had been grounded as a result.  Air travel generally declined 41% in March 2020

from 2019 levels and April saw a 60% decline.  As of April 23, 2020, LATAM's passenger

flights are limited to domestic flights in Chile and Brazil and international flights to Miami,

which reflect only roughly 4% of LATAM's routes prior to the COVID-19 crisis.  LATAM's

intention is to continue serving those passengers still flying – as well as its cargo customers –

---

[42]   This percentage is subject to normal fluctuations.

while preparing to welcome additional customers back as travel prohibitions are lifted, demand for flights increases and the industry begins to recover.

66.     In addition, LATAM's operations have been affected by travel restrictions imposed by the countries where we operate.  As of now, Argentina suspended air travel for seven months until September.  Colombia restricted domestic flights for four months until the end of June, and restricted international flights for six months until the end of August.  In Perú, there is no clear date for lifting the travel restrictions that are currently in place, involving both domestic and international travel.  The U.S. government recently announced it would deny entry to non-citizens who had traveled to Brazil within fourteen days of seeking entry into the United States.  Finally, Ecuador suspended flights for approximately three months until the beginning of June.

67.     The Debtors quickly felt the impacts of the worldwide shutdown and the heavy blow of COVID-19 on the airline industry as a whole.  LATAM has responded quickly to take all available steps to address the impact of the pandemic.  For example, as of March 16, 2020, LATAM reduced the capacity of its total passenger operations by approximately 70% representing 90% of all international operations and 40% of all domestic operations.  As the shutdowns increased and were extended, LATAM's passenger business continued to dwindle. Throughout March 2020, LATAM continued to temporarily suspend international routes, leading to a 95% reduction by April 2020.  This reduction continues today, with LATAM flying only limited domestic flights in Chile and Brazil and international flights from Santiago and São Paulo to Miami.  In addition, there is no certainty regarding the health policies and social distancing protocols under which we will need to resume the operations once the governments lift travel restrictions.

68.     In this adverse scenario it is inevitable that LATAM must right-size its operations, and therefore, it is unable to avoid a restructuring of its current capital commitments and other obligations.

69.     Importantly, while passenger operations have suffered, the cargo business remains very strong at this time.  In fact, as of May 2020, LATAM's cargo operations to Miami have grown by 15% while cargo operations to Europe have grown by 40% compared to the same period last year.  LATAM expects this demand to continue.  Unfortunately, the growth in cargo sales cannot fully offset the other negative impacts of the pandemic on LATAM's overall business operations.

70.     For several months, LATAM has been taking the difficult and necessary steps to protect the company, continue operations and meet its commitments to its employees, customers and other stakeholders.  This has included significant cost reduction and liquidity preservation in advance of the filing of these Chapter 11 Cases.  For example, LATAM has deferred or cancelled approximately $900 million in investments and has worked to postpone delivery of new planes for its fleet.  LATAM has also implemented internal cost-cutting measures, including consensual salary reductions of 50% through June for employees, while guaranteeing double the minimum wage in each country.  The initiative received support from approximately 92% of employees.  LATAM has also implemented a broad early retirement and unpaid leave program, involving 1,800 employees, and has engaged in targeted reductions in its workforce.  In May 2020, LATAM made the difficult decision to lay off about 1,850 of its employees.  In further efforts to preserve liquidity, LATAM engaged directly with its various creditors and counterparties to request accommodations based on current circumstances, including deferrals of upcoming payment obligations.

71.     In the weeks leading up to this filing, LATAM has successfully negotiated payment plans and payment deferrals with over 500 creditors and counterparties resulting in payment deferrals and payment plans of approximately $500 million worth of payments throughout the first three quarters of this year.  Although these deferrals have allowed LATAM to reduce its near-term cash expenditures and preserve existing liquidity, it has necessarily resulted in an increase in the Debtors' prepetition accounts payable, including to critical vendors, taxing authorities, lien holders, foreign vendors and fuel suppliers.

72.     In connection with its efforts to respond to unprecedented recent events, LATAM retained Cleary Gottlieb Steen & Hamilton LLP ("Cleary") as legal counsel, FTI Consulting ("FTI") to provide management support and strategic advice and PJT Partners Inc. ("PJT") to provide financial advice.  LATAM has also retained local counsel in several jurisdictions, including Claro & Cia in Chile ("Claro") to coordinate, jointly with Cleary, with counsel in other jurisdictions in which LATAM operates.  Most recently, LATAM retained Togut, Segal & Segal LLP as conflicts counsel with Cleary to perform restructuring services for the matters which Cleary cannot appropriately handle, including those involving clients of Cleary for whom Cleary does not have or is unable to obtain appropriate waivers and such other discrete matters as assigned by Cleary ("Togut" and, together with Cleary, FTI, PJT and Claro, the "Restructuring Advisors").  In connection with these retentions, LATAM paid various retainers, including amounts held in escrow accounts and other bank accounts in the Borough of Manhattan, New York.

73.     Unfortunately, despite these meaningful cost-savings and liquidity-preserving measures, LATAM's liquidity position has continued to deteriorate, culminating in the filing of these Chapter 11 Cases in order to, among other things, prevent the exercise of

remedies against the Debtors' assets, including their fleet, that could otherwise result from the Debtors' inability to pay certain of their debts.[43]  In addition, LATAM has significant obligations coming due in the following day and weeks, including a minimum shareholder dividend equal to 30% of its 2019 profits, which would be required to be paid by applicable Chilean corporate law, amounting to $57,129,110.64[44] to be paid on May 28, 2020, as well as over $130 million in debt servicing obligations due from May 28, 2020 through the first week of June alone.  If LATAM did not file these Chapter 11 Cases, payment of these obligations, or the risk of anticipated litigation or collection actions associated therewith, would substantially erode LATAM's cash position even further and deplete resources needed to maintain operations.

74.     Notably, prior to the filing of these Chapter 11 Cases and as part of its efforts to conserve liquidity, LATAM requested permission from its shareholders to defer the upcoming minimum dividend.  Although the deferral was supported by approximately 90% of voting shareholders, Chilean law requires unanimous support.

75.     Ultimately, these Chapter 11 Cases represent the Debtors' best opportunity to ensure their stability and to meet their obligations to their stakeholders.[45]  Through these proceedings, the Debtors intend to continue their efforts to streamline ongoing operations and reorganize prepetition obligations.  For example, the Debtors expect to right-size their existing

---

[43]     Notably, LATAM is among several airlines to file for chapter 11 in the wake of the COVID-19 disruption. *See In re Ravn Air Group*, No. 20-10755 (BLS), (Bankr. D. Del. Apr. 5, 2020); *In re Avianca Holdings S.A.*, No. 20-11133 (MG), (Bankr. S.D.N.Y. May 10, 2020).

[44]     The actual dividend would be paid in Chilean pesos equivalent to this US dollar amount.

[45]     As discussed further below, the Debtors also intend to file local recognition proceedings in Chile and Colombia.  In addition, certain Debtors will pursue local proceedings in the Cayman Islands and Perú.  Specifically, shortly after filing, LATAM Finance and Peuco Finance Limited will make an application pursuant to section 104(3) of the Cayman Companies Law (2020 Revision) to the Grand Court of the Cayman Islands for the appointment of Kris Beighton and Jeffrey Stower of KPMG as joint provisional liquidators (the "JPLs") to further protect such affiliates from creditor action.  LATAM Airlines Perú and Inversiones Aéreas, S.A., both incorporated in Perú, also intend to file for a preventive proceeding in Perú with the Institute for the Defense of Competition and Intellectual Property (INDECOPI), which is the administrative authority in charge of insolvency matters in Perú.  The proceeding is aimed at obtaining protection of these Peruvian entities while allowing them to restructure their debt.

aircraft fleet.  Given the current economic climate, the Debtors are likely to have a surplus of

aircraft in their fleet.  Because fleet obligations comprise a significant portion of the Debtors'

obligations, the Debtors are likely to seek to reject, renegotiate and/or assume and assign certain

aircraft leases in order to revitalize the size and makeup of their fleet.

76.    Similarly, the Debtors intend to use the substantive and procedural tools

available in bankruptcy to maximize the efficiency of their ongoing operations, including with

respect to prepetition debt and lease obligations, and to take advantage of current market

conditions in order to renegotiate certain key contractual relationships.  Importantly, the Debtors

intend to continue operating and providing world-class service to their valued customers, which

necessitates paying key stakeholders, including their employees and critical vendors, in a timely

fashion.  Specifically, on May 20, 2020, LATAM announced that it hopes to begin increasing its

passenger operations shortly, potentially up to 18% of its pre-COVID capacity by July 2020.

Ultimately, the Debtors expect to emerge from bankruptcy poised to resume their pre-COVID

trajectory of continued growth and success and to continue to serve their customers and the

communities and employees around the world that have come to depend on LATAM's service.

77.    We are filing these Chapter 11 Cases with commitments from two of our

significant  shareholders to fund $900 million of super-priority debtor-in-possession financing,

which will be part of a larger $2.15 billion debtor-in-possession facility (the "DIP Facility").

The DIP Facility will be composed of three separate tranches, which have the potential for

upsizing of an additional $500 million of lending capacity and which contain sub-facilities for

issuances of letters of credit.

78.    Each of the three DIP Facility tranches will be guaranteed by all of the

Debtors in the Chapter 11 Cases, will be funded on a *pari passu* basis and will receive customary

DIP protections, including post-petition super-priority liens. We have designed the DIP Facility

so we can attract a wide variety of prospective investors. Each of the tranches will be entitled to

super-priority administrative claims in the proceeding.

79.    We expect to reach out to prospective investors immediately after the

Chapter 11 filing, and offer them the opportunity to participate in the DIP Facility.

80.    LATAM has also engaged in discussions with certain governments for the

countries in which LATAM operates, as well as other key stakeholders, regarding potential

lending or other forms of economic assistance. We hope to progress these discussions in the

near future.

## VI.    FIRST DAY PLEADINGS

81.    To minimize the adverse effects on their businesses of seeking protection

under Chapter 11, and to ensure continued ordinary course-operations postpetition, the Debtors

have requested various types of customary relief in the following First Day Motions, all of which

are being filed concurrently with this declaration. For the reasons discussed below, I believe that

the relief requested in each of the First Day Motions is necessary and appropriate and is in the

best interest of the Debtors' estates, creditors and other parties-in-interest.

### A.    *Procedural Motions*

*Debtors' Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* (the "Joint Administration Motion")

82.    As described above, the Debtors include LATAM Parent and 28 of its

direct or indirect subsidiaries. Accordingly, the Debtors have sought entry of an order directing

the joint administration of the Chapter 11 Cases.

83.    Joint administration will eliminate the need for duplicative notices,

applications, motions, hearings and orders, which will permit the Debtors to avoid the time and

expense that would otherwise be necessary to administer individual cases separately.  Because

this Joint Administration Motion requests only administrative, and not substantive, consolidation

of the Debtors' cases, creditors' rights will not be adversely affected.  In fact, all creditors will

benefit from the reduced burdens and expenses that will result from the joint administration of

these cases.  Finally, joint administration will simplify supervision of the administrative aspects

of these Chapter 11 Cases by this Court and the Office of the United States Trustee for the

Southern District of New York (the "U.S. Trustee").

> *Debtors' Motion for an Order Extending Time to File Schedules of Assets and*
> *Liabilities, Schedules of Executory Contracts and Unexpired Leases, and*
> *Statements of Financial Affairs* (the "Schedules Extension Motion")

84.     By the Schedule Extension Motion, the Debtors seek entry of an Order

extending the time within which the Debtors must file their schedules and statements required by

Bankruptcy Rule 1007(a)(3).

85.     I believe that "cause" exists to extend the Debtors' time to file their

schedules and statements.  The Debtors operate a large, global and complex business, and there

is a significant amount of information that must be collected, reviewed and analyzed to prepare

the Schedules and Statements and ensure their accuracy.  There also are twenty-nine separate

Debtor entities, and the Debtors must prepare and review the detailed information for each of

them, and must isolate that information from LATAM's unified accounting systems and to

separate out Debtor and non-debtor information.

86.     After the commencement of these Chapter 11 Cases, the Debtors will

spend a significant amount of time making administrative and business decisions related to

employees, customers and vendors that are essential to stabilizing their operations and affairs in

the wake of their bankruptcy petitions to assure the continued vitality of the Debtors' business

operations.  The Debtors have made progress in identifying and assembling the data necessary

for the schedules, statements and equity list; however, I am concerned that the Debtors will not

be able to complete this undertaking prior the original deadline, particularly given the complexity

of their operations, and the pressing needs of the Debtors' reorganization during this critical

time.

87.    At present, the Debtors estimate that an extension of an additional [orty-

five days to file their schedules and statements, should provide sufficient time to compile and

analyze information and prepare the schedules and statements, without prejudice to the Debtors'

right to seek further extensions if necessary.  By the Schedule Extension Motion, the Debtors

seek entry of an Order extending the time within which the Debtors must file their schedules and

statements.

> *Debtors' Motion for an Order (I) Waiving the Requirement That Each Debtor File a List of Creditors and Equity Security Holders and Authorizing Preparation of a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, and (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Forty  Largest Unsecured Creditors* (the "Consolidated Creditors List Motion")

88.    By the Consolidated Creditors List Motion, the Debtors seek entry of an

order (i) waiving the requirement that each of the Debtors file a list of creditors and equity

security holders and authorizing the Debtors to prepare a consolidated list of creditors in lieu of

submitting a formatted matrix and (ii) authorizing the Debtors to file a single, consolidated list of

the Debtors' forty largest unsecured creditors.

89.    The Debtors presently maintain various computerized lists of the names

and addresses of their respective creditors.  I believe that such information will be utilized more

efficiently if it is taken as maintained in the various computer files and then consolidated.  In

addition, filing the lists in the format or formats currently maintained in their ordinary course of

business will be sufficient to permit the claims and noticing agent to notice promptly all applicable parties.

90.    Furthermore, I believe that filing a consolidated list of the forty  largest unsecured creditors will be both efficient for the Debtors and sufficient to reflect the body of unsecured creditors that have the greatest stake in these cases.  Indeed, the consolidated top forty list captures creditors with outstanding amounts as low as approximately $4.2 million.

91.    Finally, I believe that allowing the Debtors or their claims and noticing agent to complete the mailings to creditors and equity holders in lieu of effecting service through the Office of the Clerk of this Court (the "Clerk's Office") will save both the Debtors and this Court's staff and personnel significant time, cost and expense.

*Debtors' Motion for Entry of Order Implementing Certain Notice and Case Management Procedures* (the "Case Management Motion")

92.    Pursuant to the Case Management Motion the Debtors seek entry of an order approving and implementing certain notice, case management and administrative procedures set forth therein (collectively, the "Case Management Procedures").

93.    Given the size and scope of these cases, the Case Management Procedures will facilitate service of notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents and other papers filed in these Chapter 11 Cases that will be less burdensome and costly than serving such documents on every potentially interested party.  This will maximize the efficiency and orderly administration of these Chapter 11 Cases, while also ensuring that appropriate notice is provided.

*Debtors' Motion Pursuant to Section 1505 of the Bankruptcy Code for Authorization of LATAM Airlines Group S.A. to Act as the Foreign Representative of the Debtors* (the "Foreign Representative Appointment Motion")

94.     By this motion, the Debtors seek to appoint LATAM Parent as foreign representative pursuant to section 1505 of the Bankruptcy Code so that the LATAM Parent may seek recognition of the Chapter 11 proceedings and other orders of this Court in the relevant Chilean and Colombian courts as well as any additional courts as LATAM deems appropriate.

95.     It is my understanding that in order for the Debtors to receive certain benefits of the Chapter 11 process, including enforcing the automatic stay in foreign countries, it is necessary for a duly appointed foreign representative to seek recognition in certain foreign courts.  The relief sought in the Foreign Representative Appointment Motion will facilitate the Debtors' efforts to have the Chapter 11 Cases recognized in Chile and Colombia, where local creditors otherwise may attempt to foreclose on assets or take other measures contrary to the automatic stay and to the detriment of the Debtors' estates and their stakeholders generally.

### B.     *Professional Related Motions*

*Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent (the "Prime Clerk Retention Application")*

96.     I have been informed that the numerous creditors and other parties in interest involved in these Chapter 11 Cases may impose heavy administrative and other burdens on the Court and the Clerk's Office.  Therefore, the Debtors seek to appoint Prime Clerk LLC ("Prime Clerk") as their notice, claims and balloting agent.  Among other things, Prime Clerk will (i) prepare and serve required notices in these Chapter 11 Cases; (ii) maintain copies of all proofs of claims filed in these Chapter 11 Cases; and (iii) act as a balloting agent.  The Debtors selected Prime Clerk because it is one of the nation's leading bankruptcy administrators, and has extensive experience performing these tasks before this Court in cases of this size.  I believe that Prime Clerk is well-qualified to perform the services contemplated in its retention application.

### C.      Motions Related to the Debtors' Operations in Chapter 11

*Debtors' Motion for an Order Authorizing Debtors to Operate Their Businesses in the Ordinary Course and Ordering Implementation of the Automatic Stay* (the "Automatic Stay Order")

97.      By this motion, the Debtors seek a clarifying order from this Court enforcing the automatic stay existent pursuant to section 362 of the Bankruptcy Code and the ipso facto and anti-discrimination provisions of the Bankruptcy Code (the "Automatic Stay") and confirming the Debtors' authority to continue to operate their businesses postpetition, pursuant to sections 363, 1107 and 1108 of the Bankruptcy Code.

98.      This order is necessary to inform affected parties of the existence of the Automatic Stay, especially as to the protections that it provides to the Debtors, particularly with respect to foreign creditors who may be unfamiliar with the impact of the Automatic Stay.  It is also necessary to inform affected parties of the Debtors' right to continue business operations under the Bankruptcy Code as well as the authority of Non-Debtor Affiliates to continue business operations outside of the jurisdiction of this Court.

99.      The very nature of the Debtors' international operations means that the Debtors and their valuable property are subject to dealings with foreign counterparties in any number of jurisdictions on a daily basis.  Indeed, as of the Petition Date, the Debtors' operate in at least 29 different countries.  To continue to serve their customers around the world, it is critical that vendors, customers and other counterparties understand the nature of the Debtors' reorganization proceedings, their scope, and the protections that are afforded to the Debtors under the Bankruptcy Code.  If the Debtors' international operations are disrupted, or foreign creditors fail to understand the Debtors' authority to continue their operations, the Debtors' business operations will experience significant negative impacts.  In turn, customers will be

dissatisfied with the Debtors' performance, decreasing the Debtors' revenues and the prospects

of a successful reorganization.

100.    This danger is especially acute because many of the Debtors' creditors and

counterparties may be unfamiliar with the United States legal system and, particularly, the

protections that the Automatic Stay provides the Debtors by virtue of filing voluntary petitions.

If a foreign creditor takes action against one of the Debtors' assets in violation of the Automatic

Stay, or refuses to perform its existing contractual obligations, the negative impact on the

Debtors will be significant and the risk of damage to their overall business enormous.

101.    Accordingly, the Debtors request that this Court enter an order that will in

simple terms and without the need for extensive explanation apprise all parties in interest of the

rights and obligations of section 362 of the Bankruptcy Code and, particularly, the Debtors'

rights under the Automatic Stay.  Without such relief, the Debtors will be exposed to the

possibility of significant hardship in the form of (i) unintentional violations of the Automatic

Stay that could hamper their ability to successfully reorganize or (ii) at minimum, numerous and

burdensome discussions to educate foreign creditors on the relevant code provisions under which

the petitions themselves constitute an order for relief.

102.    Based on my experience and knowledge of the airline industry, I also am

concerned that the Debtors' foreign creditors and counterparties may be unaware that the

Bankruptcy Code allows the Debtors to continue operating their business operations under

current management in the ordinary course after the commencement of these Chapter 11 Cases.

Many of the Debtors' foreign creditors and counterparties are only familiar with liquidation

proceedings in Latin America and elsewhere, which would require that the Debtors wind down

their business operations after the commencement of proceedings under the control of a receiver

or administrator.

103.    Accordingly, the Debtors request an order memorializing the relevant

provisions of the Bankruptcy Code, to *inter alia,* inform the Debtors' foreign creditors and

counterparties that the Debtors now qualify as debtors-in-possession, allow them to operate their

business in the ordinary course, including, but not limited to, negotiating and entering into

ordinary course business transactions, performing obligations, incurring liabilities and paying

amounts in respect of such transactions on and after the Petition Date as they become due and

payable.

> *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany and Affiliate Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany and Applicable Affiliate Claims, (IV) Waiving Compliance With Restrictions Imposed by Section 345 of the Bankruptcy Code, Authorizing Use of Prepetition Bank Accounts and Payment Methods, (V) Authorizing Continued Use of Prepetition Bank Accounts, Payment Methods and Existing Business Forms and (VI) Scheduling Final Hearing* (the "Cash Management Motion")

104.    In order to operate LATAM's global business operations, in the ordinary

course of business the Debtors and their Non-Debtor Affiliates use a cash management system

(the "Cash Management System") to collect, transfer and disburse funds.  LATAM maintains

current and accurate records of the transactions processed through the Cash Management

System.  The Cash Management System involves approximately 375 bank accounts at several

different banks (the "Bank Accounts") domestically and abroad as well as investment accounts

held in various forms as detailed below.  All of these banks are safe and prudent institutions, and

the complexity of LATAM's Cash Management System is similar to that of other multinational

enterprises.  Through its Cash Management System, LATAM is able to maintain oversight over

the Bank Accounts and facilitate the routine collection, transfer, disbursement and investment of cash.

105.    The Debtors generate and receive funds from a wide variety of sources, including the sale of passenger tickets and cargo services, collection of credit card receivables, reimbursements from travel agents and the sale of miles.  These funds are generally collected and temporarily stored in a variety of deposit accounts (the "<u>Collection Accounts</u>") and general operating accounts (the "<u>Operating Accounts</u>").

106.    To manage their business, meet outstanding payment obligations, coordinate the payment of their outstanding obligations and earn the maximum return on their money, the Debtors regularly draw these cash assets together into accounts used for concentrating the Debtors' cash (the "<u>Concentration Accounts</u>") or into Operating Accounts.  In Chile, Perú and the United States, the Debtors also use pooling protocols to move cash between bank accounts holding excess cash or facing shortfalls of cash at the end of a day.

107.    Funds received in the Collection Accounts or concentrated in the Concentration Accounts are used by the Debtors to satisfy their financial obligations and fund investment opportunities.  These disbursements are either made through one of the Debtors' disbursement accounts (the "<u>Disbursement Accounts</u>") or paid directly to the requisite party from the Collection Accounts or Operating Accounts.

108.    The Debtors invest their funds according to the procedures set forth in the Debtors' Investment Policy.  The main objectives of this Investment Policy are capital preservation, liquidity and profitability.  On a daily basis, after paying costs and expenses related to the Debtors' operations and reviewing future receipts and disbursements forecasts, the

investment department analyzes whether the Debtors have excess funds available to be invested in accordance with the Investment Policy.

109.   By the Cash Management Motion, the Debtors seek entry of an order approving the continued use of their Cash Management System, Bank Accounts and Business Forms; permitting continued intercompany and Non-Debtor Affiliate transactions, and granting other relief in connection therewith; authorizing banks to honor certain transfers and charge certain fees and other amounts; and granting an interim waiver of the requirements of 11 U.S.C. § 345(b).

> *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Wages and Other Compensation and Related Obligations and (B) Maintain and Continue Employee Benefits and Programs in the Ordinary Course,, and (II) Authorizing and Directing Applicable Banks to Honor All Checks and Transfers Related to Such Obligations* (the "Employee Wage Motion")

110.   The Debtors' workforce consists of approximately 17,000 wage earners as of April 1, 2020 (the "Employees"), including pilots, flight attendants, dispatchers, mechanics, aviation maintenance support personnel, supervisors, managers, administrative support staff, sales staff and other personnel.   Approximately 96% of the Employees are based in five countries: Chile (56%), Perú (22%), Colombia (8%), the United States (6%), and Ecuador (4%). The remaining 4% (approximately 7% of the Debtors' total payroll obligations) are employed in the Debtors' branches in other countries including Argentina, Australia, Brazil, Spain, the UK, Italy, Mexico, New Zealand and Uruguay.   In addition, the Debtors from time to time rely on short term services from individuals employed through third-party employment and staffing services to fill temporary needs.

111.   The Employees perform a variety of critical functions for the Debtors' business.  The Employees' skills, their specialized knowledge of the Debtors' complex

infrastructure, aircraft, industry and operations, as well as their relationships with vendors,

customers and other third parties, are essential to the value of the Debtors' assets and businesses.

Without the support and dedication of these employees to ensure the continued operation of their

businesses, the Debtors will be unable to recommence service that has been temporarily

disrupted by the COVID-19 pandemic, and will ultimately be unable to effectively reorganize.

112.    By this Motion, the Debtors request the entry of an order pursuant to

sections 105(a), 363, 507 and 541 of the Bankruptcy Code authorizing, but not directing, the

Debtors to pay and honor certain prepetition employment-related claims, including (i) wages,

salaries and other compensation, (ii) federal, state, and foreign withholding taxes and other

amounts withheld (including, garnishments, employees' share of insurance premiums, taxes and

401(k) contributions), (iii) reimbursable expenses, (iv) health benefits, retirement and pension

benefits, insurance benefits, workers' compensation benefits, (v) select time, time-off and other

leaves and (vi) all other benefits that the Debtors have historically provided to Employees in the

ordinary course of business (collectively, together with attendant costs and expenses, the "Wages

and Benefits").  In addition, the Debtors intend to continue to exercise their rights to modify or

discontinue any of the Wages and Benefits, or to implement new Wages and Benefits in the

ordinary course of business, during the Chapter 11 Cases without the need for further Court

approval.

*Debtors' Motion for Entry of an Interim and Final Orders Pursuant to 11 U.S.C.*
*§§ 105(a), 363(b), 507(a)(8), 507(a)(8) and 541(i) Authorizing, But Not*
*Directing, the Payment of Certain Prepetition Taxes and Fees* (the "Taxes and
Fees Motion")

113.    In the ordinary course of their business, the Debtors incur, collect, and pay

a variety of taxes, fees, assessment and charges to foreign and domestic governments (the

"Authorities") including, but not limited to, income, VAT, state, municipal, tourism, asset, sales, use and airline taxes, as well as various other fees and charges ("Taxes and Fees").

114.    By the Taxes and Fees Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay, in their sole discretion, the relevant Taxes and Fees that accrued and were due and owing prior to the date hereof or become due and owing during the pendency of these Chapter 11 Cases.  In addition, the Debtors seek a grant of authorization for all applicable banks and other financial institutions to receive, process, honor and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under whether presented prior to or after the Petition Date, in accordance with, and with the protections granted in, any order approving the Debtors' use of their cash management system filed in these Chapter 11 Cases.

115.    The Debtors also incur significant Taxes and Fees from various Authorities in the ordinary course of conducting global business operations.  Failure to pay these taxes will significantly disrupt the Debtors' business operations as it will unnecessarily divert the Debtors' attention from the reorganization process due to resulting audits, penalties and interest. Further, many of these Taxes and Fees are necessary prerequisites to doing business in the applicable foreign countries.  Therefore, the Debtors will not be able to conduct business operations without prompt payment of the Taxes and Fees as they come due.

116.    In order to facilitate the payment of the above claims, the Debtors request that the banks be authorized and directed to honor such checks and complete such fund requests. Furthermore, if the banks dishonor a check or refuse to complete a fund request, the Debtors request that this Court authorize the Debtors to draw a new check.

117.    The Debtors Taxes and Fees generally fall into the following categories: (i) income taxes; (ii) municipal, tourism and asset taxes; (iii) VAT and (iv) airline taxes and fees, which include boarding fees, including customs, immigration, and security fees and ticket and transportation taxes for passenger flights, as well as stamp and ticket taxes; and any fees in relation to the Debtors' use of publicly owned airport facilities, including terminals, gates, ticketing counters and other common areas; taxes and fees attributable to flying over, or landing in, a particular jurisdiction and to the Debtors' use of airport services such as parking, boarding and onboarding infrastructure; and national tourism taxes related to education and social welfare initiatives.

> *Debtors' Motion for Entry of an Order (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment and (IV) Granting Related Relief (the "*<u>Utilities Motion</u>*")*

118.    I understand that in the normal course of their business, the Debtors rely on certain companies to provide various products or services that are necessary for the Debtors to operate and maintain their businesses, including electricity, water and telephone services (the "<u>Utility Companies</u>").  If the Utility Companies terminated these products or services, I believe that the Debtors would experience severe disruptions, loss of revenue and profits, and potentially the destruction of the Debtors' businesses.

119.    By the Utilities Motion, the Debtors seek entry of orders determining that their Utility Companies have been provided with adequate assurance of future payment.  This order is necessary so that the Utility Companies do not terminate the products or services that they provide.

120.    Over the past twelve months, the Debtors spent an average of approximately $90,000 each month on payments to U.S.-based Utility Companies.  Therefore, I believe that $45,000, which is the aggregate approximate cost of two weeks of utility services, will provide the U.S.-based Utility Companies with adequate assurance of future payment.

121.    In addition, prior to their Chapter 11 filings, the Debtors made timely payments to the Utility Companies and are not in default on any account.  The Debtors intend to pay all postpetition obligations to the Utility Companies in a timely manner, in accordance with their prepetition practice, and I believe that their current cash assets allow them to do so.

> *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Prepetition Insurance Policies and Surety Bond Programs in the Ordinary Course of Business and (B) Pay All Obligations in Respect Thereof* (the "Insurance Motion")

122.    The Debtors request authority, but not direction, pursuant to section 105(a) and 363(b) of the Bankruptcy Code to (i) continue performing their obligations under their insurance policies and surety bond programs, including the authority to pay any amounts potentially owed in connection with any premiums and/or deductibles whether such obligations relate to the prepetition or postpetition period and (ii) enter into any new policies as needed without further Court approval.  The Debtors also request entry of an order authorizing all applicable financial institutions to receive, process, honor and pay any and all checks or wire transfer requests in respect of the policies.

123.    In connection with their business operations, the Debtors maintain multiple insurance and reinsurance policies for their own benefit and the benefit of certain Non-Debtor Affiliates, (each an "Insurance Policy" and, collectively, the "Insurance Policies").  The Insurance Policies vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and

47

various contractual obligations.  The Insurance Policies provide coverage for, among other

things, aviation, general liability, property, directors and officers, cargo liability, passenger

liability, automobile liability, terrorism liability, fiduciary liability and umbrella/excess liability.

124.    Annual insurance premiums (the "Insurance Premiums") are paid by the

Debtors in a variety of ways – some are paid in a lump sum payment before or around the date

that coverage begins, while others are paid in installments.  Deductibles are subtracted by the

insurance carriers from settlements payable to the Debtors and are payable by the Debtors to the

Insurance Carriers for settlements payable to third parties (the "Deductibles").

125.    In the ordinary course of business, different statutes, rules, contracts and

regulations require that the Debtors provide surety bonds and certain foreign equivalents (the

"Surety Bonds") in favor of third parties, often to governmental units or other public agencies, to

secure the Debtors' payment or performance of certain obligations (the "Surety Bond

Programs").  The premiums for the Surety Bonds (the "Surety Bond Obligations") are generally

determined on an annual basis and are paid by the Debtors only upon issuance and renewal.

126.    The Debtors also employ various insurance brokers, including Marsh,

Willis, Aon, Lota and others as their insurance brokers (the "Brokers") to assist them with the

procurement and negotiation of their Insurance Policies.  In exchange for their services, the

Brokers receive certain fees from the Debtors (the "Brokers' Fees", and collectively with the

Insurance Premiums and the Deductibles, the "Insurance Policy Obligations").  On an annual

basis, the Debtors directly pay the Brokers approximately $1.5 million.  Most policies have

broker fees embedded within the premiums.

127.    Ensuring continuation of the Insurance Programs and entry into new

insurance policies and premium financing agreements in the ordinary course of business is

crucial to preserving the value of the Debtors' estates.  Similarly, ensuring continuation the

Surety Bond Programs is critical for the protection for the Debtors' businesses and properties.

Indeed, in certain circumstances, failure to maintain adequate insurance coverage may

necessitate serious disruption or outright cessation of the Debtors' operations.  Moreover, in

many cases, coverage provided by the Insurance Programs and Surety Bond Programs is required

by U.S. and foreign regulations, laws and contracts governing the Debtors' commercial

activities.

> *Debtors' Motion for an Order Establishing and Implementing Exclusive and*
> *Global Procedures for Treatment of Reclamation Claims* (the "Reclamation
> Procedures Motion")

128.    The Debtors seek to establish exclusive procedures (the "Reclamation

Procedures") for the treatment of all unpaid claims seeking reclamation of Goods (as defined

below) pursuant to section 546(c) of the Bankruptcy Code (the "Reclamation Claims") that may

be asserted against the Debtors.  The Debtors further seek to prohibit any Seller (as defined

below) from taking any other remedial action with respect to its goods, including any effort to

reclaim the same.

129.    Prior to the Petition Date and in the ordinary course of their business, the

Debtors purchased on credit a variety of raw materials, parts, supplies, and other goods used in

their operations (collectively, the "Goods").  As of the Petition Date, the Debtors were in

possession of certain Goods that had been delivered to them, but for which they had not yet been

invoiced and/or made payment to the suppliers.  As a result of the commencement of these

Chapter 11 Cases, the Debtors may receive Reclamation Claims from various vendors or other

parties (collectively, the "Sellers") with respect to the Goods.

130.    To avoid piecemeal disputes that would interfere with the Debtors' efforts

to preserve enterprise value and successfully reorganize, the Debtors seek to establish the

Reclamation Procedures for the reconciliation and allowance of Reclamation Claims.  The

Debtors submit that the Reclamation Procedures will effectively and efficiently streamline the

process of resolving Reclamation Claims to the benefit of the Debtors, the Sellers, and the

Debtors' estates.

> *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Certain Critical and Foreign Vendors and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims* (the "<u>Critical and Foreign Vendors Motion</u>")

131.    By this Motion, the Debtors seek an order of the Court (i) authorizing the

Debtors to pay, in the ordinary course, the prepetition claims of Critical Vendors and Foreign

Vendors (each as defined below) for continued service and on customary terms, authorizing

banks and other financial institutions to receive, process, honor and pay checks and transfers

issued in relation to the foregoing and to rely on the representations of the Debtors as to which

checks and transfers are authorized to be paid in accordance with this Motion, (iii) to the extent

necessary, authorizing the Debtors to issue replacements for any dishonored check or transfer

related to the foregoing and (iii) granting such other relief as is just and proper.

132.    The Debtors transact business with various suppliers of goods and services

whose goods and services are vital to the Debtors' ordinary business operations (the "<u>Critical

Vendors</u>").  Without a consistent supply of goods and services from these Critical Vendors, the

Debtors would be unable to operate or would operate at significantly reduced profitability.

133.    The Debtors rely on several categories of goods and services supplied by

Critical Vendors, including, without limitation: (i) safety and security providers, (ii) in-flight

services, (iii) airport services, (iv) ground handling and maintenance services, (v) flight training

providers, (vi), crew services and (viii) information technology suppliers and service providers.

134.    Many of these Critical Vendors operate locally, provide specialized equipment, or have already equipped the Debtors' aircraft, making it exceedingly costly and difficult to obtain the goods and services from other entities.  Therefore, I understand that any change in the Critical Vendors' regular supply of these goods and services will either force the Debtors to discontinue business operations or operate with significantly reduced revenue because of the increased expense.

135.    In order to identify such Critical Vendors, the Debtors extensively reviewed outstanding prepetition claims, endeavoring to identify Vendors who provide essential goods or services, are contractually obligated to provide the Debtors with goods or services, are likely to continue transacting business with the Debtors or are replaceable without significant disruption to the Debtors' business operations.

136.    As of the Petition Date, based on their books and records, the Debtors estimate that they have approximately $190 million relating to outstanding prepetition Critical Vendor and Foreign Vendor (as defined below) claims.  As explained above, a material portion of this amount stems from the Debtors' prepetition efforts to defer or otherwise extend the payment terms in respect of their existing accounts payable.  Those deferrals, although increasing the amount of outstanding prepetition claims owed to Critical Vendors and Foreign Vendors, were critical in providing the Debtors the liquidity necessary to ensure the orderly commencement of these Chapter 11 Cases, ultimately preserving the value of the Debtors' estates.

137.    I fear that if the Critical Vendor claims are not timely paid, the Critical Vendors will refuse to supply the Debtors with goods and services that are critical to the Debtors' continued business operations and prospects of a successful reorganization.

Furthermore, I believe that an attempt to identify and list all Critical Vendors would require an attempt to inquire into the willingness of the Critical Vendors to continue the provision of goods and services in the absence of payment of prepetition amounts owed to them.  In turn, this would reduce the Debtors' negotiating leverage and cause the Critical Vendors to demand immediate payment in full, leading to a significant reduction in the value of the Debtors' estates.  Thus, the Debtors request authorization to identify the Critical Vendors in the ordinary course of business, using the factors listed above.

138.    Debtors will seek to ensure that all of their rights, including automatic stay rights, under Chapter 11 are honored and, in any case will attempt to condition payment to the Critical Vendors on the Critical Vendors' agreement to continue to provide the essential goods and services on customary trade terms throughout this case.

139.    The Debtors regularly transact business with international vendors as part of their global business (collectively, the "Foreign Vendors").  Although not all of these vendors are critical to the Debtors' business operations, there is a significant risk that nonpayment or delayed payment of the Foreign Vendors' claims will lead to a significant disruption in the Debtors' overall business operations, including, without limitation, arrest of a Debtor's aircraft, enforcement of a lien in foreign jurisdiction, or delays in the operation of the aircraft.  The Debtors' business operations are dependent on the ability of the Debtors' aircraft to travel internationally without interruption.  Thus, any delay due to attachment by a Foreign Vendor will significantly disrupt the Debtors' business operations and lower the value of the Debtors' estates.

140.    Furthermore, I understand that many of the Debtors' Foreign Vendors are unfamiliar with United States bankruptcy law, including Chapter 11 proceedings.  These Foreign Vendors often have limited or no contacts with the United States.  Thus, the Court's ability to

enforce United States bankruptcy law may be constrained by the Foreign Vendors' lack of

contacts with the United States or the unwillingness of a foreign court to enforce the Automatic

Stay in a foreign jurisdiction.

> *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) For Entry of*
> *Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay*
> *Certain Prepetition (A) Charges of Shippers, Warehousemen, and Other Lien*
> *Claimants and (B) Customs Duties, and (II) Authorizing and Directing Financial*
> *Institutions to Honor and Process Related Checks and Transfers (the "*<u>*Lien*</u>*
> <u>*Claimants Motion*</u>*")*

141.    By the Lien Claimants Motion, the Debtors seek authority, but not

direction, to (i) pay prepetition charges owed to Shippers, Warehousemen, and Other Lien

Claimants (each as defined below, and collectively, the "<u>Lien Claimants</u>") that the Debtors

determine, in the exercise of its business judgment, to be necessary or appropriate to obtain the

release of supplies, merchandise, goods, tools, equipment, components, materials or other items

(collectively, the "<u>Goods</u>") in transit or otherwise held by any Lien Claimants and (ii) pay

prepetition customs duties, import-related taxes and other incidental import and related expenses

and charges, including without limitation, the fees charged by the Customs Brokers (collectively,

"<u>Customs Duties</u>") as the Debtors determines, in the exercise of its business judgment, to be

necessary or appropriate to obtain Goods in transit and to satisfy related liens, if any.  The

Debtors further seek entry of an order requiring, as a condition to payment of such charges, that

the respective Lien Claimants take all actions necessary to remove any liens on the related

Goods.

142.    In operating their business, the Debtors use and make payments to

domestic and foreign commercial common carriers, movers, shippers, freight forwarders and

consolidators, delivery services, postal services, shipping auditing services, distributors, and

other third-party service providers (collectively, the "<u>Shippers</u>") to ship, transport, store and

otherwise facilitate the movement of Goods through established national and international

distribution networks, as well as to third-party warehouses (the "Warehousemen") to store Goods

in transit (such payments, the "Shipping and Warehousing Charges").  In addition, there may be

other third parties with liens over the Debtors' property including aircraft original equipment

manufacturers, aircraft component original equipment manufacturers, engine manufacturers and

full-service maintenance, repair and overhaul shops (the "Other Lien Claimants").

     143.    The Debtors also operate a substantial cargo operation.  In the ordinary

course of their cargo business, the Debtors make payments, themselves and through third-party

customs brokers (the "Customs Brokers"), of Customs Duties to the U.S. Customs and Border

Protection Agency (the "U.S. Customs Service") and to non-U.S. customs authorities in

connection with the import or export of goods purchased from or delivered overseas on behalf of

their customers (collectively, the "Imported/Exported Goods").  The Debtors rely on a number of

Customs Brokers, as well as certain Shippers and Warehousemen to facilitate and assist them

with this process.  The Debtors pay certain of the Customs Brokers in advance, and others, after

delivery.

     144.    In the event that the Debtors fail to reimburse the Lien Claimants for

charges incurred in connection with services provided, such as shipment or storage of goods, the

applicable laws may permit the Lien Claimants to assert a statutory lien against the goods in their

possession that is the subject of any delinquent charges, securing such charges and potentially

blocking the Debtors' access to such goods.

     145.    To avoid becoming general unsecured creditors of the Debtors' estates

with respect to related goods, certain suppliers may refuse to ship or transport such goods or may

recall such shipments or refuse to deliver future orders unless the Debtors issue substitute

purchase orders postpetition or pay for such goods. The Debtors therefore require the relief

requested in the Lien Claimant's Motion to prevent any disruption to the Debtors' airline

operations.

> *Debtors' Motion for Entry of for Interim and Final Orders (I) Authorizing the Debtors to Honor Prepetition Obligations Associated With, and to Continue, Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief (the "*<u>Customer Programs Motion</u>*")*

146.    By the Customer Programs Motion, the Debtors seek, pursuant to sections

105(a), 362, 363, 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and

6004, an order (i) authorizing, but not directing, them to (a) perform and honor in the ordinary

course of business, such of their prepetition obligations arising under the Customer Programs (as

defined below) and (b) continue, renew, replace, implement new, and/or terminate such

Customer Programs on a postpetition basis, in the ordinary course of business, without further

application to the Court; and (ii) granting the Debtors such other and further relief as the Court

deems just and proper.

147.    LATAM's businesses depend upon the loyalty of their customers. To

maximize customer loyalty, LATAM has maintained and followed, in the ordinary course of

business, various practices and programs (collectively, the "<u>Customer Programs</u>") to reward and

provide incentives to existing customers and to attract new customers to LATAM's business,

including, among others, advance ticket sales, frequent flyer credit card programs, LATAM

Pass™, tour operator programs, airport lounge programs, corporate incentive programs and

cargo programs. The Customer Programs ensure customer satisfaction, generate valuable

goodwill, and address competitive pressures so that the Debtors can retain current customers,

attract new customers, and ultimately enhance net revenue. Without the ability to continue their

Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors

risk losing market share and the value of their businesses.

> *Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 362, 363 and 553 (I) Authorizing, But Not Directing, (A) Debtors to Pay Prepetition Amounts Owed to Fuel Supply Parties, (B) Debtors to Honor, Perform and Exercise Their Rights and Obligations Under Fuel Supply Arrangements and (II) (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers* (the "<u>Fuel Supply Motion</u>")

148.    The Debtors are party to various agreements for (i) pipeline and storage

(ii) into-plane services and (iii) fuel cost sharing cooperatives (the "<u>Fuel Supply Arrangements</u>").

By the Fuel Supply Motion, the Debtors request that (i) the Court authorize, but not direct, the

Debtors to pay any outstanding prepetition obligations to counterparties to the Fuel Supply

Contracts and (ii) the Court authorize, but not direct, the Debtors to continue honoring,

performing and exercising their rights and obligations (whether prepetition or postpetition) under

Fuel Supply Arrangements; *provided*, however, that the honoring, performing or exercising of

those rights and obligations shall not give rise to administrative expenses or assumption of any

executory contract solely as a result of the entry of the order.

149.    The Debtors also request that the Court authorize and direct the banks and

other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors'

direction, to receive, process, honor and pay, to the extent of funds on deposit, any and all checks

drawn or electronic fund transfers requested or to be requested by the Debtors relating to the

Debtors' obligations to counterparties to the Fuel Supply Arrangements (the "<u>Fuel Supply</u>

<u>Parties</u>").  The Debtors also seek authority to issue new postpetition checks, or effect new

electronic fund transfers, on account of their obligations to Fuel Supply Parties to replace any

prepetition checks or electronic fund transfer requests that may be lost, dishonored or rejected as

a result of the commencement of the Chapter 11 Cases.

150.    An uninterrupted fuel supply for the Debtors' fleet of aircraft is crucial to
their continued operations and successful reorganization.  I understand that many of the Debtors'
Fuel Supply Parties cannot be easily or quickly replaced.  Therefore, I fear that absent the relief
requested herein, the Debtors' fuel supply and distribution system could be disrupted, thereby
stranding the Debtors' aircraft, passengers and employees.  This would severely disrupt the
Debtors' flight schedules and seriously damage the Debtors' credibility in the marketplace.  Even
if the Debtors were able to procure alternate sources of fuel, I believe the Debtors' costs for fuel
would dramatically increase because of the piecemeal nature of an alternate supply, and,
moreover, there would be no assurance that the Debtors would even be able to even timely
procure adequate fuel.

> *Debtors' Motion for Entry of Order (I) Authorizing, But Not Directing, the*
> *Debtors to (A) Assume Certain Critical Airline Agreements Pursuant to 11 U.S.C.*
> *§§ 105(a) and 365(a), (B) Honor Certain Prepetition Obligations Pursuant to 11*
> *U.S.C. §§ 105(a) and 363(b), (II) Modifying the Automatic Stay to the Extent*
> *Necessary to Effectuate the Requested Relief Pursuant to 11 U.S.C. § 362 and*
> *(III) Scheduling a Final Hearing (the "*Critical Airline Agreements Motion*")*

151.    The Debtors are party to various agreements critical to their operations
including interline agreements, code share agreements, joint venture agreements, frequent flyer
program agreements, lounge access agreements, industry-wide standard agreements and
clearinghouse agreements with both third parties and Debtor and Non-Debtor Affiliates (the
"Critical Airline Agreements").  The Critical Airline Agreements enable the Debtors to offer
improved travel options for their customers.  For example, the interline agreements coordinate
the provision of services among airlines, such as allowing airlines to accept each other's tickets
or transfer a passenger's luggage from one airline to another.  Through these interline contracts,
LATAM is able to provide seamless service to customers whose travel plans require the services
of more than one airline.  These agreements also allow passengers whose flights are delayed or

cancelled to use their ticket from one airline for a substitute flight with another airline.  There are additional interline agreements that cover cargo sales that are equally important to the Debtors' cargo business, which has experienced increased demand over the past months.

152.    Furthermore, codeshare agreements allow the Debtors to place their own designator codes on flights operated by other airlines and sell tickets for that flight.  Through these agreements, the Debtors may offer more connections to their passengers, thereby increasing their network.  The lounge access and frequent flyer agreements help build customer loyalty, which I believe is critical, especially during these Chapter 11 Cases.  Notably, certain of these agreements are a part of larger joint-venture agreements with Delta as well as Líneas Aéreas de España, S.A.  These joint ventures, and all of the related agreements, are critical to building and maintaining our strong partnerships with these airlines.

153.    Amounts owed and payable under the interline agreements are typically settled through clearinghouses, such as the IATA clearinghouse.  Therefore, in connection with these agreements, LATAM is party to a number of clearinghouse agreements that arrange for the settlement and payment of amounts among the airlines.  Without the clearinghouse agreements, LATAM cannot effectively fulfill its obligations under the Critical Airline Agreements.

154.    By the Critical Airline Agreements Motion, the Debtors request, pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, authority to assume the Critical Airline Agreements as they deem, in their sole discretion, that assumption is in the best interests of their estates.  The Debtors also request approval of the procedures pursuant to which the Critical Airline Agreements will be assumed.  Furthermore, the Debtors seek authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to honor certain prepetition obligations and to continue honoring, performing and exercising their respective rights and obligations (whether

such rights or obligations arise prepetition or postpetition) in the ordinary course of business, in accordance with the Critical Airline Agreements (the "Prepetition Airline Obligations"). Finally, pursuant to the Critical Airline Agreements Motion, the Debtors also request that the Court modify the Automatic Stay to the extent necessary under the Assumed Contracts and the Prepetition Agreements.

155.    The operation of the airline industry involves a high degree of coordination and interrelation between individual airlines. The Critical Airline Agreements provide for and promote coordination between airlines because, among other things, they coordinate critical air travel-related activities including, but not limited to, making reservations and transferring passengers, baggage, freight, and mail between airlines. Therefore, without agreements like the Critical Airline Agreements, no airline company simply could provide the efficient service that customers have come to expect.

156.    In fact, certain services under these agreements, such as the clearinghouse functions and nationwide reservation services, are the equivalent of industry-wide cooperative services for which there is no readily available alternative. The clearinghouse functions provide for the settlement of obligations that are owed among airlines and other travel-related entities that participate in the clearinghouses. I fear that any disruption to these contractual relationships will result in irrevocable harm to the Debtors' customer base as well as other business relationships.

157.    Although the Critical Airline Agreements will not be assumed through this motion, for all the reasons explained above, I understand that it is nevertheless necessary to pay the Prepetition Airline Obligations related thereto, so that the services provided to the Debtors

are not interrupted while the Debtors focus on their business strategy and immediate operational

needs.

> *Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 364(c) (I) Authorizing, But Not Directing, Debtors to (A) Enter Into and Perform Under Hedging and Derivative Contracts (B) Provide Credit Support Under the Hedging and Derivative Contracts, and (II) Scheduling a Final Hearing* (the "Derivative Contracts Motion")

158.    By this motion, the Debtors seek entry of an (i) providing authority, but

not direction, to (A) enter into, guarantee and perform under Derivative Contracts (as defined

below), including rolling over, adjusting, modifying, settling, terminating, taking physical

delivery of commodities, settling, guaranteeing and otherwise engaging in transactions

thereunder, postpetition, so that the Debtors may continue to hedge the risk of fluctuations in the

fuel prices, interest rates, foreign currency exchange rates and other prices or rates that are

critical to the Debtors' business, (B) provide credit support under the Derivative Contracts,

including, but not limited to, posting letters of credit, entering into escrow agreements, opening

and funding escrow accounts and posting collateral or margin prepayment (collectively, "Credit

Support") and (ii) scheduling a final hearing to consider the relief requested therein on a

permanent basis.

159.    Given the impact that changes in jet fuel prices, interest rates, foreign

currency exchange rates and other similar costs have on the Debtors' business, the Debtors

mitigate the risks associated with these costs through various derivative financial contracts

(collectively, and together with all similar transactions, the "Derivative Contracts").  The

Debtors do not enter into Derivative Contracts for trading purposes.

160.    In certain circumstances, in connection with a Derivative Contract, a party

may be obligated to secure its obligations by providing Credit Support, typically in the form of

cash, to the counterparty.  Throughout the duration of a Derivative Contract, the Credit Support requirement is reevaluated, often resulting in one party providing additional Credit Support or the other party returning some of it.  I understand that requiring Credit Support is generally consistent with market practice and that the Debtors cannot avoid entering into Derivative Contracts that require Credit Support.

161.    I have been advised that Derivative Contracts are granted special treatment under the Bankruptcy Code and, most notably, a qualified counterparty to a Derivative Contract may terminate, liquidate and apply collateral held under a Derivative Contract upon the commencement of a bankruptcy case, notwithstanding section 365(e)(1) of the Bankruptcy Code. *See* 11 U.S.C. §§ 362(b)(6) & (17), 556, 560(4).  In addition, to the extent the Derivative Contract provides for such action, a non-debtor party is entitled to set off mutual debts and claims against a debtor under a Derivative Contract without needing to seek relief from the automatic stay.

162.    The Derivative Contracts are immensely beneficial for the Debtors' business operations and in order to continue their business operations successfully, I believe the Debtors must be allowed to continue hedging risk through the use of Derivative Contracts. Credit Support is an integral part of these agreements and without it, I fear the Debtors will not be able to continue to benefit from the Derivative Contracts because the Debtors' counterparties may terminate them.

> *Debtors' Motion for an Order (I) Pursuant to Section 363(c), 503(b) and 105(a) of the Bankruptcy Code Confirming Administrative Expense Status for the Debtors' Obligations Arising From the Postpetition Delivery of Goods and Services Ordered Prepetition and Authorizing the Debtors to Pay Such Obligations in the Ordinary Course of Business and (II) Scheduling a Final Hearing* (the "<u>Goods and Services Motion</u>")

163.     By the Goods and Services Motion, the Debtors seek entry of an order

granting administrative expense priority status under Section 503(b) of the Bankruptcy Code to

those undisputed obligations of the Debtors arising from goods, supplies, materials and/or

services ordered pursuant to prepetition purchase or services orders with various vendors to the

extent that such goods, supplies, materials and/or services are received and accepted by the

Debtors after the Petition Date, including, but not limited to, where partial payments for or

partial performance of such obligations occurred during the prepetition period.  The Debtors also

request authorization to satisfy such obligations in the ordinary course of business.

164.     In the ordinary course of the Debtors' business, various vendors and

suppliers provide the Debtors with critical goods, supplies, materials and services that are

necessary for successful business operations.  Before the commencement of these Chapter 11

Cases, the Debtors had prepetition purchase orders outstanding in the ordinary course of

business.  I believe that, as a consequence of the filing of these Chapter 11 Cases, vendors will

be concerned that delivering goods, supplies, materials, and providing services to the Debtors on

a postpetition basis pursuant to prepetition orders will render the vendors prepetition general

unsecured creditors.

165.     Accordingly, I understand that many vendors will refuse to deliver goods

or render services unless the Debtors reissue the purchase orders or obtain an order of this Court

providing that all undisputed obligations of the Debtors arising from such postpetition deliveries

shall be given administrative expense priority status.

166.     I believe that the relief requested would ensure that the Debtors'

operations are not significantly and detrimentally affected by delay or discontinuation of delivery

of goods, supplies, materials and rendering of services necessary to the Debtors' continued

operations.  If the relief requested is not granted, I am concerned that the Debtors will be forced

to expend substantial time, effort and money reissuing the outstanding orders.  I fear that this

would severely impact that flow of such goods and services, leading to dissatisfied customers

and distrustful suppliers.  This, in turn, would hamper the prospects of a successful

reorganization plan by significantly decreasing the value of the Debtors' estates.

>    *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Reject Certain*
>    *Aircraft Leases and Abandon Certain Aircraft, Effective* Nunc Pro Tunc *to the*
>    *Petition Date and (II) Approving Return Procedures (the "<u>Aircraft Lease</u>*
>    <u>*Rejection Motion*</u>*")*

167.    By the Aircraft Lease Rejection Motion, the Debtors seek to reject or

abandon, as applicable, numerous aircraft and aircraft leases which Debtors no longer require in

the operation of their businesses and which carry significant carrying costs, including, but not

limited to, maintenance, insurance and storage costs.  I understand that these costs are

exacerbated in light of the grounding of a significant portion of Debtors' commercial aircraft

fleet due to the current lack of demand for passenger travel.  The Debtors seek that this Court

authorize the rejection and abandonment of these aircraft *nunc pro tunc* to the date of filing the

Aircraft Lease Rejection Motion, with the exception of four aircraft with a requested effective

rejection date of June 3, 2020.  I believe that the rejection and abandonment of these aircraft will

result in significant administrative cost saving to the Debtors' estate, and therefore would be in

the best interests of the Debtors' estates and their creditors.

168.    Furthermore, the requested relief will eliminate unnecessary obligations of

Debtors under certain leases which have become burdensome; establish an orderly, efficient

process for the surrender and return of the aircraft and engines to be rejected or abandoned; and

preserve the uninterrupted operation of the Debtors' businesses.

169.     At the outset of the case, the Debtors will enter into negotiations with various aircraft lenders and lessors with respect to other aircraft.  Depending on the outcome of these negotiations, the Debtors will likely seek authority to reject additional aircraft leases and/or turn over certain aircraft to their secured lending parties

170.     I have reviewed each of the First Day Motions filed contemporaneously herewith, and the facts set forth in the First Day Motions are true and correct to the best of my knowledge, information, and belief, and are incorporated herein by reference.  It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will enhance the Debtors' ability to maximize the value of their estates for the benefit of all of the Debtors' stakeholders.

171.     I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

## VII.     INFORMATION REQUIRED BY LOCAL RULE 1007-2

172.     Local Rule 1007-2 requires certain additional information related to the Debtors, which is set forth below and in the schedules attached hereto.

173.     Pursuant to Local Rule 1007-2(a)(3), **Schedule 2** provides that, to the best of the Debtors' knowledge there were, prior to the Petition Date, no committees formed to participate in the Debtors' ongoing restructuring efforts.

174.     Pursuant to Local Rule 1007-2(a)(4), **Schedule 3** lists, for each of the holders of the forty (40) largest unsecured claims on a consolidated basis, the name, the address, the telephone number, e-mail address, the name(s) of person(s) familiar with the Debtors' account, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

175.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 4** lists, for each of the holders of the five largest secured claims on a consolidated basis the name, the address, the telephone number, e-mail address, the name(s) of person(s) familiar with the Debtors' account, the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

176.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 5** provides a summary of the consolidated assets and liabilities for the Debtors and their Non-Debtor Affiliates.

177.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 6** provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

178.      Pursuant to Local Rule 1007-2(a)(8), **Schedule 7** lists all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

179.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 8** lists all of the premises owned, leased or held under other arrangement from which the Debtors' operate their business.

180.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 9** provides the location of the Debtors' substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

181.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 10** provides the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

182.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 11** provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

183.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 12** provides (i) the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the Chapter 11 Cases; (ii) the amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the Chapter 11 Cases (A) to officers, stockholders and directors; and (B) to the Debtors' financial or business consultants.

184.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 13** provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  May 26, 2020
        Santiago, Chile

_____
Ramiro Alfonsín Balza
Chief Financial Officer
LATAM Airlines Group S.A.

## **Schedule 1**
**Organizational Chart**



LATAM Airlines Group S.A.
Main Operating Passenger Entity
Main Operating Cargo Entity
Non-filing entity.
Additional non-filing entities not shown
Latam Airlines Perú S.A.
48.47%
51.14%
Inversiones Aéreas S.A.
100%
LATAM Finance
100%
Peuco Finance
100%
Non-Filing SPVS.
100%
Lan Cargo S.A.
99.89395%
0.00409%
Inversiones Lan S.A.
99.71%
0.29%
LATAM Travel Chile II S.A.
99.99%
0.01%
Technical Training LATAM S.A.
99.83%
0.17%
Professional Airline Services
100%
Cargo Handling Airport Services, LLC
100%
Professional Airline Cargo Services, LLC
100%
Holdco I S.A.
99.99831%
Transporte Aéreo S.A.
87.12567%
12.87421%
0.00012%
Lan Cargo Overseas Limited
99.98%
0.02%
Holdco Colombia I SpA
100%
Lan Pax Group S.A.
99.8361%
0.1639%
TAM S.A. [Brasil]
36.90987%
63.09013%
Additional Non-Filing Entities in Brazil and Paraguay
100%
Holdco Ecuador S.A
99.99999%
LATAM-Airlines Ecuador S.A.
45.00%
55.00%
Mas Investment Limited
100%
Prime Airpot Services Inc
0.02857%
99.97143%
LAN Cargo Inversiones S.A.
99.00%
1.00%
Connecta Corporation
100%
Aerovías de Integración Regional S.A. (Aires S.A.)
49.47057%
0.10204%
0.15802%
49.47057%
Lan Cargo Repair Station [Florida-USA] - [D9US]
100%
Línea Aérea Carguera de Colombia
85.20%
1.60%
1.60%
1.60%
Fast Air Almacenes de Carga S.A.
99.89%
0.11%
Holdco Colombia II SpA
100%
Maintenance Service Experts, LLC
100%
Professional Airline Maintenance Services, LLC
100%

**Schedule 2**
**Committees Organized Prepetition**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge there were, prior to the Petition Date, no committees formed to participate in the Debtors' ongoing restructuring efforts.

## **Schedule 3**
**Forty Largest Unsecured Creditors**

Fill in this information to identify the case:

Debtor name: LATAM Airlines Group S.A., et al.

Bankruptcy Court for the Southern District of New York

Case number (if known): _____

☐ Check if this is an amended filing

Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 40 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 40 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 40 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 1 | LATAM 2026 Notes 240 Greenwich Street 7E New York, NY 10286 | LATAM 2026 Notes Bank of New York Mellon, as Trustee Peter Lopez PHONE: + 1 212 815 8273 FAX: EMAIL: peter.lopez@bnymellon.com | UNSECURED NOTES | | | | $800,000,000.00 |
| 2 | LATAM 2024 Notes 240 Greenwich Street 7E New York, NY 10286 | LATAM 2024 Notes Bank of New York Mellon, as Trustee Peter Lopez PHONE: + 1 212 815 8273 FAX: EMAIL: peter.lopez@bnymellon.com | UNSECURED NOTES | | | | $700,000,000.00 |
| 3 | Banco Santander Chile Bandera N° 140 Santiago, Metropolitana Chile | Banco Santander Chile Maria Soledad Schuster PHONE: 56 (2) 2648 3669 Anexo 83669 FAX: EMAIL: mariasoledad.schuster@santander.cl | FREQUENT FLIER MILES | Contingent | | | $549,000,000.00 |
| 4 | Local Bonds, Series E Avenida Libertador Bernardo O'Higgins 1111 Santiago, Metropolitana Chile | Local Bonds, Series E Banco del Estado de Chile, as Trustee Francesca Gardella PHONE: (562) 2970 2970 FAX: EMAIL: fgarde@bancoestado.cl | UNSECURED NOTES | | | | $179,030,673.32 |
| 5 | Banco de Credito del Perú Calle Centenario 156 Lima, Lima Peru | Banco de Credito del Perú Gianfranco Piero Ferrari de las Casas, CEO PHONE: 51.1.313.2000 FAX: 51.1.313.2121 EMAIL: consultationsbcp@bcp.com.pe; reclamamos@bcp.com.pe | FREQUENT FLIER MILES | Contingent | | | $167,000,000.00 |
| 6 | Banco Santander Madrid Av. de Cantabria s/n 28660 Boadilla del Monte Madrid, Madrid Spain | Banco Santander Madrid Luis Casero Ynfiesta PHONE: +34 91 289 72 47 FAX: EMAIL: luis.casero@gruposantander.com | UNSECURED DEBT | | | | $139,500,000.00 |
| 7 | Local Bonds, Series A Avenida Libertador Bernardo O'Higgins 1111 Santiago, Metropolitana Chile | Local Bonds, Series A Banco del Estado de Chile, as Trustee Francesca Gardella PHONE: (562) 2970 6210 FAX: EMAIL: fgarde@bancoestado.cl | UNSECURED NOTES | | | | $89,515,336.66 |
| 8 | Local Bonds, Series B Avenida Libertador Bernardo O'Higgins 1111 Santiago, Metropolitana Chile | Local Bonds, Series B Banco del Estado de Chile, as Trustee Francesca Gardella PHONE: (562) 2970 6210 FAX: EMAIL: fgarde@bancoestado.cl | UNSECURED NOTES | | | | $89,515,336.66 |
| 9 | Scotiabank Chile Casa Matriz Av Costanera Sur 2710 Torre A Santiago Chile | Scotiabank Chile Federico Alonso PHONE: 416-866-6161 FAX: EMAIL: Federico.Alonso@scotiabank.cl | UNSECURED DEBT | | | | $74,000,000.00 |

The information set forth herein represents the Debtors' best efforts to identify the relevant claims, and shall not constitute an admission of liability by, nor is it binding on, the Debtors. Furthermore, the failure to list a claim as contingent, disputed or subject to set off shall not be a waiver of any right of the Debtors' rights relating thereto.

Debtor LATAM Airlines Group S.A., et al.

Case number (if known) _____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim(for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 10 | Local Bonds, Series C Avenida Libertador Bernardo O'Higgins 1111 Santiago, Metropolitana Chile | Local Bonds, Series C Banco del Estado de Chile, as Trustee Francesca Gardella PHONE: (562) 2970 6210 FAX: EMAIL: fgarde@bancoestado.cl | UNSECURED NOTES | | | | $66,241,349.13 |
| 11 | Local Bonds, Series D Avenida Libertador Bernardo O'Higgins 1111 Santiago, Metropolitana Chile | Local Bonds, Series D Banco del Estado de Chile, as Trustee Francesca Gardella PHONE: (562) 2970 6210 FAX: EMAIL: fgarde@bancoestado.cl | UNSECURED NOTES | | | | $66,241,349.13 |
| 12 | Banco BTG Pactual Chile, as Agent Avenida Costanera Sur 2730, 19th floor Santiago, Metropolitana Chile | Banco BTG Pactual Chile, as Agent Rodrigo Oyarzo PHONE: +56 22 587 5027 FAX: EMAIL: Rodrigo.Oyarzo@btgpactual.com | UNSECURED DEBT | | | | $59,438,183.54 |
| 13 | American Express Travel Related Services Company, Inc 200 Vesey Street New York, NY 10285 | American Express Travel Related Services Company, Inc Liliana Gutierrez PHONE: +56 2 2783 8733 FAX: EMAIL: liliana.w.gutierrez@aexp.com | UNSECURED DEBT | | | | $52,511,111.00 |
| 14 | Banco del Estado de Chile Avenida Libertador Bernardo O'Higgins 1111 Santiago, Metropolitana Chile | Banco del Estado de Chile Francesca Gardella PHONE: 56979695018 FAX: EMAIL: fgarde@bancoestado.cl | UNSECURED DEBT | | | | $40,000,000.00 |
| 15 | BP p.l.c (Air BP) 501 Westlake Park Boulevard Houston, TX 77079 United States | BP p.l.c (Air BP) John  Platt, CEO PHONE:  971 5 04536032 FAX: 971 4 3318628 EMAIL: airbpoutofhours@bp.com | TRADE DEBT | | | | $38,940,366.00 |
| 16 | World Fuel Services 9800 NW 41 Street, Suite 400. Miami, FL 33178 | World Fuel Services RICHARD HOPPE PHONE: 1-305-799-3532 FAX: EMAIL: RHoppe@wfscorp.com | TRADE DEBT | | | | $30,030,023.00 |
| 17 | Itaú CorpBanca Avenida Presidente Riesco 5537, 16th Floor Santiago, Metropolitana Chile | Itaú CorpBanca Carlos Irarrazaval PHONE: 56961699692 FAX: EMAIL: Carlos.Irarrazaval@itau.cl | UNSECURED DEBT | | | | $29,857,588.21 |
| 18 | Dirección General de Aeronáutica Civil AV. Miguel Claro 1314 Providencia Chile | Dirección General de Aeronáutica Civil Victor Villalobos Collao PHONE: 2-4392000 FAX: EMAIL: victor.villalobos@dgac.gob.cl | TRADE DEBT | | | | $17,063,704.59 |
| 19 | Aerospace Turbine Services & Solutions Adjacent Abu Dhabi Intl Airport Turbine Services Building Gate Number 3 Abu Dhabi United Arab Emirates | Aerospace Turbine Services & Solutions Mansoor Janahi PHONE: +971 (2) 5057887 FAX: EMAIL: MJanahi@tssaero.ae | TRADE DEBT | | | | $16,632,517.20 |
| 20 | OneWorld 2 Park Avenue Suite 1100 New York, NY 10016 | OneWorld Rob Gurney, CEO PHONE: 604-713-2660 FAX: EMAIL: rob.gurney@oneworld.com | TRADE DEBT | | | | $14,753,378.00 |
| 21 | The Boeing Company 100 N Riverside Drive Chicago, IL 60606 | The Boeing Company Gayle K. Wilson PHONE: 206-6629829 FAX: EMAIL: gayle.k.wilson@boeing.com; jessica.l.waddell@boeing.com | TRADE DEBT | | | | $16,167,786.00 |
| 22 | Etihad Airways Engineering SN New Airport Road P. O. BOX 35566 Khalifa City A Abu Dhabi United Arab Emirates | Etihad Airways Engineering Frederic Dupont PHONE: 971 56 685 0160 FAX: EMAIL: FDUPONT@etihad.ae | TRADE DEBT | | | | $14,425,131.05 |
| 23 | Gate Gourmet US, Inc 1880 Campus Commons Drive Suite 200 Reston, VA 20191 | Gate Gourmet US, Inc Rodrigo Decerega PHONE:  1 (786) 2572043 FAX: EMAIL: rdecerega@gategroup.com | TRADE DEBT | | | | $13,975,615.00 |

Debtor LATAM Airlines Group S.A., et al.                                                                                                                    Case number (if known) _____

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 24 | Regional One INC, Dash 24 LLC; Case: 2013-20319 CA 01<br>Lavalle, Brown & Ronan PA<br>750 South Dixey Highway<br>Boca Raton, FL 33432 | Regional One INC, Dash 24 LLC; Case: 2013-20319 CA 01<br>Kenneth Ronan<br>PHONE: 561-395-0000<br>FAX:<br>EMAIL: kronan@lavallebrown.com | CONTINGENT LITIGATION | Contingent, Unliquidated, Disputed | | | $12,440,000.00 |
| 25 | HSBC Bank Chile<br>Av. Isidora Goyenechea 2800<br>Floor 23<br>Santiago, Metropolitana<br>Chile | HSBC Bank Chile<br>Alexandre Falcao<br>PHONE: 212-525-4449<br>FAX:<br>EMAIL: alexandre.p.falcao@us.hsbc.com | UNSECURED DEBT | | | | $12,000,000.00 |
| 26 | Sistemas Globales Chile-Asesorias Limitada<br>Av.Apoquindo Oficina S 3600<br>Las Condes<br>Chile | Sistemas Globales Chile-Asesorias Limitada<br>Natalia Croce<br>PHONE: 2 - 24468423<br>FAX:<br>EMAIL: natalia.croce@globant.com; Billing@globant.com | TRADE DEBT | | | | $11,906,629.20 |
| 27 | Repsol S.A.<br>2455 Technology Forest Blvd<br>The Woodlands, TX 77381 | Repsol S.A.<br>Josu Jon Imaz San Miguel, CEO<br>PHONE: 832-442-1000<br>FAX:<br>EMAIL: infous@repsol.com; ralvarezp.ir@repsol.com | TRADE DEBT | | | | $11,135,377.56 |
| 28 | Talma Servicios Aeroportuarios S.A.<br>Av. Elmer Faucett 2879<br>Piso 4<br>Lima Quito City, Callao 7031<br>Peru | Talma Servicios Aeroportuarios S.A.<br>Entrevista a Arturo Cassinelli, CEO<br>PHONE: 51 1 513 8900 Anexo 41123 / 41148 / 41140<br>FAX:<br>EMAIL:<br>anabel.ruiz@talma.com.pe;deisy.villar@talma.com.pe;eliza beth.pizarro@talma.com.pe;graciela.guillen@talma.com.p e;patricia.aranguren@talma.com.pe;rudi.landauro@talma. com.pe | TRADE DEBT | | | | $11,071,121.78 |
| 29 | General Directorate for Competition of the European Commission<br>Place Madou<br>Madouplein 1<br>Brussels, Saint-Josse-ten-Noode 1210<br>Belgium | General Directorate for Competition of the European Commission<br>Mr Olivier Guersent, Director General<br>PHONE: +32-229-65414<br>FAX:<br>EMAIL: Olivier.Guersent@ec.europa.eu | CONTINGENT LITIGATION | Contingent, Unliquidated, Disputed | | | $9,217,000.00 |
| 30 | CFM International, Inc.<br>One Neumann Way<br>Cincinnati, OH 45215 | CFM International, Inc.<br>Gaël Méheust, CEO<br>PHONE: 513-552-3272<br>FAX:<br>EMAIL: aviation.fleetsupport@ge.com | TRADE DEBT | | | | $7,458,917.21 |
| 31 | AerCap<br>65 St. Stephen's Green<br>AerCap House<br>Dublin  D02 YX20<br>Ireland | AerCap<br>Phil Scruggs (CCO)<br>PHONE: 353-1-819-2010<br>FAX:<br>EMAIL: akelly@aercap.com; pscruggs@aercap.com | TRADE DEBT | | | | $7,430,428.00 |
| 32 | Petróleo Brasileiro S.A<br>200 Westlake Park Boulevard<br>Suite 1000<br>Houston, TX 77079 | Petróleo Brasileiro S.A<br>RODRIGO MOTTA GUIMARES<br>PHONE: 5521996474208<br>FAX:<br>EMAIL: rodrigo@br-petrobras.com.br | TRADE DEBT | | | | $7,226,085.75 |
| 33 | Avolon<br>640 5th Ave<br>19th Floor<br>New York, NY 10019 | Avolon<br>John Higgins (CCO)<br>PHONE: 646-609-8970<br>FAX:<br>EMAIL: jhiggins@avolon.aero; fcampos@avolon.aero | TRADE DEBT | | | | $6,483,212.00 |
| 34 | BBAM Aircraft Leasing & Management<br>50 California Street<br>14th Floor<br>San Francisco, CA 94111 | BBAM Aircraft Leasing & Management<br>Daniel Silberman<br>PHONE: 415-267-1600<br>FAX: 415-618-3337<br>EMAIL: daniel.silberman@bbam.com | TRADE DEBT | | | | $6,329,142.68 |
| 35 | Petróleos del Perú S.A.<br>Av.Paseo De La Republica 3361 Sn  I<br>Lima<br>Peru | Petróleos del Perú S.A.<br>ALONSO RIVERA<br>PHONE: 996720438<br>FAX:<br>EMAIL: arivera@petroperu.com.pe. | TRADE DEBT | | | | $5,499,404.73 |
| 36 | Collins Aerospace<br>2730 W Tyvola Road<br>4 Coliseum Center<br>Charlotte, NC 28217 | Collins Aerospace<br>Stephen Ribaudo<br>PHONE: 1 860 503 9729<br>FAX:<br>EMAIL: stephen.ribaudo@collins.com | TRADE DEBT | | | | $5,341,080.00 |
| 37 | Everis Chile SA<br>Libertador 8 Ohiggins 1449. 1449<br>Santiago<br>Chile | Everis Chile SA<br>Juan Pablo Buiatti<br>PHONE: 2-4215300<br>FAX:<br>EMAIL: juan.pablo.buiatti.dal.pietro@everis.com; chile.finances@everis.com | TRADE DEBT | | | | $4,815,827.57 |
| 38 | CAE, Inc.<br>Emirates Aviation College Bldg<br>Dubai<br>United Arab Emirates | CAE, Inc.<br>Michel Azar-Hmouda<br>PHONE: 1 972 456-8070<br>FAX:<br>EMAIL: michel.azarhmouda@cae.com | TRADE DEBT | | | | $4,672,327.00 |
| 39 | Organización Terpel S.A.<br>Av Eldorado, 99.<br>Bogota<br>Colombia | Organización Terpel S.A.<br>LILIANA TOVAR SILVA<br>PHONE: 315-355-4671<br>FAX:<br>EMAIL: ltovar@terpel.com. | TRADE DEBT | | | | $4,653,261.27 |

Debtor LATAM Airlines Group S.A., et al.                                                                                          Case number (if known) _____

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim(for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured Claim |
| 40          Empresa Argentina de Navegación Aérea  Rivadavia  578 3nd Piso Buenos Aires, AAQ C-100 2 Argentina | Empresa Argentina de Navegación Aérea Cristian Arnau PHONE: FAX: EMAIL: carnau@eana.com.ar | TRADE DEBT | | | | $4,215,496.00 |

## Schedule 4
### Five Largest Secured Claims

| | Name of Creditor and Complete Mailing Address | Claim Amount | Debt Type | Description of Collateral |
|---|---|---|---|---|
| 1. | **Wilmington Trust Company** 1100 North Market Street Wilmington, Delaware 19890-1605U.S.A. Attn: Corporate Trust Administration Telephone: 302-636-6000 Fax: 302-636-4140 | $777,509,924 | EETC, Tranche A | 11 321s, 2 350s, 4 787s |
| 2. | **Citibank, N.A., Loan Administration** 1615 Brett Road, OPS 3 New Castle, DE 19720 (302) 894-6010 (212) 994-0847 Attn: Owen Coyle | $603,162,619 | Revolving Loan Agreement | 26 Planes and 15 Engines and certain spare parts |
| 3. | **Credit Agricole Corporate and Investment Bank** Credit Agricole Building 1301 Avenue of the Americas SFI Agency & Middle Office, 20th Floor, New York, NY 10019-6022 Attention: Justine Ventrelli / Claire Vacca Telephone: +1 (212) 261-7886 / + 1 (212) 261-3382 | $274,365,652 | Engine Loan Facility | 41 Engines |
| 4. | **Wells Fargo Bank Northwest, National Association** 260 North Charles Lindbergh Drive Salt Lake City, Utah 84116 Attention: Corporate Trust Lease Group Telephone: 801-246-5653 Fax: 801-246-5630 | $276,870,256 | EXIM Aircraft Loan Agreement | 9 767s |
| 5. | **Natixis** 30, avenue Pierre Mendes France - 75013 Paris BP 4 75060 Paris Cedex 02 542 044 524 RCS Paris Attn: Julie Watremez | $242,989,785 | Aircraft Loan Agreement | 9 A321s |

### Schedule 5
### Summary of Assets and Liabilities of the Debtor as of March 31, 2020

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated among affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

On a consolidated basis, the total value of the Debtors' assets is approximately $22.2 billion and the total amount of the Debtors' liabilities is approximately $14.9 billion.

### Schedule 6
### Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the Debtors have the following publicly held classes of shares of stock, debentures or other securities.

LATAM Airline Group, S.A., is a public reporting company under section 12(b) of the Securities Exchange Act of 1934.  LATAM Parent's shares of common stock trade on the Santiago Stock Exchange under the symbol "LTM."

Since August 2007, LATAM Parent's common shares have traded in the United States in the form of American Depositary Shares ("ADSs"), initially issued by BNYM as Depositary.  In October 2011, LATAM's Depositary bank changed to JP Morgan Chase Bank, N.A.  LATAM's ADSs trade on the New York Stock Exchange.  As of February 29, 2020, 3.32% of LATAM Parent's capital stock was held in the form of ADS.

For the year 2019, LATAM Parent had on average 606,407,693 shares of common stock outstanding.

## **Schedule 7**
### **Debtors' Property Not in the Debtors' Possession**

         Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

         Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, joint venturers, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

### **Schedule 8**
### **Premises from Which Debtors Operate Their Business**

   Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises location of real property owned or leased from which the Debtors and non-Debtor subsidiaries operate, or have operated, their businesses.  Certain of the leased premises may have been vacated and/or surrendered as of the Petition Date.  The Debtors operate their business primarily at Presidente Riesco 5711, 20th Floor, Las Condes, Santiago, Chile, and, to the extent there are additional real properties that the Debtors own or lease, such information will be provided during these Chapter 11 Cases.

## Schedule 9

### Location of the Debtors' Substantial Assets, Books, Records and Nature and Location of Debtors' Assets, Books, Records and Nature and Local of Debtors' Assets Outside the United States

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

### Location of Debtors' Substantial Assets

A substantial portion of the Debtors' assets are located outside of the United States. Within the United States, the Debtors have assets valued at approximately $416 million, with substantial assets in Florida and New York.

### Books and Records

The Debtors' books and records are primarily located at Presidente Riesco 5711, 20th Floor, Las Condes, Santiago, Chile.

### Debtors' Assets Outside the United States

The Debtors, together with their non-Debtor affiliates, have significant assets worldwide of more than $17.2 billion, chiefly in the form of aircraft and equipment, including significant assets held outside the United States through their direct and indirect subsidiaries, with significant assets in South America, Central America, and Europe

.

**Schedule 10[1]**

**Nature and Status of Actions or Proceedings Against the Debtors Where a Judgment or Seizure of Their Property May be Imminent**

Pursuant to Local Rule 1007-2(a)(11), the Debtors do not believe that there are actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent. Any creditor that asserts a claim against any Debtor in respect of a pending action will be included in the Debtors' list of creditors.

---

[1]    The Debtors reserve the right to supplement this exhibit if additional property is identified.

## Schedule 11

### Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name | Position | Responsibilities' and Experience |
|------|----------|----------------------------------|
| Roberto Alvo | CEO | Roberto Alvo has been CEO since April 2020. Mr Alvo joined LAN Airlines in November 2001. Prior to his current position, he served as Commercial Vice-President of LATAM, Vice-President for Strategic Planning and Development at LATAM Airlines, Chief Financial Officer of LAN Argentina, as Manager of Development and Financial Planning at LAN Airlines, and as Deputy Chief Financial Officer of LAN Airlines. Before 2001, Mr. Alvo held various positions at Sociedad Química y Minera de Chile S.A., a leading Chilean non-metallic mining company. He is a civil engineer and obtained an MBA from the IMD in Lausanne, Switzerland. |
| Ramiro Alfonsín Balza | CFO | Mr. Ramiro Alfonsín has been LATAM Airlines Group's Chief Financial Officer since July 2016. He has over 20 years' experience in investment banking and in senior positions in the power utility sector. He was Deputy CEO and CFO of the largest power generation utility in Latin America. He worked at Enel S.p.A. and in Endesa S.A. in several senior positions in Italy and in Spain.<br>Mr. Alfonsín holds a degree in business administration from the Universidad Católica de Argentina. |
| Hernan Pasman | CCO | Mr. Hernan Pasman has been the Chief Operating Officer of Latam airlines group since October, 2015. He joined LAN Airlines in 2005 as a head of strategic planning and financial analysis of the technical areas. Between 2007 and 2010, Mr. Pasman was the Chief operating officer of LAN Argentina, then, in 2011 he served as Chief Executive Officer for LAN Colombia. Prior to joining the company, between 2001 and 2005, Mr. Pasman was a consultant at McKinsey & Company in Chicago. Between 1995 and 2001, Hernan held positions at Citicorp Equity Investments, Telephonic de Argentina and Argentina Motorola. Mr. Pasman is a Civil engineer from |

| | | |
|---|---|---|
| | | ITBA (1995) and obtained an MBA from Kellogg Graduate School of Management (2001). |
| Paulo Mirando | Chief Customer Office | Mr. Paulo Miranda has been the Chief Customer Officer of LATAM Airlines Group since May 2019. Mr. Miranda has over 20 years of experience in the aviation industry with different airlines both in the USA and in Brazil. In his last role, Mr. Miranda was responsible for customer experience, having previously worked in finance, alliances as well as on the negotiation and implementation of joint ventures. Mr. Miranda holds a Business Administration degree from the Carlson School of Management at the University of Minnesota, USA. |
| Michael Rutter | Commercial VP | Mr. Michael Rutter became the Commercial VP in March 2020.  Prior to joining LATAM he worked at Aer Lingus as the Chief Operating Office from 2015 to 2020 and Chief Commercial Officer from 2014 to 2015.  Mr. Rutter holds a BA from the University of Newcastle-upon-Tyne. |
| Emilio del Real | VP of Human Resources | Mr. Emilio del Real Sota, is LATAM's HR Executive Vice-President, a position he assumed (with LAN) in August 2005. Between 2003 and 2005, Mr. del Real was the Human Resource Manager of D&S, a Chilean retail company. Between 1997 and 2003 Mr. del Real served in various positions in Unilever, including Human Resource Manager for Chile, and Training and Recruitment Manager and Management Development Manager for Latin America. Mr. del Real has a Psychology degree from Universidad Gabriela Mistral. |
| Juan Carlos Menció | VP of Legal | Mr. Juan Carlos Mencio has been the Senior Vice President Legal Affairs and Compliance for LATAM Airlines Group since September 1, 2014. He had previously held the position of General Counsel for North America for LATAM Airlines Group and its related companies, as well as General Counsel for its worldwide Cargo Operations, both since 1998. Prior to joining LAN, he was in private practice in New York and Florida representing various international airlines. He obtained his Bachelor's Degree in International Finance and Marketing from the School of Business at the University of Miami and his Juris Doctor Degree from Loyola University. |

## **Schedule 12**

### **Estimated Payroll for the 30-day Period Following the Petition Date[2]**

Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the estimate amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| | |
|---|---|
| **Payroll for Employees** | $13.5 million |
| **Payments to Officers, Directors, and Equity holders (Non-Employees)** | $25,000 |
| **Payments to Financial and Business Consultants** | $0.0 |

---

[2] As noted above, these estimates reflect the Debtors' reasonable estimates based on the current status of the restrictions imposed by the COVID-19 pandemic. To the extent that the Debtors are able, consistent with applicable law and their commitments to customers and employees, to safely resume operations at an earlier date than is currently projected, these amounts could vary materially.

## Schedule 13

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables[3]**

        Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following schedule provides an estimate of, for the 30-day period following the Petition Date, cash receipts and disbursements, net gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees:

| | |
|---|---|
| Cash Receipts | $120 million |
| Cash Disbursements | $260 million |
| Net Cash (Gain or Loss) | $140 million (loss) |
| Unpaid Obligations | $50 million |
| Uncollected Receivables | $40 million |

---

[3]     As noted above, these estimates reflect the Debtors' reasonable estimates based on the current status of the restrictions imposed by the COVID-19 pandemic.  To the extent that the Debtors are able, consistent with applicable law and their commitments to customers and employees, to safely resume operations at an earlier date than is currently projected, these amounts could vary materially.