**Objection Deadline:** To be Determined
**Hearing Date:** To be Determined

Richard J. Cooper
Lisa M. Schweitzer
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LATAM Airlines Group S.A., *et al.*, | Case No. 20-11254 (JLG) |
| Debtors.[1] | Jointly Administered |

**DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (II) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are:  LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

LATAM Airline Group S.A. ("LATAM Parent") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[2] hereby submit this motion (the "Motion") for entry of a final order, substantially in the form attached hereto as Exhibit A (the "Final DIP Order"), pursuant to sections 105, 362, 363(c), 363(c)(2), and 364(c)(3), of title 11 of the United States Code (the "Bankruptcy Code"); Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules'); and Rule 4001-2 Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").  In support of this Motion, the Debtors rely upon the *Declaration of Ramiro Alfonsín Balza Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions and Applications* (the "First Day Declaration"), Docket No. 3; the *Declaration of Timothy R. Coleman in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* filed contemporaneously herewith and incorporated herein by reference (the "Coleman Declaration"), the *Declaration of Ramiro Alfonsín Balza in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* filed contemporaneously herewith and incorporated herein by reference (the "Alfonsín DIP Declaration"), and respectfully state as follows:

## **PRELIMINARY STATEMENT**

1.      The relief sought in this Motion is critical for the Debtors to secure a substantial source of liquidity to ensure the Debtors' continued ability to pay their ordinary course

---

[2]      LATAM Parent, and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as "LATAM".

operating expenses, to finance these Chapter 11 Cases (as defined below) and, ultimately, to provide LATAM an opportunity to restructure its debts and successfully reorganize.

2.      As described in the First Day Declaration, the impact of the ongoing COVID-19 pandemic on the airline industry was almost instantaneous. The Debtors and their non-Debtor affiliates were not immune and also quickly felt the impacts of the worldwide shutdown. For the months leading up to the Petition Date (as defined below), the Debtors and non-Debtor affiliates took the difficult and necessary steps to reshape and protect their business, continue operations and meet their commitments to their employees, customers and other stakeholders. This included significant cost reduction and liquidity preservation in advance of the filing.

3.      Partially as a result of the various liquidity preserving measures, the Debtors filed for chapter 11 relief with $707 million in cash and cash equivalents, while LATAM as a whole had approximately $1.35 billion in cash and cash equivalents. However the Debtors' and their non-Debtor affiliates operational needs during the course of these proceedings are expected to far exceed this amount. Therefore, in the weeks leading up to the Petition Date, the Debtors reached out to significant shareholders and government representatives to determine their willingness to provide the financing needed in order to continue operating through these chapter 11 proceedings.

4.      Accordingly, the Debtors seek authorization to execute and deliver all final documentation consistent with the terms and conditions of that certain Super-Priority Debtors-in-Possession Term Loan Agreement, by and among LATAM Parent, as borrower (the "Borrower"), the guarantors party thereto (the "Guarantors" and together with the Borrower, the "Obligors"), Qatar Airways Investments (UK) Ltd. or one of more of its Affiliates and Costa Verde Aeronáutica S.A. or one or more of its Affiliates, as lenders (the "Tranche C DIP Lenders"), the administrative

agent (in such capacity, the "Administrative Agent"), the Local Collateral agent (in such capacity, the "Local Collateral Agent", and the collateral agent (in such capacity, the "Collateral Agent" and together with the Administrative Agent and the Local Collateral Agent, the "DIP Agents") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and together with the Final DIP Order and all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Loan Documents").

5.     The DIP Credit Agreement contemplates a secured superpriority multi-draw term loan facility of up to $2.15 billion in new money financing (the "DIP Facility") consisting of (i) a secured Tranche A facility (the "Tranche A DIP Facility") in an aggregate maximum principal to be determined (the "Tranche A DIP Commitment" and collectively the loans made thereunder the "Tranche A DIP Loans" and together with the related obligations incurred under the Tranche A DIP Facility, the "Tranche A DIP Obligations"); (ii) a secured Tranche B facility (the "Tranche B DIP Facility") in an aggregate maximum principal amount to be determined (the "Tranche B DIP Commitment" and collectively the loans made thereunder the "Tranche B DIP Loans" and together with the related obligations incurred under the Tranche B DIP Facility, the "Tranche B DIP Obligations"); and (iii) a secured Tranche C facility (the "Tranche C DIP Facility") provided by the Tranche C DIP Lenders in an aggregate maximum principal amount of at least $900 million subject to the Borrower's ability to increase the Tranche C DIP Facility with a new commitment of up to an additional $250 million as agreed with the Tranche C DIP Lenders and in accordance with the DIP Loan Documents (such increase, the "Tranche C Increase Commitment") (the "Tranche C DIP Commitment" and, together with the Tranche A DIP Commitment and Tranche B DIP Commitment, the "DIP Commitments" and collectively the loans made thereunder the "Tranche C DIP Loans" and together with the related obligations incurred under the Tranche C

DIP Facility, the "Tranche C DIP Obligations" and together with the Tranche A DIP Obligations

and Tranche B DIP Obligations, the "DIP Obligations" and collectively the loans made thereunder

the "DIP Loans").  Importantly, the Tranche C DIP Loans are subordinated to the Tranche A DIP

Loans and Tranche B DIP Loans and will serve effectively as "first loss" facilities to the other

tranches providing a substantial and critical  "equity cushion" for the lenders under such facilities

in the event the Debtors are not able to successfully reorganize.

6.       At this time, the Debtors seek authorization to enter into the DIP Credit

Agreement and obtain the Tranche C DIP Facility.  The Debtors intend to seek authorization for

borrowings under the Tranche A DIP Facility and Tranche B DIP Facility separately.  Although

the disbursement of funds pursuant to the Tranche C DIP Facility is subject to approval of  funding

to be provided under other tranches of the DIP Facility, the Debtors are seeking this relief now

both because, on the one hand, they are acutely aware that their liquidity needs will become more

pressing by August and, on the other hand, they believe that approval of the DIP Credit Agreement

and the Tranche C DIP Facility will facilitate and streamline the ongoing negotiations for the

additional tranches of financing.  In particular, the potential lenders under the Tranche A DIP

Facility and Tranche B DIP Facility will undoubtedly review this Motion and the proposed DIP

Loan Documents when deciding whether to fund and how to structure a appropriate bid.

Accordingly, the Debtors believe this Motion will pave the way for the Debtors to access the entire

amount of financing required.

7.       Furthermore, and as detailed further below, the Debtors have successfully

obtained valuable contractual undertakings from the Tranche C DIP Lenders in connection with

securing the Tranche C Facility that they believe will significantly aid the Debtors' ability to

reorganize and exit the chapter 11 proceedings.  Notably, these undertakings should also provide

comfort to potential lenders under the Tranche A DIP Facility and Tranche B DIP Facility about the chances of a successful emergence.  The Tranche C DIP Lenders' agreement to provide support through not only financing but also through these contractual undertakings is an important signal to the Debtors' other stakeholders, potential postpetition lenders and the market more broadly, that despite the current economic climate brought on by COVID-19 the Debtors' business, supported by the Tranche C Lenders and other stakeholders,  is poised for a successful recovery.

## **BACKGROUND**

8.      On May 26, 2020 (the "Petition Date"), the Debtors each filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and the *Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases* (ECF No. 34) entered by the Court in each of the Chapter 11 Cases.  On June 5, 2020, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "Creditors' Committee").  No trustee or examiner has been appointed in these Chapter 11 Cases.

9.      LATAM is Latin America's leading airline group, with a history extending back ninety years, and boasting one of the largest route networks in the world.  Before the onset of the COVID-19 pandemic, LATAM offered passenger transport services to 145 different destinations in twenty-six countries, including domestic flights in Argentina, Brazil, Chile, Colombia, Ecuador and Peru, and international services within Latin America as well as to Europe, the United States, the Caribbean, Oceania, Asia and Africa.  As of the Petition Date,

LATAM had a total fleet of 340 aircraft,[3] and in 2019, transported more than seventy-four million passengers around the world.  While the majority of LATAM's revenues have traditionally come from its passenger airline services, LATAM also offers cargo-related services to 151 destinations in twenty-nine countries.  In 2019, LATAM's consolidated revenues were over $10 billion, of which the Debtors' revenues comprised approximately $4 billion.  The Debtors have substantial international operations, and their ability to maintain these international operations is a critical element of the overall success of the Debtors' business.

10.     At the beginning of 2020, LATAM was financially and operationally one of the strongest airline groups in Latin America and poised to continue its upward trajectory, projecting growth in all of its passenger segments, as well as its cargo business.  Unfortunately, like so many businesses around the world, the unprecedented effects of the COVID-19 global pandemic have significantly affected LATAM's operations and its business plan.  On March 11, 2020 the World Health Organization declared the widespread outbreak of the novel coronavirus a global pandemic.  Over the intervening weeks, countries around the world, including each of those in which the Debtors have their primary operations, announced severe travel restrictions and/or outright closure of their borders.

11.     The impact on the airline industry was almost instantaneous, and by April 2020, in response to the precipitous decline in air travel, LATAM reduced its passenger routes by 95%.  LATAM's cargo operations largely have been unaffected by the COVID-19 pandemic. Indeed, cargo operations have increased in recent months, including to provide much needed medical and other critical supplies to areas affected by the pandemic.  Although LATAM expects

---

[3]     This number comprises both aircraft operated by LATAM and a small number that are leased to third-parties.

continued demand for its cargo operations, that demand cannot fully offset the impact of the COVID-19 pandemic on LATAM's passenger business.

12.     Despite undertaking meaningful cost-saving and liquidity preserving measures, LATAM's liquidity position has continued to deteriorate in the wake of the COVID-19 pandemic, necessitating the commencement of the Chapter 11 Cases. Additional information regarding the Debtors' business, capital structure and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated by reference herein.

13.     On May 27, 2020, the Grand Court of the Cayman Islands granted the applications of certain of the Debtors for the appointment of provisional liquidators pursuant to section 104(3) of the Companies Law (2020 Revision). On June 4, 2020, the 2nd Civil Court of Santiago, Chile issued an order recognizing the Chapter 11 proceeding with respect to the LATAM Airlines Group S.A., Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A. and Technical Training LATAM S.A. In addition, on June 15, 2020, the Superintendence of Companies of Colombia granted the recognition to the Chapter 11 proceedings.

## JURISDICTION

14.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105, 362, 363(c)(1), 363(c)(2), and 364(c)(3) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014.

## RELIEF REQUESTED

15.    By this Motion the Debtors request, pursuant to sections 105, 362, 363(c),

363(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004

and 9014, and Local Rule 4001-2: entry of a final order with respect to the Tranche C DIP Facility,

substantially in the form of the Final DIP Order pursuant to the DIP Loan Documents.

## CONCISE STATEMENTS REGARDING DIP FINANCING
## PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2[4]

16.    The following chart contains a summary of the material terms of the

proposed Tranche C DIP Facility, together with references to the applicable sections of the relevant

source documents, as required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local

Rule 4001-2. As discussed above, the DIP Credit Agreement also contemplates a Tranche A DIP

Facility and Tranche B DIP Facility. The chart below references these facilities to the extent

relevant to the Tranche C DIP Facility, but the Debtors intend to seek separate relief with respect

to these additional tranches.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | LATAM Airlines Group S.A. | DIP Credit Agreement preamble |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors other than the Borrower. | DIP Credit Agreement preamble |

---

[4] The following summary of the Tranche C DIP Facility is qualified in its entirety by reference to the applicable provisions of the relevant DIP Loan Documents. To the extent there are any inconsistencies between these summaries and the provisions of the DIP Loan Documents or the Final DIP Order, the provisions of the DIP Loan Documents or the Final DIP Order, as applicable, shall control. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DIP Loan Documents and/or the Final DIP Order, as applicable. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

Furthermore, certain DIP Loan Documents have not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

| | | |
|---|---|---|
| **Tranche C DIP Lenders** 4001(c)(1)(B) | Qatar Airways Investments (UK) Ltd. or one of more of its Affiliates and Costa Verde Aeronáutica S.A. or one or more of its Affiliates as the Tranche C Initial Lender and each party to the Tranche C Joinder Agreement (as defined in the DIP Credit Agreement); provided that, each such lender must be (i) a Tranche C Initial Lender or (ii) a holder of shares of LATAM as of the Petition Date or as of the date such party executes the Tranche C Joinder Agreement; provided further, that any Tranche C Increase Lender that was a holder as of the Petition Date shall have priority with respect to allocation of any Tranche C Increase Commitment | DIP Credit Agreement, Schedule 1.1(e); definition of Tranche C Increase Lender |
| **DIP Agents** Bankruptcy Rule 4001(c)(1)(B) | To be determined with the lenders under the Tranche A DIP Facility and Tranche B DIP Facility | |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(1) | Entire DIP Facility shall be at least $1.9 billion.<br><br>Tranche C DIP Facility: at least $900 million plus the Tranche C Increase Commitment<br><br>Tranche C Increase Commitment: The aggregate amount of the Tranche C Increase Commitment shall be up to $250,000,000, as provided in the Tranche C Joinder Agreement (as defined in the DIP Credit Agreement); provided that, (i) no Tranche C Increase Lender that is an individual shareholder (other than a Tranche C Initial Lender) (each as defined in the DIP Credit Agreement) shall, alone or together with its Affiliates, provide a Tranche C Increase Commitment in excess of $100,000,000, either in a single installment or in the aggregate, without the consent of each Tranche C Initial Lender, which consent shall not be unreasonably withheld or delayed and (ii) without the consent of the Majority Tranche C DIP Lenders (as defined in the DIP Credit Agreement), no Tranche C Increase Lender (as defined in the DIP Credit Agreement) shall provide a Tranche C Increase Commitment after the day which is thirty (30) days after the | DIP Credit Agreement, definition of the Tranche C Increase Commitment, schedule 1.1(e); Section 5.01(d) |

| | | |
|---|---|---|
| | Closing Date (as defined in the DIP Credit Agreement).[5] | |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | Pursuant to the Tranche C Interest Formula payable in kind and accruing as set forth in section 2.07(c) of the DIP Credit Agreement. For the purposes of the DIP Credit Agreement, the "<u>Tranche C Interest Formula</u>" shall mean the amount equal to interest at a rate of 14.5% per annum plus any applicable Default Interest (as defined in the DIP Credit Agreement), which amount shall be calculated on the basis of a 365-day year and actual number of days elapsed as though it had accrued daily and was capitalized quarterly to the principal amount of the Tranche C DIP Loans and be deemed to be a part of the principal amount of the Tranche C DIP Loans for all purposes hereof, commencing on and including the Closing Date and ending on (but not including) the last Business Day (as defined in the DIP Credit Agreement) of the third full calendar month thereafter, and subsequently, commencing on and including the last Business Day of the immediately preceding calculation period and ending on (but not including) the last Business Day of the third full calendar month thereafter. | Section 2.07(a)(iii); definition of "Tranche C Interest Formula" |
| **Collateral** Bankruptcy Rule 4001(c)(1)(B)(i) | As security for the Tranche C DIP Obligations, each of the Obligors grant for the benefit of the DIP Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all personal property of such Grantor including, but not limited to the following, in each case whether now or hereafter existing or in which any Grantor now has or hereafter acquires an interest and wherever the same may be located (all of which being hereinafter collectively referred to as the "<u>DIP Collateral</u>") (each as defined in the DIP Loan Documents): (a) Accounts; | Pledge and Security Agreement, Section 2.1; definition of "Excluded Assets" |

---

[5] The Debtors have engaged LarrainVial Servicios Profesionales Limitada, a Latin American financial services firm, as Latin American investment banker to help identify and evaluate, to the extent feasible, shareholder investors that are willing to participate in the Tranche C DIP Facility through a collective investment fund.

(b) Chattel Paper;

(c) Documents;

(d) Equipment

(e) General Intangibles (including, without limitations, routes, slots and gates);

(f) Instruments;

(g) Insurance;

(h) Intellectual Property and Intellectual Property Licenses;

(i) Investment Related Property (including, without limitation, Pledged Equity Interests and Deposit Accounts);

(j) Letter-of-Credit Rights;

(k) Money;

(l) Receivables and Receivable Records;

(m) Commercial Tort Claims now or hereafter described on Schedule 5.2;

(n) subject to the entry of a Final Order, the Proceeds of any Avoidance Actions brought pursuant to sections 502(d), 544, 545, 547, 548, 549 (except as set forth in clause (p) below), 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code;

(o) the Proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of the Collateral or post-petition transfer of Proceeds of the Loans;

(p) subject to the entry of a Final Order, the Obligors' rights under section 506(c) of the Bankruptcy Code and the Proceeds thereof;

(q) to the extent not otherwise included above, all other personal property of any kind and

all Collateral Records and Supporting Obligations relating to any of the foregoing;

(r) to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing; and

(s) to the extent not otherwise included above, all the foregoing rights, property, claims, and interests, without regard as to whether such rights, property, claims, and interests came into the Obligors' estates, or otherwise arose, after the Petition Date;

Notwithstanding the foregoing or anything herein to the contrary, in no event shall the Collateral include, or the security interest attach to, any Excluded Asset.

The term "Excluded Assets" shall mean:

(a)    (i) Aircraft (as defined in the DIP Credit Agreement) and (ii) Engines (as defined in the DIP Credit Agreement) located in such Aircraft (other than Pledged Engines (as defined in the DIP Credit Agreement)), whether leased or owned by any Obligor, as applicable, or any Affiliate (as defined in the DIP Credit Agreement) of any Obligor, and any related lease, sublease, license, contract or agreement to which any Obligor is a party, and any of its rights or interest thereunder;

(b)    any Avoidance Actions, but not any Avoidance Proceeds (each as defined below);

(c)    to the extent not covered in clause (a), any lease, sublease, license, contract or agreement to which any Grantor is a party, and any of its rights or interest thereunder, to the extent that the grant of a security interest therein (A) would violate any law, rule or regulation applicable to such Grantor, or (B) would, under the terms of such lease, sublease, license, contract or agreement existing on the Closing Date (as defined in the DIP Credit Agreement) or the time of entry of such lease, sublease, license, contract or agreement, violate or result in a breach under or invalidate such lease, sublease, license, contract or agreement, or require the consent of or create a right of termination in favor of any other party thereto (other than a Grantor) (unless such law, rule,

regulation, term, provision or condition would be rendered ineffective with respect to the creation of the security interest hereunder pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (the "UCC") (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity);

(d)    any governmental licenses or state or local franchises, charters and authorizations to the extent a security interest therein is prohibited by the terms thereof or requires consent (other than by a Grantor) (except to the extent such prohibition is ineffective under the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principle of equity);

(e)    any assets as to which the Borrower and the Collateral Agent reasonably determine that the cost or other consequences of obtaining a security interest therein are excessive in relation to the benefit to the DIP Secured Parties of the security to be afforded thereby;

(f)    any equity interest held by an Grantor (x) in any special purpose entity that exclusively owns or has an interest in any Excluded Asset specified in clause (a) above, related bank accounts and related assets or (y) in any entity in which such Grantor, together with any other Grantor, does not have a controlling interest and the pledge of which would violate, result in a breach under or require consent under an agreement (other than the consent of a Grantor) in respect thereof as to which the Grantor is a party.;

(g)    any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use", whereby such "intent-to-use" application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act with respect thereto (such application, an "ITU"); and

(h)    any Proceeds, products, receivables, substitutions or replacements of any of the foregoing;

(i)    provided that (i) Excluded Assets shall not include any Proceeds, products, substitutions or replacements of any Excluded Assets, unless such

| | | |
|---|---|---|
| | Proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets (it being understood that any Proceeds, products, substitutions or replacements of any Excluded Assets set forth in clause (a) of this definition shall in any case constitute Excluded Assets) and (ii) any Avoidance Proceeds shall not constitute Excluded Assets. | |
| **Superpriority Claim**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Each of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Obligors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (including adequate protection payments), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien (as defined in the DIP Credit Agreement), levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Obligors and all proceeds thereof (excluding Avoidance Actions but including any proceeds or property recovered, unencumbered, or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise) in accordance with the other DIP Loan Documents, subject only to the Carve-Out (as defined below). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if the Final DIP Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. | Section 3.01(d) |

| | | |
|---|---|---|
| | The DIP Superpriority Claims shall be subject to the following priority in payment (the "<u>DIP Superpriority Claims Waterfall</u>"): | |
| | 1)    First, DIP Superpriority Claims arising out of the Tranche A Obligations and Hedging Obligations (as defined in the DIP Credit Agreement), on a *pari passu* basis; | |
| | 2)    Second, DIP Superpriority Claims arising out of the Tranche B Obligations, if any; and | |
| | 3)    Third, DIP Superpriority Claims arising out of the Tranche C Obligations. | |
| | For the avoidance of doubt, no DIP Superpriority Claim subordinated to other DIP Superpriority Claims in the DIP Superpriority Claims Waterfall (each, a "<u>Subordinated DIP Superpriority Claim</u>", and together, the "<u>Subordinated DIP Superpriority Claims</u>") shall be entitled to payment by the Obligors, unless and until such preceding priority DIP Superpriority Claim has been Paid in Full. | |
| | The DIP Superpriority Claims shall survive any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases. | |
| | The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Obligors other than Excluded Assets. | |
| **Use of DIP Proceeds** Bankruptcy Rule 4001(c)(1)(B), | The Borrower shall use the proceeds from each DIP Loan (the "<u>DIP Loan Proceeds</u>") and Cash Collateral only (i) for working capital and general corporate purposes of the Obligors; (ii) for payment of Affiliate Costs and Expenses (as defined in the DIP Credit Agreement), (iii) for funding of Intercompany Affiliate Loans (as defined in the DIP Credit Agreement); (iv) for contributing equity to Affiliates in order to avoid their liquidation for having negative net equity, subject to the limitations set forth in Section 7.11 of the DIP Credit Agreement; (v) to pay interest, premiums, fees and expenses payable hereunder to the DIP Lenders and the | Section 2.06 |

| | | |
|---|---|---|
| | Agents as provided under the DIP Loan Documents and the Final DIP Order, including, but not limited to Section 11.04 of the DIP Credit Agreement; (vi) for provision of cash collateralization for Pre-Petition Letters of Credit, in a maximum aggregate amount up to $35 million (vii) for provision of cash collateralization for Post-Petition Letters of Credit (viii) to pay restructuring costs and Professional Fees of the Obligors, and fund the Carve-Out Account (as defined below) in accordance with the terms of the Final DIP Order (ix) to make adequate protection payments, if any, as approved by the Court, provided that such payments are included in the DIP Budget (x) to facilitate a Qualified Sale Leaseback Transaction (as defined in the DIP Credit Agreement); and (xi) for any other purpose approved by the Court in the Final DIP Order or other orders of the Court not inconsistent with the terms of this Agreement (collectively "<u>Permitted Uses</u>"). | |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(3); Local Rule 4001-2(a)(16) | The Obligors agree to pay on demand (i) all reasonable out-of-pocket fees, costs and expenses of the each of the Tranche C Initial Lenders and each DIP Agent in connection with the preparation, execution, delivery of the DIP Loan Documents (including, without limitation, all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses), including (x) the reasonable documented fees and expenses of one primary counsel and one local law counsel for each Tranche C Initial Lender and one documentation counsel for the Tranche C Initial Lenders collectively, and (y) the reasonable fees and expenses of each DIP Agent, in each case with respect thereto, and (ii) all reasonable out-of-pocket fees, costs and expenses of the Agent (including reasonable fees and expenses of counsel) and the reasonable documented fees and expenses of one primary counsel and one local law counsel (but no documentation counsel), for each Tranche C Initial Lender in connection with the administration, modification and amendment of, or any consent or waiver under, the DIP Loan | Section 2.10; 11.04(a) Final DIP Order, ¶ 28. |

Documents and the other documents to be delivered hereunder and with respect to advising the Tranche C Initial Lender and each DIP Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the DIP Loan Documents, with respect to negotiations with the Obligors or with other creditors of the Obligors or any of their Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto and (iii) all costs and expenses of each DIP Agent and each DIP Lender in connection with the enforcement of the DIP Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency, workout or restructuring or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for each DIP Agent and each DIP Lender with respect thereto).  Payment of such fees, expenses and disbursements shall be subject to the procedures set forth in the Final DIP Order.

Back-end Fee: On the repayment or prepayment in full of the Tranche C DIP Loans on the Maturity Date (as defined below) or otherwise, the Borrower shall become obligated to pay the Tranche C DIP Lenders a fee equal to 2.50% of such Tranche C DIP Lender's Tranche C DIP Commitments (the "Back-end Fee"), which fee shall be calculated on the basis of a 365-day year and actual number of days elapsed as though it had accrued daily and was capitalized quarterly to the principal amount of the Tranche C DIP Loans and be deemed to be a part of the principal amount of the Tranche C DIP Loans for all purposes hereof, commencing on and including the Closing Date and ending on (but not including) the last Business Day of the third full calendar month thereafter, and subsequently, commencing on and including the last Business Day of the immediately preceding calculation period and ending on (but not including) the last Business Day of the third full calendar month

thereafter. For the avoidance of doubt, if the full amount of the Tranche C DIP Loans are not repaid on the Maturity Date, the determination of the Back-end Fee will continue until such time as all such amounts have been repaid or prepaid in full.

Undrawn Commitment Fee. Upon repayment or prepayment in full of the Tranche C DIP Loans on the Maturity Date or otherwise, the Borrower shall become obligated to pay each Tranche C DIP Lender a fee equal to (i) the difference between (1) such Tranche C DIP Lender's Commitment and (2) such Tranche C DIP Lender's pro rata share of the aggregate principal amount of outstanding Tranche C DIP Loans, multiplied by (ii) 0.50% per annum, at the end of each month (the "Undrawn Commitment Fee"), which fee shall be calculated on the basis of a 365-day year and actual number of days elapsed as though it had accrued daily and was capitalized monthly to the principal amount of the Tranche C DIP Loans and be deemed to be a part of the principal amount of the Tranche C DIP Loans for all purposes hereof, commencing on and including the Closing Date and ending on (but not including) the last Business Day each fiscal month thereafter, and subsequently, commencing on and including the last Business Day of the immediately preceding calculation period and ending on (but not including) the last Business Day of full fiscal month thereafter.  For the avoidance of doubt, if the full amount of the Tranche C DIP Loans are not repaid on the Maturity Date and any Tranche C DIP Commitment remains undrawn, the determination of the Undrawn Commitment Fee will continue until such time as all such amounts have been repaid or prepaid in full, provided that, in all cases, upon the funding in full of the Tranche C DIP Commitments, no Undrawn Committee Fee will continue to accrue.

Administrative Agent Fees.  The Borrower shall pay to the Administrative Agent the fees set forth in that certain Administrative Agent Fee Letter dated as of the date of the DIP Credit Agreement between the Administrative Agent and the Borrower.

| | | |
|---|---|---|
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | The DIP Facility will mature on the earliest to occur of any of the following (the "Maturity Date"): (a) eighteen (18) months after the Closing Date (the "Initial Scheduled Maturity Date"), provided that, in the event that a Chapter 11 Plan has been confirmed but the Consummation Date has not occurred before the Initial Scheduled Maturity Date, the Borrower can elect to extend the Scheduled Maturity Date up to an additional sixty (60) days, at its discretion (the "Scheduled Maturity Date"); (b) the date of acceleration of any DIP Obligations under the DIP Facility pursuant to an Event of Default; (c) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Majority DIP Lenders; (d) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Majority DIP Lenders; (e) the date of consummation of a sale of all, substantially all or a material portion of the DIP Collateral, unless otherwise consented to in writing by the Majority DIP Lenders and (f) the Consummation Date (as defined in the DIP Credit Agreement) of any Chapter 11 Plan (as defined in the DIP Credit Agreement) confirmed in the Chapter 11 Cases. | DIP Credit Agreement, Definition of "Maturity Date" and "Scheduled Maturity Date" |
| **Financial Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | At all times, the Obligors shall maintain a Consolidated Liquidity of at least $300,000,000. | Section 6.18 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | In the case of the happening of any of the following events and the continuance thereof beyond the applicable grace period if any (each, an "Event of Default") and any such event that, unless cured or waived is, or with the passage of time or the giving of notice or both, would be an Event of Default (a "Default"):<br><br>(a)  *Failure of Representation or Warranty*.  Any representation or warranty made by any Obligor in the DIP Credit Agreement or in any other DIP Document shall prove to have been false or incorrect in any material respect when made and, in respect of any such incorrectness which is capable of remedy, such incorrectness shall continue | Section 8 |

unremedied for a period of thirty (30) days after the earlier of (i) written notice to the Borrower from the Administrative Agent or (ii) knowledge by an Officer of the Borrower, who becomes aware of such breach; or

(b)   *Payment Default*.  A default shall be made in the payment of (i) any principal of the DIP Loans, when and as the same shall become due and payable; (ii) any interest on the DIP Loan and such default shall continue unremedied for more than five (5) Business Days; or (iii) any other amount payable hereunder when due and such default shall continue unremedied for more than ten (10) Business Days after receipt of written notice to the Borrower from the Administrative Agent of the default in making such payment when due; or

(c)   *Certain Covenant Default*.  A default shall be made by any Obligor in the due observance of the covenants contained in Section 6.01, Section 6.04(1) (with respect to such Obligor's obligation to maintain its existence), Section 6.15, Section 6.18 or Section 7 of the DIP Credit Agreement (provided that (i) the Obligors shall have a five (5) day period to cure any default with respect to Section 6.18 of the DIP Credit Agreement and (ii) in respect to any default that is capable of remedy, a seven (7) day period to cure any default with respect to Section 7 of the DIP Credit Agreement). For the avoidance of the doubt, this Event of Default shall include any default in observance or performance of the affirmative covenant in Section 6.15 regarding assumption of the Framework Agreement and Trans-American Joint Venture Agreement (each as defined in the DIP Credit Agreement); or

(d)   *Covenant Default*.  A default shall be made by any Obligor in the due observance or performance of any other covenant, condition or agreement to be observed or performed by it pursuant to the terms of the DIP Credit Agreement or any of the other DIP Loan Documents and such default shall continue unremedied for more than thirty (30) days after the earlier of (i) receipt of written notice by the Borrower from the Administrative Agent of

such default or (ii) any Officer of the Borrower becomes aware of such default; or

(e)    *Unenforceability/Liens*. (A) any material provision of any DIP Document to which any Obligor is a party ceases to be a valid and binding obligation of such Obligor, or any Obligor shall so assert in any pleading filed in any court (B) a material portion of the guarantees by the Guarantors shall cease to be in full force and effect or (C) the DIP Liens on any material portion of the DIP Collateral intended to be created by the DIP Loan Documents shall cease to be or shall not be a valid and perfected Lien (as defined in the DIP Credit Agreement) to the extent required by the Final DIP Order and the DIP Loan Documents having the priorities required by the DIP Credit Agreement or thereby (except as permitted by the terms of the DIP Credit Agreement or other Collateral Documents (as defined in the DIP Credit Agreement)); or

(f)    *Judgments*.  Entry of judgment(s) by a court or courts of competent jurisdiction arising after the Petition Date aggregating in excess of $50,000,000 (determined net of amounts covered by insurance policies issued by creditworthy insurance companies (and as to which the applicable insurance company has not denied coverage) or by third party indemnities or a combination thereof), shall be entered or filed against any Obligor, which judgments are not paid, discharged, bonded, satisfied or stayed for a period of sixty (60) days; or

(g)    *Change of Control*. A Change of Control (as defined below) shall occur;

(h)    *Dismissal; Conversion; Appointment of Trustee*.  (i) Any of the Chapter 11 Cases of the Obligors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Obligors shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case of any Obligor under Section 1112 of the Bankruptcy Code or otherwise, or seeking the conversion of any such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, without Payment in Full (as defined in the DIP Credit Agreement) all DIP

Obligations thereunder and immediate termination of all DIP Commitments or (ii) a trustee, interim receiver, receiver or manager shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases of the Obligors; or

(i)    *Chilean Liquidation Event*.  The commencement of a Chilean liquidation procedure, excluding appeals, against the Obligors, which has not been stayed, suspended or dismissed within sixty (60) days, in which a liquidator is appointed according to Chapter IV of the Chilean Insolvency and Reorganization Act (Law 20,720) (the "Chilean Liquidation Event"); for the avoidance of doubt, the commencement and/or existence of a Chilean Local Reorganization Proceeding commenced by any of the Obligors in reaction to a Chilean Liquidation Event shall not be an Event of Default hereunder; or

(j) *Insolvency Proceeding or Liquidation Event*. The commencement of a liquidation or similar event or procedure in any of the Foreign Cases (as defined in the DIP Credit Agreement) against the Obligors, in which a liquidator or similar entity is appointed according to the debtor insolvency laws applicable in any jurisdiction in which a Foreign Case has been commenced and which has not been stayed, suspended or dismissed within sixty (60) days; or

(k)    *Bankruptcy Events*. (i) Any order of the Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Final DIP Order or any Obligor shall apply for the authority to do so, in each case in a manner that is adverse in any respect to the DIP Agents or the DIP Lenders (as defined in the DIP Credit Agreement), without the prior written consent of the Administrative Agent and the Majority DIP Lenders; (ii) the Final DIP Order shall cease to be in full force and effect; (iii) any of Obligors shall

fail to comply with the Final DIP Order in any material respect; (iv) the entry of an order in the Chapter 11 Cases with respect to any Obligor seeking to obtain financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Facility, any Permitted Sale Lease Back or any Indebtedness (each as defined in the DIP Credit Agreement) permitted under the definition of Permitted Indebtedness clause (l) of the DIP Credit Agreement); (v) an order of the Bankruptcy Court shall be entered avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations owing under the DIP Credit Agreement; (vi) (A) an application shall be filed by any Obligor for the approval of, or an order of the Court shall be entered granting, any other Liens in any of the Chapter 11 Cases of the Obligors that are *pari passu* with or senior to the DIP Liens on the DIP Collateral, other than the Carve-Out, Liens permitted by Section 7.03 of the DIP Credit Agreement, or Liens expressly permitted in the Final DIP Order to be senior to or *pari passu* with the DIP Liens or (B) any claims (as such word is defined in the Bankruptcy Code) senior to or *pari passu* with the claims (as such word is defined in the Bankruptcy Code) of the DIP Secured Parties (as defined in the DIP Credit Agreement) (other than the Carve-Out or claims in respect of Indebtedness related to any Permitted Sale Leaseback or Indebtedness permitted under the definition of Permitted Indebtedness subclauses (e) and (l), or expressly permitted in the Final DIP Order to be senior to or *pari passu* with the claims of the DIP Secured Parties) against the Obligors; (vii) any Obligor makes any payments of principal or interest or otherwise on account of any Pre-Petition Indebtedness other than (A) payments authorized by the Bankruptcy Court in respect of "first day orders" or other orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Majority DIP Lenders, (B) payments with respect to the termination of aircraft finance leases, tax leases or operating leases, (C) adequate protection payments as permitted hereunder and approved by the Court and (D) payments with respect to any

Indebtedness in connection with any Qualified Sale Leaseback Transaction; (viii) the Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Obligors that have an aggregate value in excess of $5,000,000 or to permit other actions against any assets of the Obligors that would have a Material Adverse Effect (as defined in the DIP Credit Agreement); (ix) an order shall be entered by the Bankruptcy Court terminating any of the Obligor's exclusive periods for proposing a Chapter 11 Plan; (x) an order shall be entered by the Bankruptcy Court confirming a Chapter 11 Plan other than a Company Approved Reorganization Plan (as defined in the DIP Credit Agreement); (xi) any of the DIP Collateral shall be subject to surcharge under Section 506(c) of the Bankruptcy Code or otherwise; (xii) (A) the filing by any Obligor of a motion, pleading or other proceeding that would reasonably be expected to have a Material Adverse Effect on the rights or interests of the DIP Lenders (as defined in the DIP Credit Agreement) and such motion, pleading or proceeding shall not be withdrawn or dismissed before the Bankruptcy Court approves such motion, pleading or proceeding or (B) a determination by a court of competent jurisdiction with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; (xiii) any order, resolution, judgment, injunction, stay or the like is entered in any of the Foreign Cases (as defined in the DIP Credit Agreement) that prevents, restricts or limits any of the Obligors from satisfying and/or performing all of the obligations, other than non-material obligations, required of such Obligor(s) under the DIP Credit Agreement; or (xiv) any of the Obligors shall file or support any pleading seeking relief the grant of which would give rise to an Event of Default. or

(l)    *Bankruptcy Milestones*.  The failure to meet the Bankruptcy Milestones (as defined below) as described in Section 6.17 of the DIP Credit Agreement; or.

(m) *Support of Contesting Claims.* Any Obligor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Obligor) any other Person's motion to, disallow in whole or in part the DIP Lenders' or DIP Agents' claims in respect of the DIP Obligations or contest any provision of any DIP Document or any material provision of any DIP Document shall cease to be effective (other than in accordance with its terms); or

(n)    *Default Under Other Agreements.* (1) Any Obligor shall fail to pay when due (after giving effect to any applicable grace periods) any principal installment of or interest on any of its Indebtedness that is not Stayed (as defined below) (other than the DIP Loans) which amount then due exceeds in the aggregate $50,000,000, (2) any Obligor shall default in the performance of any obligation relating to any Indebtedness of the Obligors that is not Stayed (other than the DIP Loans) outstanding under one or more agreements of the Obligors that results in such Indebtedness coming due prior to its scheduled final maturity date in an aggregate principal amount at any single time unpaid exceeding $50,000,000 or (3) the Obligors shall default in the payment of the outstanding principal amount due on the scheduled final maturity date of any Indebtedness outstanding under one or more agreements of the Obligors that is not Stayed, in an aggregate principal amount at any single time unpaid exceeding $50,000,000; provided that, no Event of Default shall result under this clause (m) as a result of the acceleration of any such Indebtedness as a result of the Chapter 11 Case that is not Stayed (for the purposes of Section 8.01(m) of the DIP Credit Agreement, the term "Stayed" means a stay issued by the Bankruptcy Court in the Chapter 11 Cases, whether or not such Chapter 11 Cases are recognized by a foreign jurisdiction); or

(n)       *Benefit Plans.* (i) Any event or circumstance shall have occurred with respect to any Benefit Plans (as defined in the DIP Credit Agreement) which has resulted or could reasonably

be expected to result in liability of the Borrower and the Obligors in an aggregate amount in excess of $50,000,000, or (ii) the Borrower or any Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment in an aggregate amount in excess of $50,000,000 with respect to its withdrawal liability under any Benefit Plan; then, and in every such event and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of, collectively, the Majority Tranche A Lenders, the Majority Tranche B Lenders (each as defined in the DIP Credit Agreement), if any, and the Majority Tranche C DIP Lenders (as defined in the DIP Credit Agreement) (except with respect to a default under Section 6.15 of the DIP Credit Agreement, upon which the Administrative Agent shall act at the request of solely the Majority Tranche C DIP Lenders), shall take one or more of the following actions, at the same or different times:

(i)    terminate forthwith the DIP Commitments;

(ii)   declare the DIP Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of the DIP Loans and other DIP Obligations together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other DIP Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other DIP Document to the contrary notwithstanding; and

(iii) upon five (5) business days' written notice to the Obligors from the Collateral Agent, in its sole and absolute discretion, the automatic stay of Section 362 (and of any other Section of the Bankruptcy Code) shall be terminated in all respects without further order of the Bankruptcy Court (or any other court), without the need for filing any motion for relief from the automatic stay or any other pleading, to permit the exercise of any

| | | |
|---|---|---|
| | and all rights and remedies under the DIP Loan Documents, the Final DIP Order, and under applicable law available to the Administrative Agent and the DIP Lenders, <u>provided</u> <u>that</u>, prior to such five (5) day period, the Collateral Agent and the DIP Lenders shall not take any enforcement action with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral). Any payment received as a result of the exercise of remedies hereunder shall be applied in accordance with Section 2.20(b) of the DIP Credit Agreement. | |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | Loan Parties shall comply with following deadlines ("<u>Bankruptcy Milestones</u>") including the following:<br><br>(a) The Bankruptcy Court shall have entered the Final DIP Order, which shall, among other things, provide for the treatment of the DIP Obligations of the Tranche C DIP Lenders consistent with the terms and conditions of the DIP Loan Documents, in form and substance reasonably acceptable to the Tranche C Initial Lenders (as defined in the DIP Credit Agreement), no later than seventy-five (75) days after the Petition Date;<br><br>(b) The Obligors shall file a Chapter 11 Plan, which shall be an Company Approved Reorganization Plan (as defined in the DIP Credit Agreement), no later than a date to be determined<br><br>(c) The Bankruptcy Court shall have entered an order approving the disclosure statement for the Company Approved Reorganization Plan (as defined in the DIP Credit Agreement), which shall, among other things, provide for the treatment of the DIP Obligations of the Tranche C DIP Lenders consistent with Section 2.12, and which disclosure statement shall be reasonably acceptable to the Majority DIP Lenders, no later than a date to be determined; and | Section 6.17 |

| | | |
|---|---|---|
| | (d) The Bankruptcy Court shall have entered an order confirming the Company Approved Reorganization Plan no later than thirty (30) days prior to the Scheduled Maturity Date. | |
| **Carve Out** Bankruptcy Rule 4001(b)(1)(B)(iii)' Local Rule 4001-2(a)(5) | The Debtors' obligations to the DIP Agents, the Tranche C DIP Lenders and the Prepetition Secured Parties (as defined in the Final DIP Order) and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Secured Credit Documents (as defined in the Final DIP Order), including the DIP Liens, the Tranche C Superpriority Claims, and the Permitted Priority Liens, shall be subject in all respects and subordinate to the Carve Out.<br><br>(A) The "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>" and such fees the "<u>Allowed Debtor Professional Fees</u>") at any time before or on the first business day following delivery by the Administrative Agent (at the direction of the Majority DIP Lenders (as defined in the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined herein) whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) incurred by persons or firms | Final DIP Order, ¶¶ 10-17. |

retained by the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and together with the Allowed Debtor Professional Fees, the "Allowed Professional Fees" and such fees the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the Administrative Agent (at the direction of the Majority DIP Lenders (as defined in the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined herein) whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (v) Allowed Debtor Professional Fees incurred after the first business day following delivery by the DIP Agents (at the direction of the Majority DIP Lender) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount to be agreed and (vi) Allowed Committee Professional Fees incurred after the first business day following delivery by the DIP Agents (at the direction of the Majority DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount to be agreed (the amounts set forth in clauses (v and vi) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by either of the DIP Agents (at the direction of the Majority DIP Lenders) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Tranche C DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(B) Carve-Out Account and Carve-Out Reserves. The Debtors shall establish and fund a segregated account (the "Carve-Out Account") for purposes of funding the Carve Out.  Upon entry of this Final DIP Order, the Carve-Out Account will be funded

from the Debtors' operating account. Notwithstanding anything to the contrary in this Final DIP Order, the DIP Loan Documents, or the Prepetition Secured Credit Documents, under no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Loan Documents), shall the Debtors be prohibited in any way from accessing or drawing upon their main operating account for the purpose of funding the Carve-Out Account. Commencing upon the earlier of (A) the first last day of the month or (B) the first 15th day of the month, in each case after the Closing Date, the Debtors shall deposit in the Carve-Out Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following two-week period in the DIP Budget plus twenty percent (20%) of such aggregate amount of Allowed Professional Fees projected to accrue in the next two week period in the DIP Budget (the "Bi-Weekly Funded Reserve Amount").  Each Professional Person shall deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding two-week period (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Bi-Weekly Funded Reserve Amount for the applicable periods, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Carve-Out Account equal to the difference between the Bi-Weekly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").  At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person and is then due and payable, the Debtors shall deposit in the Carve-Out Account an amount equal to such fee.  Upon entry of the Final DIP Order, the Debtors shall deposit into the Carve-Out Account an amount equal to (i) the Post-

Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under paragraph A(i) and (ii) above. The Carve-Out Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Carve Out Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Secured Credit Documents or DIP Loan Documents and neither the Prepetition Secured Parties, the Tranche C DIP Lenders nor the DIP Agents shall be entitled to sweep or foreclosure on such amounts notwithstanding any provision to the contrary in the Prepetition Secured Credit Documents or DIP Credit Documents. Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Carve-Out Account.

(C) On the day on which a Carve Out Trigger Notice is delivered by the Administrative Agent (at the direction of the Majority DIP Lenders) or the ABL Agent to the Debtors in accordance with paragraph 11 of the Final DIP Order, with a copy to counsel to the Creditors' Committee, and the U.S. Trustee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; provided that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Debtors that cover such Professional Person's good faith estimate of the Allowed Professional Fees incurred through the Termination Declaration Date, and the Debtors shall fund into the Funded Reserve Amount any Top Off Amounts.  The Debtors shall deposit and hold such amounts in the Carve-Out Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the

Termination Declaration Date, the Carve Out
Trigger Notice shall also constitute a demand to the
Debtors to utilize all cash on hand as of such date
and any available cash thereafter held by any
Debtor, including cash collateral, after funding the
Pre-Carve Out Trigger Notice Reserve, to fund a
reserve in an amount equal to the Post-Carve Out
Trigger Notice Cap to the extent not already funded
(including upon entry of the Final DIP Order as set
forth above). The Debtors shall deposit and hold
such amounts in a segregated account at an
institution designated by the DIP Agents (at the
direction of the Majority DIP Lenders) in trust to
pay such Allowed Professional Fees benefiting
from the Post-Carve Out Trigger Notice Cap (the
"Post-Carve Out Trigger Notice Reserve" and,
together with the Pre-Carve Out Trigger Notice
Reserve, the "Carve Out Reserves") prior to any
and all other claims. All funds in the Pre-Carve Out
Trigger Notice Reserve shall be used first to pay
the obligations set forth in clauses (i) through (iii)
of the definition of Carve Out set forth above (the
"Pre-Carve Out Amounts"), but not, for the
avoidance of doubt, the Post-Carve Out Trigger
Notice Cap, until paid in full, and then, to the
extent the Pre-Carve Out Trigger Notice Reserve
has not been reduced to zero, to pay the DIP
Agents for the benefit of itself and the Tranche C
DIP Lenders  in accordance with their pro rata
funding of the Carve Out Reserves. All funds in the
Post-Carve Out Trigger Notice Reserve shall be
used first to pay the obligations set forth in clause
(iv) of the definition of Carve Out set forth above
(the "Post-Carve Out Amounts"), and then, to the
extent the Post-Carve Out Trigger Notice Reserve
has not been reduced to zero, to pay the DIP
Agents for the benefit of itself and the Tranche C
DIP Lenders, unless the Tranche C DIP
Obligations have been indefeasibly paid in full, in
cash (or other form of payment pursuant to
paragraph 27 of the Final DIP Order), and all
commitments under the Tranche C DIP Facility
have been terminated, in which case any such
excess shall be paid to the Prepetition Secured
Parties in accordance with their rights and priorities
as set forth herein. Notwithstanding anything to the

contrary in the DIP Loan Documents, or this Final DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph C, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph C prior to making any payments to the DIP Agents (for the benefit of themselves and the Tranche C DIP Lenders) and the Prepetition Secured Parties, as applicable.

(D) Notwithstanding anything to the contrary in the DIP Loan Documents or this Final DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agents (at the direction of the Majority DIP Lenders) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Final DIP Order, (i) disbursements by the Debtors from the Carve Out Account shall not constitute a Tranche C DIP Loan or increase or reduce the Tranche C DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Final DIP Order, the DIP Loan Documents, or in any Prepetition Secured Credit Documents, the Carve Out as provided for and capped by the Final DIP Order shall be senior to all liens and claims securing the Tranche C DIP Facility, the Permitted Priority Liens, and the Superpriority Claims, and any and all other forms of liens, or

| | | |
|---|---|---|
| | claims securing the Tranche C DIP Obligations or the Prepetition Secured Credit Documents. Notwithstanding the foregoing, the Tranche C DIP Lenders reserve all rights to challenge or otherwise object to any of the fees or expenses sought to be approved by any of the Professional Persons.<br><br>(E) *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Carve-Out Account.<br><br>(F) *No Direct Obligation To Pay Allowed Professional Fees*. None of the DIP Agents, Tranche C DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment of reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final DIP Order or otherwise shall be construed to obligate the DIP Agents, the Tranche C DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.<br><br>(G) *Payment of Carve Out On or After the Termination Declaration Date*. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. | |
| **Entities with Interest in Cash Collateral** Bankruptcy Rule 4001(b) | Citi Bank N.A. has asserted approximately $3.7 million as cash collateral for the RCF Facility. | Interim Cash Management Order, ECF No. 49, ¶6 |
| **Waivers/ Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of Bankruptcy Code section 362 or otherwise are vacated and modified to the extent necessary, subject to the intercreditor provisions in Section 3.04 of the DIP Credit Agreement to permit the DIP | Final DIP Order, ¶¶19(b), 38. |

Agents and the Tranche C DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (subject to applicable grace periods) or the Maturity Date (as defined in the DIP Credit Agreement), all rights and remedies under the DIP Loan Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default (subject to any applicable grace periods) and the giving of five (5) business days' prior written notice to the Debtors (with the Debtors to promptly provide a copy to the UCC, counsel to any other statutory committee, the United States Trustee, the Prepetition Secured Parties and each of their counsel) to the extent provided for in any DIP Document, all rights and remedies against the DIP Collateral provided for in any DIP Document (including without limitation, to the extent applicable, the right to set off against any accounts maintained by the Debtors with the DIP Agents or any DIP Lender or any affiliate thereof) and provided that, upon the receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business and with respect to the Carve-Out as provided in the Final DIP Order, but may not disburse any other amounts.  In no event shall the DIP Agents or the Tranche C DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The delay or failure to exercise rights and remedies under the DIP Loan Documents or this Final DIP Order by the DIP Agents or any Tranche C DIP Lenders shall not constitute a waiver of the DIP Agents' or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Loan Documents.

To the extent not otherwise provided, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code shall be modified pursuant to the Final DIP Order as necessary

| | | |
|---|---|---|
| | for the relevant parties to effectuate all of the terms and provisions of the Final DIP Order. | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower shall indemnify each DIP Agent and each DIP Lender, and each Related Party (as defined in the DIP Credit Agreement) of any of the foregoing Persons (as defined in the DIP Credit Agreement) (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee, arising out of, in connection with, or as a result of any actual or prospective claim, litigation, investigation or proceeding, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto and whether or not any such claim, litigation, investigation or proceeding is brought by the Borrower, its equity holders, its Affiliates (as defined in the DIP Credit Agreement), its creditors or any other Person (including any investigating, preparing for or defending any such claims, actions, suits, investigations or proceedings, whether or not in connection with pending or threatened litigation in which such Indemnitee is a party), relating to (i) the execution or delivery of the DIP Credit Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any DIP Loan or the use of the proceeds therefrom or (iii) any actual or alleged presence or Release of Hazardous Materials (as defined in the DIP Credit Agreement) on or from any property owned or operated by the Borrower or any of its Subsidiaries (as defined in the DIP Credit Agreement), or any Environmental Liability (as defined in the DIP Credit Agreement) related in any way to, or asserted against, the Borrower or any of its Subsidiaries; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available (x) to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by | DIP Credit Agreement, Section 11.04(b), (e) |

final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee.

In the event of any claim under the DIP Credit Agreement or under any other DIP Document against the Borrower or other Grantor (as defined in the DIP Credit Agreement) in respect of Taxes (as defined in the DIP Credit Agreement) attributable to or arising out of the use, operation, ownership or possession of the DIP Collateral ("Collateral Taxes"), the relevant Indemnitee shall within forty-five (45) calendar days of the date such Indemnitee has received written notification of such claim, give the Borrower written notice of such claim; provided that, a failure to give such notice in a timely manner shall not preclude a claim for indemnification under the DIP Credit Agreement, except to the extent such failure precludes the Borrower's right to contest such claim and such failure is not the result of the action or omission of the Borrower.  If the Borrower so requests in writing within thirty (30) calendar days after receipt of such notice, the Indemnitee shall consult with the Borrower to consider what action may be taken to resist payment of the relevant Collateral Taxes, and following such consultation the Indemnitee shall take all reasonable action as determined in the Indemnitee's reasonable sole discretion in the name of the Indemnitee to contest the claim in the name of the Indemnitee or, if permitted by applicable law to be contested in the Borrower's name, allow the Borrower at Borrower's expense to contest in the name of the Borrower, in which case the Borrower shall control the contest; provided that the following conditions are met:

(i)      the Indemnitee shall have received adequate provision satisfactory to it for such claim and any liability, expense or loss arising out of or related to such contest (including without limitation indemnification for all costs, expenses, losses, reasonable legal and accounting fees and disbursements, penalties and interest);

|  | (ii)    the contest will not result in any material danger of the sale, forfeiture or loss of, or the creation of any Lien (as defined in the DIP Credit Agreement) on, the DIP Collateral;<br><br>(iii)    the contest does not involve any risk of criminal or any material risk of civil liability against the Indemnitee;<br><br>(iv)    if such contest shall be conducted in a manner requiring the payment of the claim, the Borrower shall have paid such claim to the extent required;<br><br>(v)    no Event of Default shall have occurred and be continuing;<br><br>(vi)    the Indemnitee shall have received a legal opinion (at the expense of the Borrower) from counsel selected by the Borrower (and reasonably satisfactory to such Indemnitee) indicating that there is a reasonable basis for contesting such Taxes; and<br><br>(vii)    the Indemnitee has not determined that the proposed actions to contest such claim give rise to a material risk of creating a local franchise issue of the Tax Indemnitee (e.g. material adverse publicity or material impairment of the Tax Indemnitee's relationship with local regulators) or impairing the status of other open Tax matters (e.g. Tax audits) between the Indemnitee and the relevant taxing authorities.<br><br>Unless one of the conditions enumerated in paragraphs (i) through (vii) above shall cease to be satisfied, the Indemnitees shall not settle any claim in respect of Collateral Taxes without the prior written consent of the Borrower, which consent shall not be unreasonably withheld or delayed.<br><br>The agreements in section 11.04 of the DIP Credit Agreement shall survive the repayment of the DIP Loans and all other amounts payable hereunder. |  |
| **Provisions Deeming** | None |  |

| | | |
|---|---|---|
| **Prepetition Debt to be Postpetition Debt**<br><br>Local Rule 4001- 2(a)(7) | | |
| **Priming Liens and Adequate Protection**<br><br>Local Rule 4001- 2(a)(4) | None | |
| **Change in Control Provisions**<br><br>Local Rule 4001- 2(a)(11) | Change of control is an Event of Default<br><br>"<u>Change of Control</u>" shall mean the occurrence of one or more of the following events: (i) the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders (as defined in the DIP Credit Agreement) is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock (as defined in the DIP Credit Agreement) of the Borrower, (ii) any sale, lease, exchange or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the assets of the Borrower and the Grantors, taken as a whole, to any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), to any transferee Person other than the Permitted Holders (as defined in the DIP Credit Agreement); provided a Change of Control shall not be triggered under this clause (ii) as a result of a transfer of all or substantially all of the Obligors' assets in connection with a Company Approved Reorganization Plan (as defined in the DIP Credit Agreement), or (iii) the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means) as a result of which any "person" or "group" other than the Permitted Holders (as | Section 8.01(g) |

| | | |
|---|---|---|
| | defined in the DIP Credit Agreement) becomes a "controller" of the Borrower in the meaning set forth in Article 97 and 99 of the Chilean Securities Market Act (as defined in the DIP Credit Agreement); provided, however, no Change of Control shall occur as a result of a share transfer by a Tranche C Lender in violation of Section 2.12(b)(i) of the DIP Credit Agreement. | |
| **Prepayment Penalty**<br><br>Local Rule 4001-2(a)(13) | None | |
| **Joint Liability of the Debtors**<br>Local Rule 4001-2(a)(14) | The DIP Obligations shall constitute allowed superpriority administrative expense claims against the Obligors on a joint and several basis. | Section 3.01(d) |
| **Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(15) | Subject to the approval of the Bankruptcy Court, the Obligors may enter into intercompany loans from the Obligors to non-debtor Affiliates to the extent constituting Pledged Debt, on terms reasonably acceptable to the Administrative Agent and the Majority DIP Lenders ("Intercompany Affiliate Loans").<br><br>Proceeds of the DIP Loan may also be used to fund Affiliate Costs and Expenses (as defined in the DIP Credit Agreement). | DIP Credit Agreement, Sections 2.06, 7.02 |
| **Conversion of Tranche C DIP Obligations to Equity** | Notwithstanding anything else in the DIP Credit Agreement or the DIP Loan Documents, (i) with respect to any repayment or prepayment of the Tranche C DIP Obligations on the Maturity Date or otherwise (except to the extent of any prepayment conducted in accordance with Section 2.13(a) of the DIP Credit Agreement), each of the Tranche C DIP Lenders may elect to subscribe and pay for new shares of common stock of LATAM (the "New Shares") immediately upon any repayment or prepayment of the Tranche C DIP Obligations on the Maturity Date or otherwise, in accordance with the procedures and subject to the terms and conditions set forth on Schedule 2.12(a) of the DIP Credit Agreement (the "Equity Subscription"). | Section 2.12 and Schedule 2.12(a) |

<u>Tranche C Covenants</u>. Each Tranche C Lender holding equity of LATAM (each, a "<u>Tranche C Shareholder</u>") agrees to:

(i)     not sell or transfer (but may pledge) any or all of such equity for the duration of the Chapter 11 Cases except (i) after the occurrence of an Event of Default or (ii) to a Tranche C Eligible Assignee (as defined in the DIP Credit Agreement) provided that, to the extent the Consummation Date (as defined in the DIP Credit Agreement) would fall on or after December 15 of any year (and prior to January 1 of the following year) the Borrower will use commercially reasonable efforts to assist any lender that is a Tranche C Lender on the Closing Date in avoiding adverse tax impact, and in connection may agree to release such Tranche C DIP Lender in whole or in part from the restriction contained in Section 12(b)(i) during such time period; and.

(ii)    participate in the shareholders meeting of LATAM and, in its capacity as shareholder, provided the Chapter 11 Plan is a Company Approved Reorganization Plan (each as defined in the DIP Credit Agreement), to (1) take all necessary corporate action under Chilean law to effectuate the Chapter 11 Plan; (2) approve the requisite capital increase, including the amount of the capital increase and the number of New Shares to be authorized and issued (which shall be an amount sufficient to effectuate in full the Equity Subscription), and the subscription mechanics after the expiration of the Rights Offering, to effectuate the Equity Subscription and the Chapter 11 Plan; (3) grant a 180-day term delegation for the pricing of the New Shares to the Board of Directors of LATAM which shall be consistent with the Chapter 11 Plan and the DIP Credit Agreement, and (4) waive in full such Tranche C Shareholder's preemptive rights in the Rights Offering (as

defined in Schedule 2.12(a)) no later than the last day of the Rights Offering and permit the Board of Directors of LATAM to place New Shares that remain unsubscribed following the expiration of the Rights Offering (as defined in Schedule 2.12(a)) to effectuate the Equity Subscription.

The obligations contained in Section 2.12(b)(i) and (ii) of the DIP Credit Agreement will be an independent obligation of each Tranche C Shareholder and shall survive any assignment by (or participation of) a Tranche C Shareholder of its portion of the DIP Loans. Tranche C Shareholders shall be entitled to advocate alongside LATAM in support of any Chapter 11 Plan valuation proposed by LATAM. No Tranche C Lender shall be bound in its capacity as shareholder by any prior actions taken under Section 2.12(b)(ii) of the DIP Credit Agreement with respect to a Company Approved Reorganization Plan in the event a Company Approved Reorganization Plan is not confirmed pursuant to an order of the Bankruptcy Court.

In each case, the Equity Subscription Election shall be subject to the payment of additional interest that would equate the greater of : (a) 47.0588235294118% and (b) an amount of interest amount that would correspond to the discount to Final Plan Valuation percentage provided to any other parties in any other equity issuance (such discount, the "Subscription Contingent Interest"),

No more than twenty days, and not less than 10 days prior to the Plan Filing Date (as defined in the DIP Credit Agreement, LATAM will deliver updated valuation materials and additional Chapter 11 Plan materials, including the Disclosure Statement, and material exhibits to the Chapter 11 Plan, including precedent transactions, public equity multiples and discounted cash flows ("Final Valuation Materials") to the Tranche C DIP Lenders.

Three (3) days after receipt of the Final Valuation Materials, the Tranche C DIP Lenders shall deliver notice (the "Election Subscription Notice") to

LATAM of their election to receive (a) cash to subscribe the New Shares under the Equity Subscription pursuant to the Equity Subscription Election or (b) cash pursuant to a repayment in cash only, upon the Plan Effective Date, which notice, once provided shall be irrevocable unless there is a "Material Valuation Change" or a "Material Plan Change" (each, as defined below).

Provided there has been no (x) Material Valuation Change (as defined below) or (y) any material change to the Chapter 11 Plan, the Disclosure Statement, the material exhibits to the Chapter 11 Plan and Disclosure Statements and the Final Valuation Materials (collectively, the "Plan Materials") that would require re-solicitation once the Plan Solicitation (as defined below) has commenced (any such material change, a "Material Plan Change"), LATAM's obligations under the DIP Credit Agreement regarding the delivery of satisfactory information to the Tranche C DIP Lenders in order for them to make an election decision shall be satisfied upon delivery of such information.

Depending upon the aggregate amount of Tranche C Commitment, if Tranche C DIP Lenders holding a certain percentage or more of the Tranche C DIP Loans elect to receive cash to subscribe the New Shares under the Equity Subscription, then all Tranche C Lenders shall be deemed to have elected to receive cash to subscribe the New Shares under the Equity Subscription on the same terms as following:

| Tranche C Commitment | Percentage Election |
|---|---|
| ≤$900,000,000 | 75% |
| > $900,000,000 and ≤$1,150,000,000 | 75% |

"Final Plan Valuation" shall mean the reorganized equity valuation proposed by the Company (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement and

| | | |
|---|---|---|
| | Schedule 2.12(a) thereof in connection with the Chapter 11 Plan prior to any objections thereto in the Chapter 11 Cases.<br><br>"Material Valuation Change" shall mean any change to the reorganized equity valuation that results in a difference (in either an increase or a decrease) of 10% or more from the Final Plan Valuation.  LATAM shall provide prompt notice of any Material Valuation Change or any Material Plan Change, and each Tranche C DIP Lender shall have (three) 3 Business Days[6] to modify its election after receipt of such notice. | |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | The Final DIP Order shall include waivers of the Loan Parties' rights under section 506(c) of the Bankruptcy Code.  In no event shall the Tranche C DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. | Final DIP Order, ¶ 21 |
| **Section 552(b)(1) Waiver** | The Final DIP Order shall include waivers of the Loan Parties' rights under section  552(b) of the Bankruptcy Code. In no event shall the Tranche C DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. | Final DIP Order, ¶ 22 |

## **PREPETITION INDEBTEDNESS**

17.    A description of the Debtors' capital structure is set forth in the First Day Declaration.  A chart setting forth a summary of the outstanding amounts under each facility as of the Petition Date is attached hereto as Annex 1.  As explained in the First Day Declaration, as of the Petition Date, LATAM has a total of $7.57 billion in financial debt obligations, $457 million of which is contracted by Tam Linhas Aéreas S.A. ("LATAM Airlines Brazil"), a non-Debtor affiliate.

---

[6] For the avoidance of doubt, this date is provided merely for illustrative purposes, does not reflect the input of all relevant creditor constituencies and other stakeholders, and remains subject to change. Failure to comply with this date shall in no event constitute an Event of Default.

18.     As disclosed above, through the Final DIP Order and the DIP Loan Documents, the Debtors do not seek to prime any valid, perfected and unavoidable liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code (such liens, the "Permitted Priority Liens").  For the avoidance of doubt, nothing in the Final DIP Order shall be deemed an admission or denial by the Debtors or any other party as to the validity, extent or priority of any lien of the Prepetition Secured Parties (as defined below).  The Debtors will not stipulate to the validity or enforceability of any claims for the payment of any so-called "make-whole" prepayment, applicable premium, or optional redemption premium provided by the Prepetition Secured Credit Documents (as defined below), and all persons' rights related thereto are expressly reserved.  All rights with respect to the foregoing will be expressly reserved.

19.     The Permitted Priority Liens include, but are not necessarily limited to, the liens granted in connection with:

(a)     That certain Credit and Guaranty Agreement dated as of March 29, 2016 (as may be amended, restated, supplemented or otherwise modified from time to time, the "RCF Credit Agreement"), by and among, for LATAM, LATAM Parent, acting through its Florida branch, as borrower, and non-Debtor LATAM Airlines Brazil, Transporte Aéreo S.A., Lan Cargo S.A., Tordo Aircraft Leasing Trust, Quertro Aircraft Leasing Trust and Caiquen Leasing LLC as guarantors (collectively, the "RCF Guarantors" and together with LATAM Parent, the "RCF Obligors") and a syndicate of lenders (the "RCF Lenders"), Citibank N.A. ("Citibank") as administrative agent, Wilmington Trust Company ("Wilmington") as collateral agent, Banco Citibank S.A. ("Banco Citibank" and together with Wilmington, the "RCF Collateral Agent" and the RCF Collateral Agents together with Citibank, the "RCF Agents" and together with the RCF Lenders, the "RCF Secured Parties"), pursuant to which the RCF Lenders provided a revolving credit facility of up to $600 million (the "RCF Facility").

(b)     That certain Amended and Restated Loan Agreement, dated as of June 29, 2018 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Spare Engine Facility Agreement") by and among LATAM Parent, acting through its Florida branch, as borrower (the "Spare Engine Facility Borrower") and Credit Agricole Corporate and Investment

46

Bank ("CACIB"), as lender, arranger, agent and security agent and the other lenders party thereto (the "Spare Engine Facility Lenders" and together with the RCF Facility Lender, the "Prepetition Secured Lenders" and the Spare Engine Facility Lenders together with CACIB in its capacity as agent and security agent, the "Spare Engine Facility Secured Parties" and, together with the RCF Secured Parties, the "Prepetition Secured Parties") pursuant to which the Spare Engine Facility Lenders provided a loan of up to $275 million to the LATAM Parent (the "Spare Engine Facility" and together with the RCF Facility, the "Prepetition Secured Debt" and all agreements, documents, and instruments delivered or executed in connection therewith, the "Prepetition Secured Credit Documents").

## **NEED FOR DIP FINANCING**

20.     On the Petition Date, in part due to the liquidity preserving measures described in the First Day Declaration, the Debtors had $707 million in cash and cash equivalents while LATAM had approximately $1.35 billion in cash and cash equivalents.  While the LATAM continues to manage its expenses and take efforts to reduce its overall expenses, LATAM has continuing cash needs to operate its business.  Specifically, the Debtors' further anticipate that their chapter 11 expenses, including payment of amounts sought pursuant to the first-day relief and other demands by vendors and suppliers, will continue to absorb their free cash.  In particular, one-time chapter 11 expenses, including those approved by the Court, will continue to strain resources.

21.     In addition, while the world is slowly beginning to reopen, LATAM's operations continue to be significantly limited by the COVID-19 pandemic, making it difficult to fund its operational and other needs throughout these proceedings absent further market improvements.  For the past several months, LATAM Parent and its subsidiaries have begun increasing operations, but are still operating at less than 10% of pre-crisis capacity.  This has a significant impact on revenues.

22.     In the current market environment, it is difficult to anticipate the level of expenses and the resumption of passenger traffic and revenues.  It is equally challenging to predict

with certainty the timing of the Debtors' exit from chapter 11 given the ongoing global pandemic and governmental responses to it, the exigencies of the Debtors' Chapter 11 Cases (and the risks associated with certain of their non-Debtor affiliates) and the complexity of the multiple proceedings occurring within and outside the United States. However, the Debtors expect that by August 2020, the cash position of LATAM as a whole and the Debtors in particular will be below the company's minimum liquidity levels to ensure uninterrupted operation of business, and the need for additional liquidity will become more urgent, particularly in the current economic climate.

## EFFORTS TO OBTAIN DIP FINANCING

23.     As noted above, the Debtors faced significant challenges leading to the commencement of the Chapter 11 Cases. As a result, and as explained in the Alfonsín DIP Declaration, LATAM, together with its advisors, analyzed the funding requirements and determined that LATAM would require $2.15 billion for the duration of the Chapter 11 Cases, the majority of which would be required for the Debtors' operations. Thus, LATAM was cognizant that its near term liquidity would continue to deteriorate after the Petition Date and that it would face increasing near term liquidity pressures as a result of the expense and uncertainties resulting from the Chapter 11 Cases.

24.     Accordingly, prior to the commencement of the Chapter 11 Cases, the Debtors reached out to government representatives in the countries where it operates in the hope of securing support either outside of a restructuring proceeding or, alternatively, in the form of postpetition financing. In furtherance of those efforts, and also to ensure a financing commitment had been secured prior to the Petition Date, LATAM separately reached out to their key shareholders who were well positioned to provide financing in the short time period required. Through these efforts, the Debtors ultimately obtained a commitment from the Tranche C DIP Lenders to provide a part of the overall $2.15 billion needed. Notably, the Debtors' ability (and

the Tranche C DIP Lenders' willingness to allow the Debtors) to announce this financing commitment upon filing the Chapter 11 Cases was in and of itself valuable to the estates as it signaled the shareholders' continued confidence in the Debtors' going-concern value, and served as a platform for the Debtors to seek further senior debtor-in-possession financing.

25.    During the course of their prepetition discussions with various governmental parties, the company emphasized the importance of the airline industry and LATAM's continued operations as well as the urgency of the support needed. LATAM was told that in order to obtain governmental funding that shareholders support would be crucial. The commitment letter provided by the shareholders contemplated separate tranches funded by the shareholders, governments and third parties. Although the Debtors continue to engage with various governments to obtain postpetition financing, to date no such commitments have been secured. Notwithstanding this, and despite the condition in their commitment letter, the Tranche C DIP Lenders have agreed to not condition their lending on securing any funding from any governmental party.

26.    While the Debtors will need to secure additional financing, the Tranche C DIP Lenders have consented to additional postpetition lending (including the potential for additional shareholder participation in the Tranche C DIP Facility), and to such Tranche A DIP Facility and Tranche B DIP Facility being senior to their loan. As such, any additional postpetition lenders would come in ahead of the Tranche C DIP Lenders, making the Tranche C DIP Facility a "first loss" facility and making the other tranches of postpetition financing particularly attractive to third party bidders. In particular, this subordination was key because the Debtors have a limited amount of hard collateral that can be offered as security and Chilean law adds additional complexity to pledging the Debtors' assets. The Tranche C DIP Lenders' willingness to be a first

loss facility demonstrates their confidence in the Debtors' business as a going concern, which is itself helpful to attract other lenders.

27.     Since the Petition Date, the Debtors have been reaching out to third party lenders.  Over the course of this postpetition process, the Debtors have reached out to, among others, over 150 financial institutions, ultimately executing non-disclosure agreements with approximately 80 parties and providing each of the interested institutions with access to a data room and other materials.  The Debtors have sought, and have been open to receiving, proposals for a number of constructs including (i) financing the full amount of capital needed, with no Tranche C DIP Facility or other shareholder support, (ii) financing for the Tranche A DIP Facility to combine with the Tranche C DIP Facility, (iii) financing for the Tranche B DIP Facility to combine with both the Tranche A DIP Facility and the Tranche C DIP Facility and (iv) alternative junior proposals in lieu of the Tranche C DIP Facility.

28.     These efforts are still active and ongoing, but to date, the Debtors have not received any proposals for the entire $2.15 billion of financing required or proposals to replace the Tranche C DIP Facility.  On the contrary, certain of the potential lenders have indicated that without the Tranche C DIP Facility acting as a first loss facility they would not be interested in providing this financing.  As such, the Debtors have concluded it is in their best interest to obtain approval of the Tranche C DIP Facility at this time, which will help advance the Debtors' ability to meet their liquidity needs and facilitate the process for obtaining the additional postpetition financing.  This financing also comes with a commitment from the Tranche C DIP Lenders and other shareholders, pursuant to the Support Agreement, to support a Chapter 11 Plan, including any capital raise, if their debt is repaid in cash, or, if they exercise their equity subscription option, in shares.  This will facilitate the Debtors' exit from Chapter 11 since shareholder approval to a

capital raise is required under Chilean law and obtaining such approval may otherwise be an impediment to the reorganization process. Postpetition lenders will be comforted to know that the emergence of LATAM will not be stalled or put at risk as a result of shareholder objections. Of course, if more attractive financing commitments for the $2.15 billion of necessary postpetition financing can be obtained that do not require or depend on the Tranche C DIP Facility, the Debtors intend to evaluate such commitments.

29.    The Debtors' efforts to seek the necessary postpetition financing from sources outside and within the Debtors' existing capital structure were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code. Following these good faith efforts, the Debtors also reasonably concluded that postpetition financing was not available on an unsecured basis, in part due to the current economic conditions as well as the complexity and cross border nature of the Debtors' capital structure and business. As set forth above and in the Coleman Declaration, given the Debtors' outreach to various stakeholders and later to various third parties in an attempt to obtain financing, the Debtors have a clear understanding of the current availability of postpetition financing. None of the proposals that the Debtors received from interested parties contemplated an unsecured facility, and the Debtors reasonably determined, with the assistance of PJT Partners LP, that it was futile to pursue such financing from the market at large, given these experiences and their analysis of the Debtors' assets. The Debtors therefore made appropriate and sufficient efforts to confirm that postpetition financing is not available on an unsecured basis.

## DIP FINANCING

30.    The terms of the DIP Facility are summarized above in the section of this Motion entitled Concise Statements Regarding DIP Financing Pursuant to Bankruptcy Rule

4001(b) and Local Rule 4001-2.  This section of the Motion highlights certain specific elements of the DIP Financing and the attendant documents.

31.    <u>DIP Liens and Superpriority Claims</u>.  The DIP Liens shall consist of the following security interests and liens granted by the Debtors to the DIP Agents for the benefit of the DIP Agents and Tranche C DIP Lenders, subject only to the Carve Out, the Tranche A DIP Liens (as defined below), the Tranche B DIP Liens (as defined below), the DIP Hedge Liens (as defined in the DIP Credit Agreement): (i) valid, binding, enforceable, non-avoidable and fully-perfected senior security interests in and continuing lien on all of the Guarantors' rights, title and interests in all of its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, business interruption insurance, supporting obligations and proceeds of all of the foregoing to the extent such property is not otherwise subject to Permitted Priority Liens, including, for the avoidance of doubt, any spare engines, routes, slots and gates, equity in subsidiaries and intellectual property (the "<u>Previously Unencumbered Collateral</u>"), and (ii) valid, binding, enforceable, non-avoidable and fully-perfected security interests in and continuing lien on all of the Guarantors' rights, title and interests in all of its property, whether now existing or hereafter acquired, that is subject to Permitted Priority Liens including, for the avoidance of doubt, any spare engines, routes, slots and gates, equity in subsidiaries and intellectual property (the "<u>Previously Encumbered Collateral</u>"), which security interests and liens in favor of the DIP Agents are junior to such valid, perfected and unavoidable liens.  In addition, all of the Debtors' cash, including any cash in deposit accounts,

where ever located as original collateral or proceeds of other DIP Collateral, constitutes cash collateral of the Tranche C DIP Lenders.  Notwithstanding anything to the contrary herein or in the DIP Loan Documents, the DIP Collateral and the Tranche C DIP Liens shall not include the Excluded Assets.

32.    For the avoidance of doubt, the DIP Loan Documents contemplate that, as security for the obligations incurred under each of the Tranche A DIP Facility and the Tranche B DIP Facility, the lenders under each facility shall be granted security interests and liens on the DIP Collateral (respectively, the "Tranche A DIP Liens" and "Tranche B DIP Liens").  The Debtors shall seek separate authorization with respect to the Tranche A DIP Liens and Tranche B DIP Liens, which shall each be senior to the Tranche C DIP Liens.  The Tranche C DIP Lenders expressly consent to such treatment as contemplated by the DIP Loan Documents and, after soliciting interest from third parties for the remainder of the DIP Obligations, it is apparent that such potential lenders are not willing to provide financing without this type of first loss facility in place.

33.    In addition, pursuant to Bankruptcy Code section 364(c)(1), all of the Tranche C DIP Obligations shall constitute allowed senior administrative expense claims against each of the Debtors (the "Tranche C Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or

other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of

Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under

Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all

prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the

payment of the Carve-Out to the extent specifically provided for herein; provided, however, that

the Tranche C Superpriority Claims shall not include, and thus shall expressly exclude, the

Obligors' claims and Causes of Action[7] arising under sections 502(d), 544, 545, 547, 548, 550 and

553 of the Bankruptcy Code or any other similar state or federal law , if any (collectively, the

"Avoidance Actions"), which Avoidance Actions shall be preserved and addressed in connection

with a chapter 11 plan and at no time prior thereto; provided, further that the Tranche C

Superpriority Claims shall have recourse to all proceeds of such Avoidance Actions (the

"Avoidance Proceeds").

    34.   **Equity Subscription**.  In accordance with Section 2.12 of the DIP Credit

Agreement, with respect to any repayment or prepayment of the Tranche C DIP Obligations on

the Maturity Date or otherwise (except to the extent of any prepayment conducted in accordance

---

[7]     "Causes of Action" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date (as defined in the DIP Credit Agreement), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

with Section 2.13(a) of the DIP Credit Agreement), each of the Tranche C DIP Lenders may elect to subscribe and pay for new shares of common stock of LATAM (the "New Shares") immediately upon any repayment or prepayment of the Tranche C DIP Obligations on the Maturity Date or otherwise pursuant to the Equity Subscription Election, for the full amount of such Tranche C DIP Obligations for its Tranche C DIP Loan the New Shares at the greater of (y) 47.0588235294118% and (z) an amount of interest that would correspond to the discount to Final Plan Valuation percentage provided to any other parties in any other equity issuance (such discount, the "Subscription Contingent Interest").

35.     Shareholder Support. In connection with the Equity Subscription Election, each Tranche C DIP Lender that is a shareholder of LATAM (a "Tranche C Shareholder") has agreed, in its capacity as shareholder, (i) not sell or transfer (but may pledge) any or all of such equity for the duration of the Chapter 11 Cases (except (A) after the occurrence of an Event of Default or (B) to a Tranche C Eligible Assignee (as defined in the DIP Credit Agreement), provided that, to the extent the Consummation Date (as defined in the DIP Credit Agreement) would fall on or after December 15 of any year (and prior to January 1 of the following year), the Borrower will use commercially reasonable efforts to assist any lender that is a Tranche C DIP Lender on the Closing Date in avoiding adverse tax impact, and in connection may agree to release such Tranche C DIP Lender in whole or in part from the restriction contained in this clause (i) during such time period and (ii) to participate in the shareholders meeting held for the purpose of approving a plan of reorganization filed in any of the Chapter 11 Cases under Section 1121 of the Bankruptcy Code (a "Chapter 11 Plan") so long as it is a Company Approved Reorganization Plan (as defined in the DIP Credit Agreement), and to (A) take all necessary corporate action under Chilean law to effectuate the Chapter 11 Plan, so long as the Chapter 11 Plan is a Company

Approved Reorganization Plan, (B) approve the requisite capital increase, including the amount of the capital increase and the number of New Shares to be authorized and issued (which shall be an amount sufficient to effectuate in full of Equity Subscription) and the subscription mechanics after the expiration of the Rights Offering, to effectuate the Equity Subscription Election and the Chapter 11 Plan, (C) grant a 180-day term delegation for the pricing of the issued shares to the board of LATAM which shall be consistent with the Chapter 11 Plan and the DIP Credit Agreement, and (D) waive in full such Tranche C Shareholder's preemptive rights in the Rights Offering not later than the last day of the Rights Offering and permit board of LATAM to place New Shares that remain unsubscribed following the Rights Offering to effectuate the Equity Subscription; provided that obligations in the foregoing clauses (i) and (ii) will be independent obligations of each Tranche C Shareholder and shall survive any assignment by (or participation of a Tranche C Shareholder of its portion of the DIP Loans; provided further that no Tranche C DIP Lender shall be bound in its capacity as shareholder by any prior actions taken under this subclause with respect to a Company Approved Reorganization Plan in the event a Company Approved Reorganization Plan is not confirmed pursuant to an order of the Bankruptcy Court.

36.    In addition to the support promised by the Tranche C Shareholders as described above, certain of LATAM Parent's shareholders, including Delta Air Lines, Inc., have agreed to enter into a support agreement (the "Support Agreement") that will mirror rand replicate the foregoing obligations set forth in paragraph 34.  Execution of the Support Agreement is a condition to closing pursuant to the DIP Credit Agreement.  Between the Tranche C DIP Lenders and the shareholders that have agreed to the Support Agreement, the Debtors have obtained support from shareholders representing over half of all outstanding shares.

37.     <u>DIP Budget</u>. To ensure that the proceeds under the DIP Facility are used prudently, on the tenth Business Day (as defined in the DIP Credit Agreement) of each calendar month, the Borrower shall deliver to the Administrative Agent an Updated DIP Budget, certified by the Chief Financial Officer with respect to the Obligors, for the current week and immediately consecutive 12 weeks set forth on a weekly basis, in form substantially similar to the Initial Approved DIP Budget (or such other form acceptable to the Majority DIP Lenders).  The term "<u>DIP Budget</u>" shall mean the most recently approved at such time: (a) 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements (the "<u>Initial Approved DIP Budget</u>"), and (b) updated 13-week cash flow forecast of receipts and disbursements made at the end of each four-week period for the then-remaining term of the DIP Facility, which shall, in each case, include detailed line item receipts and expenditures, including the aggregate amount of Professional Fees and expenses for Professional Persons, together with appropriate supporting schedules and information and an explanation of any change from the DIP Budget then in effect (each, an "<u>Updated DIP Budget</u>"). The DIP Budget (including, for the avoidance of doubt, the Initial Approved DIP Budget and each Updated DIP Budget) shall be in form and substance acceptable to the Administrative Agent and the Majority DIP Lenders.

38.     <u>Availability of Funds</u>.  In accordance with Section 5.01(d) of the DIP Credit Agreement, the obligations of the Tranche C DIP Lenders to make initial DIP Loans thereunder shall be subject to the Court approving the Tranche A Amendment and/or Tranche B Amendment (each as defined in the DIP Credit Agreement) and the aggregate amount of the DIP Commitments available under the Tranche A DIP Facility, Tranche B DIP Facility and Tranche C DIP Facility, in aggregate, being at least $1.9 billion.

39.  <u>Carve-Out Account</u>. All amounts included in the Carve-Out will be senior to the DIP Liens and the DIP Superpriority Claims.

## **THE RELIEF REQUESTED SHOULD BE GRANTED**

**A.    Entry into the Tranche C DIP Facility Is an Exercise of the Debtors' Sound Business Judgment**

40.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Credit Agreement and obtain access to the Tranche C DIP Facility.  Pursuant to Section 364 of the Bankruptcy Code, a debtor is authorized to obtain secured or superpriority financing in the ordinary course of business as an administrative expense when, as here, certain conditions are met. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Consequently, a debtor has broad discretion in negotiating and entering into a postpetition secured credit agreement, as long as the agreement comports with the debtors business judgment and does not contravene the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.") (citation omitted); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and

receivables facility because such facility "reflect[ed] sound and prudent business judgment")
(citation omitted).

41.    Bankruptcy courts will not challenge a debtor's decisions concerning the
operation of its business when those decisions reflect a "good faith business judgment, is made on
a reasonable basis, and is 'within the scope of [the trustee's] authority under the Code.'" *In re
Taub*, 441 B.R. 211, 216 (Bankr. E.D.N.Y. 2010) (quotation marks and citation omitted); *See In
re YL West 87th Holdings I LLC,* 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have
generally deferred to a debtor's business judgment in granting section 364 financing") (citations
omitted).    In evaluating whether the business judgment test is met, courts "examine whether a
reasonable business person would make a similar decision under similar circumstances." *In re
Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15,
2007) (citation omitted).    Applying this standard, "a court should approve a debtor's business
decision unless that decision is the product of bad faith or a gross abuse of discretion." *Id.*

42.    In finding the Tranche C DIP Facility represents an appropriate exercise of
the Debtors' sound business judgment, the Court should consider the current market conditions.
*See, e.g.,* Transcript of Record at 734 35:24 1, *In re Lyondell Chem. Co*., No. 09-10023 (Bankr.
S.D.N.Y. Mar. 5, 2009) (recognizing that the terms that may be available for debtor-in-possession
financing during an economic downturn may not be "as desirable" as during of financial boom);
*Matter of Ellingsen MacLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing
a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

43.    Further, the Court may appropriately consider the critical, non-economic
benefits that the Tranche C DIP Facility has to offer to the Debtors, "such as the timing and
certainty of closing, the impact on creditor constituencies and the likelihood of a successful
reorganization." *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568,

at *4 (Bankr. S.D.N.Y. July 6, 2009). This is particularly true in a bankruptcy like here, "where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan." *Id.*

44.    The Borrower's independent directors have duly deliberated and approved of the terms and conditions of the Tranche C DIP Facility, and the Debtors' decision to enter into the DIP Credit Agreement and obtain the Tranche C DIP Facility is an exercise of their sound business judgment.[8] As further discussed in the Coleman Declaration, the Debtors negotiated the terms of the Tranche C DIP Facility in good faith and through arm's length negotiations, and believe they have acquired the best terms possible for the Tranche C DIP Facility in the current market conditions. In particular, the Debtors have obtained key concessions from the Tranche C DIP Lenders, including the provision of financing without a commitment from a government entity to participate in the postpetition lending, contractual undertakings described in paragraph 35, and subordination of their claims. As discussed in more detail below, these concession make the Tranche C DIP Facility particularly favorable. The Debtors have been open to receiving a variety of proposals, including proposals for postpetition financing for the entire $2.15 billion without the Tranche C DIP Facility, but have not received any such proposals. The Debtors believe the terms of the Tranche C DIP Facility are reasonable and will allow them to maintain their current operations and avoid liquidation.

45.    The Tranche C DIP Financing is favorable for a number of reasons. *First,* not only do the Tranche C DIP Lenders not seek to prime any prepetition lenders or secured parties,

---

[8]    In addition, even if the Debtors' decision to enter into the DIP Credit Agreement and obtain the Tranche C DIP Facility were held to a higher standard of review, for the reasons discussed herein, including the substantial benefits of the DIP Credit Agreement and other shareholder agreements, the Debtors' decision would also meet that higher standard of review.

but the Tranche C DIP Lenders have also consented to subordinate their treatment to the other tranches, which makes those facilities more attractive and provides the Debtors with greater flexibility to seek such additional financing from other sources.  Indeed, as is apparent from the Coleman Declaration, the willingness of the Tranche C DIP Lenders to provide this "first loss paper" is a critical and necessary element to obtaining the requisite additional postpetition funding. *Second*, the Tranche C DIP Lenders, in their capacity as shareholders, have agreed to approve a chapter 11 plan, including any capital raise that is a part thereof, as long as it provides for the repayment in full, in cash or equity pursuant the Equity Subscription Election.  Notably, this approval is something that none of the other potential lenders can provide and is a key non-economic benefit to the Tranche C DIP Facility as it paves the way for the Debtors' emergence from chapter 11.  *Third*, the Tranche C DIP Lenders have also agreed to waive their preemptive rights and (i) hold their current shares during the pendency of these proceedings and (ii) hold any shares acquired through the Equity Subscription Election for a period of time after the Debtors' emergence.  This agreement will provide stability in the Debtors' post reorganization equity value and avoid a scenario where upon emergence the interests of stakeholders in the Debtor's equity value is reduced by the pricing pressures brought on by stakeholders immediately selling their shares into the market while at the same time ensuring a more stable shareholder platform to help the company manage its business following the reorganization.  This is yet another key benefit that only the shareholders could provide and one that will continue even after these Chapter 11 Cases. *Lastly*, certain of the Debtors' other shareholders have similarly shown their support for the DIP Credit Agreement through their promise to sign the Support Agreement as a condition to close.

46.     This overwhelming support from shareholders will provide comfort to other parties in interest, including vendors and customers.  It signals to the market generally, including

other potential postpetition lenders, that the Debtors have support from their equity holders, who believe in the strength of LATAM's business on a go-forward basis despite the current economic climate. This support has, unsurprisingly, been key for attracting lenders for the Tranche A DIP Facility and Tranche B DIP Facility who will agree to lend to the Debtors despite a limited amount of collateral to lend against.

47.    Thus, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of their business judgment.

**B.    Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

48.    The Debtors propose to obtain the Tranche C DIP Financing by providing security interests and liens as set forth in the DIP Loan Documents and described above. Section 364 of the Bankruptcy Code authorizes a debtor to incur debt or obtain credit if a debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code. *See* 11 U.S.C. § 364. Specifically, section 364 of the Bankruptcy Code authorizes the court, after notice and hearing, to grant the requested relief: "(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

49.    To meet the standards of section 364(c), a debtor need only demonstrate that that "it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *Ames Dep't Stores,* 115 B.R. at 37; *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). The statute does "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

50.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Republic Airways Holdings Inc.,* No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *see also Ames Dep't Stores*, 115 B.R. at 37–40 ; s*ee In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (citations omitted); *Crouse Grp.*, 71 B.R. at 549.

51.    Further, if a debtor is unable to obtain unsecured credit as an administrative expense under section 503(b)(1), a court may nonetheless "authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

52.    As stated in the Coleman Declaration, the Debtors made good faith efforts to obtain financing on an unsecured basis and reasonably concluded that such financing was not available. *See* Coleman Declaration, ¶11-17. None of the proposals from the parties that the Debtors engaged with either prepetition or postpetition contemplated an unsecured facility, and the Debtors reasonably determined that, given their analysis, the current economic climate and market conditions, any further efforts would be futile.

53.     Therefore, the Court should find that the requirement of section 364 of the Bankruptcy Code is satisfied and grant the requested relief.

## C.     Debtors Should Be Authorized to Pay the Fees Due Under the DIP Loan Documents

54.     As discussed above and in the Coleman Declaration, the Debtors believe that the terms of the DIP Financing Letter Agreement, including the fees imposed thereunder, are reasonable and represent the best possible terms on which the Debtors could obtain the postpetition financing necessary to maintain their ongoing business operations and fund these Chapter 11 Cases.   The fees that the Debtors are required to pay per the terms of the DIP Loan Documents are: the fees, expenses and disbursements of the Tranche C DIP Lenders and the DIP Agents and the Upfront Fee, the Undrawn Commitment Fee, and the Administrative Agent Fee.   Courts routinely authorize debtors to pay such fees where the accompanying DIP financing is in the best interest of the debtor's estate.  *See, e.g., In re THE ORIGINAL SOUPMAN, INC. et, al.,* No. 17-11313 (LSS) (Docket No. 136) (Bankr. D. Del. July 18, 2017).  The fees due under the DIP Loan Documents are in line with the transactions of this kind, are in the best interest of the Debtors estate, and should be approved on the facts and circumstances of these Chapter 11 Cases.

## D.     Carve Out Is Appropriate

55.     The liens and security interests extended under the DIP Credit Agreement and the other DIP Loan Documents are all subject to the Carve Out.  Courts treat Carve Outs similarly to other terms created for professional fees that are reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *Ames Dep't Stores*, 115 B.R. at 38 (noting it has been "the uniform practice in this Court . . . to insist on a carve out from a super-priority status and post-petition lien" to pay parties' professionals because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"); *see also In re Windstream Holdings, Inc.,* No. 19-22312 (RDD) (Bankr. S.D.N.Y.

Apr. 19, 2019) [Docket No. 376]; *In re Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y.

May 6, 2016) [Docket No. 99]; *In re The Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD)

(Bankr. S.D.N.Y. Dec. 13, 2010) [Docket No. 43]; *In re Halcón Res. Corp.*, No. 16-11724 (BLS)

(Bankr. D. Del. Aug. 19, 2016) [Docket No. 130]; *In re Ulta Stores, Inc.*, No. 09-11854 (BRL)

(Bankr. S.D.N.Y. Apr. 29, 2009) [Docket No. 97].

56.     Here, the Carve Out is necessary to protect against an unlikely

administrative insolvency and to ensure that Debtors' estates retain all rights and powers necessary

to pay for the professional services without undue restrictions.  Accordingly, the Court should find

that the proposed Carve-Out is appropriate in these circumstances and grant the relief requested.

**E.     The Tranche C DIP Lenders Should Be Deemed Good Faith Lenders under Section
        364(e)**

57.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

58.     While "'[g]ood faith,' as used in 11 U.S.C. § 364(e), is not a defined term,"

generally, good faith may be destroyed by conduct that involves, fraud, collusion or an attempt to

take grossly unfair advantage of others. *In re Gen. Growth Properties, Inc.*, 423 B.R. 716, 722

(S.D.N.Y. 2010) (citing *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4

(S.D.N.Y. June 18, 1992)) (finding sufficient evidence that postpetition financing was entered into

in good faith where the loan was "vigorously negotiated at arm's length and in good faith" and

there was no contention that the lender otherwise acted in bad faith) (quotation marks and citation

omitted).

59.    As explained in detail herein and in the Coleman Declaration, the Tranche

C DIP Facility is the result of the Debtors' reasonable and informed determination that the Tranche

C DIP Lenders offered the most favorable terms under the circumstances.  All negotiations of the

Tranche C DIP Facility were conducted in good faith, at arms' length and in the presence of or

through counsel.  The terms and conditions of the DIP Loan Documents are fair and reasonable,

and the proceeds of the Tranche C DIP Facility will be used only for purposes that are permissible

under the Bankruptcy Code, and in accordance with the Final DIP Order and the DIP Loan

Documents.  Further, no consideration is being provided to any party to the DIP Loan Documents

other than as described herein.  Accordingly, the Court should find that the Tranche C DIP Lenders

are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are

entitled to all of the protections afforded by that section.

F.    **Modification of the Automatic Stay Is Warranted**

60.    Section 362(d) of the Bankruptcy Code authorizes the Court, after notice

and a hearing, to modify the automatic stay granted under section 362 of the Bankruptcy Code to

permit the Tranche C DIP Lenders to exercise remedies outlined in the DIP Credit Agreement.

Courts routinely grant such modifications to effectuate financing agreements that comport with a

debtor's business judgment.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-

23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88] (modifying the automatic stay set

forth in section 362 of the Bankruptcy Court to the extent necessary to implement and effectuate

the DIP agreement); *In re Chassix Holdings, Inc.*, Case No. 15- 10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67] (accord); *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26] (accord); *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59] (accord).  As set forth above, the Tranche C DIP Financing comports with the Debtors' business judgment, therefore the Court should therefore modify the Automatic Stay and permit the Tranche C DIP Lenders to exercise all rights and remedies provided for in the DIP Credit Agreement.

## NOTICE

61.    The Debtors have provided notice of this Motion in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 112).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## NO PRIOR REQUEST

62.    No prior request for the relief requested herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the final order granting the relief requested herein and such other and further relief as is just.

Dated:    June 28, 2020
          New York, New York

*Lisa M. Schweitzer*
Richard J. Cooper
Lisa M. Schweitzer
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and Debtors-in-Possession*

**Exhibit A**:
**Proposed Final DIP Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| LATAM Airlines Group S.A., *et al*., | : | Case No. 20-11254 (JLG) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |
| | : | |
| | x | |

## ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, AND (B) GRANT SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (II) GRANTING RELATED RELIEF

Upon the *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* (the "Motion") of LATAM Airlines Group S.A. ("LATAM Parent") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors")[2] in the above-captioned cases (the "Chapter 11 Cases"), pursuant to sections 105, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are:  LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

[2]    LATAM Parent, and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as "LATAM".

"Bankruptcy Rules"), seeking, among other things entry of an order (the "Final DIP Order"):

    (a) authorizing the Debtors to execute and deliver all final documentation consistent with the terms and conditions of that certain Super-Priority Debtors-in-Possession Term Loan Agreement by and among LATAM Parent, as borrower (the "Borrower"), the guarantors party thereto (the "Guarantors" and together with the Borrower, the "Obligors"), Qatar Airways Investments (UK) Ltd. or one of more of its Affiliates and Costa Verde Aeronáutica S.A. or one or more of its Affiliates, as lenders (collectively, and together with such other entities that become may become lenders from time to time, the "Tranche C DIP Lenders"), the administrative agent (in such capacity, the "Administrative Agent") the Local Collateral agent (in such capacity, the "Local Collateral Agent", and the collateral agent (in such capacity, the "Collateral Agent" and together with the Administrative Agent and the Local Collateral Agent, the "DIP Agents") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"; together with this Final DIP Order and all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Loan Documents"), which DIP Credit Agreement: (i) contemplates a superpriority multi-draw term loan facility in an aggregate principal amount of up to $2.15 billion in new money financing consisting of (A) a secured Tranche A facility (the "Tranche A DIP Facility") in an aggregate maximum principal amount to be determined; (B) a secured Tranche B facility (the "Tranche B DIP Facility") in an aggregate maximum principal amount to be determined; and (C) a secured Tranche C facility provided by the Tranche C DIP Lenders in an aggregate maximum principal amount of at least

$900 million subject to the Tranche C Increase Commitment (as defined in the DIP Credit Agreement) (the "Tranche C DIP Commitment"); and (ii) shall be in substantially the same form attached hereto as Exhibit A; and to perform such other and further acts as may be required in connection with the DIP Credit Agreement or other DIP Loan Documents;

(b) authorizing LATAM Parent, as Borrower, to obtain the Tranche C DIP Commitment under the terms of the DIP Credit Agreement and for each of the other Debtors, as Guarantors, to guarantee unconditionally, on a joint and several basis, the Borrower's obligations in connection with the Tranche C DIP Commitment as described above;

(c) authorizing the Debtors to use proceeds of the Tranche C DIP Commitment as provided in Section 2.06 of the DIP Credit Agreement;

(d) granting of valid, binding, enforceable, non-avoidable and fully-perfected senior security interests in and continuing lien on all the Previously Unencumbered Property (as defined below), but excluding the Excluded Assets[3] subject only to the

---

[3] For the purposes of this Final DIP Order, "Excluded Assets" shall mean:

(a)     (i) Aircraft (as defined in the DIP Credit Agreement) and (ii) Engines (as defined in the DIP Credit Agreement) located in such Aircraft (other than Pledged Engines (as defined in the DIP Credit Agreement)), whether leased or owned by any Obligor, as applicable, or any Affiliate (as defined in the DIP Credit Agreement) of any Obligor, and any related lease, sublease, license, contract or agreement to which any Obligor is a party, and any of its rights or interest thereunder;

(b)     any Avoidance Actions, but not any Avoidance Proceeds (each as defined below);

(c)     to the extent not covered in clause (a), any lease, sublease, license, contract or agreement to which any Grantor is a party, and any of its rights or interest thereunder, to the extent that the grant of a security interest therein (A) would violate any law, rule or regulation applicable to such Grantor, or (B) would, under the terms of such lease, sublease, license, contract or agreement existing on the Closing Date (as defined in the DIP Credit Agreement) or the time of entry of such lease, sublease, license, contract or agreement, violate or result in a breach under or invalidate such lease, sublease, license, contract or agreement, or require the consent of or create a right of termination in favor of any other party thereto (other than a Grantor) (unless such law, rule, regulation, term, provision or condition would be rendered ineffective with respect to the creation of the security interest hereunder pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (the "UCC") (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity);

3

Carve Out (as defined below), on the terms and conditions set forth herein, including, for the avoidance of doubt, paragraph 24(d), and in the DIP Loan Documents;

(e) valid, binding, enforceable, non-avoidable and fully-perfected junior security interests in and continuing lien on all of the Obligors' rights in the Previously Encumbered Collateral (as defined below), subject only to the Carve Out (as defined below) and the Permitted Priority Liens (as defined below) and on the terms and conditions set forth herein, including, for the avoidance of doubt, paragraph 24(d), and in the DIP Loan Documents;

(f) granting of superpriority administrative expense claims to the DIP Agents and the Tranche C DIP Lenders pursuant to Bankruptcy Code section 364(c)(1) with respect to the Tranche C DIP Obligations (as defined below) over any and all administrative

---

(d)    any governmental licenses or state or local franchises, charters and authorizations to the extent a security interest therein is prohibited by the terms thereof or requires consent (other than by a Grantor) (except to the extent such prohibition is ineffective under the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principle of equity);

(e)    any assets as to which the Borrower and the Collateral Agent reasonably determine that the cost or other consequences of obtaining a security interest therein are excessive in relation to the benefit to the DIP Secured Parties of the security to be afforded thereby;

(f)    any equity interest held by a Grantor (x) in any special purpose entity that exclusively owns or has an interest in any Excluded Asset specified in clause (a) above, related bank accounts and related assets or (y) in any entity in which such Grantor, together with any other Grantor, does not have a controlling interest and the pledge of which would violate, result in a breach under or require consent under an agreement (other than the consent of a Grantor) in respect thereof as to which the Grantor is a party.;

(g)    any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use", whereby such "intent-to-use" application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act with respect thereto (such application, an "ITU"); and

(h)    any Proceeds, products, receivables, substitutions or replacements of any of the foregoing;

provided that (i) Excluded Assets shall not include any Proceeds, products, substitutions or replacements of any Excluded Assets, unless such Proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets (it being understood that any Proceeds, products, substitutions or replacements of any Excluded Assets set forth in clause (a) of this definition shall in any case constitute Excluded Assets) and (ii) any Avoidance Proceeds shall not constitute Excluded Assets.

expenses of any kind or nature including, without limitation, the kinds specified in or arising or ordered under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114, subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the DIP Loan Documents; and

(g) authorizing the Debtors to use Tranche C DIP Lenders cash collateral consistent with the terms of the DIP Credit Agreement and the Budget.

The Declaration of Ramiro Alfonsín Balza Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions and Applications (the "Alfonsín Declaration"), having been filed on May, 26, 2020, ECF No. 3;

The Declaration of Timothy R. Coleman in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief filed contemporaneously herewith and incorporated herein by reference (the "Coleman Declaration") having been filed on June 28, 2020.

The Declaration of Ramiro Alfonsín Balza in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and  (II) Granting Related Relief filed contemporaneously herewith and incorporated herein by reference (the "Alfonsín DIP Declaration") having been filed on June 28, 2020;

Due and appropriate notice of the Motion, the final relief requested therein and the final hearing (the "Final Hearing"), having been served by the Debtors on, among others, (i) the Office of the United States Trustee for the Southern District of New York (the "United States Trustee");

5

(ii) counsel to the DIP Agents and the Tranche C DIP Lenders; (iii) counsel to the official committee of unsecured creditors (the "Creditors' Committee"), Dechert LLP, three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036-6797, Attn: Allan Brilliant, Esq.; (iv) counsel to any known secured creditor of record; (v) the Prepetition Secured Parties (as defined below) (vi) the forty (40) largest unsecured creditors of the Debtors; (vii) any party asserting liens against any of the Debtors' assets; (viii) the Internal Revenue Service; (xi) the Federal Aviation Administration; (x) the Securities and Exchange Commission (in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"); and (xii) all parties who have filed a notice of appearance and requested service of pleadings in the Chapter 11 Cases (collectively, the "Notice Parties"); and

Upon the record made by the Debtors and other parties in interest at the Final Hearing, and the Court having considered the various objections to the Motion; and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

The Motion is GRANTED to the extent set forth herein.

1.      *Disposition*.   The Motion is granted on a final basis in accordance with the terms of this Final DIP Order.  Except as may otherwise be provided herein, any objections to the Motion with respect to the entry of this Final DIP Order that have not been withdrawn, waived or settled, and all reservation of rights included therein, are hereby denied and overruled on the merits.

2.      *Jurisdiction*.    This Court has core jurisdiction over the Chapter 11 Cases commenced on May 26, 2020 (the "Petition Date"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Chapter 11 Cases is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief granted herein are Bankruptcy Code sections 105, 361, 362, 363 and 364 and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

3.      *Notice*.  Adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4.      *Reservation of Rights Regarding Prepetition Claims and Liens*.  Through this Final DIP Order, the Debtors do not seek to prime any valid, perfected and unavoidable liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code (such liens, the "Permitted Priority Liens").  For the avoidance of doubt, nothing in this Final DIP Order shall be deemed an admission or denial by the Debtors or any other party (including, without limitation, any of the Tranche C DIP Lenders) as to the validity, extent or priority of any lien of the Prepetition Secured Parties (as defined below).  Furthermore, notwithstanding anything to the contrary herein, the Debtors do not stipulate to the validity or enforceability of any claims for the payment of any so-called "make-whole" prepayment, applicable premium, or optional redemption premium provided by any of the Prepetition Secured Credit Documents (as defined below), and all persons' rights related thereto are expressly reserved. All rights with respect to the foregoing are expressly reserved.

5.      The Permitted Priority Liens include, but are not necessarily limited to, the liens granted in connection with:

    (i)  That certain Credit and Guaranty Agreement, dated as of March 29, 2016 (as may be amended, restated, supplemented or otherwise modified from time

to time, the "RCF Credit Agreement"), by and among, for LATAM, LATAM Parent, acting through its Florida branch, as borrower, and non-Debtor TAM S.A. (a.k.a. LATAM Airlines Brazil), Transporte Aéreo S.A., Lan Cargo S.A., Tordo Aircraft Leasing Trust, Quertro Aircraft Leasing Trust and Caiquen Leasing LLC as guarantors (collectively, the "RCF Guarantors" and together with LATAM Parent, the "RCF Obligors"), and a syndicate of lenders (the "RCF Lenders"), Citibank N.A. ("Citibank"), as administrative agent, Wilmington Trust Company ("Wilmington"), as collateral agent, Banco Citibank S.A. ("Banco Citibank" and together with Wilmington, the "RCF Collateral Agent" and the RCF Collateral Agents together with Citibank, the "RCF Agents" and together with the RCF Lenders, the "RCF Secured Parties"), pursuant to which the RCF Lenders provided a revolving credit facility of up to $600 million (the "RCF Facility"); and

(ii) That certain Amended and Restated Loan Agreement, dated as of June 29, 2018 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Spare Engine Facility Agreement") by and among LATAM Parent, acting through its Florida branch, as borrower (the "Spare Engine Facility Borrower") and Credit Agricole Corporate and Investment Bank ("CACIB"), as lender, arranger, agent and security agent and the other lenders party thereto (the "Spare Engine Facility Lenders" and together with the RCF Lenders, the "Prepetition Secured Lenders" and the Spare Engine Facility Lenders together with CACIB in its capacity as agent and security agent, the "Spare Engine Facility Secured Parties" and, together with the RCF Secured Parties, the "Prepetition Secured Parties") pursuant to which the Spare Engine Facility Lenders provided a

loan of up to $275 million to the LATAM Parent (the "Spare Engine Facility" and

together with the RCF Facility, the "Prepetition Secured Debt" and all agreements,

documents, and instruments delivered or executed in connection therewith, the

"Prepetition Secured Credit Documents").

6.    *Findings Regarding the DIP Financing.*

(a)    Good and sufficient cause has been shown for the entry of this Final DIP

Order and for authorization of the Debtors to obtain financing pursuant to the DIP Credit

Agreement and the DIP Loan Documents.

(b)    The Debtors have an immediate and critical need to obtain the Tranche C

DIP Financing to, among other things, (i) permit the orderly continuation of their

businesses; (ii) maintain business relationships with vendors, suppliers, carriers, and

customers of the Debtors; (iii) make payroll; (iv) make capital expenditures; and (v) pay

the costs of administration of their estates and satisfy other working capital and general

corporate purposes of the Debtors.  The ability of the Debtors to obtain sufficient working

capital and liquidity through the incurrence of the new indebtedness for borrowed money

and other financial accommodations is vital to the preservation and maintenance of the

going concern values of the Debtors and to the Debtors' successful reorganization.

(c)    The Debtors believe the financing proposed to be provided by the Tranche

C DIP Lenders is the most favorable financing currently available, in accordance with the

terms and conditions set forth in the DIP Loan Documents and the Debtors are unable to

obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as

an administrative expense.  The Debtors are also unable to obtain secured credit allowable

under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set

forth in the DIP Loan Documents without the Debtors granting to the DIP Agents and the Tranche C DIP Lenders —subject to the Carve Out and the Permitted Priority Liens and excluding Excluded Avoidance Actions (but not the proceeds thereof) and Excluded Assets—the DIP Liens and the Superpriority Claims (each as defined below) under the terms and conditions set forth in this Final DIP Order and the DIP Loan Documents.

(d)    The terms of the Tranche C DIP Financing and the DIP Loan Documents are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.  The Tranche C DIP Lenders do not, in their capacity as lenders, owe any fiduciary duties to the Debtors, their estates, their creditors and equity holders, and are not responsible persons of the Debtors under any applicable law.

(e)    The terms and conditions of the Tranche C DIP Financing, the DIP Loan Documents and this Final Order have been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the Tranche C DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the Tranche C DIP Financing and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents in connection with the Tranche C DIP Financing and all other related obligations under the DIP Loan Documents (collectively, the "Tranche C DIP Obligations"), shall be deemed to have been extended by the DIP Agents and the Tranche C DIP Lenders and their affiliates in good faith, as that term is used in Bankruptcy Code section 364(e), and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the Tranche C DIP Obligations, the Tranche C DIP Liens (as defined below) and the Tranche C

Superpriority Claims (as defined below) shall each be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final DIP Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(f)     Absent granting the relief sought by this Final DIP Order, the Debtors' estates, their shareholders, their creditors and other parties in interest will be seriously, immediately and irreparably harmed.  Consummation of the Tranche C DIP Financing in accordance with this Final DIP Order and the DIP Loan Documents is, therefore, in the best interests of the Debtors, their estates, their shareholders, their creditors and other parties in interest and are consistent with the Debtors' fiduciary duties.

7.     *Authorization of the DIP Financing and the DIP Loan Documents*.

(a)     The Debtors are hereby expressly authorized and empowered to enter into, execute, deliver, and, on such execution and delivery, directed to perform and comply under the DIP Loan Documents, including the DIP Credit Agreement; provided that the Debtors shall seek further approval from the Court in connection with the additional borrowings contemplated in connection with the Tranche A DIP Facility and Tranche B DIP Facility, in all cases consistent with the terms, provisions and conditions of the DIP Credit Agreement.  The DIP Loan Documents are hereby approved and incorporated herein by reference.  The DIP Loan Documents and this Final DIP Order shall govern the financial and credit accommodations to be provided to the Debtors by the Tranche C DIP Lenders; provided that, in the event of any inconsistency between the DIP Credit Agreement or any other DIP Loan Document, or any other order entered in the Chapter 11 Cases, and this Final DIP Order, this Final DIP Order shall control.

(b)     The Borrower is hereby authorized to borrow money pursuant to the DIP Loan Documents and the Guarantors are hereby authorized to guaranty such borrowing, in accordance with the terms of this Final DIP Order and the DIP Loan Documents, which shall be used solely for the purposes permitted under the DIP Loan Documents and this Final DIP Order, as well as to make the payment of Allowed Professional Fees (as defined below) incurred by the Debtors and the Creditors' Committee, consistent with the terms and conditions of the DIP Credit Agreement and this Final DIP Order.

(c)     In furtherance of the foregoing and without further approval of this Court, all terms, conditions and covenants set forth in the DIP Loan Documents (including, without limitation, the DIP Credit agreement) are approved to the extent necessary to implement the terms and provisions of this Final DIP Order, and each Debtor is hereby authorized and directed, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, the execution or recordation of any security and pledge agreements, financing statements, and any mortgages contemplated thereby), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Tranche C DIP Financing including, without limitation:

(i)     the execution, delivery and performance of the DIP Loan Documents, including, without limitation, the DIP Credit Agreement in substantially the same form filed with the Court on or about June 28, 2020, any security, mortgage and pledge agreement, and any additional documents contemplated thereby;

12

(ii)     the execution, delivery and performance of one or more amendments, waivers, joinders, consents or other modifications to and under the DIP Loan Documents for, among other things, the purpose of adding additional entities as Tranche C DIP Lenders, reallocating the commitments for the Tranche C DIP Financing among the Tranche C DIP Lenders or effectuating the Tranche C Increase Commitment, in each case in such form as the Debtors, the DIP Agents and the Tranche C DIP Lenders (to the extent required under the DIP Credit Agreement) may reasonably agree, it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Loan Documents or the Tranche C DIP Obligations that do not (A) shorten the maturity of the extensions of credit thereunder, or (B) pursuant to Section 2.28 of the DIP Credit Agreement, increase the commitments or the rate of interest or fees payable thereunder other than the Tranche C Increase Commitment;

(iii)    the non-refundable payment to each of the DIP Agents or the Tranche C DIP Lenders, as the case may be, of (A) the fees referred to in the DIP Credit Agreement, and (B) reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of counsel, information agents and other professionals retained by the DIP Agents and the Tranche C DIP Lenders as provided for in the DIP Loan Documents, which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court; and

13

(iv)    the performance of all other acts required under or in connection with the DIP Loan Documents.

(d)    Upon execution and delivery of the DIP Credit Agreement and the other DIP Loan Documents, such DIP Loan Documents shall constitute valid, binding and non-avoidable obligations of the Debtors and their estates enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Final DIP Order for all purposes during the Chapter 11 Cases, any subsequently converted Chapter 11 Case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any Chapter 11 Case.  No obligation, payment or repayment thereof, or recovery on or in respect thereof, transfer or grant of security under the DIP Credit Agreement, the other DIP Loan Documents or this Final DIP Order shall be stayed, restrained, revocable, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(e)    The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the Tranche C DIP Obligations of the Borrower.

8.    *Superpriority Claims.*  Pursuant to Bankruptcy Code section 364(c)(1), all of the Tranche C DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors (the "Tranche C Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without

limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b)

and 507(b), and over any and all administrative expenses or other claims arising under sections

105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 or

otherwise, whether or not such expenses or claims may become secured by a judgment lien or

other non-consensual lien, levy or attachment, which allowed superpriority claims shall for the

purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses

allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse

to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to

the payment of the Carve Out to the extent specifically provided for herein; _provided_, _however_,

that the Tranche C Superpriority Claims shall not include, and thus shall expressly exclude, the

Obligors' claims and Causes of Action[4] arising under sections 502(d), 544, 545, 547, 548, 550 and

553 of the Bankruptcy Code or any other similar state or federal law, if any (collectively, the

"Excluded Avoidance Actions"), which Excluded Avoidance Actions shall be preserved and

addressed in connection with a chapter 11 plan and at no time prior thereto; _provided_, _further_ that

---

[4]       As used in this Final DIP Order, "Causes of Action" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date (as defined in the DIP Credit Agreement), in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

the Superpriority Claims shall have recourse to all proceeds of such Excluded Avoidance Actions

(the "Avoidance Proceeds").

9.      Except as set forth in this Final DIP Order, permitted under the DIP Loan

Documents, or expressly agreed to by the Tranche C DIP Lenders and DIP Agents, no other

superpriority claims equal or senior to the Tranche C Superpriority Claims shall be granted or

allowed in these Chapter 11 Cases.  For the avoidance of doubt, the DIP Loan Documents

contemplate that the obligations under the Tranche A DIP Facility and Tranche B DIP Facility

shall constitute allowed senior superpriority administrative expense claims against each of the

Debtors (respectively, the "Tranche A Superpriority Claims" and the "Tranche B Superpriority

Claims" and together with the Tranche C Superpriority Claims, the "Superpriority Claims").  The

Debtors shall seek separate authorization with respect to the Tranche A Superpriority Claims and

Tranche B Superpriority Claims, which shall each be senior to the Tranche C Superpriority Claims

as will be provided for in any such subsequent order from this Court.  The Tranche C DIP Lenders

expressly consent to such treatment consistent with the terms and conditions of the DIP Loan

Documents.

10.     *Carve Out.*  Notwithstanding anything to the contrary in this Final DIP Order, the

Debtors' obligations to the DIP Agents, the Tranche C DIP Lenders and the Prepetition Secured

Parties and the liens, security interests and superpriority claims granted herein, under the DIP Loan

Documents, and/or under the Prepetition Secured Credit Documents, including the DIP Liens, the

Tranche C Superpriority Claims and the Permitted Priority Liens, shall be subject in all respects

and subordinate to the Carve Out.

11.     As used in this Final DIP Order, the "Carve Out" means the sum of (i) all fees

required to be paid to the Clerk of the Court and to the Office of the United States Trustee under

16

section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without

regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000

incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice

set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural

order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or

other transaction fee of any investment bankers or financial advisors) incurred by persons or firms

retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor

Professionals" and such fees the "Allowed Debtor Professional Fees") at any time before or on the

first business day following delivery by the Administrative Agent (at the direction of the Majority

DIP Lenders (as defined in the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined

herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv)

to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all

unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of

any investment bankers or financial advisors) incurred by persons or firms retained by the

Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee

Professionals" and together with the Debtors Professional, the "Professional Persons" and such

fees the "Allowed Committee Professional Fees" and together with the Allowed Debtor

Professional Fees, the "Allowed Professional Fees") at any time before or on the first business day

following delivery by the Administrative Agent (at the direction of the Majority DIP Lenders (as

defined in the DIP Credit Agreement) of a Carve Out Trigger Notice (as defined herein), whether

allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (v) Allowed Debtor

Professional Fees incurred after the first business day following delivery by the DIP Agents (at the

direction of the Majority DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at

any time, whether by interim order, procedural order, or otherwise in an aggregate amount not to exceed $[[_____]][5] and (vi) Allowed Committee Professional Fees incurred after the first business day following delivery by the DIP Agents (at the direction of the Majority DIP Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an amount not to exceed $[[_____]][6] (the amounts set forth in clauses (v and vi) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by either of the DIP Agents (at the direction of the Majority DIP Lenders) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the Tranche C DIP Obligations under the DIP Credit Agreement, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

12.    Carve Out Account and Carve Out Reserves.  The Debtors shall establish and fund a segregated account (the "Carve Out Account") for purposes of funding the Carve Out.  Upon entry of this Final DIP Order, the Carve Out Account will be funded from the Debtors' operating account.   Notwithstanding anything to the contrary in this Final DIP Order, the DIP Loan Documents, or the Prepetition Secured Credit Documents, under no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Loan Documents) shall the Debtors be prohibited in any way from accessing or drawing upon their main operating account for the purpose of funding the Carve Out Account. Commencing upon the earlier of (A) the first last day of the month or (B) the first 15th day of the month, in each case after the Closing Date, the Debtors shall deposit in the Carve Out

---

[5] Amount subject to further discussion between the lenders and Debtors.
[6] Amount subject to further discussion between the lenders and Debtors.

Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following two-week period in the DIP Budget plus twenty percent (20%) of such aggregate amount of Allowed Professional Fees projected to accrue in the next two week period in the DIP Budget (the "Bi-Weekly Funded Reserve Amount").  Each Professional Person shall deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding two-week period (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Bi-Weekly Funded Reserve Amount for the applicable periods, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Carve Out Account equal to the difference between the Bi-Weekly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").   At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person  and is then due and payable, the Debtors shall deposit in the Carve Out Account an amount equal to such fee.  Upon entry of this Final DIP Order, the Debtors shall deposit into the Carve Out Account an amount equal to (i) the Post-Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under paragraph 11(i) and (ii) above. The Carve Out Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Carve Out Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Secured Credit Documents or DIP Loan Documents and neither the Prepetition Secured Parties, the Tranche C DIP Lenders nor the DIP Agents shall be entitled to sweep or foreclosure on such amounts notwithstanding any provision to the contrary in the

Prepetition Secured Credit Documents or DIP Credit Documents. Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Carve Out Account.

13. On the day on which a Carve Out Trigger Notice is delivered by the Administrative Agent (at the direction of the Majority DIP Lenders) or the ABL Agent to the Debtors in accordance with paragraph 11 of this Final DIP Order, with a copy to counsel to the Creditors' Committee and the U.S. Trustee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; provided that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Debtors that cover such Professional Person's good faith estimate of the Allowed Professional Fees incurred through the Termination Declaration Date, and the Debtors shall fund into the Funded Reserve Amount any Top Off Amounts. The Debtors shall deposit and hold such amounts in the Carve Out Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash collateral, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of this Final DIP Order as set forth above). The Debtors shall deposit and hold such amounts in a segregated account at an institution designated by the DIP Agents (at the direction of the Majority DIP Lenders) in

20

trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice
Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger
Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-
Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i)
through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but
not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then,
to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the
DIP Agents for the benefit of itself and the Tranche C DIP Lenders in accordance with their pro
rata funding of the Carve Out Reserves. All funds in the Post-Carve Out Trigger Notice Reserve
shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set
forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger
Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of themselves
and the Tranche C DIP Lenders, unless the Tranche C DIP Obligations have been indefeasibly
paid in full, in cash (or other form of payment pursuant to paragraph 27 below), and all
commitments under the Tranche C DIP Commitment have been terminated, in which case any
such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and
priorities as set forth herein. Notwithstanding anything to the contrary in the DIP Loan Documents,
or this Final DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set
forth in this paragraph 13, then, any excess funds in one of the Carve Out Reserves following the
payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used
to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 13
prior to making any payments to the DIP Agents (for the benefit of themselves and the Tranche C
DIP Lenders) and the Prepetition Secured Parties, as applicable.

14.     Notwithstanding anything to the contrary in the DIP Loan Documents or this Final DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agents (at the direction of the Majority DIP Lenders) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agents for application in accordance with the DIP Loan Documents.   Further, notwithstanding anything to the contrary in this Final DIP Order, (i) disbursements by the Debtors from the Carve Out Account shall not constitute a Tranche C DIP Loan (as defined in the DIP Credit Agreement) or increase or reduce the Tranche C DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve -Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.   For the avoidance of doubt and notwithstanding anything to the contrary in this Final DIP Order, the DIP Loan Documents, or in any Prepetition Secured Credit Documents, the Carve Out as provided for and capped by this Final DIP Order shall be senior to all liens and claims securing the Tranche C DIP Commitment, the Permitted Priority Liens, and the Superpriority Claims, and any and all other forms of liens, or claims securing the Tranche C DIP Obligations or the Prepetition Secured Credit Documents. Notwithstanding the foregoing, the Tranche C DIP Lenders reserve all of their rights to challenge or otherwise object to any of the fees or expenses sought to be approved by any of the Professional Persons.

15.     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Carve Out Account.

16.      *No Direct Obligation To Pay Allowed Professional Fees*.  None of the DIP Agents, Tranche C DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment of reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final DIP Order or otherwise shall be construed to obligate the DIP Agents, the Tranche C DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

17.      *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

18.      *DIP Collateral*. As security for the Tranche C DIP Obligations, effective and perfected upon the date of this Final DIP Order and without the necessity of the execution, recordation of filings by the Debtors or the Tranche C DIP Lenders of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agents or any Tranche C DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agents, for the benefit of the DIP Agents and the Tranche C DIP Lenders (all property identified in clauses (a), and (b) subject to the exclusions of the Excluded Assets being collectively referred to as the "DIP Collateral"), subject, only to the Tranche A DIP

Liens (as defined below), the Tranche B DIP Liens (as defined below), the DIP Hedge Liens (as defined in the DIP Credit Agreement), and, in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve Out (all such liens and security interests granted to the DIP Agents, for the benefit of the Tranche C DIP Lenders, pursuant to this Final DIP Order and the DIP Loan Documents, the "Tranche C DIP Liens" and together with the Tranche A DIP Liens, Tranche B DIP Liens and DIP Hedge Liens, the "DIP Liens"):

(a)    First Lien on Previously Unencumbered Property. Pursuant to Bankruptcy Code 364(c)(2) and subject to the provisions of paragraph 24(d) hereof, valid, binding, enforceable, non-avoidable and fully-perfected senior security interests in and continuing lien on all of the Obligors' rights, title and interests in all of its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, business interruption insurance, supporting obligations and proceeds of all of the foregoing, other than Excluded Assets, to the extent such property is not otherwise subject to Permitted Priority Liens, including, for the avoidance of doubt, any spare engines, routes, slots and gates, equity in subsidiaries and intellectual property (the "Previously Unencumbered Property").

(b)    Liens Junior to Certain Other Liens. Pursuant to Bankruptcy Code section 364(c)(3) and subject to the provisions of paragraph 24(d) hereof, valid, binding, enforceable, non-avoidable and fully-perfected security interests in and continuing lien on all of the Guarantors' rights, title and interests in all of its property, whether now existing

or hereafter acquired, that is subject to Permitted Priority Liens, other than Excluded Assets, including, for the avoidance of doubt, any spare engines, routes, slots and gates, equity in subsidiaries and intellectual property (the "Previously Encumbered Collateral"), which security interests and liens in favor of the DIP Agents are junior to such valid, perfected and unavoidable liens.

(c)     Cash Collateral.  All of the Debtors' cash including any cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other DIP Collateral, constitutes Cash Collateral of the Tranche C DIP Lenders.

(d)     Upon entry of this Final DIP Order, the DIP Agents shall be deemed, without the necessity of any other or further action, additional insureds, loss payee, lender loss payee, and mortgagee under all insurance policies covering the DIP Collateral.

(e)     For the avoidance of doubt, the DIP Loan Documents contemplate that, as security for the obligations incurred under each of the Tranche A DIP Facility and the Tranche B DIP Facility, the lenders under each facility shall be granted security interests and liens on the DIP Collateral (respectively, the "Tranche A DIP Liens" and "Tranche B DIP Liens").  The Debtors shall seek separate authorization with respect to the Tranche A DIP Liens and Tranche B DIP Liens, which shall each be senior to the Tranche C DIP Liens.  The Tranche C DIP Lenders expressly consent to such treatment consistent with the terms and conditions of the DIP Loan Documents.

19.     *Protection of the Tranche C DIP Lenders' Rights*.

(a)     All DIP Collateral shall be free and clear of all liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Loan Documents or this Final DIP Order.

(b)      The automatic stay provisions of Bankruptcy Code section 362 or otherwise are vacated and modified to the extent necessary to permit, subject to the intercreditor provisions in Section 3.04 of the DIP Credit Agreement the DIP Agents and the Tranche C DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (subject to applicable grace periods) or the Maturity Date (as defined in the DIP Credit Agreement), all rights and remedies under the DIP Loan Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default (subject to any applicable grace periods) and the giving of five (5) business days' prior written notice to the Debtors (with the Debtors to promptly provide a copy to the Creditors' Committee, counsel to any other statutory committee, the United States Trustee, the Prepetition Secured Parties and each of their counsel) to the extent provided for in any DIP Loan Document, all rights and remedies against the DIP Collateral provided for in any DIP Loan Document (including, without limitation, to the extent applicable, the right to set off against any accounts maintained by the Debtors with the DIP Agents or any DIP Lender or any affiliate thereof) and provided that, upon the receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business and with respect to the Carve Out as provided herein, but may not disburse any other amounts.  In no event shall the DIP Agents or the Tranche C DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The delay or failure to exercise rights and remedies under the DIP Loan Documents or this Final DIP Order by the DIP Agents or any Tranche C DIP Lenders shall not constitute a waiver of the DIP Agents' or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to

a written instrument executed in accordance with the terms of the applicable DIP Loan Documents.

20.     *Disposition of Collateral*.    Except as provided in the DIP Loan Documents, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without (i) the prior written consent of the Majority Tranche C Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the Tranche C DIP Lenders, the Administrative Agent, or the Collateral Agent), or (ii) an order of this Court.

21.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, or the Cash Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law without the prior written consent of the DIP Agents, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents or the Tranche C DIP Lenders.

22.     In light of their agreement to subordinate their liens and superpriority claims to the Carve Out, the Tranche C DIP Lenders shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and, further, the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the DIP Agents or the Tranche C DIP Lenders with respect to the proceeds, products, offspring, or profits of any of their collateral.

23.     *Additional Liens*. All intercompany/affiliate liens of the Debtors, if any (other than any liens securing the Tranche C DIP Obligations), will be contractually subordinated to the Tranche C DIP Liens and the Tranche C DIP Obligations on terms satisfactory to the DIP Agents.

24.     *Perfection of the Tranche C DIP Liens*.

(a)    The DIP Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors as their true and lawful attorneys, with full power of substitution to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final DIP Order), at the time and on the date of this Final DIP Order.  Upon the request of the DIP Agents, each of the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments to enable the DIP Agents to further validate, perfect, preserve, and enforce the Tranche C DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A copy of this Final DIP Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices wherever located are hereby authorized and directed to accept such certified copy of this Final DIP Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Final DIP Order.

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties, or (ii) the

28

payment of any fees or obligations, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto in connection with the granting of the Tranche C DIP Liens is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Thereupon, any such provision shall have no force and effect with respect to the granting and perfection of the Tranche C DIP Liens or on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Loan Documents or this Final DIP Order.

(d)    For the avoidance of doubt, but without affecting the provisions of paragraph 18 hereof, the DIP Loan Documents will not require (i) the execution, filing or recording of mortgages other than the Real Estate Mortgages (as defined in the DIP Credit Agreement) in respect of real property, control agreements (other than with respect to the Disbursement Account, the Collateral Proceeds Account, if any (each as defined in the DIP Credit Agreement)), (ii) the taking of any action to obtain possession or control of any DIP Collateral (other than in respect of any Priority Pledged Equity Interests (as defined in the DIP Credit Agreement), (iii) or any action with respect to Intellectual Property (as defined in the DIP Credit Agreement) beyond the filing of Intellectual Property Security Agreements (as defined in the DIP Credit Agreement) in respect of Intellectual Property registered, issued or applied-for with the United States Patent and Trademark Office or the Copyright Office, (iv) the filing or taking of any action with respect to the perfection of any security interest in any Pledged Spare Part or Pledged Engine (each as defined in the DIP Credit Agreement) (other than Priority Pledged Engines, as defined in the DIP Credit Agreement and as contemplated in Schedule 5.03 of the DIP Credit Agreement), or (v) in

any event, or the making of any filing or taking of any action with respect to creation, perfection, priority or other action with respect to security interests in any jurisdiction outside of the United States in assets located, titled or arising or protected under the laws of a jurisdiction outside of the United States, except as provided in Section 5.03 of the DIP Credit Agreement and those agreements included in the definition of "Collateral Documents" in the DIP Credit Agreement.

25.     *Preservation of Rights Granted Under the Order.*

(a)     Other than (i) the Carve Out and (ii) as expressly contemplated in the DIP Loan Documents, no other claim or lien having a priority superior to or *pari passu* with those granted by this Final DIP Order to the DIP Agents, the Tranche C DIP Lenders shall be granted or allowed while any portion of the DIP Financing (or any refinancing thereof) or the commitments thereunder or the Tranche C DIP Obligations remain outstanding, and the Tranche C DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551 or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

(b)     Except as set forth in the DIP Credit Agreement and as more fully described in paragraph 27 below, unless all Tranche C DIP Obligations shall have indefeasibly been paid in cash in full or satisfied in a manner otherwise agreed to by all of the Tranche C DIP Lenders, the Debtors shall not seek, and it shall constitute an Event of Default if there is entered, (i) any modification or extension of this Final DIP Order without the prior written consent of the DIP Agents and the Tranche C DIP Lenders (or, to the extent the Tranche C DIP Obligations shall have been indefeasibly paid in cash in full or satisfied in a manner

30

otherwise agreed to by all of the Tranche C DIP Lenders, as applicable), and no such consent shall be implied by any other action, inaction or acquiescence, or (ii) an order converting or dismissing any of the Chapter 11 Cases.

(c)    If an order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise is at any time entered, such order shall be deemed to provide (in accordance with Bankruptcy Code sections 105 and 349) that (i) the superpriority claims and security interests granted to the DIP Agents and the Tranche C DIP Lenders pursuant to this Final DIP Order, and all other claims, liens, protections and other rights granted pursuant to this Final DIP Order, shall continue in full force and effect and shall maintain their priorities as provided in this Final DIP Order until all Tranche C DIP Obligations shall have been indefeasibly paid in cash in full (or, with respect to the Tranche C DIP Obligations, otherwise satisfied in a manner agreed to by each of the Tranche C DIP Lenders) and that such superpriority claims and security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, protections, rights and security interests referred to in (i) above.

(d)    If any or all of the provisions of this Final DIP Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any Tranche C DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agents on the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any Tranche C DIP Obligations.  Notwithstanding any such reversal, stay, modification

31

or vacation, or any Tranche C DIP Obligations incurred by the Debtors to the DIP Agents or the Tranche C DIP Lenders prior to the actual receipt of written notice by the DIP Agents of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Final DIP Order, and the DIP Agents and the Tranche C DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in Bankruptcy Code section 364(e), this Final DIP Order and pursuant to the DIP Loan Documents, with respect to such Tranche C DIP Obligations.

(e)      Except as expressly provided in this Final DIP Order or in the DIP Loan Documents, the Tranche C DIP Liens, the Tranche C Superpriority Claims and all other rights and remedies of the DIP Agents and the Tranche C DIP Lenders granted by the provisions of this Final DIP Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining Tranche C DIP Obligations. The terms and provisions of this Final DIP Order and the DIP Loan Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, the Tranche C DIP Obligations, the Tranche C DIP Liens, the Tranche C Superpriority Claims and all other rights and remedies of the DIP Agents and the Tranche C DIP Lenders granted by the provisions of this Final DIP Order and the DIP Loan Documents shall continue in

full force and effect until the Tranche C DIP Obligations are indefeasibly paid in cash in full or otherwise satisfied as described more fully in paragraph 27 below.

26.      *Limitation on Use of Financing Proceeds and Collateral.* Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, DIP Collateral, portion of the proceeds of the DIP Financing or part of the Carve Out may be used for any of the following (each, a "<u>Lender Claim</u>") without the prior written consent of each affected party: (a) to object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under any DIP Loan Document, or the liens or claims granted under this Final DIP Order, any DIP Loan Document, (b) to assert any claim or cause of action against the DIP Agents, any DIP Lender, or any of their respective agents, affiliates, representatives, attorneys or advisors, (c) to prevent, hinder or otherwise delay the DIP Agent's assertions, enforcement or realization on the DIP Collateral in accordance with the DIP Loan Documents, this Final DIP Order, or (d) to seek to modify any of the rights granted to the DIP Agents or the Tranche C DIP Lenders, hereunder or under the DIP Loan Documents.

27.      *Treatment of DIP Claims.*[7]   Except as otherwise provided in the DIP Loan Documents, on the Maturity Date, the Borrower shall pay to the Administrative Agent the then unpaid amount of the Tranche C DIP Loan then outstanding in accordance with the provisions of the DIP Credit Agreement.  Such repayment may be made in cash or pursuant to the Equity Subscription Election pursuant to Section 2.12 of the DIP Credit Agreement.

28.      *Reimbursement of Fees, Costs and Expenses of Tranche C DIP Lenders and DIP Agents.*  The Obligors shall pay (without regard to any limitations in the DIP Budget or the necessity of filing any application with or obtaining further order from the Court), in each case

---

[7]      All terms used but not otherwise defined in this paragraph 27 shall have the meanings set forth in the DIP Credit Agreement.

subject to and in accordance with the terms of the DIP Loan Documents, (i) all reasonable out-of-pocket fees, costs and expenses of the each of the Tranche C Initial Lenders (as defined in the DIP Credit Agreement) and each DIP Agent in connection with the preparation, execution, delivery of the DIP Loan Documents (including, without limitation, all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses), including (x) the reasonable documented fees and expenses of one primary counsel and one local law counsel for each Tranche C Initial Lender and one documentation counsel for the Tranche C Initial Lenders collectively, and (y) the reasonable fees and expenses of each Agent, in each case with respect thereto, and (ii) all reasonable out-of-pocket fees, costs and expenses of the DIP Agent (including reasonable fees and expenses of counsel) and the reasonable documented fees and expenses of one primary counsel and one local law counsel (but no documentation counsel), for each Tranche C Initial Lender in connection with the administration, modification and amendment of, or any consent or waiver under, the DIP Loan Documents and the other documents to be delivered hereunder and with respect to advising the Tranche C Initial Lender and each DIP Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the DIP Loan Documents, with respect to negotiations with the Obligors or with other creditors of the Obligors or any of their Subsidiaries (as defined in the DIP Credit Agreement) arising out of any Default (as defined in the DIP Credit Agreement) or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto and (iii) all costs and expenses of each DIP Agent and each DIP Lender in connection with the enforcement of the DIP Loan Documents, whether in any action, suit or litigation, or any

bankruptcy, insolvency, workout or restructuring or other similar proceeding affecting creditors'

rights generally (including, without limitation, the reasonable fees and expenses of counsel for

each Agent and each DIP Lender with respect thereto).  The Obligors shall pay the fees, expenses

and disbursements set forth in this paragraph without the necessity of filing formal fee applications,

regardless of whether such amounts arose or were incurred before or after the Petition Date;

provided that counsel of record for the Obligors, counsel of record for the Creditors' Committee

and the U.S. Trustee shall have the ability to challenge the reasonableness of any portion of

invoiced fees, expenses and disbursement (the "Invoiced DIP Fees" and any such challenged

amounts the "Disputed Invoiced DIP Fees") for a period of ten (10) business days (the "Review

Period") after receipt of invoices therefor (which invoices may be redacted or summarized for

protection of an applicable privilege or the work product doctrine) by, prior to the end of such

Review Period, notifying the DIP Agents and each affected Tranche C DIP Lender of the objection

in writing (to be followed by the filing with the Court of a motion or other pleading requesting a

determination of allowance or disallowance of the Disputed Invoiced DIP Fees) setting forth the

specific basis for each objection to the Disputed Invoiced DIP Fees.  Promptly following, and in

no event later than five (5) business days after a Review Period, the Obligors shall pay in full all

Invoiced DIP Fees other than any Disputed Invoiced DIP Fees. The Obligors shall pay any

Disputed Invoiced DIP Fees promptly upon approval by the Court, to the extent of such approval.

In no event shall any invoice or other statement submitted by any DIP Agents or Tranche C DIP

Lender to any Debtor, the Creditors' Committee, the U.S. Trustee or any other interested person

(or any of their respective Professional Persons (as defined in the DIP Credit Agreement)) with

respect to fees or expenses incurred by any professional retained by such party operate to waive

the attorney/client privilege, the work-product doctrine or any other evidentiary privilege or protection recognized under applicable law.

29.     *Order Governs.* In the event of any inconsistency between the provisions of this Final DIP Order and the DIP Loan Documents, the provisions of this Final DIP Order shall govern. Similarly, in the event of any inconsistency between the provisions of this Final DIP Order and the other DIP Loan Documents, on the one hand, and any other order entered by this Court, on the other, the provisions of this Final DIP Order and the other DIP Loan Documents (subject to the preceding sentence of this paragraph 29) shall govern.

30.     *Binding Effect; Successors and Assigns.* The DIP Loan Documents and the provisions of this Final DIP Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the Tranche C DIP Lenders, the Creditors' Committee, any other committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents and the Tranche C DIP Lenders. In determining to make the DIP Loans (whether under the DIP Credit Agreement, a promissory note or otherwise), or in exercising any rights or remedies as and when permitted pursuant to this Final DIP Order or the DIP Loan Documents, the DIP Agents, the Tranche C DIP Lenders shall not (i) be deemed to be in control of the Debtors or the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

31.    *No Fiduciary Duty to Debtors or Creditors.*  Nothing in the DIP Loans shall be deemed as creating an advisory, fiduciary, or agency relationship between the (i) Debtors and any non-Debtor affiliate, (ii) the Tranche C DIP Lenders, (iii) the Administrative Agent, (iv) the Collateral Agent, and (v) any of their respective affiliates. The Tranche C DIP Lenders do not directly or indirectly control the Debtors.  For the avoidance of doubt, the Tranche C DIP Lenders, in their capacity as Tranche C DIP Lenders, do not owe any fiduciary duties to the Debtors or any non-Debtor affiliates, their respective shareholders, or any creditors of the Debtors' respective bankruptcy estates.  The Tranche C DIP Lenders shall not be construed to be responsible persons under applicable law for purposes of any cause of action arising under any claim of operator liability, successor liability, breach of fiduciary duty, or any other form of liability related thereto.

32.    *No Impact on Certain Contracts or Transactions.* No rights of any entity in connection with a contract or transaction of the kind listed in Bankruptcy Code sections 555, 556, 559, 560 or 561, whatever they might or might not be, are affected by the provisions of this Final DIP Order.

33.    *Release.*  The Debtors forever and irrevocably (i) release, discharge, and acquit the Tranche C DIP Lenders, and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "Releasees") of and from any and all claims, demands liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have, including, without limitation, any claims arising from any actions of the Tranche C DIP Lenders solely in their capacity as Tranche C DIP Lenders pursuant to the terms of the Final DIP

Order and the DIP Loan Documents including any equitable subordination claims, relating to any aspect of the relationship between the Tranche C DIP Lenders and the Debtors, including any equitable subordination claims or defenses, with respect to or relating to the DIP Loans, the DIP Loan Documents, the Debtors' attempts to restructure the DIP Loans, any of the Debtors' other long-term indebtedness, consent to the terms of this Final DIP Order and the use of the Tranche C DIP Commitment hereunder, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Tranche C DIP Lenders; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Tranche C DIP Obligations; provided that such release shall not apply to any claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful misconduct or gross negligence of the Releasees.  Nothing in this Final DIP Order shall in any way be construed or interpreted to impose or allow the imposition upon the Tranche C DIP Lenders any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

34.    *Payments Held in Trust*.   Except as expressly permitted in this Final DIP Order or the DIP Loan Documents, and subject to the Carve Out in all respects, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to all Tranche C DIP Obligations being indefeasibly paid in full in accordance with the DIP Loan Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of

38

the DIP Agents and the Tranche C DIP Lenders and shall immediately turn over such proceeds to the DIP Agents, or as otherwise instructed by this Court, for application in accordance with the DIP Loan Documents and this Final DIP Order.

35.    *Credit Bidding*.  In connection with any sale process authorized by the Court, to the extent such authorization is granted to the Tranche A Leaders (as defined in the DIP Credit Agreement), whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Agents (or its designee), at the direction of the Majority Tranche C DIP Lenders, may credit bid in connection with the sale of any Debtors' assets up to the full amount of the outstanding Tranche C DIP Obligations in each case including any accrued and unpaid interest, expenses, fees, and other obligations for their respective priority collateral (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code.

36.    *No Third-Party Rights*.  Except as explicitly provided for herein, this Final DIP Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

37.    *Retention of Jurisdiction*.  The Court has and will retain exclusive jurisdiction to resolve any and all disputes arising under or related to the DIP Loans, the DIP Loan Documents, and/or this Final DIP Order, and to enforce all of the terms and conditions of the DIP Loan Documents and this Final DIP Order.

38.    *Modification of Automatic Stay*.  To the extent not already provided for herein, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary for the relevant parties to effectuate all of the terms and provisions of this Final DIP Order.

39.    *Cash Collateral – Debtors Permitted Use*.  Debtors are hereby authorized to utilize the Tranche C DIP Lenders cash collateral consistent with the provisions of this Final DIP Order, the DIP Credit Agreement, and the Budget.

40.    *Effectiveness*. This Final DIP Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final DIP Order.

41.    *Headings*. Section headings used herein are for convenience only and are not to affect the construction or to be taken into consideration in interpreting this Final DIP Order.

Dated: _____, 2020
        New York, New York

_____
HONORABLE JAMES L. GARRITY JR.
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>:**
**DIP Credit Agreement**

SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

dated as of July [___], 2020

among

LATAM AIRLINES GROUP S.A., a debtor and a debtor-in-possession as Borrower,

THE GUARANTORS PARTY HERETO,
each a debtor and a debtor-in-possession,

THE DIP LENDERS PARTY HERETO,


[___], as Administrative Agent,

[___], as Local Collateral Agent,

and

[___],

as Collateral Agent

**US$2,150,000,000 Super-Priority Debtor-in-Possession Term Loan Facility**

1

## Table of Contents

**Page**

Section 1. DEFINITIONS.................................................................. 6
    Section 1.01.    Defined Terms...............................................6
    Section 1.02.    Terms Generally .............................................43
    Section 1.03.    Accounting Terms; IFRS....................................44
    Section 1.04.    Divisions....................................................44

Section 2. AMOUNT AND TERMS OF CREDIT ................................. 45
    Section 2.01.    Loans .......................................................45
    Section 2.02.    Requests for DIP Loans....................................45
    Section 2.03.    Reserved....................................................46
    Section 2.04.    Funding of Loans..........................................46
    Section 2.05.    Pro Rata Share, Availability ...............................47
    Section 2.06.    Use of Proceeds. ...........................................47
    Section 2.07.    Interest on Loans ..........................................48
    Section 2.08.    Default Interest ............................................49
    Section 2.09.    Accrual of Interest. ........................................49
    Section 2.10.    Fees........................................................50
    Section 2.11.    Repayment of Loans; Evidence of Debt...................51
    Section 2.12.    Equity Subscription Election..............................51
    Section 2.13.    Mandatory Prepayments...................................52
    Section 2.14.    Voluntary Prepayments ...................................53
    Section 2.15.    Application of Prepayment Amounts .....................53
    Section 2.16.    Waivable Mandatory Prepayment. ........................54
    Section 2.17.    Increased Costs............................................55
    Section 2.18.    Mitigation Obligations; Replacement of Lenders. .......56
    Section 2.19.    Taxes......................................................58
    Section 2.20.    Payments Generally; Pro Rata Treatment .................60
    Section 2.21.    Reserved ...................................................61
    Section 2.22.    Reserved ...................................................61
    Section 2.23.    Reserved. ..................................................61
    Section 2.24.    Reserved ...................................................61
    Section 2.25.    Right of Set-Off............................................61
    Section 2.26.    Payment of DIP Obligations...............................62
    Section 2.27.    Defaulting DIP Lenders...................................62
    Section 2.28.    Increase in Tranche C Commitment.......................64

Section 3. PRIORITY AND LIENS ................................................ 65
    Section 3.01.    DIP Liens..................................................65
    Section 3.02.    No Action With Respect to DIP Collateral ...............67
    Section 3.03.    No Interference.............................................69
    Section 3.04.    Rights of DIP Lenders .....................................70

Section 4. REPRESENTATIONS AND WARRANTIES...........................71

Section 4.01.    Organization and Authority ............................................................71
Section 4.02.    Air Carrier Status; Permits; Aircraft Operator; Permits ..............71
Section 4.03.    Due Execution ................................................................................71
Section 4.04.    Statements Made ............................................................................72
Section 4.05.    Financial Statements; Material Adverse Change ..........................72
Section 4.06.    Ownership of Subsidiaries..............................................................72
Section 4.07.    Use of Proceeds .............................................................................73
Section 4.08.    Litigation and Compliance with Laws ...........................................73
Section 4.09.    Margin Regulations; Investment Company Act .............................73
Section 4.10.    Ownership of Property ...................................................................73
Section 4.11.    Intellectual Property ......................................................................74
Section 4.12.    Perfected Security Interests ...........................................................74
Section 4.13.    Insurance ........................................................................................75
Section 4.14.    Payment of Taxes. .........................................................................75
Section 4.15.    Employee Matters...........................................................................75
Section 4.16.    Sanctions; Anti-corruption; Anti-Money Laundering Laws .........77
Section 4.17.    Process Agent .................................................................................77
Section 4.18.    DIP Orders......................................................................................77
Section 4.19.    Appointment of Trustee or Examiner; Liquidation .......................78
Section 4.20.    Environmental Compliance ............................................................78
Section 4.21.    No Default .......................................................................................78
Section 4.22.    Beneficial Ownership Certificate ...................................................78

Section 5. CONDITIONS OF LENDING ..................................................................... 79
Section 5.01.    Conditions Precedent to Initial Funding........................................79
Section 5.02.    Conditions Precedent to Each DIP Loan .......................................81
Section 5.03.    Post-Closing Obligations................................................................82

Section 6. AFFIRMATIVE COVENANTS ................................................................... 83
Section 6.01.    Financial Statements, Reports, etc ................................................83
Section 6.02.    Taxes...............................................................................................86
Section 6.03.    Stay, Extension and Usury Laws ....................................................86
Section 6.04.    Corporate Existence .......................................................................86
Section 6.05.    Compliance with Laws ...................................................................87
Section 6.06.    Air Carrier Status...........................................................................87
Section 6.07.    Collateral Ownership......................................................................87
Section 6.08.    [Reserved.........................................................................................87
Section 6.09.    Insurance ........................................................................................87
Section 6.10.    Additional Guarantors and Grantors .............................................88
Section 6.11.    Further Assurances .........................................................................88
Section 6.12.    Maintenance, Use and Operation of DIP Collateral.......................88
Section 6.13.    Use of Proceeds .............................................................................88
Section 6.14.    Cash Management System ..............................................................89
Section 6.15.    Assumption Order ..........................................................................89
Section 6.16.    Debtor-in-Possession Obligations ..................................................89
Section 6.17.    Bankruptcy Milestones...................................................................89
Section 6.18.    Consolidated Liquidity ...................................................................89

#93334561v28

Section 6.19.    Maintenance of Properties; Books and Records...........................89

Section 7. NEGATIVE COVENANTS ............................................................................ 90
Section 7.01.    Limitation on Sales of DIP Collateral ...........................................90
Section 7.02.    Transactions with Affiliates ..........................................................91
Section 7.03.    Liens ..............................................................................................91
Section 7.04.    Business Activities .........................................................................91
Section 7.05.    Merger or Consolidation ...............................................................91
Section 7.06.    Use of Proceeds .............................................................................92
Section 7.07.    Use of DIP Collateral ....................................................................92
Section 7.08.    Sale and Leasebacks ......................................................................92
Section 7.09.    Indebtedness ..................................................................................93
Section 7.10.    [Reserved]. ....................................................................................93
Section 7.11.    Investments ....................................................................................93
Section 7.12.    Restricted Payments ......................................................................93
Section 7.13.    Fiscal Year; Accounting Policies ..................................................94
Section 7.14.    Limitations on Negative Pledge Clauses .......................................94
Section 7.15.    Bankruptcy Related Matters ..........................................................94

Section 8. EVENTS OF DEFAULT ............................................................................... 95
Section 8.01.    Events of Default ...........................................................................95

Section 9. THE AGENTS ............................................................................................... 99
Section 9.01.    Administration by Agents ..............................................................99
Section 9.02.    Rights of Agents ..........................................................................100
Section 9.03.    Liability of Agents .......................................................................100
Section 9.04.    Reimbursement and Indemnification ..........................................102
Section 9.05.    Successor Agents .........................................................................102
Section 9.06.    Independent DIP Lenders .............................................................103
Section 9.07.    Advances and Payments ..............................................................103
Section 9.08.    Sharing of Setoffs ........................................................................103
Section 9.09.    Withholding Taxes .......................................................................104

Section 10. GUARANTY ............................................................................................. 104
Section 10.01.    Guaranty .....................................................................................104
Section 10.02.    No Impairment of Guaranty .......................................................105
Section 10.03.    Continuation and Reinstatement, etc .........................................106
Section 10.04.    Subrogation ................................................................................106
Section 10.05.    Subordination .............................................................................106
Section 10.06.    Right of Contribution .................................................................107
Section 10.07.    Amendments, etc. with Respect to the DIP Obligations;
                  Waiver of Rights .......................................................................107

Section 11. MISCELLANEOUS ................................................................................... 108
Section 11.01.    Notices........................................................................................108
Section 11.02.    Successors and Assigns ..............................................................109
Section 11.03.    Confidentiality............................................................................113

3

Section 11.04.    Expenses; Indemnity; Waiver ....................................................114
Section 11.05.    Governing Law; Jurisdiction; Consent to Service of
                  Process; Immunity..............................................................117
Section 11.06.    No Waiver ...........................................................................118
Section 11.07.    Extension of Maturity..........................................................119
Section 11.08.    Amendments, etc .................................................................119
Section 11.09.    Severability.........................................................................121
Section 11.10.    Headings..............................................................................121
Section 11.11.    Survival ...............................................................................121
Section 11.12.    Execution in Counterparts; Integration; Effectiveness...............122
Section 11.13.    USA Patriot Act...................................................................122
Section 11.14.    New Value ...........................................................................122
Section 11.15.    WAIVER OF JURY TRIAL ................................................122
Section 11.16.    No Fiduciary Duty................................................................123
Section 11.17.    Registrations with International Registry...................................123
Section 11.18.    Currency Indemnity.............................................................123
Section 11.19.    Acknowledgement and Consent to Bail-In of Affected
                  Financial Institutions ..........................................................124
Section 11.20.    Certain ERISA Matters ........................................................124
Section 11.21.    Acknowledgement Regarding Any Supported QFCs ................126

EXHIBITS:

Exhibit A        --        Form of Assignment and Assumption
Exhibit B        --        Form of Brazilian Engine Pledge
Exhibit C        --        Form of Chilean Engine Pledge
Exhibit D        --        Form of Chilean Mortgage
Exhibit E        --        Form of Chilean Share Pledge Agreement
Exhibit F        --        Form of Colombian Engine Pledge
Exhibit G        --        Form of Colombian Pledge Over Commercial Establishment
Exhibit H        --        Form of Colombian Share Pledge Agreement
Exhibit I        --        Form of DIP Hedge Provider Letter Agreement
Exhibit J        --        Form of Ecuadorian Share Pledge Agreement
Exhibit K        --        Form of FAA Engine Mortgage
Exhibit L        --        Form of Intercompany Note
Exhibit M        --        Form of Intercompany Subordination Agreement
Exhibit N        --        Form of Lease Subordination Agreement
Exhibit O        --        Form of Loan Request
Exhibit P        --        Form of Chilean Notarial Public Deed
Exhibit Q        --        Form of Peruvian Engine Pledge
Exhibit R        --        Form of Peruvian Mortgage
Exhibit S        --        Form of Peruvian Share Pledge
Exhibit T        --        Form of Tranche C Joinder Agreement
Exhibit U        --        Form of Promissory Note
Exhibit V        --        Pledged Spare Parts Covenants
Exhibit W        --         Pledged Engines Covenants

SCHEDULES:

| | | |
|---|---|---|
| Schedule 1.1(a) | -- | Permitted Liens |
| Schedule 1.1(b) | -- | Pre-Petition Indebtedness |
| Schedule 1.1(c) | -- | Pre-Petition Letters of Credit |
| Schedule 1.1(d) | -- | Priority Pledged Engines |
| Schedule 1.1(e) | -- | Initial Commitments and DIP Lenders |
| Schedule 1.1(f) | -- | Post-Petition Letters of Credit |
| Schedule 2.12(a) | -- | Equity Subscription Election |
| Schedule 4.06 | -- | Subsidiaries |
| Schedule 4.12 | -- | Mortgaged Real Estate |
| Schedule 5.03(a) | -- | Tranche A Post-Closing Obligations |
| Schedule 5.03(b) | -- | Tranche C Post-Closing Obligations |
| Schedule 6.02 | -- | Airport Fees |
| Schedule 7.02 | -- | Affiliate Transactions |
| Schedule 7.05 | -- | Mergers and Consolidations |
| Schedule 7.11 | -- | Investments |

SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM  LOAN AGREEMENT (as amended, restated, modified, supplemented, extended or amended and restated from time to time, the "Agreement"), executed in the City of New York, United States of America, dated as of July [__], 2020, among LATAM AIRLINES GROUP S.A., a *sociedad anónima* duly organized and validly existing under the laws of Chile, (the "Borrower"), CERTAIN AFFILIATES OF THE BORROWER, each a Chapter 11 debtor-in-possession, as Guarantors (the "Guarantors"), each of the several banks and other financial institutions or entities from time to time party hereto (the "DIP Lenders"), [__],as administrative agent (in such capacity, the "Administrative Agent"), [__] as local collateral agent (in such capacity, the "Local Collateral Agent"), and [__], as collateral agent (in such capacity, the "Collateral Agent").

## RECITALS:

WHEREAS, on the Petition Date, each of the Borrower and the Guarantors (the "Obligors"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (each, a "Chapter 11 Case" and, collectively the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (together with any other court having jurisdiction over any of the Chapter 11 Cases or any proceeding therein from time to time, the "Bankruptcy Court"), jointly administered under Case Number 20-11254;

WHEREAS, the Obligors are continuing to operate their business and manage their property as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

#93334561v28

WHEREAS, in connection with the filing of the Chapter 11 Cases of the Obligors, Borrower has requested that the DIP Lenders provide a delayed-draw term loan facility in an aggregate principal amount of US$2,150,000,000, consisting of (i) up to US$[__] under a Tranche A Facility (defined below), (ii) up to US$[__] under a Tranche B Facility (defined below) and (iii) up to US$1,150,000,000 under a Tranche C Facility (defined below);

WHEREAS, on July [__], 2020, the Bankruptcy Court entered an order authorizing the Obligors to, among other things, obtain senior secured, super-priority, post-petition financing, and grant liens and super-priority, post-petition claims, pursuant to Bankruptcy Code Sections 105, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-2, (as amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereto, the "Final DIP Order");

WHEREAS, the Borrower and the Guarantors party hereto have agreed to guarantee the DIP Obligations of the Borrower hereunder and to secure the DIP Obligations by granting to Collateral Agent and/or the Local Collateral Agent, as applicable, for the benefit of DIP Secured Parties, the Liens described herein; and

WHEREAS, upon satisfaction of the conditions set forth in Section 5, the DIP Lenders have agreed to extend such credit to the Borrower upon the terms and conditions set forth herein, the proceeds of which will be used exclusively for the purposes set forth in Section 2.06 and in the Final DIP Order.

Accordingly, the parties hereto hereby agree as follows:

## SECTION 1.

## DEFINITIONS

Section 1.01.    Defined Terms.

"Acceptable Letter of Credit" shall mean an irrevocable standby letter of credit on customary terms issued by a U.S. bank or branch having a long term unsecured debt rating of at least A (or the equivalent) or better by S&P, Moody's or Fitch and drawable by the Administrative Agent upon presentation in New York.

"Administrative Agent" shall have the meaning set forth in the first paragraph herein.

"Administrative Expense Claims" shall have the meaning set forth in Section 3.01(d).

"Administrative Agent Fee Letter" shall have the meaning set forth in Section 2.10(b).

"Administrator" shall have the meaning given it in the Regulations and Procedures for the International Registry.

#93334561v28

"Adverse Proceeding" shall mean any action, suit, proceeding, hearing (in each case, whether administrative or judicial), governmental investigation or arbitration at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Obligor, threatened in writing against or affecting any Obligor or any property of any Obligor.

"Affected Financial Institution" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be "controlled by" another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of the Controlled Person whether by contract or otherwise.

"Affiliate Costs and Expenses" shall have the meaning set forth in Section 7.11(g).

"Agent" shall mean the Administrative Agent, the Collateral Agent and the Local Collateral Agent, as applicable.

"Agreement" shall have the meaning set forth in the first paragraph herein.

"Aggregate Exposure" shall mean, with respect to any DIP Lender at any time, an amount equal to the amount of such DIP Lender's DIP Loans and unfunded DIP Commitment.

"Aggregate Exposure Percentage" shall mean, with respect to any DIP Lender at any time, the ratio (expressed as a percentage) of such DIP Lender's Aggregate Exposure at such time to the Aggregate Exposure of all DIP Lenders at such time.

"Air Carrier Guarantors" shall mean all Guarantors that own and operate Aircraft.

"Aircraft" shall mean any contrivance invented, used, or designed to navigate, or fly in, the air, which includes the engines affixed thereto.

"Aircraft Assets" shall mean all Aircraft, operating, tax or finance leases relating to Aircraft, maintenance or service agreements or purchase agreements with respect to Aircraft and equity interests of Subsidiaries party to any such agreements, to the extent such Subsidiaries are special purpose entities holding no assets, other than such Aircraft, bank accounts, leases and related collateral.

"Aircraft Protocol" shall mean the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States or any other applicable jurisdiction, as the case may be.

"Airport Authority" shall mean any city or any public or private board or other body or organization chartered or otherwise established for the purpose of administering, operating or managing airports or related facilities, which in each case is an owner, administrator, operator or manager of one or more airports or related facilities.

"Amaro Group" shall mean TEP Chile S.A. and the group of individuals that as of the date hereof, are the Controlling Persons of TEP Chile S.A., Kadoli Participações Ltda., NOA Participações Ltda. Air Holdings International 2 Ltd., Air Holdings International 3 Ltd., Hujomaisa & Co. Participações Ltda., and their respective heirs and successors, as well as any other entities Controlled by such individuals heirs and successors.

"Anti-Money Laundering Laws" shall mean any and all laws, rules and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries or Affiliates from time to time concerning or relating to terrorism financing, money laundering or any predicate crime to money laundering, including, without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Appliance" shall mean any instrument, equipment, apparatus, part, appurtenance, or accessory used, capable of being used, or intended to be used, in operating or controlling Aircraft in flight, including a parachute, communication equipment, and another mechanism installed in or attached to Aircraft during flight, and not a part of an Aircraft or Engine.

"Approved Fund" shall have the meaning given such term in Section 11.02(b).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a DIP Lender and an assignee (with the consent of any party whose consent is required by Section 11.02), and accepted by the Administrative Agent, substantially in the form of Exhibit A.

"Assumption Order" shall have the meaning as provided in Section 6.15.

"Available Liquidity Condition" shall have the meaning given such term in Section 5.02(g).

"Aviation Authorities" shall mean:

(a)    the *Dirección General de Aeronáutica Civil* of Chile and any successor organization and each other Government Authority or other Person who shall from time to time be vested with the control and supervision of, or have jurisdiction over, the registration, airworthiness and operation of Aircraft or other matters relating to civil aviation in Chile;

(b)    the FAA; and/or

(c)    any other Governmental Authority which, from time to time, has control or supervision of civil aviation,

each an "Aviation Authority".

8

"Avoidance Actions" shall mean claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code or any other similar state or federal law.

"Back-end Fee" shall have the meaning set forth in Section 2.10(a).

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part 1 of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" shall have the meaning specified in the first recital hereto.

"Bankruptcy Rules" the Federal Rules of Bankruptcy Procedure and local rules of the Bankruptcy Court, each as amended, and applicable to the Chapter 11 Cases.

"Bankruptcy Event" shall mean, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Bankruptcy Law" shall mean the Bankruptcy Code or any similar federal or state law for the relief of debtors.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Benefit Plan" shall mean any U.S. Benefit Plan, any Foreign Government Scheme or Arrangement and any Foreign Plan, in each case, established, maintained or contributed to by any Obligor or under which any Obligor has any liability, contingent or otherwise.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" shall mean:

(a)    with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)    with respect to a partnership, the Board of Directors of the general partner of the partnership;

(c)    with respect to a limited liability company, the managing member or members, manager or managers or any controlling committee of managing members or managers thereof; and

(d)    with respect to any other Person, the board, committee or administrator of such Person serving a similar function.

"Borrower" shall have the meaning set forth in the first paragraph of this Agreement.

"Borrowing" shall mean the incurrence or continuation of DIP Loans made from all the DIP Lenders on a single date.

"Brazilian Engine" shall mean, from time to time, any Engine habitually based in Brazil.

"Brazilian Engine Pledge" shall mean, with respect to each pledged Brazilian Engine that is a Priority Pledged Engine, a first priority Brazilian law mortgage, by a Grantor in favor of the Collateral Agent, in substantially the form of Exhibit B.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City, Santiago, Chile, Rio de Janeiro, São Paulo, Lima, Bogota, London and Doha, State of Qatar are required or authorized to remain closed.

"Cape Town Convention" shall mean the official English language text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements and revisions thereto, as in effect in the United States or any other applicable jurisdiction, as the case may be.

"Cape Town Treaty" shall mean, collectively, (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations (including but not limited to the Regulations and Procedures for the International Registry) adopted pursuant thereto and all amendments, supplements and revisions thereto.

"Capital Stock" shall mean, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) such person's equity, including any preferred stock.

"Carve-Out" shall have the meaning given to it in the Final DIP Order.

"Carve-Out Account" shall have the meaning given to it in the Final DIP Order.

"Carve-Out Expenses" shall have the meaning given to it in the Final DIP Order.

"Cash Collateral" shall mean all cash and Cash Equivalents of the Obligors, whenever or wherever acquired and the proceeds of all DIP Collateral.

"Cash Equivalents" shall mean each of the following to the extent denominated in Dollars:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one (1) year from the date of acquisition thereof;

(b)     Acceptable Letters of Credit;

(c)     investments in commercial paper maturing within 365 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-2 (or the equivalent thereof) from S&P or P-2 (or the equivalent thereof) from Moody's;

(d)     investments in certificates of deposit (including investments made through an intermediary, such as the certificated deposit account registry service), banker's acceptances, time deposits, eurodollar time deposits and overnight bank deposits maturing within one (1) year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any other commercial bank of recognized standing organized under the laws of the United States or any State thereof that has a combined capital and surplus and undivided profits of not less than $250.0 million;

(e)     fully collateralized repurchase agreements with a term of not more than six (6) months for underlying securities that would otherwise be eligible for investment;

(f)     investments in money in an investment company registered under the Investment Company Act of 1940, as amended, or in pooled accounts or funds offered through mutual funds, investment advisors, banks and brokerage houses which invest its assets in obligations of the

11

type described in clauses (1) through (5) above.  This could include, but not be limited to, money market funds or short- term and intermediate bonds funds;

(g)        money market funds that (A) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (B) are rated AAA (or the equivalent thereof) by S&P and Aaa (or the equivalent thereof) by Moody's and (C) have portfolio assets of at least $5.0 billion;

(h)        deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $100.0 million;

(i)        securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A- by S&P or A3 by Moody's; and

(j)        any other securities or pools of securities that are classified under IFRS as Cash Equivalents or short-term investments on a balance sheet.

"Cash Flow Statement and Notes" shall have the meaning given such term in Section 6.01(a).

 "Cash Management Order" shall mean that Final Order (I) Authorizing Continued Use of Cash Management System, (II) Authorizing the Continuation of Intercompany and Affiliate Transactions, (III) Granting Administrative Priority Status to Postpetition Intercompany and Applicable Affiliate Claims, (IV) Waiving Compliance with Restrictions Imposed by Section 345 of the Bankruptcy Code, and (V) Authorizing Continued Use of Prepetition Bank Accounts, Payment Methods, and Existing Business Forms (ECF No. ###), as amended from time to time.

"Cayman Companies Law" shall mean the Companies Law (2020 Revision) of the Cayman Islands.

"Cayman JPLs" shall mean the joint provisional liquidators appointed by the Grand Court of the Cayman Islands with regard to LATAM Finance Limited and Peuco Finance Limited pursuant to the Cayman JPL Applications.

"Cayman JPL Applications" shall mean the applications pursuant to section 104(3) of the Cayman Companies Law for the appointment of the Cayman JPLs in furtherance of the Chapter 11 Cases.

"Change in Law" shall mean, after the date hereof, (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that

12

notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" shall mean the occurrence of one or more of the following events: (i) the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Borrower, (ii) any sale, lease, exchange or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the assets of the Borrower and the Grantors, taken as a whole, to any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), to any transferee Person other than the Permitted Holders; provided a Change of Control shall not be triggered under this clause (ii) as a result of a transfer of all or substantially all of the Obligors' assets in connection with a Company Approved Reorganization Plan, or (iii) the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means) as a result of which any "person" or "group" other than the Permitted Holders becomes a "controller" of the Borrower in the meaning set forth in Article 97 and 99 of the Chilean Securities Market Act; provided, however, no Change of Control shall occur as a result of a share transfer by a Tranche C Lender in violation of **Error! Reference source not found.**.

"Chapter 11 Case" or "Chapter 11 Cases" shall have the meaning specified in the first recital hereto.

"Chapter 11 Plan" shall mean a plan of reorganization filed in any of the Chapter 11 Cases under Section 1121 of the Bankruptcy Code.

"Charges" shall have the meaning set forth in Section 2.07(d).

"Chilean Engine" shall mean, from time to time, any Engine habitually based in Chile.

"Chilean Engine Pledge" shall mean, with respect to each pledged Chilean Engine that is a Priority Pledged Engine, a first priority pledge without conveyance, by a Grantor in favor of the [Local Collateral Agent], in substantially the form of Exhibit C.

"Chilean Income Tax Law" shall mean the income tax law of Chile (*Ley sobre Impuesto a la Renta*), contained in Decree Law No. 824 of 1974.

"Chilean Liquidation Event" shall have the meaning set forth in Section 8.01(i).

#93334561v28

"Chilean Local Reorganization Proceeding" shall mean a Procedimiento de Reorganización Judicial de la Empresa Deudora or a proceeding seeking an Acuerdo de Reorganización Simplificado, in either case, before a Chilean civil court, pursuant to the Chilean Insolvency and Reorganization Law No. 20,720 (Ley de Insolvencia y Reemprendimiento) with respect to any of LATAM Airlines Group S.A. Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Holdco Colombia I SpA, Holdco Colombia II SpA, Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A., Technical Training LATAM S.A. and Holdco Ecuador S.A.

"Chilean Mortgage" shall mean certain mortgage agreements executed by means of Chilean public deeds by and between the Borrower and the [Local Collateral Agent] substantially in the form attached as Exhibit D hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time, whereby the Borrower or a Guarantor shall grant a mortgage (hipoteca) over certain real property contained on Schedule 4.12 to the [Local Collateral Agent] for the benefit of the DIP Secured Parties.

"Chilean Recognition Proceeding" shall mean the proceeding conducted before the Second Civil Court of Santiago, Chile, caratulated LATAM Airlines Group S.A./ Technical Training Latam S.A., Rol N° C-8.553-2020, concerning the recognition in Chile of the Chapter 11 Cases as foreign main insolvency proceedings pursuant to the Chilean Insolvency and Reorganization Law No. 20,720 (Ley de Insolvencia y Reemprendimiento) with respect to LATAM Airlines Group S.A. Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Holdco Colombia I SpA, Holdco Colombia II SpA, Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A., Technical Training LATAM S.A. and Holdco Ecuador S.A.

"Chilean Securities Market Act" shall mean Chilean *Ley 18,045 sobre Mercado de Valores*.

"Chilean Share Pledge Agreement" shall mean that certain pledge without conveyance agreement over certain Priority Pledged Equity Interests executed by means of a Chilean public deed by and between the Grantor party thereto and the [Local Collateral Agent], for the benefit of the DIP Secured Parties, substantially in the form attached as Exhibit E hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Chilean Stamp Tax" shall mean *impuesto de timbres y estampillas* established *Decree Law No. 3475* of year 1980, *Ley Sobre Impuesto de Timbres y Estampillas*.

"Closing Date" shall mean the date on which this Agreement has been executed and the conditions precedent set forth in Section 5.01 have been satisfied or waived.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral Agent" shall have the meaning set forth in the first paragraph of this Agreement.

14

"Collateral Documents" shall mean, collectively, the Pledge and Security Agreement, the Engine Security Documents, the Foreign Pledge Agreements, the Real Estate Mortgages, the Intellectual Property Security Agreements, any Deposit Account Control Agreement required hereunder, and any other instrument or agreement (which is designated as a Collateral Document therein) executed and delivered by any Obligor to the Administrative Agent, the Collateral Agent or the Local Collateral Agent, in each case so long as such agreement, instrument or document shall not have been terminated in accordance with its terms.

"Collateral Proceeds Account" shall have the meaning set forth in Section 2.13(a).

"Collateral Sale" shall mean any sale of DIP Collateral or series of related sales of DIP Collateral other than Permitted Dispositions.  For the avoidance of doubt, Aircraft (other than Pledged Engines and Pledged Spare Parts) and financial leases, operating leases, interchanges or charters of such Aircraft are not DIP Collateral and nothing herein restricts Obligors from entering into a sub-lease, interchange or charter of such Aircraft or rejecting leases of such Aircraft in the Chapter 11 Cases.

"Colombian Engine" shall mean, from time to time, any Engine habitually based in Colombia.

"Colombian Engine Pledge" shall mean, with respect to each pledged Colombian Engine that is a Priority Pledged Engine, a first priority pledge without conveyance, by a Grantor in favor of the Collateral Agent, in substantially the form of Exhibit F.

"Colombian Pledge Over Commercial Establishment Agreement" shall mean that certain pledge over commercial establishment agreement over the commercial establishments of the Colombian Debtors (*contrato de prenda sobre establecimiento de comercio*), executed by and between the Grantor party thereto and the [Collateral Agent] substantially in the form attached as Exhibit G hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Colombian Recognition Proceeding" shall mean the recognition proceeding before the Superintendence of Companies of Colombia, whereby the Chapter 11 Cases have been recognized as foreign main insolvency proceedings pursuant to Title III of Law No. 1116 of 2006.

"Colombian Share Pledge Agreement" shall mean that certain movable guarantee agreement over certain Priority Pledged Equity Interests (*contrato de garantía mobiliaria sobre acciones*), executed by and between the Grantor party thereto and the [Collateral Agent] substantially in the form attached as Exhibit H hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"Company Approved Reorganization Plan" shall mean a Chapter 11 Plan, as proposed by the Borrower and approved by the board of directors of LATAM, for each of the Obligors that provides for (i) the termination of the DIP Commitments and (ii) (a) if no Equity

15

Subscription Elections have been made, the payment in full of the DIP Obligations (other than contingent indemnification obligations not yet due and payable) and (b) if any Equity Subscription Elections have been made, (x) the payment in full of all Tranche A Obligations and all Tranche B Obligations and all Tranche C Obligations in respect of which an Equity Subscription Election has not been made, subject to the provisions of Schedule 2.12 (other than contingent indemnification obligations not yet due and payable), and (y) in respect of all Tranche C Obligations in respect of which an Equity Subscription Election has been made, subject to the provisions of Schedule 2.12, the satisfaction, in full, of the obligation to issue New Shares in respect of such Tranche C Obligations, all in accordance with Section 2.12, on the Consummation Date of such Chapter 11 Plan.

"Consolidated Liquidity" shall mean the sum of (i) undrawn DIP Commitments under the DIP Facility plus (ii) unrestricted cash and Cash Equivalents of the Obligors.

"Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Chapter 11 Plan that is confirmed pursuant to an order of the Bankruptcy Court; provided, that for purposes hereof the Consummation Date of the Chapter 11 Plan shall be no later than the "effective date" thereof.

"Controlled Account" shall mean any Deposit Account of an Obligor that is subject to a Deposit Account Control Agreement, including, but not limited to, the Disbursement Account and the Collateral Proceeds Account (if any).

"Costa Verde" shall mean Costa Verde Aeronáutica S.A. and the group of individuals that as of the date hereof, are the Controlling Persons of Costa Verde, and their respective heirs and successors.

"COVID-19 Extension" shall have the meaning set forth in Section 8.01(k).

"Creditors' Committee" shall mean the official committee of unsecured creditors appointed in any of the Chapter 11 Cases on June 5, 2020.

"Cueto Group" shall mean Costa Verde Aeronáutica S.A., and the group of individuals that as of the date hereof are the Controlling Persons of Costa Verde Aeronáutica S.A., Costa Verde Aeronáutica SpA, Costa Verde Aeronáutica Tres SpA, Inversiones Nueva Costa Verde Aeronáutica Ltda., Inversiones Priesca Dos y Cía. Ltda., Inversiones Caravia Dos y Cía. Ltda., Inversiones El Fano Dos y Cía. Ltda., Inversiones La Espasa Dos S.A. and Inversiones La Espasa Dos y Cía. Ltda., and their respective heirs and successors, as well as any other entities Controlled by such individuals heirs and successors.

"Currency Agreement" shall mean any foreign exchange contract, currency swap agreement or other similar agreement or arrangement.

"Default" shall mean any event that, unless cured or waived, is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Default Rate" shall have the meaning set forth in Section 2.08.

16

"Defaulting Lender" shall mean, at any time, any DIP Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid by it hereunder, to fund or pay (x) any portion of the DIP Loans or (y) any other amount required to be paid by it hereunder to the Administrative Agent or any other DIP Lender (or its banking Affiliates), unless, in the case of clause (x) above, such DIP Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such DIP Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower, the Administrative Agent or any other DIP Lender in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such DIP Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) (c) has failed, within three (3) Business Days after request by the Administrative Agent or the Borrower, acting in good faith, to provide a confirmation in writing from an authorized officer or other authorized representative of such DIP Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective DIP Loans under this Agreement, which request shall only have been made after the conditions precedent to borrowings have been met, provided that such DIP Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's, such other DIP Lender's or the Borrower's, as applicable, receipt of such confirmation in form and substance satisfactory to it and the Administrative Agent, or (d) has become, or has had its Parent Company become, the subject of a Bankruptcy Event or a Bail-In Action; provided that a DIP Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that DIP Lender or its Parent Company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such DIP Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such DIP Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such DIP Lender.  If the Administrative Agent determines that a DIP Lender is a Defaulting Lender under any of clauses (a) through (d) above, such DIP Lender will be deemed to be a Defaulting Lender upon notification of such determination by the Administrative Agent to the Borrower, and the DIP Lenders.

"Deposit Account" shall mean any "deposit account," as defined in Article 9 of the UCC.

"Deposit Account Control Agreement" shall mean, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to Collateral Agent that (a) is entered into among Collateral Agent, the financial institution or other Person at which such Deposit Account is maintained and the Obligor maintaining such Deposit Account, and (b) is effective for Collateral Agent to obtain "control" (within the meaning of Article 9 of the UCC) of such Deposit Account.

"DIP Budget" shall mean, the most recently approved at such time: (a) 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements (the "Initial Approved DIP Budget"), and (b) updated 13-week cash flow forecast of receipts and disbursements made at the end of each four-

17

week period for the then-remaining term of the DIP Facility, which shall, in each case, include detailed line item receipts and expenditures, including the aggregate amount of Professional Fees and expenses for Professional Persons, together with appropriate supporting schedules and information and an explanation of any change from the DIP Budget then in effect (each, an "Updated DIP Budget").  The DIP Budget (including, for the avoidance of doubt, the Initial Approved DIP Budget and each Updated DIP Budget) shall be in form and substance acceptable to the Administrative Agent and the Majority DIP Lenders.

"DIP Budget Variance Report" shall have the meaning set forth in Section 6.01(h).

"DIP Collateral" shall mean all of the "Collateral", "Mortgaged Property" and "Mortgaged Collateral" (or words of similar import) referred to in the Collateral Documents and all of the other property and assets that are or are intended under the terms of the Collateral Documents to be subject to Liens in favor of the Collateral Agent for the benefit of the DIP Secured Parties; provided, that, the DIP Collateral shall not include Excluded Assets.

"DIP Commitments" shall have the meaning set forth in Section 2.01(a).

"DIP Facility" shall mean the credit facility established under this Agreement in favor of the Borrower in accordance with the terms set forth herein or in the other DIP Loan Documents and pursuant to which the DIP Commitments are established.

"DIP Hedge" shall mean transactions under Hedging Agreements extended to any of the Obligors by a DIP Hedge Provider.

"DIP Hedge Liens" shall have the meaning set forth in Section 3.01(a).

"DIP Hedge Obligations" shall mean all Hedging Obligations pursuant to Hedging Agreements entered into with one or more of the DIP Hedge Providers.

"DIP Hedge Provider" shall mean any Person that is, at the time it enters into a DIP Hedge, a DIP Lender under Tranche A or any of its Affiliates; provided, however, that no such Person shall constitute a DIP Hedge Provider with respect to a DIP Hedge unless and until the Administrative Agent shall have received a DIP Hedge Provider Letter Agreement from such person with respect to the applicable DIP Hedge (and acknowledged by the Administrative Agent) within thirty (30) days after the provision of such DIP Hedge to any Obligor; provided, further, that such Person, if not already bound by the provisions thereof, acknowledges and agrees to be bound by the provisions of Article 9, Section 11.03, Section 11.15 and other provisions applicable to Lenders generally.

"DIP Hedge Provider Letter Agreement" shall mean a letter agreement substantially in the form of Exhibit I, or in such other form reasonably satisfactory to the Administrative Agent, duly executed by the applicable DIP Hedge Provider, the applicable Obligor and the Administrative Agent.

"DIP Initial Funding Amount" shall mean $450,000,000.

#93334561v28

"DIP Lenders" shall have the meaning set forth in the preamble.

"DIP Liens" shall have the meaning set forth in Section 3.01.

"DIP Loans" shall have the meaning set forth in Section 2.01(a).

"DIP Loan Documents" shall mean this Agreement, the Collateral Documents, the Tranche C Joinder Agreement (if applicable), the Tranche A Amendment, the Tranche B Amendment, the Intercompany Note, the Intercompany Subordination Agreement, any Promissory Note, the Final DIP Order and any other instrument or agreement (which is designated as a DIP Loan Document therein) executed and delivered by any Obligor to the Administrative Agent, Collateral Agent, Local Collateral Agent or any DIP Lender, in each case, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time in accordance with the terms hereof.

"DIP Loan Proceeds" shall have the meaning set forth in Section 2.06.

"DIP Obligations" shall mean at any date, the total of the Tranche A Obligations, Tranche B Obligations, if any, and Tranche C Obligations.

"DIP Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, the Tranche A Lenders, the DIP Hedge Providers, the Tranche B Lenders, if any, and the Tranche C Lenders.

"DIP Superpriority Claims" shall have the meaning given such term in Section 3.01(d).

"DIP Superpriority Claims Waterfall" shall have the meaning given such term in Section 3.01(d)(i).

"Disbursement Account" shall mean that certain deposit account number ending [_____].

"Disposition" shall mean, with respect to any property, any sale, lease, sale and leaseback, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Lender" shall mean (a) those Persons identified in writing (including by email) as such by the Borrower to the DIP Lenders or by the Borrower to the Administrative Agent (for the distribution to DIP Lenders) from time to time and (b) a Defaulting Lender or its Affiliate.  For the avoidance of doubt, no Tranche C Eligible Assignee shall be a Disqualified Lender.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Eblen Group" shall mean Inversiones Andes SpA, Inversiones Andes II, SpA, Inversiones PIA SpA, Comercial las Vertientes SpA and the group of individuals that, as of the

19

date hereof, are the Controlling Persons of such entities and their respective heirs and successors, as well as any other entities Controlled by such individuals heirs and successors.

"Ecuadorian Share Pledge Agreement" shall mean that certain pledge without conveyance agreement over certain Priority Pledged Equity Interests executed by means of an Ecuadorian public deed by and between the Grantor party thereto and the [Collateral Agent] substantially in the form attached as Exhibit J hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" shall mean (a) a DIP Lender, or any Affiliate of, or Approved Fund with respect to, a DIP Lender or (b) a finance company, insurance company or other financial institution or fund, in each case reasonably acceptable to the Administrative Agent, and whose becoming an assignee would not constitute a prohibited transaction under Section 4975 of the Code or Section 406 of ERISA; provided that Eligible Assignee shall not include any Disqualified Lender or any Person resident in a territory or jurisdiction deemed to have a preferential tax regime within the meaning of Article 41 H of the Chilean Income Tax Law or any subsequent regulations governing the definition of "low tax jurisdiction" for the purposes of Article 41 F of the Chilean Income Tax Law.

"Embargo Rules" shall have the meaning given such term in Section 9.03(h).

"Enforcement Action" shall have the meaning set forth in Section 3.02(a).

"Engine" shall mean an engine used, or intended to be used, to propel an Aircraft, including a part, appurtenance, and accessory of such Engine.

"Engine Security Documents" shall mean any or all, as the context may require, of the Engine Mortgages and Lease Subordination Agreements, entered into by the Borrower and/or the Guarantors and the [Local Collateral Agent], as applicable, as the same may be amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Engine Mortgage" shall mean, as the context may require a Chilean Engine Pledge, Colombian Engine Pledge, Peruvian Engine Pledge, FAA Engine Mortgage or Brazilian Engine Pledge.

"Environmental Claim" shall mean any written notice, claim, proceeding, notice of proceeding, investigation, demand, abatement order or other order or directive by any Person or Governmental Authority alleging or asserting liability with respect to the Obligors or the property of the Obligors, as the case may be, arising out of, based on, in connection with or resulting from (a) the actual or alleged presence, Use or Release of any Hazardous Materials, (b) any actual or alleged violation of any Environmental Law, or (c) any actual or alleged injury or threat of injury to property, health or safety, natural resources or the environment caused by Hazardous Materials.

"Environmental Laws" shall mean all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or legally binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating to the environment, preservation or reclamation of natural resources, the handling, treatment, storage, disposal, Release or threatened Release of, or the exposure of any Person (including employees) to, any Hazardous Materials.

"Environmental Liability" shall mean any liability (including any liability for damages, natural resource damage, costs of environmental investigation, remediation or monitoring or costs, fines or penalties) resulting from or based upon (a) violation of any applicable Environmental Law, (b) the generation, use, handling, transportation, storage, treatment, disposal or the arrangement for disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement, lease or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" shall mean any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Subscription" shall have the meaning given such term in Section 2.12.

"Equity Subscription Election" shall have the meaning given such term in Section 2.12.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning given such term in Section 8.01.

"Event of Loss" shall mean, with respect to any DIP Collateral, any of the following events: (i) the destruction of or damage to such property that renders repair

21

#93334561v28

uneconomic or that renders such property permanently unfit for normal use; (ii) any damage or loss to or other circumstance with respect to such property that results in an insurance settlement with respect to such property on the basis of a total loss, or a constructive or arranged total loss; (iii) the confiscation or nationalization of, or requisition of title to such property by any Governmental Authority; (iv) the theft or disappearance of such property that shall have resulted in the loss of possession of such property by any Grantor for a period in excess of thirty (30) days; or (v) the seizure of, detention of or requisition for use of, such property by any Governmental Authority that shall have resulted in the loss of possession of such property by any Grantor and such requisition for use shall have continued beyond the earlier of (A) sixty (60) days and (B) the date of receipt of insurance or condemnation proceeds with respect thereto.

An Event of Loss shall be deemed to have occurred:

     (a)     in the case of an actual total loss, at 12 midnight (London time) on the actual date the relevant DIP Collateral was lost;

     (b)     in the case of any of the events described in paragraph (i) of the definition of Event of Loss above (other than an actual total loss), upon the date of occurrence of such destruction, damage or rendering unfit;

     (c)     in the case of any of the events described in paragraph (ii) of the definition of Event of Loss above (other than an actual total loss), the date and time at which either a total loss is subsequently admitted by the insurers or a competent court or arbitration tribunal issues a judgment to the effect that a total loss has occurred;

     (d)     in the case of any of the events referred to in paragraph (iii) of the definition of Event of Loss above, upon the occurrence thereof; and

     (e)     in the case of any of the events referred to in paragraphs (iv) and (v) of the definition of Event of Loss above, upon the expiration of the period of time specified therein.

     "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

     "Excluded Assets" shall have the meaning provided in the Pledge and Security Agreement.

     "Excluded Taxes" shall mean, with respect to the Administrative Agent, any DIP Lender or any other recipient of any payment to be made hereunder or under any DIP Loan Document (collectively, "Tax Indemnitees"), (a) any Taxes based on (or measured by) its net income, profits or capital, or any franchise taxes, imposed (i) by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any DIP Lender, in which its applicable lending office is located or (ii) as a result of a present or former connection between such recipient and the jurisdiction imposing such Taxes (other than a connection arising from such recipient's having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, this Agreement or any DIP Loan Document, or sold or assigned an interest in this Agreement or any DIP Loan Document), (b) any branch profits Taxes or any similar Tax imposed by any other jurisdiction in

which such recipient is located, (c) any withholding Tax that is attributable to a recipient's failure to deliver the documentation described in Section 2.19(f) or Section 2.19(g), (d) any U.S. withholding Tax that is imposed by reason of FATCA, and (e) any withholding Taxes that are imposed by Chile, the U.S. or the jurisdiction of a DIP Lender's lending office imposed on amounts payable to or for the account of such DIP Lender that are attributable to the DIP Lender's designation of a new lending office except to the extent that, pursuant to Section 2.19 additional amounts with respect to such Taxes were payable to such DIP Lender immediately prior to such DIP Lender's designation of such new lending office.

"FAA" shall mean the Federal Aviation Administration of the United States of America and any successor thereto.

"FAA Engine Mortgage" shall mean, with respect to each pledged U.S. Engine that is a Priority Pledged Engine, a first priority New York law governed mortgage filed, or to be filed, with the FAA with respect to such Engine, by a Grantor in favor of the Collateral Agent, in substantially the form of Exhibit K.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement, any amended or successor provisions that are substantively comparable thereto and not materially more onerous to comply with, any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided, that, if the Federal Funds Effective Rate shall be less than zero (0), such rate shall be deemed to be zero (0) for purposes of this Agreement.

"Fees" shall collectively mean the Back-end Fees and the Undrawn Commitment Fees and other fees referred to in Section 2.10.

"Final DIP Order" shall have the meaning set forth in the Recitals to this Agreement.

"Final Order" shall mean an order or judgment of the Bankruptcy Court as entered on its docket that has not, in whole or in part, been reversed, vacated, modified, amended or stayed pursuant to any applicable Bankruptcy Law or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari or seek re-argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari or motion for re-argument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order

#93334561v28

or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired.

"Foreign Cases" shall mean the Cayman JPL Applications, the Chilean Recognition Proceeding, the Colombian Recognition Proceeding and the Peruvian Preventivo.

"Foreign Government Scheme or Arrangement" shall have the meaning given such term in Section 4.15(e).

"Foreign Plan" shall have the meaning given such term in Section 4.15(e).

"Foreign Pledge Agreements" shall mean the Chilean Share Pledge Agreement, the Colombian Share Pledge Agreement, the Colombian Pledge Over Commercial Establishment Agreement, the Ecuadorian Share Pledge Agreement and the Peruvian Share Pledge Agreement.

"Framework Agreement" shall mean that certain agreement dated as of September 26, 2019 by and between Delta Air Lines, Inc. and LATAM.

"Governmental Authority" shall mean the government of Chile, the United States of America and any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank organization, or other entity exercising executive, legislative, judicial, taxing or regulatory powers or functions of or pertaining to government.  Governmental Authority shall not include any Person in its capacity as an Airport Authority.

"Grantor" shall mean the Borrower or any Guarantor, as applicable.

"Guarantor" shall have the meaning set forth in the preamble to this Agreement.

"Guaranty Obligations" shall have the meaning given such term in Section 10.01(a).

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature that are regulated pursuant to, or could reasonably be expected to give rise to liability under any applicable Environmental Law.

"Hedging Agreement" shall mean any Interest Rate Agreement, any Currency Agreement and any other derivative or hedging contract, agreement, confirmation or other similar transaction or arrangement that is entered into by any Obligor, including any commodity or equity exchange, swap, collar, cap, floor, adjustable strike cap, adjustable strike corridor, cross-currency swap or forward rate agreement, spot or forward foreign currency or commodity purchase or sale, listed or over-the-counter option or similar derivative right related to any of the foregoing, non-deliverable forward or option, foreign currency swap agreement, currency exchange rate price hedging arrangement or other arrangement designed to protect against

24

fluctuations in interest rates or currency exchange rates, commodity, currency or securities values, or any combination of the foregoing agreements or arrangements.

"Hedging Obligations" shall mean obligations under or with respect to Hedging Agreements.

"Hedging Termination Value" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any netting agreements relating to such Hedging Agreements (to the extent, and only to the extent, such netting agreements are legally enforceable in insolvency proceedings against the applicable counterparty obligor thereunder), (i) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in preceding clause (i), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include an Agent or a DIP Lender or any Affiliate of an Agent or a DIP Lender).

"IFRS" shall mean the International Financial Reporting Standards.

"Increase Effective Date" shall have the meaning given such term in Section 2.28(a).

"Indebtedness" of any Person shall mean, on any date, all indebtedness of such Person as of such date, and shall include the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services other than in the ordinary course of business, (iv) all obligations of such Person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with IFRS, (v) all Hedging Obligations under Hedging Agreements valued at the Hedging Termination Value thereof, (vi) all indebtedness of others with respect to obligations referred to in (i) to (v) above, guaranteed in any manner, directly or indirectly, by such Person and (vii) all net reimbursement obligations of such Person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such Person to secure performance of obligations (other than for borrowed money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables) incurred in the ordinary course of business shall not constitute "Indebtedness."

"Indemnified Taxes" shall mean Taxes (other than Excluded Taxes) imposed on or with respect to any payments, accruals, or amounts deemed paid by the Borrower or any Guarantor under this Agreement or any other DIP Loan Document.

"Indemnitee" shall have the meaning given such term in Section 11.04(a).

"Insurances" shall mean any and all contracts or policies of insurance maintained by the Obligors (or any Permitted Lessee) in respect of any Aircraft, Engine or Spare Parts pursuant to the DIP Loan Documents.

25

"Intellectual Property" shall mean all intellectual property and other similar proprietary rights worldwide, whether registered or unregistered, including such rights in and to the following: (a) trade names, trademarks and service marks, domain names, trade dress and similar source identifiers, together with the goodwill symbolized by or associated with any of the foregoing; (b) patents and patent applications (including divisionals, continuations, continuations-in-part, renewals, reissuances, reexaminations and extensions); (c) inventions and invention disclosures (whether or not patentable); (d) copyrights and copyrightable works; (e) software; (f) trade secrets and know-how (including methods and processes) and (g) any applications, registrations or issuances for any of the foregoing.

"Intellectual Property Security Agreement" shall have the meaning set forth in the Pledge and Collateral Agreement.

"Intercompany Affiliate Loans" shall have the meaning set forth in Section 7.02.

"Intercompany Note" shall mean a global promissory note among the Obligors substantially in the form of Exhibit L.

"Intercompany Subordination Agreement" shall mean a subordination agreement with respect to the Intercompany Note substantially in the form of Exhibit M.

"Interest Payment Date" shall mean the last Business Day of each March, June, September and December.

"Interest Rate Agreement" shall mean any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement.

"International Interest" shall mean an "international interest" as defined in the Cape Town Treaty.

"International Registry" shall mean the "International Registry" as defined in the Cape Town Treaty.

"Investment" shall have the meaning given such term in Section 7.11.

"LATAM" shall mean LATAM Airlines Group S.A., a Chilean *sociedad anónima*.

"Lease Subordination Agreement" shall mean, in the case of any Permitted Lease having a term in excess of thirty (30) days, a subordination agreement in substantially the form of Exhibit N hereto or such other form as may be reasonably agreed by the Administrative Agent.

"Leasing Affiliate" shall mean (i) a Guarantor; (ii) a Subsidiary of the Borrower; (iii) a Subsidiary of any Guarantor; or (iv) any other Person controlled by the Borrower or any Guarantor, in each case that is, (a) if a commercial air carrier, possessing all necessary

26

authorizations (including, without limitation, those required to operate the Aircraft), consents and licenses and (b) organized under the laws of, and principally based in, Chile, Mexico, Peru, Ecuador, Colombia, Brazil, Argentina, Paraguay, the United States or the Dominican Republic. For purposes of this definition, the Borrower or any Guarantors shall be deemed to control another Person if the Borrower or such Guarantor possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance or hypothecation (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing) intended to assure or support payment or performance of any obligation.

"Loan Request" shall mean a request by the Borrower, executed by an Officer of the Borrower, for a DIP Loan in accordance with Section 2.02 in substantially the form of Exhibit O.

"Local Collateral Agent" shall mean [    ], in its capacity as *agente de garantías* as appointed by means of a "*contrato de agencia de garantías*", granted in accordance with Article 18 of Chilean Law N°20,190 in the form of a Chilean notarial public deed by and between the Borrower, the Local Collateral Agent and the other DIP Secured Parties substantially in the form attached as Exhibit P hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"**Majority DIP Lenders**" shall mean, collectively, each of the Majority Tranche A Lenders, the Majority Tranche B Lenders and the Majority Tranche C Lenders, in each case, to the extent DIP Lenders of such tranche are party to this Agreement, respectively, provided, until such time as the Tranche A Lenders or the Tranche B Lenders execute this Agreement (or an amendment to this Agreement to become parties hereto) then the Majority DIP Lenders shall mean the Majority Tranche C Lenders.

"Majority Tranche A Lenders" shall mean, at any date, Non-Defaulting Lenders having or holding a majority of the sum of (i) the undrawn Tranche A Commitments at such date and (ii) outstanding principal amount of the Tranche A Loans (excluding Tranche A Loans held by Defaulting Lenders) at such date.

"Majority Tranche B Lenders" shall mean at any date, Non-Defaulting Lenders having or holding a majority of the sum of (i) the undrawn Tranche B Commitments at such date and (ii) outstanding principal amount of the Tranche B Loans (excluding Tranche B Loans held by Defaulting Lenders) at such date.

"Majority Tranche C Lenders" shall mean at any date, Non-Defaulting Lenders having or holding seventy-five percent (75%) of the sum of (i) the undrawn Tranche C Commitments at such date and (ii) outstanding principal amount of the Tranche C Loans (excluding Tranche C Loans held by Defaulting Lenders) at such date.

"Margin Stock" shall have the meaning given such term in Section 4.09(a).

#93334561v28

"Material Adverse Change" shall mean any condition, development or event that after the Petition Date has resulted in, or would reasonably expected to result in a material adverse change in or material adverse effect on the business, assets, properties, liabilities, operations, conditions (financial or otherwise) or operating results of the Obligors, taken as a whole, other than (i) the filing of the Chapter 11 Cases and the events typically resulting from the filing of the Chapter 11 Cases; (ii) the filing of the Foreign Cases and the events typically resulting from the filing of such Foreign Cases and (iii) the impact of the COVID-19 pandemic on the business, financial condition or results of operations of the Obligors, taken as a whole.

"Material Adverse Effect" shall mean a material adverse effect on (a) the consolidated business, operations or financial condition of the Obligors, taken as a whole, (b) the validity or enforceability of any of the DIP Loan Documents or the rights or remedies of the Agents and the DIP Lenders thereunder, (c) the validity, perfection and priority of the Liens on the Collateral ( taken as a whole) to the extent required to be established and maintained by the Final DIP Order and the DIP Loan Documents in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) or (d) the ability of the Obligors, collectively, to pay the DIP Obligations.

"Maturity Date" shall mean the date upon which the DIP Facility will mature on the earliest to occur of any of the following: (a) the Scheduled Maturity Date; (b) the date of acceleration of any DIP Obligations under the DIP Facility pursuant to an Event of Default; (c) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Majority DIP Lenders; (d) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Majority DIP Lenders; (e) the date of consummation of a sale of all, substantially all or a material portion of the DIP Collateral, unless otherwise consented to in writing by the Majority DIP Lenders and (f) the Consummation Date of any Chapter 11 Plan confirmed in the Chapter 11 Cases.

"Maximum Rate" shall have the meaning set forth in Section 2.07(d).

"MNPI" shall mean material non-public information (within the meaning of the United States Federal, state or other applicable securities laws) with respect to the Obligors and their Affiliates or their Securities.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Collateral" shall mean all of the "Collateral" as defined in any Engine Mortgage.

"Net Proceeds" shall mean (i) with respect to any incurrence of Indebtedness, the cash received by any Obligor in respect of such incurrence net of reasonable and customary fees, commissions, costs and expenses incurred in connection therewith and (ii) the aggregate cash and Cash Equivalents received by any Grantor in respect of any Collateral Sale (including, without limitation, any cash or Cash Equivalents received in respect of or upon the sale or other disposition of any non-cash consideration received in any Collateral Sale) or Recovery Event, net of: (a) the direct costs and expenses relating to such Collateral Sale and incurred by the Borrower

or a Guarantor (including the sale or disposition of such non-cash consideration) or any such Recovery Event, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Collateral Sale or Recovery Event, taxes paid or payable as a result of the Collateral Sale or Recovery Event, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements; (b) any reserve for adjustment or indemnification obligations in respect of the sale price of such asset or assets established in accordance with IFRS; (c) any portion of the purchase price from a Collateral Sale placed in escrow pursuant to the terms of such Collateral Sale (either as a reserve for adjustment of the purchase price, or for satisfaction of indemnities in respect of such Collateral Sale) until the termination of such escrow; and (d) amounts for payment of the outstanding principal amount of, premium or penalty, if any, and interest on any claim allowed by the Bankruptcy Court in the Chapter 11 Cases relating to Indebtedness or any other obligation (other than the DIP Obligations) that is secured by a Lien on the DIP Collateral subject to Collateral Sale, that is senior to the Liens of the Agents and the DIP Lenders in the DIP Collateral, and that is required to be repaid under the terms thereof as a result of such Collateral Sale.

"Net Proceeds Amount" shall have the meaning given such term in Section 2.13(a).

"New Shares" shall have the meaning set forth in Section 2.12.

"Non-Defaulting Lender" shall mean, at any time, a DIP Lender that is not a Defaulting Lender.

"Obligors" shall have the meaning set forth in the preamble to this Agreement.

"OFAC" shall mean the U.S. Department of Treasury's Office of Foreign Assets Control.

"Officer" shall mean, with respect to any Person, the Chief Financial Officer, the Director of Finance or any Vice-President with knowledge of the transactions contemplated by this Agreement, of such Person.

"Officer's Certificate" shall mean a certificate signed on behalf of the Borrower by an Officer of the Borrower.

"Other Taxes" shall mean any and all present or future Chilean Stamp Tax, court stamp, stamp, mortgage, intangible, recording, filing or documentary taxes or any other similar, charges or similar levies arising from any payment made hereunder or from the execution, performance, delivery, registration of or enforcement of this Agreement or any other DIP Loan Document, other than Taxes imposed on or as a result of the voluntary sale, transfer, assignment (whether legal or equitable) or other disposition (including a change in the DIP Lender's lending office, but not including a disposition consisting of the conversion of a Tranche C Loan into New Shares or an assignment pursuant to Section 2.18) by a Tax Indemnitee of any rights with respect to any of the DIP Loan Documents.

#93334561v28

"Paid in Full" shall mean with respect to the DIP Obligations, paid in full in cash; provided that, to the extent an Equity Subscription Election shall have been made, Paid in Full in respect of the Tranche C Obligations shall also mean the subscription of New Shares in accordance with Section 2.12 on the Consummation Date of such Chapter 11 Plan.

"Parent Company" shall mean, with respect to a DIP Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such DIP Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such DIP Lender.

"Participant" shall have the meaning given such term in Section 11.02(d).

"Participant Register" shall have the meaning given such term in Section 11.02(d).

"Patriot Act" shall mean the USA PATRIOT Act, Title III of Pub. L. 107-56, signed into law on October 26, 2001 and any subsequent legislation that amends or supplements such Act or any subsequent legislation that supersedes such Act.

"Permits" shall have the meaning set forth in Section 4.02

"Permitted Disposition" shall mean any of the following:

(a)     sales of Spare Parts, vehicles and inventory in the ordinary course of business;

(b)     sales or dispositions in the ordinary course of surplus, obsolete, negligible or uneconomical assets or no longer used in the business of the Borrower and the other Grantors;

(c)     sales or dispositions of (including through discontinuing the use or maintenance of, abandoning, failing to pursue or enforce or otherwise allowing to lapse, terminate, be invalidated or put into the public domain) Intellectual Property that in the applicable Grantor's good faith judgment is not used or useful, or economically practicable to maintain, enforce or defend; and

(d)     in the case of any Engine, any Permitted Lease.

"Permitted Hedging Agreements" shall mean any Hedging Agreements to the extent constituting a swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates or currency exchange rates, either generally or under specific contingencies, in each case entered into the ordinary course of business and not for speculative purposes, in a manner consistent with the hedging policies of the Obligors as in effect on the Petition Date.

"Permitted Holders" shall mean any of (i) Enrique Cueto Plaza, Ignacio Cueto Plaza, Juan Jose Cueto Plaza or Mrs. María Esperanza Cueto Plaza; (ii) any spouse, descendent, heir, trust or estate of Enrique Cueto Plaza, Ignacio Cueto Plaza, Juan Jose Cueto Plaza or Mrs. María Esperanza Cueto Plaza; (iii) any Person as to whom more than 50% of the total voting power of the Voting Stock of such Person is beneficially owned (as such term is used in Rule

30

13d-3 under the Exchange Act) by one or more of the Persons specified in clauses (i) and (ii); or (iv) Qatar Group or any of its Subsidiaries.

"Permitted Indebtedness" shall mean:

(a)    the DIP Obligations;

(b)    unsecured guaranties of any Indebtedness otherwise permitted to be incurred under this Agreement;

(c)    intercompany Indebtedness (i) incurred prior to the Petition Date among any Obligor and any of its Affiliates, and (ii) incurred after the Petition Date among the Obligors, provided that such Indebtedness is evidenced by an Intercompany Note, subject to the terms of the Intercompany Subordination Agreement and pledged as DIP Collateral pursuant to the Collateral Documents;

(d)    Indebtedness consisting of the financing of insurance premiums incurred in the ordinary course of business;

(e)    Indebtedness related to any Permitted Sale Leaseback or Qualified Sale Leaseback Transaction;

(f)    Indebtedness in respect of any bankers acceptances, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business;

(g)    unsecured guarantees incurred in the ordinary course of business in respect of obligations of suppliers, customers, franchisees, lessors and licensees;

(h)    Pre-Petition Indebtedness and Pre-Petition Letters of Credit;

(i)    Post-Petition Letters of Credit; provided that if secured by cash Collateral, the aggregate face amount of such cash collateralized Post-Petition Letters of Credit issued after the Closing Date shall not exceed $400 million;

(j)    Indebtedness of the Obligors not otherwise permitted hereunder in an aggregate principal amount which, when aggregated with the principal amount or liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (j), does not exceed $30 million at any one time outstanding;

(k)    obligations of any Obligor consisting of obligations contained in supply arrangements entered into in the ordinary course of business and to the extent constituting Indebtedness;

(l)    Indebtedness of the Obligors secured by any Aircraft owned by the Obligors and approved by the Bankruptcy Court; provided, that (i) such Aircraft shall not constitute DIP Collateral and (ii) the aggregate principal amount of such Indebtedness shall not exceed $500 million; and

#93334561v28

(m)    Indebtedness under Hedging Obligations under Permitted Hedging Agreements.

"Permitted Lease" shall mean any lease, sub-lease (including Wet Leases), interchange or charter of a Pledged Engine, or pooling arrangement in respect of any Pledged Engine, to a Permitted Lessee that is permitted under this Agreement.

"Permitted Lessee" shall mean (i) a Leasing Affiliate or (ii) with the prior written consent of the Administrative Agent acting with the consent of the Majority DIP Lenders (not to be unreasonably withheld), any other commercial air carrier possessing all necessary authorizations (including, without limitation, those required to operate the applicable Engine), consents and licenses and otherwise permitted to be a lessee pursuant to the terms of the applicable DIP Loan Documents.

"Permitted Liens" shall mean:

(a)    Liens held by the Collateral Agent securing the DIP Obligations, the Guaranty Obligations and the DIP Hedge Liens;

(b)    Liens existing as of the Closing Date and listed on Schedule 1.1(a) hereto and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such Lien and (2) proceeds and products thereof and (B) such modifications, replacement, renewal or extension does not increase the amount secured or change any direct or contingent obligor in respect thereof;

(c)    Permitted Priority Liens;

(d)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(e)    Liens for Taxes the payment of which is prohibited, stayed or excused by the Bankruptcy Code or Bankruptcy Court;

(f)    Liens imposed by law, including carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(g)    Liens arising by operation of law in connection with judgments, attachments or awards which do not constitute an Event of Default hereunder;

(h)    Liens incurred in connection with any Permitted Sale Leaseback or Qualified Sale Lease Back Transaction, provided that such Liens do not extend to any property other than (1) the Aircraft subject to such Sale Lease Back or Qualified Sale Lease Back Transaction and (2) the proceeds and products thereof;

(i)      Liens securing Indebtedness permitted under clauses (i) and (l) of Permitted Indebtedness;

(j)      (A) any overdrafts and related liabilities arising from treasury, netting, depository and cash management services or in connection with any automated clearing house transfers of funds, in each case as it relates to cash or Cash Equivalents, if any, and entered into in the ordinary course of business and (B) Liens arising by operation of law or contract or that are contractual rights of set-off in favor of the depository bank or securities intermediary in respect of the Collateral Proceeds Account;

(k)      salvage or similar rights of insurers, in each case as it relates to any Aircraft, airframe, engine, or DIP Collateral, if any;

(l)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, or Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with IFRS;

(m)      customary rights of set-off and liens arising by operation of law or by the terms of documents of banks or other financial institutions in relation to the ordinary maintenance and administration of Deposit Accounts or securities accounts;

(n)      non-exclusive licenses and sublicenses, whether written, oral or implied, to Intellectual Property, and other licenses to Intellectual Property granted in the ordinary course of business or consistent with past practice that do not materially interfere with the ordinary conduct of the business of the Obligors;

(o)      in each case as it relates to any Engines, Liens on appliances, parts, components, instruments, appurtenances, furnishings and other equipment installed on Aircraft or Engines and separately financed by a Grantor, to secure such financing;

(p)      cash collateralization of Pre-Petition Letters of Credit to the extent permitted hereunder; and

(q)      Liens securing Hedging Obligations to the extent incurred pursuant to Permitted Hedging Agreements.

"<u>Permitted Priority Claim</u>" shall mean any allowed claim against an Obligor in the Chapter 11 Cases that is secured by Permitted Priority Liens.

"<u>Permitted Priority Liens</u>" shall mean valid, perfected and unavoidable Liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code.

"<u>Permitted Sale Leaseback</u>" shall have the meaning set forth in Section 7.08.

"Person" shall mean any natural person, corporation, division of a corporation, partnership, limited liability company, trust, joint venture, association, company, estate, unincorporated organization, Airport Authority or Governmental Authority or any agency or political subdivision thereof.

"Peruvian Engine" shall mean, from time to time, any Engine habitually based in Peru.

"Peruvian Engine Pledge" shall mean, with respect to each pledged Peruvian Engine that is a Priority Pledged Engine, a first priority pledge without conveyance, by a Grantor in favor of the Collateral Agent, in substantially the form of Exhibit Q.

"Peruvian Mortgage" shall mean that certain pledge over certain Peruvian Guarantors' real property set forth on Schedule 4.12 and executed by means of a Peruvian public deed by and between certain Peruvian Guarantors and the [Collateral Agent] substantially in the form attached as Exhibit R hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Peruvian Preventivo" shall mean the Peruvian "preventive proceeding" filed on May 26, 2020 with the Institute for the Defense of Competition and Intellectual Property with respect to LATAM Airlines Perú S.A. and Inversiones Aéreas S.A.

"Peruvian Share Pledge Agreement" shall mean that certain pledge over certain Priority Pledged Equity Interests of the Peruvian Guarantors executed by means of a Peruvian public deed by and between certain shareholders of the Peruvian Guarantors and the [Collateral Agent] substantially in the form attached as Exhibit S hereto, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Petition Date" shall mean the date of commencement of the Chapter 11 Cases, which date is May 26, 2020.

"Pledge and Security Agreement" shall mean that certain Pledge and Security Agreement dated as of the date hereof by and among the Collateral Agent and the Grantors, as amended, restated, modified, supplemented, extended or amended and restated from time to time.

"Pledged Debt" shall have the meaning provided in the Pledge and Security Agreement.

"Pledged Engines" shall mean, as of any date, Engines included in the DIP Collateral.

"Pledged Spare Parts" shall mean, as of any date, the Spare Parts included in the DIP Collateral.

"Post-Petition Letters of Credit" shall mean letters of credit, surety bonds, insurance bonds and any other similar instruments issued for the account of any Obligor in the ordinary course of business after the date such Obligor commenced its respective Chapter 11

Case; provided that Post-Petition Letters of Credit issued prior to the Closing Date are set forth on Schedule 1.1(f).

"Pre-Petition Encumbered Aircraft" shall mean any Aircraft owned by an Obligor or an Affiliate that is subject to Liens securing Pre-Petition Financing Leases.

"Pre-Petition Financing Leases" shall mean any finance or other lease relating to leased Aircraft pursuant to the terms of which the Obligors or an Affiliate has the option to acquire such Aircraft at the end of the term of such lease upon payment and satisfaction in full of all amounts and obligations outstanding thereunder.

"Pre-Petition Indebtedness" shall mean Indebtedness of each of the Obligors existing on the date such Obligor commences its respective Chapter 11 Case as set forth in Schedule 1.1(b).

"Pre-Petition Letters of Credit" shall mean those letters of credit, surety bonds, insurance bonds and other similar instruments, issued for the account of an Obligor prior to the date such Obligor commenced its respective Chapter 11 Case as set forth on Schedule 1.1(c) and any amendments, renewals or extensions thereof.

"Priority Pledged Engine" shall mean those Engines subject to a first priority DIP Lien as set forth on Schedule 1.1(d).

"Priority Pledged Equity Interests" shall mean those Pledged Equity Interests (as defined in the Pledge and Security Agreement) subject to a first priority DIP Lien as set forth on Schedule 5.2 to the Pledge and Security Agreement.

"Proceeds" shall mean (a) all "Proceeds" as defined in Article 9 of the UCC with respect to the DIP Collateral, and (b) whatever is recoverable or recovered when DIP Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Professional Fees" shall mean the fees and reimbursable expenses of a Professional Person, solely to the extent such fees have been approved by the Bankruptcy Court.

"Professional Person" shall mean a person who is an attorney, financial advisor, accountant, appraiser, monitor, auctioneer or other professional person and who is retained, with Bankruptcy Court approval, by (a) the Obligors pursuant to any one or more of Sections 327 328(a) and 363 of the Bankruptcy Code or (b) the Creditors' Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"Professional User" shall have the meaning given it in the Regulations and Procedures for the International Registry.

"Promissory Note" shall have the meaning set forth in Section 2.11(e).

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

#93334561v28

"Qatar Airways" shall mean each of (a) QA Investments Limited, a Jersey company with company registration number [_____]and having a registered address at 47 Esplanade, St. Helier, JE1 0BD, Jersey, and (b) QA Investments 2 Limited, a Jersey company with company registration number [_____]and having a registered address at 47 Esplanade, St. Helier, JE1 0BD, Jersey.

"Qatar Group" shall mean Qatar Airways Group Q.C.S.C., a company incorporated under the laws of the State of Qatar with commercial registration number 16070 and having its principal place of business at Qatar Airways Tower One, Airport Road, P.O. Box 22550, Doha, Qatar.

"Qualified Sale Leaseback Transaction" shall mean a transaction approved by the Bankruptcy Court pursuant to which an Obligor or an Affiliate repays one or more Pre-Petition Financing Leases substantially contemporaneously with the closing of a Sale and Leaseback with respect to each Pre-Petition Encumbered Aircraft related thereto, provided that such transaction (x) results in aggregate net liquidity for the Obligors of at least $50,000,000 (taking into account any proceeds of the DIP Loans used to repay such Pre-Petition Financing Leases) and (y) provides for escrow or collateral arrangements as necessary for the period of time between the repayment of the Pre-Petition Financing Leases and the closing of the Sale and Leaseback that are reasonably satisfactory to the Majority DIP Lenders.

"Real Estate" shall have the meaning set forth in Section 6.01(j).

"Recovery Event" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any DIP Collateral or any Event of Loss (as defined in the related Collateral Document pursuant to which a security interest in such DIP Collateral is granted to the Collateral Agent, if applicable).

"Real Estate Mortgages" shall mean, collectively the U.S. Real Estate Mortgage, the Chilean Mortgages and the Peruvian Mortgage.

"Register" shall have the meaning set forth in Section 11.02(b)(v).

"Regulations and Procedures for the International Registry" shall mean the official English language text of the International Registry Procedures and Regulations issued by the Supervisory Authority (as defined in the Cape Town Convention) pursuant to the Aircraft Protocol.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" shall mean spilling, leaking, pumping, pouring, emitting, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing of any Hazardous Material into the environment.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

#93334561v28

"Sale Lease Back" shall mean any transaction or series of related transactions pursuant to which the Borrower or the Guarantors (a) sells, transfers or otherwise disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or disposed.

"Sanctions" shall have the meaning given such term in Section 4.16(b).

"Sanctioned Country" shall have the meaning given such term in Section 4.16(b).

"Sanctioned Person" shall have the meaning given such term in Section 4.16(b).

"Scheduled Maturity Date" shall mean eighteen (18) months after the Closing Date (the "Initial Scheduled Maturity Date"), provided that, in the event that a Chapter 11 Plan has been confirmed but the Consummation Date has not occurred before the Initial Scheduled Maturity Date, the Borrower can elect to extend the Scheduled Maturity Date up to an additional sixty (60) days, at its discretion.

"S&P" shall mean Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc. and any successor thereto.

"SEC" shall mean the United States Securities and Exchange Commission.

"Security" shall mean any stock, stock equivalent, voting trust certificate, bond, debenture, promissory note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, or any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Spare Parts" shall mean all accessories, appurtenances, or parts of an Aircraft (except an Engine), Engine, or Appliance, that are to be installed at a later time in an Aircraft, Engine or Appliance.

"Standstill Period" shall have the meaning given such term in Section 3.02(a).

"Statement of Changes in Equity" shall have the meaning given such term in Section 6.01(a).

"Statement of Comprehensive Income" shall have the meaning given such term in Section 6.01(a).

"Statement of Financial Position" shall have the meaning given such term in Section 6.01(a).

"Subsidiary" shall mean, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting

37

power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

"Subordinated DIP Superpriority Claim" shall have the meaning given such term in Section 3.01(d)(ii).

"Super-priority Claim" shall mean a claim against an Obligor in any of the Chapter 11 Cases which is an administrative expense claim having priority and right to payment over all other administrative expenses and unsecured claims against such Obligor of any kind or nature, whether now existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code.

"Support Agreement" shall mean that certain support agreement dated prior to or on the date hereof by and among LATAM and all holders of 10% or more of the outstanding shares of LATAM, all Affiliates of any Tranche C Lender that holds shares of LATAM and, if a Tranche C Lender is a fund or other entity sponsored or formed on behalf of one or more beneficial owners of shares of LATAM, all such beneficial owners that are investors in such fund and their Affiliates that also hold shares of LATAM, with respect such shareholders' obligations to take all necessary corporate action under Chilean law to effectuate the Chapter 11 Plan, to vote for the approval of the capital increase necessary to effectuate the Equity Subscription Election and to take any other necessary steps in furtherance thereto, provided that such Chapter 11 Plan is a Company Approved Reorganization Plan.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, assessments, fees, deductions, charges or withholdings imposed by any Governmental Authority including any interest, additions to tax or penalties applicable thereto.

"Tax Indemnitee" shall have the meaning set forth in the definition of Excluded Taxes.

"Tax Return" shall mean any return, report, form, claim for refund, information return, declaration, statement, schedule or other similar document (including but not limited to any related or supporting information, schedule or attachment thereto and estimated or amended returns, reports, forms, information returns, declarations, statements or schedules) relating to Taxes.

"Tranche A Amendment" shall mean that certain amendment to this Agreement to effectuate the Tranche A Facility hereunder, as amended, restated, modified, supplemented, extended or amended and restated from time to time provided, that any such amendment, restatement, modification, supplement, extension or amendment is consistent with the terms hereunder.

"Tranche A Closing Date" shall mean the date of the effectiveness of the Tranche A Amendment.

38

"Tranche A Commitment" shall mean, with respect to each Tranche A Lender, the commitment of such Tranche A Lender to make Tranche A Loans hereunder. The amount of each Tranche A Lender's Tranche A Commitment as of the Tranche A Closing Date shall be set forth in the Tranche A Amendment. The aggregate amount of the Tranche A Commitments shall be $[__].

"Tranche A Facility" shall have the meaning set forth in Section 2.01(a)(i).

"Tranche A Lenders" shall mean each party identified as a "Tranche A Lender" on the Tranche A Amendment (other than any such entity that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 11.02), as well as any entity that becomes a "Tranche A Lender" hereunder pursuant to Section 11.02.

"Tranche A Liens" shall have the meaning set forth in Section 3.01(a).

"Tranche A Lien Discharge Date" shall mean the earlier of (a) the date on which all the Tranche A Obligations shall have been paid in full in cash (other than indemnity payments not yet accrued under the DIP Loan Documents and cost reimbursement obligations for which no claim has been made) and all Tranche A Commitments shall have been terminated and all Tranche A Letters of Credit have been canceled or have expired or been fully cash collateralized and all amounts drawn thereunder have been reimbursed in full and (b) the date on which all Tranche A Liens on the DIP Collateral shall have been released from the Liens created under the DIP Loan Documents.

"Tranche A Loans" shall have the meaning set forth in Section 2.01(a)(i).

"Tranche A Obligations" shall mean the due and punctual payment of (x) the principal of and interest at the applicable rate provided in this Agreement on the Tranche A Loans, when and as due, whether at maturity, by acceleration or otherwise, and (y) all other monetary obligations including fees, costs, expenses and indemnities payable to the Tranche A Lenders under the DIP Loan Documents.

"Tranche B Amendment" shall mean that certain amendment to this Agreement to effectuate the Tranche B Facility hereunder, as amended, restated, modified, supplemented, extended or amended and restated from time to time; provided, that any such amendment, restatement, modification, supplement, extension or amendment is consistent with the terms hereunder.

"Tranche B Closing Date" shall mean the date of the effectiveness of the Tranche B Amendment.

"Tranche B Commitment" shall mean, with respect to each Tranche B Lender, the commitment of such Tranche B Lender to make Tranche B Loans hereunder. The amount of each Tranche B Lender's Tranche B Commitment as of the Tranche B Closing Date shall be set forth in the Tranche B Amendment.

"Tranche B Facility" shall have the meaning set forth in Section 2.01(a)(ii).

39

"Tranche B Liens" shall have the meaning set forth in Section 3.01(b).

"Tranche B Lien Discharge Date" shall mean the earlier of (a) the date on which all the Tranche B Obligations shall have been paid in full in cash (other than indemnity payments not yet accrued under the DIP Loan Documents and cost reimbursement obligations for which no claim has been made) and all Tranche B Commitments shall have been terminated and all Tranche B Letters of Credit have been canceled or have expired or been fully cash collateralized and all amounts drawn thereunder have been reimbursed in full and (b) the date on which all Tranche B Liens on the DIP Collateral shall have been released from the Liens created under the DIP Loan Documents.

"Tranche B Lenders" shall mean each party identified as a "Tranche B Lender" on the Tranche B Amendment (other than any such entity that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 11.02), as well as any entity that becomes a "Tranche B Lender" hereunder pursuant to Section 11.02.

"Tranche B Loans" shall have the meaning set forth in Section 2.01(a)(ii).

"Tranche B Obligations" shall mean the due and punctual payment of (x) the principal of and interest at the applicable rate provided in this Agreement on the Tranche B Loans, when and as due, whether at maturity, by acceleration or otherwise, and (y) all other monetary obligations including fees, costs, expenses and indemnities payable to the Tranche B Lenders under the DIP Loan Documents.

"Tranche C Commitment" shall mean the Tranche C Initial Commitment and the Tranche C Increase Commitment.

"Tranche C Eligible Assignee" shall mean (i) with respect to any Tranche C Lender, any Wholly Owned Subsidiary of such Tranche C Lender, (ii) any holder of ten percent (10%) or more of the Capital Stock of the Borrower as of the Petition Date or any Affiliate thereof, (iii) with respect to Qatar Airways, Qatar Group and any of Qatar Group's Wholly Owned Subsidiaries, (iv) with respect to Costa Verde, its Affiliates and, as to Costa Verde and any such Affiliate assignee, to entities controlled by, or under common control, of the Cueto Group, the Amaro Group and/or the Eblen Group, and (v) with respect to the Amaro Group and the Eblen Group, to entities which are part of the Amaro Group and Eblen Group definitions, as applicable, provided that Tranche C Eligible Assignee shall not include any Person not described in (ii) above resident in a territory or jurisdiction deemed to have a preferential tax regime within the meaning of Article 41 H of the Chilean Income Tax Law or any subsequent regulations governing the definition of "low tax jurisdiction" for the purposes of Article 41 F of the Chilean Income Tax Law.

"Tranche C Facility" shall have the meaning set forth in Section 2.01(a)(iii).

"Tranche C Increase Commitment" shall mean, with respect to each Tranche C Increase Lender, the commitment of such Tranche C Increase Lender to make Tranche C Loans hereunder as reflected in the Tranche C Joinder Agreement.  The aggregate amount of the Tranche C Increase Commitment shall be up to $250,000,000, as provided in the Tranche C Joinder Agreement; provided that, (i) no Tranche C Increase Lender that is an individual

shareholder (other than a Tranche C Initial Lender) shall, alone or together with its Affiliates, provide a Tranche C Increase Commitment in excess of $100,000,000, either in a single installment or in the aggregate, without the consent of each Tranche C Initial Lender, which consent shall not be unreasonably withheld or delayed, and (ii) without the consent of the Majority Tranche C Lenders, no Tranche C Increase Lender shall provide a Tranche C Increase Commitment after the date which is thirty (30) days after the date of the Closing Date.

"Tranche C Increase Lender" shall mean each party to the Tranche C Joinder Agreement; provided that, each such lender must be (i) a Tranche C Initial Lender or (ii) a holder of shares of LATAM as of the Petition Date or as of the date such party executes the Tranche C Joinder Agreement; provided further, that any Tranche C Increase Lender that was a holder as of the Petition Date shall have priority with respect to allocation of any Tranche C Increase Commitment.

"Tranche C Initial Commitment" shall mean, with respect to each Tranche C Initial Lender, the commitment of such Tranche C Initial Lender to make Tranche C Loans hereunder. The amount of each Tranche C Initial Lender's Tranche C Initial Commitment is set forth on Schedule 1.1(e).

"Tranche C Initial Lender" shall mean each entity listed on Schedule 1.1(e).

"Tranche C Interest Formula" shall mean the amount equal to interest at a rate of 14.5% per annum plus any applicable Default Interest, which amount shall be calculated on the basis of a 365-day year and actual number of days elapsed as though it had accrued daily and was capitalized quarterly to the principal amount of the Tranche C Loans and be deemed to be a part of the principal amount of the Tranche C Loans for all purposes hereof, commencing on and including the Closing Date and ending on (but not including) the last Business Day of the third full calendar month thereafter, and subsequently, commencing on and including the last Business Day of the immediately preceding calculation period and ending on (but not including) the last Business Day of the third full calendar month thereafter.

"Tranche C Joinder Agreement" shall mean that certain joinder agreement executed by the Borrower, the Guarantors, the Administrative Agent and each Tranche C Increase Lender substantially in the form attached as Exhibit T hereto.

"Tranche C Joinder Closing Date" shall mean the date of the effectiveness of the Tranche C Joinder Agreement.

"Tranche C Lenders" shall mean the Tranche C Initial Lenders and the Tranche C Increase Lenders (other than any such entity that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 11.02), as well as any entity that becomes a "Tranche C Lender" hereunder pursuant to Section 11.02.

"Tranche C Liens" shall have the meaning set forth in Section 3.01(b).

"Tranche C Loans" shall have the meaning set forth in Section 2.01(a)(iii).

41

"Tranche C Obligations" shall mean the due and punctual payment of (x) the principal of and interest at the applicable rate provided in this Agreement on the Tranche C Loans, when and as due, whether at maturity, by acceleration or otherwise, and (y) all other monetary obligations including fees, costs, expenses and indemnities payable to the Tranche C Lenders under the DIP Loan Documents.

"Tranche C Shareholder" shall have the meaning set forth in Section 2.12(b).

"Trans-American Joint Venture Agreement" shall mean that certain agreement dated May 7, 2020 by and among Delta Air Lines, Inc., LATAM, TAM Linhas Aéreas S.A., LATAM Airlines Perú S.A., Transportes Aereos del Mercosur S.A. and Aerovías de Integración Regional, Aires S.A. and each executed Country JV Agreement and Implementing Agreement (as each such term is defined therein).

"Transactions" shall mean the execution, delivery and performance by the Borrower and the Guarantors of this Agreement and the other DIP Loan Documents to which they may be a party, the creation of the DIP Liens in the DIP Collateral in favor of the Collateral Agent, for the benefit of the DIP Secured Parties, the borrowing of DIP Loans and the use of the proceeds thereof.

"UCC" shall mean the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"UK Financial Institution" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Undrawn Commitment Fee" shall have the meaning set forth in Section 2.10(a)(ii).

"Uninsured Liabilities" shall mean any losses, damages, costs, expenses and/or liabilities (including any losses, damages, costs, expenses or liabilities resulting from property damage or casualty, general liability, workers' compensation claims and business interruption) incurred by the Borrower or any Guarantor which are not covered by insurance, but with respect to which insurance coverage is commercially available to Persons engaged in the same or similar business as the Borrower and the Guarantors.

"U.S. Benefit Plan" shall mean an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I or Title IV of ERISA.

"U.S. Engine" shall mean any Engine habitually based in the U.S.

"U.S. Real Estate Mortgage" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, as amended, restated, modified, supplemented, extended or amended and restated from time to time, creating and evidencing a Lien in favor of the Collateral Agent on that certain real property leased by Grantor and set forth on Schedule 4.12.

"Use" shall mean, with respect to any Hazardous Materials, generation, manufacture, processing, distribution, handling, possession, use, discharge, placement, treatment, disposal, transportation, disposition, removal, abatement, recycling or storage.

"Voting Stock" of any specified Person as of any date shall mean the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Waivable Mandatory Prepayment" shall have the meaning set forth in Section 2.16(a).

"Wet Lease" shall mean any arrangement whereby any Obligor agrees to furnish any Engines to an air carrier and pursuant to which such Engines (i) shall be operated solely by cockpit crew provided by the Borrower possessing all current certificates and licenses required by applicable laws, (ii) shall be maintained by such Obligor in accordance with the normal maintenance provisions of a Permitted Lease and (iii) shall continue to be insured by such Obligor in accordance with the terms of a Permitted Lease.

"Wholly Owned Subsidiary" of any Person shall mean a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors qualifying shares or shares or interests required to be held by foreign nationals) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

"Withholding Agent" shall mean the Borrower, each Guarantor and the Administrative Agent.

"Write-down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02.    Terms Generally¶ The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the

43

phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, extended, amended and restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless expressly provided otherwise, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) "knowledge" or "aware" or words of similar import shall mean, when used in reference to the Borrower or the Guarantors, the actual knowledge of any Officer.

Section 1.03.    Accounting Terms; IFRS¶ Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with IFRS, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in IFRS or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Majority DIP Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in IFRS or in the application thereof, then such provision shall be interpreted on the basis of IFRS as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Upon any such request for an amendment, the Borrower, the Majority DIP Lenders and the Administrative Agent agree to consider in good faith any such amendment in order to amend the provisions of this Agreement so as to reflect equitably such accounting changes so that the criteria for evaluating the Borrower's consolidated financial condition shall be the same after such accounting changes as if such accounting changes had not occurred.

Section 1.04.    Divisions¶ For all purposes under the DIP Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Capital Stock at such time.

#93334561v28

# SECTION 2.

## AMOUNT AND TERMS OF CREDIT

Section 2.01.      Loans¶

(a)      Upon entry of the Final DIP Order and subject to Section 2.05 and the satisfaction of the other applicable conditions precedent set forth in Section 5 and, with respect to the Tranche A Commitments, the Tranche A Closing Date, and, with respect to the Tranche B Commitments, the Tranche B Closing Date, the DIP Lenders severally agree to make loans to the Borrower with respect to their respective tranche as described below, in an aggregate amount not to exceed the sum of the Tranche C Commitments, after the effectiveness of the Tranche A Amendment, the Tranche A Commitments and, after the effectiveness of the Tranche B Amendment, the Tranche B Commitments (collectively, the "DIP Commitments" and collectively the loans made thereunder "DIP Loans") and not to exceed such DIP Lenders' respective pro rata of any amount of the then-remaining unfunded commitments in their respective tranche.

(i)      The Tranche A Commitments.  Subject to the Final DIP Order, the Tranche A Closing Date and the terms and conditions set forth herein and in the Tranche A Amendment, the Tranche A Lenders agree to make loans (the "Tranche A Facility" collectively the loans made thereunder, the "Tranche A Loans") to the Borrower in an amount not to exceed each Tranche A Lender's pro rata share of the Tranche A Commitment from time to time during the term of this Agreement.

(ii)      The Tranche B Commitments.  Subject to the Final DIP Order, the Tranche B Closing Date and the terms and conditions set forth herein and in the Tranche B Amendment, the Tranche B Lenders agree to make loans (the "Tranche B Facility" and collectively the loans made thereunder, the "Tranche B Loans") to the Borrower in an amount not to exceed such Tranche B Lender's pro rata share of the Tranche B Commitment from time to time during the term of this Agreement.

(iii)      The Tranche C Commitments.  Subject to the Final DIP Order and the terms and conditions set forth herein, each Tranche C Lender agrees to make loans (the "Tranche C Facility") and collectively the loans made thereunder, the "Tranche C Loans") to the Borrower in an amount not to exceed such Tranche C Lender's pro rata share of the Tranche C Commitment from time to time during the term of this Agreement.

(b)      Any amount borrowed under this Section 2.01 and subsequently repaid or prepaid may not be reborrowed.  Subject to Section 2.11, 2.13, and 2.14, all amounts owed hereunder with respect to the DIP Loans shall be Paid in Full no later than the Maturity Date.

Section 2.02.      Requests for DIP Loans¶

(a)      To request a DIP Loan, the Borrower shall notify the Administrative Agent of such request by hand, facsimile or electronic mail delivery of a written Loan Request not later than 2:00 p.m., New York City time, five (5) Business Days before the date of the proposed DIP

Loan, provided however, that the Loan Request for the initial funding after the Closing Date shall only be required to be received at least three (3) Business Days before the date of the proposed DIP Loan.

(b)      Promptly following receipt of a Loan Request in accordance with this Section 2.02, the Administrative Agent shall advise each DIP Lender of the details thereof and of the amount of such DIP Lender's DIP Loan to be made as part of the requested DIP Loan.

Section 2.03.    Reserved.

Section 2.04.    Funding of Loans¶

(a)      Each DIP Lender shall make each DIP Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 11:00 a.m., New York City time, or such earlier time as may be reasonably practicable, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the DIP Lenders.  Upon satisfaction or waiver of the conditions precedent specified herein, the Administrative Agent will make such DIP Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower in accordance with Section 2.04(c).

(b)      Unless the Administrative Agent shall have received notice from a DIP Lender prior to the proposed date of any DIP Loan that such DIP Lender will not make available to the Administrative Agent such DIP Lender's share of such DIP Loan, the Administrative Agent may assume that such DIP Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.04 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a DIP Lender has not in fact made its share of the applicable DIP Loan available to the Administrative Agent, then the applicable DIP Lender and the Borrower severally agree to pay to the Administrative Agent forthwith upon written demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such DIP Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate otherwise applicable to such DIP Loan.  If such DIP Lender pays such amount to the Administrative Agent, then such amount shall constitute such DIP Lender's DIP Loan included in such DIP Loan and the Borrower shall not be obligated to repay such amount pursuant to the preceding sentence if not previously repaid.

(c)      All DIP Loan Proceeds (less any agreed upon amounts to be retained for payments allocable under Section 2.06(a)(iii) and (vi)) shall be deposited into the Disbursement Account on the date of funding pending such use of proceeds. Amounts in the Disbursement Account shall only be utilized in accordance with the use of proceeds restrictions set forth in Section 2.06.

(d)      The Borrower will request to fund the full amount of the Tranche C Commitments and Tranche A Commitments, on a pro rata basis, if any remaining, on or prior to the first date

46

on which the DIP Lenders fund any DIP Commitments in excess of the sum of the Tranche C Commitments and any other DIP Commitments approved by the Bankruptcy Court as of the Closing Date.

Section 2.05.    Pro Rata Share, Availability of Funds.

(a)    Pro Rata Share.  All DIP Loans shall be made by the DIP Lenders proportionately to their respective pro rata share of the DIP Commitments and substantially contemporaneously as among the Lenders in each respective Tranche, it being understood that no DIP Lender shall be responsible for any default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder nor shall any DIP Commitment of any DIP Lender be increased or decreased as a result of a default by any other DIP Lender in such other DIP Lender's obligation to make a DIP Loan requested hereunder.

(b)    True-up Funding.  Notwithstanding anything to the contrary herein, upon the Tranche A Closing Date, Tranche B Closing Date and/or the Tranche C Joinder Closing Date, all subsequently funded DIP Loans shall be made by the Tranche A Lenders, Tranche B Lenders and/or the Tranche C Increase Lenders, as the case may be, until such time as the Tranche A Loans funded by the Tranche A Lenders, the Tranche B Loans funded by the Tranche B Lenders and/or the Tranche C Loans funded by the Tranche C Increase Lenders are proportionate to their respective pro rata share of the DIP Commitments.

(c)    Availability of Initial DIP Funding.  Upon entry of the Final DIP Order and satisfaction the terms and conditions set forth in Section 5 herein, the DIP Initial Funding Amount shall be available in one (1) draw on the Closing Date.

(d)    Availability of Subsequent DIP Funding.  On or after September 30, 2020, subject to the satisfaction of the terms and conditions set forth in Section 5 herein, the remaining DIP Commitments shall be available in one (1) or more draws in a minimum amount of $100,000,000, not to exceed five (5) draws in total (each a "Subsequent DIP Funding").

Section 2.06.    Use of Proceeds.

(a)    Use of Proceeds. The Borrower shall use the proceeds from each DIP Loan (the "DIP Loan Proceeds") and Cash Collateral for only the following purposes, in each case subject to the terms and conditions herein and the Final DIP Order:

(i)    for working capital and general corporate purposes of the Obligors;

(ii)    for payment of Affiliate Costs and Expenses;

(iii)     for funding of Intercompany Affiliate Loans;

(iv)    for contributing equity to Affiliates in order to avoid their liquidation for having negative net equity, subject to the limitations set forth in Section 7.11;

47

(v)    to pay interest, premiums, fees and expenses payable hereunder to the DIP Lenders and the Agents as provided under the DIP Loan Documents and the Final DIP Order, including, but not limited to, Section 11.04 hereof;

(vi)    for provision of cash collateralization for Pre-Petition Letters of Credit, in a maximum aggregate amount up to $35 million;

(vii)    for provision of cash collateralization for Post-Petition Letters of Credit;

(viii)    to pay restructuring costs and Professional Fees of the Obligors, and fund the Carve-Out Account in accordance with the terms of the Final DIP Order;

(ix)    to make adequate protection payments, if any, as approved by the Bankruptcy Court; provided that such payments are included in the DIP Budget;

(x)    to facilitate a Qualified Sale Leaseback Transaction; and

(xi)    for any other purpose approved by the Bankruptcy Court in the Final DIP Order or other orders of the Bankruptcy Court not inconsistent with the terms of this Agreement.

(b)    Notwithstanding anything to the contrary in this Agreement, no DIP Loan Proceeds, Cash Collateral or Carve-Out Expenses may be used in any manner to:

(i)    object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under, or the Liens or security interests granted under, the DIP Loan Documents;

(ii)    investigate, initiate, assert or prosecute any claims or defenses or commence any cause of action against, under or relating to this Agreement or any other DIP Loan Document; or

(iii)    prevent, hinder or delay, whether directly or indirectly, Collateral Agent's assertion or enforcement of its Liens on the DIP Collateral, or its efforts to realize upon any DIP Collateral under the DIP Loan Documents or exercise any other rights and remedies under the DIP Loan Documents or applicable law.

Section 2.07.    Interest on Loans¶

(a)    Subject to the provisions of Section 2.08, each DIP Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 days or 366 days in a leap year) at a rate *per annum* equal to:

(i)    Tranche A Loans: As provided for in the Tranche A Amendment.

(ii)    Tranche B Loans: As provided for in the Tranche B Amendment.

(iii)    Tranche C Loans: As determined pursuant to the Tranche C Interest Formula, payable in kind and accruing as set forth in clause (c) of this Section 2.07.

(b)    Except as otherwise set forth herein, interest on each Tranche A Loan and each Tranche B Loan shall accrue on a daily basis and shall be payable in arrears on (i) each Interest Payment Date with respect to interest accrued on and up to each such Interest Payment Date; (ii) any prepayment of such DIP Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) the maturity of the DIP Loans, including on the Maturity Date; provided, that, for any cash payments of interest made by the Borrower, if the Interest Payment Date is not a Business Day, such cash payment shall be due on the next succeeding Business Day.

(c)    Interest on each Tranche C Loan shall be determined pursuant to the Tranche C Interest Formula and shall automatically accrue and be payable only on the Maturity Date (or the date of repayment or prepayment in full of the Tranche C Loans, if earlier).  For the avoidance of doubt, if the full amount of the Tranche C Loans are not repaid on the Maturity Date, the determination thereof will continue until such time as all such amounts have been repaid or prepaid in full.

(d)    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any DIP Loan, together with all fees, charges, and other amounts which are treated as interest on such DIP Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the DIP Lender holding such DIP Loan, the rate of interest payable in respect of such DIP Loan hereunder, together with all related Charges, shall by limited to the Maximum Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Rate, the Borrower shall continue to pay interest hereunder at the Maximum Rate until such time as the total interest received by the Administrative Agent, on behalf of applicable DIP Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

Section 2.08.    Default Interest¶ Upon the occurrence of an Event of Default, the principal amount of all DIP Loans outstanding and, to the extent permitted by applicable law, any interest payments on the DIP Loans or any fees or other amounts owed hereunder, shall thereafter automatically bear interest payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the DIP Loans (the "Default Rate"); provided that, with respect to the Tranche C Loans, such Default Rate shall be payable in kind on the basis described in Section 2.07(c) above.  For the avoidance of doubt, if the full amount of the Tranche C Loans are not repaid on the Maturity Date, the determination thereof will continue until such time as all such amounts have been repaid or prepaid in full.

Section 2.09.    Accrual of Interest.¶For the avoidance of doubt, all interest and fees in respect of the Tranche C Loans and Tranche C Commitments provided for in Section 2.07, 2.08, and 2.10 shall accrue and become payable on, and not prior to, the Maturity Date (or the date of repayment or prepayment in full the Tranche C Loans, if earlier), provided

49

that the full amount of the Tranche C Loans are not repaid on the Maturity Date, the determination thereof pursuant to the Tranche C Interest Formula will continue until such time as all such amounts have been repaid or prepaid in full.  For illustrative purposes, Schedule 2.09 sets forth examples of the aggregate amount of interest and fees which would be payable on the Tranche C Commitments in effect on the Closing Date in certain circumstances.

Section 2.10.    Fees¶

(a)    DIP Lender Fees.

(i)    Back-end Fee.  On the repayment or prepayment in full of the Tranche C Loans on the Maturity Date or otherwise, the Borrower shall become obligated to pay the Tranche C Lenders a fee equal to 2.50% of such Tranche C Lender's Tranche C Commitments (the "Back-end Fee"), which fee shall be calculated on the basis of a 365-day year and actual number of days elapsed as though it had accrued daily and was capitalized quarterly to the principal amount of the Tranche C Loans and be deemed to be a part of the principal amount of the Tranche C Loans for all purposes hereof, commencing on and including the Closing Date and ending on (but not including) the last Business Day of the third full calendar month thereafter, and subsequently, commencing on and including the last Business Day of the immediately preceding calculation period and ending on (but not including) the last Business Day of the third full calendar month thereafter. For the avoidance of doubt, if the full amount of the Tranche C Loans are not repaid on the Maturity Date, the determination of the Back-end Fee will continue until such time as all such amounts have been repaid or prepaid in full.

(ii)    Undrawn Commitment Fee.  Upon repayment or prepayment in full of the Tranche C Loans on the Maturity Date or otherwise, the Borrower shall become obligated to pay each Tranche C Lender a fee equal to (i) the difference between (1) such Tranche C Lender's Commitment and (2) such Tranche C Lender's pro rata share of the aggregate principal amount of outstanding Tranche C Loans, multiplied by (ii) 0.50% per annum, at the end of each month (the "Undrawn Commitment Fee"), which fee shall be calculated on the basis of a 365-day year and actual number of days elapsed as though it had accrued daily and was capitalized monthly to the principal amount of the Tranche C Loans and be deemed to be a part of the principal amount of the Tranche C Loans for all purposes hereof, commencing on and including the Closing Date and ending on (but not including) the last Business Day each fiscal month thereafter, and subsequently, commencing on and including the last Business Day of the immediately preceding calculation period and ending on (but not including) the last Business Day of full fiscal month thereafter.  For the avoidance of doubt, if the full amount of the Tranche C Loans are not repaid on the Maturity Date and any Tranche C Commitment remains undrawn, the determination of the Undrawn Commitment Fee will continue until such time as all such amounts have been repaid or prepaid in full, provided that, in all cases, upon the funding in full of the Tranche C Commitments, no Undrawn Committee Fee will continue to accrue.

50

(b)      _Administrative Agent Fees_.  The Borrower shall pay to the Administrative Agent the fees set forth in that certain fee letter (the "_Administrative Agent Fee Letter_") dated as of the date hereof between the Administrative Agent and the Borrower.

Section 2.11.      Repayment of Loans; Evidence of Debt¶

(a)      On the Maturity Date, the Borrower hereby unconditionally promises to pay to the Administrative Agent for the ratable account of each DIP Lender the then unpaid principal amount of each DIP Loan then outstanding.

(b)      Each DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such DIP Lender resulting from each DIP Loan made by such DIP Lender, including the amounts of principal and interest payable and paid to such DIP Lender from time to time hereunder.

(c)      The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each DIP Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each DIP Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the DIP Lenders and each DIP Lender's share thereof.  The Borrower shall have the right, upon reasonable notice, to request information regarding the accounts referred to in the preceding sentence.

(d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.11 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; _provided_ that the failure of any DIP Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the DIP Loans in accordance with the terms of this Agreement.

(e)      Any DIP Lender may request that DIP Loans made by it be evidenced by a promissory note, issued in the City of New York, United States of America, substantially in the form attached hereto as Exhibit U (a "_Promissory Note_").  In such event, the Borrower shall as promptly as reasonably possible execute and deliver to such DIP Lender a Promissory Note payable to such DIP Lender (or its permitted assigns).

Section 2.12.      Equity Subscription Election¶

(a)      _Equity Subscription_.  Notwithstanding any of the foregoing, with respect to any repayment or prepayment of the Tranche C Obligations on the Maturity Date or otherwise (except to the extent of any prepayment conducted in accordance with Section 2.13(a)), each of the Tranche C Lenders may elect to subscribe and pay for common stock of the reorganized LATAM entity ("_New Shares_" and such election, the "_Equity Subscription Election_"), all in accordance with the procedures and subject to the terms and conditions set forth on Schedule 2.12(a)[1] (the "_Equity Subscription_").

---

[1] NTD: Schedule subject to further review.

51

(b)    Tranche C Covenants. Each Tranche C Lender holding equity of LATAM (such Lender, a "Tranche C Shareholder") hereby agrees to:

(i)    not sell or transfer (but may pledge) any or all of such equity for the duration of the Chapter 11 Cases except (i) after the occurrence of an Event of Default or (ii) to a Tranche C Eligible Assignee, provided that, to the extent the Consummation Date would fall on or after December 15 of any year (and prior to January 1 of the following year), the Borrower will use commercially reasonable efforts to assist any lender that is a Tranche C Lender on the Closing Date in avoiding adverse tax impact, and in connection may agree to release such Tranche C Lender in whole or in part from the restriction contained in this clause (b)(i) during such time period; and

(ii)    participate in the shareholders meeting of LATAM and, in its capacity as shareholder, provided the Chapter 11 Plan is a Company Approved Reorganization Plan, to (1) take all necessary corporate action under Chilean law to effectuate the Chapter 11 Plan; (2) approve the requisite capital increase, including the amount of the capital increase and the number of New Shares to be authorized and issued (which shall be an amount sufficient to effectuate in full the Equity Subscription), and the subscription mechanics after the expiration of the Rights Offering, to effectuate the Equity Subscription and the Chapter 11 Plan; (3) grant a 180-day term delegation for the pricing of the New Shares to the Board of Directors of LATAM which shall be consistent with the Chapter 11 Plan and this Agreement, and (4) waive in full such Tranche C Shareholder's preemptive rights in the Rights Offering (as defined in Schedule 2.12(a)) no later than the last day of the Rights Offering and permit the Board of Directors of LATAM to place New Shares that remain unsubscribed following the expiration of the Rights Offering (as defined in Schedule 2.12(a)) to effectuate the Equity Subscription.

The obligations contained in **Error! Reference source not found.** and (ii) will be an independent obligation of each Tranche C Shareholder and shall survive any assignment by (or participation of) a Tranche C Shareholder of its portion of the DIP Loans. Tranche C Shareholders shall be entitled to advocate alongside LATAM in support of any Chapter 11 Plan valuation proposed by LATAM. No Tranche C Lender shall be bound in its capacity as shareholder by any prior actions taken under Section 2.12(b)(ii) with respect to a Company Approved Reorganization Plan in the event a Company Approved Reorganization Plan is not confirmed pursuant to an order of the Bankruptcy Court.

Section 2.13.    Mandatory Prepayments¶

(a)    Collateral Asset Sales and Insurance/Condemnation Proceeds. Upon receipt by any Obligor of any Net Proceeds as a result of a Collateral Sale or a Recovery Event in respect of DIP Collateral, the Borrower shall deposit cash in an amount (the "Net Proceeds Amount") equal to 100% of the Net Proceeds received, subject to the payment of any Permitted Priority Claims, into the Disbursement Account or another account established for such purpose (a "Collateral Proceeds Account") that is subject to a Deposit Account Control Agreement and thereafter such Net Proceeds Amount shall be applied (to the extent not otherwise applied pursuant to the immediately succeeding proviso), subject to the payment of any Permitted Priority Claims, in accordance with the requirements of Section 2.15; provided (i) for so long as no Event of Default

shall be continuing, such Net Proceeds shall not be required to be so applied to the extent that the Borrower, within five (5) Business Days following the receipt of any Net Proceeds, shall have delivered an Officer's Certificate to the Administrative Agent stating that such Net Proceeds are reasonably expected to be reinvested (or committed to be reinvested) to replace with additional DIP Collateral or, solely in the case of any Net Proceeds Amount in respect of any Recovery Event, to repair the assets which are the subject of such Recovery Event , in each case, within ninety (90) days after such Net Proceeds are received (it being understood that any such Net Proceeds shall be maintained in  a Controlled Account in anticipation of any permitted reinvestment or application for repair), and (ii) for the avoidance of doubt, the Borrower does not have to deposit any sale proceeds from any Permitted Sale Leaseback or Permitted Disposition (other than any Permitted Disposition pursuant to clause (d) of the definition thereof) into a Controlled Account or to apply such proceeds to payments of DIP Obligations in accordance with Section 2.15.

(b)    Issuance of Debt.  On the date of receipt by any Obligor of any Net Proceeds (it being understood that any such Net Proceeds shall be deposited into the Disbursement Account or another Controlled Account within one (1) Business Day after receipt thereof) from the incurrence of any Indebtedness of any Obligor, the Borrower shall prepay the DIP Obligations as set forth in Section 2.15 in an aggregate amount equal to 100% of such Net Proceeds, provided that no prepayment shall be required with respect to any Net Proceeds received with respect to any Permitted Indebtedness, provided, further the Borrower does not have to deposit any Net Proceeds from any Permitted Sale Leaseback into a Controlled Account or to apply such proceeds to payments of DIP Obligations in accordance with Section 2.15.

Section 2.14.    Voluntary Prepayments¶

(a)    Voluntary Prepayments. The Borrower shall have the right, at any time and from time to time, to prepay any Tranche A Loans or Tranche B Loans, in whole or in part, without premium or penalty, upon (A) telephonic notice (followed promptly by written, facsimile or electronic mail notice) or (B) written, facsimile or electronic mail notice, in any case received by 1:00 p.m., New York City time, two (2) Business Days prior to the proposed date of prepayment. Upon the giving of any such notice, the principal amount of the DIP Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be applied as specified in Section 2.15. For the avoidance of doubt, the Borrower shall not have the right to voluntarily prepay the Tranche C Loans.

(i)    Each notice of prepayment shall specify the prepayment date, the principal amount of the DIP Loans to be prepaid. The Administrative Agent shall, promptly after receiving notice from the Borrower hereunder, notify each DIP Lender of the principal amount of the DIP Loans held by such DIP Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

(b)    Mandatory Termination or Reduction of DIP Commitments. The DIP Commitments shall automatically and permanently terminate on the Maturity Date.

Section 2.15.    Application of Prepayment Amounts¶

#93334561v28

(a)    Unless otherwise provided herein, each prepayment of DIP Loans shall be applied pro rata among the DIP Loans. The Administrative Agent shall apply prepayments of DIP Loans as follows:

(i)    *first*, to any payments owed under the Administrative Agent Fee Letter.

(ii)    to the payment of all fees and expenses specified in Section 9.04, to the full extent thereof;

(iii)    *second*, to the payment of all fees specified in Section 2.10(b);

(iv)    *third*, pro rata, to all Tranche A Obligations, in the following order: (1) to the payment of any accrued interest payable at the Default Rate, if any, (2) to the payment of any accrued interest (other than Default Rate interest), (3) to the payment of the outstanding principal amounts of any Tranche A Loans on a pro rata basis, and (4) to the payment of any remaining Tranche A Obligations;

(v)    *fourth*, pro rata, to all Tranche B Obligations, if any, in the following order: (1) to the payment of any accrued interest payable at the Default Rate, if any, (2) to the payment of any accrued interest (other than Default Rate interest), (3) to the payment of the outstanding principal amounts of any Tranche B Loans, if any, on a pro rata basis, and (4) to the payment of any remaining Tranche B Obligations, if any; and

(vi)    with respect to mandatory prepayments under Section 2.13, *fifth*, pro rata to all Tranche C Obligations (subject to the right of any Tranche C Lender to waive such payment under Section 2.16) in the following order: (1) to the payment of any accrued interest payable at the Default Rate, if any, (2) to the payment of any accrued interest (other than Default Rate interest), (3) to the payment of the outstanding principal amounts of any Tranche C Loans on a pro rata basis, and (4) to the payment of any remaining Tranche C Obligations.

Section 2.16.    Waivable Mandatory Prepayment.

(a)    Notwithstanding anything to the contrary contained in this Article II or elsewhere in this Agreement, the Borrower shall, give the  Tranche C Lenders with outstanding  Tranche C Loans, the option to waive their pro rata share of a mandatory prepayment of DIP Loans to be made pursuant to Section 2.13 (each such prepayment, a "Waivable Mandatory Prepayment") upon the terms and provisions set forth in this Section 2.16. In the event that any such Tranche C Lender with outstanding Tranche C Loans desires to waive its pro rata share of such Tranche C Lender' s right to receive any such Waivable Mandatory Prepayment in whole or in part, such DIP Lender shall so advise the Administrative Agent no later than 4:00 P.M. (New York time) on the date which is four (4) Business Days after the date of such notice from the Administrative Agent (and the Administrative Agent shall promptly thereafter notify the Borrower thereof), which notice shall also include the amount such Tranche C Lender desires to receive in respect of such prepayment.  If any Tranche C Lender with outstanding Tranche C Loans does not reply to the Administrative Agent within such four (4) Business Day period, such DIP Lender will be deemed not to have waived any part of such prepayment.  If any DIP Lender with outstanding Tranche C Loans does not specify an amount it wishes to receive, such Tranche C Lender will be

54

deemed to have accepted 100% of its share of such prepayment. In the event that any such Tranche C Lender waives all or part of its share of any such Waivable Mandatory Prepayment, such waived amounts shall be distributed to the other Tranche C Lenders on a pro rata basis, provided that if all Tranche C Lenders waive such prepayment, the Borrower shall retain 100% of the amount so waived.

Section 2.17.    Increased Costs¶

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any DIP Lender (except any such reserve requirement subject to Section 2.17(c)); or

(ii)    impose on any DIP Lender any other condition, cost or expense or subject any DIP Lender to any liability in respect of any Taxes (other than Excluded Taxes, Indemnified Taxes, or Other Taxes) imposed on or with respect to any payment made on any DIP Loan under this Agreement;

and the result of any of the foregoing shall be to increase the cost to such DIP Lender of making, converting into, continuing or maintaining any DIP Loan (or of maintaining its obligation to make any such DIP Loan) or to reduce the amount of any sum received or receivable by such DIP Lender hereunder with respect to any DIP Loan (whether of principal, interest or otherwise), then, upon the request of such DIP Lender, the Borrower will pay to such DIP Lender (without duplication of any other amounts to such DIP Lender under this Agreement or any other DIP Loan Document) such additional amount or amounts as will compensate such DIP Lender for such additional costs incurred or reduction suffered.

(b)    If any DIP Lender reasonably determines in good faith that any Change in Law affecting such DIP Lender or such DIP Lender's holding company regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such DIP Lender's capital or on the capital of such DIP Lender's or holding company, if any, as a consequence of this Agreement or the DIP Loans made by such DIP Lender, to a level below that which such DIP Lender or such DIP Lender's holding company could have achieved but for such Change in Law (taking into consideration such DIP Lender's policies and the policies of such DIP Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such DIP Lender, as the case may be, such additional amount or amounts, in each case as documented by such DIP Lender to the Borrower as will compensate such DIP Lender or such DIP Lender's holding company for any such reduction suffered; it being understood that to the extent duplicative of the provisions in Section 2.19, this Section 2.17(b) shall not apply to Taxes.

(c)    Solely to the extent arising from a Change in Law, the Borrower shall pay to each DIP Lender (i) as long as such DIP Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the DIP Commitments or the funding of the DIP Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if

#93334561v28

necessary, to the nearest five (5) decimal places) equal to the actual costs allocated to such DIP Commitment or DIP Loan by such DIP Lender (as determined by such DIP Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such DIP Loan, provided the Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such DIP Lender.  If a DIP Lender fails to give written notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)    A certificate of a DIP Lender setting forth the amount or amounts necessary to compensate such DIP Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.17 and the basis for calculating such amount or amounts shall be delivered to the Borrower and shall be *prima facie* evidence of the amount due; provided however, that any determination by a DIP Lender of amounts owed pursuant to this Section 2.17 to such DIP Lender due to any such Change in Law shall be made in good faith in a manner generally consistent with such DIP Lender's standard practice.  The Borrower shall pay such DIP Lender the amount due within fifteen (15) days after receipt of such certificate.

(e)    Failure or delay on the part of any DIP Lender to demand compensation pursuant to this Section 2.17 shall not constitute a waiver of such DIP Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a DIP Lender pursuant to this Section 2.17 for any increased costs or reductions incurred more than 180 days prior to the date that such DIP Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such DIP Lender's intention to claim compensation therefor; provided, further that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The protection of this Section 2.17 shall be available to each DIP Lender regardless of any possible contention as to the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed.

(f)    The Borrower shall not be required to make payments under this Section 2.17 to any DIP Lender if (A) a claim hereunder arises solely through circumstances peculiar to such DIP Lender and which do not affect commercial banks in the jurisdiction of organization of such DIP Lender generally or (B) the claim arises out of a voluntary relocation by such DIP Lender of its applicable lending office (it being understood that any such relocation effected pursuant to Section 2.21 is not "voluntary").

Section 2.18.    Mitigation Obligations; Replacement of Lenders.

(a)    Mitigation of DIP Obligations.  If any DIP Lender requests compensation under Section 2.17, or if the Borrower is required to pay any additional amount to any DIP Lender or any Governmental Authority for the account of any DIP Lender pursuant to Section 2.19, then such DIP Lender shall use reasonable efforts to designate a different lending office for funding or booking its DIP Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, to file any certificate or document reasonably requested by the Borrower or to take other reasonable measures, if, in the reasonable judgment of

56

such DIP Lender, such designation or assignment (i) would eliminate or reduce materially amounts payable pursuant to Section 2.17 or Section 2.19, as the case may be, in the future, (ii) would not subject such DIP Lender to any unreimbursed cost or expense, (iii) would not require such DIP Lender to take any action inconsistent with its internal policies or legal or regulatory restrictions, and (iv) would not otherwise be disadvantageous to such DIP Lender. The Borrowers, jointly and severally, shall pay all reasonable costs and expenses incurred by any DIP Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such DIP Lender to the Administrative Agent shall be conclusive absent manifest error.

(b)    <u>Replacement of DIP Lenders</u>. In the event (i) any DIP Lender delivers a certificate requesting compensation pursuant to Section 2.17(a), (ii) the Borrower is required to pay any additional amount to any DIP Lender or any Governmental Authority on account of any DIP Lender pursuant to Section 2.19, (iii) any DIP Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower that requires the consent of 100% of the DIP Lenders or 100% of all affected DIP Lenders and which, in each case, has been consented to by the Majority DIP Lenders or (iv) any DIP Lender becomes a Defaulting Lender, the Borrower may, at its sole expense and effort, upon notice to such DIP Lender and the Administrative Agent, require such DIP Lender to transfer and assign, without recourse (in accordance with and subject to restrictions contained in Section 11.02), all of its interests, rights and obligations under this Agreement to an Eligible Assignee pursuant to an Assignment and Acceptance (<u>provided</u> that the failure of such assigning DIP Lender to execute an Assignment and Acceptance shall not affect the validity and effect of such assignment and such assignment shall be recorded in the Register) which shall assume such assigned obligations (which Eligible Assignee may be another DIP Lender, if a DIP Lender accepts such assignment); <u>provided</u>, that (w) in the case of any such assignment resulting from a claim for compensation under Section 2.17(a) or payments required to be made pursuant to Section 2.19, such assignment will result in a reduction in such compensation or payments thereafter, (x) such assignment shall not conflict with any applicable legal requirement, (y) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld or delayed, and (z) the Borrower or such assignee shall have paid to the affected DIP Lender in immediately available funds an amount equal to the sum of the principal of and interest and any prepayment premium or penalty (if any) accrued to the date of such payment on the outstanding DIP Loans of such DIP Lender affected by such assignment plus all Fees and other amounts owing to or accrued for the account of such DIP Lender hereunder; <u>provided</u>, further, that, if prior to any such transfer and assignment the circumstances or event that resulted in such DIP Lender's claim for compensation cease to cause such DIP Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to result in amounts being payable under Section 2.19, as the case may be, or if such DIP Lender shall waive its right to claim further compensation under to Section 2.17(a) in respect of such circumstances, then such DIP Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each DIP Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such DIP Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such DIP Lender's interests hereunder in the circumstances contemplated by this Section 2.18(b).

#93334561v28

Section 2.19.    Taxes¶

(a)    Any and all payments by or on account of any DIP Obligation of the Borrower or any Guarantor hereunder or under any other DIP Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if any Indemnified Taxes or Other Taxes are required to be withheld from any amounts payable to the Administrative Agent or any DIP Lender, as determined in good faith by the applicable Withholding Agent, then (i) the sum payable by the Borrower or a Guarantor shall be increased as necessary so that after making all required deductions for any Indemnified Taxes or Other Taxes (including deductions for any Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 2.19), the Administrative Agent, DIP Lenders or any other recipient of such payments (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable Withholding Agent shall make such deductions and (iii) the applicable Withholding Agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower or the Guarantors, as applicable, shall pay any Other Taxes (except any such Taxes or portions thereof that have been paid or will be paid under Section 2.19(a)) to the relevant Governmental Authority in accordance with applicable law, or at the option and upon written demand of the Administrative Agent timely reimburse it for the payment of any such Taxes (except any such Taxes or portions thereof that have been paid or will be paid under Section 2.19(a)) made on behalf of the Borrower or the Guarantors, as applicable, to the extent permitted by applicable law.

(c)    The Borrower shall indemnify the Administrative Agent and each DIP Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by or on behalf of or withheld or deducted from payments owing to the Administrative Agent or such DIP Lender, as the case may be, on or with respect to any payment by or on account of any DIP Obligation of the Borrower or the Guarantors hereunder or under any other DIP Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.19) and any penalties, interest and reasonable out-of-pocket expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability delivered to the Borrower by a DIP Lender or by the Administrative Agent on its own behalf or on behalf of a DIP Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment to the extent available, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Each DIP Lender shall, within ten (10) days after written demand therefor, indemnify the Administrative Agent (to the extent the Administrative Agent has not been reimbursed by the Borrower) for the full amount of any Taxes imposed by any Governmental Authority that are attributable to such DIP Lender and that are payable or paid by the Administrative Agent, together with all interest, penalties, reasonable out-of-pocket costs and

#93334561v28

expenses arising therefrom or with respect thereto, as determined by the Administrative Agent in good faith. A certificate as to the amount of such payment or liability delivered to any DIP Lender by the Administrative Agent shall be conclusive absent manifest error.

(f)      Any Tax Indemnitee that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable law or as reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate; provided that a DIP Lender shall not be required to deliver any documentation pursuant to this Section 2.19(f) that such DIP Lender is not legally able to deliver or, except to the extent the Borrower has provided indemnification acceptable to the Tax Indemnitee in its sole discretion exercised in good faith, that would materially prejudice the commercial position of such DIP Lender.

(g)      (1) Any Tax Indemnitee that is a "United States Person" (as such term is defined in Section 7701(a)(30) of the Code) shall deliver to the Administrative Agent and the Borrower, on or prior to the date on which such Tax Indemnitee becomes a party to this Agreement or any other DIP Loan Document (and from time to time thereafter when the previously delivered certificates and/or forms expire, or upon request of the Borrower or the Administrative Agent), two (2) copies of Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by such Tax Indemnitee, certifying that such Tax Indemnitee is entitled to an exemption from United States backup withholding tax.

(h)      If a payment made to a Tax Indemnitee under this Agreement or any DIP Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Tax Indemnitee were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Tax Indemnitee shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law or at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower or the Administrative Agent to comply with its obligations under FATCA, to determine that such Tax Indemnitee has or has not complied with such Tax Indemnitee's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.19(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)      If a Tax Indemnitee determines, in its reasonable sole discretion exercised in good faith, that it has received a refund of any Taxes or Other Taxes from the Governmental Authority to which such Taxes or Other Taxes were paid and as to which it has been indemnified by the Borrower or any Guarantor or with respect to which the Borrower or any Guarantor has paid additional amounts pursuant to this Section 2.19, it shall pay over such refund to the Borrower or the Guarantor (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or the Guarantor under this Section 2.19 with respect to the Taxes or Other

#93334561v28

Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of such Tax Indemnitee incurred in obtaining such refund (including Taxes imposed with respect to such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower or the Guarantors, upon the request of the Tax Indemnitee, agrees to repay the amount paid over to the Borrower or the Guarantors (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee in the event or the Tax Indemnitee is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (i), in no event will the Tax Indemnitee be required to pay any amount to the Borrower pursuant to this paragraph (h) if, and then only to the extent, the payment of such amount would place such Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax indemnification payments or additional amounts under this Section 2.19 giving rise to such refund had never been paid. This Section shall not be construed to require the Tax Indemnitee to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(j)     The Tax Indemnitees agree to reasonably cooperate with any Borrower in connection with such Borrower's investigating alternatives for reducing or avoiding any Taxes indemnifiable hereunder and to use reasonable efforts to cooperate with the Borrower to avoid or minimize, to the greatest extent possible and permitted by applicable laws, any liability with respect to such Taxes, provided that such alternatives would not, in the sole opinion of such Tax Indemnitee exercised in good faith, result in any economic, legal, or regulatory disadvantage to such Tax Indemnitee; provided, further, that no Tax Indemnitee shall be obliged to take any action that would, in its good faith judgment, cause it to incur any loss or cost, unless the Borrower agrees to reimburse the Tax Indemnitee therefor in manner reasonably satisfactory to such Tax Indemnitee.

Section 2.20.     Payments Generally; Pro Rata Treatment¶

(a)     The Borrower shall make each payment or prepayment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Sections 2.17, or otherwise) prior to 1:00 p.m., New York City time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent pursuant to wire instructions to be provided by the Administrative Agent, except that payments pursuant to Sections 2.17 and 11.04 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all DIP Obligations then due hereunder, such funds shall be applied (i) first, towards payment of Fees and expenses then due under **Error! Reference source**

**not found.**Section 2.10(b) and Section 11.04 payable to each Agent, (ii) <u>second</u>, towards payment of Fees and expenses then due under Section 2.10(a) and Section 11.04 payable to the DIP Lenders and towards payment of interest then due on account of the DIP Loans, ratably among the parties entitled thereto in accordance with the amounts of such Fees and expenses and interest then due to such parties, (iii) <u>third</u>, pro rata, to all Tranche A Obligations, (iv) <u>fourth</u>, pro rata to all Tranche B Obligations, if any, and (v) <u>fifth</u>, pro rata to all Tranche C Obligations (subject to the right of any Tranche C Lender to refuse a mandatory payment under Section 2.16(a)).

(c)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the DIP Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the DIP Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the DIP Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such DIP Lender with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(d)     If any Defaulting Lender shall fail to make any payment required to be made by it pursuant to Sections 2.04 or 9.04, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Defaulting Lender to satisfy such Defaulting Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.21.    <u>Reserved</u>¶

Section 2.22.    <u>Reserved</u>¶

Section 2.23.    <u>Reserved.</u>

Section 2.24.    <u>Reserved</u>¶

Section 2.25.    <u>Right of Set-Off</u>¶ Subject to the Final DIP Order, upon the occurrence and during the continuance of any Event of Default, each Agent and each DIP Lender (and their respective banking Affiliates) are hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness (including obligations owing under any derivatives positions) at any time owing by such Agent and each such DIP Lender (or any of such banking Affiliates) to or for the credit or the account of the Borrower or the Guarantors against any and all of any such overdue amounts owing under the DIP Loan Documents, irrespective of whether or not such Agent or such DIP Lender shall have made any demand under any DIP Loan Document; <u>provided</u> that in the event that any Defaulting Lender exercises any such right of setoff, (x) all amounts so set off will be paid over immediately to the Administrative Agent for

#93334561v28

further application in accordance with the provisions of Section 2.10(b) and, pending such payment, will be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the DIP Lenders and (y) the Defaulting Lender will provide promptly to the Administrative Agent a statement describing in reasonable detail the DIP Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each DIP Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such DIP Lender (or any of such banking Affiliates) and the Administrative Agent agrees promptly to notify the Borrower after any such set-off and application made by it (or any of its banking Affiliates), as the case may be, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each DIP Lender and each Agent under this Section 2.25 are in addition to other rights and remedies which such DIP Lender and Agent may have upon the occurrence and during the continuance of any Event of Default as provided for in the Final DIP Order.

Section 2.26.    Payment of DIP Obligations¶ Subject to the provisions of Section 8.01, upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations under this Agreement or any of the other DIP Loan Documents of the Borrower, the DIP Lenders shall be entitled to immediate payment of such DIP Obligations.

Section 2.27.    Defaulting DIP Lenders¶

(a)    If at any time any DIP Lender becomes a Defaulting Lender, then the Borrower may, on fifteen (15) Business Days' prior written notice to the Administrative Agent and such DIP Lender, replace such DIP Lender by causing such DIP Lender to (and such DIP Lender shall be obligated to) assign pursuant to Section 11.02(b) (with the assignment fee to be waived in such instance and subject to any consents required by such Section) all of its rights and obligations under this Agreement to one (1) or more assignees; provided that neither the Administrative Agent nor any DIP Lender shall have any obligation to the Borrower to find a replacement DIP Lender or other such Person.

(b)    Any DIP Lender being replaced pursuant to Section 2.27(a) shall (i) execute and deliver an Assignment and Acceptance with respect to such DIP Lender's outstanding DIP Commitments and DIP Loans, and (ii) deliver any documentation evidencing such DIP Loans to the Borrower or the Administrative Agent.  Pursuant to such Assignment and Acceptance, (A) the assignee DIP Lender shall acquire all or a portion, as specified by the Borrower and such assignee, of the assigning DIP Lender's outstanding DIP Commitments and DIP Loans, (B) all obligations of the Borrower owing to the assigning DIP Lender relating to the DIP Commitments and DIP Loans so assigned shall be Paid in Full by the assignee DIP Lender to such assigning DIP Lender concurrently with such Assignment and Acceptance, and (C) upon such payment and, if so requested by the assignee DIP Lender, delivery to the assignee DIP Lender of the appropriate documentation executed by the Borrower in connection with previous Borrowings, the assignee DIP Lender shall become a DIP Lender hereunder and the assigning DIP Lender shall cease to constitute a DIP Lender hereunder with respect to such assigned DIP Commitments and DIP Loans, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning DIP Lender; provided that an assignment contemplated by this Section 2.27(b) shall become effective notwithstanding the failure by the

#93334561v28

DIP Lender being replaced to deliver the Assignment and Acceptance contemplated by this Section 2.27(b), so long as the other actions specified in this Section 2.27(b) shall have been taken, and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender shall constitute a waiver or release of any claim of any party hereunder arising from such DIP Lender's having been a Defaulting Lender.

(c)      Anything herein to the contrary notwithstanding, if a DIP Lender becomes, and during the period it remains, a Defaulting Lender, during such period, such Defaulting Lender shall not be entitled to any fees accruing during such period pursuant to Section 2.10 (without prejudice to the rights of the Non-Defaulting Lenders in respect of such fees).

(d)      Any amount paid by the Borrower or otherwise received by the Administrative Agent for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Lender, but shall instead be retained by the Administrative Agent in a segregated account until (subject to Section 2.27(e)) the termination of the DIP Commitments and payment in full of all DIP Obligations of the Borrower hereunder and will be applied by the Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority:

first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent,

second, to the payment of the default interest and then current interest due and payable to the DIP Lenders which are Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such interest then due and payable to them,

third, to the payment of fees then due and payable to the Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them,

fourth, to the ratable payment of other amounts then due and payable to the Non-Defaulting Lenders, and

fifth, after the termination of the DIP Commitments and payment in full of all obligations of the Borrower hereunder, to pay amounts owing under this Agreement to such Defaulting Lender or as a court of competent jurisdiction may otherwise direct.

The Borrower may terminate the unused amount of the DIP Commitment of any DIP Lender that is a Defaulting Lender upon not less than fifteen (15) Business Days' prior notice to the Administrative Agent (which shall promptly notify the DIP Lenders thereof), and in such event the provisions of Section 2.27(d) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), provided that (i) no Event of Default shall have occurred and be continuing and (ii) such termination shall not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, or any DIP Lender may have against such Defaulting Lender.

63

(e)     If the Borrower and the Administrative Agent agree in writing that a DIP Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the DIP Lenders, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such DIP Lender shall purchase at par such portions of outstanding DIP Loans of the other DIP Lenders, and/or make such other adjustments, as the Administrative Agent may determine to be necessary to cause the DIP Lenders to hold DIP Loans on a pro rata basis in accordance with their respective DIP Commitments, whereupon such DIP Lender shall cease to be a DIP Lender and will be a Non-Defaulting Lender; provided that no adjustments shall be made retroactively with respect to fees accrued while such DIP Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender shall constitute a waiver or release of any claim of any party hereunder arising from such DIP Lender's having been a Defaulting Lender.

(f)     Notwithstanding anything to the contrary herein, the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.05.

Section 2.28.     Increase in Tranche C Commitment¶

(a)     Notice of Increase.  The Borrower shall provide written notice to the Administrative Agent of any Tranche C Increase Commitment.  Such notice shall specify (i) the date (each, an "Increase Effective Date") on which the Borrower proposes that the Tranche C Increase Commitment shall be effective, which shall be a date not less than five (5) Business Days after the date on which such notice is delivered to the Administrative Agent, and (ii) the identity of each Tranche C Increase Lender.

(b)     Tranche C Joinder Agreement.  The Tranche C Increase Commitment shall be effectuated by the Tranche C Joinder Agreement executed by the Borrower, the Guarantors, the Administrative Agent and each Tranche C Increase Lender.  The Tranche C Joinder Agreement may, without the consent of any other DIP Lenders, effect such amendments to this Agreement and the other DIP Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent, to effect the provisions of this Section 2.28 it being understood, for the avoidance of doubt, that any loans made pursuant to a Tranche C Increase Commitment shall be on the same terms and conditions, in all respects, including as to conversion rights, as the existing Tranche C Loans.  In addition, unless otherwise specifically provided herein, all references in the DIP Loan Documents to DIP Loans or Tranche C Loans shall be deemed, unless the context otherwise requires, to include references to Tranche C Loans made pursuant to any Tranche C Increase Commitment made pursuant to this Agreement.

(c)     Equal and Ratable Benefit.  The Tranche C Loans made pursuant to the Tranche C Increase Commitments established pursuant to this paragraph shall constitute DIP Loans and DIP Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other DIP Loan Documents and shall, without limiting the foregoing, benefit equally and ratably from the security interests created by the Collateral Documents.

(d)     No Default or Event of Default.  No Tranche C Increase Commitment shall be established pursuant to this Section 2.28 unless, both prior to the Increase Effective Date and

after giving effect to the Tranche C Increase Commitment and any borrowings pursuant thereto, no Default or Event of Default has occurred and is continuing.

(e)    Representations and Warranties.  Both prior to the Increase Effective Date and after giving effect to the Tranche C Increase Commitment and any borrowings pursuant thereto, the representations and warranties contained in Section 4 of this Agreement and the other DIP Loan Documents are true and correct in all material respects (without duplication of any materiality qualifiers set forth therein) on and as of the Increase Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifiers set forth therein) as of such earlier date.

(f)    Use of Proceeds.  The proceeds from the DIP Loans made pursuant to the Tranche C Increase Commitments will be used by the Borrower and the Guarantors as provided in Section 2.06 herein.

(g)    Certificates.  The Borrower shall deliver to the Administrative Agent (for distribution to the DIP Lenders) a certificate of the Borrower, in form and substance satisfactory to the Administrative Agent, dated as of the Increase Effective Date signed by an Officer of the Borrower certifying to the satisfaction of the conditions set forth in Section 2.28(d) and Section 2.28(e) as of the Increase Effective Date.

(h)    Conflicting Provisions.  This Section 2.28 shall supersede any provisions in Section 2.05 or Section 11.08 to the contrary.

## SECTION 3.

## PRIORITY AND LIENS

Section 3.01.    DIP Liens¶ Subject to the Carve-Out, the DIP Obligations shall be secured by valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected Liens on, and security interests in (such Liens and security interests, the "DIP Liens") to the extent required by the Final DIP Order and the DIP Loan Documents, the DIP Collateral in the following order of priority:

(a)    Tranche A Liens. The DIP Liens securing the Tranche A Obligations (collectively, the "Tranche A Liens") and the DIP Hedge Obligations (the "DIP Hedge Liens") shall have the following priority:

(i)    Pursuant to Bankruptcy Code section 364(c)(2), secured by a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and Lien on the DIP Collateral not otherwise subject to Permitted Priority Liens, subject only to the Carve-Out.

(ii)    Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully-perfected junior priority security interest and Lien on the DIP Collateral, subject to Permitted Priority Liens and the Carve-Out.

65

(b)     Tranche B Liens. The DIP Liens securing the Tranche B Obligations, if any, (collectively, the "Tranche B Liens") shall have the following priority:

(i)     Pursuant to Bankruptcy Code section 364(c)(2), secured by a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and Lien on the DIP Collateral not otherwise subject to Permitted Priority Liens, subject only to the Carve-Out, the Tranche A Liens and the DIP Hedge Liens.

(ii)     Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and Lien on the DIP Collateral, subject to the Permitted Priority Liens, the Carve-Out, the Tranche A Liens and the DIP Hedge Liens.

(c)     Tranche C Liens. The DIP Liens securing the Tranche C Obligations (collectively, the "Tranche C Liens") shall have the following priority:

(i)     Pursuant to Bankruptcy Code section 364(c)(2), secured by a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and Lien on DIP Collateral not otherwise subject to Permitted Priority Liens, subject only to the Carve-Out, the Tranche A Liens, the Tranche B Liens, if any, and the DIP Hedge Liens.

(ii)     Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and Lien on DIP Collateral, subject to the Permitted Priority Liens, the Carve-Out, the Tranche A Liens, the Tranche B Liens, if any, and the DIP Hedge Liens.

(d)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Obligors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code (including adequate protection payments), whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Obligors and all proceeds thereof (excluding Avoidance Actions but including any proceeds or property recovered, unencumbered, or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise) in accordance with the other DIP Loan Documents, subject only to the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if the Final DIP Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

#93334561v28

(i)      The DIP Superpriority Claims shall be subject to the following priority in payment (the "<u>DIP Superpriority Claims Waterfall</u>"):

1)      First, DIP Superpriority Claims arising out of the Tranche A Obligations and Hedging Obligations, on a pari passu basis;

2)      Second, DIP Superpriority Claims arising out of the Tranche B Obligations, if any; and

3)      Third, DIP Superpriority Claims arising out of the Tranche C Obligations.

(ii)     For the avoidance of doubt, no DIP Superpriority Claim subordinated to other DIP Superpriority Claims in the DIP Superpriority Claims Waterfall (each, a "<u>Subordinated DIP Superpriority Claim</u>", and together, the "<u>Subordinated DIP Superpriority Claims</u>") shall be entitled to payment by the Obligors, unless and until such preceding priority DIP Superpriority Claim has been Paid in Full.

(iii)    The DIP Superpriority Claims shall survive any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases.

(iv)     The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Obligors other than Excluded Assets.

Section 3.02.      <u>No Action With Respect to DIP Collateral</u>¶

(a)      Neither the Majority Tranche B Lenders nor the Majority Tranche C Lenders shall direct the Agents to commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or institute any action or proceeding with respect to any right, remedy or power with respect to, or otherwise take any action to enforce its interest in or realize upon, or take any other action available to it in respect of, any DIP Collateral under any Collateral Document, applicable law or otherwise (hereinafter, an "<u>Enforcement Action</u>"), at any time when such DIP Collateral shall be subject to any Tranche A Lien and any Tranche A Obligations secured by such Tranche A Lien shall remain outstanding or any commitment to extend credit that would constitute Tranche A Obligations secured by such Tranche A Lien shall remain in effect, it being agreed that only the Majority Tranche A Lenders, acting in accordance with the applicable DIP Loan Documents or applicable law, shall be entitled to direct the Agents to take any such actions or exercise any such remedies during such time, all in such order and such manner as they may determine in their sole discretion, subject to the rights of any holders of any Permitted Priority Liens on such DIP Collateral; <u>provided</u>, that the Proceeds of any such Enforcement Actions are applied in accordance with this Agreement; <u>provided</u>, <u>further</u>, that the Majority Tranche B Lenders and, following the Tranche B Lien Discharge Date, the Majority Tranche C Lenders may direct the Agents to exercise any or all such rights with respect to the DIP Collateral after a period (the "<u>Standstill Period</u>") of ninety (90) consecutive days has elapsed from the date of delivery of written notice to the Agents by the Majority Tranche B Lenders or the Majority Tranche C

67

Lenders stating that an Event of Default has occurred and is continuing hereunder and stating their intention to exercise their rights to take such actions only so long as the Majority Tranche A Lenders (or the Agents on their behalf) have not commenced and are diligently pursuing any of their Enforcement Actions with respect to a material portion of the DIP Collateral (including seeking relief from the automatic stay or any other stay in any bankruptcy, insolvency or liquidation proceeding).

(b)    The Majority Tranche B Lenders and the Majority Tranche C Lenders may take any Enforcement Actions with respect to the DIP Collateral after the termination of the Standstill Period to the extent permitted by Section 3.02(a) above.  If the Majority Tranche B Lenders and the Majority Tranche C Lenders exercise any rights or remedies with respect to such DIP Collateral in accordance with Section 3.02(a) and thereafter the Majority Tranche A Lenders commence and diligently pursue the exercise of any of their rights or remedies with respect to a material portion of the DIP Collateral (including seeking relief from the automatic stay or any other stay in any bankruptcy, insolvency or liquidation proceeding), the Standstill Period shall recommence and the Majority Tranche B Lenders and Majority Tranche C Lenders shall rescind any such rights or remedies already exercised with respect to the DIP Collateral.

(c)    After the occurrence of the Tranche A Lien Discharge Date, the Majority Tranche C Lenders shall not be permitted to direct the Agents to take any Enforcement Actions in respect of the DIP Collateral at any time when such DIP Collateral shall be subject to any Tranche B Lien and any Tranche B Obligations secured by such Tranche B Lien shall remain outstanding or any commitment to extend credit that would constitute Tranche B Obligations secured by such Tranche B Lien shall remain in effect, it being agreed that, after the occurrence of the Tranche A Lien Discharge Date, only the Majority Tranche B Lenders, acting in accordance with the applicable DIP Loan Documents or applicable law, shall be entitled to direct the Agents to take any such actions or exercise any such remedies during such time, all in such order and such manner as they may determine in their sole discretion, subject to the rights of any holders of any Permitted Priority Liens on such DIP Collateral; provided, that the Proceeds of any such Enforcement Actions are applied in accordance with this Agreement; provided, further, that the Majority Tranche C Lenders may direct the Agents to exercise any or all such rights with respect to the DIP Collateral after the Standstill Period has elapsed from the date of delivery of written notice to the Agents by the Majority Tranche C Lenders stating that an Event of Default has occurred and is continuing hereunder and stating their intention to exercise their rights to take such actions only so long as the Majority Tranche B Lenders (or the Agents on their behalf) have not commenced and are diligently pursuing any of their Enforcement Actions with respect to a material portion of the DIP Collateral (including seeking relief from the automatic stay or any other stay in any bankruptcy, insolvency or liquidation proceeding).

(d)    After the occurrence of the Tranche A Lien Discharge Date, the Majority Tranche C Lenders may exercise any of its rights or remedies with respect to the DIP Collateral after the termination of the Standstill Period to the extent permitted by Section 3.02(c) above, subject to the rights of any holders of any Permitted Priority Liens on such DIP Collateral.  If the Majority Tranche C Lenders exercise any rights or remedies with respect to such DIP Collateral in accordance with Section 3.02(c) and thereafter the Majority Tranche B Lenders commence and diligently pursue the exercise of any of their rights or remedies with respect to a material portion of the DIP Collateral (including seeking relief from the automatic stay or any other stay in any

68

bankruptcy, insolvency or liquidation proceeding), the Standstill Period shall recommence and the Majority Tranche C Lenders shall rescind any such rights or remedies already exercised with respect to the DIP Collateral.

Section 3.03.        No Interference.

(a)        Subject to provisions provided for in Section 1.1(b) below, the Tranche C Lenders agree that (i) they will not take or cause to be taken any action the purpose or effect of which is, or could be, to make any Tranche C Lien *pari passu* with, or to give such Tranche C Lender any preference or priority relative to, any Tranche A Lien or Tranche B Lien with respect to the DIP Collateral or any part thereof, (ii) they will not challenge or question in any proceeding the validity or enforceability of any Tranche A Obligations or of any Tranche B Obligations, or the validity, attachment, perfection or priority of any Tranche A Lien or Tranche B Lien, or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Section 3, (iii) they will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the DIP Collateral by any Tranche A Lender or by any Tranche B Lender, (iv) they shall have no right to (A) direct the Majority Tranche A Lenders or Majority Tranche B Lenders to exercise any right, remedy or power with respect to the DIP Collateral or (B) consent to the exercise by the Majority Tranche A Lenders or by the Majority Tranche B Lenders of any right, remedy or power with respect to the DIP Collateral, (v) they will not object to the forbearance by any of the Majority Tranche A Lenders or by any of the Majority Tranche B Lenders from bringing or pursuing any foreclosure proceeding or action nor any other exercise of any rights or remedies relating to the DIP Collateral, and (vi) they will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Section 3.  The Tranche A Lenders and the Tranche B Lenders agree that they will not (i) challenge or question in any proceeding the validity or enforceability of any Tranche C Obligations, or the validity, attachment, perfection or priority of any Tranche C Lien (including any perfection effected pursuant to this Section 3), or the validity, or enforceability of the rights or duties established by or other provisions of this Section 3 and (ii) attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Section 3.

(b)        Subject to the provisions set forth in Section 3.04 below, the Tranche B Lenders agree that (i) they will not take or cause to be taken any action the purpose or effect of which is, or could be, to make any Tranche B Lien *pari passu* with, or to give such Tranche B Lender any preference or priority relative to, any Tranche A Lien with respect to the DIP Collateral or any part thereof, (ii) they will not challenge or question in any proceeding the validity or enforceability of any Tranche A Obligations, or the validity, attachment, perfection or priority of any Tranche A Lien, or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Section 3, (iii) they will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the DIP Collateral by any Tranche A Lender, (iv) they shall have no right to (A) direct the Majority Tranche A Lenders to exercise any right, remedy or power with respect to the DIP Collateral or (B) consent to the exercise by the Majority Tranche A Lenders of any right, remedy or power with respect to the DIP Collateral, (v) they will not object to the forbearance by the Majority Tranche A Lenders

69

from bringing or pursuing any foreclosure proceeding or action nor any other exercise of any rights or remedies relating to the DIP Collateral, and (vi) they will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Section 3.  Each Tranche A Lender agrees that it will not (i) challenge or question in any proceeding the validity or enforceability of any Tranche B Obligations, or the validity, attachment, perfection or priority of any Tranche B Lien (including any perfection effected pursuant to this Section 3), or the validity, or enforceability of the rights or duties established by or other provisions of this Section 3 and (ii) attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Section 3.

Section 3.04.      Rights of DIP Lenders¶ The parties hereto agree that (a) it is their intention that the DIP Collateral would be identical for each of the Tranche A Lenders, Tranche B Lenders and the Tranche C Lenders, (b) notwithstanding anything provided for in this Section 3, the Majority Tranche A Lenders, the Majority Tranche B Lenders and the Majority Tranche C Lenders shall be entitled to exercise their rights set forth in the last sentence Section 8.01, and (c) nothing in this Agreement shall prohibit the receipt by the Tranche A Lenders, Tranche B Lenders or Tranche C Lenders of the required payments of interest, principal and other amounts owed in respect of their respective DIP Obligations so long as such receipt is not the result of any Enforcement Action by such DIP Lenders of rights or remedies as a secured creditor in contravention of this Section 3 of any DIP Lien held by such DIP Lender.  Notwithstanding anything provided in this Section 3, (A) each of the Majority Tranche A Lenders, the Majority Tranche B Lenders or the Majority Tranche C Lenders may or may direct the Agents to (1) exercise any of its rights or remedies with respect to the DIP Collateral after the termination of the Standstill Period to the extent otherwise permitted by Section 3.02 or (2) take any action (not adverse to the priority status of the DIP Liens on the DIP Collateral) in order to create, perfect, preserve or protect its Lien on the DIP Collateral at such DIP Lender's expense; and (B) each of the Tranche A Lenders, Tranche B Lender or Tranche C Lenders may (1) file a claim or statement of interest with respect to its DIP Obligations, (2) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Tranche A Lenders, Tranche B Lenders or the Tranche C Lenders, including any claims secured by the DIP Collateral, if any, in each case in accordance with the terms of this Agreement, (3) vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the DIP Collateral, or (4) exercise any rights or remedies, file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Obligors arising under bankruptcy or applicable non-bankruptcy law, so long as such actions would not conflict with an express agreement contained in this Section 3.

#93334561v28

## SECTION 4.

## REPRESENTATIONS AND WARRANTIES

In order to induce the DIP Lenders to make DIP Loans hereunder, the Borrower and the Guarantors jointly and severally represent and warrant as follows:

Section 4.01.    Organization and Authority¶ The Borrower has no separate legal personality from that of LATAM.  LATAM is a *sociedad anónima* duly organized and validly existing under the laws of Chile.  The Borrower and each of the Guarantors (a) (i) are duly organized, validly existing and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the laws of the jurisdiction of its organization and (ii) are duly qualified and in good standing in each other jurisdiction in which the failure to so qualify would have a Material Adverse Effect and (b) subject to the entry by the Bankruptcy Court of the Final DIP Order have the requisite corporate or limited liability company power and authority to effect the Transactions, to own or lease and operate its properties and to conduct their business as now or currently proposed to be conducted.

Section 4.02.    Air Carrier Status; Permits; Aircraft Operator; Permits¶ The Borrower and each of the Air Carrier Guarantors are authorized to operate as an "air carrier" in all jurisdictions in which each has air routes.  The Borrower and each of the Air Carrier Guarantors possess all necessary certificates, franchises, licenses, permits, rights, designations, authorizations, exemptions, concessions, frequencies and consents which relate to the operation of the routes flown by them and the conduct of their business and operations as currently conducted (the "Permits") except where failure to so possess would not, in the aggregate, have a Material Adverse Effect.  Each Aircraft is operated by a duly authorized and certificated air carrier in good standing under applicable law, who has complied with and satisfied all of the requirements of and is in good standing with the applicable Aviation Authority, and to otherwise lawfully operate, possess, use and maintain the applicable Aircraft in accordance with the DIP Loan Documents.

Section 4.03.    Due Execution¶ Subject to the entry of the Final DIP Order and subject to the terms thereof, the execution, delivery and performance by the Borrower and each of the Guarantors of each of the DIP Loan Documents to which it is a party (a) are within the respective corporate or limited liability company powers of the Borrower and each of the Guarantors, have been duly authorized by all necessary corporate or limited liability company action, including the consent of shareholders or members where required, and do not (i) contravene the charter, by-laws or limited liability company agreement (or equivalent documentation) of the Borrower or the Guarantors, (ii) violate any applicable law (including, without limitation, the Securities Exchange Act of 1934) or regulation (including without limitation, Regulations T, U or X) or any material order or decree of any court or Governmental Authority, (iii) except to the extent arising under the documents governing the Pre-Petition Indebtedness, conflict with or result in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust or any material lease, agreement or other instrument binding on the members of the Obligors or any of their properties or (iv) result in or require the creation or imposition of any Lien upon any of the property of the Borrower or any of the other Grantors other than the Liens granted pursuant to this

71

Agreement or the other DIP Loan Documents; and (b) does not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority or any other Person, other than (i) the filings and consents contemplated by the Collateral Documents, (ii) approvals, consents and exemptions that have been obtained on or prior to the Closing Date and remain in full force and effect, (iii) consents, approvals and exemptions that the failure to obtain in the aggregate would not be reasonably expected to result in a Material Adverse Effect, (iv) payment of the Chilean Stamp Tax, if and when applicable, and mandatory filings associated to Chilean Stamp Tax, and (v) routine reporting obligations.  Each DIP Loan Document to which the Borrower or a Guarantor is a party has been duly executed and delivered by the Borrower and the respective Guarantor party thereto.  This Agreement and the other DIP Loan Documents to which the Borrower or a Guarantor is a party, each is a legal, valid and binding obligation of the Borrower and the Guarantor party thereto, enforceable against the Borrower and the applicable Guarantor, as the case may be, in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 4.04.    Statements Made¶The written information furnished by or on behalf of the Borrower to the Administrative Agent or any DIP Lender in connection with the negotiation of this Agreement (as modified or supplemented by other written information so furnished), taken as a whole as of the Closing Date did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein not misleading in light of the circumstances in which such information was provided; provided that, with respect to projections, estimates or other forward looking information the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 4.05.    Financial Statements; Material Adverse Change¶

(a)    The audited consolidated financial statements of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2019 and the fiscal quarter ended March 31, 2020, included in the Borrower's consolidated audited financial statements filed with the SEC, as amended, present fairly, in all material respects, in accordance with IFRS, the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis as of such date and for such period.

(b)    The DIP Budget has been based on good faith estimates and assumptions believed by such Persons to be reasonable at the time made, it being recognized by the DIP Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

(c)    Since the Petition Date, there has been no Material Adverse Change.

Section 4.06.    Ownership of Subsidiaries¶ As of the Closing Date, other than as set forth on Schedule 4.06 each of the Persons listed on Schedule 4.06, is a Wholly Owned

Subsidiary (direct or indirect) of the Borrower and the Borrower owns no other Subsidiaries, either directly or indirectly.

Section 4.07.    Use of Proceeds¶ The proceeds of the DIP Loans shall be used in accordance with Section 2.06 herein.

Section 4.08.    Litigation and Compliance with Laws¶

(a)    Except for the Chapter 11 Cases, there are no actions, suits, proceedings or investigations pending or, to the knowledge of the Borrower or any Guarantor, threatened against the Borrower or any Guarantor or any of their respective properties (including any properties or assets that constitute DIP Collateral under the terms of the DIP Loan Documents), before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that (i) are likely to have a Material Adverse Effect or (ii) could reasonably be expected to affect the legality, validity, binding effect or enforceability of the DIP Loan Documents or, in any material respect, the rights and remedies of the Administrative Agent or the DIP Lenders thereunder or in connection with the Transactions; provided, that the commencement and/or existence of a Chilean Local Reorganization Proceeding solely in the terms provided in Section 8.01(i) shall not affect the representation in this Section 4.08(a).

(b)    Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, the Borrower and each of the Guarantors to its knowledge is currently in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and ownership of its property, including, without limitations regulation issued by the *Dirección General de Aeronáutica Civil* of Chile and the FAA.

Section 4.09.    Margin Regulations; Investment Company Act¶

(a)    Neither the Borrower nor the Guarantors is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board, "Margin Stock"), or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any DIP Loans will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock in violation of Regulation U.

(b)    Neither the Borrower nor the Guarantors (i) is, or after the making of the DIP Loans will be, or is required to be, registered as an "investment company" under the Investment Company Act of 1940, as amended or (ii) otherwise is subject to any other regulatory requirement limiting its ability to incur a guarantee or Indebtedness or grant a security interest in its property to secure such guarantee or Indebtedness  or requiring any approval or consent from, or registration or filing with, any Government Authority in connection therewith, provided, that the commencement and/or existence of a Chilean Local Reorganization Proceeding solely in the terms provided in Section 8.01(i) shall not affect the representation in this Section 4.08(a)(ii).

Section 4.10.    Ownership of Property¶ The Obligors have, in each applicable case, (i) good, sufficient and legal title to (in the case of fee interests in real or personal property), (ii) valid leasehold interests in (in the case of leasehold interests in real or

73

personal property), and (iii) except as would not reasonably be expected to have a Material Adverse Effect, good title to (in the case of all other personal property), all properties and assets (other than Intellectual Property, which is the subject of Section 4.11) owned by the Obligors free and clear of all Liens other than Liens permitted under Section 7.03, except, in each case, for assets disposed of in accordance with the terms hereof or the Final DIP Order.

Section 4.11.   <u>Intellectual Property</u>¶ Except as would not reasonably be expected to have a Material Adverse Effect, (i) each of the Obligors owns, or has a valid and enforceable right, whether express or implied, to use, all Intellectual Property that is necessary to the conduct of their respective businesses as currently conducted; (ii) no Adverse Proceeding is pending or threatened in writing against any Obligor (or, to the knowledge of any Obligor, otherwise threatened) by any Person (1) challenging the right of an Obligor to use any Intellectual Property owned by or licensed to such Obligor, (2) challenging the validity of any Intellectual Property owned by an Obligor or (3) claiming infringement, misappropriation or any other violation by an Obligor of any right in Intellectual Property of any Person, and (iii) no Intellectual Property used in the operation of the business of each Obligor as currently conducted infringes, misappropriates or otherwise violates any rights in Intellectual Property of any Person.

Section 4.12.   <u>Perfected Security Interests</u>¶ Upon entry of the Final DIP Order, the Final DIP Order shall be effective to create in favor of the Collateral Agent or the Local Collateral Agent, as applicable, for the benefit of the DIP Secured Parties, a legal, valid, enforceable and perfected security interest in the DIP Collateral with the priority as provided in Section 3.01, as and to the extent contemplated by and described in such Final DIP Order and the Collateral Documents. At such time as (a) UCC financing statements in appropriate form are filed in the appropriate offices (and the appropriate fees are paid) and (b) the other requirements of the Collateral Documents have been taken as and when required therein, the Collateral Agent or the Local Collateral Agent, as applicable, for the benefit of the DIP Secured Parties, shall have a perfected security interest under the UCC and any other jurisdiction required in the Collateral Documents  in that portion of  such DIP Collateral to the extent that the Liens thereon may be perfected upon the taking of the actions described in clauses (a) and (b) above, subject in each case only to the Carve-Out and Permitted Liens, and such security interest is (i) entitled to the benefits, rights and protections afforded under the Collateral Documents applicable thereto (subject to the qualification set forth in the first sentence of this Section 4.12) and (ii) of such priority as provided herein in Section 3 and in the Final DIP Order.  For the avoidance of doubt but without affecting the first sentence of this Section 4.12, the DIP Loan Documents will not require (i) the execution, filing or recording of mortgages in respect of real property (other than the Real Estate Mortgages), control agreements (other than with respect to the Disbursement Account and the Collateral Proceeds Account, if any), (ii) the taking of any action to obtain possession or control of any DIP Collateral (other than in respect of any Priority Pledged Equity Interests), (iii) or any action with respect to Intellectual Property beyond the filing of Intellectual Property Security Agreements in respect of Intellectual Property registered, issued or applied-for with the United States Patent and Trademark Office or the Copyright Office, (iv) the filing or taking of any action with respect to the perfection of any security interest in any Pledged Spare Part or Pledged Engine (other than Priority Pledged Engines, and as contemplated in Schedule 5.03), or (v) in any event, the

#93334561v28

making of any filing or taking of any action with respect to creation, perfection, priority or other action with respect to security interests in any jurisdiction outside of the United States in assets located, titled or arising or protected under the laws of a jurisdiction outside of the United States, except as provided in Section 5.03 and the execution of those agreements included in the definition of Collateral Documents.

Section 4.13.    Insurance¶The properties of the Borrower and its Guarantors are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties and assets in localities where the Borrower or such applicable Guarantor operates, as are necessary to ensure that Uninsured Liabilities of the Borrower and/or any such applicable Guarantor are not reasonably likely to result in a Material Adverse Effect.

Section 4.14.    Payment of Taxes.

(a)    The Borrower and the Guarantors have timely filed or caused to be filed all Tax Returns and reports required to have been filed by them and have paid or caused to be paid when due all Taxes required to have been paid by them (whether or not shown on any Tax Return), taking into account any applicable extensions.  All such Tax Returns are true, complete and correct in all material respects.

(b)    There are no pending or threatened audits or claims relating to the assessment or collection of Taxes with respect to the Borrower and the Guarantors or any unresolved questions or claims concerning the Tax liability of the Borrower and the Guarantors.

(c)    There are no encumbrances for Taxes against the assets of the Borrower and the Guarantors.

(d)    The Borrower and the Guarantors have deducted or withheld and timely paid over to the proper Governmental Authorities all Taxes required to have been deducted or withheld and paid over, and have complied with all information reporting, withholding and backup withholding requirements.

(e)    The Borrower and the Guarantors do not have liability for the Taxes of another person as a transferee, successor, by contract, or pursuant to applicable law.

In any event, the Borrower and the Guarantors jointly and severally represent and warrant the above Section 4.14(a) to Section 4.14(e) except and solely to the extent that, in each case, (i) Taxes, if any, are being contested in good faith by appropriate proceedings and subject to maintenance of adequate reserves in accordance with IFRS, or (b) any such Taxes, related liabilities, audits or claims could not reasonably be expected to result in a Material Adverse Effect.

Section 4.15.    Employee Matters¶

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Obligors are not engaged in any unfair labor practice,

#93334561v28

and there is no (i) unfair labor practice charge or complaint pending against any Obligor or, to the knowledge of the Obligors, threatened by or on behalf of any employees of the Obligors, (ii) material grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Obligor or, to the knowledge of the Obligors, threatened against any Obligor and (iii) strike, work stoppage or other labor dispute against any of the Obligors or, to the knowledge of the Obligors, threatened against any Obligor, except where any such situation could not reasonably be expected to result in a Material Adverse Effect.

(b)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Obligors are in compliance with all applicable laws respecting employment, discrimination in employment, terms and conditions of employment, worker classification, wages, hours and occupational safety and health and employment practices.

(c)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Benefit Plan has been adopted and administered in accordance with its terms and complies with applicable law and (ii) there are no pending or, to the knowledge of the Obligors, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Benefit Plan.

(d)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) no Benefit Plan is subject to ERISA Title IV and there are no circumstances under which an Obligor could have any liability under ERISA Title IV with respect to any current or previous employee benefit plan including on account of any entity which is treated as a single employer within the meaning of Code Section 414, and (ii) no Obligor has ever contributed to or been required to contribute to a "multiemployer plan" as defined in Section 3(37) or Section 4001(a)(3) of ERISA.

(e)     With respect to each scheme or arrangement mandated by a government other than the United States (a "Foreign Government Scheme or Arrangement") and with respect to each employee benefit plan maintained or contributed to by any Obligor that is not subject to United States law (a "Foreign Plan") except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(i)     any employer and employee contributions required by law or by the terms of any Foreign Government Scheme or Arrangement or any Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices;

(ii)     the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the date hereof, with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and

76

(iii)    each Foreign Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

Section 4.16.    Sanctions; Anti-corruption; Anti-Money Laundering Laws¶

(a)    Neither the Borrower nor any of its Subsidiaries or Affiliates, or their respective directors or officers, nor to their knowledge, their Affiliates or their Affiliates' employees, has engaged in any activity or conduct which would comprise a material violation of any applicable anti-bribery, anti-corruption or Anti-Money Laundering Laws, regulations or rules in any applicable jurisdiction, and the Borrower and its Subsidiaries has instituted and maintains policies and procedures in place designed to promote compliance with such laws, regulations and rules.

(b)    Neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates is an individual or entity (for the purposes of this Section 4.16, a "Person"), that is: (i) the target of any Sanctions (a "Sanctioned Person"); located, organized or resident in a country or territory that is the subject of Sanctions broadly prohibiting dealings with such country or territory (currently, Crimea, Cuba, Iran, North Korea, and Syria) (each, a "Sanctioned Country") or (iii) a Person with whom dealings are prohibited or restricted by reason of a relationship of ownership or control with any Person described in (i) or (ii). "Sanctions" shall mean any economic or trade sanctions enacted, imposed, administered or enforced by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, the United Kingdom and/or any other Governmental Authorities with jurisdiction over any country or territory in which any Obligor or any of its Subsidiaries are organized or resident.

(c)    Neither the Obligors, nor to their knowledge based on the information available to them after due inquiry, any Person acting on their behalf in connection with the DIP Loan (A) are; or (B) are more than 50% owned by, or are acting on behalf of a Person listed on OFAC's Specially Designated Nationals list.

(d)    None of the proceeds in connection with this Agreement will be used, lent, contributed, or otherwise made available, directly or indirectly, (i) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or (ii) in any other manner, in each case as would result in a violation of Sanctions by any Person in connection with this Agreement (including any Person participating in the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise).

Section 4.17.    Process Agent¶ The Borrower shall continue to maintain Law Debenture Corporate Services, Inc., 801 2nd Avenue, Suite 403, New York, New York, 10017, or another entity acceptable to the Administrative Agent, as its process agent (the "Process Agent").

Section 4.18.    DIP Orders¶

#93334561v28

(a)    The Final DIP Order is in full force and effect and has not been vacated, reversed, terminated, stayed, modified or amended in any manner without the written consent of the Majority DIP Lenders.

(b)    Upon the occurrence of the Maturity Date (whether by acceleration or otherwise), the DIP Lenders shall, subject to Section 8.01 and the applicable provisions of the Final DIP Order, be entitled to immediate payment of the Borrower's DIP Obligations, and to enforcement of the remedies provided for under the DIP Loan Documents in accordance with the terms thereof and such Final DIP Order, as applicable, without further application to or order by the Bankruptcy Court.

Section 4.19.    Appointment of Trustee or Examiner; Liquidation¶ No order has been entered in any of the Obligors' Chapter 11 Cases (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of a responsible officer or examiner (other than a fee examiner) having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code or (c) to convert any of the Obligors' Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Obligors' Chapter 11 Cases.

Section 4.20.    Environmental Compliance¶

(a)    Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each of the Obligors is in compliance with all applicable Environmental Laws.

(b)    There are no Environmental Claims pending or, to the knowledge of the Obligors, threatened against the Obligors, or any of their respective properties (including any properties or assets that constitute DIP Collateral under the terms of the DIP Loan Documents), that are reasonably expected to have a Material Adverse Effect.

(c)    Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, to the knowledge of the Borrower, there are no conditions or circumstances that are likely to result in any Environmental Liability or requirement for investigation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Materials at any site, location or operation to be imposed on, or asserted against, the Obligors.

Section 4.21.    No Default¶ No Default has occurred and is continuing under this Agreement or would result from the consummation of the transactions contemplated by this Agreement or any other DIP Loan Document.

Section 4.22.    Beneficial Ownership Certificate¶ As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

#93334561v28

## SECTION 5.
## CONDITIONS OF LENDING

Section 5.01.    Conditions Precedent to Initial Funding¶ The obligation of the DIP Lenders to make initial DIP Loans hereunder shall be subject to satisfaction of the following conditions precedent (unless waived in writing in accordance with Section 11.08 by the Administrative Agent (acting at the direction of the Majority DIP Lenders)).

(a)    Commencement of Cases. The Chapter 11 Cases and the Foreign Cases shall have been filed.

(b)    Executed Counterparts of the DIP Loan Documents. The Administrative Agent and the DIP Lenders shall have received duly executed copies of the DIP Loan Documents by (A) each DIP Lender, (B) each Obligor and (C) each of the other parties thereto.

(c)    Final DIP Order. The Bankruptcy Court shall have entered the Final DIP Order which shall be in form and substance satisfactory to the Tranche C Initial Lenders acting reasonably, and such order (i) shall have become a Final Order, and (ii) shall not have been vacated, reversed, modified, amended or stayed except as otherwise agreed to in writing by the Tranche C Initial Lenders.

(d)    DIP Commitments.  The Tranche A Amendment and/or Tranche B Amendment, as applicable, shall have been approved by the Bankruptcy Court, which order shall have become a Final Order, and the aggregate amount of DIP Commitments available under the Tranche A Facility, the Tranche B Facility, and the Tranche C Facility, in the aggregate, at the Closing Date shall be at least $2,000,000,000, unless such conditions are waived by the Tranche C Initial Lenders.

(e)    13-Week DIP Budget. The Administrative Agent shall have received the Initial Approved DIP Budget.

(f)    Material Adverse Change. Since the Petition Date, there shall have been no Material Adverse Change.

(g)    Corporate and Other Proceedings. The Administrative Agent shall have received from each Obligor a certificate, executed by an officer of such Obligor attaching: (i) a copy of the resolutions of the Board of Directors (or similar body) or shareholders (as required pursuant to applicable law) of such Obligor (or a duly authorized committee thereof) authorizing (A) the execution, delivery and performance of this Agreement and the Collateral Documents to which such Obligor is party (and any other agreements relating thereto) and (B) in the case of the Borrower, the extensions of credit contemplated hereunder; (ii) copies of the organizational documents (or any document of similar import) of each of the Obligors, certified by an Officer of such Obligor; and (iii) a certificate of good standing (or such other document of similar import) with respect to such Obligor from the secretary of state (or comparable body), or the relevant companies' registry of the jurisdiction in which such Obligor is organized, dated as of a recent date.

#93334561v28

(h)     Opinions of Counsel.  The Administrative Agent shall have received (i) a legal opinion from Cleary Gottlieb Steen & Hamilton LLP, New York counsel to the Obligors, (ii) a legal opinion from Claro & Cia, Chilean counsel to the Obligors, (iii) a legal opinion from Brigard Urrutia, Colombian counsel to the Obligors, (iv) a legal opinion from Rodrigo Elias & Medrano, Peruvian counsel to the Obligors and (v) a legal opinion from Walkers, Cayman counsel to the Obligors, as requested by the Tranche C Lenders.

(i)     Officer's Certificate.  The Administrative Agent shall have received an Officer's Certificate of the Borrower, dated the Closing Date, confirming compliance with the conditions of lending set forth in this Section 5.01.

(j)     Lien Searches.  The Administrative Agent shall have received (i) Uniform Commercial Code lien searches conducted in Florida, Delaware and the District of Columbia, as applicable, reflecting the absence of Liens and encumbrances on the assets of the Obligors constituting DIP Collateral, other than Permitted Liens and (ii) if applicable, priority search certificates for each Priority Pledged Engine reflecting the absence of registered International Interests on such Pledged Engines other than those International Interests which have been registered in connection with a Permitted Lien. Upon the taking of the actions specified in Section 4.12, the Collateral Agent shall hold perfected security interests in and Liens (having the priority provided for herein and in the DIP Order) upon the DIP Collateral, and the DIP Lenders shall have received such evidence of the foregoing as they reasonably require, provided that nothing herein shall require any Obligor to take any actions not required under Section 4.12 and Section 5.03 with respect to the pledge and perfection of DIP collateral.

(k)     Consents.  All material governmental and third party consents and approvals necessary in connection with the financing contemplated hereby shall have been obtained, in form and substance reasonably satisfactory to the Administrative Agent, and be in full force and effect.

(l)     Patriot Act; Beneficial Ownership Regulation. (i) The Administrative Agent and each DIP Lender that has requested the same shall have received at least three (3) days prior to the Closing Date all documentation and other information reasonably requested in writing by them at least eight (8) Business Days prior to the Closing Date that they shall have reasonably determined is required by the applicable regulatory authorities to comply with applicable "know your customer" and Anti-Money Laundering Laws, rules and regulations, including the USA PATRIOT Act and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five (5) days prior to the Closing Date, any DIP Lender that has requested, in a written notice to the Borrower at least ten (10) days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification.

(m)     Compensation, Fees and Expenses. The Administrative Agent and DIP Lenders shall have received all compensation (to the extent due), transaction costs, expenses (including, without limitation, reasonable documented legal and financial advisor fees) required to be paid on or prior to the Closing Date and all reasonable, documented and invoiced out-of-pocket expenses incurred by the DIP Lenders solely in connection with the preparation, negotiation and

80

execution of the DIP Loan Documents for which invoices have been presented at least two (2) Business Days prior to the Closing Date.

(n)     Priority Pledged Stock Certificates. The Collateral Agent shall have received, to the extent obtainable by the Borrower prior to the Closing Date after the use of commercially reasonable efforts, any Security Certificates (as defined in the Pledge and Security Agreement) issued and evidencing Priority Pledged Equity Interests consisting of Certificated Securities (as defined in the Pledge and Security Agreement) and, to the extent customary in the applicable issuer's jurisdiction, duly indorsed with an effective indorsement or accompanied by share transfer powers or other instruments of transfer duly endorsed by such an effective indorsement, in each case, to the Collateral Agent or in blank.

(o)     Insurance Coverage. The Collateral Agent shall have received, to the extent obtainable by the Borrower prior to the Closing Date after evidence of the use of commercially reasonable efforts, evidence of all primary liability and property insurance coverages of the Obligors together with certificates of insurance and endorsements of insurance, naming the Administrative Agent as an additional insured or loss payee.

(p)     Cash Management Order. The cash management order encompassing cash management arrangements satisfactory to the Tranche C Initial Lenders shall be in full force and effect.

(q)     Disbursement Account.  The Disbursement Account shall have been established, and a Deposit Account Control Agreement shall be entered into with respect to such account unless such Deposit Account Control Agreement is permitted to be delivered after the Closing Date at the reasonable discretion of the Tranche C Initial Lenders.

(r)     Foreign Cases.  There is no order, injunction, stay, restriction or other similar limitation in any of the Foreign Cases that in any way prevents, limits, or restricts any of the Obligors' ability to enter into this Agreement or otherwise consummate or perform any of the transactions contemplated by this Agreement, including, but not limited to, the transactions provided for in the DIP Loan Documents.

(s)     Support Agreement.  LATAM shall have received duly executed copies of the Support Agreement by the shareholders party thereto.

Section 5.02.    Conditions Precedent to Each DIP Loan¶ The obligation of the DIP Lenders to make each DIP Loan, including the initial DIP Loans and any subsequent DIP Loans, is subject to the satisfaction (or waiver in accordance with Section 11.08) of the following conditions precedent:

(a)     Notice.  The Administrative Agent shall have received a Loan Request pursuant to Section 2.02 with respect to such borrowing five (5) Business Days prior to funding, provided however, that the Loan Request for the initial DIP Loans shall only be required to be received at least three (3) Business Days prior to funding.

(b)     Representations and Warranties.  All representations and warranties contained in this Agreement and the other DIP Loan Documents shall be true and correct in all material

81

respects on and as of the date of such DIP Loan (both before and after giving effect thereto and, in the case of each DIP Loan, the application of proceeds therefrom) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; provided that any representation or warranty that is qualified by materiality, "Material Adverse Change" or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, before and after giving effect to such DIP Loan.

(c)    No Default.  On the date of such DIP Loan, no Default or Event of Default, shall have occurred and be continuing nor shall any such Event of Default or Default, as the case may be, occur by reason of the making of the requested Borrowing and, in the case of each DIP Loan, the application of proceeds thereof.

(d)    Final DIP Order. The Final DIP Order shall be in full force and effect, and such order shall not have been vacated, reversed, modified, amended or stayed.

(e)    Compensation, Fees and Expenses. The Administrative Agent and DIP Lenders shall have received all compensation (to the extent due), transaction costs, expenses (including, without limitation, reasonable documented legal and financial advisor fees) due and payable as required under the DIP Loan Documents.

(f)    Trustee. No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed with respect to the Obligors or their respective properties or assets under any of the Chapter 11 Cases.

(g)    Subsequent DIP Funding.  Immediately prior to the first Subsequent DIP Funding, the sum of (i) unfunded DIP Commitments under the DIP Facility, plus (ii) unrestricted cash and Cash Equivalents of the Obligors shall be equal to or greater than the sum of (a) unfunded DIP Commitments, plus (b) outstanding DIP Loans, minus (c) $500,000,000 (the "Available Liquidity Condition").  For the avoidance of doubt, the Available Liquidity Condition shall only apply to the first Subsequent DIP Funding and not apply to any Subsequent DIP Funding after the first such Subsequent DIP Funding.

Section 5.03.    Post-Closing Obligations¶

(a)    Post-Closing Obligations. The Obligors shall (i) execute and deliver the Engine Security Documents within forty-five (45) days, after the Closing Date, (ii) execute and deliver certain other collateral documents as provided on Schedule 5.03 within the time specified therein, and (iii) take such actions as set forth on Schedule 5.03 within the time limits specified therein, in each case subject to reasonable extension with the consent of the Administrative Agent..

#93334561v28

## SECTION 6.

## AFFIRMATIVE COVENANTS

From the date hereof and for so long as the DIP Commitments remain in effect and until all DIP Obligations are Paid in Full:

Section 6.01.    Financial Statements, Reports, etc¶ The Borrower shall deliver to the Administrative Agent on behalf of the DIP Lenders:

(a)    Quarterly Financials. As soon as available and in any event on or before the date that is seventy (75) days after the end of each of the first three quarterly accounting periods in each fiscal year of the Borrower, the consolidated financial statements of the Borrower and its Subsidiaries, in each case as at the end of such quarterly period, that includes a statement of financial position (the "Statement of Financial Position"), a statement of comprehensive income (the "Statement of Comprehensive Income"), a statement of changes in equity (the "Statement of Changes in Equity"), a cash flow statement and notes (the "Cash Flow Statement and Notes"), comprising a summary of the significant accounting policies for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year, all of which shall be certified by the Chief Financial Officer of the Borrower as having been prepared in accordance with IFRS subject to changes resulting from audit and normal year-end audit adjustments and shall include certificates of the Chief Financial Officer of the Borrower as to compliance with the terms of this Agreement

(b)    Annual Financials. As soon as available and in any event on or before the date that is ninety (90) days after the end of each fiscal year of the Borrower, the consolidated financial statements of the Borrower and its Subsidiaries as at the end of such fiscal year, , that includes the Statement of Financial Position, the Statement of Comprehensive Income, the Statement of Changes in Equity, a Cash Flow Statement and Notes, comprising a summary of the significant accounting policies, setting forth comparative consolidated figures for the preceding fiscal year, and certified by PriceWaterhouseCoopers or another independent certified public accountant of recognized national standing;

(c)    Financial Certification. Within the time periods under Section 6.01(a) and (b) above, a certificate of an Officer of the Borrower certifying that, to the knowledge of such Officer, no Default or Event of Default has occurred and is continuing, or, if, to the knowledge of such Officer, such a Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(d)    Notices of Events of Default. Promptly after an Officer of any of the Obligors obtains actual knowledge thereof, notice of the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

#93334561v28

(e)    Notices of Employee Plan. Prompt notice of the occurrence of any event or circumstance relating to any employee retirement or similar plan of the Obligors that could reasonably be expected to have a Material Adverse Effect;

(f)    Notice of Litigation. Prompt notice after any officer of the Borrower or a Guarantor becomes aware of any actions, suits, proceedings or investigations pending or, to the knowledge of the Borrower or either Guarantor, threatened against the Borrower or any Guarantor or any of their respective properties (including any properties or assets that constitute DIP Collateral under the terms of the DIP Loan Documents), before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that (i) are likely to have a Material Adverse Effect or (ii) could reasonably be expected to affect the legality, validity, binding effect or enforceability of the DIP Loan Documents or, in any material respect, the rights and remedies of the Administrative Agent or the DIP Lenders thereunder or in connection with the Transactions;

(g)    Monthly Reporting. On the tenth Business Day of each calendar month after the Closing Date, an Updated DIP Budget certified by the Chief Financial Officer with respect to the Obligors for the current week and the immediately following consecutive 12 weeks, set forth on a weekly basis, in form substantially similar to the Initial Approved DIP Budget (or such other form acceptable to the Majority DIP Lenders);

(h)    Bi-Weekly Reporting. Commencing on the tenth Business Day after the Closing Date, and then bi-weekly, on the Wednesday following each reporting period, a report certified by the Chief Financial Officer (A) showing actual cash receipts and disbursements for the two (2) week period ending prior to the week prior to the reporting date, (B) noting therein variances for such two (2) week period from amounts set forth in the DIP Budget for such period on a line item basis, (C) providing an explanation for all material variances thereto, and (D) showing compliance with the Consolidated Liquidity covenant of Section 6.18 at the end of each such two (2) week period (a "DIP Budget Variance Report");

(i)    Bankruptcy Matters. (x) As soon as practicable in advance, and in any event no less than three (3) calendar days in advance of filing, (1) prior written notice of any assumption or rejection of any Obligor's material contracts pursuant to Section 365 of the Bankruptcy Code; and (2) copies of all the Obligors' material pleadings, affecting the DIP Facility and Equity Subscription in the Chapter 11 Cases and in any Foreign Case which shall be reasonably satisfactory to the Administrative Agent, the Majority DIP Lenders, and the Tranche C Initial Lenders, provided the Obligors shall not be required to provide material pleadings relating to the DIP Facility if doing so would violate any applicable legal rule or such material pleadings contain privileged information and (y) substantially contemporaneously with the filing or distribution thereof, copies of all financial information and non-privileged information distributed by or on behalf of any Obligor to the Creditors' Committee;

(j)    Environmental Matters. The Borrower will promptly advise the Administrative Agent in writing after obtaining actual knowledge of any one or more of the following environmental matters, unless such environmental matters would not, individually or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect:

(i)        Any pending or threatened Environmental Claim against any Obligor or any Real Estate;

(ii)        Any condition or occurrence on any Real Estate that (x) could reasonably be expected to result in noncompliance by the Borrower or any of the Guarantors with any applicable Environmental Law or (y) could reasonably be anticipated to form the basis of an Environmental Claim against the Borrower or any of the Guarantors or any Real Estate;

(iii)        Any condition or occurrence on any Real Estate that could reasonably be anticipated to cause such Real Estate to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Estate under any Environmental Law; and

(iv)        The conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, Release or threatened Release of any Hazardous Material on, at, under or from any Real Estate.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the response thereto. The term "Real Estate" shall mean land, buildings and improvements owned or leased by the Borrower or any of the Guarantors;

(k)        Information. Such other material information regarding the DIP Collateral and , to the extent not constituting MNPI, the operations, business affairs and financial condition of the Obligors, in each case as the Administrative Agent, may reasonably request from time to time; and

(l)        Patriot Act; Beneficial Ownership Regulation. Promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any DIP Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation.

Subject to the next succeeding sentence, information delivered pursuant to this Section 6.01 to the Administrative Agent may be made available by the Administrative Agent to the DIP Lenders by posting such information on the [Intralinks website on the Internet at http://www.intralinks.com].  Information required to be delivered pursuant to this Section 6.01 by the Borrower shall be delivered pursuant to Section 11.01 hereto.  Information required to be delivered pursuant to this Section 6.01(a) or (b) (to the extent not made available as set forth above) shall be deemed to have been delivered to the Administrative Agent on the date on which the Borrower provides written notice to the Administrative Agent that such information has been posted on the Borrower's general commercial website on the Internet (to the extent such information has been posted or is available as described in such notice), as such website may be specified by the Borrower to the Administrative Agent from time to time.  Information required to be delivered pursuant to this Section 6.01 shall be in a format which is suitable for transmission.

#93334561v28

Any notice or other communication delivered pursuant to this Section 6.01, or otherwise pursuant to this Agreement, shall be deemed to contain material non-public information unless (i) expressly marked by the Borrower or the Guarantors as "PUBLIC", (ii) such notice or communication consists of copies of the Borrower's public filings with the SEC or (iii) such notice or communication has been posted on a the Borrower's general commercial website on the Internet, as such website may be specified by the Borrower to the Administrative Agent from time to time.

Section 6.02.    Taxes¶ The Borrower shall, and shall ensure that, the Guarantors shall pay all material taxes (including, for the avoidance of doubt, any Indemnified Taxes and Other Taxes, without duplication of any indemnification obligations set forth under any DIP Loan Document), assessments, and governmental levies before the same shall become more than ninety (90) days delinquent (taking into account any applicable extensions), other than taxes, assessments and levies (i) being contested in good faith by appropriate proceedings and subject to maintenance of appropriate reserves in accordance with IFRS, (ii) in connection with or constituting certain airport fees as described on Schedule 6.02 or (iii) the failure to effect such payment of which are not reasonably be expected to result in a Material Adverse Effect.

Section 6.03.    Stay, Extension and Usury Laws¶ The Borrower and the Guarantors covenant (to the extent that it may lawfully do so) to not, at any time, insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement; and the Borrower and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Administrative Agent and the other DIP Secured Parties, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 6.04.    Corporate Existence¶ The Borrower and the Guarantors shall do or cause to be done all things reasonably necessary to preserve and keep in full force and effect:

(1)    their corporate existence, and the corporate, partnership or other existence, in accordance with the respective organizational documents (as the same may be amended from time to time); and

(2)    their rights (charter and statutory) and material franchises; provided, however, that the Borrower and the Guarantors shall not be required to preserve any such right or franchise, or the corporate, partnership or other existence, if any of their respective Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and that the loss thereof would not, individually or in the aggregate, have a Material Adverse Effect.

#93334561v28

Section 6.05.    <u>Compliance with Laws</u>¶Compliance with Environmental Laws. The Borrower shall comply, and cause each of its Subsidiaries to comply in all material respects, with all applicable laws, rules, regulations and orders of any Governmental Authority (including Sanctions and anti-bribery laws) applicable to it or its property.

(a)    The Borrower and each of the Guarantors shall comply, in all material respects, with all applicable laws, rules, regulations and orders of any Governmental Authority (including Sanctions, Anti-Money Laundering Laws and anti-bribery laws) applicable to it or its business or property.

(b)    The Borrower and each of the Guarantors shall comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all material Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in each case in all material respects as required by and in accordance with the requirements of all applicable Environmental Laws; <u>provided</u>, <u>however</u>, that neither the Borrower nor any Guarantor shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances.

Section 6.06.    <u>Air Carrier Status</u>¶ The Borrower and each Air Carrier Guarantor will maintain at all times its status and rights to operate as an "air carrier" in Chile, Peru or Colombia, as applicable, and all other jurisdictions in which it operates air routes from time to time, except to the extent the failure to maintain such rights would not reasonably be expected to result in a Material Adverse Effect. The Borrower and each Air Carrier Guarantor will possess and maintain at all times, all Permits, except where a failure to so possess would not reasonably be expected to have a Material Adverse Effect.

Section 6.07.    <u>Collateral Ownership</u>¶Subject to the provisions described (including the actions permitted) under Section 7.01 and Section 7.05 hereof, each of the Grantors will continue to maintain its interest in and right to use all property and assets in its reasonable judgment necessary for the conduct of its business, taken as a whole.

Section 6.08.    <u>[Reserved</u>¶.

Section 6.09.    <u>Insurance</u>¶The Borrower and the Guarantors shall:

(a)    keep all DIP Collateral that is tangible property insured at all times in accordance with the insurance provisions of Exhibit V (in the case of the Pledged Spare Parts), and Exhibit W (in the case of the Pledged Engines), as applicable, against such risks, including risks insured against by extended coverage, as is prudent and customary in each case with companies of the same or similar size in the same or similar businesses and predominately operating in the same jurisdiction;

(b)    maintain in full force and effect aviation liability insurance in accordance with the insurance provisions of Exhibit V (in the case of the Pledged Spare Parts), and Exhibit W (in the

#93334561v28

case of the Pledged Engines), as applicable, against claims for property damage occurring upon, in, about or in connection with the use of the tangible DIP Collateral;

(c)     maintain such other insurance or self-insurance as may be required by law; and

(d)     with respect to DIP Collateral, (i) ensure that general property insurance and general liability insurance policies are endorsed to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as certificate holder, mortgagee and loss payee or additional insured) and (ii) ensure that such endorsements shall state that such insurance policies shall not be cancelled or materially adversely changed without at least thirty (30) days' prior written notice thereof, except in the case of a cancellation or material adverse change resulting from war, which shall require at least seven (7) days' prior written notice thereof, by the respective insurer to the Collateral Agent.

Section 6.10.     <u>Additional Guarantors and Grantors</u>¶ Subject to approval by the Bankruptcy Court and any requisite approval in any of the Foreign Cases, the Borrower will cause each material Subsidiary that becomes a debtor under the Chapter 11 Cases after the Closing Date to execute joinder agreements and amendments to this Agreement and the other DIP Loan Documents and related schedules and exhibits thereto, in each case as necessary to cause such material Subsidiary to become a Guarantor and Grantor hereunder and thereunder and in form and substance reasonably satisfactory to the Majority DIP Lenders.

Section 6.11.     <u>Further Assurances</u>¶ Subject to the Collateral Documents, upon the reasonable request of the Administrative Agent, each Obligor shall execute, acknowledge and deliver or shall cause to be executed, acknowledged and delivered, all such further agreements, instruments, certificates or documents, that such Administrative Agent shall reasonably request in order to ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Secured Parties with respect to the DIP Collateral; subject to the last sentence of Section 4.12 herein, and <u>provided</u>, that, no Obligor shall be required to complete any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States, and no actions in any non-U.S. jurisdiction or required by the laws of any non-US jurisdiction shall be required to be taken with respect to any DIP Collateral in assets located, titled or arising or protected under the laws of a jurisdiction outside of the United States, except with respect to those actions described on Schedule 5.03 and the execution of those agreements included in the definition of Collateral Documents.

Section 6.12.     <u>Maintenance, Use and Operation of DIP Collateral</u>¶ The Borrower and the Guarantors shall maintain, use and operate the Pledged Engines and Pledged Spare Parts in accordance with the terms of Exhibit V (in the case of the Pledged Spare Parts), and Exhibit W (in the case of the Pledged Engines) and in all cases, in accordance with the applicable Engine Security Documents.

Section 6.13.     <u>Use of Proceeds</u>¶ The proceeds from the DIP Loans will be used by the Borrower and the Guarantors as provided in Section 2.06 herein.

#93334561v28

Section 6.14.    <u>Cash Management System</u>¶ The Obligors shall maintain until the Maturity Date their cash management systems in accordance with the Cash Management Order, the Final DIP Order and the Collateral Documents.

Section 6.15.    <u>Assumption Order</u>¶ Within 105 days after the Petition Date, the Bankruptcy Court shall have entered an order in form and substance satisfactory to the Majority Tranche C Lenders (the "<u>Assumption Order</u>") (and such order shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, unless with respect to such modification or amendment, as approved by the Majority Tranche C Lenders and LATAM, and, to the extent subject to any stay or appeal, such stay or appeal shall be contested in good faith) authorizing the applicable Obligors to assume pursuant to Section 365 of the Bankruptcy Code the Framework Agreement and the Trans-American Joint Venture Agreement.

Section 6.16.    <u>Debtor-in-Possession Obligations</u>¶ Each Obligor shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules and any order of the Bankruptcy Court (including, for the avoidance of doubt, the Final DIP Order), as each such order is amended and in effect from time to time.

Section 6.17.    <u>Bankruptcy Milestones</u>¶ The Obligors shall comply with the following milestones (the "<u>Bankruptcy Milestones</u>"):

(a)    The Bankruptcy Court shall have entered the Final DIP Order, which shall, among other things, (i) provide for the treatment of the DIP Obligations of the Tranche C Lenders consistent with the terms and conditions of the DIP Loan Documents, and (ii) be reasonably acceptable to the Tranche C Initial Lenders, no later than seventy-five (75) days after the Petition Date;

(b)    The Obligors shall file a Chapter 11 Plan, which shall be a Company Approved Reorganization Plan, no later than [___];

(c)    The Bankruptcy Court shall have entered an order approving the disclosure statement for the Company Approved Reorganization Plan, which shall, among other things, provide for the treatment of the DIP Obligations of the Tranche C Lenders consistent with Section 2.12, and which disclosure statement shall be reasonably acceptable to the Majority DIP Lenders, no later than [___]; and

(d)    The Bankruptcy Court shall have entered an order confirming the Company Approved Reorganization Plan no later than thirty (30) days prior to the Scheduled Maturity Date.

Section 6.18.    <u>Consolidated Liquidity</u>¶At all times, the Obligors shall maintain a Consolidated Liquidity of at least $300,000,000.

Section 6.19.   <u>Maintenance of Properties; Books and Records</u>¶ The Borrower and each of the Guarantors shall:

#93334561v28

(a)    maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities;

(b)    (i) maintain proper books of record and account, in which full, true and correct entries in conformity with IFRS shall be made of all financial transactions and matters involving the assets and business of the Borrower and the Guarantors, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or the Guarantors, as the case may be; and

(c)    with respect to Aircraft, (i) ensure that each Aircraft or procure that the same is kept in good repair and condition (except for reasonable wear and tear consistent with the age and operational use of such Aircraft) and maintain or preserve the Aircraft in accordance with original equipment manufacturer standards and applicable regulatory requirements (in the appropriate category for the nature of the operations of that Aircraft without restrictions) and, if required by applicable law, a certification as to maintenance for that Aircraft issued by or on behalf of the applicable Aviation Authority, (ii) not permit the use of any Aircraft in any manner contrary to any recommendation of the manufacturers of the Aircraft, Engine or other part referred to in any mandatory service bulletins issued, supplied or available by or through such manufacturer, or any applicable airworthiness directives issued by the applicable Aviation Authority, (iii) ensure, or shall procure, that each Aircraft is registered with the applicable Aviation Authority in the name of owner or operator (as applicable) in accordance with the applicable laws of the jurisdiction of registration, (iv) ensure that the crew engaged in connection with the operation of any Aircraft have the qualifications and hold the licenses or certification required by the Aviation Authority and applicable law, (v) obtain and maintain in full force all certificates, licenses, permits and authorizations at any time required for the use and operation of such Aircraft; and (vi) not abandon the Aircraft or knowingly do or permit to be done anything which may expose an Aircraft or any part of it to the risk of damage, destruction, arrest, confiscation, seizure, forfeiture, impounding, detention or appropriation.

## SECTION 7.

## NEGATIVE COVENANTS

From the date hereof and for so long as the DIP Commitments remain in effect and until all DIP Obligations are Paid in Full:

Section 7.01.   <u>Limitation on Sales of DIP Collateral</u>¶ The Obligors shall not convey, sell, lease, assign, transfer or otherwise Dispose of DIP Collateral, except for:

(a)    an Obligor may sell, transfer or otherwise dispose of cash and Cash Equivalents in the ordinary course of business or as otherwise expressly permitted under this Agreement;

90

(b)      any sale or other Disposition permitted under Section 7.05;

(c)      any Lien permitted under Section 7.03;

(d)      any Permitted Sale Leaseback, any Qualified Sale Leaseback Transaction or any Permitted Disposition; and

(e)      any Obligor may sell or discount without recourse accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof.

For the avoidance of doubt, subject to Bankruptcy Court approval, nothing herein shall restrict the Obligors from (i) rejecting Aircraft operating, tax or finance leases, (ii) maintenance or services agreements or purchase arrangements in respect of Aircraft and Engines, or (iii) leases of real property or any other executory contracts.

Section 7.02.    Transactions with Affiliates¶No Obligor shall directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Borrower other than (i) transactions existing as of the Petition Date and listed on Schedule 7.02, (ii) Investments specified under Section 7.11(g), (iii) transactions among an Obligor and any of its Subsidiaries and other Obligors, (iv) subject to the approval of the Bankruptcy Court, intercompany loans from the Obligors to non-debtor Affiliates to the extent constituting Pledged Debt, on terms reasonably acceptable to the Administrative Agent and the Majority DIP Lenders ("Intercompany Affiliate Loans"), (v) Qualified Sale Leaseback Transactions, (vi) transactions approved by the Bankruptcy Court, and (vii) transactions expressly permitted by, or required to be conducted in furtherance of, this Agreement.

Section 7.03.    Liens¶ No Obligor will, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any property or asset, except:

(a)      Permitted Liens;

(b)      Liens extending to Aircraft;

(c)      other Liens so long as the value of the property subject to such Liens, and the Indebtedness and other obligations secured thereby, do not exceed $5,000,000 in the aggregate; and

(d)      the Carve-Out, solely to the extent set forth in the Final DIP Order.

Section 7.04.    Business Activities¶ No Obligor will make any material change in the nature of its business as carried on at the Petition Date.

Section 7.05.    Merger or Consolidation¶No Obligor (i) shall enter into any transaction of merger or consolidation with any entity, liquidate or dissolve itself (or suffer any liquidation or dissolution), (ii) Dispose, in one (1) transaction or a series of transactions, all or substantially all of its business, assets or property, or (iii) other than the Disposition of

91

Aircraft Assets, any Permitted Disposition, or the incurrence of any Permitted Indebtedness or Permitted Liens, Dispose any assets in one or more transactions  for which the Net Proceeds in aggregate exceeds $300,000,000 in the aggregate, except:

(a)      as set forth in Schedule 7.05 hereof;

(b)      A sale of assets or equity pursuant to Section 363 of the Bankruptcy Code, or in connection with a Chapter 11 Plan, in each case with the consent of the Administrative Agent and Majority DIP Lenders, and approved by the Bankruptcy Court;

(c)      Investments made in accordance with Section 7.11; and

(d)      An Obligor may merge or consolidate into another Obligor so long as no Default or Event of Default exists and the Borrower is the surviving entity in any transaction involving the Borrower.

Section 7.06.      Use of Proceeds¶ The Obligors will not use, and will not permit any of their respective Subsidiaries to use, the proceeds of any DIP Loan (i) in violation, in any material respect, of any anti-corruption laws or Anti-Money Laundering Laws or (ii) (A) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or (B) in any other manner, in each case as would result in a violation of Sanctions by any Person in connection with this Agreement (including any Person participating in the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise).

Section 7.07.      Use of DIP Collateral¶ The Obligors will not use, lease/sub-lease or otherwise operate or maintain any Pledged Engines except in a manner permitted by this Agreement and the applicable Collateral Documents.  Without limiting the foregoing, any Permitted Lease of a Priority Pledged Engine, executed after the Closing Date will be subject and subordinate to the DIP Loan Documents and terminable at will upon thirty (30) days' notice by the lessor provided that Permitted Leases to non-Affiliates will not be required to be terminable at will if a favorable legal opinion in form and substance reasonably satisfactory to the Administrative Agent is provided to the DIP Secured Parties as to the enforceability of the subordination provision.  For the avoidance of doubt, Aircraft (other than Pledged Engines and Pledged Spare Parts) and financial leases, operating leases, interchanges or charters of such Aircraft are not DIP Collateral and nothing herein restricts Obligors from entering into a sub-lease, interchange or charter of such Aircraft or rejecting any such Aircraft leases in the Chapter 11 Cases.

Section 7.08.      Sale and Leasebacks¶ No Obligor shall, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, that such Obligor (a) has sold or transferred or is to sell or to transfer to any other Person, or (b) intends to use for substantially the same purpose as any other property that has been or is to be sold or transferred by such Obligor to any Person in connection with such lease (a "Sale and Leaseback"), provided that any Obligors shall be permitted to enter into any Sale and Leaseback with respect to Aircraft owned by such Obligor that is

92

consummated for fair value as determined at the time of consummation in good faith by such Obligor (each a "Permitted Sale Leaseback") or into a Qualified Sale Leaseback Transaction.

Section 7.09.    Indebtedness¶ (a) No Obligor shall directly or indirectly, create, incur, assume or guaranty or otherwise become or remain directly or indirectly liable with respect to any Indebtedness (including with respect to or under any Hedge Agreement), except for Permitted Indebtedness; and (b) the Borrower will not issue any preferred stock or other preferred equity interests.

Section 7.10.    [Reserved].

Section 7.11.    Investments¶ No Obligor shall directly or indirectly, make or own any investment in any Person (an "Investment"), except:

(a)    Investments in cash or Cash Equivalents;

(b)    Investments in an aggregate amount not to exceed $250,000 at any one time for all Investments made pursuant to this subclause;

(c)    Investments outstanding on the Petition Date and identified on Schedule 7.11;

(d)    Investments (i) constituting deposits, prepayments and other credits suppliers, and/or (ii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, made in the ordinary course of business and consistent with the past practices of the Obligors and, in the case of clause (ii), to the extent necessary to maintain the ordinary course of supplies;

(e)    Investments in any Subsidiary as required under the laws of the jurisdiction or formation of such Subsidiary to avoid liquidation under such laws;

(f)    Intercompany Affiliate Loans to the extent permitted under Section 7.02;

(g)    Investments in any Affiliate in an aggregate amount not to exceed $[500,000] in any one calendar month for all such Investments pursuant to this subclause and, in each case, to pay employee severance, taxes, permits, government charges or wind-down costs in respect of such Affiliate (the "Affiliate Costs and Expenses");

(h)    Accounts receivable created in the ordinary course of businesses;

(i)    Hedging Obligations entered into pursuant to Permitted Hedging Agreements and permitted pursuant to this Agreement; and

(j)    Qualified Sale Leaseback Transactions.

Section 7.12.    Restricted Payments¶

(a)    No Obligor will make (or agree to make) directly or indirectly, any payments of Pre-Petition Indebtedness, other than adequate protection payments, cash collateralization of Pre-Petition Letters of Credit as permitted hereunder, any Qualified Sale Leaseback Transaction or as approved by the Bankruptcy Court.

(b)    The Borrower will not declare or pay any dividends (other than dividends payable solely in its Capital Stock) or return any capital to its stockholders or make any other distribution, payment or delivery of property or cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Capital Stock or the Capital Stock of any direct or indirect parent now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock), or set aside any funds for any of the foregoing purposes, or permit any of the Obligors or any of their Subsidiaries to purchase or otherwise acquire for consideration any shares of any class of the Capital Stock of the Borrower, now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock) (all of the foregoing "dividends"), in each case, except to the extent required by applicable law.

Section 7.13.    Fiscal Year; Accounting Policies¶ No Obligor shall change its Fiscal Year end from December 31 or make any change in its accounting policies that is not permitted under IFRS.

Section 7.14.    Limitations on Negative Pledge Clauses¶ No Obligor will directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Obligor to create, incur, assume or permit to exist any DIP Lien on any DIP Collateral securing its DIP Obligations under the DIP Loan Documents; provided that the foregoing shall not apply to restrictions and conditions (i) imposed by law or by this Agreement or any of the other DIP Loan Documents, (ii) existing prior to the Petition Date, (iii) contained in agreements relating to any asset sale, provided such restrictions and conditions apply only to the asset that is to be sold and to the extent such sale is permitted hereunder, (iv) imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations, or (v) in leases, licenses and other contracts relating to the use and occupancy of airport premises and facilities restricting the assignment thereof.

Section 7.15.    Bankruptcy Related Matters¶ The Obligors shall not permit any of the following:

(a)    use any portion or proceeds of the DIP Loans or the DIP Collateral for payments or purposes that would violate the terms of the Final DIP Order;

(b)    incur, create, assume, suffer to exist or permit, except for the Carve-Out or as otherwise expressly permitted by the Final DIP Order, any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Agents or the DIP Lenders against any Obligor, other than with respect to claims related to any Indebtedness permitted under the definition of Permitted Indebtedness subclauses (e) and (l);

94

(c)    subject to the Final DIP Order, assert, join, investigate, support or prosecute any claim or cause of action against any of the DIP Lenders or Agents (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the DIP Loan Documents against any such party;

(d)    seek, consent to, or permit to exist any order granting authority to take any action that is prohibited by the terms of this Agreement, the Final DIP Order, or the other DIP Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Final DIP Order or any of the other DIP Loan Documents;

(e)    subject to the terms of the Final DIP Order, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents or the DIP Lenders with respect to the DIP Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any DIP Secured Party to lift an applicable stay of proceedings to do the foregoing (provided that any Obligor may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Final DIP Order and the DIP Loan Documents);

(f)    make or permit to be made any change to the Final DIP Order, unless approved by the Majority DIP Lenders; or

(g)    file, prosecute, support or otherwise adopt, in any manner whatsoever, any Chapter 11 Plan in any of the Chapter 11 Cases that does not provide for the treatment of the DIP Obligations to the Tranche C Lenders consistent with the terms and conditions of the DIP Loan Documents and the Final DIP Order.

## SECTION 8.

## EVENTS OF DEFAULT

Section 8.01.    Events of Default¶ In the case of the happening of any of the following events and the continuance thereof beyond the applicable grace period if any (each, an "Event of Default"):

(a)    Failure of Representation or Warranty.  Any representation or warranty made by any Obligor in this Agreement or in any other DIP Loan Document shall prove to have been false or incorrect in any material respect when made and, in respect of any such incorrectness which is capable of remedy, such incorrectness shall continue unremedied for a period of thirty (30) days after the earlier of (i) written notice to the Borrower from the Administrative Agent or (ii) knowledge by an Officer of the Borrower who becomes aware of such breach; or

(b)    Payment Default.  A default shall be made in the payment of (i) any principal of the DIP Loans, when and as the same shall become due and payable; (ii) any interest on the DIP Loans and such default shall continue unremedied for more than five (5) Business Days; or (iii) any other amount payable hereunder when due and such default shall continue unremedied for more than ten (10) Business Days after receipt of written notice to the Borrower from the Administrative Agent of the default in making such payment when due; or

#93334561v28

(c)    Certain Covenant Default.  A default shall be made by any Obligor in the due observance of the covenants contained in Section 6.01, Section 6.04(1) (with respect to such Obligor's obligation to maintain its existence), Section 6.15, Section 6.17(a) or Section 7 hereof (provided that (i) the Obligors shall have a five (5) day period to cure any default with respect to Section 6.18 and (ii) in respect of any default that is capable of remedy, a seven (7) day period to cure any default with respect to Section 7); or

(d)    Covenant Default.  A default shall be made by any Obligor in the due observance or performance of any other covenant, condition or agreement to be observed or performed by it pursuant to the terms of this Agreement or any of the other DIP Loan Documents and such default shall continue unremedied for more than thirty (30) days after the earlier of (i) receipt of written notice by the Borrower from the Administrative Agent of such default or (ii) any Officer of the Borrower becomes aware of such default; or

(e)    Unenforceability/Liens. (A)any material provision of any DIP Loan Document to which any Obligor is a party ceases to be a valid and binding obligation of such Obligor, or any Obligor shall so assert in any pleading filed in any court, (B) a material portion of the guarantees by the Guarantors shall cease to be in full force and effect, or (C) the DIP Liens on any material portion of the DIP Collateral intended to be created by the DIP Loan Documents shall cease to be or shall not be a valid and perfected Lien to the extent required by the Final DIP Order and the DIP Loan Documents having the priorities required hereby or thereby (except as permitted by the terms of this Agreement or the Collateral Documents);

(f)    Judgments.  Entry of judgment(s) by a court or courts of competent jurisdiction arising after the Petition Date aggregating in excess of $50,000,000 (determined net of amounts covered by insurance policies issued by creditworthy insurance companies (and as to which the applicable insurance company has not denied coverage) or by third party indemnities or a combination thereof), shall be entered or filed against any Obligor, which judgments are not paid, discharged, bonded, satisfied or stayed for a period of sixty (60) days; or

(g)    Change of Control. A Change of Control shall occur; or

(h)    Dismissal; Conversion; Appointment of Trustee.  (i) Any of the Chapter 11 Cases of the Obligors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Obligors shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case of any Obligor under Section 1112 of the Bankruptcy Code or otherwise, or seeking the conversion of any such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, without Payment in Full of all DIP Obligations hereunder and immediate termination of all DIP Commitments or (ii) a trustee, interim receiver, receiver or manager shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(b) of the Bankruptcy Code shall be appointed in any of the Chapter 11 Cases of the Obligors; or

(i)    Chilean Liquidation Event.  The commencement of a Chilean liquidation procedure, excluding appeals, against the Obligors, which has not been stayed, suspended or dismissed within sixty (60) days, in which a liquidator is appointed according to Chapter IV of

the Chilean Insolvency Law (Law 20,720) (the "Chilean Liquidation Event"); for the avoidance of doubt, the commencement and/or existence of a Chilean Local Reorganization Proceeding commenced by any of the Obligors in reaction to a Chilean Liquidation Event shall not be an Event of Default hereunder; or

(j)      Insolvency Proceeding or Liquidation Event in other Foreign Cases.  The commencement of a liquidation or similar event or procedure in any of the Foreign Cases against the Obligors, in which a liquidator or similar entity is appointed according to the debtor insolvency laws applicable in any jurisdiction in which a Foreign Case has been commenced and which has not been stayed, suspended or dismissed within sixty (60) days; or

(k)      Bankruptcy Events. (i) Any order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Final DIP Order or any Obligor shall apply for the authority to do so, in each case in a manner that is adverse in any respect to the Agents or the DIP Lenders, without the prior written consent of the Administrative Agent and the Majority DIP Lenders; (ii) the Final DIP Order shall cease to be in full force and effect; (iii) any of Obligors shall fail to comply with the Final DIP Order in any material respect; (iv) the entry of an order in the Chapter 11 Cases with respect to any Obligor seeking to obtain financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Facility, any Permitted Sale Lease Back or any Indebtedness permitted under the definition of Permitted Indebtedness clause (l)); (v) an order of the Bankruptcy Court shall be entered avoiding or permitting recovery of any portion of the payments made on account of the DIP Obligations owing under this Agreement; (vi) (A) an application shall be filed by any Obligor for the approval of, or an order of the Bankruptcy Court shall be entered granting, any other Liens in any of the Chapter 11 Cases of the Obligors that are *pari passu* with or senior to the DIP Liens on the DIP Collateral, other than the Carve-Out, Liens permitted by Section 7.03, or Liens expressly permitted in the Final DIP Order to be senior to or *pari passu* with the DIP Liens or (B) any claims (as such word is defined in the Bankruptcy Code) senior to or *pari passu* with the claims (as such word is defined in the Bankruptcy Code) of the DIP Secured Parties (other than the Carve-Out or claims in respect of Indebtedness permitted under the definition of Permitted Indebtedness subclauses (e) and (l), or expressly permitted in the Final DIP Order to be senior to or *pari passu* with the claims of the DIP Secured Parties) against the Obligors; (vii) any Obligor makes any payments of principal or interest or otherwise on account of any Pre-Petition Indebtedness other than (A) payments authorized by the Bankruptcy Court in respect of "first day orders," or other orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Majority DIP Lenders, (B) payments with respect to the termination of aircraft finance leases, tax leases or operating leases, (C) adequate protection payments as permitted hereunder and approved by the Bankruptcy Court, (D) payments with respect to any Indebtedness in connection with any Qualified Sale Leaseback Transaction; (viii) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Obligors that have an aggregate value in excess of $5,000,000 or to permit other actions against any assets of the Obligors that would have a Material Adverse Effect; (ix) an order shall be entered by the Bankruptcy Court terminating any of the Obligor's exclusive periods for proposing a Chapter 11 Plan; (x) an order shall be entered by the Bankruptcy Court confirming a Chapter 11 Plan other than a Company Approved Reorganization Plan; (xi) any of

the DIP Collateral shall be subject to surcharge under Section 506(c) of the Bankruptcy Code or otherwise; (xii) (A) the filing by any Obligor of a motion, pleading or other proceeding that would reasonably be expected to have a Material Adverse Effect on the rights or interests of the DIP Lenders and such motion, pleading or proceeding shall not be withdrawn or dismissed before the Bankruptcy Court approves such motion, pleading or proceeding or (B) a determination by a court of competent jurisdiction with respect to a motion, pleading or proceeding brought by another party that results in such an impairment; (xiii) any order, resolution, judgment, injunction, stay or the like is entered in any of the Foreign Cases that prevents, restricts or limits any of the Obligors from satisfying and/or performing all of the obligations, other than non-material obligations, required of such Obligor(s) under this Agreement; or (xiv) any of the Obligors shall file or support any pleading seeking relief the grant of which would give rise to an Event of Default.

(l)    Bankruptcy Milestones.  The failure to meet the Bankruptcy Milestones described in Section 6.17; or

(m)    Support of Contesting Claim.  Any Obligor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Obligor) any other Person's motion to, disallow in whole or in part the DIP Lenders' or Agents' claims in respect of the DIP Obligations or contest any provision of any DIP Loan Document or any material provision of any DIP Loan Document shall cease to be effective (other than in accordance with its terms); or

(n)    Default Under Other Agreements. (1) Any Obligor shall fail to pay when due (after giving effect to any applicable grace periods) any principal installment of or interest on any of its Indebtedness that is not Stayed (other than the DIP Loans) which amount then due exceeds in the aggregate $50,000,000, (2) any Obligor shall default in the performance of any obligation relating to any Indebtedness of the Obligors that is not Stayed (other than the DIP Loans) outstanding under one or more agreements of the Obligors that results in such Indebtedness coming due prior to its scheduled final maturity date in an aggregate principal amount at any single time unpaid exceeding $50,000,000 or (3) the Obligors shall default in the payment of the outstanding principal amount due on the scheduled final maturity date of any Indebtedness outstanding under one or more agreements of the Obligors that is not Stayed, in an aggregate principal amount at any single time unpaid exceeding $50,000,000; provided that, no Event of Default shall result under this clause (m) as a result of the acceleration of any such Indebtedness as a result of the Chapter 11 Case that is not Stayed (for the purposes of this Section 8.01(n), the term "Stayed" means a stay issued by the Bankruptcy Court in the Chapter 11 Cases, whether or not such Chapter 11 Cases are recognized by a foreign jurisdiction); or

(o)    Benefit Plans.  (i) Any event or circumstance shall have occurred with respect to any Benefit Plans which has resulted or could reasonably be expected to result in liability of the Borrower and the Obligors in an aggregate amount in excess of $50,000,000, or (ii) the Borrower or any Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment in an aggregate amount in excess of $50,000,000 with respect to its withdrawal liability under any Benefit Plan; then, and in every such event and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request

#93334561v28

of, collectively, the Majority Tranche A Lenders, the Majority Tranche B Lenders, if any, and the Majority Tranche C Lenders (except with respect to a default under Section 6.15, upon which the Administrative Agent shall act at the request of solely the Majority Tranche C Lenders), shall take one or more of the following actions, at the same or different times:

(i)    terminate forthwith the DIP Commitments;

(ii)    declare the DIP Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of the DIP Loans and other DIP Obligations together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other DIP Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other DIP Loan Document to the contrary notwithstanding; and

(iii)    upon five (5) business days' written notice to the Obligors from the Collateral Agent, in its sole and absolute discretion, the automatic stay of Section 362 (and of any other Section of the Bankruptcy Code) shall be terminated in all respects without further order of the Bankruptcy Court (or any other court), without the need for filing any motion for relief from the automatic stay or any other pleading, to permit the exercise of any and all rights and remedies under the DIP Loan Documents, the Final DIP Order, and under applicable law available to the Administrative Agent and the DIP Lenders, provided that, prior to such five (5) day period , the Collateral Agent and the DIP Lenders shall not take any enforcement action with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral). Any payment received as a result of the exercise of remedies hereunder shall be applied in accordance with Section 2.20(b).

## SECTION 9.

## THE AGENTS

Section 9.01.   <u>Administration by Agents</u>¶

(a)    Each of the DIP Lenders hereby irrevocably appoints [__], as its administrative agent and [__] as its collateral agent, and authorizes each such Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto, including (but not limited to) the execution and delivery of the DIP Loan Documents to which such Agent is a party and the performance of duties as expressly stated thereunder.

(b)    Each of the DIP Lenders hereby authorizes each Agent, as applicable:

(i)    in connection with the sale or other disposition of any asset or property that is part of the DIP Collateral of the Borrower or any other Grantor, as the case may be, to the extent permitted by the terms of this Agreement, including without limitation upon any Permitted Disposition or as otherwise permitted under Section 7.01, to

automatically release the Lien granted to the Collateral Agent, for the benefit of the DIP Secured Parties, on such asset, other than in respect of any proceeds, products or Investment related thereto, if applicable;

(ii)      if directed by the Majority DIP Lenders in their sole discretion, to determine that the cost to the Borrower or any other Grantor, as the case may be, is disproportionate to the benefit to be realized by the DIP Secured Parties by perfecting a Lien in a given asset or group of assets included in the DIP Collateral and that the Borrower or such other Grantor, as the case may be, should not be required to perfect such Lien in favor of the Collateral Agent for the benefit of the DIP Secured Parties;

(iii)      to enter into the other DIP Loan Documents on terms acceptable to the Administrative Agent and to perform its respective obligations thereunder; and

(iv)      to enter into any other agreements reasonably satisfactory to the Administrative Agent granting Liens to the Collateral Agent for the benefit of the DIP Secured Parties, on any assets or properties of the Borrower or any other Grantor to secure the DIP Obligations.

Section 9.02.   Rights of Agents¶ Any institution serving as the Agent hereunder shall have the same rights and powers in its capacity as a DIP Lender as any other DIP Lender and may exercise the same as though it were not an Agent, and such institution and its respective Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Obligors or any Subsidiary or other Affiliate of the Obligor as if it were not an Agent hereunder.

Section 9.03.   Liability of Agents¶

(a)      The Agents shall not have any duties or obligations except those expressly set forth herein, and no duties, responsibilities or obligations shall be inferred or implied against any Agent.  Without limiting the generality of the foregoing, (i) the Agents shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (ii) the Agents shall not have any duty to take any discretionary action or exercise any discretionary powers (by consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by any Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by any Agent), except discretionary rights and powers expressly contemplated hereby that each Agent is required to exercise in writing as directed by the Majority DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary under the circumstances as provided in Section 11.08), (iii) except as expressly set forth herein, the Agents shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of the Borrower's Subsidiaries that is communicated to or obtained by the institution serving as an Agent or any of its Affiliates in any capacity and (iv) the Agents will not be required to take any action that, in their opinion or the opinion of their counsel, may expose any Agent to liability or that is contrary to any DIP Loan Document or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any Federal, state or

100

foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Majority DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary under the circumstances as provided in Section 11.08) or in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Event of Default unless and until written notice thereof is given to such Agent by the Borrower, any other Grantor or a DIP Lender and such Agent shall not be responsible for, or have any duty to ascertain or inquire into, (A) any statement, warranty or representation made in or in connection with this Agreement, (B) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (D) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (E) the satisfaction of any condition set forth in Section 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

(b)     Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, at the expense of the Borrower, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(c)     Each Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through its Related Parties.

(d)     The Agents shall not be responsible for and shall make no representation as to (i) the existence, genuineness, value or protection of any DIP Collateral, (ii) the legality, effectiveness or sufficiency of any Collateral Document, or (iii) the creation, perfection, priority, sufficiency or protection of any DIP Liens.  For the avoidance of doubt, nothing herein shall require any Agent to file financing statements or continuation statements, or be responsible for maintaining the security interests purported to be created as described herein (except for the safe custody of any DIP Collateral in its possession and the accounting for moneys actually received by it hereunder or under any other DIP Loan Document) and such responsibility shall be solely that of the Borrower.

(e)     The Agents shall not be required to expend or risk any of their own funds or otherwise incur any liability, financial or otherwise, in the performance of any of their duties hereunder or under the DIP Loan Documents.

#93334561v28

(f)      In no event shall any Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)      No Agent shall incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of any such Agent (including any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Board's wire or facsimile or other wire or communication facility).

(h)      Each Agent shall have the right to, unilaterally and without prior notice, remove itself or not comply with any obligation that would reasonably be expected to result in violation of Sanctions or local embargo laws ("Embargo Rules"). The parties hereto expressly agree that no Agent shall be liable for not performing and/or delaying the receipt or the payment of any amount solely due to such Agent's compliance with Embargo Rules.

(i)      The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of any Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Section 9.04.   Reimbursement and Indemnification¶ Each DIP Lender severally agrees (a) to reimburse on demand each Agent (acting in its capacity as such) for such DIP Lender's Aggregate Exposure Percentage of any expenses and fees incurred for the benefit of the DIP Lenders under this Agreement and any of the DIP Loan Documents, including, without limitation, counsel fees and compensation of agents and employees paid for services rendered on behalf of the DIP Lenders, and any other expense incurred in connection with the operations or enforcement thereof, not reimbursed by the Obligors and (b) to indemnify and hold harmless each Agent and any of its Related Parties, on demand, in the amount equal to such DIP Lender's Aggregate Exposure Percentage, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any of them in any way relating to or arising out of this Agreement or any of the DIP Loan Documents or any action taken or omitted by it or any of them under this Agreement or any of the DIP Loan Documents to the extent not reimbursed by the Obligors (except such as shall result from its gross negligence or willful misconduct as determined in a final and nonappealable judgment by a court of competent jurisdiction).

Section 9.05.   Successor Agents¶ Subject to the appointment and acceptance of a successor agent as provided in this paragraph, each Agent may resign at any time by notifying the DIP Lenders and the Borrower.  Upon any such resignation by such Agent, the Majority DIP Lenders shall have the right, with the consent (provided no Event of Default or Default has occurred and is continuing) of the Borrower (such consent not to be unreasonably withheld or delayed), to appoint a successor Agent.  If no successor Agent shall have been so appointed by the Majority DIP Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, with the consent (provided no Event of

102

Default or Default has occurred or is continuing) of the Borrower (such consent not to be unreasonably withheld or delayed), appoint a successor Agent which, in the case of the retiring Administrative Agent, shall be a bank institution with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as an Agent.

Section 9.06.   Independent DIP Lenders¶ Each DIP Lender acknowledges that it has, independently and without reliance upon any Agent or any other DIP Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each DIP Lender also acknowledges that it will, independently and without reliance upon any Agent or any other DIP Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

Section 9.07.   Advances and Payments¶

(a)    On the date of each DIP Loan, the Administrative Agent shall be authorized (but not obligated) to advance, for the account of each of the DIP Lenders, the amount of the DIP Loan to be made by such DIP Lender in accordance with such DIP Lender's DIP Commitment hereunder.  Should the Administrative Agent do so, each of the DIP Lenders agrees forthwith to reimburse the Administrative Agent in immediately available funds for the amount so advanced on its behalf by the Administrative Agent, together with interest at the Federal Funds Effective Rate if not so reimbursed on the date due from and including the date such DIP Loan was advanced by the Administrative Agent but not including the date of reimbursement.

(b)    Any amounts received by the Administrative Agent in connection with this Agreement (other than amounts to which the Administrative Agent is entitled pursuant to Sections 2.11, 9.04 and 11.04), the application of which is not otherwise provided for in this Agreement, shall be applied in accordance with Section 2.20(b).  All amounts to be paid to a DIP Lender by the Administrative Agent shall be credited to that DIP Lender, after collection by the Administrative Agent, in immediately available funds either by wire transfer or deposit in that DIP Lender's correspondent account with the Administrative Agent, as such DIP Lender and the Administrative Agent shall from time to time agree.

Section 9.08.   Sharing of Setoffs¶ Subject to the application of payments in Section 2.20(b), each DIP Lender agrees that, except to the extent this Agreement expressly provides for payments to be allocated to a particular DIP Lender, if it shall, through the exercise either by it or any of its banking Affiliates of a right of banker's lien, setoff or counterclaim against any Obligor under any applicable bankruptcy, insolvency or other similar law, or otherwise, obtain payment in respect of

103

its DIP Loans as a result of which the unpaid portion of its DIP Loans is proportionately less than the unpaid portion of the DIP Loans of any other DIP Lender (a) it shall promptly purchase at par (and shall be deemed to have thereupon purchased) from such other DIP Lender a participation in the DIP Loans of such other DIP Lender, so that the aggregate amount of each DIP Lender's DIP Loans and its participation in DIP Loans of the other DIP Lenders shall be in the same proportion to the aggregate unpaid principal amount of all DIP Loans then outstanding as the amount of its DIP Loans prior to the obtaining of such payment was to the amount of all DIP Loans prior to the obtaining of such payment and (b) such other adjustments shall be made from time to time as shall be equitable to ensure that the DIP Lenders share such payment pro-rata, provided that if any such non-pro-rata payment is thereafter recovered or otherwise set aside, such purchase of participations shall be rescinded (without interest).  The Borrower expressly consents to the foregoing arrangements and agrees, to the fullest extent permitted by law, that any DIP Lender holding (or deemed to be holding) a participation in a DIP Loan acquired pursuant to this Section or any of its banking Affiliates may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such DIP Lender as fully as if such DIP Lender was the original obligee thereon, in the amount of such participation.  The provisions of this Section 9.08 shall not be construed to apply to (a) any payment made by the Borrower or the Guarantors pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (b) any payment obtained by any DIP Lender as consideration for the assignment or sale of a participation in any of its DIP Loans or other DIP Obligations owed to it.

Section 9.09.   Withholding Taxes¶  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any DIP Lender an amount equivalent to any withholding tax applicable to such payment.  If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any DIP Lender for any reason, or the Administrative Agent has paid over to any Governmental Authority the applicable withholding tax relating to a payment to a DIP Lender but no deduction has been made from such payment, without duplication of any indemnification obligations set forth in Section 9.04 or Section 2.19(e) (and without limiting any obligations of the Borrower or any Guarantor pursuant to Section 2.19) such DIP Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with any expenses incurred.

## SECTION 10.

## GUARANTY

Section 10.01.   Guaranty¶

(a)      Each Guarantor hereby, jointly and severally, unconditionally, absolutely and irrevocably guarantees the full and prompt payment when due, whether upon maturity, acceleration or otherwise, by the Borrower of the DIP Obligations (the obligations of each Guarantor in respect thereof, its "Guaranty Obligations").  Each Guarantor further agrees that, to the extent permitted by applicable law, the Guaranty Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and it will remain bound upon this guaranty notwithstanding any extension or renewal of any of the Guaranty Obligations.  The

Guaranty Obligations of the Guarantors shall be joint and several.  Each Guarantor further agrees that its guaranty hereunder is a primary obligation of the Guarantor and not merely a contract of surety.

(b)    To the extent permitted by applicable law, each Guarantor waives presentation to, demand for payment from and protest to the Borrower and also waives notice of protest for nonpayment.  The obligations of each Guarantor hereunder shall not, to the extent permitted by applicable law, be affected by (i) the failure of the Administrative Agent, Collateral Agent or a DIP Lender to assert any claim or demand or to enforce any right or remedy against the Borrower under the provisions of this Agreement or any other DIP Loan Document or otherwise; (ii) any extension or renewal of any provision hereof or thereof; (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of any of the DIP Loan Documents; (iv) the release, exchange, waiver or foreclosure of any security held by the Administrative Agent for the DIP Obligations or any of them; (v) the failure of the Administrative Agent, Collateral Agent, or a DIP Lender to exercise any right or remedy against any other Guarantor; or (vi) the release or substitution of any DIP Collateral.

(c)    To the extent permitted by applicable law, each Guarantor further agrees that this guaranty constitutes a guaranty of payment when due and not just of collection, and waives any right to require that any resort be had by the Administrative Agent or a DIP Lender to any security held for payment of the DIP Obligations or to any balance of any deposit, account or credit on the books of the Administrative Agent, Collateral Agent, or a DIP Lender in favor of the Borrower or to any other Person.

(d)    To the extent permitted by applicable law, each Guarantor hereby waives any defense that it might have based on a failure to remain informed of the financial condition of the Borrower or any other Guarantor and any circumstances affecting the ability of the Borrower or any other Guarantor to perform under this Agreement.

(e)    To the extent permitted by applicable law, each Guarantor's guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the DIP Obligations or any other instrument evidencing any DIP Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the DIP Obligations which might otherwise constitute a defense to this guaranty (other than payment in full in cash of the DIP Obligations in accordance with the terms of this Agreement).  Neither the Administrative Agent nor any of the DIP Lenders makes any representation or warranty in respect to any such circumstances or shall have any duty or responsibility whatsoever to the Guarantors in respect of the management and maintenance of the DIP Obligations.

(f)    Upon the occurrence of the DIP Obligations becoming due and payable (whether upon maturity, by acceleration or otherwise), the DIP Lenders shall be entitled to immediate payment of such DIP Obligations, together with any and all expenses which may be incurred by the DIP Secured Parties in collecting any of the DIP Obligations as provided hereunder, by the Guarantors upon written demand by the Administrative Agent.

Section 10.02.    <u>No Impairment of Guaranty</u>¶ To the extent permitted by applicable law, the obligations of the Guarantors hereunder shall not be subject to any reduction,

limitation or legal impairment for any reason, including, without limitation, any claim of waiver, release, surrender, alteration or compromise, other than pursuant to a written agreement in compliance with Section 11.08 and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the DIP Obligations.  To the extent permitted by applicable law, without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or a DIP Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision hereof or thereof, by any default, failure or delay, willful or otherwise, in the performance of the DIP Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law.

Section 10.03.    <u>Continuation and Reinstatement, etc</u>¶ The Guarantors further agree that the guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any DIP Obligation is rescinded or must otherwise be restored by the Administrative Agent, any DIP Lender or any other DIP Secured Party upon the bankruptcy or reorganization of any Obligor, or otherwise.

Section 10.04.    <u>Subrogation</u>¶ Upon payment by the Guarantors of any sums to the Administrative Agent or a DIP Lender hereunder, all rights of the Guarantors against the Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior payment in full of all the DIP Obligations (including interest accruing on and after the filing of any petition in bankruptcy or of reorganization of an obligor whether or not post filing interest is allowed in such proceeding).  If any amount shall be paid to the Guarantors for the account of the Borrower relating to the DIP Obligations prior to payment in full of the DIP Obligations, if an Event of Default has occurred and is continuing, such amount shall be held in trust for the benefit of the Administrative Agent and the DIP Lenders and shall forthwith be paid to the Administrative Agent and the DIP Lenders to be credited and applied to the DIP Obligations, whether matured or unmatured.

Section 10.05.    <u>Subordination</u>¶ Any Indebtedness of any Guarantor now or hereafter owing to any other Guarantor or the Borrower is hereby subordinated to the DIP Obligations.  Upon the occurrence and during the continuance of any Event of Default, if the Administrative Agent so requests, all such Indebtedness of any Guarantor to another Guarantor or the Borrower shall be collected, enforced and received by such other Guarantor or the Borrower for the benefit of the DIP Secured Parties and be paid over to the Administrative Agent on behalf of the DIP Secured Parties on account of the DIP Obligations of such Guarantor to the DIP Secured Parties, but without affecting or impairing in any manner the liability of any other Grantor under the other provisions of this Section 10.  Without limiting the generality of the foregoing, each Guarantor hereby agrees with the DIP Secured Parties that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this guaranty (whether contractual, under

106

Section 509 of the Bankruptcy Code or otherwise) until all DIP Obligations have been irrevocably paid in full in cash.

Section 10.06.    Right of Contribution¶ Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder who has not paid its proportionate share of such payment.  The provisions of this Section 10.06 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the other DIP Secured Parties, and each Guarantor shall remain liable to the Administrative Agent and the other DIP Secured Parties for the full amount guaranteed by such Guarantor hereunder.

Section 10.07.    Amendments, etc. with Respect to the DIP Obligations; Waiver of Rights¶ Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, (a) any demand for payment of any of the DIP Obligations made by the Administrative Agent or any other DIP Secured Party may be rescinded by such party and any of the DIP Obligations continued, (b) the DIP Obligations, DIP Collateral or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent or any other DIP Secured Party, (c) this Agreement, any other DIP Loan Document and any other documents executed and delivered in connection therewith, may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Majority DIP Lenders, as the case may be) may deem advisable from time to time, subject to Section 11.08 and (d) any DIP Collateral, guaranty or right of offset at any time held by the Collateral Agent, the Administrative Agent or any other DIP Secured Party for the payment of the DIP Obligations may be sold, exchanged, waived, surrendered or released. Neither the Administrative Agent nor any other DIP Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the DIP Obligations or for this guaranty or any property subject thereto. When making any demand hereunder against any Guarantor, the Administrative Agent or any other DIP Secured Party may, but shall be under no obligation to, make a similar demand on the Borrower or any other Guarantor, and any failure by the Administrative Agent or any other DIP Secured Party to make any such demand or to collect any payments from the Borrower or any other Guarantor or any release of the Borrower or any other Guarantor shall not relieve any Guarantor in respect of which a demand or collection is not made or any Guarantor not so released of its several obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Administrative Agent or any other DIP Secured Party against any Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

## SECTION 11.

## MISCELLANEOUS

Section 11.01.     Notices¶

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein or under any other DIP Loan Document shall be in writing (including by facsimile and electronic mail with (.pdf attached)), and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or electronic mail, as follows:

(i)     if to the Borrower or any Guarantor, to it at:

LATAM Airlines Group S.A.
Edificio Huidobro
Av. Presidente Riesco 5711
Piso 20
Las Condes
Santiago
Chile
Attention:  Corporate Finance Director
Telephone:  + 56 2 565 3952
Facsimile:  + 56 2 565 3950

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:  Richard J. Cooper
        Lisa M. Schweitzer
        Kara A. Hailey
Telephone:  + 1 (212) 225-2276
            + 1 (212) 225-2629
Facsimile:  +1 (212) 225-3999

(ii)     if to [ __ ] as Administrative Agent, to [ __ ]; Attention:  [ __ ];

(iii)     if to any other DIP Lender, to it at its address (or telecopy number) set forth in Annex A hereto or, if subsequently delivered, an Assignment and Acceptance; and

(iv)     if to the Collateral Agent, to [ __ ], Att. [ __ ]

(b)     Notices and other communications to the DIP Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the

108

#93334561v28

Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable DIP Lender. The Administrative Agent or the Borrower may, in its reasonable discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address, telecopy number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 11.02.    Successors and Assigns¶

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither the Borrower nor any Guarantor may assign or otherwise transfer any of their respective rights or obligations hereunder without the prior written consent of each DIP Lender (and any attempted assignment or transfer by the Borrower or any Guarantor without such consent shall be null and void), provided that the foregoing shall not restrict any transaction permitted by Section 7.05, and (ii) no DIP Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 11.02.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (d) of this Section 11.02) and, to the extent expressly contemplated hereby, the Related Parties of the Administrative Agent and the DIP Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Subject to the conditions set forth in paragraph (b)(iii) below,

(i)    each Tranche A Lender and each Tranche B Lender, if any, may assign all or any part of, its respective pro rata shares of the Tranche A Facility and the Tranche B Facility, as the case may be, to any of their respective Affiliates and, with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent and the Borrower, to an Eligible Assignee.

(ii)    Each Tranche C Lender may assign all or any part of their respective pro rata share of the DIP Facility to a Tranche C Eligible Assignee.

(iii)    Assignments shall be subject to the following additional conditions:

1)    except in the case of an assignment to a DIP Lender, an Affiliate of a DIP Lender or an Approved Fund of a DIP Lender the amount of such DIP Commitment or DIP Loans of the assigning DIP Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $50,000,000, and after giving effect to such assignment, the portion of the DIP Loan or DIP Commitment held by the assigning DIP Lender of the same

tranche as the assigned portion of the DIP Loan or DIP Commitment shall not be less than $50,000,000, in each case unless the Borrower and the Administrative Agent otherwise consent; provided that no consent of the Borrower shall be required with respect to such assignment if an Event of Default has occurred and is continuing; provided, further, that any such assignment shall be in increments of $10,000,000 in excess of the minimum amount described above;

2)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning DIP Lender's rights and obligations under this Agreement;

3)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of [$3,500] for the account of the Administrative Agent;

4)    the assignee, if it was not a DIP Lender immediately prior to such assignment, shall deliver (i) to the Administrative Agent an administrative questionnaire in a form as the Administrative Agent may require and (ii) any documents required to be delivered pursuant to Section 2.19;

5)    The assignee shall have provided to each Agent any information required by such Agent in connection with its "know your customer" process.

For the purposes of this Section 11.02(b), the term "Approved Fund" means with respect to any DIP Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) such DIP Lender, (b) an Affiliate of such DIP Lender or (c) an entity or an Affiliate of an entity that administers or manages such DIP Lender.

(iv)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iii) of this Section 11.02, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a DIP Lender under this Agreement, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement, except as provided in Section 2.27(b) (and, in the case of an Assignment and Acceptance covering all of the assigning DIP Lender's rights and obligations under this Agreement, such DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.17, 2.19 and 11.04).  Any assignment or transfer by a DIP Lender of rights or obligations under this Agreement that does not comply with this Section 11.02 shall be treated for purposes of this Agreement as a sale by such DIP Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 11.02.

(v)    The Administrative Agent shall maintain at its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names

#93334561v28

and addresses of the DIP Lenders, and the DIP Commitments of, and principal amount (and stated interest) of the DIP Loans owing to, each DIP Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Guarantors, the Administrative Agent and the DIP Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a DIP Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any DIP Lender, at any reasonable time and from time to time upon reasonable prior notice.

(vi)     Notwithstanding anything to the contrary contained herein, no assignment may be made hereunder to any Defaulting Lender or any of its subsidiaries, or any Person who, upon becoming a DIP Lender hereunder, would constitute any of the foregoing Persons described in this clause (vi).

(vii)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment will be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of DIP Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Borrower, Administrative Agent and each other DIP Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all DIP Loans in accordance with its Aggregate Exposure Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder becomes effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest will be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning DIP Lender and an assignee, the assignee's completed administrative questionnaire in a form as the Administrative Agent may require (unless the assignee shall already be a DIP Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register; provided that if either the assigning DIP Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.04, 9.04 or 11.04(c), the Administrative Agent shall have no obligation to accept such Assignment and Acceptance and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(d)      (i) The Tranche A Lenders and the Tranche B Lenders, if any, may, sell participations to one or more banks or other entities (other than a Disqualified Lender) (a "Participant") in all or a portion of such DIP Lender's rights and obligations under this Agreement (including all or a portion of its DIP Commitment and the DIP Loans); provided that (A) such DIP Lender's obligations under this Agreement shall remain unchanged, (B) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the DIP Lenders shall continue to deal solely and directly with such assigning DIP Lender in connection with such assigning DIP Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a DIP Lender sells such a participation shall provide that such DIP Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such DIP Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 11.08(a) that affects such Participant.  Subject to Section 11.02(d)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.17 and 2.19 to the same extent as if it were a DIP Lender and had acquired its interest by assignment pursuant to Section 11.02(b), provided that, no such Participant shall be entitled to receive any benefits under Section 2.17 or 2.19 in excess of such amounts as would have been received by the applicable DIP Lender had no participation occurred, except to the extent such entitlement by such DIP Lender to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a DIP Lender, provided such Participant agrees to be subject to the requirements of Section 9.08 as though it were a DIP Lender.  Each DIP Lender that sells a participation, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the DIP Loans or other obligations under this Agreement (the "Participant Register"); provided that no DIP Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any DIP Commitments, DIP Loans or its other obligations under this Agreement or any DIP Loan Document) except to the extent that such disclosure is necessary to establish that such DIP Commitment, DIP Loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such DIP Lender, the Borrower, the Guarantors and the Administrative Agent shall treat each person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(ii)      A Participant shall not be entitled to the benefits of Section 2.19 unless such Participant agrees, for the benefit of the Borrower, to comply with Section 2.19(f), and 2.19(h) as though it were a DIP Lender (it being understood that such Participant shall deliver such forms and information to its participating DIP Lender).

(e)      Notwithstanding the foregoing, no assignment may be made or participation sold to a Disqualified Lender without the prior written consent of the Borrower. Notwithstanding anything contained in this Agreement or any other DIP Loan Document to the contrary, if any

DIP Lender was a Disqualified Lender at the time of the assignment of any DIP Loans or DIP Commitments to such DIP Lender, following written notice from the Borrower to such DIP Lender and the Administrative Agent: (1) such DIP Lender shall promptly assign all DIP Loans and DIP Commitments held by such DIP Lender to an Eligible Assignee; provided that (A) the Administrative Agent shall not have any obligation to the Borrower, such DIP Lender or any other Person to find such a replacement DIP Lender, (B) the Borrower shall not have any obligation to such Disqualified Lender or any other Person to find such a replacement DIP Lender or accept or consent to any such assignment to itself or any other Person subject to the Borrower's consent and (C) the assignment of such DIP Loans and/or DIP Commitments, as the case may be, shall be at par plus accrued and unpaid interest and fees; (2) such DIP Lender shall not have any voting or approval rights under the DIP Loan Documents and shall be excluded in determining whether all DIP Lenders, all affected DIP Lenders or the Majority DIP Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 11.02(e)); provided that (x) the DIP Commitment of any Disqualified Lender may not be increased or extended without the consent of such Disqualified Lender and (y) any waiver, amendment or modification requiring the consent of all DIP Lenders or each affected Lender that affects any Disqualified Lender adversely and in a manner that is disproportionate to other affected DIP Lenders shall require the consent of such Disqualified Lender; and (3) no Disqualified Lender is entitled to receive information provided solely to DIP Lenders by the Administrative Agent or any DIP Lender or will be permitted to attend or participate in meetings attended solely by the DIP Lenders and the Administrative Agent, other than the right to receive notices or Borrowings, notices or prepayments and other administrative notices in respect of its DIP Loans or DIP Commitments required to be delivered to DIP Lenders pursuant to Section 2 hereof.

(f)     No DIP Lender shall at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such DIP Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such DIP Lender.

(g)     Any DIP Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 11.02, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower or the Guarantors furnished to such DIP Lender by or on behalf of the Borrower or the Guarantors; provided that prior to any such disclosure, each such assignee or participant or proposed assignee or participant is subject to an agreement containing provisions substantially the same as those of Section 11.03 (and the Borrower shall be a third party beneficiary thereof).

Section 11.03.    Confidentiality¶ Each DIP Lender agrees to keep any information delivered or made available by the Borrower or the Guarantors to it confidential, in accordance with its customary procedures, from anyone other than persons employed or retained by such DIP Lender who are or are expected to become engaged in evaluating, approving, structuring or administering the DIP Loans, and who are advised by such DIP Lender of the confidential nature of such information and instructed to keep such information confidential; provided that nothing herein shall prevent any DIP Lender from disclosing such information (a) to any of its Affiliates and their respective agents, advisors, officers, directors and employees (it being understood that the Persons to whom such

#93334561v28

disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential) or to any other DIP Lender or any other party hereto, (b) upon the order of any court or administrative agency or to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (c) upon the request or requirement of any regulatory agency or authority (including any self-regulatory authority), (d) which has been publicly disclosed other than as a result of a disclosure by the Administrative Agent or any DIP Lender which is not permitted by this Agreement, (e) in connection with any litigation to which the Administrative Agent, any DIP Lender, or their respective Affiliates may be a party to the extent required under applicable rules of discovery, (f) to the extent required in connection with the exercise of any remedy or enforcement of rights hereunder, (g) to such DIP Lender's legal counsel and independent auditors, (h) on a confidential basis to any rating agency in connection with rating the Borrower and its Subsidiaries or the DIP Facility, (i) with the consent of the Borrower, and (j) to any actual or proposed participant or assignee of all or part of its rights hereunder, to any direct or indirect contractual counterparty (or the professional advisors thereto) to any swap or derivative transaction under which payments are to be made by reference to the Borrower and its obligations or to any credit insurance provider under which payments are to be made by reference to the Borrower and its obligations, in each case, subject to the proviso in Section 11.02(f) (with any reference to any assignee or participant set forth in such proviso being deemed to include a reference to such contractual counterparty or credit insurance provider for purposes of this Section 11.03(j)).  If any DIP Lender is in any manner requested or required to disclose any of the information delivered or made available to it by the Borrower or the Guarantors under clauses (b) or (e) of this Section, such DIP Lender will, to the extent permitted by law, provide the Borrower or the Guarantors with prompt notice, to the extent reasonable, so that the Borrower or the Guarantors may seek, at its sole expense, a protective order or other appropriate remedy or may waive compliance with this Section 11.03.

Section 11.04.    Expenses; Indemnity; Waiver¶

(a)    The Obligors agree to pay on demand (i) all reasonable out-of-pocket fees, costs and expenses of the each of the Tranche C Initial Lenders and each Agent in connection with the preparation, execution, delivery of the DIP Loan Documents (including, without limitation, all due diligence, collateral review, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses), including (x) the reasonable documented fees and expenses of one primary counsel and one local law counsel for each Tranche C Initial Lender and one documentation counsel for the Tranche C Initial Lenders collectively, and (y) the reasonable fees and expenses of each Agent, in each case with respect thereto, and (ii) all reasonable out-of-pocket fees, costs and expenses of the Agent (including reasonable fees and expenses of counsel) and the reasonable documented fees and expenses of one primary counsel and one local law counsel (but no documentation counsel), for each Tranche C Initial Lender in connection with the administration, modification and amendment of, or any consent or waiver under, the DIP Loan Documents and the other documents to be delivered hereunder and with respect to advising the Tranche C Initial Lender and each Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the DIP Loan Documents, with respect to negotiations with the Obligors or with other creditors of the Obligors or any of their Subsidiaries arising out of any Default or any events or

circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto and (iii) all costs and expenses of each Agent and each DIP Lender in connection with the enforcement of the DIP Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency, workout or restructuring or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for each Agent and each DIP Lender with respect thereto).  All payments or reimbursements pursuant to the foregoing clause (a)(i) shall be paid within five (5) business days after the applicable Review Period (as defined in the Final DIP Order).  Payment of such fees, expenses and disbursements in this Section 11.04(a) shall be subject to the procedures set forth in the Final DIP Order.

(b)    The Borrower shall indemnify each Agent and each DIP Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable and documented fees, charges and disbursements of any counsel for any Indemnitee, arising out of, in connection with, or as a result of any actual or prospective claim, litigation, investigation or proceeding, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto and whether or not any such claim, litigation, investigation or proceeding is brought by the Borrower, its equity holders, its Affiliates, its creditors or any other Person (including any investigating, preparing for or defending any such claims, actions, suits, investigations or proceedings, whether or not in connection with pending or threatened litigation in which such Indemnitee is a party), relating to (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any DIP Loan or the use of the proceeds therefrom or (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to, or asserted against, the Borrower or any of its Subsidiaries; provided that such indemnity shall not, as to any Indemnitee, be available (x) to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee.

(c)    To the extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any DIP Loan or the use of the proceeds thereof; provided that nothing in this clause (d) shall relieve Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party and further provided any release, waiver or exculpation by the Borrower does not apply to the DIP Lenders in their capacity as shareholders or in respect to their involvement in any contractual arrangements with the Obligors or its affiliates other than with regard to the DIP Facility.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information

115

transmission systems in connection with this Agreement or the other DIP Loan Documents or the transactions contemplated hereby or thereby (except to the extent determined in a final and non-appealable judgment by a court of competent jurisdiction to have arisen from the bad faith, willful misconduct or gross negligence of such Indemnitee).

(d)        The Obligors agree not to compel marshalling and affirmatively waive any claim they otherwise might have under section 506(c) and 552(b) of the Bankruptcy Code and agree that the DIP Collateral securing the DIP Facility may not be charged with any costs or expenses they or their estates may have except with respect to the priority provided under this Agreement for the Carve-Out Expenses.

(e)        In the event of any claim hereunder or under any other DIP Loan Document against the Borrower or other Grantor in respect of Taxes attributable to or arising out of the use, operation, ownership or possession of the DIP Collateral ("Collateral Taxes"), the relevant Indemnitee shall within forty-five (45) calendar days of the date such Indemnitee has received written notification of such claim, give the Borrower written notice of such claim; provided that, a failure to give such notice in a timely manner shall not preclude a claim for indemnification hereunder, except to the extent such failure precludes the Borrower's right to contest such claim and such failure is not the result of the action or omission of the Borrower.  If the Borrower so requests in writing within thirty (30) calendar days after receipt of such notice, the Indemnitee shall consult with the Borrower to consider what action may be taken to resist payment of the relevant Collateral Taxes, and following such consultation the Indemnitee shall take all reasonable action as determined in the Indemnitee's reasonable sole discretion in the name of the Indemnitee to contest the claim in the name of the Indemnitee or, if permitted by applicable law to be contested in the Borrower's name, allow the Borrower at Borrower's expense to contest in the name of the Borrower, in which case the Borrower shall control the contest; provided that the following conditions are met:

(i)        the Indemnitee shall have received adequate provision satisfactory to it for such claim and any liability, expense or loss arising out of or related to such contest (including without limitation indemnification for all costs, expenses, losses, reasonable legal and accounting fees and disbursements, penalties and interest);

(ii)        the contest will not result in any material danger of the sale, forfeiture or loss of, or the creation of any Lien on, the DIP Collateral;

(iii)        the contest does not involve any risk of criminal or any material risk of civil liability against the Indemnitee;

(iv)        if such contest shall be conducted in a manner requiring the payment of the claim, the Borrower shall have paid such claim to the extent required;

(v)        no Event of Default shall have occurred and be continuing;

(vi)        the Indemnitee shall have received a legal opinion (at the expense of the Borrower) from counsel selected by the Borrower (and reasonably satisfactory to such Indemnitee) indicating that there is a reasonable basis for contesting such Taxes; and

116

(vii)    the Indemnitee has not determined that the proposed actions to contest
such claim give rise to a material risk of creating a local franchise issue of the Tax
Indemnitee (e.g. material adverse publicity or material impairment of the Tax
Indemnitee's relationship with local regulators) or impairing the status of other open Tax
matters (e.g. Tax audits) between the Indemnitee and the relevant taxing authorities.

Unless one of the conditions enumerated in paragraphs (i) through (vii) above shall cease to be
satisfied, the Indemnitees shall not settle any claim in respect of Collateral Taxes without the
prior written consent of the Borrower, which consent shall not be unreasonably withheld or
delayed.

The agreements in this Section 11.04 shall survive the repayment of the DIP Loans and all other
amounts payable hereunder.

Section 11.05.    Governing Law; Jurisdiction; Consent to Service of Process;
Immunity¶

(a)    This Agreement shall be construed in accordance with and governed by the law of
the State of New York and, to the extent applicable, the Bankruptcy Code.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and
its property, to the exclusive jurisdiction of the Bankruptcy Court, and, if the Bankruptcy Court
does not have (or abstains from) jurisdiction, the courts of the State of New York, the courts of
the United States of America for the Southern District of New York and appellate courts from
any thereof. Each of the parties hereto agrees that a final judgment in any such action or
proceeding shall, to the extent permitted by law, be conclusive and may be enforced in other
jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest
extent it may legally and effectively do so, any objection which it may now or hereafter have to
the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement
in any court referred to in Section 11.05(b).  Each of the parties hereto hereby irrevocably
waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the
maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the
manner provided for notices in Section 11.01, except that each Obligor hereby agrees that service
of all writs, process and summonses in any such suit, action or proceeding brought in such courts
may be made upon the Process Agent and irrevocably appoints the Process Agent as its true and
lawful attorney-in-fact in its name, place and stead (as well as that of its respective successors
and assigns) to accept such service of any and all such writs, process and summonses (including
any *citação inicial*), and agree that the failure of the Process Agent to give any notice of any
such service of process to it shall not impair or affect the validity of such service or of any
judgment based thereon.  Each Obligor further agrees (to the extent permitted by applicable
laws) that a final judgment against it in any such action or proceeding may be enforced in other
jurisdictions by suit on the judgment or in any other manner provided by law, a certified or true
copy of which final judgment shall be conclusive evidence of the fact and of the amount of any

117

indebtedness or liability of the Borrower and/or the Guarantors, as the case may be, therein described.  Each Obligor agrees that (x) the sole responsibilities of the Process Agent shall be (i) to receive such process, (ii) to send a copy of any such process so received to such Obligor, by airmail, or overnight courier at its address set forth in Section 11.01, or at the last address filed in writing by it with the Process Agent and (iii) to give prompt facsimile notice of receipt thereof to such Obligor, at such address and (y) the Process Agent shall have no responsibility for the receipt or nonreceipt by such Obligor of such process.  Each Obligor hereby agrees to pay to the Process Agent such compensation as shall be agreed upon from time to time by it and the Process Agent for the Process Agents' services hereunder.  Each Obligor hereby agrees that its submission to jurisdiction and its designation of the Process Agent is made for the express benefit of the DIP Lenders, the Agents, and their respective successors, subrogees and assigns.  Each Obligor agrees that it will at all times continuously maintain a Process Agent to receive service of process in the City, County and State of New York on behalf of itself and its properties with respect to this Agreement and the other relevant DIP Loan Documents and shall give each party hereto written notice prior to any change of address for such Process Agent, and in the event that, for any reason, the Process Agent named pursuant to this Section 11.05 shall no longer serve as Process Agent to receive service of process on such Obligor's behalf, such Obligor shall promptly appoint a successor Process Agent.  Each Obligor hereby irrevocably further consent to the service of process in any suit, action or proceeding in said courts by the mailing thereof by any party hereto by registered or certified mail, postage prepaid, to it at its address specified in Section 11.01.  Nothing in this Section 11.05 shall affect the right of any party hereto to serve legal process in any other manner permitted by law or affect the right of such party or its successors, subrogees or assigns to bring any action or proceeding against such Obligor or any of their respective property in the courts of other jurisdictions.

(e)     Each party hereto acknowledges and agrees that the activities contemplated by the provisions of the DIP Loan Documents are commercial in nature rather than governmental or public and therefore acknowledges and agrees that it is not entitled to any right of immunity on the grounds of sovereignty or otherwise with respect to such activities or in any legal action or proceeding arising out of or relating to the DIP Loan Documents.  Each such party in respect of itself and its properties and revenues, expressly and irrevocably waives any such right of immunity (including, but not limited to, any immunity from suit, from the jurisdiction of any court, from service of process, from set-off, from any execution, or attachment in aid of execution prior to judgment or otherwise or from any other legal process) or claim thereto which may now or hereafter exist (whether or not claimed) and irrevocably agrees not to assert any such right or claim in any such action or proceeding that may at any time be commenced, whether in the United States of America or otherwise.

Section 11.06.     No Waiver¶ No failure on the part of the Administrative Agent, the Collateral Agent or any of the DIP Lenders to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other DIP Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

#93334561v28

Section 11.07.    <u>Extension of Maturity</u>¶ Should any payment of principal of or interest or any other amount due hereunder become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate herein specified during such extension.

Section 11.08.    <u>Amendments, etc</u>¶

(a)    No modification, amendment or waiver of any provision of this Agreement or any other DIP Loan Document (other than the Deposit Account Control Agreements), and no consent to any departure by the Borrower or the Guarantors therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority DIP Lenders (or signed by the Administrative Agent with the consent of the Majority DIP Lenders), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given; <u>provided</u>, <u>however</u>, that no such modification or amendment shall without the prior written consent of:

(i)    Each DIP Lender directly and adversely affected thereby (A) increase the DIP Commitment of any DIP Lender or extend the termination date of the DIP Commitment of any DIP Lender (it being understood that a waiver of an Event of Default shall not constitute an increase in or extension of the termination date of the DIP Commitment of a DIP Lender), (B) reduce the principal amount of any DIP Loan, or the rate of interest payable thereon (provided that only the consent of the Majority DIP Lenders shall be necessary for a waiver of default interest referred to in Section 2.08)), or extend any date for the payment of interest or Fees hereunder or reduce any Fees payable hereunder or extend the final maturity of the Borrower's obligations hereunder or (C) amend, modify or waive any provision of Section 2.20(b) (including the last sentence of Section 8.01), Section 3.01 or Section 9.08; and

(ii)    all of the DIP Lenders (A) amend or modify any provision of this Agreement which provides for the unanimous consent or approval of the DIP Lenders, (B) amend or modify this Section 11.08 or modify the percentage of the DIP Lenders required in the definition of Majority DIP Lenders, (C) release all or substantially all of the Liens on the DIP Collateral granted to the Collateral Agent hereunder or under any other DIP Loan Document, (D) release all or substantially all of the Guarantors, or (E) amend, modify or waive any provision of this Agreement in order to permit the incurrence of any financing pursuant to Section 364 of the Bankruptcy Code (other than the DIP Facility in the maximum amounts permitted after giving effect to the Final DIP Order) that would be secured by the DIP Collateral (or any portion thereof) on a pari passu or senior basis with the DIP Obligations or that would benefit from any Super-priority Claim in the Chapter 11 Cases that is pari passu or senior to the Super-priority Claims with respect to the DIP Obligations as provided in the Final DIP Orders; <u>provided further</u>, that any Collateral Document may be amended, supplemented or otherwise modified with the consent of the applicable Grantor and the Administrative Agent (i) to add assets (or categories of assets) to the DIP Collateral covered by such Collateral Document or (ii) to remove any asset or type or category of asset (including after-acquired assets of that type or category) from the DIP Collateral covered by such

#93334561v28

Collateral Document to the extent the release thereof is expressly permitted by this Agreement; and

(iii)    with respect to the Tranche A Facility, the Majority Tranche A Lenders, with respect to the Tranche B Facility, the Majority Tranche B Lenders, and with respect to the Tranche C Facility, the Majority Tranche C Lenders, (A) amend or modify the order of application of any reduction in the DIP Commitments or any prepayment of DIP Loans among the Tranche A Facility, Tranche B Facility or Tranche C Facility, as applicable, from the application thereof set forth in the applicable provisions of Section 2.05, 2.13, 2.14(b) or 2.15, respectively, in any manner that adversely affects the DIP Lenders under the Tranche A Facility, Tranche B Facility or Tranche C Facility, as applicable, (B) impose any greater restriction on the ability of any DIP Lender under the Tranche A Facility, Tranche B Facility or Tranche C Facility, as applicable, to assign any of its rights or obligations hereunder, or (C) amend or modify Sections 3.02, 3.03 or 3.04 in any manner that adversely affects the DIP Lenders under the Tranche A Facility, Tranche B Facility or Tranche C Facility, as applicable.

(b)    No such amendment or modification shall adversely affect the rights and obligations of any Agent without such Agent's prior written consent.

(c)    No notice to or demand on the Borrower or the Guarantors shall entitle the Borrower or the Guarantors to any other or further notice or demand in the same, similar or other circumstances, unless otherwise required under a DIP Loan Document. Each assignee under Section 11.02(b) shall be bound by any amendment, modification, waiver, or consent authorized as provided herein, and any consent by a DIP Lender shall bind any Person subsequently acquiring an interest on the DIP Loans held by such DIP Lender. No amendment to this Agreement shall be effective against the Borrower or any Guarantor unless signed by the Borrower or such Guarantor, as the case may be.

(d)    Notwithstanding anything to the contrary contained in Section 11.08(a), if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature in any provision of the DIP Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any DIP Loan Document if the same is not objected to in writing by the Majority DIP Lenders within seven (7) Business Days after written notice thereof to the DIP Lenders.

(e)    No such amendment, modification or waiver shall be made in respect of Section 2.12 or Schedule 2.12(a) or Section 2.16 or in respect of the definitions of Tranche C Increase Lender or Tranche C Increase Commitment or this Section 11.08(e) or Section 11.11 (as it relates to Section 2.12 or Schedule 2.12(a)), in each case without the consent of the Tranche C Initial Lenders.

(f)    The consent of any of the Tranche B Lenders, if any, or the Tranche C Lenders shall not be required for any amendments to the DIP Loan Documents necessary in connection with the negotiation of Tranche A Commitment, so long as such amendments are not adverse to the rights of such Tranche B Lenders, if any, or Tranche C Lenders (it being understood that (x)

120

any amendments which result in the Tranche A Lenders or Tranche B Lenders having equity conversion rights or subscription rights, or any changes to the Tranche C Lenders equity conversion rights or subscription rights will be considered adverse to the Tranche C Lenders and (y) any commercially reasonable amendments to Section 3.02 will not be considered adverse to the Tranche C Lenders). To the extent any additional or more restrictive (to the Obligors) Affirmative Covenant in accordance with Section 6 or Negative Covenant in accordance with 0, event of default, financial covenant or representation is added or a more restricted (to the Obligors) mandatory prepayment is added for the benefit of the Tranche A Lenders, such additional or more restrictive provision shall be added for the benefit of the Tranche B Lenders, if any, and the Tranche C Lenders in their sole discretion. To the extent any collateral or guarantees are added or any perfection measures with respect thereto are taken, in each case for the benefit of the Tranche A Lenders, such additional collateral, guarantees or perfection measures shall likewise be taken for the benefit of the Tranche B Lenders and Tranche C Lenders.

(g)    The consent of the Tranche A Lenders and the Tranche C Lenders shall not be required for any amendments to the DIP Loan Documents necessary in connection with the negotiation of Tranche B Commitment, so long as such amendments are not adverse to the rights of the Tranche A Lenders and the Tranche C Lenders (it being understood that (x) any amendments which result in the Tranche B Lenders having equity conversion rights or subscription rights, or any changes to the Tranche C Lenders equity conversion rights or subscription rights will be considered adverse to the Tranche C Lenders and (y) any commercially reasonable amendments to Section 3.02 will not be considered adverse to the Tranche C Lenders). To the extent any additional or more restrictive (to the Obligors) Affirmative Covenant in accordance with Section 6 or Negative Covenant in accordance with Section 7 ,event of default, financial covenant or representation is added or a more restricted (to the Obligors) mandatory prepayment is added for the benefit of the Tranche B Lenders, such additional or more restrictive provision shall be added for the benefit of the Tranche C Lenders in their sole discretion. To the extent any collateral or guarantees are added or any perfection measures with respect thereto are taken, in each case for the benefit of the Tranche B Lenders, such additional collateral, guarantees or perfection measures shall likewise be taken for the benefit of the Tranche A Lenders and the Tranche C Lenders.

Section 11.09.    Severability¶ Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 11.10.    Headings¶ Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

Section 11.11.    Survival¶ All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been

#93334561v28

relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any DIP Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any DIP Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder. The provisions of Sections 2.12, 2.17, 2.19, 11.04, 11.11, 11.18, Schedule 2.12(a) and Section 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the DIP Loans, the expiration or termination of the DIP Commitments, the termination of this Agreement or any provision hereof, or the resignation or removal of any Agent.

Section 11.12.    Execution in Counterparts; Integration; Effectiveness¶ This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 5.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic .pdf copy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.13.    USA Patriot Act¶ Each DIP Lender that is subject to the requirements of the Patriot Act hereby notifies the Borrower and the Guarantors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and the Guarantors and other information that will allow such DIP Lender to identify the Borrower and the Guarantors in accordance with the Patriot Act.

Section 11.14.    New Value¶ It is the intention of the parties hereto that any provision of DIP Collateral by a Grantor as a condition to, or in connection with, the making of any DIP Loan shall be made as a contemporaneous exchange for new value given by the DIP Lenders to the Borrower.

Section 11.15.    WAIVER OF JURY TRIAL¶ EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY OF THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF

#93334561v28

LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND
(B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN
INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE
MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.15.

Section 11.16.    No Fiduciary Duty¶ Each Agent, each DIP Lender and their
Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have
economic interests that conflict with those of the Borrower, the Guarantors, their respective
stockholders and/or their respective affiliates.  The Borrower and each Guarantor agrees that
nothing in the DIP Loan Documents or otherwise related to the Transactions will be deemed
to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty
between any Lender, on the one hand, and the Borrower, any Guarantor, their respective
stockholders or their respective affiliates, on the other hand.  The parties hereto
acknowledge and agree that (i) the Transactions contemplated by the DIP Loan Documents
(including the exercise of rights and remedies hereunder and thereunder) are arm's-length
commercial transactions between the Lenders, on the one hand, and the Borrower and the
Guarantors, on the other hand, and (ii) in connection therewith and with the process leading
thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of the
Borrower, its stockholders or its affiliates with respect to the Transactions contemplated
hereby (or the exercise of rights or remedies with respect thereto) or the process leading
thereto (irrespective of whether any Lender has advised, is currently advising or will advise
the Borrower, its stockholders or its affiliates on other matters) or any other obligation to the
Borrower except the obligations expressly set forth in the DIP Loan Documents and (y) each
Lender is acting solely as principal and not as the agent or fiduciary of the Borrower, any
Guarantor, their respective management, stockholders, affiliates, creditors or any other
Person.  The Borrower and each Guarantor acknowledges and agrees that it has consulted its
own legal and financial advisors to the extent it deemed appropriate and that it is responsible
for making its own independent judgment with respect to such Transactions and the process
leading thereto.  The Borrower and each Guarantor agrees that it will not claim that any
Lender has rendered advisory services of any nature or respect or owes a fiduciary or similar
duty to the Borrower or such Guarantor, in connection with such Transaction or the process
leading thereto.

Section 11.17.    Registrations with International Registry¶Subject to Section
5.02(g), upon the Tranche A Closing Date, each of the parties hereto consents to the
registrations with the International Registry of the International Interests constituted by the
Engine Mortgage, and (ii) covenants and agrees that it will take all such action reasonably
requested by the Borrower or Administrative Agent in order to make any registrations with
the International Registry, including without limitation establishing a valid and existing
account with the International Registry and appointing an Administrator and/or a
Professional User reasonably acceptable to the Administrative Agent to make registrations
with respect to the Mortgaged Collateral and providing consents to any registration as may
be contemplated by the DIP Loan Documents.

Section 11.18.    Currency Indemnity¶ The payment obligations of any party to a
DIP Loan Document (the "payor") expressed to be payable thereunder in one currency (the
"first currency") shall not be discharged by an amount paid in another currency, whether

#93334561v28

pursuant to a judgment or otherwise, to the extent that the amount so paid on prompt conversion to the first currency under normal banking procedures would not yield the full amount of the first currency due thereunder, and the payor shall indemnify the recipient of such payment (the "payee") against any such shortfall; and in the event that any payment by the payor, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of the first currency, the payee shall have a separate cause of action against the payor for the additional amount necessary to yield the amount due and owing to the payee.  If it is necessary to determine for any reason other than that referred to above the equivalent in the first currency of a sum denominated in the second currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with the second currency on the Business Day on which such determination is to be made (or, if such day is not a Business Day, on the next preceding Business Day).

Section 11.19. <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>¶

(a)     Notwithstanding anything to the contrary in any DIP Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(ii)     the effects of any Bail-in Action on any such liability, including, if applicable:

1)     a reduction in full or in part or cancellation of any such liability;

2)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other DIP Loan Document; or

3)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 11.20.     <u>Certain ERISA Matters</u>¶

(a)     Each DIP Lender (x) represents and warrants, as of the date such Person became a DIP Lender party hereto, to, and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a DIP Lender party hereto, for the benefit of,

#93334561v28

the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Obligor, that at least one of the following is and will be true:

(i)      Such DIP Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more U.S. Benefit Plans with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments or this Agreement,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement,

(iii)    (A) such DIP Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such DIP Lender to enter into, participate in, administer and perform the DIP Loans, the DIP Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such DIP Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such DIP Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a DIP Lender or (2) a DIP Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such DIP Lender further (x) represents and warrants, as of the date such Person became a DIP Lender party hereto, to, and (y) covenants, from the date such Person became a DIP Lender party hereto to the date such Person ceases being a DIP Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Obligor, that the Administrative Agent is not a fiduciary with respect to the assets of such DIP Lender involved in such DIP Lender's entrance into, participation in, administration of and performance of the DIP Loans, the DIP Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any DIP Loan Document or any documents related hereto or thereto).

125

Section 11.21.    <u>Acknowledgement Regarding Any Supported QFCs</u>.¶To the extent that the DIP Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the DIP Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the DIP Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the DIP Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 11.20, the following terms have the following meanings:

"<u>BHC Act Affiliate</u>" of a party shall mean an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"<u>Covered Entity</u>" shall mean any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

#93334561v28

[Remainder of page intentionally left blank]

127

SCHEDULE 2.12(a) to DIP Loan Agreement

# EQUITY SUBSCRIPTION ELECTION[1]

Section 1. <u>Equity Subscription</u>.

(i).   With respect to any repayment or prepayment of the Tranche C Obligations on the
Maturity Date or otherwise (except to the extent of any prepayment conducted in
accordance with Section 2.13(a) of the DIP Loan Agreement), each of the Tranche C
Lenders may elect to subscribe and pay for New Shares.

(ii).   Each Tranche C Lender holding equity of LATAM (such Tranche C Lender, a "<u>Tranche
C Shareholder</u>") hereby agrees to:

   (a) not sell or transfer (but may pledge) any or all of such equity for the duration of
   the Chapter 11 Cases except (i) after the occurrence of an Event of Default or (ii)
   to a Tranche C Eligible Assignee, provided that, to the extent the Consummation
   Date would fall on or after December 15 of any year (and prior to January 1 of the
   following year), the Borrower will use commercially reasonable efforts to assist
   any lender that is a Tranche C Lender on the Closing Date in avoiding adverse tax
   impact, and in connection may agree to release such Tranche C Lender in whole
   or in part from the restriction contained in this clause (a) during such time period;
   and

   (b) participate in the Shareholders' Meeting (as defined below) and, in its capacity as
   shareholder, provided the Chapter 11 Plan is a Company Approved
   Reorganization Plan, to:

      1) take all necessary corporate action under Chilean law to effectuate the
      Chapter 11 Plan,

      2) approve the requisite capital increase, including the amount of the capital
      increase and the number of New Shares to be authorized and issued
      (which shall be an amount sufficient to effectuate in full the Equity
      Subscription), and the subscription mechanics after the expiration of the
      Rights Offering, to effectuate the Equity Subscription and the Chapter 11
      Plan,

      3) grant a 180-day term delegation for the pricing of the New Shares to the
      board of LATAM which shall be consistent with the Chapter 11 Plan and
      the DIP Loan Agreement, and

      4) waive in full such Tranche C Shareholder's preemptive rights in the
      Rights Offering (as defined below) not later than the last day of the Rights
      Offering and permit the board of LATAM to place New Shares that
      remain unsubscribed following the expiration of Rights Offering to
      effectuate the Equity Subscription (as described in Section 16 below).

The obligations in the foregoing clauses (a) and (b) will be an independent obligation of
each Tranche C Shareholder and shall survive any assignment by (or participation of) a
Tranche C Shareholder of its portion of the DIP Loans. Tranche C Shareholders shall be

---

[1] Unless otherwise defined herein and unless context otherwise requires, capitalized terms used herein shall have the
meaning as provided in the DIP Loan Agreement. Timeline herein subject to change and based on reasonable
estimates.

entitled to advocate alongside LATAM in support of any Chapter 11 Plan valuation proposed by LATAM. No Tranche C Lender shall be bound in its capacity as shareholder by any prior actions taken under clause (b) with respect to a Company Approved Reorganization Plan in the event a Company Approved Reorganization Plan is not confirmed pursuant to an order of the Bankruptcy Court.

(iii).    A mirror support agreement between LATAM and certain additional shareholders, including Delta Air Lines Inc. (together, the "Additional Shareholders"), will be entered into prior to the initial disbursement under the DIP Loan Documents and will replicate the foregoing obligations with respect to such Additional Shareholders. Collectively, the Additional Shareholders and the Tranche C Shareholders shall hold shares representing at least a majority of LATAM's outstanding shares.

(iv).    Any Tranche C Lender electing to subscribe for New Shares shall not sell or transfer (but may pledge) such New Shares for fifteen (15) months after the Effective Date (the "Lock-up Period"). After the Lock-up Period, each Tranche C Lender shall be permitted to sell or transfer any New Shares to which it subscribed, provided that for each of the first three (3) quarters after the Lock-up Period, sales or transfers during any quarter shall be limited (the "Sale Limitation") to 1/3 of the amount of the New Shares held by the Tranche C Lender on the Effective Date, except to the extent consented to by LATAM, such consent not to be unreasonably withheld, conditioned or delayed.

(v).    The DIP Loan Agreement, including the provisions set forth in this Schedule 2.12(a), shall be duly approved by a unanimous vote of the board members of LATAM that do not have an interest in the transaction.

Section 2. Plan Term Sheet Preparation; Discussions with UCC and other Creditor Constituencies.

(i)    Prior to the delivery of the Valuation Materials and Plan Term Sheet (each, as defined below), LATAM will commence discussions with the UCC, any *ad hoc* committees, Tranche C Lenders and other creditor constituencies regarding a potential term sheet containing a summary of certain terms and conditions of the Chapter 11 Plan that is a Company Approved Reorganization Plan, including the proposed treatment of all impaired creditors under such Plan (the "Plan Term Sheet") and the valuation of reorganized LATAM. The Tranche C Lenders shall be kept apprised of all such discussions.

(ii)    LATAM will also make a preliminary determination on exit liquidity needs, and potential method of raising necessary liquidity.

Section 3. Delivery of Initial Valuation Materials, Plan Term Sheet.

At least 75 days prior to the proposed filing date ("Plan Filing Date") of the disclosure statement with respect to the Chapter 11 Plan that is a Company Approved Reorganization Plan (the "Disclosure Statement") and the Chapter 11 Plan that is a Company Approved Reorganization Plan with the Bankruptcy Court for approval for solicitation, LATAM will provide the Tranche

2

C Lenders an initial plan valuation (the "Initial Plan Valuation"), including numerical values and backup ("Initial Valuation Materials"), and the Plan Term Sheet (together with the Initial Valuation Materials, the "Initial Materials").

Section 4. Initial Indication of Equity Subscription Election.

No more than 14 days after receipt of Initial Materials, Tranche C Lenders will provide non-binding initial indication of Equity Subscription Election ("Initial Subscription Indication").

Section 5. Adjustment of Estimation of Exit Liquidity Needs.

Depending on the Initial Subscription Indication, LATAM will make adjustments to its exit liquidity needs, in connection with discussions with the creditor constituencies (including the UCC) and other stakeholders.

Section 6. Delivery of Final Valuation Materials; Equity Subscription Election.

(i). No more than twenty (20) days and no less than ten (10) days prior to the Plan Filing Date, LATAM will deliver updated valuation materials and additional Chapter 11 Plan materials, including the Disclosure Statement, and material exhibits to the Chapter 11 Plan, including precedent transactions, public equity multiples and discounted cash flows ("Final Valuation Materials") to the Tranche C Lenders.

(ii). Three (3) days after receipt of the Final Valuation Materials, the Tranche C Lenders shall deliver notice (the "Election Subscription Notice") to LATAM of their election to receive (a) cash to subscribe the New Shares under the Equity Subscription pursuant to the Equity Subscription Election or (b) cash pursuant to a repayment in cash only, upon the Plan Effective Date, which notice, once provided shall be irrevocable unless there is a "Material Valuation Change" or a "Material Plan Change" (each, as defined below).

(iii). Provided there has been no (x) Material Valuation Change (as defined below) or (y) any material change to the Chapter 11 Plan, the Disclosure Statement, the material exhibits to the Chapter 11 Plan and Disclosure Statements and the Final Valuation Materials (collectively, the "Plan Materials") that would require re-solicitation once the Plan Solicitation (as defined below) has commenced (any such material change, a "Material Plan Change"), LATAM's obligations under the DIP Loan Agreement regarding the delivery of satisfactory information to the Tranche C Lenders in order for them to make an election decision shall be satisfied upon delivery of such information.

(iv). Depending upon the aggregate amount of Tranche C Commitment, if Tranche C Lenders holding a certain percentage or more of the Tranche C Loans elect to receive cash to subscribe the New Shares under the Equity Subscription, then all Tranche C Lenders shall be deemed to have elected to receive cash to subscribe the New Shares under the Equity Subscription on the same terms as following:

| Tranche C Commitment | Percentage Election |
|---|---|
| ≤$900,000,000 | 75% |

| > \$900,000,000 and ≤\$1,150,000,000 | 75% |
|---|---|

(v).    "<u>Final Plan Valuation</u>" shall mean the reorganized equity valuation proposed by the Company in accordance with the DIP Loan Agreement and this Schedule 2.12(a) in connection with the Chapter 11 Plan prior to any objections thereto in the Chapter 11 Cases.

(vi).    "<u>Material Valuation Change</u>" shall mean any change to the reorganized equity valuation that results in a difference (in either an increase or a decrease) of 10% or more from the Final Plan Valuation.  LATAM shall provide prompt notice of any Material Valuation Change or any Material Plan Change, and each Tranche C Lender shall have (three) 3 Business Days[2] to modify its election after receipt of such notice.

Section 7. <u>First Board Meeting; Shareholders' Meeting</u>.

(i).    Following the delivery of the Election Subscription Notice, the board of directors of LATAM shall hold a meeting (the "<u>First Board Meeting</u>") to (a) approve the Chapter 11 Plan, Disclosure Statement and Final Valuation Materials and (b) summon the Shareholders' Meeting (as defined below).

(ii).    No later than twenty (20) days after the First Board Meeting, the shareholders of LATAM shall hold a meeting (the "<u>Shareholders' Meeting</u>") to take all necessary corporate action under Chilean law to effectuate a Chapter 11 Plan that is a Company Approved Reorganization Plan, including to approve the capital increase payable in cash for the amount of newly issued shares of LATAM required to satisfy (a) the Tranche C Lenders' elections to effectuate the Equity Subscription, (b) the Subscription Contingent Interest, (c) any additional amounts necessary for Chapter 11 Plan purposes and (d) cushion (the "<u>Share Increase</u>"), each of which shall be conditioned on the entry of an order of the Bankruptcy Court confirming a Company Approved Reorganization Plan. Affirmative vote of a majority of LATAM shareholders in attendance at the Shareholders' Meeting is required for such approval.

(iii).    The "<u>Subscription Contingent Interest</u>" payable to Tranche C Lenders pursuant to the Equity Subscription Election equals an amount of additional interest that would equate to the greater of (y) 47.0588235294118% and (z) an amount of interest that would correspond to the discount to Final Plan Valuation percentage provided to any other parties in any other equity issuance.

Section 8. <u>Commencement of New Shares Registration</u>.

Upon approval of the Share Increase by the Shareholders' Meeting, LATAM shall commence the process for registering the New Shares with the Chilean regulatory authorities (the "<u>New Shares Registration</u>"), which process is expected to require at least fifty (50) days and will run

---

[2] For the avoidance of doubt, this date is provided merely for illustrative purposes, does not reflect the input of all relevant creditor constituencies and other stakeholders, and remains subject to change. Failure to comply with this date shall in no event constitute an Event of Default.

concurrently with the Disclosure Statement and Plan Solicitation (as defined below) approval process.

Section 9. <u>Filing of Plan and Disclosure Statement</u>.

No later than 20 days after the delivery of the Equity Subscription Notice and in any event no more than 75 days after delivery of the Initial Valuation Materials, LATAM will file a Chapter 11 Plan that is a Company Approved Reorganization Plan and Disclosure Statement with the Bankruptcy Court for approval (the date of such filing, the "<u>Plan Filing Date</u>").

Section 10. <u>Disclosure Statement Hearing and Approval</u>.

(i).    Approximately [45][3] days after the Plan Filing Date the Bankruptcy Court will hold the Disclosure Statement hearing.

(ii).    At the conclusion of the Disclosure Statement hearing, the Bankruptcy Court will enter an order approving the Disclosure Statement (assuming the Bankruptcy Court finds that the Disclosure Statement meets the requirements under the Bankruptcy Code).

Section 11. <u>Commencement of Plan Solicitation</u>.

(i).    Approximately [15][4] days after the Disclosure Statement hearing, the Debtors will commence solicitation of the Chapter 11 Plan (the "<u>Plan Solicitation</u>").

(ii).    The Plan Solicitation period will last approximately [45 to 75][5] days.

Section 12. <u>Plan Confirmation Hearing</u>.

Approximately [45 to 75][6] days after the Plan Solicitation, the Chapter 11 Plan confirmation hearing will be held. The Rights Offering (as defined below) will be a condition subsequent to the Effective Date of the Chapter 11 Plan.

Section 13. <u>Chapter 11 Plan Confirmation</u>.

(i).    Upon the conclusion of the Chapter 11 Plan confirmation hearing, the Bankruptcy Court will enter an order (the "<u>Plan Confirmation Order</u>") approving the Chapter 11 Plan

---

[3] For the avoidance of doubt, this date is provided merely for illustrative purposes, does not reflect the input of all relevant creditor constituencies and other stakeholders, and remains subject to change. Failure to comply with this date shall in no event constitute an Event of Default.

[4] For the avoidance of doubt, this date is provided merely for illustrative purposes, does not reflect the input of all relevant creditor constituencies and other stakeholders, and remains subject to change. Failure to comply with this date shall in no event constitute an Event of Default.

[5] For the avoidance of doubt, this date is provided merely for illustrative purposes, does not reflect the input of all relevant creditor constituencies and other stakeholders, and remains subject to change. Failure to comply with this date shall in no event constitute an Event of Default.

[6] For the avoidance of doubt, this date is provided merely for illustrative purposes, does not reflect the input of all relevant creditor constituencies and other stakeholders, and remains subject to change. Failure to comply with this date shall in no event constitute an Event of Default.

(assuming it finds the Chapter 11 Plan meets the requirements under the Bankruptcy Code).

(ii).    Plan Confirmation Order is subject to a 14-day appeal period.

Section 14. Completion of New Shares Registration.

(i).    Before the share price is approved, LATAM will complete the New Shares Registration.

Section 15. Second Board Meeting for Pricing of New Shares.

(i).    Promptly after the completion of the New Shares Registration and the entry of the Plan Confirmation Order, and within 180 days of the Shareholders' Meeting, the board of directors of LATAM shall hold a meeting (the "Second Board Meeting") to set the price of the New Shares to be issued under the Share Increase, which price shall be consistent with the Chapter 11 Plan.

(ii).    After the pricing of the New Shares is complete, LATAM shall inform the market about the New Shares price determination in accordance with Chilean law.

Section 16. Rights Offering.

(i).    As soon as practicable following completion of the New Shares Registration and the Second Board Meeting, LATAM will launch the preemptive rights offering in Chile (the "Rights Offering"). No later than the last day of the Rights Offering, the Tranche C Shareholders (including those LATAM stockholders who are party to the Support Agreement) shall waive in full their preemptive rights to subscribe for New Shares in the Rights Offering, which will allow LATAM to offer, upon the expiration of the Rights Offering, those unsubscribed shares to Tranche C Lenders that have made Equity Subscription Elections. The Rights Offering will remain open for 30 days and will be a condition to the effectiveness of the Chapter 11 Plan.

(ii).    Immediately after the expiration of the Rights Offering, the board of directors of LATAM shall place New Shares among the Tranche C Lenders who have made an Equity Subscription Election, and the Tranche C Lenders that have made an Equity Subscription Election shall have the right to purchase such unsubscribed New Shares at the same price offered in the Rights Offering in a number sufficient to effectuate in full their Equity Subscription. Any remaining unsubscribed New Shares after the effectuation of the Equity Subscription may be placed by the board of directors of LATAM in accordance with the Chapter 11 Plan, including purchase by the Tranche C Shareholders.

Section 17. Effective Date of the Chapter 11 Plan.

(i).    After other conditions to effectiveness are met, simultaneously with the closing of the Equity Subscriptions, on the Effective Date of the Chapter 11 Plan: the Debtors shall distribute cash in an amount sufficient to repay in full all Tranche C Obligations (including the Subscription Contingent Interest), to the Tranche C Lenders that have

6

made an Equity Subscription Election, which lenders shall immediately subscribe and pay for the New Shares distributable pursuant to their Equity Subscription Election.

**Annex 1:**
**Debtors' Capital Structure as of the Petition Date**

| Debt Structure (US$ Mn) | LATAM | The Debtors |
|---|---|---|
| Revolving Credit Facility | 600 | 600 |
| Local Unsecured Bank Loans | 416 | 215 |
| Unsecured International Bonds | 1,500 | 1,500 |
| Chilean Unsecured Bonds | 491 | 491 |
| Fleet Financing | 4,423 | 4,168 |
| Pre-Delivery Payments Facility | 139 | 139 |
| **Total** | **7,570** | **7,113** |