**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                  :
In re                                             :        Chapter 11
                                                  :
LATAM Airlines Group S.A., *et al.*, :                    Case No. 20-11254 (JLG)
                                                  :
Debtors.[1]                                       :        (Jointly Administered)
                                                  :
-----------------------------------------------------------------x

## MEMORANDUM DECISION ON DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING AND (B) GRANT SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (II) GRANTING RELATED RELIEF

<u>**APPEARANCES**</u>:

CLEARY GOTTLIEB STEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
By:     Lisa M. Schweitzer, Esq.
        Jeffrey A. Rosenthal, Esq.
        Andrew Weaver, Esq.
        Thomas S. Kessler, Esq.
        Luke A. Barefoot, Esq.
        Lina Bensman, Esq.

*Attorneys for the Debtors*

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
By:     Marshall S. Huebner, Esq.
        Lara Samet Buchwald, Esq.

*Attorneys for Delta Airlines, Inc.*


DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
By:     Allan S. Brilliant, Esq.
        Craig P. Druehl, Esq.
        Gary J. Mennitt, Esq.

2929 Arch Street
Philadelphia, PA 19104
By:     Michael S. Doluisio, Esq.

*Attorneys for the Official Creditors' Committee*


QUINN EMANUEL URQUHART &
    SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:     Susheel Kirpalani, Esq.
        Victor Noskov, Esq.

*Attorneys for Knighthead Capital Management*


WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
By:     John K. Cunningham, Esq.
        Gregory M. Starner, Esq.
        Joshua Weedman, Esq.
        - and -
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:     Richard S. Kebrdle, Esq. (admitted pro hac vice)

*Attorneys for the Ad Hoc Group of LATAM Bondholders*

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
By:    Daniel P. Goldberg, Esq.
        Scott Danner, Esq.

*Attorneys for the Ad Hoc Group of LATAM Bondholders*


WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
By:    Kimberly A. Havlin, Esq.
        - and -
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
By:    Thomas Lauria, Esq. (admitted pro hac vice)

*Attorneys for the Oaktree Capital Management*


ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
By:    Raniero D'Aversa, Jr. Esq.
        Evan C. Hollander, Esq.

*Attorneys for Scotiabank Chile*


ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, New York 10016
By:    Gerard S. Catalanello, Esq.

*Attorneys for Qatar Airways Investments (UK) Ltd.*


BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, DE 19801
By:    Leslie C. Heilman, Esq.
        Laurel D. Roglen, Esq.
        - and -

1735 Market Street, 51st Floor
Philadelphia, PA, 19103-7599
By:    Lindsey Zionts, Esq.

*Attorneys for Aero Miami I, LLC*


PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
By:    Pedro A. Jimenez, Esq.

*Attorneys to Banco del Estado de Chile, in its capacity as indenture trustee under the Chilean*
*Local Bonds Series A through E issued by LATAM Airlines Group S.A.*


WONG FLEMING, P.C.
821 Alexander Road, Suite 200
Princeton, NJ 08540
By:    Dafney Dubuisson Stokes

*Attorneys for Zendesk, Inc.*


OFFICE OF THE UNITED STATES TRUSTEE
201 Varick Street, Suite 1006
New York, New York 10014
By:    Brian S. Masumoto, Esq.

*Office of the United States Trustee*

**HONORABLE JAMES L. GARRITY, JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

## INTRODUCTION

The Debtors collectively are Latin America's leading airline group.  The impact of the COVID-19 pandemic on their business was immediate and devastating.  In a matter of weeks they suffered the loss of 95% of their passenger business in the wake of COVID-related restrictions on flying throughout Latin America.  They commenced their Chapter 11 cases in late May.  The matter before the Court are the Debtors' Motions for approval of a $2.45 billion DIP Credit Agreement provided by Oaktree Capital Management Inc. ("Oaktree"), as Tranche A Lender,[2] and Qatar Airways Investments (U.K.) Ltd and Costa Verde Aeronautica S.A., as Tranche C Lenders.  Oaktree had no relationship with the Debtors prior to signing onto the Tranche A Loan.  Its involvement in this matter is non-controversial.  It has agreed to make a $1.3 billion senior secured loan as part of the proposed DIP Facility.  The Tranche C Lenders are two of the Debtors' largest shareholders.  Together they hold approximately 21% of the Debtors' common stock.  When the holdings of their affiliates are accounted for, they hold over 32% of the stock.  The Tranche C loan is a $900 million first loss, undercollateralized junior loan.

The Committee, the Ad Hoc Group of bondholders, and Knighthead (all as those terms are defined below) object to the Tranche C DIP Facility.  In substance, they assert that the shareholders are getting a "sweet" deal because they are the Debtors' largest shareholders and that the Court should deny the motion on the grounds that the Debtors have not demonstrated the "entire fairness" of the Tranche C "insider" loan.  They say that the loan is overpriced and that it is not the product of good faith, arm's length negotiations.  Part of their concern is that the

---

[2]    Capitalized terms used but not defined in this Introduction are defined in later sections of this decision.

Tranche C DIP Facility provides the Debtors – at their option – with the right to compel the Tranche C Lenders to subscribe to restricted equity in the reorganized Debtor at a 20% discount to plan value.  The Debtors say that this Modified Equity Subscription Election (as defined below) is a valuable asset for them, especially if they do not have the cash to pay off the Tranche C DIP Facility at the end of the case.  The Objectors (defined below) contend that the election is really a means for the Debtors' major shareholders to ensure that they will retain their equity interests in the reorganized Debtors at the potential expense of unsecured creditors.  They also assert, in any event, that the Court should reject the DIP Credit Agreement as running afoul of the absolute priority rule and the bar to "sub rosa" plans.

In late July, the Court conducted a two-day evidentiary hearing on the Motions.  In early August, the Court heard argument on the motion.  For the reasons set forth herein, the Court finds that the Debtors have met their burden of proving that the DIP Financing satisfies the "entire fairness" test and that there are grounds under section 364(c) to authorize the Debtors to enter into the DIP Credit Agreement.  Further, they have demonstrated that the Tranche A and Tranche C Lenders are entitled to a "good faith" finding under section 364(e) of the Bankruptcy Code.  However, the Court finds that Modified Equity Subscription Election gives rise to improper sub rosa plan treatment of the Tranche C Lenders and the Debtors' equity holders.  For that reason, the Court will not approve the DIP Financing.

## **JURISDICTION**

This Court has jurisdiction to consider this matter pursuant to sections 1334(a) and 157(a) of title 28 of the United States Code, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

# FACTS

## Background

LATAM Airlines Group, S.A. ("LATAM Parent" or the "Company") is a publicly traded company in Chile. *See* Trial Ex. 141 (First Alfonsín Decl.) ¶¶ 5, 14.[3]  On May 26, 2020 (the "Initial Petition Date"), LATAM Parent and certain of its affiliates (the "Initial Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code in this Court (the "Initial Chapter 11 Cases").  On July 7, 2020 and July 9, 2020 (as applicable to each Subsequent Debtor, the "Subsequent Petition Date" and, together with the Initial Petition Date, as applicable to each Debtor, the "Petition Date"), additional LATAM affiliates (the "Subsequent Debtors" and with the Initial Debtors, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Subsequent Chapter 11 Cases" and together with the Initial Chapter 11 Cases, the "Chapter 11 Cases").[4]  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[5]  On June 5, 2020, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "Committee").  No trustee or examiner has been appointed in these Chapter 11 Cases.

---

[3]    *See* Trial Ex. 141 (Declaration of Ramiro Alfonsin Balza In Support of First Day Motions and Applications in Compliance With Local Rule 1007-2 [ECF No. 3], the "First Alfonsin Declaration").

[4]    All of the Debtors are direct or indirect subsidiaries of LATAM Parent.  *See* Trial Ex. 267 (Second Declaration of Ramiro Alfonsin Balza In Support of the Subsequent Chapter 11 Cases [ECF No. 483], the "Second Alfonsin Declaration"), Schedule 1.

[5]    The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and the Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases [ECF No. 34] entered by the Court in each of the Chapter 11 Cases.  *See also* Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases [ECF No. 511].

LATAM[6] is primarily involved in the air transportation of passengers and cargo.  *See*

Trial Ex. 141 (First Alfonsín  Decl.) ¶ 5.  It is Latin America's leading airline group, with a

history extending back ninety years, and boasting one of the largest route networks in the world.

*Id.* ¶ 2.  It is the largest passenger airline carrier group in South America, and, measured by

passengers carried, it is the fourteenth-largest airline group in the world.  *Id.* ¶¶ 2, 5.[7]  Prior to

flight disruptions occasioned by the COVID-19 pandemic, LATAM had a total fleet of 340

aircraft (comprised of aircraft operated by LATAM and aircraft that are leased to third parties),

and offered passenger transportation services to 145 different destinations in twenty-six

countries, including domestic flights in Argentina, Brazil, Chile, Colombia, Ecuador and Perú

and international services within Latin America as well as to the United States, Europe, the

Caribbean, Oceania, Asia and Africa.  *Id.* ¶¶ 3, 16-17.[8]

---

[6]    LATAM Parent, and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as
"LATAM."

[7]    Latin America is comprised of a diverse set of countries with separate aeronautical regulators, route rights,
employment legislation, corporate legislation and tax regulation.  LATAM is a group of airlines with different Air
Operator Certificates operating under the unified brand "LATAM."  Trial Ex. 141 (First Alfonsin Decl.) ¶ 4.  Under
this structure, LATAM has access to six domestic markets and flies from South America to five continents.  *Id.*

[8]    The Debtors also have sought and obtained relief in certain non-U.S. jurisdictions.  In particular:

> On May 27, 2020, the Grand Court of the Cayman Islands granted the applications of certain of
> the Debtors for the appointment of provisional liquidators pursuant to section 104(3) of the
> Companies Law (2020 Revision).

> On June 4, 2020, the 2nd Civil Court of Santiago, Chile issued an order recognizing the Chapter
> 11 proceeding with respect to the LATAM Airlines Group S.A., Lan Cargo S.A., Fast Air
> Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Transporte
> Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A. and Technical Training LATAM S.A.

> On June 15, 2020, the Superintendence of Companies of Colombia granted the recognition to the
> Chapter 11 proceedings.

*See* Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B)
Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 397] (the
"First DIP Motion").

**Prepetition Capital Structure**

The Debtors' capital structure includes a secured revolving credit facility, a series of local unsecured bank loans, series of unsecured international bonds,[9] series of domestic Chilean bonds,[10] and a series of financings related to the acquisition of the Debtors' fleet.  *See id.* ¶¶ 42, 51-56; Trial Ex. 267 (Second Alfonsín Decl.) ¶¶ 12-21.  As of the Petition Date, LATAM had a total of $7,637 million in financial debt obligations.  *See* Trial Ex. 267 (Second Alfonsín Decl.) ¶ 12.  In addition, as of the Petition Date, the Debtors had letters of credit outstanding of approximately $562 million.  *See* Trial Ex. 141 (First Alfonsín Decl.) ¶ 57; Trial Ex. 267 (Second Alfonsín Decl.) ¶ 21.

**Equity Structure**

The Cueto family is the Company's largest shareholder.  It beneficially owns 21.46% of the common shares through a series of companies (collectively, the "Cueto Group").  *See* Trial Ex. 141 (First Alfonsín Decl.) ¶ 58.  Additionally, the Cueto Group, through entities it controls, is party to a shareholder agreement (the "Cueto-Amaro Agreement") with TEP Chile S.A (the "Amaro Shareholder"), an entity controlled by the Amaro family, which holds just under 2% of the shares of LATAM Parent.  Pursuant to the Cueto-Amaro Agreement, the Cueto Group and

---

[9]    The Debtors identify those bonds as the "LATAM 2024 Bonds" and the "LATAM 2026 Bonds."  Pursuant to the indenture dated April 11, 2017, by and among Debtor LATAM Finance Limited ("LATAM Finance") as issuer, LATAM Parent as guarantor and the Bank of New York Mellon Corporation ("BNYM") as Trustee, Registrar Transfer Agent and Paying Agent, LATAM Finance sold 6.875% senior, unsecured notes due April 2024 in principal amount of $700 million (the "LATAM 2024 Bonds").  Pursuant to the indenture dated February 11, 2019, by and among Debtor LATAM Finance as issuer, LATAM Parent as guarantor and BNYM as Trustee Registrar, Transfer Agent and Paying Agent, LATAM Finance sold 7% senior, unsecured notes due March 2026 in the principal amount of $800 million (the "LATAM 2026 Bonds").  *See* Trial Ex. 141 (First Alfonsin Decl.) ¶¶ 47-48.

[10]    On August 17, 2017, LATAM Parent, as issuer, sold Chilean bonds on the Santiago Stock Exchange in an aggregate principal amount of approximately $311.5 million (the "Local Bonds").  The Local Bonds originally consisted of four series (the "Series A Local Bonds", the "Series B Local Bonds", the "Series C Local Bonds", and the "Series D Local Bonds").  On July 6, 2019, LATAM Parent issued an additional series of the Local Bonds (the "Series E Local Bonds") for an aggregate principal amount of approximately $179.0 million.  The Local Bonds are Chilean law-governed.  *Id.* ¶ 49.

the Amaro Shareholder have agreed to "vote together to elect individuals to our board of directors" and collaborate to reach joint agreement on "all actions to be taken by our board of directors or [at a] shareholders' meeting", including any decisions of the company requiring a super-majority vote under Chilean law.[11]  Costa Verde Aeronáutica S.A. ("Costa Verde") is part of the Cueto Group.  It owns 11.19% of LATAM Parent.  *See* Corporate Ownership Statement at 8.[12]  Juan José Cueto, is Chairman of Costa Verde.[13]  Until on or about April 1, 2020, he was also a member of the Company's nine-member board of directors (the "Board").  *See* LATAM 6-K (Apr. 2, 2020).  Until March 31, 2020, Enrique Cueto served as CEO of LATAM and its predecessors for the last 25 years.  *See* Annual Rpt. at 71.  He replaced Juan Cueto on the Board. He and Ignacio Cueto serve respectively as the Chairman and Vice Chairman of the Board.  *See* Trial Ex. 141 (First Alfonsín  Decl.) ¶ 58.[14]  The Cueto Group is entitled to designate three of the nine members of the Board.  *See* Annual Rpt. at 78.  The group's current board representatives are Chairman Ignacio Cueto, Vice-Chairman and former CEO Enrique Cueto, and Henri Philippe Reichstul.[15]

Delta Airlines, Inc. ("Delta") is LATAM Parent's second largest shareholder.  *See* Trial Ex. 141 (First Alfonsín  Decl.) ¶ 59.  It holds approximately 19.99% of LATAM Parent's

---

[11]    *See* LATAM Airlines S.A., Amendment No. 6 to Form F-4 (Form F-4) at H-i (May 7, 2012).

[12]    *See* Corporate Ownership Statement Pursuant to Federal Rules of Bankruptcy Procedure 1007 and 1007.1 [ECF No. 1] (the "Corporate Ownership Statement").

[13]  *See* LATAM Airlines Group S.A., Annual Report (Form 20-F) at 72 (March 18, 2020) (the "Annual Report").

[14]    Currently, the members of the Board are: (i) Ignacio Cueto, Chairman; (ii) Enrique Cueto, Vice Chairman; (iii) Giles Agutter; (iv) Nicolás Eblen; (v) Patrick Horn; (vi) Eduardo Novoa; (vii) Enrique Ostalé; (viii) Henri Philippe Reichstul; and (ix) Sonia Villalobos.  *See* Trial Ex. 141 (First Alfonsin Decl.) ¶ 34.

[15]    *See* Press Release: Shareholders Meeting (April 30, 2020), *available at*:  www.latamairlinesgroup.net/news-releases/news-release-details/shareholders-meeting-10.

common stock.  *Id.*; *see also* Delta Statement ¶ 6, Ex. 4.[16]  Delta obtained its equity stake

pursuant to a $1.9 billion tender offer, which closed in December of 2019.  *See* Trial Ex. 141

(First Alfonsín Decl.) ¶ 59.  That transaction was memorialized pursuant to a Framework

Agreement between the Company and Delta.  *Id.*  This agreement also contemplated certain

codeshare and joint venture agreements with LATAM Parent's subsidiaries.  *Id.*  In May of 2020,

Delta and LATAM signed a Trans-American Joint Venture Agreement that, pending regulatory

approvals, will combine the routes of the two airlines between North and South America.  *Id.*  In

November of 2019, Delta and LATAM entered into an Aircraft Purchase Agreement by which

Delta committed to purchase four A350 airplanes from LATAM.  That agreement was

terminated on May 25, 2020, the day before the Initial Chapter 11 Cases were filed.  *See id.* ¶ 41

n.20; *see also* 7/29/20 Hr'g Tr. at 103:12-106:12.  In exchange for termination of the Aircraft

Purchase Agreement, Delta agreed to pay LATAM $62 million and not to terminate the

Framework Agreement or JV Agreement (in the event that LATAM were to file for chapter 11),

provided that LATAM would assume the Delta Framework Agreement and JV Agreement (the

"Assumption Commitment") in the bankruptcy case, within certain timeframes.  *See id.*  *See also*

Jacobson Dep. Tr. at 96:3-6; 7/29/20 Hr'g Tr. at 103:12-106:12.[17]  Delta is entitled to designate

two members of the Board.  *See* Delta Statement ¶ 9.[18]

---

[16]    *See* Statement of Delta Air Lines, Inc. In Support of the Debtors' Motion for an Order (I) Authorizing the
Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense and (II) Granting
Related Relief [ECF No. 669] (the "Delta Statement"), Ex. 4 (Delta Air Lines, Inc., Schedule 13-D, dated Jan. 6,
2020 (describing tender offer that expired on December 26, 2019, and identifying Delta's holdings as 121,281,538
of 606,874,525 shares of LATAM Parent's common stock, or a 19.9984615% stake)).

[17]    As noted below, section 6.15 of the DIP Credit Agreement (as filed in the First DIP Motion) contained a "Delta
Covenant," which requires the entry of an order approving the assumption of the Delta Framework Agreement and
JV Agreement within 105 days of the Petition Date.  This timeframe was subsequently revised to November 7, 2020.
The failure to comply with this covenant constitutes an Event of Default under the Revised Credit Agreement (as
defined below).

[18]    *See also* Alfonsin Dep. Tr. at 46:10-23.

As of April 30, 2020, Chilean pension funds and Qatar Airways Investments (UK) Ltd.
("Qatar") held 15.26% and 10%, respectively, of LATAM Parent's common stock.  *See* Trial Ex.
141 (First Alfonsín Decl.) ¶¶ 60-61.[19]  Qatar is the Company's second largest corporate
shareholder and is permitted to nominate one director to LATAM Parent's Board.  *See* Annual
Rpt. at 78.[20]  The three remaining major shareholder groups are: (i) Andes SpA, Inversiones
Andres II SpA, Inversiones PIA SpA and Comercial las Vertientes SpA (collectively, the "Eblen
Group") (ii) Axxion S.A. and Inversiones HS SpA (the "Bethia Group") and (iii) the Amaro
Shareholder.  *See* Trial Ex. 141 (First Alfonsín Decl.) ¶ 61.  As of April 30, 2020, the Eblen and
Bethia Groups held 4.56% and 4.23% of the Company's common shares, respectively.  The
Amaro Shareholder held 1.98% of the shares.  *Id.*  As of April 30, 2020, there were over 1,000
record holders of the Company's common shares, representing the remaining 18.69% of the
equity interest.  *Id.* ¶ 62.

Patrick Horn ("Horn") and Eduardo Novoa Castellon ("Novoa") are two of the
independent members of the Board.  Horn is a member of the Economic Council of the
Universidad de los Andes with more than 35 years' experience as an executive.  Novoa serves on
the board of directors of several companies and was a professor of Finance and Economics at
Universidad de Chile and other universities.  They have served on the Board since April 2019
and April 2017, respectively.  Each was nominated by the Company's pension group.  *See*
7/29/20 Hr'g Tr. at 94:20-24.[21]  The Board has a standing Directors and Audit Committee (the

---

[19]    *See* Press Release: Shareholders Meeting (April 30, 2020), *available at*: www.latamairlinesgroup.net/news-
releases/news-release-details/shareholders-meeting-10.

[20]    That member is currently Mr. Giles Agutter.

[21]    *See* LATAM Airlines Group S.A., Registration Statement Pursuant to Section 12(b) or (g) of the Securities
Exchange act of 1934 (Form 20-F) at 72–73 (Mar. 18, 2020); Eduardo Novoa Castellón profile on LATAM:
http://www.latamairlinesgroup.net/board-member/eduardo-castellon; Patrick Horn profile on LATAM:
http://www.latamairlinesgroup.net/board-member/patrick-horn.  *See also* 7/29/20 Hr'g Tr. at 37:4-13.

"Directors Committee") whose purpose is, among other things, to examine related-party

transactions brought for Board approval.  Horn and Novoa (each an "Independent Director") sit

on that committee with Nicolas Eblen Hirmas.  Novoa is the Chairman of the committee.

## Company Operations

Over the past decade, LATAM has experienced increasing economic growth and

continued to expand its operations throughout the world.  *See* Trial Ex. 141 (First Alfonsín

Decl.) ¶ 25.  In 2019, LATAM employed approximately 42,000 people worldwide, in the

operation of its eight passenger and three cargo airline entities.[22]  It operated approximately

1,400 flights per day, transported seventy-four million passengers per year and 900,000 tons of

cargo per year.  *Id.* ¶¶ 2, 22.  It generated over $10 billion in revenues and over $1 billion of

operating cash flow after investments.  *Id.* ¶ 3.  Its success in 2019 added to a string of three

consecutive years of net profits and over $1 billion of operating cash flow after investments.  *Id.*

¶ 6.  While the majority of LATAM's revenues have traditionally come from its passenger airline

services, LATAM integrates its passenger network with exclusive cargo destinations to offer

cargo-related services to 151 destinations in twenty-nine countries.  *Id.*  Revenue from the

passenger business primarily consists of ticket sales, along with ancillary revenue associated

with, for example, passenger baggage fees, lounge passes and/or in-flight purchases.  *Id.* ¶ 24.

---

[22]    The Debtors include:

> Six of LATAM's eight main passenger airline entities: (i) LATAM Parent, (ii) Transporte Aéreo
> S.A.; (iii) LATAM Airlines Perú S.A.; (iv) LATAM-Airlines Ecuador S.A.; (v) Aerovías de
> Integración Regional, Aires S.A. (incorporated in Columbia), and (vi) TAM Linhas Aéreas S.A.
> (incorporated in Brazil).

> LATAM's three cargo airline entities: (i) Lan Cargo, a company incorporated in Chile, (ii) Línea
> Aérea Carguera de Colombia S.A., a company incorporated in Colombia, and (iii) Aerolinhas
> Brasileiras S.A., a cargo company incorporated in Brazil.

Passenger revenue comprised approximately 89% of LATAM's revenue in 2019, while cargo revenues accounted for approximately 11% of LATAM's revenue. *Id.*

At the beginning of 2020, LATAM viewed itself as financially and operationally one of the strongest airline groups in Latin America and poised to continue its upward trajectory, projecting growth in all of its passenger segments, as well as its cargo business. *See* Trial Ex. 141 (First Alfonsín Decl.) ¶ 64. However, the landscape changed on March 11, 2020, when the World Health Organization declared the widespread outbreak of the novel coronavirus a global pandemic. In the wake of that announcement, countries around the world, including each of those in which the Debtors have their primary operations, announced severe travel restrictions and/or outright closure of their borders. *Id.* ¶ 65. The International Air Transport Association estimated that by April 1, 2020, customers living in countries with severe travel restrictions accounted for 98% of global passenger revenue, and that two-thirds of the world's overall fleet (i.e., more than 8,500 passenger aircraft) had been grounded as a result. *Id.* Air travel generally declined 41% and 60% from levels in 2019 in March and April 2020, respectively. *Id.* Closer to home, LATAM's passenger operations were severely curtailed in the countries where it operates. *Id.* ¶ 66.[23] Beginning in late April of 2020, LATAM's passenger flights were limited to domestic

---

[23]    The Debtors explain that as of the Initial Petition Date:

> Argentina suspended air travel for seven months until September.
>
> Colombia restricted domestic flights for four months until the end of June, and restricted international flights for six months until the end of August.
>
> Perú had not provided a clear date for lifting the travel restrictions in place, involving both domestic and international travel.
>
> The U.S. government announced it would deny entry to non-citizens who had traveled to Brazil within fourteen days of seeking entry into the United States.
>
> Ecuador suspended flights for approximately three months until the beginning of June.

Trial Ex. 141 (First Alfonsin Decl.) ¶ 66.

flights in Chile and Brazil and international flights to Miami, which reflect only roughly 4% of

LATAM's routes prior to the COVID-19 crisis.  *See id.* ¶ 67.[24]

In substance, the Debtors say that in response to the near cessation of its passenger

service, they developed a business strategy that focused on preserving cash, promoting liquidity

and seeking new sources of financing in an effort to avoid bankruptcy, while simultaneously

assessing LATAM's financing needs in an in-court or out-of-court restructuring, and identifying

sources of such financing.

In an effort to reduce costs and preserve liquidity, LATAM (a) deferred or cancelled

approximately $900 million in investments, (b) worked to postpone delivery of new planes for its

fleet, and (c) implemented internal cost-cutting measures, including consensual salary reductions

of 50% through June for employees, while guaranteeing double the minimum wage in each

country.  *Id.* ¶ 70.  It also implemented a broad early retirement and unpaid leave program,

involving 1,800 employees, and has engaged in targeted reductions in its workforce.  *Id.*  By

April of 2020, in response to the precipitous decline in demand for air travel, LATAM reduced is

passenger capacity by 95%.  *Id.* ¶ 67; *see also* Trial Ex. 293 (Alfonsín  Suppl. Decl.) ¶ 5.[25]  In

May of 2020, LATAM laid off 1,850 of its employees.  *See* Trial Ex. 141 (First Alfonsín  Decl.)

¶ 70.  In the weeks prior to the Initial Petition Date, LATAM successfully negotiated payment

plans and payment deferrals with over 500 creditors and counterparties resulting in payment

deferrals and payment plans of approximately $500 million worth of payments throughout the

---

[24]    LATAM's cargo operations largely have been unaffected by the COVID-19 pandemic.  Indeed, cargo
operations have increased in recent months, including to provide much needed medical and other critical supplies to
areas affected by the pandemic.  *Id.* ¶ 69.

[25]    *See* Trial Ex. 293 (Supplemental Declaration of Ramiro Alfonsin Balza In Support of Debtors' Motion of an
Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative
Expense Claims and (II) Granting Related Relief [ECF No. 671], the "Alfonsin Supplemental Declaration").

first three quarters of this year.  *Id.* ¶ 71.[26]  While it was implementing the cost saving measures,

LATAM reached out to government representatives in Chile, Brazil, Peru and Columbia in an

effort to obtain financing or other governmental support similar to that received by other airlines

around the world.  *See* Trial Ex. 293 (Alfonsín  Suppl. Decl.) ¶ 6.  In doing so, it reasoned that it

was in the governments' interests to provide financial assistance given the importance of the

airline industry and LATAM's continued operations to the countries' economies, LATAM's

economic situation, and the urgent need of that support.  *See* Trial Ex. 242 (Alfonsín  DIP Decl.)

¶ 19.[27]  To date, those efforts have proved futile, as no governmental authority has offered to

provide financial assistance to LATAM.  *Id.*[28]

**The Company Retains Restructuring Advisors**
**And Explores Restructuring Alternatives**

In April of 2020, LATAM retained Cleary Gottlieb Steen & Hamilton, LLP ("Cleary

Gottlieb") as restructuring counsel and Evercore Group LLC ("Evercore"), an independent

investment banking advisory firm, to assist it in developing strategic in-court and out-of-court

---

[26]    Notwithstanding the implementation of those cost-savings and liquidity preserving measures, LATAM's liquidity position continued to deteriorate and, to preserve their assets, the Debtors filed the Chapter 11 Cases.  *See* Trial Ex. 141 (First Alfonsin Decl.) ¶ 73 (Debtors filed the cases "in order to, among other things, prevent the exercise of remedies against the Debtors' assets, including their fleet, that could otherwise result from the Debtors' inability to pay certain of their debts.").

     Partially as a result of the various liquidity preserving measures, as of the Initial Petition Date, the Debtors had $707 million in cash and cash equivalents, while LATAM as a whole had approximately $1.2 billion in cash and cash equivalents.  *See* Trial Ex. 141 (First Alfonsin Decl.) ¶ 42.

[27]    *See* Trial Ex. 242 (Declaration of Ramiro Alfonsin Balza In Support of Debtors' Motion For an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 399], the "Alfonsin DIP Declaration").

[28]    The Debtors contend that throughout those discussions, government authorities made it clear that they expected shareholders to be involved in any company financing or restructuring.  *See* Trial Ex. 293 (Alfonsin Suppl. Decl.) ¶ 6.  More specifically, Alfonsin explained that certain governments have indicated to LATAM that shareholders must support the Company and provide liquidity if any governmental assistance is to be granted.  *See* 7/29/20 Hr'g Tr. at 135:14-138:10.  However, Alfonsin also testified that he had not personally discussed LATAM's DIP financing with any particular government, nor did any particular government indicate that it would not support a DIP financing provided by non-shareholder, third-party lenders.  *See id.*

alternatives to address LATAM's "cash burn and deteriorating liquidity position." By mid-April of 2020, Ramiro Alfonsín Balza ("Alfonsín "), LATAM Parent's Chief Financial Officer, and his management team began working with Cleary Gottlieb and Evercore to analyze the funding requirements necessary for LATAM to accomplish its restructuring objectives – either in-court or out-of-court – and to maintain its operations and the available options to obtain such financing. *See* Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 7. In exploring the viability of an out-of-court restructuring, management reached out to the Company's lessors and vendors in an effort to renegotiate contracts, with the goal of improving the Company's liquidity position. *Id.* The enormity of that challenge was readily apparent to management as it would have to reach new or amended agreements with all the relevant counterparties in a compressed period of time. *Id.* In analyzing LATAM's financing requirements, Alfonsín and his team considered, among other things:

> The minimum liquidity needs of the Debtors, and also for the LATAM group as a whole, given that the strength of LATAM's business derives from its pan-Latin America operations and its ability to such services, originating from its Debtor and non-Debtor affiliates to its worldwide passenger and cargo customers;

> The fact that the company faces significant uncertainly about future revenues and cash flows until the COVID-19 pandemic allows it to return to its normal operations; and

> The company's need to ensure sufficient liquidity is available in order to take advantage of opportunities to increase its operations as restrictions ease and passenger travel increases.

*See* Trial Ex. 242 (Alfonsín DIP Decl.) ¶¶ 15-16.[29]

---

[29]   *See* Trial Ex. 243 (Declaration of Timothy R. Coleman In Support of Debtor's Motion For An Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 398], the "First Coleman Declaration").

**April 30 Board Meeting**

On April 30, 2020, after spending three weeks performing "extensive diligence and analysis to understand [the Company's] business model, liquidity position and go-forward optionality[,]" Evercore and Cleary Gottlieb made a presentation to the Board regarding the in-court and out-of-court restructuring alternatives available to the Company. *See* Trial Ex. 24 (April 30 Board Discussion Materials). In the materials, the advisors noted that the Company was contemplating two paths forward: an out-of-court consensual restructuring transaction ("C.1"), and a court - led process to right size the Company's balance sheet to meet the go-forward business plan ("C.2"). *Id.* at 5. They explained that the purpose of their presentation "was to provide an overview and comparison of C.1 and C.2 in the subsequent sections to address the Company's potential strategic pathways and the associated timing of each[.]" *Id.* The materials included an "Overview of U.S. Chapter 11 Process," and a specific discussion around an in-court Company restructuring. *See id.* at 12-14; 16-24. The discussion of the Chapter 11 Process included a "Debtor in Possession Financing Overview" in which the advisors identified "typical sources" of such financing to include prepetition lenders, third parties specializing in such financing and governmental entities. *Id.* at 14. In describing "Potential Alternatives" for Debtor-in-Possession financing, the advisors laid out a three-tier structure where "equity also may participate on a junior basis" and noting that repayment of the most junior tier indebtedness required "[f]lexibility to take different types of consideration" including "rights offering[s]" and "convertible debt." *Id.* at 17. They noted that among the "Considerations" for the Board in assessing the merits of a restructuring under chapter 11 was that it was "[l]ikely that existing equity will not have a material recovery," and that "[e]quity upside in the emerging company will require new capital." *Id.* at 18.

Directors Ignacio and Enrique Cueto attended the meeting, together with the directors designated by Delta, Qatar and the Eblen family. *See* Trial Ex. 26 (Minutes of the Extraordinary Board Meeting No. 154 of the LATAM Board of Directors, dated 4/30/2020), at 18-19. Representatives of Delta and Costa Verde obtained copies of the April 30 Board Discussion Materials. Paul Jacobson ("Jacobson") is Delta's Chief Financing Officer. According to Jacobson, Delta criticized the presentation because "[it] didn't seem to take into account other alternatives" and did not "qualify as good advice to LATAM." *See* Jacobson Dep. Tr. at 65:2-8. He says that "Delta made [that] known to LATAM." *Id.*

**The Company Retains PJT Partners**

PJT Partners LP ("PJT") is a global advisory-focused investment bank. The services it provides includes acting as advisor to companies, creditors and financial sponsors in restructurings and bankruptcies. Timothy R. Coleman ("Coleman") is a Partner and Global Chairman of the Restructurings and Special Situations Group at PJT. He has known Jacobson since 2004, when Coleman (not then with PJT) worked for Delta on its own restructuring. *Id.* at 64:18-25, 67:4-12, 110:9-18; *see also* Coleman Dep. Tr. at 26:8-20; 29:2-9. After discussing the situation with Coleman, Jacobson asked Coleman if PJT could represent Delta in the LATAM matter. *See* 7/29/20 Hr'g Tr. at 233:25-234:3. Coleman had to decline due to a conflict. Thereafter, Jacobson asked Coleman if PJT was able to represent LATAM. *See id.* at 234:4-11. *See also* Jacobson Dep. Tr. at 108:3-18-109:3. After Coleman cleared conflicts, Jacobson recommended PJT to LATAM. *See* 7/29/20 Hr'g Tr. at 234:19-22. Thereafter, LATAM, through Alfonsín , terminated Evercore, and retained Coleman and his team at PJT, effective May 7, 2020. *See* 7/29/20 Hr'g Tr. at 113:21-114:13; Trial Ex. 43 (Minutes of the Ordinary Session No. 454 of the LATAM Board of Directors, dated 5/12/2020), at 1 (noting that changing

Evercore was "mainly due to issues of coordination and agility in the consultancy").  *See also*

Jacobson Dep. Tr. at 108:24-109:3; Coleman Dep. Tr. at 29:2-9 (Coleman's first conversation

regarding the LATAM engagement was with Jacobson at Delta).

**The Company Determines That Bankruptcy Filing Is**
**Probable And Begins To Explore Sources For DIP Financing**

May 12 Board Meeting

PJT was introduced to the Board at the May 12 Board meeting.  PJT included the concept

of a shareholder funded DIP in the materials that it presented at the May 12 Board meeting.  *See*

Trial Ex. 39 (LATAM Board of Directors Discussion Materials, dated May 12, 2020, the "May

12 Presentation").  Those materials included a slide titled "Illustrative DIP Approach."  *Id.* at 8.

Among the "Considerations" noted by PJT in that slide were "Potential DIP sources, 3rd party

investors, government, existing shareholders."  *Id.*  The minutes of the meeting reflect that Brent

Herlihy of PJT addressed the Board on matters relating to DIP financing.  *See* Trial Ex. 43

(Minutes of the Ordinary Session No. 454 of the LATAM Board of Directors, dated 5/12/2020),

at 14.  Referring to the May 12 Presentation, Mr. Herlihy noted that "[w]ith regard to DIP

financing, it explains that the size must be determined, against what loans can be made, what the

sources are – potential third parties, shareholders, or governments or combinations of the three of

them – how it is properly structured if there are three types of collateral with different interests

and different approaches towards the exit . . ."  *Id.*

May 16 Meeting With Members of the Cueto Family

On May 16, 2020, PJT attended a meeting with members of the Cueto family and senior

executives at LATAM.  *See* Trial Ex. 46 (Meeting/Call invitation), at 1; *see also* Coleman Dep.

Tr. at 54:2-16.  For that meeting, PJT prepared and delivered a slide presentation titled:

"Illustrative Capital Structure Before, During and After Ch. 11." *See* Trial Ex. 47 (Coleman

Email to Alfonsín ), at 2-3.  The presentation illustrated how a $2 billion DIP financing "equally

split" into two tranches, one of which would be "equitized at plan value" at emergence, could

result in the existing equity holders, as lenders to that tranche, receiving either 60% or 100% of

the equity in the reorganized LATAM at emergence from chapter 11.  *See id.*; *see also* Coleman

Dep. Tr. at 63:6-23 (stating that purpose was to explain to the Cueto family that, depending on

plan valuation, either "they would have 60 percent of the equity" or they "could end up with a

hundred percent of the equity").  PJT shared the presentation with Alfonsín in advance.  *See* Trial

Ex. 47 (Coleman Email to Alfonsín ), at 1.

<u>May 19 Board Meeting</u>

By the time of the May 19 Board meeting, the Company and its advisors had developed a

three-tier DIP structure in which the first tranche (Tranche A) would be provided by commercial

banks and guaranteed by the Chilean government, the second tranche (Tranche B) would be

provided by shareholders, and the third tranche (Tranche C) would be provided by third-party

capital providers or financial institutions.  *See* Trial Ex. 54 (Extraordinary Board Meeting

Minutes No. 156, dated May 19, 2020), at -517; *see also* Trial Ex. 53 (External Advisors'

Discussion Materials Presentation, dated May 19, 2020), at -663 to -664.

**The Company Seeks Shareholder DIP Financing**

Despite the Company's best efforts, "LATAM's liquidity position continued to

deteriorate in the wake of the COVID-19 pandemic, necessitating the commencement of the

Chapter 11 Cases."  Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 11; *see also* Ex. 141 (First Alfonsín

Decl.) ¶¶ 70-71 (detailing measures taken to "protect the company, continue operations and meet

its commitments to its employees, customers, and other stakeholders").  Prior to the filing, the

Debtors forecasted they would fall below the minimum liquidity levels needed to run the business by August of 2020, and they were facing significant upcoming payment obligations at the end of May. *See* Trial Ex. 121 (LATAM Board of Directors Financial Update, dated 5/25/2020); Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 17. Given this time constraint, it soon became apparent that an out-of-court restructuring would be impractical. *See* Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 7. Together with PJT and FTI, the Debtors determined that at least $2.15 billion in funding was needed to successfully reorganize in light of the uncertainties surrounding their business in the face of the pandemic, the costs associated with resuming operations, and other factors. *See* Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 16.

In May of 2020, the Company and its advisors concluded that it was probable that LATAM would need to file for bankruptcy by the end of May. *See* Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 8. Although the Debtors were not expected to need access to DIP financing immediately upon the commencement of the Chapter 11 Cases, the Company believed that it was important for the Debtors to have at least some of that financing in place when they filed their cases in order to signal financial strength to the market generally, and specifically, to retain the confidence of their customers, employees, and vendors by showing that they would have the necessary working capital to continue operating as they explore their restructuring options. *See* Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 20. That was especially important because most of the Debtors' stakeholders and contractual counterparties likely were unfamiliar with the chapter 11 process. *Id.*

In developing the multi-tier DIP structure, the Company and its advisors believed that it was important to the success of an in-court restructuring that the Company obtain shareholder financing for the following reasons:

First, it would enhance the potential for governmental support (because governments with whom the Debtors were discussing potential financing made clear that shareholder financing was a condition to any government financing). *See, e.g.*, Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 6.[30]

Second, the Company considered looking to the capital markets for financing, but concluded that (i) it had no viable options to finance the amount of liquidity required to fund its restructuring, including the ability to right size its fleet, because it would not be able pledge enough collateral to fully secure $2 billion in new financing; and (ii) it was impractical to seek financing from the capital markets because it was important to keep the planned bankruptcy filing confidential, to avoid third parties from placing liens on or attempting to seize LATAM's property or trying to terminate contracts. *See* Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶¶ 7, 9.

Third, because the Company could not pledge assets to fully secure a $2 billion loan, a lender would need to lend based on an expectation the Debtors would successfully reorganize. The Company reasoned that a substantial shareholder would most likely be a candidate to make such a loan. *See id.* ¶ 7; *see also* Trial Ex. 243 (First Coleman Decl.) ¶ 15 ("The going-concern value of the company is particularly important here, given LATAM has limited hard collateral . . . without a junior tranche of financing, the likelihood of raising the full $2.15 billion in new funding appears low."); Trial Ex. 292 (Coleman Reply Decl.) ¶ 7.[31]

Fourth, the Company's financial advisors maintained that the provision of committed funding by shareholders "was an important signal to the market that the shareholders retained their confidence in the business." Trial Ex. 243 (First Coleman Decl.) ¶ 14. *See also* Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 9 ("The Debtors and their advisors thought it important to have fully committed funding when they filed "in order to signal strength to [their] passengers, vendors, lessors, lenders, and the market generally."). They believed that was especially important for the Company, which has many stakeholders and counterparties who are

---

[30]   *See also* Jacobson Dep. Tr. at 25:8–26:15 (Jacobson informed by LATAM "about obtaining some financial support from the government and that a – I wouldn't describe it as necessarily a prerequisite, but as a condition of support and at the request of the government, the shareholders would have to be invested prior to the government extending any financing. . . . Delta[] knows from its experience in dealing with other global partners that that is a very similar and common request."); Ho Dep. Tr. at  85:6–12 ("Q. Who told you that if the shareholders provide support for LATAM that the government would also provide support, how did you learn that? A. That was the initial information that we receive from LATAM at the very beginning when we were asked to consider this.").

[31]   *See* Trial Ex. 292 (Reply Declaration of Timothy Coleman in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 673], the "Coleman Reply Declaration").

unfamiliar with the U.S. bankruptcy process.  *See* Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 20.[32]

The Company viewed shareholder financing as a necessary lifeline in the uncertain COVID environment, not as a means for shareholders to protect their existing investments.  *See* Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 9.  The shareholders likewise recognized LATAM's urgent liquidity needs and their ability to support their partner in the industry.  *See* Jacobson Dep. Tr. at 36:8–22 ("LATAM is a very important partner of ours, if not a new partner, and there were many considerations that we were undertaking at that time . . . .  [Y]es, we were seriously considering . . . how Delta could support LATAM."); *see also id.* at 33:15-16 ("Upon diligence, we quickly came to the conclusion that more was better for [LATAM].").

After identifying the shareholders as a potential source of DIP financing, the Company reached out to representatives of Delta, Costa Verde and Qatar, and began negotiating the terms of a shareholder DIP financing tranche.  After confirming their willingness to provide DIP financing, Costa Verde and Qatar did not involve themselves in the negotiations with LATAM on the terms of the (now named) Tranche C DIP Facility (defined below).  Costa Verde was clear to the Company that it would refrain from direct negotiations with the Company and would join in whatever agreement was made between the Company and Qatar.  *See* Trial Ex. 72 (Extraordinary Board Meeting Minutes, dated May 22, 2020), at -634; Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 10 (stating that he had no discussions with Costa Verde or the Cueto Group concerning the DIP outside of Board meetings).  Neither Enrique nor Ignacio Cueto, one a

---

[32]    This belief was borne out by the fact that Oaktree, the proposed Tranche A Lender, has pointed to shareholder support as a reason behind its decision to invest its $1.3 billion in Tranche A.  *See, e.g.*, Statement of Oaktree Capital Management in Support of the Debtors' Reply [ECF No. 688] (the "Oaktree Statement") ¶ 3 ("The existence of these shareholders' commitment to provide subordinate financing was a substantial inducement – not an impediment – to securing the DIP financing that the Debtors badly needed.").

former LATAM executive and both current Board members, played any role in the negotiations on behalf of either side. Rather, they deferred to the Debtors' management and external advisors on the one hand, and to other shareholders with no involvement in management (first Delta and then Qatar) on the other, to negotiate the financing terms with each other. *See* Alfonsín Dep. Tr. at 221-224; Jacobson Dep. Tr. at 152:6-14. After Qatar's CEO confirmed Qatar's willingness to provide funding to LATAM based on LATAM's initial general request, Qatar did not separately negotiate or provide feedback on the economic terms being negotiated.[33] Thus, Delta and its advisors led the discussions on behalf of the shareholders. Costa Verde and Qatar were not involved. *See* Jacobson Dep. Tr. at 127:6-10 ("Q. How did that come to be that Delta would take the lead? A. I believe – I believe it had to do with our independence since we're not – we're not on the board. We don't have anyone in the boardroom."); s*ee also id.* at 79:6-9 (explaining that Delta has not appointed anyone to LATAM's board, although it nominated two individuals who were appointed by the shareholders.).

In negotiating the terms of a DIP financing facility that ultimately would result in the "Tranche C Commitment Letter," Delta did not merely accept or deliver terms for the loan; rather it undertook diligence, and LATAM and Delta negotiated the terms of the proposed financing. *See* Jacobson Dep. Tr. at 32:9-21 ("[U]pon initial review of the cash forecast, without an ability to ask any questions, we wanted to ensure that the appropriate diligence had been done and, candidly, that LATAM wasn't coming to Delta because it was a much bigger company and had capital available and it was an easy way out. So as we pressure tested, as we had

---

[33]    S*ee* Ho Dep. Tr. at 55:13–19 ("Q. Did you have any reaction to those drafts in terms of the economics? A. To the extent that we are comfortable with what was already negotiated, yes, that's the reaction."); *id.* at 56:2-6 ("[O]ur understanding is that [the terms were] already negotiated heavily by LATAM and Delta and the only interest we have is that all three parties end up with the same terms and that's all that we [were] interested in.").

conversations with Ramiro Alfonsín and his finance team, we ultimately came to a similar

conclusion as we have come to at Delta that the situation was dire and remains dire in the

absence of revenue and that, you know, maximizing liquidity was the best opportunity for them.

For LATAM, sorry."); *id.* at 33:15-16 ("Upon diligence, we quickly came to the conclusion that

more was better for the company.").   Hours of arms-length negotiations yielded the original

Tranche C Commitment Letter (defined below) to provide a $900 million junior loan as part of a

multi-tranche DIP financing.  *See, e.g.*, Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 21; Trial Ex. 243

(First Coleman DIP Decl.) ¶¶ 18-21.[34]  Through these negotiations, the Debtors were able to

"materially improve[]" the original terms of the Tranche C [DIP Facility], including obtaining a

waiver of the proposed requirement that there be government financing, the Tranche C lenders'

agreement to vote in favor of the chapter 11 plan, a reduction in rate of the conversion discount

and the elimination of a 9% "conversion fee."  Trial Ex. 243 (First Coleman Decl.) ¶ 18.

*Compare* Trial Ex. 74 (Tranche C lenders' original term sheet proposal to Debtors) *with* Trial

Ex. 130 (executed version of Tranche C DIP term sheet).

On May 21, 2020, LATAM's counsel sent the initial draft term sheet and DIP financing

letter agreement to Delta's counsel.  *See* Trial Ex. 62 (Email from K. Hailey to M. Steinman, V.

Jackson, A. Troconis and K. Huang, dated May 21, 2020, attaching draft DIP Letter Agreement

and term sheet).  Among other things, the initial draft term sheet provided for a Tranche B DIP[35]

loan to be funded in an aggregate maximum principal amount of $1.0 billion, in equal proportion

---

[34]    Those negotiations included "multiple drafts of term sheets and debtor in possession loan documents" and
"testing of a DIP Budget by the Debtors' and the Tranche C [] Lenders' financial advisors."  Trial Ex. 243 (First
Coleman Decl.) ¶ 19.  For examples of competing term sheets between counsel for the Debtors and counsel for the
Tranche C Lenders see Trial Exs. 74, 81, 85 and 105.

[35]    As noted above, at that time, the junior shareholder tranche loan was referred to as Tranche B.  It would later
become the present Tranche C.

by Delta, Qatar and Costa Verde, and for the for the shareholders to have the option to receive as

repayment of the DIP on effective date of a plan, reorganization common stock of the

reorganized LATAM entity at plan valuation.  *See id.*  Thus, the equity conversion right granted

the lenders the right to elect to be paid at the end of the case in shares of the reorganized

company rather than in cash.  Over the span of  several days, the parties, through their respective

advisors, exchanged several drafts of the proposed term sheet and commitment letter,[36] and

negotiated material terms of the loan.[37]  At the close of the negotiation, the agreed-to equity

conversion discount was 32%.

Initially, the parties contemplated that Qatar, Delta, and the Cueto family each would

provide one-third of the financing to what is now Tranche C DIP Facility (then Tranche B), in

equal shares.  *See* Trial Ex. 53 (External Advisors' Discussion Materials Presentation, dated May

19, 2020), at -663 (noting that the lenders will be "[i]n equal proportion, the Cueto family, Qatar

---

[36]    *See* Trial Ex. 74 (Email from A. Troconis to K. Hailey, R. Cooper, L. Schweitzer, et al., dated May 23, 2020)
(containing Delta comments); Trial Ex. 81 (Email from S. Charles to A. Troconis, K. Hailey, R. Cooper et al, dated
May 24, 2020) (highlighting a number of issues to discuss); Trial Ex. 85 (Email from M. Steinman to S. Charles, R.
Cooper, K. Hailey, A. Troconis, et al., dated May 24, 2020) (with more Delta comments); Trial Ex. 113 (Email from
K. Hailey to M. Steinman, S. Charles, A. Troconis, L. Schweitzer, et al., dated May 25, 2020) (LATAM comments);
Trial Ex. 105 (Email from K. Hailey to S. Charles, G. Catalanello and R. Cooper, dated May 25, 2020) (further
LATAM comments); Trial Ex. 108 (Email from P. Hespel to K. Hailey, S. Charles, G. Catalanello and R. Cooper,
dated May 25, 2020) (Qatar comments); Trial Ex. 109 (Email from M. Steinman to M. Huebner, R. Cooper, K.
Hailey, A. Troconis and S. Charles dated May 25, 2020) (Delta comments); Trial Ex. 112 (Email from K. Hailey to
M. Steinman, S. Charles, A. Troconis, L. Schweitzer, et al., dated May 25, 2020) (LATAM comments); Trial Ex.
128 (Email from A. Troconis to K. Hailey, M. Steinman, S. Charles, et al., dated May 26, 2020) (Delta comments);
Trial Ex. 129 (Email from K. Hailey to A. Troconis, M. Steinman, S. Charles, et al., dated May 26, 2020) (LATAM
comments, incorporating feedback from Qatar); Trial Ex. 130 (Email from A. Troconis to J. Meyzaguirre and S.
Charles, dated May 26, 2020) (executed version).

[37]    For example, the Debtors made clear that if a certain percentage of Tranche C lenders (then referred to as the
tranche B lenders) made the Equity Subscription Election, then all such shareholders should be deemed to do so.
*Compare* Trial Ex. 68 (LATAM Airlines Grp. DIP Redline, dated May 23, 2020) at 373 (LATAM comments
requiring drag rights) *with* Trial Ex. 130 (Letter from D. Ho, Qatar Airways Invs., to J.C. Mencio, dated May 25,
2020) at -944 (execution version containing drag rights with percentage to be determined subsequently).  The
Debtors also removed denial of recognition in foreign proceedings as an event of default, as proposed by Delta.  *See*
Trial Ex. 68 (LATAM Airlines Grp. DIP Redline, dated May 23, 2020) at -379.  The parties also negotiated the
maturity date and length of an extension option.  *Id.* at 364; *see also* Trial Ex. 130 (Email from A. Troconis to J.
Meyzaguirre and S. Charles, dated May 26, 2020) at 936.

and Delta"). However, by the time the May 25, 2020 Tranche C Commitment Letter was

executed (*see* Trial Ex. 130 (Email from A. Troconis to J. Meyzaguirre and S. Charles, dated

May 26, 2020)), Delta had concluded that it would not be a lender party to the Tranche C

Commitment Letter due to its own unrelated issues, such that Qatar agreed to lend $600 million

of the $900 million, and Qatar's counsel, Alston & Bird LLP, began to engage in direct

negotiations with LATAM, and Qatar and Costa Verde ultimately became the lender parties

under the Tranche C Commitment Letter.

## May 25 Board Meeting

Company management presented the Tranche C DIP term sheet  for Board approval at

the May 25 Board meeting.  Before that transactions was presented to the Board, it was presented

for review by the Independent Directors at a Directors Committee meeting.[38]  The subject that

was discussed at the May 25 Directors Committee meeting, was the "Approval Of The Execution

Of The DIP Financing Tranche B Term Sheet."  *See* Trial Ex. 125 (May 25th Directors

Committee Minutes); *see also* Trial Ex. 124 (Statement from the Committee of Directors of

LATAM Airlines Group S.A., dated 5/25/2020, "May 25th Directors Committee Statement").

At that meeting, the Independent Directors received a presentation from LATAM's management

and the Company's financial and legal advisors on the proposed term sheet for the Commitment

Letter for the $900 million Tranche C DIP Facility (the "Tranche C Commitment Letter"), which

could be used in conjunction with financing and support from the markets and relevant

---

[38]    Mr. Eblen excused himself from reviewing and voting on the transaction because he disclosed that the Eblen Group may be interested in participating in the Tranche C DIP Facility.  *See* Trial Ex. 125 (Minutes of the Special Meeting No. 82 of the LATAM Directors Committee, dated 5/25/2020, the "May 25th Directors Committee Minutes") ("Mr. Nicolás Eblen Hirmas, Director, excused himself from attending because an entity in which he has an interest could participate in the transaction under review."); *see also* Trial Ex. 123 (May 25th BOD Minutes) ("Finally, Mr. Nicolás EBLEN stated that the companies in which he has an equity interest are shareholders and are considering joining the DIP Financing[,]" and therefore abstained from voting on the transaction.).

governments in two additional proposed tranches in order to provide LATAM's expected $2 billion liquidity needs. *See* Trial Ex. 122 (LATAM Board of Directors Discussion Materials, dated May 25, 2020, "May 25 BOD Materials").[39] In sum, and as set forth in the minutes of the Directors Meeting:

ALVO

- explained that, in the context of the major crisis facing the Company arising from the COVID-19 pandemic, the Company was seeking new financing sources, and that as directed by the Board, management had negotiated a term sheet reflecting the financing conditions that LATAM's shareholders could give the Company in a reorganization under Chapter 11 of the United States Bankruptcy Code (the "DIP Financing");

- explained that LATAM has focused its negotiation of the terms and conditions of the DIP Financing with Qatar, for the purpose of first setting the grounds with such shareholder, and then submitting the same conditions to the other main shareholders who have showed interest in participating in the DIP Financing;

- noted that LATAM has negotiated with Qatar the terms and conditions of a term sheet for the Tranche B of the DIP Financing, which regulates an 18-month loan convertible into shares; and that the term sheet contemplated USD 2.15 billion in financing, including (i) a financing tranche reserved to the shareholders, (ii) a tranche of financing for governmental support, and (iii) a tranche of financing for investors., in a total amount of USD 2.15 billion; and

- advised that in the tranche reserved to shareholders, the amount required by LATAM amounts to USD 900 million, USD 600 of which will be financed by Qatar, and it is expected that the other USD 300 million will be financed by other shareholders, starting with Costa Verde.

Trial Ex. 125 (May 25th Directors Committee Minutes), at 5.

COLEMAN

- made a brief reference to the DIP Financing negotiation process, and indicated that PJT will launch a robust marketing process for the DIP Financing after the Chapter 11 filing,

---

[39]    The minutes reflect that the meeting was also attended by Senior Officers Messrs. Roberto Alvo ("Alvo"), CEO, and Mr. Juan Carlos Menció, VP for Legal Matters, who served as *ad hoc* secretary, and external legal counsel José María Eyzaguirre B., partner of Claro & Cía. The following persons joined the meeting via videoconference in order to participate: Richard Cooper, Esq. of Cleary Gottlieb, as LATAM's U.S. counsel, and Tim Coleman, of PJT. Trial Ex. 125 (May 25th Directors Committee Minutes) at 5.

and that the presentation submitted to the Directors Committee will be subject to competitive proposals that may be submitted by other prospective lending parties;

- commented that PJT, together with the Management, have been proactively working on a list of prospective lending parties, who will be contacted in order to raise interest. Coleman stressed, however, that the global pandemic posed by the COVID-19 makes it especially difficult to raise financing, since many companies have substantially restricted their operations and are seeking liquidity in order to remain in business; and

- explained to the Directors Committee that, within such process, as the agreements relating to the DIP Financing must be submitted to the court, it is possible that there are other interested parties that present better offers. Likewise, he presented the key financial conditions considered under these assumptions, i.e. committed amount, commitment fee, upfront fee, interest, PIK and conversion discount, which would be applied at the end of the process.

*Id.* at 5-6.

The minutes further reflect that in response to questions from Directors Committee members, "Mr. Coleman reported comparable transactions as to their financial cost and equity conversion rate," and that after the close of the presentations to the Directors Committee, Novoa "indicated that a decision must be made on the term sheet of the Tranche B of the DIP Financing and, especially, if LATAM is interested and if it is consistent with market conditions." *Id.* at 6. The minutes summarize the Directors Committee's deliberations, as follows:

[A]fter a brief discussion, and taking especially into account the matters presented by LATAM's Management, PJT and Cleary Gottlieb, as well as the conditions of the airline business due to the closing of borders caused by the COVID-19 pandemic, the [Directors] Committee concluded that the subscription of the DIP Financing Tranche B term sheet is in the benefit of the corporate interest and is consistent with conditions comparable with the current market conditions, upon considering the full context surrounding the Company.

It is taken into account that the DIP Financing remains open to third parties who could offer better conditions, and is also subject to approval by the Court in the United States once the Chapter 11 is filed, and that the other shareholders may also participate.

*Id.* The Directors Committee resolved, by unanimous vote of the attending members, to recommend that the Board approve the execution of the term sheet with the conditions for the Tranche B of the DIP Financing.

The May 25 Board meeting followed the Directors Committee's meeting. At that meeting, Novoa, in his capacity as Chairman of the Directors Committee, made a presentation to the Board on the proposed term sheet and, at the close of his presentation, recommended that the Board approve the Company's execution of the term sheet. *See* Trial Ex. 125 (May 25th Directors Committee Minutes), at 2; Trial Ex. 123 (May 25th BOD Minutes), at 9. The minutes of the meeting reflect that during his presentation, Novoa

> stated that the [Directors] Committee concluded that the subscription of the term sheet of Tranche B of the DIP Financing is in for the benefit of the corporate interest and is in conditions comparable to the current market ones considering the complete context in which the Company finds itself today. Additionally, he highlighted that the DIP Financing is kept open for potential third parties that may offer better terms and is also subject to the approval of the US court once the Chapter 11 proceeding has begun. Lastly, he stated that other shareholders would also be allowed to participate.

*Id.* at 23. Seven of the nine Board members abstained from voting on the grounds that they had been nominated and elected as a director by entities that have or may have an interest in participating in the DIP financing. *See* Trial Ex. 123 (May 25th BOD Minutes), at 10. Only the two Independent Directors – Horn and Novoa - were eligible to vote. They voted unanimously to approve the execution of the term sheet with the conditions for Tranche B of the DIP financing. *See id.*

**The Company Files For Bankruptcy**

Notwithstanding the successful implementation of the cost-savings and liquidity preserving measures, LATAM's liquidity position continued to deteriorate. The Debtors filed for chapter 11 protection on May 26, 2020. On May 25, 2020, the Board of Directors of LATAM met, under the Chairmanship of Ignacio Cueto, with his brother Enrique Cueto in

27

attendance, to take the necessary corporate action to file for chapter 11.[40]  The Board of Directors

unanimously approved the resolutions, including to file for chapter 11, request the appointment

of LATAM Airlines Group S.A. as the foreign representative in non-U.S. proceedings, and to

authorize certain company officers as the "Representatives" of the Debtors with the power to

take all actions required in connection with the chapter 11 filing, including to obtain secured

post-petition financing,[41] and "to exercise the rights of [LATAM Airlines Group S.A.] in its

capacity as shareholder, member, partner or investor with respect to any of its subsidiaries and

coligadas."[42]  Partially as a result of the various liquidity preserving measures, as of the Initial

Petition Date, the Debtors had $707 million in cash and cash equivalents, while LATAM as a

whole had approximately $1.3 billion in cash and cash equivalents.  *See* Trial Ex. 141 (First

Alfonsín Decl.) ¶ 42; *see also* Trial Ex. 267 (Second Alfonsín Decl.) ¶ 12.

## Post-Petition Marketing Efforts

On May 26, 2020, the day after the Tranche C Commitment Letter was approved, the

Initial Debtors commenced their Chapter 11 Cases.  As of the Initial Petition Date, there were a

---

[40]    *See* Voluntary Petition for Non-Individual Filing For Bankruptcy of LATAM Airlines Group S.A. [ECF No. 1] (the "Voluntary Petition") at 16.

[41]    The minutes of the board meeting describe the proposed financing as follows:

> The Term Sheet includes a financing tranche reserved for shareholders, a financing tranche reserved for state support, and a financing tranche reserved for investors, for a total of 2.15 billion. In the tranche reserved for shareholders, the amount required by LATAM is USD 900 million, of which Qatar would finance USD 600 million, and the remaining USD 300 million is expected to be financed by other shareholders, starting with Costa Verde."

Trial Ex. 123 (May 25th BOD Minutes) at 9.

[42]    *See* Voluntary Petition at 22 (authorizing "Representatives" "to exercise the rights of [LATAM Airlines Group S.A.] in its capacity as shareholder, member, partner or investor a with respect to any of its subsidiaries and coligadas, if any, for the purpose of submitting all or part of such companies to the Chapter 11 Proceeding, including by authorizing, executing and verifying a voluntary petition to commence proceedings under Chapter 11, causing the same to be filed and taking any and all action that they deem necessary, proper and desirable in connection with the Chapter 11 Proceeding. It is resolved that the Representatives shall have the authority to make such assessment and to decide whether to submit one or more such companies to the Chapter 11 Proceeding at their discretion.").

handful of unresolved issues related to the Tranche C financing.  In the wake of the

commencement of the Chapter 11 Cases, and in parallel to their negotiation and finalization of

the Tranche C DIP Facility, immediately upon filing their bankruptcy petitions, the Debtors and

their advisors began a marketing process seeking the full $2 billion-plus that LATAM required.

*See* Trial Ex. 243 (First Coleman Decl.) ¶ 24; Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 9.  The

Debtors also engaged LarrainVial Servicios Profesionales Limitada, a Latin American financial

services firm to help identify and evaluate, to the extent feasible, shareholder investors that are

willing to participate in the Tranche C DIP Facility as a part of the Tranche C Increase

Commitment,[43] which is a part of the overall Tranche C DIP Facility that the Debtors seek

approval of.  *See* First DIP Motion at 11, n.5.

Thus, after receiving a fully committed Tranche C DIP Facility, the Debtors continued

soliciting proposals for the entire $2 billion plus of funding sought.  *See* Trial Ex. 268 (Suppl.

Coleman Decl.) ¶ 15[44] ("PJT has solicited and indicated a willingness to entertain (i) proposals

for the full amount of the capital need, (ii) proposals to combine the Tranche A DIP Facility and

Tranche C DIP Facility, (iii) proposals to combine the Tranche B DIP Facility, Tranche A DIP

---

[43]    The "Tranche C Increase Commitment" is defined in the DIP Credit Agreement to mean:

> with respect to each Tranche C Increase Lender, the commitment of such Tranche C Increase Lender
> to make Tranche C Loans hereunder as reflected in the Tranche C Joinder Agreement. The aggregate
> amount of the Tranche C Increase Commitment shall be up to $250,000,000, as provided in the
> Tranche C Joinder Agreement; provided that, (i) no Tranche C Increase Lender that is an individual
> shareholder (other than a Tranche C Initial Lender) shall, alone or together with its Affiliates,
> provide a Tranche C Increase Commitment in excess of $100,000,000, either in a single installment
> or in the aggregate, without the consent of each Tranche C Initial Lender, which consent shall not
> be unreasonably withheld or delayed, and (ii) without the consent of the Majority Tranche C
> Lenders, no Tranche C Increase Lender shall provide a Tranche C Increase Commitment after the
> date which is thirty (30) days after the date of the Closing Date.

DIP Credit Agmt. § 1.01.

[44]    *See* Trial Ex. 268 (Declaration of Timothy R. Coleman in Support of Debtors' Supplemental motion for an
Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Superpriority Administrative
Expense Claims and (II) Granting Related Relief [ECF No. 486], the "Supplemental Coleman Declaration").

Facility, and the Tranche C DIP Facility, and (iv) alternative junior DIP proposals in lieu of the

Tranche C DIP."). The Debtors also made this clear publicly in the First DIP Motion. *See* First

DIP Motion ¶ 27 ("The Debtors have sought, and have been open to receiving, proposals for a

number of constructs including [] financing the full amount of capital needed, with no Tranche C

DIP Facility or other shareholder support….").

In furtherance of that process, PJT sent "teasers" to over 150 parties. In describing the

"Financing Opportunity," the "teaser" states, as follows:

> LATAM Airlines is seeking $2+ billion in Debtor-in-Possession ("DIP")
> financing, structured as a multi-tranche delayed draw term loan, to fund
> continuing operations through a chapter 11 proceeding.
>
> DIP will be given superpriority administrative claim and is secured by first
> priority liens on certain of LATAM's unencumbered assets and junior liens on
> certain encumbered assets.
>
> Certain existing shareholders have committed to provide $900mm to serve as the
> junior-most tranche of the DIP.

Trial Ex. 31 (LATAM DIP Lenders Teaser). Over 80 of those parties signed non-disclosure

agreements. *See* Trial Ex. 243 (First Coleman Decl.) ¶ 24; Trial Ex. 276 (PJT contact log); Trial

Ex. 292 (Coleman Reply Decl.) ¶ 9 (no party that agreed to sign an NDA been denied access to

the data room housing detailed financial and due diligence information about LATAM).

Post-petition, the Board (including the Independent Directors) remained actively involved

with respect to the negotiation of the DIP Credit Agreement (defined below), including

negotiations with Oaktree in respect of  the Tranche A DIP Facility. *See* Trial Exs. 149, 156,

157, 173, 174, 179, 192, 197-201 (post-petition Board and Directors Committee minutes).

## June 24 Board Meeting

The Company finalized the terms of the Tranche C DIP Facility and on June 24, 2020,

management and the Company's advisors presented it for approval by the Board. At that

meeting, the Board approved the DIP Financing Proposal for Tranche C (formerly Tranche B) by

the shareholders Costa Verde and Qatar.  Prior to the Board meeting, the Independent Directors

convened a meeting of the Directors Committee to discuss the Tranche C DIP Facility.  *See* Trial

Ex. 200 (Minutes of the Special Meeting No. 84 of LATAM's Directors Committee, dated

6/24/2020, the "June 24th Directors Committee Minutes"), at 1.[45]  The minutes of that meeting

reflect that Horn identified the purpose of the Directors Committee's meeting as:

> [T]o analyze the background information previously received in connection with the DIP financing structure by shareholders Costa Verde – which also includes the Amaro group and the Eblen group- and Qatar Airways. Said analysis seeks to conclude whether the transaction meets the requirements provided for by the Corporations Act (No. 18.046), namely:
>
> a)      Contribution to the corporate interest; and
>
> b)      Fair market price, terms and market conditions.

*Id.*  The Debtors' counsel and financial advisor attended the meeting, and at the Independent

Directors' invitation, Coleman gave his opinion on the merits of the financing.  In sum he stated

that:

> [I]n his opinion, the DIP financing under analysis contemplates a price, terms and conditions reasonable under market standards for these very particular kinds of transaction, where comparability is not simple, but it is possible with past cases included in the above mentioned presentation.

*Id.* at 2.[46]  The minutes reflect that after Coleman finished addressing the committee, and

"[f]ollowing a brief discussion, the Committee's members agreed to submit to the Board of

---

[45]   The minutes of the meeting reflect that it was also attended by lawyer José María Eyzaguirre, partner of the firm Claro & Cia, Coleman and Mr. Brent Herlihy of the firm PJT Partners, financial advisors, and Kara Harley, Esq., of Cleary Gottlieb.  The minutes also reflect that the following officers also were present: Juan Carlos Menció, Senior Legal Vice President, and Mario Roiter, LATAM's Chief Comptroller, who acted as secretary.  *See* Trial Ex. 200 (June 24th Directors Committee Minutes) at 5.

[46]   The minutes reflect that Coleman provided the following context for his opinion:

> Mr. COLEMAN noted that within the framework of the COVID 19 contingency affecting the world in general and the aircraft industry in particular (resulting in an almost absolute reduction in revenues), it is very difficult to predict when this situation may be materially reversed. In order to

Directors the recommendation to approve the DIP financial proposal by Costa Verde – including

Amaro and Eblen – and Qatar[.]" *Id.* at 6.  At the Board meeting, Horn and Novoa addressed the

Board on matters relating to the Tranche C DIP Facility.  Based upon the materials in their

presentation to the Board, Novoa "informed the Board of Directors that the Committee members

resolved to recommend to the Board of Directors the approval of the DIP financing proposal by

Costa Verde and Qatar[.]" *See* Trial Ex. 198 (Minutes of the Extraordinary Meeting No. 164 of

the LATAM Airlines Group S.A., dated 6/24/2020, the "June 24th Board Minutes"), at 11.[47]

Nine board members attended the meeting, but, for the reasons stated at the May 25 meeting,

only the non-interested directors Horn and Novoa, "with the favorable opinion of the other

---

manage this contingency, the Company submitted for a Reorganization Proceeding pursuant to the rules set forth in Chapter 11 of the United States Code ("Chapter 11"), and needs an extraordinary financial support to continue its business and avoid bankruptcy. It is in this so uncertain context that there is no possibility, in the first instance, of obtaining a financing other than by the very existing shareholders (which would subscribe to Tranche "C" – former Tranche "B"). This contribution by the investors is of vital importance as a sign of confidence to allow the possibility to complete the financing necessary by other institutions in the other Tranches, particularly, Tranche "A". Therefore, there is no doubt that this transaction contributes to the corporate interest as it is key to the business continuity.

Regarding the second matter to be analyzed, Mr. COLEMAN informed that although it was true that the nominal internal rate of return is high, which is constructed based on an up/front fee of 2.5%, a 14,5% PIK interest and a 32% conversion discount, all of them are within market ranges for the comparable transactions that are discussed during the meeting. This analysis should also take into account that this investment has the risk that, in case of bankruptcy, the shareholders would not only lose their initial investment in the Company but also their investment made under the DIP financing structure. Mr. COLEMAN believes the return to be reasonable with respect to other comparable information included in the document he distributed to the Directors. Ms. HAILEY added [redacted text].

Trial Ex. 200 (June 24th Directors Committee Minutes), at 1-2.

[47]    The Directors Committee took their recommendation to the full Board, noting that the Company required extraordinary financial support, that there was no possibility of alternative financing in the first instance and that the shareholder financing was a vital sign of confidence. Trial Ex. 198 (June 24th Board Minutes) at 645.  Further, the Independent Directors noted that the rate of return under the agreement was justified in light of risks involved for the lenders and that better financing alternatives could be presented. *Id.* at -645.  Following additional presentations from PJT and Cleary Gottlieb, the Independent Directors, on behalf of the Board, unanimously approved the DIP Credit Agreement. *Id.* at -649.  (Director Novoa noting that Tranche C DIP Facility remains open with the possibility of other alternatives entering); *see also* Trial Ex. 199 (Board of Directors Statement, dated June 24, 2020); Trial Ex. 197 (External Advisors' Presentation Discussion Materials, dated June 24, 2020).

directors," voted unanimously in favor of filing the Tranche C DIP Financing in the amount of

$900 million USD to be provided by the Cueto, Amaro, Eblen and Qatar shareholders.  *Id.*

**The First DIP Motion**

On June 28, 2020, certain of the Debtors filed the First DIP Motion seeking authorization

to execute and deliver all final documentation consistent with the terms and conditions of that

certain Super-Priority Debtors-in-Possession Term Loan Agreement (the "DIP Credit

Agreement").[48]  As agreed among LATAM and the equity holders, the DIP Credit Agreement

contemplates a secured super priority multi-draw term loan facility of up to $2.15 billion in new

money financing (the "DIP Facility") consisting of (i) a secured Tranche A facility (the "Tranche

A DIP Facility") in an aggregate maximum principal to be determined; (ii) a secured Tranche B

facility (the "Tranche B DIP Facility") in an aggregate maximum principal amount to be

determined; and (iii) a secured Tranche C facility (the "Tranche C DIP Facility") provided by

Qatar and Costa Verde and/or their affiliates (in such capacity, the "Tranche C Lenders" or

"Tranche C Shareholders," as appropriate) in an aggregate maximum principal amount of at least

$900 million, subject to the ability of LATAM Parent, as borrower, to increase the Tranche C

DIP Facility with a new commitment of up to an additional $250 million as agreed with the

Tranche C DIP Lenders and in accordance with the underlying DIP loan documents.  *See* First

DIP Motion ¶ 4.  The Debtors filed the First DIP Motion with the Tranche C Lenders'

commitments to fund at least $900 million of the Tranche C DIP Facility, but without funding

commitments for the Tranche A and Tranche B DIP Facilities.  The disbursement of funds

pursuant to the Tranche C DIP Facility is subject to the approval of funding to be provided under

---

[48]    The parties to the DIP Credit Agreement are LATAM Parent, as borrower, the guarantors party thereto, Qatar
Airways Investments (UK) Ltd. or one of more of its Affiliates and Costa Verde Aeronáutica S.A. or one of more of
its Affiliates, as lenders, the administrative agent, the local collateral agent.

either the Tranche A DIP Facility or the Tranche B DIP Facility (or both). *See id.* ¶ 6. Thus,

although the Debtors could not then access the Tranche C DIP Facility, they nonetheless sought

authorization to enter into the DIP Credit Agreement and obtain the Tranche C DIP Facility.

They explained that they filed the First DIP Motion because they were acutely aware that their

liquidity needs will become more pressing by August 2020 and they believed that approval of the

DIP Credit Agreement and the Tranche C DIP Facility would facilitate and streamline then

ongoing negotiations for the additional tranches of financing. *Id.* As filed, the principal terms of

the Tranche C DIP Facility were as follows:

| | |
|---|---|
| Commitment | $900 million committed |
| | Up to $250 million uncommitted (the Tranche C Increase Commitment) |
| Undrawn Commitment Fee | 0.5% |
| Back End Fee | 2.5% |
| Interest Rate | 14.5% PIK |
| Equitization Process | Tranche C Lenders' option – At the lenders' option, the Company shall repay the Tranche C DIP loans in stock at 32% effective discount to plan value |
| Events of Default[49] | Section 8.01(c) provides that it shall be an Event of Default if the Debtors fail to comply with certain covenants, including the covenant set forth in section 6.15, which dictates the entry of a final order approving the assumption of the Delta Agreement within 105 days of the Petition Date (the "Delta Covenant"). |
| | Any of the Bankruptcy Events set forth in section 8.01(k) shall occur, including: (a) an order terminating the Debtors' exclusivity period; (b) an order confirming a Chapter 11 Plan other than a Company Approved Reorganization |

---

[49]   As relevant to the Motions and objections.

Plan;[50] and (c) any of the Obligors shall file or support any pleading seeking relief the grant of which would give rise to an Event of Default.

Failure to meet any of the Bankruptcy Milestones set forth in section 6.17.

## July 8 Board Meeting

Before and after the Debtors filed the First DIP Motion, the Debtors, with their advisors, engaged in negotiations with Oaktree and its advisors, among others, regarding a proposed Tranche A DIP Facility. *See* Trial Ex. 268 (Suppl. Coleman Decl.) ¶ 18. By early July 2020, the Debtors completed their negotiations with Oaktree for the Tranche C DIP Facility loan in an amount of up to $1.3 billion.

On July 8, 2020, the Company and its advisors presented the Tranche A DIP Facility with Oaktree to the Directors Committee. *See* Trial Ex. 265 (Minutes of the Extraordinary Session of the LATAM Directors Committee, dated 7/8/2020, the "July 8th Directors Committee Minutes"), at 1.[51] At that meeting, PJT, made a presentation, reporting that the Tranche A DIP proposal

---

[50]   Company Approved Reorganization Plan is defined in the DIP Credit Agreement to mean:

a Chapter 11 Plan, as proposed by the Borrower and approved by the board of directors of LATAM, for each of the Obligors that provides for (i) the termination of the DIP Commitments and (ii) (a) if no Equity Subscription Elections have been made, the payment in full of the DIP Obligations (other than contingent indemnification obligations not yet due and payable) and (b) if any Equity Subscription Elections have been made, (x) the payment in full of all Tranche A Obligations and all Tranche B Obligations and all Tranche C Obligations in respect of which an Equity Subscription Election has not been made, subject to the provisions of Schedule 2.12 (other than contingent indemnification obligations not yet due and payable), and (y) in respect of all Tranche C Obligations in respect of which an Equity Subscription Election has been made, subject to the provisions of Schedule 2.12, the satisfaction, in full, of the obligation to issue New Shares in respect of such Tranche C Obligations, all in accordance with Section 2.12, on the Consummation Date of such Chapter 11 Plan.

[51]   Also in attendance was Alvo, LATAM's CEO and director, Alfonsin, LATAM's CFO, Juan Carlos Menció, VP, and Mario Roiter, Auditor General for LATAM, who acted as secretary. *See* Trial Ex. 265 (July 8th Directors Committee Minutes) at 1.

from Oaktree, among other things, provides the requisite amount of funds needed (i.e., $1.3

billion), contained "good economic terms," including allowance of PIK interest, "provides

certainty for a seamless contractual closure," and has been substantially completed through the

commitment letter.  PJT recommended to the Directors Committee to approve the Tranche A

DIP Facility.  *Id.*  Following a brief debate, the Committee concluded that signing the DIP

Tranche "A" financing agreement with Oaktree is "beneficial for the social interest," and

accounts for reasonable market terms, since a "detailed selection process between various

bidders" had been undertaken.  Based on PJT's recommendation and the progress reported, the

non-interested members of the Directors Committee—i.e., Horn and Novoa—unanimously

agreed to recommend to the Board to approve the execution of the Oaktree Tranche A

agreement.  *See id.* at 2.  *See also* Trial Ex. 264 (Notice of the LATAM Airlines Group S.A.

Directors Committee, dated 7/8/2020), at 2 ("After a brief discussion, the members of the

Committee agreed that the recommendation to approve the DIP Tranche "A" financing proposal

with Oaktree will be submitted to the Board, and then submitted to the Judge involved in the

Chapter 11 process.").

**The Supplemental DIP Motion**

On July 9, 2020, the Debtors filed their Supplemental DIP Motion[52] seeking to

supplement the First DIP Motion and authorization of the consolidated DIP Facility, increasing

the overall requested amount from $2.15 billion to $2.45 billion.  The Debtors consolidated the

Tranche A and Tranche C financing into a single credit agreement and filed the Supplemental

DIP Motion seeking authorization for the Tranche A DIP Facility as offered by Oaktree (in such

---

[52]    *See* Debtors' Supplemental Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition
Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No.
485] (the "Supplemental DIP Motion" and with the First DIP Motion, the "Motions").

capacity, the "Tranche A Lender" and, together with the Tranche C Lenders, the "DIP Lenders"),

along with the Tranche C DIP Facility on the terms set forth in the DIP Credit Agreement.[53]

**The Objections to the DIP Facility**

The Committee, Knighthead Capital Management LLC ("Knighthead"), and the Ad Hoc

Group[54] (collectively with the Committee and Knighthead, the "Objectors") each filed an

"initial" and "subsequent" objection to the First DIP Motion.[55]  The Debtors filed a reply to those

---

[53]    The Debtors commenced the Subsequent Chapter 11 Cases after they filed the First DIP Motion.  The Debtors and the DIP Lenders have agreed to add the Subsequent Debtors that filed their cases on July 9, 2020 as Guarantors under the DIP Credit Agreement (the "Additional Guarantors").  Furthermore, as a part of their agreement to provide the Tranche A DIP Facility, the Tranche A Lender specifically contemplated the additional security provided by having the Additional Guarantors as Guarantors under the DIP Credit Agreement.  Therefore, by the Supplemental DIP Motion, the Debtors also seek approval of the addition of the Additional Guarantors as Guarantors under the DIP Credit Agreement.

[54]    The Ad Hoc Group consists of certain holders of the LATAM 2024 Bonds and LATAM 2026 Bonds, and the Series A Local Bonds, Series B Local Bonds, Series C Local Bonds, Series D Local Bonds and the Series E Local Bonds.  The 2024 Bonds, 2026 Bonds, Series A Local Bonds, Series B Local Bonds, Series C Local Bonds, Series D Local Bonds, and Series E Local Bonds are collectively referred to herein as the "Bonds."  The members of the Ad Hoc Group hold in the aggregate approximately $675 million of the Bonds.  *See* Second Verified Statement of the Ad Hoc Group of LATAM Bondholders Pursuant to Bankruptcy Rule 2019 [ECF No. 536].

[55]    Those filed objections are as follows:

- Initial Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 538] (the "Committee Initial DIP Objection");

- Supplemental and Restated Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 613] ("Committee Supplemental and Restated DIP Objection");

- Initial Objection of the Ad Hoc Group of LATAM Bondholders To Debtors' Motion For An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 537] ("Ad Hoc Group Initial DIP Objection")

- Supplemental Objection of the Ad Hoc Group of LATAM Bondholders To Debtors' Motion For An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 608] ("Ad Hoc Group Supplemental DIP Objection")

- Initial Objection of Knighthead Capital Management LLC to the Motion for an Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 535] ("Knighthead Initial DIP Objection")

objections and in support of the Motion (the "Debtors Reply").[56]  The Court scheduled an

evidentiary hearing on the First DIP Motion and Supplemental DIP Motion to commence on July

28, 2020 (the "Hearing").

**After The Objections Are Filed Jefferies
Submits Its Tranche C DIP Facility Proposal**

---

- Supplemental Objection of Knighthead Capital Management LLC to the Motion for an Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 599] ("Knighthead Supplemental DIP Objection")

In addition to the Objections, several other parties also filed objections to the DIP Facility, as follows:

- Initial Objection And Reservation Of Rights Of Scotiabank Chile To Debtors' Motion For An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Grant Superpriority Administrative Expense Claims And (II) Granting Related Relief And Debtors Supplemental Motion For An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Grant Superpriority Administrative Expense Claims And (II) Granting Related Relief [ECF No. 530]; and Supplemental Objection of Scotiabank Chile to Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief And Debtors' Supplemental Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 598]

- Limited Objection of Aero Miami I, LLC to Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superiority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 528]

- Joinder and Reservation of Rights of Zendesk, Inc. to Limited Objection of Aero Miami I, LLC to Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superiority Administrative Expense Claims and (II) Granting Related Relief and Initial Objection of Zendesk, Inc. to Debtors' Supplemental Motion and Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 689]

- Joinder of Banco del Estado de Chile, in its Capacity as Indenture Trustee under the Chilean Local Bonds Series A through E, to Objection of the Ad Hoc Group of LATAM Bondholders to Debtors Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 554]

While Banco Estado de Chile and ScotiaBank joined in the arguments of the Objectors in opposing the Tranche C DIP Facility, AeroMiami and Zendesk raised specific, stand-alone objections, which were consensually resolved by certain agreed-to language incorporated into the Debtors' proposed order approving the DIP Facility, and the Debtors' agreement to pay the agreed-to amounts due and owing to Zendesk, as set forth on the record of the Hearing on July 30, 2020, respectively.  *See* 7/30/20 Hr'g Tr. at 70:14-72:12.

[56]   *See* Debtors' Reply In Support Of Motion for An Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 672].

Knighthead is a New York-based registered investment adviser founded in 2008 with over $4 billion in assets under management. Through funds or accounts it manages and/or advises, Knighthead holds over $100 million in unsecured bonds issued or guaranteed by LATAM Parent and its subsidiaries. *See* Trial Ex. 280 (Wagner Declaration) ¶ 1.[57] From the outset of these cases, it has explored avenues for it to act as a DIP lender to the Debtors. Thomas A. Wagner ("Wagner") is the co-founder and managing member of Knighthead. After the Initial Petition Date, and before the Debtors filed the First DIP Motion, Wagner reached out to Coleman and PJT to discuss Knighthead's interest in providing the Debtors with Tranche C DIP financing. *See id.* ¶¶ 6-7. Wagner asserts that in response to his overtures, Coleman discussed the possibility of Knighthead's participation in the Tranche A DIP or a commitment of a combined DIP of $2-plus billion (Tranche A and Tranche C), even though Wagner explained that Knighthead was not interested in the Tranche A DIP facility given Knighthead's investment profile in more high-risk/high-reward financings, and that Knighthead did not have the capital for such amounts as it was not a commercial bank or arranger and would have reach out to investment bankers. *See id.* ¶¶ 8-11. According to Wagner, Coleman also indicated that Knighthead could submit its Tranche C DIP proposal only if it were fully committed for its entire size (not less than $900 million), and if there was a way to solve the "complex Chilean law" issues associated with Tranche C DIP, although Coleman did not specifically explain what those complex Chilean law issues were to Wagner. *See id.* ¶ 12.

---

[57]    *See* Trial Ex. 280 (Declaration of Thomas A. Wagner In Support of the Supplemental Objection of Knighthead Capital Management LLC to the Motion for an Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 600], the "Wagner Declaration") ¶ 1.

Knighthead retained legal and financial advisors to assist it in formulating and formalizing an alternate financing proposal for the Tranche C financing.  In support of its initial objection to the Debtors' First DIP Motion, Knighthead represented that it was seeking commitments from third-party unsecured creditors in order to formulate alternative, competing Tranche C financing, and at PJT's suggestion, it would work with the Debtors in good faith discussions on such proposal before publicly filing a term sheet.  Knighthead Initial DIP Objection ¶ 7.  On July 14, 2020, Knighthead sent the Debtors a detailed term sheet for its creditor-led alternative Tranche C DIP (albeit, not fully committed), along with a draft credit agreement, marked against the credit agreement submitted by the Debtors in connection with the motion to approve Tranche A financing.  Knighthead Suppl. DIP Objection ¶ 2; *see also* Trial Ex. 280 (Wagner Decl.) ¶ 19.  Knighthead says that in response to that overture, the Debtors served document requests and notices for depositions of Knighthead and Houlihan Lokey, its financial advisor.  *See* Trial Ex. 280 (Wagner Decl.) ¶ 20.  Wagner asserts that beyond returning a list of "alleged defects" with Knighthead's proposal three days later, the Debtors did not reach out to anyone at Knighthead concerning any aspect of Knighthead's proposal.  *See id.*; *see also* Knighthead Suppl. DIP Objection ¶¶ 3, 5.

The Debtors disagree with Knighthead's account.  They say on July 15, PJT and FTI, on behalf of the Company, hosted a phone call with Houlihan and Moelis, the financial advisors to Knighthead and the Ad Hoc Group respectively, on which PJT answered diligence questions and also asked questions about the Knighthead draft term sheet, the response to which was that further communications were best had through the attorneys.  *See* Trial Ex. 292 (Coleman Reply Decl.) ¶ 13.  On July 17, Cleary Gottlieb provided detailed comments on the draft term sheet

(and an accompanying draft credit agreement) to Knighthead's counsel, and the parties'

respective counsel held a telephonic conference to discuss the comments on July 21st.  *See id.*[58]

Before and after it submitted its proposal, Knighthead solicited interest in the alternative

Tranche C DIP.  On July 16th, Wagner inquired of Jefferies Finances LLC ("Jefferies") whether

it had any interest in arranging a competing financing proposal for the Debtors' Tranche C DIP

Facility, with Knighthead being willing to commit $300-$400 million of such arrangement, and

Jefferies underwriting the committed $900 million facility.  *See* Trial Ex. 295 (Wagner Suppl.

Decl.) ¶ 6.  Jefferies agreed to do so, and on July 23, 2020, it submitted its commitment to

provide $900 million in alternative Tranche C DIP financing (the "Initial Jefferies

Commitment") to the Debtors, which bid was filed on the docket on July 24, 2020.  *See* Notice

by the Ad Hoc Group of LATAM Bondholders of Alternative Tranche C DIP Facility Proposal

[ECF Nos. 664, 675 (as corrected)].  The commitment consisted of an executed commitment

letter (the "Initial Commitment Letter") setting forth the salient terms of the proposed DIP

financing, and a draft DIP Credit Agreement (the "Jefferies Credit Agreement"), marked against

the Debtors' DIP Credit Agreement as filed in the First DIP Motion.

Without limitation, the terms of the Initial Commitment Letter provided for (i) a single-

draw facility under the Tranche C DIP, (ii) Jefferies to act as lead arranger and to syndicate the

Tranche C DIP to various banks, financial institutions, and other investors, and (iii) the payment

---

[58]    Wagner disputes Coleman's version of events.  Although Wagner concedes that Houlihan Lokey would not
have been familiar with the terms of Knighthead's proposal since Houlihan Lokey was only recently retained and
was limited to performing due diligence for Knighthead, Houlihan Lokey did not instruct that "further
communication be done through lawyers[,]" but rather suggested that the Debtors' "representatives reach out
directly *to Knighthead Capital or Knighthead Capital's counsel*" with respect to the competing Tranche C DIP.
Wagner also notes that Coleman was not even on that call with Houlihan Lokey and Moelis.  *See* Trial Ex. 295
(Supplemental Declaration of Thomas A. Wagner in Further Support of the Objections of Knighthead Capital
Management, LLC to the Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and
(B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No.678], the
"Wagner Supplemental Declaration") ¶ 17.

of the professional fees and expenses of the junior Tranche C DIP lenders, including Knighthead, as a committed junior Tranche C DIP lender for $400 million, and counsel to the Ad Hoc Group for its role in negotiating and preparing the Jefferies Initial Proposal. *See* Initial Commitment Letter; *see also* Jefferies Credit Agmt. § 2.02.  The Objectors say that compared to the Tranche C DIP, the terms of the Initial Commitment Letter would result in savings to the Debtors' estate of approximately $500,000,000.  *See* Knighthead Post-Trial Brief ¶ 2; Committee Post-Trial Brief at 3 ("According to the Debtors' analysis, the first Jefferies proposal would have saved the estate $454 million versus the original proposed Insider DIP Facility.").[59]

**The Debtors Reject Jefferies Proposal**

The Debtors deny that the Initial Jefferies Commitment was superior to the shareholders' Tranche C DIP Facility.  Coleman asserts that following their review of the Initial Jefferies Commitment, the Debtors' advisors updated the Debtors' management and Independent Directors of its terms.  PJT also reached out to Jefferies concerning the Debtors' issues but Jefferies had not timely responded.  *See* Trial Ex. 292 (Coleman Reply Decl.) ¶ 14.  More specifically, the Debtors believed that the Initial Jefferies Commitment had certain conditions (and reserves to Jefferies the ability to impose additional conditions later) and contained certain requirements, including changes to the agreed credit documents and arrangements with the

---

[59]    The Debtors filed their Post-Trial Brief simultaneously with the post-trial briefs of the Objectors as follows:

- Post-Trial Brief of Knighthead Capital Management, LLC [ECF No. 752] (the "Knighthead Post-Trial Brief");

- Post-Trial Brief of the Ad Hoc Group of LATAM Bondholders in Opposition to Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 753] (the "Ad Hoc Group Post-Trial Brief"); and

- Post Hearing Brief of UCC in Further Opposition to the Debtors Motion [ECF No. 749] (the "Committee Post-Trial Brief").

Tranche A lender, "which raise[d] serious issues."  The Debtors also maintained that the Initial

Jefferies Commitment left "the door open to additional collateral, and at a minimum the

Knighthead's attendant commitment letter explicitly contemplate[d] the inclusion of additional

collateral."  *Id.*  Alfonsín also similarly testified at trial as to the Debtors' concerns with the

Jefferies Initial Commitment and attempts to discuss same with Jefferies.[60]

## The Debtors File Modified Tranche C DIP Facility Proposal

On July 28, 2020, in the wake of the submission of the Initial Commitment Letter, and on

the morning that the Hearing was scheduled to commence, the Debtors and Tranche C Lenders

agreed to certain modifications to the DIP Credit Agreement (and as further amended, the

"Revised Credit Agreement") that significantly modified the Tranche C DIP Facility (the

"Modified Tranche C DIP Facility").  They revised the agreement to give the Debtors the option

to repay the Tranche C DIP loan in cash or to exercise the "Equity Election Subscription" to

repay the Tranche C DIP loan in stock, at 20% discount to plan value (the "Modified Equity

---

[60]    At trial, Alfonsin testified, as follows:

> Q. What was LATAM's reaction to that commitment letter?
> A. We received it late last Thursday, I would say beginning  of Friday. We reviewed the document in the early morning of Friday. We sat down with our advisors and then we reached out to -- to the proponents.
> Q. And what was your reaction to the terms and conditions being proposed?
> A. Well, we identified certain concerns of ours on -- on --on the document, and we wanted to discuss them with – with Jefferies. And that's why we reach out and ask for a meeting to be held that Friday.
> Q. And did Jefferies indeed engage with LATAM up until Sunday?
> A. They asked us to postpone the meeting that we asked for Friday to Saturday morning, and we hold that meeting on Saturday morning and send them the issues list that we had identified as major issues for us and asked them to have a reply by Sunday.
> Q. And did they in fact reply by Sunday?
> A. We received a proposal on late Monday.
> Q. So not by Sunday?
> A. No.

*See* 7/29/20 Hr'g Tr. at 89:9-90:5.

Subscription Election").[61]  The principal terms of the Modified Tranche C DIP Facility are as follows:

| | |
|---|---|
| Commitment | $900 million committed |
| | Up to $250 million uncommitted |
| Undrawn Commitment Fee | 0.5% |
| Back End Fee | 2.5% |
| Interest Rate | 14.5% PIK; *provided, however*, that the rate will be different in the event that the Debtors exercise the Cash Payment Election |
| | Cash Payment Election The Debtors may elect to repay the "Tranche C Cash Pay Obligations Amount," in cash, which is equal to the sum of: a.   (i) The Tranche C Obligations at the interest rate of LIBOR + 15%; *plus* (ii) Closing fee of 2.00%; *plus* (iii) Extension Fee[62] (if any) (together, the "Tranche C Recalculated Obligations"); plus b.       In lieu of the Back End Fee, an Exit Fee of 3.0%; *plus* c.   A fee of 6.0% on (x) the Tranche C Recalculated Obligations *plus* (y) the Exit Fee. |
| Equitization Process | At the Company's option, the Company shall repay the Tranche C DIP loans in stock at 20% discount to plan value |
| Events of Default | Section 8.01(c) provides that it shall be an Event of Default if the Debtors fail to comply with certain covenants, including the covenant set forth in section 6.15, which mandates the entry of a final order approving the assumption of the Delta agreements by November 7, 2020. |

---

[61]    *See* Notice of Revised Documents in Connection With Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 708]; *see also* Notice of Further Revised Documents in Connection With Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [ECF No. 746].

[62]    The "Extension Fee" is a fee in cash that shall be payable by the Debtors to the Administrative Agent for the account of each Tranche A Lender on the date of the extension of the Initial Scheduled Maturity Date, equal to 0.50% of the sum of the Tranche A loans.  *See* Revised Credit Agmt. § 2.10(c).

> Any of the Bankruptcy Events set forth in section 8.01(k) shall occur, including: (a) an order confirming a Chapter 11 Plan other than a Company Approved Reorganization Plan; and (b) any of the Obligors shall file or support any pleading seeking relief the grant of which would give rise to an Event of Default.

> Failure to meet any of the Bankruptcy Milestones set forth in section 6.17.

The Revised Credit Agreement modified the Equity Subscription Election in two principal ways. First, the Debtors, not the Tranche C Lenders, are vested with the right to make the election. Second, the discount rate is reduced to 20% discount to plan value. Below, the Court summarizes the procedures for effectuating the Modified Equity Subscription Election under the Revised Credit Agreement.

> Section 2.12 of the Revised Credit Agreement contains the Debtors' election to convert the Tranche C DIP Obligations into equity. It provides that the Debtors may elect to require "the Tranche C Lenders to subscribe to stock of the reorganized LATAM entity … upon repayment of the Tranche C Obligations." Revised Credit Agmt. Sch. 2.12(a)(i). The Equity Subscription Election must be made in accordance with the terms and procedures set forth in Schedule 2.12(a)(i) of the Revised Credit Agreement. *See id.*

> Under those terms and procedures, the option may only be exercised by the Debtors and only in connection with a plan approved by the Board -- i.e., a "Company Approved Reorganization Plan." *See id.* § 4(i).[63]

---

[63] The Revised Credit Agreement defines the term "Company Approved Reorganization Plan" to mean:

> Chapter 11 Plan, as proposed by the Borrower and approved by its board of directors, for each of the Obligors that provides for (i) the termination of the DIP Commitments and (ii) (a) if the Equity Subscription Election has not been made, the Payment in Full of the DIP Obligations (other than contingent indemnification obligations not yet due and payable) and (b) if the Equity Subscription Election has been made, (x) the Payment in Full of all Tranche A Obligations and all Tranche B Obligations and (y) subject to the provisions of Schedule 2.12(a)(i), the satisfaction, in full, of the obligation to issue New Shares in respect of such Tranche C Obligations, all in accordance with Section 2.12, on the Consummation Date of such Chapter 11 Plan.

Revised Credit Agmt. § 1.01.

Schedule 2.12 provides that the Debtors must notify the Tranche C Lenders of their election within ten and twenty days before they file a Company Approved Reorganization Plan (hereinafter, the "Chapter 11 Plan"). *See id.* § 4(i). The notice must be accompanied by certain "valuation materials" and drafts of plan documents. Once the notice is delivered to the Tranche C Lenders, it is generally irrevocable, subject to limited exceptions, including if the Chapter 11 Plan is not confirmed. *See id.*

After the Debtors deliver their notice, the Board must hold a meeting to approve the Chapter 11 Plan, disclosure statement, and valuation. *See id.* § 5(i). Within 20 days thereafter, the Debtors will hold a shareholders' meeting to take steps to "effectuate a Chapter 11 Plan that is a Company Approved Reorganization Plan." *Id.* § 5(ii).

If the Debtors have elected to repay the Tranche C Lenders in equity, the Company's shareholders will be asked to approve a capital increase for the amount of newly issued shares required to satisfy the Equity Subscription, including the shares issuable on account of the Tranche C Lenders' 20% discounted purchase. *See id.*[64] Such capital increase must be approved by "a majority of LATAM shareholders in attendance" at the meeting. *See id. See also* Trial Ex. 337 (Yrarrázaval Decl.) ¶¶ 30-32 (citing Corporations Act, Art. 67).[65]

---

[64]   The Corporations Act (Law No. 18,046) (defined below) governs Chilean public corporations, like LATAM, and prescribes the rights and powers accorded to shareholders in Chile. To raise equity capital, a public company must amend its bylaws by shareholder vote, and all shareholders have the right to participate in any equity raise on a pro-rata basis through preemptive rights. *See* Corporations Act, Arts. 10, 25, 67. Article 10 of the Corporations Act reads:

> The capital stock of a corporation shall be specifically determined in the corporation's by-laws, and such stock can only be increased or reduced by means of an amendment to the by-laws.

In turn, Article 57 reads:

The special meeting of shareholders shall deal with the following matters:
*          *          *
> 2) the transformation, merger and division of the corporation and any amendment to its bylaws

Article 25 states:

> Any options to subscribe shares involving a corporation's capital increase or convertible debentures which may convert to shares of the issuing corporation, or any other security granting future rights over such shares, shall be offered at least once to the shareholders preemptively, in the proportion of their shareholding interest. Any non-paying shares issued by the corporation shall be distributed in the same proportion.

> This preemptive right may be waived and transferred.

[65]   Article 67 of the Corporations Act provides:

> Resolutions adopted at the special shareholders' meeting that involve an amendment to the corporate bylaws or the rectification of formal defects causing amendments to be void, shall be adopted by

It would be subject to an order of this Court confirming a Chapter 11 Plan.  *See*
Revised Credit Agmt. Sch. 2.12(a)(i) § 5(ii).

After this Court has confirmed the Chapter 11 Plan, the reorganized Debtors'
board will meet "to set the price of the New Shares to be issued under the Share
Increase, which price shall be consistent with the Chapter 11 Plan."  *Id.* § 13(i).

Prior to the effective date of the Chapter 11 Plan, the Debtors would launch a
"preemptive rights offering" in Chile.  *See id.* § 14(i).  This Rights Offering
would be to all shareholders, even if they did not participate in the financing, and
allow all shareholders to purchase shares.  *See* Corporations Act, Art. 25, *supra*.
Schedule 2.12(a)(i) provides that the "Rights Offering . . . will be a condition to
the effectiveness of the Chapter 11 Plan."  Revised Credit Agmt. Sch. 2.12(a)(i) §
14(i).  The Board will have the right to place any unsubscribed shares from the
Rights Offering with the Tranche C Shareholders.  *See id.* § 14(ii).

On the effective date of the Chapter 11 Plan, the Debtors will distribute cash to
the Tranche C Lenders sufficient to pay the Tranche C Obligations, and the
Tranche C Lenders would immediately use that cash to subscribe and pay for the
equity distributable under the Equity Subscription Election, including the
discounted shares.

The Objectors say that the Company paid dearly for the Tranche C Lenders' agreement to

reduce the discount rate from 32% of plan value, since the cost of repaying the Tranche C

Lenders in cash under the Modified Tranche C DIP Facility, increased by 44%, or $106 million.

*See* Knighthead Post-Trial Brief ¶ 3 (first citing to Trial Ex. 341 (Second Suppl. Wagner Decl.),

at -005; then citing Trial Ex. 295 (Wagner Suppl. Decl.), at -010).  It is undisputed that the value

to the Tranche C Lenders attributable to the 20% discount upon equitization equals

approximately $282.6 million.[66]

---

the affirmative vote of the majority to be determined in the bylaws, which, in the case of closely
held corporations, may not be less than the absolute majority of issued shares with voting rights.

[66]    *See* Trial Ex. 341 (Second Suppl. Wagner Decl.) at -005 (illustration showing amount attributable to 20%
discount upon equitization).  The Debtors' analysis quantifies the discount to shareholders at $279.2 million.  *See*
Trial Ex. 333 (LATAM Discussion Materials) at -004.

At the request of the Committee, and to give interested parties the opportunity to consider the terms of the Modified Tranche C DIP Facility, the Court postponed the start of the Hearing to July 29, 2020.

**Jefferies Files the Amended Jefferies Commitment**

That day, Jefferies filed an amended proposal (the "Amended Jefferies Commitment"). *See* Notice by the Ad Hoc Group of LATAM Bondholders of Amended Alternative Tranche C DIP Facility Proposal [ECF No. 692] (the "Amended Jefferies Commitment"). The Debtors advised the Court that they would move forward and seek approval of the Modified Tranche C DIP Facility, and the evidentiary Hearing proceeded accordingly.

At the Hearing, Coleman, testified as to the comparative terms between the Amended Jefferies Commitment and the Modified Tranche C DIP Facility, and as summarized in the presentation prepared by PJT titled "LATAM Discussion Materials" dated July 28, 2020. *See* 7/29/20 Hr'g Tr. at 124:5-124:18; *see also* Trial Ex. 333 (LATAM Discussion Materials). The LATAM Discussion Materials contained a side-by-side comparison of the principal terms of the shareholders' Modified Tranche C DIP Facility and the Amended Jefferies Commitment, as follows:

|  | **Shareholders DIP** | **Amended Jeffries Commitment** |
|---|---|---|
| Commitment: | $900m, up to $1,150m | same |
| Draw Conditions: | Delayed draw (5 draws max, 50% in first draw) | Tranche A and Tranche C fully drawn at closing |
| Interest: | 14.5% PIK with 0.5% LIBOR floor Compounds quarterly and accrues daily based on a 365 day (or 366 when applicable) calendar year | L+ 15.0% PIK with 1.0% LIBOR floor, compounds quarterly and accrues daily based on a 360 day calendar year |
| Fees: | 2.5% Back-End Fee<br><br>0.5% Undrawn Commitment Fee | 2.0% Closing Fee (PIK)<br><br>3.0% Exit Fee (Cash) |

| | If LATAM elects equity repayment, 20.0% Equity Conversion discount to Plan Valuation<br><br>If Company elects cash repayment, balance due calculated as principal plus interest at Jefferies rate (L+15.0%) plus Jefferies' closing fee (2.0%) plus Jefferies' exit fee (3.0%) plus 6.0% | 2.25% Underwriting / Arranger Fee to Jefferies (Cash)<br><br>$175,000 per annum Admin. Fee to Jefferies (Cash)<br><br>Alternative Transaction Fee for fees owed if Debtors choose another deal within 6 months and/or certain other conditions |
|---|---|---|
| Maturity: | 18 months with 60 day extension at Borrower's option subject to no Event of Default and bankruptcy milestones met | (same) 18 months with 60 day extension at Borrower's option, subject to following additional maturity date triggers: (i) date a foreign insolvency court orders liquidation of a Borrower / Guarantor and (ii) the date any guarantor that is not a Debtor at the time of entry of the DIP Order files a Chapter 11 petition |
| Treatment at Exit: | Cash repayment or equity conversion at Debtors' option | Cash repayment/refinance only |
| Tranche A Negotiation: | No | Yes |

Alfonsín  testified that after reviewing the two proposed Tranche C DIPs, the Debtors felt that the economic terms of the Amended Jefferies Commitment did not improve, and many non-economic terms still posed issues for the Debtors; and therefore, the Board ultimately decided to reject the Amended Jefferies Commitment, and proceed with the Modified Tranche C DIP Facility.[67]

---

[67]   Alfonsin testified, in part, as follows:

> Q. And what was LATAM's reaction to the Jefferies revised proposal?
> A. Well, we reviewed it. Economics -- terms did not change, and the terms and the issues that we had raised have been dealt 25 with in a very limited way. We still had an issues list that was considerable.
> Q. And what did LATAM do with the two revised proposals they had received, the Tranche C lender proposal and the Jefferies proposal?

**After Hearing Commences Jefferies Submits**
**Further Revised Tranche C DIP Facility Proposal**

On July 29, 2020, the Court commenced the Hearing.  That day, Jefferies submitted a

further revised Tranche C DIP proposal (the "Further Amended Jefferies Commitment"),

ostensibly to address the Debtors' concerns with the Amended Jefferies Commitment. *See*

Notice by the Ad Hoc Group of LATAM Bondholders of Further Amended Alternative Tranche

C DIP Facility [ECF No. 726].  The Further Amended Jefferies Commitment modified several

terms from the Amended Jefferies Commitment, including, without limitation:

- Providing for a dual-draw (as opposed to a single-draw) facility of an initial draw of 50% of the commitment upon closing, with the remainder 50% to be drawn at any time before October 15, 2020;

- Removing a Right to Purchase offered to the Tranche C DIP Lenders to acquire equity interest in the Debtors in the event the Debtors contemplate an equity issuance (*see* Jefferies Credit Agmt. § 6.24);

- Removing the Tranche C DIP Lenders' right to approve certain of the Debtors' sale-leaseback transactions above a certain threshold;

- Removing the requirement for Tranche A commitments as a closing condition;

- Loosening certain DIP budget restrictions, financial covenant requirements, and events of default, in sections 2, 7 and 8 of the Jeffries Credit Agreement; and

- Revising the requirement that the Debtors must have assumed certain agreements with Delta by a date certain to requiring the Debtors to use commercially reasonably efforts in seeking the assumption of such agreement.

---

A. On Tuesday morning, we sat down with our audit committee with the two independent board members and reviewed both proposals.
Q. And was there a recommendation at the end of the meeting?
A. Yes. They -- they recommended to the board that was held after the audit committee -- they recommended to the board to move forward with the revised Tranche C proposal.
Q. And was it in fact presented to the board?
A. I understand they did, yes.
Q. And what was the decision of the board with respect to the revised Tranche C proposal?
A. To move forward with the revised Tranche C proposal from the current parties.

*See* 7/29/20 Hr'g Tr. at 90:21-91:17.

*See* Further Amended Jefferies Commitment (Letter).  As further support of the Further

Amended Jefferies Commitment, Knighthead also filed the Second Supplemental Declaration of

Thomas Wagner, in support of the Further Amended Jefferies Commitment, which included, as

Exhibit A thereto, an updated "Cost Differential Analysis" comparing the returns to the investors

and costs to the Debtors' estates between the Modified Tranche C DIP Facility and Further

Amended Jefferies Commitment.[68]

At the Hearing, Wagner testified with respect to his updated Cost Differential Analysis,

concluding that he believed the Further Amended Jefferies Commitment provided better terms,

and at a lesser cost to the Debtors' estates, compared to the Revised Credit Agreement.  *See*

7/30/20 Hr'g Tr. at 186:21-22 ("The deal was and remains superior on economic terms to the

insider proposal so I don't know why Jefferies would feel a need to improve the economic terms

when they're already in the lead.").  *See also* Trial Ex. 341 (Second Suppl. Wagner Decl.), Ex. A.

Further, Wagner testified that Knighthead was the "anchor" lender under the Jefferies'

alternative DIP and remains committed to provide the $400 million thereunder.  *See* 7/30/20

Hr'g Tr. at 194:5-12.[69]

Notwithstanding Wagner's and Jefferies' assertions that the Further Amended Jefferies

Commitment was significantly improved and provides better terms than the Modified Tranche C

---

[68]    *See* Trial Ex. 341 (Second Supplemental Declaration of Thomas A. Wagner in Further Support of the
Objections of Knighthead Capital Management, LLC to the Motion for an Order (I) Authorizing the Debtors to (A)
Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related
Relief [ECF No. 727], the "Second Supplemental Wagner Declaration").

[69]    That exchange was as follows:

> A. Do you stand by your commitment for 400 million dollars today?
> A. Absolutely.
> Q. Okay. You were described by Mr. Rosenthal as the anchor tenant for the Jeffries proposal. Is that how
> you would also describe yourself?
> A. We're the largest commitment to our knowledge in that facility. So I think that's a fair characterization.

DIP Facility with the Tranche C Lenders, the Debtors nevertheless rejected the Further Amended

Jefferies Commitment.  Instead, the Debtors maintain that the DIP Facility is their best and only

DIP financing available and continues to seek approval of the Revised Credit Agreement.

## ANALYSIS

### Relief Requested

The Debtors seek entry of a final order (the "Final DIP Order"), pursuant to sections 105,

362, 363(c), 363(c)(2), 364(c)(3) and 364(e), of title 11 of the United States Code (the

"Bankruptcy Code"); Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules'); and Rule 4001-2 Local Bankruptcy Rules for the Southern

District of New York with respect to the proposed DIP financing, including the Tranche A DIP

Facility and the Tranche C DIP Facility, in the form of the Final DIP Order pursuant to the DIP

loan documents.

Each of the Objectors denies that the Debtors have demonstrated that they require the

DIP Facility; and each challenges the terms of the Tranche C DIP Facility as being above-

market, and the Debtors' good faith in negotiating those terms.  They contend that the Tranche C

DIP Facility is a transaction between the Debtors and their insiders that fails to satisfy the

heightened scrutiny of the "entire fairness" test, and, in any event, runs afoul of section 1129 of

the Bankruptcy Code because, among other things, it violates the absolute priority rule and is a

sub rosa plan.  They also contend that the Debtors have not demonstrated that the Tranche C

Lenders are entitled to a "good faith" determination under section 364(e) of the Bankruptcy

Code.  The Ad Hoc Group and Committee also objected to the Supplemental DIP Motion.[70]  In

---

[70]    *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Supplemental Motion for an
Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative
Expense Claims and (II) Granting Related Relief [ECF No. 658] (the "Committee Tranche A DIP Objection"); and

substance and in brief, the objections to the Tranche A DIP Facility focus on the fact that not

only is the Tranche A DIP Facility structurally tied to the Tranche C DIP Facility (in that they

are encompassed in one DIP Credit Agreement and cannot be separated and share overlapping

terms), but that the Tranche A DIP Facility is economically tied to the Tranche C DIP Facility in

that funding under the Tranche A DIP Facility is conditioned upon approval of and funding of

the Tranche C DIP Facility, and in particular, the Tranche C DIP Facility with the Tranche C

Lenders.[71]  Thus, the Objectors assert that approval of the Tranche A DIP Facility would only

serve "to further entrench (and benefit) the proposed Tranche C lenders at the expense of the

Estate."  Ad Hoc Tranche A DIP Objection ¶ 2.  The Objectors maintain that the interdependence

of the Tranche A and Tranche C DIP Facilities renders the entire DIP Facility subject to

heightened scrutiny (notwithstanding the fact that Oaktree is clearly not an insider), and

reviewed in that light, the Debtors cannot show that the DIP Facility terms are entirely fair.  *See,

e.g.*, Committee Tranche A DIP Objection ¶¶ 6-7; 12-15.[72]

The Debtors deny those assertions.  They reject the absolute priority and sub rosa plan

objections as irrelevant to the approval of the DIP Facility, because they say that plan terms are

not being dictated and the lenders do not control the plan process.  They say that the Tranche C

Lenders are instead agreeing to provide shareholder consents in furtherance of an eventual plan

process later in the case, which can only serve as a benefit to the Debtors in their reorganization.

---

Ad Hoc Bondholder Group's Objection to Debtors' Supplemental Motion to, Inter Alia, Approve Post-Petition
Financing (Dkt. 485) [ECF No. 653] (the "Ad Hoc Tranche A DIP Objection").

[71]   The Ad Hoc Group notes, for example, that one of the "Linking Provisions" that ties Tranche A to Tranche C is
that an Event of Default would be triggered under the DIP Credit Agreement if the proposed Tranche C Lenders
were replaced by other Tranche C (third party) lenders, such as Jefferies.  *See* Ad Hoc Tranche A DIP Objection ¶ 9.

[72]   The Committee also object to the Tranche A DIP Facility, the form of Final DIP Order, as well as the good faith
finding as to Oaktree under section 364(e) of the Bankruptcy Code.  *See* Committee Tranche A DIP Objection ¶¶
16-18.

*See generally* Debtors Reply at 5.  Moreover, they contend that the DIP loan does not purport to pay the lenders anything on account of their existing equity.  *Id.*  The Debtors contend that in attacking the terms of the Tranche C DIP Facility, the Objectors fail to account for either the difficult current environment in the airline industry or the extensive and thorough efforts undertaken by the Debtors and their professionals.  *See id.* at 2.  They maintain that they sought a financing commitment from their shareholders because they were best placed to provide such a commitment in the run-up to the bankruptcy filing, and that it was important that they commenced the Chapter 11 Cases with the ability to provide assurances to their passengers, vendors, lessors, lenders and others that they had the financing needed to operate the business. *Id.* at 3.  They deny that the "entire fairness" standard applies to the DIP Facility – particularly as to the Tranche A DIP Facility – but contend that the DIP Facility passes muster regardless of the standard applied.  They assert that the loan terms and the DIP Credit Agreement were negotiated with separate and sophisticated advisors on all sides, where the shareholder lenders and company management separated themselves, and where the proposed financing was reviewed and approved by independent directors at LATAM, who were well educated about the process and had ample opportunity to provide feedback.  *See id.* at 3-4.  The Debtors maintain that complaints about the scope of claims being released is misplaced because the DIP Order was always intended to provide releases to the lenders "in their capacity as such," and not the global releases suggested in the objections.

In resolving these matters, the Court will first consider whether the Debtors have established grounds to obtain secured financing in these Chapter11 Cases.

## **Discussion**

Section 364(c)(3) of the Bankruptcy Code states that:

[i]f the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt . . . (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  The factors that courts consider in assessing the merits of a debtor's motion

to obtain financing under section 364(c) are:

(i)     whether the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

(ii)    whether the credit transaction is necessary to preserve the assets of the estate; and

(iii)   whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender.

In re Republic Airways Holdings Inc., No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr.

S.D.N.Y. May 4, 2016) (citing In re Los Angeles Dodgers LLC, 457 B.R. 308, 312-13 (Bankr. D.

Del. 2011)).  To demonstrate that it qualifies to seek secured financing under this section, a

debtor need only demonstrate that that "it has reasonably attempted, but failed, to obtain

unsecured credit under sections 364(a) or (b)."  In re Ames Dep't Stores, 115 B.R. 34, 37 (Bankr.

S.D.N.Y. 1990); see also In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  "The

statute imposes no duty [on a debtor] to seek credit from every possible lender before concluding

that such credit is unavailable."  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe

Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  See also Pearl-Phil GMT (Far E.) Ltd. v. Caldor

Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses

where debtor could not obtain credit as an administrative expense).

The Debtors have demonstrated that they are unable to obtain unsecured credit allowable

as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  See Trial Ex. 243

(First Coleman Decl.) ¶¶ 11-17; Trial Ex. 268 (Suppl. Coleman Decl.) ¶¶ 13-15.  The Objectors

do not contend otherwise.  Further, the Debtors have demonstrated that they require all of the

financing now.  It is undisputed that by reason of the adoption of short-term cost savings

measures, the Company has exceeded its recent cash forecast projections.  *See* 7/29/20 Hr'g Tr.

171:3–7, 179:3–180:1 (Alfonsín).[73]  Nonetheless, the Company has demonstrated that without

financing available, it is at risk that by the end of August, its cash position will drop below the

"absolute minimum" needed, and because "the situation … is very delicate . . . we must through

our efforts[] try to avoid reaching that level."[74]  Further, it is undisputed that the current lack of

confirmed DIP Financing is "providing huge uncertainties" in the Company's ongoing

"negotiations with lessors," as well as customers and vendors.[75]  The Objectors—all of whom

have been provided with the Debtors' cash flow and liquidity forecasts—offer no evidence that

the Debtors' needs are inflated.[76]  The Court finds that that the Debtors have established that they

have an urgent need for financing and that it is appropriate for them to seek approval of the full

$2.45 billion DIP Facility at this time.

---

[73]    Alfonsín explained that LATAM has preserved additional cash by, among other things, selling tickets for future trips at a discount, negotiating with vendors to defer expenditures, and postponing refunds.  *See* 7/29/20 Hr'g Tr. at 179:5-180:1 (Alfonsín).  On the other hand, Mr. Alfonsín also explained that it has become increasingly difficult to negotiate with LATAM's vendors, as many of them ask for upfront payments and LATAM is only able to defer payments for so long.  7/29/20 Hr'g Tr. at 178:14–179:2 (Alfonsín).

[74]    7/29/20 Hr'g Tr. at 164:11-15 (Alfonsín), *see also* Trial Ex. 332 (LATAM 18 Month DIP Budget 13 Week Cash Flows) at 005 (consolidated 15-week cash flow); 7/29/20 Hr'g Tr. at 120:3-6, 165:11-17 (Alfonsín) (explaining that the absolute minimum level of liquidity to operate the Company is $700 million).

[75]    7/29/20 Hr'g Tr. at 178:25-179:2 (Alfonsín) ("I need to provide comfort to all the different stakeholders that we have financing to [get] through this process, and to restructure the company.").

[76]    The DIP Lenders also have confirmed LATAM's need for the full DIP Facility amount.  *See* Jacobson Dep. Tr. at 35:18–23 ("And then upon doing the due diligence . . . . Delta came to agreement with the conclusion that LATAM needed more capital than . . . Delta's original view.");  Oaktree Statement ¶ 10 ("Oaktree has performed extensive analysis of the Debtors' liquidity needs and fully supports the need for DIP financing of this size and at this time, in light of all the circumstances and especially the uncertainty of the Debtors' business prospects as these Chapter 11 Cases proceed.").

Still, the Objectors contend that the Court should deny the Motions, because, among

other reasons, the terms of the Tranche C DIP Facility are not "fair or reasonable."   The business

judgment rule "is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res.,*

*Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quotation marks and

citations omitted).  It "shields corporate decision-makers and their decisions from judicial

second-guessing when the following elements are present: '(1) a business decision, (2)

disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and

commentators, no abuse of discretion or waste of corporate assets.'" *Id.* (quoting Dennis J.

Block, Nancy E. Barton & Stephen A. Radin, The Business Judgment Rule 12 (3d ed. 1991)).

Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a

debtor's business judgment provided that the financing does not unduly benefit a party in interest

at the expense of the estate.  *See In re Ames Dep't Stores*, 115 B.R. at 40  (approving debtors'

proposed financing in absence of alternative financing and finding that the business judgment

standard applies "so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit a party-in-interest."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL

2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (denying post-petition financing in exercise of

the court's "important oversight role" and finding that the court's "normal function in reviewing

requests for post-petition financing is to defer to a debtor's own business judgment so long as a

request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the

reorganization to one party in interest." (citation omitted)).  The Debtors say that is so because

the Independent Directors have deliberated and approved of the terms and conditions of the

Tranche A and Tranche C DIP Facilities, the Debtors' decision to enter into the Revised Credit

Agreement and obtain the Tranche A and Tranche C DIP Facilities is an exercise of their sound

business judgment.

By definition, the business judgment rule is not applicable to transactions among a debtor

and an insider of the debtor.  Those kinds of transactions are inherently suspect because "they are

rife with the possibility of abuse."  *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551

(Bankr. S.D.N.Y. 1997) (quoting *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread

Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988)).  Instead, courts apply a "heightened scrutiny"

test in assessing the *bona fides* of a transaction among a debtor and an insider of the debtor.  *See

In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y.

Oct. 1, 2013) ("[C]ourts in this jurisdiction have generally applied a heightened standard of

scrutiny when the transaction [in] question is with an insider of the debtor." (citing *In re

Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).  *See also Pepper v. Litton*, 308

U.S. 295, 306 (1939) (noting that a controlling shareholder's "dealings with the corporation are

subjected to rigorous scrutiny and where any of their contracts or engagements with the

corporation is challenged the burden is on the director or stockholder to not only prove the good

faith of the transaction but also to show its inherent fairness..."); *Schubert v. Lucent Techs Inc.

(In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the

dealings between a debtor and an insider is to be rigorously scrutinized by the courts." (quoting

*Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th

Cir. 1991))).  "In applying heightened scrutiny, courts are concerned with the integrity and entire

fairness of the transaction at issue, typically examining whether the process and price of a

proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. at 231.

Thus, an insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the "entire fairness" of the transaction at issue. *See WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage . . . insiders' loans in a bankruptcy must be subject to rigorous scrutiny." (citation omitted)); *In re L.A. Dodgers LLC*, 457 B.R. at 313 (applying "entire fairness" standard in lieu of business judgment rule to financing transaction where principal stood to personally benefit); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein." (citation omitted)), *aff'd*, 160 F.3d 982 (3rd Cir. 1998). So too will a transaction between a company and its minority shareholder where the shareholder exercises influence and control over the corporation through other means, including board seats or exclusive access to confidential information. *See Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369, 387-88 (S.D.N.Y. 2007) (applying entire fairness standard where shareholder was an insider on account of its minority interest in company and board seats).

The Objectors deny that the business judgment standard is applicable in this case. They say that the Court cannot defer to the Debtors' business judgment because the Tranche C DIP Facility is the product of an exclusive negotiation among the Company and its controlling

shareholders and that those shareholders are on both sides of the transaction. They argue that in assessing the merits of the DIP Financing, the Court must subject the Debtors' actions to heightened scrutiny and apply the entire fairness standard to the proposed DIP Facility. *See, e.g.*, Committee Tranche A DIP Objection ¶ 6 ("In short, the Debtors structured both the Tranche A process and the Tranche A terms in a manner that entrenched and isolated the positions of their insiders. Close scrutiny of these issues, not deference to the business judgment of Debtors, is necessary here."); Ad Hoc Tranche A DIP Objection ¶ 12 ("The Linking Provisions guarantee that the Court cannot approve Oaktree's proposal to fund the Tranche A DIP Facility without the objectionable terms in the Tranche C DIP Facility; accordingly, the Supplemental DIP Motion must be reviewed under the 'entire fairness' test."). They say that is especially true because the Tranche C DIP Facility is designed to guaranty that the Tranche C Lenders can forego repayment of the Tranche C DIP Facility in cash and instead, take repayment of their Tranche C DIP loans in the form of new equity in the reorganized Debtors at a discount to plan value – all allegedly in violation of the absolute priority rule and the bar to sub rosa plans.

The Bankruptcy Code defines the term "insider" to include an "affiliate, or insider of an affiliate as if such affiliate were the debtor[.]" 11 U.S.C. § 101(31)(E). It defines the term "affiliate" to mean, with an irrelevant exception, "an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor[.]" *Id.* § 101(2)(A). "Courts uniformly treat [section 101(31)] as illustrative of types of insider relationships but not as exclusive, and instead refer to the definition of insider contained in the legislative history: 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the

debtor.'"  *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 111 (Bankr. S.D.N.Y.

2005) (quoting *Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438, 449 (S.D.N.Y. 1994)).

Costa Verde and Qatar are the proposed Tranche C Lenders.  Costa Verde holds 11.19%

of the Company's stock.  It is part of the Cueto Group which owns or controls approximately

21.46% of the stock and designates three of the nine members of the Board, including the

Board's Chairman and Vice-Chairman.  Qatar holds 10% of the stock.  It designates one

director.  Although Delta is not a party to the Tranche C DIP Facility, it was instrumental in

negotiating the terms of the transaction and remains interested in the transaction.  Delta holds

19.99 % of the Company's common stock and designates two Board members.  Thus, in the

aggregate, these shareholders own or control more than 51% of the common stock and designate

six of the nine Board members.  It bears noting that, as set forth above, at the relevant Board

meetings, the Board designees of Qatar, Costa Verde and Delta and the Eblen Group

representative abstained from voting on any aspect of the Tranche A and C DIP Facilities on the

grounds that they were related parties to those transactions.  The Court finds that the Tranche C

DIP Facility is an insider transaction that is subject to review under the entire fairness doctrine.

*See In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. at 551 (applying heightened scrutiny standard

to review of insider sale transaction).

No one contends that that Oaktree is an insider.  The Committee and Ad Hoc Group have

objected to the Tranche A DIP Facility and argue that the heightened scrutiny standard should

apply to that tranche because the Tranche A DIP Facility and Tranche C DIP Facility are

intertwined.  *See* Committee Tranche A DIP Objection ¶¶ 6-7; *see also* Ad Hoc Tranche A DIP

Objection ¶ 15.  The Debtors contend that even if the Court reviews the Tranche C portion of the

DIP Financing under a heightened scrutiny standard, the Court can approve the remainder of the

financing on a business judgment basis, given the extensive marketing process, competitive

bidding and substantial evidence of arms-length bargaining that they contend took place with the

Tranche A Lender. *See* Debtors Reply ¶ 31 (citing Suppl. Coleman Decl. ¶¶ 18-21 (describing

arms-length negotiation with Tranche A Lender)). However, that cuts against the Debtors'

contention that the DIP loan transaction "needs to be assessed holistically, and the record shows

that the terms of the Tranche C Facility were essential in raising the Tranche A DIP Facility."

Debtors Reply ¶ 56. The evidence confirms the latter point. The Court will apply the entire

fairness test in reviewing the Tranche C DIP Facility and the Tranche A DIP Facility.

**Whether The DIP Financing**
**Satisfies The "Entire Fairness" Test**

To demonstrate that they have satisfied the "entire fairness" standard, the Debtors must

show that the Revised Credit Agreement, including the Tranche A DIP Facility and Tranche C

DIP Facility results from fair dealing and reflects a fair price. *See In re Innkeepers USA Tr.*, 442

B.R. 227, 231 (Bankr. S.D.N.Y. 2010) ("In applying heightened scrutiny, courts are concerned

with the integrity and entire fairness of the transaction at issue, typically examining whether the

process and price of a proposed transaction not only appear fair but are fair and whether

fiduciary duties were properly taken into consideration."); *Carlson v. Hallinan*, 925 A.2d 506,

531 (Del. Ch. 2006) ("Entire fairness has two components: fair dealing and fair price." (citation

omitted)). *See also In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. at 549 ("[T]he conduct of

bankruptcy proceedings not only should be right but must seem right." (citation omitted)). The

Objectors contend that the Debtors have not met that burden because they have not demonstrated

that the Tranche C DIP Facility is the product of a fair process or that it is fairly priced. *See*

Committee Suppl. and Restated DIP Objection ¶ 59; Ad Hoc Group Initial DIP Objection ¶ 26;

Knighthead Initial DIP Objection ¶ 28. The Court considers those matters below.

Before addressing the elements of the "entire fairness" test, the Court considers the

Objectors' challenge to the Debtors' good faith in pursuing the Tranche C DIP Facility.  They

contend that Delta persuaded the Company to fire Evercore because Delta was not satisfied with

the advice Evercore gave the Board during the April 30 meeting.  They assert that Delta

recommended that the Company hire PJT and, thereafter, PJT introduced the Board to the

concept of a shareholder DIP loan with an equity conversion right exercisable by the DIP lender,

that would afford the DIP lender the opportunity, through the DIP financing process – and

outside of a plan confirmation process - to acquire or retain a substantial interest in the

reorganized Debtors' equity.  As noted previously, at the May 16 meeting that it had with

members of the Cueto family and Debtors' management, PJT distributed a document titled

"Illustrative Capital Structure Before, During and After Ch. 11."  Trial Ex. 47 (Coleman Email to

Alfonsín ), at 2-3.  It showed that a $1 billion shareholder DIP facility would convert to between

60% and 100% of the reorganized equity of the Debtors.  *See id.*  The Objectors say that with the

help of that document, at that meeting, PJT sold the group, including the Debtors' largest

shareholders, on the concept of a DIP loan with an equity conversion right, as a means for major

shareholders to "protect their investment" in the Debtors (albeit at the price of the DIP loan) and,

in doing so, PJT ensured that it would be retained as the Debtors' investment banker in the

Chapter  11 Cases.  In substance, the Objectors contend that from that point forward, the Debtors

and PJT have promoted the concept of a multi-tranche DIP loan – with one tranche reserved for

existing shareholders – for the benefit of the Debtors' largest shareholders, but to the detriment

of the Debtors' unsecured creditors.

The evidence does not support the Objectors' assertions.  First, Evercore had signaled the

possibility of a multi-tranche DIP facility, including funding from stakeholders, in the April 30

Board Discussion Materials.  *See* Trial Ex. 24 (April 30 Board Discussion Materials), at 17.

Moreover, in labeling the document that it handed out at the May 16 meeting as "illustrative" or

"highly illustrative," PJT was clear that it does not demonstrate that the Tranche C Lenders

would receive any particular equity percentage.  More significantly, at the trial, Coleman

explained the purpose of the presentation, as follows:

> This was an illustrative -- and I underline "illustrative" -- capital structure analysis
> that we did for investors in the Costa Verde group, many family members who have
> never been associated with a bankruptcy, much less a U.S. bankruptcy. And they
> were asking us how do I get repaid if I put this money in because, obviously,
> Chilean bankruptcies and Brazilian bankruptcies are very different, so we created
> a chart. . . . We were trying to show them what might happen if their tranche needed
> to be converted into equity. . . . I would call this Bankruptcy 101. This doesn't
> anticipate a planned reorganization. It doesn't anticipate anything.

7/29/20 Hr'g Tr. at 220:14-221:10.  The Court credits that testimony.  Further, PJT was hired

prior to the May 12 Board meeting and was introduced to the Board at that meeting.  *Id.* at

232:4-7 (stating PJT executed a Retainer on May 20, 2020, effective May 7, 2020.)  The minutes

of the May 12 Board meeting reflect that Alvo (the Company's CEO), discussed the Company's

retention of PJT, and explained to the Board that

> Evercore fulfilled in technical terms the task that had been assigned to it, but that
> the change was mainly due to issues of coordination and agility in the consultancy
> since, in case of entering [an in-court restructuring], an advisor is required to get
> used to the pace of the Administration for the next twelve months.    We have
> decided to hire PJT as financial advisors who, in just a few days, have internalized
> all the information about the Company and the decision process being developed,
> and the Administration considers that they have been agile, collaborative and that
> they have provided better advice regarding the DIP financing that shall be
> commented on later in this session.

Trial Ex. 40 (Minutes of the Ordinary Session No. 454 of the LATAM Airlines Group S.A.

Board of Directors, dated 5/12/2020).  Later during the May 12 meeting, PJT made a

presentation to the Board which, among other things, highlighted that a chapter 11 filing for the

Company likely would be necessary and that the Company should secure commitments for a multi-tranche DIP facility—including a first loss junior shareholder tranche—that the Company and its advisors had already contemplated.  In those materials, in a slide titled "Illustrative DIP Approach," among the "Considerations" noted by PJT were "Potential DIP sources, 3rd party investors, government, existing shareholders."  Trial Ex. 39 (May 12 Presentation), at 8.  The minutes of the meeting reflect that Brent Herlihy of PJT addressed the Board on matters relating to DIP financing.  Referring to the slides, Herlihy noted that "[w]ith regard to DIP financing, it explains that the size must be determined, against what loans can be made, what the sources are – potential third parties, shareholders, or governments or combinations of the three of them – how it is properly structured if there are three types of collateral with different interests and different approaches towards the exit."  *Id.* at 6.  Finally, they had good reasons for approaching their major shareholders for DIP financing.  As previously discussed, the Debtors have demonstrated that the benefits to them in obtaining shareholder financing include that such financing (i) potentially creates or enhances opportunities to obtain governmental financial support, (ii) sends a strong message to the market with respect to the viability of the Debtors' business, and (iii) is a condition to obtaining Tranche A financing.  The Court finds no merit to the Objectors' challenge to the Debtors' good faith in seeking approval of the Tranche C DIP Facility.

**Whether The DIP Facility, Including**
**The Tranche C Loan, Resulted From A Fair Process**[77]

---

[77]    This discussion is supplemented by the Court's detailed recitation of the facts relevant to the Motions, including, without limitation, its discussion of the Board meetings and the actions by the Debtors, their management and advisors, the Directors and the Board, and the Independent Directors and Directors Committee in connection with the Tranche C DIP Facility and Tranche A DIP Facility.

"Fair dealing focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation." *Carlson v. Hallinan*, 925 A.2d at 531 (internal quotations marks and footnote omitted). The concept of "due care" is directly relevant to the "fair process" prong of the entire fairness test. *In re Innkeepers USA Tr.*, 442 B.R. at 231. It can be established by evidence of careful consideration and process, including but not limited to, financial analyses, independent advice and careful deliberation. *Id. See also Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172-76 (Del. 1995) (discussing the initiation, negotiation, structure and disclosure of the transaction in order to determine whether it was the result of fair dealing). The Court considers whether the Debtors have met their burden of demonstrating that the Revised Credit Agreement, including the Tranche C and Tranche A DIP loans, are products of a fair process.

The sudden onset of the COVID-19 pandemic devastated the Debtors' business in just a matter of weeks, causing millions of dollars in losses every day. *See* Otton Dep. Tr. at 109:24-110:1 ("And the information we've seen so far suggests that LATAM is burning about $13 million a day."). The Debtors' immediate, pre-petition, response to the onset of the pandemic was measured, informed and the product of careful, well-informed deliberation. In response to that shock to the Debtors' collective system, in the roughly ten weeks between the onset of the pandemic and the filing of the Chapter 11 Cases, the Board met no less than 15 times. At those meetings, the Company's management and outside advisors presented information to the Board on the Company's cash flow and liquidity, restructuring alternatives, the possible need to file a chapter 11 bankruptcy under the U.S. Bankruptcy Code, attempts to obtain government financing, DIP financing and other operational and strategic matters. *See, e.g.*, Trial Exs. 7-21, 23-27, 35-37, 39-40, 43, 52-55, 64, 71-73, 121-125 (minutes of LATAM Board meetings). The

Debtors, through their management and the Board, and with the assistance of the Company's

legal and financial advisors, implemented a systematic approach in developing a business plan

that allowed them to (i) stabilize their business; (ii) assess the viability of an out of court

restructuring of that businesses, including, in the first instance, the availability of obtaining

prompt financial assistance from governmental units; and (iii) when it was clear that a

bankruptcy filing was necessary, to obtain the financing needed to underwrite it.[78]  The record

shows that management, with the assistance of the Company's legal and financial advisors,

regularly advised the Board of developments impacting the business.  When it appeared likely

that a bankruptcy filing by the end of May would become necessary, the Company's advisors

provided the Board with information and analysis relevant to the chapter 11 process generally,

and specifically regarding the need for, and potential sources of, DIP financing, which ultimately

evolved into the DIP Credit Agreement.  *See, e.g.*, Trial Ex. 53 (External Advisors' Discussion

Materials Presentation, dated May 19, 2020).  When the Company determined, for good reasons,

that it would look to its shareholders to provide a portion of the DIP financing, it structured the

---

[78]    The Board minutes are particularly instructive on these matters.  In early March when the pandemic literally grounded the Debtors' lucrative passenger operations, the Board received regular updates on the impact of the pandemic and the affirmative steps the Company was taking to reduce costs, manage cash flow and respond to the crisis.  *See, e.g.*, Trial Ex. 7 (Extraordinary Board Meeting Minutes No. 148, dated Mar. 11, 2020) at -0313.  By late April, as the pandemic continued, the Company's management and financial and legal advisors were developing and reporting to the Board on potential paths to address the developing and worsening situation, including an out-of-court restructuring and a possible chapter 11 bankruptcy filing, where the Company remained focused on determining whether an out -of- court solution could succeed.  *See, e.g.*, Trial Ex. 19 (Ordinary Meeting of the Board of Directors Minutes No. 152, dated April 21, 2020); Trial Ex. 21 (Alternatives Under Analysis Presentation, dated April 21, 2020) at -8652; Trial Ex. 23 (Ordinary Meeting of the Board of Directors Minutes No. 153, dated April 28, 2020) at-68602; Trial Ex. 26 (Ordinary Meeting of the Board of Directors Minutes No. 154, dated April 30, 2020); Trial Ex. 25 (Financial & Legal Presentation, dated April 30, 2020).  The level of board engagement expanded by May, as the directors received detailed assessments of the Company's liquidity positions and efforts to obtain assistance outside of a formal bankruptcy filing, including discussions with various governmental representatives on the potential for financing or other support.  *See, e.g.*, Trial Ex. 25 (Financial & Legal Presentation, dated April 30, 2020) at -525 to -561; Trial Ex. 55 (Extraordinary Board Meeting Minutes No. 156, dated May 19, 2020) at -516 to -518; Trial Ex. 39 (May 12 Presentation); Trial Ex. 53 (External Advisors' Discussion Materials Presentation, dated May 19, 2020).  The Board received regular and detailed information from the Company's financial advisors, including PJT from the time it was first engaged on May 7, 2020, as well as legal advice from company counsel.  *See, e.g.*, Trial Ex. 43 (Ordinary Meeting of the Board of Directors Minutes No. 454, dated May 12, 2020) at -296 to -299; Trial Ex. 39 (May 12 Presentation).

ensuing negotiations among the Debtors and shareholders to ensure that Board representatives were not on either side of the negotiations.[79]  Several draft term sheets and drafts of the Tranche C Commitment Letter were exchanged between the parties, and management updated the Board on the status negotiations of the DIP term sheet.  *See, e.g.*, Trial Ex. 72 (Extraordinary Board Meeting Minutes, dated May 22, 2020), at -634 (noting that "negotiations with Qatar Airways have been progressing" and "Costa Verde has expressed interest and has indicated that it will refrain from direct negotiations and will join in what [management] agrees with Qatar").  Finally, the process adopted by the Board in reviewing and ultimately approving the Tranche C DIP term sheet was "by the book."  As discussed below, under Chilean corporate law, public companies like LATAM Parent, must ensure that "related party" transactions, like the Tranche C DIP Facility, are reviewed by the Directors Committee, and are put to a Board vote, excluding interested directors, based on the Directors Committee's recommendations.  Company management brought that "related party" transaction to the Directors Committee for its review at the May 25 Directors Committee meeting and, after approving the transaction, the Independent Directors brought the transaction to the Board for review at the May 25 Board meeting, with only non-conflicted Board members voting on the proposed transaction.[80]

---

[79]  On the one hand, the Company's management, including Alfonsin, and its outside advisors Cleary Gottlieb and PJT, negotiated on behalf of the Company.  *See* Trial Ex. 72 (Extraordinary Board Meeting Minutes, dated May 22, 2020) at -637.  On the other hand, Delta and its counsel negotiated on behalf of the shareholders, while Qatar and Costa Verde (and Enrique and Ignacio Cueto particularly) did not participate in the negotiation of the financing terms, other than that Qatar's counsel stepped in to negotiations around May 25, when Delta concluded it would not be an initial DIP lender party to the financing.  *See* Factual Background, *supra*; Trial Ex. 123 (May 25th BOD Minutes).

[80]  *See* Trial Ex. 125 (May 25th Directors Committee Minutes); Trial Ex. 124 (May 25th Directors Committee Statement); Trial Ex. 123 (May 25th BOD Minutes); Trial Ex. 122 (May 25 BOD Materials).

Immediately upon filing their bankruptcy petitions, the Debtors and their advisors began an extensive marketing process seeking the full $2 billion plus in DIP financing that the Debtors required. *See* Trial Ex. 243 (First Coleman Decl.) ¶ 24; Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 9. *See also* Coleman Dep. Tr. at 92:6-9 ("[W]e did seek to replace all of the Tranche C with anybody that was willing to give, by example, more than $2 billion in total without tranches."). PJT sent teasers "seeking $2+ billion" in DIP financing to over 150 parties seeking financing for the Debtors, with over 80 of those parties signing non-disclosure agreements. *See* Trial Ex. 243 (First Coleman Decl.) ¶ 24; Trial Ex. 276 (PJT contact log); Trial Ex. 292 (Reply Coleman Decl.) ¶ 9 (stating that no party that agreed to sign an NDA had been denied access to the data room housing detailed financial and due diligence information about LATAM). However, notwithstanding the willingness of parties to access the data room, the Debtors did not receive better alternative offers. *See* Coleman Dep. Tr. at 94:23-25 ("My recollection on [the PJT call log] is not one of those parties was willing to come in at a cheaper-better price, if you will, than what was in the Tranche C."). Several parties reached advanced negotiations with the Debtors on a possible Tranche A DIP loan. The Company received proposals of up to $1.5 billion, where parties like Oaktree offered significantly more financing than their initial proposal. *See* Oaktree Statement ¶ 8. The Board remained actively engaged in the DIP loan process post-petition. On June 24, after the terms of the Tranche C DIP Facility had been further negotiated and documented, management and the Company's financial and legal advisors presented the DIP Credit Agreement to the Directors Committee for its review and consideration. The Independent Directors reviewed the transaction, and thereafter, the Directors Committee recommended that the Board approve it. At the June 24 Board meeting, the Independent Directors voted

unanimously to approve it.[81]   A few weeks later, the Company finalized its negotiations with

Oaktree over the Tranche A financing and on July 8, management and the Company's advisors

presented the Tranche A DIP Facility with Oaktree to the Directors Committee.  The

Independent Directors reviewed the transaction, the Directors Committee recommended that the

Board approve it, and, at the Board meeting, the Independent Directors voted unanimously to

approve it.[82]

The Debtors' consideration of the Tranche C DIP Facility did not end after the Board

approved it.  As detailed previously, in response to Knighthead's overtures regarding alternative

DIP sources and Jefferies' submission of the Initial Jefferies Commitment, the Debtors, through

their management and advisors engaged Knighthead and Jefferies on the terms of the proposals,

considered the merits of the proposals and reported to the Board, as necessary.  While that

process unfolded, the Debtors re-engaged the Tranche C Lenders over the terms of the Tranche C

DIP Facility and thereafter, the parties agreed to the Revised Credit Agreement which reflected

the changes to the Tranche C DIP Facility.  The Debtors did so while their advisors remained in

contact with Jefferies and reviewed and reported to the Board on the modifications to the Initial

Jefferies Commitment.

In soliciting interest in the Tranche A and Tranche C DIP Facilities, the Debtors cast a

wide net.  The process that the Debtors adopted in negotiating and agreeing to the terms of the

Tranche A and Tranche C DIP Facilities was "fair," as evidenced by the Debtors' careful, well-

informed and open consideration of the issues relating to the DIP financing.  Through their

---

[81]    *See* Trial Ex. 200 (June 24th Directors Committee Minutes); Trial Ex. 198 (June 24th Board Minutes); Trial Ex. 199 (Board of Directors Statement); Trial Ex. 197 (External Advisors' Presentation Discussion Materials, dated June 24, 2020).

[82]    *See* Trial Ex. 265 (July 8th Directors Committee Minutes).

management and financial advisors, the Debtors widely marketed the Tranche A and C loans,

engaged with Jefferies and Knighthead on alternative loan proposals, and obtained significant

modifications to the Tranche C DIP Facility, as reflected in the Revised Credit Agreement.  That

plainly supports a determination that the Revised Agreement, including the Tranche C and

Tranche A DIP Facilities is the product of a "fair process."  Still, the Objectors raise the

following four points in contending that the Debtors cannot meet the "entire fairness" test with

respect to Debtors' loan review process.

> The Objectors raise

> 1.    The Further Amended Jefferies Commitment is superior to the Tranche C DIP
>        Facility;

> 2.    The Debtors' failure to market the Tranche C DIP Facility pre-petition precludes a
>        finding that the process was fair;

> 3.    The Independent Directors' review of the Tranche C DIP Loan Facility did not
>        comply with Chilean law; and

> 4.    The Debtor failed to market the Tranche C DIP Facility post-petition.

The Court considers those matters below.
### **Whether The Debtors' Review of the Jefferies Proposals Is Flawed**

First, the Committee and Ad Hoc Group maintain that the Debtors' process was flawed

because the Further Amended Jefferies Commitment is "superior" to the Debtors' proposed

Tranche C DIP Facility.  *See* Committee Post-Trial Brief at 3.  As support, the Committee points

to the Debtors' own analysis showing that the Jefferies proposal "would have saved the estate

$454 million versus the original proposed Insider DIP Facility."  *See id.* at 3-4 (citing Trial Ex.

312 (PJT Presentation dated 7/24/2020 with Tranche C Side-By-Side Comparison), at 006-007

(wherein analysis indicates that, "[a]ll else being equal, current Tranche C lenders would have to

reduce the discount to plan value on their equity conversion option from 32.0% to ~11.2% to

equate their total costs with that of Jefferies' proposal.")).  The Committee further notes that

when comparing the cash repayment options "the evidence shows that the Insider Lenders would

be vastly overcompensated . . . and entitled to be repaid at an interest rate that is 6% greater than

that proposed by Jefferies."  *Id.* at 10.  The Committee also contends that the Jefferies proposal is

itself "evidence that there was significant untapped interest in the market in providing Tranche C

financing on superior terms [and] disproves the Debtors' repeated assertions that the majority

shareholders were uniquely positioned and 'very critical' to provide this financing."  *Id.* at 18.

The Debtors disagree that the Further Amended Jefferies Commitment is superior, and

maintain that the Revised Credit Agreement (i.e., the combined Tranche A DIP Facility with

Oaktree and the Tranche C DIP Facility with the shareholders) is the only and best financing

available to the Debtors because it "(i) is unconditional, subject only to this Court's approval, (ii)

provides the entirety of the DIP funds needed by the Debtors, including critically the $1.3 billion

senior Tranche A, (iii) provides the Debtors—*at their option*—with a right to compel the junior

lenders to subscribe to restricted equity at a pre-determined discount irrespective of the market

discount for such equity at reorganization, (iv) leaves the Debtors virtually unrestricted in their

future efforts to seek Tranche B financing from a number of potential sources, and (v) respects

the Debtors' operational challenges and offers critical flexibility to run their business."  Debtors

Post-Trial Brief ¶ 2.  They say that the Further Amended Jefferies Commitment for an alternative

Tranche C DIP loan is "not executable" (*see id.* ¶ 7), and still presents issues for the Debtors,

which the Committee's financial advisor, Charles Otton ("Otton") at UBS Investment Bank

("UBS"), had failed to consider, as follows:

- The Debtors cannot afford to abandon the hard-fought Tranche A DIP Facility with Oaktree (who has conditioned its commitment and funding upon the current Tranche C DIP Facility with the shareholder Tranche C Lenders), and risk their future prospects and the livelihoods of tens of thousands of employees worldwide

by foregoing a fully funded Tranche A DIP Facility in favor of the hope
something that is at best equivalent may be obtainable later. *Id.* ¶ 4.

- The opportunity to seek Tranche B financing from a broad number of potential
  lenders, whereas, the Jefferies proposal restricts potential lenders to only one, the
  government of Chile. *Id.*

- Numerous non-financial terms where the Jefferies Proposal does not come close
  to stacking up to the DIP Facility, including for example the former's unworkable
  requirement that LATAM maintain cash accounts of no more than $500 million *in
  the aggregate* outside the United States, a restriction that shows an alarming
  failure to comprehend what is required to run a global airline such as LATAM.
  *Id.*

- The Further Amended Final Jefferies Commitment is "committed in name only."
  *Id.* ¶ 9.[83]

The Debtors also say that beyond these non-economic issues, the economic terms of the

Jefferies proposal, even by the Objectors' own metrics, are not superior. Specifically, they say

that at the Hearing, Otton conceded that with respect to the cash repayment election, "the total

cost of repayment of the two proposals is essentially the same." Debtors Post-Trial Brief ¶ 8

(citing 7/30 Hr'g Tr. at 422:4–10;[84] Ex. 334 (Tranche C Side-by-Side Comparison)). The

---

[83]    The Debtors contend that the Further Amended Jefferies Commitment is not fully committed because there are
conditionality to funding. At the Hearing, Coleman testified as follows:

> Q. I want to ask you what is explained in the first row that's titled "Commitment", that first comparison
> row?
> A. This is the -- both the size of the amount that is potentially committed -- in the case of the Tranche C, it
> is committed -- and then in case of Jefferies, it's the potential commitment.
> Q. And why do you say that it's a potential commitment?
> A. It originally started with a lot of conditionality. They have made improvements on a conditionality, but
> they still have terms which they can introduce that are unknown and could change the face of this deal.

7/29/20 Hr'g Tr. at 204:18-205:3.

[84]    Otton's testimony is as follows:

> Q. And Exhibit 334, which is your comparison chart –
> A. Yes, sir.
> Q. -- and just to make sure my math is right, because I'm not a finance guy, your conclusion from this chart
> is that the total cost of cash repayments of the two proposals is virtually equal, correct?
> A. On a conservative basis, yes. It's in fact, slightly -- it doesn't matter, you don't want a long answer. But
> yes, cash is -- is very similar.

Debtors further assert that the proposed Revised Credit Agreement provides non-economic advantages that the Objectors have failed to value—including, significantly, the Debtors' option, under the Tranche C DIP Facility, as revised, to exercise the Equity Subscription Election. They say that "[i]n a global pandemic with little visibility toward resolution," they need to retain this flexibility in the event that they are unable to refinance the DIP Facility, and that Otton conceded that such option was valuable, although he did not value it. *See id.* They maintain that in addition to the conversion option, there is value to the Debtors' ability to compel a waiver of the Chilean preemptive rights in the event that the Modified Equity Subscription Election is made under the Modified Tranche C DIP Facility. *See* Revised Credit Agreement § 2.12(b)(ii)(4)(y).

The Court finds merit in the Debtors' arguments. The evidence before the Court demonstrates that, contrary to the Objectors' contentions, the Debtors and their advisors, including the Independent Directors, evaluated and considered the Jefferies proposal in good faith, and engaged Jefferies and its professionals. The testimony confirms that, far from ignoring or turning away Jefferies, the Debtors had expressed and communicated to Jefferies a variety of economic and non-economic concerns with respect to its proposal, and these discussions led to improvements in Jefferies' bid, and culminated in the Further Amended Jefferies Commitment. Although the Debtors did not ultimately choose to pursue the Further Amended Jefferies Commitment over the existing shareholders Tranche C DIP Facility, they have shown that the Tranche C DIP process undertaken vis-à-vis the Jefferies competing bid was nonetheless fair.

Likewise, with respect to the fairness of price, the different terms between the Further Amended Jefferies Commitment and the Tranche C DIP Facility with the shareholders were borne out from the evidence and testimony. While Jefferies' revised proposals addressed some

---

7/30/20 Hr'g Tr. at 134:15-24.

of the Debtors' economic and non-economic concerns, many issues still remained unresolved

with the Further Amended Jefferies Commitment, including, as noted above, conditionality to

funding, the requirement to maintain cash minimums within the United States, and limits on

governmental funding under the Tranche B DIP Facility.  While the Objectors submit that the

Further Amended Jefferies Commitment is superior to the Tranche C DIP Facility, applying

"heightened scrutiny" standards, the Court finds that it is not unreasonable for the Debtors to

conclude that the Jefferies proposal was "not executable" given its terms and restrictions, and

that the proposed Tranche C DIP Facility represents the only available option to the Debtors for

such post-petition financing.

### Whether The Debtors' Admitted Failure To Market The Tranche C DIP Facility Pre-Petition Precludes A Finding That Its Process Was Entirely Fair

There is no dispute that the Debtors agreed to the Tranche C Term Sheet without first

testing the market.  The Objectors say that is fatal defect to the process and, as support, they cite

to *In re Innkeepers USA Tr.*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010); *In re Los Angeles Dodgers,*

*LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); and *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547

(Bankr. S.D.N.Y. 1997).  *See* Committee Post-Trial Brief at 16.  But those cases are

distinguishable because in each case, the bankruptcy court found that the debtor acted in bad

faith to the detriment of the estate, in refusing to market the subject transaction.[85]  Although the

---

[85]   In *Innkeepers*, the debtors sought to assume a plan support agreement (the "PSA"), the terms of which would give its existing shareholder equity in the reorganized debtors.  442 B.R. at 231.  The Bankruptcy Court denied the relief, because the debtors failed to shop the PSA (either before or after its execution), and because the evidence showed that (i) the debtors never intended to shop it, (ii) the investment banker was specifically told not to seek any other investors, (iii) the PSA expressly prohibited the debtors from discussions with other parties, and (iv) the debtors essentially hid the PSA terms and its negotiation from their other secured lenders. *Id.*  at 231-32.

In *L.A. Dodgers*, the debtors sought approval of a secured DIP loan with the Highbridge Funds ("Highbridge"), its secured lender (such loan, the "Highbridge Loan").  457 B.R. at 310-11.  The debtors' principal had a financial interest in the loan transaction because if the debtors did not seek court approval of the loan, the principal would owe $5.25 million to Highbridge. *Id.* at 313.  Major league baseball objected to the court's approval of the Highbridge Loan and argued that it was prepared to make an unsecured DIP loan on better terms than those in

Debtors did not market the Tranche C DIP Facility pre-petition, as summarized above and fully described in the Court's discussion of the facts and application of the absolute priority rule herein, the Debtors engaged in a robust marketing process post-petition.  Moreover, the Debtors have demonstrated that there were good reasons for them not to go to the market with the DIP proposal prior to filing for bankruptcy protection.  Briefly, but as previously discussed at length, the Debtors reasonably concluded, among other things, (i) that a DIP underwritten by its major shareholders would enhance the potential for governmental support and send a strong signal to the market that their equity holders had confidence in the Debtors' business; and (ii) that it was impractical to go into the market because it did not have adequate collateral to fully secure a $2 billion loan.  Under these circumstances, the Debtors' failure to market the Tranche C DIP Facility before executing the Tranche C Term Sheet does not support the Objectors' contention that the process fails the entire fairness test.

**Whether The Independent Directors' Review Of**
**The Tranche C DIP Facility Complied With Chilean Law**

The Objectors also contend that the Debtors cannot establish the "entire fairness" of the process because the Independent Directors allegedly failed to comply with Chilean law when, as members of the Directors Committee, they reviewed and, thereafter, as Board members,

---

Highbridge Loan, but that the debtors refused to negotiate the terms of such a loan.  *Id.*  Given the debtors' principal's interest in the Highbridge Loan, the bankruptcy court applied the "entire fairness" standard in evaluating the transaction.  It denied the debtors' motion finding, in part, the "[b]aseball's willingness to extend unsecured credit on better terms and [d]ebtors' refusal to negotiate with Baseball precludes a finding of entire fairness."  *Id.* at 314.

In *Bidermann*, the Bankruptcy Court declined to approve a letter agreement/memorandum of understanding that proposed an LBO of the debtors by certain entities owned by the debtors' CEO, which would have provided for many advantageous benefits for the CEO and the debtor's principal.  203 B.R. at 551-52.  In so doing, the Bankruptcy Court explained that there was little integrity in the process because the debtors had not market tested the transaction at all (and indeed, did not respond to at least one other interested bid), but more importantly, the letter agreement had contained "window shop" provisions and sale procedures designed to discourage other sale bids altogether.  *Id.*

approved the Tranche C "related party" loan transaction. *See* Ad Hoc Group Post-Trial Brief ¶ 9.

A Chilean publicly-held corporation, such as LATAM Parent, is governed by two key statutes:

(a) the Chilean Corporations Act, Law No. 18.046 (Appendix A *Statutes* no. 1, Law No. 18.046

Art. 2, *Ley Sobre Sociedades Anónimas* (the "Corporations Act"), and (b) the Chilean Securities

Act (Appendix A *Statutes* no. 2, Law No. 18.045, *Ley de Mercado de Valores* (the "Securities

Act")). Trial Ex. 337 (Yrarrázaval Decl.) ¶ 13.[86]  For companies like LATAM Parent, the

Corporations Act governs the incorporation of the company and the minimum terms that must

be included in its bylaws, and regulates the company's governance, by the Board of Directors

and those matters reserved to the shareholders (*e.g.*, amendments to the bylaws). *Id.* ¶ 15. Title

XVI of the Corporations Act (Articles 146-49) sets forth rules governing approval of "related

party" transactions in respect of publicly held corporations. *See* Trial Ex. 337 (Yrarrázaval

Decl.) ¶ 58. Transactions involving "related parties" are subject to "heightened scrutiny."

Trial Ex. 294 (Bofill Suppl. Decl.) ¶ 13.[87]  As relevant, Article 100 of the Securities Act defines

the term "related parties" to include "[t]he corporation's parent company (*matriz*), or a company

that holds 10% or more of the equity interests of the corporation (*coligante*) as these terms are

defined in the Corporations Act." Trial Ex. 337 (Yrarrázaval Decl.) ¶ 59 (citations omitted).

Article 146 of the Corporations Act states that for publicly held corporations like LATAM

Parent, a related-party transaction includes any negotiation, act, agreement or deal between the

corporation and an entity that owns 10% or more of the corporation's equity. *See* Corporations

Act, Art. 146 (1). Article 147 authorizes related party transactions provided that the transactions

---

[86]   *See* Trial Ex. 337 (Declaration of Arturo Yrarrazaval [ECF No. 674], the "Yrarrazaval Declaration"). Professor Yrarrazaval is the Debtors' Chilean law expert.

[87]   *See* Trial Ex. 294 (Supplemental Declaration of Octavio Bofill Pursuant to 28 U.S.C. § 1746 [ECF No. 680], the "Bofill Supplemental Declaration"). Professor Bofill is the Ad Hoc Group's Chilean law expert.

(i) are intended to contribute to the corporation's social interests, and (ii) are consistent in regard

to price, terms and conditions with those prevailing in the market at the time the transaction is

approved.  They also must comply with certain enumerated formalities and procedures.  *See*

Corporations Act, Art. 147.[88]

The parties agree that provisions of the Tranche C DIP Facility qualify as a "transaction

with a related party" under the Corporations Act.  *See* Trial Ex. 337 (Yrarrázaval Decl.) ¶ 65;

Trial Ex. 294 (Bofill Suppl. Decl.) ¶¶ 11-12.  The concept of "corporate interest" is not

defined under Chilean law.  Trial Ex. 294 (Bofill Suppl. Decl.) ¶ 14.  For Professor Bofill, the

concept equates with maximizing the value of a company or at least preserving that value.

---

[88]    Those formalities and procedures are:

    i.    The interested directors must immediately inform the board of directors of their conflict of interest;

    ii.    The transaction must be approved by an absolute majority of the board members, with the interested directors abstaining (and to be informed to the shareholders afterwards). In case the majority of directors are *interested* directors, the transaction can only be approved by unanimous vote of the remaining directors or in a shareholders' meeting with a quorum of 2/3 of the voting shares;

    iii.    In case a shareholders' meeting is called to approve the transaction, the board must appoint at least one independent evaluator to inform the shareholders about the conditions of the operation, its effects and the impact at the company.  In their report, the independent evaluators shall express their opinion regarding the matters that the committee of directors expressly requests to be evaluated.  The company's committee of directors may appoint an additional independent appraiser in case they do not agree with the selection made by the board of directors;

    iv.    The reports of the independent evaluators shall be made available and the company shall communicate them to the shareholders and to the public, by means of a communication to the Chilean market through the CMF.

    v.    The members of the board shall inform the shareholders about how beneficial is the transaction for the company's interest;

    vi.    In addition, duties of the committee of directors are precisely to examine the background of the transaction and to issue a report in regards to such operations. A copy of the report shall be submitted to the board of directors and shall be voted for approval or rejection.

*Id.* Professors Bofill and Yrarrázaval agree that where a company is insolvent, consideration of the "corporate interest" requires directors to consider the interests of creditors before shareholders. *Id.*; 7/30/20 Hr'g Tr. at 522:20-25; *id.* at 523:1-3. Professor Bofill contends that to assess whether a transaction conforms to the terms and conditions prevailing in the market, the company must ensure that no better offer is available before it contemplates accepting the insider transaction. *Id.* ¶¶ 15-17. He maintains that to do so, "market testing is required." *Id.*[89] In reviewing the actions of the Independent Directors in connection with their consideration of the Tranche C DIP Facility, the parties agree that the Independent Directors:

- Did not retain their own legal counsel, financial advisor, or other professional advisor in connection with the Tranche C Facility.

- Did not direct the Debtors' management or any of the Debtors' advisors in connection with the Tranche C Facility.

- Did not engage in any negotiations relating to the Tranche C Facility.

Independent Director Stipulation ¶¶ 2-4.[90] The parties also agree that (i) the Independent Directors have not identified or produced any documents or other form of written

---

[89] Professor Bofill says that market testing is required because:

> The company must ensure that no better offer is available before it contemplates accepting the insider transaction. Thus, the evaluation of the "price, terms and conditions adjusted to those prevailing in the market at the time of its approval", requires to estimate under which conditions the market offers a similar transaction, in order to analyze the convenience of a given transaction.

Trial Ex. 294 (Bofill Suppl. Decl.) ¶ 15.

[90] *See* Joint Stipulation of Facts Regarding the Independent Directors [ECF No. 716] (the "Independent Director Stipulation"). During a discovery conference on July 17, 2020, at the Court's direction, the parties agreed to rely on a stipulation of facts (which became the Independent Director Stipulation) regarding the actions that the Independent Directors took in reviewing the Tranche C DIP Facility. They entered into the stipulation in lieu of the Committee, Knighthead and the Ad Hoc Group deposing the Independent Directors.

communications exchanged amongst themselves, with any advisors, or with other directors of the

Board, concerning their evaluation of the Tranche C DIP Facility; and (ii) there is no record of

any discussions, deliberations, information received, updates received, or other involvement, by

either of the Independent Directors concerning the Tranche C DIP Facility, other than what is

contained in the minutes and related materials of the Directors Committee and Board, referenced

in the Independent Director Stipulation.

The Ad Hoc Group makes much of the fact that the Directors Committee did not retain

independent advisors, notwithstanding the fact that it was provided with a budget for that very

purpose.  Even though the Independent Directors were not required to retain advisors, the Ad

Hoc Committee says that their failure to do so undermines the validity of the  decisions that they

made with respect to the Tranche C DIP Facility.  *See* Ad Hoc Group Post-Trial Brief ¶ 15.

Professor Bofill says that "in [his] experience it is customary for the Board of Directors

Committee to seek an independent legal and/or financial advice from advisors who are

independent from those advising the Board of Directors."  Trial Ex. 294 (Bofill Suppl. Decl.) ¶

17.  Moreover, the Ad Hoc Group asserts that the minutes of the May 25 and June 24 Board

meetings reflect that neither the Board nor the Independent Directors discussed the "equity

conversion feature" in the DIP or how that feature would affect creditors, let alone whether the

Tranche C DIP satisfied the Debtors' corporate interests or served the interests of creditors.  Ad

Hoc Group Post-Trial Brief ¶ 11.  They say that the minutes show that the directors considered

the interests of the Tranche C Lenders as existing shareholders in reaching their decision to

submit the Tranche C DIP Facility for Board approval.[91]  Professor Bofill advises that based

---

[91]    *See* Trial Ex. 200 (June 24th Directors Committee Minutes) at -77918 (taking note of "the risk that, in the case
of bankruptcy, the shareholders would lose . . .  their initial investment in the Company").

upon his review of the minutes of the May 25 and June 24 meetings of the Board of Directors

and the Board of Directors Committee, the "Tranche C DIP Facility was not approved in a

manner that satisfies the Chilean law requirements for related-party transactions."  Trial Ex.

294 (Bofill Suppl. Decl.) ¶ 18.[92]  In contrast, based upon his review of the minutes, Professor

Yrarrázaval  found that the LATAM Parent's Board of Directors (i) effectively considered that

the DIP Credit Agreement contributed to the corporation's interest, and (ii) effectively

considered that the DIP Credit Agreement conformed to reasonable market conditions.  *See* Trial

Ex. 337 (Yrarrázaval Decl.) ¶ 68.

In considering the hallmarks of fair process, courts look to applicable corporate law.

*See Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) (looking to Delaware corporate law

to define the entire fairness standard, including fair process).  The parties do not dispute that

under Chilean law, a board of a publicly traded company like LATAM Parent cannot approve a

related party transaction like the Tranche C DIP Facility without finding that the related-party

transaction is in the corporate interest and that it conforms to the prevailing market terms at the

time of the transaction.  They also do not dispute that the Board made those findings in

approving the Tranche C DIP Facility.  Professor Bofill contends that, nonetheless, the

transaction was not approved in a manner that satisfies Chilean law requirements because the

---

[92]    Professor Bofill elaborated on that conclusion, as follows:

> The minutes reflect that (i) there was no sufficient review, analysis and discussion on whether
> the Tranche C DIP Facility satisfies the corporate interest, including minority shareholders or
> creditors, (ii) did not engage in a thorough analysis of whether the transaction conformed with
> market conditions since the terms and conditions of the Tranche C DIP Facility appear to have
> been compared against itself only (in the context of the situation of the company and the air
> transportation market), and (iii) considering the relevance of the transaction in hand, the Board
> of Directors Committee do not appear to have received independent legal or financial advice in
> connection with the approval of the Tranche C DIP Facility.

Trial Ex. 294 (Bofill Suppl. Decl.) ¶ 18.

Independent Directors did not do enough in reviewing the pricing of the transaction, and failed

to consider whether the transaction satisfied the corporate interest, including the interests of

minority shareholders or creditors.  Professor Yrarrázaval  disagrees with him.  Still, neither

the Debtors' nor Ad Hoc Group's experts deny that the clear statutory provision of the

Corporations Act control and that in interpreting the law, they do not look beyond the clear

language of the statute.  *See* 7/30/20 Hr'g Tr. at 235:2-4.

It is clear to the Court that the Independent Directors embraced their roles as members

of the Board and Directors Committee.  Professor Bofill does not contend that they erred in

considering the presentations and analysis of management and the Company's advisors who

were not conflicted, at the May 25 and June 24 meetings.  *See* Coleman Reply Decl. ¶ 4 (noting

the PJT will not receive capital raising fee for financing in connection with shareholder

participants in Tranche C).  No one contends that in approving the Tranche C DIP Facility, the

Independent Directors breached their fiduciary duties under Chilean law.  In assessing whether

the Debtors' process in agreeing to the Revised Credit Agreement, including the Tranche C and

Tranche A DIP Facilities was "entirely fair," the Court will not look behind the Independent

Directors' decision and attempt to resolve the dispute between two Chilean law experts over

whether the Board's approval of the transaction complied with applicable Chilean law.  It need

not do so.  The Board and Independent Directors treated the DIP loan as a "related party"

transaction as required under Articles 146 and 147 of the Corporations Act.  There is no dispute

that the appropriate procedures were followed, that no party related to the Tranche C DIP

Facility (for purposes of Chilean law) played a role in approving the transaction, and that the

Board approved the transaction.  The Court will consider the dispute between the experts over

the Independent Directors' actions in assessing the weight to which the Court will give to the

Independent Directors' role in the transaction in reviewing the "entire fairness" of the transaction.

**Whether The Debtors Marketed The**
**Tranche C DIP Facility Post-Petition**

The Committee contends that the Debtors failed to adduce any evidence that they conducted a post-petition marketing process for the Tranche C DIP Facility. They say this is so in part because they have not introduced dozens of e-mails and pages upon pages of testimony evidencing (a) solicitation of numerous parties to provide the Tranche C on better terms; and (b) demands to the shareholder lenders to improve their terms. *See* Committee Post-Trial Brief at 16. However, the Debtors plainly conducted a post-petition marketing process as evidenced by the teasers, and the fact that PJT "solicited and indicated a willingness to entertain (i) proposals for the full amount of the capital need, (ii) proposals to combine the Tranche A DIP Facility and Tranche C DIP Facility, (iii) proposals to combine the Tranche B DIP Facility, Tranche A DIP Facility, and the Tranche C DIP Facility, and (iv) alternative junior DIP proposals in lieu of the Tranche C DIP Facility." Trial Ex. 243 (First Coleman Decl.) ¶ 24. It is undisputed that "[o]ver the course of this DIP marketing process, over 80 parties have signed non-disclosure agreements and received access to information on the Company and a virtual data room." *Id.* Nonetheless, the Committee says that the Debtors have admitted that the post-petition marketing process was limited to seeking Tranche A financing. *See* Committee Post-Trial Brief at 16 (citing Coleman Dep. Tr. at 204:23-24 ("we had locked in C the terms were done now we're trying to lock in A"); *id.* at 204:1-3 ("At this stage, we're not focused on trying to find C . . . .")). The contention is, at best, confusing, as is the cite to Coleman's testimony. That is because in that exchange, Coleman was testifying with regard to the Company's efforts as of June 30 – more than one month after the Debtors commenced marketing the Tranche A and Tranche C loans. *See*

Coleman Dep. Tr. at 202:9-10.  Moreover, the Committee contends that neither Alfonsín nor

Coleman could recall ever making an active effort to facilitate a superior Tranche C proposal.

*See* Coleman Dep. Tr. at 95:16-25; *id.* at 203:20-204:1 ("throughout" PJT's documents, there has

been no discussion about an "effort" to obtain a "less  expensive junior tranche"); 07/29/20 Hr'g

Tr. at 133:19-21 (Alfonsín) ("Q.  You never called up a lender and  said, we'd like you to make a

proposal to replace Tranche C specifically, did you?  A.  Not only for Tranche C, no."); *see also*

Trial Ex. 253 (June 30 board deck), at 002 (stating that "Since signing the  Tranche C term sheet

with certain shareholders . . . the company and its advisors have focused  significant time and

effort on identifying and contacting . . . and negotiating with potential  Tranche A lenders.").

But that does not detract from the fact that the evidence shows that – before Jefferies emerged –

in response to the Debtors' marketing efforts, the Debtors spoke with parties potentially

interested in the Tranche C loan.  *See* Coleman Dep. Tr. at 94:23-25 ("My recollection on [the

PJT call log] is not one of those parties was willing to come in at a cheaper-better price, if you

will, than what was in the Tranche C").  The Committee also contends that the Debtors'

corporate documents confirm that, rather than seeking the best available terms, the proposed

Tranche C facility was always intended to be "reserved" for the Debtors' existing shareholders.

*See* Committee Post-Trial Brief at 17-18 (citing Trial Ex. 123 (May 25th BOD Minutes), at 023

(stating that "[t]he term sheet includes a financing tranche reserved for shareholders"); Trial Ex.

96 (May 25 Costa Verde Board Minutes), at 6700 (referring to "the tranche reserved for

shareholders" and describing it as "a tranche of financing to which the rest of the shareholders

can join"); Trial Ex. 251 (June 30th Costa Verde Board Minutes), at 007 (stating that "The

Tranche C financing is reserved for shareholders.")).  However, that disregards the fact that in

obtaining approval for the Tranche C Commitment Letter, the Debtors' advisors informed the

Board that they would conduct a marketing process for both loans and, beginning on the Initial

Petition Date, conducted a marketing process.  *See* Trial Ex. 122 (May 25 BOD Materials)  ("all

three tranches will be subject to competing proposals from other lenders").  Further, the

Directors noted as much at the May 25, 2020 board meeting.  *See* Trial Ex. 125 (May 25th

Directors Committee Minutes), at 5 (Coleman stated "PJT will launch a robust marketing process

for the DIP Financing after the Chapter 11 filing, and that the presentation submitted to the

Committee will be subject to competitive proposals that may be submitted by other prospective

lending parties").

The Objectors also contend that the Debtors discouraged interested parties from bidding

on the Tranche C DIP loan by steering them to the Tranche A DIP loan and/or not being

responsive to potential bidders.  *See, e.g.*, Committee Initial DIP Objection ¶ 48; Ad Hoc Group

Post-Trial Brief ¶ 13 ("Here, the Debtors' failed to undertake any reasonable efforts to market

the Insider Tranche C DIP Facility. In fact, the Debtors have dissuaded or at least ignored

competing proposals, claiming that the Tranche C 'economic terms are set' and that the Insider

DIP Facility is 'designed to allow shareholders to participate in the recovery of the business.'").

The Court finds no merit to those contentions because at trial, they failed to substantiate

those claims.  First, neither Otton nor Jamal could testify to a single conversation in which

anyone from PJT or the Debtors chilled bidding:

> Otton testified he could not report on a single specific conversation in which
> anyone ever said to anyone at UBS that they were chilled,[93] and acknowledged
> that PJT had consistently told UBS it was open to all offers.  *See* 7/30/20 Hr'g Tr.
> at 130:2-5 (Q. "And in your conversations with PJT, PJT was always very clear
> that there was no impediment to anyone proposing an alternative C in its entirety
> on better terms; is that correct?"  MR. OTTON:  "That's what they said to us,

---

[93]    *See* 7/30/20 Hr'g Tr. at 130:17-23 (Q: "[Y]ou cannot tell this Court of a single statement made to anybody at
UBS by a prospective DIP lender who claims to have been discouraged from making a Tranche C offer, can you?"
MR. OTTON: "So no . . . is the answer to your question.").

correct." Otton also confirmed that PJT was available for regular communications with the Committee's advisors. 7/30/20 Hr'g Tr. at 130:24-131:1 (Q. "[Y]ou have regular check-ins with PJT?" MR. OTTON: "Yes, sir.").

Jamal gave similar testimony. *See* 7/30/20 Hr'g Tr. at 57:13-18 ("Q: You personally, as the financial advisor to the Ad Hoc Group, are not aware of a single instance in which anyone reached out to the Debtors and found the Debtors unresponsive; correct? MR. JAMAL: "No one has called me and said, 'I tried to call the Debtors, and they weren't responsive to me[.]'"); *id.* at 57:24-58:5 (Q: "You cannot describe for us a single conversation where someone told you that PJT or the Debtors had ever discouraged them from bidding on Tranche C, can you?" MR. JAMAL: "I can recall some frustrations that people expressed, but . . . it's kind of hard for me to sort of parse the words that you're describing to say, whether I could -- I would describe that as discouragement or not.").[94]

Further, the evidence that the Objectors offered at trial did not support their contentions that

parties were being discouraged from proposing an alternate Tranche C:

Otton asserted that one institution submitted an indication of interest to participate in Tranche C but PJT "shut them out of the process." Trial Ex. 278 (Otton Decl.) ¶ 63. The Debtors contend, and the Court agrees, that the document cited by Otton does not support the accusation. It shows that the institution was interested in "providing a commitment for the full $1.1 billion Tranche A," and "further analyzing an investment in Tranche C alongside the existing Tranche C investors." Trial Ex. 170 (Cleaver Sower Email to Tim Coleman, Brent Herlihy, Daniel DeGosztonyi re LATAM Goldman Sachs Indication of Interest), at 002. The evidence also shows that the institution became one of the finalists among those competing to provide the Tranche A, with a Tranche C additional component in its proposal. Trial Ex. 253 (June 30, 2020 BOD Discussion Materials), at 007. However, Otton could not name anyone from this institution who voiced their frustration that the Debtors or PJT had discouraged them in any respect. 7/30/20 Hr'g Tr. at 57:24-58:5.

Otton also cited to alleged interest from a hedge fund. *See* Trial Ex. 278 (Otton Decl.) ¶ 61. However, as the Debtors demonstrate, he bases that assertion on an out-of-context reference to PJT's own log. The Debtors are correct that Otton has not cited any communications with the fund where they indicated their interest was discouraged (*see* 7/30/20 Hr'g Tr. at 130:17-23), the fund never even signed an NDA with the Debtors and, notably, the fund is not among the parties committed to the Jefferies proposal.

---

[94]   Wagner's testimony undercuts those contentions. He testified that during his conversations with Coleman, Coleman advised him that the Debtors would welcome an alternate Tranche C proposal and only named three requirements: that any financing (i) be committed, (ii) be better than the Tranche C that the Debtors' proposed and (iii) discuss how it would address any Chilean law issues. *See* 7/30/20 Hr'g Tr. at 163:12-164:3.

> Finally, although Otton cites "Tranche A/C Bidder 6" in Exhibit F of his report,
> the Debtors correctly point out that the document he cites makes clear that the
> bidder was only willing to offer up to $50 million in Tranche A and C financing
> combined, constituting less than 2.5% of the Debtors' needs.  *See* 7/30/20 Hr'g
> Tr. at 117:11-118:20.  Furthermore, the Objectors have not provided any evidence
> that fund is even participating in the Jefferies proposal.

The Court finds no merit to assertion that the Debtors discouraged and refused to engage potential Tranche C investors.

The evidence demonstrates that the Debtors, through the Board and management, and with the assistance of legal and financial advisors, identified their financial needs,  actively marketed the loans, reasonably evaluated other sources of funding, engaged in arm's length good faith negotiations with prospective lenders, adhered to corporate protocol, and fulfilled their fiduciary duties.  The Court finds that the process adopted by the Debtors in connection with the Revised Credit Agreement, including the Tranche A DIP Facility and Tranche C DIP Facility was "fair."  *See In re Innkeepers USA Tr.*, 442 B.R. at 231; *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. at 549.

**Whether the DIP Financing**
**Facility Reflects a Fair Price**

The Objectors complain that the price and terms of the Tranche C DIP Facility are not "entirely fair" because the pricing is excessive, and the terms broadly deviate from market standards and, in part, are calculated to entrench management, impair the protections to which creditors are entitled, and impinge on this Court's authority.  *See* Committee Suppl. and Restated DIP Objection ¶¶ 70-72.  It also contends that the Proposed DIP Order[95] contains improper

---

[95]   *See* First DIP Motion, Ex. A (the "Proposed DIP Order").

releases of the Tranche C Lenders and others from any and all past, present, and future claims,

including claims that are unrelated to the DIP Financing. *Id.* ¶¶ 73-76.

Turning first to the last point, paragraph 33 of the Proposed DIP Order is entitled

"Release" and contains broad release language.[96]  The Committee asserts that the Court should

reject that language as "the Debtors' back-door attempt to shield their insiders from liability,

including for causes of action unrelated to the proposed financing." *Id.* ¶ 74.  In response to the

objection, the Debtors have made it clear that the releases contained in the Proposed DIP Order

are intended to apply only to claims that the Debtors may have against the Tranche C Lenders, in

their capacity as DIP lenders.  *See* Debtors Reply ¶ 14.  The Debtors agree that the releases will

not impact any other claims of the estate against the Tranche C Lenders and have no effect on

---

[96]    That paragraph reads, as follows:

> Release. The Debtors forever and irrevocably (i) release, discharge, and acquit the Tranche C DIP
> Lenders, and each of their respective former and current officers, employees, directors, agents,
> representatives, owners, members, partners, financial advisors, legal advisors, shareholders,
> managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case,
> solely in their respective capacities as such (collectively, the "Releasees") of and from any and all
> claims, demands liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and
> obligations, of every type, that the Debtors at any time had, now have or may have, including,
> without limitation, any claims arising from any actions of the Tranche C DIP Lenders solely in their
> capacity as Tranche C DIP Lenders pursuant to the terms of the Final DIP Order and the DIP Loan
> Documents including any equitable subordination claims, relating to any aspect of the relationship
> between the Tranche C DIP Lenders and the Debtors, including any equitable subordination claims
> or defenses, with respect to or relating to the DIP Loans, the DIP Loan Documents, the Debtors'
> attempts to restructure the DIP Loans, any of the Debtors' other long-term indebtedness, consent to
> the terms of this Final DIP Order and the use of the Tranche C DIP Commitment hereunder, any
> and all claims and causes of action arising under the Bankruptcy Code, and any and all claims
> regarding the validity, priority, perfection or avoidability of the liens or secured claims of the
> Tranche C DIP Lenders; and (ii) waive any and all defenses (including, without limitation, offsets
> and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and
> non-avoidability of the Tranche C DIP Obligations; provided that such release shall not apply to any
> claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful
> misconduct or gross negligence of the Releasees. Nothing in this Final DIP Order shall in any way
> be construed or interpreted to impose or allow the imposition upon the Tranche C DIP Lenders any
> liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries
> or affiliates in the operation of their businesses or in connection with their restructuring efforts.

Proposed DIP Order ¶ 33.

third party claims against the lenders.  *Id.* ¶ 59 n.27.  Accordingly, that objection has been
resolved.

As to the terms of the agreement, the Committee notes that the Revised Credit Agreement
permits the Debtors to prepay the Tranche A DIP loan, but not the Tranche C DIP loan.  *See*
Committee Suppl. and Restated DIP Objection ¶ 79; *see* also Revised Credit Agmt. §2.14(a)).[97]
The Committee maintains that the Debtors' lack of prepayment rights is unusual, unreasonable
and outrageous because the Tranche C DIP Facility is the most expensive component of the DIP
Financing, in contrast with the more standard terms of the Tranche A DIP Facility.  *See*
Committee Suppl. and Restated DIP Objection ¶ 71.  It asserts that the Debtors should be able to
pay off the Tranche C DIP first  rather than last.  *Id.*  The Committee contends that to make
matters worse, rather than obtaining more financing on better terms, "the Debtors chose to
borrow no less than $900 million from the [Tranche C Lenders] on unprecedented, extremely
expensive and shareholder-friendly terms."  *Id.*  The Court finds no merit to either point.  First,
as the Debtors note, the Tranche C DIP Facility is a delayed-draw facility.  The Debtors are not
required to draw down all the funds upfront.  They can draw from the facility as needed.  Debtors
Reply ¶ 59.  That diminishes the importance of the right to prepay the Tranche C DIP loan.
Moreover, the Debtors tried to increase the size of the Tranche A facility relative to the Tranche
C facility.  *See* Trial Ex. 268 (Suppl. Coleman Decl.) ¶ 20 ("Through these negotiations [with the
Tranche A DIP Lender] the Debtors materially improved the terms of the DIP financing as
compared to those originally offered . . . includ[ing] . . . [an] increased Tranche A DIP Facility
size.").  But, in the end, the Debtors "were cognizant of the need for sufficient liquidity to outlast

---

[97]    The Committee filed its objection to the Motions before the Debtors filed the Revised Credit Agreement.
Accordingly, the objection cites to relevant sections in that now superseded agreement.  In analyzing the objection,
the Court will cite to provisions in the Revised Credit Agreement, to the extent applicable.

the crisis and had no offers that would reduce the size of Tranche C while satisfying Debtors'

capital needs."  Debtors Reply ¶ 59.

Finally, in making these arguments, the Committee seeks to separate the terms and price

of the Tranche C DIP Facility from the favorable terms of the Tranche A DIP Facility.  The

Debtors maintain that the Court must assess the transaction holistically, as one integrated

transaction, because the record shows that the terms of the Tranche C DIP Facility were essential

in raising the Tranche A DIP Facility.  The Court credits that contention, as Coleman's position

on this is unchallenged: the shareholders' willingness to lend into the subordinated Tranche C

DIP Facility demonstrated their faith in, and continuing commitment to, the Company as a going

concern, which was necessary in attracting interest in a Tranche A investment.  *See* Trial Ex. 243

(First Coleman Decl.) ¶ 16 ("Based on the negotiations with potential Tranche A lenders, it has

become apparent that the Debtors' ability to announce to prospective senior lenders that they had

secured financing commitments from their shareholders in the form of the Tranche C DIP

Facility has been an important factor in other funds' willingness to offer financing."); Trial Ex.

292 (Coleman Reply Decl.) ¶ 7 ("LATAM's limited available hard collateral meant that

attracting lenders was dependent on convincing them that the Debtors' business will continue as

a going concern, making a vote of confidence from major shareholders critically important . . .

discussions with potential Tranche A lenders also confirmed the importance of a preexisting

commitment from major shareholders.").  "[N]one of the potential Tranche A lenders were

willing to provide financing without the Tranche C DIP Facility acting as a first-loss facility."

Trial Ex. 268 (Suppl. Coleman Decl.) ¶ 15.  The Committee concedes that the Tranche A Facility

is "far more standard,"  (Committee Suppl. and Restated DIP Objection ¶ 71), and it is

undisputed that it was "the lowest in terms of pricing compared to each of the other fully

90

committed proposals received by the Company."  Trial Ex. 268 (Suppl. Coleman Decl.) ¶ 22.

That supports the Debtors' contention that the terms of the subordinated first loss Tranche C DIP

Facility, include the pricing, are fair.

Fair price "relates to the economic and financial considerations of the proposed merger,

including all relevant factors: assets, market value, earnings, future prospects, and any other

elements that affect the intrinsic or inherent value of a company's stock." *Owen v. Cannon*, No.

8860 C.A. (CB), 2015 WL 3819204, at *31 (Del. Ch. June 17, 2015) (quoting *Weinberger* v.

*UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).  The Committee challenges the Tranche C DIP Loan

as "significantly above market."  Committee Suppl. and Restated Objection ¶ 70.  It says that

together with the Tranche C Lenders' ability to convert the Tranche C DIP Facility into the

equity of reorganized Debtors at a discount, the terms of the Tranche C DIP loan far exceed

acceptable market rates based on comparable DIP financings.  *Id.*  In assessing the merits of the

Committee's challenge to the pricing of the Tranche C DIP loan, the Court considers a number

of factors.  First, the Debtors negotiated the loan in the early days of a global pandemic which

has no precedent in the history of commercial aviation.  *See* Trial Ex. 292 (Coleman Reply

Decl.) ¶ 18.  Through a combination of government bans on travel and customer cancellations,

the pandemic has essentially shut down air travel, and it is unclear when the Debtors will be able

to return to normal operations and when demand for air travel will return to pre-pandemic levels.

*Id.*  Second, the Debtors have limited hard-asset collateral available to secure the DIP Facility.

*Id.* ¶ 7.  The Court agrees that means that a Tranche C Lender in the junior, first loss,

undercollateralized facility, must rely heavily on the survival of the Company as a going concern

to see a return on its investment.  *See* Debtors Reply ¶ 22.  Finally, LATAM is a Latin American

airline that is not investment-grade, has not received government financial support, but is seeking

bankruptcy financing in excess of $2 billion.  *See* Trial Ex. 292 (Coleman Reply Decl.) ¶ 19.  All of those factors must be accounted for in assessing the fairness of the pricing of the Tranche C DIP Facility.

The Court also agrees with the Debtors that the Committee does not appear to have addressed those issues in assessing the risk that the Tranche C Lenders will assume in making the loan.  That is borne out by the fact that the Committee's expert's analysis, relies on "out-of-court, investment-grade financings, often highly capitalized, as well as financings of materially smaller size or taking place over much different time frames," which, are "not comparable or instructive here."  *Id.*  ¶ 21.[98]  Without limitation, they include comparisons between LATAM and U.S. airlines which have received CARES Act funds.  The Court finds merit to the Debtors' assertion that the terms on which those airlines can obtain financing adds very little to a determination of options available to LATAM.[99]  Finally, in his report, Otton assumes that the

---

[98]    In general, Otton's initial report largely compared the Debtors' proposed financing to non-bankrupt airlines, recipients of billions of dollars of U.S. government aid, and small DIP loans (mostly under $100 million) about which he had performed no analysis of whether they were under-collateralized, the roll-up of pre-existing debt or possessed any other inapplicable characteristics.  *See* Otton Dep. Tr. at 48:5-14 (inapplicable DIPs); *id.* at 88:25–89:6 (same); *id.* at 90:11-15 (received government aid); *id.* at 95:19 (not in bankruptcy); *id.* at 139:21-140:4 (inapplicable DIPs).

At his deposition, Otton acknowledged differences between LATAM and some of his purported comparables. *See, e.g.*, Otton Dep. Tr. at  82:24-83:6 ("Q.  So while LATAM is in bankruptcy, none of these airlines listed here are the top of page 11 are in bankruptcy; isn't that correct? THE WITNESS:  . . . I said,  'Correct.'"); *id.* 85:8-11 ("Q . . . [B]ut you would agree that the risk profile of a non-bankrupt US  Airline that has received government aid would be viewed as better by an investor than the risk  profile of a company like LATAM; right? Setting aside degree, the risk profile would be viewed  as better?  A. Yes."); *id.* at 139:21-140:4 ("Fifty-nine DIPs that you cite in Exhibit D pages 43 to  44 are outside the airline industry; isn't that correct? . . . THE WITNESS: Looking at pages 43 and  44 which are the most recent DIPs, that is indeed true.").

[99]    In particular, Coleman challenges Otton's use of Delta Air Lines, an American airline with a market cap in excess of  $16 billion and that has raised billions of out-of-court financing since the pandemic started, and Raven Air, a small, Alaska-based airline that recently sold the majority of its operating assets pursuant to a liquidating plan, as comparable to LATAM.  *See* Trial Ex. 292 (Coleman Reply Decl.) ¶ 22.  He points out that both U.S. airlines have received CARES Act funds, and neither has capital needs which are similar to those of the Debtors.  *Id.*  He argues that "[t]o compare their cost of borrowing because both are airlines is simplistic and a true embodiment of an 'apples to oranges' comparison."  *Id.*  The Court agrees.

Debtors would not liquidate irrespective of the length and severity of the pandemic.  *See* Otton

Dep. Tr. at 74:3-10.

Moreover, and in any event, the pricing has been subjected to a thorough marketing test

and there are no other proposed transactions that will enable the Debtors to obtain financing on

better terms consistent with its liquidity needs.  Fair price can also be established by

demonstrating that no better alternatives were available.  *See Cancan Dev., LLC v. Manno*, No.

6429 C.A. (VCL), 2015 WL 3400789, at *26 (Del. Ch. May 27, 2015) (fairness established

where there was no future for the business and alternative transactions left stockholders no better

off), *aff'd*, 132 A.3d 750 (Del. 2016); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 76-78 (Del.

Ch. 2013) (same); *Blackmore Partners L.P. v. Link Energy LLC*, 864 A. 2d 80, 86 (Del. Ch.

2004) ("Of course, it is also possible to infer (and the record at a later stage may well show) that

the Director Defendants made a good faith judgment, after reasonable investigation, that there

was no future for the business and no better alternative for the unit holders.").  That is what we

have here – the pricing of the Tranche C DIP Facility, and the "fairness" of the terms – were

fully vetted through a post-petition market test (described throughout this decision), which the

Court has determined to be robust and fair.  The Court finds that the terms of the Tranche C DIP

Facility reflect a "fair price" that has been negotiated to incorporate the respective parties' risks

and rewards, and more, importantly, thoroughly tested by the market.

The Debtors have established that the Revised Credit Agreement, including the Tranche

A DIP Facility and Tranche C DIP Facility results from fair dealing and reflects a fair price.  In

doing so, they have met their burden to satisfy the heightened scrutiny, "entire fairness" standard

applicable to insider transactions.  *See Carlson v. Hallinan*, 925 A.2d at 531 ("Entire fairness has

two components: fair dealing and fair price." (citation omitted)).  As such, they have met their

burden under § 364(c) to demonstrate that the terms Tranche A DIP Facility and Tranche C DIP

Facility are fair, reasonable and adequate.  *See In re Republic Airways Holdings Inc.*, No. 16-

10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) (noting that court must

assess whether proposed DIP financing is "fair, reasonable and adequate" (citation omitted)).

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on

loans extended to a debtor, and its right in any lien securing those loans, even if the authority of

the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred, or
> any priority or lien so granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or lien,
> were stayed pending appeal.

11 U.S.C. § 364(e).  The term "good faith" is not defined in the Bankruptcy Code.  *See In re Pan

Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4 (S.D.N.Y. 1992) ("'Good faith,'

as used in 11 U.S.C. §§ 364(e), is not a defined term.").  Generally, courts do not define what is

good faith but rather, what is not.  *See Whorl v. Solidus Networks, Inc. (In re Solidus Networks,

Inc.)*, No. BAP CC-08-1046-MKKPA, 2008 WL 8462968, at *4 (B.A.P. 9th Cir. Dec. 24, 2008).

Specifically, courts will not find good faith where there is fraud, collusion, actions for an

improper purpose, or knowledge of illegality of the transaction.  *See In re Gen. Growth Props.,

Inc.*, 423 B.R. 722 (S.D.N.Y. 2010) (stating "the misconduct that would destroy a purchaser's

good faith status at a judicial sale involves fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" and

upholding a good faith finding where the postpetition loan was negotiated in good faith).  *See

*also In re Solidus Networks, Inc.*, 2008 WL 8462968, at *4 (explaining that to determine the

existence of good faith for purposes of section 364(e), a court should "look to the integrity of an

actor's conduct during the proceedings." (internal quotation marks and citation omitted)).

### The Tranche C Lenders

The Committee contends that the Tranche C Lenders are not entitled to a good faith

determination under section 364(e) for two reasons.  First, they say that the lenders are "insiders"

and that insiders that are parties to DIP loan agreements are not entitled to a good faith finding

under section 364(e).  *See* Committee Suppl. and Restated DIP Objection ¶¶ 98-99.  As support

for that argument the Committee misplaces its reliance on *In re Arena Media Networks, LLC*,

No. 10-10667(BRL), 2010 WL 5264241, *1 (Bankr. S.D.N.Y. Feb. 25, 2010).  That reported

"decision" consists of the court's final order (the "Arena DIP Order") authorizing the debtor to

obtain DIP financing.[100]  In that order, the court did not find that an insider lender is *per se*

precluded from a good faith determination under section 364(e) of the Bankruptcy Code.  Rather,

the Arena DIP Order merely includes a finding that the lender subject to that order was not an

"insider" or "affiliate" of the debtor.  *See id.* at *2.[101]  There is no merit to the Committee's first

argument.

---

[100]  *See In re Arena Media Networks, LLC*, 2010 WL 5264241 (Final Order Approving Debtor's Motion for Order
(I) *Authorizing Debtor to Obtain Postpetition Financing and to Grant Security Interests and Superpriority
Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); and (II) Modifying the Automatic
Stay Pursuant to 11 U.S.C § 362).*

[101]  The relevant language referenced in the Arena DIP Order states:

> ***Business Judgment and Good Faith.*** The terms of the DIP Loan (including as outlined in the DIP
> Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured
> financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgments
> consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair
> consideration. The terms of the DIP Loan have been negotiated in good faith and at arms' length by
> and between the parties, with all parties represented by counsel. Any credit extended under the terms
> of the DIP Loan is being extended in good faith by the Lender as that term is used in section 364(e)
> of the Bankruptcy Code. The Lender is also acting in good faith within the meaning of section 364(e)
> of the Bankruptcy Code in closing the transactions contemplated in the DIP Documents at any time

Second, the Committee contends that the Tranche C Lenders are not entitled to a good

faith finding because they intentionally pursued a transaction – i.e., the Tranche C DIP Facility –

that, on its face, subverts the principles of absolute priority and constitutes a sub rosa plan. *See*

Committee Suppl. and Restated DIP Objection ¶ 100. As support, the Committee cites to *In re*

*EDC Holding Co.*, 676 F.2d 945 (7th Cir. 1982). There, Chase Manhattan Bank ("Chase"), was

a secured creditor of Wisconsin Steel ("WS Debtor"). After WS Debtor defaulted on its

underlying obligation, Chase set off the funds in its cash account at Chase against the amounts

owed. As a result, WS Debtor's paychecks (issued from the same Chase cash account) bounced.

The union representing WS Debtor's workers sued the debtor and Chase seeking payment of the

employees' unpaid wages. *Id.* at 946. The parties eventually reached a settlement of the lawsuit,

which in part called for Chase to lend WS Debtor $1.7 million, which would be used by WS

Debtor to pay the union employee's wages. *Id.* The settlement provided that $77,000 of the $1.7

million would be paid to the union for the cost of the union's attorneys' fees and other legal

expenses in the lawsuit. It also stated that the entire loan would receive the priority that section

507(a)(3) of the Bankruptcy Code gives to wage claims. *Id.* The Bankruptcy Court approved the

$1.7 million loan as post-petition financing under section 364 of the Bankruptcy Code, including

the loan's priority status under section 507(a)(3), over the objection of the debtor's creditors

committee. The committee argued that the section 507(a)(3) priority should not be extended to

the funds earmarked to pay the union's lawyers. *Id.* at 946-47. The committee appealed, but the

District Court dismissed the appeal as moot as the committee did not seek a stay of the

---

after the entry of this Interim Order. The Lender is not an "insider" or "affiliate" of the Debtor (as
such terms are defined in the Bankruptcy Code). The Lender shall be entitled to the full protection
of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision herein
is vacated, reversed or modified, on appeal or otherwise.

Bankruptcy Court's order.  The committee appealed that dismissal.  Thus, the Seventh Circuit

had to decide whether Chase had been acting in good faith, for purposes of section 364(e) in

lending WS Debtor $77,000 to pay the union's legal fees.  *See id.* at 947.

Chase argued that as long as the terms of the DIP loan are not misrepresented to the

bankruptcy judge, the creditor may rely on the bankruptcy judge's order unless it is stayed,

irrespective of the errors in the order.  *See id.*  The Seventh Circuit rejected that argument.  First,

it read the purpose of section 364(e) to be

> to protect not the lender who seeks to take advantage of a lapse in oversight by the
> bankruptcy judge but the lender who believes his priority is valid but cannot be
> certain that it is, because of objections that might be upheld on appeal. If the lender
> knows his priority is invalid but proceeds anyway in the hope that a stay will not
> be sought or if sought will not be granted, we cannot see how he can be thought to
> be acting in good faith.

*Id.*  The Court found that the loan agreement gave the union a claim against WS Debtor for

$77,000 in attorneys' fees, and simultaneously paid it in full, and that Chase's priority under

section 507(a)(3), meant that the burden would be borne by the estate's general unsecured

creditors, rather than by Chase itself.  *Id.*  However, the Court found that the union's claim could

not be paid out of WS Debtor's estate at all.  It found that Chase could not have acted in good

faith in advancing the $77,000, because on the face of the loan agreement, that transaction had an

intended effect that under well settled law, was improper under the Bankruptcy Code, and that

Chase knew it.  *Id.*  The Court stated, as follows:

> Just as Chase would not have been a purchaser in good faith if it had bought from
> Wisconsin Steel property to which it knew the company did not have good title, so
> it could not be a lender in good faith in extending credit in exchange for a priority
> that it knew the company could not properly give it since the transaction amounted
> to taking money out of the pockets of the general creditors to pay lawyers whose
> claims were not allowable under bankruptcy law at all.

*Id.* at 948.

The Committee contends that the Tranche C Lenders are not entitled to a good faith

finding under section 364(e) because like Chase in *EDC Holdings*, the lenders have entered into

a loan agreement that, on its face has an intended effect that is improper under the Bankruptcy

Code, to wit: to violate the absolute priority rule and the bar to sub rosa plans.  *See* Committee

Suppl. and Restated DIP Objection ¶ 100.  ("The Debtors and the [Trance C Lenders]

intentionally sought to violate absolute priority and short-circuit the bankruptcy process by

making no meaningful effort to seek financing from third-parties.  Because the [Tranche C DIP

Facility] has an 'intended effect that is improper under the Bankruptcy Code,' the transaction

cannot have been concluded in good faith." (quoting *EDC Holdings*)).

The argument lacks merit.  Application of *EDC Holdings* does not bar a good faith

finding under section 364(e) because whether the Tranche C DIP Facility is an improper sub rosa

plan and/or violates the absolutely priority rule is hotly contested and the subject of this Court's

determination.  From the outset, the Debtors have maintained that the Tranche C DIP Facility is

not a sub rosa plan and does not violate the absolute priority rule because, among other things,

the DIP Facility represents new money invested in the Debtors.  In contrast to Chase in *EDC

Holdings*, the Tranche C Lenders are not seeking relief that is improper under settled law.  The

decision in *Burchinal v. Central Washington Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484 (9th

Cir. 1987) is instructive.  There, creditors appealed from a judgment of the district court

affirming the bankruptcy court's approval of financing that included a cross-collateralization

provision.  The order was not stayed pending appeal and the creditors argued that by application

of section 364(e), the appeal was moot.  The Ninth Circuit rejected the creditors' argument that

the fact that the loan included cross-collateralization proved that the lender entered into the loan

agreement in bad faith and for an improper purpose.  *Id.* at 1490.  It found that the lenders did

not act in bad faith because the issue of whether cross collateralization could be employed had

not been resolved in the Ninth Circuit.  The Ninth Circuit stated:

> We do not think that the good faith requirement was intended to deny protection to lenders who can advance reasonable legal arguments in support of their actions, even if their arguments are ultimately deemed unpersuasive. . . . Accordingly, we conclude that [the lender] did not act in bad faith as a matter of law simply because some courts have held cross-collateralization clauses to be illegal per se.

*Id.* (internal citations omitted).  The same principle applies here.  The Debtors and the Tranche C

Lenders cannot be said to intend to effect an improper transaction because the Tranche C

Lenders have reasonable legal bases in support of their position.  *See also In re Solidus*, 2008

WL 8462968, at *5 (noting that "the good faith requirement does not deny protection to lenders

who can support their actions with reasonable legal arguments, even if these arguments are

ultimately unsuccessful.").

Moreover, in looking to the conduct of the Tranche C Lenders, the Objectors have not

cited to any evidence demonstrating that the Tranche C Lenders misused their status as

shareholders.  Nor is there any evidence that they engaged in fraud or collusion, or attempted to

take gross advantage of other bidders which is the typical misconduct giving rise to a finding of

bad faith.  Instead, the testimonial and documentary evidence already discussed extensively

above, shows that the Tranche C DIP Facility is the product of a robust and arm's-length process

where Company's management had the advice of outside legal counsel and financial advisor in

negotiating the terms of the Tranche C DIP, and all decisions were fully vetted and voted upon

(unanimously) by the Company's Directors Committee.  *See* Trial Ex. 31 (LATAM DIP Lenders

Teaser), sent to over 150+ potential investors; Trial Ex. 243 (First Coleman Decl.) ¶ 24

(describing PJT's solicitation process); Trial Ex. 276 (PJT contact log); Trial Ex. 292 (Coleman

Reply Decl.) ¶ 9 (noting that potential bidders who have signed NDAs were given access to the

Debtors' data room). *See also* Trial Ex. 125 (May 25th Directors Committee Minutes) (discussing whether to approve, *inter alia*, the Tranche B DIP loan (now Tranche C), and receiving advice from legal counsel (Cleary Gottlieb) and investment banker (PJT)); Trial Ex. 124 (May 25th Directors Committee Statement) (same));[102] Trial Ex. 198 (June 24th Board Minutes) (discussing Tranche C DIP loan); Trial Ex. 200 (June 24th Directors Committee Minutes) (reflecting PJT's attendance at meeting and presentation to Board for the Tranche C DIP Facility, and ultimate vote in favor of DIP).

Accordingly, the Court finds that the Tranche C Lenders are entitled to a finding of good faith under section 364(e). *See generally In re MF Glob. Holdings Ltd.*, No. 11-15059 MG, 2011 WL 6210374, at *3 (Bankr. S.D.N.Y. Dec. 14, 2011) ("The record further establishes that the negotiation of the final cash collateral order was conducted in good faith, entitling JPMC to the good faith finding under section 364(e) of the Bankruptcy Code included in the order.").

### The Tranche A Lender

The Committee contends that Oaktree is not entitled to a good faith finding under section 364(e). It says that although Oaktree is not a "bad actor" or an insider, it "signed up to participate in an insider transaction that on its face violates the absolute priority rule and constitutes an impermissible *sub rosa* plan." *See* Committee Tranche A DIP Objection ¶ 17. There is no merit to that contention.

First, the Court's analysis of *Arena Media* and *EDC Holdings* with respect to the Tranche C Lenders applies equally to Oaktree. Moreover, the Committee does not allege, and there is no evidence in the record to support a finding that Oaktree engaged in misconduct of any form in

---

[102]   Moreover, the minutes at that same meeting also made clear that the Tranche C DIP Facility was approved, unanimously by both Independent Directors, with any conflicted or related director – i.e., Nicholas Eblen – having duly excused himself.

connection with the Tranche A DIP Facility.  To the contrary, the undisputed testimony from

Coleman was that, among other things, Oaktree and the Debtors had engaged in good faith,

arm's length negotiations, with both sides represented by competent counsel (White & Case LLP

for Oaktree) and financial advisors (Ducera Partners for Oaktree); exchanged multiple drafts of

term sheets and DIP loan documents; and conducted hours of intense negotiations over the

telephone and by video-conference.  *See* Trial Ex. 268 (Suppl. Coleman Decl.) ¶¶ 18-20.  *See*

*also* Trial Ex. 265 (July 8th Directors Committee Minutes) (noting review and discussion and

approval of terms of Tranche A DIP Facility).  Coleman testified that through these hard-fought

negotiations, both sides gave concessions, and the Tranche A DIP loan was ultimately improved

to its current form.  In short, the Court finds that the Tranche A Lender is entitled to a good faith

finding under section 364(e) of the Bankruptcy Code.

Having determined that the Debtors have established grounds under section 364 to obtain

the requested DIP Financing, and that each of the DIP Lenders is entitled to a "good faith"

finding under section 364(e), the Court considers whether the DIP Financing violates any

applicable Bankruptcy Code principles.

### Whether the Tranche C DIP Facility Violates The Absolute Priority Rule

The absolute priority rule is a "bedrock principle of bankruptcy law, under which

creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets."

*Adler v. Lehman Bros. Holdings, Inc. (In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 470 (2d

Cir. 2017) (citation omitted).  The rule is codified in various provisions of the Bankruptcy Code,

and "is particularly prominent in 11 U.S.C. § 1129(b)(2)(B) . . . " *Id.* at 471, n.11.  Pursuant to

section 1129(b)(1), for a court to confirm a chapter 11 reorganization plan over the vote of a

dissenting class of claims, the plan must be "fair and equitable with respect to [each] class of

claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  A

plan will be "fair and equitable" with  respect to a class of unsecured claims if --

> (i)     the plan provides that each holder of a claim of such class receive or retain
>         on account of such claim property of a value, as of the effective date of the
>         plan, equal to the allowed amount of such claim; or
>
> (ii)    the holder of any claim or interest that is junior to the claims of such class
>         will not receive or retain under the plan on account of such junior claim or
>         interest any property. . . .

11 U.S.C. § 1129(b)(2)(B).  In this way, the "fair and equitable" rule "includes a form of the

absolute priority rule as a prerequisite."  *DISH Network Co. v. DBSD N. Am., Inc. (In re DBSD*

*N. Am., Inc.*), 634 F. 3d 79, 94 (2d Cir. 2011) (hereinafter "*DBSD*").  That is to say, under the

rule, a reorganization plan "may not give 'property' to the holders of any junior claims or

interests 'on account of' those claims or interests, unless all classes of senior claims either

receive the full value of their claims or give their consent."  *Id.* at 88.  *See also Norwest Bank*

*Worthington  v. Ahlers*, 485 U.S. 197, 202 (1988) ( "Under current law, no Chapter 11

reorganization plan can be confirmed over the creditors' legitimate objections . . . if it fails to

comply with the absolute priority rule.").

By its terms, the transfer of "property," "under a plan," to an existing shareholder triggers

application of section 1129(b)(2)(B), if the transfer is "on account of" the shareholder's "junior

interest."  11 U.S.C. § 1129(b)(2)(B).  The Objectors contend that this Court should apply

section 1129(b)(2)(B) to the Tranche C DIP Facility and find that it violates the absolute priority

rule because it (a) extends to existing shareholders (i.e., the Tranche C Lenders – on account of

their status as shareholders) the exclusive option to acquire the equity of the reorganized Debtors

at a discount, and (b) extends to all other shareholders – on account of their status as

shareholders – the option to acquire all of the new equity in the reorganized Debtors at plan

value.[103]  *See* Committee Post-Trial Brief at 4-5 ("The proposed financing violates the absolute priority rule by extending to existing shareholders the exclusive option to acquire the equity of the reorganized company at a discount on account of their being shareholders and to all other shareholders at plan value.").  They argue that the Tranche C Lenders are insiders holding controlling interests in the Debtors, and that through the proposed DIP Facility, the Debtors will vest the Tranche C Lenders, on account of their old equity, with the exclusive right to acquire equity in the reorganized debtor, at an untested price and without extending an opportunity to anyone else to compete for equity.  *See id.*  Knighthead likewise contends that the proposed Tranche C DIP Facility violates the absolute priority rule because it provides potentially for a not-market tested payment of $282.6 million to the Tranche C Lenders on account of their equity in the Debtors.  *See* Knighthead Post-Trial Brief ¶ 10.  Knighthead and the Committee maintain that the payments are "on account of" the Tranche C Lenders' pre-existing equity interests in the Debtors because the Tranche C Lenders only got the opportunity to sign onto the Tranche C DIP Facility because they are the Debtors' major shareholders.

The Debtors say that the absolute priority rule is irrelevant because section 1129 only applies in a plan confirmation process, which is "still months away," and that the Tranche C DIP Facility is not an exit-financing under a plan, but rather a pre-confirmation loan with real committed funds and a real risk of little to no recovery as the first loss tranche.  *See* Debtors Reply ¶ 72.  The Debtors accuse the Objectors of trying to "shoehorn" the Tranche C DIP

---

[103]  The Objectors say that such preferential treatment for the exclusive benefit of the Tranche C Lenders is compounded by the fact that the Debtors' other existing shareholders (beyond the Tranche C Lenders) can also participate in these favorable terms through the incremental Tranche C DIP increase of $250 million, and the rights offering mandated in Schedule 2.12 of the Revised Credit Agreement.  *See, e.g.*, Revised Credit Agmt. § 1.01 (definition of "Tranche C Increase Commitment" ); Committee Suppl. and Restated DIP Objection ¶ 9 ("Moreover to further privilege prepetition equity holders at the expense of unsecured creditors, the Debtors are proposing to let additional shareholders participate in the Shareholder DIP Facility on the same outrageous terms by giving themselves the right to expand Tranche C by up to an additional $250 million.").

Facility "into the type of exit financing governed by § 1129" and maintain that the caselaw does

not support such an approach.  *Id.* ¶ 73.  They also assert, in any event, that the Tranche C

Lenders are not entitled to 100% of the reorganized Debtors' shares upon exit, only a portion of

such shares at a certain plan discount, such that there would still be value for other creditors to be

determined under a plan.  *See id.*  As noted previously, the Revised Credit Agreement specifies

the terms governing the payment of the Tranche C DIP loan.  In seeking approval of the DIP

Facility, the Debtors seek to foreclose any later challenge to the terms of the loan, including to

the provisions of the loan that are potentially germane to a plan of reorganization.  In these

circumstances, it is appropriate to consider whether the proposed DIP Facility complies with the

absolute priority rule.  *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017)

(nothing that debtors may not enter into transactions that "circumvent the Code's procedural

safeguards." (citation omitted)).

The Debtors also argue that the absolute priority rule is not applicable because under a

plan, the Tranche C Lenders will be repaid "based on their lending of at least $900 million (and

up to $1.15 billion) in superpriority DIP financing of funds," not on account of their

shareholdings.  Debtors Post-Trial Brief ¶ 54.  They maintain that the Objectors have

mischaracterized the absolute priority rule, which mandates that secured lenders such as the

Tranche C Lenders get repaid in full before unsecured creditors; therefore, repayment of the

Tranche C Lenders under the terms of the Revised Credit Agreement does not contravene the

absolute priority rule.  *See id.*  Moreover, they say that with the Revised Credit Agreement, the

Debtors now have the option of exercising the Modified Equity Subscription Election, which

provides them with additional flexibility as to the form of repayment.  And that even without

such a feature, the Tranche C Lenders would still be entitled to repayment before other creditors

receive any distributions.  They add that any concerns over the extent of the conversion discount (now at 20%) is simply a challenge to the overall economics of the deal, "and not any larger issue."  *Id.*  In substance, they contend that for purposes of section 1129(b)(2)(B), payment to the Tranche C Lenders will be "on account of" the Tranche C DIP loan, not "on account of" their old equity.

"[W]hether a particular plan gives old equity a property interest 'on account of' its old ownership interests in violation of the absolute priority rule or for another, permissible reason is a factual question."  *In re Red Mountain Mach. Co.*, 451 B.R. 897, 905 n.18 (Bankr. D. Ariz. 2011) (citation omitted).  In *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (hereinafter, "*North LaSalle*"), the Supreme Court construed the phrase "on account of," as used in 1129(b)(2)(B), to mean some form of "because of."  *Id.* at 450 ("Since the 'in exchange for' reading [of the term "on account of"] merits rejection, the way is open to recognize the more common understanding of 'on account of' to mean 'because of.'").  *See also DBSD*, 634 F.3d at 96 (noting that "[t]he existing shareholder received its property 'because of,' and thus 'on account of,' its prior interest[.]").  The Tranche C DIP Facility calls for the Tranche C Lenders – the Debtors' majority shareholders – to receive "property" in the form of cash or common stock (at a 20% discount to plan value) of the reorganized debtors.  If they are given stock, that will afford the Debtors' non-lender shareholders the right to purchase stock in the reorganized Debtors at plan value.  The non-lender shareholders will be extended rights to purchase the equity under the Rights Offering simply "because" they are shareholders of the Debtor, as Chilean law mandates that the Rights Offering be extended to them.  The Tranche C Lenders will receive their "property" in satisfaction of the Tranche C DIP loan.  It is undisputed that the Tranche C Lenders are being given the exclusive opportunity to make that loan "because

of" the fact that they are the Company's largest shareholders.  At the Hearing, Coleman was

quite clear that the purpose of the Tranche C DIP Facility was to attract shareholders to

participate in the DIP financing.  *See* 7/29/20 H'rg Tr. at 276:14-277:5.[104]  Thus, any payments

to the Tranche C Lenders in satisfaction of the Tranche C DIP Facility will be at least "partly" on

account of the their equity interests.  That is enough to trigger analysis under the absolute

priority rule.  *See DBSD*, 634 F.3d at 96 ("[A] transfer partly on account of factors other than the

---

[104]   The Debtors have been consistent on that issue from the outset of the Chapter 11 Cases.  The Debtors highlighted the importance of the "shareholder" tranche of the DIP financing on the Initial Petition Date (*see* Trial Ex. 141 (First Alfonsin Decl.) ¶ 77), and continue to do so in support of the Motion.  *See* Debtors Post-Trial Brief ¶¶ 22-23.  In support of the First DIP Motion, the Debtors' management and outside advisors submitted declarations which, in part, address the Debtors' focus on negotiating the terms of the Tranche C DIP with its major shareholders.  *See, e.g.*, Trial Ex. 242 (Alfonsín DIP Decl.) ¶ 19 ("In the weeks prior to the bankruptcy filing, LATAM separately reached out to its large shareholders to obtain their support of the company through additional financing, both to further the possibility of governmental financing and to retain the confidence of the market in its business in the current economic climate."); ¶ 20 ("LATAM's large shareholders were best placed to provide such financing commitments in the short time frame required given their extensive familiarity with LATAM's business and operations, and their willingness to support the business through the current business cycle."); Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 7 (discussing LATAM's limited ability to pledge collateral as a reason to seek financing from shareholders); ¶ 9 (noting the need to keep LATAM's financial distress, impending bankruptcy filing, and funding shortage in confidence); ¶ 15 (explaining that shareholder funding of junior tranche financing would be a positive signal to stakeholders); Trial Ex. 292 (Coleman Reply Decl.) ¶ 5 ("LATAM engaged in a prepetition process designed to achieve DIP financing on the best available terms, negotiating with the key stakeholders who were most likely to make a meaningful commitment in the short window of time remaining to LATAM prior to a bankruptcy filing, and whose public support of LATAM was necessary to securing needed additional financing.").

   That the Tranche C DIP Facility is targeted exclusively at the Debtors' existing shareholders is bolstered by its terms.  First, the Tranche C DIP Facility provides for an additional "Tranche C Increase Commitment" in the amount of up to $250 million, that could be supplied by a "Tranche C Increase Lender," which is defined in the Revised Credit Agreement as (i) a Tranche C Initial Lender or (ii) a holder of shares of LATAM as of the Petition Date or as of the date such party executes the Tranche C Joinder Agreement[.]"  *See* DIP Credit Agmt. §§ 1.01, 2.27.  In other words, only an existing LATAM shareholder may provide the additional commitment under the Tranche C DIP Facility.  Second, under the procedures established for the implementation of an Equity Subscription Election, "LATAM will launch the preemptive rights offering in Chile" that would make any new shares issued available for purchase by any and all of the Debtors' existing shareholders (but not creditors or other third parties).  *See* Revised Credit Agmt. Sch. 2.12(a)(i) § 14(i).  By definition, this rights offering is available solely to shareholders, *qua* shareholders.  *See* Committee Suppl. and Restated DIP Objection at 7 ("Accordingly, even shareholders who are not DIP lenders will share in the exclusive right of old equity holders to purchase equity in the reorganized Debtors, while the rights offering will allow the Insider Lenders to acquire the unsubscribed shares at the discounted price under the Equity Subscription Election.").  Further, any remaining unsubscribed shares following the rights offering, "may be placed by the board of directors of LATAM in accordance with the Chapter 11 Plan, including purchase by the Tranche C Shareholders."  Revised Credit Agmt. Sch. 2.12(a)(i) § 14(ii).

prior interest is still partly 'on account of' that interest. 'If Congress had intended to modify [on account of] with the additional "only," "solely," or even "primarily," it would have done so.'" (quoting *In re Coltex Loop Cent. Three Partners, L.P.*, 138 F.3d 39, 43 (2d Cir. 1998) ("*Coltex II*")). That is what the Bankruptcy Court held in *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440 (Bankr. S.D. Ohio 2011). There, the chapter 11 debtors sought confirmation of plans that proposed to, among other things, grant the debtors' existing equity holders, some of whom held promissory notes against the debtors (such holders, the "Member Noteholders") pro rata membership interests in the reorganized debtors. *Id.* at 453. The plans also provided for quarterly payments to be made to general unsecured creditors until the earlier of: (1) payment in full of all allowed claims in the class, without interest; or (2) the date that is five years from the applicable petition date. The general unsecured creditors were impaired and did not vote on the plans. *Id.* at 454. The debtors' largest creditor, PNC Bank, N.A. ("PNC"), which held a partially secured claim, objected to confirmation, contending, *inter alia*, that the debtors failed to provide unsecured creditors with the treatment required by the "absolute priority rule." *Id.* at 452. As relevant, the debtors argued, among other things, that the proposed plans did not violate the absolute priority rule because Member Noteholders were not receiving membership interests on account of their existing equity, but on account of their promissory notes. The Bankruptcy Court rejected this argument, explaining that while it was "true that the Member Noteholders are not receiving the equity in the reorganized Debtors *solely* on account of their prior equity interests," the new membership interests were only being offered to them (and to other shareholders who did not hold promissory notes), which would violate the absolute priority rule, especially where the existing equity members did not contribute any new value. *Id.* at 508. *See also In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 489 (Bankr. E.D. Mich. 1995) (stating that absolute

priority rule "does not prevent 'old equity' from acquiring such an interest, so long as the

acquisition is not wholly or partially 'on account of' the pre-existing interest in the debtor."). *Cf.*

*North LaSalle*, 526 U.S. at 456 (observing that there was no justification for giving old equity the

exclusive bargain to acquire debtors' equity interest unless "the very purpose of the whole

transaction is, at least in part, to do old equity a favor.").

The Debtors having triggered application of the absolute priority rule—because the

Tranche C DIP Facility is at least partly being extended and repaid to the Tranche C Lenders

(and other shareholders) on account of their pre-existing equity holdings—the Court next

considers whether the Debtors may nevertheless invoke the "new value exception" to the

absolute priority rule.  The new value exception is the proposition that "the objection of an

impaired senior class does not bar junior claim holders from receiving or retaining property

interests in the debtor after reorganization, if they contribute new capital in money or money's

worth, reasonably equivalent to the property's value, and necessary for successful reorganization

of the restructured enterprise."  *North LaSalle*, 526 U.S. at 442.  *See also Liberty Nat'l Enters. V.

Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir.

1997) ("Allowing old equity to retain an interest does not violate the absolute priority rule if the

former equity holders provide new value to the reorganized debtor, under the 'new value

corollary' to the absolute priority rule.").  The new value corollary permits a debtor's old equity

holders – in exchange for a new capital contribution – to retain their equity in the company, even

as creditors are not paid in full.  *See In re RAMZ Real Estate Co., LLC*, 510 B.R. 712, 718

(Bankr. S.D.N.Y. 2014) ("Recognizing that sometimes the best option for all parties is to allow

old equity to participate in the reorganized debtor, the 'new value exception' was created."

(citation omitted)).  Congress did not explicitly codify the new value corollary when it codified

the absolute priority rule. The Supreme Court has left open the possibility that old equity could

take under a plan if it invests new value in the reorganized entity, at least as long as a "market

valuation" tests the adequacy of its contribution. *See North LaSalle*, 526 U.S. at 458 ("Whether

a market test would require an opportunity to offer competing plans or would be satisfied by a

right to bid for the same interest sought by old equity is a question we do not decide here. It is

enough to say, assuming a new value corollary, that plans providing junior interest holders with

exclusive opportunities free from competition and without benefit of market valuation fall within

the prohibition of § 1129(b)(2)(B)(ii).").

In this Circuit, to invoke the new value corollary, the "the capital contribution by old

equity must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a

successful reorganization and (5) reasonably equivalent to the property that old equity is

retaining or receiving." *BT/SAP Pool C Assocs. v. Coltex Loop Cent. Three Partners*, 203 B.R.

527, 534 (S.D.N.Y. 1996) (citation omitted), *aff'd*, 138 F.3d 39 (2d Cir. 1998) (hereinafter,

"*Coltex I*"); *In re RAMZ Real Estate Co.*, LLC, 510 B.R. at 718 (same). *Accord Case v. Los

Angeles Lumber Products, Co.,* 308 U.S. 106, 121-22, 60 S. Ct. 1, 10, 84 L. Ed. 110 (1939). The

Debtors contend that even if the absolute priority rule has application herein, the proposed

Tranche C DIP Facility clears the new value corollary requirements "without issue." Debtors

Reply ¶ 76.

The parties do not dispute that the $900 million the Tranche C Lenders are loaning to the

Debtors is new, substantial money. The first three prongs of the new value test are satisfied

herein.[105] To demonstrate that the DIP funds are "necessary," the Debtors must prove that they

---

[105] "New" contributions are supposed to be from outside a debtor's business. *See In re S.A.B.T.C. Townhouse
Ass'n Inc.,* 152 B.R. 1005, 1010 (Bankr. M.D. Fla. 1993) (noting that existing equity holders "must contribute
something to the debtor that does not already belong to the debtor or to which the debtor is not already entitled").
The DIP Facility plainly qualifies as "new" money. It also qualifies as "substantial" contribution as it is not

need funds to reorganize and that it is necessary for old equity to contribute those funds. *See Coltex I*, 203 B.R. at 535. There, the District Court explained the "necessary" element of new value as follows:

> Before a debtor can claim that old equity's participation is "necessary," the market must be tested for other sources of funding and the debtor must be able to satisfy the bankruptcy court, with tangible proof, that the debtor would be unable to obtain funds from any other source or that no other source was willing to infuse the same amount of capital as old equity. Only upon this showing can it be found that the infusion of new capital by old equity was "necessary" and, therefore, that old equity is not receiving any property "on account of" its prior interests.

*Id. See also North LaSalle*, 526 U.S. at 454 (stating that proposed plan was "doomed ... by its provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan."); *In re RAMZ Real Estate Co., LLC*, 510 B.R. at 719 (denying plan confirmation where Debtor had not provided for a competing plan and there was no evidence that any other party was given an opportunity to bid on the interest sought by new equity).

Courts have found that the "reasonably equivalent" prong is not satisfied where the new value contributed by the existing equity-holders is grossly disproportionate to the value of the debtor's equity or assets. *See, e.g.*, *In re Gramercy Twins Assocs.*, 187 B.R. 112, 127 (Bankr. S.D.N.Y. 1995) (holding that $250,000 new value contribution in debtor with $7.65 million in assets in exchange for a 70% equity interest was not reasonably equivalent); *In re 8315 Fourth*

---

"nominal," "gratuitous' or a "token" payment. *See Matters of Treasure Bay Corp*., 212 B.R. 520, 544 (S.D. Miss. 1997) ("The proposed contribution is 'substantial' as defined by the courts in that it is not a 'gratuitous, token cash infusion proposed primarily to buy cheap financing.'" (quoting *In re Snyder,* 967 F.2d 1126, 1131 (7th Cir. 1992)). *Cf. In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 762 (Bankr. S.D.N.Y. 1995) (explaining that new value contribution must be "substantial in relation to the claims being disposed of under the Plan[,]" and finding that the proposed $25,000 contribution was not substantial as it represented 2.3% of the unsecured claims in the case (citation omitted)).

*Ave. Corp.*, 172 B.R. 725, 739 (Bankr. E.D.N.Y. 1994) (finding that new value contribution of

$25,000 in debtor with approximately $4 million in assets was a "token cash contribution" and

not reasonably equivalent to the value of the retained equity).  *Cf. In re Treasure Bay Corp.*, 212

B.R. at 544 (explaining that "reasonable equivalent" element requires "comparing the proposed

contribution with the interest received." (citing *Travelers Ins. Co. v. Bryson Props., VIII (In re*

*Bryson Props., XVIII)*, 961 F.2d 496, 505 (4th Cir. 1992)).  Furthermore, the Supreme Court

made it clear in *North LaSalle* that "the best way to determine value is exposure to a market."

526 U.S. at 457.

        In sum, *Coltex I*, and *North LaSalle* mandate that a debtor market-test a proposed

transaction in order to demonstrate that the purported new value was necessary and reasonably

equivalent, and was not merely an exclusive opportunity for old equity to gain advantages at the

expense of creditors.  The Objectors assert that the Debtors cannot satisfy the new value

exception because they cannot establish that the Tranche C Lenders are giving "full value" in

exchange for the property they will retain under the DIP.  They maintain that the Debtors cannot

show that the $900 million for the Tranche C DIP Facility is reasonably equivalent to the

property old equity will receive – i.e., the new equity of reorganized LATAM at a   plan value

discount – because the Debtors failed to market test the Tranche C DIP Facility pre- or post-

petition, as required under *North LaSalle* and its progeny.  *See, e.g.*, Ad Hoc Group Post-Trial

Brief ¶ 13 ("Here, the Debtors' [*sic*] failed to undertake any reasonable efforts to market the

Insider Tranche C DIP Facility.").  *See also* Knighthead Post-Trial Brief ¶ 16 ("Setting aside that

the opportunity to participate in the Tranche C financing was given exclusively to the Insider

Lenders and the terms of the Modified Insider Financing were not appropriately marketed by the

Debtors pre- or post-petition, there is absolutely no dispute that the 20% discount now proposed

by the Insider Lenders did not undergo a market test." (footnote omitted)); Committee Post-Trial

Brief at 15-16 (same). They say that under *North LaSalle*, since the Debtors failed to shop the

Tranche C DIP Facility, it is up to this Court to determine whether the Tranche C Lenders are

paying "full value," but that such determination cannot be made at this juncture because that is

an issue to be addressed at plan confirmation. *See* Ad Hoc Group Initial DIP Objection ¶ 12

("Ultimately, the Debtors' total enterprise value is a matter to be determined and tested at the

plan confirmation stage; however, it is already clear that the Debtors cannot demonstrate that the

Tranche C Lenders are paying "top dollar" for their equity subscription rights."). The Objectors

further complain that under the terms of the Tranche C DIP Facility and conversion feature, the

Company's value will be determined by the Tranche C Lenders, who are the Company's

majority shareholders (and hence, insiders) that exert control over the Debtors, and who will be

incentivized to value the company as low as possible because it would result in a bigger discount

in the conversion. *See* Revised Credit Agmt. Sch. 2.12(a)(i).[106] *See also* Knighthead Suppl.

---

[106]  The relevant section of that schedule provides:

> No more than twenty (20) days and no less than ten (10) days prior to the Plan Filing Date, LATAM
> will deliver updated valuation materials and additional Chapter 11 Plan materials, including the
> Disclosure Statement, and material exhibits to the Chapter 11 Plan, including precedent transactions,
> public equity multiples and discounted cash flows ("Final Valuation Materials") to the Tranche C
> Lenders and will deliver notice to the Tranche C Lenders of its election (the "Election Subscription
> Notice") to repay the Tranche C Obligations in (a) cash to be used by the Tranche C Lenders to
> subscribe the New Shares under the Equity Subscription pursuant to the Equity Subscription
> Election or (b) cash pursuant to a repayment in cash only, in each case upon the Plan Effective
> Date. The Equity Subscription Election, once made, and the related Election Subscription Notice,
> once provided, shall be revocable only (i) with the consent of the Majority Tranche C Lenders, (ii)
> if there is any change to the Company Approved Reorganization Plan, the Disclosure Statement, the
> material exhibits to the Company Approved Reorganization Plan or Disclosure Statement or the
> Final Valuation Materials that would require re-solicitation, as determined by the Bankruptcy Court
> after notice and a hearing, once the Plan Solicitation (as defined below) has commenced, or (iii) if
> the Company Approved Reorganization Plan is not confirmed by the Bankruptcy Court. The
> Borrower shall provide prompt written notice of its determination to revoke any election pursuant
> to (ii) or (iii), but shall have the right (but not the obligation) to make a new Equity Subscription
> Election in connection with any subsequent Company Approved Reorganization Plan.

Objection ¶ 15 ("Contrary to the traditional notions of priority in chapter 11 bankruptcy, the

Insider Lenders would actually *benefit* from lower plan value because they would be able to

exchange their debt (at a 32% discount) for a correspondingly larger portion (and under any

number of scenarios, a controlling interest) of equity as plan valuation falls.").

The Objectors contend that the Debtors failed to conduct any kind of post-petition

marketing and solicitation process for the Tranche C DIP, let alone a "robust" and

"comprehensive one".  They say that, "[a]t best, the record shows that the Debtors and PJT

employed a 'no-shop' strategy and did not *actively* seek any Tranche C offers and instead only

responded to offers made for the Tranche A DIP Facility."  Ad Hoc Group Post-Trial Brief ¶ 14.

At worst, they say the Debtors purposefully worked to discourage any potential interest in an

alternative Tranche C DIP.  Specifically, they raise several sub-arguments as to why that is.

The Debtors must prove that they market tested the Tranche C DIP Facility.  *See, e.g.*, *In

re NNN Parkway 400 26, LLC*, 505 B.R. 277, 283 (Bankr. C.D. Cal. 2014) (holding that "debtors

bear the burden of showing that the new money offered is the most and best reasonably

obtainable after some 'market testing' in order to cram down over the objections of a non-

consenting class of unsecured creditors. This probably requires, at a minimum, demonstration of

a systematic effort designed to 'market test' the deal. Debtor bears the burden of persuasion on

that point and that burden is not carried in this case."); *In re Crosscreek Apts., Ltd.*, 213 B.R.

521, 546 (Bankr. E.D. Tenn. 1997) ("Like other confirmation requirements, the burden of

---

Notwithstanding anything provided for herein, the Equity Subscription Election shall in any case become irrevocable upon the commencement of any Rights Offering (as defined below) in respect of any such Equity Subscription Election.

Revised Credit Agmt. Sch. 2.12(a)(i), § 4(i) (emphasis added).

proving these new value elements lies with the plan proponent." (citing *In re Montgomery Court Apts. of Ingham Cty., Ltd.*, 141 B.R. 324, 346 (Bankr. S.D. Ohio 1992))).

The Objectors contend that the Debtors adduced no evidence, such as emails or communications or "pages upon pages of testimony" evidencing the solicitation of numerous parties to provide the Tranche C DIP Facility on better terms, or demands to the Tranche C Lenders to improve their terms; and that they cannot do so, because there were, in fact, none. *See* Committee Post-Trial Brief at 16-17.

Second, they point to the testimony from Otton, the Committee's financial advisor, who explained that the Debtors' marketing process was flawed because, *inter alia*, (1) the Debtors' marketing materials provided that Tranche C was "already being committed by the insider shareholders" without seeking lenders to participate in Tranche C on better terms or to replace it altogether; and (2) the Debtors "did not aggressively seek out" parties who participate in DIP loans and "ask them to bid on the Tranche C and tell them [that] Tranche C was available to go to the party with the best terms." *See* Trial Ex. 278 (Otton Decl.) ¶ 60.

Third, the Objectors claim that the Debtors' own documentary and testimonial evidence confirms that they did not actively seek to market the Tranche C DIP post-petition, but were limited to seeking a Tranche A lender. They say that Coleman's deposition and trial testimony, and board minutes and email correspondence clearly show that from the beginning, the Debtors erroneously believed that a shareholders only Tranche C DIP Facility was "critical" and "uniquely positioned" and thus failed to actively seek a replacement Tranche C DIP Facility on better terms.[107]

---

[107]  As support for their position, the Objectors cite to the testimony of Coleman and Alfonsin, as follows:

- Coleman Dep. Tr. at 204:23-24 ("[W]e had locked in C the terms were one now we're trying to lock in A…"); *id.* at 204:1-3 ("At this stage, we're not focused on trying to find C[,]"); Coleman Dep. Tr. at

Fourth, the Objectors say that when interested parties such as Knighthead sought to participate in the Tranche C DIP on competitive terms, PJT directed them towards investing in Tranche A. They contend that PJT further dissuaded efforts towards an alternative Tranche C DIP by indicating that the Debtors would only consider competitive financings for the entire DIP – i.e., $2 billion-plus; or for the entire Tranche C, rather than portions of Tranche C. *See* Committee Post-Trial Brief at 17 (citing Trial Ex. 280 (Wagner Decl.) ¶¶ 6, 8, 9-12).

The Debtors disagree, and say that the Tranche C DIP Facility provides new value that was "necessary" to their reorganization in that the evidence establishes that the proposed

---

203:20-204:1 (discussing how "throughout" PJT's documents, there has been no discussion about an "effort" to obtain a "less expensive junior tranche"); Coleman Dep. Tr. at 95:18-25 (does not recall ever trying "to facilitate a group of Tranche C investors getting together to as a group replace Trance C."); Coleman Dep. Tr. at 238:4-13 (stating that PJT marketed Tranche A as dependent on the shareholder Tranche C);

- Trial Ex. 243 (First Coleman Decl.) ¶¶ 23-24 ("In addition, and as already discussed, the Tranche C DIP Lenders have agreed to subordinated treatment and several contractual undertakings. Importantly, the contractual undertakings described above can only be agreed to by the company's shareholders and, therefore, these are benefits to the Debtors that could not be obtained through financing provided by other lenders.")

- 7/29/20 Hr'g Tr. at 133:19-21 ("Q. You never called up a lender and said, we'd like you to make a proposal to replace Tranche C specifically, did you? A. [Alfonsin] Not only for Tranche C, no.")

The Objectors also point to the Board minutes as support, as follows:

- Trial Ex. 253 (Board of Directors presentation dated June 30, 2020), at 002 ("Since signing the Tranche C term sheet with certain shareholders . . . the company and its advisors have focused significant time and effort on identifying and contacting . . . and negotiating with potential Tranche A lenders.")

- Trial Ex. 123 (May 25 BOD Minutes), at 023 ("The term sheet includes a financing tranche reserved for shareholders.")

- Trial Ex. 96 (May 25 Costa Verde Board Minutes), at 6700 (referring to "the tranche reserved for shareholders" and describing it as "a tranche of financing to which the rest of the shareholders can join")

- Trial Ex. 251 (June 30 Costa Verde Board Minutes), at 007 ("The Tranche C financing is reserved for shareholders.")

- Trial Ex. 169 (Email from Javier Grana to Ramiro Alfonsin attaching DIP Common Questions Update) (stating "claiming that the Tranche C "economic terms are set" and that the DIP facility is "designed to allow shareholders to participate in the recovery of the business.")

Tranche C DIP Facility represents the best possible financing available to them (after a market

test), and that the Jefferies proposal is not a viable alternative. *See* Debtors Reply ¶¶ 79-80. The

Debtors also contend that the $900 million Tranche C DIP Facility meets the "reasonably

equivalent" requirement because it is not a "token or grossly disproportionate figure[,]" but

rather it is the result of an arms' length negotiations. *Id.* ¶ 80; *see also* Debtors Post-Trial Brief ¶

58. They contend, in any event, that the undisputed caselaw (under *North LaSalle* and its

progeny) requiring a market test of the Tranche C DIP Facility has been satisfied because "[that]

is exactly what happened here." Debtors Reply ¶ 79. To that end, the Debtors contend that the

post-petition marketing process[108] for the Tranche C DIP was "incredibly robust." Debtors Post-

Trial Brief ¶ 17. The Debtors say that together with their advisors, including PJT, they engaged

in an "extensive marketing process seeking the full $2 billion-plus" that the Debtors needed,

whereby PJT contacted over 150 parties seeking financing post-petition for the Debtors, which

resulted in over 80 interested parties signing non-disclosure agreements. *Id.* ¶ 36. As a result of

PJT's efforts, the Debtors received proposals of up to $1.5 billion for the Tranche A DIP loan,

which is $400 million more than what the Debtors initially sought. *See id.* ¶ 37.[109]

---

[108]  That the Tranche C DIP Facility was not marketed, at all, pre-petition, is clear from the testimonial evidence in the record. *See* 7/29/20 Hr'g Tr. at 250:19-25 (Coleman) ("Q. Okay. Now, prior to the bankruptcy, Tranche C was not marketed to anyone other than the three major shareholders we've talked about, correct, Delta, [Qatar], and Costa Verde? A. Well, just to be clear, this Tranche B is the – what became a Tranche C, and so -- Q. Yes. A. -- the answer is that's correct. That's correct."); *id.* at 251:15-19 (Q. But again, you didn't mark the junior equitized tranche to anyone other than the three major shareholders, Delta -- A. The -- 18 Q. -- Costa Verde -- A. Yeah, that -- that crowd. That's correct."). *See also* 7/29/20 Hr'g Tr. at 132:4-7 (Alfonsin) ("Q. And prior to the bankruptcy filing, Tranche C wasn't marketed to anyone other than the few existing shareholders; isn't that right? A. That is correct.").

[109]  As support for their contentions, the Debtors cite declarations submitted by Alfonsin and Coleman, as follows:

- Trial Ex. 243 (First Coleman Decl.) ¶ 24 ("In an effort to obtain the most attractive financing available to LATAM, an extensive marketing process was launched immediately after the Petition Date. More than 150 parties have been contacted in order to seek proposals for the Debtors' $2.15 billion capital need.")

- Trial Ex. 293 (Alfonsín Suppl. Decl.) ¶ 9 ("It was important to keep the planned bankruptcy filing confidential, to avoid third parties from placing liens on or attempting to seize LATAM's property or trying to terminate contracts. It was also important to have a significant portion of LATAM's debtor-in-

As part of this marketing process, PJT sent a "teaser" to every interested investor stating that the Debtors were "seeking $2+ billion in [DIP] financing, structured as a multi-tranche delayed draw term loan[.]" *See* Trial Ex. 31 (LATAM Teaser). In particular, the teaser indicated that "[c]ertain existing shareholders have committed to provide $900mm to serve as the junior-most tranche of the DIP[,]" (*id.*) which the Debtors maintain was intended to "inform potential competitors what any higher and better offer must beat." Debtors Post-Trial Brief ¶ 38. The Debtors also say that in the First DIP Motion, they made clear that they were open to "proposals for a number of constructs including (i) financing the full amount of capital needed, with no Tranche C DIP Facility or other shareholder support, (ii) financing for the Tranche A DIP Facility to combine with the Tranche C DIP Facility, (iii) financing for the Tranche B DIP Facility to combine with both the Tranche A DIP Facility and the Tranche C DIP Facility and (iv) alternative junior proposals in lieu of the Tranche C DIP Facility." First DIP Motion ¶ 27.

The Debtors dispute the Objectors' contention that they had discouraged potential investors and creditors from competing for the Tranche C DIP or directed potential interests towards the Tranche A DIP.[110] They note that at the Hearing, none of the financial advisors to

---

possession financing committed prior to any filing, in order to signal strength to our passengers, vendors, lessors, lenders, and the market generally. Accordingly, LATAM and PJT initially marketed what would become the Tranche C DIP Facility to our main shareholders.")

- Trial Ex. 292 (Coleman Reply Decl.) ¶ 9 ("I reject the Objecting Parties' suggestions that PJT or the Debtors neither sought nor were open to alternative proposals. Nor did PJT or the Debtors discourage potential lenders from proposing alternatives to the existing Tranche C Facility. Quite the opposite, PJT and the Debtors have been and continue to be clear that they are open to, and will consider, any proposal that meets the Debtors' capital needs. Throughout the postpetition marketing process, PJT has continuously updated the LATAM Board of Directors, including separately, the disinterested independent directors committee as to its activities and negotiations with potential lenders." (footnotes omitted))

[110] The Debtors also challenge the Objectors' criticism that PJT's Call Log (Trial Ex. 276 [redacted]) shows that PJT did not actively solicit interest in the Tranche C DIP. *See* Debtors Post-Trial Brief ¶ 42 (citing 7/29/20 Hr'g Tr. at 264:16-21 (Coleman)). They explain that the call log does not capture PJT's message to interested lenders, which is already reflected in the LATAM Teaser. The Debtors further dispel the Objectors' criticism that PJT did not try to coordinate an alternative lender group for the Tranche C DIP from the bidders with interests in smaller participations, contending that it was reasonable for PJT to properly focus on obtaining commitments for the Tranche A DIP Facility. *See id.*

the Committee[111] and the Ad Hoc Group,[112] nor Knighthead's representative, could recall a

specific instance in which an interested investor was turned away, or that PJT had been

unresponsive in engaging in discussions.[113]

Lastly, the Debtors maintain that they were responsive and engaged in good faith with

both Knighthead and Jefferies concerning their potential proposals for an alternative Tranche C

DIP loan.  More specifically, they say that the testimony revealed that Wagner admitted that PJT

had met with Knighthead's financial advisor, Houlihan Lokey, only to be told by Houlihan

Lokey that they were unfamiliar even with the terms of Knighthead's proposal, and that the

Debtors' efforts to engage Knighthead were unfruitful.  *See* 7/30/20 Hr'g Tr. at 174:12-182:24.

Further, the Debtors say that notwithstanding the late submission of Jefferies' proposal, the

---

[111]  *See*, for example, Otton's testimony:

- 7/30/20 Hr'g Tr. at 131:2-5 (Q. "And in your conversations with PJT, PJT was always very clear that there was no impediment to anyone proposing an alternative C in its entirety on better terms; is that correct? A. [Otton] That's what they said to us, correct.")

- 7/30/20 Hr'g Tr. at 130:24-131:1 (Q. "[Y]ou have regular check-ins with PJT?A. [Otton] Yes, sir.")

- 7/30/20 Hr'g Tr. at 130:16-23 ("Q. In fact, sir, even if I broaden this question, you cannot tell this Court of a single statement made to anybody at UBS by a prospective DIP lender who claims to have been discouraged from making a tranche C offer; can you? A. [Otton] I can name a series of investors who are interested in new C, yes. So no -- Q. Okay. A. -- is the answer to your question.")

[112]  *See*, for example, Jamal's testimony:

- 7/30/20 Hr'g Tr. at 57:13-18 ("Q. You personally, as the financial advisor to the ad hoc group, are not aware of a single instance in which anyone reached out to the Debtors and found the Debtors unresponsive, correct? A. [Jamal] Yeah, no one has called me and said, 'I tried to call the Debtors, and they weren't responsive to me.'").

- 7/30/20 Hr'g Tr. at 57:24-58:5 ("Q. You cannot describe for us a single conversation where someone told you that PJT or the Debtors had ever discouraged them from bidding on Tranche C, can you? A. [Jamal] I can recall some frustrations that people expressed, but . . . it's kind of hard for me to sort of parse the words that you're describing to say, whether I could -- I would describe that as discouragement or not.")

[113]  *See, e.g.*, Wagner's testimony:  7/30/20 Hr'g Tr. at 163:12-16 ("Q. And isn't it true that Mr. Coleman explicitly told you in one of those conversations that the debtors would consider a bid for Tranche C financing from Knighthead, but it had to meet three requirements? A. [Wagner] That is correct.").

Debtors engaged in discussions with Jefferies.  In that regard, they maintain that after receipt of

the Jefferies proposal, the Debtors immediately reviewed the commitment letter overnight, and

LATAM's management and board met the next day to discuss and attempted to connect with

Jefferies, who was not available until the next day, the 25th.  *See* 7/29/20 Hr'g Tr. at 89:9-90:1

(Alfonsín ).  They say on the morning of July 25th, the Debtors' advisors discussed the Debtors'

concerns with Jefferies and urged a further proposal to be submitted no later than Sunday

evening, but that Jefferies failed to do, only submitting their revised proposal the evening of July

27th, and then only making minor changes that did not address all of the Debtors' concerns.  *See*

*id.* at 89:22–90:3.  The Debtors assert that while Jefferies continued to submit further revised

proposals over the course of Wednesday and later, Jefferies never improved the economic terms

of their proposal nor addressed the Debtors' primary issues with its proposal.  *See* Debtors Post-

Trial Brief ¶ 44.

The Court credits the Debtors' contentions.  A review of the record of the Motions and

Chapter 11 Cases and the above described evidence cited by the Debtors and Objectors amply

demonstrates that Debtors adequately market tested the Tranche C DIP Facility post-petition.

The uncontroverted testimony from Coleman, which the Court found to be credible, was that PJT

and, to a lesser extent, Cleary Gottlieb, as advisors to the Debtors, made clear to market

participants, that the Debtors were seeking post-petition DIP financing, including for the junior

Tranche C DIP.  To that end, PJT actively solicited over 150+ interested parties in good faith and

set up a data room to those interested parties who have executed non-disclosure agreements to

conduct due diligence.  *See* Trial Ex. 243 (First Coleman Decl.) ¶ 24 ("In an effort to obtain the

most attractive financing available to LATAM, an extensive marketing process was launched

immediately after the Petition Date. More than 150 parties have been contacted in order to seek

proposals for the Debtors' $2.15 billion capital need.").  Although the LATAM teaser indicated

that the Tranche C DIP Facility was fully committed (a fact that was true), the Debtors' message

to creditors and parties in interest, was that they were open to any proposals for any combination

of financing structures, including "(i) financing the full amount of capital needed, with no

Tranche C DIP Facility or other shareholder support, (ii) financing for the Tranche A DIP

Facility to combine with the Tranche C DIP Facility, (iii) financing for the Tranche B DIP

Facility to combine with both the Tranche A DIP Facility and the Tranche C DIP Facility and

(iv) alternative junior proposals in lieu of the Tranche C DIP Facility."  First DIP Motion ¶ 27.

*See also* 7/29/20 Hr'g Tr. at 264:8-22 (Coleman).[114]  Moreover, contrary to the Objectors'

assertion that the Debtors meant to protect this sweetheart DIP financing for their shareholders,

the Debtors' internal meeting minutes confirm that the Debtors, through PJT, intended to market

test all aspects of the DIP Facility, including the Tranche C DIP.  *See* Trial Ex. 123 (May 25th

BOD Minutes) ("Mr. COLEMAN made a brief reference to the DIP Financing negotiating

process and pointed out that PJT will launch a robust marketing process of the DIP Financing

tomorrow, wherefore the three Tranches, A, B and C, will be subject to competitive proposals

that may be made by other creditors."); Trial Ex. 125 (May 25th Directors Committee Minutes)

("Mr. COLEMAN, from PJT, made a brief reference to the DIP Financing negotiation process,

---

[114]   Coleman's testimony was as follows:

>    Q. Okay. And specifically I went through and found the call log entries indicating that a number of
>    potential investors had interest in Tranche C, correct?
>    A. I don't agree with that.
>    Q. Do you know if there's anything in the call log or otherwise in writing that documents any PJT employee
>    actively soliciting Tranche C interest or pressing investors interested in Tranche C to offer better terms?
>    A. The -- the -- well, first of all, I -- the -- the call log does not record what we're typically saying, unless
>    we're answering somebody's comment or question. So it wouldn't have in it what we were saying to all the
>    holders about, you know, here's an A, here's a B, here's a C; you can invest in all or some. So I don't have a
>    recollection of the call log, because it wouldn't exist that way.

7/29/20 Hr'g Tr. at 264:8-22.

and indicated that PJT will launch a robust marketing process for the DIP Financing after the

Chapter 11 filing, and that the presentation submitted to the Committee will be subject to

competitive proposals that may be submitted by other prospective lending parties.").

There is also no support for the Objectors' contention that the Debtors and their

professionals were non-responsive to any expressed interest in the Tranche C DIP Facility or that

PJT discouraged potential bidders from submitting proposals for the Tranche C DIP. *See, e.g.*,

Trial Ex. 292 (Coleman Reply Decl.) ¶ 10 ("I note that the Objecting Parties have not identified

any concrete action through which PJT or the Debtors have prevented or discouraged them from

proposing an alternative to the Tranche C Facility, either on their own or in combination with

others.  For example, no one willing to execute a non-disclosure agreement has been prevented

from accessing the data room through which the Debtors have made significant nonpublic

financial and other information available to potential lenders.").  Coleman's testimony is

confirmed by the Objectors' professionals. *See* 7/30/20 Hr'g Tr. at 131:2-5 (Otton) (Q. And in

your conversations with PJT, PJT was always very clear that there was no impediment to anyone

proposing an alternative C in its entirety, on better terms, correct? A. That's what they said to us,

correct.").  Indeed, Wagner's testimony with regard to Knighthead's experience in the post-

petition marketing process, was that he had more than one conversation with Coleman at PJT

concerning Knighthead's interest in providing the Tranche C DIP. *See* Trial Ex. 280 (Wagner

Decl.) ¶¶ 6-11.  In that regard, when Knighthead submitted its written proposal for a competing

Tranche C DIP, the Debtors, through PJT and Cleary Gottlieb, attempted to engage in

negotiations with Knighthead's professionals over its terms. *See* Trial Ex. 292 (Coleman Reply

Decl.) ¶¶ 13-14.  The testimony also establishes that upon receiving the Initial Jefferies

Commitment, the Debtors promptly reviewed, considered, and reached out to Jefferies

concerning their issues with the Jefferies' proposal, and did so with the subsequent revisions or

improvements submitted by Jefferies.  *See* 7/29/20 Hr'g Tr. at 89:5-90:5.[115]  Notwithstanding the

revised proposals, Jefferies did not materially improve the economic terms of its alternative

Tranche C DIP, and did not meaningfully address the Debtors' concerns with the terms of the

Jefferies proposals.[116]  As such, for the reasons already discussed herein, the Debtors concluded

that the Tranche C DIP Facility with the shareholders is superior and represents the only viable

---

[115]   That testimony from Alfonsin was as follows:

Q. [Debtors' counsel] Mr. Alfonsin -- excuse me. Mr. Alfonsin, I want to focus you on recent developments
since last Thursday. Did LATAM receive a commitment letter from Jefferies last Thursday?
A. Yes.
Q. What was LATAM's reaction to that commitment letter?
A. We received it late last Thursday, I would say beginning of Friday. We reviewed the document in the early
morning of Friday. We sat down with our advisors and then we reached out to -- to the proponents.
Q. And what was your reaction to the terms and conditions being proposed?
A. Well, we identified certain concerns of ours on -- on -- on the document, and we wanted to discuss them with
– with Jefferies. And that's why we reach out and ask for a meeting to be held that Friday.
Q. And did Jefferies indeed engage with LATAM up until Sunday?
A. They asked us to postpone the meeting that we asked for Friday to Saturday morning, and we hold that
meeting on 24 Saturday morning and send them the issues list that we had identified as major issues for us and
asked them to have a reply by Sunday.
Q. And did they in fact reply by Sunday?
A. We received a proposal on late Monday.
Q. So not by Sunday?
A. No.

[116]   For example, Wagner testified that he believed the Jefferies proposal was economically superior and did not
need to be improved.  *See, e.g.*, 7/30/20 Hr'g Tr. at 186:22-23 ("I don't know why Jefferies would feel the need to
improve [it]."); *id.* at 189:3-9 ("Q. Let me put it more simply. Is there anything from the time the first Jefferies
proposal was made until today, on any of its provisions, that improve -- but that it made those terms better for the
debtors than they were on Monday? A. No. They -- they were better than the original insider proposal. They have
not changed. And they remain better than the revised insider proposal."); *id.* at 186:21-24 ("The deal was and
remains superior on economic terms to the insider proposal so I don't know why Jefferies would feel a need to
improve the economic terms when they're already in the lead.").

Alfonsin also testified to the Company's concerns with the revised Jefferies proposal as follows:

Q. And I believe you mentioned that LATAM also received a subsequent proposal from Jefferies on Monday; is
that correct?
A. Yes.
Q. And what was LATAM's reaction to the Jefferies revised proposal?
A. Well, we reviewed it. Economics -- terms did not change, and the terms and the issues that we had raised
have been dealt with in a very limited way. We still had an issues list that was considerable.

7/29/20 Hr'g Tr. at 90:18-91:1.

Tranche C DIP with terms that they find acceptable.[117]  The Court has no reason to challenge that

determination, and in any event, such determination is not a basis for concluding that the Debtors

did not undertake an active market test of the Tranche C DIP Facility.  Moreover, the evidence in

the record more than confirms that other than Jefferies, no other party came forward with a

committed offer, let alone a better offer, for an alternative Tranche C DIP, in the amount of $900

million.[118]

The Court also finds unconvincing the Committee's argument that the Court cannot take

into account the marketing efforts of the Committee.  *See, e.g.*, Committee Post-Trial Brief at 18

("Finally, the Debtors cannot rely on the marketing efforts of the Creditors Committee—which

could not provide confidential information or management meetings and had an unfairly limited

period of time to market—as a substitute for its own obligations.").  While the burden and

obligation to establish a robust post-petition marketing of the Tranche C DIP loan is indisputably

with the Debtors, they are not relying on UBS's efforts as a substitution for their obligation,

---

[117]   More specifically, the Debtors submit that the proposed Tranche C DIP Facility is superior because "(i) is unconditional, subject only to this Court's approval, (ii) provides the entirety of the DIP funds needed by the Debtors, including critically the $1.3 billion senior Tranche A, (iii) provides the Debtors—*at their option*—with a right to compel the junior lenders to subscribe to restricted equity at a pre-determined discount irrespective of the market discount for such equity at reorganization, (iv)[] leaves the Debtors virtually unrestricted in their future efforts to seek Tranche B financing from a number of potential sources, and (v) respects the Debtors' operational challenges and offers critical flexibility to run their business[,]" (*see* Debtors' Post-Trial Brief ¶ 2), whereas, the Jefferies Final Commitment is "not executable" because (a) he Debtors risked losing the Tranche A DIP Facility with Oaktree (who has conditioned its commitment and funding upon the current shareholders Tranche C DIP Facility) if they went with the Jefferies proposal; (b) the Jefferies proposal restricts potential Tranche B lenders to the government of Chile; (c) the Jefferies proposal contains numerous non-financial terms that are unworkable for the Debtors, including, for example, the requirement LATAM maintain cash accounts of no more than $500 million in the aggregate outside the United States, a restriction that shows an alarming failure to comprehend what is required to run a global airline such as LATAM; the Final Jefferies Commitment is "committed in name only"; and (d) the Jefferies proposal does not provide for the Modified Equity Subscription Election, which the Debtors contend gives them flexibility to determine the form of repayment of the Tranche C DIP loan if they are unable to obtain favorable exit financing.

[118]   *See, e.g.*, Coleman Dep. Tr. at 94:23-25 ("My recollection on [the PJT call log] is not one of those parties was willing to come in at a cheaper—better price, if you will, than what was in the Tranche C"); Wagner Dep. Tr. at 271:2-6 ("Q. [I]s there any entity on [Knighthead's call log] at all that you can testify as committed to providing DIP financing to the Debtors? A. No.").

which the Court finds has been satisfied, but as additional affirmation that even with the marketing efforts of UBS, no higher or better Tranche C DIP proposal is available. That UBS and Moelis separately reached out on their own to potentially interested DIP providers does not detract from, but rather lends further support to, the fact that a fulsome marketing process was undertaken with respect to the Tranche C DIP Facility.

Finally, there is likewise no merit to the Objectors' criticism that PJT should have tried more to coordinate the various interests of potential bidders in smaller participations or sought an underwriter to arrange the Tranche C DIP Facility or the full DIP Facility. That a different investment banker or professional would have undertaken a different marketing strategy with respect to the Tranche C DIP is of no moment. The issue before the Court is not whether the Debtors' marketing process should have been a process that the Objectors would have undertaken; all that is required under *North LaSalle* and *Coltex I*, for the Tranche C DIP Facility to satisfy the required elements of reasonable equivalence and necessity for purposes of the new value exception is that the Debtors ultimately market tested the Tranche C DIP Facility to third parties other than the existing shareholders.

Based upon all of the foregoing, the Court is satisfied that the Tranche C DIP Facility was negotiated at arms-length and underwent an extensive post-petition market test, the end result of which supports the Court's conclusion that no third-party creditor came forward with a competing Tranche C DIP Facility. The total pricing of the loan, including the equity conversion feature, reflects this value of the risk undertaken by the Tranche C Lenders in making this loan, and the fact that Jefferies' alternative Tranche C DIP financing was not viable demonstrates that the $900 million provided by the Tranche C DIP Lenders was reasonably equivalent and necessary because the shareholders were the "last resort." *See Coltex I*, 203 B.R. 527, 535 ('In

other words, under the 'necessary' requirement of the new value exception, old equity must be willing to contribute more money than any other source or it must be the lender of 'last resort.'" (citation omitted)).  In sum, application of the absolute priority rule is not grounds to deny the Motions.  The Debtors have carried their burden to satisfy all of the elements of the new value exception in that the Tranche C DIP Facility represents new, substantial money that is necessary for a successful reorganization and reasonably equivalent to the value of that which the Tranche C Lenders will be receiving.

The Court will next address the Objectors' arguments that the Tranche C DIP Facility must be denied as containing impermissible sub rosa elements by dictating future plan terms and impinging on creditors' rights under a plan confirmation process.

## Whether the Tranche C DIP Facility Is an Improper Sub Rosa Plan

A debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.  *Motorola, Inc. v Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).  The term "sub rosa" is not defined in the Bankruptcy Code.  The Fifth Circuit applied it in *Braniff* in reversing the district court's order approving a sale of the debtors' assets under section 363 of the Bankruptcy Code.  The circuit found that the proposed sale was a "plan sub rosa " because if approved, it would have dictated some of the terms of any future reorganization plan, restructured the rights of creditors, and required all parties to release all claims against the debtor, its officers, directors, and secured creditors.  *In re Braniff Airways, Inc.*, 700 F.2d at 939-40.  Concerns about sub rosa plans are not limited to transactions involving section 363 asset

sales.  They are germane to any transaction by a debtor that adversely impacts on interested

parties' rights to participate in the restructuring process.  "The reason *sub rosa* plans are

prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in

effect, 'short circuit the requirements of Chapter 11 for confirmation of a reorganization plan.'"

*Iridium*, 478 F.3d at 466 (quoting *In re Braniff Airways, Inc.*, 700 F.2d at 940).  The Objectors

contend that is precisely the effect of the Modified Equity Subscription Election and, as such, the

Tranche C DIP Facility must be rejected as an improper sub rosa plan.

Under the DIP Credit Agreement, the Tranche C Lenders had the exclusive right to

exercise the Equity Subscription Election at a 32% discount to plan value.  The Objectors

challenged that version of the DIP Facility as a sub rosa plan that violated the absolute priority

rule because, among other things, through that election:

> The Tranche C DIP Facility locked in arbitrary recoveries to the Debtors' existing
> shareholders based on negotiations among the Debtors and their major
> shareholders without any market test to assess the fairness of the transaction and
> in violation of the absolute priority rule;
>
> The DIP Credit Agreement gave complete discretion to the Tranche C Lenders to
> choose, under any plan, whether to be paid in full in cash on the plan's effective
> date, or to exchange their debt into equity at a 32% discount to yet-to-be-
> determined plan value; and
>
> The DIP loan imposed a requirement that any plan must be approved by a
> shareholder vote, and that only a "Company Approved Reorganized Plan" may be
> proposed and confirmed in these cases.

*See, e.g.*, Knighthead Initial DIP Objection ¶¶ 2, 33.  The Objectors argued that if the Tranche C

DIP Facility was approved, the Tranche C Lenders would be able to direct how and when the

Debtors will emerge from bankruptcy, and, in their discretion, reserve for themselves, a windfall

distribution and potential role in the go-forward business.  *See id.* ¶¶ 1, 2.  S*ee also* Committee

Suppl. and Restated DIP Objection ¶ 79 (complaining that Tranche C DIP Facility dictates key

terms of eventual plan of reorganization by prematurely allocating reorganization value to insider equity holders.); Ad Hoc Group Initial DIP Objection ¶ 16 ("The Tranche C DIP Facility would impermissibly convert the bankruptcy process from one designed to benefit all creditors, to one designed to benefit existing shareholders at the expense of not only the Ad Hoc Group but all unsecured creditors.").

The Revised Credit Agreement modified the Equity Subscription Election in two principal ways. First, the Debtors, not the Tranche C Lenders, are vested with the right to make the election. Second, the discount rate is reduced to 20% discount to plan value. The Committee asserts that the equity of a reorganized debtor is a form of plan "currency" and that it is only through the chapter 11 plan process that the parties and the Court can determine the proper allocation of that "currency" among a debtor's creditors and equity holders. *See* Committee Post-Trial Brief at 5. It complains that the Modified Equity Subscription Election subverts that process because the discount is not market-tested, the Debtors can make this election and profit from the discount, without the approval or oversight of the Court, and that the election dictates key terms of an eventual plan of reorganization by prematurely allocating reorganization value to insider equity holders. It maintains that through the proposed Tranche C DIP Facility, the Debtors are proposing to vest the Tranche C Lenders with the exclusive right to acquire equity in the reorganized debtor, without extending an opportunity to anyone else to compete for the reorganized equity. *See id.* at 4-5. Thus, the Committee contends that the election "short-circuits Chapter 11 safeguards by taking what belongs to the plan negotiation and confirmation process (i.e., allocation of the equity of the reorganized company as a form of plan currency) and prematurely allocating it to existing shareholders." *See id.* at 8. *See also* Knighthead Post-Trial Brief ¶ 17 ("The Modified Insider Financing therefore necessarily determines plan terms—

giving shareholders an unmarketed discount that would never be subject to judicial review—and

infringes on creditor rights to object to any 'choice' made by the Debtors to put this option into

effect.").  Further, the Objectors say that the purported "improvement" that "flips" this option to

the Debtors (from the prior iteration where the Tranche C Lenders held the option), is "of no

moment," because the "evidence demonstrates that the [Tranche C Lenders] control the Debtors

and direct their management."  Committee Post-Trial Brief at 5.  In sum and substance, the

Objectors contend that, with the Modified Equity Subscription Election, the Tranche C DIP

Facility is no less a sub rosa plan that violates the absolute priority rule than its predecessor.  *Id.*

at 2 ("Among other things, [the election] eviscerates the creditors' right to reject a plan that

proposes to distribute the equity in the reorganized debtors to shareholders at an unfair price, as

well as other safeguards of the confirmation process.").  *See also* Knighthead Post-Trial Brief ¶

10 ("Just like the Insider Financing, the Modified Insider Financing is a sub rosa plan that

violates the absolute priority rule.  Indeed, testimony elicited at trial only proved that the

Modified Insider Financing provides $282.6 million in value to the Debtors' controlling

shareholders on account of their old equity.")

The Objectors also complain that the covenants in the DIP Facility are calculated to

ensure that only a Company Approved Reorganization Plan may be proposed and confirmed in

these cases.  *See* Committee Post-Trial Brief at 8 ("In addition, through a variety of covenants,

the transaction would vest the insiders with excessive control over plan process itself. This is

legally impermissible in its own right because it circumvents critical chapter 11 safeguards in the

manner of a *sub rosa* plan.").  In particular, it shall be an Event of Default under the Revised

Credit Agreement if, among other things, (i) the Debtors fail to comply with the Bankruptcy

Milestones set forth in section 6.17, including the milestone that the Debtors (a) shall file a

Chapter 11 Plan, which shall be a Company Approved Reorganization Plan, no later than fifteen

(15) months after the Petition Date, and (b) this Court shall have entered an order confirming the

Company Approved Reorganization Plan no later than thirty (30) days prior to the maturity date

under the Revised Credit Agreement; and (ii) the occurrence of a "Bankruptcy Event," including,

among others, that "an order shall be entered by the Bankruptcy Court confirming a Chapter 11

Plan other than a Company Approved Reorganization Plan." *See* Revised Credit Agmt. § 6.17

(milestones), § 8.01(k) (events of default).  The Committee contends that these covenants

effectively prevent any other plan proponent from filing an alternative plan that does not contain

the equity conversion feature. *See* Committee Post-Trial Brief at 1 ("In addition, the option can

only be exercised as part of a plan that has been approved by the insider-controlled board, not by

any other plan proponent.").  It asserts that "if the DIP Facility is approved, it will ensure (under

penalty of default) that the only plan of reorganization that can be confirmed is one that has been

approved by the Debtors' lender-controlled board that gives the Insider Lenders the full benefit

of their exclusive option." *See id.* at 9.

Finally, the Objectors say that the Rights Offering feature under the terms of the

Modified Equity Subscription Election adds to the improper recovery guaranteed to the Debtors'

existing equity holders, and undermines the Debtors' arguments that any recovery under the

Tranche C DIP Facility is not on account of equity interests, but on account of new value.  That

is because under the procedures for implementing the Modified Equity Subscription Election,

LATAM's shareholders must engage in a Chilean Rights Offering, whereby any new capital

raises must be offered to all of the Debtors' shareholders (i.e., including non-Tranche C

Lender/Shareholders), and any remaining unsubscribed shares may be placed with the Tranche C

Shareholders.  *See* Revised Credit Agmt. Sch. 2.12(a)(i) § 14.[119]  Thus, the Committee contends

that approval of the Tranche C DIP Facility is an approval now, of the future right of the

Debtors' other shareholders who are not Tranche C Lenders and who have not put new money

into the Debtors, to acquire shares of the reorganized debtors upon exit from these bankruptcy

proceedings.  *See* Committee Post-Trial Brief at 9 ("The Debtors have made it plain that they

intend to lock in the Court's approval of the conversion feature now, including the obligation to

do a shareholder rights offering, and that any and all substantive objections would be

foreclosed.").

      DIP financings sometimes trigger sub rosa plan issues.  "[A] bankruptcy court cannot,

under the guise of section 364, approve financing arrangements that amount to a plan of

reorganization but evade confirmation requirements."  *Resolution Tr. Corp. v. Official*

*Unsecured Creditors Comm. (In re Def. Drug Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP

1992) (citation omitted).  To put a finer point on it, "[w]hile certain favorable terms [under a

---

[119]  That section provides:

      (i)  As soon as practicable following completion of the New Shares Registration and the Second
Board Meeting, LATAM will launch the preemptive rights offering in Chile (the "Rights Offering").
If LATAM makes an Equity Subscription Election that has not been revoked in accordance with the
terms hereof, no later than the last day of the Rights Offering, the Tranche C Shareholders (including
those LATAM stockholders who are party to the Support Agreement) shall waive in full their
preemptive rights to subscribe for New Shares in the Rights Offering, which will allow LATAM to
offer, upon the expiration of the Rights Offering, those unsubscribed shares to Tranche C Lenders
in accordance with the Equity Subscription Election. The Rights Offering will remain open for 30
days and will be a condition to the effectiveness of the Chapter 11 Plan.

      (ii)  Immediately after the expiration of the Rights Offering, the board of directors of LATAM shall
place New Shares among the Tranche C Lenders in accordance with the Equity Subscription
Election, and the Tranche C Lenders shall purchase such unsubscribed New Shares at the same price
offered in the Rights Offering in a number sufficient to effectuate in full the Equity Subscription
with respect to their Tranche C Obligations. Any remaining unsubscribed New Shares after the
effectuation of the Equity Subscription may be placed by the board of directors of LATAM in
accordance with the Chapter 11 Plan, including purchase by the Tranche C Shareholders.

Revised Credit Agreement Sch. 2.12(a)(i) § 14.

financing agreement] may be permitted as a reasonable exercise of the debtor's business

judgment, bankruptcy courts do not allow terms in financing arrangements that convert the

bankruptcy process from one designed to benefit all creditors to one designed for the

unwarranted benefit of the postpetition lender. . ." *Id.* (citation omitted).  The touchstone

consideration in conducting that analysis is "whether the proposed terms would prejudice the

powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter

11 process by granting the lender excessive control over the debtor or its assets as to unduly

prejudice the rights of other parties in interest[.]" *Id.* (citation omitted).  *See also In re Ames

Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "the court's discretion

under section 364 is to be utilized on grounds that permit reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-

interest.").  Thus, courts will reject proposed DIP loans as improper sub rosa plans where the

terms of the loan include concessions to creditors or parties in interest that are unauthorized

under, or in conflict with, provisions under the Bankruptcy Code.  *See, e.g.*, *In re Belk Props.,

LLC*, 421 B.R. 221, 225-26 (Bankr. N.D. Miss. 2009) (denying motion to approve secured DIP

facility where DIP term sheet (i) called for lender to act as debtor's chief manager and obtain at

least 51%, and as much as 90% of reorganized equity, and (ii) loosely detailed the manner in

which existing creditors were to be treated; court found that before DIP lender "will consent to

infusing the post-petition funding, it requires a final, non-appealable order approving the post-

petition financing proposal which obviously incorporates the conditions set forth on the Term

Sheet. In the opinion of the court, once the financing order is final and non-appealable, the plan

of reorganization is a fait accompli, that is, it is an accomplished fact for all practical

purposes."); *In re Chevy Devco*, 78 B.R. 585, 589 (Bankr. C.D. Cal. 1987) (denying motion to

obtain secured DIP financing that called for DIP loan to subordinate existing secured debt where

debtor "admitted . . . that the proposal that was brought to [the] Court [was] equivalent to its plan

of reorganization[,]" and stipulated "that if this subordination proposal had been put forward in a

plan of reorganization, the plan could not be confirmed over [objector's] rejection.").

     The Debtors say that those types of cases are not applicable here because the Tranche C

DIP Facility does not constitute a sub rosa plan since plan terms are not being dictated under the

Tranche C DIP Facility, and the Tranche C Lenders do not control the plan process. They also

contend that provisions in a credit agreement establishing the terms for repayment of the debt do

not dictate the treatment of the claims of other creditors and do not circumvent the protections

provided to creditors as a part of the plan confirmation process. *See* Debtors Reply ¶ 67.

     The Debtors assert that the fact that they have the option of distributing reorganized

equity (at a discount) in satisfaction of the Tranche C DIP loan does not further the Objectors'

sub rosa plan argument. As support, they point to *In re Chrysler*, 405 B.R. 84 (Bankr. S.D.N.Y.

2009). *See* Debtors Reply ¶ 68 ("Particularly relevant here, a lender's right to receive equity in

exchange for its postpetition loan does not amount to a sub rosa plan."); *see also* Debtors Post-

Trial Brief ¶ 55, n.35 (bankruptcy court found no sub rosa plan where "Governmental Entities'

receipt of an equity interest in New Chrysler is not based on prepetition claims . . . . It reflects

additional consideration to the Governmental Entities for making the $6.2 billion loan to New

Chrysler[.]") (citing *In re Chrysler LLC*, 405 B.R. at 100)). In that case, the United Auto

Workers ("UAW"), the voluntary employees' beneficiary association established in conjunction

with the UAW ("VEBA," and with the UAW, the "Unions"), and certain Governmental Entities

were prepetition creditors of the Chrysler debtors and creditors of New Chrysler, the entity

established prepetition to purchase Chrysler's assets out of bankruptcy pursuant to a section 363

asset sale. *In re Chrysler LLC*, 405 B.R. at 92.  Pursuant to that sale, New Chrysler paid

Chrysler $2 billion in cash and assumed certain liabilities of Chrysler, and Chrysler transferred

substantially all of its operating assets to New Chrysler. *Id.*  At the closing of the sale

transaction, New Chrysler gave the Unions and the Governmental Entities equity interests in

New Chrysler, in satisfaction of their claims against New Chrysler.  The Debtors highlight that in

rejecting contentions that the asset sale was a sub rosa plan, the *Chrysler* court noted that the

stock distributions to the Unions and the Governmental Entities were not on account of those

entities' prepetition claims against the Chrysler debtors, but rather, were on account of their

claims against New Chrysler. *See id.* at 100 ("Similarly, the Governmental Entities' receipt of an

equity interest in New Chrysler is not based upon their prepetition claims against Old Chrysler.

Rather, it is an unrelated transaction that was negotiated between New Chrysler and the source of

its funds—the Governmental Entities. It reflects additional consideration to the Governmental

Entities for making the $6.2 billion loan to New Chrysler to fund the purchase of Old Chrysler's

business and its ongoing operations.").  The Debtors overstate the significance of that

determination.  The transaction had no impact on, and was irrelevant to, the Chrysler estate and

its creditors.  The bankruptcy court found that the provision of the ownership interests in New

Chrysler was "neither a diversion of value from the Debtors' assets nor an allocation of the

proceeds from the sale of the Debtors' assets. The allocation of ownership interests in the new

enterprise is irrelevant to the estates' economic interests." *Id.* at 99.  In contrast, a determination

now that the Debtors are free to allocate the reorganized equity to their shareholders (and at a

20% discount to some of them) is relevant to the estate's economic interests generally, and

specifically to the rights of all estate creditors under the plan process.

The Debtors assert that the Tranche C DIP Facility is not a sub rosa plan, but rather is "influencing" the restructuring because it is "paving the way towards or otherwise narrowing the [D]ebtors' options for a restructuring[.]"  Debtors Reply ¶ 68.  As support they cite to *In re Iridium Operating LLC*.  In that case, a consortium of lenders (the "ILenders") asserted liens over the bulk of Iridium's assets.  478 F.3d at 456.  Iridium's official committee of unsecured creditors (the "IUCC") contested those liens; in particular, the IUCC objected to the ILenders' claim to Iridium's remaining cash held in accounts at JPMorgan Chase Bank.  The IUCC also sought to pursue claims against Motorola, Inc. ("Motorola"), Iridium's former parent company, but lacked money to fund the litigation.  Motorola was an administrative creditor of the Iridium estates.  *Id.*  The IUCC and the ILenders agreed to settle their disputes and sought court approval of their settlement (the "ISettlement") under Bankruptcy Rule 9019.  The settlement conceded the validity of the ILenders' liens and, among other things, divided the estate's cash into three funds.  One fund split $130 million between the ILenders ($92.5 million) and a litigation trust (the "ILLLC") ($37.5 million) that served as the funding vehicle for all Motorola litigation.  Iridium's unsecured creditors were the trust beneficiaries.  *See id.* at 459.  If the IUCC and the estate prevailed against Motorola, 62.5% of the recovery would go to the estate to be distributed according to a future, as-yet-confirmed reorganization plan, with administrative creditors – such as Motorola – taking first.  Motorola objected to the ISettlement, in part, on the grounds that it was an impermissible sub rosa plan.  *Id.* at 466.  The Second Circuit rejected the argument.  In doing so, it noted that in this circuit the sale of an asset of the estate under § 363 is permissible if the court expressly finds a good business reason for allowing the sale.  *See id.* (citing *Comm. of Equity Sec. Holders v. Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  In rejecting the sub rosa plan argument, the bankruptcy court identified a proper business justification for the

ISettlement, to wit: "By allowing the [ILenders] to take $92.5 million and redirect another $37.5 million to the ILLLC in exchange for the [IUCC] dropping the challenge to the liens, the [IUCC] has cleared the way for implementation of a reorganization plan. The Estate stands to gain significantly more from the action against Motorola than it might if it or the [IUCC] were forced to fund the litigation themselves at some much later date." *Id.* at 467.  In essence, the *Iridium* court found that, but for the ISettlement, the Iridium estate would not have had the means for proposing and implementing a reorganization plan.  Although the ISettlement afforded the unsecured creditors indirect access to funds that they could not have accessed outside of the terms of the ISettlement (i.e., the funds to underwrite the Motorola litigation), it did so without altering plan confirmation requirements, or prejudicing Motorola's right to payment of its administrative expense claim, ahead of any distribution to unsecured creditors.  In that light, the Second Circuit found that the Settlement was not a sub rosa plan, but rather, was "a step towards possible confirmation of a plan of reorganization and not an evasion of the plan confirmation process." *Id.*   In a similar vein, there are cases in which courts have rejected sub rosa plan arguments and approved settlements which effectively fix the treatment of some, but not all, classes of claims in yet to be filed reorganization plans, but do so without running roughshod over the rights of the remaining claimants, and the Code's plan confirmation procedures. *See, e.g.*, *Official Committee of Unsecured Creditors v. Tower Automotive, Inc. (In re Tower Auto. Inc.)*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006) (finding no sub rosa plan because the transaction did not dispose of all of debtor's assets for distribution or prevent recovery to other creditors).[120]

---

[120]   In that case, Tower filed a motion pursuant to sections 1113 and 1114 of the Bankruptcy Code to reject a collective bargaining agreement and modify retiree benefits, respectively. *In re Tower Auto. Inc.*, 241 FRD at 163. The unions and retirees objected, and the parties eventually resolved the objections pursuant to the terms of a settlement.  In part, under the settlement, Tower agreed that in its reorganization plan, it would provide for the payment of cash or equity in an amount equal to not less than 20% of the unsecured claims asserted by the union and retirees, in full satisfaction of those claims. *See id.* at 165.  The bankruptcy court approved the settlement over the

The Debtors have demonstrated that there is a proper business justification for the

Tranche C DIP Facility. Without it, they will lack the funding needed to operate their business.

The Tranche C DIP Facility is not a substitute for a reorganization plan like the DIP loans in *In*

*re Belk*, 421 B.R. at 225; and *In re Chevy Devco*, 78 B.R. at 589. However, it contains

provisions that will give the Debtors a leg up in the plan confirmation process. In contrast to the

situation in *Iridium,* the Debtors are not asking the Court to approve a transaction that will

merely bring them a step closer to plan confirmation in the same fashion as the *Iridium* debtor.

They are asking the Court to approve a transaction that will fix now, some of the terms of a plan

yet to be filed. If approved, the Tranche C DIP Facility locks into place the 20% discount to plan

value on the stock to be issued to the Tranche C Lenders in satisfaction of the Tranche C DIP

loan, if the Debtors elect to distribute stock, in lieu of cash, in satisfaction of that obligation.

There is no way of knowing now whether that discount is appropriate. Yet, if the DIP is

approved, neither the Debtors' decision to make that election, nor the 20% discount, will be

subject to creditor comment or Court review. The Court assumes that the Debtors will act in

good faith in determining whether to exercise the election, but the fact remains that the Tranche

C DIP Facility necessarily determines plan terms giving the Debtors the right to distribute equity

in the reorganized Debtors to the Tranche C Lenders – at a 20% discount to plan value – that

---

creditors committee's objection. *Id.* On appeal, the creditors committee argued that the settlement should be denied as a *sub rosa* plan. The court rejected that argument since the settlement did not dispose of all of the debtor's assets. The Court explained that "[e]vidence admitted at the trial . . . indicates that Tower expects to emerge from bankruptcy with an enterprise value of approximately $1.2 billion. . . . The Creditors Committee emphasizes that the [unions'] $150 million claim alone represents 56 percent of Tower's total unsecured claims . . . . While payment of at least 20 percent on this significant claim may represent a substantial portion of Tower's unencumbered estate (although this is disputed), the Retiree Settlements cannot be said to dispose of all or substantially all of Tower's assets." *Id.* at 169 (citation omitted). Here, there is no evidence regarding the Debtors' enterprise value, and such a valuation analysis is simply not possible at this stage of the bankruptcy. Thus, there is no record upon which the Court can determine what value or assets, if any, is left for distribution to other creditors of the LATAM estates. To the contrary, the evidence in the record indisputably establish that *all* of the equity interests in reorganized LATAM would be distributed exclusively to the existing shareholders if the Equity Subscription Election is exercised by the Debtors.

will not be subject to court review.  That "short circuits" the chapter 11 plan review process

under the Bankruptcy Code, by establishing plan terms sub rosa in the Tranche C DIP Facility.

There is a domino effect to the Debtors' exercise of the Modified Equity Subscription Election

that exacerbates that problem.  Pursuant to the Rights Offering called for under section 2.12 of

the Revised Credit Agreement, all of the Debtors' shareholders (whether or not acting as a DIP

Lender) are entitled to acquire stock in the reorganized at plan value.  That violates the absolute

priority rule since the shareholders will be receiving the stock solely by reason of their status as

shareholders, and without the benefit of market testing the transaction.  *See North LaSalle*, 526

U.S. 434, 456 (finding that partner's exclusive opportunity to acquire equity of reorganized

debtor, without market scrutiny or competing bids, rendered such property interest granted "on

account of" old equity and thus, violative of the absolute priority rule).  This likewise establishes

plan terms sub rosa.  Moreover, the covenants under the Revised Credit Agreement mandate that

only a Company Approved Reorganization Plan may be confirmed in these Chapter 11 cases,

regardless of exclusivity, or an Event of Default will be triggered.  Those provisions effectively

lock up any future plan of reorganization to be only the Debtors' plan providing for the equity

conversion.  Although the Tranche C DIP Facility does not include provisions limiting the rights

of creditors to vote on a plan, it indirectly impacts creditor rights of franchise by mandating that

only a Company Approved Reorganization Plan may be confirmed in these Chapter 11 cases.

The court finds that the Modified Equity Subscription Election subverts the reorganization

process because the discount is not market-tested, the Debtors can make this election without the

approval or oversight of the Court, and that the election dictates key terms of an eventual plan of

reorganization by prematurely allocating reorganization value to LATAM's existing equity

holders.  That aspect of the Tranche C DIP Facility is problematic and bars approval of the

Revised Credit Agreement.  *See In re Def. Drug Stores, Inc.*, 145 B.R. at 317 (denying post-petition DIP financing where proposed terms would prejudice the powers and rights of creditors under the Bankruptcy Code and leverage the Chapter 11 process unduly prejudice the rights of parties).

## CONCLUSION

Based on the foregoing, the Court finds that the price and terms of the Revised Credit Agreement, including the Tranche A DIP Facility and Tranche C DIP Facility, are entirely fair, and there are grounds under section 364(c) of the Bankruptcy Code to authorize the Debtors to enter into the DIP Credit Agreement.  Further, the DIP Lenders are entitled to a good faith finding under section 364(e) of the Bankruptcy Code.  However the Court finds that the Modified Equity Subscription Election gives rise to improper sub rosa plan treatment of the Tranche C Lenders and the Debtors' equity holders.  For that reason the Court will not approve the Motions.

IT IS SO ORDERED.

Dated: September 10, 2020
      New York, New York                    /s/ *James L. Garrity, Jr.*
                                            Honorable James L. Garrity, Jr.
                                            United States Bankruptcy Judge