UNITED STATES BANKRUPTCY COURT                    NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re:                                                   :
                                                         :   Case No. 20-11254 (JLG)
                                                         :   Chapter 11
LATAM Airlines Group S.A., et al.,                       :
                                                         :
                                        Debtors.[1]      :   (Jointly Administered)
                                                         :
----------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER GRANTING THE DEBTORS' MOTIONS FOR ENTRY OF AN ORDER APPROVING SETTLEMENT STIPULATIONS BY AND AMONG THE DEBTORS, SAJAMA INVESTMENTS, LLC AND CERTAIN OTHER CLAIMANTS

**A P P E A R A N C E S :**

TOGUT, SEGAL & SEGAL LLP
*Attorneys for the Debtors*
One Penn Plaza, Suite 3335
New York, New York 10119
By:     Albert Togut, Esq.
        Kyle J. Ortiz, Esq.
        Bryan M. Kotliar, Esq.
        Amanda C. Glaubach, Esq.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

DECHERT LLP
*Counsel to the Official Committee*
*of Unsecured Creditors*
1095 Avenue of the Americas
New York, NY 10036
By:    Allan S. Brilliant, Esq.
        David A. Kotler, Esq.
        Stephen M. Wolpert, Esq.

PAUL HASTINGS LLP
*Counsel to Banco del Estado de Chile,*
*in its capacity as indenture trustee under the*
*Chilean Local Bonds Series A through D and*
*Series E issued by LATAM Airlines Group S.A.*
200 Park Avenue
New York, New York 10166
By:    Pedro A. Jimenez, Esq.
        Andrew Tenzer, Esq.
        Nicholas Bassett, Esq.
        Shlomo Maza, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction

There are two matters before the Court. The first is the motion of LATAM Airlines

Group S.A. ("LATAM Parent") and TAM Linhas Aéreas, S.A. ("TAM"), as the lessees under

certain aircraft leases, and certain of their affiliated debtors and debtors-in-possession

(collectively, the "Debtors")[2] (the "SVP Settlement Motion")[3] for entry of an order, pursuant to

sections 105(a), 362, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code")

and Rules 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[2]   LATAM Parent and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as
"LATAM."

[3]   *See Debtors Motion for Entry of An Order (I) Authorizing the Debtors to Implement Certain Transactions,*
*Including Entry Into Long Term Restructuring Agreements with the Centaurus/Triton Lessors, The SBI Lessors, and*
*Pilar II Leasing Limited and (II) Approving the Related Settlement Agreement with Certain Claimants* [ECF No.
4108]. Citations to "ECF No. __" refer to electronic filings in the Debtors jointly administered Chapter 11 Cases
(Case No. 20-11254).

Rules"), (a) authorizing the Debtors to implement certain transactions with (i) Poppintree Park

LLC ("Poppintree"); (ii) Strategic Value Dislocation Master Fund L.P. ("SVDMF"); (iii)

Strategic Value Opportunities Fund L.P. ("SVOF"); (iv) Strategic Value Special Situations

Master Fund IV L.P. ("SVSSMF-IV"); (v) Strategic Value Special Situations Master Fund V

L.P. ("SVSSMF-V"); and (vi) Strategic Value New Rising Fund L.P. ("SVNRF"), including the

entry into the transactions contemplated by a certain term sheet (the "Term Sheet"),[4] providing

for the Debtors' entry into the New Leases and other Transaction Documents (each as defined

below), and (b) approving the related settlement agreement (the "Aircraft Lease Settlement

Agreement")[5] between the Debtors and certain claimants (the "SVP Settlement").[6]  In substance,

by the SVP Settlement Motion, the Debtors seek authorization to enter into sixteen aircraft lease

agreements (defined below as the "Go Forward Lease") and to reject the underlying

Centaurus/Triton Leases and the SBI Leases (defined below), which will remain in effect until

each Go Forward Leases respective of the same Aircraft becomes effective. The SVP Settlement

Motion also seeks to resolve lease rejection damage claims (the "SVP Claims") by allowing the

following general unsecured claims: (i) headlease claims against LATAM Parent in the

aggregate amount of $484,000,000; (ii) guarantee claims against LATAM Parents in the

aggregate amount of $226,000,000; and (iii) claims of $140,000,000 against TAM. Accordingly,

the SVP Settlement Motion proposes the allowance of a total of $850,000,000 in allowed general

unsecured claims against the Debtors.

---

[4]     A copy of the Term Sheet is annexed as Exhibit B to the SVP Settlement Motion.

[5]     A copy of the Aircraft Lease Settlement Agreement is annexed as Exhibit C to the SVP Settlement Motion.

[6]     Collectively, (a) SVDMF, SVOF, SVSSMF-IV and SVSSMF-V are referred to herein as the "SBI Claims
Beneficial Owners"; (b) SVDMF, SVOF, SVSSMF-IV, SVSSMF-V and SVNRF are referred to herein as
the "Pilar/Picaflor Claims Beneficial Owners"; and (c) Poppintree, SBI Claims Beneficial Owners and
Pilar/Picaflor Claims Beneficial Owners are referred to herein as "SVP" or the "SVP Parties".

The second matter is a motion (the "Sajama Settlement Motion" with the SVP Settlement Motion, the "Settlement Motions")[7] by LATAM Parent and certain of its affiliated Debtors for the entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 9019, for approval of the terms and conditions of the settlement set forth in the stipulation and order by and among the Debtors and Sajama Investments, LLC ("Sajama"). Various lessors and Wilmington Trust Company ("WTC"), as security assignee of such lessors, filed individual claims against Debtors LATAM Parent, TAM Transport Aéreo S.A., Latam Airlines Perú S.A. and LATAM Airlines Ecuador S.A., each in the amount of no less than $1,102,090,322, plus certain unliquidated damages. By the Sajama Settlement Motion, the Debtors seek the approval of the Sajama Settlement, which will resolve twenty-four claims (the "Settled Sajama Claims") acquired by Sajama relating to the LATAM Pass-Through Certificates, Series 2015-1 (the "EETC") for a single general unsecured claim against LATAM Parent in the sum of $695 million. The Settled Sajama Claims arise out of the Debtors' Court-approved surrender of seventeen aircraft (the "EETC Aircraft"), all of which were subject to separate leasing arrangements (the "EETC Aircraft Leases").

The Official Committee of Unsecured Creditors (the "Committee") and Banco Estado del Chile ("BancoEstado") (collectively, the "Objectors") each filed a single objection to both motions[8] (collectively, the "Objections"). BancoEstado appears herein in its capacity as

---

[7]    *See Debtors' Motion for Entry of an Order Approving Settlement Stipulation by and Among the Debtors and Sajama Investments, LLC* [ECF No. 3772].

[8]    *Objection of the Official Committee of Unsecured Creditors to (I) Debtors' Motion for Entry of an Order Approving Settlement Stipulation by and Among the Debtors and Sajama Investments, LLC and (II) Debtors' Motion for entry of an order (i) Authorizing the Debtors to Implement Certain Transactions, Including Entry into Long Term Restructuring Leases Agreements with the Centaurus./Triton Lessors, the SBI Lessors, and Pilar II Leasing Limited and (II) Approving the Related Settlement Agreement with Certain Claimants* [ECF No. 4091] (the "UCC Objection" or "UCC Obj."). *Objection of Banco Del Estado De Chile, In Its Capacity as Indenture Trustee Under Chileans Bonds Series A through D and Series E, to Debtors' Motions for Entry of Orders Approving Settlements with Certain RSA Creditors* [ECF No. 4092] (the "BancoEstado Objection" or "BancoEstado Obj.").

indenture trustee under the Chilean Local Bonds issued by LATAM Airlines Group S.A. in the

aggregate amount of $490.5 million (the "Chilean Bonds"). Those bonds represent nearly half a

billion dollars of unsecured claims against LATAM Parent. The majority of the holders of the

Chilean Bonds are Chilean Pension Fund Administrators (Administradores de Fondos de

Pensiones), which are investment funds tasked with managing the retirement savings accounts of

Chilean workers under Chile's pension system.   The Debtors filed a single reply to the

Objections (the "Reply").[9] Sajama and the SVP Parties each filed a statement in support of the

Settlement Motions.[10]

On January 21 and 24, 2022, the Court conducted an evidentiary hearing on the

Settlement Motions. For the reasons stated herein, the Court overrules the Objections and grants

the Settlement Motions.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.).  This is a

core proceeding pursuant to 28 U.S.C. § 157(b).

---

[9]    *See Debtors' Omnibus Reply to Objections to (A) Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to Implement Certain Transactions, Including Entry Into Long Term Restructuring Agreements With the Centaurus/Triton Lessors, the SBI Lessors, and Pilar II Leasing Limited and (II) Approving the Related Settlement Agreement with Certain Claimants and (B) Debtors' Motion for Entry of an Order Approving Settlement Stipulation by and Among the Debtors and Sajama Investments, LLC* [ECF No. 4094]. The Debtors attached the direct testimony of Ramiro Alfonsin Balza, the Chief Financial Officer at LATAM Parent, as Exhibit A; the direct testimony of Sebastian Adolfo Acuto, the Vice President of Fleet & Projects at LATAM Parent, in support of the SVP Settlement Motion, as Exhibit B; the direct testimony of Sebastian Adolfo Acuto in support of the Sajama Motion as Exhibit C; and the direct testimony of Keith McGregor, the Senior Managing Director for FTI Consulting, Inc. ("FTI") as Exhibit D.

[10]    *See The SVP Parties' Statement (A) In Support of Debtors' Motion to Approve the SVP Settlement That Resolves Claims Arising From Twenty Aircraft Transaction and Provides For Sixteen Amended Aircraft Leases and (B) In Response to Objections to Such Settlement Asserted By (I) Creditors' Committee and (II) Banco del Estado de Chile, As Indenture Trustee for Chilean Local Bonds* [ECF No. 4095] (the "SVP Statement"); *Sajama Investments, LLC's Statement In Support of the Debtors' Motion For Entry Of An Order Approving Settlement Stipulation By and Among the Debtors and Sajama* [ECF No. 4097] (the "Sajama Statement").

## Background[11]

The Chapter 11 Cases

On May 26, 2020 (the "Initial Petition Date"), certain of the Debtors (the "Initial Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Chapter 11 Cases"). On July 7 and 9, 2020 (the "Subsequent Petition Date" and, together with the Initial Petition Date, as applicable to each Debtor, the "Petition Date"), additional LATAM affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Subsequent Chapter 11 Cases" and together with the Initial Chapter 11 Cases, the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only. On June 5, 2020, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Committee and on May 26, 2021, the U.S. Trustee amended the appointment of the Committee. No trustee or examiner has been appointed in any of these Chapter 11 Cases.[12]

On May 27, 2020, the Grand Court of the Cayman Islands granted the applications of certain of the Debtors for the appointment of provisional liquidators pursuant to section 104(3) of the Companies Law.  On June 4, 2020, the 2nd Civil Court of Santiago, Chile issued an order recognizing the Chapter 11 Cases with respect to LATAM Airlines Group S.A., Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A. and Technical Training

---

[11]    Terms not defined herein retain the definitions ascribed in the Settlement Motions.

[12]    The U.S. Trustee has not solicited additional members for the Committee on the basis of the Subsequent Chapter 11 Cases.

LATAM S.A.  In addition, on June 12, 2020, the Superintendence of Companies of Colombia

granted the recognition to the Chapter 11 Cases.

On September 24, 2020, the Court entered  an order (the "Bar Date Order")[13] which

established December 18, 2020 as the general date by which most creditors must submit their

proofs of claim.

The Debtors' Proposed Bankruptcy Plan

On November 26, 2021, the Debtors filed the Joint Plan of Reorganization of LATAM

Airlines Group, S.A., et al, under Chapter 11 of the Bankruptcy Code, as amended (the "Plan")

and the related disclosure statement, as amended (the "Disclosure Statement").[14] Shortly

thereafter, the Debtors filed the operative amended Plan and Disclosure Statement.[15] As detailed

in the Disclosure Statement, the Plan is supported by a Restructuring Support Agreement (the

"RSA")[16] executed among the Debtors, a group of creditors purporting to holding more than

70% of the general unsecured claims asserted against LATAM Parent (the "Evercore Group")

and holders of more than 50% of LATAM Parent's existing equity. Under the RSA, if the Plan is

confirmed and goes effective, the members of the Evercore Group will receive $734 million in

backstop fees and $427 million in excess allocation of convertible notes being offered under the

---

[13]    *Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief*  [ECF No. 1106].

[14]    *See Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al, Under Chapter 11 of the Bankruptcy Code* [ECF No. 3666]; *Disclosure Statement With Respect to the Joint Plan of Reorganization of LATAM Airlines Group S.A., et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 3667].

[15]    *Notice of Filing of Third Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code with Respect to the Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code* [ECF No. 4189]; *Notice of Filing of Third Revised Disclosure Statement With Respect to the Joint Plan of Reorganization of LATAM Airlines Group S.A., et al., Under Chapter 11 of the Bankruptcy Code* [ECF No. 4190].

[16]    A copy of the RSA is annexed as Exhibit E to the Disclosure Statement.

Plan. The RSA lists a series of "Termination Events" under which the RSA "shall terminate",

making "all obligations of the Parties . . . be of no further force and effect," including:

> with respect to any Commitment Creditor, the successful prosecution,
> challenge or objection, filed by any party (other than any of the
> Commitment Parties or their respective affiliates, transferees or assignees)
> to the amount (i) as previously Allowed (as defined in the Plan Term Sheet)
> by a court order and/or (ii) as separately previously agreed to by the Debtors
> and such Commitment Creditor with respect to any individual claim (to the
> extent such agreement exists[.]

RSA § 7(f). Sajama is a joint venture comprised of two hedge funds, Sculptor Capital LP

("Sculptor") and Sixth Street Partners, LLC ("Sixth Street").[17] SVP is also a collection of hedge

funds.[18] Sixth Street, Sculptor, and SVP are all members of the Evercore Group.[19]  The RSA

defines "Commitment Creditor" to include, *inter alia*, Sculptor, Sixth Street, and SVP. *See* RSA,

Schedule II.C (Commitment Creditors as of the Agreement Effective Date).

The Settlement Motions

The SVP Settlement Motion

The Aircraft Leases

The Debtors' fleet comprises of owned aircraft as well as aircraft under finance leases

and operating leases. *See* First Day Decl. ¶ 51.[20] The aircraft subject to finance leases are

generally owned by entities located in the Cayman Islands and Delaware (the "SPVs"), certain of

which are affiliates of LATAM Parent. Most of the SPVs are not Debtors in these Chapter 11

Cases. *See id*. ¶ 52. The initial lessee of the leased aircraft is typically LATAM Parent or, for

---

[17]    *See* UCC Obj., Ex. 3, Sajama 30(b)(6) Witness Samuel Lovett ("Lovett Tr.") Jan. 5, 2022 Dep. Tr. at 12:19–24.

[18]    *See* UCC Obj., Ex. 61, SVP 30(b)(6) Witness Jeffrey Craine ("Craine Tr.") Jan. 3, 2022 at 8:18–11:25.

[19]    *See Ad Hoc Group of Parent Unsecured Creditors' Second Verified Statement Pursuant to Bankruptcy Rule 2019 Creditors* [ECF No. 3447].

[20]    *See Declaration of Ramiro Alfonsin Balza in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* [ECF No. 3] (the "First Day Decl.").

certain aircraft, TAM. *See id.* ¶ 51; Suppl. First Day Decl. ¶ 11.[21] LATAM Parent then typically subleases the aircraft subject to finance leases to other operating entities, including certain of the Debtors. *See* First Day Decl. ¶ 38. The aircraft leases relevant to the SVP Settlement are described in greater detail below. A portion of the Debtors' fleet includes certain tax leases, which include Spanish Tax Operating Leases ("STOLs") and Japanese Operating Leases with Call Options ("JOLCOs"). *See* Suppl. First Day Decl. ¶ 13-14.

The STOL Leases

There are seven aircraft subject to tax lease agreements under which an entity incorporated in Spain owns and leases an aircraft to TAM. *See id.* ¶ 13. Those aircraft are owned and leased to TAM by two non-Debtor entities: Aviación Tritón, A.I.E. ("Triton") and Aviación Centaurus, A.I.E. ("Centaurus" and, together with Triton, the "Centaurus/Triton Lessors"). *See id.* The Triton Aircraft (as defined below) were financed by debt provided by BNP Paribas and originally guaranteed by the European export credit agencies and an equity contribution provided by Banco Santander. *See id.* The Debtors understand that after the Petition Date, the European export credit agencies exposure was acquired by a third party. The Centaurus aircraft (as defined below) were financed by debt provided by BNP Paribas, CIC and KFW and an equity contribution provided by Banco Santander. *Id.* The STOLs with the Centaurus/Triton Lessors concerned:

> (i) with respect to Triton, leases for three (3) Airbus A319-132 aircraft bearing MSNs 4000, 4163, and 4171 (collectively, the "Triton Leases" and the "Triton Aircraft", as applicable), and
>
> (ii) with respect to Centaurus, leases for (i) three (3) Airbus A319-100 aircraft bearing MSNs 4734, 4756, and 4773 and (ii) one (1) Airbus A321-200 aircraft

---

[21] *See Second Declaration of Ramiro Alfonsin Balza in Support of the Subsequent Chapter 11 Cases* [ECF No. 483] (the "Suppl. First Day Decl.").

bearing MSN 4662 (the "Centaurus/Triton Leases" and "Centaurus/Triton Aircraft", as applicable).[22]

<u>The JOLCO Leases</u>

Eight of the aircraft leased by the Debtors are subject to tax leasing structures through the JOLCOs. *See* First Day Decl. ¶ 54. LATAM is not a borrower under these facilities. These aircraft are leased directly to LATAM Parent by certain non-Debtor entities consisting of the SBI Lessors[23] and are subleased to and primarily operated by other Debtor affiliates or by TAM. The JOLCOs with the SBI Lessors concerned eight Airbus A320-214 aircraft bearing MSNs 5654, 5666, 5686, 5707, 5748, 5764, 5845, and 5883 (collectively, the "SBI Leases" and the "SBI Aircraft", as applicable, and, together with the Centaurus/Triton Leases and the Centaurus/Triton Aircraft, the "STOL/JOLCO Leases" and the "STOL/JOLCO Aircraft", as applicable). A list of the STOL/JOLCO Leases is set forth in the SVP Settlement. The Court granted various stipulations and side letter agreements among the Debtors and the Centaurus/Triton Lessors and the SBI Lessors with respect to the Debtors' rights to the continued use of the respective Aircraft during the Chapter 11 Cases (collectively, the "STOL/JOLCO Side Letters and Stipulations"). A list of the STOL/JOLCO Stipulations and Side Letters is annexed as Exhibit 1 to the SVP Settlement.

In July 2021, after initial extensions of the expiration of the STOL/JOLCO Side Letters and Stipulations, the Debtors received purported notices of termination and/or expiration thereof from the Centaurus/Triton Lessors and the SBI Lessors. On September 10, 2021, the Debtors filed a motion which requested that the Court approve the assumption of the Centaurus/Triton

---

[22]    A list of the Centaurus/Triton Leases is set forth in Paragraph C of the SVP Settlement.

[23]    The term "SBI Lessors" refers, collectively, to LS – Aviation No.17 Co. Ltd., LS – Aviation No.18 Co. Ltd., LS – Aviation No.19 Co. Ltd., LS – Aviation No.20 Co. Ltd., LS – Aviation No.21 Co. Ltd., LS – Aviation No.22 Co. Ltd., LS – Aviation No.23 Co. Ltd., and LS – Aviation No.24 Co. Ltd.

Leases and the SBI Leases (the "STOL/JOLCO Leases Assumption Motion").[24] On October 12, 2021, each of the Centaurus/Triton Lessors (the "Centaurus/Triton Objection")[25] and the SBI Lessors (the "SBI Objection"[26] and, together with the Centaurus/Triton Objection, the "STOL/JOLCO Leases Assumption Objections") filed objections to the STOL/JOLCO Leases Assumption Motion.

Thereafter, the Debtors engaged in negotiations with the SVP Parties (on behalf of the Centaurus/Triton Lessors and the SBI Lessors) concerning a resolution of the STOL/JOLCO Leases Assumption Objections and the related claims as well as the restructuring of the STOL/JOLCO Leases. The parties resolve the STOL/JOLCO Leases Assumption Objections as part of the SVP Settlement, as set forth below.

<u>The Pilar/Picaflor Leases</u>

The Debtors are party to certain lease agreements concerning the leasing of Airbus A320 family aircraft and Airbus A350 family aircraft. The leases that are relevant to the SVP Settlement Motion are:

---

[24]    *See Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume Various Aircraft Agreements and for Related Relief (Tritón, Centaurus and JOLCO) (MSNS 4000, 4163, 4171, 4662, 4734, 4756, 4773, 5654, 5666, 5686, 5707, 5748, 5764, 5845 & 5883)* [ECF No. 3179]. On July 30, 2020, the Debtors filed the *Debtors' Third Motion for Entry of an Order (I) Authorizing Debtors to Reject Certain Aircraft Leases and Abandon Certain Aircraft and (II) Approving Return Procedures* [ECF No. 735], and on September 11, 2020, the Debtors' filed the *Debtors' Fourth Motion for Entry of an Order (I) Authorizing Debtors to Reject Certain Aircraft Leases and Abandon Certain Aircraft and (II) Approving Return Procedures* [ECF No. 1061] (collectively, the "Aircraft Rejection Motions"). Together, the Aircraft Rejection Motions sought approval to reject certain aircraft leases, among which were the SBI Leases. On September 13, 2021, after having certain of the requested lease rejections granted, the Debtors withdrew the Aircraft Rejection Motions [ECF Nos. 3185 & 3186] in connection with filing the STOL/JOLCO Leases Assumption Motion.

[25]    *See Response of the Santander Lessors Objecting to Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume Various Aircraft Agreements and for Related Relief (Tritón, Centaurus and JOLCO) (MSNS 4000, 4163, 4171, 4662, 4734, 4756, 4773, 5654, 5666, 5686, 5707, 5748, 5764, 5845 & 5883) [ECF 3179]* [ECF No. 3353].

[26]    *Response of the SBI Lessors Objecting to Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume Various Aircraft Agreements and for Related Relief (Tritón, Centaurus and JOLCO) (MSNS 4000, 4163, 4171, 4662, 4734, 4756, 4773, 5654, 5666, 5686, 5707, 5748, 5764, 5845 & 5883) [ECF 3179]* [ECF No. 3354].

(i) with respect to Pilar I Leasing Limited ("Pilar I"), three (3) Airbus A350-941 aircraft bearing MSNs 0035, 0045, and 0079 (collectively, the "Pilar I Leases" and the "Pilar I Aircraft", as applicable),

(ii) with respect to Pilar II Leasing Limited ("Pilar II", and collectively with Pilar I, "Pilar"), one (1) Airbus A320-271N aircraft bearing MSN 6286 (the "Pilar II Lease" and the "Pilar II Aircraft", as applicable), and

(iii) with respect to Picaflor Leasing Limited ("Picaflor", and collectively with Pilar, the "Pilar/Picaflor Lessors", and collectively with the Centaurus/Triton Lessors and the SBI Lessors, the "Aircraft Lessors"), one (1) Airbus A350-941 aircraft bearing MSN 0363 (the "Picaflor Lease" and the "Picaflor Aircraft", as applicable, and, together with the Pilar I Leases and Pilar I Aircraft, and Pilar II Lease and Pilar II Aircraft, the "Pilar/Picaflor Leases"[27] and "Pilar/Picaflor Aircraft", as applicable, and collectively with the STOL/JOLCO Leases and the STOL/JOLCO Aircraft, the "Aircraft Leases" and the "Aircraft", as applicable).

The Court granted various stipulations and side letter agreements among the Debtors and Pilar and Picaflor with respect to the Debtors' rights to the continued use of the respective Pilar/Picaflor Aircraft during the Chapter 11 Cases. The stipulations and side letter agreements are annexed to the SVP Settlement.

On September 11, 2020, the Debtors filed their fourth Aircraft Lease Rejection Motion[28] which, among other things, sought authorization to reject the Pilar II Lease. On October 19, 2020, the Debtors and Bank of Utah as security trustee and Pilar II entered into the Side Letter to Aircraft Lease Agreement (the "Pilar II Rejection Side Letter") in connection with the pending rejection of the Pilar II Lease. On November 5, 2020, the Court approved the stipulation ordering the rejection of the Pilar II Lease (the "Pilar II Rejection").[29]

---

[27]    A list of the Pilar/Picaflor Leases is set forth in Paragraph C of the SVP Settlement Agreement. The "Go Forward Lease" refers to the leases held by the Centaurus, Triton, Pilar II, and the SBI Lessors. The related Pilar I and Picaflor lease agreements are referred to herein as the "Terminated Leases," as applicable.

[28]    *See Debtors' Fourth Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Aircraft Leases and Abandon Certain Aircraft and (II) Approving Return Procedures* [ECF No. 1061].

[29]    *See Stipulation and Order Authorizing Debtors to Reject Certain Unexpired Leases with Aircraft Counterparties* [ECF No. 1333].

On June 17, 2021, the Debtors filed the Picaflor Rejection[30] which caused the Picaflor Lease to be rejected. On June 17, 2021, the Debtors, Bank of Utah as security trustee, Glas USA LLC as successors to Sumitomo Mitsui Banking Corporation, New York Branch and Picaflor entered into the Side Letter to Aircraft Agreement (the "Picaflor Rejection Side Letter") in connection with the Picaflor Rejection.

On June 24, 2021, the Debtors filed the Pilar I Rejection[31] (and together with the Pilar II Rejection and the Picaflor Rejection, the "Rejections") which caused the Pilar I Leases to be rejected. On June 24, 2021, the Debtors and Bank of Utah as security trustee and Pilar I entered into the Side Letter to Aircraft Lease Agreements (the "Pilar I Rejection Side Letter" and together with the Pilar II Rejection Side Letter and the Picaflor Rejection Side Letter, the "Rejection Side Letters") in connection with the Pilar I Rejection.

On November 25, 2020, the Debtors and Pilar II entered into the Aircraft Lease Termination Agreement (the "Pilar II Termination Agreement") terminating the Pilar II Lease and sublease. On June 25, 2021, the Debtors and Picaflor entered into the Aircraft Lease Termination Agreement (the "Picaflor Termination Agreement") terminating the Picaflor Lease and sublease. On July 21, 2021, the Debtors and Pilar I entered into the Aircraft Lease Termination Agreement (the "MSN 0079 Termination Agreement") terminating the MSN 0079 Lease and sublease. On August 19, 2021, the Debtors and Pilar I entered into the Aircraft Lease Termination Agreement (the "MSN 0035 Termination Agreement") terminating the MSN 0035 Lease and sublease. On October 26, 2021, the Debtors and Pilar I entered into the Aircraft Lease Termination Agreement (the "MSN 0045 Termination Agreement" and together with the Pilar II

---

[30]    *See Notice of Confirmation of Rejection of Certain Unexpired Aircraft Lease Agreements and the Abandonment of Certain Related Assets* [ECF No. 2538].

[31]    *See Notice of Confirmation of Rejection of Certain Unexpired Aircraft Lease Agreements and the Abandonment of Certain Related Assets* [ECF No. 2589].

Termination Agreement, the Picaflor Termination Agreement, the MSN 0079 Termination

Agreement and the MSN 0035 Termination Agreement, the "Termination Agreements")

terminating the MSN 0045 Lease and sublease. Consequently, as of June 24, 2021, the Picaflor

Lease and all the Pilar Leases had been rejected, and by October 26, 2021, all of the

corresponding aircraft returned.

Thereafter, the Debtors engaged in negotiations with the SVP Parties (on behalf of Pilar I,

Pilar II, and Picaflor) concerning a resolution of the Aircraft Lease Claims related to the Pilar/

Picaflor Aircraft as well as the restructuring of the Pilar II Lease. The parties resolved the

relevant claims as part of the SVP Settlement, as set forth below.

The Aircraft Lease Rejection Damage Claims

On or before the applicable deadline set by the Bar Date Order by which a proof of claim

was required to be filed, the Original Claimants[32] (other than Picaflor) filed proofs of claim

bearing the following claim numbers against LATAM Parent and certain of the other Debtors in

connection with the Aircraft Leases, related operative documents and/ or in respect of the

Aircraft:

> Centaurus Claims – Nos. 2306, 2504, 2521, 2547, 2557, 2962, 3115, and 3341
>
> Triton Claims – Nos. 2470, 2477, 2493, 2522, 2661, and 3338
>
> SBI Claims – Nos. 3887, 4140, 4398, 4404, 4422, 4470, 4567, 4608, 6340, 6341, 6342, and 6343
>
> Pilar Claims – Nos. 2314, 2463, 2469, 2495, 2559, 2561, 2649, 2717, 6371, 6372, 6395, 6396, 6449, and 6450

---

[32]    "Original Claimants" refers, collectively, to (i) the Bank of Utah, as the security trustee with respect to financings related to the Picaflor Aircraft (ii), BNP Paribas, as either the senior facility agent with respect to financings related to the Pilar I Aircraft, as the senior facility agent with respect to financings related to the Pilar II aircraft, and/ or as security agent with respect to financings related certain of the Aircraft (in any such capacity, "BNP Paribas"), (iii) Investec Bank PLC, as the junior facility agent with respect to financings related to the Pilar I Aircraft and the Pilar II Aircraft (in any such capacity, "Investec"), (iv) MUFG Bank, Ltd ., New York Branch, as the facility agent with respect to financings related to the SBI Aircraft ("MUFG"), (v) UMB Bank, N.A., as the security trustee with respect to financings related to the SBI Aircraft, and (vi) the Aircraft Lessors.

Bank of Utah – Nos. 6348, 6349, 6350 and 6354

BNP Claims – Nos. 2473, 2475, 2563, 2607, 2638, 2711, 2808, 2810, 3218, and 3362

Investec Claims – 3403, 395, 3500, 3505, 3643, and 3880

MUFG Claims – 4064, 4157, 4457, 4497, 4509, 4515, 4518, and 4669

UMB Claims – 4067, 4242, 4251, 4499, 4527, 4583, 4683, and 4688.

The Aircraft Lease Settlement
Agreement and Term Sheet

The Debtors assert that they have engaged in good faith arm's length negotiations with the SVP Parties (on behalf of the Aircraft Lessors) to restructure the Go Forward Leases in a manner consistent with the Debtors' business plan and to resolve the SVP Claims on mutually agreeable terms. SVP Settlement Motion ¶ 36. The negotiations resulted in an agreement to resolve the Aircraft Lease Claims and restructure the Go Forward Leases. In broad strokes, the agreement consists of:

> *Claims Settlement Agreement*: subject to Court approval, the Debtors and the SVP Parties have entered into the SVP Settlement, which, among other things, provides for the allowance of rejection damages claims arising from transactions covering twenty aircraft (collectively, the "SVP Aircraft"), in the amounts, and against the Debtors, as set forth therein (such portion of the SVP Settlement, the "SVP Claims Settlement"); and (ii) the rejection of the Centaurus/Triton Leases and the SBI Leases, which will nonetheless remain in effect until each such New Lease (defined below) respective of the same Aircraft becomes effective.

> *Long Term Restructuring Agreements*: the Debtors and the SVP Parties agreed to the terms expressed in the Term Sheet for long term restructuring of the Go Forward Leases pursuant to the rejection of such leases and entry into new aircraft leases for the sixteen SVP Aircraft that the SVP Parties previously demanded to be or were returned (the "New Leases")[33] and related agreements with respect to each such New Lease (together with such related agreements, the "Transaction Documents"), which is annexed as Exhibit B to the Motion (such portion of the SVP Settlement, the "Aircraft Retention and Lease Terms Settlement").

---

[33]    The New Leases contemplated under the Term Sheet concern leases for all of the Aircraft other than the aircraft in the Debtor's Airbus A350 family, which the Debtors have determined no longer fit within their fleet needs. SVP Settlement Motion ¶ 38.

Below is a summary of the principal terms of the Aircraft Retention and Lease Terms Settlement.

Rejection of STOL/JOLCO Leases

While the Pilar/Picaflor I Leases have already been rejected, the SVP Settlement contemplates the rejection of the STOL/JOLCO Leases, which will nonetheless remain in effect until the New Lease respective of each such Aircraft becomes effective.

Terms for Long Term Restructuring Agreement

The Term Sheet sets forth the terms intended for the execution of relevant transaction documents among the Debtors and the Aircraft Lessors (other than Pilar I and Picaflor) with respect to the Centaurus/Triton Aircraft, the SBI Aircraft, and the Pilar II Aircraft. The Term Sheet also contemplates terms for the New Leases.

Allowed Claims

The Aircraft Lease Settlement Agreement contemplates allowed general unsecured claims in favor of the Aircraft Lessors consisting of

(i) headlease claims against LATAM Parent in the aggregate amount of $484,000,000;

(ii) general unsecured guarantee claims against LATAM Parent in the aggregate amount of $226,000,000; and

(iii) general unsecured claims against TAM in the aggregate amount of $140,000,000.

The Allowed Claims shall be in full and final satisfaction of any and all claims that have been or may be asserted by the Claimants in connection with the STOL/JOLCO Leases, including any administrative claims, additional rejection damages claims, or in connection with the Stipulations and Side Letters, the Rejections, the Rejection Side Letters, the Termination Agreements or the Aircraft, where all such claims are deemed to have been released and waived, subject to the Aircraft Lessors' rights to assert post-petition administrative claims pursuant to section 503 of the Bankruptcy Code with respect to the New Leases to the extent permitted under the applicable Stipulations and Side Letters, and subject to the Debtors' rights to object to any such additional claims and the preservation of the Debtors' defenses thereto. Once effective, the Aircraft Lease Settlement Agreement will resolve seventy-six claims asserting approximately $4.941 billion that the claimants have filed against the Debtors, in addition to unliquidated claim amounts.

Plan Recoveries

> The Parties have agreed on certain terms pertaining to the recoveries respective of the claims in favor of Pilar I, Pilar II, and Picaflor.

Conditions Precedent

> The binding effect of the Term Sheet is conditioned on, among other things, the Parties' entry into the Aircraft Lease Settlement Agreement and the Court's approval thereof, and the full execution of all of the Transaction Documents. In turn, the allowance, satisfaction and expungement of various claims contemplated under the Aircraft Lease Settlement Agreement is conditioned on (i) in the case of the Go Forward Leases, on the effectiveness of each corresponding New Lease and (ii) in the case of the Terminated Leases, on the effectiveness of all New Leases contemplated under the Term Sheet.

*See generally* SVP Settlement.

The Sajama Settlement Motion

In May 2015, LATAM Parent entered into $1,020,823,000[34] in leasing arrangements with WTC in its capacities as pass-through trustee, subordination agent, paying agent under a note purchase agreement, and loan trustee under certain indentures and security agreements, pursuant to which WTC was able to obtain the Aircraft—eleven new Airbus A321-200 aircraft, four new Boeing 787-9 aircraft, and two new Airbus A350-900 aircraft—and their associated engines which it then leased to LATAM Parent.[35] *See* Acuto Sajama Decl. ¶ 10.[36]

The EETC Aircraft Leases arise from four special purchase vehicles: Cuclillo Leasing Limited, Parina Leasing Limited, Canastero Leasing Limited, and Rayador Leasing Limited

---

[34]    In April 2017, a $140,000,000 junior tranche secured by the same collateral was added to the EETC Lease Financing.

[35]    The Aircraft have the following manufacturing serial numbers ("MSNs"): eleven Airbus A321-200 aircraft with MSNs 6949, 7005, 7036, 7081, 6698, 6780, 6797, 6798, 6894, 6895, and 6899; four Boeing B787-916 aircraft with MSNs 38461, 38478, 38479, and 38459; and two Airbus A350-941 aircraft with MSNs 24 and 27.

[36]    *See Direct Testimony of Sebastian Adolfo Acuto in Support of Debtors' Motion for Entry of an Order Approving Settlement Stipulation By and Among the Debtors and Sajama Investments, LLC* [ECF No. 4094] ("Acuto Sajama Declaration" or "Acuto Sajama Decl."). The Acuto Sajama Declaration is attached as Exhibit C to the Reply.

(collectively, the "EETC Lessors"). *See id.* ¶ 11; Sajama Settlement Motion ¶ 16.  The Lessors

financed, purchased, and owned the engines, Aircraft and other miscellaneous equipment. *See*

Acuto Sajama Decl. ¶ 11; Sajama Settlement Motion ¶ 16. To finance these purchases, the EETC

Lessors issued three series of secured equipment notes under a separate indenture for each

Aircraft (the "EETC Notes") to three corresponding pass-through trusts (with WTC acting as

Pass Through Trustee).  Acuto Sajama Decl. ¶ 11; Sajama Settlement Motion ¶ 16. The EETC

Notes were secured by an all-asset pledge of the Lessors' property in favor of WTC as loan

trustee. Acuto Sajama Decl. ¶ 11; Sajama Settlement Motion ¶ 16. The pass-through trusts

acquired the EETC Notes by collecting proceeds from its issuance of pass-through trust

certificates. Acuto Sajama Decl. ¶ 11; Sajama Settlement Motion ¶ 16.

On the Initial Petition Date, LATAM filed a motion (the "Aircraft Lease Rejection

Motion")[37] seeking authority to reject, or abandon, as applicable, certain leases, including the

EETC Aircraft Leases. Acuto Sajama Decl. ¶ 12. On June 24, 2020, the Bankruptcy Court

entered an order granting the relief requested in the Aircraft Lease Rejection Motion.[38] On or

before the Bar Date, WTC and the EETC Lessor Parties (collectively, the "Original EETC

Lessor Claimants") filed twenty-four proofs of claim, with each claim filed in an amount of not

less than $1,102,090,322.00, plus certain unliquidated damages,[39] on account of future rents,

fees, and expenses relating to the repossession, ferry flight, storage, maintenance, liquidity

facility provider liabilities, return conditions, and associated advisor fees relating to the Aircraft

---

[37]    *See Debtors' Motion for Entry of an Order (I) Authorizing Debtors to Reject Certain Aircraft Leases and Abandon Certain Aircraft, Effective Nunc Pro Tunc to the Petition Date and (II) Approving Return Procedures* [ECF No. 23].

[38]    *See Order (I) Authorizing Debtors to Reject Certain Aircraft Leases and Abandon Certain Aircraft, Effective Nunc Pro Tunc to the Petition Date, and (II) Approving Return Procedures* [ECF No. 295].

[39]    This amount includes unliquidated damages estimated in an amount of "no less than" $250,000. The Debtors say that the Claimant has advised the Debtor that it estimates the total value of its Allowed Claim to exceed $1,320,000,000. *See Acuto Sajama Decl.* ¶ 14, n.7.

and the EETC Aircraft Leases. Sajama Settlement Motion ¶ 14. In addition to the twenty-four

claims, the Original EETC Lessor Claimants also asserted two additional claims that were

withdrawn as part of the prior stipulation.

On March 10, 2021, LATAM filed a motion (the "LTA Motion"),[40] which, among other

things, sought the Court's approval of (a) the Debtors' entry into new leases with respect to

eleven of the Aircraft, and (b) a *Stipulation and Agreed Order Concerning Certain Proofs of

Claim* by and between the Debtors and the Original EETC Lessor Claimants, attached to the

LTA Motion as Exhibit M (the "Prior Stipulation"). Acuto Sajama Decl. ¶ 15. As part of the

Prior Stipulation, the Original EETC Lessor Claimants agreed, among other things, that with

respect to any amount asserted as owing under the claims in the Lease Rejection Motion, the

Original EETC Lessor Claimants shall be limited to one non-duplicative claim, if allowed, for

such amount against such Debtor. *Id.*  Additionally, as part of the Prior Stipulation, the Original

Claimants agreed to withdraw proofs of claim 3788 and 3608 as duplicative of proof of claim

3885. The Prior Stipulation expressly preserved the Original EETC Lessor Claimants'

entitlement to bring allowable, non-duplicative claims in multiple Debtor cases, as appropriate,

and preserved the Debtors' right to object to any such claims. *Id*. On April 6, 2021, the Court

approved the LTA Motion, including the Prior Stipulation.[41] *Id*.

On April 28, 2021, LATAM filed a motion (the "B787 Motion"),[42] which sought the

Court's approval of the Debtors' entry into new leases with respect to four of the Aircraft. *Id*. ¶

---

[40]    *Debtors' Motion for an Order Authorizing the Debtors to Implement Certain Transactions, Including Entry into Lease Agreements with Wilmington Trust Company Solely in its Capacity as Trustee* [ECF No. 1975].

[41]    *See Order Authorizing the Debtors to Implement Certain Transactions, Including Entry Into Lease Agreements with Wilmington Trust Company Solely in its Capacity as Trustee* [ECF No. 2153].

[42]    *See Debtors' Motion for an Order Authorizing the Debtors to Implement Certain Transactions, Including Entry into Lease Agreements with UMB Bank N.A., Solely in Its Capacity as Owner Trustee* [ECF No. 2259].

16. On May 30, 2021, the Court approved the B787 Motion.[43] On or about April 29, 2021, WTC entered into a purchase agreement with a third party pursuant to which it agreed to sell the Aircraft to the winning bidder, following an auction conducted by WTC, for a purchase price of $575,000,000. Sajama Settlement Motion ¶ 34. On July 30, 2021, Sajama, as transferee, and WTC, as transferor, filed a Transfer Notice,[44] evidencing that WTC, in its capacities as subordination agent, loan trustee, and pass-through trustee, had unconditionally and irrevocably sold, transferred, and assigned to Sajama all right, title, and interest to the claims against the Debtors, which it held as collateral for the secured EETC Notes. *Id*. ¶ 22.

The Stipulation and Order

The principal terms and conditions of the Stipulation and Order are generally as follows:

a. In full and final satisfaction of the Sajama Claims, claim number 3572 will be allowed as a prepetition general unsecured claim against LATAM Parent in the amount of $695 million.

b. All Sajama Claims, other than claim number 3572, shall be deemed disallowed.

*Id*. ¶ 23.

## **Legal Standards**

Section 365(a) of the Bankruptcy Code provides that, with certain irrelevant exceptions, "a trustee subject to the court's approval, may assume or reject any executory contract or an unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also ReGen Capital I, Inc. v. Halperin (In re Wireless Data, Inc.)*, 547 F.3d 484, 488 (2d Cir. 2008). Section 1107 of the Bankruptcy Code provides the same power to a debtor-in-possession. *See* 11 U.S.C. § 1107(a); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d

---

[43]    *See Order Authorizing the Debtors to Implement Certain Transactions, Including Entry into Lease Agreements with UMB Bank N.A., Solely in Its Capacity as Owner Trustee* [ECF No. 2431].

[44]    *Notice of Transfer of Claim Other Than for Security* [ECF No. 2837].

Cir. 1993) ("Since 11 U.S.C. § 1107(a) gives debtors-in-possession the same rights and powers

of a trustee, a debtor-in-possession, such as Orion, also may assume a contract with bankruptcy

court approval."). "The purpose behind allowing the assumption or rejection of executory

contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate

and to renounce title to and abandon burdensome property." *In re Orion Pictures Corp.*, 4 F.3d at

1098 (internal quotation marks omitted); *see also Phoenix Exploration, Inc. v. Yaquinto (Matter

of Murexco Petroleum, Inc.),* 15 F.3d 60, 62 (5th Cir. 1994) (noting that Section 365 "allows a

trustee to relieve the bankruptcy estate of burdensome agreements which have not been

completely performed.").

Courts apply the "business judgment" standard in determining whether to authorize a

debtor in possession to reject an unexpired lease. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S.

513, 523 (1984) (recognizing the "business judgment" standard is used to approve rejection of

executory contracts). To satisfy that standard, a debtor in possession must demonstrate that the

proposed rejection of the executory contract or unexpired lease will benefit the debtor's estate.

*See COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d

Cir. 2008); *In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009).  Accordingly, the

Court will approve a debtor's rejection of an executory contract or unexpired lease where such

rejection is made in the exercise of sound business judgment and if the rejection benefits its

estate. *See In re Penn Traffic Co.,* 524 F.3d at 383 ("[t]hat the debtor's interests are paramount in

the balance of control is underscored by the business judgment standard employed by courts in

determining whether to permit the debtor to assume or reject the contract."); *Westbury Real Est.

Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr.

S.D.N.Y. 1996) ("[U]nder this business judgment test, . . . [a court should approve a debtor's

proposed rejection] if the debtor can demonstrate that rejection will benefit the estate."). A

rejection should thus be granted if a debtor determines in its business judgment that a benefit will be realized by rejecting a contract or lease. *See In re Penn Traffic Co.,* 524 F.3d at 383 ("Th[e] [business judgment] standard rather obviously presupposes that the estate . . . will reject contracts whose performance would benefit the counterparty at the expense of the estate."). In applying the standard, a court will approve the debtor's business decision unless that judgment is the product of bad faith. *See In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994), *aff'd sub nom. John Forsyth Co., Inc. v G Licensing Ltd.*, 187 B.R. 111 (S.D.N.Y. 1995).

Read with section 1107(a), section 363 of the Bankruptcy Code provides that a "[debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Courts review a debtor's decision to proceed with a transaction conducted pursuant to section 363 of the Bankruptcy Code under the business judgment test. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (upholding debtors' entry into a transaction pursuant to section 363 of the Bankruptcy Code where the bankruptcy court held that "the Debtors had advanced good business reasons" for the transaction, which was "a reasonable exercise of each of the Debtors' business judgment."). Once a debtor sets forth good business reasons for the transaction under review, there "is a presumption that in making a business decision the [debtor] acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Allard*, Case No. 18-14092 (MG), 2019 WL 4593854, at *4 (Bankr. S.D.N.Y. Sept. 20, 2019) (citation omitted).

Settlements can be important in bankruptcy cases because they can "help clear a path for the efficient administration of the bankrupt estate." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452, 455 (2d Cir.2007). *See also In re MF Global Inc.,* No. 11–2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012)

("Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."). Bankruptcy Rule 9019(a) provides that "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In evaluating a settlement under Bankruptcy Rule 9019, a court must determine that it is fair, equitable, and in the best interests of the estate before it may approve it. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25 (1968); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.),* 156 B.R. 414, 426 (S.D.N.Y.1993), *aff'd,* 17 F.3d 600 (2d Cir.1994).

The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court. *See Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.),* 134 B.R. 499, 505 (Bankr. S.D.N.Y.1991). A court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y.1998) (citations omitted). "While the bankruptcy court may consider the objections lodged by parties in interest, such objections are not controlling. . . the bankruptcy court must still make [an] informed and independent judgment." *In re WorldCom, Inc.,* 347 B.R. 123, 137 (Bankr. S.D.N.Y.2006). Although courts have discretion to approve settlements, the court should factor the debtor's business judgment in recommending the settlement into its analysis. *In re MF Glob. Inc.,* No. 11-2790 (MG), 2012 WL 3242533, at *5–6 (Bankr. S.D.N.Y. Aug. 10, 2012) (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns),* 419 B.R. 221, 252 (Bankr. S.D.N.Y.2009)). "At the same time, a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement." *In re Rosenberg,* 419 B.R. 532, 536 (Bankr.E.D.N.Y.2009) (citations omitted). In addition, courts may

give weight to the opinion of bankruptcy counsel supporting the settlement. *Id.* ("In [approving the settlement agreement], the court is permitted to rely upon 'opinions of the trustee, the parties, and their attorneys.'"). The proposed settlement must be supported by an adequate record with sufficient detail for the Court to conduct a thorough and informed canvassing of the issues and distinguish the Court's decision from "mere boilerplate approval." *In re Lion Capital Grp.*, 49 B.R. 163, 176 (Bankr. S.D.N.Y. 1985).

A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement but must only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983) (internal quotation marks omitted). *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 158–59 (Bankr. S.D.N.Y.), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005). "It is not the court's task to determine whether the settlement proposed by the parties is the best possible, or fairest, or most appropriate resolution of the dispute." *In re Soup Kitchen Int'l Inc.,* 506 B.R. 29, 37 (Bankr. E.D.N.Y. 2014) (citations omitted).

In *In re Iridium Operating LLC,* the Second Circuit set forth interrelated factors (the "*Iridium Factors*") to be used to evaluate if a settlement is fair and equitable and in the best interests of the estates. 478 F.3d at 462. The *Iridium Factors* are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;
>
> (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

(4) whether other parties in interest support the settlement;

(5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

(6) "the nature and breadth of releases to be obtained by officers and directors"; and

(7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.*

## The Objections

In their objections, the Committee and BancoEstado focus on the claims that

BancoEstado describes as comprising the "bulk" of the Aircraft Lease Settlement Agreement and

Sajama Settlement (collectively, the "Fleet Settlements"): the stipulated claim amounts related to

(i) the EETC Aircraft underlying Sajama's $695 million in stipulated claims and (ii) the four

A350 aircraft (the "SVP A350s") underlying approximately $588 million of SVP's total

stipulated claims. BancoEstado Obj. ¶ 6. In so doing, they concentrate on two points. First, they

contend that the Fleet Settlements are not the product of an arms' length claims settlement

between the Debtors and unrelated, disinterested parties. *Id*. ¶ 3. The Objectors assert that

Sajama and the SVP Parties are not merely members of the Evercore Group but comprise its

steering committee and were "the face of" the group in the negotiation of the RSA and the Plan.

*Id*.; *see* UCC Obj. ¶ 1.  In substance, they assert that the Debtors did not negotiate the Fleet

Settlements with the SVP Parties and Sajama in good faith but rather, agreed to outsized,

unsupportable claims in order to obtain the Evercore Group's support for the Plan. *See, e.g.,*

UCC Obj. ¶ 15. They maintain that on those facts, in reviewing the Fleet Settlements, the Court

should not defer to the Debtors' business judgment but should instead review the settlements

with closer scrutiny than "the lowest end of the range of reasonableness" standard  it might

otherwise apply under Bankruptcy Rule 9019. *Id*. ¶ 13; BancoEstado Obj ¶ 3. They say that in

applying that standard, the Court should deny the Settlement Motions because the Debtors did

not negotiate them in good faith. Second, they contend that, in any event, the Court should deny

the Settlement Motions because the Fleet Settlements are patently unreasonable and, as such,

under any standard are not fair and equitable because they do not pass muster under the *Iridium*

*Factors*. UCC Obj. ¶ 2; BancoEstado Obj. ¶¶ 53-55.

The Court considers those matters below.

## Discussion

### The Fleet Settlement Negotiations

The business judgment rule is not applicable to transactions among a debtor and an

insider of the debtor. *See In re Latam Airlines Grp. S.A.,* 620 B.R. 722, 769 (Bankr. S.D.N.Y.

2020) ("By definition, the business judgment rule is not applicable to transactions among a

debtor and an insider of the debtor. Those kinds of transactions are inherently suspect because

'they are rife with the possibility of abuse.'" *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547,

551 (Bankr. S.D.N.Y. 1997) (quoting *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re*

*Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988))). Instead, "courts apply a

'heightened scrutiny' test in assessing the *bona fides* of a transaction among a debtor and an

insider of the debtor." *Id.* (quotation marks omitted) (citation omitted). *See Schubert v. Lucent*

*Techs. Inc. (In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising

from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."

(quoting *Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458,

1465 (5th Cir. 1991))). "In applying heightened scrutiny, courts are concerned with the integrity

and entire fairness of the transaction at issue, typically examining whether the process and price

of a proposed transaction not only appear fair but are fair and whether fiduciary duties were

properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr.

S.D.N.Y. 2010).

The Objectors challenge the Debtors' good faith in entering into the Settlement Motions.

Both maintain that the Debtors conducted a fundamentally flawed claims resolution process. The

Committee asserts that the Court must consider the Settlement Motions in light of the terms of

the Plan, and in particular, "in the full light of the preferential treatment the Evercore Group is to

receive under the Plan as part of their bargain with the Debtors' controlling shareholders (the

'Insider Shareholders') permitting the Insider Shareholders to retain a significant ownership

interest in the Debtors." UCC Obj. ¶ 15; *see also id.* ¶ 88 (contending that "the transaction is

intertwined with insider transactions . . ."). The Committee argues that (i) the prospects of

success for this bargain turn on obtaining support from the Evercore Group; and (ii) that because

the amount of the Settlement Agreements represent much more than the claimants' expected

recovery in litigation, the Court may conclude that the Debtors capitulated to Sajama's and the

SVP Parties' demands as a means of advancing the Plan.  *Id.* ¶ 15; *see also id*. ¶ 135 ("If

anything, [the Fleet Settlement negotiations] reflect a capitulation of the Debtors to the

allowance of outsize claims to win the Claimants' support for other matters."). The Committee

contends that (a) the Fleet Settlements were negotiated between the Sajama and the SVP Parties

and representatives of the Debtors' management simultaneously with, and in the shadow of, the

negotiation for their treatment under the Plan, and (b) at the same time between the same persons

who were negotiating with the Debtors on the Plan, the relevant backstop fees to be paid to

Claimants under the Plan, the management incentive plan ("MIP") and the assumption of

management contracts that inure to the benefit of the company personnel responsible for

negotiating the resolution of the claims. *Id.* ¶ 11; *see also id*. ¶ 135 ("The  [Settlement] Motions

were not the product of arms-length negotiations, but instead were tainted by being intertwined

with negotiations over the Plan and preserving equity for the Insider Shareholders, negotiation
over a management incentive plan, and assumption of management contracts.").

The Committee contends that starting in the summer of 2021, after Sajama and the SVP
Parties acquired interests in the claims arising from rejected aircraft financings, the Debtors took
positions documented by reasoned analysis that the fair and reasonable amount of the claims was
far lower than the Claimants asserted. UCC Obj. ¶ 12. It asserts that, in the Fall, as Plan
negotiations with the Steering Committee started to progress, the claims negotiations were "put
on the back burner," but as the "framework for the Plan" came into focus in early November
2021, the urgency to settle the claims increased. *Id.* The Committee maintains that since the
backstop fees and other consideration under the Plan is sized to a specific percentage of claims
held by the Evercore Group, that percentage had to be set, and, at that point, the Debtors
capitulated on the claims' negotiations, giving both SVP and Sajama claims in amounts that the
Debtors themselves previously had considered to be beyond the "outer reaches" of what is
"defensible." *Id.* It says that in Sajama's case, after agreeing to a $675 million claim amount, the
Debtors even acquiesced to adding another $20 million to the claim to offset the effect of a
change in the Plan that would have reduced Sajama's recovery.[45] The Committee argues that in
light of these circumstances, the Court should apply strict scrutiny to the Settlement Agreements,
and not defer to, or even consider, the Debtors' business judgment regarding what is
"defensible." *Id.* ¶ 13. It asserts that when viewed objectively, the Settlement Agreements "are
not, by any stretch, fair, reasonable, or in the best interests of the estates or its creditors." *Id.*
Moreover, it complains that although the Settlement Agreements involve almost 30% of the

---

[45]   *See* Lovett Tr. at 121:21-122:3 (agreeing to $675 million settlement under previous plan construct and
subsequently agreeing to $695 million settlement based on the new plan construct).

Debtors' total general unsecured claims, they were not presented to or approved by the Debtors' board. *Id.* ¶ 11.

BancoEstado echoes those complaints.[46]  It asserts that the stipulated claim amounts in the Settlement Agreement (i) carry all the backstop and other favorable Plan economics that the Evercore Group negotiated under the RSA and thus unjustly enrich the claimants at the expense of other creditors, and (ii) include approximately 40% of the Evercore Group's total claims against LATAM Parent. BancoEstado Obj. ¶ 1. It contends that in agreeing to those claims, the Debtors have ensured that the Evercore Group, as a whole, holds enough claims to carry the vote in Class 5 of the Plan against the will of other general unsecured creditors, including the Chilean Bondholders, whom the Debtors have strategically placed in that same class. *Id.* It maintains that although the Debtors have done their best in the Fleet Settlements to avoid the appearance of any connection between the negotiation of the Fleet Settlements and the RSA, the two sets of transactions were, in fact, closely intertwined. It maintains that the Debtors, Sajama and the SVP Parties negotiated and executed the Settlement Agreements and the RSA simultaneously, they made offers in connection with Fleet Settlements that were influenced by or dependent upon the

---

[46]  BancoEstado likewise argues that the Fleet Settlements are not the product of arm's length, hard-fought negotiations. It asserts that in their settlement discussions with Sajama and SVP, the Debtors repeatedly emphasized the need to reach a settlement that would be "defensible" in court. *See* BancoEstado Obj. ¶ 31. It argues that a legitimate arms' length negotiation is one where each side strives to obtain the best possible settlement for itself, not merely a settlement that is "defensible." *Id.* BancoEstado says that the flawed approach to the negotiations is manifested by the multiple offers the Debtors made to the SVP Parties during the course of the negotiations that they labeled as "best and final," but then shortly thereafter made additional higher offers. *Id.* ¶ 32. It asserts that even if this is negotiation posturing, the tactic is not effective and is not evidence of a "hard-fought negotiation." *Id.* Sebastian Adolfo Acuto is the LATAM Parent's Vice President of Fleet and Projects. BancoEstado asserts that he conceded that to reach the final settlement with Sajama, the Debtors capitulated on most of the disputed issues. *Id.* ¶ 33. As support for that contention, it points to the fact that Mr. Acuto prepared an excel spreadsheet in which he compared the parties' past offers and positions on particular issues with the final settlement, leaving Sajama with a claim of $695 million, and he labeled the final settlement as the scenario in which Sajama "wins most." *Id.* BancoEstado asserts that the Sajama Settlement was supported by a December 3, 2021 document created by FTI (the "December 3 Report") which misrepresented the course of the negotiations among the parties in an effort to make the Sajama Settlement seem reasonable. *Id.* BancoEstado complains that the Debtors agreed to modify the Sajama Settlement based on a revised plan structure (*i.e.*, where Sajama adjusted its settlement upward to achieve desired economics under the Plan). *Id.* ¶ 34. It argues that such conduct is inconsistent with the Debtors' assertions that the Debtors arrived at the stipulated claim amounts by evaluating the merits of the asserted claims. *Id.*

status of the RSA negotiations, and the RSA expressly provides that a successful objection to the allowance of the claims in their full stipulated amounts is a "Termination Event." *Id*. ¶¶ 2, 20.  It says that against this backdrop, it is clear that the Settlement Agreements should not be viewed through the typical lens of Bankruptcy Rule 9019, as if the Debtors had entered into arms' length settlements of claims with unrelated, disinterested parties. *Id.* ¶ 3.

The Objectors say that in applying Bankruptcy Rule 9019 to the Settlement Agreements, the Court should employ the heightened scrutiny of the "entire fairness" doctrine–as opposed to the business judgment standard–because the Settlement Agreements are "intertwined with insider transactions." *See* UCC Obj. ¶ 88; *see also* BancoEstado Obj. ¶ 24.  The Committee contends that "[i]n light of the circumstances here, the Court should grant no deference to the Debtors' business judgement, but rather apply the entire fairness standard, and instead of engaging in a 'range of reasonableness' inquiry, the Court should examine 'whether the process and price of [the Settlement Agreements] not only appear fair but are fair and whether fiduciary duties were properly taken into consideration.'" *Id.* ¶ 89; BancoEstado Obj. ¶ 24 (noting that "transactions that involve insider agreements are subject to heightened scrutiny.").

Section 101(31)(B) of the Bankruptcy Code defines an "insider" of a debtor corporation as a (i) director of the debtor, (ii) officer of the debtor, (iii) person in control of the debtor, (iv) partnership in which the debtor is a general partner, (v) general partner of the debtor, or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).  An insider may also be an affiliate, or insider of an affiliate as if such affiliate were the debtor or a managing agent of the debtor. *Id.* § 101(31)(E)-(F). Sajama and the SVP Parties are creditors of the Debtors and hold no stock in the Debtors. They do not have a relationship with the Debtors that falls within the scope of the relevant provisions of section 101(31). However, "courts have acknowledged that an insider, in the context of a corporation can

encompass more than just the six categories enumerated in section 101(31)(B)." *In re Borders Group, Inc.,* 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (citations omitted). Thus, "[i]nsider status can also be determined on a case-by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." *Id.* (citations omitted). SVP and Sajama are not involved in the Debtors' affairs and neither has the authority to dictate the Debtors' corporate policy or disposition their assets. Nonetheless, the Objectors seem to invoke the totality of the circumstances in arguing in favor of application of the heightened scrutiny standard in this case. BancoEstado asserts that the Fleet Settlements should be subject to heightened scrutiny and not a deferential business judgment standard because SVP and Sajama make up the Evercore Group steering committee and "[a]s a result of these positions, each will receive hundreds of millions of dollars in value and significant equity in the reorganized Debtors, both under the proposed Plan and pursuant to the equity rights offering that it offers only to select creditors." BancoEstado Obj. ¶ 26.

The Court understands the Objectors to argue that although SVP and Sajama are not presently insiders of the Debtors, it  should nonetheless apply the heightened standard in assessing the merits of the Settlement Motions, because, if the Plan is confirmed and goes effective, Sajama and SVP will hold substantial interests in the reorganized Debtors. The Court is not aware of any authority supporting that proposition and reject it. The Objectors misplace their reliance on *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 494-95 (Bankr. S.D.N.Y. 1993). That case involved an agreement between the debtor and the debtors' Senior Executive Vice President and Vice Chairman of the Board of Directors. Notwithstanding the individual's status as an insider, the *Drexel* court still applied the lowest range of reasonableness standard. *Id.* at 497-98. Moreover, the Court finds no merit to BancoEstado's reliance on *In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010).  There, the court applied the entire

fairness standard in its review of a motion to assume a prepetition plan support agreement, which

contemplated the issuance of equity to an entity that was "directly and inextricably" involved in

the agreement's formulation. *Id.* at 231. That party was clearly an insider as it held 100% of the

equity in one of the debtors and the debtors' ultimate parent. *Id.*[47]  The Court will apply the

business judgment standard in assessing the merits of the Settlement Motions. In reaching that

determination, that Court finds no merit to the Objectors' assertions that the Debtors acted in bad

faith in negotiating the Settlement Agreements.

    In July 2021, the Debtors began discussions with SVP and Sajama with respect to settling

their respective claims.[48]  Sebastian Adolfo Acuto was primarily responsible for the settlement

negotiations with both SVP and Sajama.[49]  Acuto Tr. at 14:6-11.  Keith McGregor assisted Mr.

Acuto in formulating the claim ranges that informed the Debtors' internal analysis of the claims.

Acuto Sajama Decl. ¶ 18. Although the Plan and SVP Claims negotiations were linked

temporally, there is no evidence of any improper overlap between the two negotiations. The

record does not support the Objectors assertions that the SVP Claims, the RSA and the Plan were

negotiated by the same parties at the same time. The Plan and Fleet Settlement negotiations

---

[47]    None of the other authorities cited by the Committee supports its assertion that a party can be held to the
standards of an insider on account of its claims. *See, e.g.*, *In re CS Mining, LLC*, 574 B.R. 259, 276-77 (Bankr. D.
Utah 2017) (settlement counterparty was insider where two of the debtor's board members stood to benefit
economically from the settlement through their interests in and relationship with counterparty); *In re HyLoft, Inc.*,
451 B.R. 104, 113 (Bankr. D. Nev. 2011) (settlement counterparties were insiders where two individuals were
principals of both the debtor and the counterparties); *In re Moultonborough Hotel Grp., LLC*, No. BR 10-14214-
JMD, 2012 WL 5464630, at *3, 9 (Bankr. D.N.H. Nov. 8, 2012) (stricter scrutiny applied to confirmation of plan
that granted release to insider who was the debtor's principal and manager); *In re LATAM Airlines Grp., S.A.*, 620
B.R. 722, 771 (Bankr. S.D.N.Y. 2020) (DIP facility found to be an insider transaction where its two lenders and a
third entity retaining interest in transaction held, in the aggregate, 51% of the debtors' common stock and retained
the authority to designate six of the nine members of the debtors' board).

[48]    Joint Hr'g Ex. 295, Deposition Transcript of Debtors' 30(b)(6) Witness Sebastian Adolfo Acuto ("Acuto Tr.")
at 56:9-12; Joint Hr'g Ex. 76 (Revised), Deposition Transcript of Sajama 30(b)(6) Witness Samuel Lovett ("Lovett
Tr.") at 44:2-5.

[49]    Acuto Tr. at 14:6-11.

never occurred at the same time.[50]  Mr. Acuto and Mr. McGregor were involved in the

negotiations of the SVP Claims but played no role in negotiating the RSA or Plan.[51]  To preserve

the separation between negotiation of the Sajama Settlement and ongoing negotiations of the

Plan, Sajama hired separate legal counsel – Milbank LLP – to prosecute the Sajama claims.  *See*

Sajama Statement ¶ 2; Lovett Tr. at 44:2-12.  Sajama did not share the status of its negotiations

of the Sajama Settlement with any member of, or advisor to, the Evercore Group, including

SVP.[52]  *See Lovett Tr.* at 46:18-47:6, 53:23-54:9. Likewise, the lead negotiators for the SVP

Parties on each of the SVP Claims Settlement (overseen by Skyworks Capital, LLC, on behalf of

the SVP Parties) and the Aircraft Retention and Lease Terms Settlement (separately led by

Deucalion Aviation, on behalf of the SVP Parties) were not involved whatsoever in Plan

negotiations. *See* SVP Statement ¶ 5.  Moreover, it is undisputed that the "key impetus" for the

Aircraft Lease Settlement Agreement flowed from the SVP Parties' actions to obtain the return

of the fifteen JOLCO/STOL Aircraft.  *Id.* ¶ 6.  As noted, on July 15, 2021, the SVP Parties

delivered notices to the Debtors and in doing so, exercised their purported rights to terminate the

STOL/JOLCO Side Letters and Stipulations and demand the return of each of the STOL/JOLCO

Aircraft. *Id.* The SVP Parties assert that LATAM's receipt of the termination notices caused it to

immediately commence negotiations for the SVP Parties to unwind such terminations and allow

LATAM to retain these aircraft. *Id.*; *see generally* the STOL/JOLCO Leases Assumption

Objections. The SVP Parties assert that immediately after they filed the Assumption Objections

on October 12, 2021, LATAM and the SVP Parties recommenced active negotiations and agreed

---

[50]    *See* Joint Hr'g Ex. 64, Direct Testimony of Ramiro Alfonsin Balza (the "Alfonsin Decl.") ¶ 10; Acuto Tr. at 17:5-18:16; Joint Hr'g Ex. 296, Transcript of Deposition of Keith McGregor ("McGregor Tr.") Jan. 6, 2022 Dep. Tr. at 30:18-31:12.

[51]    *See* Acuto Tr. at 17:5-8:16; McGregor Tr. at 30:18-31:12.

[52]    *See* Lovett Tr. at 46:18-47:6, 53:23-54:9.

to substantial concessions which, shortly thereafter, led to the Aircraft Lease Settlement Agreement. *Id.*

Although Mr. Acuto was principally in charge of the SVP Claims negotiations, Ramiro Alfonsin Balza was involved in the negotiations and, ultimately, authorized and approved the Settlement Agreements.[53]   The Debtors reached resolutions with SVP and Sajama in early November.  It is undisputed that in November, prior to reaching the Settlement Agreements, Mr. Alfonsin and other representatives of the Debtors attended two dinners that the Committee asserts are relevant to the Court's consideration of the Settlement Motions. The first dinner was attended by representatives of  Delta, Qatar, the Cueto family, Sixth Street, Sculptor and SVP. The second dinner was attended by Mr. Alfonsin and other representatives of the Debtors and representatives of SVP. The Committee asserts that at the first dinner, the attendees discussed, among other things, the status of the SVP Claims settlement negotiations. *See* UCC Obj. ¶ 61. The record is clear that the parties at the dinner did not discuss the substance of the Sajama and SPV claims or matters relating to the negotiation of the claims.[54]   The Committee asserts that during the second dinner the Debtors met with SVP and discussed, among other things, "getting to a plan that worked for everyone" and conversations about the SVP Claims. *Id.*  The record is clear that during the dinner there were high-level conversations about the claims and brief mention of the MIP, but no substantive discussions about either topic.[55] There is no evidence

---

[53]    Acuto Tr. at 14:6-16.

[54]    Craine Tr. at 218:18-219:19.

[55]    Craine Tr. at 218:18-219:19; Alfonsin Decl. ¶ 15.

demonstrating that the parties involved in the RSA/Plan negotiations were involved in the MIP discussions.[56]

The evidence in the record also does not support the Objectors' contentions that in reaching the Settlement Agreements, the Debtors capitulated to the demands of SVP and/or Sajama. The Court finds no merit in the Committee's contention that the Settlement Agreements negotiations were flawed because management did not seek or obtain board approval of the Fleet Settlements.  It is undisputed the Debtors' senior management are authorized to approve and enter into long-term fleet restructuring agreement and claim settlements.[57]  Board approval was not required for any fleet claim settlement.[58] The Committee contends that materials presented to the Board in connection with its evaluation of plan options during this time period show the evolving nature of the Debtors' views on the aggregate claims of the Evercore Group and with it, the Board's willingness to accommodate Sajama and the SVP Parties. UCC Obj. ¶ 67. The Objectors suggest that the Debtors were working towards a fixed "target" amount of the Evercore Group's holdings for plan confirmation purposes. BancoEstado Obj. ¶¶ 36, 56; UCC Obj. ¶¶ 12, 67. The Committee argues that the Debtors' estimates of the Evercore Group's holdings were a sham as evidenced by the dramatic changes from what was set forth in certain illustrative hypothetical scenario analyses in materials presented to the Board in November 2021 to what was ultimately disclosed in the RSA. UCC Obj. ¶ 67.  The Court finds no merit in those contentions. Those Board materials contained estimates of the Evercore Group's holdings based on publicly available information contained in Rule 2019 statements, claims transfer reports, and

---

[56]    *See* Joint Hr'g Ex. 297, Ramiro Alfonsin Balza ("Alfonsin Tr.") Jan. 7, 2022 Dep. Tr. at 61:9-62:23, 65:21-68:21, 73:5-9.

[57]    *See* Acuto Sajama Decl. ¶ 8.

[58]    *See* Alfonsin Tr., 55:24-56:5.

filings where counsel for certain members of the Evercore Group had appeared.  Reply ¶ 19,

n.18. The actual figures increased from 50% and 60% to more than 70% in connection with the

filings related to the RSA because the Debtors had received the Evercore Group's actual

holdings as part of their entry into the RSA. *Id.*

BancoEstado asserts that Mr. McGregor prepared the December 3 Report "to justify the

Sajama settlement to the Committee after the fact[.]" BancoEstado Obj. ¶ 33. It maintains that

while "[t]he document contained 'settlement' figures purporting to show the dollar amounts at

which the Debtors and Sajama had agreed to settle various components of the $695 million

stipulated claim amount, including return conditions and mitigation" (*id.*¶ 33, n.37),  it actually

"misrepresents the course of negotiations in a failed effort to make the settlement seem

reasonable." *Id.* ¶ 33. It says that is so because in his deposition, Mr. McGregor conceded that

the parties had not actually negotiated these component settlement amounts. *Id.* ¶ 33, n.37 (citing

Farmer Decl., Ex. CC, McGregor Dep. 87-88, Jan. 7, 2021 (saying he had "no idea" if the

numbers were correct)).

But that is consistent with the negotiations between the Debtors and Sajama. Mr.

McGregor was tasked with developing initial estimated ranges of the Debtors' actual liability

under both the Sajama and SVP Claims. In June/July 2021, he estimated the range at

approximately $256 million to $645 million for the Sajama Claims and approximately $353

million to $940 million for the SVP Claims. *See* Decl. of Keith McGregor, Ex. D to Reply ¶ 11.

On August 3, 2021, Sajama's counsel sent a letter to the Debtors asserting a total claim of

approximately $1.32 billion and offered to settle the Sajama Claims for $890 million.[59] After

considering the arguments, Mr. McGregor adjusted the estimated range for the Sajama Claims

---

[59]    *See* Joint Hr'g Ex. 11, August 3, 2021 Letter from A. Leblanc to L. Schweitzer (the "August 3, 2021 Sajama
Letter"), at 3.

upward to $310 million to $717 million to reflect the Debtors' understanding of Sajama's position on the claims. *Id.* ¶ 12. The Debtors and SVP negotiated and structured the SVP Settlement Agreement on an aircraft-by-aircraft basis (MSN-by-MSN level basis). *Id.* ¶ 15. In contrast, the Debtors and Sajama negotiated and structured the Sajama Settlement on an aggregate level. *Id.* ¶ 16. Thus, the Debtors' explain that the report was a "stress test", analytical analysis of the aggregate claims by FTI using established models consistent with prior settlements. *Id.* It is undisputed that FTI promptly provided the December 3 Report to the Committee, and that FTI did not receive a substantive response to the report. *Id.* ¶ 14.

The Court finds no merit to the Objectors' contentions that in negotiating the Settlement Agreements, the Debtors acted in bad faith.

Whether The Fleet Settlement
Satisfies The *Iridium Factors*

The Fleet Settlements contain integrated compromises and settlements. In resolving the Settlement Motions, the Court must consider each part of each settlement to determine whether each settlement agreement "as a whole [is] fair and equitable." *In re Enron Corp.*, No. 02 Civ. 8489 (AKH), 2003 WL 230838, at *3 (S.D.N.Y. Jan. 31, 2003 ). *See also In re Washington Mutual, Inc.,* 442 B.R. 314, 329 (Bankr.D.Del.2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable. This is not to say, however, that this is a mere math exercise comparing the sum of the parts to the whole. Rather, the Court recognizes that there are benefits to be recognized by a global settlement of all litigation. . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately."). Accordingly, in assessing the merits of the Motions, [t]he appropriate inquiry is whether the Settlement Agreement[s] in [their] entirety

[are] appropriate for the [Debtors'] estate[s]." *In re Ionosphere Clubs*, 156 B.R. 414, 430 (Bankr. S.D.N.Y. 1993).

The SVP Settlement has two interdependent components: (i) the Aircraft Retention and Lease Terms Settlement; and (ii) SVP Claims Settlement. The former provides for a long-term restructuring for the Go Forward Aircraft pursuant to the New Leases on terms beneficial to the Debtors and their estates. The SVP Claims Settlement resolves claims relating to the Go Forward Aircraft and the previously rejected Pilar/Picaflor Aircraft. The Term Sheet and the Settlement Agreement are cross-conditional on one another; that is to say that the claims for the restructured aircraft are not allowed unless and until the New Lease for that Aircraft is consummated. Moreover, the claims for the Pilar/Picaflor Aircraft are not allowed unless and until all of the New Leases for the Go Forward Aircraft are consummated.[60] Acuto SVP Decl. ¶¶ 65-68.

Neither BancoEstado nor the Committee questions the Debtors' business judgment in entering into the New Leases and seeking to resolve the SVP and Sajama Claims, and there are no grounds for them to do so. The Aircraft Retention and Lease Terms Settlement is plainly in the best interests of the Debtors, their creditors, and estates. The New Leases are essential to the Debtors' operations. They will provide the Debtors with continued use of the Go Forward Aircraft, for which there are no available substitutes in the market or from within the Debtors' fleet, on amended lease terms with valuable concessions.[61]  The resolution of the Fleet

---

[60]    *See* SVP Settlement Motion, Ex. C, Settlement Agreement § 4.

[61]    *See Direct Testimony of Sebastian Adolfo Acuto in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Implement Certain Transactions, Including Entry Into Long Term Restructuring Agreements With the Centaurus/Triton Lessors, the SBI Lessors, and Pilar II Leasing Limited and (II) Approving the Related Settlement Agreement with Certain Claimants* [ECF No. 4094] ("Acuto SVP Declaration" or "Acuto SVP Decl."). The Acuto SVP Declaration is attached as Exhibit B to the Reply.

Settlement claims preserves estate assets that would have been allocated to the liquidation of those claims and provides the estate with greater certainly of the size of the claims pool. The Debtors assert that the SVP Claims Settlement aside, the Aircraft Retention and Lease Terms Settlement is more beneficial to the Debtors' estates than pursuing the STOL/JOLCO Leases Assumption Motion that brings with it no lease amendments or term extensions and a risk that it is not approved (or is approved subject to substantially higher liability and cure costs). *Id.* ¶¶ 72-79.  It is undisputed that in such a scenario, the loss of the STOL/JOLCO Aircraft would significantly damage the Debtors' businesses, including by causing disruption in passenger flight service in key markets, risking the loss of valuable slots at key airports, and by incurring additional costs and risks while the Debtors source and retrofit replacement planes. *Id.* ¶ 78.

Nonetheless, even with those clear, quantifiable benefits, the Committee and BancoEstado contend that the Settlement Agreements are patently unreasonable and, as such, fail to satisfy the first and second *Iridium Factors*. The Committee argues that the Sajama Claims and SVP Claims total approximately $2.4 billion, or approximately 3.4 times the current outstanding amount of the relevant secured debt. UCC Obj. ¶ 6. It maintains that these top line numbers have no basis in any realistic or legitimate claim values since, among other things, they do not reflect any amount for mitigation, and they are premised on a fundamental mischaracterization of the relevant transactions as involving true leases between SVP Parties and LATAM Parent, when in truth, the transactions involve classic secured financings utilizing "leases" for tax purposes. *Id.* ¶¶ 6-7. The Committee contends that upon proper recharacterization of the claims as involving secured financings rather than leases, the SVP A350 claims would be limited to $204 million ($430 million - $226 million) and Sajama's claims would be limited to $269 million ($844 million - $575 million). *Id.* ¶ 8. *See also id.* ¶¶ 10, 93-120.

The Committee also argues that even if the underlying transactions involved true leases SVP and Sajama's Claims still would not approach the values the Debtors ask the Court to approve. *Id.* ¶ 8. *See also id.* ¶¶ 121-134. The Committee explains that "rent" owed under the lease fully amortizes the entire cost of the aircraft. It maintains that adding a damage amount tied to the cost of the maintenance condition associated with each aircraft on top of damages designed to compensate the lessor for its full acquisition cost yields an unconscionable and unenforceable penalty. *Id.* It asserts that if allowed at all, the highest reasonable amount for return conditions under the SVP Settlement would not exceed $30 million. *Id.* ¶ 8. The Committee also asserts that the EETC Aircraft Leases themselves provide a remedy allowing the lessor to dispose of the property and apply the proceeds to the rent. *Id.* ¶ 8. It maintains that because that remedy was utilized, resulting in sale proceeds of $575 million, Sajama cannot now claim that the proper deduction from the relevant total rental obligation is $271 million less than the value of the proceeds actually realized. *Id.* Finally, the Committee asserts that SVP's Claims are overstated because they include triple counting for purported head lease, loan guarantee, and sublease obligations that actually are foreclosed by the express contractual terms governing the Pilar/Picaflor financing. *Id.* ¶ 9. The Committee contends that taking all of this into account, and assuming the relevant agreements are considered true leases, an appropriate valuation of

> (i) the Sajama claims is $292 million (compared to $695 million, a 58% reduction), and
>
> (ii) the SVP claims related to the A350 aircraft is $278 million (compared to three duplicative claims totaling $588 million, a 52.7% reduction).

*Id.* ¶ 10.

BancoEstado also contends that the Settled Sajama Claims and the Stipulated SVP Claims are unreasonably overvalued; it makes many of the same arguments raised by the Committee. Briefly, it asserts that in settling with Sajama for a claim of $695 million, the

Debtors have given Sajama substantial credit for their assertions during settlement discussions that Sajama's unsecured EETC Aircraft Lease rejection damages claims include (i) the present value of the future rent that would have been paid under the EETC Aircraft Leases, without reduction by the $575 million in sale proceeds, plus (ii) return condition damages. BancoEstado Obj. ¶ 40. It contends that those positions are not correct and that the Debtors erred in giving them credence in reaching the settlement. *Id.* It also maintains that the stipulated SVP claims are outside the range of reasonableness, regardless of recharacterization. *Id.* ¶ 50. It contends that the Pilar/Picaflor Leases are structured in substantially the same manner as the EETC Aircraft Leases—including that they are designed to amortize the full value of the "leased" aircraft, with the Debtor entitled to purchase the aircraft at lease end for $10. *Id.* It asserts that like the EETC Aircraft Leases, the Lessors under the Pilar/Picaflor Leases had no expectation of a residual interest and, as such, SVP is not entitled to return conditions damages. *Id.*  BancoEstado also maintains that the Debtors have unreasonably failed to apply any cognizable litigation discount to the approximately $226 million in guarantee claims that SVP is receiving against LATAM Parent under the settlement. *Id.* ¶ 51. It explains that under the Pilar/Picaflor Leases transaction structure, the special purpose vehicle Lessor that leased the aircraft to LATAM borrowed money to finance its purchase of the aircraft, and LATAM Parent guaranteed that debt. SVP is asserting a claim against LATAM Parent in the amount of all principal and interest due under the loan, while it simultaneously asserts another claim against LATAM Parent for the exact same payment stream. *Id.* It maintains that there are serious issues regarding the legal ability of SVP to assert the guarantee claim. *Id.* ¶ 52.[62]

---

[62]    The Committee contends that the Court should deny the Settlement Motions because the Debtors have not demonstrated that they satisfy the Iridium Factors. It maintains that, as a threshold matter, the Motions fail to present anything near adequate information for the Court to assess the relative strengths and weaknesses of the parties' positions, the cost to litigate the claims, or the consequences of the Fleet Settlements to the estates and their creditors. UCC Obj. ¶ 14; BancoEstado Obj. ¶ 30. It says that the record is devoid of any facts demonstrating that

In short, in opposing the Settlement Motions, the Objectors contend that the Fleet

Settlements are too expensive and resolve claims that the Debtors could easily, and should

litigate. They assert that there is a high likelihood that the Debtors could successfully litigate the

claims at issue. For them, that likelihood of success in litigation necessarily outweighs the Fleet

Settlements' future benefits to the Debtors and weighs against the Court approving the Fleet

Settlements. *See, e.g.*, UCC Obj. ¶ 92 ("in canvassing the merits of potential challenges to the

[Fleet Settlements]. . . Sajama Claims and SVP Claims, there is no significant doubt that the

Debtors would succeed on all or multiple aspects of such challenges, many of which may be

assessed on the relevant transaction documents alone. Further, such canvassing reveals that the

Debtors' agreed claim amounts are objectively unfair (failing the entire fairness test), and do not

fall within the range of reasonableness.") (footnote omitted); BancoEstado Obj. ¶ 27 ("the [Fleet

Settlements] are not reasonable and should not be approved because [] the stipulated claim

amounts do not properly weigh the strengths and weaknesses of the parties' respective legal

positions on the merits . . . ."). The Debtors (and Sajama and SVP) contend that the Objections

fail to acknowledge the significant financial and other risk in litigating issues regarding

recharacterization, mitigation, and return conditions–any one of which could be decided against

the Debtors and, accordingly, result in claims against the Debtors that might exceed the

stipulated settlement amounts. *See, e.g.*, Reply ¶ 3 ("[t]he objections . . . conjure an alternate

universe where . . . incredibly complex claims are subject to no litigation risk . . . ."); Sajama

Statement  ¶ 4 ("The Objectors conclude the Settlement is unreasonable by assuming the Debtors

would unquestionably prevail on every contested issue in litigation . . ."). The Debtors state that

---

Settlements are based on any substantive cost-benefit or probability-weighted analysis that shows the Fleet
Settlements are in the range of expected litigation outcomes. *Id.* It asserts that for this reason alone, the Court does
not have an adequate record on which to approve the Settlements. *Id.* The Court disagrees. It has an adequate record
to conduct the "range of reasonableness" analysis called for under Rule 9019.

this contingency necessarily means that the approval of the Settlement Agreements is in the best interests of the Debtors, their estates, and their creditors.

As noted, Bankruptcy Rule 9019 directs this Court to form an independent judgement on whether the Settlement Agreements are fair, equitable, and in the best interest of the Debtors' estate. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007). This inquiry does not require the Court to conduct a mini-trial on the Settlement Agreements and the merits of the parties' arguments–but rather merely directs the Court to canvass the record and independently analyze the merits of the claims resolved in the Settlement Agreements and the likelihood of success of those claims in litigation. *See In re NII Holdings, Inc.*, 536 B.R. 61, 121 (Bankr. S.D.N.Y. 2015) ("The first *Iridium* [*Factor*] and the principal factor at issue here, asks whether the likelihood of the debtor succeeding in litigating the claims proposed to be settled is outweighed by the future benefits the debtor can enjoy from the settlement"). The Court's responsibility is "not to decide the numerous questions of law and fact raised" by the objections, "but rather to canvass the issues" raised in those questions. *See In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

The balance between the likelihood and benefits of a successful outcome in litigation and the benefit of the proposed settlement is "perhaps the most important factor to be considered in assessing a proposed settlement." *In re Hilsen*, 404 B.R. 58, 71 (Bankr. E.D.N.Y. 2009) ("It is fair to say that this balance often tips in favor of settlement. The outcome of litigation is nearly always uncertain and may be distant."). When claims at issue in a settlement raise complex questions of fact and law that are not easily decided, courts find that the first *Iridium Factor* weighs towards approving a settlement. *See, e.g.*, *In re NII Holdings, Inc.*, 536 B.R. at 122 (the "[c]laims raise complex disputed issues that cannot be decided simply as a matter of law, and numerous triable issues create uncertainty as to likelihood of success on the merits of these

claims"; because "there is limited case law directly on point . . . the Court finds that the Debtors

reasonably concluded that the outcome of any litigation of the [claims at issue] would be

vigorously contested and fraught with uncertainty"); *In re Chemtura Corp.*, 439 B.R. 561, 598-

99 (Bankr. S.D.N.Y. 2010) (approving settlement as "well within the 'range of reasonableness'"

after finding that lack of binding authority and with conflicting persuasive case law addressing

the merits of the claim at issue).

 As such, below, the Court considers the Debtors' likelihood of success in litigating the

claims proposed to be resolved in the Settlement Agreements, namely, the contested issues of

recharacterization of the Aircraft Leases, mitigation of damages, return condition damages owed

to Sajama and SVP on account of the Debtors' rejection of certain leases, and the guarantee and

sublease claims.

> *Whether the Settlement Agreements Reasonably*
> *Compromise Recharacterization Issues*

 The Objections (and the Pastushan Report) assume that the Debtors would easily win on

a cause of action to reclassify the Pilar/Picaflor Leases and EETC Leases as secured loans. *See*

UCC Obj. ¶¶ 6-8, 93-104; Banco Estado Obj. ¶¶ 6-7, 38. As a matter of federal law, economic

substance controls whether an agreement counts as a "lease" for purposes of the Bankruptcy

Code. *See United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 612 (7th Cir. 2005)

("substance controls and … only a 'true lease' counts as a 'lease' under § 365," and "[w]hether

the word "lease" in a federal statute has a formal or a substantive connotation is a question of

federal law; it could not be otherwise"). "[S]tate law determines the existence, scope and nature

of a debtor's property" and the "determination of whether a 'lease constitutes a security interest

under the bankruptcy code will depend on whether it constitutes a security interest under

applicable state or local law.'" *In re PSINet, Inc.*, 271 B.R. 1, 42–43 (Bankr. S.D.N.Y. 2001)

(quoting *In re Powers*, 983 F.2d 88, 90 (7th Cir. 1993)) (footnote omitted). However, "a state or local law that identified a 'lease' in a formal rather than a functional manner would conflict with the [Bankruptcy] Code." *United Airlines, Inc*., 416 F.3d at 615. The Sajama lease agreements are governed by New York law. N.Y. U.C.C. § 1- 203(b) states, as follows:

> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
>> (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
>>
>> (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>>
>> (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>>
>> (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

N.Y. U.C.C. § 1-203 (b) (McKinney 2014). The Committee contends that the Sajama lease agreements meets the statute's *per se* test and, as a matter of law, are secured loans, not true leases. UCC Obj. ¶ 96.

The Pilar/Picaflor Lease Agreements are governed by English law and, as such, cannot satisfy the *per se* standards under the New York statute. Still, the Committee contends that even if the *per se* test was not met the courts would still consider the economic reality of the transaction to determine whether the transaction is a true lease or secured financing. *See In re Barney's, Inc*., 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997) ("while the parties to a transaction may intend that, as between themselves, their relationship be governed by the label they affix,

that label neither governs the rights of third parties nor affects the legal consequences of the

parties' agreement"); *id*. ¶ 97.  The Objectors contend that the Pilar/Picaflor Leases and EETC

Aircraft Leases are actually secured loans under the "economic substance" test, which examines:

> (1) whether the "rental" payments compensate the lessor for use of the property as
> opposed to being structured for some other purpose, such as to ensure a particular
> return on an investment; (2) whether the purchase price is related to the fair
> market value of the property or calculated as the amount necessary to finance the
> transaction; (3) whether the property was purchased by the lessor specifically for
> the lessee's use; (4) whether the transaction is structured as a lease to secure
> certain tax advantages; (5) whether the lessee assumed many of the obligations
> normally associated with outright ownership, including the responsibility for
> paying taxes and insurance; and (6) whether the lessee can acquire the property at
> the expiration of the lease term for nominal consideration.

*See In re Barney's, Inc*., 206 B.R. at 332 (citing *Liona Corp., N.V. v. PCH Assocs.* (*In re PCH*

*Assocs.)*, 804 F.2d 193, 198 (2d Cir.1986)). The Committee contends that under the leases, if the

Debtors had paid all the "rent" payments over the course of the lease terms, they would have

fully amortized the acquisition financing for each aircraft and, under the lease terms, could have

purchased the aircraft for a nominal fee—$100 for the EETC Aircraft and either no additional

consideration or $10 for the Pilar/Picaflor Aircraft. *See* UCC Obj. ¶ 98; Pastushan Report ¶ 48.[63]

The Committee further argues that the fact that LATAM Parent was a party to the purchase

agreements with the manufacturers of the relevant aircraft also supports recharacterization. UCC

Obj. ¶ 99. Finally, it argues that because the aircraft leases provide beneficial tax treatment and

because that LATAM Parent is responsible for providing insurance and maintaining the aircraft,

the Aircraft Leases are actually secured loans. *See id*. ¶ 101; *see also* McGregor Tr., 140:20-25

("I'm aware that structures like this are often used to extract tax benefits . . ."). Accordingly, the

---

[63]    Joint Hr'g Ex. 10, Amended Rule 26(a)(2)(B) Expert Report of Nicholas Pastushan ("Pastushan Report").

Objectors contend that the Aircraft Leases are unequivocally financing agreements under the "economic substance" test.

According to the Objectors, the significance of successfully recharacterizing a lease as a financing transaction, is that SVP and Sajama would not be entitled to components of damages that are only appropriate in true leases—such as return condition damages–because the lessors had no ownership interest and thus are entitled to no residual recovery in the aircraft. *See*, *e.g.*, UCC Obj. ¶ 107. The Committee contends this is "not a close call" and, as such, demonstrates that the value of the allowed claims under the Settlement Agreements–$695 million for Sajama and $850 million for SVP–are patently unreasonable. *See* UCC Obj. ¶¶ 103-109. It makes this argument because it contends that return condition damages should be $0, whereas the Debtors' expert assigns $96 million in return condition costs in the Sajama Settlement and $123 million in the SVP Settlement. *See* McGregor SVP Report at 1;[64] McGregor Sajama Report at 1.[65]

Upon canvasing the record, the Court finds that the Objectors overstate the Debtors' likelihood of success (and the import) of recharacterizing the Aircraft Leases as financing agreements—even assuming *arguendo* that the economic realities test applies. The record suggests that the outcome of the issue in litigation would be contested, complex, uncertain, and ripe with risk for the Debtors, especially as compared to the benefits of the Settlement Agreements. First, while the Committee vigorously applied the economic realities test for recharacterization, it is silent on the standard of proof governing that test. In litigation over the SVP and Sajama Claims, the Debtors would bear a "substantial burden of proof" in challenging the bona fides of the Aircraft Leases. *See In re Integrated Health Services*, 260 B.R. 71, 75

---

[64]    Joint Hr'g Ex. 7, Expert Report of Keith McGregor, FTI Consulting, Inc., SVP Settlement Motion ("McGregor SVP Report").

[65]    Joint Hr'g Ex. 8, Expert Report of Keith McGregor, FTI Consulting, Inc., EETC Settlement Motion ("McGregor Sajama Report").

(Bankr. D. Del. 2001) ("The party challenging the bona fides of the lease carries a substantial

burden of proof."); *see also In re Barney's, Inc.*, 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997)

("The burden of proof lies with the party challenging the bona fides of the lease . . . The quantum

of evidence necessary to satisfy that burden is 'substantial'") (quoting *In re PCH Associates*, 804

F.2d at 198).

The Debtors' expert, Keith McGregor, testified that the aircraft leases are "atypical" and

rest in a "big gray area" "between a simple financing and a simple operating lease." McGregor

Tr. at 42:23-44:8; 184:19-185:20. Mr. Acuto's testimony was similar. *See* Acuto Tr. at 143:8-17

("this [lease] structure doesn't fall into a finance lease or an operating lease. This is a structure

that is complex, that contains elements of a finance lease and an operating lease.") And, despite

the Committee's assertion that recharacterization was "not a close call", even its expert, Mr.

Pastushan, concedes that the return conditions in the Aircraft Leases–which he claims are

characteristic of leases but not financing agreements–were "unusual" but not "meaningless." *See*

Pastushan Tr. at 245:18-24; 236:11-19. The Court finds that this ambiguity, at a minimum, could

portend litigation with no certain outcome. "Gray area" is not ripe for determining that any party

is likely to succeed, absent a trial on the merits, which the Court is not to conduct at this juncture

under Bankruptcy Rule 9019. If the Debtors litigated the Sajama and SVP Claims, they would

have to address the following issues: (i) the appropriate choice of law under the Aircraft Leases,

other transaction documents, and relevant conflict of law principles;[66] (ii) for the Pilar/Picaflor

---

[66]    The SVP Leases contain a provision stating that they are governed by English law, which Mr. Pastushan and the UCC concede. *See* Pastushan Tr. at 329:11-23; UCC Obj. ¶ 97 n.23. The Debtors contend that, under English law, leases are not subject to recharacterization. Reply ¶ 29. Neither the Committee nor BancoEstado disputes this. The Committee argues that the economic realities test applies anyway, without conducting any meaningful choice of law analysis to buttress the claim. The Court need not determine choice of law questions at this time, even assuming *arguendo* it would be necessary to do so in litigation. However, the Court notes that the issue is muddled. In litigation, the Court may be faced with assessing whether English law precludes the Aircraft Leases from being recharacterized, or whether the economic substance doctrine applies as a threshold question of bankruptcy law. The Court finds, at least preliminarily, there is support for both arguments. *Compare*, *e.g.*, *King v. Bombardier Aerospace Corporation*, No.: 2:17-bk-21386-SK; Adv. No. 2:19-ap-01147 SK (Bankr. C.D. Cal. Oct. 15, 2020)

Aircraft, whether an English law governed lease is subject to recharacterization under English

law, which does not recognize the principle; (iii) the parties' intent in entering into the Aircraft

Leases; (iv) the terms and circumstances of the purchase options; (v) whether the economic

realities test is the correct way to assess recharacterization; and (vi) if so, whether the economic

realities test has been satisfied. The Debtors would have the burden of proof on these and other

inquiries in an area with very little directly applicable case law, especially concerning the case of

English-law governed leases with "unusual" provisions, as Mr. Pastushan conceded. *See*

Pastushan Tr. at 236:11-19. These considerations weigh heavily in favor of approving the Fleet

Settlements. *See In re NII Holdings, Inc.,* 536 B.R. 61, 122 (Bankr. S.D.N.Y. 2015) (approving

settlement as exceeding the lowest point in range of reasonableness, in part, because "the Court

finds that none [of the 'Settled Claims and Disputes'] has an easy or obvious resolution, []

[which makes] each [] ripe for settlement").

Absent approval of the Settlement Agreements, each of these issues would be hotly

contested and potentially lead to complex and protracted litigation that could materially alter the

value of the allowed claims and subject the Debtors to additional uncertainty, and potential

liability, as they seek to emerge from chapter 11. Indeed, counsel for Sajama and SVP have

repeatedly taken the position that the Aircraft Leases are in fact leases and, accordingly, that

their damages include amounts that would logically flow from a lease. *See*, *e.g.*, August 3, 2021

Sajama Letter ("[w]e remain of the view that the leases are in fact leases, as they are

---

(enforcing aircraft lease with English choice of law provision and finding that provision precludes recharacterization of an aircraft lease as a security agreement), *with United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 615 (7th Cir. 2005) (reasoning that a state (or foreign) law that identified a "lease" in a formal rather than a functional manner would conflict with Bankruptcy Code). This question, among others, brings significant uncertainty as to whether the relevant law allows the Aircraft Leases to be reclassified as financing agreements and, thus—coupled with the record evidence cited above—undermines the Debtors' likelihood of success on the merits. *See In re Chemtura Corp.*, 439 B.R. at 606 (approving settlement as "well within the 'range of reasonableness'" given that the "legal premises" at issue in litigation are "at the least subject to debate").

denominated, as their quintessentially 'lease-like' terms (such as the return condition provision)

suggest, as they have been described by the Debtors to the Court, and as the Debtors have

consistently treated them—including by expressly rejecting them as unexpired aircraft lease

agreements. Unless the parties can agree on a fair and defensible claim amount, the nature of the

instrument will need to be determined in court."). Given these considerations, the Court finds

that the Settlement Agreements reasonably compromise the issue of recharacterization and,

accordingly, that the benefits of the Fleet Settlements exceed the Debtors' likelihood of success

on recharacterizing the leases.

*Whether the Settlement Agreements Reasonably*
<u>*Compromise Mitigation Issues*</u>

The SVP Settlement compromises the mitigation amounts for the Pilar/Picaflor Aircraft.

The Debtors explain that using industry standard Cirium "full life" values for the Terminated

Aircraft and taking into account the costs for retrofitting and reconditioning the aircraft and

discounting to the Initial Petition Date, the Debtors receive the maximum credit under the

mitigation component for the return conditions claims associated with the Pilar/Picaflor Aircraft.

Reply ¶ 33. The Sajama Settlement compromises mitigation through an agreed-upon value of the

cash flows expected from the re-leasing of the aircraft during the prepetition lease period,

discounted to the Initial Petition Date. *Id.* The Debtors assert that in contrast, with respect to the

Pilar/Picaflor Aircraft, the Objections omit independent valuation evidence, but instead rely on

certain Board materials from April 2020 which expressed a higher estimate of the value of this

aircraft based on an allegedly outdated third-party appraisal and an assumed decline in value of

20-30% in the early days of COVID-19. UCC Obj. ¶ 47; BancoEstado Obj. ¶ 11. For the EETC

Settlement, the Objectors assert that the mitigation amount should be the $575 million in auction

proceeds received by WTC and later used to pay down certain equipment notes associated with

the EETC Aircraft. UCC Obj. ¶¶ 112-13; BancoEstado Obj. ¶¶ 4, 45-49.

The Debtors contend, and the Court agrees that mitigation would be a hotly contested

issue in litigation, and that among other things, this Court would need to decide:

> The form of mitigation required—*i.e.*, the sale or re-leasing of the aircraft—and
> the costs associated with each form, including sale and storage costs,
> maintenance, loss of income and costs incurred while the aircraft is on the ground;

> Whether the auction process for certain EETC Aircraft was proper and the extent
> to which auction proceeds should mitigate the claims;

> If the value of the aircraft is deemed relevant, the point in time at which the
> aircraft should be valued—*i.e.*, the date of rejection/abandonment or sale—and
> whether the standard for valuing collateral under applicable bankruptcy and
> nonbankruptcy law is the actual sale price, fair market value, or foreclosure value;

> Whether any subsequent re-leasing of the aircraft is deemed relevant to
> mitigation, and if so, whether to use then-current market rents or contract rates,
> whether to use the full term of the new lease or only the rents during the original
> lease; and

> The appropriate discount rate, if any, that should apply in a net present value
> calculation of the future value.

The Court finds that in light of the litigation risks, the Settlement Agreements reasonably

compromises the mitigation issues.

*Whether The Settlement Agreements Reasonably*
*Compromise The Return Conditions Claims*

The SVP Settlement compromises claims for return condition provisions in the

Pilar/Picaflor Leases by use of similar Cirium "full life" and "half life" amounts pursuant to an

agreed-upon formula.[67]  The Sajama Settlement compromises return condition claims based on

---

[67]    The Debtors successfully negotiated no return conditions claims for the Go Forward Aircraft in
connection with the SVP Settlement and the re-leased Aircraft in connection with the Sajama Settlement.

full life restoration amounts. It is clear that in resolving the claims for return conditions, the

Court would have to determine, among other things:

> The applicable governing law and whether choice of law principles applies the law set forth in the contract or another jurisdiction;

> Whether the return condition provisions in each of the lease agreements is enforceable as a matter of contract law, in either the lease or loan characterization scenario;

> The interpretation of such provisions and whether and what form of overhaul or maintenance is required to comply;

> Whether the counterparties suffered any cognizable damages as a result of the Debtors' purported breach of the return conditions, and whether a damages assessment is required when determining such contractual claims; and

> Whether the claims should be disallowed under legal and equitable principles limiting a claimant's recovery on account of a claim.[68]

The Court agrees with the Debtors that assessing the meaning of the return condition

provisions alone would involve extrinsic evidence of the intention of the parties at the time of the

structuring of the leases, as well as likely expert reports and testimony regarding very

challenging market conditions. *See* Reply ¶ 41. Moreover, the Court would need to evaluate the

circumstances of different aircraft, each with their own particular maintenance and use records

and potential for different shop rates (*i.e.*, costs) depending on the actual and estimated cost of

maintenance. *Id.* The Court finds that Debtors' benefits to the estates of resolving the return

---

[68]  *See, e.g., Declaration of Jared C. Borriello in Support of (A) Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Implement Certain Transactions, Including Entry Into Long Term Restructuring Agreements with the Centaurus/Triton Lessors, the SBI Lessors, and Pilar II Leasing Limited and (II) Approving the Related Settlement Agreement with Certain Claimants and (B) Debtors' Motion for Entry of an Order Approving Settlement Stipulation by and Among the Debtors and Sajama Investments, LLC* [ECF No. 4083] ("Borriello Decl."), Ex. 16 (Lease Agreement re MSN 024) § 5(c)-(i); Ex. 17 (Lease Agreement re MSN 027) § 5(c)-(i); Ex. 18 (Lease Agreement re MSN 7081) § 5(c)-(i); Ex. 19 (Lease Agreement re MSN 6899) § 5(c)-(i); Ex. 20 (Aircraft Lease Agreement re MSN 0079 (Pilar I) § 20.2; Ex. 21 (Aircraft Lease Agreement re MSN 0363 (Picaflor)) § 20.2. Illustrating the complexity of these contract provisions, Mr. Pastushan acknowledged in his deposition that he amended the Pastushan Report with respect to the SVP Settlement just hours after its submission following his re-reading of the Pilar Aircraft Leases and discovering the word "engines." According to Mr. Pastushan, just this one word could result in as much as $30 million in return conditions claims using his claim calculation methodology. *See* Joint Hr'g Ex. 61, Pastushan Dep. Jan. 8, 2022 at 44:21-45:24; 170:5-171:15.

conditions claims pursuant to the Settlement Agreements outweighs the benefits that would inure to the proponents or opponents of the claims were they to be litigated.

*Whether The SVP Settlement Reasonably*
*Compromises Guarantee and Sublease Claims*

The SVP Settlement compromises the LATAM Parent guarantee claims related to the Pilar/Picaflor Aircraft for $226 million, which consists of the outstanding indebtedness guaranteed by LATAM Parent, less the return conditions claims plus fees less the agreed-upon mitigation value for the aircraft. The SVP Settlement also resolves the Pilar/Picaflor Sublease claims against TAM for $30 million, which is calculated as 23% of the return condition claims under the applicable headlease plus fees.  Under the SVP Settlement, the LATAM Parent guarantee claims and Pilar/Picaflor sublease claims are collateral support for, and not in addition to, the $594 million total direct headlease claims against LATAM Parent ($484 million) and TAM ($110 million). In this regard, the SVP Settlement is consistent with the purpose of the principal agreement (as defined in the UCC Objection)—which relates to distributions of proceeds and not allowance of claims—because SVP can never recover more than $594 million.[69]   Thus, there is no "double dipping" or "triple counting" as asserted by the Objections.[70]

The Committee asserts that in the case of recharacterization, there is no "legal, equitable, or rational basis for allowing SVP a duplicative claim for LATAM Parent's guarantee of a loan for which LATAM Parent is also the borrower." UCC Obj. ¶ 120 (citing Pastushan Report ¶ 22).

---

[69]    Joint Hr'g Ex. 225, Principal Agreement between Pilar I Leasing Limited, LATAM Airlines Group S.A., Various Financial Institutions, BNP Paribas, Investec Bank PLC and Bank of Utah.

[70]    Absent the SVP Settlement, SVP would argue that, under *Ivanhoe Building & Loan Ass'n v. Orr*, 295 U.S. 243, 244 (1935), SVP is entitled to assert the full amount of its guarantee and indemnification claims against all applicable Debtors under the relevant transaction documents. The Committee argues that *Ivanhoe* is distinguishable and not controlling in these circumstances. UCC Obj. ¶ 119. Those and other arguments on both sides are appropriately compromised by the SVP Settlement.

Assuming the Court were to order recharacterization, it is not clear, and very likely would be

hotly contested, whether in such a scenario, the Court would disregard the LATAM Parent

Guarantees—separate agreements (guarantees and leases) with separate parties (LATAM Parent

and the facility agent/lenders) for which separate proofs of claim have been filed.[71]

The Court finds that the benefits to the estates of resolving the guarantee and sublease

claims pursuant to the Fleet Settlements significantly outweighs the benefits that would inure to

the proponents or opponents of the claims were they to be litigated. Accordingly, application of

the first and second *Iridium Factors* weighs in favor of approving the Settlement Agreements. So

does the application of the remaining factors.[72] The foregoing makes clear that the Settlement

Agreements are the product of arms' length bargaining (seventh *Iridium Factor*), and there is no

dispute that the settling parties were represented by experienced and skilled legal and other

professional advisors, and the Debtors, Sajama, SVP were advised by separate counsel and

financial advisors. (Fifth *Iridium Factor*). The Debtors have demonstrated that the settlements

are in the paramount interests of creditors. (Third *Iridium Factor*). As noted, approval of the

Aircraft Retention and Lease Terms Settlement will help to ensure that there is no disruption in

the Debtors' passenger services. Moreover, the Settlement Agreements will enhance the Plan

process. Given the number of issues involved with respect to the SVP and Sajama Claims, absent

the Settlement Agreements, it likely would not be feasible to litigate the claims to conclusion

during the pendency of these Chapter 11 Cases. Accordingly, the Debtors likely would need to

implement a "reserve" structure under their proposed Plan, which if confirmed, would require

---

[71]    *See Nw. Mut. Life Ins. Co. v. Delta Airlines, Inc. (In re Delta Airlines, Inc.)*, 608 F.3d 139 (2d Cir. 2010)
(rejecting arguments that claims under tax indemnity agreement were duplicative of "stipulated loss value"
provisions under aircraft leasing and financing arrangements).

[72]    The Fleet Settlements do not call for the release of the Debtors officers or directors. Accordingly, the sixth
*Iridium Factor* is not relevant to the Motions.

withholding a substantial portion of distributions, potentially up to the full amount of the claims in their fully asserted amounts.[73]  Doing so would also require withholding amounts from other creditors in order to fund and facilitate the foregoing reserve. The Debtors assert and the Objectors do not deny that such a reserve structure would create numerous issues, including, among others, (a) holders of claims against LATAM Parent would likely oppose having a substantial amount of their recoveries withheld pending the outcome of litigation, (b) because the plan consideration proposed to be distributed to holders of such claims are convertible to equity, there could be corporate governance issues in light of undetermined ownership stakes, and (c) it could materially and adversely impact the Debtors' share price, which would further result in a drain on their liquidity and limit their capital raising abilities. Reply ¶ 50. Finally, the Court notes that the Committee and BancoEstado emphasize that they object to the Settlement Agreements while no other creditors support it. UCC Obj. ¶ 136; BancoEstado Obj. ¶ 54. In this case, that is not fatal to the Settlement Motions.  Settlements in bankruptcy do not require unanimous or even widespread creditor approval. *Cf. In re Chemtura Corp.*, 439 B.R. 561, 591 (Bankr. S.D.N.Y. 2010) (noting that it is "typical" and "to be expected" that settlements  in chapter 11 cases will not be entirely consensual); *see also In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (courts may consider a creditor's objection but the objection does not bar the approval of the agreement if it does not fall below the lowest point in the range of reasonableness)).

As described above, throughout these Chapter 11 Cases, the Debtors, and their advisors, including FTI and counsel, estimated their claims pool by category, such as fleet, and within

---

[73]    The amount of such reserve would likely need to be determined by the Court pursuant to Bankruptcy Rule 3018 and would likely be hotly contested. This too, is another issue resolved by each of the Settlement Agreements.

each category by broad sub-categories, such as EETC, STOL, JOLCO, etc.[74] As of July 2021, in the early stages of the Debtors' engagement with SVP and Sajama, the Debtors had estimated the SVP Claims from low to high of approximately $353 million to $940 million and the EETC Claims from low to high of approximately $332 million to $645 million.[75] Public blowout materials released on September 9, 2021 for claims estimates as of July 2021 incorporate these figures, which show low and high fleet claims of approximately $2.941 billion to $3.775 billion.[76]  On September 13, 2021, following engagement with SVP and Sajama on their respective positions in connection with the claims, the Debtors revised the estimated range for the SVP Claims from low to high of approximately $424 million to $1.08 billion and EETC Claims from low to high of approximately $332 million to $717 million.[77] The Fleet Settlements fall within the estimated ranges calculated by the Debtors and their advisors.[78] After the Settlement Agreements, the Debtors updated and released public blowout materials in late November 2021.[79] These materials show a low to high estimate of approximately $3.906 billion to $3.980 billion related to fleet claims. [80]

---

[74]    FTI Decl. ¶¶ 9-13.

[75]    *See* Joint Hr'g Ex. 1 (FTI Estimated Claims Range - July 2021).

[76]    *See* Joint Hr'g Ex. 2 (LATAM Reports Material Fact (as of July 2021)) at LATAM_EETC_0023508 (Low Estimate – Fleet claims) & LATAM_EETC_0023516 (High Estimate – Fleet claims).

[77]    *See* FTI Decl. ¶¶ 12-13; Debtor Ex. 3 (FTI Estimated Claims Range - Sept. 2021) at LATAM_EETC_0026757.

[78]    FTI Decl. ¶¶ 12-13; Acuto EETC Decl. ¶¶ 22, 29.

[79]    Joint Hr'g Ex. 4 (LATAM Reports Material Fact (as of November 2021)) at LATAM_EETC_0023682 (Low Estimate – Fleet claims) & LATAM_EETC_0023691 (High Estimate – Fleet claims).

[80]    The Committee notes the increase in the low end of the range. UCC Obj. ¶66. The Debtors maintain that the increase is "unremarkable," as it "merely reflects that fact that, following the Debtors' receipt of position statements from SVP and Sajama, the claims settled above the low end estimate." Reply ¶ 19.

Each of the Settlement Agreements was reached within the ranges estimated by the Debtors. The expert reports submitted by the Debtors demonstrate that each of the SVP Settlement and Sajama Settlement is within its respective range of reasonableness.[81]  The Pastushan Report does not contradict the ranges of reasonableness submitted by the FTI Expert Reports. In his report, Mr. Pastushan opines that the value of the Settled SPV Claims is $414 million (assuming either loan or lease structures) and $295 million or $292 million for the Settled Sajama Claims (assuming loan and lease structures, respectively). At his deposition he explained that those figures his view of the "accurate or appropriate value of the settled claims," which he considered as "the true or fair value of the claims based on [his] commercial understanding." *See* Joint Hr'g Ex. 61, Pastushan Dep. Jan. 8, 2022 at 88:8-15; 113:14-25. Mr. Pastushan did not calculate the range of reasonableness or even a range of expected outcome for the claims following litigation. *Id.* 61:2-19; 92:5- 17; 93:6-12.

The Court finds that the Settlement Agreements satisfy the *Iridium Factors* and that the Settlement Agreements do not fall below the lowest level of reasonableness.

### Conclusion

For the reasons set forth herein, the Court overrules the Objections and grants the Motions.

IT IS SO ORDERED.

Dated: New York, New York
January 28, 2022

*/s/ James L. Garrity, Jr.*

Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

---

[81]    *See generally* McGregor SVP Report; McGregor Sajama Report.