**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LATAM Airlines Group, S.A., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 20-11254 (JLG)<br><br>(Jointly Administered) |

**STATEMENT OF DELTA AIR LINES, INC. IN SUPPORT
OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING THE DEBTORS' (A) ENTRY INTO
AND PERFORMANCE UNDER BACKSTOP AGREEMENTS AND (B) PAYMENT
OF RELATED FEES AND EXPENSES AND INCURRENCE OF CERTAIN
INDEMNIFICATION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

Delta Air Lines, Inc. ("Delta") respectfully submits this statement[1] in support of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* [ECF No. 4056] (the "Backstop Approval Motion") and in response to the objections thereto.[2] For the reasons set forth therein and below, Delta respectfully requests that the Court grant the relief requested in the Backstop Approval Motion and overrule the Objections.

---

[1] Capitalized terms used but not defined herein shall have the meaning set forth in the Backstop Approval Motion (as defined herein).

[2] Delta hereby responds to (a) *Columbus Hill Capital Management's Objection to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* [ECF No. 4184] (the "Columbus Hill Objection"), (b) the *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* [ECF No. 4289] (the "Creditors' Committee Objection"), (c) the *Objection of the Ad Hoc Group of Unsecured Claimants to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* [ECF No. 4291] (the "Unsecured AHG Objection"), and (d) the *Objection of Banco del Estado de Chile, in Its Capacity as Indenture Trustee Under the Chilean Local Bonds Series A Through D and Series E, to the Debtors' Motion for Entry of an Order (I) Authorizing and*
(….continued)

**STATEMENT**

1. The Backstop Agreements and the $5.44 billion in aggregate financing committed by various parties thereunder form the centerpiece of the restructuring transactions contemplated by the Debtors' Plan, providing the Debtors with certainty that they will receive the substantial new money necessary to fund their emergence from chapter 11 and to execute on their business plan. Moreover, the Backstop Agreements are essential to effectuating the global deal embodied in the Plan that consensually resolves numerous complex and novel issues relating to the intersection between the Bankruptcy Code and Chilean law, thereby avoiding prolonged and value-destructive litigation on these issues.

2. The Backstop Shareholders Backstop Agreement, in particular, provides the Debtors with significant value, a fact that even the Objectors find challenging to dispute.[3] Among other things, the agreement provides that the Backstop Shareholders are backstopping an aggregate of $1.77 billion of common stock and New Convertible Notes Class B (a significant amount) for no fee (which is extremely rare) and for up to ten months[4] (which is unusually long).[5] The New Convertible Notes Class B Term Sheet provides that the shares to be issued

---

(continued….)
*Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* [ECF No. 4293] (the "Banco del Estado Objection", and collectively with the foregoing objections, the "Objections", and the foregoing objecting parties, collectively, the "Objectors"). For the sake of convenience, Delta refers to the Backstop Approval Motion and the Debtors' reply to the Objections filed substantially concurrent herewith (the "Debtors' Response") together as the "Debtors' Backstop Approval Pleadings".

[3] *See* Creditors' Committee Objection Ex. D. ¶ 16.d. (noting the reasonableness of terms in the Backstop Shareholders Backstop Agreement); *see also* Banco del Estado Objection ¶ 28 (noting that "the Backstop Shareholders are receiving no fee for backstopping the Class B Notes and a portion of the ERO").

[4] The eight-month commitment may be extended up to two additional months if certain conditions are met. *See* Backstop Shareholders Backstop Agreement § 1.1 (definition of "Outside Date").

[5] *See Declaration of Brent Herlihy in Support of the Backstop Agreements Motion* [ECF No. 4065] ¶ 44 (stating that the commitment under the Backstop Agreements "is one of the longest, largest recent commitments").

2

upon conversion of the New Convertible Notes Class B are subject to a four-year lock-up,[6] which commits the Backstop Shareholders to accept less valuable, illiquid shares and will benefit the reorganized Debtors by reducing stock price volatility in the years immediately following the Debtors' emergence.

3. Despite these clear benefits, the Objectors ask this Court to deny approval of the Backstop Shareholders Backstop Agreement on the grounds that (i) the Backstop Shareholder Backstop Agreement should be evaluated under the "entire fairness" standard, which the Debtors allegedly cannot meet, (ii) the expense reimbursement and indemnity provided thereunder are unreasonable and unnecessary and therefore should not be approved, and (iii) the indemnity violates applicable Chilean law. As discussed further below, each of these arguments falls flat, and none provides cause to overrule the Debtors' sound judgment.

4. ***First***, the Creditors' Committee's and Banco del Estado's arguments that the Backstop Shareholders Backstop Agreement should be evaluated under the "entire fairness" standard should be rejected.[7] In raising its objection, the Creditors' Committee reiterates its refrain that Delta is an insider[8] even though this Court made clear more than six months ago that it has not found Delta to be an "insider," either statutorily or otherwise.[9] Further, Delta is neither a statutory insider (as it owns, and has owned at all relevant times, less than 20% of the Debtors'

---

[6] *Notice of Filing of (I) Revised Restructuring Support Agreement and (II) First Amendment to Restructuring Support Agreement* [ECF No. 4165] Ex. C.

[7] Creditors' Committee Objection ¶¶ 3, 41, 64; Banco del Estado Objection ¶ 20.

[8] Creditors' Committee Objection ¶ 2; *see also Delta Air Lines, Inc.'s Reply in Support of the Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 4135] ¶ 3 (identifying recent Creditors' Committee pleadings mischaracterizing Delta as an insider and previewing that the Creditors' Committee was presumably laying the groundwork for its argument that any settlements in the Plan be evaluated under an "entire fairness" standard).

[9] 7/30/2021 Hr'g Tr. 52:4–11.

3

outstanding common stock) nor a nonstatutory insider (based on its lack of control over the Debtors).[10]

5. The Backstop Shareholders Backstop Agreement is also markedly distinguishable from the initial proposed Tranche C DIP Facility, where the Court ruled that the "entire fairness" standard applied.[11] While the terms of the Tranche C DIP Facility were negotiated at arm's length between the Debtors and Qatar, Delta and Costa Verde, the key terms of the Backstop Agreements were negotiated during a weeks-long mediation before the Honorable Allan Gropper (Ret.) and involved extensive, intense, and arm's-length plan negotiations that included third-party creditors that are members of the Parent GUC Ad Hoc Group. Courts in this District have held that when numerous noninsider stakeholders are involved in negotiating a transaction or when an agreement "result[s] from a months-long, Court-supervised mediation involving numerous parties" and "numerous proposed compromises and settlements of billions of dollars of claims," the "entire fairness" standard is not warranted.[12] The key terms of the Backstop Agreements squarely fit this standard. Further, the Backstop Shareholders were each represented

---

[10] *Statement of Delta Air Lines, Inc. in Support of the Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* [ECF No. 669] ¶¶ 5–10 (explaining that Delta has never been an insider or in control of LATAM); *see also* 8/5/2020 Hr'g Tr. 72:8–12 (summarizing evidence from DIP hearing, which showed Delta's board nominees "never . . . met the Delta CFO"; must "[m]eet NYSE independence criteria"; and are "prohibited from voting on behalf of Delta's interest"); *Statement of Delta Air Lines, Inc. with Respect to the Debtors' Fifth Motion for Entry of an Order Extending the Debtor's Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof* [ECF No. 3411] ¶ 6 (explaining Delta's right to nominate two directors to LATAM's nine-member board of directors does not constitute control).

[11] *See In re LATAM Airlines Group S.A.*, 620 B.R. 722, 771 (Bankr. S.D.N.Y. 2020).

[12] *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013); *see also* Hr'g Tr. 85:24–186:22, *Momentive Performance Materials, Inc. v. Bank of New York Mellon Trust Co. (In re MPM Silicones, LLC)*, No. 14-08227 (RDD) (Bankr. S.D.N.Y. July 7, 2014) [ECF No. 615] (applying business judgment standard and declining to apply entire fairness standard to a transaction involving a party that was both a creditor and controlling shareholder of the debtors but was one of many parties to the transaction); *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (finding that "entire fairness" standard did not apply in light of record showing that negotiations that resulted in "settlement were initiated by Lazard for the benefit of the enterprise, not by Mr. Allen [an insider] for his benefit, and that the settlement was approved by independent members of Charter's board").

4

by separate counsel and evaluated the Backstop Shareholders Backstop Agreement independently. It is made express in the Backstop Shareholders Backstop Agreement that the Backstop Shareholders disclaim membership in a group and are not fiduciaries to one another.[13]

6. Even if the "entire fairness" standard were applied, the Backstop Shareholders Backstop Agreement would easily satisfy it. In applying the "entire fairness" standard previously in these cases, this Court has analyzed the integrity and fairness of the process that led to the transaction and the terms thereof, both of which must "not only appear fair, but [be] fair."[14] The Debtors' disinterested governance processes meets this standard: an audit committee composed of independent directors, advised by competent counsel and financial advisors, assessed the Backstop Shareholders Backstop Agreement and recommended its approval to the full Board, which then reviewed and unanimously approved it.[15] Significantly, not one of the LATAM Parent directors that was previously nominated by Delta or the other Backstop Shareholders participated in the Board vote approving the Backstop Shareholders Backstop Agreement.[16] Further, the terms of the Backstop Shareholders Backstop Agreement represent a substantial economic benefit to the Debtors given that Delta and the other Backstop Shareholders

---

[13] Backstop Shareholders Backstop Agreement § 10.14 (noting that the "[p]arties do not constitute a 'group' within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended, nor an '*acuerdo de actuación conjunta*' within the meaning of Article 98 of Chilean Law No. 18,045" and do not owe "any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other").

[14] *LATAM Airlines*, 620 B.R. at 771 (citing *In re Innkeepers*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)) ("To demonstrate that they have satisfied the 'entire fairness' standard, the Debtors must show that the Revised Credit Agreement . . . results from fair dealing and reflects a fair price."); *see also In re Innkeepers*, 442 B.R. at 227 (finding that transactions involving insiders may be subject to an entire fairness standard and examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration).

[15] As the Debtors note, this is the same process that the Court carefully reviewed in connection with the Debtors' DIP financing and found to be "fair" under the entire fairness standard. Backstop Approval Motion ¶ 38.

[16] Backstop Approval Motion n.14; *see also supra* note 11.

5

are committing an aggregate of approximately $1.77 billion in financing for up to ten months – one of the largest and longest chapter 11 backstop commitments[17] – without demanding any backstop fee in return.[18]  Indeed, Delta's advisors have identified only three backstop agreements filed publicly in chapter 11 cases in the last 16 years that contemplated no commitment or backstop fees,[19] and the lack of any backstop or commitment fees almost certainly saves the estates hundreds of millions of dollars, which inures to the benefit of unsecured creditors.

7.      ***Second***, the Objectors' arguments that the expense reimbursement and indemnity provisions in the Backstop Shareholders Backstop Agreement are "completely inappropriate" and "improper" lack any supporting case law or comparable precedent transactions.[20]  This is because these types of provisions are routinely approved in this District and others as appropriate to secure backstop commitments and reimburse backstop parties for the substantial time, resources, and costs involved in negotiating such agreements that benefit the Debtors' estates.[21]

---

[17] *See* Backstop Approval Motion Ex. 1.

[18] The Unsecured AHG and Creditors' Committee wrongly allege that the Backstop Shareholders receive the "exclusive right" to subscribe to the ERO New Common Stock or New Convertible Notes Class B. Creditors' Committee Objection ¶¶ 4, 66, 67, 72, 73; Unsecured AHG Objection ¶ 17.  As set forth in the Plan, each of the New Convertible Notes and ERO New Common Stock rights offerings will be subject to the preemptive rights of all LATAM Parent shareholders in accordance with applicable Chilean law.

[19] *See* Notice of Replacement Backstop Commitment Agreement Ex. A, *In re Garrett Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Mar. 9, 2021) [ECF No. 991]; Backstop Commitment Letter Ex. K, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 1, 2016) [ECF No. 601]; Disclosure Statement Ex. D, *In re Genco Shipping & Trading Ltd.*, No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 21, 2014) [ECF No. 15].

[20] Creditors' Committee Objection ¶¶ 4, 71; Unsecured AHG Objection ¶¶ 52, 53; Banco del Estado Objection ¶¶ 8, 46–48, 49–51.  Banco del Estado cites a backstop agreement from *PG&E* as its sole example of a backstop agreement imposing fee caps on backstop party professional costs. However, *PG&E* is an outlier and is not indicative of customary terms of expense reimbursement for backstop agreements.

[21] *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 12, 2020) [ECF No. 1806] (authorizing debtors to reimburse all fees and expenses related to the negotiation of a backstop commitment agreement and to incur associated indemnification obligations); *In re 21st Century Oncology Holdings, Inc.*, No. 17-22770 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2017) [ECF No. 443] (same); *In re Roust Corp.*, No. 16-23786 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2017) [ECF No. 40] (same); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014) [ECF No. 509] (same); *see also In re Peabody Energy Corp.*, No. 16-42529 (….continued)

Indeed, the Objectors have failed to cite even a single precedent backstop or commitment agreement that has not contained expense reimbursement and indemnification provisions. Delta's advisors are aware of none. Here, these features are especially reasonable when considered in light of the fact that the Backstop Shareholders are agreeing to commit an aggregate of over $1.7 billion in capital for up to ten months without seeking compensation or downside protection through backstop or termination fees. Moreover, the indemnity and its proposed scope are customary and further justified here given the prolonged duration of the backstop commitments. The scope of the indemnity is appropriately limited in that it only covers claims and litigation arising out of or in connection with the Backstop Shareholders Backstop Agreement, the Plan and the transactions contemplated under both documents, and contains customary carve-outs for bad faith, willful misconduct and gross negligence.[22] Therefore, the indemnity is appropriately tailored for the purposes of the Backstop Shareholders Backstop Agreement.

8. Similarly, the expense reimbursement is appropriate as the Backstop Shareholders may incur significant professionals' fees and costs in supporting the Debtors' restructuring efforts and the approval and consummation of their Plan. Any professionals' fees that may be reimbursed under the Backstop Shareholders Backstop Agreement would likely be a rounding error by comparison to the Backstop Shareholders' aggregate $1.77 billion funding commitment. Importantly, the Debtors maintain discretion over such reimbursement as any reimbursable Backstop Shareholder professionals' fees must be documented and found reasonable by the

---

(continued….)
(Bankr. E.D. Mo. Jan. 31, 2017) [ECF No. 2282] (approving backstop agreement that provided for expense reimbursement and indemnification of backstop parties and that resulted from mediation).

[22] Backstop Shareholders Backstop Agreement § 8.1.

Debtors prior to payment.[23]  Further, these features are integral components of the Backstop Shareholders Backstop Agreement, and Delta would not have entered into its commitments without receiving these inducements.[24]  Accordingly, the expense reimbursement and indemnity are actual and necessary costs of maximizing the value of the Debtors' estates and their proposed administrative expense priority treatment is warranted.

9.  Finally, the Creditors' Committee's reference to comments made by Delta's Chief Executive Officer at Delta's annual investor day with respect to Delta's Plan investment is a patent and improper attempt to lay the groundwork to seek discovery from Delta's highest-ranking officer.  Such discovery would be inappropriate and ultimately impermissible.  The Creditors' Committee's pretext for referring to these comments is that they serve as evidence that Delta would have made its investment even without receiving the expense reimbursement and indemnity protections, thereby rendering such provisions unnecessary to Delta.[25]  This argument is a red herring.  The remarks of Delta's Chief Executive Officer, besides being taken out of context, are entirely irrelevant to this Court's assessment of the Backstop Shareholders Backstop Agreement.  Such assessment focuses on whether *the Debtors'* decision to enter into the Backstop Shareholders Backstop Agreement and agree to its underlying terms was reasonable *from the Debtors' business perspective*, regardless of the perspective of the negotiating counterparty.[26]

---

[23] *Id*. at § 3.1.

[24] *Id*. at §§ 3.1, 8.5.

[25] Creditors' Committee Objection ¶ 73.

[26] *See In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009) (noting that "absent a showing of bad faith, or an abuse of business discretion, *the debtor's business judgment* will not be altered") (emphasis added) (citations omitted); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) (noting that the nondebtor party "bears the burden of proving that *the debtor's decision* derives from bad faith, whim or caprice") (emphasis added) (citations omitted); *In re Global Crossing Ltd.*, 295 B.R. 726, 742–46 (Bankr. S.D.N.Y. 2003) (approving a (….continued)

8

10. **_Third_**, Banco del Estado's argument that the indemnity in the Backstop Shareholders Backstop Agreement violates applicable Chilean law because it extends to the Debtors' directors is based on a fundamental misinterpretation of the provision. By its express terms, the indemnity narrowly covers the Backstop Shareholders in their capacity as backstop parties and only extends to their related persons.[27] Accordingly, the indemnity does not cover the Backstop Shareholders in any other capacity nor does it expressly or impliedly extend to any LATAM Parent director (including any directors nominated by any Backstop Shareholders) in such capacity. With respect to Delta in particular, the plain language of the indemnity does _not_ cover the two LATAM Parent directors nominated by Delta, as these directors are not controlled by Delta and do not serve as its employees.[28] Even if the indemnity were found to violate applicable Chilean law, the appropriate remedy would be a corrective revision to the indemnity provision and not wholesale disapproval of the Backstop Shareholder Backstop Agreement.

## CONCLUSION

11. Pursuant to the Backstop Agreements, the Debtors have obtained two of the largest and longest backstop commitments ever negotiated against a backdrop of prolonged and extreme uncertainty in the aviation industry. The Backstop Agreements are each reasonable and

---

(continued….)
transaction as made in the debtors' "honest belief that the action it proposed to take was in the best interests of the company"); *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment *of the debtor's management*.") (emphasis added); *In re Integrated Res., Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992) ("[T]he business judgment *of the Debtor* is the standard applied under the law in this district.") (emphasis added).

[27] Backstop Shareholders Backstop Agreement § 8.1 (defining an "Indemnified Person" as consisting of "each Backstop Party, its Affiliates, shareholders, members, partners, and other equity holders, general partners, managers, directors and its and their respective Representatives, agents and controlling persons"); *see also* RSA, Recitals (defining "Backstop Shareholder" as referring to any of Delta, Qatar, and Costa Verde (each as defined in the RSA) "in their capacities as parties providing a backstop").

[28] Both LATAM directors nominated by Delta – neither of whom has any prior affiliation with Delta – are required to (1) meet the New York Stock Exchange's independence criteria with respect to Delta and (2) vote on LATAM board matters according to the best interests of LATAM, not Delta. 8/5/2020 Hr'g Tr. 72:8–12.

9

should be approved. Disapproval of the Backstop Agreements would represent a tremendous setback in these cases, reversing the months of progress made following mediation and delaying (and perhaps jeopardizing) the Debtors' emergence from chapter 11. For the foregoing reasons and for the reasons set forth in the Debtors' Backstop Approval Pleadings, Delta respectfully requests that the Court overrule the Objections to the Debtors' Backstop Approval Motion and grant the relief requested therein and such further relief as the Court may deem just and proper.

Dated:   New York, New York
         February 7, 2022

DAVIS POLK & WARDWELL LLP

By:  */s/ Adam L. Shpeen*
     Marshall S. Huebner
     Lara Samet Buchwald
     Adam L. Shpeen

     450 Lexington Avenue
     New York, New York 10017
     (212) 450-4000
     marshall.huebner@davispolk.com
     lara.buchwald@davispolk.com
     adam.shpeen@davispolk.com

     *Counsel for Delta Air Lines, Inc.*