Jeffrey A. Rosenthal
Lisa M. Schweitzer
David H. Herrington
Abena A. Mainoo
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>LATAM Airlines Group S.A., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.:  20-11254 (JLG)<br><br>Jointly Administered<br><br>**Related Docket Nos. 4056, 4184, 4289, 4291, 4293** |

**DEBTORS' OMNIBUS BRIEF IN FURTHER SUPPORT OF THEIR
MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE DEBTORS' (A) ENTRY INTO AND PERFORMANCE
UNDER BACKSTOP AGREEMENTS AND (B) PAYMENT OF
RELATED FEES AND EXPENSES AND INCURRENCE OF CERTAIN
INDEMNIFICATION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are:  LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM-Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services LLC (30-1133972); Maintenance Service Experts LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services, Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); LATAM Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); ABSA Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348); and Multiplus Corretora de Seguros Ltda. (N/A).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is:  6500 NW 22nd Street, Miami, FL 33122.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 2

ARGUMENT ...................................................................................................... 6

  A.  The Court Should Approve the Commitment Creditors Backstop Agreement. ................. 6

    1.  Entry Into the Commitment Creditors Backstop Agreement Is Subject To The Business Judgment Standard And It Plainly Satisfies That Standard..................................................... 6

    2.  The Backstop Payments to the Commitment Creditors Are "Necessary" under Section 503(b)(1). ........................................................................................................... 9

    3.  The Expert Opinions Support the Reasonableness of the Backstop Agreements. ......... 11

      i.  None of the Objectors' Experts Challenge the Reasonableness of the Backstop Shareholders Backstop Agreement. .................................................................. 11

      ii.  The Backstop Payments to the Commitment Creditors Have a Rational Business Purpose........................................................................................................ 12

      iii.  The Blended Metric Is an Appropriate Factor for the Court to Consider................... 14

      iv.  PJT's Set of Comparables Is Appropriate. .............................................. 16

      v.  Mr. Herlihy's Implied Discount Methodology Properly Reflects the Cost of the Commitment Creditors Backstop Agreement to the Estates............................................. 21

        a.  The Backstop Premium Is a Meaningless Fictional Calculation. ......................... 23

        b.  The Objectors' Experts Wrongly Criticize Mr. Herlihy's Analysis for Failing to Account for the Payment of the Backstop Fee in Cash.................................................. 25

      vi.  The Risks Associated with the Backstop Agreements Warrant Fees on the Higher, Not Lower, End of the Range. ......................................................................... 26

        a.  The Backstop Here Is of an Unprecedented Long Duration................................. 27

        b.  Other Factors Also Support a Backstop Fee at the Higher End of the Range of Reasonableness....................................................................................... 28

    c.    The Conditions Precedent to Closing Do Not Materially Decrease the Risk to the Backstop Parties. ......................................................................................... 29

   vii.    No Alternative Proposal Exists. ............................................................... 33

   viii.    The Objectors' Experts' Remaining Criticisms Are Not Only Unfounded, But in Many Respects, They Support a Finding of Reasonableness Here. .................................. 34

   4.    The Backstop Payments to the Commitment Creditors Do Not Violate Section 1129 of the Bankruptcy Code. ....................................................................... 39

   5.    The Commitment Creditors Backstop Agreement Does Not Violate Section 1123(a)(4) of the Bankruptcy Code. ...................................................................... 41

   6.    The Termination Fees Are Appropriate. ........................................................ 42

B.    The Court Should Approve the Backstop Shareholders Backstop Agreement .................. 43

C.    The Reimbursement, Indemnification and Alternative Transactions Provisions in the Backstop Agreements Are Appropriate. ................................................................... 45

   1.    The Objectors' Arguments As To The Indemnification and Reimbursement Provisions Are Unfounded. ................................................................................ 45

   2.    The Alternative Transactions Provision Is Appropriate. ................................. 48

CONCLUSION .............................................................................................. 49

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Rules and Statutes</u>

11 U.S.C. § 105 ...................................................................................................... 1

11 U.S.C. § 363 ................................................................................................. 1, 6, 7

11 U.S.C. § 503 ............................................................................................... *passim*

11 U.S.C. § 507...................................................................................................... 1

11 U.S.C. § 1123 ............................................................................................. *passim*

11 U.S.C. § 1129................................................................................................ 9, 40, 41

Local Bankr. R. 9013-1........................................................................................ 1

Fed. R. Bankr. P. 2002......................................................................................... 1

Fed. R. Bankr. P. 6004......................................................................................... 1

## <u>Cases</u>

*In re 21st Century Oncology Holdings, Inc.,*
No. 17-22770 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2017)...................................... 47

*In re Bd. of Directors of Telecom Arg., S.A.,*
528 F.3d 162 (2d Cir. 2008)................................................................................. 39

*In re CHC Group, Ltd.,*
2017 WL 11093971 (Bankr. N.D. Tex. Mar. 3, 2017) ........................................ 42

*In re Ditech Holding Corp.,*
606 B.R. 544 (Bankr. S.D.N.Y. 2019)................................................................. 39

*In re Garrett Motion Inc.,*
No. 20-12212 (MEW) (Bankr. S.D.N.Y. Sept. 20, 2017) ................................... 46

*In re Genco Shipping & Trading Limited,*
509 B.R. 455 (Bankr. S.D.N.Y. 2014)................................................................. 7

*In re Innkeepers USA Tr.,*
442 B.R. 227 (Bankr. S.D.N.Y. 2010) ................................................................... 45

*In re Integrated Res. Inc.,*
147 B.R. 650 (S.D.N.Y. 1992) ................................................................................ 6

*In re Lehman Brothers Holdings Inc.,*
508 B.R. 283 (Bankr. S.D.N.Y. 2014) ................................................................... 40

*In re Residential Cap., LLC,*
504 B.R. 358 (Bankr. S.D.N.Y. 2014) ................................................................... 7

*In re Roust Corp.,*
No. 16-23786 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2017) ....................................... 46

*In re TCI 2 Holdings, LLC,*
428 B.R. 117 (Bankr. D.N.J. 2010) ................................................................... 40, 42

*In re Trenton Ridge Investors, LLC,*
461 B.R. 440 (Bankr. S.D. Ohio 2011) ................................................................. 40

*In re Windstream Holdings, Inc.,*
No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 12, 2020) ....................................... 47

*Kane v. Johns-Manville Corp.,*
843 F.2d 636 (2d Cir. 1988) ................................................................................... 39

LATAM Airlines Group S.A. ("<u>LATAM Parent</u>") and certain of its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>")[2] hereby submit this reply (the "<u>Reply</u>") in further support of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (the "<u>Motion</u>"),[3] pursuant to sections 105(a), 363(b), 503(b)(1), and 507(a)(2) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"); Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); and Rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>"), in reply to the:

- *Columbus Hill Capital Management's Objection to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (ECF No. 4184) (the "<u>Columbus Hill Objection</u>");

- *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (ECF No. 4289) (the "<u>Creditors Committee Objection</u>");

- *Objection of the Ad Hoc Group of Unsecured Claimants to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (ECF No. 4291) (the "<u>A&P Ad Hoc Group Objection</u>"); and

- *Objection of Banco del Estado de Chile, in its Capacity as Indenture Trustee under the Chilean Local Bonds Series A Through D and Series E, to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and*

---

[2]    LATAM Parent and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as "<u>LATAM</u>."

[3]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion and the Disclosure Statement.

*Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (ECF No. 4293) (the "<u>Banco Estado Objection</u>" and, together with the Columbus Hill Objection, the Creditors Committee Objection, and the A&P Ad Hoc Group Objection, the "<u>Objections</u>" filed by the "<u>Objectors</u>");

and state as follows:[4]

## **PRELIMINARY STATEMENT**

1.     The Backstop Agreements mark another major milestone in the Debtors' Chapter 11 Case and the commitments provided under those agreements are essential to the Debtors' ability to exit bankruptcy well-positioned to continue their pre-bankruptcy path of success.  Pursuant to the Backstop Agreements, the Debtors have obtained commitments from the Commitment Creditors and Backstop Shareholders to backstop over $5.4 billion in new money investments.  The Backstop Agreements are part of the broader agreements on a comprehensive restructuring and recapitalization of the Debtors that are memorialized in the RSA.  In addition to their agreement to backstop more than $5.4 billion in new capital, the Backstop Parties have committed to support the Plan and to take all actions necessary to implement the transactions it contemplates.

2.     The restructuring contemplated under the Plan requires the Debtors to raise over $8 billion in new money to satisfy the Plan's cash payment obligations and to finance the Reorganized Debtors' ongoing operations and capital needs following their emergence from the Chapter 11 Cases.  Most of that capital will come from the New Convertible Notes Offering and Equity Rights Offering.  In total, the Backstop Parties have agreed to backstop a $4.642

---

[4]     At the hearing on the Motions, the Debtors intend to submit the testimony of Ramiro Alfonsín Balza (the "<u>Alfonsín Decl.</u>" and the "<u>Alfonsín Supp. Decl.</u>") and Brent Herlihy (the "<u>PJT Decl.</u>" and the "<u>PJT Supp. Decl.</u>"), in the form of the declarations attached hereto as Exhibit 1, Exhibit 2, Exhibit 3, and Exhibit 4, respectively (collectively, the "<u>Declarations</u>").  As used herein, "Objectors' Experts" refer to Elizabeth LaPuma on behalf of the Creditors Committee, Rodi Blokh on behalf of Banco Estado and Joshua Scherer on behalf of the A&P Ad Hoc Group.

billion new money investment in the New Convertible Notes Offering and an $800 million

Equity Rights Offering.  They have agreed to maintain that commitment for a period of at least

eight and up to ten months if certain conditions are met.  No third parties other than the Backstop

Parties have presented a viable proposal that satisfies all of the Debtors' requirements to emerge

from Chapter 11.

        3.     The Backstop Agreements include terms providing for Backstop Payments

and Termination Payments to the Commitment Creditors, reimbursement to the Backstop Parties

of certain reasonable costs incurred in connection with their backstop commitment, as well as

indemnification of the Backstop Parties as consideration for their backstop commitment.  The

Commitment Creditors Backstop Agreement offers 50% of the New Convertible Notes Class C

to the Commitment Creditors as consideration for providing the backstop commitment.

        4.     The Backstop Agreements were negotiated in good faith and at arm's

length among the Debtors, the Backstop Parties, and their respective professional advisors over

the course of many months.  At the outset of the process of seeking exit financing and over the

course of many months, the Debtors and their advisors engaged in a vigorous and robust

marketing process in an effort to generate interest among any and all potentially-interested

parties.  As these efforts progressed, the Debtors and their advisors engaged in discussions with

numerous sophisticated investment funds and key stakeholders with the ability and potential

interest to provide the necessary capital commitments for the Debtors to emerge from Chapter

11.  Importantly, the Debtors' five-year business plan and other plan-related materials were all

disclosed in public securities filings in September 2021.  This open process resulted in multiple

initial proposals that the Debtors and their advisors rigorously explored.  The Debtors' Plan and

Disclosure Statement, supported by an RSA, reflect the ultimate results of those efforts and

negotiations, and the agreed-upon terms have been available to the public since November 26, 2021.  No better actionable arrangements have been offered to the Debtors since that time.

5.      The Debtors' entry into and performance under the Backstop Agreements is a proper exercise of their business judgment, the Backstop Shareholders Backstop Agreement is entirely fair (to the extent that standard applies), and the payments and other terms provided to the Backstop Parties are necessary and commonly used inducements.

6.      The Objectors do not (and cannot) take issue with the importance of the backstop commitments to the Debtors' eventual emergence.  Instead, they second-guess the Debtors' reasoned business decisions.  They suggest that negotiations could have played out differently, that certain fees could have been lower, and certain provisions could have been narrower.  The Creditors Committee alone takes the radical and unsupported position that, in addition, the heightened "entire fairness" standard applies to the Backstop Agreements, the Debtors do not meet that standard, and other financing is available on better terms.  But the Objectors' speculations and wish list as to what might have been different mischaracterize the facts and misstate the law.

7.      The record provides overwhelming support for the Court to find the Backstop Agreements reasonable.

- **No expert challenged the Backstop Shareholders Backstop Agreement.** The Objectors' Experts do not dispute the reasonableness of the Backstop Shareholders Backstop Agreement.  In fact, they suggest the opposite.

- **While unnecessary, it is appropriate for the Court to consider the blended metric.** The Debtors' Expert presented both the total combined cost to the Debtors of the Commitment Creditors Backstop Agreement and Backstop Shareholders Backstop Agreement (the "blended" metric), as well as the costs associated with the individual agreements.  As an economic matter, the blended costs of the offerings represent the overall cost to the Debtors' estates of raising the necessary funds for exit and accordingly it is appropriate to assess the reasonableness of the economic terms in aggregate.  In disagreeing

with this approach, the Objectors' Experts declined (with one exception) even to present this information for the Court's consideration under their methodologies.

- **The set of comparables selected by the Debtors' Expert is appropriate.** None of the Objectors' Experts challenged the set of comparable backstop arrangements identified by the Debtors' Expert—    **REDACTED\***

    Discontent with the results from the data set, the Objectors' Experts instead nitpicked at specific comparables included in the set, often in inconsistent ways.

- **The Debtors' Expert's Implied Discount methodology is appropriate.** In contrast to the approaches taken by the Objectors' Experts, the Implied Discount methodology measures the total cost of the Backstop Agreements (individually or on a blended basis) to the Debtors' estates. The Implied Discount shows that the Backstop Agreements (both individually and on a blended basis) are reasonable. The Creditors Committee's expert's approach is based on a speculative counterfactual, ignores the costs to the Debtors and the benefits to the backstopping parties, and is subject to manipulation.

- **The risks here support backstop payments on the higher end of the range.** While the risks present here would support a backstop payment at the high end of the range of comparable transactions, the Backstop Payments are below the median and average backstop payments using either the Debtors' Expert's methodology or the adjustment to that methodology made by the A&P Ad Hoc Group's expert. The backstops are of an unprecedented length, given to an airline operating in the midst of the COVID pandemic and navigating a host of other market, financial, and political risks. The evidence demonstrates that the conditions precedent are likely to be met and are not a reason for lower payments.

8.     The Objections otherwise repeat the same plan confirmation objections this Court has already heard in several other contexts or raise new ones, all of which are still premature. On the merits, they are wrong. For example, the Debtors disagree with Columbus Hill's claims that implementation of the Plan will not succeed in Chile under Chilean law. Also, contrary to the assertions of the Creditors Committee and other objectors, the consideration being provided to the Commitment Creditors does not implicate, let alone violate, Section 1123(a)(4).

9.     In conclusion, the Objections fail to rebut the presumption that the Debtors' entry into the Backstop Agreements is a proper exercise of their business judgment. To

\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.

the extent that the entire fairness standard applies to the Backstop Shareholders Backstop

Agreement (or indeed to the Commitment Creditors Backstop Agreement as the Creditors

Committee wrongly suggests), the Debtors have established that they followed a fair process and

obtained a fair price.  For these and all the reasons discussed below and in their Motion, the

Court should grant the Motion and overrule the Objections, thus allowing the Debtors to

continue their progress toward a successful reorganization.

## ARGUMENT

### A.  The Court Should Approve the Commitment Creditors Backstop Agreement.

    1.  <u>Entry Into the Commitment Creditors Backstop Agreement Is Subject To The Business Judgment Standard And It Plainly Satisfies That Standard.</u>

    10.    As detailed in the Motion, the Debtors seek authorization to enter into the

Backstop Agreements pursuant to Section 363 of the Bankruptcy Code, and thus the business

judgment standard applies to the Debtors' entry into the Commitment Creditors Backstop

Agreement.  Motion ¶¶ 32-36.  The Objectors have not rebutted the presumption that entry into

the Commitment Creditors Backstop Agreement is a proper exercise of the Debtors' business

judgment.

    11.    With the exception of the Creditors Committee, the Objectors do not

dispute that the business judgment standard applies, although they also argue that the Court

should evaluate the Backstop Agreements under additional standards, as discussed below.[5]

Without any support, the Creditors Committee claims that the "entire fairness" standard should

apply to approval of the Commitment Creditors Backstop Agreement.  Creditors Committee Obj.

¶ 64.  It is wrong.[6]  Pursuant to Section 363(b)(1) of the Bankruptcy Code, a debtor in possession

---

[5]    A&P Ad Hoc Group Obj. ¶¶ 2-3, 54; Banco Estado Obj. ¶ 20; Columbus Hill Obj. ¶ 1.

[6]    The court in *In re Integrated Res. Inc.*, 147 B.R. 650 (S.D.N.Y. 1992), which the Creditors Committee cites, rejected the position that "a [break-up] fee [that] is too large . . . is not protected by the business judgment rule[.]" *Id.* at 660.

may use property of the estate "other than in the ordinary course of business" after notice and a

hearing. 11 U.S.C. § 363(b)(1). "The standard used for judicial approval of the use of estate

property outside of the ordinary course of business is also the business judgment of the debtor."

*In re Genco Shipping & Trading Limited*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014).

12.     "The business judgment rule 'is a presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company.'" *In re Residential Cap.,*

*LLC*, 504 B.R. 358, 366 (Bankr. S.D.N.Y. 2014). A party opposing a debtor's proposed exercise

of its business judgment bears the burden of rebutting that presumption. *In re Genco Shipping &*

*Trading Limited*, 509 B.R. at 464. The Objectors have not rebutted the presumption that in

approving the Commitment Creditors Backstop Agreement, the Debtors' directors acted on an

informed basis, in good faith and in the honest belief that it was in the best interests of the

company.

13.     The Debtors undertook vigorous and robust efforts to raise exit capital.

Beginning in June 2021, the Debtors and their advisors affirmatively contacted approximately 45

investment funds and strategic parties. Exhibit A to Exhibit 4, PJT Supp. Decl. ("Herlihy

Transcripts"), 81:9-25, 82:2-11. This included various sophisticated funds, who are members of

the Evercore Group and the Moelis Group (the memberships of such groups having evolved over

time), as well as each of the Backstop Shareholders. *Id.* The Debtors and their advisors also

contacted additional funds, including funds that have provided DIP loans to the Debtors and

holders of Chilean bonds. *Id.* Of those parties, the Debtors ultimately received initial proposals

or responses from the Evercore Group, the Moelis Group, and the Backstop Shareholders in

August and September 2021. Herlihy Tr. 85:23-25.

14.     The Debtors' financial condition, as well as their efforts to raise capital,

also were and have been well-known in the market for over eight months.  Herlihy Tr. 39:24-25,

40:2-3, 60:3-13;  *see also Debtors' Third Motion for Entry of an Order Extending the Debtors'*

*Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptance Thereof* ¶ 24 (ECF

No. 2480) (noting in June 2021 that "[t]he Debtors now have developed their forward looking

business plan, and are beginning to engage with their major stakeholders regarding the business

plan and to begin discussing potential exit capital alternatives"); *Debtors' Fourth Motion for*

*Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan*

*and Solicit Acceptances Thereof* ¶¶ 24-25 (ECF No. 3169) (setting forth in September 2021

initial proposals received and the Debtors' receipt of exit proposals which contemplate raising in

excess of $5 billion through the issuance of new debt and equity in LATAM Parent).

Subsequently, in early September 2021, the Debtors disclosed, in public securities filings, their

exit capital raise process letter, illustrative plan term sheet, business plan presentation and draft

claims estimates.  Declaration of Abena A. Mainoo ("Mainoo Declaration"), Exhibit A.  The

Debtors have also engaged with parties other than key stakeholders.  Herlihy Tr. 81:9-25; 82:2-

11; 95:23-25; 96:2-10.  By way of example, the Debtors received a proposal from a group that

was advised by **REDACTED\***The Debtors and their advisors responded to the proposal, **REDACTED\***


Herlihy Tr. 96: 6-10, 15-22; 97:2-14.

Following many months of negotiation (where certain of the members of the Moelis group

declined to continue to participate and others joined the Evercore Group), the Debtors reached

agreement with the Commitment Creditors, Backstop Shareholders and others through Court-

ordered mediation.  Herlihy Tr. 94:4-6, 11-13, 16-21.  The Backstop Agreements are the result of

\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.

hard-fought negotiations among the Debtors, the Commitment Creditors and Backstop

Shareholders.  Herlihy Tr. 108:10-17; 113:3-22; 348: 19-23.

15.     The Backstop Agreements offer substantial benefits to the Debtors.  The

Commitment Creditors have agreed to reserve $3.669 billion over a backstop period of eight

months (or more) for new money investments in the New Convertible Notes Class C and Equity

Rights Offering.  Herlihy Tr. 63:8-12.

16.     The independent directors who serve on LATAM Parent's audit

committee met with the Debtors' advisors more than two dozen times during the negotiation

process.  PJT Decl. ¶ 26.  Those independent directors, after reviewing the terms of the Backstop

Agreements, recommended approval by the full LATAM Parent board of directors.  *Id.*  The

Backstop Agreements were then presented to the full LATAM Parent board, which ultimately

accepted the recommendation of the independent directors and approved the Backstop

Agreements by a unanimous vote of all voting directors.[7]  *Id.*

17.     In sum, the Debtors' proposed entry into the Backstop Agreements

satisfies the business judgment standard.  And even if either or both of the Backstop Agreements

were subject to the entire fairness standard, they would satisfy that too for the same reasons

outlined above and in Section B below.

2.     The Backstop Payments to the Commitment Creditors Are "Necessary" under
Section 503(b)(1).

18.     The A&P Ad Hoc Group suggests that the backstop fees are "grossly

above market" and as a result "do not satisfy the requirements of Section 503(b)(1)."  A&P Ad

---

[7]     Messrs. Enrique Cueto, Ignacio Cueto and Henri Reichstul, the Costa Verde Aeronáutica S.A.-nominated
directors, Ms. Sonia J.S. Villalobos and Mr. Enrique Ostalé, the Delta-nominated directors, and Mr. Alexander
Wilcox, the Qatar-nominated director, did not vote on the Backstop Shareholders Backstop Agreement.  PJT Decl.
¶ 26 n.11.

Hoc Group Obj. ¶4.  The backstop payments, however, are "actual, necessary costs and expenses

of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  Given the substantial benefits provided by

the Commitment Creditors and the need to secure their commitment, the backstop payments are

actual and necessary costs for maximizing the value of the Debtors' estates and enhancing

creditors' recoveries.

19.    The Objectors rely on *Pacific Drilling* to suggest that the backstop

payments are somehow contrary to the Bankruptcy Code.  *See Pacific Drilling S.A.*, No. 17-

13193 (MEW) (Bankr. S.D.N.Y 2018).  Such reliance is misplaced due to the different factual

circumstances in those cases.

20.    *In Pacific Drilling*, the court ultimately approved a Plan which offered a

46.9% discount on equity in the reorganized debtor, but prior to doing so, stated that it would not

approve other benefits afforded to the backstop parties, such as a private placement.  *Pacific*

*Drilling*, Sept. 25, 2018 Hr'g Tr. 22:22-25-23:1.  The court also questioned the backstop

payment in light of the significant discount on equity.  *See, e.g.*, *Pacific Drilling*, Sept. 25, 2018

Hr'g Tr. 20:5-11 (questioning fee in light of "very large" discount); Sept. 18, 2021 Hr'g Tr.

21:22-25 (expressing concern over discount to plan value for the rights offering and private

placement); *id*. at 77:22-24 (questioning discount).  Here, the Commitment Creditors Backstop

Agreement provided the Commitment Creditors with the opportunity to acquire equity in the

reorganized LATAM at a discount rate of 20.7%.  *See* PJT Decl., Ex. 1.  Taken together, the

provisions here represent substantially less compensation than the benefits provided in the plan

approved by Judge Wiles in *Pacific Drilling*.  PJT Decl., Ex. 1.  Moreover, the Commitment

Creditors' agreement to backstop the Plan for eight months, substantially longer than the two

month commitment of the backstop parties in *Pacific Drilling*, further justifies the Backstop

Payments.  *See* PJT Decl. ¶ 24.

        3.   <u>The Expert Opinions Support the Reasonableness of the Backstop Agreements.</u>

        21.     The opinions of four experts have been presented to the Court – Brent

Herlihy of PJT Partners LP on behalf of the Debtors, Elizabeth LaPuma of UBS Securities LLC

on behalf of the Creditors Committee, Rodi Blokh of AlixPartners, LLP on behalf of Banco

Estado, and Joshua Scherer of Ducera Partners LLC on behalf of the A&P Ad Hoc Group.

Collectively, their opinions provide overwhelming support for this Court to find the Backstop

Agreements reasonable.  Not only does Mr. Herlihy offer the Court compelling reasons for

approval, but the reports and testimony of the Objectors' Experts either support Mr. Herlihy's

analysis or ultimately reveal that the Objectors' criticisms are without reasoned basis.[8]

        *i.*   *None of the Objectors' Experts Challenge the Reasonableness of the*
               *Backstop Shareholders Backstop Agreement.*

        22.     As an initial matter, none of the Objectors' Experts dispute the

reasonableness of the Backstop Shareholders Backstop Agreement.  Mainoo Decl., Exhibit D

("<u>Blokh Tr.</u>") 97:10-13; Mainoo Decl., Exhibit E ("<u>LaPuma Tr.</u>") 57:10-12; Mainoo Decl.,

Exhibit F ("<u>Scherer Tr.</u>") 69:19-70:2.  To the contrary, their argument that the Court should not

look at the collective cost to the Debtors of the Backstop Shareholders Backstop Agreement and

the Commitment Creditors Backstop Agreement necessarily concedes that the former is *so good*

for the Debtors that the Objectors fear that the blending of the backstops will mask what they

consider to be the poor economics of the latter.  While the Debtors address the propriety of the

---

[8]     The Objectors' Experts reports are overwhelmingly duplicative.  Therefore, while this reply addresses their arguments collectively, in the interest of economy, it does not respond to each expert on each issue.  Given the overlap in their opinions, failure to respond to a specific Objectors' Expert on a specific subject does not constitute the Debtors' agreement.

blending below, the Objectors' Experts do not and cannot dispute the reasonableness of the

Backstop Shareholders Backstop Agreement.[9]

> ii. *The Backstop Payments to the Commitment Creditors Have a Rational Business Purpose.*

23.    As consideration for their commitment to backstop the $3.269 billion new

money investment in the New Convertible Notes Class C, the Commitment Creditors will

receive a 20% payment (measured against the Commitment Creditors' new money commitment)

payable in cash on the Effective Date.  PJT Decl. ¶ 27.  The Commitment Creditors will receive,

as consideration for their commitment to backstop $400 million of the Equity Rights Offering, an

aggregate 20% backstop payment, allocated in accordance with the applicable provisions of the

Commitment Creditors Backstop Agreement and payable in cash on the Effective Date.  *Id.*

Upon approval of the backstop, the Commitment Creditors will reserve capital to fund their

commitment to the Debtors, pursuant to the terms of the Commitment Creditors Backstop

Agreement, so that they will be able to cover their portion of the issuance and backstop the

portion of the offering offered to other parties if it is not fully subscribed.  PJT Decl. ¶¶ 24, 32.

24.    The Objectors challenge the backstop payments to the Commitment

Creditors because they claim the Commitment Creditors "have already committed to purchase"

85.4% of the Convertible Class C notes.  *See* Banco Estado Obj. ¶ 6; A&P Ad Hoc Group Obj.

¶ 29; Columbus Hill Obj. ¶ 1; Creditors Committee Obj. ¶ 53-55.  This mischaracterizes the

terms of the Commitment Creditors Backstop Agreement and, more fundamentally, disregards

the billions of dollars "at risk" that even the Objectors' Experts concede.

---

[9]    Certain provisions, such as indemnification, addressed below, are present in both the Backstop Shareholders Backstop Agreement and the Commitment Creditors Backstop Agreement.

25.     Under the Commitment Creditors Backstop Agreement, "the Backstop Parties shall be *offered* the Direct Allocation Securities."  Section 2.1(a)(ii) (emphasis added). This means that the Commitment Creditors are not required to subscribe to all of the notes *offered* to them as part of the Direct Allocation.  For example, without further commitments, the Commitment Creditors would have the option of subscribing to less than they were offered if market conditions were to worsen by the time of the offering.  Critically, in that circumstance, the backstop obligation would kick in to protect the Debtors and ensure the complete success of their offering.  Should the Commitment Creditors decline to subscribe to all of the notes offered to them, and no other party to buy those notes, the Commitment Creditors Backstop Agreement obligates the Commitment Creditors to buy all  remaining class notes.  The Backstop Payments to the Commitment Creditors provide consideration in exchange for that substantial capital commitment to backstop the entire $3.669 billion new money investment for the entire commitment period—a period that is potentially longer than any backstop period identified by the experts as a comparable transaction.  *See* PJT Decl. ¶ 33, Ex. 1.

26.                    **REDACTED\***

Scherer Tr. 43:1-7.    REDACTED*

*Id.* 50:7-10.  The direct allocation offered to the Commitment Creditors has no effect on the downside risk to the backstop parties.  While a direct allocation provides upside benefits by guaranteeing the

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

Backstop Parties the right to purchase the underlying security, the downside is identical whether or not there is a direct allocation; the backstop parties are obligated to purchase all undesired securities. Scherer Tr. 52:11-20.

        *iii.   The Blended Metric Is an Appropriate Factor for the Court to Consider.*

27.     As a preliminary matter, the Objectors' Experts all disagree with Mr. Herlihy's decision, in Exhibit 1 to the PJT Declaration, to even show the Court the total combined cost to the Debtors of the Backstop Agreements. According to the Objectors' Experts, the Court should not even know the total combined cost to the Debtors in analyzing the reasonableness of the Backstop Agreements. Therefore, with a single exception, *see* Expert Report of Joshua S. Scherer, Ducera Partners LLC (the "Scherer Report") at 31 (Appendix A), every exhibit/appendix prepared by the three Objectors' Experts conceals from the Court the combined cost to the Debtors based on any of the methodologies they advocate. If the Court wants to know how the *total* cost to the Debtors of the Backstop Agreements compares to the comparable transactions utilized by the Objectors' Experts, it is left completely in the dark. Except for Appendix A of the Scherer Report, the Objectors' Experts refuse to say anything.

28.     The Debtors do not argue that the "blended" metrics are the only ones for the Court to consider. On the contrary, Exhibit 1 to the PJT Declaration presents the Court with *both* the fees associated with the individual backstop agreements *and* the blended metrics. It advocates why *the Court* should conclude the blended metrics are a more appropriate comparison but importantly, provides all necessary data and calculations for the Court to make its own determination. The Objectors' Experts refuse to do so; they are so fearful of what the data shows that other than Appendix A to the Scherer Report, they have declined even to calculate the blended metrics under their methodologies.

29.    According to the Objectors, the blended metrics "understate" or "deflate" the Commitment Creditors backstop fee, *see, e.g.*, Declaration and Expert Report of Rodi Blokh ("Blokh Declaration") ¶ 10, but they offer no precedent in which a Court found that the fees for separate parties backstopping an offering must be evaluated separately.  It is indisputable that the blended fee reflects the total cost to the Debtors' estates of the Backstop Agreements.  Scherer Tr. 81:18-22.  This metric presents how much committed funding the Debtors will receive upon their exit from Chapter 11 and how much it will cost the Debtors.  The Objectors want the Court to focus on a different question:  how much will the backstop parties each receive?  The question is posed because the Objectors posit that even if the total cost to the Debtors is reasonable, if some of the backstop parties receive a higher fee than others, the Debtors could have negotiated a better deal with those specific parties.  Not only are the Objectors' arguments impractical and internally inconsistent, but this specific argument was rebutted by the A&P Ad Hoc Group's own expert,                              **REDACTED\***

[10]    And in any event, the Debtors—and the Debtors alone—present the Court with both metrics for consideration:  both the total cost to the Debtors as well as the fees earned

---

[10]    While the Objectors urge the Court to focus on the returns to the Commitment Creditors and the returns to the Backstop Shareholders rather than the total cost to the estate with respect to a holistic transaction, Mr. Blokh recognized that his same logic would require the Court to analyze the returns to each of the individual Commitment Creditors vis-a-vis each other before it determines the reasonableness of the Commitment Creditors Backstop Agreement,                              **REDACTED\***
Blokh Tr. 162:6-10; Scherer Tr. 95:2-8.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

under each of the Backstop Agreements.[11]  And the Backstop Agreements are reasonable under either analysis.[12]

### iv.  *PJT's Set of Comparables Is Appropriate.*

30.    Regardless of the metric used for comparison purposes, it is indisputable that the starting point for a comparative analysis is the collection of data from a comparable set of transactions.  Scherer Tr. 21:3-7.

**REDACTED\***

Scherer Tr. 50:3-51:15.

31.    PJT's objective criteria focused on equity backstop arrangements for amounts of at least $200 million over a five-year period before the backstop hearing (*i.e.*, since February 10, 2017), as well as equity backstop arrangements of more than $50 million that have been executed since the beginning of the COVID-19 pandemic.  PJT Decl. ¶ 38; Herlihy Tr. 177:3-8, 20-25; 178:2-25; 179: 2-4.  Implicit is that PJT only chose transactions for which the necessary data to perform its calculations was available.  PJT set a $200 million threshold because it generated a sufficient sample size of comparables with similar characteristics.  *Id.* The five-year period captured current macro market trends.  Herlihy Tr. 329:10-16.  And more broadly including transactions that occurred  during the unique circumstances of the COVID-19 pandemic ensured that the challenges faced by the Debtors were not underrepresented in the

---

[11]    Mr. Scherer discusses the non-monetary benefits to strategic investors of backstopping an equity rights offering that should be considered.  Scherer Report at 19.  While there is no allegation that any strategic investors are party to the Commitment Creditors Backstop Agreement, none of the Objectors' Experts examined the list of comparable transactions to ascertain whether the backstop parties in any of them were strategic investors and, therefore, the total benefits in some of the comparable transactions in Exhibit 1 to the PJT Declaration are actually understated.  *See, e.g.*, Scherer Tr. 81:9-12.

[12]    The Objectors' position also cannot be squared with their assertion that even the Commitment Creditors Backstop Agreement should be considered under the "entire fairness" standard although even they do not contend that any alleged "insider" is part of the Commitment Creditors group.

\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.

comparative set.  *Id.*  The result of PJT's criteria was a data set of 28 transactions,  **REDACTED\***

Scherer Tr. 58:21-22.

32.     Critically, while finding subjective arguments to remove the highest

comparables from PJT's data set, *none* of the Objectors' Experts propose a new data set on

which to conduct an analysis of the Backstop Payment.           **REDACTED\***

LaPuma Tr. 93:3-7.

33.     Importantly, other than subjectively excluding a handful of transactions

from PJT's data set (discussed below), the exhibits and appendices prepared by the Objectors'

Experts all rely on PJT's comparables.  *See* Blokh Decl., Adjusted Ex. 1; Scherer Report at 31-32

(Appendices A and B); Corrected Declaration and Expert Report of Elizabeth LaPuma ("LaPuma

Declaration"), Exs. A, B.  Those subjective exclusions, unfortunately, render the Objectors'

Experts' calculations meaningless with the exception of Appendix B of the Scherer Report.

34.     Because the Backstop Agreements here fall within the reasonable range of

the transactions in the data set—whether analyzed on a blended basis or individually, and

whether the Court uses PJT's recommended "Implied Discount" methodology or Mr. Blokh's

"All-In Backstop Fee at Plan Value" approach[13]—the Objectors' Experts strive to eliminate the

transactions with the highest fees.  Of course, all transactions have their own unique

circumstances, which is why PJT's approach of presenting a robust sample from objective

---

[13]                     **REDACTED\***                     , Scherer Tr. 25:8-13, and Ms. LaPuma's artificial
approach is discussed below.

\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.

criteria makes sense.  Otherwise, one can completely manipulate the results by eliminating one-by-one the transactions at either end of the range, as the Objectors' Experts do here with respect to the comparable transactions with the highest fees.

35.    **Seadrill.**  Each of the Objectors' Experts offer reasons for the elimination of Seadrill, the comparable with the highest fees on PJT's list.    **REDACTED***

Herlihy Tr. 194:17-21; *see also* LaPuma Decl. ¶ 33; Blokh Decl. ¶ 10; Scherer Report at 20.

36.    A second reason for the Objectors' Experts' exclusion of Seadrill is simply that the fee was too high so it should be excluded altogether.  *See, e.g.*, Scherer Report at 21.  This rationale is thoroughly unprincipled and should be rejected.    **REDACTED***

Scherer Tr. 113:3-6.

37.    A third reason offered for the exclusion of Seadrill—    **REDACTED***

Scherer Tr. 107:25-108:1—is that there was a debt, as well as an equity, component to the offering.    **REDACTED***

Scherer Tr. 115:22-116:2.    **REDACTED***

.  Scherer Tr. 109:2-6.  Notably, from a size perspective, Seadrill is one of the closest comparables to the LATAM backstops of the 28

\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
   Dated February 2, 2021.

backstops on Mr. Herlihy's list.  *See* PJT Decl., Exhibit 1; Scherer Tr. 114:1-12    **REDACTED***

38.    **Hexion.**  The Objectors' Experts eliminate one of the two Hexion
backstop comparables solely because they show two metrics for the same rights offering, despite
the varying terms offered to the backstop parties in the Hexion backstop agreement.  For the
same reason discussed above with respect to Seadrill, that is improper.

39.    **Chesapeake Energy.**  Mr. Scherer excludes Chesapeake Energy—the
comparable with the next highest Implied Discount after Seadrill—from his Appendix A on the
basis that the plan valuation rose significantly from the time of approval to the closing date.
Scherer Report at 22.                    **REDACTED***

Herlihy Tr.
367:22-25; 368:2-18**.**  In any event, at worst, Mr. Scherer should have used the Chesapeake
Energy backstop fee as calculated at the time of court approval rather than eliminate it entirely
from Appendix A to the Scherer Report,                    **REDACTED***

See Scherer Tr. 73:8-16.  As with
Seadrill, Chesapeake Energy is one of the closest comparables to LATAM measured by size.
PJT Decl., Exhibit 1.

40.    **Avianca**.  In addition to the improper exclusions by the Objectors'
Experts, Mr. Blokh adds Avianca to the set of comparables in Adjusted Exhibit 1 to the Blokh
Declaration (Ms. LaPuma and Mr. Scherer do not include Avianca in their exhibits of
comparable cases).  Mr. Blokh says that Avianca fits PJT's criteria.    **REDACTED***

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.

REDACTED*

Herlihy Tr.

246:11-25; 247:2-13.                           REDACTED*

Blokh Tr. 249:9-250:3.[14]

41.    Because, with one exception, the Objectors' Experts' exhibits and

appendices do not present their calculations using PJT's data set, unless the Court agrees with the

modifications discussed immediately above, they are all useless to the Court. The sole exception

is Appendix B to the Scherer Report, which presents four sets of calculations using the exact data

set used by PJT. In two of the four sets of calculations presented, the Commitment Creditors

Backstop Payment alone (not even the lower blended fee, which Mr. Scherer does not present) is

*below* the median *and below* the average of the comparable transactions. Scherer Report at 32.

The other two sets of calculations utilized the same methodology as Ms. LaPuma's "Backstop

Premium" approach, a completely meaningless calculation for the reasons discussed below. *Id.*

42.    **Other criticisms to the data set.** While making no further adjustments,

Ms. LaPuma offers certain criticisms of Mr. Herlihy's objectively-determined list on bases that

show a miscomprehension of the purpose of a data set. She questions the inclusion of

transactions with large discounts compared to the New Convertible Notes Class C Offering (such

as in Chesapeake Energy, 24 Hour Fitness, and Seadrill (Hemen)), but not transactions with

small relative discounts. LaPuma Decl. ¶ 29.                     REDACTED*

---

[14]    This itself was an obvious miscalculation as Mr. Blokh said it was the result of the $20 million stated backstop fee divided by $220 million ($200 million for the rights offering size plus the $20 million the backstop parties received). This calculation, in addition to being erroneous, did not apply Mr. Herlihy's Implied Discount methodology.

\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.

REDACTED*

LaPuma Tr. 44:25-45-11.  Finally, Ms. LaPuma states that

transactions in the oil and gas industry are not comparable because that industry has a higher

equity cost of capital than those in the air transport industry.  LaPuma Decl. ¶ 26.  REDACTED*

LaPuma Tr. 93:3-7.

43.     In summary, the set of comparables selected by PJT is both appropriate

and reasonable for evaluating the economics of the transaction.  Herlihy Tr. 177:3-185:21.

> v.  *Mr. Herlihy's Implied Discount Methodology Properly Reflects the Cost of the Commitment Creditors Backstop Agreement to the Estates*

44.     Two points are indisputable:

- Only Mr. Herlihy's Implied Discount methodology measures the total cost *to the Debtors' estates* of either the individual, or the collective, Backstop Agreements; and

- Using that methodology, each of the Backstop Agreements at issue here—again, separately or blended—has a lower cost to the estates than either the median or the average of the comparables sets used by Mr. Herlihy and unchallenged by the Objectors except as discussed above.

45.     The Implied Discount methodology is relatively simple and reasonable—it

measures the overall cost to the Debtors of a given backstop agreement (or collection of

agreements).  There are three components to that cost:  (i) the cash or equity component of the

backstop fee itself; (ii) the direct allocation or "holdback" amount purchasable by the backstop

parties; and (iii) the value of any other portion of the new money paid by the backstop parties

21

(which can range from the pro rata allocation to 100% if no other parties wish to subscribe to the offering).  Collectively, this is what's known as the "Implied Discount."  PJT Decl. ¶¶ 40-41.

46.     The Implied Discount is an appropriate metric because it measures the economic cost to the estate relative to plan value, which in turn is a measure of the value of obtaining the backstop agreement.  *Id.*    **REDACTED***

Scherer Tr. 81:18-22.[15]    **REDACTED***


Herlihy Tr. 186:21-25; 187:2-10.

47.     Unhappy with the irrefutable conclusion that the Implied Discount methodology establishes the reasonableness of the Backstop Payment here (individually or collectively), the Objectors' Experts level two primary complaints:  that the Implied Discount methodology does not (i) calculate the difference between the backstop party's implied discount and the discount available to all other, non-backstop participants in the offering (an analysis created by Ms. LaPuma that she calls the "Backstop Premium")[16]; or (ii) account for the backstop fees being paid in cash rather than equity.  *See* LaPuma Decl. ¶¶ 32, 40-41; Blokh Decl. ¶¶ 19-23; Scherer Report at 25-26.  Both of these criticisms are baseless.

---

[15]     Ms. LaPuma calls this a "complicated analysis," LaPuma Decl. ¶ 32,    **REDACTED***

LaPuma Tr. 230:21-232:15.

[16]     While Ms. LaPuma endorses the Backstop Premium methodology, LaPuma Decl. ¶ 38, Mr. Scherer merely describes the methodology (in his report, as the "Incremental Discount," Scherer Report at 26)    **REDACTED***
Scherer Tr. 25:8-13.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

*a.   The Backstop Premium Is a Meaningless Fictional Calculation.*

48.     First, the Objectors Experts' assertion that the appropriate measurement should exclude value received by the backstop parties to the extent it "is available to non-backstop parties who will participate in the offering," LaPuma Decl. ¶ 37, is completely divorced from reality.  *Without the backstop, there is no offering, and the non-backstop parties will receive nothing in the offering.*  Subtracting from the consideration received by the backstop parties that which non-backstop participants receive assumes a world that doesn't exist—that this offering proceeds without the backstop and thus the backstop parties are going to receive as a baseline the "non-backstop party" consideration.  That consideration is a fiction, and the Objectors do not, and cannot, contend otherwise.  Accordingly, there is no basis to measure only the difference in what the backstop parties will receive relative to what the Objectors contend they would receive in an alternate universe.

49.     Second, the Objectors' Experts' focus is entirely in the wrong place.  The Backstop Premium methodology embraced by Ms. LaPuma bears no correlation to the *cost to the Debtors*.  Nor does it reflect how any backstop parties would evaluate a transaction.  The notion that the benefits to *other* unsecured creditors would induce backstop parties to accept lower fees to guarantee those benefits is illogical, and Ms. LaPuma's methodology embracing that approach lacks any cited precedent.  Debtors look at the costs to the estates, and backstop parties look at the benefits they will receive.

50.     Third, the Backstop Premium methodology is utterly random, and its output can be easily manipulated to decrease the percentage without decreasing the cost to the Debtors or the amount of the consideration to the Backstop Parties.  Ms. LaPuma opines that the median Backstop Premium is 4.7% or 5.8% using PJT's data set (with certain adjustments).  LaPuma Decl., Ex. A.                                     **REDACTED***

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.

**REDACTED***                    , LaPuma Tr. 257:6-20,    **REDACTED***

LaPuma Tr. 262:10-22.

51.    But Ms. LaPuma's Backstop Premium is such a meaningless computation that it can be readily manipulated to be whatever parties desire, including down to zero. Mr. Herlihy offers an example of a theoretical backstop arrangement (Illustrative Scenario 1 below) with a Backstop Premium that is *more than double* the one condemned by Ms. LaPuma here and demonstrates how that transaction can be restructured (Illustrative Scenario 2) through a change that reduces the Backstop Premium to zero without decreasing the cost to the estate or the fees paid to the backstop parties by one cent.  PJT Supp. Decl. ¶ 8.  Equally stark is Illustrative Scenario 3, in which a decrease (compared to Illustrative Scenario 2) in the amount of the consideration to the backstop parties and a lower cost to the estate results in a *higher* Backstop Premium under Ms. LaPuma's methodology.

## Illustrative Comparison Using Ms. LaPuma's Methodology

| $ in millions | Illustrative Scenario 1 | Illustrative Scenario 2 | Illustrative Scenario 3 |
|---|---|---|---|
| Total New Money Available Through Pro Rata Equity Allocation | $1,000 | $1,000 | $1,000 |
| (x) Backstop Parties Pro Rata Share | 75.0% | 75.0% | 75.0% |
| **New Money to Backstop Parties** | **$750** | **$750** | **$750** |
| | | | |
| Stated Fee on Total New Money Paid in Equity | 30.0% | 0% | 5% |
| **Fee Paid in Equity at Discount** | **$300** | **$0** | **$50** |
| | | | |
| Discount | 10.0% | 35.7% | 10.0% |
| | | | |
| Total Equity to Backstop Parties at Discount | $1,050 | $750 | $800 |
| (/) 1 - Discount | 90.0% | 64.3% | 90.0% |
| **Total Equity to Backstop Parties at Plan Value** | **$1,167** | **$1,167** | **$889** |
| *Implied Discount for Backstop Parties* | *35.7%* | *35.7%* | *15.6%* |
| *(Implied Discount is calculated as 1 minus new money divided by total equity to backstop parties at plan value)* | | | |
| | | | |
| Cost to Estate Paid to Backstop Parties | $417 | $417 | $139 |
| | | | |
| **Backstop Premium Under LaPuma Methodology** **(Calculated as Implied Discount Less Discount)** | **25.7%** | **0%** | **5.6%** |

52.    This alone exposes the complete fallacy of Ms. LaPuma's approach.[17]

---

[17]    In the above chart, Illustrative Scenario 1 shows a 25.7% Backstop Premium under Ms. LaPuma's methodology.  However, by reducing the stated fee from $300 million (30%) to zero and increasing the discount rate

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.

> b. *The Objectors' Experts Wrongly Criticize Mr. Herlihy's Analysis
> for Failing to Account for the Payment of the Backstop Fee in
> Cash.*

53.    The Objectors' criticism that Mr. Herlihy wrongly failed to account for the

difference in value from the payment of the backstop fee in cash instead of equity is reflected in

the chart on page 11 of the Blokh Declaration, where he "calculates" a $276.5 million

differential with respect to the New Convertible Notes Class C backstop.  Blokh Decl. ¶ 23.  That

calculation, and the Objectors' entire theory, suffers from an egregious error—Mr. Blokh

neglected to adjust the total cost of the equity backstop fee (the calculation for Row T in his

chart) to account for the plan value of the equity backstop fee.

54.    As Mr. Scherer writes, a backstop fee "is customarily paid in equity *and

valued at the price of the underlying rights offering.*"  Scherer Report at 13 (emphasis added).

This means that the stated amount of the backstop fee is *grossed up* to plan value by increasing it

based on the plan discount.  Thus, for example, if a $70 million backstop fee is paid in equity in

connection with a plan in which securities are discounted by 30%, $100 million in equity would

be paid to the backstop parties.  Scherer Tr. 44:12-47:2.

55.                                    **REDACTED\***

            Blokh Tr. 207:7-23                              **REDACTED\***

                                                                    Blokh Tr.

214:6-219:24.                          **REDACTED\***

---

from 10% to 35.7%, the Total Equity to Backstop Parties at Plan Value remains identical at $1.167 billion and the
Implied Discount remains identical at 35.7%.  Under Ms. LaPuma's methodology, however, the Backstop Premium
drops to 0% solely by changing the *form* of the compensation to the backstop parties.  PJT Supp. Decl. ¶ 8.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.**

**REDACTED\***        Blokh Tr. 221:19-224:1.                    **REDACTED\***

Blokh Tr. 57:3-7.[18]

56.    Of course, it is a truism that consideration paid by a debtor in cash may

ultimately be more or less valuable than the consideration paid in equity at plan value, depending

on how well the debtor ultimately performs.  Indeed, the soaring plan value post-approval is

what resulted in the higher backstop fees in Chesapeake Energy (*because* they were paid in

equity), leading Mr. Scherer to recommend it be excluded from the analysis as discussed above.

The Objectors cannot both claim that the payment in equity resulted in an outsized fee in

Chesapeake Energy, while at the same time arguing that equity fees are worth so much less than

cash fees that Mr. Blokh adjusts the total fees for the Commitment Creditors Backstop

Agreement here from roughly 23% to more than 33%.  Blokh Report ¶ 37.

      vi.    *The Risks Associated with the Backstop Agreements Warrant Fees on the
Higher, Not Lower, End of the Range.*

57.    To be clear, the Backstop Payments here (whether analyzed individually

or blended) are below both the median and average of the comparable fees analyzed by PJT

using its recommended Implied Discount methodology (the only one that measures the *total* cost

---

[18]    While untethered to its expert's analysis, and therefore without any demonstration that it would have any
impact on the cost to the Debtors, Banco Estado's objection includes a footnote stating that "Chilean law allows the
issuance of convertible notes" to be used to pay a backstop fee, "assuming the formal requirements of such an
issuance are met, including the allowance of the exercise of shareholder preemptive rights."  *See* Banco Estado Obj.
¶ 4 n.9 (citing Gutierrez Decl. ¶¶ 9-12).  But as Banco Estado expressly admits, doing so would require "allowance
of the exercise of shareholder preemptive rights," which would make the mechanism of paying the backstop fee
contingent, uncertain and complex.  *First*, attempting to pay the backstop fee in the form of convertible notes,
whether by taking a portion of the existing classes of convertible notes or creating a new class of convertible notes,
would inevitably alter the carefully crafted structure in its entirety consisting of the various classes of offerings, in
ways that also would be complex and uncertain and that may be unacceptable to the various parties and
constituencies.  *Second*, as discussed herein, the Objectors' argument that the backstop fee should be valued
differently because it is paid in cash is based on Mr. Blokh's flawed and misleading calculation.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

to a debtor of a backstop arrangement). *See* PJT Decl., Ex. 1; Herlihy Tr. 195:14-25, 196:2-4.

While that should be sufficient for the Court to find them reasonable, there are numerous

additional factors that would support a fee at the high end of the range – regardless of

methodology – of comparable transactions.

> a.   *The Backstop Here Is of an Unprecedented Long Duration.*

58.                     **REDACTED***

> Scherer Tr. 47:20-22. *See also* LaPuma Decl.

¶ 58                **REDACTED***

59.     Of the 28 comparable transactions identified by PJT, *not a single one* has a

backstop of a longer duration than the backstops in this case.[19]  This is necessarily the case given

the post-confirmation Chilean approvals that will necessarily precede the effective date of the

Plan.

60.     In expressing concern about the conditions precedent to closing (discussed

below), the Objectors' Experts have articulated the significant uncertainties the Debtors face as a

Latin American airline.  While the Debtors are quite confident that those uncertainties will not

trigger the extremely limited termination rights they were able to negotiate with the Backstop

Parties (also discussed below), they do render the value of the Backstop Parties' investment—

and whether it will be accretive or dilutive to the Backstop Parties —unclear, as well as the

likelihood that their backstop commitment will be called upon.  The Objectors certainly must

agree with this given their professed grave (albeit unfounded) concerns about the Debtors' ability

---

[19]      Indeed, only one of the 28 transactions had an eight-month backstop duration.      **REDACTED***
erlihy Tr. 17:20-
25; 18:2-3.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

even to satisfy the narrow conditions precedent. Thus, here in particular, the up-to-ten-month duration of the backstop warrants higher backstop fees.

    b. *Other Factors Also Support a Backstop Fee at the Higher End of the Range of Reasonableness.*

  61. The list of comparable transactions includes backstop commitments both before and during the Covid-19 pandemic. Nearly all are in industries less impacted than the global airline industry, which has suffered devastating consequences (as apparent from the extent to which the Debtors went from being significantly profitable to insolvent within months of the onset of the pandemic). While there are numerous reasons to be optimistic about the Debtors' future, and to be extremely confident that they will not sink to the depths they encountered prior to the rise of vaccinations in Latin America in the second half of 2021, there is still significant uncertainty about the ultimate returns they will generate on investments. By guaranteeing billions of dollars in financing now (subject to limited conditions), while participants in the Debtors' rights offering have months to make their election, the Backstop Parties are taking on greater risk than those in the average comparable company analyzed by the experts.

  62. Even Ms. LaPuma recognizes the greater risk to the Backstop Parties here—she suggests that backstop parties in the oil and gas industry merit higher fees because of the higher cost of equity capital. But she has her facts wrong; it is the air transport industry that has a higher cost of equity capital, and thus under her own logic, higher fees are warranted here (although, as noted, the fees are below median and below average). NYU professor Aswath Damodaran—    **REDACTED\***     [20]—regularly publishes a report on the cost of equity capital by industry. Aswath Damodaran, *Cost of Equity and Capital (US),* Damodaran Online (January 2022), https://pages.stern.nyu.edu/~adamodar/

---

[20] Blokh Tr. 123:5-124:6.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

New_Home_Page/datafile/wacc.html.  Out of a total market of 47,606 companies, Professor

Damodaran computed that the average cost of equity is 7.26% in 2022, with the oil and gas

industry being at 8.24%.[21]  *Id.*  In contrast, the 151 firms in the air transport industry had a cost

of equity of 9.89%.  *Id.*  That's 36% higher than average and 20% higher than the oil and gas

industry.

> c.  *The Conditions Precedent to Closing Do Not Materially Decrease*
> *the Risk to the Backstop Parties.*

63.     In their depositions, the Objectors' Experts universally resiled from their

bold statements in their reports such as the "broad conditions precedent to their obligations under

the Commitment Creditors Backstop Agreement that significantly mitigates their risks."  Scherer

Report at 28; *see also* Blokh Decl. ₱ 34 ("these various contingencies make backstop financing

far from certain"); LaPuma Decl. ₱ 58 (the conditions precedent "undermine the binding nature

of the commitment").

64.     In fact, not one of the Objectors' Experts evaluated the conditions

precedent to ascertain whether any of them posed a material—or even a non-negligible—risk to

the Debtors.  Nor were they even qualified to do so.  Indeed, after expressing that there is

"significant uncertainty" regarding, for example, the Debtors' ability to satisfy the forward net

bookings condition based on entirely irrelevant historical statistics, Blokh Decl. ¶ 28, **REDACTED***

> Blokh Tr. 10:23-11:1; 15:18-20.  **REDACTED***

---

[21]     References the integrated oil and gas sector and excludes exploration and production, consistent with the
presentation by Mr. Damodaran.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

**REDACTED\***

Blokh Tr. 7:20-8:8; 9:21-10:11.

65.                                                        **REDACTED\***

Scherer Tr. 120:20-121:12.                        **REDACTED\***

Scherer Tr. 121:13-122:5.        **REDACTED\***

Blokh Tr. 26:9-16.[22]

**REDACTED\***                        *See also* Blokh Tr. 17:24-

18:6; 21:4-22; 22:17-23:21; 263:11-20; 267:18-268:2; 274:14-18; Scherer Tr. 121:13-19;

121:20-25; 122:1-2; 123:3-5; 122:3-5; LaPuma Tr. 338:24-339:4; 346:12-21; 344:4-8; 348:12-

349:6; 340:21-341:8.

66.      All the Objectors' Experts could say is that some of the conditions were

"atypical."  Blokh Decl. ¶¶ 27-33 (discussing Forward Net Booking Condition, COVID

Suspension Period, minimum liquidity provision, and revenue performance condition); *see also*

LaPuma Decl. ¶¶ 58-60 (discussing "uncommon provisions," including those regarding forward

net-bookings, minimum liquidity, cumulative revenue, and COVID-19); Scherer Report at 28

(noting Forward Net Bookings condition, Variant of Concern condition, Minimum Liquidity

---

[22]      In its Objection, Banco Estado embellishes its expert's concern about "uncertainty" to claim that there is "substantial risk" that the Debtors would not meet this condition.  Compare Banco Estado Obj. ¶ 17 *with* Blokh Decl. ¶ 28.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

Test, and "No Material Adverse Effect" provision).                    **REDACTED***

Scherer Tr. 122:21-25 ("Clearly,

most of the comp set wouldn't, as an example, have a variant of concern condition, and most of

them also wouldn't have a forward net booking condition, given that most of them are not

airlines").                              **REDACTED***

Scherer Tr. 123:6-8.  At the end of the day,

for all of the overbroad statements in their declarations—and the further embellishments of those

statements in the Objections—not one of the Objectors' Experts could testify that he or she had

performed any analysis enabling one to conclude that the Debtors faced any genuine risk from a

single one of the closing conditions.

67.     This is not surprising given their lack of expertise regarding the airline

industry.  For example, Mr. Blokh and Banco Estado put forth a simplistic argument that because

the Debtors allegedly would not have satisfied the forward net bookings condition    **REDACTED***

in 2021, Blokh Decl. ¶ 29, there must be a significant risk that

they will not do so when this closing condition is measured in late 2022.  Banco Estado

Objection ¶ 17.                          **REDACTED***

Alfonsín Supp. Decl., Ex. A ("Alfonsín Tr."), 212:20-23,[23] as well

as the fact that every single one of those              **REDACTED***

*when only a small portion of the population in the Debtors'*

*home countries was vaccinated and there were outright lockdowns in Chile prohibiting travel.*

---

[23]     The forward net bookings condition is measured by the absolute number of passengers the Debtors fly,
rather than how full their planes are.  *See* Commitment Creditors Backstop Agreement, Ex. B.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

*See* Alfonsín Supp. Decl. Ex. C.[24]  Tellingly, *even* during the rise of the Delta and Omicron

variants, the Debtors' performance would have satisfied the forward net bookings condition.  *Id.*

68.    Which leads to another provision mischaracterized by the Objectors—the

"variant of interest" provision.  If there is a new variant of interest, the Backstop Parties *cannot*

terminate their agreements.  Commitment Creditors Backstop Agreement, Section 7.1(u).

Instead, the backstop period is extended by 45 additional days.  If during that period, the Debtors

meet the conditions precedent (such as the forward net bookings requirement, **REDACTED\***

the Backstop Parties must close as of the end of the period.

*Id*.  The Objectors' arguments concerning this provision either reveal alarming ignorance or

worse.

69.    As LATAM's CFO Ramiro Alfonsín sought to explain to the Objectors,

**REDACTED\***

*See* Alfonsín Tr. 214:14-

215:07 *and generally* 212:12-215:24.  This led Mr. Alfonsín to point out the absurdity of the

Objectors' comparison insofar as the Debtors plainly would not have agreed to the same forward

net bookings condition in early 2021 given their significantly different capacity level of

operations and (and which, as noted, was a pre-vaccination and mass lockdown environment ).

**REDACTED\***

---

[24]    For example, as of July 30, 2021, Brazil had administered 6.5 doses per 100 people compared to 168 doses
as of January 28, 2022.  Those numbers are 69 and 189, respectively, for Argentina, 135 and 242 for Chile, and 40
and 165 for Peru.  https://www.as-coa.org/articles/timeline-tracking-latin-americas-road-vaccination.  For the first
five months of 2021, vaccination rates in Latin America were just a small fraction of those numbers.  Needless to
say, vaccination rates have had an enormously positive impact on air travel.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

**REDACTED***

*See* Alfonsín Decl. Ex. C.                                    **REDACTED***

Alfonsín Tr. 214:14-25.

70.      Once the Court dispenses with the Objectors' wholly unsupported

assertions that the risk of not closing is greater than with any other backstop arrangement,

**REDACTED***

Scherer Tr. 121:2-12.  That

hardly mitigates the risk undertaken by the Backstop Parties.

vii.   *No Alternative Proposal Exists.*

71.      While the Creditors Committee touts the existence of an alternate proposal

from Ducera, the financial advisor to the A&P Ad Hoc Group, UCC Obj. ¶¶ 28-29, that so-called

proposal is illusory.                          **REDACTED***

For all of these reasons,

while the proposal may have been crafted in the hope of inducing the Backstop Parties to

33

* **All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.**

sweeten their deal for the benefit of the Debtors, it is not a legitimate alternative for which the

Debtors could possibly cast aside the binding and actionable commitment the Backstop Parties

have made.

> viii.   *The Objectors' Experts' Remaining Criticisms Are Not Only Unfounded,
> But in Many Respects, They Support a Finding of Reasonableness Here.*

72.    The deposition testimony leaves one befuddled as to the Objectors'

Experts' opinions.  Indeed, in many respects, they backed away from offering any opinions and

in others, they supported the Debtors.

73.    For example, in his testimony, Mr. Scherer           **REDACTED\***


Scherer Tr. 74:42-7.  Instead, we are left with four methods of comparison in Mr. Scherer's

Appendix B, two of which demonstrate that the fees associated with the New Convertible Notes

Class C and ERO backstop arrangements here are each below the median.[25]  While not going as

far as Mr. Scherer in suggesting that even the fees before the Court may be reasonable,

**REDACTED\***




Blokh Tr. 168:7-14.

74.    Indeed, Mr. Scherer all but endorsed Mr. Herlihy's Implied Discount

methodology, opining that it "would be appropriate for an equity backstop fee," but required an

adjustment to adequately analyze a cash backstop fee.  Scherer Report at 25.  While the Debtors

disagree with the so-called cash-to-equity adjustment for the reasons addressed above, even with

Mr. Scherer's "cash-adjusted" metrics, his Appendix B shows the backstop fees for the

---

[25]    The other two utilize the deeply flawed Backstop Premium methodology discussed above.

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.**

Commitment Creditors Backstop Agreement (the columns labeled D and E) of between 36.6%

and 39.3% to be below the median of 39.0 to 40.9%.  Scherer Report at 32.

75.    Mr. Scherer also offered a calculation that was presumably intended to be

eyebrow-raising but ultimately meaningless.  Using a definition of "at-risk" that did not reflect

reality—or even his opinion—Scherer stated that "the proposed backstop arrangements

constitute nearly an 84% fee on the financial risk they are backstopping" and that "solely with

respect to the Convert C," the number would be over 136%.  Scherer Report at 27.  A key

problem with this calculation is that it is predicated on a definition of "at-risk" as being solely

the portion of the backstop commitment made available to other parties to subscribe.  *Id.*  But

Mr. Scherer himself made it clear throughout his deposition that this is not the proper definition

of "at-risk."  The Commitment Creditors are at risk to fund the *entire* backstop commitment of

$3.669 billion.  Scherer Tr. 103:25-104:9.

76.                                        **REDACTED***



Scherer Tr. 109:11-15.[26]  Indeed, applying this

measurement to a recent transaction in which Mr. Scherer was involved—Aeromexico—the

percentage fee would be infinite and thus incalculable because the allocation to the commitment

parties was 100%                            **REDACTED***

. *See* Scherer Tr. 106:7-12; Scherer Report at 27.  Thus, Mr.

---

[26]    Ms. LaPuma also cites this 136% figure without comparing it to anything or even opining that it relates to the Commitment Creditors' "at risk" commitment in any way (as noted, it does not).  LaPuma Decl. ¶ 48.

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.

Scherer's rather meaningless mathematical exercise offers this Court no guidance as to whether the fee here is reasonable or not, nor did Mr. Scherer claim otherwise.[27]

77.    Another example of an outright misstatement in the Blokh Declaration is Mr. Blokh's assertion in his conclusion that a comparable range of the "'All-In Backstop Fee at Plan Value' in other transaction with cash fee components" is 7.2%-8.0%.  Blokh Decl. ¶ 35 (1st bullet).  In fact, correcting for Mr. Blokh's baseless exclusion of Seadrill (which his report nowhere suggests eliminating other than suggesting that it should not be listed *twice*) and using figures in Adjusted Exhibit 1 to the Blokh Declaration, it is 7.2%-110.8%.        **REDACTED***

Blokh Tr. 53:11-14.[28]  In the next bullet, Mr. Blokh likewise misrepresents the range of the "'All-In Backstop Fee at Plan Value" in the pair of other multi-billion transactions" as being 3.7%-9.4%, Blokh Decl. ¶ 35 (2nd bullet), when the upper number is indisputably 110.8%.  Once again, Mr. Blokh simply excludes Seadrill (a $1.08 billion offering, *see* Blokh Decl., Adjusted

---

[27]    The Creditors Committee cites a hearing transcript in *Momentive Performance Materials Inc. v. Bank of New York Mellon Tr. Co.* ("*Momentive*") to argue that the so-called "at-Risk" approach backstop fee is an established methodology.  Creditors Committee Objection ¶ 53.  This does not stand up to scrutiny for many reasons.  First, this so-called methodology has never been cited by a court in a published or unpublished decision known to the Debtors' counsel (or presumably the Creditors Committee and the other Objectors either).  Second, the court in *Momentive* subsequently approved a backstop fee with a higher "at-risk" calculation.  *See* Order, *In re MPM Silicones, LLC, et al.*, No. 14-22503-rdd (Bankr. S.D.N.Y. June 23, 2014) (approving Motion, *In re MPM Silicones, LLC, et al.*, No. 14-25503 (RDD) (Bankr. S.D.N.Y. May 9, 2014)).  Third, **REDACTED***
Scherer Tr. 103:25-104:9.  Fourth, many of the comparable transactions on Exhibit 1 to the Herlihy Declaration have "at-risk" calculations far larger than the one criticized by Judge Drain, some by orders of magnitude.  Indeed, as noted above, the higher the percentage of shares allocated to the backstop parties, the closer to infinity approaches the "at-risk" calculation (until becoming incalculable for transactions such as Aeromexico and Quorum Health).  Quite simply, as noted above, this metric does not offer the Court a meaningful analysis, and thus not surprisingly, none of the Objectors' Experts presented a comparison to other cases.

[28]    Ironically, while the cash portion of the backstop fee in Seadrill was not negligible (5% of the $1.08 billion exit capital raised), Disclosure Statement of Seadrill Limited, *In re Seadrill Limited, et al.*, Case No. 17-60079 (DRJ) (S.D. Tex. Feb. 26, 2018), Dkt. No. 1002, Ex. B, Acosta, a transaction Mr. Blokh included in the very same sentence in which he excluded Seadrill, involved a cash fee of $2.925 million, or 0.9% of the $325 million rights offering, Notice of Filing of the Debtors' Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization, *In re Anna Holdings, Inc., et al.*, Case No. 19-12551 (CSS) (Dec. 3, 2019), Dkt. No. 111, Ex. A.

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.

Exhibit 1) without even noting that he does so or offering any explanation for doing so. As for

Mr. Blokh's third bullet regarding other post-COVID Latin American airline transactions, both

Grupo Aeromexico and Avianca involved direct commitments (in Avianca's case, from DIP

lenders that the airline could not repay).                    **REDACTED***


                    Scherer Tr. 91:5-9.

        78.     As with Mr. Scherer's presentation of a meaningless "at-risk" calculation

untethered even to Mr. Scherer's own definition of "at risk," Mr. Blokh has his own chart that

proves nothing. On page 9 of the Blokh Declaration, Mr. Blokh asserts that Mr. Herlihy's

methodology is flawed because an Implied Discount of 35.2% with no holdback drops by 3.6%

to 31.6% with a 100% holdback. But in Mr. Blokh's deposition, he explained the logic behind

that very modest change from one extreme to the other. As the backstop parties are compelled to

buy more shares—moving from no holdback to 100%—their additional investment is at a 20.7%

implied discount. Given that their initial investment in the no holdback scenario is at a 35.2%

implied discount, as more shares are purchased at 20.7%, the lower the blended implied discount

becomes. Blokh Tr. 201:21-202:1. But most importantly, undisclosed in Mr. Blokh's chart (or

indeed anywhere in his Declaration), the cost *to the Debtors* is unchanged in all three scenarios.

Blokh Tr. 204:25-205:6.

        79.     As for Ms. LaPuma, she casually flips between discussing fees in absolute

dollars amounts and percentages depending on when it best suits her argument, although at times

she herself confuses or misstates the two.                    **REDACTED***

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.

REDACTED*                                    LaPuma Tr. 122:22-

123:7.  Of course, no expert—not even Ms. LaPuma—advocates a methodology that looks at the

stated backstop fee alone.  For example, Mr. Herlihy compares the Implied Discount (of which

the backstop fee is only one of three inputs), Herlihy Decl. ¶ 71, Mr. Blokh compares All-In

Backstop Fee at Plan Value (of which the backstop fee is one of two inputs), Blokh Decl. ¶ 18,

and Ms. LaPuma herself uses a Backstop Premium methodology (of which the backstop fee is

one of four inputs), LaPuma Decl. ¶ 38.  As noted above, Mr. Scherer          REDACTED*

                    Scherer Tr. 29:12-17, but does find Mr. Herlihy's Implied Discount

approach appropriate subject to a cash adjustment.  Scherer Report at 25.

         80.    Ms. LaPuma also posits that the Commitment Creditors are "gaining a

baked-in 'control premium' that further increases the value" to them by 30-40%.  LaPuma Decl.

¶ 31.  Tellingly, none of the other Objectors' Experts took such an absurd position.  The

Commitment Creditors are a disparate group of creditors that have joined together for the sole

purpose of providing a backstop arrangement to the Debtors.          REDACTED*

                                                                    LaPuma Tr.

167:6-15; 173:24-174:2; 176:12-17.                REDACTED*

                                                                    LaPuma Tr.

182:3-10.  But Ms. LaPuma raises an interesting point—insofar as backstop parties who

genuinely gain a controlling interest and intend to utilize that control in the operation of the

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
  Dated February 2, 2021.

company receive an additional benefit of 30-40% of their backstop fees, the "fees" to some of

the backstopping parties on Mr. Herlihy's list of comparable transactions are presumably

understated, and thus the fees here compare even more favorably.  In stating that the Court

should consider the existence of a control premium here before backing away from that

argument, Ms. LaPuma never looked at whether any of the comparable transactions should be

adjusted upwards.  LaPuma Tr. 162:17-163:2.

81.    Finally, it is notable that not one Objectors' Expert takes issue with Mr.

Herlihy's calculations in comparing the backstop agreements here with the comparable

transactions.                                   **REDACTED***                                *See, e.g.,*

Scherer Tr. 116:7-16.

### 4.    The Backstop Payments to the Commitment Creditors Do Not Violate Section 1129 of the Bankruptcy Code.

82.    The Objections further recycle several plan confirmation challenges based

on (i) Section 1129(a)(4); and (ii) Section 1129(a)(11)'s feasibility requirement, arguing that the

Plan is patently unconfirmable based on the Backstop Agreements.  *See* Creditors Committee

Obj. ¶¶ 39, 56; A&P Ad Hoc Group Obj. ¶¶ 2-4; Columbus Hill Obj. ¶ 9.[29]  As a preliminary

matter, inquiries such as those required to determine the reasonableness of fees under Section

1129(a)(4) and plan feasibility under Section 1129(a)(11) are properly reserved for confirmation.

---

[29]    The Creditors Committee refers to Section 1129(a)(3) in the "Legal Standards" but does not make any argument that the instant motion should be rejected on these grounds.  Creditors Committee Obj. ¶¶ 40-41.  In any event, absent proof that the Plan was proposed with dishonest intent and without "a basis for expecting that a reorganization can be effected," any objection premised on Section 1129(a)(3) would be meritless.  *In re Bd. of Directors of Telecom Arg., S.A.*, 528 F.3d 162, 174 (2d Cir. 2008); *see In re Ditech Holding Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019).  The Debtors have more than adequately shown that the Plan and associated Backstop Agreements were proposed in good faith.  The Plan and the Backstop Agreements provide the Debtors with a viable path to emerge from Chapter 11, and ensure the necessary financing to emerge as a successful company.  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (holding that a Plan conformed to Section 1129(a)(3) because it "was negotiated and proposed with the intention of accomplishing a successful reorganization").  The Debtors have also established that the Backstop Agreements are necessary for a successful reorganization and that the associated fees are reasonable in light of the circumstances.

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction
Dated February 2, 2021.

*See* 7 Collier on Bankruptcy P 1129.02 (16th 2021) ("The time to employ [the reasonableness]

test [codified in Section 1129(a)(4)] is at plan confirmation and not before."); *In re Drexel*

*Burnham Lambert Group, Inc.*, 138 B.R. 723, 762 (Bankr.S.D.N.Y.1992) (noting that Section

1129(a)(11) safeguards *against confirmation of plans* which are "visionary or speculative")

(emphasis supplied).  In any event, the Objections are unfounded as they relate to the Backstop

Agreements.

83.     Section 1129(a)(4) addresses the reasonableness of professional fees and

expenses in connection with the plan, not the approval of backstop payments.  *See In re TCI 2*

*Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) (noting that Section 1129(a)(4) provides

that "all payments of *professional fees* made from estate assets be subject to review and approval

by the Bankruptcy Court as to their reasonableness" and instead analyzing backstop payments

under Section 503(b)) (emphasis supplied); *accord In re Trenton Ridge Investors, LLC*, 461 B.R.

440, 473 (Bankr. S.D. Ohio 2011).  The Objectors do not identify a single case in which the

reasonableness of backstop fees is evaluated under Section 1129(a)(4), because the applicable

Bankruptcy Code provision is Section 503(b).  *See In re Lehman Brothers Holdings Inc.*, 508

B.R. 283, 292-93 n.9 (Bankr. S.D.N.Y. 2014) (rejecting arguments that section 1129(a)(4)

addresses "plan payments for professional fees outside of § 503(b)").  As discussed above, the

Backstop Payments are "actual and necessary" costs to the estates and should be approved as a

result.  *See supra* Section A.2.

84.     Columbus Hill's "feasibility" objection rehashes its arguments that

implementation of the Plan will not succeed in Chile under Chilean law; that the Plan should

therefore be deemed not feasible under Section 1129(a)(11); and that on this basis the Motion

should be rejected.  Columbus Hill Obj. ¶¶ 11-12.  In reprising these arguments, Columbus Hill

repeats and refers to the same arguments it presented in its objection to the Disclosure Statement. *Id*. Just as the Court found that these confirmation-related arguments were not a proper basis for objecting to the Disclosure Statement, they are not a proper basis for objecting to the instant Motion. Further, as the Debtors explained in their Reply as to the Disclosure Statement Motion, Columbus Hill is wrong as to Chilean law and wrong in its characterization of the facts relating to its argument. Disclosure Statement Reply at ¶¶ 60-62. The Debtors are confident that the Plan fully complies with Chilean law and will be successfully implemented in Chile following confirmation.

5.    The Commitment Creditors Backstop Agreement Does Not Violate Section 1123(a)(4) of the Bankruptcy Code.

85.    In objecting to the Disclosure Statement Motion, the Creditors Committee and other parties argued that if the consideration being provided under the Commitment Creditors Backstop Agreement were deemed to be treatment that the Commitment Creditors are receiving merely in their capacity as unsecured creditors, that would create a Section 1123(a)(4) unequal treatment issue. *See* Disclosure Statement Reply ¶ 30 (summarizing objections). But as the Debtors have demonstrated, the consideration being provided – including the Direct Allocation Amount – plainly is in accordance with and in exchange for the Commitment Creditors Backstop Agreement. *Id.* at ¶¶ 31-39. Hence, Section 1123(a)(4) is not implicated or violated.

86.    The Objectors acknowledge this point, that there would be no Section 1123(a)(4) problem if the Direct Allocation is being provided as consideration in connection with and in exchange for the Backstop Agreement. *See* Banco Estado Obj. ¶ 2 n.4; A&P Ad Hoc Group Obj. ¶ 13 n.12. Because this indeed is the case, there can be no Section 1123(a)(4) violation here. As courts have recognized, it is common for members of a creditor class to

41

provide a backstop commitment as part of the plan and the fact that they receive compensation as part of the backstop agreement does not create a Section 1123(a)(4) problem. *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (rejecting Section 1123(a)(4) argument where certain Second Lien note holders who agreed to provide backstop financing would receive 20% of the equity of the reorganized debtor, while Second Lien holders as a class would receive a pro rata share of 5% of the equity, because "all holders of allowed Second Lien Note claims . . . receive the same treatment on account of their claims. The Backstop Fee proposed to be paid to the Backstop Parties is not a distribution to the Second Lien Noteholders on account of their Second Lien Note Claims. Rather, [it] is offered as consideration [for their backstop commitment.]"); *In re CHC Group, Ltd*., 2017 WL 11093971, at *12 (Bankr. N.D. Tex. Mar. 3, 2017) (rejecting Section 1123(a)(4) objection to the payment of a "Put Option Premium" to certain creditors who were providing a backstop commitment because such compensation was "consideration paid in return for [their] agreement to backstop" the Plan). So too here.

### 6. The Termination Fees Are Appropriate.

87.    The Objectors challenge the Commitment Creditors' termination fees as "excessive and unreasonable." LaPuma Corrected Decl. ¶¶ 51, 54; *see also* Banco Estado Obj. ¶¶ 43. Focusing exclusively on the 8-10% termination fees that apply only in one set of circumstances, while not even acknowledging that in many circumstances, the termination fee would be only 2-3%, Ms. LaPuma simply says the dollar amount is too high. LaPuma Decl. ¶¶ 51-53. Ms. LaPuma not only ignores that numerous comparable transactions have higher percentage termination fees (including Aeromexico approved most recently at 15%), *see* PJT Decl., Exhibit 1, but she disregards that it is not uncommon for termination payments to be structured as 100% of the stated backstop payment. This is evident from Exhibit 1 to the PJT Declaration: Carlson Wagonlit, Gulfport, Chesapeake, 24 Hour Fitness, Hornbeck Offshore

Services, Ultra Petroleum, Quorum Health, Hexion, Windstream Communications, Claire's

Stores, Fieldwood Energy, Expro Internation Group, Pacific Drilling, and Toys R Us all have

termination fees equal to the stated backstop fee (each being expressed as a percentage of the

rights offering).  In the present case, however, the termination fee ranges between a minimum of

10% and a maximum of 50% of the stated backstop payment (depending on the circumstances).

Commitment Creditors Backstop Agreement at 75.  As a result, the termination fee here is

eminently reasonable.  *Id.*

### B.  The Court Should Approve the Backstop Shareholders Backstop Agreement.

88.     The Court should review and approve the Backstop Shareholders

Backstop Agreement under the business judgment standard.  And even if it were assessed under

the entire fairness standard, it likewise should be approved.

89.     The A&P Ad Hoc Group Objection properly recognizes that both

Backstop Agreements should be assessed under the business judgment rule.  A&P Ad Hoc

Group Objection ¶ 54.  Banco Estado suggests that the Backstop Shareholders Backstop

Agreement should be subject to entire fairness review on the theory that the Backstop

Shareholders are "insiders."  Banco Estado Obj. ¶ 20.  In addressing the Backstop Shareholders

Backstop Agreement, the Creditors Committee does not expressly invoke the entire fairness

standard, though it mistakenly refers to the Backstop Shareholders as "insiders."  Creditors

Committee Obj. ¶¶ 71-73.  Both Banco Estado and the Creditors Committee are wrong.

90.     None of the Backstop Shareholders is a statutory insider (each owns less

than 20% of the Debtors' outstanding common stock) or a non-statutory insider (none exercises

the requisite level of control over the Debtors).[30]  *See* 11 U.S.C. § 101(2)(A).  Even if they could

---

[30]      *See e.g.*, *Statement of Delta Air Lines, Inc. in Support of the Debtors' Motion for an Order (I) Authorizing
the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and*

be argued to be insiders if grouped together, courts have recognized that when an agreement results from a "court-supervised mediation" involving numerous non-insider stakeholders, and where debtors are represented by "an unconflicted fiduciary," the "business judgment standard is appropriately applied" regardless of whether the agreement involves an interested party.  *In re Residential Cap., LLC*, No. 12-12020, 2013 WL 3286198, at \*19 (Bankr. S.D.N.Y. June 27, 2013); *see also In re Charter Commc'ns,* 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (finding that the entire fairness standard did not apply to a settlement agreement because the negotiations were initiated by the debtor for its benefit and approved by an independent board committee).  Here, the business judgment rule should apply because the Backstop Agreements were negotiated at arms' length under the auspices of a weeks-long court-ordered mediation where each of the parties were represented by independent counsel, and which included third-party creditors who are members of the Parent GUC Ad Hoc Group, and was subject to the independent review of the independent directors serving on the audit committee.  *See* Motion ¶ 38; PJT Decl. ¶ 26.

91.    Even if the Backstop Shareholders Backstop Agreement were subject to entire fairness review, it clearly satisfies that standard.  The entire fairness standard examines whether the process and price of a proposed transaction are fair and fiduciary duties were properly considered.  *See, e.g.*, *In re LATAM Airlines Group S.A.*, 660 B.R. 722, 774 (Bankr. S.D.N.Y. 2020) (ECF No. 1056) (quoting *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).  The Debtors engaged in a fair process, consistent with their fiduciary duties.

---

*(II) Granting Related Relief* [Dkt. No. 669] ¶¶ 5–10 (explaining that Delta has never been an insider or in control of LATAM); *Statement of Qatar Airways Investments (Uk) Ltd. in Support of Approval of Disclosure Statement and Joinder in The Debtors' Omnibus Brief to Objections Thereto* [Dkt. No. 4139] ¶¶ 10–13.

92.     As explained above, the Debtors, through the Board and management, and with the assistance of their advisors, determined their financial needs, marketed the exit capital raise, reasonably evaluated the proposals they obtained, engaged in hard-fought negotiations, followed corporate practices[31] and satisfied their fiduciary duties.  *See supra* Section A.1.

93.     The Backstop Shareholders Backstop Agreement reflects a fair price. During the negotiations prior to the November mediation, the Backstop Shareholders took the position that their investment price should be equal to or lower than the price for creditors. Herlihy Tr. 56:11-17.  The Backstop Shareholders also sought a backstop fee.  Mainoo Decl., Exhibit B.  Ultimately, the Backstop Shareholders agreed to backstop the full Class B Convertible Notes in addition to $400 million of the ERO (subject to a 27% equity ownership limitation in the aggregate), a commitment worth approximately $1.8 billion in total, for no fee. PJT Decl. ¶ 22.

94.     In sum, even if the proposed entry into the Backstop Shareholders Backstop Agreement were reviewed under the entire fairness standard, it would satisfy that standard.  Further, as discussed above, the agreement represents an actual and necessary expense that benefits the estates, *see supra* Section A.2.  Accordingly, the Court should approve it.

### C. The Reimbursement, Indemnification and Alternative Transactions Provisions in the Backstop Agreements Are Appropriate.

1.  The Objectors' Arguments As To The Indemnification and Reimbursement Provisions Are Unfounded.

95.     The Backstop Agreements compensate the Backstop Parties for the "actual, necessary costs and expenses of preserving the estate," including through the

---

[31]     Messrs. Enrique Cueto, Ignacio Cueto and Henri Reichstul, the Costa Verde Aeronáutica S.A.-nominated directors, Ms. Sonia J.S. Villalobos and Mr. Enrique Ostalé, the Delta-nominated directors, and Mr. Alexander Wilcox, the Qatar-nominated director, did not vote on the Backstop Shareholders Backstop Agreement.  PJT Decl. ¶ 26 n.11.

reimbursement of the fees of professionals employed during the restructuring process.  11 U.S.C. § 503(b)(1)(A).

96.     The Objectors, however, allege that the reimbursement provisions are impermissible because they are "very high," Creditors Committee Obj. ¶ 60, and because the Backstop Parties have not made a "substantial contribution to the bankruptcy cases."  A&P Ad Hoc Group Obj. ¶ 53.  These objections are unfounded.

97.     *First*, the reimbursement of the Backstop Parties' expenses is explicitly limited to "reasonable expenses."  Backstop Shareholders Backstop Agreement § 3.1; Commitment Creditors Backstop Agreement, § 3.3.  The "reasonable fees and expenses" of the "advisors and consultants" of backstop parties are routinely approved in this district and elsewhere as actual, necessary costs under Section 503(b).  *In re Roust Corp.*, No. 16-23786 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2017) [Dkt. No. 40], ¶ 12.         **REDACTED\***

*Id.* 299:13-20.  No support for the A&P Ad Hoc Group's objection to this issue can be found in the opinion of its expert, Mr. Scherer.

98.     *Second*,  as detailed in the Backstop Motion, the reimbursement and indemnification provisions were integral in obtaining the financing commitments necessary for the Debtors to accomplish a successful reorganization.  *See* Mot. ¶ 41; PJT Decl. ¶ 47 ("The Expense Reimbursement and the Indemnification Obligations are essential components of the Backstop Agreements. . . . The Backstop Commitment Parties have required these obligations, as

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

applicable, as a condition to providing the commitments under the Backstop Agreements, and

entry into the Backstop Agreements is required under the RSA."); *see also* Alfonsín Tr. 93: 17-

24.  As such, and given "the significant benefit to the Debtors' estate of having a definitive

binding commitment to fund the Debtors' restructuring," the indemnification and reimbursement

provisions qualify as "actual, necessary" costs of preserving the Debtors' estates and should be

approved.  *See, e.g.*, *In re 21st Century Oncology Holdings, Inc.*, No. 17-22770 (RDD) (Bankr.

S.D.N.Y. Sept. 20, 2017) [Dkt. No. 443], at 2; *In re Windstream Holdings, Inc.*, No. 19-22312

(RDD) (Bankr. S.D.N.Y. May 12, 2020) [Dkt. No. 1806], at ¶ 5.

　　　　99.　　Banco Estado contends that Section 8.1 of the Backstop Shareholders

Backstop Agreement may be read as intending to indemnify persons affiliated with a Backstop

Shareholder in their capacity as board members of LATAM and that this would be unenforceable

under Chilean law.  Banco Estado Obj. ¶ 50.[32]  But the point is irrelevant because Section 8.1

provides that the Debtors shall indemnify "Backstop Parties" and does not extend to

indemnifying anyone in their capacity as a member of the LATAM board.  *See* Backstop

Shareholder Agreement, § 8.1 (The Debtors shall "indemnify and hold harmless each *Backstop*

*Party*" as well as its "[a]ffiliates, shareholders, members, partners and other equity holders,

general partners, managers, directors . . . .") (emphasis supplied).  Therefore, under Section 8.1,

the Debtors indemnify the directors and representatives of the Backstop Parties only in that

capacity.

　　　　100.　　Banco Estado also argues that including a reference to "the Plan" in

Section 8.1's indemnification provision is purportedly improper, on the theory that this might

---

[32]　　The Creditors Committee objection includes a sentence referring to the same purported principle that
Chilean law prohibits a corporation from indemnifying its directors but then argues that this means the Debtors
cannot indemnify the Commitment Creditors.  Creditors Committee Obj. ¶ 61.  This argument makes no sense,
given that no Commitment Creditors are members of the Debtors' board.

make "the Debtors financially responsible for claims against third parties that may have nothing to do with the Backstop Agreements." Banco Estado Obj. ¶ 51. Banco Estado fails to explain the basis for its speculation that, despite the centrality of the Backstop Agreements to the Plan, there may be a claim against the Backstop Parties relating to the Plan that "may have nothing to do with the Backstop Agreements." In any event, given the interrelationship of the Backstop Agreements and the Plan and the other transactions contemplated under the Plan, it is proper and reasonable for the indemnity to encompass claims relating to the Plan. Courts in this district regularly approve backstop agreements with such an indemnification provision. *See, e.g.*, Order Authorizing and Approving the Debtors' (I) Entry Into and Performance Under the Backstop Commitment Agreement, (II) Payment of Related Fees and Expenses, and (III) Incurrence of Certain Indemnification Obligations First Amendment § 8.1, *In re MPM Silicones, LLC*, No. 14-22503 (Bankr. S.D.N.Y. June 23, 2014), ECF No. 509 (authorizing backstop agreement indemnifying "each Commitment Party" for losses incurred "in connection with this Agreement [and] the Plan"); *see also In re Garrett Motion, Inc.*, No. 20-11212 (Bankr. S.D.N.Y. Mar. 9, 2021), ECF No. 1015; *In re Windstream Holdings, Inc.* (Bankr. S.D.N.Y. Mar. 13, 2020), ECF No. 1806.

2. The Alternative Transactions Provision Is Appropriate.

101. Banco Estado asserts that the Alternative Transactions provision in the Backstop Agreements unduly binds the Debtors. Banco Estado Obj. ¶ 39-42. Banco Estado's objection is unfounded.

102. Banco Estado overstates the scope of the restrictions. While the Debtors cannot actively seek an Alternative Transaction or engage in substantive negotiations with respect to an Alternative Transaction without terminating the Backstop Agreements, the Backstop Agreements do not prevent the Debtors from reviewing Alternative Transactions as

they are presented to the Debtors.  While each of the RSA and Backstop Agreements also do have fiduciary out provisions, it is reasonably tailored to balance the interests of the Debtors and their estates against the commitments to the backstop arrangements in light of the Backstop Parties' commitment of their own capital for several months in support of the Plan.

## **CONCLUSION**

103.    For the reasons stated herein, the Objections should be overruled, the Debtors' Motion should be granted, and the Debtors respectfully request that the Court enter an order substantially in the form attached to the Motion as Exhibit A.

Dated:    February 7, 2022
      New York, New York

              */s/ Lisa M. Schweitzer*
              Jeffrey A. Rosenthal
              Lisa M. Schweitzer
              David H. Herrington
              Abena A. Mainoo
              CLEARY GOTTLIEB STEEN & HAMILTON LLP
              One Liberty Plaza
              New York, New York 10006
              Telephone:  (212) 225-2000
              Facsimile:  (212) 225-3999

              *Counsel to the Debtors and Debtors-in-Possession*