## Exhibit A

**Excerpts of the Deposition (Redacted)**

1                   ALFONSIN HIGHLY CONF'L

2     of directors?

3                   MR. HERRINGTON:  Object to the

4          form.

5          A.    I don't know that

6     specifically. I should refer to my

7     lawyers.

8          Q.    All right.  Let's go ahead and

9     go to the deposition notice now.

10                 MR. HERRINGTON:  Just to

11         confirm, we're moving out of the

12         individual deposition and into the

13         30(b)(6) and that's where we'll end

14         up.

15                 MR. BASSETT:  I'm not going to

16         confirm that. I reserve my right to

17         move back and others may have

18         questions. So you can reserve your

19         rights as well.

20                 MR. HERRINGTON:  In your

21         questioning I would object to you

22         going back and forth. That's

23         confusing to the witness and not

24         fair.

25                 MR. BASSETT:  Your objection

1          ALFONSIN HIGHLY CONF'L

2      is noted. Thank you.

3              THE WITNESS: Can you reorient

4      me to which document I must open?

5              MR. FARMER:  It's Exhibit 10.

6      There's a duplicate of Exhibit ask

7      1.

8              THE WITNESS: Exactly. I see it

9      now. Thank you, sir. Are.

10     A.    I have it now, Mr. Bassett.

11             (Alfonsin Exhibit 10, Notice

12     of Deposition was received and

13     marked on this date for

14     identification.)

15             MR. FARMER:  It was BAES

16     Exhibit 1 but there was already a

17     Committee Exhibit 1, so I remarked

18     the same Exhibit 10.  So it should

19     be in numerical order and the stamp

20     reflects BAES.

21             MR. HERRINGTON:  The file that

22     we should open is Exhibit 1.

23             THE WITNESS: Exhibit 10, no?

24             MR. BASSETT:  Exhibit 10.

25             MR. HERRINGTON:  I'm not

Page 203

1              ALFONSIN HIGHLY CONF'L

2         seeing a pdf saying Exhibit 10.

3         Okay. I see it now.

4         Q.    Mr. Alfonsin, have you seen

5    this document before?

6         A.    I think not. Not this

7    specifically.

8         Q.    Mr. Alfonsin, do you

9    understand generally that you are here

10   today to testify as a representative of

11   the debtors concerning the topic listed

12   on page 2, Topic 2 of this document?

13        A.    Yes, sir.

14        Q.    First, let me just ask you,

15   earlier Mr. Doluisio asked you some

16   questions concerning your preparation for

17   this deposition.

18             Did you do anything in

19   addition to what you testified to earlier

20   to prepare as the debtors' corporate

21   representative on this topic?

22        A.    Not that I recall.

23        Q.    Now, Mr. Alfonsin, generally

24   you understand that the backstop

25   agreement, both backstop agreements

Page 204

1              ALFONSIN HIGHLY CONF'L

2     contain conditions precedent, including

3     those in section 7.1(e) and (f) of the

4     agreements, correct?

5          A.    Yes, sir.

6          Q.    And do you generally

7     understand that if a condition precedent

8     is not satisfied, the backstopping

9     shareholders or the Commitment Creditors,

10    as applicable, will no longer have an

11    obligation to fund and consummate the

12    transactions contemplated by the backstop

13    agreements?

14         A.    In general terms, yes.

15         Q.    Earlier you mentioned, I

16    believe, that one of the reasons why the

17    debtors were paying a fee to the parties

18    to the backstop agreements was to

19    compensate them for the risk involved in

20    making their commitments in an uncertain

21    industry and environment.  Is that

22    generally correct?

23              MR. HERRINGTON:  Object to the

24         form.

25         A.    There is -- there is an

Page 205

ALFONSIN HIGHLY CONF'L

1
2     uncertainty in the industry that affects
3     the potential attractiveness of the
4     instruments that we were discussing.
5         Q.    And would you agree with me
6     that a condition precedent that would
7     allow, as we just discussed, these
8     parties to not consummate the
9     transactions called for by these
10    agreements under certain circumstances
11    would reduce the risk that they are
12    undertaking?
13              MR. HERRINGTON:  Object to the
14        form.
15        A.    Can you simplify the question?
16        Q.    Would you agree with me
17    generally that these conditions precedent
18    would serve to reduce the risk that the
19    backstop shareholders and Commitment
20    Creditors are assuming under the backstop
21    agreements?
22              MR. HERRINGTON:  Object to the
23        form.
24        A.    It is my understanding that
25    they -- they have conditions to fund, if

Page 206

1              ALFONSIN HIGHLY CONF'L

2     there is a severe impact in the company,

3     which in my mind is different to

4     committing equity into a company based on

5     a long term plan. I think there are

6     different moments of uncertainty when you

7     look at the company six months from now

8     or when you look at the company four

9     years or five years down the line. The

10    backstop commitment, you're committing

11    equity when you look at the company in

12    the longer, in the longer term.

13         Q.    I'm just asking you, if there

14    are conditions precedent that would allow

15    the parties to the backstop agreements to

16    not have to fund under certain

17    circumstances, that that serves to reduce

18    the risk they are undertaking?

19              MR. HERRINGTON:   Object to the

20         form.

21         A.    Again, for me it's -- it's

22    different, no? It's the risk they are

23    undertaking is committing capital, first

24    in the form of a Convert C that will be

25    equity afterwards for a company that you

Page 207

1            ALFONSIN HIGHLY CONF'L

2    think will -- will have a specific value.

3    And that is the risk that they are

4    committing to.

5              In the short term there are

6    conditions precedent to funding.  If

7    there is a severe impact to the industry

8    then there is a condition precedent for

9    funding but there are risks, two separate

10   risks in my mind, as I understand.

11        Q.    Let's look at section 7.1(e).

12   Let's focus on 7.1(e) of the backstop

13   agreements.

14        A.    Yes, sir.

15        Q.    Can you just give me your

16   general understanding of what this --

17   what this condition provides for?

18              MR. HERRINGTON:  Object to the

19         form.

20        A.    It's a provision that looks at

21   as of the date, five business days prior,

22   from closing date, it looks at the

23   forward bookings for the next 30 days and

24   compares to a threshold that we have

25   negotiated.

Page 208

1            ALFONSIN HIGHLY CONF'L

2        Q.     And what are forward bookings?

3        A.     Forward bookings are the -- in

4    this case, they are defined in an

5    exhibit.  It's the number of tickets that

6    the company has received as bookings for

7    the next 30 days of flying.

8        Q.     And that's generally compared

9    to a threshold based on bookings that

10   existed for the same months in 2019; is

11   that generally correct?

12       A.     That is generally correct.

13       Q.     By the way, do you know the

14   origin of this provision, how it

15   initially became part of the agreement?

16       A.     I don't recall it

17   specifically. I think they wanted -- let

18   me think.

19            MR. HERRINGTON:  Let me again

20       caution the witness.  It's okay to

21       give general responses but this is

22       all negotiated through the

23       mediation. So just be careful

24       you're not disclosing specific

25       conditions in the mediation.

1              ALFONSIN HIGHLY CONF'L

2        A.    I don't recall the original

3   ask, Mr. Bassett.  But they were asking

4   for a commitment that we didn't want to

5   give and we feel comfortable with the

6   commitment that we are giving here, this

7   condition precedent that we have included

8   in the backstop.

9        Q.    But this condition was

10  something that was requested by the

11  Commitment Creditors?

12       A.    They requested a different

13  condition that, I don't recall at this

14  moment, that we didn't consider it

15  acceptable.

16            MR. HERRINGTON:  Actually, let

17       me clarify. I think this was after

18       the mediation period has ended. So

19       I don't want to confuse the

20       witness, but to the extent anything

21       happened during the mediation, that

22       should be protected.

23       Q.    Have the debtors conducted any

24  analysis of the likelihood of this

25  condition here in 7.1(e) being satisfied

Page 210

                     ALFONSIN HIGHLY CONF'L

1  at the time of closing?

2       A.    We looked at our business plan

3  and we looked at the perspective of

4  meeting this parameter in the months of

5  2022.

6       Q.    And what did the debtors

7  conclude?

8       A.    We think that, although it's

9  an uncertain environment, not only on the

10 long term but also in the short term, we

11 believe that that is a low probability

12 scenario not to be able to meet this

13 parameter.

14      Q.    When you say "low probability

15 scenario", what do you mean by that?

16      A.    It feels that today, sitting

17 down with you today, I feel confident

18 that we will meet this condition

19 precedent.

20      Q.    Do you think there's a greater

21 than 50% chance that --

22           MR. HERRINGTON:  Object to the

23      form.

24      Q.    -- that this condition will be

Page 211

1            ALFONSIN HIGHLY CONF'L

2    met during any month in 2022?

3        A.    This is --

4            MR. HERRINGTON:    Object to the

5        form.

6        A.    This is an extremely volatile

7    industry, fuel prices today are

8    skyrocketing, demand is impacted by

9    Omicron. I can't tell you with certainty

10    how things are going to look in June or

11    September next year but I think that

12    today I feel very comfortable that we can

13    meet this parameter.

14        Q.    Just to be clear, did the

15    debtors ever put a specific probability

16    on the ability to satisfy this condition?

17        A.    Not that I recall.

18        Q.    Did the debtors consider the

19    impact that the emergence of a new COVID

20    19 variant could have on their ability to

21    meet this condition?

22        A.    We considered everything and

23    different scenarios and assumptions.

24        Q.    How would the emergence of a

25    new COVID 19 variant affect your

Page 212

1            ALFONSIN HIGHLY CONF'L

2    confidence in this condition being

3    satisfied?

4              MR. HERRINGTON:  Object to the

5         form.

6         A.    It depends on the impact that

7    that variant will have and how severe it

8    is and how it is impacting the market --

9    the market, the government restrictions

10   that are established due to that variant.

11   It depends very much.

12        Q.    Did the debtors look back and

13   determine how often this condition would

14   have been satisfied using historical 2021

15   numbers?

16        A.    We looked more at 2022.

17   Comparing 2021 or 2020 with 2022, is -- I

18   don't believe is a good comparison.

19        Q.    Why not?

20        A.    For instance, the company was

21   operating, I don't know, maybe 25% of its

22   capacity in 2021. In certain months now

23   we're operating over 65% of our capacity.

24   PBH agreements that provide us

25   flexibility to shrink capacity in 2021

Page 213

ALFONSIN HIGHLY CONF'L

1   are now no longer available from half of

2   2022 onwards.  So the restrictions of

3   operations are much more limited.  The

4   competitive landscape has a completely

5   different scenario than past year, fuel

6   prices are $30 more than what they were

7   in 2021.

8              It is a completely different

9   scenario what you're looking at and the

10  market that we are seeing in 2022 than

11  what we saw in 2021.

12       Q.   Do you know, sitting here

13  today, approximately what -- what

14  percentage of days in 2021 this condition

15  would have been satisfied?

16       A.   Again, the company was

17  operating during the second half and

18  beginning of the year less than 40%.

19  Remember that we had an impact in 2021 of

20  what we call the second or third wave in

21  Latin America that reduced our

22  operations.

23             Today we're operating over 65%

24  of the capacity and we no longer have the

Page 214

1              ALFONSIN HIGHLY CONF'L

2    flexibility to reduce our operations from

3    the second half onwards because of the

4    PBH agreements that were negotiated and

5    the stipulations on those paragraphs. So

6    it's not comparable to look at 2021

7    vis-à-vis 2022.

8         Q.    Does it sound generally

9    correct to you that LATAM would not have

10   satisfied this metric on approximately

11   half of the days of last year?

12             MR. HERRINGTON:   Object to the

13        form.

14        A.    Again, I don't think it's an

15   adequate comparison. You're comparing a

16   company that operated 25% with a company

17   that operates over 65%.

18             So when you look at your

19   forward bookings, if you operate more,

20   you have more forward bookings.  And you

21   are comparing to a baseline that is

22   between 45 to 60% of 2019 levels. So the

23   closer you get to that operation, the

24   more likelihood you have of meeting the

25   target.

Page 215

ALFONSIN HIGHLY CONF'L

1

2          So you cannot compare 2021 to

3    a threshold in 2019 and ask me if it's

4    reasonable that I compare to 2021 or

5    2022. I think it's reasonable to look at

6    2022 because of the operations that we're

7    having in 2022.

8       Q.    I understand that you do not

9    think it's an adequate comparison. That's

10   not the question that I'm asking.

11          I'm just asking, do you

12   understand that this condition would not

13   have been satisfied on approximately half

14   of the days in 2021?

15          MR. HERRINGTON:  Object to the

16       form.

17       A.    I understand the question and

18   I'm telling you that that's not the way

19   to compare it. Because if I was standing

20   in 2021 I would have asked for a

21   different threshold vis-à-vis 2019,

22   because the sizing of the company was

23   completely different.

24          MR. BASSETT:  All right. Will,

25       can you please mark tab 93?

Page 216

```
 1            ALFONSIN HIGHLY CONF'L
 2              (Alfonsin Exhibit 11, Excel
 3        spreadsheet: Forward Net Booking
 4        Threshold, Bates BE2_00010970 was
 5        received and marked on this date
 6        for identification.)
 7              THE WITNESS:  You let us know.
 8              MR. FARMER:  It's the Excel
 9        file. It's Exhibit 11.
10        A.    I have it here, sir.
11        Q.    I will represent to you that
12   this is a document that was produced to
13   Banco Estado in discovery.
14              When you open it up I'm going
15   to start by asking you if you've seen
16   this before?
17        A.    No, sir.
18        Q.    Do you see that it has a list
19   of dates on the column A, column B has
20   Actual Net Bookings, and then there are
21   other columns and then column G is Net
22   Bookings Threshold. Do you see that?
23        A.    Yes, sir. My column G is in
24   blank, the one I'm seeing.
25        Q.    If you scroll down,
```

Page 217

ALFONSIN HIGHLY CONF'L

1

2      Mr. Alfonsin, if you scroll down to --

3      let's scroll down to 2021.

4          A.    I am in 2021.

5          Q.    Okay. And Mr. Alfonsin, you

6      say you have not seen this document. Do

7      you recall the company creating any sort

8      of analysis like this?

9          A.    We're looking at for the net

10     forward bookings, Mr. Bassett? Sorry, net

11     forward bookings?

12         Q.    Yes.

13         A.    Yes. We looked at 2022 more in

14     detail, which is the monthly data that

15     we're concerned with in order to meet the

16     condition precedent.

17         Q.    But would you agree with me

18     that this document also contains

19     historical data as to the net bookings

20     threshold, including for 2021?

21         A.    Yes.

22         Q.    And if one -- and look, I

23     agree that you do not think 2021 is an

24     adequate comparison, but would you just

25     agree with me, just so I understand how

Page 218

1              ALFONSIN HIGHLY CONF'L

2      the forward net bookings calculation

3      works under the agreement, that what you

4      would do to see if it was satisfied is to

5      compare what is in column B, as in boy,

6      to what is in column G?

7          A.      No, sir. We compare not 2021.

8      I would compare 2022.

9          Q.      I understand that. For the

10     sake of just humor me, if you were

11     applying it to 2021, the way you would do

12     the calculation would be to look at what

13     is in column B and compare it to column

14     G, correct?

15         A.      Mr. Bassett, I'm not

16     calculating this based on 2021. The

17     metric is clear, it's in an exhibit. It

18     is based on the months of 2022, which the

19     operation of the company --

20         Q.      Okay.  If you were -- if you

21     were to do it for 2022, and we had the

22     same chart, I'm just trying to understand

23     how you would look at the way 7.1(e) of

24     the agreement operates.  If all of these

25     dates here were from 2020 instead of

Page 219

1              ALFONSIN HIGHLY CONF'L

2     2021, I'm just asking you, would you

3     compare what's in column B to column G to

4     determine whether the condition has been

5     met?

6              MR. HERRINGTON:  Object to the

7         form.

8         A.    I don't know this Excel. I

9     would take the exhibit, and we made an

10    example to the exhibit so it is friendly

11    and we can explain it and there is no

12    discussion on how this is being

13    calculated, and I can walk you through

14    the exhibit to explain how it is

15    calculated.

16             I don't know what formulas are

17    here on column G and I don't know -- and

18    what I'm seeing here is 2021.  So that is

19    not the analysis that we will be doing

20    under the conditions to funding.

21        Q.    I believe we discussed this

22    before. The agreement contemplates in

23    section 7.1(e) a comparison between

24    actual net bookings and the net bookings

25    threshold, correct?

Page 220

ALFONSIN HIGHLY CONF'L

1

2        A.    Yes, sir.

3        Q.    Thank you. Mr. Alfonsin, did

4    the inclusion of section 7.1(e) in the

5    agreement have any impact on the backstop

6    fee or other compensation that LATAM was

7    willing to provide to the backstop

8    parties?

9            MR. HERRINGTON:  Object to the

10        form.

11        A.    The backstop agreement was

12    negotiated, again, with -- it's a very

13    complex agreement, it has lots of

14    interrelated parts, so it was negotiated

15    as a whole.

16        Q.    So what's the answer to my

17    question, yes or no?

18            MR. HERRINGTON:  He just

19        answered your question. Objection.

20        A.    My answer stands.

21        Q.    Mr. Alfonsin, section 7.1(f)

22    of the agreement contains a minimum

23    liquidity condition precedent; is that

24    correct?

25        A.    Yes, sir.

Page 221

1          ALFONSIN HIGHLY CONF'L

2      Q.      What can you tell me about the

3   origin of this agreement?

4              MR. HERRINGTON:   Object to the

5      form.

6      A.      I think this was included on

7   the first draft submitted by Evercore

8   with different, with different thresholds

9   and it was a point that we negotiated

10  extensively also.

11     Q.      Have the debtors conducted any

12  analysis of the likelihood of this

13  condition being satisfied at closing in

14  2022?

15     A.      We looked at our business plan

16  and we considered the 2022 that we were

17  seeing and we concluded that we think

18  there is also in this case a very low

19  probability of not being able to deliver

20  these liquidity levels.

21     Q.      And when you say "low

22  probability", did the debtors put any

23  percentage on that probability?

24     A.      No, sir.

25     Q.      Did the debtors consider how

Page 222

1                ALFONSIN HIGHLY CONF'L

2    that probability might be impacted by the

3    emergence of a new COVID 19 variant in

4    2022?

5         A.    We looked at how the financial

6    markets were looking, we looked at our

7    demand, we looked at our -- at how we

8    were seeing 2022, we looked at the fuel

9    prices, we looked at the general market

10   environment and we feel reasonably

11   comfortable with this, with these levels

12   and this condition to fund.

13        Q.    Do you have any understanding,

14   Mr. Alfonsin, as to whether or not the

15   conditions set forth in 7.1(e) and (f) of

16   the agreement are common in backstop

17   arrangements?

18              MR. HERRINGTON:   Object to the

19        form.

20        A.    I'm more familiar with

21   covenants in the financial markets and

22   underwritings.  I would say liquidity is

23   a covenant that we are used to seeing in

24   the financial markets. In fact, we have

25   certain facilities in LATAM that have

Page 223

1                ALFONSIN HIGHLY CONF'L

2    that covenant of liquidity.

3                Forward booking is probably

4    one that we normally don't -- don't have

5    but I understand that going through a

6    pandemic, it's a condition that is

7    reflected after the negotiation.

8        Q.   Are you aware of any other

9    backstop agreement that has contained a

10   condition precedent similar to that set

11   forth in section 7.1(e)?

12                MR. HERRINGTON:  Object to the

13       form.

14       A.   I'm not familiar with other

15   backstop agreements, per se.  I'm

16   familiar with covenants and

17   underwritings.

18       Q.   Did you ask your advisors

19   whether or not these two conditions

20   precedent are consistent with those in

21   other agreements?

22                MR. HERRINGTON:  Object to the

23       form.

24       A.   We reviewed the backstop

25   agreement holistically with our advisors.

Page 224

```
1              ALFONSIN HIGHLY CONF'L
2    And a foreign airline in Latin America
3    during the pandemic, with these amount of
4    funds being committed, for this period of
5    time of more than eight months, we
6    concluded it was reasonable to include it
7    with this level of thresholds that we
8    were very comfortable that we could meet.
9              MR. BASSETT:  Can we take a
10        quick break and I can regroup and
11        see what I have left?
12             MR. HERRINGTON:  Sure.
13             (Recess is taken.)
14             MR. BASSETT:  Mr. Alfonsin, I
15        do not have any additional
16        questions right now, but Banco
17        Estado does reserve the same rights
18        as the Committee with respect to
19        continuing this deposition as
20        necessary after the debtors have
21        completed the production of
22        documents that the court has
23        ordered the debtors to produce.
24             MR. HERRINGTON:  Again, we
25        disagree and reserve our rights. We
```

Page 225

1            ALFONSIN HIGHLY CONF'L

2       hear you.

3            THE WITNESS: Thank you,

4       Mr. Bassett.

5            MR. BASSETT:  Thank you.

6            MR. FRANCISCOVICH:  This is

7       Rob Franciscovich from Arnold &

8       Porter for the Ad Hoc Group of

9       Unsecured Creditors.

10           I don't have any questions

11      right now but I reserve the same

12      rights that Mr. Bassett just

13      expressed, just for the record.

14           MR. HERRINGTON:  Understood.

15      Again, we reserve our rights. Okay.

16      Great. Does that mean we are done?

17           MR. DOLUISIO:  We are done for

18      today.

19           MR. HERRINGTON:  All right.

20           (The proceedings were

21   adjourned at 4:00 p.m.)

22

23

24

25