## Exhibit 3

**Herlihy Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LATAM Airlines Group S.A., *et al.*, | Case No.: 20-11254 (JLG) |
| Debtors.[1] | Jointly Administered |

# DECLARATION OF BRENT HERLIHY
# IN SUPPORT OF THE BACKSTOP AGREEMENTS MOTION

I, Brent Herlihy, make this Declaration under 28 U.S.C. § 1746:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM-Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services LLC (30-1133972); Maintenance Service Experts LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services, Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); LATAM Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); ABSA Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corretora de Seguros Ltda. (N/A). For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33122.

1. I am a Managing Director in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"), the investment banker to the debtors and debtors-in-possession in the above-captioned Chapter 11 Cases[2] (collectively, the "Debtors").[3]

2. PJT's Restructuring and Special Situations Group was spun off from The Blackstone Group L.P. ("Blackstone") in 2015. Prior to joining PJT in 2015, I worked in the Restructuring and Reorganization group at Blackstone from 2013 to 2015. Prior to that, I received a JD from Harvard Law School and an MBA from Harvard Business School. I also worked in the M&A group of Lazard from 2007 to 2009 after obtaining a BA in politics from Princeton University. I have 8 years of restructuring experience advising companies, creditors, and sponsors in restructurings and special situations, and have worked across numerous industries including power, media/telecom, retail, automotive, industrials, aerospace, and oil and gas. Over the course of my career, I have advised senior management and boards of directors in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions. I have been involved in numerous restructurings including Aegean Marine Petroleum, APC Automotive, Automores Gildemeister, BCBGMAXAZRIA, Covia, Danaos, Desarrolladora Homex, ExGen Texas Power, Frontera Generation, Fusion Connect,

---

[2] Capitalized terms that are used but not defined here have the same meaning as set forth in the Backstop Agreements Motion as defined below or, as applicable, in the Joint Plan of Reorganization of LATAM Airlines Group S.A., *et al.*, under Chapter 11 of the Bankruptcy Code, dated November 26, 2021 (as it may be supplemented or amended, the "Plan") or the related disclosure statement (as it may be supplemented or amended, the "Disclosure Statement").

[3] More detail regarding PJT's background, qualifications and retention as the Debtors' investment banker is set forth in the *Declaration of Timothy R. Coleman in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* (ECF No. 398) and the *Declaration of Timothy R. Coleman in Support of Debtors' Supplemental Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* (ECF No. 486).

2

GenOn Mid-Atlantic, Key Energy Services, Preferred Sands, Quicksilver Resources, Sandy Creek Energy Associates, Sears and VER Technologies.

3. I submit this Declaration in support of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (the "Backstop Agreements Motion").

4. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gained throughout PJT's engagement by the Debtors; my discussions with the Debtors' senior management, other members of the PJT team, and the Debtors' other advisors; and my review of relevant documents and/or my opinion based upon my experience. If called to testify, I would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, and/or opinion.

5. I am not being specifically compensated for this testimony other than through payments received by PJT as a professional retained by the Debtors.[4] I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.

## THE DEBTORS REQUIRE SIGNIFICANT LIQUIDITY
## TO FUND THE PLAN AND EMERGE FROM CHAPTER 11

6. The unprecedented effects of the global COVID-19 pandemic significantly affected the Debtors' operations and business plan. The Debtors' air traffic levels have recovered somewhat since the onset of the pandemic, but their business activity still remains

---

[4] PJT will not receive a capital raising fee in connection with the New Exit Debt Financing, New Convertible Notes and Equity Rights Offering.

3

substantially below pre-pandemic levels. Further, the nature of the COVID-19 pandemic and the response by the various nations in which the Debtors operate make future recovery difficult to forecast.

7. In view of the uncertainty about the trajectory of the pandemic and the timing of the expected recovery, it is very important for the Debtors to emerge from Chapter 11 with sufficient liquidity. The Debtors also need to raise significant capital to meet their obligations to pay various creditors under the Plan, including the repayment of the DIP financing, as well as to ensure that necessary capital expenditures are made to maintain the aircraft and equipment required to run their business.

8. To obtain this capital, the Debtors need to raise more than $8 billion in new money. This new money will be available from the proceeds of the New Exit Debt Financing, the New Convertible Notes Offering and the Equity Rights Offering.

9. Beginning in June 2021, the Debtors engaged with various interested parties regarding potential proposals for exit capital to support a Chapter 11 plan and in July 2021, sent a term sheet and process letter to several stakeholder groups seeking proposals.

10. The Debtors also began discussions with several stakeholders regarding their Chapter 11 Cases and the terms of a potential plan of reorganization. In November 2021, the Debtors commenced mediation with various major stakeholders to resolve a number of issues including the economic and legal terms of a potential plan of reorganization and exit funding. The mediation culminated in the filing of the Plan and entry into the Restructuring Support Agreement with support from shareholders that own over a majority of the equity and creditors that own approximately 70% of the general unsecured claims asserted against LATAM Parent.

11. The Debtors concluded, after fully exploring a number of

restructuring proposals, that the comprehensive restructuring embodied in the Plan, including approximately $2.25 billion of new Exit Notes/Loan and an approximately $500 million revolving credit facility (collectively, the "New Exit Debt Financing") and $5.442 billion in investment commitments, represents the best available alternative for the Debtors' successful emergence from Chapter 11 and provides the best available treatment of the Debtors' creditors as a whole.

12. I believe that the transactions contemplated by the Plan, including the New Convertible Notes and Equity Rights Offering, which new money components are fully committed pursuant to the Backstop Agreements and the Plan, represent the most favorable and certain path currently available to achieve a successful and expeditious exit from these Chapter 11 Cases and will thereby maximize the value of the Debtors' estates.

### THE DEBTORS OBTAINED COMPETITIVE PROPOSALS THROUGH THEIR EXIT CAPITAL MARKETING EFFORTS

13. As an airline business in Latin America operating during the global COVID-19 pandemic, the Debtors faced substantial challenges in pursuing parties that may be willing and able to provide the necessary exit capital and backstop support to successfully emerge from bankruptcy. Further, given the particular challenges of navigating the rights and claims of the various constituents of the Debtors' estates, and the need to develop a plan of reorganization that receives the creditor and shareholder support necessary to be confirmable under the Bankruptcy Code and Chilean corporate law, it was appropriate to focus these efforts on key stakeholders.

14. The Debtors, with the assistance of their advisors, provided their business plan and answers to countless diligence questions on a confidential basis to those stakeholders to

5

enable them to engage with the Debtors on the form, structure and financial aspects of a plan of reorganization and exit strategy.

15. The Debtors and their advisors negotiated over sixty non-disclosure agreements with certain parties and their advisors. The Debtors engaged in a significant diligence process with multiple parties and groups, including providing non-public information regarding the Debtors' operations and forward-looking strategic goals and planning, as well as answering over 600 diligence questions.

16. In July 2021, the Debtors distributed to certain interested parties subject to non-disclosure agreements an indicative term sheet for a plan of reorganization and associated exit funding for review and feedback.

17. Between September and October 2021, the Debtors received non-binding proposals and responses from: (i) the Parent GUC Ad Hoc Group,[5] (ii) the Ad Hoc Creditor Group,[6] and (iii) the Backstop Shareholders,[7] Inversiones Costa Verde Ltda y Cia, en Comandita por Acciones and the Eblen Group.[8]

18. The Debtors engaged with these parties regarding potential exit capital and related matters, and received various revised non-binding proposals.

---

[5] The Parent GUC Ad Hoc Group consists of an ad hoc group of certain LATAM Parent creditors represented by Kramer Levin Naftalis & Frankel LLP and Evercore. The Commitment Creditors are Aurelius, Barclays, Citigroup, Cross Ocean, Deutsche Bank, Grosvenor, Monarch, Olympus Peak, PSAM, Sculptor, Silver Point, Sixth Street, Strategic Value Partners, Third Point, and Varde.

[6] The Ad Hoc Creditor Group consists of certain Debtor creditors represented by White & Case LLP and Moelis & Company.

[7] The Backstop Shareholders consist of certain of the Debtors' large shareholders, comprising Costa Verde Aeronáutica S.A., Delta and Qatar, each as advised in their individual capacity by Greenhill & Co., LLC, and separately advised by Wachtell, Lipton, Rosen & Katz, Davis Polk & Wardwell LLP and Alston & Bird LLP, respectively. Delta, in its individual capacity, also has retained Perella Weinberg Partners, L.P. as its financial advisor, and Qatar, in its individual capacity, also has retained HSBC as its financial advisor.

[8] The Eblen Group consists of Andes Aerea SpA, Inversiones Pia SpA and Comercial Las Vertientes.

6

19. In November 2021, the Debtors commenced mediation to seek to resolve various shareholder-related matters and ultimately the economic and legal terms of a potential plan of reorganization and exit funding, among other issues.

20. Ultimately, through Court-ordered mediation, the Debtors, the Parent GUC Ad Hoc Group and each of the Backstop Shareholders, Inversiones Costa Verde Ltda y Cia, en Comandita por Acciones and the Eblen Group reached an agreement on a comprehensive restructuring and recapitalization of the Debtors, which is memorialized in the RSA.

### THE BACKSTOP COMMITMENTS OFFER SUBSTANTIAL BENEFITS TO THE DEBTORS

21. To date, the Backstop Commitment Parties are the only parties that have committed to fund the cash costs of the Debtors' emergence and subsequent cash needs with equity and convertible debt capital. In parallel, the Debtors are in the process of soliciting interest in proposals for the $2.750 billion New Exit Debt Financing as well as refinancing or renegotiation of $873 million across the $600 million pre-petition Revolving Credit Facility and $273 million Spare Engine Facility.

22. The Backstop Shareholders have committed to backstop the full $1.373 billion offering of New Convertible Notes Class B and $400 million of the $800 million Equity Rights Offering.[9] The Commitment Creditors have committed to backstop a $3.269 billion new money investment in the New Convertible Notes Class C and the remaining $400 million of the Equity Rights Offering.

---

[9] Subject to a pro forma equity ownership limitation of 27.0% in the aggregate.

7

23. The Debtors agreed to the backstop arrangements as part of the negotiations surrounding the Plan as a whole. The Backstop Commitment Parties have negotiated the terms of the Backstop Agreements on a holistic basis.

24. The backstop arrangements offer substantial benefits to the Debtors and their estates. First, the commitments serve as a key source of support for the Plan and further the Debtors' ability to meet the proposed timetable for confirmation of the Plan. Second, they protect against the contingency that insufficient funds will be generated by the New Convertible Notes Offering and the Equity Rights Offering. Without the commitments by the Backstop Commitment Parties (along with the proceeds of the New Exit Debt Financing contemplated under the Plan), there is no assurance that the Debtors would be able to successfully emerge from Chapter 11 with a well-capitalized balance sheet during a time of great uncertainty in the airline industry and region. Further, the backstop arrangements provide the Debtors with the best path toward emergence while meeting the requirements of the Bankruptcy Code and Chilean corporate law. Collectively, the Backstop Commitment Parties have committed an aggregate $5.442 billion with the understanding that, if accepted, their respective commitments would have to remain outstanding for approximately eight months to participate in the New Convertible Notes and Equity Rights Offering.[10] My understanding is that such capital will be reserved by the Commitment Creditors, pursuant to the terms of the Commitment Creditors Backstop Agreement, to fund their commitment to the Company. Moreover, during that time, the Debtors will continue to face numerous economic, market and commercial risks, including as a result of the continued uncertainty due to the ongoing global COVID-19 pandemic. In light of these

---

[10] The outside date can be extended an additional two months under certain conditions.

8

benefits, the proposed backstop arrangements maximize the value of the Debtors' enterprise for the benefit of all of their stakeholders.

25. No third parties other than the Backstop Commitment Parties have presented a viable proposal that satisfies all of the Debtors' requirements for emergence from Chapter 11. On November 11, 2021, counsel for a competitor of the Debtors, Azul S.A. ("Azul"), sent a letter to counsel for the Debtors that offered a general, non-binding and preliminary overview of a potential transaction. The overview included bracketed and unstated terms, did not identify committed financial support for the transaction, did not provide any process or timeline for the transaction and did not address key value and execution risks of pursuing that potential transaction. For example, the overview failed to address the timing and feasibility of obtaining regulatory consents that may be required in multiple jurisdictions, a structure for execution, Azul's considerable debt obligations and requirements under Chilean corporate law.

## THE TERMS OF THE BACKSTOP AGREEMENTS WERE NEGOTIATED AT ARM'S-LENGTH AND IN GOOD FAITH, AND THEY ARE WITHIN THE RANGE OF COMPARABLE AGREEMENTS

26. The Debtors negotiated the Backstop Agreements in good faith, at arm's length and with the assistance of their advisors under the auspices of Court-ordered mediation. The independent directors who serve on LATAM Parent's audit committee were kept fully apprised as to the status of the Plan and Backstop Agreements negotiations, meeting with the Debtors' advisors more than two dozen times during the negotiation process. Once finalized, the Backstop Agreements were subject to the independent review of the independent directors serving on the audit committee. After reviewing the terms of the Backstop Agreements, these independent directors recommended approval of the agreements by the full LATAM Parent

9

board of directors. Only then was the full LATAM Parent board presented with the Backstop Agreements, ultimately accepting the independent directors' recommendation and approving the Backstop Agreements via a unanimous vote of all voting directors.[11]

27. As consideration for their commitment to backstop the $3.269 billion new money investment in the New Convertible Notes Class C, the Commitment Creditors will receive a 20% payment (measured against the Commitment Creditors' new money commitment) payable in cash on the Effective Date. The Commitment Creditors will receive, as consideration for their commitment to backstop $400 million of the Equity Rights Offering, an aggregate 20% backstop payment, allocated in accordance with the applicable provisions of the Backstop Commitment Agreement and payable in cash on the Effective Date. The Backstop Shareholders will receive no backstop payment on account of their commitments under the Backstop Shareholders Backstop Agreement, backstopping the $1.373 billion of New Convertible Notes Class B and $400 million of the Equity Rights Offering[12] for no fee.

28. In the event of termination resulting from the Debtors' entry into an Alternative Transaction, breach of the Backstop Commitment Agreement, or under certain other circumstances, the Backstop Parties (as defined in the Commitment Creditors Backstop Agreement) will receive a Termination Payment of 40% of the Backstop Payment (8% of the Commitment Creditors' new money commitment) if such termination occurs prior to entry by the Bankruptcy Court of the Confirmation Order and 50% of the Backstop Payment (10% of the Commitment Creditors' new money commitment) if such termination occurs after entry by the

---

[11] For the avoidance of doubt, Messrs. Enrique Cueto, Ignacio Cueto and Henri Reichstul, the Costa Verde Aeronáutica S.A.-nominated directors, Ms. Sonia J.S. Villalobos and Mr. Enrique Ostalé, the Delta-nominated directors, and Mr. Alexander Wilcox, the Qatar-nominated director, did not vote on the Backstop Shareholders Backstop Agreement.

[12] Subject to a pro forma equity ownership limitation of 27.0% in the aggregate.

10

Bankruptcy Court of the Confirmation Order.  Under certain other circumstances, the Backstop Parties (as defined in the Commitment Creditors Backstop Agreement) will receive a Termination Payment of 10% of the Backstop Payment (2% of the Commitment Creditors' new money commitment) if such termination occurs prior to entry by the Bankruptcy Court of the Confirmation Order and a Termination Payment of 15% of the Backstop Payment (3% of the Commitment Creditors' new money commitment) if such termination occurs after entry by the Bankruptcy Court of the Confirmation Order.

29. The Backstop Commitment Parties and their advisors will receive payment and reimbursement, as applicable, of certain reasonable costs incurred in connection with the Backstop Commitment Parties' commitment to backstop the new money investment in the New Convertible Notes Class B or New Convertible Notes Class C (as applicable) and the ERO New Common Stock.  The Backstop Agreements require the Debtors to indemnify, and pay certain contribution and reimbursement claims to, the Backstop Commitment Parties for certain losses, claims, damages, liabilities, and costs and expenses arising out of or in connection with their participation in the Plan, the New Convertible Notes Class B or New Convertible Notes Class C (as applicable) and the ERO New Common Stock, as applicable.

30. The consideration provided to the Backstop Commitment Parties under the Backstop Agreements is designed to compensate them for the substantial financial, economic, market, commercial and execution risks and uncertainties that they are undertaking to aid the Debtors in their restructuring efforts.

31. Backstop fees are typically charged by commitment parties in Chapter 11 cases for a number of reasons.

11

32. First, my understanding is that such parties must maintain the capacity to fully fund the issuance associated with the offering. They must be able to cover their portion of the issuance and backstop other parties' portion of the offering if it is not fully subscribed.

33. Second, such parties incur an opportunity cost: my understanding is that during the period that the commitment is maintained, such capital will be reserved by the Backstop Parties (as defined in the Commitment Creditors Backstop Agreement), pursuant to the terms of the Backstop Commitment Agreement, to fund their commitment to the Company.

34. Third, such parties face numerous economic, market, and commercial risks during the extended period that such commitments remain in place. The economy broadly and/or the Debtors specifically could suffer a downturn because of the continued uncertainty and challenges caused by the global COVID-19 pandemic[13] and other economic developments or geopolitical or domestic political events that reduce the attractiveness of the investment, but the terms of the commitment may still require them to provide and backstop equity financing.

35. Consequently, commitment parties to equity-linked offerings in Chapter 11 cases typically seek and obtain consideration in the form of commitment fees for the significant risk they take that an investment obligation that appears attractive when undertaken turns out to be much less so when, often some months later, the commitment and/or backstop must be honored.

36. The risks and uncertainties outlined above are especially significant for industries considerably impacted by the global COVID-19 pandemic, such as the airline industry, which has suffered rapid and severe downturns due to declines in global travel. The committed

---

[13] The Backstop Agreements include a limited provision temporarily pausing the parties' obligations under the Backstop Agreements in the event a new COVID-19 variant emerges that is deemed a "variant of concern" or a "variant of high consequence" by the World Health Organization or the U.S. Centers for Disease Control and Prevention.

12

backstop arrangement provides the Debtors the certainty needed to exit Chapter 11, even if the COVID-19 pandemic extends longer than currently projected.

37. These risks and uncertainties are further heightened by the principal markets in which LATAM operates, which have undergone significant political volatility over the course of these cases.

38. In connection with the negotiations of the Backstop Commitment Agreement, PJT analyzed backstop arrangements for comparable rights offerings. While PJT reviewed a wider set of backstop arrangements, the most comparable set comprised equity backstop arrangements for amounts greater than $200 million over the last five years, as well as backstop arrangements of all sizes that have been executed since the beginning of the COVID pandemic. *See* Exhibit 1.

39. The proposed Backstop Payments fall within the range of commitment fees paid in other comparable cases, as Exhibit 1 illustrates. It should be noted that the special challenges presented here, as well as the duration of the commitment, serve to further justify the Backstop Payments.

40. Costs of backstopped capital in comparable equity rights offerings can take the form of (i) the discount at which the new money is being invested; (ii) a backstop fee, which is typically paid on the full size of the commitment provided by backstop parties using equity consideration priced at the same discount to plan value as the rights offering; (iii) a direct allocation or "holdback" amount that allows the backstop parties to invest no less than a certain amount; and (iv) typical reimbursements of professional fees and expenses.

13

41. In order to compare the cost of backstops across different cases, PJT calculated the combined impact of (i), (ii) and (iii) above[14] and netted it against the investment made in the rights offering to determine an "implied discount" to invest (the "Implied Discount"). A higher Implied Discount indicates better economics for the backstop parties.

42. PJT further analyzed scenarios where (i) the backstop parties backstop and subscribe for 100% of the rights offering; and (ii) the backstop parties subscribe to their pro rata allocation of the new money (i.e., the rights offering is fully subscribed by eligible parties). PJT assumed that, in the latter case, backstop parties receive any applicable holdback amount plus their pro rata allocation of the post-holdback new money, based on the backstop parties' stated share of the unsecured claims pool.

43. Using both metrics, the Commitment Creditors' backstop of the New Convertible Notes Class C is priced at an Implied Discount around the median and mean of the cases in Exhibit 1.

44. The size of the backstop commitment and the backstop duration of approximately eight months are well above the median and mean of the comparable backstop arrangements. As shown in Exhibit 1, the median and mean backstop duration are three months, respectively, while the maximum backstop duration is eight months. The Debtors' approximately eight-month backstop commitment is one of the longest, largest recent commitments, yet has an Implied Discount that is less than comparable cases.

45. The Termination Payment is payable to the Backstop Parties (as defined in the Commitment Creditors Backstop Agreement) as compensation in scenarios where the Backstop Commitment Agreement is terminated either (a) because of the Debtors' exercise of

---

[14] Due to limited information, reimbursements of professional fees and expenses in various cases were not included in determining the Implied Discount in comparable cases.

14

their option to pursue an Alternative Transaction, (b) failure to meet certain condition precedents, or (c) certain other termination events in the control of the Debtors. A Termination Payment is customary in rights offerings in chapter 11, and was necessary to provide the requisite protections to induce the Backstop Parties (as defined in the Commitment Creditors Backstop Agreement) to agree to provide the commitments.

46. In the event of a termination under which the Debtors enter into an Alternative Transaction, the backstop commitment requires a Termination Payment of 40% of the Backstop Payment if such termination occurs prior to entry by the Bankruptcy Court of the Confirmation Order. This Payment would increase to 50% of the Backstop Payment if such termination occurs after entry of the Confirmation Order. This Payment represents 8% of the total Commitment backstopped by the Commitment Creditors (if termination occurs prior to entry by the Bankruptcy Court of the Confirmation Order) and 10% of the total Commitment backstopped by the Commitment Creditors (if termination occurs after the entry by the Bankruptcy Court of the Confirmation Order). Both fees fall within the range of termination fees paid in other comparable cases, as Exhibit 1 illustrates. In the case of a "no-fault" termination, the Termination Payment will be even lower: 10% of the Backstop Payment if such termination occurs prior to the entry by the Bankruptcy Court of the Confirmation Order and 15% of the Backstop Payment if the termination occurs after the entry by the Bankruptcy Court of the Confirmation Order.

47. The Backstop Payments, Termination Payment, Expense Reimbursement, and the Indemnification Obligations are essential components of the Backstop Agreements. Such obligations serve as compensation for the substantial undertakings of the Commitment Creditors and Backstop Shareholders and are in line with market precedent. The Backstop

15

Commitment Parties have required these obligations, as applicable, as a condition to providing the commitments under the Backstop Agreements, and entry into the Backstop Agreements is required under the RSA.

48. Without the protection afforded by providing the Backstop Payments, Termination Payment, Expense Reimbursement and Indemnification Obligations, the Debtors' ability to confirm the Plan and effectively restructure their business pursuant to the Plan would be uncertain.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: January 12, 2022
    New York, New York

/s/ Brent Herlihy
Brent Herlihy
Managing Director
PJT Partners LP

# Exhibit 1

# Rights Offering Comparables
## Offerings of $200+ Million or Post-COVID, Inclusive of Direct Investments

| Company | Filing Date | Rights Offering Size | Backstop Duration | Discount | Holdback | Backstop Fee (%) Stated | Backstop Fee (%) At Plan Value | (+) Holdback Value | All-In Backstop Fee at Plan Value | Implied Discount Backstop Party does 100% of New Money | Implied Discount Backstop Party does Pro-Rata Share of New Money[1] | Termination Fee at Plan Value % of Commitment | Termination Fee at Plan Value $ Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carlson Wagonlit | Nov-21 | $350 | 3 | 25.0% | 46% | 5.0% | 6.7% | 1.5% | 8.2% | 28.6% | 28.8% | 5.0% | $18 |
| Washington Prime Group | Jun-21 | 325 | 4 | 32.5% | 50% | 9.0% | 13.3% | 7.9% | 21.3% | 38.1% | 39.1% | 20.0% | 65 |
| Gulfport Energy | Nov-20 | 50 | 1 | 30.0% | – | 10.0% | 14.3% | – | 14.3% | 36.4% | 39.1% | 10.0% | 5 |
| Garrett Motion | Sep-20 | 1,301 | 4 | 7.5% | 56% | – | – | 2.1% | 2.1% | 7.5% | 7.5% | 1.9% | 25 |
| California Resources | Jul-20 | 450 | 2 | 35.0% | 39% | 10.0% | 15.4% | 4.2% | 19.6% | 40.9% | 41.7% | 5.0% | 23 |
| Grupo Aeromexico | Jun-20 | 720 | 4 | – | 100% | 15.0% | 15.0% | – | 15.0% | 13.0% | 13.0% | 15.0% | 108 |
| Chesapeake Energy | Jun-20 | 600 | 4 | 71.7% | 25% | 10.0% | 35.3% | 10.8% | 46.1% | 74.3% | 74.6% | 10.0% | 60 |
| 24 Hour Fitness | Jun-20 | 65 | 2 | 50.0% | 50% | 10.0% | 20.0% | 10.5% | 30.5% | 54.5% | 55.0% | 10.0% | 7 |
| Extraction Oil & Gas | Jun-20 | 200 | 4 | 35.0% | – | 9.5% | 14.6% | – | 14.6% | 40.6% | 42.1% | 6.0% | 15 |
| Hertz | May-20 | 4,416 | 4 | – | 63% | 3.7% | 3.7% | – | 3.7% | 3.6% | 4.6% | 3.0% | 77 [2] |
| Hornbeck Offshore Services | May-20 | 100 | 3 | – | – | 5.0% | 5.0% | – | 5.0% | 4.8% | 5.8% | 5.0% | 5 |
| Ultra Petroleum | May-20 | 85 | 3 | 49.0% | 50% | 7.5% | 14.7% | 7.2% | 21.9% | 52.5% | 52.8% | 7.5% | 6 |
| Quorum Health | Apr-20 | 200 | 0 | 25.0% | 100% | 7.5% | 7.5% | – | 7.5% | 30.2% | 30.2% | 7.5% | 15 |
| Acosta | Dec-19 | 325 | 3 | 21.0% | 20% | 4.5% | 5.7% | 1.5% | 7.2% | 24.4% | 25.4% | – | – |
| Monitronics | Jun-19 | 300 | 2 | 16.1% | 41% | 8.0% | 9.5% | 1.5% | 11.0% | 22.3% | 23.1% | – | – |
| Legacy Reserves Inc. | Jun-19 | 256 | 4 | (2.5%) | 78% | 6.0% | 5.9% | (0.8%) | 5.1% | 3.3% | 4.9% | – | – |
| Bristow Group Inc. | May-19 | 385 | 3 | 17.9% | – | 10.0% | 12.2% | – | 12.2% | 25.4% | 30.0% | 5.0% | 19 |
| Hexion (Common) | Apr-19 | 300 | 3 | 35.0% | – | 8.0% | 12.3% | – | 12.3% | 39.8% | 41.5% | 8.0% | 24 |
| Hexion (Cash)[3] | Apr-19 | 300 | 3 | 35.0% | – | 8.0% | 8.0% | – | 8.0% | 38.2% | 39.4% | 8.0% | 24 |
| Windstream Communications | Feb-19 | 750 | 8 | 37.5% | 50% | 8.0% | 12.8% | 8.4% | 21.2% | 42.1% | 42.8% | 8.0% | 60 |
| PG&E | Jan-19 | 12,000 | 3 | – | – | 9.4% | 9.4% | – | 9.4% | 8.6% | NM [4] | 6.4% | 764 |
| Claire's Stores | Mar-18 | 250 | 1 | 37.5% | 50% | 10.5% | 16.8% | 8.4% | 25.2% | 43.4% | 44.3% | 10.5% [5] | 26 |
| Fieldwood Energy | Feb-18 | 525 | 3 | – | – | 6.0% | 6.0% | – | 6.0% | 5.7% | 7.2% | 6.0% | 32 |
| Expro International Group | Dec-17 | 200 | 2 | 36.8% | 25% | 5.0% | 7.9% | 5.1% | 13.0% | 39.9% | 40.9% | 5.0% | 10 |
| Pacific Drilling S.a. | Nov-17 | 500 | 2 | 46.9% | – | 5.3% | 9.9% | – | 9.9% | 49.8% | 50.7% | 5.3% | 26 |
| Toys R Us | Sep-17 | 365 | 5 | 45.0% | – | 6.5% | 11.8% | – | 11.8% | 48.4% | 49.7% | 6.5% | 24 |
| Seadrill (Hemen) | Sep-17 | 1,080 | 8 | 72.8% | 38% | 6.8% | 20.1% | 90.7% | 110.8% | 77.0% | 81.6% | – | – |
| Seadrill (Other Backstop Parties) | Sep-17 | 1,080 | 8 | 72.8% | 47% | 2.8% | 4.1% | 87.4% | 91.5% | 73.2% | 74.5% | – | – |
| **Summary Statistics** | | | | | | | | | | | | | |
| Maximum | | $12,000 | 8 | 72.8% | 100% | 15.0% | 35.3% | 90.7% | 110.8% | 77.0% | 81.6% | 20.0% | $764 |
| 75th Percentile | | 630 | 4 | 39.4% | 50% | 9.6% | 14.6% | 7.4% | 21.2% | 44.7% | 47.0% | 8.0% | 28 |
| Mean | | 981 | 3 | 29.7% | 33% | 7.4% | 11.4% | 8.8% | 20.2% | 34.5% | 36.7% | 6.2% | 51 |
| Median | | 338 | 3 | 33.8% | 38% | 7.7% | 10.9% | 0.7% | 12.2% | 38.1% | 39.4% | 6.0% | 21 |
| 25th Percentile | | 238 | 2 | 14.0% | – | 5.2% | 6.5% | – | 7.9% | 20.0% | 24.2% | 4.5% | 6 |
| Minimum | | 50 | 0 | (2.5%) | – | – | – | (0.8%) | 2.1% | 3.3% | 4.6% | – | – |
| **LATAM (Blended)**[3] | May-20 | $5,442 | 8 [6] | 18.1% | 30.0% | 13.5% | 13.5% | 2.3% | 15.8% | 26.2% | 29.1% | 5.4% / 6.7% [7] | 294 / 367 |
| **LATAM (Convert B)** | May-20 | $1,373 | 8 [6] | 13.7% | – | – | – | – | – | 13.7% | 13.7% | – | – |
| **LATAM (Convert C)**[3] | May-20 | 3,269 | 8 [6] | 20.7% | 50.0% | 20.0% | 20.0% | 3.8% | 23.8% | 31.6% | 33.1% | 8.0% / 10.0% [8] | 262 / 327 |
| **LATAM (ERO)**[3] | May-20 | 800 | 8 [6] | 13.7% | – | 10.0% [9] | 10.0% | – | 10.0% | 20.6% | 26.6% | 4.0% / 5.0% [8] | 32 / 40 |

(1) Includes grossed-up amount allocated through holdback.
(2) 3% Backstop Fee owed to Centerbridge/Warburg Group on their $2.6bn committed when Hertz chose the Knighthead/Certares Plan. Knighthead/Certares did not subsequently impose a second Termination Fee.
(3) Backstop Fees paid entirely in cash, therefore not grossed up at Plan Value.
(4) Backstop parties were not entitled to do a certain portion of the new money.
(5) Assumes $38.75mm Break Fee is split pro rata between the debt and equity backstops in the same proportions as the Backstop Fee.
(6) Illustratively assumes entry of Backstop Commitment Agreement Order on 2/15/22, 3 business days after the expected date of Backstop Commitment Agreement Hearing.
(7) Reflective of blended average termination fees on $1.373bn of Convert B, $3.269bn of Convert C and $400mm portion of ERO backstopped by Commitment Creditors. Reflects 40% of Backstop Payment under termination by alternative transaction or other circumstances before entry of Confirmation Order, and 50% of Backstop Payment if terminated under the same circumstances after entry of Confirmation Order.
(8) Reflects 40% of Backstop Payment under termination by alternative transaction or other circumstances before entry of Confirmation Order and 50% of Backstop Payment if terminated under the same circumstances after entry of Confirmation Order.
(9) Reflective of Evercore Group 20% Backstop Fee on $400mm of the Equity Rights Offering.

PJT Partners    1