KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Rachael L. Ringer
David E. Blabey Jr.
Douglas Buckley
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel to the Parent Ad Hoc Claimant Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------X
                                                :
In re:                                          :   Chapter 11
                                                :
LATAM Airlines Group S.A., et al.,              :   Case No. 20-11254 (JLG)
                                                :
                           Debtors.[1]          :   Jointly Administered
                                                :
------------------------------------------------------------------ X
```

**STATEMENT OF THE PARENT AD HOC CLAIMANT GROUP
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
AUTHORIZING AND APPROVING THE DEBTORS' (A) ENTRY INTO AND
PERFORMANCE UNDER BACKSTOP AGREEMENTS AND (B) PAYMENT OF
RELATED FEES AND EXPENSES AND INCURRENCE OF CERTAIN
INDEMNIFICATION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605 885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM-Airlines Ecuador S.A. (98- 0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services LLC (30- 1133972); Maintenance Service Experts LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services, Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corretora de Seguros Ltda. (N/A). For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

INTRODUCTION ................................................................................................................. 3

ARGUMENT ........................................................................................................................ 7

I.    THE BACKSTOP AGREEMENTS ARE REASONABLE AND MARKET-
      BASED ...................................................................................................................... 7

      A.    The Backstop Agreements Reflect the Debtors' Exercise of Prudent
            Business Judgment and Hard-Fought Negotiations................................................ 7

      B.    The Backstop Agreements are Consistent with Market Standards and
            Warranted by the Costs and Risks Associated with the Backstop Parties'
            Commitment ........................................................................................................ 11

II.   THE BACKSTOP AGREEMENTS DO NOT RESULT IN PREFERENTIAL
      TREATMENT TO CREDITORS ON ACCOUNT OF THEIR CLAIMS....................... 17

CONCLUSION.................................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Charter Comm.*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................................... 12

*Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
    722 F.2d 1063 (2d Cir. 1983) ........................................................................................... 6

*In re Extraction Oil & Gas, Inc.*,
    ECF 1032, No. 20-11548 (CSS) (Bankr. D. Del. Nov. 5, 2020) ....................................... 13

*In re Grupo Aeroméxico, S.A.B. de C.V.*,
    ECF 2369, No. 20-11563 (Bankr. S.D.N.Y. Dec. 28, 2021) .............................................. 15

*Momentive Performance Materials Inc., v. Bank of New York Mellon Tr. Co.*,
    No. 1422503 (RDD) (Bankr. S.D.N.Y. Jun. 19, 2014) .......................................... 13, 14, 18

*In re MPM Silicones*,
    ECF 509, No. 14-22503 (Bankr. S.D.N.Y. June 23, 2014) ................................................ 14

*In re Noble Corp. PLC*,
    ECF 542, No. 20-33826 (DRJ) (Bankr. S.D. Tex. Oct. 9, 2020) ................................. 13, 15

*In re Peabody Energy Corp.*,
    933 F.3d 918 (8th Cir. 2019) ............................................................................................ 5

*In re Peabody Energy Corp.*,
    ECF 2233, No. 16–42529 (Bankr. E.D. Mo. Jan. 27, 2017) ........................................ 5, 14

*In re SunEdison, Inc.*,
    ECF 3283 (Bankr. S.D.N.Y. June 6, 2017) ........................................................................ 5

*In re SunEdison, Inc.*,
    No. 16-10992 (Bankr. S.D.N.Y May 19, 2017) ................................................................. 18

**Statutes**

11 U.S.C. § 1123 ....................................................................................................................... 16

11 U.S.C. 1129(a)(3) ................................................................................................................. 18

11 U.S.C. 363(b)(1) ................................................................................................................ 2, 5

11 U.S.C. 503(b)(1) .................................................................................................................... 6

11 U.S.C. 1123(a)(4) ................................................................................................. 4, 15, 16, 18

11 U.S.C. 1129(a)(4) .................................................................................................................. 5

The Parent Ad Hoc Claimant Group (the "**Parent Ad Hoc Group**"), by and through its undersigned counsel, hereby submits this Statement in Support of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief* (the "**Backstop Agreements Motion**")[2] [ECF No. 4056], which seeks approval of the Debtors' entry into the *Commitment Creditors Backstop Agreement* (the "**Commitment Creditors Backstop Agreement"**)[3] and the *Backstop Shareholders Backstop Agreement* (the "**Backstop Shareholders Backstop Agreement**," and together with the Commitment Creditors Backstop Agreement, the "**Backstop Agreements**"), annexed to the Backstop Agreements Motion as Exhibits A and B, respectively. The Parent Ad Hoc Group respectfully states as follows:[4]

## INTRODUCTION

1.     Approval of the Backstop Agreements is the critical next step in the Debtors' restructuring, ensuring the Debtors' access to more than $5 billion in committed funds. In the face of significant challenges confronting the global economy and the airline industry, the Backstop Agreements provide the Debtors the ability to emerge from bankruptcy with a de-leveraged balance sheet and access to the capital required to ensure the continued success of the business, in addition to facilitating the near-term refinancing of the Debtors' Existing DIP Facility. The Backstop Agreements were negotiated at arm's length among sophisticated parties over the course

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Backstop Agreements Motion*. The following deposition transcripts (or excerpts thereof) can be found in the Exhibits filed under seal by the Debtors in connection with the Debtors' reply in support of the Backstop Agreements Motion as follows:

[3] Also referred to herein as "**BCA**." [ECF No. 4056-1, Ex. A].

[4] Each member of the Parent Ad Hoc Claimant Group files this Statement exclusively on its own behalf and does not assume any fiduciary or other duties to any other member or to any other entity or individual.

*All redacted text is Redacted Per Amended Standing Order Regarding Redactions Dated February 2, 2021.

of many months, are consistent with relevant comparable transactions, and reflect a careful give and take among the parties.

2.      Notwithstanding the substantial benefits the funding provides to the company and the absence of any other basis to successfully reorganize the airline, the official committee of unsecured creditors (the "**Committee**") and certain minority creditor groups persist in their efforts to derail the resolution of these cases and undermine the Plan that is supported by the extraordinary financial commitments made in the Backstop Agreements.  The Court should reject these attempts, as the backstop structure supporting the Plan, and the Backstop Agreements themselves, are both legally sound and in the best interest of the estates.[5]

3.      The Commitment Creditors Backstop Agreement clearly reflects the prudent exercise of the Debtors' business judgment and can be approved under Bankruptcy Code section 363(b)(1).  No doubt recognizing that the business judgment standard is readily met, certain Objectors attempt to invoke the "entire fairness" standard, repeating arguments the Court rejected only last month in approving the Debtors' settlements with certain claimholders. (Committee Obj. ¶¶ 3, 64; BancoEstado Obj. ¶ 20).  The Committee's latest effort to rely on this heightened standard should fare no better:  the "entire fairness" standard has no application to a backstop agreement negotiated at arm's length with unsecured creditors, particularly one where the material terms were negotiated as part of the mediation led by the Hon. Allan L. Gropper (ret.), with the Debtors achieving significant concessions with respect to some of the very terms the Objectors purport to challenge.

---

[5] This Statement addresses certain of the objections made by (i) the Committee ("**UCC Obj.**") [ECF No. 4289], (ii) the Ad Hoc Group of Unsecured Claimants (the "**Ad Hoc Group**") ("**AHG Obj.**") [ECF No. 4291], (iii) Columbus Hill Capital Management ("**CHC**") ("**CHC Obj.**") [ECF No. 4184], and (iv) Banco del Estado de Chile ("**BancoEstado**," and together with the Committee, Ad Hoc Group and CHC, the "**Objectors**") ("**BancoEstado Obj.**") [ECF No. 4293].

4.      Additionally, the terms of the Backstop Agreements are reasonable and consistent with market standards.  The Commitment Creditors negotiated and committed to fund the ***entirety*** of the $3.269 billion New Convertible Notes Class C and $400 million of the Equity Rights Offering – a significant majority of the capital the Debtors' need to exit bankruptcy – despite substantial risks and costs associated with this particular investment.  Absent this commitment, the Commitment Creditors would have no obligation to fund ***any portion*** of the Debtors' necessary exit capital and would have the ability to make their investment decision on the eve of closing, potentially as many as ten months later, alongside all other creditors.  The Debtors simply cannot afford to bear that risk.

5.      In exchange for this long-term, risk-laden commitment, the Commitment Creditors are afforded reasonable compensation and other protections embodied in the Commitment Creditors Backstop Agreement.  The backstop compensation and related protections serve to compensate the Commitment Creditors for, among other things, risks attendant to the unusually long duration of their financial commitment (including the unpredictable economic environment from a macro and airline-specific perspective due to the ongoing pandemic, political change in Chile and other jurisdictions, and volatility in the Debtors' primary markets), opportunity costs of making these commitments and earmarking funds for up to ten months, and the significant time and expense the Commitment Creditors have devoted to negotiating and facilitating the consummation of these complex global restructuring transactions and the Debtors' efficient emergence from bankruptcy.

6.      Contrary to the Objectors' assertions, the protections afforded to the Backstop Parties were heavily negotiated and ultimately determined by the Debtors to appropriately limit any conditionality of the Backstop Agreements (with many of such protections merely taking the form of conditions precedent to closing that do not afford the Commitment Creditors the

opportunity to terminate their commitments). The Committee might prefer to impose its own economic terms on the Commitment Creditors, but those are simply not the terms on which the creditors are willing to invest, nor does the market compel such alternative financing terms. Indeed, notwithstanding the Debtors' significant efforts to obtain fully committed financing for the better part of the last six months, the Backstop Parties remain ***the only group*** that has actually committed sufficient capital to enable the Debtors to emerge successfully from bankruptcy. [6]

7.    Finally, while the Objectors again attempt to prematurely import plan confirmation standards on other relief sought by the Debtors, the Backstop Agreements do not commit the Debtors to a Plan that violates the equal treatment requirements of Bankruptcy Code section 1123(a)(4), as asserted (again) by the Objectors. Putting aside that such objections are to be decided in the context of plan confirmation, this objection continues to lack any substantive merit. All general unsecured claims against LATAM Parent are receiving the exact same treatment on account of those claims. The consideration afforded to the Commitment Creditors (whether in the form of the backstop payments, Direct Allocation, or otherwise) represents consideration for their substantial new financing commitments; ***it is not being provided on account of their claims***. This reality has already been recognized by this Court, and is entirely consistent with applicable case law on this issue.

8.    Thus, the Court should overrule the objections and approve the Backstop Agreements.[7]

---

[6] Ironically, while the Committee complains of the structure of the proposed transaction, the alternative "proposal" put forth by the Ad Hoc Group and endorsed by the UCC reflects that *very same structure*, and would not meet the standards the Committee attempts to impose on the existing deal. Committee Obj. ¶¶ 65-70; *see also* BancoEstado Obj. ¶ 5.

[7] For the reasons set forth herein, the Parent Ad Hoc Group submits that the Backstop Agreements should be approved in accordance with the applicable standards of the Bankruptcy Code. Nevertheless, in an effort to minimize objections to the Backstop Agreements and/or Plan confirmation, the Parent Ad Hoc Group has been actively participating in another round of mediation led by Hon. Allan L. Gropper (ret.). The Parent Ad Hoc Group will inform the Court if any resolutions are reached through mediation in advance of the hearing.

## ARGUMENT

## I.    THE BACKSTOP AGREEMENTS ARE REASONABLE AND MARKET-BASED

### A.    The Backstop Agreements Reflect the Debtors' Exercise of Prudent Business Judgment and Hard-Fought Negotiations

9.    The Objectors assert, as they did in opposition to the Debtors' motion to approve the Disclosure Statement, that the fees payable to the Parent Ad Hoc Group under the Commitment Creditors Backstop Agreement are "unreasonable" and therefore violate Bankruptcy Code section 1129(a)(4).  On multiple grounds, this objection is meritless.

10.    As an initial matter, the Debtors' entry into the Commitment Creditor Backstop Agreement, including their agreement to make the backstop payments, is a pre-confirmation, non-ordinary course transaction governed by Bankruptcy Code section 363(b)(1) – not section 1129(a)(4) as urged by the Objectors.  Thus the transaction should be approved so long as the Debtors' decision was grounded in their business judgment.  *E.g., In re SunEdison, Inc.*, No. 16-10992 (Bankr. S.D.N.Y. June 6, 2017), ECF 3283 at ¶¶ C, E  (debtors' entry into backstop agreement reflected debtors' exercise of "prudent business judgment" and backstop commitment fee and breakup fee were "reasonable and customary"); *In re Peabody Energy Corp.*, No. 16–42529 (Bankr. E.D. Mo. Jan. 27, 2017), ECF 2233 at 2  (under section 363(b), debtors' decision to enter into backstop agreement and plan support agreements was "an appropriate exercise of the [d]ebtors' business judgment"); *see In re Peabody Energy Corp.*, 933 F.3d 918 (8th Cir. 2019) (affirming confirmation of the Debtors' plan); *see also* Backstop Agreements Motion ¶¶ 32-33 and the cases cited therein.

11.    The Debtors' decision to enter into the Commitment Creditors Backstop Agreement meets this standard.  As the Debtors have demonstrated, the Backstop Parties' commitment of approximately $5.44 billion in new money investments (i) ensures that the Debtors have sufficient

cash to fund distributions under the Plan, (ii) facilitates the Debtors' need to obtain exit debt financing on reasonable terms, (iii) serves as the linchpin for a Chapter 11 plan that affords the Debtors a feasible post-emergence capital structure and restructuring as a going concern, and (iv) otherwise protects against the contingency that insufficient funds are generated by the New Convertible Notes Offering and Equity Rights Offering. (Backstop Agreements Motion ¶ 34). The long-duration backstop commitment required by the Debtors' Plan consummation timeline, and which is accommodated by the Commitment Creditor Backstop Agreement, makes it all the more critical to guarantee that sufficient funds are generated by the New Convertible Notes Offering and Equity Rights Offering. Against this backdrop, the Debtors have amply demonstrated an "articulated business justification" for their decision. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).[8]

12.    The Committee suggests that the entire backstop transaction is subject to – and fails to satisfy – the "entire fairness" standard. (Committee Obj. ¶¶ 3, 64). But that is *not* the standard that governs the Commitment Creditors Backstop Agreement. It is striking that the Committee would suggest otherwise, given the Court's decision just days ago in approving the Debtors' settlement with certain claimholders, in which the Court held that creditors who hold no stock in the Debtors "do not have a relationship with the Debtors that falls within the scope of …section 101(31)." (Jan. 28, 2022 Memorandum Decision [ECF No. 4210] at 30). Assessing the Committee's argument that the heightened standard should apply because the creditors "will hold substantial interests in the reorganized Debtors," the Court noted it was "not aware of any authority supporting that proposition and reject[s] it." *Id.* at 31. The Court's holding, which is consistent

---

[8] As the Debtors have noted, the Backstop Payments are also permissible under Bankruptcy Code section 503(b)(1)(A), as administrative expenses for "the actual, necessary costs and expenses of preserving the estate." (Backstop Agreements Motion ¶ 40).

with settled law, mandates that the Debtors' backstop agreement with creditors who are not "insiders" be evaluated under the business judgment standard. *Id.* at 32.

13.    The Objectors assert that the Debtors did not adequately negotiate for alternative financing to the backstop agreement structures. To the contrary, and as addressed in the Backstop Agreements Motion, the Debtors "explor[ed] a number of restructuring proposals over the year and a half that these Chapter 11 Cases have been pending." (Alfonsin Decl. ¶ 9; *see also* Herlihy Decl. ¶ 11; Backstop Agreements Motion ¶¶ 23-24). Based on that investigation, the Debtors concluded that the comprehensive restructuring embodied in the Plan, including the backstop arrangements, "represents the best available alternative for the Debtors' successful emergence from Chapter 11." (Herlihy Decl. ¶ 11; *see also* Alfonsin Decl. ¶ 9). There are simply no other viable transactions that would solve the Debtors' substantial funding needs and satisfy the requirements of both the Bankruptcy Code and Chilean law.

14.    Despite the Objectors' repeated urging that such alternatives exist, no actual or viable binding commitments have materialized in the two plus months since the filing of the Restructuring Support Agreement (or in the four months that preceded it). Indeed, it is not without some irony that the Committee, one of the Plan's harshest critics, not the Ad Hoc Group, touts a belated "proposal" made *by the Ad Hoc Group* on the eve of the disclosure statement hearing last week and described by the Ad Hoc Group on the record at the hearing on January 28, 2022.[9] *See* Hr'g Tr. at 112:9-113:5 (Jan. 28, 2022), ECF 4278. That proposal – embodied in an unsigned commitment letter – is no more actionable today than when it was delivered. It relies on the same

---

[9] The fact that the Ad Hoc Group does not even mention their purported alternate financing – which only purports to provide a portion of what the Debtors require (as it only covers the New Convertible Notes Class C) – at all in their objection should make it clear that there is no other party willing and able to backstop over $5 billion of post-reorg airline equity for up to ten months. Though the Objectors may complain about certain terms of the backstop, it is without question that there is no alternative source for this financing.

convertible notes construct, and suffers from far greater contingencies (including due diligence

outs and the potential for wholly insufficient commitments) and legal infirmities (utter lack of

support from critical stakeholders and inability to accomplish the same New Convertible Notes

Class C issuance) than the Objectors complain about with respect to the transactions underlying

the Backstop Agreements.[10]

15.    Equally important, the Backstop Agreements themselves are the product of

vigorous negotiations stretching over a period of months.  As detailed in the Backstop Agreements

Motion, the Debtors, the Committee, the Parent Ad Hoc Group, and various other parties in interest

began mediation overseen by the Hon. Allan L. Gropper (ret.) beginning on November 1, 2021,

culminating in the signing of the RSA on November 26, 2021.  In the face of a vertical wall of

COVID-19 cases arising out of the emergence of the Omicron variant on essentially the very day

the RSA was signed, the parties then engaged in more than six weeks of additional negotiations

(with milestones being extended in one- to two-day increments over the December holidays into

the New Year) before finalizing the Backstop Agreements on January 12, 2022.  (Backstop

Agreements Motion ¶¶ 26-29).

16.    Both the Debtors and the Parent Ad Hoc Group invested significant time and

resources in that effort.  What is more, and as detailed in Point I.B below, those negotiations

yielded significant concessions by the Backstop Parties with respect to many of the terms now

being challenged by the Objectors.  In the face of this extensive record, the Parent Ad Hoc Group

submits that the Backstop Agreements represent a sound exercise of the Debtors' business

judgment, and should be approved, affording the Debtors the opportunity to solicit and confirm

their proposed Plan.

---

[10] Given their apparent willingness to support the Plan structure when it serves them in this capacity, any future Plan
objections by the Committee to that same structure should be discounted.

**B.**    **The Backstop Agreements are Consistent with Market Standards and Warranted by the Costs and Risks Associated with the Backstop Parties' Commitment**

17.    Reflecting the robust process by which the backstop structure was negotiated and designed, the fees payable under the Backstop Agreements are reasonable and consistent with market standards.

18.    Payments of this type are common in large, complex Chapter 11 cases like these, as a necessary inducement to secure the financial commitments made by backstop parties and compensate them for the substantial resources invested in negotiating such agreements, the opportunity cost created by their commitment and the risks they undertake to support the debtors' restructuring efforts.  (*See* Backstop Agreements Motion ¶¶ 40-41; Herlihy Decl. ¶ 30).  In this case, the costs and risks attendant to the Backstop Parties' commitments are particularly acute, as the duration of the commitment is unusually long, requiring the Backstop Parties to forgo potential returns on other investments for possibly more than ten months. *Compare* BCA Art. I (requiring commitments for at least eight months and potentially up to ten months under certain conditions) *with* Herlihy Decl., Ex. 1  (providing mean and median length of comparable backstops as three months, respectively), *and* Corrected Decl. and Expert Rep. of Elizabeth LaPuma, Exs. A and B (ECF No. 4289-1, Ex. D) (same), *and* Decl. and Expert Rep. of Rodi Blokh, p. 19 (ECF No. 4289-1, Ex. F) (same), *and* Expert Rep. of Joshua S. Scherer, Ducera Partners LLC, App. A: Adjusted PJT Comps Set (ECF No. 4291-2, Ex. B) (same).  In addition, the ongoing COVID-19 pandemic presents a tangible risk of further economic downturns, especially in the airline industry, a risk which may reduce the attractiveness of the investment by the time the commitment must be honored.  Finally, the markets in which the Debtors principally operate are subject to significant political and regulatory uncertainty, a circumstance which could materially undercut the value of the Backstop Parties' investment.  (Backstop Agreements Motion ¶ 41; Herlihy Decl. ¶¶ 30-37).

19.     Notably, many of the risks associated with the Backstop Parties' commitment –
made on January 12, 2022, at the height of the Omicron surge – do not apply to the non-backstop
parties, who are not required to commit until sometime after Plan confirmation and CMF
registration, a date likely many months away.  By the time the non-backstop parties must subscribe
for their allocation of New Convertible Notes Class C only a few weeks prior to a Plan effective
date, much of the uncertainty inherent in the current economic environment is likely to have
resolved.[11]  The backstop payment thus properly compensates the Backstop Parties for the long
term commitment of funds required by the Debtors, in the face of turmoil of the last two COVID-
marred years.

20.     The Objectors assert that the backstop payments are unnecessary because the risks
to the Commitment Creditors are fully mitigated by the conditions precedent in the Commitment
Creditors Backstop Agreement.  (Committee Obj. ¶¶ 19-21; AHG Obj. ¶¶ 46-51). According to
the Objectors, the conditions precedent, if not satisfied, effectively relieve the Commitment
Creditors of any contractual obligation whatsoever.  (AHG Obj. ¶ 48).  By this argument, the
Objectors improperly conflate conditions precedent with termination rights.  The conditions
precedent merely serve to postpone the Closing Date by affording the Debtors additional time to
meet various requirements relating to liquidity and bookings, among other things, if they cannot
meet them by the dates specified in section 7.1 of the BCA.  The BCA does not allow for Backstop
Parties to terminate based on the Debtors' inability to satisfy these conditions unless the conditions
remain unsatisfied as of the Outside Date (which date may be extended under certain
circumstances, *see* BCA at 9), or one of the defined Termination Events occurs in the interim (*see*
BCA § 9.1).  ███████████████████████████████

---

[11] If the current uncertainty is not resolved, such non-backstop parties can refrain from subscribing, thereby triggering
the Debtors' need to call on the backstop commitments.

*All redacted text is Redacted Per Amended Standing Order Regarding Redactions Dated February 2, 2021.



21.    Notably, the conditions precedent were heavily negotiated, with the Debtors achieving significant concessions from the Commitment Creditors who initially proposed that some of the terms now designated as conditions be deemed termination events. (*See* Herlihy Dep. at 140:10-142:3)

. Thus, the parties were keenly focused on the important distinction between these two types of provisions and arrived at a construct that the Debtors believed, and the Commitment Creditors understood, did not simply allow the Backstop Commitment Parties to walk away if a particular condition precedent is unmet by the targeted closing date.

22.    The backstop payments are likewise consistent with market standards. A review of the comparable transactions noted by the Debtors' advisors confirms that the 20% fee payable to the Parent Ad Hoc Group – on account of their commitment to backstop the $3.269 billion new money investment in the New Convertible Notes Class C and $400 million of the ERO Rights Offering – is within the range of backstop payments paid in comparable cases. (Herlihy Decl. ¶¶ 38-39 and Ex. 1). The Objectors focus on "stated" rates, noting that the 20% backstop payment is greater than the comparables highlighted by the Debtors' advisors. (Committee Obj. ¶ 42; *see also* CHC Obj. ¶ 5). But the focus on "stated" rates ignores a more fundamental component of the

*All redacted text is Redacted Per Amended Standing Order Regarding Redactions Dated February 2, 2021.*

analysis: the actual cost to the Debtors' estates relative to plan value.  Thus, when the backstop

payment is more appropriately viewed in the context of the Implied Discount methodology

employed by PJT, the backstop terms are eminently reasonable.  Moreover, the payment here is

being made upon closing in cash rather than discounted equity – which is standard but not possible

here on account of Chilean preemptive rights (*see* Herlihy Dep. at 45:25-46:9), the reasonableness

of the backstop payment is likewise supported by the implied full value comparison. (*See* Herlihy

Dec. Ex. 1, "All in Backstop Fee at Plan Value" column).  A total fee of 23.8% for Convert C

(including 3.8% for the Direct Allocation, listed at the bottom of the Holdback Value column) is

remarkably close to the mean and consistent with those approved in several other complex cases.

And as discussed above, the proposed payments are particularly justified by the lengthy duration

of the commitment and unique risks to be shouldered in this case by the Backstop Parties.[12]  The

Objectors' attempts to cherry pick comparable transactions and arbitrarily eliminate other

transactions with equally high (or higher) backstop payments to try to skew the data in their favor

is both intellectually inconsistent and belied by the Debtors' testimony in support of the Backstop

---

[12] The Committee, in a misguided attempt to portray the consideration payable to Backstop Parties as unreasonable, argues that the Backstop Parties will obtain "control" of the Reorganized Debtors and thus the resulting equity they will own will have embedded a "control premium," a concept borrowed from the world of mergers and acquisitions (i.e., their equity will be worth 30-40% more than others' equity, thereby seeking to inflate the consideration Backstop Parties are receiving pursuant to the Commitment Creditors Backstop Agreement). Committee Obj. ¶¶ ▮ 45.  This attack fares no better than the Committee's others; there is no evidence that the Backstop Parties will enjoy "control" *under applicable Chilean law* or that Commitment Creditors (currently comprised of dozens of signatories across 15 investment managers)  will otherwise remain strictly coordinated in any material fashion post-emergence ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ The fact that the Commitment Creditors, at most, might be similarly motivated in their efforts to consummate the underlying restructuring transactions *today*, says nothing about their intentions or actions post-emergence. *See In re Charter Commn'cs*, 419 B.R. 221, 239 (Bankr. S.D.N.Y. 2009) (holding that despite being similarly situated and perhaps also similarly motivated, a group of ad hoc bondholders was not acting in concert for purposes of acquiring, holding or disposing of securities).  The Committee has not cited any evidence to the contrary.

14

*All redacted text is Redacted Per Amended Standing Order Regarding Redactions Dated February 2, 2021.*

Agreements ████████████████████████████ (Herlihy Decl. ¶¶ 32-39; ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

23.     The Objectors also take issue with calculation of the backstop payment based on the full amount of the backstop commitment instead of on a lesser purportedly "at risk" commitment amount that excludes amounts directly allocated to the Backstop Parties. But this analysis ignores that absent the commitments embodied in the Backstop Agreements, the Commitment Creditors would have *no obligation* to participate in any portion of the New Convertible Notes Class C, putting the Debtors at material risk of failing to obtain the full amount of exit capital needed to consummate the Plan. Moreover, courts routinely hold that backstop payments and holdback constructs like those at issue here are reasonable and appropriate, including with respect to amounts committed under a direct allocation. *See, e.g., In re Noble Corp. PLC*, No. 20-33826 (DRJ) (Bankr. S.D. Tex. Oct. 9, 2020), ECF 542 (approving backstop that contemplated fee for backstopping parties as calculated against full amount of commitment); Hr'g Tr. at 80:9-80:2, *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Nov. 5, 2020), ECF 1032, 2 (in approving backstop agreement providing for a 35% discount to backstop parties, Judge Sontchi noted "it's reasonable that the fees be calculated on the full amount of the commitment. That is absolutely market."); *see also* Herlihy Decl. ¶ 40 (backstop payment is "typically paid on the full size of the commitment provided by backstop parties using equity consideration priced at the same discount to plan value as the rights offering"). The Objectors cite no case to the contrary.

24.     On this issue the Objectors' reliance on *Momentive* is decidedly misplaced. *In re MPM Silicones, LLC,* No. 14-22503 (Bankr. S.D.N.Y.). While Judge Drain there expressed reluctance to approve a backstop payment based on the entire commitment amount, he also noted

that the court did not have evidence concerning the market reasonableness of paying a fee like the

one the debtors proposed.  (Hr'g Tr. at 112:13-17, *Momentive Performance Materials Inc. v. Bank*

*of New York Mellon Tr. Co.*, Adv. Pro. 14-08227 (Bankr. S.D.N.Y. June 19, 2014)).  Because the

backstop parties subsequently reached an agreement with the objectors, the court never reached

the issue on a full record, and ultimately approved the backstop with an even higher so-called "at-

risk" fee – in other words, as a percentage fee based on the total commitment and not just the

unspoken for portion.  *See In re MPM Silicones, LLC,*, No. 14-22503 (Bankr. S.D.N.Y. June 23,

2014), ECF No. 509.[13]  Significantly, the cases relied on by the Objectors both predate the 8th

Circuit's decision in *Peabody.*

　　　25.　　Finally, the remaining protections afforded to the Commitment Creditors under the

Commitment Creditors Backstop Agreement are entirely consistent with market standard and in

that respect, utterly unremarkable:

- *First,* termination fees, payable in circumstances other than the backstop parties' material breach, are consistent with market practice and intended to compensate backstop parties for the long-term lock-up of significant capital, and the failure of the transaction through no fault of the backstop parties.  The termination fees payable under the Commitment Creditors Backstop Agreement here were heavily negotiated and are appropriately tailored both in amount and with respect to the events by which they are triggered, and therefore are eminently reasonable under the circumstances.

- *Second,* the expense reimbursement was part-and-parcel with all other bargained-for rights under the Commitment Creditors Backstop Agreement and cannot be eliminated

---

[13] Beyond that, the duration of the $600 million commitment in *Momentive* was 180 days (and it was consummated in less than 170 days), whereas the Parent Ad Hoc Group has committed approximately $3.669 billion in new money that will remain available for potentially up to ten months – a strikingly long period for such a large investment and far longer than the one in *Momentive*.

The Objectors' reliance on *Pacific Drilling* is equally unavailing.  The Objectors point to the equity financing proposed in that case to argue that the financing construct under the Backstop Agreements is impermissible.  Putting aside that *Pacific Drilling* is an unpublished bench decision, the case is inapposite – for multiple reasons.  For one, that case concerned a far larger discount to plan value than that conferred by the Backstop Agreements – 46.9%, versus approximately 21% here.  Beyond that, the backstop funding in *Pacific Drilling* was committed only for approximately two months, a dramatically shorter period than the potential ten months that the funding must be available here. *See In re Pacific Drilling, S.A.*, No. 17-13193 (MEW) (Bankr. S.D.N.Y. 2018).  As noted above, such a lengthy commitment period creates significant risks for the Backstop Parties, especially in light of the unique and unpredictable economic environment and the complex nuances of the airline industry.

or unilaterally modified without impacting other economic and substantive terms of that agreement. Notably, though, the Parent Ad Hoc Group is not aware of a *single case* where expense reimbursement for the professionals for the backstopping parties was not provided. Nor have the Objectors cited to any such case.

- *Finally*, the Objectors appear to take issue with the indemnification obligations provided in the Backstop Agreements. While much of their focus is on the indemnification obligations set forth in the Backstop Shareholders Backstop Agreement, to the extent the Objectors are arguing that the inclusion of indemnification provided in the Commitment Creditors Backstop Agreement relating to claims relating to the Plan, such a provision is appropriate where the backstop agreement is the foundation for the Chapter 11 plan, and commonplace in backstop agreements of this nature. *See, e.g., In re Valaris plc*, No. 20-34114 (Bankr. S.D. Tex. Dec. 30, 2020), ECF No. 884; *In re Noble Corp. PLC*, No. 20-33826 (Bankr. S.D. Tex. Sept. 4, 2020), ECF No. 263,; *In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. July 28, 2020). ECF No. 520; California Resources Corp.*, Current Report (Form 8-K), Ex. No. 10-4 (July 24, 2020); *cf. In re Grupo Aeroméxico, S.A.B. de C.V.*, No. 20-11563 (Bankr. S.D.N.Y. Dec. 28, 2021), ECF No. 2369.

## II.  THE BACKSTOP AGREEMENTS DO NOT RESULT IN PREFERENTIAL TREATMENT TO CREDITORS ON ACCOUNT OF THEIR CLAIMS

26.   Finally, the Objectors continue to contend that the Backstop Agreements should not be approved because they support a Plan structure that violates the equal treatment requirements of 11 U.S.C. § 1123(a)(4), on the theory that the Parent Ad Hoc Group will receive more favorable treatment than other unsecured creditors by virtue of (i) the allocation of New Convertible Notes Class C comprising the Direct Allocation, plus (ii) the backstop payment. (Committee Obj. ¶¶ 65-70; AHG Obj. ¶¶ 4, 13). But as the Debtors and Parent Ad Hoc Group have previously noted, objections concerning purported unequal treatment of similarly situated creditors certainly do not render the Plan "patently unconfirmable," are properly determined in the context of plan confirmation, and are prematurely raised at this stage. *See Debtors' Omnibus Brief in Further Support of Their Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto,* ECF 4138 (Jan. 24, 2022) ("**Debtors' Disclosure Statement Reply**"), ¶¶ 18-21; *Statement of the Parent Ad*

*Hoc Claimant Group in Support of the Debtors' Motion Seeking Approval of the Disclosure Statement*, ECF 4146 (Jan. 24, 2022) ("**Parent Ad Hoc Group Disclosure Statement Reply**"), ¶¶ 12-13; 11 U.S.C. § 1123 (setting forth requirements for the "Contents of Plan").

27.     In any event, the Objectors' arguments lack merit.  As the Parent Ad Hoc Group explained in connection with the Debtors' motion to approve the Disclosure Statement, courts have uniformly held that consideration afforded to some members of a class of creditors or shareholders in connection with a new investment does not violate section 1123(a)(4) when that consideration is not part of the treatment for their claim.  (*See* Parent Ad Hoc Group Disclosure Statement Reply, ¶ 15).

28.     The Parent Ad Hoc Group and Backstop Shareholders are committing billions of dollars necessary to ensure the Debtors emerge with sufficient capital to fund plan distributions and their operations – in a particularly volatile economic environment.  Building off the certainty provided by the Backstop Agreements, the Debtors and the Backstop Parties have worked hard to forge a path that balances domestic and Chilean law considerations and establishes an achievable framework for LATAM to emerge from bankruptcy.  As is customary, the parties backstopping the Debtors' exit financing process are being afforded certain consideration *solely in exchange* for their financing commitments.  This construct is standard and, in this case, doubly critical given (i) the large amount of capital necessary for the company to emerge from bankruptcy, (ii) the duration of the commitments, (iii) the current global environment, and (iv) the lack of other viable financing alternatives.  The Court appears to agree, as it commented during the recent hearing on the Debtors' motion to approve the Disclosure Statement, in response to argument by counsel for the Ad Hoc Group:

> "I'm not sure that I agree with you that the 5b [C]ommitment [Creditors] are being -- they're not being treated differently.  I don't believe that . . . .  They're not getting that benefit based upon their

claim.  And . . . if that's the point you want to make, I most respectfully disagree with you."

*See* Disclosure Statement Hr'g Tr. at 64:23-25-65:1-3 (Jan. 27, 2022), ECF No. 4279.

29.    Under the proposed Plan, all general unsecured claims against LATAM Parent are receiving the same treatment ***on account of those claims***.  As described in detail in the Plan, unsecured creditors are receiving, collectively, in full satisfaction and discharge of their claims, (i) New Convertible Notes Class A, or their equivalent in New Convertible Notes Class C, with the same underlying conversion ratio, and (ii) an opportunity to elect for their *pro rata* share of the GUC New Convertible Notes Class C Distribution, a new money contribution together with such settlement of claims.  *See* Plan, Ex. A, § 3.2(e)(ii)**.**  Regardless of whether a creditor receives the New Convertible Notes Class A or elects to receive (together with a new money contribution) New Convertible Notes Class C as treatment and settlement for *its claims*, the conversion ratio will be the same.  (See BCA § 1.1, definitions of "New Convertible Notes Class A" and "New Convertible Notes Class C" providing that unsecured creditors of LATAM Parent will, through their receipt of New Convertible Notes, share 12.7237% of Reorganized LATAM Parent Stock, on as converted basis, in settlement of their claims, based on a creditor's pro rata share of all such claims).[14]  The new-money component of the New Convertible Notes Class C, not surprisingly, has a higher conversion ratio.  This structure is directly in line with the requirements of the Bankruptcy Code.

30.    The cases cited by the Objectors are of no help on this motion.  The Objectors quote a snippet of a hearing transcript from *Pacific Drilling* to argue that the backstop construct here creates "an insurmountable 'equal treatment problem.'"  (Committee Obj. ¶ 69 (quoting Disclosure

---

[14] This is true regardless of the class of New Convertible Notes to be received, and, in the case of the New Convertible Notes Class C, regardless of whether the notes acquired are part of the Direct Allocation or the GUC New Convertible Notes Class C Distribution.  *See also* Plan, Ex. A, Section 3.2(e)(ii), Class 5b treatment ("For the avoidance of doubt, the treatment of such Unused Allowed Claims shall be on the same terms and Conversion Ratio applicable to non-Participating Holders of General Unsecured Claims.").

Statement Hr'g Tr. at 26, *In re Pacific Drilling, S.A.*, No. 17-13193 (Bankr. S.D.N.Y. Sept. 18, 2018) ("**Pacific Drilling Hr'g Tr.**")).  They have, however, taken Judge Wiles' comment out of context.  Reading the quoted portion together with the very next sentence makes clear that the private placement opportunity afforded to certain backstop parties in that case would create an equal treatment problem were it "in consideration of current holdings and the agreement to equitize them," but *not* if the opportunity was "a separate, standalone, reasonable financing term."  (*Pacific Drilling Hr'g* Tr. at 26:19-27:2).  That is precisely what the Backstop Agreements represent.  The Objectors also point to *Momentive*, but the cited portion of the transcript related to the court's concerns about the size of the backstop payment on the particular facts of that case (discussed in ¶ 24 above) and not a purported section 1123(a)(4) violation.[15]

31.     In short, nothing raised by the Objectors poses any obstacle to approval of the Backstop Agreements.  To the extent there is any merit to the Objectors' legal arguments—and as set forth above, there is none—the Court may address those issues at the Confirmation Hearing.

---

[15] The Objectors likewise further suggest that the backstop payments constitute improper "vote-buying" in violation of the good faith requirements of Bankruptcy Code 1129(a)(3).  (*E.g.*, Committee Obj. ¶¶ 2, 41).  This is an issue to be addressed at plan confirmation, not at this juncture, nor can the Objectors invent a new standard for backstop approvals based on this theory.  *See* Disclosure Statement Hr'g Tr. at 211; 4-15, *In re SunEdison, Inc.*, No. 16-10992 (Bankr. S.D.N.Y May 19, 2017) [ECF 3193]  (deferring vote-buying objections when raised in connection with disclosure statement because "these are confirmation issues … [that] may be rendered moot by subsequent modifications to the plan, the agreement, or other events.").  As will be established at confirmation, these types of allegations are not grounded in any sort of evidence or reality. The record clearly reflects that the Debtors' Plan, including the backstop construct, was developed through arms-length negotiations and borne out of a hard-fought mediation overseen by Hon. Allan L. Gropper (ret.); the Objectors do not offer any evidence of a lack of good faith affecting that process. (*See* ¶ 15 above).   Despite the Objectors continued reliance on Judge Wiles' comments in *Pacific Drilling* (Committee Obj. ¶ 65), this case is nothing like *Pacific Drilling*: the backstop payments here are critical to the Debtors' plan of reorganization, provide the Debtors with substantial benefits and are otherwise a key component of an integrated global settlement of the complicated intersection between U.S. Bankruptcy and Chilean laws.

## **CONCLUSION**

For the reasons set forth here and in the responses filed by the Debtors, the Parent

Ad Hoc Group respectfully requests that the Court overrule the objections and approve the

Backstop Agreements.

Dated: February 7, 2022
       New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

*/s/ Rachael L. Ringer*
Kenneth H. Eckstein
Rachael L. Ringer
David E. Blabey Jr.
Douglas Buckley
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile:  (212) 715-8000
Email: keckstein@kramerlevin.com
        rringer@kramerlevin.com
        dblabey@kramerlevin.com
        dbuckley@kramerlevin.com

*Counsel to the Parent Ad Hoc Claimant Group*

## **Certificate of Service**

The undersigned hereby certifies that on this 7th day of February 2022, a true and correct copy of the foregoing Statement was served via the Court's electronic case filing system (CM/ECF) to all parties registered to receive such notice in the above-caption case.

/s/ *Douglas Buckley*
Douglas Buckley