UNITED STATES BANKRUPTCY COURT   NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

In re:           : Case No. 20-11254 (JLG)
               : Chapter 11
LATAM Airlines Group S.A., et al.,  :
               :
          Debtors.[1] : (Jointly Administered)

------------------------------------------------------- x

**MEMORANDUM DECISION GRANTING THE DEBTORS' MOTION FOR ENTRY OF
AN ORDER AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AND
PERFORMANCE UNDER BACKSTOP AGREEMENTS AND PAYMENT OF
RELATED FEES AND EXPENSES AND INCURRENCE
OF CERTAIN INDEMNIFICATION OBLIGATIONS**

**A P P E A R A N C E S :**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for the Debtors*
One Liberty Plaza
New York, New York 10006
By: Richard J. Cooper, Esq.
   Lisa M. Schweitzer, Esq.
   Luke A. Barefoot, Esq.
   Thomas S. Kessler, Esq.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

DECHERT LLP
*Counsel to the Official Committee*
*of Unsecured Creditors*
1095 Avenue of the Americas
New York, NY 10036
By:    Allan S. Brilliant, Esq.
       David A. Kotler, Esq.
       Stephen M. Wolpert, Esq.


PAUL HASTINGS LLP
*Counsel to Banco del Estado de Chile,*
*in its capacity as indenture trustee under the*
*Chilean Local Bonds Series A through D and*
*Series E issued by LATAM Airlines Group S.A.*
200 Park Avenue
New York, New York 10166
By:    Pedro A. Jimenez, Esq.
       Andrew Tenzer, Esq.
       Nicholas Bassett, Esq.
       Shlomo Maza, Esq.


ARNOLD & PORTER KAYE SCHOLER LLP
*Counsel to the Ad Hoc Group of Unsecured Claimants*
250 West 55th Street
New York, New York 10019
By:    Michael D. Messersmith, Esq.
       Sarah Gryll, Esq.
       Jeffrey A. Fuisz, Esq.
       Robert T. Franciscovich, Esq.


HUNTON ANDREWS KURTH LLP
*Counsel to Columbus Hill Capital Management, L.P.*
200 Park Avenue
New York, NY 10166
By:    Paul N. Silverstein, Esq.
       Brian Clarke, Esq.
       Philip M. Guffy, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Counsel for Costa Verde Aeronáutica S.A.*
51 West 52nd Street
New York, New York 10019
<u>By:</u>    Richard G. Mason, Esq.
        John R. Sobolewski, Esq.
        Angela K. Herring, Esq.


DAVIS POLK & WARDWELL LLP
*Counsel for Delta Air Lines, Inc.*
450 Lexington Avenue
New York, New York 10017
<u>By:</u>    Marshall S. Huebner, Esq.
        Lara Samet Buchwald, Esq.
        Adam L. Shpeen, Esq.


ALSTON & BIRD LLP
*Attorneys for Qatar Airways Investments (UK) Ltd.*
90 Park Avenue
New York, NY 10016
<u>By:</u>    Gerard S. Catalanello, Esq.
        James J. Vincequerra, Esq.
        Geoffrey C. Williams, Esq.


KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel to the Parent Ad Hoc Claimant Group*
1177 Avenue of the Americas
New York, New York 10036
<u>By:</u>    Kenneth H. Eckstein, Esq.
        Rachael L. Ringer, Esq.
        David E. Blabey Jr., Esq.
        Douglas Buckley, Esq.

**Introduction**[2]

LATAM Airlines Group S.A. ("LATAM Parent") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") together with certain non-debtor affiliates ("LATAM") is Latin America's leading airline group. LATAM is the largest passenger airline group in South America and one of the largest airlines in the world in terms of network connections. LATAM Parent is a publicly traded company incorporated in Chile. After eighteen months of effort by the Debtors and their advisors to stabilize their business and right-size their operations, and in the wake of a mediation conducted by the Honorable Allan L. Gropper (Ret.) the Debtors entered into a Restructuring Support Agreement (the "RSA")[3] with (i) an ad hoc group of LATAM Parent creditors (the "Parent GUC Ad Hoc Group," and as signatories along with other creditors to the RSA, the "Commitment Creditors") who together controls more than 70% in amount of the general unsecured claims asserted against LATAM Parent, and (ii) a group of shareholders (the "RSA Shareholders") who together control more than 51% of LATAM Parent's common stock. The restructuring contemplated under the RSA is reflected in the Debtors' Plan and provides that LATAM will continue to operate as an integrated group (the "Reorganized Debtors") under LATAM Parent or any successor thereto, on or after the Effective Date (the "Reorganized LATAM Parent"). It calls for the Debtors to raise more than $8 billion in

---

[2]    Capitalized terms used but otherwise not defined shall have the meanings ascribed herein or, as applicable, in the Restructuring Support Agreement, the Plan, Disclosure Statement and Backstop Agreements (all as defined below).

[3]    On November 26, 2021, the Debtors filed the Disclosure Statement with Respect to the Joint Plan of Reorganization of LATAM Airlines Group S.A., et al., Under Chapter 11 of the Bankruptcy Code [ECF No. 3667] (the "Disclosure Statement"). Attached to the Disclosure Statement as Exhibit E was the first draft of the Restructuring Support Agreement (the "Original Restructuring Support Agreement" together with amendments and exhibits thereto, and as may be modified amended or supplemented from time to time, the "Restructuring Support Agreement"). On January 25, 2022, the Debtors filed a revised Restructuring Agreement and the First Amendment to the Restructuring Support Agreement. *See* Notice of Filing of (I) Revised Restructuring Support Agreement and (II) First Amendment to Restructuring Support Agreement [ECF No. 4165].

new money to pay in full in cash under the Plan allowed administrative and priority claims, the DIP Facility, LATAM 2024 Bond Claims, LATAM 2026 Bond Claims, and general unsecured claims against all Debtors other than LATAM Parent, Piquero Leasing Limited, and LATAM Finance, and to finance the Reorganized Debtors' ongoing operations and capital needs following their emergence from the Chapter 11 Cases.

The Debtors intend to raise most of those funds through certain New Capital Notes Offerings and ERO Rights Offerings in the Chilean capital markets and in accordance with Chilean law. That means LATAM Parent must obtain the consent of a majority of its shareholders before it can launch the rights and notes offerings, and that those offerings will be subject to the preemptive rights of its shareholders to subscribe for and purchase their pro rata shares of the Plan Securities. Key aspects of the RSA are (i) the agreements of the RSA Shareholders to consent to the Plan Securities offerings, and (ii) the agreements of the Commitment Creditors and a subset of the RSA Shareholders to backstop a total of $5.4 billion of those offerings. The Commitment Creditors will act as a backstop to the ERO Rights Offering and New Convertible Notes Class C Offering and, as necessary, will purchase up to $400 million of the Unsubscribed ERO New Common Stock, and subscribe for and purchase up to $3.269 billion of the Unsubscribed New Convertible Notes Class C. As consideration for those commitments, the Debtors will pay the Commitment Creditors a cash payment (the "Backstop Payment") equal to 20% of the $3.669 billion backstop commitment, or approximately $734 million, and will hold back and offer 50% of the New Convertible Notes Class C Offering to the Commitment Creditors, for their subscription and purchase under the Plan. A subset of the RSA Shareholders consisting of Costa Verde Aeronáutica S.A. and Inversiones Costa Verde Ltda y Cia. En Comandita por Acciones (together, "Costa Verde"), Delta Air Lines, Inc. ("Delta"), and

Qatar Airways Investment (UK) Ltd. ("Qatar", together with Costa Verde and Delta, the "Backstop Shareholders" and with the Commitment Creditors, the "Backstop Parties") will backstop up to $400 million of the Unsubscribed ERO New Common Stock, and up to $1.373 billion of the New Convertible Notes Class B Offering, subject to the "Backstop Shareholders Cap."[4] They will not be paid a fee for that commitment, but, like the Commitment Creditors under their backstop agreement, they are entitled to Expense Reimbursement and Indemnification Benefits from the Debtors. Those agreements are reflected in the "Commitment Creditors Backstop Agreement" and the "Backstop Shareholders Backstop Agreement" (collectively, the "Backstop Agreements").[5]

The matter before the Court is the Debtors' motion (the "Motion")[6] for entry of an order pursuant to sections 105(a), 363(b), 503(b)(1), and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules of the Southern District of New York (the "Local Bankruptcy Rules"), (i) authorizing and approving the Debtors' (a) entry into and performance under the Commitment Creditors Backstop Agreement, and the Backstop Shareholders Backstop Agreement, and (b) payment of the Backstop Payment and Expense Reimbursement and incurrence of the Backstop Indemnification Obligations; and (ii)

---

[4]    The term "Backstop Shareholders Cap" means the total number of shares of Reorganized LATAM Parent Stock issued to Backstop Shareholders pursuant to this Plan (inclusive of the Backstop Shareholders' equity ownership in Reorganized LATAM Parent on an as-converted basis with respect to the New Convertible Notes Class B and exclusive of any Existing Equity Interests) which shall be no greater than 27% of the total amount of such Reorganized LATAM Parent Stock (exclusive of any Existing Equity Interests) the apportionment of which among the Backstop Shareholders shall be determined by the Backstop Shareholders in their sole discretion. *See* Initial RSA, Ex. E, Equity Rights Offering of New Common Stock at 2–3 (definition of "Backstop Shareholders Cap").

[5]    Copies of the Commitment Creditors Backstop Agreement and the Backstop Shareholders Backstop Agreement are annexed as Exhibits A and B, respectively, to the Motion.

[6]    *See* Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4056].

granting related relief. In short, in support of the Motion, the Debtors assert that their entry into and performance under the Backstop Agreements is an exercise of their sound business judgment and is in their best interests, as well as the best interests of their estates, and all parties in interest.

The Official Committee of Unsecured Creditors (the "Committee"),[7] Banco del Estado de Chile ("BancoEstado"),[8] an Ad Hoc Group of Unsecured Claimants (the "A&P Ad Hoc Group")[9] and Columbus Hill Capital Management, L.P. ("Columbus Hill")[10] (together, the "Objectors") filed objections to the Motion (the "Objections"). They contend that the Court should not defer to the Debtors' business judgment and should deny the Motion because the Backstop Payment and other fees and expenses that the Debtor will incur under the agreements are unreasonably high and significantly above market. The Debtors filed a Reply to the Objections.[11] Costa Verde,[12]

---

[7]    *See* Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion for Entry of An Order (I) Authorizing and Approving the Debtors' (A) Entry Into And Performance Under Backstop Agreements And (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, And (II) Granting Related Relief [ECF No. 4289] (the "Committee Obj.").

[8]    *See* Objection of Banco del Estado de Chile, in Its Capacity as Indenture Trustee Under the Chilean Local Bonds Series A Through D and Series E, to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4293] (the "BancoEstado Obj.").

[9]    *See* Objection of the Ad Hoc Group of Unsecured Claimants to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4291] (the "A&P Ad Hoc Group Obj.").

[10]    *See* Columbus Hill Capital Management's Objection to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4184].

[11]    *See* Debtors' Omnibus Brief in Further Support of Their Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4311] (the "Reply").

[12]    *See* Statement of Costa Verde Aeronautica S.A. in Support of Debtors Motion for Entry of an Order (I) Authorizing and Approving the Debtors (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4309].

Qatar,[13] Delta[14] and the Parent Ad Hoc Claimant Group[15] filed statements in support of the

Motion that urge the Court to grant the Motion, approve the Backstop Agreements and authorize

the Debtors to make the payments and incur the liabilities called for under the agreements.

The Court conducted an evidentiary hearing on the Motion. As discussed below, the

Court finds that the Backstop Parties are providing necessary funding to the Debtors on terms

that are fair and reasonable in the particular circumstances of these cases. The authorization of

the Debtors to enter into and perform under the Backstop Agreements is integral to the Debtors'

pursuit of the Plan. For the reasons set forth below, the Court overrules the Objections and grants

the Motion.

### Jurisdiction

The Court has jurisdiction to consider this contested matter pursuant to 28 U.S.C. §§ 157

and 1334 and the Amended Standing Order of Reference, dated January 31, 2012 (Preska, C.J.).

This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

On May 26, 2020 (the "Initial Petition Date"), certain of the Debtors (the "Initial

Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Chapter

11 Cases"). On July 7 and 9, 2020 (the "Subsequent Petition Date" and, together with the Initial

---

[13]   *See* Statement of Qatar Airways Investments (UK) Ltd. (I) in Support of the Debtors' Motion for Entry of an Order (1) Authorizing and Approving the Debtors (A) Entry into and Performance under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Response to the Limited Objections Raised to the Backstop Shareholder Backstop Agreement [ECF No. 4310].

[14]   *See* Statement of Delta Air Lines, Inc. in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors (A) Entry into and Performance under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4308].

[15]   *See* Statement of the Parent Ad Hoc Claimant Group in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4312] (the "Parent GUC Ad Hoc Group Statement").

Petition Date, as applicable to each Debtor, the "Petition Date"), additional LATAM affiliates (the "Subsequent Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Subsequent Chapter 11 Cases" and together with the Initial Chapter 11 Cases, the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only. On June 5, 2020, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Committee and on May 26, 2021, the U.S. Trustee amended the appointment of the Committee.[16] No trustee or examiner has been appointed in any of these Chapter 11 Cases.

On May 27, 2020, the Grand Court of the Cayman Islands granted the applications of certain of the Debtors for the appointment of provisional liquidators pursuant to section 104(3) of the Companies Law (2020 Revision). On June 4, 2020, the 2nd Civil Court of Santiago, Chile issued an order recognizing the Chapter 11 Cases with respect to LATAM Parent., Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A. and Technical Training LATAM S.A. On June 12, 2020, the Superintendence of Companies of Colombia granted recognition to the Chapter 11 Cases.

The Mediation Process

On June 16, 2021, the Committee filed two motions seeking derivative standing to assert certain purported avoidance claims, principally under section 548 of the Bankruptcy Code, held by the Debtors against (i) Qatar and certain of its affiliates and (ii) Delta and certain of its affiliates. *See Motion of the Official Committee of Unsecured Creditors for (I)*

---

[16]    The U.S. Trustee has not solicited additional members for the Committee on the basis of the Subsequent Chapter 11 Cases.

Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of

Action On Behalf of the Debtors' Estates Against Qatar Airways Q.C.S.C. and Its Affiliates and

(II) Non-Exclusive Settlement Authority Regarding Such Claims [ECF No. 2532] (the "Qatar

Standing Motion"); Motion of the Official Committee of Unsecured Creditors for (I) Leave,

Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action On

Behalf of the Debtors' Estates Against Delta Air Lines, Inc. and Its Affiliates and (II) Non-

Exclusive Settlement Authority Regarding Such Claims [ECF No. 2531] (the "Delta Standing

Motion" and, together with the Qatar Standing Motion, the "Standing Motions").

Upon the Court's suggestion that a mediator might facilitate resolution of the issues

raised with respect to the Standing Motions, including shareholder-related issues in connection

with the plan process. After negotiating a form of mediation order with various stakeholders and

parties in interest, on August 17, 2021, the Debtors filed a proposed order appointing the

Honorable Allan L. Gropper (Ret.) (the "Mediator" or "Judge Gropper") as mediator and

establishing procedures for a mediation regarding the Standing Motions. Notice of Presentment

of Proposed Order Appointing Mediator and Establishing Procedures for Mediation [ECF No.

2962].

On August 31, 2021, the Court issued an order directing certain parties to conduct a

mediation regarding the Standing Motions before the Mediator. *See* Order Appointing Hon.

Allan L. Gropper (Ret.) as Mediator [ECF No. 3060] (the "Mediation Order"). The Mediation

Order also contemplated that certain parties may seek to mediate "other shareholder matters that

were raised at the July 30, 2021 hearing, if and when the Designated Parties agree that such

issues are ripe for mediation or as directed by the Court; and (c) such other matters as the

Designated Parties may agree upon or the Court may direct." *Id.* at ¶ 1.[17] The mediation on the Standing Motions was conducted between September and October 2021. On October 15, 2021, the Mediator filed a report informing the Bankruptcy Court that the mediation on the Standing Motions was not successful. *See* Mediator's Final Report [ECF No. 3371].

The Debtors sought and received numerous extensions of the periods during which the Debtors have the exclusive right to file a plan and the periods during which the Debtors have the exclusive right to solicit acceptance thereof (together, the "Exclusivity Periods"). On October 14, 2021, the Debtors sought to further extend the Exclusivity Periods. *See* Fifth Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement [ECF No. 3363] (the "Fifth Exclusivity Motion"). Various parties in interest filed statements in support of the exclusivity period extensions. *See* Statement of Delta Air Lines, Inc. with Respect to the Debtors' Fifth Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof [ECF No. 3411]; Statement of Costa Verde Aeronautica S.A. and Lozuy S.A. Regarding Debtors Fifth Motion for Entry of an Order Extending the Debtors Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Certain Responses Thereto [ECF No. 3413]; *See* Statement of Qatar Airways Investment (UK) Ltd. Concerning Debtors' Fifth Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof [ECF Nos. 3414]. Although the Committee and the Parent GUC Ad Hoc Group did not oppose the requested exclusivity extension, they filed responses expressing concerns related to a potential plan of reorganization. In particular, the Parent GUC Ad Hoc

---

[17]    As defined in the Mediation Order, the Designated Parties consist of: (a) the Debtors; (b) the Committee; and some or all of the following parties as applicable to the relevant Mediation Matters: (c) Delta; (d) Qatar; (e) the Parent GUC Ad Hoc Group; (f) the Moelis Ad Hoc Creditor Group represented by White & Case LLP; and (g) Costa Verde. *See* Mediation Order ¶ 2.

Group requested that the Court condition a further extension of the Exclusivity Periods on further
mediation with the Mediator regarding potential plan, exit and shareholder related issues. *See
Parent Ad Hoc Claimant Group's Limited Objection to Debtors' Fifth Motion for Entry of an
Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit
Acceptances Thereof* [ECF No. 3394]. On October 25, 2021, the Debtors filed a reply in further
support of their request to further extend the Exclusivity Periods, indicating their willingness to
engage in further mediation. *See Debtors' Reply in Further Support of Debtors' Fifth Exclusivity
Extension Motion* [ECF No. 3419]. The Debtors also began discussions with various parties on
the form and structure of such mediation. At the October 28, 2021 hearing, the Debtors
announced that the Debtors and certain interested parties, including the Committee, the Parent
GUC Ad Hoc Group, Delta, Qatar, Costa Verde and BancoEstado, had reached an agreement on
a construct to mediate certain shareholder and Chilean law issues and that the Fifth Exclusivity
Motion was therefore proceeding on an uncontested basis. The Court granted the Debtors'
requested extension of the Exclusivity Periods, which extended the period of time to file a plan
of reorganization to November 26, 2021, and the period of time to solicit acceptances to that plan
to January 26, 2022. *See Order Extending the Debtors' Exclusive Periods in Which to File a
Chapter 11 Plan and Solicit Acceptance Thereof* [ECF No. 3485].[18]

Pursuant to the Mediation Order and as discussed at the October 28, 2021 hearing before
the Court, the Designated Parties, together with Lozuy S.A. and BancoEstado (the
"Mediation Parties") agreed to mediate certain shareholder issues, Chilean law issues, and other

---

[18]    The Court has since extended the Subsequent Debtors' exclusivity to file a Plan and solicitation period to
January 7, 2022 and March 7, 2022, respectively. *See* Order Granting Motion to Extend/Limit Exclusivity Period for
Filing a Chapter 11 Plan and Disclosure Statement and Denying Motion to Terminate the Debtors' Exclusive Periods
[ECF No. 4355].

issues related thereto (the "Mediation"). The Debtors also notified the Mediator that Columbus

Hill, the Ad Hoc Committee of Shareholders and a syndicate of lenders wished to participate in

the Mediation. The Debtors filed a notice of mediation regarding the subjects identified in

paragraph 1(b) of the Mediation Order. *See* Notice of Mediation With Respect to Additional

Mediation Matters [ECF No. 3457]. This notice further indicated that the Mediator had the

discretion to invite any additional parties that were not otherwise Designated Parties to

participate. *See id*. The Mediation Parties commenced the Mediation on November 1, 2021

before the Mediator. The Mediation spanned several weeks and included numerous in-person

meetings in New York among key stakeholders' advisors and principals from around the globe.

The RSA and Plan

On November 26, 2021, the Debtors entered into the RSA with the Commitment

Creditors and the RSA Shareholders. Together, the Commitment Creditors hold approximately

70.74% of the General Unsecured Claims asserted against LATAM Parent. The RSA

Shareholders are comprised of: Andes Aerea SpA, Inversiones Pia SpA and Comercial Las

Vertientes, Costa Verde, Delta, and Qatar. *See* RSA at 1; *See also* Plan § 5.10. Together, they

control more than 51% of LATAM Parent's common stock. On November 26, 2021, the Debtors

filed their Joint Plan of Reorganization of LATAM Airlines Group, S.A., et al, Under Chapter 11

of the Bankruptcy Code [ECF No. 3666] (as amended or supplemented, the "Plan") and the

related disclosure statement [ECF No. 3667] (as amended or supplemented, the "Disclosure

Statement").[19] Thereafter, the parties engaged in more than six weeks of additional negotiations

---

[19]    The Debtors filed a revised version of the Plan and Disclosure Statement on December 17, 2021. *See* ECF No.
3837. For administrative reasons, the revised documents were separately re-filed on December 20, 2021. *See* ECF
Nos. 3844, 3845. The Debtors filed the Fourth Revised Joint Plan and Fourth Revised Disclosure Statement,
respectively, on February 28, 2022. *See* ECF Nos. 4449, 4452. References to the "Plan" and "Disclosure Statement"
will be to those versions of the documents.

before finalizing the Backstop Agreements on January 12, 2022. *See* Parent GUC Ad Hoc Group Statement ¶ 15.

The Plan calls for a multi-billion-dollar capital infusion in the form of exit financing,[20] and through a combination of transactions (the "Restructuring Transactions"), including rights offerings and convertible notes offerings, which the Debtors will conduct in the Chilean capital markets and in accordance with applicable Chilean law. Under Chilean law, a Chilean company can issue new shares of stock only with shareholder approval, and subject to the preemptive rights of eligible shareholders to subscribe for and purchase their pro rata shares of any newly issued equity and convertible debt. The Debtors assert that their proposed equity rights offering and convertible notes offerings will comply with Chilean law because the Plan contemplates that in all cases, the offering and allocation of new shares or new convertible notes will include a preemptive rights offering to Eligible Equity Holders with only the unsubscribed shares after the preemptive rights offering, if any, being distributed, offered or sold to other parties. Moreover, the Plan calls for LATAM Parent to obtain the requisite shareholder approvals for such capital raises from its shareholders at a shareholders' meeting prior to the Effective Date. *See* Plan §§ 6.1, 6.2, 10.2. As noted, the RSA Shareholders collectively hold approximately 51% of the outstanding equity of LATAM Parent. *See* RSA, Schedule II – Commitment Parties, Eblen Group, Participating Claims and Equity Interests. Pursuant to the RSA, they have agreed to vote in favor of approving all capital increases, stock issuances and convertible debt issuances and/or bylaw amendments as may be contemplated as part of the Restructuring Transactions, including the issuance of all Plan Securities. *Id.* § 4.03.

---

[20]    The Plan contemplates the inclusion of (i) $2.25 billion of new Exit Notes/Loan, (ii) a $500 million revolving credit facility, which shall be undrawn at emergence and (iii) the refinancing or amendment and extension of the Debtors' existing revolving credit facility, and (iv) the refinancing or amendment and extension of the Revised Spare Engine Facility. *See* Plan § 5.8; *See also id.* § 1.1 (defining terms and amounts).

The Plan construct contemplates a rights offering (the "ERO Rights Offering") in an amount of $800 million of new common stock of Reorganized LATAM Parent (the "ERO New Common Stock"). *See* RSA at 3. In exchange for, among other things, an aggregate 20% Backstop Payment, the Commitment Creditors will provide a backstop commitment to acquire up to $400 million in ERO New Common Stock that is not purchased by the Eligible Equity Holders to the extent they exercise their preemptive rights under the ERO Rights Offering (the "Unsubscribed ERO New Common Stock"). *See* RSA, Ex. E, Equity Rights Offering of New Common Stock. The Backstop Shareholders will backstop the remaining $400 million of the offering, without a fee, but subject to the Backstop Shareholders Cap. *Id.* Thus, the ERO Rights Offering will include: (i) Eligible Equity Holders (other than the Backstop Shareholders) to the extent they are exercising their preemptive rights under the ERO Rights Offering, (ii) the Backstop Shareholders, and (iii) the Commitment Creditors, as backstop providers. *See id.* The cash proceeds from the rights offering will be used as necessary under the Plan and otherwise for working capital purposes. *See id.*

The Plan construct also calls for Reorganized LATAM Parent to issue three series of convertible notes (the "New Convertible Notes Offerings") consisting of New Convertible Notes Class A, B and C (collectively, the "New Convertible Notes" and, together with the ERO New Common Stock, the "Plan Securities"). *See* RSA at 2–5; *see also* RSA at Exs. B–D. In each case, the offering is subject to the rights of Eligible Equity Holders to exercise their preemptive rights under Chilean law to purchase the New Convertible Notes. Thus, the offering of each class of the New Convertible Notes will include a preemptive rights offering to Eligible Equity Holders. *See id.* at Exs. B–D.

The aggregate principal amount of the New Convertible Class B Notes (the "Class B Notes") is approximately $1.372 billion. *See* RSA at 2; *see also id.,* Ex. A, Offering of New Convertible Notes Class B Due December 31, 2121 at 1. The Backstop Shareholders will agree to exercise all their preemptive rights to subscribe for and purchase the Class B Notes, and backstop (the "New Convertible Notes Class B Backstop Commitment") the remainder of the Class B Notes not subscribed for and purchased by the Eligible Equity Holders in the New Convertible Notes Class B Preemptive Rights Offering, subject to the Backstop Shareholders Cap. *Id*. The Backstop Shareholders will not be paid a fee on account of the New Convertible Notes Class B Backstop Commitment. *See id.* at 2. The offering of Class B Notes will include (i) a preemptive rights offering to Eligible Equity Holders, and (ii) the allocation on the Effective Date of Class B Notes not subscribed for and purchased by Eligible Equity Holders (the "New Convertible Notes Class B Subsequent Notes Allocation") to the New Convertible Notes Class B Backstop Parties. *Id.* Any cash proceeds generated by the New Convertible Notes Class B Preemptive Rights Offering and the New Convertible Notes Class B Subsequent Notes Allocation will be used by LATAM Parent for payments as necessary under the Plan and otherwise for working capital purposes. *Id*.

The New Convertible Notes Class A and Class C Notes will be distributed/offered for purchase under the Plan. The aggregate principal amount of the New Convertible Notes Class A (the "Class A Notes") is approximately $1.467 billion. Those notes are not backstopped. *See* RSA, Ex. B, Offering of New Convertible Notes Class A Due December 31, 2121 at 1–2. The aggregate principal amount of the New Convertible Notes Class C (the "Class C Notes") is approximately, $6.816 billion–consisting of allowed claims and new money. *See id.*, Ex. D,

Offering of New Convertible Notes Class C Due December 31, 2121 at 1–2. Those notes are

backstopped by the Commitment Creditors. *Id*.

The Plan classifies Holders of Claims and Equity Interests in eleven classes. *See* Plan §

2.2. Class 5 of the Plan consists of General Unsecured Claims against LATAM Parent. *Id*. This

class is impaired and is entitled to vote to accept or reject the Plan. *Id*. The Commitment

Creditors are among the Holders of General Unsecured Claims holding Allowed Class 5 Claims.

The Plan calls for each Holder of Allowed General Unsecured Claims against LATAM Parent to

receive in full satisfaction, settlement, discharge and release of its Allowed Class 5 Claim, a

distribution pursuant to the Plan's Class 5a Treatment, unless such Holder opts into Class 5b

Treatment. *See id.* § 3.2(e)(ii). The Plan contemplates that in accordance with Chilean law, the

Class A Notes and Class C Notes will be offered to Eligible Equity Holders during the 30-day

New Convertible Notes Preemptive Rights Offering Period. *Id*. § 6.2(b); *See also id.* § 1.1

(defining terms). It provides that to the extent not subscribed for and purchased by Eligible

Equity Holders during such preemptive rights offering period, (i) the Class A Notes will be

distributed to the Holders of Allowed Class 5 Claims who do not opt into Class 5b Treatment;

(ii) and subject to allocation of the Direct Allocation Amount to the Commitment Creditors, the

Class C Notes will be offered for subscription to, and purchase by, Holders of Allowed Class

who opt into Class 5b Treatment in accordance with the terms of the Plan. *See id* § 6.2(b).[21]

---

[21]    The Backstop Shareholders will waive their preemptive rights to Class A and C Notes. *See* RSA, Ex. B,
Offering of New Convertible Notes Class A Due December 31, 2121 at 3 ("The Backstop Shareholders
shall waive their preemptive rights with respect to such offering, and the related New Convertible Notes Class A
shall be retained by the Issuer for allocation in the New Convertible Notes Class A Subsequent Notes Allocation. . .
."); RSA, Ex. D, Offering of New Convertible Notes Class C Due December 31, 2121 at 2. ("The offering and
allocation of New Convertible Notes Class C will include (i) a preemptive rights offering (the "New Convertible
Notes Class C Preemptive Rights Offering") to Eligible Equity Holders, provided, however, that the Backstop
Shareholders will waive their preemptive rights with respect to such offering, . . .").

Class 5a Treatment calls for Holders of Allowed Class 5 Claims to receive their pro rata shares of the issuance of the $1.467 billion of the Class A Notes in full satisfaction, settlement, discharge and release of their Allowed Class 5 claims. *See* Plan § 3.2(e). The Class A Notes will convert into equity at a conversion rate of 0.19333x. *See* RSA, Ex. B, Offering of New Convertible Notes Class A Due December 31, 2121 at 3. Class 5b Treatment provides for Holders of Allowed Class 5 Claims (the "Class 5 Opt In Creditors") to receive Class C Notes in satisfaction of their claims, conditioned on such Holders subscribing to and purchasing $0.921692 of new money Class C Notes for each $1 of Allowed General Unsecured Claims receiving Class 5b Treatment. *See id*., Ex. D, Offering of New Convertible Notes Class C Due December 31, 2121 at 4; Plan § 5.10. The Class C Notes, inclusive of new money ($3.269 billion), are capped at $6.816 billion. *See id*., Ex. D, Offering of New Convertible Notes Class C Due December 31, 2121 at 1; s*ee also* RSA at 2; Plan §§ 5.10, 6.2. The Class C Notes would convert into equity at a conversion ratio of 0.705506x, inclusive of the new money investment obligation. *See* RSA, Ex. D, Offering of New Convertible Notes Class C Due December 31, 2121 at 4. To the extent that Class C Notes are oversubscribed, the Class 5 Opt In Creditors will receive Class A Notes in full satisfaction, settlement, discharge and release of their claims. *See* Plan § 6.2(c).

The distribution of Class C Notes under the Plan is subject to the Debtors' obligation under the Commitment Creditors Backstop Agreement to hold back 50% of the Class C Notes (the "Direct Allocation Amount") and offer them for subscription and purchase by the Commitment Creditors. *See* Plan § 6.2; *see also id.* § 1.1 (definition of "Direct Allocation Amount"). The Commitment Creditors shall subscribe to the Direct Allocation Amount with new money (as with the other Class C Notes) and an amount of Allowed Claims equal to 50% of the

Allowed Claims held by the Commitment Creditors. *See id* § 3.2(e). The new money

requirement totals approximately $1.635 billion. Under the Class 5b Treatment, the Class C

Notes available (if any) after the conclusion of the New Convertible Notes Preemptive Rights

Offering Period and the distribution of the Direct Allocation Amount (i.e. the "GUC New

Convertible Notes Class C Distribution") will be allocated as follows:

> The Class 5 Opt In Creditors (excluding the Commitment Creditors) (collectively,
> the "Other Class 5 Opt In Creditors") shall receive in full satisfaction, settlement,
> discharge and release of their Allowed Class 5 Claims, their respective Pro Rata
> shares of the GUC New Convertible Notes Class C Distribution in settlement of
> an amount of such Allowed Claims (and related new money) equal in the
> aggregate to approximately 35.37% of the Allowed Class 5 Claims that are held
> by the New Convertible Notes Class C Unsecured Creditors. Those creditors have
> the opportunity to subscribe to and purchase approximately 14.6% of the Class C
> Notes at an aggregate new money commitment of $477 million.

> The Commitment Creditors shall receive in full satisfaction, settlement, discharge
> and release of their Allowed Class 5 Claims, their respective Pro Rata shares of
> the GUC New Convertible Notes Class C Distribution in settlement of an amount
> of such Allowed Claims (and related new money) equal in the aggregate to
> approximately 70.74% of the Allowed Claims held by the New Convertible Notes
> Class C Backstop Parties that remain after reduction by Allowed Class 5 Claims
> used in the Direct Allocation Amount. Those creditors have the opportunity to
> subscribe to and purchase approximately 35.4% of the Class C Notes at an
> aggregate new money commitment of $1.157 billion.

> Any GUC New Convertible Notes Class C Distribution that remains unallocated
> after such applications shall be allocated to the Commitment Creditors in
> accordance with their New Convertible Notes Class C pursuant to the
> Commitment Creditors Backstop Agreement.

*See* Plan § 5.10. Thus, under the Plan, the Commitment Creditors will have the opportunity to

subscribe for and purchase approximately 85.4% of the Class C Notes not purchased by Eligible

Equity Holders during the New Convertible Notes Preemptive Rights Offering Period, at a new

money cost of approximately $2.762 billion. The Commitment Creditors shall backstop the Class

C Notes (i) that are not purchased by the Eligible Equity Holders during the New Convertible

Notes Preemptive Rights Period; (ii) that are held back and allocated to the Commitment

Creditors for purchase under the Plan (the "Direct Allocation Securities") but that the

Commitment Creditors do not subscribe for and purchase; and (iii) that are not subscribed for

and purchased by Holders of Class 5 Claims under the Plan, up to an aggregate amount of new

money contribution of $3.269 billion. *Id.*; RSA, Ex. D, Offering of New Convertible Notes Class

C Due December 31, 2121 at 1–2.

The Backstop Agreements

      Below, the Court summarizes the terms of the Backstop Agreements most relevant to the

Motion.

      Commitment Creditors Backstop Agreement

Allocation of Securities

> On and subject to the terms and conditions of the agreement and subject to the
> registration of the Plan Securities in the *Registro de Valores* of the Comisión para
> el Mercado Financiero (the "CMF"), the Backstop Parties shall be offered the
> Direct Allocation Securities, in an aggregate principal amount equal to the Direct
> Allocation Amount, based on the respective Backstop Commitment Percentages of
> such Backstop Parties.

Commitment Creditors Backstop Agreement § 2.1(a)(ii).

Backstop Commitment

> Each Backstop Party, on a several and not joint basis, shall backstop the New
> Convertible Notes Class C and ERO New Common Stock in the following
> amounts: (a) Unsubscribed New Convertible Notes Class C, up to $6,816,071,621
> (consisting of approximately $3,269,160,305 in cash and the remainder in parent
> general unsecured claims); and (b) Unsubscribed ERO New Common Stock, up to
> $400,000,000.

*Id.* §§ 2.2 (a), (b).

Backstop Payment

> As consideration for the Backstop Commitment and the other agreements of the
> Backstop Parties in the agreement, the Debtors shall pay or cause to be paid to the
> Backstop Parties a Backstop Payment paid in cash equal to an aggregate of 20%
> of approximately $3,669,160,305.88; the payment shall be fully earned,

nonrefundable and non-avoidable upon entry by the Bankruptcy Court of the Backstop Order, and will be payable in cash on the closing date and the effective date (or, if applicable, in the form of a termination payment).

*Id.* § 3.1(a).

Expense Reimbursement

Whether or not the transactions contemplated under the agreement are consummated, the Debtors agree to pay the reasonable and documented fees, expenses, disbursements and other costs (excluding travel, meal and entertainment expenses except as otherwise agreed in writing by LATAM Parent) (the "Reimbursable Expenses") incurred in connection with the Chapter 11 Cases by (x) each of the Backstop Parties, up to a maximum aggregate amount of $3,000,000 for all such parties, and (y) the Parent GUC Ad Hoc Group represented by Kramer Levin Naftalis & Frankel LLP, including but not limited to the fees and Reimbursable Expenses of the Reimbursable AHG Professionals, for which there is not cap on the expenses.

*Id.* § 3.3.

Conditions Precedent

Article VII contains conditions precedent to the parties' obligations mutually acceptable to the Debtors and the Backstop Parties including customary conditions such as no material adverse effect occurring, payment and reimbursement of all expenses, no legal impediment to implementation being enacted, adopted or issued, performance of all covenants in all material respects, board and shareholder approvals, and representations and warranties continuing to be true and correct. It also contains precedent tailored to particular aspects of the Plan, the RSA and the Debtors' business operations.

*Id.* Art. VII.

Indemnification Obligations

Under Article VIII of the agreement, irrespective of whether or not the transactions contemplated by the agreement or the Plan are consummated or whether or not the agreement is terminated, the LATAM Parent and the other Debtors have broad indemnification obligations to each Backstop Party, its Affiliates, shareholders, members, partners and other equity holders, general partners, managers, directors and its and their respective Representatives, agents and controlling persons from and against any and certain losses, claims, damages, liabilities and costs and expenses imposed by any Chilean Government Entity subject arising out of or in connection with this agreement, the Plan and the transactions contemplated under the agreement and the Plan, including the

Commitment Creditors Backstop Commitment, the Offerings, the payment of the Backstop Payment or the use of the proceeds of the Offerings or the Commitment Creditors Backstop Commitments, or any breach by the Debtors of the agreement (including the use of proceeds thereof).

*Id.*§ 8.1.

Termination Payment

Article IX of the agreement governs the termination of the agreement. Section 9.1 includes the rights of the parties to terminate the agreement. Section 9.2 addresses the Effect of Termination and includes a schedule of payments upon termination. The termination payments range from 10% to 50% of the Backstop Payment.

*Id.* §§ 9.1, 9.2

Backstop Shareholders Backstop Agreement

Backstop Commitments

The Backstop Parties on a several and not joint basis, shall backstop the New Convertible Notes Class B and ERO New Common Stock in the following amounts: (a) Unsubscribed New Convertible Notes Class B, up to $1,372,839,694; and (b) Unsubscribed ERO New Common Stock, up to $400,000,000, subject to the Backstop Shareholders Backstop Agreement.

Backstop Shareholders Backstop Agreement § 2.2.

Backstop Payment

None

Expense Reimbursement

Whether or not the transactions contemplated under the agreement are consummated, the Debtors agree to pay the reasonable and documented fees, expenses, disbursements and other costs (excluding travel, meal or entertainment expense, except as otherwise agreed in writing by the Company) incurred by each of the Backstop Parties in connection with the Chapter 11 Cases, including, but not limited to, attorneys', financial advisors', consultants', and agents fees incurred by the Backstop Parties, whether prior to or after the execution of the agreement and whether prior to or after consummation of the Plan. There is no cap on the expenses.

*Id.* § 3.1

Conditions Precedent

> Article VII of the Backstop Shareholders Backstop Agreement contains
> conditions precedent to the parties' obligations mutually acceptable to the Debtors
> and the Backstop Parties including customary conditions such as no material
> adverse effect occurring, payment and reimbursement of all expenses, no legal
> impediment to implementation being enacted, adopted or issued, performance of
> all covenants in all material respects, board and shareholder approvals, and
> representations and warranties continuing to be true and correct. It also contains
> conditions precedent tailored to particular aspects of the Plan, the RSA and the
> Debtors' business operations.

*Id.* Art. VII.

Indemnification Obligations

> Under Article VIII of the agreement, irrespective of whether or not the
> transactions contemplated by the agreement or the Plan are consummated or
> whether or not the agreement is terminated, the LATAM Parent and the other
> Debtors have broad indemnification obligations to each Backstop Party, its
> Affiliates, shareholders, members, partners and other equity holders, general
> partners, managers, directors and its and their respective Representatives from and
> against any and certain losses, claims, damages, liabilities and costs and expenses
> imposed by any Chilean Government Entity subject arising out of or in
> connection with the agreement, the Plan and the transactions contemplated under
> the agreement and the Plan, including the Backstop Shareholders Backstop
> Commitment, the Offerings, the payment of the Backstop Payment or the use of
> the proceeds of the Offerings or the Backstop Shareholders Backstop
> Commitments, or any breach by the Debtors of the agreement (including the use
> of proceeds thereof).

*Id.* Art. VIII.

The Issuance of the Plan Securities

The entry of the Confirmation Order will put into motion the steps that the Debtors

project will culminate in the issuance of the Plan Securities. In the Disclosure Statement, the

Debtors summarize the steps they will take after the Plan is confirmed in offering the Plan

Securities, as follows:

Within one month after entry of the Confirmation Order, the Debtors will initiate the securities offering procedures under Chilean law.

To comply with the Chilean law requirements, the LATAM Parent Board will convene an extraordinary meeting of Holders of Existing Equity Interests (the "Shareholders' Plan Meeting").

At the Shareholders' Plan Meeting, the shareholders must vote to approve the issuance of the Plan Securities. The requisite voting threshold for each of the Plan Securities is the majority of the Existing Equity Interests attending the Shareholders' Plan Meeting.

The Debtors contemplate that at the Shareholders' Plan Meeting, the shareholders would delegate the pricing of the ERO New Common Stock to the LATAM Parent Board and such delegation will be effective for 180 days thereafter.

The LATAM Parent Board will then agree to issue the Plan Securities which will then be registered with the CMF. After such registration is completed, the LATAM Parent Board will set the price of the ERO New Common Stock.

After registration of the Plan Securities with the CMF, and prior to the Effective Date, LATAM Parent will notify the Eligible Equity Holders of their right to subscribe and purchase the ERO New Common Stock and the New Convertible Notes. The regulatory vote and issuance of the new securities is anticipated to take approximately three months from the date of the order confirming the Plan.

Eligible Equity Holders will have thirty days from the date of that notice to exercise their preemptive rights to subscribe and purchase the ERO New Common Stock and New Convertible Notes.

*See* Disclosure Statement § X, G (1)–(2).

The Backstop Agreements commit the Backstop Parties to provide the backstops through the Effective Date and possibly longer. Among the conditions precedent to the Plan's Effective Date are:

All shareholder approvals and board approvals necessary to implement the Plan and issue the New Convertible Notes and ERO New Common Stock and amend the bylaws of LATAM Parent shall have been obtained. Plan § 10.2(c).

All of the conditions precedent for consummation of the transactions contemplated by the Backstop Agreements shall have been satisfied or waived in accordance with the terms thereof. *Id.* § 10.2(g)

> All government and regulatory filings and approvals necessary to implement the
> Plan shall have been completed or received, as applicable, including anti-trust and
> competition filings (to the extent required) and registration of Plan Securities with
> the CMF. *Id.* § 10.2(i).

The Debtors and the Backstop Providers estimate that it could take eight months, and perhaps

longer, for the Reorganized Debtors to satisfy the conditions precedent to the Plan's Effective

Date.

**The Motion**

Most of the over $8 billion in new money that the Debtors require to satisfy the Plan's

cash payment obligations and to finance the Reorganized Debtors' ongoing operations and

capital needs following their emergence from the Chapter 11 Cases will come from the New

Convertible Notes Offering and ERO Rights Offering. The Backstop Parties agreements to

backstop over $5.4 billion in new money investments are part of the broader agreements among

the Commitment Creditors and RSA Shareholders on a comprehensive restructuring and

recapitalization of the Debtors that are memorialized in the RSA. This includes the parties'

commitments to support the Plan and to take all actions necessary to implement the transactions

called for under the Plan.

The record shows that to date, the Backstop Parties (along with the lenders providing the

Exit Financing) are the only parties that have proposed any reorganization transaction, plan and

exit proposal, that have any realistic prospect of consummation, and which enjoy the creditor and

shareholder support necessary to confirm and implement an otherwise confirmable plan of

reorganization that complies with applicable foreign law in the United States and the other

jurisdictions where the Debtors operate, including Chile. Motion ¶ 6. The Debtors say that the

Backstop Parties' commitments are the product of extensive arm's-length negotiations and offer

a variety of benefits to the Debtors and their estates by enabling the Debtors to meet the

proposed timetable for confirmation of the Plan and protecting against the contingency that insufficient funds will be generated by the New Convertible Notes Offering and the ERO Rights Offering. *Id.* ¶ 5. They maintain that the Backstop Parties' commitments are necessary to enable the Debtors to satisfy the Plan's cash payment obligations and successfully emerge from these Chapter 11 Cases with a well-capitalized balance sheet. *Id.*

The Debtors contend that their entry into and performance under the Backstop Agreements is an exercise of their sound business judgment and that the Court should authorize them to do so under section 363(b) of the Bankruptcy Code and pursuant to its equitable powers under section 105 of the Bankruptcy Code. They assert that the Backstop Payments (with respect to the Commitment Creditors), Expense Reimbursement and Indemnification Obligations are reasonable and appropriate under the circumstances and the Debtors' decision to pay such fees and incur such obligations is a reasonable exercise of their business judgment. They argue that given the substantial benefits provided by the Backstop Parties respective commitments under the Backstop Agreements and the need to secure their respective commitments, such fees, reimbursements, and incurrence of indemnification obligations, as applicable, are actual and necessary costs for maximizing the value of the Debtors' estates and enhancing creditor recoveries and the Court should accord them administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.

To support their contention that the Backstop Payment and other fees and costs payable under Backstop Agreements to the Backstop Parties are reasonable, the Debtors rely on the expert advice of Brent Herlihy.[22] He is a Managing Director in the Restructuring and Special

---

[22] *See* Trial Ex. 11, Declaration of Brent Herlihy in Support of the Backstop Agreements Motion ("Herlihy Decl." or "Herlihy Declaration"); Trial Ex. 12, Supplemental Declaration of Brent Herlihy in Support of the Backstop Agreements Motion.

Situations Group at PJT Partners LP ("PJT"), the investment banker that the Debtors have

retained in these Chapter 11 Cases. *See* Herlihy Decl. ¶ 1. The Herlihy Declaration provides an

analysis through which Mr. Herlihy opines that the Backstop Payments are reasonable and

appropriate. *Id.* ¶¶ 7–12. In reaching that conclusion, he measures the Backstop Payments against

a purported "comparable set" of 28 backstop arrangements from 26 chapter 11 cases (the "PJT

Comps Set"). *See id.* Ex. 1 (the "Chart"). The PJT Comps Set consists of backstop arrangements

for amounts greater than $200 million over the last five years and all backstop arrangements that

have been executed since the beginning of the COVID-19 pandemic. *Id.* ¶ 38. Mr. Herlihy notes

that in comparable equity rights offerings the costs of backstopped capital take the form of (i) a

backstop fee, which is typically paid on the full size of the commitment provided by backstop

parties using equity consideration priced at the same discount to plan value as the rights offering;

(ii) a direct allocation or "holdback" amount that allows the backstop parties to invest no less

than a certain amount; (iii) the discount at which the new money is being invested in the

offerings; and (iv) typical reimbursements of professional fees and expenses. *Id.* ¶ 40. He

explains that:

> In order to compare the cost of backstops across different cases, PJT calculated
> the combined impact of (i), (ii) and (iii) above and netted it against the investment
> made in the rights offering to determine an "implied discount" to invest (the
> "Implied Discount"). A higher Implied Discount indicates better economics for
> the backstop parties.
>
> PJT further analyzed scenarios where (i) the backstop parties backstop and
> subscribe for 100% of the rights offering; and (ii) the backstop parties subscribe
> to their pro rata allocation of the new money (i.e., the rights offering is fully
> subscribed by eligible parties). PJT assumed that, in the latter case, backstop
> parties receive any applicable holdback amount plus their pro rata allocation of
> the post-holdback new money, based on the backstop parties' stated share of the
> unsecured claims pool.

*Id.* ¶¶ 41–42. The Chart reflects these calculations for the rights offerings in these Chapter 11

Cases, and in the PJT Comps Set. In the Chart, Mr. Herlihy includes analysis of the maximum,

75th percentile, mean, median, 25th percentile, and minimum backstop payments using the

methodology and metrics described above as a percentage of the full size of the commitment. He

also sets forth the termination fee provided to backstop parties—both as a percentage of the

commitment and the dollar value—and the backstop commitment duration for the comparable

transactions. *See id.*, Chart. Mr. Herlihy notes that the particularly long duration of the Backstop

Parties' commitments in these Chapter 11 Cases—under which the Backstop Agreements

Closing Date could be extended until November 30, 2022—informs how he assesses the

reasonableness of the Backstop Payments here. *See id.* ¶ 39; *see also*, Feb. 10, 2022 Hr'g Tr. at

238:18–21 [ECF No. 4373].

According to Mr. Herlihy, the Backstop Payments fall within the range of backstop

commitment fees paid in the comparable transactions set forth in the Chart. Herlihy Decl. ¶ 39.

Although he does not include an analysis of the Expense Reimbursement and Indemnification

Obligations, he asserts that those provisions are "essential components" of the agreements that

are "in line with market precedent." *Id.* ¶ 47.

The Objectors oppose the Motion and urge the Court to deny it. They contend that in

applying section 363 of the Bankruptcy Code to the Backstop Agreements, the Court must hold

the Debtors to a heightened standard of scrutiny, not merely their business judgment, because

"insiders" of the Debtors are parties to the agreements. They assert that the Court should not

accord any deference the Debtors' business judgment because the Backstop Agreements are

unfair and unreasonable and are the products of a flawed process that did not include arm's-

length negotiations of the agreements, and because the Debtors did not subject the Commitment

Creditors Backstop Agreement to a market test. They argue that the Backstop Payment on account of the Class C Notes runs afoul of sections 503(b)(1)(A) and 1129(a)(4) of the Bankruptcy Code because it is unreasonable and unnecessary since, by its terms, the Commitment Creditors Backstop Agreement mitigates any risk of loss to the Commitment Creditors and the economics of the Plan guarantee that between them, the Commitment Creditors (85.4%) and Other Class 5 Opt In Creditors (14.6%) will subscribe for and purchase 100% of the Class C Notes.

In that light, Columbus Hill labels the Backstop Payment as "illusory" and contends that it violates Chilean law and thereby renders the Plan unconfirmable under section 1129(a)(11) of the Bankruptcy Code. The Committee and A&P Ad Hoc Group likewise raise a Plan confirmation issue in opposing the Motion. They contend that Backstop Agreements should not be approved because they support a Plan structure that violates the equal treatment requirements of section 1123(a)(4) of the Bankruptcy Code, on the theory that the GUC Parent Ad Hoc Group will receive more favorable treatment than other unsecured creditors by virtue of (i) the allocation of New Convertible Notes Class C comprising the Direct Allocation, plus (ii) the backstop payment. *See* Committee Obj. ¶¶ 65-70; A&P Ad Hoc Group Obj. ¶¶ 4, 13. Both objections are premature, as they must await the Plan confirmation hearing. On that basis, the Court overrules the objections, without prejudice to those parties' rights to assert the objections in connection with the Plan confirmation hearing.

Finally, relying on their own experts' analyses,[23] the Objectors contend that the fee data (that does not account for the fact that the Debtors are paying the fee in cash), the PJT Comps

---

[23]    The Committee relies on their expert, Elizabeth LaPuma. She is the head of Debt Advisory and Restructuring at UBS Securities LLC, the investment banker for the Committee. *See* Trial Ex. 197, Corrected Declaration and Expert Report of Elizabeth LaPuma (the "LaPuma Decl.") ¶ 1. The A&P Ad Hoc Group relies on the testimony of their expert, Joshua S. Scherer. Mr. Scherer is a partner at Ducera Partners LLC ("Ducera") and is the financial advisor to

and Mr. Herlihy's Implied Discount Methodology are flawed. They also say that the Expense

Reimbursement, Indemnification Obligations, Termination Payments, and other terms and

conditions of the Backstop Agreements are unreasonable and not at market rates. They argue that

the Court should deny the Motion both because the Backstop Payments are not necessary and

because the prices of the Backstop Agreements are grossly over market.

The Committee also contends that the Court should not approve the Backstop

Shareholders Backstop Agreement. *See* Committee Obj. ¶¶ 71–73. It contends that although that

agreement does not call for the payment of a "backstop fee," it would provide the Backstop

Shareholders with broad indemnification rights and obligate the estates (and ultimately impaired

creditors) to pay these shareholders' fees and expenses arising from these Chapter 11 Cases,

which while undisclosed would be at least in the tens of millions of dollars. *Id*. ¶ 71. Moreover,

the Committee contends that the Backstop Shareholders are not proposing to "backstop"

anything at all, because the equity investment they purport to backstop is one that they have

vigorously sought the exclusive right to make for the entire duration of these Chapter 11 Cases.

*Id*. ¶ 72. Further, it asserts that one hundred percent of the securities the Backstop Shareholders

purport to "backstop" are reserved exclusively for those insiders themselves, with the technical

(though not meaningful) caveat that the Class B Notes offering is subject to minority

shareholders' preemptive rights. *Id*. It contends that there is no need for the Debtors to agree to

pay the Backstop Shareholders' fees and expenses in connection with these cases, or to agree to

---

the A&P Ad Hoc Group. *See* Trial Ex. 5, Revised Expert Report of Joshua S. Scherer, Ducera Partners LLC –
February 7, 2022 (the "Scherer Report") at 4. BancoEstado relies on the testimony of their expert Rodi Blokh. Mr.
Blokh is a Director in the Turnaround & Restructuring Services Group at AlixPartners, LLP, and serve as financial
advisor to BancoEstado. *See* Trial Ex. 191, Declaration and Expert Report of Rodi Blokh (the "Blokh Decl.") ¶ 1.
BancoEstado also relies on their expert, Pedro Pablo Gutierrez, who opines solely on issues of Chilean law. Mr.
Gutierrez is a Chilean lawyer and senior partner of Gutiérrez, Waugh, Jimeno & Asenjo, a Chilean law firm. *See*
Trial Ex. 192, Declaration of Pedro Pablo Gutierrez Regarding Certain Chilean Law Issues (the "Gutierrez Decl.") ¶
1.

broad indemnification provisions, to induce the Backstop Shareholders to make the investments that they have always wanted to make. *Id.*

The Court considers those matters below.

## The Backstop Agreement

Whether the Debtors Followed a Fair Process
In Negotiating the Backstop Agreements

The Objectors contend that in pursuing the Backstop Agreements, the Debtors did not conduct arm's-length negotiations with third parties for the best financing terms possible, but, instead, settled for an unreasonable deal with the Commitment Creditors which vastly overcompensates them with special treatment, generous fees, and steep discounts to divert money to the Debtors' controlling shareholders and procure votes by the Commitment Creditors in favor of the Plan. *See*, *e.g.*, Committee Obj. ¶ 3. They insinuate that this is evident because the Commitment Creditors hold roughly 70% of the Debtors' general unsecured claims and, as such, is collectively a key voting bloc needed to approve the Plan. The Objectors contend that the Debtors failed to conduct a fair process in negotiating the Backstop Agreements because they (i) limited their pool of prospective counterparties for the Backstop Agreements to the RSA Shareholders and a handful of large creditors; (ii) failed to respond to a competing backstop financing proposal from Ducera; and (iii) failed to subject the Commitment Creditors Backstop Agreement to market competition. They also assert that the LATAM Parent board lacked sufficient information to properly vet the Backstop Agreements. The Court considers those matters below.

Turning first to the last point, the Court is satisfied that the process that the Debtors employed to vet the agreements with the LATAM Parent board and audit committee was adequate and appropriate and is consistent with the process they have employed throughout the

case. The independent directors who serve on LATAM Parent's audit committee were kept fully apprised as to the status of negotiations of the Plan and Backstop Agreements and met with the Debtors' advisors more than two dozen times during the negotiation process. Herlihy Decl. ¶ 26. Mr. Herlihy met with the audit committee and conveyed to the committee his belief that the terms of the Backstop Agreements, including the fees called for under the agreements, were within the range of comparable transactions. *See* Trial Ex. 196, Jan. 31, 2022 Herlihy Deposition (the "Jan. 31 Herlihy Dep.") at 176:15-24. *See also id.* at 218:15-25 ("we discussed [the size of the termination fees]. I believe we included it in slides we provided to the Independent Directors Committee and we absolutely discussed it with them."). Once the parties finalized the terms of the Backstop Agreements, the agreements were subject to the review of the independent directors serving on the audit committee. Herlihy Decl. ¶ 26. After reviewing the terms of the Backstop Agreements, these independent directors recommended approval of the agreements by the full LATAM Parent board of directors. *Id.*[24]

The Objectors note that the record shows that in June 2021, the Debtors distributed an illustrative plan term sheet (Trial Ex. 114, Term Sheet at Bates 2316-22), but that the distribution was limited to the lenders under the DIP Facility, the RSA Shareholders not party to the DIP Facility, and certain of the Debtors' major creditor constituencies. *See* Jan. 31 Herlihy Dep. at 84:18-85:17; Trial Ex. 116, LATAM - Board - Discussion Materials at Bates 0682. *See also* Committee Obj. ¶ 26. They say that other than this initial outreach to pre-existing major shareholders and creditors, the Debtors did not send the term sheet to any other sources. *See* Jan. 31 Herlihy Dep. at 92:18-93:7. Moreover, it is undisputed that when the Debtors finalized their

---

[24]    Messrs. Enrique Cueto, Ignacio Cueto and Henri Reichstul, the Costa Verde nominated directors, Ms. Sonia J.S. Villalobos, and Mr. Enrique Ostalé, the Delta-nominated directors, and Mr. Alexander Wilcox, the Qatar-nominated director, did not vote on the Backstop Shareholders Backstop Agreement. *See* Herlihy Decl. ¶ 26 n.11.

backstop proposal with the Commitment Creditors, they took no steps to "solicit additional proposals" in the market that might have been superior. *Id.* at 108:3-23. The Objectors maintain that the Debtors did not subject the Commitment Creditors Backstop Agreement to market competition. *See* Committee Obj. ¶¶ 26-27.

However, in making those arguments, the Objectors fail to acknowledge that the Plan is a product of the mediation process which focused in part on issues of Chilean securities law and Chilean shareholder rights in these Chapter 11 Cases. The Debtors have structured the Plan – based on the RSA and Backstop Agreements that were negotiated and agreed to during the Mediation – with the understanding that they must obtain the requisite shareholder consents to permit them to access the Chilean capital markets without running afoul of Chilean securities laws. Moreover, Mr. Alfonsin testified that the Plan is the "best alternative" for the Debtors to emerge from these Chapter 11 Cases after the Debtors "explored a number of restructuring proposals" during the pendency of these Chapter 11 Cases. Alfonsin Decl. ¶¶ 9–10;[25] *see also id.* ¶ 8 (testifying that the Plan and the Backstop Agreements "represent the product of extensive good faith, arm's-length negotiations among the Debtors and their key stakeholders"). Mr. Alfonsin's conclusion is largely borne out by aspects of Mr. Herlihy's testimony which speak to the fairness of the process. Mr. Herlihy testified that (1) the Debtors contacted 45 investment funds and other entities in an effort to raise capital, including members of the Parent GUC Ad Hoc Group, the Moelis Group, the Backstop Shareholders, the DIP Loan providers and Chilean bondholders, *see* Jan. 31 Herlihy Dep. at 81:9-82:11; (2) the Debtors received and considered a proposal from entities with no connection to the Debtors or key shareholders, including one from

---

[25]    *See* Trial Ex. 6, Declaration of Ramiro Alfonsin Balza in Support of the backstop Agreements Motion (the "Alfonsin Decl.").

a group advised by Pericles,[26] and (3) the Debtors' financial condition was open and obvious,

suggesting that parties with workable financing offers had the opportunity to come forward and

work with the Debtors. *See id.* at 39:24-40:3; *see also* Reply ¶ 14 (citing, *inter alia*, public

securities filings). Of the entities the Debtors contacted, the Debtors ultimately received initial

proposals or responses from the Parent GUC Ad Hoc Group, the Moelis Group, and the

Backstop Shareholders in August and September 2021. *See* Jan. 31 Herlihy Dep. at 85:23-25. He

also testified that the Debtors engaged each of the entities that provided proposals, encouraged

follow up from each, and did so with an eye towards reaching a proposal that allowed them to

emerge from the Chapter 11 Cases. *See* Feb. 10, 2022 Hr'g Tr. at 219:7-20 [ECF No. 4373]. As

noted, this process occurred against the backdrop of a vigorous, hard-fought and lengthy

mediation overseen by Judge Gropper, which produced the Backstop Agreements and the RSA,

which were finalized in the face of the worldwide surge in COVID-19 infections spurred by the

emergence of the Omicron variant. *See* Parent GUC Ad Hoc Group Statement ¶ 15; *see* Trial Ex.

195, Jan. 29, 2022 Alfonsin Deposition (the "Jan. 29 Alfonsin Dep.") at 139:24-140:7 ("Q.  Mr.

Alfonsin, were every single one of the conversations about the [Commitment Creditors] backstop

fee in November [2021] part of the mediation process?" A.  "In my understanding, we were

under mediation and we sat with [Judge Gropper] day in, day out. So, yes, I believe that was all

part of the mediation.").

By letter dated January 26, 2022, Joshua Scherer submitted to the Debtors an alternative

financing commitment letter (the "Ducera Proposal"), on behalf of the Ad Hoc Group of

Unsecured Claimants. Trial Ex. 190, Ducera Proposal. In his letter, Mr. Scherer represented that

---

[26]    Mr. Herlihy testified that the proposal from Pericles was not actionable for the Debtors because it only
purported to provide approximately $300 million, whereas the Debtors seek to raise over $5 billion in capital. *See*
Jan. 31 Herlihy Dep. at 96:6-22, 97:2-14.

the Ducera Proposal provides "significant enhancements to LATAM's current filed Plan of

Reorganization" including:

> 1. A reduction of the backstop fee to 15% (from 20%);
>
> 2. No priority allocation, with all participating claimants receiving a ratable allocation to Class C Notes; and
>
> 3. An oversubscription mechanism to allow all interested claimants to increase participation in unallocated Class C Notes.

Ducera Proposal at 1. He explained that the proposal "includes a Commitment Schedule which

provides the names of the 17 institutions providing the backstop commitments for the proposed

transaction[,]" and that he expected the list of backup parties to grow because "[w]e continue to

have discussions with other institutions potentially interested in participating[.]" *Id.* at 1-2. The

A&P Ad Hoc Group contends that the Ducera Proposal is "facially superior" to the Commitment

Creditors Backstop Agreement since it "matches the new money commitments of the

[Commitment Creditors] on a standalone basis while, at the same time, it reduces the backstop

fee that would be payable to the . . . backstop parties from 20% to 15% and eliminates the 50%

direct allocation of [Class C Notes] to the backstop parties." Committee Obj. ¶ 28. The Debtors

did not respond to the proposal. The Objectors contend that the failure to do so provides

additional grounds for the Court to conclude that the Debtors have failed to meet their burden of

demonstrating that the Court's approval of the Commitment Creditors Backstop Agreement is in

the best interests of the Debtors, their estates, and creditors. *Id.* ¶ 29.

> The Debtors contend, and the Court agrees that the Objectors overstate the significance of

the Ducera Proposal for the following reasons:

> First, it does not provide sufficient committed capital. Although it purports to cover the amounts backstopped by the Commitment Creditors, it does not include funding to cover the approximately $1.8 billion commitment by the Backstop Shareholders.

Second, it has an expansive due diligence condition that would allow the A&P Ad Hoc Group to withdraw its proposal at any time, at its sole discretion.

Third, the proposal does not provide a secure path to confirmation.

Fourth, although the Ducera Proposal lists parties that would provide funding, it does not state the amounts that each party would individually contribute.

Finally, the proposal is an unsigned letter, offering no binding commitments.

Reply ¶ 71 (citations omitted).

The Court finds that the proposal falls short of a viable alternative or substitute for the Backstop Agreements. No entity sought to provide the Debtors with backstop proposals that would provide a framework to permit the Debtors to raise a level of capital they believe to be necessary to emerge from the Chapter 11 Cases and the evidence before the Court undermines the Objectors' argument that the Debtors did not appropriately or sufficiently seek other partners beyond the parties to the Backstop Agreements. *See* Parent GUC Ad Hoc Claimant Group Statement ¶ 13 ("There are simply no other viable transactions that would solve the Debtors' substantial funding needs and satisfy the requirements of both the Bankruptcy Code and Chilean law").

The Debtors' negotiations with the Commitment Creditors also belie the Objectors' insinuation that the Debtors blindly accepted all of their terms in an effort to gain their support for the Plan. There is no evidence demonstrating that the Debtors' pre-determined to partner with the Commitment Creditors to raise the funds they need to exit chapter 11. *See* Jan. 29 Alfonsin Dep. at 78:25-79:8 ("We carried out a very long and detailed due diligence process with many counterparts. I believe that we received proposal from the Evercore Group, from Moelis Group, from Moelis Group, [and] from the shareholders.") Indeed, Mr. Alfonsin testified that the Debtors met with a myriad of funds multiple times over a two-month period as they attempted to

locate suitable proposals. *See id.* at 79:20-25 ("We met with Knighthead, we met with Oaktree,

we met with Apollo, we met with many funds, a couple of banks [] also participated and

participated in the due diligence . . . process . . . there were two months with an enormous

amount of meetings every time representing the business plan and encouraging people to present

a business plan for the exit."). That process lead the Debtors to execute nearly 60 non-disclosure

agreements with prospective partners. *See* Jan. 31 Herlihy Dep. at 82:18-24. Moreover, once the

Debtors received the initial proposal from the Commitment Creditors, the negotiations suggest

an arm's-length process by which the Debtors received concessions from the Commitment

Creditors since the start of their negotiations. *See*, *e.g.*, *id.* at 140:10-142:3 (describing how the

Commitment Creditors ultimately agreed to change certain termination events into conditions

precedent that did not simply allow the Commitment Creditors to walk away if a condition

precedent is unmet by the targeted closing date); *id.* at 113:10-19, 237:5-15 (explaining that the

Commitment Creditors initially proposed a 20% "alternative transaction" termination fee, which

the parties later negotiated down to 10%, as reflected in the Commitment Creditors Backstop

Agreement).

  The Court is satisfied that the evidence demonstrates that the Debtors engaged in arm's-

length negotiations with the Commitment Creditors and employed a fair and reasonable process

in negotiating and executing the Backstop Agreements. The Court finds that these factors weigh

towards finding that the Debtors acted fairly and reasonably in entering into the Backstop

Agreements.

Whether The Debtors Can Justify Making
The Backstop Payment For The Class C Notes

Part of the Debtors' rationale for agreeing to make the Backstop Payment to the Commitment Creditors and to hold back the Direct Allocation Securities for their benefit is that the Commitment Creditors face particularly acute "economic, market, and commercial risks" in their backstop commitment because of the "continued uncertainty due to the ongoing global COVID-19 pandemic" and the extended period the commitments must remain in place. *See* Motion ¶ 41. Thus, the Debtors reason that the costs and fees they are agreeing to pay to the Commitment Creditors, and that, under the agreement, they will earn upon the approval of the agreement, are commensurate with the risks that the Commitment Creditors assume entering into the agreement. The Objectors contend that the Debtors overstate that risk. They assert that while the Commitment Creditors may retain some risk of a broad economic downturn or business downturn specific to the Debtors, the terms of the Commitment Creditors Backstop Agreement insulate them from the risk that they will be called on to perform under the agreement. As support they point to the "Conditions To The Obligations Of The Parties" set forth in Article VII of the agreement. In particular, they maintain that sections 7.1(e), 7.1(f) and 7.1(u) of the Commitment Creditors Backstop Agreement specifically guard against risks to the Commitment Creditors in providing a backstop commitment here and, as such, the proposed Backstop Payment and other consideration to be paid under the agreement dwarf the actual risk profile of the commitments. A&P Ad Hoc Group Obj. ¶¶ 47–51.

Sections 7.1(e) and 7.1(f) contain Forward Net Booking and Minimum Liquidity conditions, respectively. By application of section 7.1(e), if, immediately before the intended Closing of the Backstop Commitment, the short-term outlook for LATAM's passenger business (measured by the total number of passengers booked for travel within the next 30 days) is weaker

than the outlook on the same day of 2019 by a specific margin, then the Debtors either would not

be able to close on the offerings or would require a waiver from the Commitment Creditors to do

so (the "Forward Net Bookings Condition").[27] Pursuant to section 7.1(f), to close, the

Reorganized Debtors must satisfy required levels of minimum liquidity amounts based on the

Effective Date (the "Minimum Liquidity Condition").[28] The Backstop Agreements provide that

they will close "on the date on which all of the conditions set forth in Article VII shall have been

satisfied or waived . . . ." Commitment Creditors Backstop Agreement § 2.5(a) (defining the

"Closing Date"). If the Closing Date does not occur by the Outside Date, the agreement is

subject to termination by either the Debtors or the Commitment Creditors. *See id*. § 9.1(b)(i).

The Outside Date is September 30, 2022. S*ee id*. § 1.1. That date is subject to extension in the

event of a Backstop Party Default, *see id*. § 2.3, or the designation of a variant of the SARS-

---

[27]  Section 7.1(e) of the Commitment Creditors Backstop Agreement states, as follows:

> Forward Net Bookings. As of the date that is five (5) Business Days prior to the Closing Date, the
> Forward Net Bookings (as defined in Exhibit B) exceed the Net Booking Threshold (as defined in
> Exhibit B) (such condition, the "Forward Net Booking[s] Condition").

[28]  Section 7.1(f) of the Commitment Creditors Backstop Agreement states, as follows:

> Minimum Liquidity. After giving pro forma effect to the occurrence of the Effective Date and
> related transactions, including the entry into, and borrowings to be made (and letters of credit
> issued) on the Effective Date under, the Exit Financing, the Reorganized Debtors shall have
> minimum liquidity (consisting of unrestricted cash and cash equivalents, plus proceeds from the
> Offerings and the Unsubscribed Securities purchased pursuant to the Backstop Commitment net of
> repayment of all DIP Claims and other uses of proceeds plus amounts available to be drawn under
> any revolving facilities (but excluding increases to liquidity resulting from (x) material asset sales
> or financings not contemplated by the Base Business Plan or (y) incurrence of indebtedness for
> borrowed money other than the Exit Financing) on the Effective Date of no less than (i) $2.20
> billion if the Effective Date takes place in June 2022; (ii) $2.15 billion if the Effective Date takes
> place in July 2022; (iii) $2.05 billion if the Effective Date takes place in August 2022; (iv) $1.95
> billion if the Effective Date takes place in September 2022; (v) $1.9 billion if the Effective Date
> takes place in October 2022 and (vi) $1.85 billion if the Effective Date takes place in November
> 2022. For the purposes of this Section 7.1(f), Exit Financing shall be calculated such that (A) (I)
> notes or term loans do not exceed $2.250 billion plus (II) an amount not to exceed $500 million of
> additional notes or term loans incurred in lieu of the exit revolving commitments in the succeeding
> clause (B), (B) exit revolving commitments do not exceed $1.100 billion less any amount of
> additional notes or term loans incurred pursuant to the foregoing item (A)(II), and (C) the
> Company's Spare Engine Facility (as defined in the Restructuring Support Agreement) does not
> exceed $273 million.

CoV-2 virus a "variant of concern" ("VOC") or a "variant of high consequence" ("VOHC") by

the World Health Organization ("WHO") or the U.S. Center for Disease Control ("CDC") within

45 days prior to a proposed Closing Date. *See id*. § 7.1(u).

In the event that a VOC or VOHC is designated in such forty-five-day period, the Closing

Date shall be suspended for forty-five days (the "COVID Suspension Period"). *See id.* If, at the

conclusion of the COVID Suspension Period the conditions in Article VII are met, the Closing

will occur. If not, the Closing will not occur.[29] In the event the WHO or CDC declares a VOC or

VOHC during this period, the Outside Date may be extended as late as November 30, 2022. *See*

*id.* If the Commitment Creditors Backstop Agreement is terminated because it does not close by

the Outside Date, the Debtors shall pay the Commitment Creditors a Termination Payment of

10% of the Backstop Payment (if the agreement is terminated prior to an order of this Court

confirming the Plan) or 15% of the Backstop Payment (if the agreement is terminated after the

Court confirms the Plan). *See id.* § 9.2(b)(ii) (setting forth termination payments "[i]n the case of

any termination of th[e Commitment Creditors Backstop Agreement] other than a termination

described in [section 9.2(b)(i)]").

---

[29]    Section 7.1(u) of the Commitment Creditors Backstop Agreement states, as follows:

> Variant of Concern. Neither the World Health Organization or the U.S. Centers for Disease
> Control shall have designated or characterized any variant of SARS-CoV-2 (i.e., the virus that
> causes COVID-19) as a [] VOC or [] VOHC (or such other designations as may be used by them
> with similar effect after the date hereof) within such period that begins forty-five (45) days prior to
> and through a proposed Closing Date; provided if the condition set forth in this Section 7.1(u) is
> not satisfied as of a proposed Closing Date, such Closing Date shall be suspended for a period of
> forty-five (45) days (which period may be waived or shortened by the Requisite Backstop Parties,
> (the "COVID Suspension Period") in which case, if the Outside Date occurs during the COVID
> Suspension Period, the Outside Date (and, if applicable, the End Date) shall be extended until the
> earlier of the end of the COVID Suspension Period or November 30, 2022 without any
> requirement for payment of an extension fee by the Company. If, as of the conclusion of the
> COVID Suspension Period, the conditions set forth in Article VII hereof (including Section 7.1(e))
> are met (and this Agreement has not otherwise been terminated in accordance with its terms), then
> the suspension of the Closing Date shall terminate and the Closing Date shall occur.

BancoEstado contends that the Forward Net Bookings Condition imposes a risk that the Commitment Creditors Backstop Agreement will not close because the Debtors' passenger ticket sales are highly sensitive to the emergence of a new COVID-19 variant. BancoEstado Obj. ¶ 17. It maintains that if a future COVID-19 variant induces national governments to reinstate travel restrictions or burdensome quarantine requirements, then there is a significant risk that the Debtors will not meet the Forward Net Bookings Condition. *Id.* It asserts that the Debtors' own analysis shows that they would have failed the Forward Net Bookings Condition during certain periods of 2021. *Id.* BancoEstado maintains that the Debtors do not have to return to the depths of 2020's COVID-19 booking underperformance to fail to satisfy the Forward Net Bookings Condition, they need only to look to last year's levels. *Id.* It also argues that because the Forward Net Bookings Condition in section 7.1(e) applies at the end of any COVID Suspension Period under section 7.1(u), the Debtors could satisfy the Forward Net Bookings Condition on the cusp of the Closing Date only to have a COVID Suspension Period imposed, thus delaying the Closing Date for 45 days in which the Debtors' Forward Net Bookings may plummet because of the announcement of a new COVID-19 variant. *Id*. ¶ 19. It asserts that the Debtors may find that once the COVID Suspension Period is over, they will be unable to satisfy the Forward Net Bookings Condition, and worse, should these delays occur near the Outside Date under the agreement, the Debtors run the risk (despite the extension of the Outside Date under section 7.1(u) to November 30, 2022) that Closing will have failed to occur prior to the Outside Date, thus allowing the Commitment Creditors to terminate the agreement, and leading to a 10% or 15% Termination Payment becoming payable in favor of the Commitment Creditors. *Id.* Finally, BancoEstado contends that the Forward Net Bookings Condition appears unprecedented, including in the recent, post-COVID-19 airline cases of *Avianca* and *Aeromexico. Id.* ¶ 17.

The A&P Ad Hoc Group contends that these provisions insulate the Commitment Creditors from economic, market and commercial risk because they would prevent a Closing on the Backstop Commitment (and free them from any obligation thereunder) in the event that a VOC, VOHC, or other material disruption upends the Debtors' business outlook. *See* A&P Ad Hoc Group Obj. ¶ 48; *see also* Scherer Report at 28 ("LATAM may continue to face economic, market, and commercial risks during the pendency of the chapter 11 process, but the Commitment Creditors Backstop Agreement has hedged the Commitment Creditors against these risks in a manner that does not justify the contemplated Commitment Creditors Backstop Fees"). Because the Debtors' proposed order provides that the Commitment Creditors receive and retain the Backstop Payment even if these conditions precedent are not met, the A&P Ad Hoc Group contends the Commitment Creditors Backstop Agreement could provide the Commitment Creditors with an unreasonable windfall, which further demonstrates that the Court should deny the Motion. A&P Ad Hoc Group Obj. ¶ 48 (citing Motion, Ex. A, Proposed Order ¶ 5 (Backstop Payment "shall be fully earned, nonrefundable and non-avoidable upon entry of this Order.")). Like BancoEstado, the A&P Ad Hoc Group notes that the *Aeromexico* and *Avianca* equity raises in connection with their chapter 11 restructurings did not include similar provisions despite facing the same risks brought on by the COVID-19 pandemic in the same industry. A&P Ad Hoc Group Obj. ¶ 50.

The Debtors maintain and have demonstrated that despite the Objectors' professed concern about the Debtors' ability to satisfy these and other conditions precedent set forth in Article VII of the Commitment Creditors Backstop Agreement, none of the Objectors' experts evaluated the conditions precedent to assess whether any of them pose a genuine risk to the Debtors. *See, e.g.,* Trial Ex. 2, Feb. 4, 2022 Deposition of Rodi Blokh (the "Feb. 4 Blokh Dep.")

at 26:9-31:6 (testifying that "I can't really answer that question. I don't have an answer" in response to being asked whether the Forward Net Bookings Condition introduces "significant or insignificant" "uncertainty into the backstop agreement."); Trial Ex. 3, Feb. 5, 2022 Deposition of Joshua Scherer (the "Feb. 5 Scherer Dep.") at 121:9-12 ("Q. But other than [your opinion that these conditions precedent are broader than what you typically see is a backstop agreement] you have no opinion with respect to the risk that any of these actually get triggered? A. That's correct"); Trial Ex. 1, Feb 3, 2022 Deposition of Elizabeth La Puma ("Feb 3 LaPuma Dep.") at 338:24-339:4 ("Q. 'Yes' or 'no' you agree that you don't presently have sufficient information to determine whether some of the conditions precedent are likely to be met? A. Yes."). "At the end of the day, . . . not one of the Objectors' Experts could testify that he or she had performed any analysis enabling one to conclude that the Debtors faced any genuine risk from a single one of the closing conditions." Reply ¶ 66.

The Debtors further maintain that the limited analysis the Objectors performed provides no meaningful measure of the likelihood of the Debtors' failure to meet the conditions precedent because it rests on outdated information and assumptions. *Id.* ¶ 67. For example, they point to Mr. Blokh's argument that because he estimated that the Debtors would have failed to meet the Forward Net Bookings Condition for a period in 2021, there is a significant risk that they would not do so in late 2022 when the closing condition must be met. *Id.* (citing Blokh Decl. ¶ 29). The Debtors dispute that contention. They note that their capacity in 2022 is higher than it was in 2021, and that every single day in 2021 that Mr. Blokh cites to in support of his argument, occurred at a time when Chile—and many other countries in which the Debtors operated—faced government-mandated lockdowns that prohibited air travel, as well as a low COVID-19 vaccination rate. *Id.* ¶ 67; Jan. 29 Alfonsin Dep. at 212:20-23. They imply that those hurdles are

not present today, at least not to the same degree. *See*, *e.g.*, Jan. 29 Alfonsin Dep. at 213:3-4 ("[s]o the restrictions of operations are much more limited.").

Moreover, the Debtors correctly contend that the A&P Ad Hoc Group misreads the VOC condition in section 7.1(u). *See* Reply ¶ 68. This condition precedent serves merely to postpone the Closing Date by affording the Debtors additional time to meet the Forward Net Bookings Condition and Minimum Liquidity Condition, among other things, if they cannot meet them by the proposed Closing Date. The Backstop Parties are not permitted to terminate the Backstop Agreements based on the Debtors' inability to satisfy these conditions unless the conditions remain unsatisfied as of the Outside Date (which may be extended under certain circumstances (*see* Commitment Creditors Backstop Agreement § 1.1 (defining the Outside Date)) or one of the defined Termination Events occurs in the interim (*see id.* § 9.1). Application of section 7.1(u) will not cancel the agreement; rather, if invoked, it will extend the closing for an additional 45 days. *See id.* § 7.1(u) ("provided if the condition set forth in this Section 7.1(u) is not satisfied as of a proposed Closing Date, such Closing Date shall be suspended for a period of forty-five (45) days . . ."). The Court finds no merit to the A&P Ad Hoc Group's objection to this aspect of the agreement.

The Debtors also challenge the Objectors' assertions that there is a high risk that they will not be able to satisfy the Forward Net Bookings Condition and Minimum Liquidity Condition. As support, they point to Mr. Alfonsin's testimony concerning the differences between the Debtors' financial performance in 2021 and their outlook for 2022 as indicative of the likelihood that that the Debtors will meet the Forward Net Bookings Condition. *See* Jan. 29 Alfonsin Dep. at 212:12-215:24. Moreover, Mr. Alfonsin explained that the Debtors plainly would not have agreed to the same Forward Net Bookings Condition and Minimum Liquidity Condition in early

2021 given their significantly different capacity and level of operations (and which, as noted, was a pre-vaccination and mass lockdown environment). Reply ¶ 69; *see* Jan. 29 Alfonsin Dep. at 215:19-23 ("if I was standing in 2021 I would have asked for a different threshold vis-à-vis 2019, because the sizing of the company was completely different").

Mr. Herlihy concedes that some of the conditions precedent in Article VII are unique to the Commitment Creditors Backstop Agreement. *See, e.g.*, Feb. 10, 2022 Hr'g Tr. at 179:8-12, 205:5-13 [ECF No. 4373] (testifying that he is personally not aware of any airline industry backstop agreements with a condition precedent relating to forward net bookings or any backstop agreements in general containing a condition precedent relating to COVID-19 variants).

Nonetheless, the Objectors have not demonstrated that those conditions insulate the Commitment Creditors from risk of loss. Moreover, as set forth above, the Debtors have demonstrated that there is a significant likelihood that they will be able to meet the conditions precedent necessary to hold the Commitment Creditors to the funding requirements under the agreement. *See, e.g., id.* at 238:2-11 (Mr. Herlihy testifying that the Debtors "gained comfort" about the conditions precedent through "extensive discussions with management," including with respect to the Forward Net Bookings Condition, "consider[ing] where the company is today, what we expect under the business plan, and how significant of a drop would need to occur for the [condition precedent to fail]"); *id.* at 238:12-25 (Mr. Herlihy testifying that the invocation of the COVID Suspension Period "does not create significant additional conditionality" for the Debtors because it merely "pause[s]" the effective date of the Backstop Agreements and does not, by itself, prevent closing).

The Objectors also contend that the Backstop Payment is unreasonable and unnecessary because the economics of the Plan guarantee full participation of the Class C Notes. They note that the Plan allocates over 85% of the Class C Notes to the Commitment Creditors and that given the materially higher recovery provided for Class C Notes under the Plan, as compared to Class A Notes, the other Class 5 Creditors will most certainly opt into Class 5b Treatment of their Class 5 Claims and acquire the remaining (approximately) 15% of the Class C Notes. A&P Ad Hoc Group Obj. ¶ 42. They contend that even if the Debtors are correct that there is a risk that the Class C Notes would not be fully subscribed, then not only should the Commitment Creditors encourage the participation of all similarly situated creditors, but the New Convertible Notes Offering Procedures should be altered to permit oversubscription by all parties entitled to subscribe. *Id.* ¶ 45. They assert that oversubscription would, in effect, provide for an equitable, *pro rata* backstop by all eligible Holders of LATAM Parent General Unsecured Claims who already have the incentive to participate, and avoids the unjustified diversion of value from the approximately twenty-nine percent (29.0%) of Holders that were excluded from the opportunity to participate as Commitment Creditors. *Id.*

The Committee also argues that the Court should assess the reasonableness of the Backstop Payment by measuring it against the "uncommitted portion" of the backstopped offering. Committee Obj. ¶ 53. It contends that since the Plan allocates $2.791 billion of Class C Notes to the Commitment Creditors, they are actually backstopping only $478 million of the new money for the Class C Notes. The Committee contends that the nearly $654 million fee for doing so (i.e., 20% of the $3.269 billion) represents a 136.8% fee on the $478 million unallocated "at risk" portion of the Class C Notes. *Id*. ¶ 54. The Committee further contends that when viewed together with the ERO Rights Offering, the Commitment Creditors' $734 million fee to backstop

$878 million in new money investments, represents an 83.6% fee on the unallocated at risk portion of the offerings. *Id.* ¶ 55.

The Debtors' take issue with that methodology because neither the Commitment Creditors Backstop Agreement nor the Plan obligates the Commitment Creditors to subscribe for and purchase the Class C Notes. Direct allocations options are commonplace in backstop agreements as potential compensation to a backstop party. *See* Jan. 30 Herlihy Dep. at 196:11-18 ("The [holdbacks on the chart of comparable transactions] are direct allocations, similar to the 50% that you see in the LATAM case with respect to the Convert C. In other cases . . . perhaps more than half of them, there is a similar concept of a direct allocation or holdback."). Here, the Commitment Creditors Backstop Agreement merely provides that "the Backstop Parties shall be offered the Direct Allocation Securities." Commitment Creditors Backstop Agreement § 2.1(a)(ii). The Plan gives effect to that provision. It accounts for the Direct Allocation but does not obligate the Backstop Parties to subscribe for and purchase those securities. *See* Plan § 5.10 (providing for allocation of the Class C Notes that remain after reductions in the pool made by the Commitment Creditors on account of their Direct Allocation and the pro rata share of their claims). Likewise, the Plan does not obligate the Holders of Allowed Class 5 Claims to opt into Class 5b Treatment of their claims. In contrast, under the agreement the Commitment Creditors are obligated to purchase up to $3.269 billion of Unsubscribed New Convertible Notes Class C and up to $400 million in ERO New Common Stock. As parties to the agreement, the Commitment Creditors are exposed to risk from the full amount of the offerings – that they do not otherwise have – because they hold the right, not the obligation, to claim their contractual Direct Allocation and pro rata share of the Class C Notes, which they may decline if the Debtors' business takes a turn for the worse. The Direct Allocation and the Class 5b Treatment provide

upside benefits by giving the Commitment Creditors the right to purchase the underlying

securities. The downside under the Commitment Creditors Backstop Agreement is the same for

the Commitment Creditors whether or not they purchase the securities – they are obligated to

purchase 100% of the Class C Notes and up to $400 million of the ERO New Common Stock.

As parties to the agreements, the Commitment Creditors are assuming the risk that they will be

called upon to purchase the entire $3.669 billion in securities that they have agreed to backstop;

not merely the new money that would be provided by other investors if the Commitment

Creditors elected their Direct Allocation and pro rata share of the Class C Notes.

The Objectors assert that any risk to the Commitment Creditors is technical and small.

*See*, *e.g*., A&P Ad Hoc Group Obj. ¶ 30. They contend that the Commitment Creditors bargained

for the Direct Allocation of 50% of the Class C Notes, plus their 70.74% pro rata share for the

remaining half of the Class C Notes because it is a good deal economically and, as such, they

will exercise their rights to subscribe to and purchase the Class C Notes. *See*, *e.g*., Committee

Obj. ¶ 68; *see also* RSA, Ex. D, Offering of New Convertible Notes Class C Due Dec. 31, 2121

at 1 n.1. The Committee asserts that the Court should assess the reasonableness of a backstop fee

is by measuring the fee against the uncommitted portion of the offering. *See* Committee Obj. ¶

53. As support it cites to a bench ruling by Judge Drain in *Momentive*. *See* June 19, 2014 Hr'g

Tr. at 198:6-11, *Momentive Performance Materials Inc., v. Bank of N. Y. Mellon Tr. Co.*

(*"Momentive"*), No. 14-08227 (RDD) (Bankr. S.D.N.Y Jun. 23, 2014), [ECF No. 28] (requiring

that the proposed backstop fee arrangement only be calculated against uncommitted portions of a

rights offering). But that overstates the import of *Momentive*. While Judge Drain there expressed

reluctance to approve a backstop payment based on the entire commitment amount, he also noted

that he did not have evidence concerning the market reasonableness of paying a fee like the one

the debtors proposed. *See id.* at 112:13-17. The backstop parties subsequently reached an

agreement with the objectors. Accordingly, Judge Drain never reached the issue on a full record,

and ultimately approved the backstop with an even higher so-called "at-risk" fee – in other

words, as a percentage fee based on the total commitment and not just the unspoken for portion.

*See* Order Authorizing and Approving the Debtors' (I) Entry Into, and Performance Under the

Backstop Commitment Agreement, (II) Payment of related Fees and Expenses, and (III)

Incurrence of Certain Indemnification Obligations. *In re MPM Silicones, LLC*, No. 14-22503

(Bankr. S.D.N.Y. June 23, 2014), [ECF No. 509].

　　The Objectors also rely on *Pacific Drilling* to suggest that the Backstop Payments run

afoul of the Bankruptcy Code. *See Pacific Drilling S.A.* ("*Pacific Drilling*"), No. 17-13193

(MEW) (Bankr. S.D.N.Y 2018). However, that case is distinguishable. *In Pacific Drilling*, the

court ultimately approved a Plan which offered a 46.9% discount on equity in the reorganized

debtor, but prior to doing so, stated that it would not approve other benefits afforded to the

backstop parties, such as a private placement. *See* Sept. 25, 2018 Hr'g Tr. at 22:22-25-23:1,

*Pacific Drilling*, [ECF No. 634]. The court also questioned the backstop payment in light of the

significant discount on equity. *See id.* at 20:5-11 (questioning fee in light of "very large"

discount). *See also* Sept. 18, 2018 Hr'g Tr. at 21:22-25, *Pacific Drilling* [ECF No. 622]

(expressing concern over discount to plan value for the rights offering and private placement); *id.*

at 77:22-24 (questioning discount). Here, the Commitment Creditors Backstop Agreement

provides the Commitment Creditors with the opportunity to acquire equity in the reorganized

LATAM at a discount rate of 20.7%. *See* Herlihy Decl., Chart. Taken together, the provisions

here represent substantially less compensation than the benefits provided in the plan approved by

Judge Wiles in *Pacific Drilling*. *See id*. Moreover, the agreement to backstop the Plan for eight

months is substantially longer than the two-month commitment of the backstop parties in *Pacific Drilling* and, as such, exposes them to significantly more risk.

At the Hearing on the Motion, counsel for the Commitment Creditors advised that since executing the Backstop Agreement on January 12, 2022, the Commitment Creditors have earmarked and reserved the entire $3.669 billion for the backstop commitment. *See* Feb. 11, 2022 Hr'g Tr. at 34:20-23 [ECF No. 4381]. She explained that those funds would remain earmarked and at risk under the Backstop Agreement for a minimum of several months after the Debtors confirm their Plan. She reasoned that the process for registering the Plan Securities with the CMF and giving effect to the preemptive rights of the Eligible Equity Holders to acquire Plan Securities as required under Chilean law and the Plan likely would not be completed until two or three months after confirmation of the Plan. *See id*. at 32:1-7. At that time, the Commitment Creditors would be offered the opportunity to acquire the Direct Allocation Securities. As counsel explained, those creditors are under no obligation to acquire any of those securities. *Id*. at 32:19-21 ("They could take up zero, they could take up twenty percent, they could take up fifty percent. But whatever they elect to do, they will have the right to do that."). At that point, the Holders of Allowed Class 5 Claims (including the Commitment Creditors) can elect Class 5b Treatment under the Plan and acquire the remaining Class C Notes. However, they are not required to do so. *Id*. at 32:23-33:7.

Plainly, until the rights and notes offerings close, the Commitment Creditors are exposed to the risks of material changes in the Debtors' business outlook which could negatively impact the price of the Debtors' stock. As the Debtors note, potential downfalls in the Debtors' business outlook are not mere abstractions, as Mr. Alfonsin testified about multiple factors that could

adversely impact the Debtors' future performance, including the "variance of the Omicron variants" and volatile fuel prices—*e.g.*, some of the same variables that have plagued the aviation industry the onset of the COVID-19 pandemic. *See* Jan. 29 Alfonsin Dep. at 183:18-24, 182:6-16, 184:14-24. As parties to the Backstop Agreement, the Commitment Creditors must acquire the securities, irrespective of the trading price. The Backstop Payments to the Commitment Creditors provide consideration in exchange for that substantial capital commitment to backstop the entire $3.669 billion new money investment for the entire commitment period—a period that is potentially longer than any backstop period identified by the experts as a comparable transaction. *See* Herlihy Decl. ¶ 30; *id.*, Chart. The Court finds that the Commitment Creditors are subject to meaningful risk on the entire portion of the rights offerings they are backstopping.

Whether The Fees Charged Under
The Backstop Agreement Are Reasonable

The Objectors challenge the reasonableness of the Backstop Payment and other fees, costs and expenses under the Commitment Creditors Backstop Agreement in several ways. They contend that the Court should not approve the agreement because the Termination Payments and Expense Reimbursement provisions are excessive, the agreement fails to include a meaningful "fiduciary out" provisions for the Debtors, and the Indemnification Provisions are overly broad and run afoul of Chilean law. They assert that the Herlihy Implied Discount analysis fails to account for the fact that the Backstop Payment is a cash payment, and relies on a skewed set of comparables. Finally, they contend that the Court should reject the Implied Discount Methodology because it does not isolate the costs associated with the Commitment Creditors Backstop Agreement. The Court considers those matters below.

51

The Termination Payments

Article IX of the Commitment Creditors Backstop Agreement contains the agreement's "Termination" provisions.[30] Section 9.1 lists the "Termination Rights" of the parties, while Section 9.2 addresses the "Effect of Termination." Section 9.2(b) regulates the "Termination Payments" obligation that arises upon the termination of the agreement. It calls for a payment equal to 10%, 15%, 40% or 50% of the Backstop Payment, depending on the Termination Right exercised under section 9.1 of the agreement.

The Committee acknowledges that as a general matter, termination fees, are common aspects of backstop agreements. *See* LaPuma Decl. ¶ 51. However, it maintains that the Termination Payments under the agreement are excessive and unreasonable. *Id.* As support, the Committee notes that the Commitment Creditors Backstop Agreement provides for termination fees as high as 8% or 10% of the total offering, depending on whether the agreement is terminated before or after plan confirmation, and that on a percentage basis, that greatly exceeds the mean and median from the PJT Comps Set (6.2% and 6%). *Id.* Moreover, it contends that the PJT Comps Set demonstrate that the size of termination fees on a percentage basis tends to be smaller when the equity offerings are larger. *Id.* ¶ 52. It notes that every example Mr. Herlihy provides in which termination fees of 10% or higher were permitted were for offerings of $720 million or less (and often much less). *Id.* In contrast, the $3.669 billion offerings that the Commitment Creditors seek to backstop is more than five times larger than the largest of the other offerings where similar termination fees (on a percentage basis) were permitted. *Id.* It contends that in the *Hertz* bankruptcy, which is the only comparable with a similarly-sized equity offering, the termination fees were a mere 3%. *Id.* The Committee contends that Mr. Herlihy

---

[30]    There are no termination fees in the Backstop Shareholders Backstop Agreement.

conceded that the Termination Payments, on a percentage basis, exceed the mean and median
amounts in other backstop agreements and that, on a dollar basis, they are the highest termination
fees he has observed (other than in *PG&E*, which involved a $12 billion offering.) Committee
Obj. ¶ 15. Even if the Commitment Creditors Backstop Agreement is terminated through no fault
of the Debtors, the Debtors would still be obligated to pay fees totaling $147 million or $220
million (i.e., 2-3% of the total amounts backstopped), which also exceeds the termination
payments in other agreements on a dollar basis except for *PG&E*. *Id.*

BancoEstado likewise complains that the Termination Payments are excessive. It
contends that if it is approved the Termination Payment will create untoward pressure in favor of
confirmation of the Plan, because the entry of an order denying the Plan would allow the
Commitment Creditors to terminate that agreement and charge a fee of 10% of the Backstop
Payment (or $73.4 million). Commitment Creditors Backstop Agreement §§ 9.1(c)(xiii)(A)-(C),
9.2(b)(ii)(A). It contends that parties in interest that would otherwise object to or vote against the
Plan will be faced with the prospect of either asserting their rights, on the one hand, or, on the
other hand, potentially contributing to a failure of confirmation and the resultant expense of
millions of dollars of termination fees for nothing. *See, e.g.*, BancoEstado Obj. ¶ 45. Moreover,
and in any event, BancoEstado asserts that the justification for providing termination or break-up
fees is to induce bidding by parties that would otherwise refrain from purchasing a debtor's
assets or funding its reorganization. *See* Jan. 12, 2007 Hr'g Tr. at 118:10-18, *In re Delphi Corp.*,
No. 05-44481 (Bankr. S.D.N.Y. Jan 12. 2007) [ECF No. 7118] ("alternative transaction fees and
the like" were not appropriate where "stalking horse bidders were so imbedded in the capital
structure already that they did not need further incentive to make their proposal."). It says that
rationale does not apply to the Commitment Creditors because they are prepetition creditors

whose investment in the Debtors will allow them to obtain superior recoveries on their

prepetition claims of over 60%. BancoEstado Obj. ¶ 44. In short, it maintains that there is no

reason to provide those creditors with additional inducement.

The Debtors focus on the Termination Fee in the Commitment Creditors Backstop

Agreement on a percentage basis as compared to the termination fees in other comparable

backstop agreements. *See* Reply ¶ 87. They contend that the Objectors and their experts simply

assert that the fee is too high without considering that the fee of 8-10% of the new money

commitment only applies in some circumstances, while the 2-3% fee applies in others—both of

which are aligned with those in the market and, indeed, are far lower than the fees in other

backstop agreements. *See id.* ¶ 87 (noting that the court in the *Aeromexico* restructuring approved

a termination fee of 15% of the total amount backstopped); Commitment Creditors Backstop

Agreement §§ 9.2(b)(i) (describing the Termination Fee of 8-10% of new money commitment

under certain terminations), 9.2(b)(ii) (describing Termination Fee of 2-3%). *See also* Herlihy

Decl. ¶ 28. The Debtors point to the fact that while the termination fee in the Commitment

Creditors Backstop Group could be as high as 10% of the new money commitment in some

circumstances (*i.e.*, 50% of the backstop fee), this compares favorably to the termination fees in

*Carlson Wagonlit*, *Gulfport*, *Chesapeake*, *24 Hour Fitness*, *Hornbeck Offshore Services*, *Ultra

Petroleum*, *Quorum Health*, *Hexion*, *Windstream Communications*, *Claire's Stores*, *Fieldwood

Energy*, *Expro International Group*, *Pacific Drilling*, and *Toys R Us*—14 of the comparable

transactions analyzed by Mr. Herlihy—each of which had termination fees in excess of 50% of

the backstop fee. *See* Reply ¶ 87.

The Court finds the termination fee in the Commitment Creditors Backstop Agreement is reasonable as drafted. The termination payment to the Commitment Creditors ranges from 2% to 10% of the new money to be provided by the Commitment Creditors—*i.e.*, 10% to 50% of the backstop fee. Termination payments to entities providing backstop commitments are common aspects of backstop agreements– the Objectors do not claim otherwise. Mr. Herlihy has demonstrated that, on a percentage basis, the termination payment ranges are commensurate with those in his chart of 28 comparable backstop fees in 26 cases. *See* Herlihy Decl., Chart. Even the highest termination fee, 10% of the new money offering, is less than or equal to six of the 28 comparable transactions. *See id.* While the Objectors disagree that the termination fee ranges are reasonable, none of their experts actually opined otherwise or critiqued this aspect of the Herlihy Declaration. Moreover, the fact that the dollar amount of the termination fee well exceeds that of the comparable backstops Mr. Herlihy analyzed is immaterial because many those transactions involved much smaller offerings.

Expense Reimbursement Provisions

In the Backstop Agreements, the Debtors agree (regardless of the consummation of the transactions contemplated by the Backstop Agreement) to pay:

> The Reimbursable Expenses of the Backstop Parties in an aggregate amount of up to $3 million, and the uncapped professional fees (including success/completion fees) incurred by the AHG Advisors (i.e., Kramer Levin, Evercore, Coeymans Edwards Poblete & Dittborn and Bofill Silva Escobar Abogados).

> The uncapped reasonable and documented fees and expenses, including professional fees of (a) Costa Verde (represented by Wachtell, Lipton, Rosen & Katz and Cuatrecasas); (b) Delta (represented by Davis Polk & Wardwell LLP, Barros & Errázuriz Abogados, and Perella Weinberg Partners, L.P. ("Perella Weinberg"); and (d) Qatar (represented by Alston & Bird LLP, Carey Abogados and HSBC). In addition, the Debtors have agreed to pay the fees of Greenhill, which represents Costa Verde, Delta, and Qatar collectively.

*See* Commitment Creditors Backstop Agreement § 3.3; Backstop Shareholders Backstop

Agreement § 3.1. BancoEstado notes that this group of advisors includes four U.S. law firms,

five Chilean law firms, and four U.S. financial advisory firms, and that separate

success/completion fees will be charged by at least three of the financial advisory firms–

Evercore ($18.5 million), Greenhill ($7 million), and Perella Weinberg — in connection with the

same transaction.[31] BancoEstado Obj. ¶ 47 (internal citations omitted). It maintains that

according to documentation produced in discovery, the Debtors estimated in December 2021 that

the total expected fees of the Backstop Parties' advisors would reach $60.6 million, without

including the fees of Greenhill, Perella Weinberg, and HSBC, which at the time of the Debtors'

estimate were still "TBD."[32] *Id.* BancoEstado complains that the professional fees the Debtors

propose to pay are duplicative, excessive, and unsupported by any evidence or even estimates in

the Motion or Herlihy Declaration of what the final amount of the Expense Reimbursement

Payment will actually be, or what fees were charged in comparable cases. *Id.* ¶ 48. It contends

that the Debtors make no arguments specific to the Expense Reimbursement Payment, but

simply argue using boilerplate language that the Expense Reimbursement Payment, along with

the Backstop Payment and indemnification provisions, are "commonly used" and "necessary

inducements" to compensate the Backstop Parties. *See Id.* (citing Motion ¶ 40). It argues that

given the numerous professional firms the Debtors propose to pay, including enormous

success/completion fees with respect to the same transaction, the Backstop Agreements should at

the very least be revised to include caps on the fees payable to the professionals of the Backstop

---

[31]    BancoEstado contends that these fees are in addition to the success/completion fee of $17.5 million the Debtors
will need to pay their own financial advisor, PJT Partners. *See* BancoEstado Obj. ¶ 47 n.65.

[32]    *See* Declaration of Will Clark Farmer in Support of Objection (the "Farmer Declaration") Ex. A
(LATAM_C11_BE_00002196) ("RSA Party Professional Fee Build (Dec. 2021)"). The Farmer Declaration is
annexed to the BancoEstado Obj.

Commitment Parties. The Committee complains that the potential fees are "extraordinary" (*see* Committee Obj. ¶ 60) and the A&P Ad Hoc Group says that the Debtors should not pay the fees because the Backstop Parties have not made a "substantial contribution to the bankruptcy cases." A&P Ad Hoc Group Obj. ¶ 53.

The Court finds no merit to the objections. The reimbursement of the Backstop Commitment Parties' expenses is limited to "reasonable expenses." *See* Backstop Shareholders Backstop Agreement § 3.1; Commitment Creditors Backstop Agreement, § 3.3. Further courts in this district approve the "reasonable fees and expenses" of the "advisors and consultants" of backstop parties as actual, necessary costs under Section 503(b). *See, e.g.*, Order Granting Debtors' Motion For Order Pursuant To Bankruptcy Code Sections 105(a), 363 And 365, Bankruptcy Rule 6006, And Local Bankruptcy Rules 6006-1 And 9013-1 (I) Authorizing The Debtors To Assume The Restructuring Support Agreement, (II) Authorizing The Debtors To (A) Assume The Backstop Agreement, (B) Pay The Backstop Commitment Fee, And (C) Incur Certain Indemnification Obligations, And (III) Granting Related Relief, *In re Roust Corp.*, No. 16-23786 (RDD), at ¶ 12 (Bankr. S.D.N.Y. Jan. 10, 2017) [ECF. No. 40]. The Objectors' experts concede that that courts considering backstop agreements "frequently reimburse[] reasonable expenses." Feb. 3 LaPuma Dep. at 297:14-15. The reimbursement and indemnification provisions were integral in obtaining the financing commitments from the Backstop Parties. *See* Motion ¶ 41; Herlihy Decl. ¶ 47 ("The Expense Reimbursement and the Indemnification Obligations are essential components of the Backstop Agreements . . . . The Backstop Commitment Parties have required these obligations, as applicable, as a condition to providing the commitments under the Backstop Agreements, and entry into the Backstop Agreements is required under the RSA."); *see also* Jan. 29 Alfonsin Dep. at 93:17-24. As such, and given "the

significant benefit to the Debtors' estate of having a definitive binding commitment to fund the

Debtors' restructuring," the Court approves the indemnification and reimbursement provisions as

"actual, necessary" costs of preserving the Debtors' estates. *See, e.g.*, Order (I) Authorizing

Debtors to (A) Enter into Backstop Purchase Agreement, (B) Pay Specified Payment and Related

Expenses, (C) Provide Indemnification to Certain Parties and (II) Granting Related Relief, *In re*

*21st Century Oncology Holdings, Inc.*, No. 17-22770 (RDD), at 2 (Bankr.S.D.N.Y. Sept. 20,

2017) [ECF. No. 443]; Order Authorizing (I) The Debtors Entry into the Backstop Commitment

Agreement and (II) Payment of Related Fees and Expenses, *In re Windstream Holdings, Inc.*,

No. 19-22312 (RDD), at ¶ 5 (Bankr. S.D.N.Y. May 12, 2020) [ECF. No. 1806].

Alternative Transactions Proposals

Section 6.7 of the Commitment Creditors Backstop Agreements addresses "Alternative

Transaction Proposals". Section 6.7(a) provides the general rule that from the date of the

agreement until the earlier of the termination of the agreement in accordance with its terms and

the Closing Date, each Debtor agrees, without limitation, that it will not seek, solicit, encourage,

propose, assist, consent to, vote for, or participate in the formulation or preparation of any

Alternative Transaction and enter into any agreement to pursue any Alternative Transaction. *See*

Commitment Creditors Backstop Agreement § 6.7; Backstop Shareholders Backstop Agreement

§ 6.7. Each Debtor also agrees that if any of the Debtors receive an unsolicited bona fide

proposal or expression of interest regarding any Alternative Transaction it shall promptly inform

the Backstop Parties of any Alternative Transaction and any offer or agreements related to any

Alternative Transaction that such Debtor becomes aware of and promptly provide counsel to the

Backstop Parties with a summary of the material terms thereof. For these purposes, an

"Alternative Transaction" is a transaction that is outside of the scope of the Restructuring

Transactions under the RSA. *See* Commitment Creditors Backstop Agreement § 1.1 (providing, in substance, that the terms "Restructuring Transactions" and "Alternative Transaction" have the meanings set forth in the Restructuring Support Agreement).

Section 6.7(b) of the agreement modifies section 6.7(a). In substance, it provides that to the extent any of the Debtors' boards of directors reasonably determines in good faith on the advice of legal counsel with respect to their "Exercise of Fiduciary Obligation" that the Debtors' fiduciary obligations under applicable law require the Debtors to take any action or refrain from taking any action with respect to the Restructuring Transactions or that such action or inaction would violate applicable law, including actions or inactions that would constitute a breach under the agreement, the Debtors may terminate the agreement pursuant to section 9.1(d)(ii) without incurring any liability to any one or more of the Backstop Parties under this agreement (other than payment of the Expense Reimbursement and any payments to be made in connection with the Indemnification Obligations under Article VIII); provided that the Debtors shall be required to terminate this agreement pursuant to section 9.1(d)(ii) and to pay all fees, expenses and other obligations in accordance with section 9.2. *Id.* § 6.7(b). Thus, section 6.7(b) of the agreements allows the Debtors to do (or not do) what their fiduciary duties or applicable law require in respect of their deal with the Backstop Parties on the Restructuring Transactions. BancoEstado notes that nothing in section 6.7(b) expressly overrides the restrictions imposed on the Debtors in section 6.7(a) from considering an Alternative Transaction Proposal, which by definition is a deal outside the scope of the Restructuring Transactions. It contends that this imposes a Hobson's choice on the Debtors. If the Debtors receive an Alternative Transaction Proposal, they cannot consider it without violating section 6.7(a) because nothing in section 6.7(b) expressly allows them to do so in their "Exercise of Fiduciary Obligations." BancoEstado Obj. ¶ 42.

The Plan is the product of the RSA that the Debtors formulated during the Mediation. It is based on the Debtors' reasoned determination that they are best able to raise the substantial amounts of capital they require to exit these Chapter 11 Cases and operate their businesses in the future through the transactions called for under the Plan including the proposed notes and rights offerings in Chile. The terms of the RSA reflect the Debtors' commitment to that strategy. The Court recognizes that it should not sanction provisions of a backstop agreement that unreasonably interfere with the Debtors' exercise of their fiduciary obligations. *See In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010). Under the facts of this case, the provisions in section 6.7(b) do not do so here. While the Debtors cannot actively seek an Alternative Transaction or engage in substantive negotiations with respect to an Alternative Transaction without terminating the Backstop Agreements, the Backstop Agreements do not prevent the Debtors from reviewing Alternative Transactions as they are presented to the Debtors. Section 6.7 is reasonably tailored to balance the interests of the Debtors and their estates against the commitments to the backstop arrangements in light of the Backstop Parties' commitment of their own capital for several months in support of the Plan.

Indemnification Obligation

Section 8.1 of the Backstop Shareholders Backstop Agreement governs the Debtors' obligation to indemnify Costa Verde, Qatar and Delta, as the Backstop Parties under the agreement. In part, that section provides that the Debtors "shall jointly and severally, indemnify and hold harmless each Backstop Commitment Party, its Affiliates, shareholders, members, partners and other equity holders, general partners, managers, directors and its and their respective Representatives, agents and controlling persons" from losses "arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby .

60

. . ." Backstop Shareholders Backstop Agreement § 8.1. BancoEstado contends that the Court

cannot approve this provision because it violates Chilean law. BancoEstado Obj. ¶ 50. The

Committee likewise raises the issue. Committee Obj. ¶ 61. As support, BancoEstado relies on the

unchallenged testimony of Pedro Pablo Gutierrez. *See* Gutierrez Decl. In support of

BancoEstado's contention that Chilean law prohibits indemnification of shareholder designees

on the Debtors' board of directors, Mr. Gutierrez notes that Article 41 of the Law No. 18,046 of

1981, as amended, on stock corporations (*Ley Sobre Sociedades Anónimas*, the "Chilean

Corporations Law") states, as follows:

> *Directors must employ in the exercise of their functions the care and*
> *diligence that men employ ordinarily in their own businesses and will be*
> *jointly and severally liable for the damages caused to the company and to the*
> *shareholders by their fraudulent or negligent actions.*
> *It is void any provision of the bylaws and any resolution of the shareholders'*
> *meeting that tends to release or limit the liability of the directors referred to*
> *in the preceding paragraph.*

*See id.* ¶ 14. He explained that in addition to Article 41's "golden rule", Article 42 Nos. 1 and 7

of the Chilean Corporations Law "forbids corporate directors from the exercise of acts that are

illegal or against the bylaws or the social interest (*interés social*) of a corporation, or using

his/her office to obtain undue advantages for themselves or for related parties that are detrimental

to the social interest." *Id.* ¶ 15. He asserted that "[t]he Chilean securities regulator (i.e., the CMF)

has examined the Chilean Corporations Law and has concluded that corporations cannot

contractually indemnify 'a director who has incurred an expense by reason of an action that, in

turn, constitutes a loss to the company he administers, insofar as said action, and the consequent

payment for it, bear no relationship whatsoever to the corporate interest.'" *Id.* ¶ 16 (citing *Oficio*

No. 13057 dated April 5, 2017 of the CMF). Based on the foregoing, Mr. Gutierrez concluded

that "[i]n sum, Chilean law prohibits a corporation from indemnifying its own directors." *Id.* In

response, the Debtors contend that the agreement does not purport to indemnify the directors in their capacities as "directors," and, as such, the "golden rule" does not apply. Reply ¶ 99. Moreover, they assert that the resolution of that issue is best left to the Chilean courts - if the issue arises at all. *See* Feb. 11, 2022 Hr'g Tr. at 278:16-25 [ECF No. 4381]. The Court concurs with the Debtors.

BancoEstado also contends that indemnifying claims of non-Debtors "in connection with the Plan," would effectively provide non-Debtors with an improper third-party release by making the Debtors financially responsible for claims against third parties that may have nothing to do with the Backstop Agreements, but arguably are claims "in connection with the Plan." BancoEstado Obj. ¶ 51. It asserts that if creditors like BancoEstado or holders of Chilean Bonds assert claims against non-Debtors covered by the proposed indemnification, then the Debtors are likely to argue that such claims should be stayed or enjoined based on the financial impact of such claims on the Debtors. It asserts that the Court can resolve this problem by removing the reference to the term "Plan" in the indemnification. *Id.* As support, BancoEstado contends that indemnification language without such a reference to plan-related claims can be found in a number of recent cases. *Id.* ¶ 51 n.73.[33] The Court finds, as the Debtors urge, that given the interrelationship of the Backstop Agreement and the Plan and the other transactions contemplated by the Plan, it is reasonable and proper for the indemnity to encompass claims relating to the Plan. Other courts have likewise extended indemnities to cover matters relating to

---

[33]    As support, and without limitation, BancoEstado cites to the following: Avianca Equity Commitment Agreement, *In re Avianca Holdings S.A.,* No. 20-11133 (MG) (Bankr. S.D.N.Y. Sept. 15, 2021), [ECF No. 2134] § 6.1 (indemnifying claims "asserted by a third-party in connection with this Agreement or the transactions contemplated hereby, including the Equity Conversion or Equity Raise"); Debt Backstop Commitment Agreement, *In re Hexion Holdings LLC,* No. 19-10684 (KG) (Bankr. D. Del. Apr. 25, 2019), [ECF No. 198-4] Equity Backstop Agreement § 8.1 (indemnifying claims "arising out of or in connection with this Agreement, including the Rights Offering Backstop Commitment, the Rights Offering, the payment of the Commitment Premium or the use of the proceeds of the Rights Offering").

the reorganization plan. *See, e.g.* Order Authorizing and Approving the Debtors' (I) Entry into

and Performance Under the Backstop Commitment Agreement, (II) Payment of Related Fees and

Expenses, and (III) Incurrence of Certain Indemnification Obligations, *In re MPM Silicones,*

*LLC,* No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014) [ECF No. 509]; *see also* Order

Authorizing (I) The Debtors Entry into the Backstop Commitment Agreement and (II) Payment

of Related Fees and Expenses, *In re Windstream Holdings, Inc.,* No. 19-22312 (RDD) (Bankr.

S.D.N.Y. May 12, 2020), [ECF No. 1806] (indemnifying backstop parties for claims and losses

"arising out of or in connection with the [backstop agreement], the plan, or the transactions

contemplated hereby . . ."). The Court overrules this aspect of BancoEstado's and the

Committee's objection to the Motion.

Failure To Account For Backstop Cash Payment

        The Objectors contend that the Implied Discount improperly equates backstop

arrangements paid in equity to the cash Backstop Payment and in doing so, understates the cost

to the Debtors. BancoEstado contends that the cash backstop payment is more expensive than

one paid in equity because the Debtors must raise additional cash in their rights offering to pay it.

BancoEstado Obj. ¶ 26. The Debtors challenge those contentions. It contends that the Objectors

disregard the fact that backstop fees that are paid in equity are grossed up to plan value by

increasing it based on the plan discount. Reply ¶ 54 ("Thus, for example, if a $70 million

backstop fee is paid in equity in connection with a plan in which securities are discounted by

30%, $100 million in equity would be paid to the backstop parties.") (citation omitted).

Moreover, the Debtors note that consideration paid by a debtor in cash may ultimately be more

or less valuable than the consideration paid in equity at plan value, depending on how well the

debtor ultimately performs. *Id. ¶* 56 (noting that the soaring plan value post-approval is what

resulted in the higher backstop fees in *Chesapeake Energy* – one of the PJT Comps Set - because

they were paid in equity). The Court credits the Debtors' analysis.

The PJT Comps Set

The parties agree that regardless of the metric used for comparison purposes, the starting

point for a comparative analysis is the collection of data from a comparable set of transactions.

*See, e.g.*, Feb. 5 Scherer Dep. at 25:7-22; *see also id.* at 54:7-57:9 (noting that the selection of an

initial set of comparable transactions should be based upon objective data such as transaction

size, recency, existence, or absence of disruptive events (such as the 2008 financial crisis or the

COVID pandemic)). As noted, Mr. Herlihy's objective criteria focuses on equity backstop

arrangements for amounts of at least $200 million over a five-year period before the backstop

hearing (*i.e.*, since February 10, 2017), as well as equity backstop arrangements of more than $50

million that have been executed since the beginning of the COVID-19 pandemic. Herlihy Decl. ¶

38; Jan. 31 Herlihy Dep. at 177:3-8, 20-25, 178:2-179:4. Mr. Sherer noted that the PJT Comps

Set is "robust." Feb. 5 Scherer Dep. at 58:21-22. Although the Objectors challenge the use of

certain of the comparables, none of the Objectors' Experts propose a new data set on which to

conduct an analysis of the Backstop Payment.[34]

The PJT Comps Set includes *Seadrill, Hexion* and *Chesapeake Energy.* Mr. Herlihy

includes *Seadrill* and *Hexion* twice, because the backstop agreements in those cases had different

terms for different backstop parties. *See* Jan. 31 Herlihy Dep. at 194:17-21. The Objectors'

experts all claim that *Seadrill* should be eliminated, in part, because it included the highest

backstop of all comparables in the PJT Comps Set, and because it includes two backstop

---

[34]    Other than excluding certain of the transactions from the PJT Comps Set and in some instances adding
*Avianca* to the PJT Comps Set (as discussed below), the Objectors' experts all rely on the same set of comparables.
*See* Blokh Decl., Adjusted Ex. 1 at 19; Scherer Report, App'x. A, B at 31-32; LaPuma Decl., Exs. A, B at 25-26.

payments. They say that including it twice overstates its relative comparable impact (and thus inflates the average of the comparable transactions). *See* LaPuma Decl. ¶ 33; Blokh Decl. ¶ 10; Scherer Report at 20. They make the same argument for *Hexion. See* Reply ¶ 38; LaPuma Decl. ¶ 33 ("By double counting . . . Mr. Herlihy inflates the mean implied discount from his comparable agreements"); Blokh Decl. ¶ 10; Scherer Report at 20. The Objectors assert that by eliminating the "double count" on these two comparable transactions, the resulting average backstop will be more accurate. *See, e.g.*, Scherer Report at 20 ("eliminating the double-counting by removing the lower of the two backstop fees for each of *Seadrill* and *Hexion* reduces the average All-In Backstop Fee at Plan Value to 17.9%. A 17.9% backstop fee on the Convert C and Commitment Creditors' portion of the ERO would imply a $657 million fee, $77 million lower than the proposed Commitment Creditors Backstop Fees"). Mr. Scherer wants to delete *Chesapeake Energy* from the PJT Comps Set because in that case, the plan valuation increased between approval of the backstop and confirmation of the plan, which effectively transformed a 10% backstop fee into the 46.1% All-In Backstop Fee at Plan Value Mr. Herlihy listed in his comparable transactions. *Chesapeake Energy* is the second highest backstop fee—by percentage—in his list. *See* Scherer Report at 22; Herlihy Decl., Chart.

The Debtors argue that *Seadrill* and *Hexion* are appropriately considered as comparable transactions (as twice listed among the PJT Comps Set) because (1) each backstop agreement in these cases had different terms for different backstop parties; (2) excluding *Seadrill* merely because it is the highest backstop fee is unprincipled; and (3) *Seadrill's* backstop agreements are the third-closest to the Debtors' Backstop Agreements in terms of offering size, making it more analogous. *See* Reply ¶¶ 33-38; Jan. 31 Herlihy Dep. at 194:17-21. The Debtors assert that the bankruptcy court approved the *Chesapeake Energy* backstop with a provision that allowed for

the discount to float based on an increase in plan value, which was anticipated given the

tailwinds behind the energy market at the time. *See* Jan. 31 Herlihy Dep. at 367:22-368:18. The

Debtors argue that the *Chesapeake Energy* court was aware when it found a higher valuation that

the backstop fee percentage would increase from 10% to 46.1%, which validates including the

latter figure as the backstop fee in Mr. Herlihy's analysis. *See* Reply ¶ 39; Herlihy Decl., Chart.

The Court finds merit in the Debtors' contentions and disagrees with the Objectors' contentions

that *Seadrill, Hexion* and *Chesapeake Energy* should be excluded from the PJT Comps Set.

Mr. Blokh contends that *Avianca* should be added to the PJT Comps Set. Mr. Herlihy

concedes that it falls within the criteria of the PJT Comps Set because the case was filed at the

advent of COVID 19 and/or was a bankruptcy within the past five years and that the case

includes a rights offering of $200 million or more. *See* Jan. 31 Herlihy Dep. at 248:21-249:2.

However, in *Avianca,* there was not a conventional backstop agreement. Instead, the *Avianca*

debtors could not repay their DIP, and converted the debt to equity with a direct commitment as

opposed to a traditional backstop agreement. The direct commitment parties would receive a 5%

fee in return for taking the equity. *See* Blokh Decl. ¶ 25; Feb. 5 Scherer Dep. at 91:5-9; Jan. 31

Herlihy Dep. at 246:11-25, 247:2-13. Mr. Herlihy acknowledges that *Avianca* fits within the

comparables, but explained that "[i]f I had included *Avianca* I wouldn't have been able to

calculate some of the key metrics that I described because without a plan value you can't

calculate a discount and once you can't calculate a discount you can't calculate certainly my

implied discount metric. And to the extent there was a holdback, you can't calculate the value of

the holdback. So including *Avianca* without those data points, which were not part of the plan, at

least that's my understanding, would have rendered it a meaningless comp in my set." Jan. 31

Herlihy Dep. at 248:3-17. The Court finds merit to that explanation. The Debtors did not err in

excluding *Avianca* from the PJT Comps Set.

The Court finds no merit to the Objectors' challenges to the PJT Comps Set.

<u>The Implied Discount Methodology</u>

As noted, Mr. Herlihy calculates the Implied Discount by considering: (i) the discount at

which the new money is being invested; (ii) the stated backstop fee; (iii) the value of the direct

allocation, or "holdback" amount reserved for the backstop parties; and (iv) typical

reimbursements of professional fees and expenses. *See* Herlihy Decl. ¶¶ 40–41. The Debtors

contend that it is an appropriate metric for measuring the reasonableness of the fees because it

measures the total economic cost of the Backstop Agreements to the estate. Reply ¶ 45–46; *see*

*also* Jan. 31 Herlihy Dep. at 186:21-187:10. They say that is so because each of the initial three

parts is integral to the securities offering–i.e., without any one of the parts, there could be no

securities offering and, as such, no possibility for the Debtors to raise the capital they require to

exit from the Chapter 11 Cases. *Cf.* Reply ¶ 48 (stating that *"[w]ithout the backstop, there is no*

*offering, and the non-backstop parties will receive nothing in the offering*"); *see also* Alfonsin

Decl. ¶ 12 (Commitment Creditors and Backstop Shareholder parties—the only entities that

provided an offer of sufficient financing for the Debtors to successfully emerge from Chapter 11

would not have agreed to provide any of their commitments under the Backstop Agreements

without the negotiated backstop fee and other benefits under the agreements).

Applying this methodology, Mr. Herlihy produced two sets of figures for both the

Backstop Agreements and the PJT Comps Set: (i) "Backstop Party Does 100% of New Money"

and (ii) the "Backstop Party Does Pro Rata Share of New Money." *See* Herlihy Decl., Chart.

Those figures represent the "bookends of potential outcomes" for the Backstop Parties. *See* Jan.

31 Herlihy Dep. at 190:5-7. The "100%" figure is the extreme high end: a backstop is called, and the backstop party must purchase the entire part of their contractual commitment. *See id.* at 190:5-15. The "pro rata share" figure is the opposite extreme: the offering at issue is fully subscribed, the backstop is not called and the backstop party merely purchases a section of the offering they are entitled to under their pro rata share. *See id.* According to Mr. Herlihy, the "outcome" for backstopping parties in practice "very likely lies somewhere in the middle." *Id.* at 190:13-15. Mr. Herlihy's analysis demonstrates, as follows:

> Assuming a backstop party backstops and subscribes for 100% of the rights offering (i.e., the "Backstop Party Does 100% of New Money"), the range of Implied Discounts for the comparable figures stretched from 20% (25th percentile) to 34.5% (mean) to 38.1% (median) to 44.7% (75th percentile). The Commitment Creditors' commitment with respect to the New Convertible Notes Class C is 31.6%--i.e., between the 25th percentile and the mean; their backstop commitment with respect to the ERO is 20.6%--i.e., just above the 25th percentile. The "blended" figure is 26.2%--i.e., between the 25% percentile and the mean.

> Assuming the backstop parties subscribe to their pro rata allocation of the new money—in other words, when the rights offering is fully subscribed by eligible parties (i.e., the "Backstop Party does Pro-Rata Share of New Money" column), the range of Implied Discounts for the comparable figures stretched from 24.2% (25th percentile) to 36.7% (mean), to 39.4% (median), to 47% (median). The Implied Discount of the Commitment Creditors' commitment with respect to the New Convertible Notes Class C is 33.1%--i.e., between the 25th percentile and the mean; their backstop commitment with respect to the ERO is 26.6%--i.e., also between the 25th percentile and the mean. The "blended" figure is 29.1%--i.e., between the 25th percentile and the mean.

*See* Herlihy Decl., Chart. Mr. Herlihy contends that using both metrics, the Commitment Creditors' backstop commitments fall within the range of fees paid in other comparable cases. *See id.* ¶ 39. This data is central to the Debtors' conclusion that the Court should find and approve the Backstop Agreements as a reasonable and proper exercise of the Debtors' business judgment. *See* Reply ¶¶ 6–7 ("[t]he record provides overwhelming support for the Court to find

the Backstop Agreements reasonable . . . [including that] [t]he Debtors' Expert's Implied

Discount Methodology is appropriate").

The Objectors collectively reject this methodology. The crux of their criticism is that the

Implied Discount Methodology does not isolate the compensation paid to the backstop parties for

their commitment to fund the backstop. They say that is so because the Implied Discount

Methodology adds the value that the backstop provider receives through the new money discount

that is available to all creditors participating in the offering, including those without any

backstopping commitment. *See* Committee Obj. ¶ 35; A&P Ad Hoc Group Objection ¶¶ 35–37;

BancoEstado Obj. ¶ 31. They reject this "blending" of the unique benefits available to a

backstopping party (i.e., a holdback or Direct Allocation and a backstop fee) with the new money

discount available to all parties investing in the offering. *See* Committee Obj. ¶ 35; Blokh Decl.

¶¶ 16, 18. Mr. Scherer puts it this way: the Implied Discount Methodology focuses on the cost of

the rights offerings, not the costs of the backstops. *See* Scherer Report at 26.

The Objectors contend that Mr. Herlihy's analysis of the Commitment Creditors

Backstop Agreement and the PJT Comps Set through the lens of the Implied Discount

Methodology distorts the cost of backstops. They say that is because many of the alleged

comparable offerings reflect a high Implied Discount on account of a large discount available to

all participants in an offering, not because of a large backstop fee or holdback (i.e., the specific

value provided specifically to the backstop party). *See* Committee Obj. ¶ 35.[35] The Committee

contends that this apples-to-oranges comparison is the only way Mr. Herlihy has been able to

claim the backstop fees in the Commitment Creditors Backstop Agreement are reasonable. Ms.

---

[35]    Using the Implied Discount methodology, a plan that provides a 5% discount to all new money equity investors and a 95% backstop fee to the backstopping parties has the same implied discount as a plan that provides a 95% discount to all new money investors and a 5% backstop fee. *See* BancoEstado Obj. ¶ 31.

LaPuma agrees that the Implied Discount Methodology fails to isolate the true backstop fee; she contends that it is prone to manipulation. *See* LaPuma Decl. ¶ 34. She discusses the *Toys R Us* comparable backstop as an example of how a low backstop fee can produce a high Implied Discount and thus frame the backstop fees at issue here as more reasonable than they would otherwise appear by failing to isolate the benefits the Commitment Creditors receive only on account of their backstopping commitment. *Id.* ¶ 35. The Commitment Creditors Backstop Agreement provides far larger backstop fees and holdback amounts for the Class C Notes backstop (20% and 3.8% of the offering, respectively) than *Toys R Us* offered to its backstop parties (6.5% and 0%, respectively). Yet, the Implied Discount for the *Toys R Us* backstop dwarfs that of the Class C Notes backstop—48.4% to 49.7% versus 31.6% to 33.1%, respectively.[36] *See id.* According to Ms. LaPuma, the difference results solely from the fact that the full offering in *Toys R Us*—none of which was allocated directly to the backstop parties (i.e., there was no holdback)—was offered at a discount rate of 45%, which more than doubles the 20.7% discount rate for the Class C Notes here.[37] *Id.; see also* Herlihy Decl., Chart. She contends that the large discount in *Toys R Us* was not consideration provided to the *Toys R Us* backstopping parties on account of their backstop commitment and thus should not factor into any calculation of the backstop fee. *See* LaPuma Decl. ¶ 35. This example illustrates that the Implied Discount Methodology can be manipulated and does not provide the true cost of the backstop to the Debtors because it does not isolate the fees being paid to the Backstop Parties on

---

[36]     The two Implied Discounts for the Class C Notes backstop and *Toys R Us* backstop represent the figures when the Backstop Parties' backstop and subscribe for 100% of the rights offering versus when they subscribe to their pro rata allocation of the new money (i.e., the rights offering is fully subscribed by eligible parties). *See* Herlihy Decl. ¶ 42. *See also id.,* Chart.

[37]     Ms. LaPuma points to Mr. Herlihy's calculations in the *Gulfport Energy, Extraction Oil & Gas, Hexion* (Common), *Hexion* (Cash), and *Pacific Drilling* comparables as presenting the same misleading Implied Discounts as she detailed in *Toys R Us*. LaPuma Decl. ¶ 36.

account of the Backstop Agreements, but instead includes the benefit they receive by being

permitted to purchase shares at the discount on account of being a creditor.

In addition to calculating the Implied Discount for the Backstop Agreements and the PJT

Comps Set, Mr. Herlihy also calculates the "All-In Backstop Fee at Plan Value" for those

agreements. *See* Jan. 31 Herlihy Dep. at 198:22-24. He says that metric measures the sum of the

benefits to a backstop party, since it reflects the discounted shares that a backstop fee is paid in,

plus the value of the holdback. *See id*. at 311:16-24; *see also* Feb. 10, 2022 Hr'g Tr. at 200:12-16

[ECF No. 4373] ("Q.  Mr. Herlihy, the all-in backstop plan value measures the backstop,

including in cases where the fee is paid in equity, offered at a discount plus any holdback value,

correct?  A.  That's correct."). He testified that the All-In Backstop Fee at Plan Value is a valid

metric to compare backstop fees. *See* Feb. 10, 2022 Hr'g. Tr. at 176:18-23 [ECF No. 4373]. Mr.

Blokh, on behalf of BancoEstado, endorses the methodology.[38] *See* Blokh Decl. ¶ 17 ("the 'All-

In Backstop Fee at Plan Value' is the most appropriate figure to compare to comparable

transactions as it looks specifically at the Commitment Creditors' backstop economics."); Feb. 4

Blokh Dep. at 169:15-17 ("In this situation, I think all-in backstop fee at plan value is a good

metric to use to compare . . . to the comps"). Mr. Blokh says that is so because it removes

consideration of the Implied Discount, which Mr. Blokh contends cannot isolate the fees at issue

in the Backstop Agreements. Blokh Decl. ¶ 18 ("the all-in backstop fee at plan value [] focuses

solely on the fees at issue in the [Motion]"). According to Mr. Blokh, the Implied Discount

cannot isolate the value provided to a backstop party because it conflates the actual backstop fees

---

[38]    So does Ms. LaPuma. *See*, *e.g.*, Feb. 3 LaPuma Dep. at 225:16-20 (testifying that the All-In Backstop Fee at Plan Value is an accurate value of the actual value the backstop party receives). Mr. Scherer does not opine on the proper methodology to compare backstop fees. *See*, *e.g.*, Feb. 5 Scherer Dep. at 29:12-17 ("Q. Your methodology uses the fifth from the right column, which is the all-in backstop fee at plan value, right?  A.  Again, when you say my methodology all I was doing was reviewing Mr. Herlihy's report and critiquing it.").

with the benefit of the new money discount—a benefit that is compensation for new money

investments that is available to all investing parties in an offering, not solely to backstopping

parties as compensation for the backstop. *See* Feb. 4 Blokh Dep. at 172:2-9.[39] Essentially, Mr.

Blokh contends that the Court should not utilize the Implied Discount Methodology evaluating

the Backstop Payment because it focuses on the benefit provided to the Commitment Creditors

on account of their status as creditors, not as backstopping parties.

By combining a stated backstop fee, the value of the holdback, and the value a backstop

party receives through the new money discount that is available to all creditors participating in

an offering, the Implied Discount Methodology focuses on the total cost of the rights offering to

the estate. *See* Reply ¶ 44-47. However, at issue here is whether the Backstop Payment in the

Commitment Creditors Backstop Agreement should be approved as "actual, necessary costs and

expenses of preserving the estates" under section 503(b)(1)(A) of the Bankruptcy Code. In doing

so, the Court will consider whether the cost of the Backstop Agreements is reasonable. Mr.

Herlihy concedes that he is aware of no court that has used the Implied Discount Methodology to

assess the reasonableness of a backstop fee and that he himself has never used it. *See* Jan. 31

Herlihy Dep. at 173:2-12. The parties agree that the All-In Backstop Fee at Plan Value

methodology provides a useful tool to evaluate backstop fees in rights offerings. Mr. Blokh

expressly adopts it, Ms. LaPuma calls it a "superior value", and Mr. Herlihy describes it as a

"valid metric." *See* Feb 10, 2022 Hr'g Tr. at 176:21-177:3 [ECF No. 4381]; Blokh Decl. ¶ 10

(any comparative analysis of a backstop fee should focus on the "All-In Backstop Fee at Plan

Value"); *see e.g.,* Feb. 3 LaPuma Dep. at 225:2-20. In their Proposed Order the Debtors ask the

Court to find that "[e]ach of the Backstop Payments, Expense Reimbursement, and Backstop

---

[39]    Mr. Herlihy concedes this point–he agrees that the All-In Backstop Fee at Plan Value figures showcases "value that only goes to parties who are backstopping parties." Jan. 31 Herlihy Dep. at 311:25-312:6.

Indemnification Obligations . . . is reasonable and warranted. . . .", *see* Proposed Order ¶ G, and to "authoriz[e] and approv[e] . . . payment of the Backstop Payments." *Id*. at 1–2.[40]  To make that determination, the Court must review the consideration paid to the Commitment Creditors on account of the Backstop Agreements. The Court will apply that methodology in assessing the reasonableness of the of the Backstop Payment and related costs and expenses under the Backstop Agreements.

In the Chart annexed to the Herlihy Declaration, Mr. Herlihy applies the All-In Backstop Fee at Plan Value analysis to the Commitment Creditors' agreement to backstop the New Convertible Notes Class C and the ERO New Common Stock—both individually and "blended" with each other and the New Convertible Notes Class B. *See* Herlihy Decl., Chart. The All-In Backstop Fee at Plan Value for the New Convertible Notes Class C is 23.8%--i.e., the 20% backstop fee as provided in the Commitment Creditors Backstop Agreement, plus the 3.8% holdback value (or, the value of the Direct Allocation). *See* Commitment Creditors Backstop Agreement § 3.1 (". . . a backstop payment paid in cash equal to an aggregate of 20% of the [Commitment Creditors backstop] commitment . . ."); Scherer Report at 16. The 3.8% holdback value represents the incremental value provided to the Commitment Creditors through the Direct Allocation relative to their pro rata share (approximately 70%) of the claims in the LATAM Parent General Unsecured Claims Pool—i.e., in Class 5 treatment under the Plan. *See* Scherer Report at 16.[41] The result is $125 million of value to the Commitment Creditors due to the Direct Allocation, or 3.8% of their backstop commitment on the New Convertible Notes Class C. *Id.* at

---

[40]    A copy of the Proposed Order is annexed as Exhibit A to the Motion.

[41]    *See also* Jan. 31 Herlihy Dep. at 202:9-19 ("the holdback value column takes the difference between what the backstop group, the portion of the rights group would have been able to participate in based on their ownership of the group that it's offered to. The difference between that . . . participation level and the level that they're able to participate in due to the holdback and then it takes that amount of the new money and it multiples by the discount.").

16. Put simply, the holdback value of 3.8% is a measurement of the benefit that the Commitment Creditors obtain from the discount on the portion of the offering they obtain in excess of their pro rata share. For the New Convertible Notes Class C offering, the 23.8% All-In Backstop Fee at Plan Value exceeds the 75th percentile backstop fee of 21.2% for the 28 comparable backstops analyzed by Mr. Herlihy. *See* Herlihy Decl., Chart.  It is higher than all but 5 of those 28 backstops. *See id.* The Objectors suggest that the All-In Backstop Fee at Plan Value strongly demonstrates that the New Convertible Notes Class C backstop fee is unreasonably high.

With respect to the ERO New Common Stock, as set forth above, the Commitment Creditors are only backstopping half of this $800 million offering in return for a 20% fee ($80 million) on the backstopped portion. *See* Commitment Creditors Backstop Agreement § 3.1. The remaining $400 million of the ERO New Common Stock is backstopped by the Backstop Shareholders without payment of any backstop fee. *See* Backstop Shareholders Backstop Agreement § 2.2. The Commitment Creditors do not receive any holdback on the ERO Common Stock. Accordingly, the aggregate, or "blended", All-In Backstop Fee at Plan Value for the ERO is 10%. *See* Herlihy Decl., Chart. This places the ERO backstop fee between the 25th percentile (7.9%) and the median (12.2%) of Mr. Herlihy's comparable transactions. *See id.* It is well below the mean of 20.2%. *See id.* Standing alone, the Commitment Creditors "20%" All-In Backstop Fee at Plan Value exceeds the 75th percentile backstop fee of 21.2% for Mr. Herlihy's comparable transactions. *See* Herlihy Decl., Chart.

At the Hearing, counsel for the Debtors argued that the Backstop Agreements, including payment of the Backstop Fee is reasonable under either the Implied Discount Method or the All-In Backstop Fee at Plan Value metric.  *See* Feb. 11, 2022 Hr'g Tr. at 201:6-202:9 [ECF No. 4381]. They cite to their chart created for the closing arguments. *See* Debtors' Demonstrative for

Closing Arguments (the "Demonstrative"). The demonstrative shows that applying the Implied

Discount Methodology to the Class C Notes and the ERO New Common Stock, on either a

blended or separately basis, that the Backstop Fee is under the average of 34% and the median.

*See id.* at 2; Herlihy Decl., Chart (noting the ERO under the Implied Discount Methodology

(Backstop Party Does Pro Rata Share of new Money) is 26.6% and the Covert C is 33.1%).  The

Debtors value the ERO New Common Stock at 26.6%, which is under the average and is in the

2nd quartile and under the median of the PJT Comps Set. The Class C Notes are valued at 33.1%

which is also in the 2nd quartile but is right below median. The blended value is at 29.1% which

is also squarely in the 2nd quartile and below the median. The Debtors say that applying the

Implied Discount Methodology to the Backstop Payment shows that the proposed fee is

reasonable and within the range of other comparables.

They also say that even if the Court were to apply the All-In Backstop Fee at Plan Value

to the Backstop Payment, the fees would still be under the maximum but "a hair" above the 75th

percentile. *See* Feb. 11, 2022 Hr'g Tr. at 202:5-9 [ECF No. 4381] ("And even if the Court

decides to do the all-in fee plan value approach but uses Mr. Herlihy's dataset rather than cherry-

pick one, you'll find it's just a hair above average and it's right around the seventy-fifth

percentile. Certainly within the range of reasonableness.") The Demonstrative shows that in

applying the All-In Backstop Fee at Plan Value to the PJT Comps Set, the Backstop Fee on the

Class C Notes exceed the 3rd quartile and is the sixth highest fee based on the PJT Comps Set.

Under the All-In Backstop Fee at Plan Value metric, the average percentage is 20% and

the 3rd quartile is 21.2% with the maximum at 110.8%. *See* Demonstrative at 2; Herlihy Decl.,

Chart (noting the 25th percentile, the 75th percentile and maximum value under the PJT Comps

Set). The Debtors look at, and value the ERO New Common Stock and Class C Notes separately

and also on a blended basis. When looked at separately, the Demonstrative shows that the ERO

New Common Stock is at 10% which is in the 2nd quartile, and below the average of 20%. The

Class C Notes are at 23.8%, which is above the 3rd quartile. *See* Demonstrative at 2; Herlihy

Decl., Chart (noting the ERO New Common Stock under the All-In Backstop Fee at Plan Value

is 10% and the Covert C is 23.8%).  In fact, the Class C Notes, valued by itself, is the sixth

highest comparable in the PJT Comps Set.  *See* Demonstrative at 2 (noting that the only

comparables higher than the Class C Notes is *Claire's* (25.2%), *24Hr Fitness* (30.5%),

*Chesapeake* (46.1%), *Seadrill* (others) (91.5%) and *Seadrill* (Hemen) (110.8%)).  The Debtors

also say that even if the ERO New Common Stock and Class C Notes were blended, the metric

would be 15.8%, which is below the average of 20%.  They say that this demonstrates that when

taken together and viewed as one agreement, the fees on the ERO New Common Stock and

Class C Notes are in line with other comparables and are thus reasonable. The Court gives no

merit to the blended fee as it distorts the true cost to the Debtors' estate.

## Discussion

Pursuant to the Backstop Agreements, the Debtors seek to use property of the estate

"other than in the ordinary course of business," therefore section 363 of the Bankruptcy Code

applies to the Motion. Section 363 provides that the "trustee, after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C.

§ 363(b)(1). Pursuant to section 363(b)(1), a debtor may use property of the estate outside the

ordinary course of business if there is a sound business reason to do so. *See Comm. of Equity*

*Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring

"some articulated business justification" to approve the use, sale, or lease of property outside the

ordinary course of business); *In re Ionosphere Clubs, Inc*., 100 B.R. 670, 675 (Bankr. S.D.N.Y.

1989) (noting that the standard for determining a section 363(b) motion is "good business reason"). *See also In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) ("The standard used for judicial approval of the use of estate property outside of the ordinary course of business is also the business judgment of the debtor.") (citations omitted).

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)). *See also Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 472 (Bankr. S.D.N.Y. 2006) ("[T]he business judgment rule . . . provides that in making business decisions, there is a presumption that the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company.") (citations omitted). When applying the "business judgment" standard, courts show great deference to the debtor's decision-making. *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management."). Thus, in applying that standard, courts will approve corporate actions unless they "derive[] from bad faith, whim or caprice." *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) (quoting *In re Cent. Jersey Airport Servs., LLC*, 282 B.R.176, 183 (Bankr. D.N.J. 2002) (internal quotations omitted)). "Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment will not be altered." *In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009) (quoting *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994)). "Parties opposing the proposed exercise of a debtor's business judgment have

the burden of rebutting the presumption of validity." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

The business judgment rule is not applicable to transactions among a debtor and an insider of the debtor. Rather, courts "have generally applied a heightened standard of scrutiny when the transaction [in] question is with an insider of the debtor." *In re MSR Hotels & Resorts, Inc.*, No. 13-11512 (SHL), 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013) (citing *In re Innkeepers USA Tr.,* 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers*, 442 B.R. at 231. Section 101(31) of the Bankruptcy Code provides the relevant definition of "insider". The Bankruptcy Code defines the term "insider" to include an "affiliate, or insider of an affiliate as if such affiliate were the debtor[.]" 11 U.S.C. § 101(31)(E). It defines the term "affiliate" to mean, with an irrelevant exception, "an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor[.]" *Id.* § 101(2)(A). "Courts uniformly treat [section 101(31)] as illustrative of types of insider relationships but not as exclusive, and instead refer to the definition of insider contained in the legislative history: 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms[']s[-]length with the debtor.'" *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 111 (Bankr. S.D.N.Y. 2005) (quoting *Pan Am. Corp. v. Delta Air Lines*, 175 B.R. 438, 449 (S.D.N.Y. 1994)).

The Committee suggests that the entire backstop transaction is subject to the "entire fairness" standard. *See* Committee Obj. ¶¶ 3, 64. However, the Commitment Creditors are not "insiders" of the Debtors as they fall outside of the scope of section 101(31).[42]  The Court will apply the business judgment test in analyzing the Commitment Creditors Backstop Agreement. Under the Backstop Shareholders Backstop Agreement, the Backstop Shareholders would purchase (a) any unsubscribed portion of the Debtors' issuance of $1.373 billion of the Class B Notes, and (b) any unsubscribed shares of new common stock in an amount of up to $400 million, subject to the Backstop Shareholders Cap. They are doing it for no fee and for up to ten months. Moreover, in the RSA, they have agreed to support the Plan by taking actions in Chile in their capacity as shareholders in support of the ERO Rights Offering and New Convertible Notes Offerings. No single Backstop Shareholder meets the definition of an "insider", but together the Backstop Shareholders own or control at least 51% of the Debtors' common stock. Previously, in assessing arm's-length negotiations of the Tranche C Financing among the Debtor and Qatar, Delta and Costa Verde, the Court applied the "entire fairness" test because, in the aggregate, those shareholders own or control at least 51% of the common stock and were negotiating directly with the Debtors. *See In re LATAM Airlines Group S.A*, 620 B.R. 722, 781 (Bankr. S.D.N.Y. 2020). The Committee urges the Court to apply that standard here. *See* Committee Obj. ¶ 41.

However, the facts underlying this motion do not support application of the "entire fairness" standard to the Backstop Shareholders Backstop Agreement. The key terms of the agreement were negotiated during the weeks-long Mediation conducted by Judge Gropper and

---

[42]    If the Court approves the Commitment Creditors Backstop Agreement, and the Debtors confirm the Plan and the Plan goes effective, the Commitment Creditors will hold substantial interests in the Reorganized Debtors. That is not grounds for applying the "entire fairness" test to the Commitment Creditors and Backstop Shareholders. *See In re LATAM Airlines Grp. S.A.,* No. 20-11254 (JLG), 2022 WL 272167, at *16 (Bankr. S.D.N.Y. Jan. 28, 2022).

involved extensive, intense, and arm's-length plan negotiations that included third-party creditors

that are members of the Parent GUC Ad Hoc Group. The Backstop Shareholders were each

represented by separate counsel and evaluated the Backstop Shareholders Backstop Agreement

independently. Further, in the agreement, the Backstop Shareholders disclaim membership in a

group and are not fiduciaries to one another. *See* Backstop Shareholders Backstop Agreement §

10.14 (noting that the "[p]arties do not constitute a 'group' within the meaning of Rule 13d-5

under the Securities Exchange Act of 1934, as amended, nor an '*acuerdo de actuación conjunta*'

within the meaning of Article 98 of Chilean Law No. 18,045" and do not owe "any fiduciary

duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or

form to each other"). Where, as here, numerous non-insider stakeholders were involved in good

faith negotiations of a transaction or when an agreement "result[s] from a months-long, Court-

supervised mediation involving numerous parties" and "numerous proposed compromises and

settlements of billions of dollars of claims," the "business judgment standard is appropriately

applied." *See In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr.

S.D.N.Y. June 27, 2013); *see also* June 9, 2014 Hr'g Tr., *In re MPM Silicones, LLC*, No. 14-

22503 (RDD) (Bankr. S.D.N.Y. July 7, 2014), [ECF No. 615] (applying business judgment

standard and declining to apply entire fairness standard to a transaction involving a party that

was both a creditor and controlling shareholder of the debtors but was one of many parties to the

transaction); *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (finding that

"entire fairness" standard did not apply in light of record showing that negotiations that resulted

in "settlement were initiated by Lazard for the benefit of the enterprise, not by Mr. Allen [an

insider] for his benefit, and that the settlement was approved by independent members of

Charter's board").[43]

The Objectors have not rebutted the presumption that entry into the Backstop Agreements

is a proper exercise of the Debtors' business judgment. Moreover, the facts demonstrate that the

Debtors have met that standard. As described above, the Debtors followed a fair process both

internally and externally in seeking sources of capital and, ultimately, negotiating the terms of

the RSA and Backstop Agreements, with the assistance of the Mediator. Moreover, the Debtors

have demonstrated that they have good business reasons for entering into the Backstop

Agreements. Without limitation, the Backstop Parties' commitment of approximately $5.44

billion in new money investments for up to ten months

> (i) ensures that the Debtors have sufficient cash to fund distributions under the
> Plan,

> (ii) facilitates the Debtors' need to obtain exit debt financing on reasonable terms,

---

[43]    In any event, the Debtors have demonstrated that they have satisfied the "entire fairness" standard entering into the Backstop Shareholders Backstop Agreement. In applying the "entire fairness" standard previously in these cases, the Court analyzed the integrity and fairness of the process that led to the transaction and the terms thereof, both of which must "not only appear fair, but [be] fair." *In re LATAM Airlines Group S.A.,* 620 B.R. at 769 (citing *In re Innkeepers*, 442 B.R. at 231) ("To demonstrate that they have satisfied the 'entire fairness' standard, the Debtors must show that the Revised Credit Agreement . . . results from fair dealing and reflects a fair price."); *see also In re Innkeepers*, 442 B.R. at 231 (finding that transactions involving insiders may be subject to an entire fairness standard and examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration). The Debtors have satisfied both standards here. As discussed above, the independent directors who serve on LATAM Parent's audit committee were kept fully apprised as to the status of the Plan and Backstop Agreements negotiations, meeting with the Debtors' advisors more than two dozen times during the negotiation process. Once the Backstop Shareholders Backstop Agreement was finalized, it was subject to the independent review of the independent directors serving on the audit committee. *Id.* After reviewing the terms of the Backstop Shareholders Backstop Agreement, these independent directors recommended approval of the agreement by the full LATAM Parent board of directors. Thereafter, the full LATAM Parent board was presented with the Backstop Shareholders Backstop Agreement. Ultimately it accepted the independent directors' recommendation and approved the Backstop Shareholders Backstop Agreement via a unanimous vote of all voting directors. As noted previously, Messrs. Enrique Cueto, Ignacio Cueto and Henri Reichstul, the Costa Verde nominated directors, Ms. Sonia J.S. Villalobos and Mr. Enrique Ostalé, the Delta-nominated directors, and Mr. Alexander Wilcox, the Qatar-nominated director, did not vote on the Backstop Shareholders Backstop Agreement. Further, the terms of the Shareholders Backstop Agreement represent a substantial economic benefit to the Debtors given that the Backstop Shareholders are committing an aggregate of approximately $1.77 billion in financing for up to ten months without demanding any backstop fee in return.

(iii) serves as the linchpin for a Chapter 11 plan that affords the Debtors a feasible post-emergence capital structure and restructuring as a going concern, and

(iv) otherwise protects against the contingency that insufficient funds are generated by the New Convertible Notes Offering and Equity Rights Offering.

In short, the agreements reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

Section 503(b)(1)(A) of the Bankruptcy Code provides that there shall be allowed administrative expenses for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). "The words 'actual' and 'necessary' have been construed narrowly: the debt must benefit [the] estate and its creditors." *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992) (quotation marks and citation omitted). Thus, "the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("courts do not have the authority to create new ways to authorize the payment of fees from a bankruptcy estate, and the methods of recovering fees from an estate are limited to the procedures established by the Bankruptcy Code"). When authorized, courts in this jurisdiction regularly approve agreements to reimburse reasonable fees and expenses and incur indemnification obligations associated with the negotiation and execution of backstop purchase agreements. *See, e.g.*, Order Authorizing (I) The Debtors Entry into the Backstop Commitment Agreement and (II) Payment of Related Fees and Expenses, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 12, 2020), [ECF No. 1806] (authorizing the Debtors to reimburse all fees and expenses in connection with the negotiation thereof and incur indemnification obligations); Order (I) Authorizing

82

Debtors to (A) Enter into Backstop Purchase Agreement, (B) Pay Specified Payment and Related Expenses, (C) Provide Indemnification to Certain Parties and (II) Granting Related Relief, *In re 21st Century Oncology Holdings, Inc.*, No.17-22770 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2017), [ECF No. 443] (same); Order Granted Debtors' Motion for an Order (I) Authorizing the Debtors to Assume the Restructuring Support Agreement, (II) Authorizing the Debtors to (A) Assume the Backstop Agreement, (B) Pay the Backstop Commitment Fee, and (C) Incur Certain Indemnification Obligations, and (III) Granting Related Relief, *In re Roust Corp.*, No. 16-23786 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2017), [ECF No. 40] (same); Order Authorizing and Approving the Debtors' (I) Entry into and Performance Under the Backstop Commitment Agreement, (II) Payment of Related Fees and Expenses, and (III) Incurrence of Certain Indemnification Obligations, *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014), [ECF No. 509] (same).

The Objectors contend that because the Debtors seek to enter into the Backstop Agreements in connection with the Plan, the agreements must satisfy the requirements of section 1129(a)(4) of the Bankruptcy Code. *See* Committee Obj. ¶ 39; A&P Ad Hoc Group Obj. ¶ 1. Under that section, to confirm a plan, among other things, the bankruptcy court must approve as "reasonable" any payment called for by the debtor under the plan for costs and expenses in connection with the plan. 11 U.S.C.§ 1129(a)(4). "This [section] mandates full disclosure of all payments or promises of payment for services, costs, and expenses in connection with the case, and subjects the reasonableness of such payments to the scrutiny and approval of the court." *In re Trenton Ridge Invs, LLC*, 461 B.R. 440, 473 (S.D. Ohio 2011) (internal quotation marks and citation omitted). Section 1129(a)(4) is one of the conditions that must be satisfied to confirm a chapter 11 plan. It is not relevant to the Motion and to the Court's review of the Backstop

Payment. The Motion seeks approval of a post-petition transaction that is outside the ordinary

course of the Debtors' business. It is governed by sections 363 and 503. Section 1129(a)(4) is not

relevant to the Motion.

The Debtors contend that the Court should allow that fees and expenses under the

Backstop Agreements as administrative expenses because:

> The fees and related payment obligations compensate the Backstop Parties for
> their binding commitment to fully fund more than $5 billion in new money
> investments to fund Plan distributions.
>
> The fees to the Backstop Parties provide compensation for the opportunity cost
> created by their commitment—a period potentially exceeding up to ten months
> under the Backstop Agreements—during which the committing parties are
> foregoing their ability to allocate the committed capital to other investments (and
> forfeiting the potential returns on such other hypothetical investments in light of
> their commitment).
>
> The fees to the Backstop Parties compensate them for the economic, market, and
> commercial risks during the extended period that such commitments remain in
> place.

*See* Motion ¶¶ 40–45. The Court finds merit to those contentions. The Objectors assert that many

of the fees called for under the Backstop Agreements are unnecessary, unreasonable and over

market. The Court has addressed and rejected those arguments above. The Objectors focus

particularly on the Backstop Payment with respect to the Class C Notes and contend that it is

grossly over market. As noted previously, the Court finds that the All-In Backstop Fee at Plan

Value is the appropriate metric for assessing the reasonableness of the Backstop Payment.

Utilizing the PJT Comps Set, the Commitment Creditors "20%" All-In Backstop Fee at Plan

Value exceeds the 75th percent backstop fee of 21.2%. It is plainly among the highest fees on the

Chart. The Commitment Creditors have agreed to backstop $3.669 billion of Plan Securities in a

volatile industry (airlines) for a period that could reach ten months. As discussed, the Debtors

require the financing to exit chapter 11. They have demonstrated that they have sought out, but

not located any other financing sources. They have also demonstrated that they engaged in

arm's-length negotiations with the Commitment Creditors over the terms of the financing. Under

the circumstances of this case, the Court finds that the Backstop Payment is reasonable and

authorizes the Debtors to make payment and other payments called for under the Backstop

Agreement when, and if, necessary. In reaching this determination with respect to the Backstop

Payment under the Commitment Creditors Backstop Agreement, the Court finds no merit in the

Objectors' objection to the Backstop Shareholders Backstop Agreement.

## **Conclusion**

Based on the foregoing, the Court overrules the Objections and grants the Motion.

SETTLE ORDER.

Dated:  New York, New York
        March 15, 2022

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge