UNITED STATES BANKRUPTCY COURT                        NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:                                                    :

                                                          :    Case No. 20-11254 (JLG)

LATAM Airlines Group S.A., et al.,                        :    Chapter 11

                                                          :

                                            Debtors.[1]   :    (Jointly Administered)

------------------------------------------------------------ x


**MEMORANDUM DECISION AND ORDER OVERRULING THE OBJECTION OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
CLAIM ASSERTED BY LATAM FINANCE LTD.**


**A P E A R A N C E S :**


CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for the Debtors*
One Liberty Plaza
New York, New York 10006
By:    Richard J. Cooper, Esq.
       Lisa M. Schweitzer, Esq.
       Jeffrey A. Rosenthal, Esq.
       Jane VanLare, Esq.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

DECHERT LLP
*Counsel to the Official Committee*
*of Unsecured Creditors*
1095 Avenue of the Americas
New York, NY 10036
By:     Allan S. Brilliant, Esq.
        Craig P. Druehl, Esq.
        David A. Herman, Esq.
        Michael Doluisio, Esq.
        Brian Raphel, Esq.

PAUL HASTINGS LLP
*Counsel to Banco del Estado de Chile,*
*in its capacity as indenture trustee under the*
*Chilean Local Bonds Series A through D and*
*Series E issued by LATAM Airlines Group S.A.*
200 Park Avenue
New York, New York 10166
By:     Pedro A. Jimenez, Esq.
        Andrew Tenzer, Esq.
        Nicholas Bassett, Esq.
        Douglass Barron, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel to the Parent Ad Hoc Claimant Group*
1177 Avenue of the Americas
New York, New York 10036
By:     Kenneth H. Eckstein, Esq.
        Douglas Mannal, Esq.
        Rachael L. Ringer, Esq.
        Andrew Pollack, Esq.

WHITE & CASE LLP
*Attorneys for the Ad Hoc Group of LATAM Bondholders*
1221 Avenue of the Americas
New York, New York 10020
By:     John K. Cunningham, Esq.
        Brian D. Pfeiffer, Esq.
        Gregory M. Starner, Esq.
        Joshua Weedman, Esq.
        Kathryn Sutherland-Smith, Esq.

200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:     Richard S. Kebrdle, Esq. (admitted *pro hac vice*)

## Introduction[2]

LATAM Parent and certain of its affiliates, including LATAM Finance Ltd. ("LATAM

Finance") and Peuco Finance Ltd. ("Peuco"), are debtors in these Chapter 11 Cases. Pre-petition,

in 2016, as part of its business strategy, LATAM Parent formed LATAM Finance as a special

purpose wholly owned Cayman Islands entity to issue notes to raise funds for general corporate

purposes of the LATAM group, and to lend the funds to various LATAM affiliates in the period

prior to the time those notes had to be repaid. At the same time, it formed Peuco, also as a wholly

owned Cayman Islands entity. As of the Initial Petition Date, LATAM Finance had issued USD

1.5 billion in notes (collectively defined below as the "NY Law Notes"), and, in turn, loaned

over USD 1.4 billion of the proceeds to various affiliates.

At issue are five purported loans (one in 2017 and four in 2019) of the proceeds of the

NY Law Notes aggregating approximately USD 1.4 billion, from LATAM Finance to Peuco (the

"Intercompany Loans"). Each such loan is evidenced by an Intercompany Loan Agreement.

Peuco purported to use the loan proceeds to purchase accounts receivables from LATAM Parent.

Peuco does not have a bank account. So, in obtaining the loans, and acquiring the accounts

receivables, Peuco allegedly directed LATAM Finance to transfer the loan proceeds directly to

LATAM Parent. As of the Initial Petition Date, Peuco owed USD 1,307,721,003 to LATAM

Finance on account of the Intercompany Loans. LATAM Finance did not file a claim against

Peuco in these Chapter 11 Cases. However, on its Schedule of Assets and Liabilities filed in

these cases, LATAM Finance lists under assets USD 1,307,721,003 of "Intercompany

Receivables" owed by Peuco (the "Intercompany Claim"). On its Schedule of Assets and

Liabilities, Peuco lists the same amount under liabilities and a corresponding noncontingent,

---

[2]   Capitalized terms not defined in the Introduction shall have the meanings ascribed to them below, in the
Objection, or in the Disclosure Statement.

liquidated, and undisputed unsecured claim by LATAM Finance on the basis of "Intercompany
Note Payable."

The matter before the Court is the Official Committee of Unsecured Creditors' (the
"Committee") objection to the Intercompany Claim (the "Objection").[3] The Committee does not
dispute that the Intercompany Claim is the product of a legitimate business strategy that calls for
LATAM Finance to loan the proceeds of the NY Law Notes to Peuco, that the Debtors adopted
and have executed that strategy in good faith, and that they have enjoyed the benefits of that
strategy. Moreover, the Committee does not assert that the Intercompany Loans are in any way
tainted by fraud or wrongdoing on the part of the Debtors. Still, it seeks to expunge the
Intercompany Claim pursuant to sections 502(b)(1) and 1111(a) of title 11 of the United States
Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules"). In short, the Committee contends that the Intercompany Claim does not
give rise to a valid and enforceable "debt" under the Bankruptcy Code because the Intercompany
Loan Agreements – which are governed by New York law – lack terms that are essential to
create an enforceable loan under New York law. It also contends that the Court should expunge
the Intercompany Claim because, notwithstanding the terms of the loan agreements, the "true
character" of these agreements is that they are not loan agreements. Finally, the Committee
asserts that the loan agreements are not enforceable because Peuco and LATAM Finance did not
obtain the requisite board approvals to enter into the Intercompany Loan Agreements. Banco del

---

[3]   Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF
No. 4043]; Notice of Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM
Finance Ltd. [ECF No. 4044].  References to "ECF No.__" are to documents filed on the electronic docket in these
Chapter 11 Cases (Case No. 20-11254).

Estado de Chile ("BancoEstado"), as the indenture trustee under certain unsecured Local Bonds,

joins in the Objection (the "BancoEstado Joinder").[4]

The Debtors filed a response in opposition to the Objection (the "Response").[5] Two

creditor groups support the Debtors. The Parent Ad Hoc Claimant Group holds over 70% of the

General Unsecured Claims against LATAM Parent. It filed a statement in support of the

Debtors' Response (the "Parent Ad Hoc Claimant Group Statement").[6] The Ad Hoc Group of

LATAM Bondholders (the "Noteholder Ad Hoc Group") holds in excess of USD 350 million of

the NY Law Notes. It responded in opposition to the Objection (the "Noteholder Ad Hoc Group

Opposition").[7] The Committee replied to the opposition (the "Committee Reply")[8] and the

Debtors filed a sur-reply[9] in further support of their Response. The Court conducted an

---

[4]    Joinder and Reservation of Rights of Banco Del Estado de Chile, in Its Capacity as Indenture Trustee Under the Chilean Local Bonds Series A Through D and Series E, With Respect to Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4397].

[5]    Debtors' Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4420]. In support of the Response, the Debtors filed the Declaration of Jorge Marin Muñoz in Support of the Debtors' Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4421], the Declaration of Brock Edgar in Support of the Debtors' Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted By LATAM Finance Ltd. [ECF No. 4422], and the Declaration of Jane VanLare in Support of Debtors' Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4424].

[6]    The Parent Ad Hoc Claimant Group's Statement in Support of the Debtors' Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4440].

[7]    Opposition of the Ad Hoc Group of LATAM Bondholders to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd.  [ECF No. 4415].

[8]    Reply in Support of the Official Committee of Unsecured Creditors' Objection to Claim Asserted By LATAM Finance Ltd. [ECF No. 4487].

[9]    Debtors' Sur-Reply to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd.  [ECF No. 4530]. In further support of the Debtors' position, the Debtors filed the Supplemental Declaration of Jorge Marin Muñoz in Support of Debtors' Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4569].

evidentiary hearing on the Objection.[10] At the conclusion of the hearing, the parties submitted

post hearing briefs in furtherance of their respective positions.[11] Thereafter, the Court heard

arguments on the Objection.[12]

As explained below, the Debtors intended for LATAM Finance to loan funds to Peuco,

and the unambiguous Intercompany Loan Agreements contain the essential elements of a loan

under New York law. The Court finds that the Debtors have met their burden of persuasion in

demonstrating that LATAM Finance and Peuco were authorized to enter into the loan

agreements and the Intercompany Loans are enforceable loans under New York law.

Accordingly, the Court overrules the Objection.

## Jurisdiction

The Court has jurisdiction to consider this contested matter pursuant to 28 U.S.C. §§ 157

and 1334 and the Amended Standing Order of Reference, dated January 31, 2012 (Preska, C.J.).

This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

On May 26, 2020 (the "Initial Petition Date"), LATAM Airlines Group S.A. ("LATAM

Parent") and 28 affiliates (collectively, with LATAM Parent, the "Initial Debtors") filed their

---

[10]    Mar. 10, 2022 Hr'g Tr. – Public Session [ECF No. 4640]; Mar. 10, 2022 Hr'g Tr. – Sealed Session [ECF No. 4641].

[11]    Proposed Findings of Fact and Conclusions of Law Submitted By the Official Committee of Unsecured Creditors in Support of Its Objection to Claim Asserted by LATAM Finance Ltd. [ECF No. 4720] (the "Committee Proposed Findings and Conclusions"); Debtors' Post-Hearing Brief in Response to the Objection of the Official Committee of Unsecured Creditors to Claim Asserted by LATAM Finance Ltd. [ECF No. 4729] (the "Debtors' Post Hearing Brief"); Parent Ad Hoc Claimant Group's Statement in Support of the Debtors' Post-Hearing Brief [ECF No. 4756] (the "Parent Ad Hoc Claimant Group Post Hearing Statement"); and Post-Hearing Brief of the Ad Hoc Group of LATAM Bondholders [ECF No. 4764] (the "Noteholder Ad Hoc Group Post Hearing Brief").

[12]    Mar. 18, 2022 Hr'g Tr. – Public Session [ECF No. 4741]; and Mar. 18, 2022 Hr'g Tr. – Sealed Session [ECF No. 4743].

petitions for relief under chapter 11 of the Bankruptcy Code with this Court (the "Initial Chapter 11 Cases"). On July 7, 2020 and July 9, 2020 (as applicable, the "Subsequent Petition Date") nine additional affiliates of LATAM Parent (together with the Initial Debtors, the "Debtors") filed their petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Subsequent Chapter 11 Cases", together with the Initial Chapter 11 Cases, the "Chapter 11 Cases"). Since the Initial Petition Date and Subsequent Petition Date, as applicable, the Debtors have continued to operate as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only. On June 5, 2020, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the Committee and on May 26, 2021, the U.S. Trustee amended the appointment of the Committee.[13] No trustee or examiner has been appointed in any of these Chapter 11 Cases.

It is common practice for multinational companies based in Latin America, such as LATAM group, to issue international notes through Cayman Islands subsidiaries to access participants in international capital markets that are familiar with the financing structure used in such issuances. Ex. 1 (Marin Decl.) ¶ 9.[14] Such international notes issued by a Cayman Islands entity may be governed by New York law, which makes the notes more familiar, and therefore more attractive, to international investors. *Id*. LATAM Finance is such an entity. It was formed in September 2016 as a wholly owned Cayman Islands subsidiary of LATAM Parent in order to issue international notes, *id.* ¶ 6, to raise money in international markets, Ex. 200 (Marin Dep. Tr.) at 20:14-15, and to loan the funds to various LATAM affiliates. *Id.* at 21:4-7. LATAM

---

[13]    The U.S. Trustee has not solicited additional members for the Committee on the basis of the Subsequent Chapter 11 Cases.

[14]    Citations to "Ex. ___" are to exhibits entered into evidence and referenced on the Joint Exhibit List in Connection with the Objection.

Finance issued the NY Law Notes and has no operations other than those involved in issuing the notes. Mar. 10, 2022 Hr'g Tr. - Public Session (the "March 10 Tr.") at 81:5-7 (Marin). It has no employees, officers, or operations of its own and acts solely through the actions of its board of directors. *Id.* at 81:8-25 (Marin); *see also* Ex. 40 (LATAM Finance's Register of Directors and Officers). At the time of the transactions at issue, LATAM Finance did not have any directors independent from LATAM Parent. *See* March 10 Tr. at 81:10-12 (Marin).

Peuco is another special purpose Cayman Islands entity that is wholly owned by LATAM Parent. Ex. 1 (Marin Decl.) ¶ 10. It has no employees, officers, or operations of its own, and acts solely through the actions of its board of directors. March 10 Tr. at 83:25-84:13 (Marin); *see also* Ex. 43 (Peuco's Register of Directors and Officers). While certain directors have served on the boards of both LATAM Finance and Peuco, the two companies have never had completely overlapping boards. *Compare* Ex. 40 (LATAM Finance's Register of Directors and Officers), *with* Ex. 43 (Peuco's Register of Directors and Officers). At the time of the transactions at issue, Peuco did not have any directors independent from LATAM Parent. *See* March 10 Tr. at 84:1-10 (Marin). Consistent with LATAM's general cash management policies, as a non-operating subsidiary, Peuco does not maintain its own bank account. Ex. 1 (Marin Decl.) ¶ 15. As such, it has never sent or received any wire transfer of funds to or from anyone. March 10 Tr. at 85:1-5 (Marin).

On April 11, 2017, LATAM Finance issued New York law-governed 6.875% senior, unsecured notes due April 2024 in the principal amount of USD 700 million ("2024 NY Law Notes"). Ex. 6 (2017 Offering Mem.). On February 12, 2019, LATAM Finance issued New York law-governed 7.000% senior unsecured notes due March 2026 in the principal amount of USD 600 million (the "2026 NY Law Notes"). Ex. 8 (2019 Feb. Offering Mem.). LATAM Finance

8

later reopened the 2026 NY Law Notes in June 2019 and issued additional notes in the principal

amount of USD 200 million on the same terms as the February 2019 issuance. Ex. 9 (2019 July

Offering Mem.). The total principal amount of the 2019 note series was USD 800 million (the

2026 NY Law Notes with the 2024 NY Law Notes, the "NY Law Notes", and the holders of

those notes, the "NY Law Noteholders"). *See* Ex. 8 (2019 Feb. Offering Mem.); Ex. 9 (2019 July

Offering Mem.). Each issuance of NY Law Notes was made pursuant to an offering

memorandum dated as of the date of the issuance (each, an "Offering Memorandum"). Ex. 6

(2017 Offering Mem.); Ex. 8 (2019 Feb. Offering Mem.); Ex. 9 (2019 July Offering Mem.).[15]

Pursuant to a series of loan agreements, from time to time prior to December 2017,

LATAM Finance lent certain of the proceeds from the NY Law Notes to various LATAM

affiliates, other than Peuco.[16] On April 21, 2017, LATAM Finance lent USD 12,000,000 to TAM

Capital I Inc. ("TAM Capital"). Ex. 50 (USD 12,000,000 Loan Agreement). On August 28,

2017, LATAM Finance lent USD 57,016,524.45 to TAM Linhas. Ex. 51 (USD 57,016,524.45

Loan Agreement). On June 29, 2017 LATAM Finance lent a further USD 173,323,810.96 to

TAM Linhas (together with the loan made to TAM Capital, the "TAM Loans"). Ex. 52 (USD

---

[15]    Each Offering Memorandum states that the net proceeds of the NY Law Notes are to be used "for general corporate purposes" of the LATAM group. *See, e.g.,* Ex. 6 (2017 Offering Mem.) at 18. Each also states that LATAM Parent is providing an unconditional and irrevocable guarantee to the NY Law Notes. *See, e.g., id.* at 7. Each Offering Memorandum informed investors that LATAM Finance's directors were required to "act in accordance with our instructions as we are its sole shareholder", *see, e.g., id.* at 20, that LATAM Finance had "no operations of its own," and that LATAM Finance's ability to service the NY Law Notes will depend on "our financial condition." *See, e.g., id.* at 14; *see also id.* at ii (noting that the use of "our" in the Offering Memorandum "refer[s] to LATAM [Parent] and its consolidated affiliates," including LATAM Finance and Peuco); Ex. 8 (2019 Feb. Offering Mem.) at ii (referencing "subsidiaries" instead of "affiliates").

[16]    LATAM Finance retained other funds in its bank account and invested until it loaned the proceeds to LATAM affiliates. *See, e.g.,* Ex. 62 (LATAM Finance February 2019 Bank statement) (showing USD 100 million transfer to BNP Paribas on February 11, 2019, and return of that sum with interest on February 25, 2019); Ex. 67 (LATAM Finance July 2019 Bank statement) (showing a USD 200 million transfer to Bank of America on July 18, 2019 and return of that sum with interest on the same day).

173,323,810.96 Loan Agreement).[17] The TAM Loans were repaid to LATAM Finance on

December 27, 2017, December 19, 2018, and July 22, 2019, respectively. Response ¶ 18.

LATAM Finance also purportedly used the proceeds from the NY Law Notes to make

loans to Peuco from time to time, and Peuco purportedly used the loan proceeds to acquire

accounts receivables from LATAM Parent. The Debtors assert that between December 2017 and

December 2019, LATAM Finance lent an aggregate of USD 1,491,068,300 to Peuco in five

Intercompany Loans. They say that since Peuco does not maintain its own bank account, in

making the Intercompany Loans to Peuco, LATAM Finance transferred the loan proceeds in five

transfers–one for each Intercompany Loan–from its bank account directly to a bank account held

by LATAM Parent. Specifically, LATAM Finance transferred:

> (i) USD 608,191,331.89 on December 27, 2017;

> (ii) USD 470,303,833.89 on February 26, 2019;

> (iii) USD 104,392,112.13 on March 21, 2019;

> (iv) USD 273,769,839.13 on July 25, 2019; and

> (v) USD 34,411,182.49 on December 19, 2019.

For each Intercompany Loan, there is a notarized document titled "Loan Agreement" which

provides that LATAM Finance will loan the amount listed in the agreement to Peuco. Exs.10-14

(Intercompany Loan Agreements).[18] Each agreement is governed by New York law. *See, e.g.*,

Ex. 10 (December 2017 Loan Agreement) ¶ 9. Between December 2017 and December 2019,

---

[17]    LATAM Finance's loan with TAM Capital had a maturity date of April 21, 2024, and an interest rate of 6.875%, which is the same interest rate that applies to the 2024 NY Law Notes (Ex. 50 (USD 12,000,000 Loan Agreement)); the two loans to TAM Linhas had a maturity date of April 10, 2024, but had no fixed interest rate, and no schedule or payments. Ex. 51 (USD 57,016,524.45 Loan Agreement); Ex. 52 (USD 173,323,810.96 Loan Agreement).

[18]    The Court will refer to the agreements collectively as the "Intercompany Loan Agreements." It will refer to the agreements individually as the (i) December 2017 Loan Agreement, (ii) February 2019 Loan Agreement, (iii) March 2019 Loan Agreement, (iv) July 2019 Loan Agreement, and (v) December 2019 Loan Agreement.

Peuco purportedly used the loan proceeds to purchase accounts receivables aggregating USD

1,491,068,300 from LATAM Parent (collectively, the "Intercompany Accounts Receivables").

They consist of receivables payable to LATAM Parent by three of its operating subsidiaries–Lan

Cargo S.A. ("LAN Cargo"), Lan Pax Group S.A. ("LAN Pax"), and Transporte Aéreo S.A

("Transporte Aéreo," and together with LAN Pax and LAN Cargo, the "Affiliates"). To facilitate

Peuco's purchase of the Intercompany Accounts Receivables, (i) each Affiliate that owed the

purchased receivables executed a notarized Acknowledgment of Debt for each assigned

receivable verifying that it was a valid debt owed by that Affiliate, Exs. 15-22

(Acknowledgments of Debt), and (ii) for each purchase of the Intercompany Receivables by

Peuco, LATAM Parent and Peuco executed a formal Credit Assignment Agreement. Exs. 23-30

(Credit Assignment Agreements).[19]

To effectuate the purchase of the Intercompany Accounts Receivables from LATAM

Parent with the proceeds from the Intercompany Loans, Peuco instructed LATAM Finance to

transfer the loaned funds on its behalf directly to LATAM Parent. *See* March 10 Tr. at 119:6-11

(Marin). In a Funds Flow Agreement dated December 27, 2017, and in connection with the

December 2017 Loan Agreement, Peuco instructed LATAM Finance to transfer USD

608,191,331.89 on its behalf directly to LATAM Parent to effectuate the purchase of the

Intercompany Accounts Receivables from LATAM Parent with the proceeds from the

Intercompany Loans. *See* Ex. 31 (Funds Flow Agreement).

Mr. Marin is LATAM's Financial Controller and Head of Tax. Ex. 1 (Marin Decl.) ¶ 1.

He testified that the boards of directors of LATAM Finance and Peuco approved each

---

[19]    According to the Assignment Agreements, LATAM Parent, as the "Assignor," "assigns and transfers to" Peuco, as the "Assignee," which "buys, acquires and accepts" the Intercompany Receivables. *See, e.g.,* Ex. 23 (December 2017 Credit Assignment Agreement) at 1-2. The receivables that Peuco purchased were up to eight years old.

Intercompany Loan Agreement with proper authorizations. Ex. 200 (Marin Dep. Tr.) at 119:3-20. As relevant, the record reflects the following:

> Minutes of LATAM Finance and Peuco board meetings approving (i) the December 2017 Loan Agreement (Exs. 44 (LATAM Finance minutes), 45 (Peuco minutes)) and (ii) the July 2019 Loan Agreement. Exs. 46 (LATAM Finance minutes), 47 (Peuco minutes). The minutes reflect that the board approved the December 2017 Loan Agreement on December 27, 2017, and the July 2019 Loan Agreement on October 10, 2019.

> Unsigned minutes of Peuco and LATAM Finance board meetings approving the December 2019 Loan Agreement. Exs. 48 (LATAM Finance unsigned minutes), 49 (Peuco unsigned minutes).

> No board minutes relating to the February 2019 Loan Agreement and March 2019 Loan Agreement.

Mr. Marin also testified that each Intercompany Loan Agreement was executed by an individual authorized by LATAM Finance and Peuco to do so. He says that he was granted power of attorney to sign the Intercompany Loan Agreements on behalf LATAM Finance. *See* March 10 Tr. at 82:24-25, 118:22-24 (Marin). As relevant, the record reflects that the Intercompany Loan Agreements were executed, as follows:

> December 2017 Loan Agreement

> > LATAM Finance: Jorge Marin Munoz
> > Peuco: Jose Miguel Bellagamba

> The board minutes identify Mr. Bellagamba as an authorized signatory of the agreement for LATAM Finance and Peuco. They do not identify Mr. Marin as an authorized signatory of the agreement. The December 2017 Loan Agreement was signed on December 27, 2017. Ex. 10 (December 2017 Loan Agreement).

> February 2019 Loan Agreement

> > LATAM Finance: Jorge Marin Munoz
> > Peuco: Jose Miguel Bellagamba

> There are no board minutes identifying Messrs. Bellagamba and/or Marin as authorized signatories of the agreement. The February 2019 Loan Agreement was signed on February 26, 2019. Ex. 11 (February 2019 Loan Agreement).

March 2019 Loan Agreement

> LATAM Finance: Jorge Marin Munoz
> Peuco: Jose Miguel Bellagamba

There are no board minutes identifying Messrs. Bellagamba and/or Marin as authorized signatories of the agreement. The March 2019 Loan Agreement was signed on March 25, 2019. Ex. 12 (March 2019 Loan Agreement).

July 2019 Loan Agreement

> LATAM Finance: Joaquin Arias
> Peuco: Elvira Vial

The board minutes identify Joaquin Arias and Elvira Vial as authorized signatories of the agreement. The July 2019 Loan Agreement was signed on October 10, 2019. Ex. 13 (July 2019 Loan Agreement).

December 2019 Loan Agreement

> LATAM Finance: Elvira Vial
> Peuco: Joaquin Arias

The unsigned board minutes identify Joaquin Arias and Elvira Vial as authorized signatories of the agreement. The December 2019 Loan Agreement was signed on December 19, 2019. Ex. 14 (December 2019 Loan Agreement).

Each Intercompany Loan Agreement contains the same material provisions, including (i) an obligation by the borrower to repay the Loan in full or in part on demand; (ii) default interest to accrue on the principal of any amount unpaid on demand at a rate of 2% per annum; and (iii) the right of the lender to accelerate the loan in response to an event of default, such as non-payment or an insolvency proceeding. *See, e.g.*, Ex. 10 (December 2017 Loan Agreement) ¶¶ 3, 5.2.2, 7.3. The agreements –

> Do not provide for the payment of interest, unless and until LATAM Finance elects to declare a default.

> Do not state a maturity date.

> Do not provide any stated payment schedule.

> Do not provide for any security, such as a lien on any of Peuco's assets.

*See, e.g.,* Ex. 10 (December 2017 Loan Agreement).

The Intercompany Loans are reflected in LATAM Finance's and Peuco's financial

statements in 2017, 2018, and 2020. Exs. 33, 34, 37, 100 (various LATAM and Peuco Financial

Statements). These financial statements were reviewed by PricewaterhouseCoopers,

incorporated into LATAM Parent's consolidated financial statements, and also publicly filed

with the Chilean Financial Market Commission (*Comisión para el Mercado Financiero*). *See*

Mar. 10, 2022 Hr'g Tr. – Sealed Session at 18:2-9 (Marin); *see, e.g.,* Ex. 33 (2020 Peuco

Financial Statement) (showing PricewaterhouseCoopers as independent auditors).

Between April 2018 and August 2020, Peuco repaid the Intercompany Loans to LATAM

Finance with cash received when the Affiliates paid down the Intercompany Receivables. In

total, Peuco repaid USD 183,477,457.35 to LATAM Finance under the Intercompany Loans, and

the Intercompany Receivables owed to Peuco were reduced by the same amount. Ex. 81 (Marin

Supp. Decl.) ¶¶ 4-5. The record reflects that the funds were transferred to LATAM Finance to

repay the Intercompany Loans on behalf of Peuco by either LATAM Parent or an Affiliate to

LATAM Finance. Of the USD 183,477,457.35 repaid to LATAM Finance by Peuco –

> USD 71,757,953.28 was transferred directly from the bank account of LAN
> Cargo, one of the Affiliates owing the Intercompany Receivables, to Peuco. *Id.* ¶
> 5; *see also* Ex. 80 (Wire Transfer Confirmation) (showing five transfers from
> bank account of LAN Cargo to bank account of LATAM Finance).

> Of the remaining amount, LATAM Parent paid on behalf of the Affiliates to
> reduce the Intercompany Receivables the Affiliates owed to Peuco, and
> transferred the funds to LATAM Finance to repay the Intercompany Loans on
> behalf of Peuco. March 10 Tr. at 119:17-24 (Marin); *see also* Ex. 57 (LATAM
> Finance September 2018 Bank Statement), Ex. 63 (LATAM Finance March 2019
> Bank Statement), Ex. 64 (LATAM Finance April 2019 Bank Statement), Ex. 65
> (LATAM Finance May 2019 Bank Statement), Ex. 68 (LATAM Finance August
> 2019 Bank Statement), Ex. 70 (LATAM Finance October 2019 Bank Statement),
> Ex. 74 (LATAM Finance February 2020 Bank Statement), Ex. 76 (LATAM
> Finance April 2020 Bank Statement).

By 2020 –

> As a result of the payments by the Affiliates under the Intercompany Receivables, the debts owed by the Affiliates to Peuco were reduced to USD 1,307,721,003. This outstanding amount is reflected in Peuco's 2020 financial statement as accounts receivables from the Affiliates. Ex. 37 (Peuco 2020 Financial Statement) at 12.

> As a result of the repayments by Peuco under the Intercompany Loans, the debts Peuco owed to LATAM Finance were reduced to USD 1,307,721,003. This outstanding amount is reflected in Peuco's 2020 financial statement as accounts payable to LATAM Finance, Ex. 37 (Peuco 2020 Financial Statement) at 13, and in LATAM Finance's 2020 financial statement as accounts receivable from Peuco, Ex. 33 (LATAM Finance 2020 Financial Statement) at 17.

The Debtors' capital structure includes Chilean Local Bonds Series A-D and Series E issued by LATAM Parent in the aggregate amount of USD 488.6 million (the "Local Bonds"). In its capacity as Indenture Trustee under the bonds, BancoEstado filed three general unsecured claims aggregating USD 499,649,615.92 against the Debtors. *See* Proof of Claim Nos. 1559, 1564 and 1569. LATAM Finance has not filed a claim against Peuco. On September 8, 2020, LATAM Finance and Peuco filed their respective Schedules of Assets and Liabilities in these Chapter 11 Cases. On its Schedule of Assets and Liabilities, LATAM Finance lists under assets USD 1,307,721,003 of "Intercompany Receivable" owed by Peuco. Ex. 4 (LATAM Schedule of Assets and Liabilities) at 22. On Peuco's Schedule of Assets and Liabilities, it lists the same amount under liabilities and a corresponding non-contingent, liquidated, and undisputed unsecured claim by LATAM Finance on the basis of "Intercompany Note Payable." Ex. 3 (Peuco Schedule of Assets and Liabilities) at 22, 25.

On November 26, 2021, the Debtors filed their Joint Plan of Reorganization of LATAM Airlines Group, S.A., et al, Under Chapter 11 of the Bankruptcy Code (the "Plan") and the

related disclosure statement (the "Disclosure Statement").[20] The Plan is the product of over

eighteen months of effort by the Debtors, their management, directors and employees, and the

Debtors' advisors to stabilize the Debtors' business, right-size their operations for the future and

develop a plan for the Debtors' restructuring and emergence. Disclosure Statement at 2. The

primary terms of the Plan reflect the terms of an agreement between the Debtors, the Parent Ad

Hoc Claimant Group, the Noteholder Ad Hoc Group (or a subset of that group), and certain of

the Debtors' large Holders of Existing Equity Interests. *Id.* That agreement is embodied

principally in a restructuring support agreement, dated November 26, 2021 (as amended,

restated, amended and restated, supplemented or otherwise modified, the "Restructuring Support

Agreement", or "RSA"). *Id.*[21]

The Plan classifies Holders of Claims and Equity Interests throughout eleven classes. As

relevant, and in brief, Class 4 consists of claims of the NY Law Noteholders against LATAM

Finance and LATAM Parent (defined in the Plan as the "LATAM 2024/2026 Bond Claims").

Plan § 2.2. Class 5 consists of General Unsecured Claims against LATAM Parent. *Id.* The Local

Bonds are classified as Class 5 claims. *Id.* The Plan's classification and treatment of the Class 4

and Class 5 claims reflects an agreement and compromise among the parties to the RSA and is

set forth in the RSA. *See* RSA, Restructuring Term Sheet. The Plan treatment of the Class 4

LATAM 2024/2026 Bond Claims comprises and depends on a combined recovery on account of

allowed claims against both LATAM Parent and LATAM Finance. *See* Plan § 3.2(d). Class 4 is

---

[20]    The Debtors subsequently filed several revised versions of the Plan and Disclosure Statement. On March 21, 2022, the Court approved the Debtors' revised Disclosure Statement. Order Approving (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto [ECF No. 4728]. The Debtors then filed the Sixth Revised Joint Plan and Sixth Revised Disclosure Statement, respectively, on March 25, 2022. [ECF Nos. 4776, 4777]. References to the "Plan" and "Disclosure Statement" will be to those versions of the documents.

[21]    A copy of the Restructuring Support Agreement is annexed as Exhibit E to the Disclosure Statement.

unimpaired and presumed to accept the Plan. *Id.* The Holders of Allowed Class 5 Claims will not receive full recoveries on account of their claims. *Id.* Accordingly, Class 5 is impaired and Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan. *Id.*

## **Applicable Legal Principles**

Pursuant to sections 501 and 502 of the Bankruptcy Code, an executed and filed proof of claim is *prima facie* evidence of the validity of the claim and is deemed allowed unless a party in interest objects. *See* 11 U.S.C. §§ 501, 502; *see also* Bankruptcy Rule 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.") By application of section 1111(a) of the Bankruptcy Code, "[a] proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(a)(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated." 11 U.S.C. 1111(a); *see also* Bankruptcy Rule 3003(b)(1) ("The schedule of liabilities filed pursuant to § 521(l) of the Code shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated. It shall not be necessary for a creditor or equity security holder to file a proof of claim or interest except as provided in [Rule 3003(c)(2)].").[22] LATAM Finance did not file a claim against Peuco in these Chapter 11 Cases. However, as noted, in their respective Schedules of Assets and Liabilities filed herein, LATAM Finance lists under assets USD 1,307,701,003 of "Intercompany Receivables"

---

[22]    Rule 3003(c)(2) is not applicable to the Intercompany Claim. It states, as follows:

> Who Must File. Any Creditor or equity holder whose claim or interest is not scheduled or scheduled as disputed, contingent or unliquidated shall file a proof of claim or interest within the time prescribed in [Rule 3002(c)(3)]; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

Fed. R. Bankr. P. 3003(c)(2).

owed by Peuco, and Peuco lists under liabilities USD 1,307,721,003 of "Intercompany Notes

Payable" and a corresponding noncontingent, liquidated, and undisputed unsecured claim by

LATAM Finance on the basis of "Intercompany Note Receivable."

A properly scheduled claim is "deemed filed" under section 501, and is "deemed

allowed," unless a party in interest objects. 11 U.S.C. § 502(a). As relevant, if such an objection

to a claim is made, the court will allow the claim "except to the extent that such claim is

unenforceable against the debtor and property of the debtor, under any agreement or applicable

law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. §

502(b)(1). Whether a claim is allowable "generally is determined by applicable nonbankruptcy

law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006). "What claims of

creditors are valid and subsisting obligations against the bankrupt at the time a petition is filed, is

a question which, in the absence of overruling federal law, is to be determined by reference to

state law." *In re Hess*, 404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting *Vanston Bondholders*

*Protective Comm. v. Green*, 329 U.S. 156, 161 (1946)); *see also In re Genco Shipping & Trading*

*Ltd.*, 550 B.R. 676, 680 (S.D.N.Y. 2015) ("One basis for sustaining an objection and disallowing

a claim is that 'such claim is unenforceable against the debtor and property of the debtor, under

any agreement or applicable law for a reason other than because such claim is contingent or

unmatured'. . . . Applicable law most often refers to state law.") Since New York law governs

the Intercompany Loan Agreements, it applies to any section 502(b)(1) analysis. *See, e.g.*, *In re*

*Okura & Co.*, 249 B.R. 596, 603 (Bankr. S.D.N.Y. 2000) (applying New York law to 502(b)

analysis pursuant to contractual choice-of-law provision); *Hartford Fire Ins. Co. v. Orient*

*Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear

in cases involving a contract with an express choice-of-law provision: Absent fraud or violation

of public policy, a court is to apply the law selected in the contract as long the state selected has sufficient contacts with the transaction.").

Courts within this circuit employ a burden-shifting methodology in which a proof of claim is *prima facie* evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion. *See In re Oneida Ltd.,* 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Cocoa Servs., L.L.C.,* No. 17-11936-JLG, 2018 WL 1801240, at *16 (Bankr. S.D.N.Y. Apr. 13, 2018). "To overcome the *prima facie* validity of the claim, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly),* 245 B.R. 768, 773 (2d Cir. BAP 2000) (internal citations omitted); *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992). By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant. *Creamer v. Motors Liquidation Co. GUC Tr. (In re Motors Liquidation Co.),* No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013). At that point, the claimant must prove by a preponderance of the evidence that under applicable law the claim should be allowed. *In re Cocoa Servs., L.L.C.,* 2018 WL 1801240 at *16; *see also In re Eternal Ent., Inc.*, 558 B.R. 47, 56 (Bankr. D. Conn. 2016) (discussing burden of proof regarding objection to debtor's scheduled claim).

## The Objection

The Committee argues that the Court should disallow and expunge the Intercompany Claim because by their terms, the Intercompany Loans do not create legitimate, enforceable debts under New York law. Objection ¶¶ 2, 7; Committee Reply ¶¶ 1-2. It labels the case as a "no debt" case (Committee Reply ¶ 1) and asks the Court to find "that no Allowed Claim exists [on account of the Intercompany Loans] for [Plan] distribution purposes." Committee Proposed

Findings and Conclusions ¶ 31 n.2. Moreover, the Committee maintains that in assessing

whether the Intercompany Loans give rise to Allowed Claims against Peuco, the Court is not

bound by the terms that the Debtors use in the Intercompany Loan Agreements. It says that New

York law mandates that the loans "be considered in [their] totality and judged by [their] real

character." Committee Reply ¶ 1 (quoting *LG Funding, LLC v. United Senior Props of Olathe,*

*LLC*, 181 A.D.3d 664, 665 (2d Dept 2020)). It urges the Court to adopt a "totality of the

circumstances" approach in assessing the "true character" of the Intercompany Loans by utilizing

the framework that courts apply in determining whether to recharacterize a claim of debt as

equity, first enunciated in *In re AutoStyle Plastics, Inc.*[23] The Committee disclaims any effort to

recharacterize the Intercompany Loans, "because there was no payment to Peuco to be

characterized as debt, equity or anything else – there was only a transfer of funds from LATAM

Finance to LATAM Parent . . ." *Id.* ¶ 9. It maintains that the Court need not reach the question of

how to characterize the Intercompany Loans because simply determining that there is no valid

debt suffices to disallow the Intercompany Claim. *Id.* ¶ 10.[24] Nonetheless, during the hearing,

Committee counsel argued that the Court should apply the *AutoStyle* factors in assessing whether

---

[23] Below, the Court considers the Committee's contentions regarding the applicability of the "recharacterization" cases herein. For now, it is enough to note that courts analyzing recharacterization claims balance the factors set forth by the Sixth Circuit in *Basco Corp. v. Masco Tech, Inc.* (*In re AutoStyle Plastics, Inc.),* 269 F.3d 726 (6th Cir. 2001). Those factors are: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) identity of interest between creditor and stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advance was used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Id.* at 750.

[24] The Committee asserts that it does not believe (and does not argue) that LATAM Finance made any equity investment in Peuco. Committee Reply ¶ 10. It says that LATAM Finance's transfer to LATAM Parent "is most directly analogous to a dividend or consideration for the guaranty that LATAM Parent provided on the bonds," and that Peuco's receipt of the receivables from LATAM Parent are characteristic of capitalizations. *Id.* The Court need not and does not address those matters.

the Intercompany Loans are "debts." *See* Mar. 18, 2022 Hr'g Tr. - Public Session at 25:10-26:10

(Brilliant). The Committee also contends that at a minimum the cases applying the equitable

remedy of recharacterization will provide helpful, "analogous guidance" to the Court. Committee

Reply ¶ 9.

The Committee argues that the following factors support its contention that the

Intercompany Loans do not give rise to enforceable debts under New York law: (i) the purported

debt obligations were neither consistently documented at the time they occurred, nor accurately

recorded as such at the time in the amounts alleged by the Debtors on either Peuco's or LATAM

Finance's financial statements; (ii) the loans have no pre-default interest rate, maturity date, or

schedule of payments; (iii) LATAM Finance neither transferred funds to Peuco, nor demanded

payment from Peuco, and Peuco never made a payment to LATAM Finance; and (iv) Peuco's

only assets were "stale" intercompany claims that it never attempted to collect. Committee Reply

¶ 2. It maintains that those factors, coupled with the fact that the Intercompany Loans are not at

market rates and were not negotiated at arms-length, present the "paradigmatic" scenario in

which the Court should not recognize the Intercompany Loans as giving rise to enforceable debt

obligations under New York law because LATAM Parent controls both LATAM Finance (the

transferor) and Peuco (the transferee) and LATAM Finance transferred the funds to LATAM

Parent with little or no expectation that Peuco would pay LATAM Finance back. *See* Objection ¶

57 (citing *In re BH S&B Holdings LLC*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009), *aff'd as

modified* 807 F. Supp. 2d 199 (S.D.N.Y. 2011)). Finally, it contends that LATAM Finance

cannot enforce the Intercompany Loans because neither LATAM Finance nor Peuco obtained

necessary board approvals to enter into the Intercompany Loan Agreements and did not adhere to the terms of those agreements.[25]

Against that backdrop, in support of the Objection the Committee argues that the Plan's treatment of the Class 4 LATAM 2024/2026 Bond Claims is premised on the Debtors' mistaken belief that there is any substance behind the Intercompany Claim and Peuco's obligation to pay LATAM Finance. *See* Objection ¶ 2. The Committee contends that since there is allegedly no substance to that claim, the NY Law Noteholders should not receive an "enhanced" return – once on account of Peuco's purported obligation to pay LATAM Finance and once again on account of LATAM Parent's direct obligation to pay under its guarantee of the NY Law Notes. Committee Reply ¶ 4. The Committee maintains that resolution of the Objection is "vitally important because, if the intercompany claim against Peuco is not a valid debt obligation, the sole meaningful recourse for the [NY Law Notes] is an unsecured claim against LATAM Parent based on LATAM Parent's guarantee." Objection ¶ 2. It concludes that "[t]his would have the effect of placing the [NY Law Notes] on equal footing with other general unsecured creditors against LATAM Parent." *Id.* The approximately USD 488.6 million in Local Bonds are classified as Class 5 claims under the Plan. In its joinder to the Objection, BancoEstado, as the

---

[25] In its Objection, the Committee also requests that the Court disallow the Intercompany Claim in its entirety under section 502(b)(1) by invoking the Court's broad equitable power to ensure that "fraud will not prevail." *See* Objection ¶ 53 (citing *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships")); *In re Lyondell Chem. Co.*, 544 B.R. 75, 92-93 (Bankr. S.D.N.Y. 2016) (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939) ("fraud will not prevail . . . substance will not give way to form . . .")). However, the Committee has not alleged fraud on the part of LATAM Finance or Peuco. Moreover, section 502(b) specifically enumerates the bases upon which the Court may disallow a claim and thus limits the Court to those bases when adjudicating an objection to a claim. The conduct of a creditor is not among those bases. Courts in the Second Circuit consistently hold that bankruptcy courts cannot rely solely on their equitable powers under section 105(a) to disallow a claim under section 502(b) of the Bankruptcy Code. *See In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 157 (Bankr. S.D.N.Y. 2014) (concluding that the bankruptcy court "cannot disallow an otherwise valid claim based on general principles of equity"); *In re Lightsquared Inc.*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("[T]his Court holds that the Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b) of the Bankruptcy Code."). The Court overrules that aspect of the Objection.

Local Bonds' indenture trustee, requests that the Intercompany Claim be disallowed in its

entirety under section 502(b)(1) of the Bankruptcy Code. BancoEstado Joinder ¶ 1.

As scheduled, the USD 1,307,721,003 Intercompany Claim is deemed filed, *prima facie*

valid and "is accorded the same evidentiary effect as is one actually filed by the creditor." *In re*

*Cocoa Servs., L.L.C.,* 2018 WL 1801240 at *15 (quoting *In re ATD Corp.*, 278 B.R. 758, 762–63

(Bankr. N.D. Ohio 2002), *aff'd*, 352 F.3d 1062 (6th Cir. 2003)); *see also In re Jorczak*, 314 B.R.

474, 481–82 (Bankr. D. Conn. 2004) (noting that the scheduling of a debt is a judicial admission

by the debtor); *In re Burkett*, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005) ("A debtor's

scheduling of a debt constitutes a sworn statement and admission against interest, which is

strongly probative of the claim's validity.").

In response to the Objection, the Debtors note that the Intercompany Loans are

documented in the five notarized Intercompany Loan Agreements, and that the Committee does

not challenge the validity of the loan documents themselves or argue that the documents are

ambiguous or incomplete on their face. Debtors' Post Hearing Brief ¶ 2. They say that the

Objection notwithstanding, the Committee has not and cannot meet its burden to present

evidence that negates the Intercompany Claim's presumptive validity because New York law-

governed contracts are enforced in accordance with their plain terms, and the Intercompany Loan

Agreements contain both -

> (i) the only terms that are required under New York law for a valid loan: an
> advance of money with a promise to repay it at a future time, and

> (ii) other typical loan provisions: they are payable on demand, provide for default
> interest, and allow LATAM Finance to accelerate the entirety of the Intercompany
> Loans upon an event of default.

*Id.* Moreover, they assert that the record contains substantial evidence demonstrating that, in

furtherance of the Debtors' business strategy, LATAM Finance and Peuco intended to enter into

loan agreements and were authorized to do so and to perform under the agreements. As noted, the Noteholder Ad Hoc Group opposes the Objection, and the Parent Ad Hoc Claimant Group supports the Debtors' Response to the Objection. In substance, and without limitation, both groups contend that the Committee (i) misplaces its reliance on the "recharacterization" cases and (ii) has failed to articulate any valid legal or factual basis to disregard and ignore the clear and unambiguous terms of the Intercompany Loan Agreements, which they say are enforceable under New York law. *See* Noteholder Ad Hoc Group Opposition ¶¶ 3-4; Parent Ad Hoc Claimant Group Statement ¶¶ 6, 8-11. Moreover, both complain that in pursuing the Objection, the Committee is running afoul of the fiduciary duties that it owes to the unsecured creditors of all the Debtors because it is advancing the interests of the LATAM Parent's unsecured creditors at the expense of LATAM Finance's unsecured creditors. *See* Noteholder Ad Hoc Group Opposition ¶¶ 26-27; Parent Ad Hoc Claimant Group Statement ¶¶ 14-16. They contend that provides additional grounds for overruling the Objection.

The Court considers those matters below.

## Discussion

Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Bank of New York v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 556 (S.D.N.Y. 2009), *aff'd*, 607 F.3d 905 (2d Cir. 2010) (citing *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (Ct App 2002)); *see also Marin v. Constitution Realty, LLC*, 28 N.Y.3d 666, 673 (Ct App 2017) ("A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") (internal citation omitted). Absent exigent circumstances such as fraud, duress, undue influence or mutual mistake, New York courts preclude a party from offering evidence to

contradict or modify an unambiguous contract. *See, e.g.*, *Polygram Holding, Inc. v. Cafaro*, 42

A.D.3d 339, 340 (1st Dept 2007); *see also* 6 *Corbin on Contracts* § 25.21 (2021) (recognizing

that extrinsic evidence is only admissible to prove a claim of mistake or fraud and identifying

lack of consideration, fraud, duress, undue influence, or illegality as circumstances in which

evidence may be offered to contradict or modify a contract). The Committee does not allege

exigent circumstances and does not deny that the Intercompany Loan Agreements are clear and

unambiguous. Still, as discussed above, the Committee contends that the Court should expunge

the Intercompany Claim because the Intercompany Loan Agreements do not give rise to

enforceable debts under New York law, and because LATAM Finance and Peuco were not

authorized to enter into those agreements.

The Court first considers whether the Intercompany Loan Agreements give rise to

enforceable debts under New York law. The Court finds no merit to the Committee's assertion

that in addressing that issue, it should look behind the plain language of the agreements and

undertake an analysis of the "true character" of the agreements akin to that conducted by courts

applying the *AutoStyle* factors in determining whether to recharacterize debt as equity. First, in

the New York cases that the Committee cites in support of the proposition that courts look

beyond the plain language of the agreement in assessing the character of the agreement, the

courts acknowledged that standard, but ultimately did not look beyond the four corners of the

agreements in assessing the "real character" of the underlying transactions.[26] Next, the Court is

---

[26]    The Committee relies on *Rubenstein v. Small*, 273 A.D. 102 (1st Dept 1947) and *LG Funding, LLC v. United Senior Props of Olathe, LLC*, 181 A.D.3d 664 (2d Dept 2020). *In Rubenstein,* the trial court dismissed the complaint seeking an accounting on the grounds that the plaintiff, who gave the defendant $2,500 to be used in the production of a vaudeville show, was not entitled to an accounting because under his written loan agreement, he had an adequate remedy at law. In reversing the trial court, the appellate court found that it was free to go behind the characterization in the agreement describing the plaintiff's advances as a loan to find that something other than a debtor-creditor relationship existed among the parties to the agreement. *Rubenstein*, 273 A.D. at 104. However, in assessing the "real character" of the of the transaction the court did not go beyond the four corners of the agreement and did not consider *Autostyle*-like factors. It found that the agreement did not give rise to a "true loan" because on

not aware of any New York state court that has applied the *AutoStyle* factors in assessing the

"true character" of a purported loan agreement and finds no grounds for doing so. The

"recharacterization" cases that that the Committee cites in support of the Objection involve the

prototypical recharacterization scenario: a sponsor making an investment to prop up a struggling

enterprise or start-up business.[27] They are plainly not applicable herein. Neither is the doctrine of

recharacterization in general. "Recharacterization" is a remedy that is "grounded in bankruptcy

courts' equitable authority to ensure 'that substance will not give way to form, that technical

considerations will not prevent substantial justice from being done.'" *Cohen v. KB Mezzanine*

*Fund, II, LP (In re SubMicron Sys., Corp.),* 432 F.3d 448, 454 (3d Cir. 2006) (quoting *Pepper v.*

*Litton,* 308 U.S. 295, 305 (1939)); *see also In re Lyondell Chem. Co.*, 544 B.R. 75, 92–93

(Bankr. S.D.N.Y. 2016) ("[B]ankruptcy courts, as courts of equity, have broad authority to

---

the face of the agreement, it did not provide for "repayment absolutely." Rather, the agreement provided that the lender would be repaid only out of "unused loans, advances and the excess of gross receipts over production costs and operating expenses", and not otherwise. The case is distinguishable because the demand notes issued under the Intercompany Loan Agreements are repayable absolutely. In *LG Funding LLC*, the plaintiff sued to recover damages for breach of contract. In their answer, the defendants asserted a counterclaim alleging that the transaction at issue was a criminally usurious loan. 181 A.D.3d at 665. As relevant, the plaintiff moved to dismiss the counterclaim. The trial court denied the motion. *Id*. On appeal, the appellate court affirmed. In so ruling, the court noted that "[t]he rudimentary element of usury is the existence of a loan . . . and where there is no loan, there can be no usury . . ." *Id.* (citations omitted). The court noted that in assessing the merits of the motion, it had to consider the "real character" of the transaction and whether the plaintiff was "absolutely entitled to repayment under all circumstances." *Id.* In doing that analysis, the appellate court did not look beyond the four corners of the agreement or consider the *AutoStyle* factors. It found that based on the plain language of the agreement, the plaintiff was entitled to such repayment. *Id.* at 666. Neither *Rubenstein* nor *LG Funding, LLC* supports the Committee's assertion that in assessing whether the Intercompany Loan Agreements give rise to valid indebtedness, the Court should look behind the four corners of the agreements.

[27]    *See In re Lyondell Chem. Co.*, 544 B.R. 75, 102-103 (Bankr. S.D.N.Y. 2016) (rejecting request to recharacterize revolver draws as equity contributions where an affiliate of the controlling shareholder was providing the revolver loan); *In re Live Primary, LLC*, 626 B.R. 171, 209 (Bankr. S.D.N.Y. 2021) (deeming certain funds equity rather than debt with respect to start-up company where evidence demonstrated that when the party holding 40% of the debtor's equity had advanced $6,000,000, both such shareholder and the debtor intended for the advance to be an equity contribution); *In re BH S & B Holdings LLC*, 420 B.R. 112, 160 (Bankr. S.D.N.Y. 2009) (rejecting request to recharacterize certain loans where certain loans were furnished by entities controlled by principal shareholders), *aff'd as modified,* 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *In re Lane*, 742 F.2d 1311, 1320 (11th Cir. 1984) (holding that purported debt would be construed as equity contributions where individual provided funds to corporations he owned without a firm expectation such funds would be repaid and therefore such individual could not sustain action for a "bad debt deduction" under relevant tax law).

modify creditor-debtor relationships."). The remedy is available "where the circumstances show that a debt transaction was 'actually [an] equity contribution [] *ab initio*.'" *In re AutoStyle Plastics, Inc.*, 269 F.3d at 747-48 (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)). In "recharacterization" cases, the issue before the court is the proper characterization of the investment in the first instance. Accordingly, "[t]he debt-versus-equity inquiry is not an exercise in *recharacterizing* a claim, but of *characterizing* the advance's true character." *Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd. P'ship),* 240 B.R. 124, 137 (Bankr. D.D.C. 1999); *see also In re Cold Harbor Assocs., L.P.,* 204 B.R. at 915 ("Rather than recharacterizing the exchange from debt to equity, or subordinating the claim for some reason, the question before this Court is whether the transaction created a debt or equity relationship from the outset."). The recharacterization of a debt claim does not relieve the obligor of the obligation to repay the claimant; it does not result in the disallowance of the claim. *In re AutoStyle Plastics, Inc.*, 269 F.3d at 749 ("In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation.") (internal citations omitted). Application of the doctrine of recharacterization does not provide a basis for disallowing a claim; it is a separate and distinct inquiry from disallowance under section 502(b)(1). It does not support the Committee's objection to the Intercompany Claim. *See In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1148 (10th Cir. 2015) ("Under § 502(b), disallowance of a claim is appropriate when the claimant has no rights vis-à-vis the bankrupt, i.e., when there is no basis in fact or law for any recovery from the debtor. Recharacterization, on the other hand, is

not an inquiry into the enforceability of a claim; instead, it is an inquiry into the true nature of a

transaction underlying a claim.") (internal citations and quotations omitted).

The Court next considers whether the plain terms of the loan agreements give rise to

enforceable debts. "A loan is a contract whereby one party advances monies to the other upon a

promise to repay at a future time a sum equivalent to that which was transferred, with or without

interest." *People v. Grasso*, 13 Misc. 3d 1227(A), 2006 N.Y. Slip Op. 52019(U), *21 (Sup Ct,

New York County 2006), *aff'd as mod on other grounds. People v. Grasso*, 54 A.D.3d 180 (1st

Dept 2008); *Merchant Cash & Capital, LLC v Yehowa Med. Servs., Inc.*, No. 602039-16, 2016

WL 4478805, at *5 (Sup Ct, Nassau County July 29, 2016) ("The essence of a loan or

forbearance is a lender's absolute right to repayment") (citing *Rubenstein v. Small,* 273 A.D.

102, 104 (1st Dept 1947)). The Committee asserts that an agreement that purports to be a loan is

not enforceable under New York law where "essential terms of the loan are missing" and that the

"essential terms . . . include an interest rate, a maturity date and a schedule of payments."

Committee Reply ¶ 6. However, the cases that the Committee cites in support of that argument

are distinguishable because they address only whether, in the absence of a clearly documented

agreement, the court should find that the parties agreed to basic terms forming an enforceable

contract. The cases do not address the question of the validity of a documented loan agreement.[28]

---

[28]    In *L.K. Sta. Group., LLC v. Quantek Media, LLC*, the court refused to enforce an alleged loan contained in
certain documents because they were expressly nonbinding and contained terms that were "too uncertain to
constitute enforceable agreements." 62 A.D.3d 487, 491-92 (1st Dept 2009). In *Gianascio v. Giordano*, the court
refused to characterize a transfer of money as a loan where there had been no written documents or real discussion
regarding the terms of the alleged loan. No. 99 CV 1796 GBD, 2003 WL 22999454, at *3 (S.D.N.Y. Dec. 19, 2003)
("Obviously if it cannot be ascertained what the agreement is, it cannot be determined whether a party has breached
that agreement."). In *Barshay v. Naithani*, the court considered whether an oral loan agreement existed among the
parties by addressing the question of "whether all of the terms of the alleged contract had been agreed upon." No. 20
Civ. 85479 (KPF), 2022 WL 170599, at *6 (S.D.N.Y. Jan. 18, 2022). In doing so, the Court applied a set of factors
articulated in *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78 (2d Cir. 1985) to decide whether the oral agreement was
enforceable. *See id.* at *6-7. However, the *Winston* test applies only where the court must "determine whether the
parties intended to be bound in the absence of a document executed by both sides." *Winston,* 777 F.2d at 80. Finally,
in *Roully v. Inex Co.*, one of the parties submitted a letter as evidence of an oral loan agreement, but the court

Moreover, neither an interest rate, a payment schedule, nor even a formal, written agreement is necessary to enforce a debt obligation under New York law. *See Grasso*, 2006 N.Y. Slip Op. 52019(U), *21 (explaining that courts may consider various factors but "[u]ltimately, however, where the obligation to repay the amount extended is deduced, the law will regard the transaction as a loan"); *see also In re Regan*, No. 18-31694, 2019 WL 6125924, at *3 (Bankr. N.D.N.Y. Nov. 15, 2019) (upholding a claim based on an interest-free loan under New York law); *Elia v. Perla*, 150 A.D.3d 962, 964 (2d Dept 2017) (upholding loan without maturity date; loans that are payable on demand are enforceable upon execution); *Bass v. Bass*, 140 A.D.2d 251, 253 (1st Dept 1988) (noting that the "lack of loan documents, terms of repayment [in a loan or a] demand for repayment do not necessarily preclude a finding that a debt exists and is payable on demand."); *Cathy Young for Senate v. New York State Senate Republican Campaign Comm.*, 67 Misc.3d 1229(A), 2020 N.Y. Slip Op. 50672(U), *4 (Sup Ct, Cattaraugus County 2020) ("As for when payment on such a loan is due, if the agreement contains no specified time for repayment, the loan is payable upon demand.") (citing *ABKCO Music & Records, Inc. v. Montague*, 90 A.D.3d 402 (1st Dept 2011)).

The record reflects that there are written, notarized Intercompany Loan Agreements with respect of each of the five Intercompany Loans. *See* Exs. 10-14 (Intercompany Loan Agreements). Each document states that it is a "Loan Agreement," and unambiguously provides that LATAM Finance as "Lender" makes available to Peuco as "Borrower" a "term loan" in a fixed amount, which the "Borrower shall repay in full or in part, upon demand by the Lender." The Intercompany Loan Agreements contain the essential elements of a loan under New York law – a definite sum advanced with expectation of repayment in full, including (i) an obligation

---

refused to enforce it because it lacked basic terms that indicated the existence of a written contract. 677 F.2d 14, 15 (2d Cir. 1982).

to repay the Loan in full or in part on demand; (ii) default interest to accrue on the principal of

any amount unpaid on demand at a rate of 2% per annum; and (iii) an ability for the lender to

accelerate the loan in response to an event of default, such as non-payment or an insolvency

proceeding. The plain terms of the unambiguous Intercompany Loan Agreements create debt

obligations, and also reflect the intent of the parties to create debt obligations by LATAM

Finance. "The fundamental, neutral precept of contract interpretation is that agreements are

construed in accord with the parties' intent and the best evidence of what parties to a written

agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (2022)

(citing *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) (internal quotations omitted)).

The Intercompany Loan Agreements are unambiguous and are valid and enforceable in

accordance with their clear terms. *See Cobblestone Advisory Group, LLC v. Lembi Group

Partners, LLC*, No. 10 Civ. 4761 (WHP), 2011 WL 5881187, at *4 (S.D.N.Y. Nov. 22, 2011)

(enforcing loan agreement in accordance with its terms where it was "complete, clear and

unambiguous on its face.").

In challenging the enforceability of the Intercompany Claim, the Committee failed to

refute the Debtors' contentions that the plain and unambiguous terms of the Intercompany Loan

Agreements give rise to enforceable debts under New York law. As such, in that regard, the

Committee has failed rebut the *prima facie* validity of the claim. The Court overrules that aspect

of the Objection. In reaching that conclusion, and as explained below, the Court finds no merit to

the Committee's assertions that the Intercompany Loans did not establish valid debt obligations

because (i) the loan agreements lack substance; (ii) no arms-length lender would have agreed to

the terms of those loans, (iii) Peuco did not maintain a bank account, (iv) two of the transfers

made pursuant to the Intercompany Loan Agreements occurred before the corresponding

Intercompany Loan Agreements were memorialized in writing, and (v) LATAM Finance never demanded that the balance of the Intercompany Loans be paid.

The Committee asserts that the Intercompany Loan Agreements lack substance because Peuco's only assets were the "stale" Intercompany Receivables. *See* Objection ¶¶ 7, 22, 23, 31, 32, 34. There is no dispute that certain of the Intercompany Receivables are over eight years old. However, the Committee has not demonstrated that the age of the receivables has any bearing on the validity of such receivables. It is undisputed that Intercompany Receivables across the LATAM group are always collected. Ex. 200 (Marin Dep.) Tr. 85:2-4; 21-24. Moreover, as noted previously, between April 2018 and August 2020, Peuco repaid USD 183,477,457.35 to LATAM Finance under the Intercompany Loans, and the Intercompany Receivables owed to Peuco were reduced by the same amount. *See* Ex. 81 (Marin Supp. Decl.) ¶¶ 4-5. The record reflects that the funds were transferred to LATAM Finance to repay the Intercompany Loans on behalf of Peuco by either LATAM Parent or an Affiliate to LATAM Finance. Next, the fact that the loans were not arm's length is of no moment to the enforceability of the agreements. Courts applying New York law regularly enforce loans negotiated between "arm-in-arm" or related parties containing terms otherwise unavailable from commercial lenders. *See, e.g., J.D. v. A.D.*, 54 Misc.3d 1221(A), 2017 N.Y. Slip Op. 50261(U), *6 (Sup Ct, Richmond County 2017) (enforcing interest-free, on-demand loan negotiated between two family members); *Stein v. Anderson*, 123 A.D.3d 1322, 1322 (3d Dept 2014) (enforcing interest-free loan between friends even though agreement was never committed to writing). Further, the Committee asserts that "LATAM Finance transferred the funds to LATAM Parent directly and, upon information and belief, never deposited money into a bank account belonging to Peuco." It maintains that the loans in question were not, in fact, ever made to Peuco. Objection ¶ 4; Committee Reply ¶ 9.

However, there is no support for the contention that a separate bank account for the borrower

entity is required for a documented intercompany loan to be valid. To the contrary, it is common

for large, multinational companies to record transactions in ledgers for corporate affiliates that

have no bank accounts without the need for an actual cash transfer. Ex. 2 (Edgar Decl.) ¶ 25.

This practice reduces the number of bank accounts where possible and minimizes bank

transaction fees. *Id*.[29]  Moreover, and in any event, it is undisputed that money flowed from

LATAM Finance to LATAM Parent on behalf of Peuco, as documented in the Intercompany

Loan Agreements and the Funds Flow Agreement.

The fact that certain of the loans were funded before the agreements were drafted does

not diminish the enforceability of the loans. Courts uphold loans agreed to orally, *see, e.g., Stein*

*v. Anderson*, 123 A.D.3d at 1323, or recorded months after the relevant funds are advanced. *See,*

*e.g.*, *Calianno v. Distinctive Brands, Inc*, Civ. Act No. 4:12-cv-435, 2013 WL 12140296, at *1-3

(S.D. Tex. Feb. 20, 2013) (recognizing validity of a promissory note where note was executed

two months after loan was advanced).[30] Finally, the Committee makes much of the fact that

LATAM Finance never demanded that the balance of the Intercompany Loans be paid.

---

[29]    Brock Edgar is a Senior Managing Director at FTI Consulting, Inc., the financial advisors to the Debtors. The Debtors submitted the Edgar Declaration in support of the Debtors' Response to the Objection. Mr. Edgar is a Canadian Chartered Professional Accountant, Certified Insolvency Professional and Licensed Trustee in Bankruptcy. Ex. 2 (Edgar Decl.) ¶ 6, Ex. 1. He has over 35 years of experience in large, multi-national, restructuring assignments in Mexico, Canada, the Caribbean and South America, including advising Latin American companies that have reorganized under Chapter 11 of the Bankruptcy Code. *Id.* ¶ 7. His assignments have involved the successful restructuring of more than USD 150 billion of indebtedness. The Committee contends that the Court should accord little weight to Mr. Edgar's opinions. Committee Proposed Findings and Conclusions ¶¶ 102-110. The Court finds no merit to that assertion as it relates to this testimony. The Court fully credits this testimony of Mr. Edgar.

[30]    The Committee misplaces its reliance on *Gianascio v. Giordano*, No. 99 CV 1796 GBD, 2003 WL 22999454 (S.D.N.Y. Dec. 19, 2003). *See* Committee Reply ¶¶ 6-7 It argues that in *Gianascio,* the court did not enforce a loan "where funds were transferred before alleged agreement was formed." *See id.* ¶ 7. The Court disagrees. In *Gianascio,* the court held that the party transferred the funds without there being an agreement in the first place. 2003 WL 22999454 at *3. That is not the situation before the Court. Here, the parties agreed to a loan and transferred the funds. The completion of the formal execution of the agreement occurred later.

Committee Reply ¶ 6. However, as the Debtors assert, prior to the commencement of these

Chapter 11 Cases, LATAM Finance did not have a need to demand full repayment (and doing so

would be contrary to the purpose of borrowing the funds for group operational purposes), and

after the commencement of these cases, the automatic stay would have prohibited it from doing

so. Response ¶ 37. Rather, LATAM Finance and Peuco scheduled the Intercompany Claim, and

ascribe value to the claim because the Plan provides for payment of the NY Law Notes based, in

part, on the value associated with the claim. *See* Disclosure Statement at 67 n.68.

As previously noted, the Noteholder Ad Hoc Group and the Parent Ad Hoc Claimant

Group support the Debtors' opposition to the Objection. The Court will not review the

overlapping arguments among the Debtors and these creditors. However, the Court will consider

the contentions of these creditors that in pressing the Objection, the Committee is violating its

fiduciary duty to them and other unsecured creditors.

It is settled that the Committee owes a fiduciary duty to advance and protect the interests

of all unsecured creditors in these Chapter 11 Cases. *See In re Refco Inc*., 336 B.R. 187, 195

(Bankr. S.D.N.Y. 2006) ("[T]he members of an official committee owe a fiduciary duty to their

constituents–in the case of an official creditors' committee, to all of the debtor's unsecured

creditors."); *In re Residential Cap*., *LLC,* 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012)

("[S]tatutory unsecured creditors committees owe a fiduciary duty to the entire class of creditors

represented by such committee and are required to place the collective interest of the class they

represent above their own personal stake in the bankruptcy case."). The Parent Ad Hoc Claimant

Group says that the Plan "represents the Debtors' best, and at present, only chance of

successfully emerging from bankruptcy as a going concern." Post Hearing Parent Ad Hoc

Claimant Group Statement ¶ 1. It describes the Plan as containing several carefully negotiated,

interrelated elements that are the product of numerous and complex settlements among the Debtors, various creditor groups, and interest holders. Parent Ad Hoc Claimant Group Statement ¶¶ 3-4; Post Hearing Parent Ad Hoc Claimant Group Statement ¶ 1. Those elements include (i) the terms for facilitating nearly $5.4 billion in new money financing backstopped by the Parent Ad Hoc Claimant Group and Backstopping Shareholders, and the terms on which certain unsecured creditors may participate in the exit financing offering, (ii) the form and manner of recovery to the various creditors under the Plan on account of their claims, and (iii) the settlement of certain estate claims and causes of action against certain shareholders. *See* Post Hearing Parent Ad Hoc Claimant Group Statement ¶¶ 1, 2. It asserts that a key assumption underlying the Plan settlements, and the form and manner of recovery to the various creditor groups under the Plan, is reflected in the treatment of claims and interests held by LATAM Finance, LATAM Parent, and Peuco. *See* Parent Ad Hoc Claimant Group Statement ¶¶ 3-4. The Parent Ad Hoc Claimant Group explains that it and its members agreed to the Plan treatment of the Class 4 LATAM 2024/2026 Bond Claims because they determined that the allowance of the claim helps to foster the global settlement underlying the Plan and allows for the Debtors' timely and value-maximizing emergence from bankruptcy. *Id.* ¶ 4. It contends that when viewed in the broader context of these Chapter 11 Cases, the treatment of the Intercompany Claim is an essential underlying component of the carefully negotiated elements of the Debtors' Plan. Post Hearing Parent Ad Hoc Claimant Group Statement ¶ 1.

The Parent Ad Hoc Claimant Group complains that notwithstanding the overwhelming unsecured creditor support for the Plan – with approximately 70% of the unsecured claims against LATAM Parent and nearly 70% of the NY Law Noteholders signed on to the Restructuring Support Agreement – the Committee is jeopardizing the Debtors' successful

reorganization through "ongoing and meritless litigation." *Id.* ¶ 2. It maintains that by objecting to the Intercompany Claim, the Committee is not only failing to fulfill its duties to maximize recoveries for all of the Debtors' general unsecured creditors but is also attacking a Plan that enjoys broad support from Committee's own constituents. *Id.* It asserts that the Committee has placed the unsecured creditors of LATAM Finance firmly at odds with the unsecured creditors of LATAM Parent. *Id.* ¶ 14. As such, it maintains that the Committee is not an appropriate party to object to the Intercompany Claim because its mandate is to represent all general unsecured creditors, not merely to represent the interests of certain unsecured creditors. *Id.*

The Parent Ad Hoc Claimant Group contends that to represent the diverse unsecured creditor groups in these cases productively, the Committee must strike a "proper balance" among the parties so that "an effective and viable reorganization of the [Debtors] may be accomplished." *Id.* ¶ 15 (quoting *In re Hills Stores Co.,* 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992)). It says that the Committee's actions are contrary to these established principles. *Id.* It criticizes the Committee for failing to balance the agendas of differing creditor classes in these Chapter 11 Cases, and instead advancing the interests of a select group of unsecured creditors to increase their recoveries at the expense of other unsecured creditors. *Id.* The Parent Ad Hoc Claimant Group asserts that "[t]his is a plain, and material conflict of interest" and that the Committee "should not be allowed to wade into a dispute whose outcome would increase recoveries to some at the expense of others it represents." *Id.; see also id.* ¶ 16 ("[T]he Committee appears to be favoring a select group of unsecured creditors – minority creditors of LATAM Parent – to the detriment of the others it has been appointed to represent – holders of bonds issued by Finance and *holders of approximately 70% of the claims against LATAM Parent itself* that support the treatment of the Intercompany Claim as part of the interrelated settlements in the Plan."). In sum,

it contends that the Court should overrule the Objection because it is "simply the latest attempt

by the Committee to derail the Plan." *Id*. ¶ 5 ("The Committee appears to have made the strategic

decision to assert the Intercompany Claim Objection in an effort to upset one of the assumptions

embodied in the Plan and thereby undermine the treatment afforded to the creditors in Classes 4

and 5 under the Plan.").

 The Noteholder Ad Hoc Group raises similar concerns. It says that in filing the

Objection, the Committee has placed itself in an "untenable position" because in seeking to

expunge the Intercompany Claim, it "is blatantly advancing the interests of the unsecured

creditors of one debtor (LATAM Parent), at the expense of the unsecured creditors of another

debtor (LATAM Finance)." Noteholder Ad Hoc Group Opposition ¶ 2. It says that is so because

the Committee's objective in filing the Objection is to: (i) disallow the Intercompany Claim, (ii)

effectively ignore LATAM Finance as the issuer of the NY Law Notes, and (iii) force the NY

Law Noteholders to look solely to LATAM Parent, as guarantor, for any meaningful recovery,

thereby diluting their recoveries. *Id.* ¶ 2; *see also id*. ¶ 29 ("In these Chapter 11 Cases, the

Committee represents the unsecured creditors of both LATAM Parent and LATAM Finance. Yet

through the Objection, the Committee seeks to eliminate LATAM Finance's major asset - the

Intercompany Loan - for the purported benefit of the creditors of LATAM Parent."). The

Noteholder Ad Hoc Group asserts that because "the Committee is hopelessly conflicted," the

Court "should not permit the Committee to prosecute the Objection further." *Id.* ¶ 30.

 The Committee denies that there is merit to the contentions of the Noteholder Ad Hoc

Group and Parent Ad Hoc Claimant Group. It says that courts recognize that "'creditors

committees often contain creditors having a variety of view-points' that may conflict with each

other and 'such conflicts are not unusual in reorganization.'" Committee Reply ¶ 26 (quoting *In*

*re McLean Industries, Inc.*, 70 B.R. 852, 861 (Bankr. S.D.N.Y. 1987) (internal citation and quotation omitted)). It maintains that its "obligations require it to 'represent the interests of the entire class fairly.'" *Id.* (quoting *Pension Benefit Guar. Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Pro. Corp.*, 42 B.R. 960, 963 (E.D. Pa. 1984)). It contends that is what it is doing in filing the Objection and maintains that it is not "somehow precluded from asserting this objection because some unsecured creditors would benefit from the windfall created by allowing the LATAM Finance Claim." Committee Proposed Findings and Conclusions ¶ 138; *see also* Committee Reply ¶ 26 (noting that the Noteholder Ad Hoc Group and Parent Ad Hoc Claimant Group do not "cite any authority suggesting that it is somehow inappropriate or impermissible for the Committee to object to an invalid claim."). To the contrary, it asserts that "[t]he filing of this objection to a claim that the Committee believes is invalid is in furtherance of [its obligation to represent the interests of the entire class fairly]. The Committee is not precluded from seeking fair treatment of all unsecured creditors simply because some unsecured creditors may prefer a different outcome." Committee Proposed Findings and Conclusions ¶ 138.

From the Parent Ad Hoc Claimant Group's perspective, there is much more at stake in the Objection than merely the disallowance of a claim. It maintains that if the Court expunges the Intercompany Claim, there may be significant adverse ramifications to LATAM Parent's business, and to the viability of the Plan. *See* Post Hearing Parent Ad Hoc Claimant Group Statement ¶¶ 1-2. The Committee consists of three creditors. It failed to reach a consensus on whether to file the Objection, as one of the three Committee members abstained from voting on the decision to file it. Noteholder Ad Hoc Group Post Hearing Brief ¶ 21, n.44. Nonetheless, no one questions the Committee's authority to file the Objection. However, the Parent Ad Hoc Claimant Group questions the proper role of the Committee in taking actions that could

adversely impact the Plan that has the "overwhelming" support of the Debtors' unsecured

creditors. Post Hearing Parent Ad Hoc Claimant Group Statement ¶ 2. On the record before the

Court, it is not clear that in filing the Objection, the Committee breached its fiduciary duties to

either the Noteholder Ad Hoc Group or the Parent Ad Hoc Claimant Group. *Cf. In re ETP, Inc.,*

171 B.R. 601, 602 (Bankr. N.D. Ohio 1994) ("The fact that the Class 8 unsecured claimants

voted in favor of the Debtor's Plan, while the Committee filed an objection to the Plan is not

necessarily incongruous."). Moreover, the Noteholder Ad Hoc Group does not cite any authority

in support of its assertion that the Court can bar the Committee from prosecuting the Objection,

and the Court is not aware of any such authority. The Court finds no merit to this aspect of the

opposition to the Objection.

Finally, the Court considers the Committee's contention that the Intercompany Loan

Agreements are unenforceable because the Debtors and the signatories to the agreements failed

to obtain board approval to enter into the agreements. Mr. Marin testified that the boards of

directors of LATAM Finance and Peuco approved each Intercompany Loan Agreement with

proper authorizations. However, the Committee is correct that the Debtors did not produce

documentary evidence substantiating that testimony. The Debtors failed to produce board

minutes relating to the February 2019 and March 2019 Loan Agreements and produced only

unsigned draft minutes relating to the December 2019 Loan Agreement. Moreover, although Mr.

Marin testified that he was granted power of attorney to sign the Intercompany Loan Agreements

on behalf of LATAM Finance, no board minutes identify him as an authorized signatory of any

of the agreements, and the record does not contain a copy of the power of authority, or written

authorization of kind, for Mr. Marin to execute the agreements on behalf of LATAM Finance.[31]

---

[31]    It is undisputed the under Cayman Islands law, powers of authority must be in writing to be valid and
enforceable.

The Committee makes the following additional points in support of the Objection. Paragraph 3 of each Intercompany Loan Agreement states that "[t]he borrower shall repay the Loan in full or in part, upon demand by the Lender, for which purpose it is agreed that Lender shall provide a written notice to Borrower requesting the amount to be prepaid." Ex. 10 (December 2017 Loan Agreement) ¶ 3. Paragraph 4.1 of each such agreement states that "[t]he Borrower may at all times, upon prior written notice to the Lender, prepay the Loan on any Business Day in whole or in part." *Id.* ¶ 4.1. The Committee asserts that although the Debtors attempt to characterize the payments that LATAM Parent made to LATAM Finance for purposes of paying the Bondholders as partial "repayments" by Peuco of the purported loans, the evidence of record disproves that characterization of the transfers because -

(a) LATAM Finance never demanded repayment from Peuco as required under Section 3 of the Loan Agreements. *See* Ex. 200 (Marin Dep. Tr.) at 101:10-14.

(b) Even if LATAM Parent's payments were deemed a voluntary pre-payment by Peuco under Section 4 of the Loan Agreements, Peuco was required to serve written notice of such pre-payment to LATAM Finance, but never did so. *See id.* at 114:25-115:6.

(c) Marin confirmed that Peuco never transferred funds to anyone or issued any written direction to LATAM Parent to do so on its behalf. *Id.* at 26:12-14; 102:19-21.

Finally, the Committee notes that although it is uncontested that LATAM Finance never transferred funds to Peuco and, instead, always transferred them to LATAM Parent directly, the Debtors executed a written agreement directing funds to be transferred in this way only for one of the five loan transactions. Ex. 1 (Marin Decl.) ¶ 15 n.8; *see also* Ex. 200 (Marin Dep. Tr.) at 98:20-25 (Marin testified that Peuco did not provide similar written instructions with respect to the other four loans.).

The Committee has demonstrated that, with the exception of the July 2019 Loan Agreement, the Debtors failed to comply with corporate formalities in entering into the Intercompany Loan Agreements. To that extent, the Committee has rebutted the *prima facie* validity of the Intercompany Claim. It is thus incumbent upon the Debtors to demonstrate, by a preponderance of the evidence, that LATAM Finance and Peuco were authorized to entered into the loan agreements. *See Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 508 B.R. 814, 817 (S.D.N.Y. 2014) ("The objecting party bears the initial burden of production and must provide evidence showing the claim is legally insufficient. The burden then shifts to the claimant, who must prove by a preponderance of the evidence that under applicable law the claim should be allowed.") (internal citations and quotation marks omitted). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Shiqiu Chen v. H.B. Rest. Grp., Inc.,* No. 16 CIV. 2005 (RWL), 2020 WL 115279, at *8–9 (S.D.N.Y. Jan. 9, 2020) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997)). The Court finds that the Debtors have met that burden. As demonstrated below, evidence extrinsic to the Intercompany Loan Agreements including contemporaneous records, internal communications, and the manner in which LATAM treated other intercompany debt obligations clearly supports the Debtors' assertion that LATAM Finance and Peuco intended to, and were authorized to, enter into the Intercompany Loan Agreements and to make the transfers under the agreements.

First, the Court finds no significance to the fact that LATAM Finance and Peuco executed only one Funds Flow Agreement. It is undisputed that LATAM Finance and Peuco did not execute Funds Flow Agreements for Peuco's subsequent purchases of LATAM Parent's accounts receivables because it was deemed unnecessary for them to do so since those

transactions were effectuated in the same manner as the December 2017 transaction. *See* Ex. 1

(Marin Decl.) ¶ 15 n.8; March 10 Tr. at 110:2-4 (Marin).

Next, LATAM Finance's and Peuco's ledgers reflect the Intercompany Loans as debt

owed by Peuco to LATAM Finance; in Peuco's ledgers, the Intercompany Accounts Receivables

purchased by Peuco from LATAM Parent are entered as debts owed by the Affiliates to Peuco.

*See* Ex. 32 (LATAM Finance 2017 Financial Statement) (showing USD 608 million debt owed

by Peuco Finance); Ex. 33 (LATAM Finance 2020 Financial Statement) (showing USD 1.3

billion debt owed by Peuco Finance); Ex. 34 (Peuco 2017 Financial Statement) (showing USD

608 million debt owed to LATAM Finance and USD 608 million in accounts receivable from

Lan Pax); Ex. 37 (Peuco 2020 Financial Statement) (showing USD 1.3 billion debt owed to

LATAM Finance and USD 1.3 billion in accounts receivable from LAN Pax, Transporte Aéreo,

and LAN Cargo); Ex. 1 (Marin Decl.) ¶ 17. *See also Ehrlich v. American Moninger Greenhouse

Mfg. Corp.*, 26 N.Y.2d 255, 259 (1st Dept 1970) (entries in "books of account and financial

statements" of disputed transaction as debt constituted evidence of underlying loan agreement).[32]

Further, the attendant circumstances in which the Intercompany Loans were made, the

situation of the parties, and the objectives they were trying to attain demonstrate that LATAM

Finance was authorized to make the loans and that it expected Peuco to repay them. *See SR Int'l

Bus. Ins. Co. Ltd. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 125 (2d Cir. 2006)

(applying New York law); *Brown Bros. Elec. Contrs*, 41 N.Y.2d at 399–400. The record reflects

that LATAM Finance "entered into loan agreements rather than into other types of transactions

with Peuco," because LATAM Finance needed the principal transferred pursuant to the

---

[32]    The Committee correctly notes that the 2019 financial statements for LATAM Finance and Peuco do not reflect
an outstanding debt of USD 1.3 Billion between LATAM Finance and Peuco. *See* Committee Proposed Findings
and Conclusions ¶¶ 92-100. The Debtors addressed that issue at the hearing and the Court credits their explanation.
*See* Mar. 10, 2022 Hr'g Tr. – Sealed Session at 9:13-11:15 (Marin)

Intercompany Loans to repay the NY Law Notes. Ex. 1 (Marin Decl.) ¶ 13 (noting that for business purposes, it "was important that the transactions were properly documented as debt obligations by LATAM Finance[.]"). That also is reflected in contemporaneous correspondence and internal presentations in which LATAM employees refer to the transactions underlying the Intercompany Loans as loans. *See* Ex. 42 (Email correspondence dated December 2019 between LATAM employees) (wherein Jose Madariaga Montes, LATAM's Director of Tax reiterated the importance of having accurate books and records); Ex. 41 (Email correspondence dated December 2017 between LATAM employees) (referring to the December 2017 transfer as a loan); Ex. 39 (internal LATAM presentation) (showing proceeds from NY Law Notes transferred from LATAM Finance via an intercompany loan); *see also J.D. v. A.D.*, 2017 N.Y. Slip Op. 50261(U), *3-4 (text messages and other written communications indicating that parties understood that sums transferred had to be paid back were evidence that disputed transaction was a loan and not a gift); *NAB Const. Corp. v. City of New York*, 276 A.D.2d 388, 390 (1st Dept 2000) (correspondence between parties constitutes evidence that debt obligation was not released).

Further, sums that LATAM Finance transferred to other LATAM entities pursuant to loan agreements with nearly identical provisions to the Intercompany Loan Agreements were repaid in full. *See* Ex. 50 (USD 12,000,000 Loan Agreement); Ex. 51 (USD 557,016,524.45 Loan Agreement); Ex. 52 (USD 173,323,810.96 Loan Agreement); *see also* Ex.1 (Marin Decl.) ¶ 12 (describing the TAM loans and noting the dates on which they were repaid). The evidence shows that LATAM repaid intercompany loans and did not forgive intercompany debt obligations. Ex. 1 (Marin Decl.) ¶ 17. That supports the Debtors' assertions that the loans were authorized and that LATAM Finance plainly expected that Peuco would repay the amounts due

under the Intercompany Loans. *See New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010) ("There is no surer way to find out the intent of the parties to a contract than to see what they have done" previously) (internal quotations, citations, and brackets omitted). Moreover, Peuco had already repaid part of the amount owed to LATAM Finance under the Intercompany Loan Agreements. *See Stein v. Anderson*, 123 A.D.3d at 1323 (part repayment of a debt obligation constituted evidence of valid loan agreement). It is undisputed that Peuco caused LATAM Parent and Lan Cargo to repay USD 183,477,457 under the Intercompany Loans. Ex. 81 (Marin Suppl. Decl.) ¶ 5; *see also* Ex. 80 (Wire Transfer Confirmation) (documenting transfers between LAN Cargo and LATAM Finance); Ex. 58 (LATAM Finance October 2018 Bank Statement) (showing receipt of funds from LATAM Parent); Ex. 64 (LATAM Finance April 2019 Bank Statement) (same); Ex. 65 (LATAM Finance May 2019 Bank Statement) (showing receipt of funds from Lan Cargo). As a result of these transfers, the amounts owed by Peuco to LATAM Finance under the Intercompany Loans decreased by USD 183,477,457. *See* Ex. 37 (2020 Peuco Financial Statement) (showing amount owed to LATAM Finance as USD 1,307,721,003 i.e., USD 183 million less than USD 1,491,068,300, the principal amount owed under the Intercompany Loans.).

The Court finds that the Debtors have met their burden of demonstrating that LATAM Finance and Peuco were authorized to enter into the Intercompany Loan Agreements. The Court overrules that aspect of the Objection.

## **Conclusion**

Based on the foregoing, the Court overrules the Objection.

IT IS SO ORDERED.

Dated: New York, New York

April 29, 2022

_/s/ James L. Garrity, Jr._
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge