Richard J. Cooper
Lisa M. Schweitzer
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LATAM Airlines Group S.A., *et al.*, | Case No.:  20-11254 (JLG) |
| Debtors.[1] | Jointly Administered |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are:  LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM-Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services LLC (30-1133972); Maintenance Service Experts LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services, Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); LATAM Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); ABSA Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corretora de Seguros Ltda. (N/A).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33122.

### DEBTORS' MOTION FOR AN ORDER
### (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN DIP AND
### DIP-TO-EXIT FINANCING AND (B) GRANT SUPERPRIORITY
### ADMINISTRATIVE EXPENSE CLAIMS AND (II) GRANTING RELATED RELIEF

LATAM Airlines Group S.A. ("LATAM Parent") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"),[2] hereby submit this motion (the "Motion") for entry of a final order, substantially in the form attached hereto as Exhibit A (the "DTE/DIP Final Order"), pursuant to sections 105, 362, 363(c), 363(c)(2), and 364(c)(3), of title 11 of the United States Code (the "Bankruptcy Code"); Rules 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 4001-2 Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"). In support of this Motion, the Debtors rely upon the *Declaration of Ramiro Alfonsín Balza in Support of First Day Motions and Applications in Compliance With Local Rule 1007-2*, filed May 26, 2020 (ECF No. 3) (the "First Day Declaration"), the *Second Declaration of Ramiro Alfonsín Balza in Support of the Subsequent Chapter 11 Cases*, filed July 9, 2020 (ECF No. 483) (the "Supplemental Declaration"), both incorporated herein by reference, the *Declaration of Ramiro Alfonsín Balza in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain DIP and DIP-to-Exit Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* filed contemporaneously herewith and incorporated herein by reference (the "Alfonsín DTE Declaration"), and the *Declaration of Brent Herlihy in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain DIP and DIP-to-Exit Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief* filed

---

[2]     LATAM Parent, and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as "LATAM".

contemporaneously herewith and incorporated herein by reference (the "Herlihy DTE Declaration"), and respectfully state as follows:

### PRELIMINARY STATEMENT[3]

1.      The Debtors have made significant progress in their prosecution of the Chapter 11 Cases, including through the development of their joint plan of reorganization (as it has been and may be further amended, supplemented or otherwise modified, the "Plan") that enjoys the support of the Debtors' major creditors as well as backstop agreements approved by the Court that further support the Debtors' emergence in accordance with the terms of the Plan,  the completion of the solicitation of votes in support of the Plan, which process reaffirmed the broad creditor support for the Plan, and the completion of the hearing to consider confirmation of the Plan which, subject to obtaining Court approval of the Plan, provides a clear path for the Debtors to emerge from the Chapter 11 Cases in the second half of 2022.

2.      In order to ensure that the Debtors have seamless access to the liquidity needed to operate their business and finance the remainder of their Chapter 11 Cases and their emergence from bankruptcy, it is necessary for the Debtors to enter into new facilities that will provide debtor-in-possession ("DIP") financing for the remainder of the Chapter 11 Cases, certain of which will convert to exit financing upon the effective date of the Plan.  Accordingly, by this Motion, LATAM seeks authority to enter into five new financing facilities, including four DIP-to-exit facilities and one junior DIP facility, on the terms described in the term sheets attached to the respective commitment letters.

3.      In order to obtain financing for the Debtors' emergence from bankruptcy, the Debtors have pursued financing options in the market and engaged in extensive negotiations

---

[3]        Capitalized terms used in this Preliminary Statement have the meaning ascribed to them in this Motion.

with potential lenders over the past several months, which has resulted in the Debtors securing commitments for five new financing facilities, which will be used in part to (i) repay the existing A&R DIP Facility in full, and (ii) provide the Debtors with liquidity necessary to operate their businesses, including: a revolving credit facility of up to $500,000,000, substantially consistent with the terms and conditions described in the term sheet attached as Exhibit A to the Omnibus Commitment Letter (the "Revolving Facility")[4] provided by the lenders thereto (the "Revolving Facility Lenders"); a Term Loan B credit facility of up to $750,000,000 (the "Term Loan B Facility"[5] and together with the Revolving Facility, the "Credit Facilities"); a senior secured bridge term loan credit facility of up to $750,000,000 (the "Bridge to 5Y Notes Facility") or the 5-year exchange notes issued to replace or refinance the Bridge to 5Y Notes Facility (the "5Y Exchange Notes", together with the Bridge to 5Y Notes Facility, the "5Y Bridge Facility/Notes")[6]; a senior secured bridge term loan credit facility of up to $750,000,000 (the "Bridge to 7Y Notes Facility")[7] or the 7-year exchange notes issued to replace or refinance the Bridge to 7Y Notes Facility (the "7Y Exchange Notes", together with the Bridge to 7Y Notes Facility, the "7Y Bridge

---

[4]    Collectively the lenders thereto, the "Revolving Lenders", the loans made thereunder, the "Revolving Loans", the commitments made thereunder, the "Revolving Commitments" and the related obligations under the Revolving Facility and all DTE/DIP Loan Documents (including commitment, engagement and fee letters) related to the Revolving Facility, the "Revolving Obligations".

[5]    Collectively the lenders thereto, the "Term Lenders", the loans made thereunder, the "Term Loan B Loans", the commitments made thereunder, the "Term Loan B Commitments" and the related obligations under the Term Loan B Facility and all DTE/DIP Loan Documents (including commitment, engagement and fee letters) related to the Term Loan B Facility, the "Term Loan B Obligations".

[6]    Collectively the lenders thereto or holders of such notes, the "Bridge to 5Y Lenders/Holders", the loans made or notes issued thereunder, the "Bridge to 5Y Loans/Notes", the commitments made thereunder, the "Bridge to 5Y Notes Commitments" and the related obligations under the 5Y Bridge Facility/Notes and all DTE/DIP Loan Documents (including commitment, engagement and fee letters) related to the 5Y Bridge Facility/Notes, the "Bridge to 5Y Notes Obligations".

[7]    Collectively the lenders thereto or holders of such notes, the "Bridge to 7Y Lenders/Holders", the loans made or notes issued thereunder, the "Bridge to 7Y Loans/Notes", the commitments made thereunder, the "Bridge to 7Y Notes Commitments" and the related obligations under the 7Y Bridge Facility/Notes and all DTE/DIP Loan Documents (including commitment, engagement and fee letters) related to the 7Y Bridge Facility/Notes, the "Bridge to 7Y Notes Obligations".

Facility/Notes", and together with the 5Y Bridge Facility/Notes, the "Bridge Facilities/Notes" and

together with the Credit Facilities, the "DTE Facilities") and a debtor-in-possession junior DIP

facility of up to $1,172,882,484 of commitments (comprised of $24,885,093 funded in cash and

up to $1,147,997,391 funded on a cashless basis through the deemed extension of loans

outstanding under the existing Tranche C Facility (as defined in the Existing DIP Credit

Agreement) on the Closing Date)[8] (the "Junior DIP Facility"[9] and together with the DTE

Facilities, the "DTE/DIP Facilities").[10] Given the unstable market conditions, it is in the Debtors'

best interests to refinance the A&R DIP Facility and secure the DTE/DIP Facilities on the currently

negotiated terms rather than seek additional financing closer to their emergence from bankruptcy.

    4.    At this time, the Debtors seek authorization to enter into the DTE/DIP

Facilities and obtain the commitments thereunder, on the terms and conditions described[11] in (i)

---

[8]    The aggregate amount of commitments funded on a cashless basis through a deemed extension of loans under the Tranche C Facility (as defined in the Existing DIP Credit Agreement) is to be adjusted to reflect the outstanding amount of such loans under the Tranche C Facility on the Closing Date.

[9]    Collectively the lenders thereto, the "Junior DIP Lenders" (together with the agents thereto, the "DIP Secured Parties") (together with the DTE Lenders, the "DTE/DIP Lenders," the DTE/DIP Lenders with the guarantors to the DTE Facilities, the "Obligors", and the DTE/DIP Lenders together with the collateral agents or collateral trustees (and the successors and assigns thereof), the agents, arrangers, commitment parties, bookrunners, underwriters, issuing banks, placement agents, and trustees to the DTE/DIP Facilities, the "DTE/DIP Secured Parties"), the loans made thereunder, the "Junior DIP Loans" (together with the Revolving Loans, the Term Loan B Loans, the Bridge to 5Y Loans, and the Bridge to 7Y Loans, the "DTE/DIP Loans"), the commitments made thereunder, the "Junior DIP Commitments" (together with the Revolving Commitments, the Term Loan B Commitments, the Bridge to 5Y Notes Commitments, and the Bridge to 7Y Notes Commitments, the "DTE/DIP Commitments") and the related obligations under the Junior DIP Facility and all DTE/DIP Loan Documents (including commitment, engagement and fee letters), the "Junior DIP Obligations" (together with the Revolving Obligations, the Term Loan B Obligations, the Bridge to 5Y Notes Obligations, and the Bridge to 7Y Notes Obligations, the "DTE/DIP Obligations").

[10]    The commitment letter obtained by the Debtors from the DTE/DIP Lenders with respect to the Credit Facilities and the Bridge Facilities is attached hereto as Exhibit B (the "Omnibus Commitment Letter"). The commitment letter obtained by the Debtors from the DTE/DIP Lenders with respect to the Junior DIP Facility is attached hereto as Exhibit C (the "Junior DIP Commitment Letter" and together with the Omnibus Commitment Letter, the "DTE/DIP Commitment Letters").

[11]    The DTE Facilities contemplate fees that are customary in these types of transactions, which do not exceed 2% in each of such facilities. The Debtors will disclose more details about such fees upon finalizing currently ongoing negotiations, which may be affected in the event the amount of such fees was disclosed on the date hereof. In any event, the Debtors will disclose more precise information regarding such fees upon conclusion of the aforementioned negotiations that are currently ongoing.

that certain term sheet governing the Revolving Facility and the Term Loan B Facility, attached as Exhibit A to the Omnibus Commitment Letter (the "Credit Facilities Term Sheet"), (ii) that certain term sheet governing the 5Y Bridge Facility/Notes, attached as Exhibit B to the Omnibus Commitment Letter (the "Bridge to 5Y Notes Facility Term Sheet"), (iii) that certain term sheet governing the 7Y Bridge Facility/Notes, attached as Exhibit C to the Omnibus Commitment Letter (the "Bridge to 7Y Notes Facility Term Sheet"), and (iv) that certain term sheet governing the Junior DIP Facility, attached as Exhibit A to the Junior DIP Commitment Letter (the "Junior DIP Facility Term Sheet" and together with the Credit Facilities Term Sheet, the Bridge to 5Y Notes Facility Term Sheet, and the Bridge to 7Y Notes Facility Term Sheet, each as may be further amended, restated or otherwise modified from time to time, the "DTE/DIP Term Sheets" and all agreements, documents, schedules and instruments delivered or executed in connection therewith, the "DTE/DIP Loan Documents").  As set forth below, the terms of each of the proposed DTE/DIP Facilities were negotiated in good faith, and will provide material benefits to the Debtors, including providing the Debtors committed financing necessary to successfully emerge from these Chapter 11 Cases.[12]

## BACKGROUND[13]

5.      On May 26, 2020 (the "Initial Petition Date"), certain of the Debtors (the "Initial Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Chapter 11 Cases").  On July 7 and 9, 2020 (as applicable to each Subsequent Debtor, the "Subsequent Petition Date" and, together with the Initial Petition Date, as applicable to each Debtor, the "Petition Date"), additional LATAM affiliates (the "Subsequent Debtors") filed

---

[12]      The amount of total financing under the DTE/DIP Facilities is $3.923 billion.

[13]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the DTE/DIP Term Sheets or the DTE/DIP Final Order, as applicable.

voluntary petitions under chapter 11 of the Bankruptcy Code (the "Subsequent Chapter 11 Cases" and together with the Initial Chapter 11 Cases, the "Chapter 11 Cases").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only.  On June 5, 2020, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases.[14]

6.      On May 27, 2020, the Grand Court of the Cayman Islands granted the applications of certain of the Debtors for the appointment of provisional liquidators pursuant to section 104(3) of the Companies Law (2020 Revision).  On June 4, 2020, the 2nd Civil Court of Santiago, Chile issued an order recognizing the chapter 11 proceedings with respect to LATAM Airlines Group S.A., Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A. and Technical Training LATAM S.A.  In addition, on June 12, 2020, the Superintendence of Companies of Colombia granted recognition to the Chapter 11 proceedings.

7.      On March 21, 2022, the Court entered the *Order Authorizing the Debtors' Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* (ECF Nos. 4728, 4739), approving the *Disclosure Statement with Respect to the Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code* filed at ECF No. 4777 (as it has been and

---

[14]     The United States Trustee has not solicited additional members for the Creditors' Committee on the basis of the Subsequent Chapter 11 Cases.

may be revised, amended or modified from time to time, the "Disclosure Statement"). [15]    In addition, the convertible debt and equity issuances contemplated by the Plan are fully backstopped by the commitments of the Commitment Creditors and Backstop Local Bondholders (as defined in the Plan) and the Backstop Shareholders (as defined in the Plan), each pursuant to a backstop commitment agreement, which were approved by the Court on March 22, 2022.  *See Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief*, ECF No. 4732.

8.    On May 11, the Debtors filed revised versions of the Plan, the RSA and Backstop Commitment Agreements that reflect the terms of an agreement among the Debtors, the Commitment Creditors, Backstop Shareholders, Banco del Estado de Chile in its capacity as trustee of the Local Bonds (the "Local Bond Trustee"), and certain holders of the Local Bonds (the "Local Bondholder Group") and certain agreements between the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") (ECF Nos. 5331, 5334, 5339). The Plan is supported by parties to a restructuring support agreement, which now include holders of more than 70% in amount of LATAM Parent general unsecured claims, holders of over $1.1 billion in New York-law governed bonds, and equity holders holding more than 50% of LATAM Parent's existing equity.  The Plan received overwhelming support, with over 81.95% of holders in amount of LATAM Parent general unsecured claims, 100% in Class 7 Claims, and 95.79% in amount of Class 1 Claims voting to accept the Plan.

---

[15]    The Debtors' *Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code* has been modified several times, with the seventh revised version presented to the Court for confirmation at ECF No. 5331 (as has been supplemented, revised or amended, or otherwise modified in accordance with its terms, the "Plan").

9.     On May 17, 18 and 20, 2022, the Court held a hearing to consider the confirmation of the Plan.

## DEBTOR-IN-POSSESSION FINANCING

10.     On September 19, 2020, following an evidentiary hearing and related proceedings, the Court issued an *Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Grant Superpriority Administrative Expense Claims, and (II) Granting Related Relief*, ECF No. 1091 (as amended by ECF No. 1454, the "Tranche A/C Final DIP Order") and, on October 18, 2021, following an evidentiary hearing and related proceedings, the Court issued an *Order (I) Authorizing the Debtors to (A) Obtain Tranche B Postpetition Financing, and (B) Grant Superpriority Administrative Expense Claims, and (II) Granting Related Relief*, ECF No. 3378 (the "Tranche B Final DIP Order" and along with the Tranche A/C Final DIP Order, the "Initial Final DIP Orders") approving a secured superpriority multi-draw term loan facility for new money financing (the "Initial Tranche Facilities") as set forth in that certain Super-Priority Debtor-In-Possession Term Loan Agreement, dated as of September 29, 2020 and amended by that certain First Amendment (the "First Amendment"), dated as of October 9, 2020, further amended by that certain Second Amendment (the "Second Amendment"), dated as of August 2, 2021, further amended by that certain Third Amendment (the "Third Amendment"), dated as of September 7, 2021, further amended by that certain Fourth Amendment (the "Tranche B Amendment"), dated as of November 10, 2021 and further amended by that certain Fifth Amendment (the "Fifth Amendment"), dated as of January 7, 2022, and further amended by that certain Sixth Amendment (the "Sixth Amendment"), dated as of February 9, 2022, further amended by that certain Seventh Amendment (the "Seventh Amendment"), dated as of February 24, 2022, further amended by that certain Eighth Amendment (the "Eighth Amendment"), dated as of March 4, 2022, and further

amended by that certain Ninth Amendment (the "Ninth Amendment"), dated as of March 7, 2022, (such facility, as has been amended from time to time, the "Initial DIP Credit Agreement").

11.    In broad terms, the Initial DIP Credit Agreement included three tranches of financing: (i) up to $1.3 billion under a secured Tranche A facility (the "Tranche A Facility" provided by the "Tranche A DIP Lenders"); (ii) up to $750 million under a secured Tranche B facility (the "Tranche B Facility" provided by the "Tranche B Lenders"); and (iii) up to $1.15 billion under a secured Tranche C facility (the "Initial Tranche C Facility" provided by the "Initial Tranche C Lenders").  The Tranche A/C Final DIP Order approved the Debtors' ability to borrow under the Tranche A Facility and the Initial Tranche C Facility while the Tranche B Final DIP Order approved the Debtors' ability to borrow under the Tranche B Facility.

12.    On February 18, 2022, the Debtors filed the *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Enter into the Amended and Restated Credit Agreement, (B) Obtain Replacement Tranche C Postpetition Financing, and (C) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief,* ECF. No. 4392 (the "Initial A&R DIP Motion"), seeking authority to enter into an amended and restated credit agreement attached thereto (the "Initial A&R DIP Credit Agreement") and obtain financing under an amended and restated DIP facility (the "Initial A&R DIP Facility"), including a replacement Tranche C facility, and the entry of an order approving the Initial A&R DIP Motion (the "Initial A&R DIP Order").

13.    On March 7, 2022, the Debtors filed the *Debtors' Supplement to the Motion for an Order (I) Authorizing the Debtors to (A) Enter into the Amended and Restated Credit Agreement, (B) Obtain Replacement Tranche C Postpetition Financing, and (C) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief,* ECF. No. 4511 (the "A&R DIP Supplement"), which sought to amend certain terms of the Initial A&R DIP Credit

Facility (the "Amended Initial A&R DIP Facility"), the related commitment letters and the Initial A&R DIP Order. The amended terms of the Amended Initial A&R DIP Facility were a result of subsequent negotiations with the lenders providing the facility, in conjunction with the extension of certain milestones under the Initial DIP Credit Agreement.

14.     On March 15, 2022, the Debtors filed the *Debtors' Additional Supplement to the Motion for an Order (I) Authorizing the Debtors to (A) Enter into the Amended and Restated Credit Agreement, (B) Obtain Replacement Tranche C Postpetition Financing, and (C) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief*, ECF No. 4660 (the "Additional A&R DIP Supplement" and together with the Initial A&R DIP Motion and the A&R DIP Supplement, the "A&R DIP Motion"), seeking authority to enter an alternative financing arrangement with better terms than the Amended Initial A&R DIP Facility (the "A&R DIP Facility" provided under the "Existing DIP Credit Agreement") including entry into a Replacement Tranche A Facility of up to $2.05 billion (the "Replacement Tranche A Facility") and a Replacement Tranche C Facility of up to $1.65 billion (the "Replacement Tranche C Facility"), which allowed the Debtors to access a total of $3.7 billion in liquidity, all on terms more favorable than the Amended Initial A&R DIP Facility.

15.     On March 18, 2022, following a hearing, the Court issued an *Order (I) Authorizing the Debtors to (A) Enter Into the Amended and Restated Credit Agreement, (B) Obtain Replacement Postpetition Financing, and (C) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief,* approving the A&R DIP Facility as set forth in that certain Amended and Restated Super-Priority Debtor-In-Possession Term Loan Agreement, dated as of April 8, 2022.

## JURISDICTION AND VENUE

16.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105, 362, 363(c)(1), 363(c)(2), 364(c)(3) and 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001, 6004 and 9014.

## RELIEF REQUESTED

17.    By this Motion the Debtors request, pursuant to sections 105, 362, 363(c)(1), 363(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001, 6004 and 9014, and Local Rule 4001-2; entry of a final order with respect to the DTE/DIP Facilities, substantially in the form of the DTE/DIP Final Order.  As explained herein, approval of the DTE/DIP Facilities will further the Debtors' efforts to confirm their Plan and emerge from these Chapter 11 Cases in an orderly manner, while eliminating uncertainty around the financing of their exit from bankruptcy.

## CONCISE STATEMENTS REGARDING DIP AND DIP-TO-EXIT FINANCING PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2[16]

18.    The following charts each contain a summary of the material terms of the proposed Revolving Facility, Term Loan B Facility, 5Y Bridge Facility/Notes, 7Y Bridge

---

[16]    The following summaries of the DTE/DIP Facilities are qualified in their entirety by reference to the applicable provisions of the relevant DTE/DIP Loan Documents, including, for the avoidance of doubt, the DTE/DIP Commitment Letters.  To the extent there are any inconsistencies between these summaries and the provisions of the DTE/DIP Term Sheets or any other DTE/DIP Loan Document, or any other order entered in the Chapter 11 Cases, and the DTE/DIP Final Order, the provisions of the DTE/DIP Final Order shall control.  Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DTE/DIP Loan Documents and/or the DTE/DIP Final Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.  Furthermore,

Facility/Notes and Junior DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

**Revolving Facility**

| SUMMARY OF MATERIAL TERMS OF THE REVOLVING FACILITY | | |
|---|---|---|
| Summary of Materials Terms of the Revolving Facility[17] | | |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | LATAM Airlines Group S.A., acting through its Florida branch | Exhibit[18] A - Page 1 |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Prior to the Exit Conversion Date, same as in the Existing DIP Credit Agreement (the "Pre-Conversion Guarantors").<br><br>On and after the Exit Conversion Date, the Pre-Conversion Guarantors and any entity that, from time to time, pledges or grants liens in the Collateral (as defined below) or owns Significant Assets (as defined below) other than, in each case, any Excluded Subsidiaries (as defined below) (collectively, the "Guarantors") and subject in all cases to the Guaranty and Security Principles (as defined in Exhibit D to the Commitment Letter).<br><br>"Excluded Subsidiary" means any subsidiary that (i) is not or ceases to be a subsidiary in which at least 85% of its capital stock is owned by LATAM or other subsidiary, other than due to a minority interest required to comply with a local ownership requirement; provided that this clause (i) shall not apply to Holdco Ecuador S.A. or LATAM Airlines Peru, S.A., (ii) is prohibited or restricted by | Exhibit A - Page 1-2, 13 |

---

certain DTE/DIP Loan Documents have not yet been finalized as of the time of filing of this Motion. Accordingly, the summaries reflect the current state of the relevant provisions and are subject to change.

[17]    For the avoidance of doubt, the terms and conditions set forth herein are intended to be a convenience summary only and are subject to and qualified in all respects by the terms and conditions specified in the Omnibus Commitment Letter and the corresponding provisions of the Final DIP Order. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the Omnibus Commitment Letter and the Final DIP Order, as applicable.

[18]    Unless otherwise indicated, all references to Exhibits refer to Exhibits to the Omnibus Commitment Letter.

| | | |
|---|---|---|
| | applicable law, or regulation from being or becoming a guarantor, (iii) is subject to any contract or other restrictions prohibiting such guarantee existing prior to the date hereof or the date such entity becomes a subsidiary, as applicable, (iv) LATAM and the applicable Administrative Agent mutually agree that the granting or maintenance of a guarantee by such subsidiary would result in material adverse tax consequences to such Borrower or any of its subsidiaries, (v) is a captive insurance company, special purpose entity, securitization, receivables subsidiary or not-for-profit subsidiary, (vi) at the option of LATAM, LAN Argentina S.A., Transportes Aéreos del Mercosur S.A and other entities, in each case to the extent that such entity owns an immaterial amount of Significant Assets subject to a threshold to be agreed and (vii) any Subsidiary acquired by LATAM after the Exit Conversion Date that owns a passenger airline not principally a cargo business for so long as such Non-Guarantor Acquired Airline operates its cargo business and Frequent Flyer Program business separately from and on an arms' length basis with LATAM (a "<u>Non-Guarantor Acquired Airline</u>").<br><br>The Borrowers and, without duplications the Guarantors, the "<u>Loan Parties</u>".<br><br>"<u>Significant Assets</u>" means (a) the Collateral, (b) Coverage Assets (as defined below) and (c) any other slots, gates and routes.<br><br>"<u>Coverage Assets</u>" means (a) the Frequent Flyer Program Assets (as defined below) of the Loan Parties, (b) the Cargo Business Assets (as defined below) of the Loan Parties, (c) intellectual property constituting Collateral, and (d) slots, gates and routes in the United States and the United Kingdom constituting Collateral. | |
| **Lenders** 4001(c)(1)(B) | Each of JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>"), Goldman Sachs Lending Partners LLC ("<u>GS</u>"), Barclays Bank PLC. ("<u>Barclays</u>"), BNP Paribas ("<u>BNP Paribas</u>"), BNP Paribas Securities Corp. ("<u>BNP Securities</u>" and, together with BNP Paribas, "<u>BNP</u>") and Natixis, New York Branch ("<u>Natixis</u>") (together with each Additional Arranger that becomes a Commitment | Commitment Letter - Page 1 |

|  |  |  |
|---|---|---|
|  | Party pursuant to Section 7 of the Commitment Letter, each, a "<u>Revolving Commitment Party</u>" and, collectively, the "<u>Revolving Commitment Parties</u>" and together with certain other lenders from time to time party to the Revolving Facility, the "<u>Lenders</u>") |  |
| **DIP Agents** Bankruptcy Rule 4001(c)(1)(B) | JPMorgan will act as sole administrative agent for the Revolving Facility (the "<u>Revolving Administrative Agent</u>") | Exhibit A – Page 3 |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(1) | The aggregate principal amount of the Revolving Facility shall be equal to $500 million. | Exhibit A - Page 4 |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | <u>Interest Rates</u>: At LATAM's election, either (i) the ABR plus the Applicable Margin or (ii) the Adjusted Term SOFR Rate plus the Applicable Margin; provided that all Swingline Loans shall bear interest based upon the ABR.  The interest period for Adjusted Term SOFR shall be 1, 3 or 6 months at the Borrower's election.  <u>Applicable Margin</u>: (i) for ABR, 3.00% or (ii) for Adjusted Term SOFR Rate, 4.00%, subject in each case to certain increases or other adjustments (including adjustments to take into account any applicable original issue discount based on market conditions).  <u>Unused Commitment Fee</u>: <sup>REDACTED*</sup>%.  <u>Default Rate</u>: Upon the occurrence and during the continuation of a payment Event of Default, unpaid and overdue amounts shall accrue interest at (i) with respect to principal, 2% above the rate otherwise applicable thereto and (ii) in the case of all other amounts, the rate applicable for ABR loans plus 2.0%.  <u>Floor</u>: The initial floor for the Adjusted Term SOFR Rate shall be 0.00%. The initial floor for the ABR shall be 1.00%. | Exhibit A - Page 29 |

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

| | | |
|---|---|---|
| | Rate and Fee Basis: All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of Loans bearing interest at ABR the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.<br><br>Terms used without definition have the meaning set forth on Annex A-3 of Exhibit A to the Commitment Letter. | |
| **Collateral**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | The Revolving Facility will be secured by a perfected security interest as provided in the section "Priority" of Exhibit A to the Commitment Letter (subject to permitted liens, consistent with the "Negative Covenants" section of Exhibit A to the Commitment Letter, and other exceptions to be agreed as set forth in Credit Facilities Documentation) in the Collateral (as defined below).<br><br>"Collateral" means:<br><br>(x) prior to the Exit Conversion Date, those assets of the Loan Parties pledged to secure the A&R DIP Facility (as defined in Exhibit E to the Commitment Letter) consistent with the Existing DIP Credit Agreement and the A&R DIP Order (as defined in the Existing DIP Credit Agreement (as defined in Exhibit E to the Commitment Letter)), the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law, and including second or junior liens in collateral securing the Existing RCF Facility or the Existing Spare Engine Facility and<br><br>(y) on and after the Exit Conversion Date, all assets of the Loan Parties consistent with the A&R DIP Facility, including (A) third party receivables of the Frequent Flyer Program Assets with payment terms that are more than 120 days, (B) third party receivables of the Cargo Business Assets and (C) intercompany receivables of a Loan Party in respect of the Frequent Flyer Program Assets and the Cargo Business Assets (clauses (A) through (C), collectively, the "Receivables Collateral"), in respect of this clause (y), subject to and in | Exhibit A - Page 2-3 and 13-14 |

accordance with Guaranty and Security Principles, in each case, other than Excluded Property.

"Excluded Property" means (A) prior to the Exit Conversion Date, (i) receivables (other than the Receivables Collateral (as defined above)), (ii) Excluded Assets (as defined in the A&R DIP Facility), (iii) real estate (other than any real estate constituting collateral pledged to secure the A&R DIP Facility) and (iv) engines and spare parts (other than any engines and spare parts pledged to secure the A&R DIP Facility and with the priority specified therein) and (B) upon and after the Exit Conversion Date, (i) any Collateral in which there is a lien second or junior to the collateral securing the Existing RCF Refinancing or the Existing Spare Engine Facility Refinancing, (ii) receivables (other than the Receivables Collateral (as defined above)), (iii) deposit accounts, (iv) Excluded Assets (as defined in the A&R DIP Facility), (v) real estate, (vi) engines and spare parts and (vii) customary exclusions.

In accordance with the Final DIP Order (as defined in Exhibit E to the Commitment Letter), prior to the Exit Conversion Date, all of the liens described herein shall be effective and perfected upon entry of the Final DIP Order, as applicable, without the necessity of the execution, recordation or filing by the Loan Parties of security agreements, control agreements, financing statements or other similar documents, or possession or control by the applicable collateral agent of, or over, any Collateral, as set forth in the Final DIP Order. Certain Collateral of the Loan Parties shall be, prior to the Exit Conversion Date, pledged pursuant to local law governed security agreements, and on and after the Exit Conversion Date, pledged pursuant to additional local law governed security agreements to be documented (including, for the avoidance of doubt, in respect of intellectual property, subject to and in accordance with the Guaranty and Security Principles). Notwithstanding the foregoing, (x) the security interest in receivables that constitute Collateral shall only be required to be granted pursuant to the Final DIP Order and the U.S. security agreement and (y) local law perfection steps shall only be required for (A) receivables in

respect of certain significant third party contracts of the Cargo Business Assets to be mutually agreed between the applicable Administrative Agent and LATAM, and (B) intercompany receivables of a Loan Party in respect of the Cargo Business Assets, in each case pursuant to clauses (x) and (y) above, to the extent such receivables may be pledged in accordance with the Guaranty and Security Principles. Upon the entry into a new contract with a new third party, the receivables of which would otherwise constitute Collateral, LATAM shall be required to exercise commercially reasonable efforts to seek to avoid restrictions on (i) the granting of a security interest in such receivables and (ii) a termination of such contract solely due to a change of control; provided that the foregoing shall not apply to any extension, replacement or amendment of a contract with an existing (as of the date hereof) third party that contains such a restriction.

All the above-described pledges and security interests shall be created on terms and subject to exceptions permitted under the Credit Facilities Documentation.

"Frequent Flyer Program" means any customer loyalty program available to individuals that is operated, owned or controlled, directly or indirectly, by LATAM or any of its subsidiaries and which loyalty program grants members in such program Currency (as defined below) based on a member's purchasing behavior and that entitles a member to accrue and redeem such Currency for a benefit or reward, including flights and/or other goods and services.

"Frequent Flyer Program Assets" means (a) all currently existing, future and successor co-branding agreements, partnering agreements, airline-to-airline frequent flyer program agreements or similar agreements related to or entered into in connection with a Frequent Flyer Program ("Frequent Flyer Program Agreements"), (b) intellectual property (including proprietary source code) owned or purported to be owned, or later developed or acquired and owned or purported to be owned, by

| | | |
|---|---|---|
| | LATAM or any of its subsidiaries and required or necessary to operate a Frequent Flyer Program, (c) customer data owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and used, generated or produced as part of a Frequent Flyer Program (including a list of all members and profile data for each member), (d) all currently existing or future intercompany agreements governing the sale, transfer or redemption of Currency under any Frequent Flyer Program ("Intercompany Frequent Flyer Agreements") and (e) accounts receivable in respect of any Frequent Flyer Program, including accounts receivable arising under Frequent Flyer Program Agreements or Intercompany Frequent Flyer Agreements.<br><br>"Currency" means miles, points and/or other units that are a medium of exchange constituting a convertible, virtual and private currency that is tradeable property and that can be sold or issued to persons.<br><br>"Cargo Business Assets" means (a) all intercompany aircraft leases in respect of freighter aircraft used in the cargo business of LATAM and its subsidiaries, (b) all intercompany contracts providing rights to use the belly of passenger airplanes for the cargo business of LATAM and its subsidiaries, (c) all accounts receivable in respect of the cargo business of LATAM and its subsidiaries and (d) all owned and leased real estate assets used in the cargo business of LATAM and its subsidiaries. | |
| **Superpriority Claim**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Prior to the Exit Conversion Date, all obligations under the Credit Facilities shall, upon the entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order), constitute superpriority administrative expense claims against each of the Loan Parties (but with the superpriority administrative claims in respect of the Revolving Facility being satisfied on a "first out" basis), with priority over all other administrative expense claims, including with respect to the Junior DIP Facility. | Exhibit A – Page 6-7 |

| | | |
|---|---|---|
| | Prior to the Exit Conversion Date, all obligations of the Loan Parties with respect to the Credit Facilities shall be secured on a pari passu basis with each other Debt Facility and with any Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) and senior to the Junior DIP Facility upon entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order) pursuant to the priorities set forth in the Intercreditor Terms. The liens and security interests (the "DTE Liens") securing such obligations shall consist of the following (any terms used but not defined herein shall have the meaning given to them in the Intercreditor Terms (defined below)):

(i) Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien on the Collateral not otherwise subject to Permitted Priority Liens (as defined in the A&R DIP Order), subject only to the Carve-Out (as defined in the A&R DIP Order); and

(ii) Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest in and lien on the Collateral, subject to Permitted Priority Liens and the Carve-Out. Upon and after the Exit Conversion Date, all obligations of the Loan Parties with respect to the Credit Facilities shall be secured on a pari passu basis with each other Debt Facility and with any Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) pursuant to the priorities set forth in the Intercreditor Terms and subject to the Guaranty and Security Principles. | |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Revolving Facility will be used by the Borrowers for working capital, capital expenditures, other general corporate purposes, and to pay related fees and expenses; provided that, for the avoidance of doubt, proceeds of the Revolving Facility shall not be | Exhibit A – Page 6 |

| | | |
|---|---|---|
| | used to make any restricted payments (other than the Minimum Chilean Dividends). | |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(3); Local Rule 4001-2(a)(16) | Expenses:<br><br>Subject to the limitations set forth in Section 5 of the Commitment Letter, the Borrowers shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lead Arrangers associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Facilities Documentation and any amendment, modification or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of one primary counsel (together with the reasonable and documented fees, disbursements and other charges incurred by Milbank LLP incurred prior to May 1, 2022 (which, for the avoidance of doubt, are reasonable and documented and invoiced in accordance with the procedures set forth in the final DIP Order)), one regulatory counsel, one special bankruptcy counsel and one additional local counsel in each applicable jurisdiction) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent, the Issuing Lenders and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel) in connection with the enforcement of the Credit Facilities Documentation.<br><br>Subject in certain cases to certain increases or other adjustments (including adjustments to take into account any applicable original issue discount) based on market conditions.<br><br>Fees:<br><br>(i) An underwriting and arrangement fee, equal to REDACTED*% of the aggregate committed amount, payable on the closing date.<br><br>(ii) An annual administration fee of US$REDACTED* to be paid to JPMorgan. | Exhibit A – Page 26<br><br>Fee Letter – Page 2 |
| **Maturity Date** Bankruptcy Rule | Tenor of the earlier of (i) December 31, 2026, (ii) the date that is four years and six months from the | Exhibit A – Page 4 |

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.

| | | |
|---|---|---|
| 4001(c)(1)(B), Local Rule 4001-2(a)(10) | Closing Date and (iii) the date that is 4 years after the Exit Conversion Date (the "<u>Revolving Maturity Date</u>"); provided that if the Exit Conversion Date does not occur on or prior to December 1, 2023, the Revolving Maturity Date shall be December 1, 2023. The Revolving Facility shall include an mechanic to allow individual Revolving Lenders to extend their commitments or loans; provided that such offer to extend the maturity date is offered to all lenders ratably. | |
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | Subject to the Credit Facilities Documentation Principles and limited to the following:<br><br>(i) Asset Coverage Ratio of not less than 1.60:1.00, as of the last day of each semi-annual period (the "<u>Asset Coverage Ratio Covenant</u>"), and subject to a 45 day cure period.<br><br>(ii) Consolidated Liquidity (as defined in the Prepetition RCF) of not less than $750,000,000, as of the close of each business day (the "<u>Consolidated Liquidity Covenant</u>"). | Exhibit A – Page 19-20 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | The Credit Facilities Documentation will contain only the following events of default (subject to the Credit Facilities Documentation Principles): nonpayment of principal or L/C Reimbursement when due; nonpayment of interest, fees or other amounts after a grace period of five business days; material inaccuracy of representations and warranties (subject to a 10 business day grace period following the earlier to occur of (x) the responsible officer of the applicable Borrower having actual knowledge about the default, and (y) the applicable Borrower receiving a notice from the applicable Administrative Agent with respect to the occurrence of such default); the Credit Facilities Documentation ceasing to be in full force and effect or any Borrower party thereto so asserting; the Final DIP Order remaining in full force and effect; violation of covenants (subject, in the case of certain customary affirmative covenants, to a grace period of 30 days and in the case of the Consolidated Liquidity Covenant, to a grace period of ten (10) business days following the earlier to occur of (x) the responsible officer of the applicable Borrower having actual knowledge about the | Exhibit A – Page 22 |

| | | |
|---|---|---|
| | default, and (y) the applicable Borrower receiving a notice from the applicable Administrative Agent with respect to the occurrence of such default; subject to customary carve outs prior to the Exit Conversion Date, cross-acceleration and cross-payment default with respect to material indebtedness; bankruptcy events (from and after the Closing Date); certain ERISA and employment events; material judgments; actual or asserted invalidity of security documents representing a material portion of the Collateral; and a change of control (to be defined in a manner to be agreed). | |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | None | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Administrative Agent, the Lead Arrangers, the Issuing Lenders and the Lenders (and their affiliates and their respective officers, Related Parties) (each, an "Indemnified Person") will have no liability for, and will be indemnified and held harmless against, any loss, liability, claims (including intraparty claims), demands, damages, cost or expense (collectively, "Liabilities") incurred in connection with or as a result of (i) the execution and delivery of the Credit Facilities Documentation and any agreement or instrument contemplated thereby; (ii) the performance by the Indemnified Persons of their obligations under the Credit Facilities Documentation or the consummation of the transactions contemplated thereby, (iii) the funding of the Credit Facilities, issuance of letter of credits thereunder, or the use or the proposed use of proceeds thereof, and (iv) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "Proceeding") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by any Borrower, its affiliates or equity holders or | Exhibit A – Pages 26-27 |

| | | |
|---|---|---|
| | any other party (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Credit Facilities Documentation in performing its activities or in furnishing its commitments or services under the Credit Facilities Documentation or (z) disputes among Lenders not arising from a Borrower's breach of its obligations under the Credit Facilities Documentation (other than a dispute involving a claim against an Indemnified Person for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of any Credit Facility, except, with respect to this clause (z), to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnified Person in such capacity)). <br><br> The parties herein (and their affiliates and their respective Related Parties) shall not have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by the parties hereto, their affiliates or any of their subsidiaries arising out of, in connection with, or as a result of, the Credit Facilities or the Credit Facilities Documentation. | |
| **Provisions Elevating Prepetition Debt to Administrative Expense (or Higher) Status** <br><br> Local Rule 4001 - 2(a)(6) | None | |

| | | |
|---|---|---|
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>Local Rule 4001- 2(a)(7) | None | |
| **Priming Liens and Adequate Protection**<br><br>Local Rule 4001- 2(a)(4) | None | |
| **Change in Control Provisions**<br><br>Local Rule 4001- 2(a)(11) | Change of Control is an Event of Default to be agreed. | Exhibit A – Page 22 |
| **Prepayment Penalty**<br><br>Local Rule 4001- 2(a)(13) | Voluntary prepayments of borrowings under either Credit Facility will be permitted at any time, in minimum principal amounts to be set forth in the Credit Facilities Documentation, without premium or penalty, subject to reimbursement of the Lenders' break funding costs (other than lost profits) in the case of a prepayment of Adjusted Term SOFR Rate loans prior to the last day of the relevant interest period; provided that the voluntary prepayment of borrowings under the Term Loan B Facility (i) any time on and after the Closing Date to but not including the first anniversary of the Closing Date shall be subject to a premium of 2.00% over the aggregate principal amount so repaid and (ii) any time from and after the first anniversary of the Closing Date and to, but not including, the second anniversary of the Closing Date shall be subject to a premium of 1.00% over the aggregate principal amount so repaid. Upon and after the second anniversary of the Closing Date, there shall be no penalty or premium. For the avoidance of doubt, subject to the reimbursement of reasonable and documented Lenders' break funding costs as set forth in this paragraph, voluntary prepayments of borrowing under either Credit | Exhibit A – Page 8 |

| | | |
|---|---|---|
| | Facility after the expiration of the foregoing periods shall be without premium or penalty.<br><br>Voluntary reductions of the unutilized portion of the Revolving Commitments will be permitted at any time, in minimum principal amounts to be set forth in the Credit Facilities Documentation. | |
| **Joint Liability of the Debtors**<br>Local Rule 4001-2(a)(14) | Prior to the Exit Conversion Date, the obligations of the Loan Parties under the Revolving Facility shall constitute allowed superpriority administrative expense claims against the Loan Parties on a joint and several basis. | Exhibit A – Page 4 |
| **Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(15) | To be agreed in the DTE/DIP Loan Documents | None |
| **Limitations on Certain Powers**<br>Local Rule 4001-2(a)(8) | The DTE/DIP Term Sheets, the DTE/DIP Loan Documents and the provisions of the DTE/DIP Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DTE/DIP Secured Parties, the Creditors' Committee, any other committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties. | DTE/DIP Final Order, ¶ 31 |
| **Releases**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors forever and irrevocably (i) release, discharge, and acquit the DIP Secured Parties including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, | DTE/DIP Final Order, ¶ 34 |

| | responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have, arising from any actions of the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, pursuant to the terms of the DTE/DIP Final Order and any other DTE/DIP Loan Documents including any equitable subordination claims, relating to any aspect of the relationship between the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and the Debtors, including any equitable subordination claims or defenses, with respect to or relating to the DTE/DIP Loans, the DTE/DIP Obligations, the DTE/DIP Loan Documents, the Debtors' attempts to restructure the DTE/DIP Loans, consent to the terms of the DTE/DIP Final Order and the use of the DTE/DIP Commitments hereunder, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DIP Secured Parties, including the DTE/DIP Agents or the DTE/DIP Lenders, solely in their capacities as such; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DTE/DIP Obligations; *provided* that such release shall not apply to any claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful misconduct or gross negligence of the Releasees. | |

**Term Loan B Facility**

| SUMMARY OF MATERIAL TERMS OF THE TERM LOAN B FACILITY | | |
|---|---|---|
| **Summary of Materials Terms of the Term Loan B Facility[19]** | | |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | LATAM Airlines Group S.A. ("LATAM")<br><br>Professional Airline Services Inc., a Florida corporation, as Co-Borrower. | Exhibit[20] A - Page 1 |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Prior to the Exit Conversion Date, same as in the Existing DIP Credit Agreement (the "Pre-Conversion Guarantors").<br><br>On and after the Exit Conversion Date, the Pre-Conversion Guarantors and any entity that, from time to time, pledges or grants liens in the Collateral (as defined below) or owns Significant Assets (as defined below) other than, in each case, any Excluded Subsidiaries (as defined below) (collectively, the "Guarantors") and subject in all cases to the Guaranty and Security Principles (as defined in Exhibit D to the Commitment Letter).<br><br>"Excluded Subsidiary" means any subsidiary that (i) is not or ceases to be a subsidiary in which at least 85% of its capital stock is owned by LATAM or other subsidiary, other than due to a minority interest required to comply with a local ownership requirement; provided that this clause (i) shall not apply to Holdco Ecuador S.A. or LATAM Airlines Peru, S.A., (ii) is prohibited or restricted by applicable law, or regulation from being or becoming a guarantor, (iii) is subject to any contract or other restrictions prohibiting such guarantee existing prior to the date hereof or the date such entity becomes a subsidiary, as applicable, (iv) LATAM and the applicable Administrative Agent mutually agree that the granting or maintenance of a guarantee by such subsidiary would result in | Exhibit A - Page 1-2, 13 |

---

[19]    For the avoidance of doubt, the terms and conditions set forth herein are intended to be a convenience summary only and are subject to and qualified in all respects by the terms and conditions specified in the Omnibus Commitment Letter and the corresponding provisions of the Final DIP Order. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the Omnibus Commitment Letter and the Final DIP Order, as applicable.

[20]    Unless otherwise indicated, all references to Exhibits refer to Exhibits to the Omnibus Commitment Letter.

| | | |
|---|---|---|
| | material adverse tax consequences to such Borrower or any of its subsidiaries, (v) is a captive insurance company, special purpose entity, securitization, receivables subsidiary or not-for-profit subsidiary, (vi) at the option of LATAM, LAN Argentina S.A., Transportes Aéreos del Mercosur S.A and other entities, in each case to the extent that such entity owns an immaterial amount of Significant Assets subject to a threshold to be agreed and (vii) any Subsidiary acquired by LATAM after the Exit Conversion Date that owns a passenger airline not principally a cargo business for so long as such Non-Guarantor Acquired Airline operates its cargo business and Frequent Flyer Program business separately from and on an arms' length basis with LATAM (a "Non-Guarantor Acquired Airline").<br><br>The Borrowers and, without duplications the Guarantors, the "Loan Parties".<br><br>"Significant Assets" means (a) the Collateral, (b) Coverage Assets (as defined below) and (c) any other slots, gates and routes.<br><br>"Coverage Assets" means (a) the Frequent Flyer Program Assets (as defined below) of the Loan Parties, (b) the Cargo Business Assets (as defined below) of the Loan Parties, (c) intellectual property constituting Collateral, and (d) slots, gates and routes in the United States and the United Kingdom constituting Collateral. | |
| **Lenders**<br>4001(c)(1)(B) | Each of JPMorgan Chase Bank, N.A. ("JPMorgan"), Goldman Sachs Lending Partners LLC ("GS"), Barclays Bank PLC. ("Barclays"), BNP Paribas ("BNP Paribas"), BNP Paribas Securities Corp. ("BNP Securities" and, together with BNP Paribas, "BNP") and Natixis, New York Branch ("Natixis") (together with each Additional Arranger that becomes a Commitment Party pursuant to Section 7 of the Commitment Letter, each, a "TLB Commitment Party" and, collectively, the "TLB Commitment Parties" and together with certain other lenders from time to time party to the Term Loan B Facility, the "Lenders") | Commitment Letter - Page 1 |

| | | |
|---|---|---|
| **DIP Agents**<br>Bankruptcy Rule 4001(c)(1)(B) | GS will act as the sole administrative agent for the Term Loan B Facility (the "<u>TLB Administrative Agent</u>") | Exhibit A – Page 3 |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(1) | The aggregate principal amount of the Term Loan B Facility shall be equal to $750 million. | Exhibit A - Page 5 |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | <u>Interest Rates</u>: At LATAM's election, either (i) the ABR plus the Applicable Margin or (ii) the Adjusted Term SOFR Rate plus the Applicable Margin.<br><br>The interest period for Adjusted Term SOFR shall be 1, 3 or 6 months at the Borrower's election.<br><br><u>Applicable Margin</u>: (i) for ABR, <sup>REDACTED*</sup>% or (ii) for Adjusted Term SOFR Rate, <sup>REDACTED*</sup>%, subject in each case to certain increases or other adjustments (including adjustments to take into account any applicable original issue discount) based on market conditions.<br><br><u>Default Rate</u>: Upon the occurrence and during the continuation of a payment Event of Default, unpaid and overdue amounts shall accrue interest at (i) with respect to principal, 2% above the rate otherwise applicable thereto and (ii) in the case of all other amounts, the rate applicable for ABR loans plus 2.0%.<br><br><u>Floor</u>: The initial Floor for the Adjusted Term SOFR Rate shall be 0.50%. The initial floor for the ABR shall be 1.50%.<br><br><u>Rate and Fee Basis</u>: All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of Loans bearing interest at ABR the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.<br><br>Terms used without definition have the meaning set forth on Annex A-3 of Exhibit A to the Commitment Letter. | Exhibit A - Page 30 |

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

| | | |
|---|---|---|
| **Collateral**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | The Term Loan B Facility will be secured by a perfected security interest as provided in the section "Priority" of Exhibit A to the Commitment Letter (subject to permitted liens, consistent with the "Negative Covenants" section of Exhibit A to the Commitment Letter, and other exceptions to be agreed as set forth in Credit Facilities Documentation) in the Collateral (as defined below).<br><br>"<u>Collateral</u>" means (x) prior to the Exit Conversion Date, those assets of the Loan Parties pledged to secure the A&R DIP Facility (as defined in Exhibit E to the Commitment Letter) consistent with the Existing DIP Credit Agreement and the A&R DIP Order (as defined in the Existing DIP Credit Agreement (as defined in Exhibit E to the Commitment Letter)), the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law, and including second or junior liens in collateral securing the Existing RCF Facility or the Existing Spare Engine Facility and (y) on and after the Exit Conversion Date, all assets of the Loan Parties consistent with the A&R DIP Facility, including (A) third party receivables of the Frequent Flyer Program Assets with payment terms that are more than 120 days, (B) third party receivables of the Cargo Business Assets and (C) intercompany receivables of a Loan Party in respect of the Frequent Flyer Program Assets and the Cargo Business Assets (clauses (A) through (C), collectively, the "<u>Receivables Collateral</u>"), in respect of this clause (y), subject to and in accordance with Guaranty and Security Principles, in each case, other than Excluded Property.<br><br>"<u>Excluded Property</u>" means (A) prior to the Exit Conversion Date, (i) receivables (other than the Receivables Collateral (as defined above)), (ii) Excluded Assets (as defined in the A&R DIP Facility), (iii) real estate (other than any real estate constituting collateral pledged to secure the A&R DIP Facility) and (iv) engines and spare parts (other than any engines and spare parts pledged to secure the A&R DIP Facility and with the priority specified therein) and (B) upon and after the Exit Conversion Date, (i) any Collateral in which there is a lien second or junior to the collateral securing the | Exhibit A - Page 2-3 and 13-14 |

Existing RCF Refinancing or the Existing Spare Engine Facility Refinancing, (ii) receivables (other than the Receivables Collateral (as defined above)), (iii) deposit accounts, (iv) Excluded Assets (as defined in the A&R DIP Facility), (v) real estate, (vi) engines and spare parts and (vii) customary exclusions.

In accordance with the Final DIP Order (as defined in Exhibit E to the Commitment Letter), prior to the Exit Conversion Date, all of the liens described herein shall be effective and perfected upon entry of the Final DIP Order, as applicable, without the necessity of the execution, recordation or filing by the Loan Parties of security agreements, control agreements, financing statements or other similar documents, or possession or control by the applicable collateral agent of, or over, any Collateral, as set forth in the Final DIP Order. Certain Collateral of the Loan Parties shall be, prior to the Exit Conversion Date, pledged pursuant to local law governed security agreements, and on and after the Exit Conversion Date, pledged pursuant to additional local law governed security agreements to be documented (including, for the avoidance of doubt, in respect of intellectual property, subject to and in accordance with the Guaranty and Security Principles). Notwithstanding the foregoing, (x) the security interest in receivables that constitute Collateral shall only be required to be granted pursuant to the Final DIP Order and the U.S. security agreement and (y) local law perfection steps shall only be required for (A) receivables in respect of certain significant third party contracts of the Cargo Business Assets to be mutually agreed between the applicable Administrative Agent and LATAM, and (B) intercompany receivables of a Loan Party in respect of the Cargo Business Assets, in each case pursuant to clauses (x) and (y) above, to the extent such receivables may be pledged in accordance with the Guaranty and Security Principles.  Upon the entry into a new contract with a new third party, the receivables of which would otherwise constitute Collateral, LATAM shall be required to exercise commercially reasonable efforts to seek to avoid restrictions on (i) the granting of a security interest in such receivables and (ii) a

termination of such contract solely due to a change of control; provided that the foregoing shall not apply to any extension, replacement or amendment of a contract with an existing (as of the date hereof) third party that contains such a restriction.

All the above-described pledges and security interests shall be created on terms and subject to exceptions permitted under the Credit Facilities Documentation.

"Frequent Flyer Program" means any customer loyalty program available to individuals that is operated, owned or controlled, directly or indirectly, by LATAM or any of its subsidiaries and which loyalty program grants members in such program Currency (as defined below) based on a member's purchasing behavior and that entitles a member to accrue and redeem such Currency for a benefit or reward, including flights and/or other goods and services.

"Frequent Flyer Program Assets" means (a) all currently existing, future and successor co-branding agreements, partnering agreements, airline-to-airline frequent flyer program agreements or similar agreements related to or entered into in connection with a Frequent Flyer Program ("Frequent Flyer Program Agreements"), (b) intellectual property (including proprietary source code) owned or purported to be owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and required or necessary to operate a Frequent Flyer Program, (c) customer data owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and used, generated or produced as part of a Frequent Flyer Program (including a list of all members and profile data for each member), (d) all currently existing or future intercompany agreements governing the sale, transfer or redemption of Currency under any Frequent Flyer Program ("Intercompany Frequent Flyer Agreements") and (e) accounts receivable in respect of any Frequent Flyer Program, including accounts receivable arising under Frequent Flyer Program Agreements or Intercompany Frequent Flyer Agreements.

| | | |
|---|---|---|
| | "Currency" means miles, points and/or other units that are a medium of exchange constituting a convertible, virtual and private currency that is tradeable property and that can be sold or issued to persons.<br><br>"Cargo Business Assets" means (a) all intercompany aircraft leases in respect of freighter aircraft used in the cargo business of LATAM and its subsidiaries, (b) all intercompany contracts providing rights to use the belly of passenger airplanes for the cargo business of LATAM and its subsidiaries, (c) all accounts receivable in respect of the cargo business of LATAM and its subsidiaries and (d) all owned and leased real estate assets used in the cargo business of LATAM and its subsidiaries. | |
| **Superpriority Claim**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Prior to the Exit Conversion Date, all obligations under the Credit Facilities shall, upon the entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order), constitute superpriority administrative expense claims against each of the Loan Parties (but with the superpriority administrative claims in respect of the Revolving Facility being satisfied on a "first out" basis), with priority over all other administrative expense claims, including with respect to the Junior DIP Facility.<br><br>Prior to the Exit Conversion Date, all obligations of the Loan Parties with respect to the Credit Facilities shall be secured on a pari passu basis with each other Debt Facility and with any Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) and senior to the Junior DIP Facility upon entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order) pursuant to the priorities set forth in the Intercreditor Terms. The liens and security interests (the "DTE Liens") securing such obligations shall consist of the following (any terms used but not defined herein shall have the meaning given to them in the Intercreditor Terms (defined below)): | Exhibit A – Page 6-7 |

| | | |
|---|---|---|
| | (i) Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien on the Collateral not otherwise subject to Permitted Priority Liens (as defined in the A&R DIP Order), subject only to the Carve-Out (as defined in the A&R DIP Order); and | |
| | (ii) Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest in and lien on the Collateral, subject to Permitted Priority Liens and the Carve-Out. Upon and after the Exit Conversion Date, all obligations of the Loan Parties with respect to the Credit Facilities shall be secured on a pari passu basis with each other Debt Facility and with any Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) pursuant to the priorities set forth in the Intercreditor Terms and subject to the Guaranty and Security Principles. | |
| **Use of Proceeds** Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Term Loan B Facility will be used by the Borrowers on the Closing Date in accordance with the Plan to repay the Existing DIP Credit Agreement and to pay related fees and expenses. | Exhibit A – Page 6 |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(3); Local Rule 4001-2(a)(16) | Expenses: Subject to the limitations set forth in Section 5 of the Commitment Letter, the Borrowers shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lead Arrangers associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Facilities Documentation and any amendment, modification or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of one primary counsel (together with the reasonable and documented fees, disbursements and other charges incurred by Milbank LLP incurred prior to May 1, 2022 (which, for the avoidance of doubt, are reasonable and documented and invoiced in accordance with the procedures set forth in the final | Exhibit A – Page 26 Fee Letter – Page 1-2 |

| | | |
|---|---|---|
| | DIP Order)), one regulatory counsel, one special bankruptcy counsel and one additional local counsel in each applicable jurisdiction) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent, the Issuing Lenders and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel) in connection with the enforcement of the Credit Facilities Documentation.<br><br>Subject in certain cases to certain increases or other adjustments (including adjustments to take into account any applicable original issue discount) based on market conditions.<br><br><u>Fees</u>:<br><br>(i) An underwriting and arrangement fee, equal to REDACTED* of the aggregate committed amount (but without giving effect to any increase in the term loan B facility commitments to fund original issue discount), payable on the closing date.<br><br>(ii) An annual administration fee of US$<sup>REDACTED*</sup> to be paid to Goldman Sachs. | |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | Tenor of five years from the Closing Date (the "<u>Term Loan B Maturity Date</u>"); provided that if the Exit Conversion Date does not occur on or prior to December 1, 2023, the Term Loan B Maturity Date shall be December 1, 2023 without the payment of any premium or penalty. The Term Loan B Facility shall include a mechanic for individual lenders to extend the maturity date of the Term Loan B Loans; provided that such offer to extend the maturity date is offered to all lenders ratably. | Exhibit A – Page 5 |
| **Financial Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | Subject to the Credit Facilities Documentation Principles and limited to the following:<br><br>(i) Asset Coverage Ratio of not less than 1.60:1.00, as of the last day of each semi-annual period (the "<u>Asset Coverage Ratio Covenant</u>"), and subject to a 45 day cure period.<br><br>(ii) Consolidated Liquidity (as defined in the Prepetition RCF) of not less than $750,000,000, as | Exhibit A – Page 19-20 |

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.

| | | |
|---|---|---|
| | of the close of each business day (the "Consolidated Liquidity Covenant"). | |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | The Credit Facilities Documentation will contain only the following events of default (subject to the Credit Facilities Documentation Principles): nonpayment of principal or L/C Reimbursement when due; nonpayment of interest, fees or other amounts after a grace period of five business days; material inaccuracy of representations and warranties (subject to a 10 business day grace period following the earlier to occur of (x) the responsible officer of the applicable Borrower having actual knowledge about the default, and (y) the applicable Borrower receiving a notice from the applicable Administrative Agent with respect to the occurrence of such default); the Credit Facilities Documentation ceasing to be in full force and effect or any Borrower party thereto so asserting; the Final DIP Order remaining in full force and effect; violation of covenants (subject, in the case of certain customary affirmative covenants, to a grace period of 30 days and in the case of the Consolidated Liquidity Covenant, to a grace period of ten (10) business days following the earlier to occur of (x) the responsible officer of the applicable Borrower having actual knowledge about the default, and (y) the applicable Borrower receiving a notice from the applicable Administrative Agent with respect to the occurrence of such default; subject to customary carve outs prior to the Exit Conversion Date, cross-acceleration and cross-payment default with respect to material indebtedness; bankruptcy events (from and after the Closing Date); certain ERISA and employment events; material judgments; actual or asserted invalidity of security documents representing a material portion of the Collateral; and a change of control (to be defined in a manner to be agreed). | Exhibit A – Pages 22 |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | None | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix ) | The Administrative Agent, the Lead Arrangers, the Issuing Lenders and the Lenders (and their affiliates and their respective officers, Related Parties) (each, an "Indemnified Person") will have no liability for, and will be indemnified and | Exhibit A – Pages 26-27 |

| | held harmless against, any loss, liability, claims (including intraparty claims), demands, damages, cost or expense (collectively, "<u>Liabilities</u>") incurred in connection with or as a result of (i) the execution and delivery of the Credit Facilities Documentation and any agreement or instrument contemplated thereby; (ii) the performance by the Indemnified Persons of their obligations under the Credit Facilities Documentation or the consummation of the transactions contemplated thereby, (iii) the funding of the Credit Facilities, issuance of letter of credits thereunder, or the use or the proposed use of proceeds thereof, and (iv) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "<u>Proceeding</u>") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by any Borrower, its affiliates or equity holders or any other party (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Credit Facilities Documentation in performing its activities or in furnishing its commitments or services under the Credit Facilities Documentation or (z) disputes among Lenders not arising from a Borrower's breach of its obligations under the Credit Facilities Documentation (other than a dispute involving a claim against an Indemnified Person for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of any Credit Facility, except, with respect to this clause (z), to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross | |

|  | negligence, bad faith or willful misconduct of such Indemnified Person in such capacity)).<br><br>The parties herein (and their affiliates and their respective Related Parties) shall not have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by the parties hereto, their affiliates or any of their subsidiaries arising out of, in connection with, or as a result of, the Credit Facilities or the Credit Facilities Documentation. |  |
|---|---|---|
| **Provisions Elevating Prepetition Debt to Administrative Expense (or Higher) Status**<br>Local Rule 4001 - 2(a)(6) | None |  |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br>Local Rule 4001- 2(a)(7) | None |  |
| **Priming Liens and Adequate Protection**<br>Local Rule 4001- 2(a)(4) | None |  |
| **Change in Control Provisions**<br>Local Rule 4001- 2(a)(11) | Change of Control is an Event of Default to be agreed. | Exhibit A – Page 22 |
| **Prepayment Penalty** | Voluntary prepayments of borrowings under either Credit Facility will be permitted at any time, in minimum principal amounts to be set forth in the | Exhibit A – Page 8 |

| | | |
|---|---|---|
| Local Rule 4001-2(a)(13) | Credit Facilities Documentation, without premium or penalty, subject to reimbursement of the Lenders' break funding costs (other than lost profits) in the case of a prepayment of Adjusted Term SOFR Rate loans prior to the last day of the relevant interest period; provided that the voluntary prepayment of borrowings under the Term Loan B Facility (i) any time on and after the Closing Date to but not including the first anniversary of the Closing Date shall be subject to a premium of 2.00% over the aggregate principal amount so repaid and (ii) any time from and after the first anniversary of the Closing Date and to, but not including, the second anniversary of the Closing Date shall be subject to a premium of 1.00% over the aggregate principal amount so repaid. Upon and after the second anniversary of the Closing Date, there shall be no penalty or premium. For the avoidance of doubt, subject to the reimbursement of reasonable and documented Lenders' break funding costs as set forth in this paragraph, voluntary prepayments of borrowing under either Credit Facility after the expiration of the foregoing periods shall be without premium or penalty.<br><br>Voluntary prepayments of Term Loan B Loans shall be applied to reduce installments thereof as directed by the applicable Borrower making such prepayment (and absent such direction, in direct order of maturity), as applicable. | |
| **Joint Liability of the Debtors**<br>Local Rule 4001-2(a)(14) | Prior to the Exit Conversion Date, the obligations of the Loan Parties under the Term Loan B Facility shall constitute allowed superpriority administrative expense claims against the Loan Parties on a joint and several basis. | Exhibit A – Page 5-6 |
| **Funding of Non-Debtor Affiliates**<br>Local Rule 4001-2(a)(15) | To be agreed in the DTE/DIP Loan Documents | None |
| **Limitations on Certain Powers**<br>Local Rule 4001-2(a)(8) | The DTE/DIP Term Sheets, the DTE/DIP Loan Documents and the provisions of the DTE/DIP Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DTE/DIP Secured Parties, the Creditors' Committee, any other | DTE/DIP Final Order, ¶ 31 |

| | | |
|---|---|---|
| | committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties. | |
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors forever and irrevocably (i) release, discharge, and acquit DIP Secured Parties including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have, arising from any actions of the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, pursuant to the terms of the DTE/DIP Final Order and any other DTE/DIP Loan Documents including any equitable subordination claims, relating to any aspect of the relationship between the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and the Debtors, including any equitable subordination claims or defenses, with respect to or relating to the DTE/DIP Loans, the DTE/DIP Obligations, the DTE/DIP Loan Documents, the Debtors' attempts to restructure the DTE/DIP Loans, consent to the terms of the DTE/DIP Final Order and the use of the DTE/DIP Commitments hereunder, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DIP Secured Parties, including the DTE/DIP Agents or the DTE/DIP Lenders, solely in their capacities as such; and (ii) | DTE/DIP Final Order, ¶ 34 |

41

| | waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DTE/DIP Obligations; *provided* that such release shall not apply to any claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful misconduct or gross negligence of the Releasees. | |

**Bridge to 5Y Notes Facility**

| SUMMARY OF MATERIAL TERMS OF THE BRIDGE-TO-5Y-NOTES FACILITY | | |
| --- | --- | --- |
| **Summary of Materials Terms of the Bridge-to-5Y-Notes Facility** | | |
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | LATAM Airlines Group S.A. | Exhibit B - page 1[21] |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Prior to the Exit Conversion Date, same as in the Existing DIP Credit Agreement (the "<u>Pre-Conversion Guarantors</u>") and subject in all cases to the Guaranty and Security Principles (as defined in Exhibit D to the Commitment Letter).<br><br>Upon the Exit Conversion Date, the Pre-Conversion Guarantors and any entity that, from time to time, pledges or grants liens in the Collateral (as defined below) or owns Significant Assets (as defined below) other than, in each case, any Excluded Subsidiaries (as defined below) (collectively, the "<u>Guarantors</u>") and subject in all cases to the Guaranty and Security Principles.<br><br>"<u>Excluded Subsidiary</u>" means any subsidiary that (i) is not or ceases to be a subsidiary in which at least 85% of its capital stock is owned by LATAM or other subsidiary, other than due to a minority interest required to comply with a local ownership requirement; provided that this clause (i) shall not apply to Holdco Ecuador S.A. or LATAM Airlines Peru, S.A., (ii) is prohibited or restricted by applicable law, or regulation from being or becoming a guarantor, (iii) is subject to any contract | Exhibit A - page 1 |

---

[21] Unless otherwise indicated, all references to Exhibits refer to Exhibits to the Omnibus Commitment Letter.

| | | |
|---|---|---|
| | or other restrictions prohibiting such guarantee existing prior to the date hereof or the date such entity becomes a subsidiary, as applicable, (iv) LATAM and the applicable Administrative Agent mutually agree that the granting or maintenance of a guarantee by such subsidiary would result in material adverse tax consequences to such Borrower or any of its subsidiaries, (v) is a captive insurance company, special purpose entity, securitization, receivables subsidiary or not-for-profit subsidiary or (vi) at the option of LATAM, LAN Argentina S.A., Transportes Aéreos del Mercosur S.A and other entities, in each case to the extent that such entity owns an immaterial amount of Significant Assets subject to a threshold to be agreed.<br><br>The Borrowers and, without duplications the Guarantors, the "Loan Parties".<br><br>"Significant Assets" means (a) the Collateral, (b) Coverage Assets (as defined below) and (c) any other slots, gates and routes.<br><br>"Coverage Assets" means (a) the Frequent Flyer Program Assets (as defined below) of the Loan Parties, (b) the Cargo Business Assets (as defined below) of the Loan Parties, (c) intellectual property constituting Collateral, and (d) slots, gates and routes in the United States and the United Kingdom constituting Collateral. | |
| **Lenders**<br>4001(c)(1)(B) | Lead Arrangers and Bookrunners:<br><br>JPMorgan Chase Bank, N.A. ("*JPMorgan*"), Goldman Sachs Lending Partners LLC ("*GS*"), Barclays Bank PLC. ("*Barclays*"), BNP Paribas ("*BNP Paribas*"), BNP Paribas Securities Corp. ("*BNP Securities*" and, together with BNP Paribas, "*BNP*") and Natixis, New York Branch ("*Natixis*"). | Exhibit B - page 1 |
| **Agents**<br>Bankruptcy Rule<br>4001(c)(1)(B) | JPMorgan Chase Bank, N.A., as sole Administrative and Collateral Agent. | Exhibit B - page 1 |
| **Borrowing Limits**<br>Bankruptcy Rule | A senior secured bridge term loan credit facility denominated in U.S. dollars in an aggregate principal amount equal to $750 million. | Exhibit B - page 1 |

| | | |
|---|---|---|
| 4001(c)(1)(B), Local Rule 4001-2(a)(1) | | |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | The Bridge to 5Y Facility will bear interest at an interest rate per annum equal to the Total 5Y Bridge Loan Cap        **REDACTED\*** | Annex B-I to Exhibit B |
| | Interest shall be payable on the last day of each fiscal quarter of LATAM, on the date of prepayment of any Bridge to 5Y Facility and on the maturity date. thereof, in each case, payable in arrears and computed on the basis of a 360 day year. | |
| | For the avoidance of doubt, any special interest described in Exhibit B under the caption "Special Interest Trigger" shall be in addition to the interest payable pursuant to the preceding or succeeding paragraphs. | |
| **Collateral** Bankruptcy Rule 4001(c)(1)(B)(i) | (*Bridge-to-5Y Facility Collateral shall be the same as the Term Loan B Facility Collateral*) | Exhibit A - Page 2-3 and 13-14 |
| | Subject in each case to the Guaranty and Security Principles, the Term Loan B Facility will be secured by a perfected security interest as provided in the section "Priority" of Exhibit A to the Commitment Letter (subject to permitted liens, consistent with the "Negative Covenants" section of Exhibit A to the Commitment Letter, and other exceptions to be agreed as set forth in Credit Facilities Documentation) in the Collateral (as defined below). | |
| | "Collateral" means (x) prior to the Exit Conversion Date, those assets of the Loan Parties pledged to secure the A&R DIP Facility (as defined in Exhibit E to the Commitment Letter) consistent with the Existing DIP Credit Agreement and the A&R DIP Order (as defined in the Existing DIP Credit Agreement (as defined in Exhibit E to the Commitment Letter)), the proceeds of any causes of | |

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law, and including second or junior liens in collateral securing the Existing RCF Facility or the Existing Spare Engine Facility and (y) on and after the Exit Conversion Date, all assets of the Loan Parties consistent with the A&R DIP Facility, including (A) third party receivables of the Frequent Flyer Program Assets with payment terms that are more than 120 days, (B) third party receivables of the Cargo Business Assets and (C) intercompany receivables of a Loan Party in respect of the Frequent Flyer Program Assets and the Cargo Business Assets (clauses (A) through (C), collectively, the "Receivables Collateral"), in each case, subject to and in accordance with Guaranty and Security Principles, in each case, other than Excluded Property.

"Excluded Property" means (A) prior to the Exit Conversion Date means (i) receivables (other than the Receivables Collateral (as defined above)), (ii) Excluded Assets (as defined in the A&R DIP Facility), (iii) real estate (other than any real estate constituting collateral pledged to secure the A&R DIP Facility) and (iv) engines and spare parts (other than any engines and spare parts pledged to secure the A&R DIP Facility and with the priority specified therein) and (B) upon and after the Exit Conversion Date means (i) any Collateral in which there is a lien second or junior to the collateral securing the Existing RCF Refinancing or the Existing Spare Engine Facility Refinancing, (ii) receivables (other than the Receivables Collateral (as defined above)), (iii) deposit accounts, (iv) Excluded Assets (as defined in the A&R DIP Facility), (v) real estate, (vi) engines and spare parts and (vii) customary exclusions.

In accordance with the Final DIP Order (as defined in Exhibit E to the Commitment Letter), prior to the Exit Conversion Date, all of the liens described herein shall be effective and perfected upon entry of the Final DIP Order, as applicable, without the necessity of the execution, recordation or filing by the Loan Parties of security agreements, control agreements, financing statements or other similar documents, or possession or control by the

applicable collateral agent of, or over, any Collateral, as set forth in the Final DIP Order. Certain Collateral of the Loan Parties shall be, prior to the Exit Conversion Date, pledged pursuant to local law governed security agreements, and on and after the Exit Conversion Date, pledged pursuant to additional local law governed security agreements to be documented (including, for the avoidance of doubt, in respect of intellectual property, subject to and in accordance with the Guaranty and Security Principles). Notwithstanding the foregoing, (x) the security interest in receivables that constitute Collateral shall only be required to be granted pursuant to the Final DIP Order and the U.S. security agreement and (y) local law perfection steps shall only be required for (A) receivables in respect of certain significant third party contracts of the Cargo Business Assets to be mutually agreed between the applicable Administrative Agent and LATAM, and (B) intercompany receivables of a Loan Party in respect of the Cargo Business Assets, in each case pursuant to clauses (x) and (y) above, to the extent such receivables may be pledged in accordance with the Guaranty and Security Principles.  Upon the entry into a new contract with a new third party, the receivables of which would otherwise constitute Collateral, LATAM shall be required to exercise commercially reasonable efforts to seek to avoid restrictions on (i) the granting of a security interest in such receivables and (ii) a termination of such contract solely due to a change of control; provided that the foregoing shall not apply to any extension, replacement or amendment of a contract with an existing (as of the date hereof) third party that contains such a restriction.

All the above-described pledges and security interests shall be created on terms and subject to exceptions permitted under the Credit Facilities Documentation.

"Frequent Flyer Program" means any customer loyalty program available to individuals that is operated, owned or controlled, directly or indirectly, by LATAM or any of its subsidiaries and which loyalty program grants members in such program Currency (as defined below) based on a member's

purchasing behavior and that entitles a member to accrue and redeem such Currency for a benefit or reward, including flights and/or other goods and services.

"Frequent Flyer Program Assets" means (a) all currently existing, future and successor co-branding agreements, partnering agreements, airline-to-airline frequent flyer program agreements or similar agreements related to or entered into in connection with a Frequent Flyer Program ("Frequent Flyer Program Agreements"), (b) intellectual property (including proprietary source code) owned or purported to be owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and required or necessary to operate a Frequent Flyer Program, (c) customer data owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and used, generated or produced as part of a Frequent Flyer Program (including a list of all members and profile data for each member), (d) all currently existing or future intercompany agreements governing the sale, transfer or redemption of Currency under any Frequent Flyer Program ("Intercompany Frequent Flyer Agreements") and (e) accounts receivable in respect of any Frequent Flyer Program, including accounts receivable arising under Frequent Flyer Program Agreements or Intercompany Frequent Flyer Agreements.

"Currency" means miles, points and/or other units that are a medium of exchange constituting a convertible, virtual and private currency that is tradeable property and that can be sold or issued to persons.

"Cargo Business Assets" means (a) all intercompany aircraft leases in respect of freighter aircraft used in the cargo business of LATAM and its subsidiaries, (b) all intercompany contracts providing rights to use the belly of passenger airplanes for the cargo business of LATAM and its subsidiaries, (c) all accounts receivable in respect of the cargo business of LATAM and its subsidiaries and (d) all owned

| | | |
|---|---|---|
| | and leased real estate assets used in the cargo business of LATAM and its subsidiaries. | |
| **Superpriority Claim** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Prior to the Exit Conversion Date, all obligations under the Bridge to 5Y Facility shall, upon the entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order), constitute superpriority administrative expense claims against each of the Loan Parties (but with the superpriority administrative claims in respect of the Revolving Facility being satisfied on a "first out" basis), with priority over all other administrative expense claims, including with respect to the Junior DIP Facility.<br><br>Prior to the Exit Conversion Date, all obligations of the Loan Parties with respect to the Bridge to 5Y Facility shall be secured on a *pari passu* basis with each other Debt Facility and with any other Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) and senior to the Junior DIP Facility, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order) pursuant to the priorities set forth in the Intercreditor Terms. The liens and security interests (the "***DTE Liens***") securing such obligations shall consist of the following (any terms used but not defined herein shall have the meaning given to them in the Intercreditor Terms (defined below)):<br><br>(i) Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien on the Collateral not otherwise subject to Permitted Priority Liens (as defined in the A&R DIP Order), subject only to the Carve-Out (as defined in the A&R DIP Order); and<br><br>(ii) Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest in and lien on the Collateral, subject to Permitted Priority Liens and the Carve-Out.<br><br>Upon and after the Exit Conversion Date, all obligations of the Loan Parties with respect to the | Exhibit B page 3 |

|  | Bridge to 5Y Facility shall be secured on a pari passu basis with each other Debt Facility and with any other Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) pursuant to the priorities set forth in the Intercreditor Terms and subject to the Guaranty and Security Principles. |  |
|---|---|---|
| **Use of DIP Proceeds** Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Bridge to 5Y Notes Facility will be used by the Borrowers in accordance with the Plan to repay the Existing DIP Credit Agreement and to pay related fees and expenses. | Exhibit B page 1 |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(3); Local Rule 4001-2(a)(16) | Expenses: Subject to the limitations set forth in Section 5 of the Commitment Letter, the Borrowers shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lead Arrangers associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Facilities Documentation and any amendment, modification or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of one primary counsel, (together with the reasonable and documented fees, disbursements and other charges incurred by Milbank LLP incurred prior to May 1, 2022 (which, for the avoidance of doubt, are reasonable and documented and invoiced in accordance with the procedures set forth in the final DIP Order)) one regulatory counsel, one special bankruptcy counsel and one additional local counsel in each applicable jurisdiction) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent, the Issuing Lenders and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel) in connection with the enforcement of the Credit Facilities Documentation. Subject in certain cases to certain increases or other adjustments (including adjustments to take into account any applicable original issue discount) based on market conditions. | Exhibit A – Page 25 Fee Letter – Page 3-4 |

| | | |
|---|---|---|
| | Fees:<br><br>1. A bridge commitment fee of <sup>REDACTED*</sup> of the aggregate principal amount of commitments, payable on the closing date.<br><br>2. A funding fee of <sup>REDACTED*</sup> of the aggregate principal amount of the commitments actually funded at closing.<br><br>3. A rollover fee of <sup>REDACTED*</sup> of the aggregate principal amount of the loans outstanding on the first anniversary of the closing date.<br><br>4. Only in the event the bridge to 5Y facility is funded, an administration fee of <sup>REDACTED*</sup> paid to JPM in its capacity as administrative agent of the bridge to 5Y facility. | |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10)<br><br>(includes amendment to Tranche A Facility Scheduled Maturity Date) | Scheduled Maturity Date: One year from the closing date; provided, however, that if the Conversion Date does not occur on or prior to December 1, 2023, the maturity date shall be December 1, 2023.<br><br>Rollover: Notwithstanding the foregoing, subject to certain conditions precedent, on the first anniversary from the closing date, any loans under the Bridge to 5Y Notes Facility Proposal that have not been previously repaid will be automatically converted into a senior secured term loan due on the date that is five years after the closing date; provided, however, that if the Conversion Date does not occur on or prior to December 1, 2023, this extended maturity date shall be December 1, 2023. | Exhibit B - page 2 |
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | None. | Exhibit B - page 6 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | The 5Y Bridge Facility Documentation will contain only the following events of default (subject to the 5Y Documentation Principles): nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period of five business days; material inaccuracy of representations and | Exhibit B - page 6-7 |

* All text marked "REDACTED*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.

| | | |
|---|---|---|
| | warranties (subject to a 10 business day grace period following the earlier to occur of (x) the responsible officer of the applicable Borrower having actual knowledge about the default and (y) the applicable Borrower receiving a notice from the 5Y Administrative Agent with respect to the occurrence of such default); the 5Y Bridge Facility Documentation ceasing to be in full force and effect or any Borrower party thereto so asserting; the Final DIP Order remaining in full force and effect; violation of covenants (subject, in the case of certain customary affirmative covenants, to a grace period of 30 days; (from and after the Exit Conversion Date) cross-acceleration and cross-payment default with respect to material indebtedness; bankruptcy events (from and after the Closing Date); certain ERISA and employment events; material judgments; actual or asserted invalidity of security documents representing a material portion of the Collateral; and a change of control (to be defined in a manner to be agreed). | |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | None. | |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Administrative Agent, the Lead Arrangers, the Issuing Lenders and the Lenders (and their affiliates and their respective officers, Related Parties) (each, an "***Indemnified Person***") will have no liability for, and will be indemnified and held harmless against, any loss, liability, claims (including intraparty claims), demands, damages, cost or expense (collectively, "***Liabilities***") incurred in connection with or as a result of (i) the execution and delivery of the Credit Facilities Documentation and any agreement or instrument contemplated thereby; (ii) the performance by the Indemnified Persons of their obligations under the Credit Facilities Documentation or the consummation of the transactions contemplated thereby, (iii) the funding of the Credit Facilities, issuance of letter of credits thereunder, or the use or the proposed use of proceeds thereof, and (iv) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "***Proceeding***") in any jurisdiction relating to any of | Exhibit A – Pages 26-27 |

| | | |
|---|---|---|
| | the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by any Borrower, its affiliates or equity holders or any other party (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Credit Facilities Documentation in performing its activities or in furnishing its commitments or services under the Credit Facilities Documentation or (z) disputes among Lenders not arising from a Borrower's breach of its obligations under the Credit Facilities Documentation (other than a dispute involving a claim against an Indemnified Person for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of any Credit Facility, except, with respect to this clause (z), to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnified Person in such capacity)). <br><br> The parties herein (and their affiliates and their respective Related Parties) shall not have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by the parties hereto, their affiliates or any of their subsidiaries arising out of, in connection with, or as a result of, the Credit Facilities or the Credit Facilities Documentation. | |
| **Provisions Elevating Prepetition Debt to Administrative Expense (or Higher) Status** | None. | |

| | | |
|---|---|---|
| Local Rule 4001 - 2(a)(6) | | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** <br><br> Local Rule 4001- 2(a)(7) | None. | |
| **Priming Liens and Adequate Protection** <br><br> Local Rule 4001- 2(a)(4) | None. | |
| **Change in Control Provisions** <br><br> Local Rule 4001- 2(a)(11) | Consistent with the Exchange Notes Documentation Principles, the Issuer will be required to make an offer to repurchase the 5Y Senior Secured Exchange Notes following the occurrence of a "change of control" (to be defined in a manner consistent with the 5Y Exchange Notes Documentation Principles) at a price in cash equal to 101% of the outstanding principal amount thereof, plus accrued and unpaid interest to, but not including, the date of repurchase. | Exhibit B, Annex B-III page 3-4 |
| **Prepayment Penalty** <br><br> Local Rule 4001- 2(a)(13) | No prepayment penalties. | Exhibit B - page 4 |
| **Joint Liability of the Debtors** <br> Local Rule 4001- 2(a)(14) | None. | |
| **Funding of Non-Debtor Affiliates** <br><br> Local Rule 4001- 2(a)(15) | To be agreed in the DTE/DIP Loan Documents. | |
| **Limitations on Certain Powers** <br><br> Local Rule 4001- 2(a)(8) | The DTE/DIP Term Sheets, the DTE/DIP Loan Documents and the provisions of the DTE/DIP Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DTE/DIP | DTE/DIP Final Order, ¶ 31 |

| | Secured Parties, the Creditors' Committee, any other committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties. | |
|---|---|---|
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors forever and irrevocably (i) release, discharge, and acquit the DIP Secured Parties including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have, arising from any actions of the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, pursuant to the terms of the DTE/DIP Final Order and any other DTE/DIP Loan Documents including any equitable subordination claims, relating to any aspect of the relationship between the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and the Debtors, including any equitable subordination claims or defenses, with respect to or relating to the DTE/DIP Loans, the DTE/DIP Obligations, the DTE/DIP Loan Documents, the Debtors' attempts to restructure the DTE/DIP Loans, consent to the terms of the DTE/DIP Final Order and the use of the DTE/DIP Commitments hereunder, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DIP Secured Parties, | DTE/DIP Final Order, ¶ 34 |

<table>
<tr><td></td><td>including the DTE/DIP Agents or the DTE/DIP Lenders, solely in their capacities as such; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DTE/DIP Obligations; <em>provided</em> that such release shall not apply to any claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful misconduct or gross negligence of the Releasees.</td><td></td></tr>
</table>

## Bridge to 7Y Notes Facility

| SUMMARY OF MATERIAL TERMS OF THE BRIDGE-TO-7Y-NOTES FACILITY | | |
|---|---|---|
| **Summary of Materials Terms of the Bridge-to-7Y-Notes Facility** | | |
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | LATAM Airlines Group S.A. | Exhibit C - page 1[22] |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Prior to the Exit Conversion Date, same as in the Existing DIP Credit Agreement (the "<u>Pre-Conversion Guarantors</u>") and subject in all cases to the Guaranty and Security Principles (as defined in Exhibit D to the Commitment Letter).<br><br>Upon the Exit Conversion Date, the Pre-Conversion Guarantors and any entity that, from time to time, pledges or grants liens in the Collateral (as defined below) or owns Significant Assets (as defined below) other than, in each case, any Excluded Subsidiaries (as defined below) (collectively, the "<u>Guarantors</u>") and subject in all cases to the Guaranty and Security Principles.<br><br>"<u>Excluded Subsidiary</u>" means any subsidiary that (i) is not or ceases to be a subsidiary in which at least 85% of its capital stock is owned by LATAM or other subsidiary, other than due to a minority interest required to comply with a local ownership requirement; provided that this clause (i) shall not apply to Holdco Ecuador S.A. or | Exhibit A - page 1 |

[22]    Unless otherwise indicated, all references to Exhibits refer to Exhibits to the Omnibus Commitment Letter.

| | | |
|---|---|---|
| | LATAM Airlines Peru, S.A., (ii) is prohibited or restricted by applicable law, or regulation from being or becoming a guarantor, (iii) is subject to any contract or other restrictions prohibiting such guarantee existing prior to the date hereof or the date such entity becomes a subsidiary, as applicable, (iv) LATAM and the applicable Administrative Agent mutually agree that the granting or maintenance of a guarantee by such subsidiary would result in material adverse tax consequences to such Borrower or any of its subsidiaries, (v) is a captive insurance company, special purpose entity, securitization, receivables subsidiary or not-for-profit subsidiary or (vi) at the option of LATAM, LAN Argentina S.A., Transportes Aéreos del Mercosur S.A and other entities, in each case to the extent that such entity owns an immaterial amount of Significant Assets subject to a threshold to be agreed. | |
| | The Borrowers and, without duplications the Guarantors, the "Loan Parties". | |
| | "Significant Assets" means (a) the Collateral, (b) Coverage Assets (as defined below) and (c) any other slots, gates and routes. | |
| | "Coverage Assets" means (a) the Frequent Flyer Program Assets (as defined below) of the Loan Parties, (b) the Cargo Business Assets (as defined below) of the Loan Parties, (c) intellectual property constituting Collateral, and (d) slots, gates and routes in the United States and the United Kingdom constituting Collateral. | |
| **Lenders** 4001(c)(1)(B) | Lead Arrangers and Bookrunners:<br><br>JPMorgan Chase Bank, N.A. ("***JPMorgan***"), Goldman Sachs Lending Partners LLC ("***GS***"), Barclays Bank PLC. ("***Barclays***"), BNP Paribas ("***BNP Paribas***"), BNP Paribas Securities Corp. ("***BNP Securities***" and, together with BNP Paribas, "***BNP***") and Natixis, New York Branch ("***Natixis***"). | Exhibit C - page 1 |
| **Agents** Bankruptcy Rule 4001(c)(1)(B) | JPMorgan Chase Bank, N.A., as sole Administrative and Collateral Agent. | Exhibit C - page 1 |

| | | |
|---|---|---|
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(1) | A senior secured bridge term loan credit facility denominated in U.S. dollars in an aggregate principal amount equal to $750 million. | Exhibit C - page 1 |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | The Bridge to 7Y Facility will bear interest at an interest rate per annum equal to the Total 7Y Bridge Loan Cap      **REDACTED***

Interest shall be payable on the last day of each fiscal quarter of LATAM, on the date of prepayment of any Bridge to 7Y Facility and on the maturity date. thereof, in each case, payable in arrears and computed on the basis of a 360 day year.

For the avoidance of doubt, any special interest described in Exhibit C under the caption "Special Interest Trigger" shall be in addition to the interest payable pursuant to the preceding or succeeding paragraphs. | Annex C-I to Exhibit C |
| **Collateral** Bankruptcy Rule 4001(c)(1)(B)(i) | (*Bridge-to-7Y Facility Collateral shall be the same as the Term Loan B Facility Collateral*)

Subject in each case to the Guaranty and Security Principles, the Term Loan B Facility will be secured by a perfected security interest as provided in the section "Priority" of Exhibit A to the Commitment Letter (subject to permitted liens, consistent with the "Negative Covenants" section of Exhibit A to the Commitment Letter, and other exceptions to be agreed as set forth in Credit Facilities Documentation) in the Collateral (as defined below).

"Collateral" means (x) prior to the Exit Conversion Date, those assets of the Loan Parties pledged to secure the A&R DIP Facility (as defined in Exhibit E to the Commitment Letter) consistent with the Existing DIP Credit | Exhibit A - Page 2-3 and 13-14 |

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

Agreement and the A&R DIP Order (as defined in the Existing DIP Credit Agreement (as defined in Exhibit E to the Commitment Letter)), the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law, and including second or junior liens in collateral securing the Existing RCF Facility or the Existing Spare Engine Facility and (y) on and after the Exit Conversion Date, all assets of the Loan Parties consistent with the A&R DIP Facility, including (A) third party receivables of the Frequent Flyer Program Assets with payment terms that are more than 120 days, (B) third party receivables of the Cargo Business Assets and (C) intercompany receivables of a Loan Party in respect of the Frequent Flyer Program Assets and the Cargo Business Assets (clauses (A) through (C), collectively, the "<u>Receivables Collateral</u>"), in each case, subject to and in accordance with Guaranty and Security Principles, in each case, other than Excluded Property.

"<u>Excluded Property</u>" means (A) prior to the Exit Conversion Date means (i) receivables (other than the Receivables Collateral (as defined above)), (ii) Excluded Assets (as defined in the A&R DIP Facility), (iii) real estate (other than any real estate constituting collateral pledged to secure the A&R DIP Facility) and (iv) engines and spare parts (other than any engines and spare parts pledged to secure the A&R DIP Facility and with the priority specified therein) and (B) upon and after the Exit Conversion Date means (i) any Collateral in which there is a lien second or junior to the collateral securing the Existing RCF Refinancing or the Existing Spare Engine Facility Refinancing, (ii) receivables (other than the Receivables Collateral (as defined above)), (iii) deposit accounts, (iv) Excluded Assets (as defined in the A&R DIP Facility), (v) real estate, (vi) engines and spare parts and (vii) customary exclusions.

In accordance with the Final DIP Order (as defined in Exhibit E to the Commitment Letter), prior to the Exit Conversion Date, all of the liens described herein shall be effective and perfected

upon entry of the Final DIP Order, as applicable, without the necessity of the execution, recordation or filing by the Loan Parties of security agreements, control agreements, financing statements or other similar documents, or possession or control by the applicable collateral agent of, or over, any Collateral, as set forth in the Final DIP Order. Certain Collateral of the Loan Parties shall be, prior to the Exit Conversion Date, pledged pursuant to local law governed security agreements, and on and after the Exit Conversion Date, pledged pursuant to additional local law governed security agreements to be documented (including, for the avoidance of doubt, in respect of intellectual property, subject to and in accordance with the Guaranty and Security Principles). Notwithstanding the foregoing, (x) the security interest in receivables that constitute Collateral shall only be required to be granted pursuant to the Final DIP Order and the U.S. security agreement and (y) local law perfection steps shall only be required for (A) receivables in respect of certain significant third party contracts of the Cargo Business Assets to be mutually agreed between the applicable Administrative Agent and LATAM, and (B) intercompany receivables of a Loan Party in respect of the Cargo Business Assets, in each case pursuant to clauses (x) and (y) above, to the extent such receivables may be pledged in accordance with the Guaranty and Security Principles.  Upon the entry into a new contract with a new third party, the receivables of which would otherwise constitute Collateral, LATAM shall be required to exercise commercially reasonable efforts to seek to avoid restrictions on (i) the granting of a security interest in such receivables and (ii) a termination of such contract solely due to a change of control; provided that the foregoing shall not apply to any extension, replacement or amendment of a contract with an existing (as of the date hereof) third party that contains such a restriction.

All the above-described pledges and security interests shall be created on terms and subject to

exceptions permitted under the Credit Facilities Documentation.

"<u>Frequent Flyer Program</u>" means any customer loyalty program available to individuals that is operated, owned or controlled, directly or indirectly, by LATAM or any of its subsidiaries and which loyalty program grants members in such program Currency (as defined below) based on a member's purchasing behavior and that entitles a member to accrue and redeem such Currency for a benefit or reward, including flights and/or other goods and services.

"<u>Frequent Flyer Program Assets</u>" means (a) all currently existing, future and successor co-branding agreements, partnering agreements, airline-to-airline frequent flyer program agreements or similar agreements related to or entered into in connection with a Frequent Flyer Program ("<u>Frequent Flyer Program Agreements</u>"), (b) intellectual property (including proprietary source code) owned or purported to be owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and required or necessary to operate a Frequent Flyer Program, (c) customer data owned, or later developed or acquired and owned or purported to be owned, by LATAM or any of its subsidiaries and used, generated or produced as part of a Frequent Flyer Program (including a list of all members and profile data for each member), (d) all currently existing or future intercompany agreements governing the sale, transfer or redemption of Currency under any Frequent Flyer Program ("<u>Intercompany Frequent Flyer Agreements</u>") and (e) accounts receivable in respect of any Frequent Flyer Program, including accounts receivable arising under Frequent Flyer Program Agreements or Intercompany Frequent Flyer Agreements.

"<u>Currency</u>" means miles, points and/or other units that are a medium of exchange constituting a convertible, virtual and private currency that is

| | | |
|---|---|---|
| | tradeable property and that can be sold or issued to persons. | |
| | "Cargo Business Assets" means (a) all intercompany aircraft leases in respect of freighter aircraft used in the cargo business of LATAM and its subsidiaries, (b) all intercompany contracts providing rights to use the belly of passenger airplanes for the cargo business of LATAM and its subsidiaries, (c) all accounts receivable in respect of the cargo business of LATAM and its subsidiaries and (d) all owned and leased real estate assets used in the cargo business of LATAM and its subsidiaries. | |
| **Superpriority Claim** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Prior to the Exit Conversion Date, all obligations under the Bridge to 7Y Facility shall, upon the entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order), constitute superpriority administrative expense claims against each of the Loan Parties (but with the superpriority administrative claims in respect of the Revolving Facility being satisfied on a "first out" basis), with priority over all other administrative expense claims, including with respect to the Junior DIP Facility. Prior to the Exit Conversion Date, all obligations of the Loan Parties with respect to the Bridge to 7Y Facility shall be secured on a *pari passu* basis with each other Debt Facility and with any other Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) and senior to the Junior DIP Facility, upon entry of, and subject to, the Final DIP Order and subject to the Carve-Out (as defined in the Final DIP Order) pursuant to the priorities set forth in the Intercreditor Terms. The liens and security interests (the "***DTE Liens***") securing such obligations shall consist of the following (any terms used but not defined herein shall have the meaning given to them in the Intercreditor Terms (defined below)): (i) Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected first | Exhibit C page 3 |

| | | |
|---|---|---|
| | priority security interest in and lien on the Collateral not otherwise subject to Permitted Priority Liens (as defined in the A&R DIP Order), subject only to the Carve-Out (as defined in the A&R DIP Order); and<br><br>(ii) Pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest in and lien on the Collateral, subject to Permitted Priority Liens and the Carve-Out.<br><br>Upon and after the Exit Conversion Date, all obligations of the Loan Parties with respect to the Bridge to 7Y Facility shall be secured on a pari passu basis with each other Debt Facility and with any other Senior Secured Notes (but with the obligations under the Revolving Facility being satisfied on a "first out" basis) pursuant to the priorities set forth in the Intercreditor Terms and subject to the Guaranty and Security Principles. | |
| **Use of DIP Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Bridge to 7Y Notes Facility will be used by the Borrowers in accordance with the Plan to repay the Existing DIP Credit Agreement and to pay related fees and expenses. | Exhibit C - page 1 |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(3);<br>Local Rule 4001-2(a)(16) | Expenses:<br><br>Subject to the limitations set forth in Section 5 of the Commitment Letter, the Borrowers shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lead Arrangers associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Facilities Documentation and any amendment, modification or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of one primary counsel (together with the reasonable and documented fees, disbursements and other charges incurred by Milbank LLP incurred prior to May 1, 2022 (which, for the avoidance of doubt, are reasonable and documented and invoiced in | Exhibit A – Page 25<br><br>Fee Letter – Page 3-4 |

| | | |
|---|---|---|
| | accordance with the procedures set forth in the final DIP Order)), one regulatory counsel, one special bankruptcy counsel and one additional local counsel in each applicable jurisdiction) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent, the Issuing Lenders and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel) in connection with the enforcement of the Credit Facilities Documentation.<br><br>Subject in certain cases to certain increases or other adjustments (including adjustments to take into account any applicable original issue discount) based on market conditions.<br><br><u>Fees</u>:<br><br>1. A bridge commitment fee of **REDACTED*** of the aggregate principal amount of commitments, payable on the closing date.<br><br>2. A funding fee of **REDACTED*** of the aggregate principal amount of the commitments actually funded at closing.<br><br>3. A rollover fee of **REDACTED*** of the aggregate principal amount of the loans outstanding on the first anniversary of the closing date.<br><br>4. Only in the event the bridge to 7Y facility is funded, an administration fee of **REDACTED*** paid to JPM in its capacity as administrative agent of the bridge to 7Y facility. | |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10)<br><br>(includes amendment to Tranche A Facility Scheduled Maturity Date) | Scheduled Maturity Date: One year from the closing date; provided, however, that if the Conversion Date does not occur on or prior to December 1, 2023, the maturity date shall be December 1, 2023.<br><br>Rollover: Notwithstanding the foregoing, subject to certain conditions precedent, on the first anniversary from the closing date, any loans | Exhibit C - page 2 |

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

| | | |
|---|---|---|
| | under the Bridge to 7Y Notes Facility Proposal that have not been previously repaid will be automatically converted into a senior secured term loan due on the date that is five years after the closing date; provided, however, that if the Conversion Date does not occur on or prior to December 1, 2023, this extended maturity date shall be December 1, 2023. | |
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | None. | Exhibit C - page 6 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | The 7Y Bridge Facility Documentation will contain only the following events of default (subject to the 7Y Documentation Principles): nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period of five business days; material inaccuracy of representations and warranties (subject to a 10 business day grace period following the earlier to occur of (x) the responsible officer of the applicable Borrower having actual knowledge about the default and (y) the applicable Borrower receiving a notice from the 7Y Administrative Agent with respect to the occurrence of such default); the 7Y Bridge Facility Documentation ceasing to be in full force and effect or any Borrower party thereto so asserting; the Final DIP Order remaining in full force and effect; violation of covenants (subject, in the case of certain customary affirmative covenants, to a grace period of 30 days; (from and after the Exit Conversion Date) cross-acceleration and cross-payment default with respect to material indebtedness; bankruptcy events (from and after the Closing Date); certain ERISA and employment events; material judgments; actual or asserted invalidity of security documents representing a material portion of the Collateral; and a change of control (to be defined in a manner to be agreed). | Exhibit C - page 6-7 |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | None. | |

| | | |
|---|---|---|
| **Indemnification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | The Administrative Agent, the Lead Arrangers, the Issuing Lenders and the Lenders (and their affiliates and their respective officers, Related Parties) (each, an "***Indemnified Person***") will have no liability for, and will be indemnified and held harmless against, any loss, liability, claims (including intraparty claims), demands, damages, cost or expense (collectively, "***Liabilities***") incurred in connection with or as a result of (i) the execution and delivery of the Credit Facilities Documentation and any agreement or instrument contemplated thereby; (ii) the performance by the Indemnified Persons of their obligations under the Credit Facilities Documentation or the consummation of the transactions contemplated thereby, (iii) the funding of the Credit Facilities, issuance of letter of credits thereunder, or the use or the proposed use of proceeds thereof, and (iv) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "***Proceeding***") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by any Borrower, its affiliates or equity holders or any other party (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Credit Facilities Documentation in performing its activities or in furnishing its commitments or services under the Credit Facilities Documentation or (z) disputes among Lenders not arising from a Borrower's breach of its obligations under the Credit Facilities Documentation (other than a dispute involving a claim against an Indemnified Person for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of any Credit Facility, except, with respect to this clause (z), to the extent such acts or omissions are | Exhibit A – Pages 26-27 |

| | | |
|---|---|---|
| | determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnified Person in such capacity)).<br><br>The parties herein (and their affiliates and their respective Related Parties) shall not have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by the parties hereto, their affiliates or any of their subsidiaries arising out of, in connection with, or as a result of, the Credit Facilities or the Credit Facilities Documentation. | |
| **Provisions Elevating Prepetition Debt to Administrative Expense (or Higher) Status**<br><br>Local Rule 4001 - 2(a)(6) | None. | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>Local Rule 4001- 2(a)(7) | None. | |
| **Priming Liens and Adequate Protection**<br><br>Local Rule 4001-2(a)(4) | None. | |
| **Change in Control Provisions**<br><br>Local Rule 4001-2(a)(11) | Consistent with the Exchange Notes Documentation Principles, the Issuer will be required to make an offer to repurchase the 7Y Senior Secured Exchange Notes following the occurrence of a "change of control" (to be defined in a manner consistent with the 7Y Exchange Notes Documentation Principles) at a price in cash equal to 101% of the outstanding principal amount thereof, plus accrued and unpaid interest to, but not including, the date of repurchase. | Exhibit C, Annex C-III page 3-4 |

| | | |
|---|---|---|
| **Prepayment Penalty**<br><br>Local Rule 4001-2(a)(13) | No prepayment penalties. | Exhibit C -<br>page 4 |
| **Joint Liability of the Debtors**<br>Local Rule 4001-2(a)(14) | None. | |
| **Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(15) | To be agreed in the DTE/DIP Loan Documents. | |
| **Limitations on Certain Powers**<br><br>Local Rule 4001-2(a)(8) | The DTE/DIP Term Sheets, the DTE/DIP Loan Documents and the provisions of the DTE/DIP Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DTE/DIP Secured Parties, the Creditors' Committee, any other committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties. | DTE/DIP<br>Final Order,<br>¶ 31 |
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors forever and irrevocably (i) release, discharge, and acquit the DIP Secured Parties including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have, arising from any actions of the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their | DTE/DIP<br>Final Order,<br>¶ 34 |

| | capacities as such, pursuant to the terms of the DTE/DIP Final Order and any other DTE/DIP Loan Documents including any equitable subordination claims, relating to any aspect of the relationship between the DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and the Debtors, including any equitable subordination claims or defenses, with respect to or relating to the DTE/DIP Loans, the DTE/DIP Obligations, the DTE/DIP Loan Documents, the Debtors' attempts to restructure the DTE/DIP Loans, consent to the terms of the DTE/DIP Final Order and the use of the DTE/DIP Commitments hereunder, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DIP Secured Parties, including the DTE/DIP Agents or the DTE/DIP Lenders, solely in their capacities as such; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DTE/DIP Obligations; *provided* that such release shall not apply to any claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful misconduct or gross negligence of the Releasees. | |

**Junior DIP Facility**

| SUMMARY OF MATERIAL TERMS OF THE JUNIOR DIP FACILITY | | |
|---|---|---|
| **Summary of Materials Terms of the Junior DIP Facility[23]** | | |
| *Except as set forth below, the material terms and conditions of the Junior DIP Facility shall be substantially similar to the material terms and conditions of the Term Loan B Facility.* | | |
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | LATAM Airlines Group S.A. | Junior DIP Facility Term Sheet; definition of Borrower. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Same as in the Existing DIP Credit Agreement (the Borrower along with the Guarantors, the "Obligors") | Junior DIP Facility Term Sheet; definition of Guarantors. |
| **Lenders** 4001(c)(1)(B) | The Commitment Parties for the Junior DIP Facility are the entities set forth on Schedule I to the Junior DIP Commitment Letter. On the closing date for the Junior DIP Facility, the Junior DIP Commitment Letter contemplates that the Commitment Parties shall become the lenders under the Junior DIP Facility (in such capacity, the "Junior DIP Lenders"). | Junior DIP Commitment Letter; Schedule I. |
| **DIP Agents** Bankruptcy Rule 4001(c)(1)(B) | JPMorgan Chase Bank, N.A., as Administrative Agent. The Collateral Trustee, as Collateral Agent. | Junior DIP Facility Term Sheet; definition of Administrative Agent and Collateral Agent. |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B), | The aggregate principal amount of the Junior DIP Facility shall be $1,172,882,484 (comprised of $24,885,093 funded in cash and up to $1,147,997,391 funded on a cashless basis | Junior DIP Facility Term Sheet; Junior |

---

[23]     For the avoidance of doubt, the terms and conditions set forth herein are intended to be a convenience summary only and are subject to and qualified in all respects by the terms and conditions specified in the Junior DIP Commitment Letter and the definitive documentation relating to the Junior DIP Facility and the corresponding provisions of the Final DIP Order. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the Junior DIP Commitment Letter and the DTE/DIP Final Order, as applicable.

| | | |
|---|---|---|
| Local Rule 4001-2(a)(1) | through the deemed extension of loans outstanding under the Tranche C Facility (as defined in the Existing DIP Credit Agreement) on the Closing Date)[24] | DIP Facility definition. |
| **Interest Rate** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | At LATAM's election, either (i) the ABR plus 12.5% or (ii) the Term SOFR Rate plus 13.5%. The interest period for Term SOFR shall be 1, 3 or 6 months at the Borrower's election. | Junior DIP Facility Term Sheet; Annex A-1. |
| **Collateral** Bankruptcy Rule 4001(c)(1)(B)(i) | The collateral (the "Collateral") securing the Junior DIP Facility includes those assets of the Loan Parties pledged to secure the A&R DIP Facility consistent with the Existing DIP Credit Agreement and the A&R DIP Order (as defined in the Existing DIP Credit Agreement), the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law. In addition, Collateral shall include any other property or asset that secures the DTE Facilities (and any Senior Secured Notes, as applicable) and shall include second or junior liens in such property or assets securing the DTE Facilities. The "Existing RCF Facility" shall mean that certain Credit and Guaranty Agreement, dated as of March 29, 2016 among LATAM, the guarantors party thereto, the lenders party thereto, Citibank, N.A., as administrative agent and the other parties thereto, as amended from time to time. The "Existing Spare Engine Facility" shall mean that certain amended and restated loan agreement, dated as of June 29, 2018, among LATAM acting through its Florida branch, as borrower, the lenders party thereto and Crédit Agricole Corporate and Investment Bank, as amended from time to time. | Junior DIP Facility Term Sheet; definition of Collateral. |

---

[24]    The aggregate amount of commitments funded on a cashless basis through a deemed extension of loans under the Tranche C Facility (as defined in the Existing DIP Credit Agreement) is to be adjusted to reflect the outstanding amount of such loans under the Tranche C Facility on the Closing Date.

| | All obligations under the Junior DIP Facility shall, upon the entry of, and subject to, the DTE/DIP Final Order and subject to the Carve-Out (as defined in the DTE/DIP Final Order), constitute superpriority administrative expense claims against each of the Loan Parties, with priority over all other administrative expense claims except for those with respect to the DTE Facilities (as defined below) and any Senior Secured Notes (as defined below), as applicable. | Junior DIP Facility Term Sheet; priority. |
|---|---|---|
| **Superpriority Claim** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | All obligations of the Loan Parties with respect to the Junior DIP Facility shall be secured on a junior basis with respect to the DTE Facilities (and any Senior Secured Notes, as applicable) upon entry of, and subject to, the DTE/DIP Final Order and subject to the Carve-Out (as defined in the DTE/DIP Final Order) pursuant to the priorities set forth in the Intercreditor Terms set forth on **Exhibit C** to the Commitment Letter and, in the case of any other property or assets that secure the DTE Facilities (and any Senior Secured Notes, as applicable), including second or junior liens in such property or assets securing the DTE Facilities. The liens and security interests (the "***Junior DIP Liens***") securing such obligations shall, pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully perfected junior priority security interest in and lien on the Collateral and any other property or assets that secure the DTE Facilities (and any Senior Secured Notes, as applicable), subject to the Permitted Priority Liens (as defined in the DTE/DIP Final Order), DTE Liens (as defined in the Intercreditor Terms), the liens in collateral securing the Existing RCF Facility or the Existing Spare Engine Facility and the Carve-Out (as defined in the A&R DIP Order). | |
| | "DTE Facilities" means, collectively (i) the $750,000,000 Debtor-In-Possession and Exit Term Loan B Facility (the "Term Loan B Facility"), (ii) the $500,000,000 Debtor-In-Possession and Exit Revolving Facility (the "Revolving Facility"; together with the Term Loan B Facility, the "Credit Facilities"), (iii) the $750,000,000 Debtor-In-Possession and Exit Bridge-to-5Y Notes Facility | |

| | | |
|---|---|---|
| | (the "Bridge to 5Y Notes Facility") and (iv) the $750,000,000 Debtor-In-Possession and Exit Bridge-to-7Y Notes Facility (the "Bridge to 7Y Notes Facility" together with the Bridge to 5Y Notes Facility, the "Bridge Facilities").[25]<br><br>"Senior Secured Notes" means up to $750,000,000 in aggregate principal amount of senior secured 5 year notes and up to $750,000,000 in aggregate principal amount of senior secured 7 year notes that the Borrower intends to issue in lieu of, or to replace, borrowings under the Bridge Facilities. | |
| **Use of DIP Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B) | The proceeds of the Junior DIP Facility will be used by the Borrower on the Closing Date to repay a portion of the Existing DIP Credit Agreement and to pay related fees and expenses | Junior DIP Facility Term Sheet; use of proceeds. |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(3); Local Rule 4001-2(a)(16) | **Expenses**<br><br>Subject to the limitations set forth in Section 5 of the Junior DIP Commitment Letter, the Borrower shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lead Arranger and the Lenders associated with the preparation, execution, delivery and administration of the Junior DIP Facility Documentation and any amendment, modification or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of counsels to the Administrative Agent and/or the Lenders to the extent provided for in the Existing DIP Credit Agreement) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel) in connection with the enforcement of the Junior DIP Facility Documentation.<br><br>**Fees**<br><br>Junior DIP Make-Whole | Junior DIP Facility Term Sheet; Expenses. Junior DIP Commitment Letter; Section 5. Agent Fee Letter. |

---

[25]    For the avoidance of doubt, the individual principal amounts of the Term Loan B Facility, Bridge to 5Y Notes Facility and Bridge to 5Y Notes Facility may change, provided that the aggregate principal amount of such facilities is $2.25 billion.

| | | |
|---|---|---|
| | Upon any payment, repayment or prepayment of any Junior DIP Facility Loans before the Junior DIP Facility Make-Whole Date, the Borrower shall pay interest at the in kind rate (i.e., Term SOFR plus 13.5%) on such Junior DIP Loans that would otherwise be payable from and after the date of such payment, repayment or prepayment through and including the Junior DIP Make-Whole Date. "<u>Junior DIP Make-Whole Date</u>" means October 14, 2022.<br><br><u>Administrative Agent Fee</u><br><br>The Borrower shall pay the Administrative Agent a monthly administration fee in an amount equal to **REDACTED\*** which fees will be payable on the Closing Date and monthly in advance on each anniversary thereof prior to the maturity or early termination of the Junior DIP Facility. | |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | The earlier of (a) December 1, 2023 or (b) the date LATAM emerges from the Chapter 11 Cases. | Junior DIP Facility Term Sheet, definition of Maturity Date. |
| **Financial Covenants**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | None | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(10) | Same as the Existing DIP Credit Agreement and any additional events of default included in the DTE Facilities (or the Senior Secured Notes, as applicable) shall be included. | Junior DIP Facility Term Sheet; events of default. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | None | |
| **Carve Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii)'<br>Local Rule 4001-2(a)(5) | Notwithstanding anything to the contrary in the DTE/DIP Final Order, the Obligors' obligations to the Junior DIP Lenders shall be subject in all respects and subordinate to the Carve Out.<br><br>"<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section | DTE/DIP Final Order, ¶ 11. |

**\* All text marked "REDACTED\*" is Redacted Per Amended Standing Order Regarding Redaction Dated February 2, 2021.**

1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) incurred by persons or firms retained by the Obligors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals" and such fees the "Allowed Debtor Professional Fees") at any time before or on the first business day following delivery by the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) incurred by persons or firms retained by the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and together with the Debtor Professionals, the "Professional Persons" and such fees the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), of a Carve Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; (v) Allowed Debtor Professional Fees incurred after the first business day following delivery by the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the

Collateral Trust and Intercreditor Agreements), of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount not to exceed $20 million and (vi) Allowed Committee Professional Fees incurred after the first business day following delivery by the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an amount not to exceed $1.5 million (the amounts set forth in clauses (v) and (vi) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), to the Obligors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DTE/DIP Obligations, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Carve Out Account and Carve Out Reserves.  Upon entry of the Tranche A/C Final DIP Order, the Obligors established and funded a segregated account (the "Carve Out Account") for purposes of funding the Carve Out.  Notwithstanding anything to the contrary in the Tranche A/C Final DIP Order, the Tranche B Final DIP Order, the A&R DIP Order or the DTE/DIP Final Order, any other DTE/DIP Loan Documents, or the Prepetition Secured Credit Documents, under no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DTE/DIP Loan Documents) shall the Obligors be prohibited in any way from accessing or drawing upon their main operating account for the purpose of funding the Carve Out Account.  As provided in the Tranche A/C Final DIP Order,

commencing upon the earlier of (A) the first last day of the month or (B) the first 15th day of the month, in each case after the Closing Date, the Obligors shall deposit in the Carve Out Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following two-week period in the DIP Budget plus twenty percent (20%) of such aggregate amount of Allowed Professional Fees projected to accrue in the next two week period in the DIP Budget (the "Bi-Weekly Funded Reserve Amount").  Each Professional Person shall deliver to the Obligors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding two-week period (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Bi-Weekly Funded Reserve Amount for the applicable periods, respectively, and such fees and expenses have otherwise not been paid by the Obligors, the Obligors shall, within one business day, fund additional amounts into the Carve Out Account equal to the difference between the Bi-Weekly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").  At any time, if the Obligors in good faith believe a restructuring, sale, financing, or other success fee previously approved by the Court has been earned by a Professional Person and is then due and payable, the Obligors shall deposit in the Carve Out Account an amount equal to such fee.  The Carve Out Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Carve Out Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Secured Credit Documents or DTE/DIP Loan Documents and neither the Prepetition Secured Parties nor the DTE/DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Secured Credit

Documents or DTE/DIP Loan Documents. Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Carve Out Account.

On the day on which a Carve Out Trigger Notice is delivered by the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), to the Obligors in accordance with paragraph 10 of the DTE/DIP Final Order, with a copy to counsel to the Creditors' Committee and the U.S. Trustee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Obligors to utilize all cash on hand as of such date and any available cash thereafter held by any Obligors, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; provided that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Obligors that cover such Professional Person's good faith estimate of the Allowed Professional Fees incurred through the Termination Declaration Date, and the Obligors shall fund into the Funded Reserve Amount any Top Off Amounts. The Obligors shall deposit and hold such amounts in the Carve Out Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Obligors to utilize all cash on hand as of such date and any available cash thereafter held by any Obligor, including cash collateral, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the DTE/DIP Final Order as set forth above). The Obligors shall deposit and hold such amounts in a segregated account at an institution designated by

the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iv) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), in accordance with their pro rata funding of the Carve Out Reserves. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (v) and (vi) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), and all commitments under the DTE/DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth herein. Notwithstanding anything to the contrary in the DTE/DIP Term Sheets, DTE/DIP Loan Documents, or the DTE/DIP Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 12, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 12 prior to making any payments

to the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), and the Prepetition Secured Parties, as applicable.

Notwithstanding anything to the contrary in the DTE/DIP Term Sheets, DTE/DIP Loan Documents or the DTE/DIP Final Order, following delivery of a Carve Out Trigger Notice, the DTE Collateral Agent, in accordance with the DTE/DIP Loan Documents (including the Collateral Trust and Intercreditor Agreements), shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Obligors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DTE Collateral Agent for application in accordance with the DTE/DIP Loan Documents.  Further, notwithstanding anything to the contrary in the DTE/DIP Final Order, (i) disbursements by the Obligors from the Carve Out Account shall not constitute DTE/DIP Loans or increase or reduce the DTE/DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Approved DIP Budget, any subsequent DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Obligors. For the avoidance of doubt and notwithstanding anything to the contrary in the DTE/DIP Final Order, the DTE/DIP Term Sheets, the DTE/DIP Loan Documents, or in any Prepetition Secured Credit Documents, the Carve Out as provided for and capped by the DTE/DIP Final Order shall be senior to all liens and claims securing the DTE/DIP Commitments, the Permitted Priority Liens, and the DTE/DIP Superpriority Claims, and any and all other forms of liens, or claims securing the DTE/DIP Obligations, or the Prepetition Secured Credit Documents. Notwithstanding the foregoing,

|  | the DTE/DIP Lenders, reserve all of their rights to challenge or otherwise object to any of the fees or expenses sought to be approved by any of the Professional Persons. |  |
|  | *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Carve Out Account. |  |
|  | *No Direct Obligation To Pay Allowed Professional Fees*. The DTE/DIP Secured Parties, including the DTE/DIP Agents and DTE/DIP Lenders, shall not be responsible for the payment of reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in the DTE/DIP Final Order or otherwise shall be construed to obligate the DTE/DIP Secured Parties, including the DTE/DIP Agents and DTE/DIP Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Obligors have sufficient funds to pay such compensation or reimbursement. |  |
|  | *Payment of Carve Out On or After the Termination Declaration Date*. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. |  |
| **Entities with Interest in Cash Collateral** Bankruptcy Rule 4001(b) | Citi Bank N.A. has asserted approximately $3.7 million as cash collateral for the RCF Facility. | Interim Cash Management Order, ECF No. 49, ¶6. |
| **Waivers/ Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | To the extent not already provided for herein, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary for the relevant parties to | DTE/DIP Final Order, ¶ 39. |

| | effectuate all of the terms and provisions of the DTE/DIP Final Order. | |
|---|---|---|
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Administrative Agent and the Lenders (and their affiliates and their respective officers, Related Parties) (each, an "<u>Indemnified Person</u>") will have no liability for, and will be indemnified and held harmless against, any loss, liability, claims (including intraparty claims), demands, damages, cost or expense (collectively, "<u>Liabilities</u>") incurred in connection with or as a result of (i) the execution and delivery of the Junior DIP Facility Documentation and any agreement or instrument contemplated thereby; (ii) the performance by the Indemnified Persons of their obligations under the Junior DIP Facility Documentation or the consummation of the transactions contemplated thereby, (iii) the funding of the Junior DIP Facility, issuance of letter of credits thereunder, or the use or the proposed use of proceeds thereof, and (iv) any actual or prospective claim, litigation, investigation, arbitration or administrative, judicial or regulatory action or proceeding (each, a "<u>Proceeding</u>") in any jurisdiction relating to any of the foregoing (including in relation to enforcing the terms of the limitation of liability and indemnification referred to above), regardless of whether or not any Indemnified Person is a party thereto and whether or not such Proceeding is brought by the Borrower, its affiliates or equity holders or any other party (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Junior DIP Facility Documentation in performing its activities or in furnishing its commitments or services under the Junior DIP Facility Documentation or (z) disputes among Lenders not arising from the Borrower's breach of its obligations under the Junior DIP Facility Documentation (other than a dispute involving a claim against an Indemnified Person for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of the Junior DIP Facility, except, with respect to this clause (z), to the extent such acts or omissions are | Junior DIP Facility Term Sheet; indemnity. |

| | determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such Indemnified Person in such capacity)). The parties herein (and their affiliates and their respective Related Parties) shall not have any Liabilities, on any theory of liability, for any special, indirect, consequential or punitive damages incurred by the parties hereto, their affiliates or any of their subsidiaries arising out of, in connection with, or as a result of, the Junior DIP Facility or the Junior DIP Facility Documentation. | |
|---|---|---|
| **Provisions Elevating Prepetition Debt to Administrative Expense (or Higher) Status** <br><br> Local Rule 4001 - 2(a)(6) | None | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** <br><br> Local Rule 4001- 2(a)(7) | None | |
| **Priming Liens and Adequate Protection** <br><br> Local Rule 4001- 2(a)(4) | None | |
| **Change in Control Provisions** <br><br> Local Rule 4001- 2(a)(11) | Same as in the Existing DIP Credit Agreement. | Junior DIP Facility Term Sheet; events of default |
| **Prepayment Penalty** | Before October 14, 2022, subject to the Junior DIP Make-Whole Amount. | Junior DIP Facility Term |

| | | |
|---|---|---|
| Local Rule 4001-2(a)(13) | | Sheet; Annex A-1 |
| **Joint Liability of the Debtors**<br>Local Rule 4001-2(a)(14) | The DIP Obligations shall constitute allowed superpriority administrative expense claims against the Obligors on a joint and several basis. | Junior DIP Facility Term Sheet; Junior DIP Facility |
| **Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(15) | To be agreed in the Junior DIP docuemnts | |
| **Limitations on Certain Powers**<br><br>Local Rule 4001-2(a)(8) | The DTE/DIP Term Sheets, the DTE/DIP Loan Documents and the provisions of the DTE/DIP Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DTE/DIP Secured Parties, the Creditors' Committee, any other committee appointed in these Chapter 11 Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties.  In determining to make the DTE/DIP Loans (whether under the DTE/DIP Term Sheets, the Commitment Letters, a promissory note or otherwise), or in exercising any rights or remedies as and when permitted pursuant to the DTE/DIP Final Order, or the DTE/DIP Loan Documents, the DTE/DIP Secured Parties, including the DTE/DIP Agents, solely in their capacity as agents under the DTE/DIP Facilities, the DTE/DIP Lenders, solely in their capacity as lenders under the DTE/DIP Facilities, shall not (i) be deemed to be in control of the Debtors or the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates. | DTE/DIP Final Order, ¶ 31 |
| **Limitations on Lender's** | No borrowings, DTE/DIP Collateral, Cash Collateral, portion of the proceeds of the DTE/DIP Facilities or the Carve Out may be used for any of | DTE/DIP Final Order, ¶ 26 |

| | | |
|---|---|---|
| **Obligation to Fund Certain Activities**<br><br>Local Rule 4001-2(a)(9) | the following (each, a "Lender Claim") without the prior written consent of each affected party: (a) to investigate, challenge, object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under any DTE/DIP Loan Document, or the liens or claims granted under the DTE/DIP Final Order or any other DTE/DIP Loan Document, (b) to assert any claim or cause of action against any DTE/DIP Secured Party, including the DTE/DIP Agents or any DTE/DIP Lender, or any of their respective agents, affiliates, representatives, attorneys or advisors, (c) to prevent, hinder or otherwise delay the DTE/DIP Secured Parties' including the DTE/DIP Agent's or any DTE/DIP Lender's, enforcement of their respective rights under the DTE/DIP Final Order or any other DTE/DIP Loan Documents, including the enforcement or realization on the DTE/DIP Collateral in accordance with the DTE/DIP Final Order or the other DTE/DIP Loan Documents, or (d) to seek to modify any of the rights granted to the DTE/DIP Secured Parties, including the DTE/DIP Agents, or the DTE/DIP Lenders, hereunder, under the DTE/DIP Final Order or under any other DTE/DIP Loan Documents. | |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DTE/DIP Collateral, or the Cash Collateral pursuant to Bankruptcy Code section 506(c) or any similar principle of law without the prior written consent of the DTE/DIP Agents, and no such consent shall be implied from any other action, inaction, or acquiescence by the DTE/DIP Secured Parties. | DTE/DIP Final Order, ¶ 21 |
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Debtors forever and irrevocably (i) release, discharge, and acquit the DTE/DIP Secured Parties including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, | DTE/DIP Final Order, ¶ 34 |

| | accountants, attorneys, affiliates, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have, arising from any actions of the DTE/DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, pursuant to the terms of the DTE/DIP Final Order and any other DTE/DIP Loan Documents including any equitable subordination claims, relating to any aspect of the relationship between the DTE/DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP Lenders, solely in their capacities as such, and the Debtors, including any equitable subordination claims or defenses, with respect to or relating to the DTE/DIP Loans, the DTE/DIP Obligations, the DTE/DIP Loan Documents, the Debtors' attempts to restructure the DTE/DIP Loans, consent to the terms of the DTE/DIP Final Order and the use of the DTE/DIP Commitments hereunder, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the DTE/DIP Secured Parties, including the DTE/DIP Agents or the DTE/DIP Lenders, solely in their capacities as such; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DTE/DIP Obligations; *provided* that such release shall not apply to any claims, liabilities, remedies, causes of action, indebtedness, and obligations arising from the willful misconduct or gross negligence of the Releasees. | |
|---|---|---|
| **Section 552(b)(1) Waiver** | In light of their agreement to subordinate their liens and superpriority claims to the Carve Out, the DTE/DIP Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and, further, the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the DTE/DIP Secured Parties, including the DTE/DIP Agents and the DTE/DIP | DTE/DIP Final Order, ¶ 22 |

| | Lenders with respect to the proceeds, products, offspring, or profits of any of their collateral. | |
|---|---|---|

## PREPETITION INDEBTEDNESS

19.    A description of the Debtors' capital structure is set forth in the First Day Declaration.  As explained in the First Day Declaration, as of the Initial Petition Date, LATAM had a total of $7.57 billion in financial debt obligations, $457 million of which is contracted by entities that were non-Debtor affiliates at the time but are now Subsequent Debtors.  A description of the Subsequent Debtors' capital structure is set forth in the Supplemental Declaration.

## NEED FOR DIP AND DIP-TO-EXIT FINANCING

20.    On the Initial Petition Date, in part due to the liquidity preserving measures described in the First Day Declaration, LATAM had approximately $1.35 billion in cash and cash equivalents, which included cash and cash equivalents held by the Subsequent Debtors, which at that time had not filed for formal relief.  Since the fall of 2020, the Initial DIP Facility and the A&R DIP Facility have provided the Debtors necessary liquidity to fund their ongoing operations. Although the world has continued to reopen, LATAM's operations continue to be significantly affected by the COVID-19 pandemic, making it necessary for LATAM to continue to have access to DIP financing to support its operational and other needs during the pendency of these proceedings.  Furthermore, given the uncertainty of market conditions, it is important for the Debtors to obtain committed financing to fund their exit from the Chapter 11 Cases.  *See* Alfonsín DTE Decl. ¶ 7. The DTE/DIP Facilities accomplish both of these objectives – providing the Debtors continued access to liquidity for the duration of these proceedings and the exit financing necessary to effectuate the Plan.  *See* Alfonsín DTE Decl. ¶ 7-8,10.

21.    Given the need to preserve liquidity and eliminate uncertainty around exit financing, after a robust marketing effort (detailed below), the Debtors have determined, in an

86

exercise of their sound business judgment, that obtaining funding through the DTE/DIP Facilities, which will provide continuing liquidity through the date of the Debtors' expected emergence from these Chapter 11 Cases as well as committed exit financing, is in the best interests of the Debtors and their estates. *See* Alfonsín DTE Decl. ¶ 10.

## **EFFORTS TO OBTAIN DIP AND DIP-TO-EXIT FINANCING**

22.      The Debtors' early efforts to obtain postpetition financing are detailed in the *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief*, ECF No. 397, the *Debtors' Supplemental Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Superiority Administrative Expense Claims and (II) Granting Related Relief*, ECF. No. 485, and the *Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain Tranche B Postpetition Financing and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief*, ECF No. 3243 (together, the "Initial DIP Motions"), which are incorporated herein by reference. As discussed in the Initial DIP Motions, the Debtors' efforts first culminated in the Initial Tranche C Facility, then the Tranche A Facility and finally the Tranche B Facility.

23.      The Debtors' later efforts to obtain postpetition financing are detailed in the Initial A&R DIP Motion, the A&R DIP Supplement, and the Additional A&R DIP Supplement, incorporated herein by reference. As discussed in the A&R DIP Motion, these efforts culminated in the A&R DIP Facility, consisting of the Replacement Tranche A Facility and the Replacement Tranche C Facility, which matures on October 14, 2022.

24.      In view of an anticipated emergence from bankruptcy in the second half of 2022, in December 2021, the Debtors, along with their advisors, launched a comprehensive, competitive process to obtain exit financing. During that process, LATAM, through its advisors,

reached out to more than 30 parties spanning both existing and third-party lenders, including banks, direct lenders, alternative investment managers and other financial institutions, either directly or through their financial advisors, to solicit potential interest in providing debt financing to fund the Debtors' emergence from bankruptcy. This process involved six bidding rounds for DIP-to-exit facilities, with later rounds involving more specific negotiations around the key terms of the exit financing. *See* Herlihy DTE Decl. ¶ 10.

25.    The Debtors received multiple proposals from various parties, including both economic terms as well as structural terms for the exit financing, for each of the six bidding rounds, subject to various terms and conditions. As described further in the Herlihy DTE Declaration, PJT Partners LP ("PJT") and Cleary Gottlieb Steen & Hamilton LLP ("Cleary") evaluated these proposals and further negotiated with each of these parties in an effort to improve each of these proposals. *See* Herlihy DTE Decl. ¶ 10, 12.

26.    In addition, certain lenders that extended financing in the Replacement Tranche C Facility of the A&R DIP Facility have agreed to continue to roll their funded Replacement Tranche C Facility loans and unfunded Replacement Tranche C Facility commitments into the Junior DIP Facility on no worse terms than the Replacement Tranche C Facility. In doing so, they agreed to continue to extend DIP financing that would be subordinate in payment and lien priority to the DTE Facilities, and with an extended maturity date of December 1, 2023. *See id.* at ¶ 11.

27.    Based on the indications of interest received, and their subsequent discussions and negotiations with various parties, the Debtors have concluded that it is in their best interests to obtain approval of the DTE/DIP Facilities. Together, the DTE/DIP Facilities will allow the Debtors to repay the existing A&R DIP Facility in full and provide up to $3.923 billion in

financing, and obtain liquidity for the Debtors throughout the remainder of the Chapter 11 Cases. Furthermore, upon the effective date of the Plan, the DTE Facilities will convert into exit financing, providing continued committed financing through the Debtors' exit from bankruptcy. *See id.* at ¶ 12.

28.    The Debtors' efforts to seek the necessary postpetition financing from sources outside and within the Debtors' existing capital structure were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.  Following these good faith efforts, the Debtors also reasonably concluded that postpetition financing was not available on an unsecured basis, due in part to the continued negative impact of the COVID-19 pandemic and in light of the general current capital market conditions.  As set forth above and in the Herlihy DTE Declaration, given the Debtors' outreach to various stakeholders as well as to various third parties in an attempt to obtain financing, the Debtors have a clear understanding of the current availability of postpetition financing. *See id.* ¶ 12-14.

29.    None of the proposals that the Debtors received from interested parties contemplated a fully unsecured facility,[26] and the Debtors reasonably determined, with the assistance of PJT, that it was futile to pursue such financing from the market at large, given these experiences and their analysis of the Debtors' assets, and that the Initial Tranche Facilities and the A&R DIP Facility are structured as secured loans. *See Id.* at ¶ 13.  The Debtors therefore made appropriate and sufficient efforts to confirm that postpetition financing is not available on an unsecured basis.

---

[26]    Although one proposal received by the Debtors potentially contemplated a partially unsecured notes facility, the Debtors did not receive a proposal that contemplated a wholly unsecured facility, and determined that the DTE/DIP Facilities provided better terms for financing. *See* Herlihy DTE Decl. ¶ 13.

## DIP-TO-EXIT FINANCING

30.    The terms of the DTE/DIP Facilities are summarized above in the section of this Motion entitled Concise Statements Regarding DIP and DIP-to-Exit Financing Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2.  This section of the Motion highlights certain specific elements of the DTE/DIP Facilities and the attendant documents.

31.    <u>DTE/DIP Liens and Superpriority Claims</u>. The DTE/DIP Loan Documents contemplate that, as security for the obligations incurred under each of the Revolving Facility, the Term Loan B Facility, the 5Y Bridge Facility/Notes, the 7Y Bridge Facility/Notes and the Junior DIP Facility, the DTE/DIP Lenders shall be granted security interests and liens on the DTE/DIP Collateral (respectively, the "<u>Revolving Facility Liens</u>," the "<u>Term Loan B Facility Liens</u>," the "<u>Bridge to 5Y Notes Facility Liens</u>," the "<u>Bridge to 7Y Notes Facility Liens</u>" and the "<u>Junior DIP Facility Liens</u>," and collectively, the "<u>DTE/DIP Liens</u>").  The Revolving Facility Liens, the Term Loan B Facility Liens, the Bridge to 5Y Notes Facility Liens and the Bridge to 7Y Notes Facility Liens (collectively, the "<u>DTE Liens</u>") shall be *pari passu* with each other, provided that the Revolving Obligations will be satisfied on a "first out" basis.  The Junior DIP Facility Liens shall be junior to the DTE Liens.  The DTE/DIP Liens shall consist of the following security interests and liens granted by the Debtors to the DTE/DIP Lenders, subject to the priority set forth in the DTE/DIP Final Order, and, in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve Out (all such liens and security interests granted for the benefit of the DTE/DIP Lenders), in accordance with the DTE/DIP Term Sheets and pursuant to the DTE/DIP Loan Documents: (i) valid, binding, enforceable, non-avoidable and fully-perfected senior security interests in and continuing liens on all of the Obligors' rights, title and interests in all of its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold

interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, business interruption insurance, supporting obligations and proceeds of all of the foregoing, including, for the avoidance of doubt, any spare engines, routes, slots and gates, equity in subsidiaries and intellectual property (the "Previously Unencumbered Collateral"), and (ii) valid, binding, enforceable, non-avoidable and fully-perfected security interests in and continuing liens on all of the Obligors' rights, title and interests in all of its property, whether now existing or hereafter acquired, including, for the avoidance of doubt, any spare engines, routes, slots and gates, equity in subsidiaries and intellectual property (the "Previously Encumbered Collateral"), which security interests and liens in favor of the DTE/DIP Lenders are junior to such valid, perfected and unavoidable liens.  In addition, all of the Debtors' cash, including any cash in deposit accounts, where ever located as original collateral or proceeds of other DTE/DIP Collateral, constitutes cash collateral of the DTE/DIP Lenders.  Notwithstanding anything to the contrary herein or in the DTE/DIP Loan Documents, the DTE/DIP Collateral and the DTE/DIP Liens shall not include the Excluded Assets (as defined in the DTE/DIP Final Order).

32.    In addition, pursuant to Bankruptcy Code section 364(c)(1), all of the obligations under the DTE/DIP Loan Documents shall constitute allowed senior administrative expense claims against each of the Obligors (the "DTE/DIP Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising

under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent specifically provided for herein; *provided, however*, that the DTE/DIP Superpriority Claims shall not include, and thus shall expressly exclude, the Obligors' claims and Causes of Action arising under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code or any other similar state or federal law, if any (collectively, the "Excluded Avoidance Actions"), which Excluded Avoidance Actions shall be preserved and addressed in connection with a chapter 11 plan and at no time prior thereto; provided, further that the DTE/DIP Superpriority Claims shall have recourse to all proceeds of such Excluded Avoidance Actions (the "Avoidance Proceeds"); *provided, further*, that the DTE/DIP Superpriority Claims shall be subject to the following priority in payment (the "DIP Superpriority Claims Waterfall"): (i) first, DTE/DIP Superpriority Claims arising out of the Revolving Obligations; (ii) second, DTE/DIP Superpriority Claims arising out of the Term Loan B Obligations, the Bridge to 5Y Notes Obligations and the Bridge to 7Y Notes Obligations, on a *pari passu* basis; and (iii) third, DIP Superpriority Claims arising out of the Junior DIP Obligations.

33.    DIP Budget. To ensure that the proceeds under the DTE/DIP Facilities are used prudently, on the tenth Business Day of each calendar month, the Borrower shall deliver to the Administrative Agent an Updated DIP Budget, certified by the Chief Financial Officer with respect to the Obligors, for the current week and immediately consecutive 12 weeks set forth on a

weekly basis, in form substantially similar to the Initial Approved DIP Budget (as defined under the A&R DIP Facility, or such other form acceptable to the Majority DTE Secured Parties, the Majority Non-Controlling DTE Secured Parties and the Required Lenders). The term "DIP Budget" shall mean the most recently approved at such time: (a) 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements (the "Initial Approved DIP Budget"), and (b) updated 13-week cash flow forecast of receipts and disbursements made at the end of each four-week period for the then-remaining term of the DTE/DIP Facilities, which shall, in each case, include detailed line item receipts and expenditures, including the aggregate amount of Professional Fees and expenses for Professional Persons, together with appropriate supporting schedules and information and an explanation of any change from the DIP Budget then in effect (each, an "Updated DIP Budget"). The DIP Budget (including, for the avoidance of doubt, the Initial Approved DIP Budget and each Updated DIP Budget) shall be in form and substance acceptable to the Controlling DTE Representative, the Non-Controlling DTE Representative, the Junior Priority DIP Agent, the Majority DTE Secured Parties and the Majority Non-Controlling DTE Secured Parties, Majority Junior Priority DIP Lenders.

34.    Carve Out Account. All amounts included in the Carve Out will be senior to the DTE/DIP Liens and the DTE/DIP Superpriority Claims.

## THE RELIEF REQUESTED SHOULD BE GRANTED

**A.    Entry into the DTE/DIP Facilities Is an Exercise of the Debtors' Sound Business Judgment**

35.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into DTE/DIP Facilities, in accordance with the DTE/DIP Term Sheets, and obtain access to the financing that the DTE/DIP Lenders have committed to thereunder.

Pursuant to Section 364 of the Bankruptcy Code, a debtor is authorized to obtain secured or superpriority financing in the ordinary course of business as an administrative expense when, as here, certain conditions are met. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Consequently, a debtor has broad discretion in negotiating and entering into a postpetition secured credit agreement, as long as the agreement comports with the debtors business judgment and does not contravene the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.") (citation omitted); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment") (citation omitted).

36.     Bankruptcy courts will not challenge a debtor's decisions concerning the operation of its business when those decisions reflect a "good faith business judgment, is made on a reasonable basis, and is 'within the scope of [the trustee's] authority under the Code.'" *In re Taub*, 441 B.R. 211, 216 (Bankr. E.D.N.Y. 2010) (quotation marks and citation omitted); *See In re*

*YL West 87th Holdings I LLC,* 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing") (citations omitted). In evaluating whether the business judgment test is met, courts "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Applying this standard, "a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion*." Id.*

37.    In finding entry into the DTE/DIP Facilities represents an appropriate exercise of the Debtors' sound business judgment, the Court should consider the current market conditions. *See, e.g.,* Transcript of Record at 734 35:24 1, *In re Lyondell Chem. Co*., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing that the terms that may be available for debtor-in-possession financing during an economic downturn may not be "as desirable" as during of financial boom); *Matter of Ellingsen MacLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

38.    Further, the Court may appropriately consider the critical, non-economic benefits that the DTE/DIP Facilities have to offer to the Debtors, "such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization." *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009). This is particularly true in a bankruptcy like here, "where cooperation and

establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan." *Id.*

39.    LATAM Parent's independent directors have duly deliberated and approved of the terms and conditions of the DTE/DIP Facilities, and the Debtors' decision to enter into the DTE/DIP Facilities and obtain the commitments under the terms as described in the DTE/DIP Term Sheets is an exercise of their sound business judgment. *See* Alfonsín DTE Decl. ¶ 11.    As further discussed above and in the Herlihy DTE Declaration, the Debtors negotiated the terms of the DTE/DIP Facilities in good faith and through arm's length negotiations, and believe they have acquired the best terms possible for the DTE/DIP Facilities in the current market conditions. *See* Herlihy DTE Decl. ¶ 16.    The Debtors believe the terms of the DTE/DIP Facilities are reasonable and the facilities to be the best financial options currently available to the Debtors that will allow them to maintain their current operations and fund the Debtors' exit from these Chapter 11 Cases.

40.    The DTE/DIP Facilities are favorable for a number of reasons.    The DTE/DIP Facilities provide the Debtors with additional financing at a critical juncture in their Chapter 11 Cases and beyond.    Continued access to liquidity through the remainder of the bankruptcy is essential for the Debtors to continue their operations without any potential interruption in preparation to exit these Chapter 11 Cases. *See* Alfonsín DTE Decl. ¶ 7, 10; Herlihy DTE Decl. ¶ 8. The DTE/DIP Facilities will allow the Debtors to refinance the A&R DIP Facility, which matures on October 14, 2022, and provide continued access to debtor-in-possession financing until December 1, 2023. Furthermore, the DTE/DIP Facilities are structured to convert to exit financing upon the effective date of the Plan, and provide the liquidity necessary to fund the Debtors' post-emergence operations.    Given the significant uncertainty in global capital markets, it is in the Debtors' best interests to secure the DIP and DIP-to-exit financing on the

currently negotiated terms rather than seek additional financing closer to their emergence from these Chapter 11 Cases. *See* Herlihy DTE Decl. ¶ 7, 12.

41.    In negotiating the DTE/DIP Facilities, the Debtors followed the corporate process approved by the Court in the prior DIP orders. Thus, the Court should authorize the Debtors to obtain the commitments under the terms described in the DTE/DIP Term Sheets and to be set forth in the DTE/DIP Loan Documents as a reasonable exercise of their business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

42.    The Debtors propose to obtain the DTE/DIP Facilities by providing security interests and liens as described in the DTE/DIP Term Sheets and to be set forth in the DTE/DIP Loan Documents and described above. Section 364 of the Bankruptcy Code authorizes a debtor to incur debt or obtain credit if a debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code. *See* 11 U.S.C. § 364. Specifically, section 364 of the Bankruptcy Code authorizes the court, after notice and hearing, to grant the requested relief: "(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

43.    To meet the standards of section 364(c), a debtor need only demonstrate that that "it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)." *Ames Dep't Stores,* 115 B.R. at 37; *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). The statute "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority

administrative expenses authorized where debtor could not obtain credit as an administrative expense).

44.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Republic Airways Holdings Inc.,* No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *see also Ames Dep't Stores*, 115 B.R. at 37–40 ; s*ee In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (citations omitted); *Crouse Grp.*, 71 B.R. at 549.

45.    Further, if a debtor is unable to obtain unsecured credit as an administrative expense under section 503(b)(1), a court may nonetheless "authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).

46.    As stated in the Herlihy DTE Declaration, the Debtors reasonably concluded that financing was not available on an unsecured basis based on their prior efforts and that the Initial Tranche Facilities and A&R DIP Facility are secured loans.  *See* Herlihy DTE Decl. ¶ 13.  None of the proposals from the parties that the Debtors engaged with contemplated an unsecured facility or facilities that was sufficient to refinance the A&R DIP Facility, and the Debtors reasonably determined that, given their analysis, the current economic climate and market

conditions, any further efforts would be futile.  The Court in the Tranche A/C Final DIP Order, the

Tranche B Final DIP Order, and the A&R DIP Order (collectively, the "<u>DIP Orders</u>") similarly

found that the Debtors were unable to obtain adequate unsecured credit allowable under section

503(b)(1) with respect to the Tranche A Facility, Tranche B Facility, Initial Tranche C Facility,

Replacement Tranche A Facility and Replacement Tranche C Facility.  *See* Tranche A/C Final DIP

Order ¶ 6(d); Tranche B Final DIP Order ¶ 6(c); A&R DIP Order ¶ 6(c).

47.    Additionally, the credit transaction is necessary to preserve the assets of the

Debtors' estates.  The proposed DTE/DIP Facilities will provide the liquidity necessary for the

Debtors to execute their immediate restructuring objectives until emergence, while simultaneously

securing committed financing thereafter.  *See* Herlihy DTE Decl. ¶ 12, 15. Therefore, the Court

should find that the requirement of section 364 of the Bankruptcy Code is satisfied and grant the

requested relief.

### C.    Carve Out Is Appropriate

48.    The liens and security interests as described in the DTE/DIP Term Sheets

that will be extended under the DTE/DIP  Loan Documents and the DTE/DIP Final Order are all

subject to the Carve Out.  Courts treat Carve Outs similarly to other terms created for professional

fees that are reasonable and necessary to ensure that a debtor's estate and any statutory committee

can retain assistance from counsel.  *Ames Dep't Stores*, 115 B.R. at 38 (noting it has been "the

uniform practice in this Court . . . to insist on a carve out from a super-priority status and post-

petition lien" to pay parties' professionals because "[a]bsent such protection, the collective rights

and expectations of all parties-in-interest are sorely prejudiced"); *see also In re Windstream

Holdings, Inc.,* No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 19, 2019) [Docket No. 376]; *In re

Aéropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) [Docket No. 99]; *In re The

Great Atl. & Pac. Tea Co., Inc.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) [Docket

No. 43]; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) [Docket

No. 130]; *In re Ulta Stores, Inc.*, No. 09-11854 (BRL) (Bankr. S.D.N.Y. Apr. 29, 2009) [Docket

No. 97].

49.     Here, the Carve Out is necessary to protect against an unlikely

administrative insolvency and to ensure that the Debtors' estates retain all rights and powers

necessary to pay for the professional services without undue restrictions.  The Court in the Tranche

A/C Final DIP Order approved the Carve Out, as amended by the Tranche B Final DIP Order and

the A&R DIP Order, and the material terms of which were not modified under the DTE/DIP Term

Sheets.  *See* Tranche A/C Final DIP Order ¶¶ 10–17; Tranche B Final DIP Order ¶¶ 10–17; A&R

DIP Order ¶¶ 10–17.  Accordingly, the Court should find that the proposed Carve Out is

appropriate in these circumstances and grant the relief requested.

**D.     The DTE/DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

50.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

51.     While "'[g]ood faith,' as used in 11 U.S.C. § 364(e), is not a defined term,"

generally, good faith may be destroyed by conduct that involves fraud, collusion or an attempt to

take grossly unfair advantage of others. *In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y. 2010) (citing *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992)) (finding sufficient evidence that postpetition financing was entered into in good faith where the loan was "vigorously negotiated at arm's length and in good faith" and there was no contention that the lender otherwise acted in bad faith) (quotation marks and citation omitted).

52.     As explained in detail herein and in the Herlihy DTE Declaration, the proposed DTE/DIP Facilities are the results of the Debtors' reasonable and informed determination that the DTE/DIP Lenders offered the most favorable terms under the circumstances. *See* Herlihy DTE Decl. ¶ 9-14. All negotiations of the DTE/DIP Facilities were conducted in good faith and at arms' length. *See* Herlihy DTE Decl. ¶ 16. The terms and conditions of the DTE/DIP Facilities, as described in the DTE/DIP Term Sheets are fair and reasonable, and the proceeds of the DTE/DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the DTE/ DIP Final Order and the other DTE/DIP Loan Documents. Further, no consideration is being provided to any party to the DTE/DIP Loan Documents other than as described herein. The Court in the Tranche A/C Final DIP Order, the Tranche B Final DIP Order and the A&R DIP Order found that the Tranche A Lenders, the Tranche B Lenders, the Initial Tranche C Lenders, the Replacement Tranche A Lenders and the Replacement Tranche C Lenders were entitled to a "good faith" finding under section 364(e) of the Bankruptcy Code. Tranche A/C Final DIP Order ¶ 6(g)-(h); Tranche B Final DIP Order ¶ 6(f); A&R DIP Order ¶ 6(f). Accordingly, the Court should find that the DTE/DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**E.      Modification of the Automatic Stay Is Warranted**

53.     Section 362(d) of the Bankruptcy Code authorizes the Court, after notice and a hearing, to modify the automatic stay granted under section 362 of the Bankruptcy Code to permit the DTE/DIP Lenders to exercise remedies outlined in the DTE/DIP Term Sheets.  Courts routinely grant such modifications to effectuate financing agreements that comport with a debtor's business judgment.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88] (modifying the automatic stay set forth in section 362 of the Bankruptcy Court to the extent necessary to implement and effectuate the DIP agreement); *In re Chassix Holdings, Inc.*, Case No. 15- 10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67] (accord); *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26] (accord); *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59] (accord).  As set forth above, the DTE/DIP Facilities comport with the Debtors' business judgment; therefore the Court should modify the Automatic Stay and permit the DTE/DIP Lenders to exercise all rights and remedies provided for in the DTE/DIP Facilities, as described in the DTE/DIP Term Sheets.

**NOTICE**

54.     The Debtors have provided notice of this Motion in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 112).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

**NO PRIOR REQUEST**

55.     No prior request for the relief requested herein has been made to this or any other Court.

## **CONCLUSION**

WHEREFORE, for the reason set forth herein the Debtors respectfully request that this Court (a) enter an order, substantially in the form attached hereto as <u>Exhibit A</u> and (b) grant such other and further relief as is just and proper.


Dated:     June 13, 2022
          New York, New York

*/s/ Lisa M. Schweitzer*
Richard J. Cooper
Lisa M. Schweitzer
Luke A. Barefoot
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and Debtors-in-Possession*