UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

------------------------------------------------------- x

In re:                                                                    :

                                                                               :        Case No. 20-11254 (JLG)
LATAM Airlines Group S.A., et al.,                          :        Chapter 11
                                                                               :
                                                                               :        (Jointly Administered)
                                                      Debtors.[1]       :

------------------------------------------------------- x

## MEMORANDUM DECISION ON CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF LATAM AIRLINES GROUP, S.A. *ET AL.* UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**A P P E A R A N C E S :**

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
*Counsel for the Debtors and Debtors
in Possession*
One Liberty Plaza
New York, New York 10006
By:     Jeffrey A. Rosenthal, Esq.
          Lisa M. Schweitzer, Esq.
          David H. Herrington, Esq.
          Abena A. Mainoo, Esq.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

TOGUT, SEGAL & SEGAL LLP
*Counsel to the Debtors and Debtors in
Possession as to the Conflicted Claims*
One Penn Plaza, Suite 3335
New York, New York 10119
By:    Albert Togut, Esq.
       Kyle J. Ortiz, Esq.
       Bryan M. Kotliar, Esq.

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
*Counsel to the Parent Ad Hoc
Claimant Group*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.
       Rachael L. Ringer, Esq.
       David E. Blabey Jr., Esq.
       Natan Hamerman, Esq.
       Douglas Buckley, Esq.
       Andrew Pollack, Esq.

WHITE & CASE LLP
*Counsel for the Ad Hoc Group of
LATAM Bondholders*
1221 Avenue of the Americas
New York, New York 10020
By:    John K. Cunningham, Esq.
       Brian D. Pfeiffer, Esq.
       Gregory M. Starner, Esq.
       Joshua Weedman, Esq.
       Kathryn Sutherland-Smith, Esq.

200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:    Richard S. Kebrdle, Esq. (admitted *pro hac vice*)
       Varoon Sachdev, Esq. (admitted *pro hac vice*)

WACHTELL, LIPTON, ROSEN & KATZ
*Counsel for Costa Verde
Aeronáutica S.A. and Lozuy S.A.*
51 West 52nd Street
New York, New York 10019
By:    Richard G. Mason, Esq.
       John R. Sobolewski, Esq.
       Angela K. Herring, Esq.

ALSTON & BIRD LLP
*Counsel for Qatar Airways*
*Investments (UK) Ltd.*
90 Park Avenue
New York, New York 10016
By:   Gerard S. Catalanello, Esq.
       James J. Vincequerra, Esq.

DAVIS POLK & WARDWELL LLP
*Counsel for Delta Air Lines, Inc*
450 Lexington Avenue
New York, New York 10017
By:   Marshall S. Huebner, Esq.
       Lara Samet Buchwald, Esq.
       Adam L. Shpeen, Esq.

ARNOLD & PORTER KAYE
SCHOLER LLP
*Counsel to the Ad Hoc Group of*
*Unsecured Claimants*
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
By:   Michael D. Messersmith, Esq. (admitted *pro hac vice*)
       Sarah Gryll, Esq.

250 West 55th Street
New York, New York 10019
By:   Jeffrey A. Fuisz, Esq.
       Robert T. Franciscovich, Esq.
       Madelyn Nicolini, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
201 Varick Street, Room 1006
New York, New York 10014
By:   Brian S. Masumoto, Esq.

PAUL HASTINGS LLP
*Counsel for the TLA Claimholders*
*Group*
200 Park Avenue
New York, New York 10166
By:   Daniel A. Fliman, Esq.
       Christopher M. Guhin, Esq.
       Emily L. Kuznick, Esq.
       John F. Iaffaldano, Esq.

HUNTON ANDREWS KURTH LLP
*Counsel to Columbus Hill Capital*
*Management, L.P.*
200 Park Avenue
New York, New York 10166
<u>By:</u>    Paul N. Silverstein, Esq.
        Brian Clarke, Esq.
        Philip M. Guffy, Esq.

K&L GATES LLP
*Counsel to 777 Components Leasing,*
*LLC, GA Telesis, LLC and TC*
*Skyward Aviation U.S., Inc.*
599 Lexington Avenue
New York, New York 10022
<u>By:</u>    Robert T. Honeywell, Esq.

MILBANK LLP
*Counsel to Citibank, N.A. and Banco*
*Citibank S.A., as L/C Issuers*
55 Hudson Yards
New York, New York 10001
<u>By:</u>    Tyson M. Lomazow, Esq.
        Eric K. Stodola, Esq.
        Andrew C. Harmeyer, Esq.

Mr. Jose M. Orozco Jr.
*Appearing Pro Se*
1173 Front Street
San Diego, CA 92101

DECHERT LLP
*Counsel to the Official Committee*
*of Unsecured Creditors*
1095 Avenue of the Americas
New York, New York 10036
<u>By:</u>    Allan S. Brilliant, Esq.
        G. Eric Brunstad, Jr., Esq.
        Craig P. Druehl, Esq.
        David A. Herman, Esq.

PAUL HASTINGS LLP
*Counsel to Banco del Estado de Chile,*
*in its capacity as indenture trustee*
*under the Chilean Local Bonds Series*
*A through D and Series E issued by*
*LATAM Airlines Group S.A.*
200 Park Avenue
New York, New York 10166
<u>By:</u>    Pedro A. Jimenez, Esq.
        Andrew Tenzer, Esq.
        Nicholas Bassett, Esq.
        Douglass Barron, Esq.


**<u>HON. JAMES L. GARRITY, JR.</u>**
**<u>U.S. BANKRUPTCY JUDGE</u>**

**<u>Introduction</u>**[2]

LATAM Airlines Group S.A. ("LATAM Parent") and certain of its affiliates, are debtors

and debtors in possession in these Chapter 11 Cases (the "Debtors"). The matter before the Court

is the Debtors' request for the entry of an order (the "Confirmation Order") confirming their

Seventh Revised Joint Plan of Reorganization of LATAM Airlines Group, S.A. et. al. Under

Chapter 11 of the Bankruptcy Code [ECF No. 5331] dated May 11, 2022 (as may be revised,

amended, restated, supplemented, altered or modified from time to time, the "Plan"), and as

supplemented by the Plan Supplement (as may be revised, amended, restated, supplemented,

altered or modified from time to time) pursuant to section 1129 of title 11 of the United States

Code (as amended, the "Bankruptcy Code").

The following parties in interest filed objections to Plan confirmation (collectively, the

"Plan Objections"): William K. Harrington, as the United States Trustee for Region 2 (the "U.S.

---

[2]    Capitalized terms used but otherwise not defined shall have the meanings ascribed herein or in the Plan or
Disclosure Statement as applicable. References herein to "[ECF No.__]" are to documents filed on the electronic
docket in these Chapter 11 Cases (Case No. 20-11254).

Trustee"),[3] the TLA Claimholders Group (the "TLA Claimholders"),[4] Columbus Hill

Management, L.P. ("Columbus Hill"),[5] the Ad Hoc Group of Unsecured Claimants (the "A&P

Ad Hoc Group"),[6] and Mr. Jose Manuel Orozco.[7] In addition, 777 Components Leasing, LLC

and Certain Lenders filed a limited objection to confirmation (the "777 Limited Objection"),[8]

and Citibank, N.A. and Banco Citibank S.A. jointly filed a statement and reservation of rights in

connection with the Plan (the "Citibank Statement").[9] On May 2, 2022, each of the Official

Committee of Unsecured Creditors (the "Committee") and Banco del Estado de Chile

("BancoEstado"), in its capacity as indenture trustee under the Chilean Local Bonds Series A

through D and Series E issued by LATAM Parent, also filed an objection to the Plan.[10] Both

---

[3]   Objection of the U.S. Trustee to Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al., Under Chapter 11 of the Bankruptcy Code [ECF No. 5176] (the "U.S. Trustee Obj."); Supplemental Objection to Confirmation and Mot. of the U.S. Trustee to Designate the Votes of Creditors Pursuant to Section 1126(e) of the Bankruptcy Code for the Debtors' Violation of Section 1125(b) of the Bankruptcy Code [ECF No. 5217] (the "U.S. Trustee Suppl. Obj.").

[4]   Objection of the TLA Claimholders Group to Confirmation of the Debtors' Proposed Plan [ECF No. 5175] (the "TLA Claimholders Obj."); Supplemental Objection of the TLA Claimholders Group to Confirmation of the Debtors' Proposed Plan [ECF No. 5485] (the "TLA Claimholders Suppl. Obj.").

[5]   Columbus Hill Capital Management's Objection to Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group S.A., et al., Under Chapter 11 of the Bankruptcy Code [ECF No. 5177] (the "Columbus Hill Obj.").

[6]   Objection of the Ad Hoc Group of Unsecured Claimants to Confirmation of the Debtors' Joint Plan of Reorganization [ECF No. 5202] (the "A&P Ad Hoc Group Obj.").

[7]   Petitioner Objection of Jose Manuel Orozco [ECF No. 5103] (the "Orozco Objection").

[8]   Limited Objection of 777 Components Leasing, LLC and Certain Lenders to Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code [ECF No. 5171].

[9]   Statement and Reservation of Rights of Citibank, N.A. and Banco Citibank S.A. in Connection with the Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group S.A., et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5174].

[10]   Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Sixth Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al., Under Chapter 11 of the Bankruptcy Code [ECF No. 5195]; Reservation of Rights and Supplement to the Objection of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Sixth Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al., Under Chapter 11 of the Bankruptcy Code. [ECF No. 5281]; Objection of Banco del Estado de Chile to the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al Under Chapter 11 of the Bankruptcy Code [ECF No. 5207].

parties have since withdrawn their objections.[11] The Debtors filed the Debtors Omnibus Reply[12] to the Plan Objections, the 777 Limited Objection and the Citibank Statement. The Ad Hoc Group of LATAM Bondholders (the "W&C Ad Hoc Group"), Parent Ad Hoc Claimant Group (the "Parent GUC Ad Hoc Group"), Costa Verde Aeronáutica S.A. and Lozuy S.A., Delta Air Lines, Inc. ("Delta") and Qatar Airways Investments (UK) Ltd. ("Qatar") filed statements in support of Plan confirmation.[13]

The Court conducted an evidentiary hearing with respect to Plan confirmation.[14] On the record of that hearing, the Court overruled the Orozco Objection, and addressed and resolved the 777 Limited Objection and the matters raised in the Citibank Statement. The Court incorporates those rulings herein and will not further consider those matters. Based on the evidence of record

---

[11] Notice of Withdrawal of Objection of Banco del Estado de Chile to Joint Plan of Reorganization of LATAM Airlines Group S.A., et al. under Chapter 11 of the Bankruptcy Code [ECF No. 5335]; Notice of Withdrawal of Objections of the Official Committee of Unsecured Creditors to Confirmation of the Debtors' Revised Joint Plan of Reorganization [ECF No. 5336].

[12] Memorandum of Law in Support of Confirmation and Omnibus Reply to Objections to Confirmation of the Plan of Reorganization of LATAM Airlines Group S.A., Et Al., Under Chapter 11 of the Bankruptcy Code [ECF No. 5373]. The Debtors also filed two supplemental replies specific to the U.S. Trustee Supplemental Objection and the TLA Claimholders Supplemental Objection. *See* Debtors Reply to the U.S. Trustee's Supplemental Objection to Confirmation of the Debtors' Plan of Reorganization [ECF No. 5374] (the "Reply to U.S. Trustee Suppl. Obj."); Debtors' Reply to the Supplemental Objection of the TLA Claimholders Group [ECF No. 5486] (the "Reply to TLA Claimholders Suppl. Obj.").

[13] Statement of the Ad Hoc Group of LATAM Bondholders in Support of Confirmation of the Seventh Revised Joint Plan and Reservation of Rights to the Objection of the Official Committee of Unsecured Creditors and Banco del Estado de Chile [ECF No. 5343]; Parent Ad Hoc Claimant Group's Reply to Plan Objections [ECF No. 5355] (the "Parent GUC Ad Hoc Group Reply"); Statement of Costa Verde Aeronautica S.A. and Lozuy S.A. in Support of Confirmation of the Debtors' Plan of Reorganization [ECF No. 5352]; Statement of Delta Air Lines, Inc. in Support of Confirmation of Debtors' Modified Seventh Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [ECF No. 5354]; and (I) Statement of Qatar Airways Investments (UK) Ltd. In Support of Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group, S.A., Et Al. Under Chapter 11 of the Bankruptcy Code, (II) Reply to the Obj. Thereto, And (III) Reservation of Rights Thereto [ECF No. 5353].

[14] May 17, 2022 Hr'g Tr. [ECF No. 5511] (the "May 17, 2022 Hr'g Tr. – Public Session"); May 17, 2022 Hr'g Tr. (Sealed Portion) [not filed];  May 18, 2022 Hr'g Tr. [ECF No. 5499]; May 20, 2022 Hr'g Tr. [ECF No. 5513] (the "May 20, 2022 Hr'g Tr. – Public Session"); and May 20, 2022 Hr'g Tr. (Sealed Portion) [ECF No. 5662].

and for the reasons stated herein, the Court overrules the remaining Plan Objections and confirms the Plan. The Court will enter an appropriate Confirmation Order.[15]

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

LATAM Parent is a publicly traded company incorporated in Chile. *See* Alfonsín First Day Decl. ¶¶ 5, 14.[16] LATAM[17] is Latin America's leading airline group, with a history extending back ninety years and boasting one of the largest route networks in the world. *Id.* ¶ 2. Before the onset of the COVID-19 pandemic, LATAM had a total fleet of 340 aircraft (comprised of aircraft operated by LATAM and aircraft that are leased to third parties), and offered passenger transportation services to 145 different destinations in twenty-six countries, including domestic flights in Argentina, Brazil, Chile, Colombia, Ecuador and Perú and international services within Latin America as well as to the United States, Europe, the Caribbean, Oceania, Asia and Africa. *Id.* ¶¶ 3, 16-18. While the majority of LATAM's revenues have traditionally come from its passenger airline services, LATAM also offers cargo-related

---

[15] This constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, made applicable here pursuant to Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[16] Debtors Tr. Ex. 24 (Declaration of Ramiro Alfonsín Balza In Support of First Day Motions and Applications in Compliance with Local Rule 1007-2) (the "Alfonsín First Day Decl.").

[17] LATAM Parent, and its debtor and non-debtor subsidiaries and affiliates are collectively referred to as "LATAM."

services to 151 destinations in twenty-nine countries. *Id.* ¶¶ 7, 22-23. In 2019, LATAM's consolidated revenues were over $10 billion. *Id.* ¶ 17.

On May 26, 2020 (the "Initial Petition Date"), LATAM Parent and twenty-eight affiliates (collectively with LATAM Parent the "Initial Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code in this Court (the "Initial Chapter 11 Cases"). On July 7 and 9, 2020 (the "Subsequent Petition Date" and, together with the Initial Petition Date, as applicable to each Debtor, the "Petition Date"), nine additional LATAM affiliates (the "Subsequent Debtors" and together with the Initial Debtors, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Subsequent Chapter 11 Cases" and together with the Initial Chapter 11 Cases, the "Chapter 11 Cases"). Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are jointly administered for procedural purposes only. *See* Order Granting Motion for Joint Administration [ECF No. 34].

On May 27, 2020, the Grand Court of the Cayman Islands granted the applications of certain of the Debtors for the appointment of provisional liquidators pursuant to section 104(3) of the Companies Law (2020 Revision). *See* Disclosure Statement (defined below) § IV.A.4. On June 4, 2020, the 2nd Civil Court of Santiago, Chile issued an order recognizing the Chapter 11 Cases with respect to LATAM Parent., Lan Cargo S.A., Fast Air Almacenes de Carga S.A., Latam Travel Chile II S.A., Lan Cargo Inversiones S.A., Transporte Aéreo S.A., Inversiones Lan S.A., Lan Pax Group S.A. and Technical Training LATAM S.A. *Id*. On June 12, 2020, the Superintendence of Companies of Colombia granted recognition to the Chapter 11 Cases. *Id*.

On June 5, 2020, the U.S. Trustee appointed the Committee. *See* Notice of Appointment of Official Committee of Unsecured Creditors [ECF No. 115]. No trustee or examiner has been appointed in any of these Chapter 11 Cases.

In June 2021, the Debtors began distributing to certain interested parties, subject to non-disclosure agreements, an indicative term sheet for a plan of reorganization and associated exit funding for review and feedback and negotiating over sixty non-disclosure agreements with qualified, interested parties in the process. Herlihy Report at 59.[18] Between September and October 2021, the Debtors received non-binding and preliminary proposals and responses from multiple groups of key stakeholders, including: (i) the Parent GUC Ad Hoc Group, (ii) the W&C Ad Hoc Group, (iii) certain of the Debtors' largest shareholders, comprising of Costa Verde Aeronáutica S.A. ("CVA") and Inversiones Costa Verde Ltda y Cia, en Comandita por Acciones ("CVL", together with CVA, "Costa Verde"), Delta and Qatar (together with Delta and CVA, and any Affiliate Transferee (as defined in the Restructuring Support Agreement), the "Backstop Shareholders"). *Id.* The Debtors engaged with these parties regarding potential exit financing and related matters and received various revised non-binding proposals. *Id.* Furthermore, the Debtors and certain Designated Parties engaged in multiple rounds of Court-appointed mediation overseen by the Honorable (Ret.) Allan L. Gropper (the "Mediator") regarding issues in connection with the terms of a proposed restructuring. *Id.* at 59-60.

Ultimately, the mediation process bore fruit as on November 26, 2021, the Debtors and each of the Parent GUC Ad Hoc Group (as signatories of the Restructuring Support

---

[18]    Debtors Tr. Ex. 19 (Second Amended Expert Report and Declaration of Brent Herlihy, PJT Partners LP, dated April 27, 2022) (the "Herlihy Report").

Agreement,[19] the "Commitment Creditors"), Costa Verde, Delta, Qatar and the Eblen Group (the "RSA Shareholders") reached an agreement on a comprehensive restructuring and recapitalization of the Debtors, memorialized in the RSA, allowing the Debtors to emerge from Chapter 11 with an appropriate level of capital and debt, as well as access to substantial liquidity. *Id.* at 60-61. Subsequently, on February 11, 2022, certain members of the W&C Ad Hoc Group advised by Moelis & Company and White & Case LLP, holding approximately 27.7% of the LATAM 2024/2026 Bonds, signed onto the RSA. *Id.* at 62.

The restructuring contemplated under the RSA is reflected in the Plan and provides that LATAM will continue to operate as an integrated group (the "Reorganized Debtors") under LATAM Parent or any successor thereto, on or after the Effective Date (the "Reorganized LATAM Parent"). At its core, the economics of the Plan center on a $5.442 billion new equity capital raise in the Chilean capital market. The new money will be raised through a rights offering (the "ERO Rights Offering") in an amount of $800 million of new common stock of Reorganized LATAM Parent (the "ERO New Common Stock"), and Reorganized LATAM Parent's issuance of three series of convertible notes (the "New Convertible Notes Offerings") consisting of New Convertible Notes Class A (the "Class A Notes"), New Convertible Notes Class B (the "Class B Notes"), and New Convertible Notes Class C (the "Class C Notes" and with the Class A Notes and Class B Notes, the "New Convertible Notes" and, together with the ERO New Common Stock, the "Plan Securities"). *See*

---

[19]    On November 26, 2021, the Debtors filed the Disclosure Statement with Respect to the Joint Plan of Reorganization of LATAM Airlines Group S.A., et al., Under Chapter 11 of the Bankruptcy Code [ECF No. 3667] (as it has been amended, altered, modified, revised or supplemented from time to time, the "Disclosure Statement"). Annexed thereto as Exhibit E was the first draft of the RSA (the "Original RSA"). On May 13, 2022, the Debtors filed the Notice of Filing of Fifth Amendment to Restructuring Support Agreement [ECF No. 370]. On May 16, 2022, the Debtors filed the Notice of Filing Additional Executed Local Bondholder Joinder Agreement to Restructuring Support Agreement [ECF No. 5402]. References to the "RSA" mean the Original RSA as amended and as additionally joined.

Plan §§ 6.1, 6.2. Each offering is subject to the rights of Eligible Equity Holders to exercise their preemptive rights under Chilean law to purchase the Plan Securities. Thus, the offering of each class of the New Convertible Notes will include a preemptive rights offering to Eligible Equity Holders. *See id.*

Key aspects of the Plan are (i) the agreements of the RSA Shareholders to consent to the Plan Securities offerings, and (ii) the agreements of the Commitment Creditors and a subset of the RSA Shareholders (the "Backstop Shareholders") to backstop a total of $5.4 billion of those offerings. The Commitment Creditors will act as a backstop to the ERO Rights Offering and Class C Notes Offering and, as necessary, will purchase up to $400 million of the unsubscribed ERO New Common Stock, and subscribe for and purchase up to $3.269 billion of the unsubscribed Class C Notes. *See* Plan §§ 5.5-5.7, 6.1, 6.2. As consideration for those commitments, the Debtors will pay the Commitment Creditors cash payments (the "Backstop Fees") equal to 20% of the $3.669 billion backstop commitments, or approximately $734 million, and will hold back and offer 50% of the Class C Notes to the Commitment Creditors, for their subscription and purchase under the Plan (the "Direct Allocation"). The Backstop Shareholders (with the Commitment Creditors, the "Backstop Parties") will backstop up to $400 million of the unsubscribed ERO New Common Stock, and up to $1.373 billion of the Class B Notes, subject to the Backstop Shareholders Cap. They will not be paid a fee for those commitments, but, like the Commitment Creditors under their backstop agreement, they are entitled to expense reimbursement and indemnification benefits from the Debtors. Those agreements are reflected in the "Commitment Creditors Backstop Agreement" and the "Backstop Shareholders Backstop Agreement" (collectively, the "Backstop Agreements").

In accordance with the RSA, on January 12, 2022, the Debtors filed a motion seeking authority and approval of the Court for the Debtors' entry into and performance under the Backstop Agreements, and the payment of the Backstop Fees, and reimbursement of expenses in connection therewith (the "Backstop Motion").[20]  The Committee, BancoEstado, the A&P Ad Hoc Group and Columbus Hill each filed an objection to the Backstop Motion (collectively, the "Backstop Objections").[21]  On February 10 and 11, 2022, the Court conducted a two-day evidentiary hearing on the Backstop Motion.[22] Thereafter, the Court issued its Memorandum Decision granting the Backstop Motion and overruling the Backstop Objections (the "Backstop Opinion").[23] The Court issued a corresponding order granting the Backstop Motion (the "Backstop Order").[24] Certain parties appealed the Backstop Opinion.[25] On May 10, 2022, the Honorable Jesse M. Furman of the Southern District of New York dismissed the appeals. *In re LATAM Airlines Group S.A.*, No. 22-CV-2556 (JMF), Opinion and Order (S.D.N.Y. May 10, 2022).

---

[20]   Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4056].

[21]   Columbus Hill Capital Management L.P.'s Objection to the Debtors' Motion [ECF No. 4184]; Objection of the Official Committee of Unsecured Creditors to the Debtor's Motion, [ECF No. 4289]; Objection of Banco del Estado de Chile to the Debtors' Motion [ECF No. 4293]; Objection of the Ad Hoc Group of Unsecured Claimants [ECF No. 4291].

[22]   A&P Ad Hoc Group Tr. Ex. 116 (Feb. 10, 2022 Hr'g Tr.); and A&P Ad Hoc Group Tr. Ex. 118 (Feb. 11, 2022 Hr'g Tr.).

[23]   Memorandum Decision Granting the Debtors' Motion for Entry of an Order Authorizing and Approving the Debtors' Entry Into and Performance Under Backstop Agreements and Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations [ECF No. 4667].

[24]   Order (I) Authorizing and Approving the Debtors' (A) Entry into and Performance under the Backstop Agreements and (B) Payment of related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4732].

[25]   Notice of Appeal by Columbus Hill [ECF No. 4924]; Notice of Appeal by A&P Ad Hoc Group [ECF No. 4773]; Notice of Appeal by BancoEstado [ECF No. 4763]; and Notice of Appeal by Committee [ECF No. 4751].

On November 26, 2021, the Debtors filed the Plan and the Disclosure Statement. On
March 21, 2022, the Bankruptcy Court entered the order approving the Disclosure Statement, as
supplemented (the "Disclosure Statement Order"),[26] and on March 25, 2022, the Debtors filed
solicitation versions of the Plan [ECF No. 4776] and Disclosure Statement [ECF No. 4777].
Thereafter, the Debtors caused Kroll Restructuring Administration (formerly known as Prime
Clerk LLC) (the "Solicitation Agent") to commence solicitation of votes on the Plan in
compliance with the Disclosure Statement Order.  After the distribution of Solicitation Packages
and Non-Voting Status Notice Packages (each as defined in the Disclosure Statement Order),
voting commenced.  Consistent with the Disclosure Statement Order, on April 12, 2022, the
Debtors filed the plan supplement [ECF No. 5014] (the "First Plan Supplement"), and on May 4,
2022, the Debtors filed the second plan supplement [ECF No. 5243] (the "Second Plan
Supplement," together with the First Plan Supplement, the "Plan Supplement").  On May 4,
2022, the Bankruptcy Court entered a supplemental order [ECF No. 5221] approving the
solicitation of the votes to accept or reject an amended Plan by Holders of RCF Claims in Class
1, including related solicitation materials and procedures, solely as it relates to the treatment of
RCF Claims.

The Plan classifies Holders of Claims and Equity Interests throughout eleven classes.
Classes 1, 5 and 7 are classified as impaired. *See* Plan §§ 2.2, 3.2. The Voting Deadline for all
Holders of Claims entitled to vote on the Plan, except Holders of Local Bonds and RCF Claims,
was May 2, 2022, at 4:00 p.m., prevailing Eastern Time.  The Voting Deadline for the Local

---

[26]    Order signed on 3/21/2022 Approving (I) the Adequacy of Information in the Disclosure Statement, (II)
Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith,
and (IV) Certain Dates With Respect Thereto [ECF No. 4728].

Bonds was May 4, 2022,[27] and the RCF Voting Deadline was May 10, 2022 at 4:00 p.m.  On

May 6, 2022, the Solicitation Agent filed the Voting Report,[28] and on May 11, 2022, it filed the

Supplemental Voting Report.[29] As set forth in those reports, the Plan has been overwhelmingly

accepted by Classes 1, 5 and 7.

In connection with the Plan and related RSA filed on May 13, 2022, holders of

approximately $490.5 million of Local Bonds now support the confirmation of the Plan, in

addition to the accepting Class 5 votes.  *See* Notice of Fifth Amendment to Restructuring

Support Agreement, Ex. B (Executed RSA Joinders) [ECF No. 5370].  Beginning in April 2022,

the Debtors, the Commitment Creditors and BancoEstado began mediation in an effort to resolve

BancoEstado's objections to the Plan and related disputes.  *See* Herlihy Decl. ¶ 5.[30]  In May

2022, the Backstop Shareholders and the Committee joined the negotiations.  *Id.* On May 11,

2022, the Debtors announced that they had reached an agreement that would resolve all pending

disputes with BancoEstado and the Committee, including BancoEstado's request for substantive

consolidation of certain of the Debtors, with the support of the Commitment Creditors and the

Backstop Shareholders. *Id.* ¶ 6. The Plan reflects these agreements and settlements. As set out in

the Plan, the results of these negotiations include an increase in the overall recoveries to Allowed

---

[27]    Notice Regarding Extension of Local Bond Trustee's Plan Voting Deadline [ECF No. 5058].

[28]    Preliminary Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5260].

[29]    Supplemental Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5285].

[30]    Debtors Tr. Ex. 31 (Declaration of Brent Herlihy, PJT Partners LP, in Further Support of the Debtors' Proposed Plan of Reorganization dated May 12, 2022) (the "Herlihy Decl.").

General Unsecured Class 5 Claims.[31] *Id*. ¶ 7. The parties' agreement also resulted in certain modifications to the Backstop Agreements, including to allow certain Holders of Local Bonds to become parties to the Commitment Creditors Backstop Agreement, and a revised RSA, including executed joinders for Holders of Local Bonds representing more than two-thirds in amount of the outstanding Local Bonds. *Id*. ¶ 10; *see also* Notice of Fifth Amendment to Restructuring Support Agreement, Ex. B (Executed RSA Joinders) [ECF No. 5370].

### The Plan Objections

Below, the Court briefly summarizes the Plan Objections.

### The TLA Claimholders

The TLA Claimholders are asserting unsecured claims against TAM Linhas Aereas S.A. ("TLA"). Under the Plan, their claims are classified in Class 6. The Plan calls for Holders of Allowed Class 6 Claims to be paid in full (i.e., principal and pre-petition interest, as applicable). *See* Plan § 3.2(f). It provides that Class 6 is unimpaired, and that Holders of Allowed Class 6 Claims do not vote on the Plan. *Id.* The TLA Claimholders assert that TLA is solvent and, as such, that they are entitled to be paid post-petition interest ("PPI") on account of their Class 6 claims. *See* TLA Claimholders Obj. ¶ 25. They maintain that because the Plan fails to provide for the payment of PPI on account of their claims, under section 1124(1) of the Bankruptcy Code, the Class 6 claims are impaired, and the TLA Claimholders are entitled to vote on the Plan. *See Id.* ¶¶ 23-26. They object to confirmation on the grounds that the Plan violates section 1124(1) and thus, fails to comply with section 1129(a)(1) of the Bankruptcy Code. They also contend that

---

[31]    "Allowed General Unsecured Class 5 Claims," as used herein, means the "Allowed General Unsecured Claim[s] against LATAM Parent" as stated in the Plan. *See, e.g.*, Plan § 3.2(e)(ii). "Holders of Allowed General Unsecured Class 5 Claims," as used herein, means the "Holder[s] of [] Allowed General Unsecured Claim[s] against LATAM Parent" as stated in the Plan. *See id*.

the Plan fails to comply with section 1129(a)(8) of the Bankruptcy Code because Class 6 is

impaired and did not vote to accept the Plan. *See id.*

**Columbus Hill**

Columbus Hill contends that the Plan violates Chilean law and as such, the Court cannot

confirm the Plan because the Debtors filed it in bad faith in violation of section 1129(a)(3) of the

Bankruptcy Code, and because the Plan is not feasible as required under section 1129(a)(11) of

the Bankruptcy Code. *See* Columbus Hill Obj. ¶¶ 41-43.

**The A&P Ad Hoc Committee**

The A&P Ad Hoc Group objects to confirmation on the grounds that

(i) the Plan does not comply with section 1129(a)(1) of the Bankruptcy Code
because it violates section 1123(a)(4) of the Bankruptcy Code, since the Plan
provides some, but not all, of the Holders of Allowed General Unsecured Class 5
Claims the ability to receive their pro rata allocation of the Direct Allocation
Amount and a share of the Backstop Fees on account of the new ERO Common
Stock;

(ii) the Plan calls for the payment of excessive and unreasonable Backstop Fees to
the Commitment Creditors in violation of section 1129(a)(4);

(iii) the Corporate Incentive Plan established under the Plan violates section
503(c) of the Bankruptcy Code;

(iv) the Plan violates section 1129(a)(3) of the Bankruptcy Code because it
provides economics to the Commitment Creditors that amount to impermissible
"vote buying";

(v) the Non-Debtor Releases and Exculpation Clause in the Plan violate the
Bankruptcy Code; and

(vi) the Plan may violate the absolute priory rule under section 1129(b)(2) of the
Bankruptcy Code.

*See* A&P Ad Hoc Group Obj. ¶¶ 20, 22-23, 27, 35, 41-42, 44, 55, 59.

**The U.S. Trustee**

The U.S. Trustee contends that the Plan does not satisfy sections 1129(a)(1) and
1129(a)(4) of the Bankruptcy Code because the Corporate Incentive Plan established under the
Plan violates section 503(c) of the Bankruptcy Code. He further asserts that the Non-Debtor
Releases and Injunction in the Plan violate the Bankruptcy Code and should be stricken from the
Plan and the Exculpation Provision should be modified. *See* U.S. Trustee Obj. at 1, 6-14, 18.

In his supplemental objection, the U.S. Trustee contends that the Debtors solicited votes
to accept the Plan from certain Holders of Allowed General Unsecured Class 5 Claims (the
"Class 5 Claim Allowance Creditors") in violation of section 1125(b) of the Bankruptcy Code.
He contends that the Plan is not confirmable because the Debtors cannot demonstrate that their
actions comport with section 1129(a)(2) of the Bankruptcy Code. *See* U.S. Trustee Suppl. Obj. at
14-19.

*         *         *         *

To summarize, the Plan Objections focus on the Debtors' alleged failure to demonstrate
that the Plan satisfies section 1129(a)(1) (plan compliance with applicable provisions of title
11), section 1129(a)(2) (plan proponent's compliance with applicable provisions of title 11),
section 1129(a)(3) (good faith requirement), section 1129(a)(4) (payments for services or costs
under plan must be reasonable), section 1129(a)(8) (class acceptance of the plan), and section
1129(a)(11) (feasibility). The Court will address those matters below in its discussion of the Plan
Objections. The Court finds that on the record of the Confirmation Hearing, the Debtors have
demonstrated that the Plan complies with all other requirements of section 1129 of the
Bankruptcy Code, as set forth in the Confirmation Order.  The Court will not further discuss
them.

**Discussion**

**The TLA Claimholders Objection**

Overview

The TLA Claimholders is an ad hoc group of creditors asserting unsecured claims aggregating approximately $300 million (the "TLA GUCs") against TLA. TLA Claimholders Obj. ¶ 20. The claims are evidenced by certain debt instruments that are governed by Brazilian law.[32] The Debt Instruments each provide for the payment of: (i) interest at specified pre-default rates, (ii) post-default rates of interest of 1% per month, (iii) a 2% post-default late payment charge, and (iv) certain fees and expenses, including attorneys' fees. *Id*. ¶ 9. It is undisputed that a default occurred under each of the Debt Instruments either on the Initial Petition Date, in the case of the BDB CCB and Convenio, or on the Subsequent Petition Date, in the case of the Bradesco CCBs. *Id*. ¶ 10. The Plan classifies TLA GUCs, and all other General Unsecured Claims against each Debtor other than LATAM Parent, Piquero Leasing Limited and LATAM Finance, in Class 6. Plan § 3.2(f).

The Plan provides that Holders of Allowed Class 6 Claims will receive:

(x) Cash equal to the amount of such Allowed Class 6 Claim;

---

[32]    The TLA GUCs consist of:

(i) that certain *Cédula de Crédito Bancário*, dated April 22, 2020 and numbered 313.202.489 (as reflected in Proof of Claim Nos. 3526 and 3703) (the "BDB CCB");

(ii) that certain *Convênio para Antecipação de Recebíveis a Fornecedores de Produtos Ou Serviços Mediante Cessão de Direitos Creditórios*, dated October 2, 2018 and numbered 313.202.444 (as reflected in Proof of Claim No. 3731) (the "Convenio");

(iii) that certain *Cédula de Crédito Bancário Empréstimo*, dated April 29, 2020 and numbered 351/3219142 (as reflected in Proof of Claim No. 3532); and

(iv) that certain *Cédula de Crédito Bancário Empréstimo*, dated May 7, 2020 and numbered 237/2372/0705 (as reflected in Proof of Claim No. 3532).

Items (iii) and (iv), together, are referred to herein as the "Bradesco CCBs," and the Bradesco CCBs, together with the BDB CCB and Convenio, are referred to as the "Debt Instruments." TLA Claimholders Obj. ¶ 7.

(y) such other less favorable treatment as to which the Debtors and the Holder of
such Allowed Class 6 Claim shall have agreed upon in writing; or

(z) such other treatment such that the applicable Allowed Class 6 Claim will be
rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

*Id*. The amount of such Allowed Class 6 Claims excludes PPI.

The TLA Claimholders contend that TLA is solvent. They maintain that under the

Bankruptcy Code to leave a class of unsecured creditors unimpaired under a plan of a solvent

debtor, the plan must provide for the payment of principal in full, plus PPI, to those creditors.

*See* TLA Claimholders Obj. ¶¶ 1-2. They claim that they are entitled to at least $150 million in

PPI on their TLA GUCs. Debtors Omnibus Reply ¶ 56 n.53. Although the Plan does not call for

TLA GUCs to be paid PPI, it states that their claims are unimpaired and denies them the right to

vote on the Plan. Plan § 3.2(d)(iii). The TLA Claimholders object to confirmation. They contend

that the Court cannot confirm the Plan because the Debtors cannot satisfy their burden of

demonstrating that the Plan complies with sections 1124(1), 1129(a)(1), and 1129(a)(8) of the

Bankruptcy Code. TLA Claimholders Obj. ¶ 26.

The Court concludes that the TLA GUCs are not impaired under the Plan. As discussed

below, to hold otherwise would ignore the ban on "unmatured interest" (*i.e.*, PPI) under section

502(b)(2) of the Bankruptcy Code and caselaw reasoning that section 1124(1) speaks to

impairment by a bankruptcy plan, not limitations set forth by the Bankruptcy Code. Below, the

Court also assesses whether the TLA Claimholders are entitled to PPI notwithstanding that they

are unimpaired. It does so because courts have held that unimpaired creditors of solvent debtors

may nevertheless be entitled to PPI under various provisions of the Bankruptcy Code, namely

sections 1124(1) and 1129(a)(7) as relevant here. The Court considers whether TLA is solvent

under section 101(32) of the Bankruptcy Code as a threshold issue to this analysis. As discussed

below, the Court finds that TLA is insolvent because: (a) the TLA Claimholders have failed to

satisfy their burden to demonstrate that the sum of TLA's debts exceeds the sum of its property

at a fair valuation, *see* 11 U.S.C. § 101(32), and (b) in any event, the Debtors have set forth

affirmative evidence demonstrating that TLA is insolvent under section 101(32). Finally, the

Court analyzes whether the TLA Claimholders would be entitled to PPI, and at what rate of

interest, if the TLA Claimholders had in fact demonstrated TLA is solvent. In doing so, the Court

finds that the solvent debtor exception to the ban on unmatured interest survived the enactment

of the Bankruptcy Code through section 1129(a)(7) (as relevant here), not section 1124(1) and,

thus, would demand the Debtors pay PPI on the TLA GUCs at the federal judgment rate (*i.e.*, the

"legal rate" under section 726(a)(5) of the Bankruptcy Code), not at the rate called for in the

Debt Instruments.

Accordingly, based on the above, and as set forth below, the Court overrules the TLA

Claimholders Objection and finds that the Debtors have satisfied sections 1129(a)(1) and

1129(a)(8) of the Bankruptcy Code with respect to the Plan's treatment of the TLA GUCs.

### Whether the TLA GUCs Are Impaired Under the Plan

"Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case.

Section 1129 of the Bankruptcy Code provides the requirements for such confirmation,

containing Congress' minimum requirements for allowing an entity to discharge its unpaid debts

and continue its operations." *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St.*

*P'ship,* 526 U.S. 434, 465, n.4 (1999) (Stevens, J., dissenting) (quotation omitted). As the Plan

proponents, the Debtors bear the burden of proving by a preponderance of the evidence that each

of the confirmation requirements set forth in section 1129(a) of the Bankruptcy Code have been

satisfied. *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018)

21

("The proponent of the confirmation of a plan must prove by a preponderance of the evidence that it satisfies the relevant requirements of 11 U.S.C. § 1129(a), and if the plan is not fully consensual, 11 U.S.C. § 1129(b)."); *In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) ("The proponent of confirmation bears the burden of proof by a preponderance of the evidence.").

"The Bankruptcy Code creates a presumption of impairment 'so as to enable a creditor to vote on acceptance of the plan.' Under 11 U.S.C. § 1124(1), the presumption of impairment is overcome only if the plan 'leaves unaltered the [creditor's] legal, equitable, and contractual rights.' The burden is placed on the debtor to demonstrate the plan leaves the creditor's rights unaltered." *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 203 (3d Cir. 2003) (internal citations omitted). The TLA Claimholders contend that the Debtors have failed to meet that burden because the Plan purports to leave the TLA GUCs unimpaired under section 1124(1) of the Bankruptcy Code without satisfying the standards set forth therein. For that reason, they say that the Court cannot confirm the Plan because the Debtors cannot satisfy their burden under section 1129(a)(1) of the Bankruptcy Code to prove that the Plan complies with all applicable provisions of the Bankruptcy Code, or their burden under section 1129(a)(8) to show that all classes either accepted the Plan or are unimpaired under the Plan. *See* TLA Claimholders Obj. ¶¶ 22-24.

Section 1124(1) of the Bankruptcy Code states that a class of claims is impaired under a plan unless, with respect to each claim, the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim . . . ." 11 U.S.C. § 1124(1). That section says nothing about the payment of interest. However, section 502(b)(2) of the Bankruptcy Code expressly disallows claims of unsecured creditors for "unmatured interest"

(*i.e.*, PPI). 11 U.S.C. § 502(b)(2). It is settled that a creditor's "legal, equitable, and contractual rights" under section 1124(1) are subject to "the Bankruptcy Code's own limitations on claim allowance, including limitations on the allowance of postpetition interest." *In re 53 Stanhope LLC*, 625 B.R. 573, 579 (Bankr. S.D.N.Y 2021). *See also Keystone Gas Gathering L.L.C. v. Ad Hoc Comm. (In re Ultra Petroleum Corp.*), 943 F.3d 758, 763-65 (5th Cir. 2019) ("*Ultra Petroleum I*"); *In re PPI Enters. (US) Inc.,* 324 F.3d at 201-02. Accordingly, "[w]here a plan refuses to pay funds disallowed by the Code, the Code—not the Plan—is doing the impairing." *Ultra Petroleum I*, 943 F.3d at 765; *see also In re PPI Enters. (U.S.), Inc.*, 324 F.3d at 205 (where "the Bankruptcy Code, not the Plan, is the only source of limitation" on a creditor's rights, the creditor's claim is not impaired). Because the Plan provides for payment of the TLA GUCs in full (*i.e.*, principal and pre-petition interest) and the Bankruptcy Code itself disallows payment of PPI under section 502(b)(2), the claims are not impaired within the meaning of section 1124(1) the Bankruptcy Code. *Ultra Petroleum I*, 943 F.3d at 763; *see also Wells Fargo Bank, N.A. v. The Hertz Corp (In re The Hertz Corp.)*, No. 20-11218, 2021 WL 6068390, at *11 (Bankr. D. Del. Dec. 22, 2021) ("*Hertz*") ("[T]he Court concludes that any modification of the Noteholders' claim to unmatured interest . . . is an impairment of the Noteholders' contract claims by operation of section 502(b)(2) of the Bankruptcy Code, not the Debtors' Plan. Consequently, the Noteholders' claims are not impaired within the meaning of section 1124(1).").

## **Whether Solvent Debtor Exception Applies and the TLA Claimholders are Entitled to PPI**

Still, the TLA Claimholders assert that the "solvent debtor exception" applies in this case and that they have an equitable right to be paid PPI on the TLA GUCs. TLA Claimholders Obj. ¶¶ 29-30. They say that is so because TLA is solvent and, thus, should be compelled to (and has

the means) to pay them PPI. Below, the Court examines whether TLA is solvent, whether the

solvent debtor exception survived the enactment of the Bankruptcy Code, and, if so, whether

(and at what rate) the TLA Claimholders are entitled to PPI on the TLA GUCs.

The parties disagree whether the TLA Claimholders or the Debtors have the burden of

proof on the issue of TLA's solvency. The former contend that the burden is on the Debtors to

prove TLA is insolvent because the Debtors have the burden of proving that the TLA GUCs are

unimpaired under the Plan—and that they can only do so by demonstrating that it is insolvent.

*See id.* ¶¶ 23, 32. They say that is so because "[t]he Bankruptcy Code creates a presumption of

impairment 'so as to enable a creditor to vote on acceptance of the plan.' Under 11 U.S.C. §

1124(1), the presumption of impairment is overcome only if the plan 'leaves unaltered the

[creditor's] legal, equitable, and contractual rights.' The burden is placed on the debtor to

demonstrate the plan leaves the creditor's rights unaltered." *In re PPI Enters. (U.S.), Inc.*, 324

F.3d at 203 (internal citations omitted). The Debtors contend that the TLA Claimholders have the

burden to show TLA is solvent because plan objectors always bear the burden to substantiate

their objections. Debtors Omnibus Reply ¶ 110 (citing *In re W.R. Grace & Co.*, 475 B.R. 34, 162

(Bankr. D. Del. 2012)). The Debtors also contend that the TLA Claimholders' position is

immaterial because "it is clear that the TLA [GUCs] are unimpaired under the Plan," meaning

the whole question at issue concerns only solvency. *See id.* ¶ 110 n.55.

The Court agrees with the Debtors. As demonstrated above, the Debtors have met their

burden to demonstrate that the TLA GUCs are not impaired under the Plan. *See, e.g.*, *Ultra

Petroleum I*, 943 F.3d at 763; *Hertz*, 2021 WL 6068390, at *11. That burden does not extend to

require the Debtors to also prove if (and how) the common law solvent debtor exception interacts

with or overrides section 502(b)(2), which, according to the TLA Claimholders, would require

the Debtors to prove TLA's insolvency in order to avoid paying interest under the solvent debtor

exception. The TLA Claimholders have cited no caselaw for that proposition and the Court is

aware of none. Finding otherwise would be illogical as it would, in effect, mean that a debtor

could not obtain the benefit of section 502(b) unless and until it set forth affirmative evidence

that it was insolvent (assuming the solvent debtor exception is applicable under the Bankruptcy

Code). *See* May 20, 2022 Hr'g Tr. – Public Session, 194:2-10. As such, the Court finds that the

TLA Claimholders bear the burden of proof to demonstrate TLA is solvent, as it is the lynchpin

of their objection to the Plan.  *See In re W.R. Grace & Co*., 475 B.R. at 162 (upholding

bankruptcy court finding that creditors arguing for post-petition default interest "did not satisfy

their burden and that there was insufficient evidence to render [the debtor] solvent.").

Whether TLA is Solvent

Section 101(32) of the Bankruptcy Code defines the term "insolvent" as the "financial

condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a

fair valuation . . . ." 11 U.S.C. § 101(32)(A). The Bankruptcy Code does not provide a definition

of "fair valuation." The parties each rely on an expert to opine on whether TLA is insolvent. The

Debtors offer the testimony of Mr. Brock Edgar. He is a is a Senior Managing Director at FTI

Consulting, Inc., the financial advisors to the Debtors.[33] The TLA Claimholders offer the

testimony of Mr. Santiago Dellepiane.  He is a Managing Director with Berkeley Research

Group, LLC and Co-Chair of its Economics & Damages practice.[34] Mr. Edgar contends that

---

[33]    Debtors Tr. Ex. 1 (Declaration of Brock Edgar in Support of the Debtors, dated April 29, 2022) (the "Edgar Decl.") ¶ 1.

[34]    TLA Claimholders Tr. Ex. 121(Amended Declaration of Santiago Dellepiane, dated May 15, 2022) (the "Am. Dellepiane Decl.") ¶ 3.

under the standards set forth in section 101(32) of the Bankruptcy Code, TLA is insolvent; Mr.
Dellepiane contends that TLA is solvent.

While the TLA GUCs are classified in Class 6 under the Plan, the Plan's treatment of
Class 4 claims is indirectly relevant to Mr. Dellepiane's analysis of TLA's solvency. Class 4 of
the Plan consists of unsecured claims against LATAM Finance and LATAM Parent by the
holders of the LATAM 2024/2026 Bonds. *See* Plan §§ 3.2(d). The Plan's treatment of the Class
4 LATAM 2024/2026 Bond Claims comprises and depends on a combined recovery on account
of allowed claims against both LATAM Parent and LATAM Finance. *See id.* § 3.2(d); *see also*
Am. Herlihy Rebuttal Report at 7.[35] The Plan calls for Class 4 creditors to be paid in full, without
PPI and without any new money investment rights. Class 4 is unimpaired and presumed to accept
the Plan. *See* Plan § 3.2(d).[36]  The Plan's classification and treatment of the Class 4 claims
reflects an agreement and compromise among the Debtors and the parties to the RSA (the "Class
4 Compromise") and is set forth in the RSA. *See* Herlihy Report at 60-63, 69.

In the Plan, the Debtors seek approval of the Class 4 Compromise—and all the integrated
compromises and settlements reflected in the Plan—pursuant to Bankruptcy Rule 9019. *See* Plan
§ 5.2. In support of that request, the Debtors submitted the expert testimony of Mr. Brent
Herlihy. He is a Managing Director in the Restructuring and Special Situations Group at PJT
Partners LP ("PJT"), the investment banker that the Debtors have retained in these Chapter 11
Cases. Through Mr. Herlihy's testimony, the Debtors seek to demonstrate that there is sufficient
distributable value at LATAM Finance and LATAM Parent to provide a full recovery of the

---

[35]    Debtors Tr. Ex. 20 (Amended Rebuttal Report of Brent Herlihy, PJT Partners LP, dated April 27, 2022) ("Am.
Herlihy Rebuttal Report").

[36]    Nevertheless, the Debtors solicited the votes of Holders of Allowed Class 4 Claims in the manner and to the
extent provided in the Disclosure Statement Order. Plan § 3.2(d)(iii) n.14.

LATAM 2024/2026 Bonds at a $14 billion valuation (*i.e.*, that at a $14 billion valuation, the

LATAM 2024/2026 Bonds were entitled to 100% recovery of principal and pre-petition interest).

*See* Herlihy Report at 64-69. In his opinion, the Class 4 Compromise is within the range of

reasonable outcomes based on the allocation methodology described below. Initially, the

Committee and BancoEstado objected to the Class 4 Compromise. They have since withdrawn

their objections. The Court finds that the Debtors have demonstrated that the Class 4

Compromise satisfies the well-settled standards governing the approval of settlement

agreements. *See In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983) (bankruptcy courts

assessing settlement agreements must "see whether the settlement falls below the lowest point in

the range of reasonableness"); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry,*

*Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968) (in evaluating a settlement under Bankruptcy Rule

9019, a court must determine that it is fair, equitable, and in the best interests of the estate); *In re*

*Hibbard Brown & Co., Inc.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (a court may exercise its

discretion to approve or deny a settlement "in light of the general public policy favoring

settlements").

 Mr. Herlihy's methodology in evaluating the merits of the Class 4 Compromise is

relevant to the TLA Claimholders Objection. In support of the objection, Mr. Dellepiane utilizes

two methodologies to determine the value of TLA: (1) a discounted cash flow methodology (the

"DCF Methodology"); and (2) a distributable value waterfall, which allocates value to TLA

based on Mr. Herlihy's total enterprise value of the Debtors as an integrated unit (the

"Distributable Value Waterfall"). *See* Am. Dellepiane Decl. ¶¶ 19-37. From these two valuation

figures ($5.8 to $7.0 billion (DCF Methodology) and $3.446 billion (Distributable Value

Waterfall)), Mr. Dellepiane subtracts a claims value of $1.08 or $1.96 billion to opine that the

fair value of TLA's property exceeds its liabilities and, thus, that TLA is solvent. *See id.* ¶¶ 36-37. The Court briefly discusses the methodology Mr. Herlihy employed in evaluating the merits of the Class 4 Compromise.

In seeking approval of the Class 4 Compromise, the Debtors sought to demonstrate that there is sufficient distributable value at LATAM Finance and LATAM Parent to provide a full recovery of the LATAM 2024/2026 Bonds at a $14 billion valuation of the Debtors as a whole. Mr. Herlihy needed to assign value to each Debtor in order to isolate the value attributable to LATAM Finance and LATAM Parent, as issuer and guarantor of the LATAM 2024/2026 Bonds, respectively, to determine if they had sufficient capital to pay the holders of LATAM 2024/2026 Bond Claims 100% of their principal and pre-petition interest pursuant to the Class 4 Treatment under the Plan. *See* Herlihy Report at 64-69. To do so, he undertook the following process:

> Mr. Herlihy began with a Total Enterprise Value of $14 billion ("TEV"), which is the middle point of the various estimates he assigns to the consolidated value of the Debtors. *See id.* at 66-68. He adopted this figure from Exhibit D to the Disclosure Statement. *Id.* at 66 ("I evaluated recoveries across the full range of enterprise values ($13 - $15bn) filed as Exhibit D to the Disclosure Statement").

> Next, Mr. Herlihy estimated a "Total Distributable Value" for the consolidated group of Debtors. The Total Distributable Value is the amount of funds available for creditors after performing the following calculations on the TEV: (i) subtracting each Debtor's share of the DIP; (ii) adding excess cash; and (iii) subtracting net operating losses. *See id.* at 65. Mr. Herlihy calculated the Debtors' Total Distributable Value to be $10.995 billion. *See* Debtors Tr. Ex. 14 (the "Herlihy Waterfall Output") at 002 (($14bn TEV) + ($289m excess cash) – ($295m net operating losses) – ($3bn DIP Tranches A, B, and C)).

> Mr. Herlihy then calculated the percentage of the Debtors' Total Distributable Value (*i.e.*, $10.995 billion) that should be allocated to each Debtor. Although his focus was on LATAM Parent and LATAM Finance, in doing this analysis, he determined that TLA should be allocated 29% (or $3.213 billion) of the Total Distributable Value. *See id.* at 007. He arrived at that figure by blending three different allocation methodologies. *See* Herlihy Report at 64. According to Mr. Herlihy, $3.213 billion is TLA's operating allocation of the consolidated Debtors' Total Distributable Value. *See* Herlihy Waterfall Output at 002, 007.

Applying the adjustments called for in the Distributable Value Waterfall, *see* Herlihy Report at 65, Mr. Herlihy calculates the distributable value of TLA to be $3.446 billion. *See* Herlihy Waterfall Output at 033. According to Mr. Herlihy, this is the value that TLA holds to settle any claims that sit at TLA—*i.e.*, the starting point for allocating that distributable value through a waterfall for creditors (the "TLA Creditor Waterfall").[37]

Mr. Herlihy then applied the TLA Creditor Waterfall.[38] The TLA Creditor Waterfall leaves an "Equity Value" of $2.366 billion after satisfying all claims identified in the Herlihy Waterfall Output. *See id.* at 033-038. The claims identified as sitting at TLA in the Herlihy Waterfall Output total $1.080 billion.

*See id.*

*Distributable Value Waterfall*

Mr. Dellepiane applies the Distributable Value Waterfall to allocate a portion of the Debtors' consolidated enterprise value to TLA individually. In doing so, he borrows from the calculations behind Mr. Herlihy's conclusion that the Class 4 Compromise passes muster under Rule 9019. Mr. Dellepiane—purporting simply to adopt Mr. Herlihy's methodology—contends that TLA's equity value is $2.336 billion (($3.446 bn) – ($1.080 bn)). Am. Dellepiane Decl. ¶ 36. He concludes that this figure demonstrates that TLA is solvent because it is the value remaining at TLA "even after satisfying 100% of all identified claims." *Id*. Mr. Dellepiane adopts $1.080 billion as the applicable claims value because, he contends, it is "the most recent record of claim amounts against TLA that have been produced by the Debtors[.]" *Id*. ¶ 30.[39] He

---

[37]    TLA Claimholders Tr. Ex. 131 (Deposition Transcript of Brent Herlihy) at 466:19-467:9.

[38]    Mr. Herlihy performed these steps for each individual Debtor, again, as part of his assessment of the Plan's treatment of the LATAM 2024/2026 Bond Claims in Class 4. *See generally* Herlihy Waterfall Output. The Court focuses here on his calculations for TLA only because they are relevant to Mr. Dellepiane's analysis, which is based, in part, on Mr. Herlihy's calculations.

[39]    Mr. Dellepiane, however, does recognize that other documents from the Debtors reflect higher calculations of claims against TLA. *See* Am. Dellepiane Decl. ¶ 29 ("Such documents that I have reviewed include (1) FTI General Claims Breakdown, which indicates that there are approximately $1.15 billion of claims attributed to TLA, (2) the TLA Schedules of Assets and Liabilities as of July 6, 2020, which indicates that there were approximately $1.332 billion of claims attributed to TLA as of TLA's petition date, and (3) the Cleansing Blowout Materials as of November 26, 2021 which indicate a range of claims against TLA between $1.720 billion and $1.938 billion."). He does not offer why he rejects these figures and adopts a claims value of $1.080 billion, other than noting this is the

29

estimates the total claims against TLA at $1.96 billion, which he contends accounts for TLA's

share of 29% of the $3 billion DIP taken out by the Debtors. *Id*. ¶ 31. Mr. Dellepiane, however,

does not use $1.96 billon as the proper liability figure—presumably because Mr. Herlihy did not

either. As set forth below, however, he utilizes this liability figure in the DCF Methodology for

purposes of netting TLA's assets and liabilities.

*DCF Methodology*

Mr. Dellepiane's DCF Methodology calculates TLA's free cash flow and then applies a

discount rate to find the present value of those cash flows. *Id*. ¶ 21. Mr. Dellepiane contends that

the DCF is the "most appropriate and most reasonable" method to determine the fair value of

TLA's assets. *Id*. The DCF Methodology borrows from Mr. Herlihy's discounted cash flow. *See*

Herlihy Report at 43 (estimating the Debtors' total enterprise value at $13.3 to $15.9 billion).

Mr. Dellepiane starts with projected monthly financial information from the Debtors' five-year

business plan, which runs through 2026 (the "Business Plan"). Am. Dellepiane Decl. ¶ 21. From

that, he estimates TLA's free cash flows by considering its total revenues, total expenses, and

Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA")—all of which is

provided in the Debtors' projections. *Id*. ¶ 22. Next, Mr. Dellepiane estimated working capital

variations, income tax, and capital expenditures in order to determine TLA's cash flows. *Id*.

This process only measured TLA's estimated cash flow through December 31, 2026—the

projection period in the Debtors' Business Plan. To estimate TLA's cash flows after this, Mr.

Dellepiane attempted to account for future growth of TLA's cash flows. He settles on two

---

"most recent" claims estimate, as well as the estimate utilized by Mr. Herlihy in the Distributable Value Waterfall.
*See id*. ¶ 30; *see also* Herlihy Waterfall Output at 033-038.

options to do so: (1) a Perpetual Growth Model (2.25% growth rate)[40]; and (2) an Exit Multiple

Model (6.0x EV/EBITDAR multiple). *Id*. ¶ 23.

Because this process estimates the value of TLA's cash flows in the future, Mr.

Dellepiane acknowledges that a discount rate must be applied to value the cash flows today. To

do so, he utilizes two weighted average cost of capital ("WACC") estimates: (1) 9.18%

(borrowed from Mr. Herlihy, *see* Herlihy Report at 43, 48); and (2) 8.09% (which Mr.

Dellepiane opines is the appropriate rate for a Brazilian airline company). Am. Dellepiane Decl.

¶ 24.

Applying the two WACC estimates across the two growth factors (the Perpetual Growth

Model and the Exit Multiple Model), Mr. Dellepiane calculates the fair value of TLA's assets

(before subtracting the fair value of its liabilities) as follows:

Perpetual Growth Model

     8.09 % WACC: $7.0 billion

     9.18% WACC: $5.8 billion

Exit Multiple Model

     8.09% WACC: $6.4 billion

     9.18% WACC: $6.2 billion

*Id*. ¶ 27. As such, Mr. Dellepiane estimates the present value of TLA's future cash flows to be

worth between $5.8 and $7.0 billion. *Id*.

To determine the total value of TLA's liabilities, Mr. Dellepiane borrows from Mr.

Herlihy's calculation of the share of the Debtors' claims attributable to TLA as part of the

Distributable Value Waterfall. As set forth above, these claims total $1.080 billion. *See* Herlihy

---

[40]    This is the same factor utilized by Mr. Herlihy. *See* Herlihy Report at 44 (identified as a "key assumption").

Waterfall Output at 033-038. Mr. Dellepiane adds $877 million on top of this figure to account for TLA's 29% share of the Debtors' DIP, as described above. As such, for purposes of the DCF Methodology, he contends that the proper claims (*i.e.*, liability) amount is $1.96 million. Am. Dellepiane Decl. ¶¶ 31, 37.

Mr. Dellepiane contends that TLA is solvent because—even utilizing his lowest estimated value of TLA, $5.8 billion—subtracting the claims figure leaves residual equity value of at least $3.8 billion (($5.8 billion) – ($1.96 billion)). *Id.* ¶ 37.

*Mr. Dellepiane's Methodologies Do Not Measure TLA's Solvency*

The Court accords little to no weight to Mr. Dellepiane's methodologies—both the Distributable Value Waterfall and the DCF Methodology. Both suffer from unrebutted infirmities demonstrated by Mr. Edgar.

To frame the issue, the Court finds that, as the Debtors contend, insolvency is determined, in part, by the fair market price that a debtor could obtain through the sale of its assets in a prudent matter. *See In re SunEdison, Inc.*, 556 B.R. 94, 104 (Bankr. S.D.N.Y. 2016) ("the test for insolvency turns on a comparison between the debtor's debts and the 'fair valuation' of its property. 'Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'") (internal citation omitted). The TLA Claimholders acknowledge as much. *See* TLA Claimholders Obj. ¶ 28. Mr. Dellepiane's methodologies, as described above, fail to follow this directive. Neither the DCF Methodology nor the Distributable Value Waterfall assesses the aggregate price TLA could obtain for its assets and, thus, both fail to calculate the fair value of its assets. Indeed, Mr. Dellepiane testified that he sought to calculate the "fair market value of the company", not the fair value of individual

property. *See* May 17, 2022 Hr'g Tr. – Public Session, 117:21-118:3; *see also id*. at 118:4-10

(admitting he did not calculate the proceeds from the sale of individual assets).

The Court agrees with the Debtors that the Distributable Value Waterfall methodology

applied by Mr. Dellepiane does not accurately measure if TLA is insolvent. The Debtors say that

is so for two primary reasons: (1) it ignores claims excluded from Mr. Herlihy's analysis; and (2)

it excludes certain liabilities that TLA would hold if it operated alone.

The Debtors contend that the Distributable Value Waterfall undercounts TLA's liabilities

at only $1.08 billion, which, in turn, artificially inflates TLA's alleged solvency. Edgar Rebuttal

Decl. ¶ 13.[41] Mr. Edgar says that is so because the Distributable Value Waterfall was never

intended to, and does not, provide an exhaustive list of the value of all debts of the individual

operating entities. Rather, as with its calculation of assets, it simply takes the liabilities of the

consolidated Debtor group and distributes them across each Debtor. *Id*. Edgar claims that the true

value of TLA's liabilities is one of the following: (1) $1.72 to $1.938 billion (reflecting total

claims against TLA in the "Cleansing Blowout Materials" the Debtors publicly disclosed in

November 2021); or, more accurately (2) $3.5 billion (reflecting the total liabilities listed on

TLA's most recent balance sheet). *Id*. ¶ 14.

The Court agrees. While Mr. Dellepiane recognizes that TLA's liabilities may be higher

than the $1.08 billion reflected in the Herlihy Waterfall Backup, neither his declarations nor

evidence at trial provide any compelling reason why TLA's balance sheets do not accurately

reflect TLA's liabilities at $3.5 billon, as described below. Instead, Mr. Dellepiane simply adopts

the Distributable Value Waterfall's allocated amount of liabilities without further analysis. If the

---

[41]    Debtors Tr. Ex. 7 (Rebuttal Declaration of Brock Edgar in Support of the Debtors) ("Edgar Rebuttal Decl.").

balance sheets are correct and TLA's liabilities are approximately $3.5 billion[42]—and the Court

finds they were unrebutted at trial—it tops the $3.446 billion value of TLA's assets under the

Distributable Value Waterfall. As such, even utilizing the Distributable Value Waterfall (but

correcting for Mr. Dellepiane's undercount of TLA's liabilities) the Court finds the methodology

demonstrates that TLA is insolvent, not solvent.

Mr. Edgar also contends that beyond undercounting TLA's liabilities, the Distributable

Value Waterfall ignores additional liabilities TLA would hold if it operated alone. Edgar

Rebuttal Decl. ¶ 15. He says that is so, in part, because LATAM Parent (or another operating

entity) owns most of the aircraft that TLA operates. TLA rents the majority of its fleet through

short-term subleases from other Debtors. *Id.* ¶ 16. Because of the short-term leasing structure,

TLA avoids holding the liabilities of those aircraft. *Id.* If that was not the case, Mr. Edgar

contends that TLA's fleet-related liabilities would balloon by $1.386 billion—all of which he

contends should be added to Mr. Dellepiane's calculations. *Id.* ¶¶ 16-17.

The TLA Claimholders have failed to rebut these criticisms. There is no evidence in the

record demonstrating why an additional $1.386 billion in liabilities should not be subtracted from

the $3.446 billion value of TLA produced by the Distributable Value Waterfall (even assuming

*arguendo* the Distributable Value Waterfall honors the definition of "insolvent" under section

101(32) of the Bankruptcy Code). The Court finds that including this figure renders TLA even

further insolvent and, thus, provides further support for why the Distributable Value Waterfall

does not help the TLA Claimholders satisfy their burden to show TLA is solvent.

---

[42]    Mr. Dellepiane takes issue with utilizing TLA's financial statements to assess the fair value of its assets and liabilities, claiming they utilize book values of assets and liabilities, which can differ from fair value. *See* TLA Claimholders Tr. Ex. 123, Amended Rebuttal Declaration of Santiago Dellepiane, dated May 15, 2022 ¶¶ 17-22. But his criticism focuses largely on how the fair value of assets may exceed their book value, not on the fair value of liabilities.

In failing to account for the liabilities set forth above, Mr. Dellepiane has overlooked

section 101(32)'s directive that TLA is solvent only if "the sum of [its] debts is" not greater than

its assets. *See* 11 U.S.C. § 101(32). Mr. Dellepiane's consideration of only a subset of TLA's

liabilities plainly does not provide a calculation of "the sum" of its liabilities. *See id*.

Moreover, the Court finds the Distributable Value Waterfall is ill suited to assess the fair

value of the assets and liabilities of any individual Debtor and thus does not provide a solvency

analysis.  Mr. Herlihy performed a waterfall analysis to determine if the Class 4 Compromise

falls within the range of reasonable outcomes. *See*, *e.g*., Herlihy Report at 69. He concluded such

a settlement was in fact reasonable, in part, because it was crafted as part of the RSA

negotiations, which "include various interrelated terms" and ultimately culminated in the

Backstop Agreements and the Plan and paved the way for the Debtors to emerge from Chapter

11. *See*, *e.g*., *id*. at 62-64. In other words, his analysis is predicated on a holistic review of the

Class 4 Compromise and a task of determining whether the settlement falls within a range of

reasonableness when viewed in the context of the requests from the holders of the LATAM

2024/2026 Bonds and how the RSA, Backstop Agreement, and ultimately the Plan itself, rest, in

part, on recognizing those requests. *See id*. at 69 ("Based on a holistic review of these scenarios,

PJT determines that it was within the range of reasonableness to pay 100% of the principal and

accrued pre-petition interest on [the LATAM 2024/2026 Bonds] in cash at emergence, without

any post-petition interest or new money investment rights."); *see also id*. at 62 ("Without the

Class 4 Treatment, as part of the comprehensive plan terms that addressed their various claims, it

is unlikely that the parties to the RSA and related exit new money commitments under the

Backstop [] Agreements . . . would have supported the Plan and provided the approximately

$5.4bn of commitments that they have agreed to provide"). That directive does not speak to

whether "the sum of [TLA's liabilities] is greater than all of [TLA's property] . . . ." *See* 11 U.S.C. § 101(32). Section 101(32) does not call for such a holistic approach and Mr. Herlihy does not purport to perform a solvency analysis through the Distributable Value Waterfall.[43]

The Debtors criticize the DCF Methodology because it relies on financial projections that assume TLA will operate as part of the consolidated Debtor group. They say that assumption inflates the value of TLA's assets. *See* Debtors Omnibus Reply ¶ 113. These projections incorporate the Debtors' assumptions in their Business Plan and they contend that it is illogical for Mr. Dellepiane to base his DCF Methodology on those assumptions and projections. *Id.* ¶ 124. They say that is so because if the TLA Claimholders are successful in obtaining PPI at the rate they calculate, it would substantially undermine their execution of the Business Plan by extracting approximately $150 million in interest and thus depleting the cash and liquidity the Debtors need to exit chapter 11. *Id.*

The Debtors also contend that the DCF Methodology fails to assess solvency as required under section 101(32) of the Bankruptcy Code because it attempts to measure the *current* value of *future* cash flows—amounts that are inherently subjective, indefinite, and do not speak to the value of the assets TLA holds today or held at the Petition Date. *See id.* ¶ 113. The Court agrees—the discounted value of future cash flows does not measure the "sum of . . . [an] entity's property" and, thus, does not provide a fair value of an entity's assets from which to compare the fair value of its liabilities. *See* 11 U.S.C. § 101(32). In other words, the DCF Methodology, by attempting to measure today's value of TLA's future cash flows under the assumptions in the Business Plan, does not speak to the test called for under section 101(32). Put simply, it does not

---

[43]    The disconnect between Section 101(32)'s definition of insolvency and the Distributable Value Waterfall is reinforced by the fact that Mr. Dellepiane did not review the Bankruptcy Code's definition of "insolvent" as part of rendering his opinion. May 17, 2022 Hr'g Tr. – Public Session at 102:21-24.

provide a means to determine the fair value of TLA today. Courts have regularly expressed

skepticism of discounted cash flow valuations for this reason. *See, e.g., In re Breitburn Energy*

*Partners LP*, 582 B.R. 321, 331 (Bankr. S.D.N.Y. 2018) (a "forward-looking discounted cash

flow analysis . . . is even more subjective [than a precedent-transactions or comparable-company

analysis]. It involves predicting future revenues and expenses, and therefore requires

assumptions regarding future prices and future costs . . . that are no more than guesses."); *In re*

*PTM Techs., Inc*., No. 10-50980c-11W, 2013 WL 4519306, at *6 (Bankr. M.D.N.C. 2013)

(finding measurements of cash flow do not measure solvency under section 101(32) of the

Bankruptcy Code). Accordingly, the Court finds that the DCF Methodology does not accurately

measure the fair value of TLA's assets and, thus, does not accurately determine if TLA is

solvent.

*The Liquidation Analysis and Balance Sheet Test Comport with Section 101(32)*

Mr. Edgar utilizes two methodologies: (1) a liquidation analysis (the "Liquidation

Analysis"); and (2) a balance sheet analysis (the "Balance Sheet Test"). TLA is insolvent under

both. The Court finds both methodologies satisfy section 101(32) of the Bankruptcy Code for the

reasons set forth below.

The Liquidation Analysis analyzes the funds that would be raised if each item of property

(*i.e.*, each asset) of TLA were sold at market value in an orderly sale process,[44] and then

---

[44] The Liquidation Analysis sets forth values for the following categories of liabilities: wind down costs, DIP
carve out, payment of secured claims up to the value of collateral, DIP repayment, payment of administrative and
priority claims, and payment of general unsecured claims. It provides no recovery to these final two categories
because of insufficient recovery from TLA's assets in the hypothetical liquidation. *See* Debtors Tr. Ex. 4
(Liquidation Analysis of TAM Linhas Aereas S.A.) ("TLA Liquidation Backup").

Mr. Edgar presents the Liquidation Analysis for the aggregate Debtor group, as well as for each individual
Debtor, including TLA. *See* TLA Liquidation Backup; Debtors Tr. Ex. 3 (Declaration of Brock Edgar in Support of
the Liquidation Analysis Presented in Exhibit B to the Fifth Revised Disclosure Statement of LATAM Airlines
Group S.A., et al.) (the "Edgar Disclosure Statement Decl."), at Ex. 2. The Liquidation Analysis contemplates a
"low recovery scenario" and a "high-recovery scenario." In a low-recovery scenario, asset realization recoveries are

compares that total amount to the total amount of TLA's claims and liabilities. Debtors Omnibus

Reply ¶ 116. Mr. Edgar estimates that the sale of property yields between $360.1 and $490.8

million[45]—an insufficient amount to pay all administrative and priority claims, let alone all

claims (*i.e.*, the general unsecured claims, including the TLA GUCs). *See* TLA Liquidation

Backup. Because claims against TLA constitute part of its liabilities, the Liquidation Analysis

purports to show that TLA is insolvent.

Under the Balance Sheet Test, Mr. Edgar compares TLA's total liabilities and assets as

reflected on: (1) TLA's 2021 audited financial statements; and (2) TLA's March 2022 unaudited

balance sheet. Using both sources, TLA's assets exceed its liabilities and, thus, Mr. Edgar

contends TLA is insolvent. *See* Edgar Decl. ¶ 11. The 2021 financial statement shows that TLA's

liabilities as of December 31, 2021 exceeded its assets by more than BRL 2 billion (or

approximately $360 million). *Id*. The monthly balance sheet shows that TLA's liabilities

---

assumed to be negatively impacted while claims not already finally determined in the Chapter 11 claims process are estimated at their highest potential amount. Edgar Decl. ¶ 9. This scenario assumes a liquidation over a 12-month period. Edgar Disclosure Statement Decl. ¶ 12. In a high-recovery scenario, the liquidation proceedings are assumed to occur over an 18-month period, asset realization recoveries increase, and claims not finally determined in the Chapter 11 claims process are estimated at a lower potential amount. Edgar Decl. ¶ 9. Based on these two paradigms, Edgar states the Liquidation Analysis presents a range of potential recoveries creditors may likely receive under a hypothetical Chapter 7 liquidation proceeding. In both the low- and high-recovery scenarios, Edgar estimates that TLA's unsecured creditors recover nothing. Edgar Decl. ¶ 10.

[45]    Mr. Edgar states that the proceeds from the hypothetical liquidation of TLA include the following assets: cash and cash equivalents, accounts receivable, intercompany receivables, "other financial assets" (assets held for sale, cash deposits, certain collateralized letters of credit, and other cash financial guarantees provided to secure the supply of aircraft equipment and other goods and services), prepaid expenses and deposits, inventory, other receivables and prepayments, intangible assets, property, plant and equipment, deferred tax assets, and investments in related parties. Edgar Disclosure Statement Decl., Ex. 2 § D.1. Mr. Edgar assigns both a "book value" (approximately $1.912 billion in total) and "proforma value" (approximately $1.468 billion in total) to these assets, which he then multiplies by his hypothetical low-end and high-end recovery percentages. *See* TLA Liquidation Backup. This yields a collective recovery of $360.1 to $490.8 million. *See id*.

Mr. Edgar indicates that he derives the fair value of each asset by estimating what it could be sold for in the market. For example, the Liquidation Analysis relies on third-party appraisals for certain assets, such as spare parts inventory, and relies on blue book valuation reports for aircraft. Edgar Disclosure Statement Decl., Ex. 2 § D.1.

exceeded its assets by BRL 6 billion (or approximately $1.3 billion). *Id*.[46] Accordingly, Mr.

Edgar contends that TLA is insolvent using either source.

Mr. Dellepiane contends that Mr. Edgar's Liquidation Analysis does not provide the fair

value of TLA's assets and liabilities and, thus, does not accurately compare the figures. First, Mr.

Dellepiane states that the Liquidation Analysis is unreliable because it reflects an assumption

that is at odds with the Debtors' Business Plan—that TLA will not continue to operate post-

emergence as a going concern. *See* Am. Dellepiane Rebuttal Decl. ¶¶ 11-14. He says the

Liquidation Analysis itself recognizes this fact given its disclaimer stating: "THE

LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE

DEBTORS' ASSETS AS A GOING CONCERN." Am. Dellepiane Rebuttal Decl. ¶ 12 (quoting

Edgar Disclosure Statement Decl., Ex. 2 at 4). Second, Mr. Dellepiane contends that the

Liquidation Analysis inaccurately includes liabilities that would not exist but for a liquidation[47]

(which, again, Dellepiane contends, is contrary to the Debtors' Business Plan). *Id*. ¶ 15 (citing

Edgar Decl., Ex. 2 § B.4).

Mr. Dellepiane also contends that Mr. Edgar's Balance Sheet Test does not accurately

value TLA's assets and thus does not accurately determine if TLA is solvent. *See id*. ¶ 18. He

says that is so because the methodology relies on the book value of assets, which is the original

price paid for an asset less allowable depreciation. *Id*. Mr. Dellepiane contends that an asset's

current or market value will exceed its book value for entities with "significant growth

opportunities." *Id*. ¶ 20. He utilizes a bevy of examples where a company is balance-sheet

---

[46]    *See also* Debtors Tr. Ex. 6 (Classified Financial Statements of TAM Linhas Aereas S.A.) (the "TLA Financial Statements").

[47]    Mr. Edgar notes that these include: "employee termination and severance claims, tax liabilities and damages claims related to the termination of executory contracts and unexpired leases, including claims arising from the rejection of aircraft lease agreements." Edgar Disclosure Statement Decl., Ex. 2 (Liquidation Analysis) § B.4.

insolvent (utilizing book value of its assets), yet its market value is positive on a going concern

basis. *Id.*, Figures 1-3 (showcasing negative book value of equity yet positive market

capitalization for American Airlines, Air France, and Air Canada across various years). He also

points to examples outside the aviation sector in an effort to purportedly discredit Mr. Edgar's

methodology, noting that Starbucks's recent Form 10-K suggests that it is "balance-sheet"

insolvent, yet trades a value of $133 billion. *Id.* ¶ 24. Mr. Dellepiane further contends that even

companies in chapter 11 proceedings can sell their assets in excess of book value, pointing to

Hertz Global Holdings Inc.'s sale of a subsidiary for a $400 million gain over book value. *Id.* ¶

25. Mr. Dellepiane also maintains that the Debtors implicitly concede that utilizing book value is

inappropriate given that Mr. Herlihy's methodologies in assessing the Class 4 Compromise do

not rely on it, as demonstrated above. *Id.* ¶ 26.

The Court finds these criticisms are without merit. The Liquidation Analysis and Balance

Sheet Test both comport with the definition of "insolvent" under Section 101(32) of the

Bankruptcy Code. Unlike the Distributable Value Waterfall and DCF Methodology, they

measure TLA's assets on an asset-by-asset basis. The TLA Liquidation Backup sets forth high-

and low-end recoveries for eleven categories of assets, which provide the total proceeds from

selling TLA's assets. *See generally* TLA Liquidation Backup. Mr. Edgar compiled this data by

estimating what each asset could be sold for in the market over a twelve-to-eighteen month

period. *See*, *e.g.*, Edgar Disclosure Statement Decl., Ex. 2 (Liquidation Analysis) § D.1. That

methodology comports with both the plain language of section 101(32) (calling for "the sum" of

an entity's debts and liabilities) and caselaw measuring "fair valuation" for purposes of an

insolvency analysis—caselaw that the TLA Claimholders themselves cite. *See* 11 U.S.C. §

101(32); *In re BWP Transp., Inc.,* 462 B.R. 225, 234 (Bankr. E.D. Mich. 2011) (adopting

liquidation analysis detailing aggregate value of individual items of property if sold off at fair market value). Moreover, the duration of the sale process in the high-end recovery scenario—18 months—undercuts the TLA Claimholders' argument that the Liquidation Analysis provides depressed, forced-sale asset recoveries and thus does not reflect "fair valuation."[48] Edgar Disclosure Statement Decl., Ex. 2 § D (comparing the low-end recovery scenario where "asset realization recoveries are assumed to be negatively impacted by the reduced liquidation time frame" with the high-end scenario where "asset realization recoveries increase"). Under the high-end scenario, the Liquidation Analysis aggregates TLA's assets at $490.8 million—still well short of providing TLA with a means to satisfy its liabilities and thus demonstrating TLA is insolvent.

The Balance Sheet Test likewise aggregates the sum of TLA's assets and liabilities unlike the Distributable Value Waterfall and the DCF Methodology and, thus, the Court finds it also satisfies section 101(32) of the Bankruptcy Code. TLA is insolvent under the Balance Sheet Test because the sum of TLA's assets exceed the sum of its liabilities by approximately $360 million to $1.3 billion using year-end 2021 financial statements and March 2021 month-end statements, respectively. Edgar Decl. ¶ 11. While Mr. Dellepiane takes issue with the use of book values in the Balance Sheet Test, claiming that an asset's true value may exceed its book value, he has provided no concrete evidence that is the case for any particular asset of TLA and, moreover, he takes no issue with the book value of liabilities listed in TLA's financial statements. Given the delta between TLA's assets and liabilities on the March 2022 financial statement (*i.e.*, approximately $1.3 billion), Mr. Dellepiane's criticism does not even purport to demonstrate how this gap could be bridged. *See* TLA Financial Statements. Moreover, courts regularly

---

[48]    Mr. Dellepiane has set forth no evidence that an 18-month sale is somehow a rushed "fire sale" and does not provide "fair valuation" under section 101(32) of the Bankruptcy Code. *See* Rebuttal Edgar Decl. ¶ 20.

employ balance sheet tests to determine insolvency, *i.e.*, whether the sum of an entity's assets exceeds the sum of its liabilities. *See, e.g.*, *In re PTM Techs., Inc.*, 2013 WL 4519306, at *6 ("the Bankruptcy Code defines insolvency using the balance sheet test, not cash flow. The test for whether a debtor is solvent is whether the debts of such entity are less than its assets, at fair valuation"); *In re Uhlmeyer*, 67 B.R. 977, 980 (Bankr. D. Ariz. 1986) ("Insolvency is determined by use of § 101[32] of the Code, the so-called balance sheet test: Debtor is insolvent if the sum of her debts is greater than her assets at fair valuation"); *see also* 2 Collier on Bankruptcy P 101.32 (16th ed. 2022) ("the Code definition of insolvency is essentially a balance sheet test").

Accordingly, for the reasons set forth above, the Court finds that Mr. Edgar's Balance Sheet Test and Liquidation Analysis appropriately assess whether TLA is solvent under section 101(32) of the Bankruptcy Code. The Court finds TLA is insolvent under both methodologies. Accordingly, the TLA Claimholders have no right to recover PPI on the TLA GUCs.

<u>Whether the Solvent Debtor Exception Is Applicable Under the Bankruptcy Code</u>

Moreover, assuming *arguendo* that the TLA Claimholders could prove that TLA is solvent, they nonetheless would not be entitled to PPI on the TLA GUCs at the rate set forth in the Debt Instruments. The TLA Claimholders contend that the solvent debtor exception survived the enactment of the Bankruptcy Code through section 1124(1) and, if TLA is solvent, they should be permitted to recover PPI at the contract rate specified in the Debt Instruments.[49] The

---

[49]    The Debtors have requested that the Court exclude certain slides that the TLA Claimholders presented as part of their argument at the evidentiary hearing concerning Plan confirmation (the "Closing Presentation"). The Debtors contend that these slides are not proper demonstratives because they do not categorize or otherwise comment on the record evidence, but instead present new legal argument and new case law absent from the TLA Claimholders Objection.

The Court does not find that the Closing Presentation presents new legal arguments and, accordingly, declines to exclude its contents. The slides at issue speak squarely to the legal theory behind the TLA Claimholders' Objection to the Plan. These include (1) whether solvent debtors must pay PPI to creditors under section 1124(1); (2) the evolution of the solvent debtor exception; (3) whether (and how) the solvent debtor exception survived the enactment of the Bankruptcy Code; (4) the proper methodology to assess TLA's solvency under section 101(32) of

Court disagrees and finds that the solvent debtor exception survived through section

1129(a)(7),[50] not section 1124(1). Because section 1129(a)(7) adopts section 726(a)(5) of the

Bankruptcy Code, which calls for interest to be paid "at the legal rate," the Court finds that if

TLA was solvent, the TLA Claimholders would only be entitled to interest at the federal

judgment rate, not the so-called contract rate—i.e., the rate set forth in the Debt Instruments.

In support of their position, the TLA Claimholders rely heavily on a pre-Bankruptcy

Code case, *Ruskin v. Griffiths*, in which the Second Circuit articulated the solvent debtor

exception, which they contend requires that unsecured creditors of a solvent debtor receive their

full contract rights, including post-petition interest on their claims. *See* 269 F.2d 827, 832 (2d

Cir. 1959). They say that is so because the solvent debtor exception recognizes a long-standing

equitable principle: a debtor with the ability to pay his debts in full should be required to do so.

TLA Claimholders Obj. ¶ 29.

---

the Bankruptcy Code; and (5) the proper interest rate at which solvent debtors must pay PPI to their creditors. Courts will exclude closing presentations as improper when they rely on new legal arguments, but here, the issues listed above are not new. *See, e.g.*, *Bank One, Texas, N.A. v. F.D.I.C.*, 16 F. Supp. 2d 698, 706 (N.D. Tex. 1998) ("The court has analyzed Bank One's demonstrative aids by assessing whether they raise arguments included in Bank One's briefing, and has relied only on arguments and materials fairly presented in Bank One']s briefs filed prior to oral argument."). And, moreover, with the exception of two slides in the Closing Presentation, the remaining allegedly improper slides largely recast the same case law the parties have already debated in their briefs. With respect to case law not discussed in the TLA Claimholders Objection or the Debtors Omnibus Reply, the Court finds their inclusion in the Closing Presentation little different than had counsel simply raised them orally at the evidentiary hearing—an avenue that even the Debtors could not reasonably object to.

50    Section 1129(a)(7)(A) of the Bankruptcy Code states that:

   (a)   The court shall confirm a plan only if all of the following requirements are met:

     (7) With respect to each impaired class of claims or interests—

      (A) each holder of a claim or interest of such class—
          (i) has accepted the plan; or
          (ii) will receive or retain under the plan on account of such claim or interest property of a
          value, as of the effective date of the plan, that is not less than the amount that such holder
          would so receive or retain if the debtor were liquidated under chapter 7 of this title on such
          date[.]

11 U.S.C. § 1129(a)(7).

The TLA Claimholders contend the solvent debtor exception articulated in *Ruskin* has survived the enactment of the Bankruptcy Code and thus provides an exception to section 502(b)(2)'s ban on post-petition interest. *Id*. ¶ 30. They say that is so based on the legislative history of the repeal of section 1124(3) of the Bankruptcy Code. *Id*. ¶ 31. Thus, they claim that section 1124(1) effectively codified *Ruskin* and provides the mechanism for them to recover PPI from the Debtors. *See id*. ¶¶ 29-31.

In addition to citing the bar to the payment of PPI under section 502(b)(2), the Debtors advance four primary arguments in opposition to paying PPI on account of the TLA GUCs. First, the Debtors contend that the solvent debtor exception did not survive the enactment of the Bankruptcy Code in the way the TLA Claimholders claim it did, as only sections 1129(a)(7) and 726(a)(5) of the Bankruptcy Code provide exceptions to section 502(b)(2) (as relevant here), neither of which is applicable. Debtors Omnibus Reply ¶ 131. They claim if the solvent debtor exception survived, it lives in those provisions, not within section 1124(1). Second, they contend that the solvent debtor exception is not applicable because it is contrary to Supreme Court authority that limits bankruptcy courts' use of equitable power in a way that contravenes the Bankruptcy Code. *Id*. ¶ 133. Third, the Debtors argue that even if the Court finds *Ruskin* remains good law following the enactment of the Bankruptcy Code, it is distinguishable on its facts and cannot provide a rationale to award the TLA Claimholders PPI on their claims. *Id*. ¶¶ 135-136. And fourth, and relatedly, the Debtors contend that the TLA Claimholders misrepresent and distort the post-Bankruptcy Code law concerning the solvent debtor exception, none of which they claim supports a "freestanding equitable exception that permits a court to disregard § 502(b)(2)'s express disallowance of unmatured interest." *Id*. ¶ 138. The Parent GUC Ad Hoc

Group makes similar arguments in opposing the TLA Claimholders' request. *See* Parent GUC

Ad Hoc Group Reply ¶¶ 32-41.

      The TLA Claimholders and Debtors also debate what interest rate should apply to the

TLA GUCs, assuming that the TLA Claimholders are entitled to PPI. The TLA Claimholders

contend that Congress has "defined impairment in the broadest possible terms," *Taddeo v. Di*

*Pierro (In re Taddeo)*, 685 F.2d 24, 28 (2d Cir. 1982), and the "Bankruptcy Code creates a

presumption of impairment." *In re PPI Enter. (U.S.), Inc.*, 324 F.3d at 203; *see also Windsor on*

*the River Assocs., Ltd. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs., Ltd.)*, 7

F.3d 127, 130 (8th Cir. 1993) ("any alteration of a creditor's rights, no matter how minor,

constitutes 'impairment.'"). The TLA Claimholders concede that PPI has been calculated

differently by different courts. TLA Claimholders Obj. ¶ 34. *Compare In re Ultra Petroleum*

*Corp.*, 624 B.R. 178, 198-199 (Bankr. S.D. Tex. 2020) ("*Ultra Petroleum II*") (contract rate) *and*

*In re Mullins*, 633 B.R. 1, 19-20 (Bankr. D. Mass. 2021) (state judgment rate), *with Hertz*, 2021

WL 6068390, at *16 (federal judgment rate) *and In re PG&E Corp.*, 610 B.R. 308 (Bankr. N.D.

Cal. 2019) (same).

      The TLA Claimholders contend that the disparity in interest rates is new, and that,

decades ago, *Ruskin* directed that the contractual rate of interest should be applied to provide

creditors what they bargained for in solvent debtor cases. *See* Claimholders Obj. ¶¶ 35-36 (citing

*Ruskin*, 269 F.2d at 832 (reversing district court and applying PPI at the contractual default rate,

finding that such rate was neither a penalty nor unconscionable and reasoning that a solvent

debtor cannot be allowed to "escape the expressly-bargained-for result of its act")).

      The Debtors rely heavily on *In re PG&E Corp.*, 610 B.R. 308, and *Hertz*, 2021 WL

6068390, to argue that, at best, the TLA Claimholders are entitled to PPI at the federal judgment

rate. *See* Debtors Omnibus Reply ¶ 140; *see also In re Daffy's, Inc.*, No. 12-13312 (MG), 2013

WL 1703267, at *19 (Bankr. S.D.N.Y. Apr. 17, 2013) ("Courts have held that a creditor who

receives payment in full with interest at the federal judgment rate is not impaired"). The TLA

Claimholders contend that *In re PG&E Corp.* and *Hertz* should not be applied here because they

are contrary to binding Second Circuit precedent (*i.e*, *Ruskin*). TLA Claimholders Obj. ¶ 39.

They say these cases are premised on a mistaken finding that section 1129(a)(7) (the best interest

test) is the only basis to provide PPI to unimpaired unsecured creditors. *In re PG&E Corp.*, 610

B.R. at 312 (bankruptcy court's decision was based on its reading of Ninth Circuit precedent as

dictating that the best interests test, and the standard in section 726(a)(5) of the Bankruptcy

Code, was the only basis for unimpaired creditors of solvent debtors to obtain PPI); *Hertz*, 2021

WL 6068390, at *16 ("Significantly, neither the Bankruptcy Code nor the Legislative History

expressly states that unimpaired creditors are entitled to their contract rate of interest or even to

more than impaired creditors in the case of a solvent debtor. Instead, the Legislative History

provides strong evidence Congress intended that unimpaired creditors in a solvent chapter 11

debtor case should receive post-petition interest only in accordance with sections 1129(a)(7) and

726(a)(5).").

      The TLA Claimholders contend that the Court should not follow this line of cases (and

reasoning) because it is contrary to Second Circuit precedent, other rulings in this district, the

solvent debtor exception, and the Bankruptcy Code. TLA Claimholders Obj. ¶ 39 (citing *In re

Mullins*, 633 B.R. at 16 ("[I]n solvent debtor cases, the requirement in § 1129(b) that a plan of

reorganization be 'fair and equitable' may require the payment of postpetition interest on

allowed claims in amounts greater than would be required to satisfy the 'best interests test' of §

1129(a)(7)(A)(ii) and the 'absolute priority rule' set out in § 1129(b)(2)(B).")). They say that is

so because in the Second Circuit, an unimpaired creditor's entitlement to receive contract rate

interest from a solvent debtor arises from equitable considerations and is not limited by the best

interest test. *Id.* ¶ 42 (citing *In re 53 Stanhope*, 625 B.R. at 578-79).

The Court finds that if TLA was solvent, the TLA Claimholders would be entitled to PPI

on the TLA GUCs at the federal judgment rate, not the rate called for in their Debt Instruments.

As set forth below, providing contract-rate interest is contrary to the express prohibition of

unmatured interest on claims under section 502(b)(2), relies too heavily on the reasoning in *Ultra

Petroleum II*, and mischaracterizes the degree to which (and how) the solvent debtor exception

has survived the enactment of the Bankruptcy Code.

In *Ultra Petroleum II*, the bankruptcy court on remand analyzed whether the solvent

debtor exception survived enactment of the Bankruptcy Code and, if so, what provision of the

Bankruptcy Code implicitly codified it and called for a solvent debtor to pay its unimpaired

unsecured creditors interest at their contract rate. 624 B.R. at 200-204. The court held that the

solvent debtor's unimpaired creditors were entitled to post-petition interest at the contract rate

pursuant to section 1124(1) of the Bankruptcy Code in order to ensure their equitable rights to

such interest were not altered. *Id.* at 202; 11 U.S.C. § 1124(1) ("a class of claims or interests is

impaired under a plan unless . . . [it] leaves unaltered the legal, equitable, and contractual rights"

of a claimholder). It held as such based on the legislative history of section 1124 and the fact that

the provisions of the Bankruptcy Code that expressly codified aspects of the solvent debtor

exception—*e.g.*, section 1129(a)(7)—were not applicable. *Ultra Petroleum II*, 624 B.R. at 200-

202. The court noted that Congress amended section 1124 in response to *In re New Valley Corp.*,

168 B.R. 73 (Bankr. D.N.J. 1994) ("*New Valley*"), which held that a solvent debtor's plan

permissibly withheld post-petition interest from a class of unsecured creditors pursuant to section

1124(3) of the Bankruptcy Code. Section "1124(3) stated that a claim was unimpaired where 'the

holders of such claim . . . receive[d] . . . cash equal to . . . the allowed amount of such claim.'"

*Ultra Petroleum II*, 624 B.R. at 199 (quoting 11 U.S.C. § 1124(3) (1988)). In 1994, Congress

removed section 1124(3) from the Bankruptcy Code. *See* H.R. Rep. No. 103-835 (1994). In

doing so, it stated:

> The principal change in this section ... relates to the award of postpetition interest.
> In a recent Bankruptcy Court decision in *New Valley*, unsecured creditors were
> denied the right to receive postpetition interest on their allowed claims even
> though the debtor was liquidation and reorganization solvent. The *New Valley*
> decision applied section 1124(3) of the Bankruptcy Code literally by asserting ...
> that a class that is paid the allowed amount of its claims in cash on the effective
> date of a plan is unimpaired under section 1124(3), therefore is not entitled to
> vote, and is not entitled to receive postpetition interest .... In order to preclude this
> unfair result in the future, the Committee finds it appropriate to delete section
> 1124(3) from the Bankruptcy Code.

*Ultra Petroleum II*, 624 B.R. at 200 (citing H.R. Rep No. 103-835, at 47-48 (1994)).

The court found that this excerpt from the House Reporter demonstrates that in enacting

the Bankruptcy Code, Congress did not intend to eliminate the solvent debtor exception for

unimpaired unsecured creditors of solvent debtors, notwithstanding that no provision of the

Bankruptcy Code expressly provided for them to receive PPI from solvent debtors.[51] *See id.* at

199-200. Focusing on the "unfair result" evoked by Congress, the court found that the repeal of

section 1124(3) of the Bankruptcy Code demonstrated that unimpaired unsecured creditors must

receive their "bargained for interest"—*i.e.*, interest under their contractual rates—through the

solvent debtor exception's operation in section 1124(1). *See id.* at 200.

---

[51]    The court recognized that the Bankruptcy Code codified the solvent debtor exception for impaired unsecured
creditors in section 1129(a)(7) of the Bankruptcy Code but found that provision could not justify an award of PPI to
unimpaired creditors. *See Ultra Petroleum II*, 624 B.R. at 202 ("[n]othing in the text of the Bankruptcy Code applies
§ 1129(a)(7) to unimpaired creditors."). As such, it found it necessary to look elsewhere in the Code to "understand
the solvent debtor exception's operation." *Id*. at 200.

However, *Ultra Petroleum II* does not persuasively demonstrate why Congress intended for contract-rate interest to apply to creditors' claims against solvent debtors. First, applying PPI to unimpaired creditors' claims is contrary to the express language of the Bankruptcy Code. Section 502(b)(2)'s bar on unmatured interest is not limited to cases other than solvent debtors. Congress could have amended this provision accordingly—in 1994 or otherwise—but it did not. Second, *Ultra Petroleum II* analyzed only a part of the legislative history of the repeal of section 1124(3). Analyzing the Congressional record in a more fulsome way demonstrates that Congress intended to address the "unfair result" of *New Valley* in the context of section 1129(a)(7), not section 1124(1) where the court in *Ultra Petroleum II* grounded its analysis.

Judge Walrath found as much in *Hertz*; this Court finds that reasoning persuasive. The court in *Hertz* also rejected *Ultra Petroleum II*'s conclusion that the legislative history of Congress' repeal of section 1124(3) of the Bankruptcy Code showcases Congress' intent that the solvent debtor exception survived enactment of the Code through section 1124(1) and calls for unimpaired creditors of solvent debtors to receive contract-rate interest. In doing so, the *Hertz* court noted that Congress explained the repeal's impact as follows:

> The principal change in this section is set forth in subsection (d) and relates to the award of postpetition interest. In a recent Bankruptcy Court decision in *In re New Valley Corp*., 168 B.R. 73 (Bankr. D.N.J. 1994), <u>unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent.... In order to preclude this unfair result in the future</u>, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.

> As a result of this change, if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization. If creditors vote for the plan of reorganization, it can be confirmed over the vote of dissenting class of creditors only if it complies with the "fair and equitable" test under section 1129(b)(2) of the Bankruptcy Code and it can be confirmed over the vote of dissenting

individual creditors only if it complies with the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

> The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code. Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery.

637 B.R. at 796 (citing H.R. Rep. No. 103-835, at 48 (1994)).

Judge Walrath found that this synopsis from the House Reporter, analyzed collectively, undermines the conclusion of *Ultra Petroleum II* that Congress intended to ground the solvent debtor exception in section 1124(1) for unimpaired creditors of solvent debtors. *Id.* Judge Walrath said that is so because:

> [w]hile Congress states that it would be unfair in a solvent chapter 11 debtor case for unimpaired creditors to receive no interest, it did not point to any provision of the Code that would allow interest to be paid to unimpaired creditors. Instead, it suggested that the failure to pay any interest to unsecured creditors in a solvent chapter 11 debtor would make them impaired and thus eligible to be paid interest by application of sections 1129(a)(7) and 1129(b)(2).

*Id.* Indeed, the legislative history explicitly cites section 1129(a)(7), not section 1124(1), while discussing the "unfair result" in *New Valley*. The Court finds that this suggests that Congress intended to preserve the solvent debtor exception in the context of the "best interest of creditors" test under 1129(a)(7), not section 1124(1)'s requirement that a class of creditors is impaired unless a plan leaves their "legal, equitable, and contractual rights" "unaltered." *See* 11 U.S.C. § 1124(1). As analyzed above, the latter speaks to impairment under a "plan", not the Bankruptcy Code and, thus, forecloses any argument that unimpaired creditors of solvent debtors are entitled to PPI at their contract rate. *See id.*; *see also Ultra Petroleum I*, 943 F.3d at 763; *In re PG&E Corp.*, 610 B.R. at 315-16 (reasoning that group of unsecured creditors of a solvent debtor were

entitled to interest on their claims at the federal judgment rate, not the contract rate, and rejecting argument that section 1124(1) demanded otherwise).

The Court finds that to reason otherwise—and deem the solvent debtor exception to be embodied within section 1124(1)—is contrary to the Supreme Court's directive that bankruptcy courts avoid creating judicial exceptions that contravene express provisions of the Code. *See*, *e.g.*, *Law v. Siegel*, 134 S. Ct. 1188, 1196-97 (2014) ("the Code's meticulous . . . enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."). That is so because of the unconditioned prohibition on unmatured interest within section 502(b)(2). 11 U.S.C. § 502(b)(2) (a claim "shall [be] allow[ed] . . . except to the extent that . . . such claim is for unmatured interest[.]"). Grounding the solvent debtor exception in section 1129(a)(7), on the other hand, complies with *Siegel* by finding a textual hook for the common law doctrine—one that comports with Congress' intent as evidenced by the House Reporter excerpt analyzed in *Hertz*. As such, the Court finds that to the extent the TLA Claimholders are entitled to PPI, the award is derived from section 1129(a)(7) of the Bankruptcy Code. *See Hertz*, 2021 WL 6068390, at *16 ("after consideration of the . . . express language of the Bankruptcy Code, and its Legislative History, the Court is convinced that the solvent debtor exception survived passage of the Bankruptcy Code only to a limited extent . . .. [including] in section 1129(a)(7) and 726(a)(5) as to unsecured creditors.").

That is not the end of the inquiry, as the Court must reconcile how section 1129(a)(7)—which on its face applies only to an "impaired class of claims or interests"—applies to the TLA Claimholders. If section 1129(a)(7) is applicable, it would yield the TLA Claimholders post-petition interest on the TLA GUCs at the federal judgment rate—totaling approximately $3 million. That is so because section 1129(a)(7), the best interest of creditors test, prevents

confirmation of a plan under chapter 11 if a dissenting impaired class obtains less under the plan

than it would if the debtor were liquidated under chapter 7. *Ultra Petroleum II*, 624 B.R. at 201.

Since an unsecured creditor under chapter 7 must receive post-petition "interest at the legal rate,"

11 U.S.C. § 726(a)(5), before any distribution to the debtor, section 1129(a)(7) operates to

provide impaired, unsecured creditors of solvent debtors with interest on their claims at the

federal judgment rate via section 726(a)(5) of the Bankruptcy Code.

The court in *Hertz* resolved this quandary by concluding that section 1129(a)(7) must

apply to both impaired and unimpaired creditors, notwithstanding that, by its plan language, it

applies only to the former. *See Hertz*, 2021 WL 6068390, at *16. Judge Walrath said that is so,

again, based on the legislative history of Congress' repeal of 1124(3). That history, as detailed

above, abrogated *New Valley*, which held that unimpaired creditors were not entitled to post-

petition interest because "sections 726(a)(5) and 1129(a)(7) were only applicable to impaired

creditors and because section 1124(3) required only the payments of the allowed amount of their

claims. . . ." *Id.* at *11 (citing *New Valley*, 168 B.R. at 79-81). By abrogating that "unfair result",

and explicitly referencing section 1129(a)(7), the Court in *Hertz* found that Congress must have

intended that both impaired and unimpaired unsecured creditors of solvent debtors who are

receiving payment of their claims in cash in full should receive PPI "at the legal rate," *see* 11

U.S.C. § 726(a)(5)—*i.e.*, the federal judgment rate. *See Hertz*, 2021 WL 6068390, at *16.

The Court agrees with *Hertz* and holds that if TLA was solvent, then the Debtors would

have to include PPI at the federal judgment rate to satisfy the TLA GUCs under the Plan. This is

so because the Court finds that the solvent debtor exception survived the enactment of the

Bankruptcy Code through section 1129(a)(7) (as relevant here), not section 1124(1) as the TLA

Claimholders contend. While the Court is cautious with reaching conclusions based, in part, on

equitable principles that seemingly wrangle with the Bankruptcy Code, it finds that the alternative outcomes—awarding no PPI or, alternatively, PPI at the rate under the Debt Instruments—are simply untenable and illogical. The former would offend basic tenants of fairness and the purposes of the Bankruptcy Code by essentially allowing impaired creditors to be treated better than unimpaired creditors via an overly strict reading of section 1129(a)(7) that is contrary to Congressional intent. While that outcome would comport with the plain language of section 1129(a)(7), this Court is cognizant that it should not adopt an "overly literal interpretation of the Bankruptcy Code," but rather must craft holdings that give effect to the Bankruptcy Code's provisions in harmony with legislative history and public policy. *See, e.g.*, *CompuAdd Corp. v. Tex. Instruments Inc., (In re CompuAdd Corp.)*, 137 F.3d 880, 882 (5th Cir. 1998); *see also Buchwald v. Williams Energy Mktg. & Trading Co. (In re Magnesium Corp. of Am.)*, 460 B.R. 360, 367 (Bankr. S.D.N.Y. 2011) ("Statutory provisions (including, and perhaps especially, those in the Bankruptcy Code) must be considered *in pari materia*, and one statutory provision in the Bankruptcy Code cannot be considered without reference to other relevant provisions of the same statute, and its object and policy."). And, if the Court followed *Ultra Petroleum II* and awarded contract-rate PPI on the TLA GUCs, doing so would lack a clear provisional hook in the Bankruptcy Code or its legislative history given that it rests on an interpretation of section 1124(1) that the Court finds is not appropriate for the reasons set forth above.

This result is not at odds with *Ruskin*, despite the TLA Claimholders claiming otherwise. TLA Claimholders Obj. ¶ 42. They rely heavily on *Ruskin*, contending that it is binding Second Circuit precedent that mandates that the Plan provide them PPI at the contractual rates set forth in their Debt Instruments. TLA Claimholders Obj. ¶ 2. They say that is so because *Ruskin*

articulated the common law solvent debtor exception in the Second Circuit by reasoning that

principles of equity and fairness dictate that a solvent debtor cannot "escape [its] expressly-

bargained for" agreements. *Ruskin*, 269 F.2d at 832. Furthermore, the TLA Claimholders

contend that *Ruskin* has survived the enactment of the Bankruptcy Code because it has been cited

approvingly by courts within the Second Circuit after Congress enacted the Bankruptcy Code.[52]

      The Court does not disagree. But the TLA Claimholders fail to note that the cases they

cite primarily address whether oversecured creditors, not unsecured creditors, are entitled to

contract-rate interest from solvent debtors. *See, e.g., In re Gen. Growth Prop., Inc.*, 451 B.R.

323, 328 (Bankr. S.D.N.Y. 2011) ("*General Growth*") (awarding default interest at the contract

rate pursuant to section 506(b)); *Urb. Communicators PCS Ltd. P'Ship v. Gabriel Cap. L.P.*, 394

B.R. 325, 338-340 (S.D.N.Y. 2008) ("*Urb. Communicators*") (utilizing *Ruskin* to apply

contractual default rate to calculate interest due on oversecured creditors' claims under section

506(b)"). That distinction matters because section 506(b) of the Bankruptcy Code expressly

provides that on "such claim[s], there shall be allowed to the holder of such claim[s], interest on

such claim . . . provided for under the agreement or state statute under which such claim arose."

---

[52]     For these reasons, the TLA Claimholders contend that the Court, bound by *Ruskin* and its progeny in the Second Circuit, could not reach the same outcome as the court in *Hertz. See* TLA Claimholders Obj. ¶ 42. The TLA Claimholders also contend that another recent bankruptcy court case, *In re Mullins*, undercuts *Hertz*'s logic concerning where and how the solvent debtor exception survived the enactment of the Bankruptcy Code. *See id.* ¶ 39 (citing *In re Mullins* for the proposition that "*Hertz* . . . should not be followed here as [it] runs counter to . . . the solvent debtor exception[] and the Bankruptcy Code"). The Court rejects that argument because it ignores the fact that *In re Mullins* and *Hertz* analyzed the solvent debtor exception in different legal contexts. The court in *Hertz* addressed whether the solvent debtor exception could be encompassed within section 1124(1)'s requirement that to be unimpaired, a plan must "leave[] unaltered the legal, equitable, and contractual rights" of a claimholder. *See* 11 U.S.C. § 1124(1). It found the solvent debtor exception did not survive within section 1124(1). *See Hertz*, 2021 WL 6068390, at *15 ("this Court cannot agree with the Bankruptcy Court in *Ultra Petroleum [II]* that being unimpaired mandates that the Noteholders receive their contract rate of interest [under section 1124(1)] in contravention of section 502(b)(2)."). The court in *In re Mullins* court found that the solvent debtor exception survived the enactment of the Bankruptcy Code through section 1129(b)'s cram down provision and held that for the solvent debtor to satisfy the "fair and equitable" provision of section 1129(b), it had to pay post-petition interest to an impaired class of creditors that did not accept the plan. 633 B.R. at 16. As such, *In re Mullins* is inapposite because, here, the Plan treats the TLA Claimholders as unimpaired and there is no need for the Court to analyze section 1129(b) of the Bankruptcy Code.

11 U.S.C. § 506(b).  As such, unlike here, the creditors in *General Growth* and *Urb. Communicators* benefited from an *express* textual hook in the Bankruptcy Code—section 506(b)—through which the bankruptcy court could exercise its equitable power. In other words, unlike the case with unsecured creditors, the courts in *General Growth* and *Urb. Communicators* were not faced with the potential for utilizing their equitable powers in a way that contravened the Bankruptcy Code—*i.e.*, the problem that, in the Court's view, renders *Ultra Petroleum II* unpersuasive, especially its holding that the solvent debtor exception for unsecured creditors was de facto codified within section 1124(1).[53] *See, e.g.*, *Hertz*, 2021 WL 6068390, at *15-16.

In that sense, the Court finds that *Ruskin* provides a court-created tool from which a bankruptcy court can construe express allowances through express provisions of the Bankruptcy Code, like the interest rate used to calculate PPI due to oversecured creditors, without running afoul of *Siegel* and creating judicial exceptions to the Bankruptcy Code's provisions. *See, e.g.*, *General Growth*, 451 B.R. at 328 ("The payment of default interest . . . is also consistent with the increasing reluctance of courts in this and other circuits, in construing the requirement of § 506(b) that an oversecured creditor receive 'interest,' to modify private contractual arrangements imposing default interest rates except where: (i) there has been creditor misconduct; (ii) application of the contractual interest rate would cause harm to the unsecured creditors; (iii) the

---

[53]    The TLA Claimholders also rely on *In re 53 Stanhope* seemingly to support the idea that *Ruskin* carves out a separate stand-alone home for the solvent debtor exception. *See* TLA Claimholders Obj. ¶ 42 (citing *In re 53 Stanhope*, 625 B.R. at 578–79 (citing how "longstanding case law" can provide an exception to the Bankruptcy Code's ban on unmatured interest). The Court finds that the TLA Claimholders put too much emphasis on this reference. *See id.* The court in *In re Stanhope* did not reason that exceptions to section 502(b) could be grounded in case law, such as *Ruskin*, in a manner divorced from the plain language of the Bankruptcy Code, and its object and policy. Further, the TLA Claimholders' reliance on *In re 53 Stanhope* is curious given that the exceptions to section 502(b) in the excerpt it cited—i.e., (i) the "best interests" test in section 1129(a)(7)"; (ii) "the fair and equitable test of section 1129(b)"; and (iii) "long standing case law"—did not provide the basis for its award of PPI to an oversecured creditor. *See id.* Instead, section 506(b) did. *See id.* at 580 ("I therefore conclude that unimpairment under section 1124(1) does not eliminate the factors that courts consider when they decide whether to apply a contract interest rate under section 506(b) and, more specifically, the consideration of those factors when deciding whether to employ a default rate as opposed to a non-default contract rate.").

contractual interest rate constitutes a penalty; or (iv) its application would impair the debtor's

fresh start."); *In re 53 Stanhope*, 625 at 579 ("[i]t is well established that section 506(b) does not

require an oversecured creditor's post-petition interest to be paid at any *particular* rate, the issue

here.").

   The TLA Claimholders further contend that, notwithstanding the above, the balance of

the equities separately entitles them to PPI on the TLA GUCs calculated at their contractual rate

of interest. *See* TLA Claimholders Obj. ¶ 45. They cite to the fact that section 1124(1) of the

Bankruptcy Code specifically states that a plan only unimpairs creditors when it leaves their

"equitable" rights unaltered. *See* 11 U.S.C. §1124(1). The Court is unpersuaded for the reasons

set forth above. Section 1124 speaks to impairment under a plan, not limitations expressly set

forth in the Code. *See, e.g. Ultra Petroleum I*, 943 F.3d at 765. As such, and as set forth above,

the Court declines to exercise its equitable powers in a manner at odds with the express language

of the Code, including its ban on "unmatured interest" (*i.e.*, PPI) under Section 502(b)(2).[54]

   But even if the Court indulged the TLA Claimholders, their argument is without merit.

The Court agrees with the Debtors that it would not be equitable to allow the TLA Claimholders

to receive approximately $150 million more to satisfy the TLA GUCs given the context of the

Plan. The Plan represents a delicate, intricate, and integrated compromise of myriad claims,

arguments, and rights. *See, e.g.*, Plan § 5.2. As such, providing the TLA Claimholders with an

additional recovery would reduce the recoveries to impaired creditors under the Plan and risk

disrupting the delicate balance set forth in it. The Court will not sanction that result.

---

[54] As with their contention that they are entitled to PPI calculated with the rates set forth in the Debt Instruments based on the Bankruptcy Code, the TLA Claimholders rely on caselaw concerning oversecured creditors, not unimpaired unsecured creditors like TLA. *See, e.g.*, *General Growth*, 451 B.R. at 328. These are distinguishable for the reasons set forth above and thus provide no support for the TLA Claimholders' equitable arguments.

In conclusion, the Court overrules the TLA Claimholders Objection.[55] The Court finds that the TLA GUCs are treated as unimpaired under the Plan and that the Plan does not run afoul of section 1124(1) of the Bankruptcy Code. As such, the Plan does not violate section 1129(a)(1) of the Bankruptcy Code. Finally, the Plan does not violate section 1129(a)(8) with respect to the TLA GUCs because the TLA Claimholders are not impaired and thus have no right to vote to accept or reject the Plan.

---

[55]    The Court also overrules the TLA Claimholders Supplemental Objection. This objection arose from the TLA Claimholders' supplemental deposition of Mr. Edgar, which took place after the Court concluded the evidentiary hearing with respect to Plan confirmation. The Court permitted the TLA Claimholders to conduct this supplemental deposition concerning an appraisal of the Debtors' frequent flier program, LATAM Pass (the "FF Program"), which the Debtors produced after the Court's deadline for parties in interest to file objections to Plan confirmation.

The TLA Claimholders contend that the Court should not give credence to Mr. Edgar's expert opinion because his Liquidation Analysis fails to expressly value the FF Program, including specific aspects of the FF Program that could be monetized (*e.g.*, intellectual property associated with the FF Program and proceeds generated from selling frequent flier points to third-party partners). *See* TLA Claimholders Supplemental Objection ¶¶ 1-7. They also contend that TLA could have used the value of the FF Program to raise debt, which they claim undermines Mr. Edgar's conclusion that TLA could not continue to operate as a going concern without LATAM Parent. *See id*. ¶ 3; *see also* Edgar Rebuttal Decl. ¶ 22 ("[w]ithout that association, it would be difficult for TLA to survive. It is questionable whether TLA on a standalone basis would have been able to obtain sufficient DIP financing on its own to survive . . . .").

The Court finds no merit to these contentions. First, as discussed above, the TLA Claimholders, not the Debtors, bear the burden of proof with respect to the issue of TLA's solvency. The supplemental objection sets forth no affirmative evidence of the value of the FF Program, let alone whether it is sufficient to boost the sum value of TLA's assets over its liabilities, as required under section 101(32) of the Bankruptcy Code. Second, the TLA Claimholders appear to take issue primarily with Mr. Edgar's Liquidation Analysis, not the Balance Sheet Test. Even assuming *arguendo* that Mr. Edgar's failure to expressly consider the value of the FF Program is fatal to the Liquidation Analysis, the Court found above that the Balance Sheet Test adequately assesses whether TLA is "insolvent" under section 101(32) (and indeed demonstrates TLA is insolvent). Finally, the Court declines to find that the potential value of the FF Program undermines Mr. Edgar's assessment that TLA could not obtain a loan. Mr. Edgar assessed whether TLA could obtain a loan as a potential alternative for TLA to continue to operate as a going concern without its affiliation with LATAM Parent and the financial benefits it obtains from that affiliation. *See* Edgar Rebuttal Decl. ¶ 22. He concluded that TLA was unlikely to obtain DIP financing on its own for various reasons, including its lack of available collateral. *Id*. The TLA Claimholders have set forth no evidence that the FF Program is valuable enough to change that assessment.

**The Columbus Hill Objection**

As a publicly held Chilean corporation, LATAM Parent is governed by the Corporations Act,[56] Corporations Act Regulation,[57] and Securities Market Act[58] and regulations promulgated thereunder. Ried Decl. at 6.[59] It is also subject to the oversight of Chile's securities regulator, the Financial Market Commission (*Comisión para el Mercado Financiero,* or the "CMF"). *Id.* at 7. Under the Corporations Act, a Chilean corporation cannot issue new shares of stock without first obtaining shareholder approval. *See* Corporations Act, Art. 15. The Corporations Act also grants the shareholders preemptive rights to subscribe for their pro rata portion of any shares issued by that corporation. *Id.*, Art. 25. The foregoing applies equally when the corporation is issuing shares or securities convertible into shares. *Id.* It is only after the corporation has obtained shareholder approval for the issuance of new shares, and the expiration of the mandated thirty-day preemptive rights period, that a Chilean corporation may allocate or offer shares or convertible securities that have not been purchased by existing shareholders, to third parties. *Id.*, Arts. 25, 29. The corporation cannot offer those shares or convertible securities to third parties at a price lower (or otherwise on terms more favorable) than the price or other terms offered to shareholders during the preemptive rights period. *Id.*, Art. 29.

---

[56]    Law No. 18,046, Ley Sobre Sociedades Anónimas [Chilean Corporations Act], 1981, Diario Oficial [D.O.] (the "Corporations Act").

[57]    Decree No. 702, Reglamento de la Ley de Sociedades Anónimas [Chilean Corporations Act Regulation], 2012 (the "Corporations Act Regulation").

[58]    Law No. 18,045, Ley de Mercado de Valores [Chilean Securities Market Act], 1981, Diario Oficial [D.O.] (the "Securities Market Act").

[59]    Columbus Hill Tr. Ex. 1 (Declaration of José Miguel Ried) (the "Ried Decl."). Mr. Ried is a Chilean lawyer and a Professor of Commercial law in Chile. He provided expert testimony on various Chilean law matters in support of the Columbus Hill Objection. *Id.* at 1.

Article 15 of the Corporations Act provides that a corporation can offer new shares for cash or non-cash "in kind" consideration. *Id.*, Art. 15. Where the purchaser offers "in kind" consideration for new shares, Articles 15 and 67 of the Corporations Act mandate (i) that the corporation obtain appraisals of the "in kind" consideration from at least two qualified independent experts (unless the shareholders vote unanimously to waive the requirement), and (ii) that shareholders holding a two-thirds or greater supermajority of the outstanding shares entitled to vote approve the transaction and the valuation. *Id.*, Arts. 15, 67; *see also* Ried Decl. at 14-16; Puga Decl. at 4.[60] It is settled that the "in kind" standards apply to the issuance of new shares, but not to the issuance of convertible securities. *See* Third Contador Decl. ¶¶ 17-18; [61] *see also* May 6, 2022 Ried Dep. at 64:22-65:6 (testifying that Corporations Act Article 15 does not discuss convertible notes).[62]

Chilean courts and regulators evaluate transactions to ensure that Chilean corporations are not seeking to avoid or impair the statutory appraisal, approval, and preemptive rights of shareholders. They will not recognize transactions that are structured to avoid compliance with these shareholder rights. *See* Ried Decl. at 18-20; Puga Decl. at 3. Under Chilean law, if a set of purportedly valid legal acts is put in place either to obtain a result forbidden or avoided by the law, or to conceal a breach of the law, those otherwise legal acts could be declared void under the "simulation" ("simulación") or fraud to the law ("fraude a la ley") doctrines. Ried Decl. at

---

[60]    Columbus Hill Tr. Ex. 2 (Declaration of Juan Esteban Puga) (the "Puga Decl."). Mr. Puga is a Chilean lawyer and Professor of Commercial law in Chile. He provided expert testimony on Chilean law matters in support of the Columbus Hill Objection. *Id.* at 1.

[61]    Debtors Tr. Ex. 18 (Declaration of Nelson Contador in Response to the Statements of Juan Esteban Puga Vial and José Miguel Ried Concerning the Plan's Alleged Violation of the Protections Granted to Shareholders of LATAM Under Chilean Law) (the "Third Contador Decl."). Mr. Contador is a Chilean lawyer and Professor of Commercial law in Chile. He provided expert testimony on Chilean law matters in support of the Debtors' request that the Court confirm the Plan. *Id.*, Ex. A (C.V. of Nelson Contador).

[62]    Columbus Hill Tr. Ex.14 (May 6, 2022 Deposition of José Miguel Ried) (the "May 6, 2022 Ried Dep.").

18-20; Puga Decl. at 4. An act would be considered simulated if (i) it consists of a declared

intention that does not match the actual intention of the parties, (ii) the declared intention has

been agreed upon by both parties and (iii) the actual intention is to deceive third parties. Ried

Decl. at 18-19. In contrast, fraud to the law involves indirectly circumventing a legal mandate or

prohibition in a manner that it is rendered ineffective, and its final intention is evaded. *Id*. at 19.

While the purpose of simulation is to conceal a violation of the law, the purpose of a fraud to the

law is to circumvent a statutory rule. *Id.*

Columbus Hill asserts that the provisions of the Plan governing the issuance of the New

Convertible Notes violate Chilean law and cannot be implemented in Chile. For that reason, it

says that the Court must deny confirmation because the Plan does not satisfy section 1129(a)(11)

of the Bankruptcy Code since it is not feasible, and because the Debtors cannot show that they

proposed the Plan in good faith, as required by section 1129(a)(3) of the Bankruptcy Code.

*See* Columbus Hill Obj. ¶¶ 9, 46. Columbus Hill makes several arguments in support of the

objection. It contends that the Plan violates the preemptive rights of LATAM Parent's

shareholders over stock, and securities convertible into stock, because it offers Class B Notes and

new LATAM Parent shares underlying the notes to the RSA Shareholders on better terms than it

offers to existing LATAM Parent shareholders. *See id*. ¶¶ 1, 8, 27; Ried Decl. at 3, 5. It also

asserts that the Plan violates the preemptive rights of the LATAM Parent shareholders to acquire

Class A Notes and Class C Notes and the new LATAM Parent shares underlying those notes

because it offers the notes to Holders of Allowed General Unsecured Class 5 Claims at lower

prices and on better terms than those that will be offered to existing shareholders during the

preemptive rights offering period. *See* Columbus Hill Obj. ¶¶ 1, 16-26; Ried Decl. at 4-5, 9-12,

36-37.

On a different note, in support of the objection, Columbus Hill contends that the procedures that the Debtors intend to implement in issuing the Class A Notes and Class C Notes violate Chilean law. In substance, Columbus Hill argues that the Court must disregard the labels attached to the notes and treat them as stock, because the Class A Notes and Class C Notes are not bona fide debt instruments, but rather are vehicles for issuing new shares of LATAM Parent common stock to General Unsecured Class 5 Creditors. *See* Columbus Hill Obj. ¶¶ 2, 31-33, 46; Ried Decl. at 20-22. It asserts that, in reality, the Plan calls for Holders of Allowed General Unsecured Class 5 Claims to make an "in kind" contribution consisting of the Allowed General Unsecured Class 5 Claims in exchange for the new LATAM Parent shares. It maintains that the Plan violates Chilean law because it does not call for LATAM Parent to obtain an appraisal of the Allowed General Unsecured Class 5 Claims at fair market value, or for LATAM Parent's shareholders, by a vote of at least two-thirds of all shares, to approve both the issuance of the shares to creditors in exchange for their claims, and the valuation of such claims. *See* Columbus Hill Obj. ¶¶ 1, 16, 28-33; Ried Decl. at 17-18, 36-37. It asserts that the Chilean courts will not merely reject the transaction. It contends that under the simulation or fraud to the law doctrines, the Chilean courts will nullify and avoid the Debtors' attempt to issue new shares of LATAM Parent common stock to third parties in the form of "convertible notes" that are not bona fide debt instruments. *See* Columbus Hill Obj. ¶¶ 31-32, 48-49; Ried Decl. at 9-11, 20-22, 36-37.

The Debtors challenge the objection. In short, they deny that the Plan compromises the preemptive rights of the LATAM Parent shareholders with regard to the issuance of the New Convertible Notes and new LATAM Parent shares underlying the notes. *See* Debtors Omnibus Reply ¶ 86; Third Contador Decl. ¶¶ 34-37, 43. They also deny that LATAM Parent will acquire the Allowed General Unsecured Class 5 Claims in consideration for the new LATAM Parent

stock. They maintain that Columbus Hill mischaracterizes the transactions under the Plan and, as

a consequence, misstates applicable Chilean law. *See* Debtors Omnibus Reply ¶ 91; Third

Contador Decl. ¶ 36. They contend that the issuance of the New Convertible Notes under the

Plan complies with Chilean law and, if challenged in Chile, will be approved by the Chilean

courts and regulators. *See* Debtors Omnibus Reply ¶ 85; Third Contador Decl. ¶ 49.

The Court first considers Columbus Hill's assertion that the Plan violates the LATAM

Parent's shareholders' preemptive rights over stock and securities convertible into stock pursuant

to the Class B Notes. Columbus Hill complains that non-controlling shareholders who purchase

the Class B Notes and their underlying shares will be subject to a four-year lock-up period, but

that the RSA Shareholders are excepted from this requirement for trades among themselves. *See*

Columbus Hill Obj. ¶¶ 8, 27, 44; Ried Decl. at 5. For that reason, it maintains that the Plan

violates Chilean law preemptive rights because it is offering these notes to the Backstop Parties

on preferential terms not available to the other shareholders. *See* Columbus Hill Obj. ¶¶ 8, 27,

44; Ried Decl. at 5. The Court questions that contention. Like all shareholders who are getting

the opportunity to participate in the Class B Notes based on their Chilean preemptive rights and

not as Plan distributions, the RSA Shareholders are subject to the lockup restrictions against

selling shares in the market, thus achieving the goal of the lockup. That they may trade shares

among themselves does not alter this restriction.

Columbus Hill also contends that the Plan violates LATAM Parent shareholders'

preemptive rights because under Chilean law, the Backstop Fee that the Debtors will pay the

Commitment Creditors under the Commitment Creditors Backstop Agreement is a direct 20%

discount that is not available to shareholders or other non-backstop parties. *See* Columbus Hill

Obj. ¶ 21, 26; *see also* Ried Decl. at 13-14; Commitment Creditors Backstop Agreement §

3.1(a). However, that payment will be made in exchange for backstopping certain offerings under the Commitment Creditors Backstop Agreement. *See* Backstop Opinion at 51 ("The Backstop Payments to the Commitment Creditors provide consideration in exchange for that substantial capital commitment to backstop the entire $3.669 billion new money investment for the entire commitment period."). The Debtors contend, and Columbus Hill does not dispute, that the right to receipt of a fee in exchange for this commitment is not triggered by, has no relation to, and is not paid as consideration for, the acquisition of the New Convertible Notes by the Commitment Creditors in their capacity as unsecured creditors. *See* Debtors Omnibus Reply ¶ 94; Third Contador Decl. ¶ 50. Thus, they maintain that "the [Class C Notes] Backstop Fee is not consideration for the acquisition of the Notes that grants the [Commitment Creditors] an undue benefit in comparison to the terms on which the Notes will be offered to the shareholders." Third Contador Decl. ¶ 51; *see* Debtors Omnibus Reply ¶ 94. It does not appear that Mr. Ried disputes that contention. He testified that this preemptive rights argument would apply only if the Backstop Fee on the Class C Notes were paid to shareholders of the Debtors. *See* May 6, 2022 Ried Dep. at 115:9-105:11. That is plainly not the case here.

The Court next considers Columbus Hill's assertion that the provisions in the Plan governing the issuance of the Class A Notes and Class C Notes violate Chilean law. The Class A Notes and Class C Notes mature in ninety-nine years, pay no interest, have no contractual covenants, and carry a conversion ratio that is cut in half if such note is not converted within sixty days of the Effective Date. Columbus Hill Obj. ¶ 17. Moreover, once 50% of the Class A Notes or 50% of the Class C Notes are converted, all the remaining notes in that respective class will mandatorily convert simultaneously. *See* Class A Notes Term Sheet at 4; Class C Notes

Term Sheet at 4.[63] Columbus Hill asserts that because members of the LATAM Parent Ad Hoc

Group hold well over 50% of the Allowed General Unsecured Class 5 Claims, and all of them

will exercise the conversion rights under the notes on the Effective Date, it is a certainty that on

that day, all of the Class A Notes and Class C Notes will convert into LATAM Parent common

stock. *See* Columbus Hill Obj. ¶¶ 17, 33.[64] Columbus Hill argues that the Class A Notes and

Class C Notes are a "legal fiction" because their terms demonstrate that they are not genuine debt

instruments. *Id.* ¶ 17; *see* Ried Decl. at 9. It says that the notes are equivalent to equity and are

designed to permit LATAM Parent to issue shares of new common stock to the Holders of

Allowed General Unsecured Class 5 Claims in exchange, in part, for their Class 5 claims against

LATAM Parent, without invoking the "in kind" standards applicable under Articles 15 and 67 of

the Corporation Act. *See* Columbus Hill Obj. ¶ 17.[65] It maintains that Chilean courts and

---

[63]    The New Convertible Notes Class A Term Sheet (the "Class A Notes Term Sheet") and the New Convertible Notes Class C Term Sheet (the "Class C Notes Term Sheet") are annexed to the Disclosure Statement as Exhibits E-4 and E-6, respectively [ECF No. 4777].

[64]    Columbus Hill maintains that the Debtors and every other party in interest in these cases openly acknowledge this fact, and all pro forma projections and other financial materials in the Disclosure Statement assume the full conversion of all the Class A Notes and Class C Notes. Columbus Hill Obj. ¶ 17 (citing Restructuring Term Sheet, annexed to the Disclosure Statement as Exhibit E-3 [ECF No. 4777] at 6).

[65]    Mr. Ried states, as follows:

> The Class A and Class C Notes have a number of peculiarities that, taken together, show that they are not bona fide debt instruments but are rather stock: they have a maturity of 99 years, bear no interest, have no customary covenants from the issuer (in fact, they do not have any covenants), and do not contemplate any events of default.

> However, the most unusual feature of the notes is that they are, for practical purposes, mandatorily convertible and, as I understand it, are expected to be converted on the effective date of the Plan.

> The only sensible purpose of the bonds is to be immediately converted into LATAM shares.

> Therefore, the Class A and Class C Notes have practically no value as debt instruments (99 year bonds that pay no interest have a present financial value of, essentially, zero) and are all but required to be converted into shares. In fact, the conversion is mandatory at any moment if 50% of the notes are converted, which I understand will occur on the Plan effective date as soon as the Commitment Creditors convert their Class C Notes.

Ried Decl. at 20-21.

regulators will look through the form of the transactions and in focusing on their substance, will

hold the Debtors to the standards applicable to the issuance of new shares to LATAM Parent's

creditors in exchange for, in part, non-cash consideration–i.e., unsecured claims against LATAM

Parent. *See id.* ¶¶ 31-33.[66]

Columbus Hill says that the Class A Notes are being issued in exchange for Allowed

General Unsecured Class 5 Claims, and the Class C Notes are being issued in exchange for

Allowed General Unsecured Class 5 Claims and cash. It maintains that these notes and their

underlying shares will be converted on the Effective Date, and that because they are being

exchanged for assets other than money–i.e., Allowed General Unsecured Class 5 Claims–Chilean

law requires the Debtors to provide at least two expert valuations of those Class 5 claims; and

---

[66]    Mr. Ried maintains that the transaction violates the Chilean simulation and fraud to the law doctrines. He contends that:

> the overly complex structure of the convertible notes and its almost immediate and forceful conversion into shares, combined with the preferential terms on which such convertible notes and their underlying shares are available to unsecured creditors after the expiration of shareholders' preemptive rights, has been put in place to capitalize the LATAM general unsecured claims in a way that does not comply with otherwise applicable restrictions, including statutory mandates with respect to preemptive rights and contribution in kind rules.

Ried Decl. at 22. "Therefore, it is [his] opinion that the different steps of the Plan would be considered fatally flawed and declared void under the simulation or fraud to the law doctrines." *Id.*

Mr. Contador denies that LATAM Parent could be found liable for actions taken in connection with the Plan under either the simulation or fraud to the law doctrines. He maintains that the simulation doctrine is not applicable because LATAM Parent's declared intention does not differ from its true intention, and there is no claim that the purpose is to deceive third parties. Third Contador Decl. ¶¶ 29-30. He says that the terms and effects of the transactions devised under the Plan have been openly disclosed and there is no third party who could be "deceived" by a declared intention which differs from the true intention. *Id.* ¶ 30. Further, he says that the fraud to the law doctrine is not applicable because:

> There is no legal rule prohibiting the issuance of the Notes or the payment to general unsecured creditors with the cash proceeds obtained from the subscription and payment of the Notes by shareholders during the preemptive offering or with any remaining Notes. [And there] is no legal mandate directing a corporation to capitalize or acquire the claims against it instead of extinguishing and paying those claims with cash arising from the subscription and payment of those Notes or with the Notes themselves.

*Id.* ¶ 31.

requires holders of at least two-thirds of the outstanding shares with voting rights to approve

these transactions. *See id.* ¶¶ 1, 16, 28-30; Ried Decl. at 14-18. It asserts that although the

Disclosure Statement acknowledges that existing shareholders must approve the issuance of the

Class A Notes and Class C Notes at an extraordinary meeting of the shareholders, the Debtors

incorrectly state that the requisite voting threshold for such approval is a simple majority of the

existing shares in attendance at the meeting. *See* Columbus Hill Obj. ¶ 29 (citing Disclosure

Statement). Columbus Hill contends that without obtaining this required two-thirds or greater

supermajority approval, the Plan transactions would be void under Chilean law. *Id.*; Ried Decl. at

22.

Columbus Hill also argues that the shareholders' preemptive rights with respect to the

New Convertible Notes are illusory and do not comply with Chilean law. *See* Columbus Hill

Obj. ¶ 18; *see also* Ried Decl. at 8. It says that is so because existing LATAM Parent

shareholders must pay the full-face value of the Class A Notes and Class C Notes entirely in cash

to exercise their preemptive rights to acquire new LATAM Parent stock, but would receive

shares worth significantly less than the amount of cash paid, while the notes not acquired by the

LATAM Parent shareholders will be offered to Holders of Allowed General Unsecured Class 5

Claimson substantially more favorable terms (both in terms of the form of consideration and the

value of the consideration being provided by the creditors), all in violation of Chilean law. *See*

Columbus Hill Obj. ¶ 18.[67]

---

[67]    Mr. Ried succinctly summarizes the issue, as follows:

[S]hareholders are being offered the Class A and Class C Notes for an aggregate price of $8.283
billion in cash. At Plan value, the stock underlying the Class A and Class C Notes is worth an
aggregate of approximately $5.092 billion [based on the Plan value set forth in the Disclosure
Statement and the RSA]. This means that LATAM's shareholders are being asked to pay $1.64 for
every $1.00 worth of shares underlying the Class A and Class C Notes.

The Debtors deny the Class A Notes and Class C Notes are being offered to Holders of Allowed General Unsecured Class 5 Claims on different terms than they are offered to shareholders. *See* Debtors Omnibus Reply ¶ 90. They correctly note that the Plan provides that the notes will be offered to shareholders at par value, and to the extent the shareholders purchase them, the proceeds will be used to pay the claims of the General Unsecured Class 5 Creditors. *See id.*; Plan § 3.2(e). Any notes that remain after the preemptive rights period closes will be used to pay and discharge the Allowed General Unsecured Class 5 Claims at par value. *See* Debtors Omnibus Reply ¶ 90. Beyond that, the terms on which the notes are offered are consistent. *See id.*

The Debtors also say that Columbus Hill mischaracterizes the transactions under the Plan and, as a consequence, misstates applicable Chilean law. *Id.* ¶ 92. They maintain that Columbus Hill's objection rests on the erroneous assertion that the Holders of Allowed General Unsecured Class 5 Claims are purchasing the notes from LATAM Parent with their Allowed General

---

According to my calculations, LATAM's general unsecured creditors, on the other hand, are being offered the Class A and Class C Notes for an aggregate price equal to the value of stock underlying those notes. This means that the LATAM's creditors in the aggregate are being asked to pay $1.00 for every $1.00 worth of shares underlying the Class A and Class C Notes. Under the Plan, if unsecured creditors were to purchase all the Class A and Class C Notes, they would pay in part with $3.269 billion cash and in part with $5.014 billion in credits or claims ($8.283 billion in face value of the Class A and Class C Notes minus $3.269 billion in cash yields $5.014 billion face value for claims). To my knowledge, no party disputes that the $3.269 billion in cash payable by LATAM general unsecured creditors will be exchanged for convertible notes and their underlying shares that are similarly worth $3.269 billion. For the remaining $1.823 billion in convertible notes and shares, the LATAM general unsecured creditors are paying with $5.014 billion in credits or claims. Simple math dictates that that the $5.014 billion in unsecured credits or claims are worth no more than approximately 36.4%, which is the quotient of $1.823 billion in convertible notes in shares divided by the $5.014 billion in unsecured credits or claims used to acquire such convertible notes and shares. Allowing LATAM general unsecured creditors to subscribe for the Class A and Class C Notes with an exchange of LATAM general unsecured claims worth a fraction of their face value while requiring shareholders to pay a far higher price to exercise preemptive rights with respect to such Class A and Class C Notes violates Chilean law.

Ried Decl. at 4-5; *see also id.* at 12 ("Requiring LATAM shareholders to pay the par value of convertible notes in cash to exercise their preemptive rights while subsequently offering such convertible notes to creditors in exchange for credits or claims against a debtor that are worth significantly less than par value violates Chilean law.")

Unsecured Class 5 Claims. *Id.* They assert that notwithstanding Columbus Hill's claims to the contrary, LATAM Parent will not acquire the claims. *Id.* The holders of those claims will neither transfer their claims to LATAM Parent nor exchange those claims for either the Class A Notes or Class C Notes. Third Contador Decl. ¶ 6. The Debtors maintain that when they incurred the Class 5 general unsecured debt, they did so with the expectation that they would pay and discharge that debt with cash. The Plan calls for them to do so with the proceeds generated from the sale of the stock during the preemptive rights offering period. *See* Plan § 3.2(e). It also provides that the Debtors will deliver any notes that remain available after the expiration of the preemptive offering period to the Class 5 unsecured creditors in full satisfaction and settlement of those claims. *See id.* The Debtors say that the Holders of Allowed General Unsecured Class 5 Claims are tendering the notes to pay, discharge and extinguish those claims, not to acquire them. *See* Debtors Omnibus Reply ¶ 92; First Contador Decl. ¶ 24;[68] Third Contador Decl. ¶¶ 3, 6-8, 11, 16. They say that they are authorized to do so because under Chilean law, pursuant to a doctrine known as "*dación en pago*", a debtor and its creditor can agree to extinguish a debt obligation with an object different than the one originally owed. Debtors Omnibus Reply ¶ 92; Third Contador Decl. ¶ 6. The Debtors say that under the Plan, Holders of Allowed General Unsecured Class 5 Claims have agreed to receive payments on account of their claims in the Class A and Class C Notes and that the Plan discharges and extinguishes those claims as if they had been paid in cash. *See* Third Contador Decl. ¶ 8.[69] ("[T]he claims will be extinguished by their payment with the cash proceeds obtained from the subscription and payment from the notes

---

[68]    Debtors Tr. Ex. 16 (Declaration of Nelson Contador Regarding Execution in Chile of a Foreign Reorganization Plan Involving the Issuance of New Stock and Convertible Notes) (the "First Contador Decl.").

[69]    Mr. Contador does not dispute that the payment of the notes with general unsecured claims would result in the transfer of the claims to LATAM Parent. Third Contador Decl. ¶ 8.

by the shareholders during the preemptive offering period and with any notes remaining

unsubscribed after such preemptive offering period."). The Debtors maintain that since LATAM

Parent will never acquire, possess, or otherwise hold the claims, it does not need to subject them

to an appraisal or obtain shareholder approval of the appraisal under Articles 15 and 67 of the

Corporations Act. *See* Debtors Omnibus Reply ¶ 92; Third Contador Decl. ¶¶ 8, 9 (noting that

"under Chilean law, notes are financial instruments and, therefore those who acquire them are

not subscribing equity or making an equity contribution in kind that should be appraised.").[70]

Thus, they maintain that the Plan complies with Chilean law.

In support for their argument, the Debtors rely on the cases of *Enjoy S.A.* and *La Polar*

*S.A.* They contend that in those Chilean proceedings, the companies used and offered convertible

notes with terms that are almost identical to the notes at issue here to pay creditor claims in the

same way as the Debtors propose to do here, with the approval of their creditors and simple

majority of their shareholders and with the approval of the CMF, which reviewed and registered

the notes. First Contador Decl. ¶¶ 11-19, 24-25; Third Contador Decl. ¶¶ 46, 52-64; *see also*

Debtors Omnibus Reply ¶ 93.

---

[70]    Mr. Contador explains that:

> Under Chilean law, claims against LATAM are obligations, which may be extinguished by several
> means listed in the Chilean Civil Code. *Payment* is one of these means. Another means is
> *confusion*, which is when one person simultaneously holds the capacity of debtor and creditors
> regarding the same obligation. Therefore, when a debtor acquires a claim against itself from its
> creditor, the obligation or claim is extinguished by *confusion*. In the case of *confusion,* the claim is
> previously transferred from the creditor to the debtor. On the other hand, when an obligation is
> paid, either in kind or in cash, there is no transfer of the claim to the debtor and the debtor does not
> acquire it, but instead the claim is extinguished while still held by the creditor.

> Therefore, as the Notes will not be paid for with the claims of their creditors and LATAM will not
> acquire the claims, the issuance of the Notes may be approved by a simple majority of the
> shareholders and is not subject to an appraisal requirement.

Third Contador Decl. ¶¶ 11-12.

Enjoy S.A. is a stock corporation whose shares are listed on the Santiago Stock Exchange. Its Judicial Reorganization Agreement (the "JRA") provided for, among other things (i) the payment of more than 70% of the unsecured debt by means of delivery in payment of notes convertible into shares; and (ii) the acquisition of new funds through the subscription and payment of the convertible notes during their preemptive rights offering period by the shareholders of Enjoy S.A. *See* First Contador Decl. ¶ 12; Columbus Hill Tr. Ex. 9 (Judicial Reorganization Agreement of Enjoy S.A.) at 9-11. The JRA called for Enjoy S.A. to offer the convertible notes to its shareholders at par value during the preemptive rights period, and then to distribute to its general unsecured creditors, in full satisfaction of their claims (a) the proceeds of the subscription and payment of the notes by the shareholders to the extent shareholders exercised their preemptive rights; or (b) the convertible notes that were not acquired by the shareholders during the preemptive rights offering period. First Contador Decl. ¶ 13. Under the JRA, 80% of all unsecured claims would be paid, at par value, with two different series of ninety-nine year maturity convertible notes, that accrued no interest and were convertible within seventy-five days after the expiration of the preemptive rights offering period. *Id*. ¶ 14. Enjoy S.A. neither acquired the claims of its creditors nor exchanged the convertible notes in return for those claims. Rather, it used the new convertible notes to pay and discharge the claims of its creditors, serving their purpose as negotiable instruments (*títulos de crédito*). *Id.* ¶ 15. In turn, those creditors did not subscribe to or pay for the convertible notes with their claims, but instead received the convertible notes in payment and satisfaction of their claims. *Id.*

Shortly after the court approved the JRA, Enjoy S.A. convened a shareholders meeting at which the shareholders approved the capital increase and the issuance of the convertible notes. *Id.* ¶ 16. After the shareholders approved the notes offering, Enjoy S.A. requested that the CMF

register the convertible notes. *Id.* ¶ 17. After reviewing the procedures by which the convertible notes were approved and issued, and making some observations, (*Id.*, Ex. D-8 (Letter from the CMF dated December 4, 2020, requesting Enjoy S.A. to clarify some issues before registration of the notes)) the CMF duly registered the notes. *Id.* ¶ 17; *Id.*, Ex. D-4 (Registration of notes in the CMF Securities Register).[71] The Debtors contend that Enjoy S.A. obtained the approval of its JRA, (*Id.*, Ex. D-2 (Enjoy S.A Creditors' Meeting, dated August 14, 2020)) then carried out the capital increase (Columbus Hill Tr. Ex. 7 (Aug. 26, 2020 Mins. of the Extraordinary Meeting of the Shareholders of Enjoy S.A.)) and, in accordance with the JRA, the majority of the shareholders waived their right to exercise any preemptive subscription right, and all the requirements set forth in the proceeding, including the payment of the unsecured claims with the convertible notes issued by the company to that end, were fulfilled. Columbus Hill Tr. Ex. 4 (Material Fact Report (Hecho Esencial), Enjoy S.A., Securities Registry Inscription No. 1,033, Apr. 19, 2021); First Contador Decl., Ex. D-10 (Material Fact disclosed by Enjoy S.A., dated April 30, 2021). The Debtors maintain that the final implementation of the payment of the general unsecured claims through the delivery of convertible notes occurred successfully (First Contador Decl., Ex. D-7 (Material Fact disclosed by Enjoy S.A., dated October 13, 2020)) and on February 24, 2022, Enjoy S.A. fully complied with the obligations prescribed in its JRA,

---

[71]    Before Enjoy S.A. submitted its Judicial Reorganization Agreement to a vote at the creditors' meeting, a group of shareholders that in the aggregate owned 60.52% of the company signed a support agreement stating that:

(i) they agreed to attend a shareholders' meeting to be held upon the approval of the Judicial Reorganization Agreement and vote in favor of the company's capital increase,
(ii) they agreed to waive their preemptive subscription right regarding notes convertible into shares to be issued, whenever said rights arise under the terms of the support agreement and
(iii) they agreed to refrain from selling their shares.
In addition, Enjoy S.A.'s Judicial Reorganization Agreement included, as a condition precedent for the agreement to become effective, the main shareholders' fulfillment of the obligations undertaken in the support agreement.

First Contador Decl. ¶ 18.

which was deemed concluded for all legal purposes, thus ceasing to be subject to the Judicial

Reorganization Procedure, without objections from the creditors or any government agency. *Id*. ¶

19.

La Polar S.A. is a stock corporation whose shares are listed on the Santiago Stock

Exchange. Its approved reorganization plan (the "La Polar Plan") provided that the debtor would

issue convertible notes that would be first offered to its shareholders at par value in compliance

with their preemptive rights. *Id*., Ex. D-5 (Extraordinary Shareholders' Meeting Minute of

Empresas La Polar S.A., dated August 8, 2014) at 36. The notes had a ninety-nine year maturity

and accrued no interest. The La Polar Plan called for unsecured creditors to be paid with the

proceeds of the subscription and payment of the convertible notes by the shareholders, or with

the convertible notes that remained available after the preemptive rights offering. *Id.,* Ex. D-5

(Extraordinary Shareholders' Meeting Minute of Empresas La Polar S.A., dated August 8, 2014)

at 36. At the shareholders meeting convened by La Polar, the shareholders approved the issuance

of convertible notes. Thereafter, the notes were submitted for registration with the CMF, which

after reviewing the procedure, duly registered the notes. *Id.*, Ex. D-4 (Registration of notes in the

CMF Securities Register).

The Debtors maintain that in *Enjoy S.A.* and *La Polar S.A*., the requirement of the two-

thirds majority of the outstanding voting shares or the prior valuation of the claims against the

company under the Corporation Act were not applicable because the convertible notes were not

acquired with the claims but given in payment of the claims. *Id.* ¶ 25. In substance, the Debtors

maintain that *Enjoy S.A.* and *La Polar S.A.* provide a "road map" for a restructuring that calls for

the issuance and distribution of convertible notes in satisfaction of creditor claims under Chilean law.[72]

Columbus Hill contends that the Debtors overstate the significance of *Enjoy S.A.* and *La Polar S.A.* and that those cases provide no support for the Plan. To summarize, it asserts that the transactions executed by Enjoy S.A. and La Polar S.A. were never judicially tested, are materially different than the transactions proposed here in the Plan and were formally approved by shareholders holding more than two-thirds of the outstanding shares with voting rights. It contends that both transactions were fully consensual, with no objections. These transactions were also explicitly described as a capitalization of outstanding claims against the companies. As a result, it contends that those cases provide no precedent or support for the Plan, and that the transactions called for under the Plan violate Chilean Law. *See* Columbus Hill Obj. ¶¶ 34-40; Ried Decl. at 24-25.

The Debtors maintain that *Enjoy S.A.* and *La Polar S.A.* support their position that convertible notes have been issued under Chilean law and used to pay unsecured creditors in reorganization agreements in terms substantially identical to those devised in the Plan. They deny that Enjoy S.A.'s and La Polar S.A.'s reorganization agreements were implemented with the consent of all shareholders and outside of contested legal processes. They maintain that the *Enjoy S.A.* and *La Polar S.A.* cases were challengeable legal proceedings conducted before

---

[72]  Mr. Contador summarized, as follows:

> In my opinion, the structure and mechanics of the equity increase through equity and convertible notes devised in the Plan . . . complies with all Chilean law requirements . . . and is substantially similar to that implemented in the Enjoy S.A. and La Polar S.A. proceedings. Further, as noted with respect to the Enjoy S.A. and La Polar S.A. proceedings, the requirement to have the favorable vote of two-thirds of the issued shares with voting rights or to have a prior valuation of the credits against the company would not be applicable to LATAM's offering of convertible notes and securities.

First Contador Decl. ¶ 25.

Chilean courts in which the reorganization agreements were approved despite the negative vote of certain creditors. Third Contador Decl. ¶¶ 53-54. Moreover, they assert that the CMF and the Chilean Insolvency Agency were aware of the terms and conditions of the agreements and raised no objections. They contend that the notes were submitted for registration with the CMF, which duly registered the notes after reviewing the procedures by which they were approved and issued and after requesting certain clarifications from Enjoy S.A. First Contador Decl., Ex. D-8. They argue that if the CMF had any objection, it would not have registered the notes. *Id.* ¶ 55; *see also* Debtors Omnibus Reply ¶ 93.

Columbus Hill and the Debtors agree that the Chilean courts and regulators will have the final say on whether the procedures in the Plan governing the issuance of the Plan Securities comply with Chilean law. Yrarrázaval Decl. ¶¶ 54-56;[73] Columbus Hill Obj. ¶ 14; *see also* Second Contador Decl. ¶ 19[74] ("Failure to comply with the regulations governing capital increases in public corporations, including the need to approve a capital increase at a shareholders' meeting and to provide shareholders with preemptive rights to subscribe to the capital increase if they wish, would cause the absolute nullity of the act providing for the issuance of the new shares."); May 17, 2022 Hr'g Tr. at 197:9-199:14 (Ried) (asserting that if the Court confirms that Plan, even a single shareholder will have the power to object to the Plan in the Chilean courts and with the CMF).

Section 1129(a)(3) of the Bankruptcy Code mandates that a "plan [be] proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Under this section, "a plan will be found in good faith if it 'was proposed with honesty and good intentions and with a

---

[73]    Columbus Hill Tr. Ex. 6 (Declaration of Arturo Yrarrázaval) (the "Yrarrázaval Decl.").

[74]    Debtors Tr. Ex. 17 (Declaration. of Nelson Contador in Response to the Statements of Rodrigo Delaveau and Juan Luis Goldenberg Concerning the Public Policy Exception Under Chilean Law) (the "Second Contador Decl.").

basis for expecting that a reorganization can be effected.'" *Argo Fund, Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A.,* 528 F.3d 162, 169 (2d Cir. 2008) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)). Columbus Hill does not challenge the Debtors' process in formulating the Plan. Rather it contends that the Debtors filed the Plan in bad faith because it violates Chilean law. That argument is misplaced because "the requirement of Section 1129(a)(3) speaks more to the process of plan development than the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (citations omitted). Whether the Plan complies with Chilean law will be addressed, if at all, by the Chilean courts and regulators. The Court need not and will not attempt to resolve that issue in considering whether the Plan satisfies section 1129(a)(3). "[T]he plain language of section 1129(a)(3) does not require that the Plan's contents comply 'in all respects with the provisions of all nonbankruptcy laws and regulations' because it 'speaks only to the proposal of a plan.'" *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (quoting *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 59 (Bankr. S.D.N.Y. 1990)); *accord Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019) ("[W]e conclude that § 1129(a)(3) directs courts to look only to the proposal of a plan, not the terms of the plan.").

The Court recognizes that some courts find that a plan that violates applicable non-bankruptcy law is not filed in good faith and is not confirmable under section 1129(a)(3). However, in those cases the courts find that on its face, the plan violates applicable law. *See, e.g., In re Walden Palms Condo Ass'n*, 652 B.R. 543, 550 (Bankr. M.D. Fla. 2020) (denying confirmation where the plan called for legal costs incurred by an individual unit owner to be paid by the entire condominium community in clear violation of Florida law); *In re Arm Ventures*, 564 B.R. 77, 86 (Bankr. S.D. Fla. 2017) ("the Amended Plan is based on an enterprise illegal

under Federal law, and therefore one that I cannot confirm because the Debtor cannot satisfy the

requirements of 11 U.S.C. § 1129(a)(3)"); *see also In re Food City, Inc*., 110 B.R. 808, 813 n.12

(Bankr. W.D. Tex. 1990) (suggesting that an illegal plan provision is less likely to be proposed in

good faith). *But see Garvin v. Cook Invs.*, 922 F.3d at 1035-36 (not sustaining a plan objection

pursuant to 1129(a)(3) where the plan clearly violated federal law noting that 1129(a)(3)

concerns legality of the proposal and not substantive provisions). Even under that standard, the

Plan does not run afoul of section 1129(a)(3). Based on the foregoing, the Court finds that there

is legitimate debate among Columbus Hill and the Debtors regarding the enforcability of the

procedures in the Plan governing the issuance of the Plan Securities under Chilean law. The Plan

does not clearly, if at all, violate Chilean law. The Court overrules Columbus Hill's Objection to

the Plan as violating section 1129(a)(3).

> Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that:
>
> Confirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or reorganization is proposed in the
> plan.

11 U.S.C. § 1129(a)(11). To demonstrate that a plan is feasible a debtor is not required to prove

that it will successfully reorganize its business. Rather, "the feasibility standard is whether the

plan offers a reasonable assurance of success. Success need not be guaranteed." *See Kane v.

Johns-Manville Corp*, 843 F.2d 636, 649 (2d Cir. 1988); *see also In re DBSD North America,

Inc.,* 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009) ("In making determinations as to feasibility, . . .

a bankruptcy court does not need to know to a certainty or even a substantial probability, that the

plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success.")

(collecting cases). For a debtor to withstand a creditor's or interest holder's challenge to the

feasibility of a plan on the grounds that it violates applicable non-bankruptcy law, it must

demonstrate that the Plan has a "reasonable prospect of success." *See In re TCI 2 Holdings, LLC,* 428 B.R. 117, 155 (Bankr. D.N.J. 2010) (finding the plan to be feasible where there was a reasonable prospect that new owners of casino could obtain necessary gaming licenses); *see also In re Food City, Inc.,* 110 B.R. at 812 n.10, 813 n.12 (noting that an "obvious illegality" exposes a plan to feasibility considerations). Courts find that plans that violate applicable non-bankruptcy law on their face fail the feasibility test. *See In re Walden Palms Condo. Ass'n Inc.,* 625 B.R. at 550 (finding that the creditor's plan was infeasible in that it clearly violated Florida law, thereby surpassing the reasonable prospect of success standard); *In re Wabash Valley Power Ass'n Inc.,* No. 85–2238–RWV–11, 1991 WL 11004220, at *73-74 (Bankr. S.D. Ind. August 7, 1991) (finding that a competing plan clearly violated Indiana state law and denying confirmation under 1129(a)(11)). The facts and law in the record do not support a determination that the Plan is "obviously illegal" under Chilean law. The Court finds that the Debtors have demonstrated that they have reasonable grounds for contending that the Plan complies with Chilean law. Accordingly, the Court overrules Columbus Hill's Objection and in doing so, finds that, as the Plan relates to Chilean law matters, the Debtors have demonstrated that the Plan complies with section 1129(a)(11) and is feasible.

### The A&P Ad Hoc Group Objection

The A&P Ad Hoc Group asserts that the Plan provides the Commitment Creditors with unprecedented value in comparison to other *pari passu* Holders of the Allowed General Unsecured Class 5 Claims (the "Non-Commitment Creditors"), and that the Plan's economics disclose that the Backstop Fees are disproportionately high compared to the risks the Commitment Creditors are assuming in providing the Commitment Creditor Backstop Agreement. It contends that those payments are nothing more than a mechanism through which

the Commitment Creditors can take greater value and recovery from the Debtors' estates at the expense of other similarly situated creditors. *See* A&P Ad Hoc Group Obj. ¶¶ 1-4, 22-26. The A&P Ad Hoc Group asserts that the Plan violates section 1123(a)(4) of the Bankruptcy Code because it does not provide for equal treatment of General Unsecured Class 5 Creditors, and thus, the Plan does not satisfy section 1129(a)(1). It also contends that the Plan violates section 1129(a)(4) of the Bankruptcy Code by paying excessive and unreasonable fees to the Commitment Creditors. *See id.* ¶¶ 3-4, 22-34. The Debtors dispute those contentions. The Court considers those matters below.

Section 1123(a)(4) of the Bankruptcy Code addresses intra-class treatment and requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249 (Bankr. S.D.N.Y. 2007); *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007). Thus, by its terms, this provision does not mandate that members of the same class receive the same treatment on account of their claims. *See In re Quigley*, 377 B.R. at 116 ("Section 1123(a)(4) does not require precise equality, only approximate equality").

The A&P Ad Hoc Group complains that while the Non-Commitment Creditors and the Commitment Creditors are classified together in Class 5, the Commitment Creditors will receive a far superior opportunity for recovery compared to the Non-Commitment Creditors who, by default, receive Class 5a Treatment of their claims. *See* A&P Ad Hoc Group Obj. ¶¶ 22-24. It asserts that the Commitment Creditors–who automatically receive Class 5b treatment-receive over 85% of the Class C Notes through the Direct Allocation Amount, the ability to subscribe

70.74%[75] of their remaining Allowed Claims after the Direct Allocation Amount, and Backstop

Fees totaling $734 million. *Id.* ¶¶ 4, 23.

The A&P Ad Hoc Group contends that the award of 85% of the Class C Notes to the

Commitment Creditors converts to a 43.4% recovery (before factoring in any fees) on account of

their General Unsecured Class 5 Claims, while the Non-Commitment Creditors also are slated to

receive Class 5 treatment, but will receive their pro rata share of the $1.467 billion Class A Notes

issuance—which will result in a 19.3% recovery on their similarly-situated General Unsecured

Class 5 Claims. *Id.* In this light, the A&P Ad Hoc Group alleges that the inequality in

opportunity for recovery among creditors holding the exact same type of claims is stark as (i) the

limitation on the Non-Commitment Creditors' ability to subscribe to the Class C Notes permits

the Commitment Creditors to impermissibly receive outsized recoveries; and (ii) the fees payable

pursuant to the Commitment Creditors Backstop Agreement are in no way commensurate to the

risk associated with providing the backstop. *Id.* ¶ 24.

This element of the A&P Ad Hoc Group Objection implicates two aspects of section

1123(a)(4) of the Bankruptcy Code. The first is that it requires equality of treatment, among

creditors in the same class, not equality of result. It is satisfied if claimants in the same class have

the same opportunity for recovery. *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir.

2013) ("[C]ourts have interpreted the 'same treatment' requirement [of section 1123(a)(4)] to

mean that all claimants in a class must have 'the same opportunity' for recovery."); *Ad Hoc*

*Comm. of Pers. Inj. Asbestos Claimants v. Dana Corp. (In re Dana Corp)*, 412 B.R. 53, 62

(S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a

---

[75]    The most recent version of the Plan, filed after the A&P Ad Hoc Group submitted their objection to the Plan, notes that the Commitment Creditors now have the ability to subscribe to 72.46% of their remaining Allowed Claims after the Direct Allocation Amount. Plan § 5.10.

class obtain the same thing, but whether they have the same opportunity."). The second is that

"[t]he requirements of section 1123(a)(4) apply only to a plan's treatment *on account of*

*particular claims* or interests in a specific class—not the treatment that members of the class

may separately receive under a plan on account of the class members' other rights or

contributions." *In re Adelphia Commc'ns Corp*., 368 B.R. at 250-51; *see also In re CHC Grp.*,

*Ltd*., Case No. 16-31854 (BJH), 2017 WL 11093971, at *12 (Bankr. N.D. Tex. Mar. 3, 2017)

(finding that put option premium payable to plan sponsors as consideration for commitment to

backstop rights offering was not a distribution on account of plan sponsors' claims); *In re TCI 2*

*Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (finding that backstop fee proposed to

be paid to the Backstop Parties was not a distribution to the parties on account of their claims); *In*

*re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992) ("The

objectors fail to distinguish between a partner's treatment under the plan on account of a claim or

interest and treatment for other reasons. Only the former is governed by § 1123(a)(4)."). The

Debtors maintain that the Plan satisfies both aspects of section 1123(a)(4) because all Holders of

Allowed General Unsecured Class 5 Claims have the same opportunity for recovery, are being

treated equally, and that the Backstop Fees and Direct Allocation are distributed to the Backstop

Parties in consideration for their willingness to backstop the Class C Notes and the ERO Rights

Offering, not on account of their General Unsecured Class 5 Claims. *See* Debtors Omnibus

Reply ¶¶ 40-42. The Court agrees.

The treatment that the Commitment Creditors are receiving in their capacity as Holders

of Allowed General Unsecured Class 5 Claims of LATAM Parent is the same as the Non-

Commitment Creditors in Class 5. Each General Unsecured Class 5 Creditor will receive, in full

satisfaction and discharge of its claims, the opportunity to elect for either (i) Class 5a Treatment,

consisting of the receipt of Class A Notes plus its pro rata portion of the cash payments now provided under the Plan, or (ii) Class 5b Treatment, consisting of the receipt of its pro rata share of the New Convertible Notes Class C Offering (the latter of which requires a new money contribution) plus its pro rata portion of the cash payments now provided under the Plan. *See* Plan § 3.2(e)(ii); *see also* Backstop Opinion at 17-18 (describing Class 5 treatment); Disclosure Statement §§ V.A.1(e), V.B.10.[76] Non-Commitment Creditors are free to choose which of the two treatment options they prefer. The Non-Commitment Creditors who elect to receive Class 5b Treatment receive the same distribution on account of their claims as the Commitment Creditors – *i.e.,* each receives their pro rata share of the Class C Notes in exchange for the contribution of new money and their General Unsecured Class 5 Claims. *See* Class C Notes Term Sheet at 4; Plan §§ 3.2(e), 5.10. The additional compensation that the Commitment Creditors will receive under the Plan is not based on their status as Holders of Allowed General Unsecured Class 5 Claims; it is in consideration for their commitments described in the Commitment Creditors Backstop Agreement. *See* Commitment Creditors Backstop Agreement at 1-2, 8, 12, 24, 33-35; Disclosure Statement §§ I.A, IV.K; Herlihy Report at 61 (describing consideration provided by Commitment Creditors). This includes the Direct Allocation Amount, the Backstop Fees and the Class C Backstop Commitment, which are each described at length in the Commitment Creditors Backstop Agreement. *See* Commitment Creditors Backstop Agreement at 8, 12, 24, 26, 33-35; Disclosure Statement § IV.K.

---

[76]    Pursuant to the amendments filed on May 11, 2022, the Plan now includes an additional election option, Class 5c Treatment, which entitles a General Unsecured Creditor to elect to receive its pro rata share of New Local Notes. *See* Plan § 3.2(e). The Backstop Parties generally are not eligible to elect Class 5c Treatment. *See id.*; Commitment Creditors Backstop Agreement § 2.2(a). The Class 5c Treatment is simply another option that General Unsecured Creditors may elect to receive and does not change the equal treatment analysis.

The Commitment Creditors Backstop Agreement clearly states that the Direct Allocation Amount and the Backstop Fees are provided to the Commitment Creditors in their roles as Backstop Parties. Commitment Creditors Backstop Agreement at 2 ("[P]ursuant to the terms of this Agreement, the Company will offer the Backstop Parties [Class C Notes] . . . in an aggregate principal amount equal to the Direct Allocation Amount."), 33-35 (describing payment of the Backstop Fees). That the Commitment Creditors must discharge their claims to access the Direct Allocation Amount does not implicate section 1123(a)(4) of the Bankruptcy Code. It is the mechanism through which Class C Notes are obtained. *See* Plan § 3.2(e). Under the Class C Backstop Commitment, the Commitment Creditors are agreeing to purchase the unsubscribed Class C Notes at the Class C Purchase Price, *see* Commitment Creditors Backstop Agreement at 15 (defining the Class C Purchase Price), 26 (defining the Class C Backstop Commitment), after the Non-Commitment Creditors have declined the opportunity to subscribe to their pro rata share of Class C Notes, in lieu of electing to receive Class 5a Treatment. *See* Plan § 1.1 (defining Commitment Creditors); *id.* § 3.2(e). That is to say that they are committing to purchase Class C Notes at the Class C Purchase Price, even if other Holders of Allowed General Unsecured Class 5 Claims (*i.e.* the Non-Commitment Creditors) decline to do so. The Commitment Creditors' obligation to purchase unsubscribed Class C Notes does not provide them with something of value unavailable to the Non-Commitment Creditors. The Commitment Creditors are not receiving outsized recoveries on account of their Allowed General Unsecured Class 5 Claims.

The A&P Ad Hoc Group complains that the Backstop Fees create a section 1123(a)(4) problem because they "are in no way commensurate to the risk associated with the backstop." A&P Ad Hoc Group Obj. ¶ 24. However, in the Backstop Opinion, the Court found that the benefits to the Commitment Creditors were reasonable, *see* Backstop Opinion at 85, and that the

Direct Allocation Amount and the Backstop Fees are appropriate given the risks assumed by the Commitment Creditors, including the "risks of material changes to the Debtors' business outlook which could negatively impact the price of the Debtors' stock" such as "the Omicron variant and volatile fuel prices." *Id*. at 50-51. These findings are equally applicable here.

Moreover, the A&P Ad Hoc Group asserts that "despite the Commitment Creditors and [Non-Commitment] Creditors having the same types of claims, only the Commitment Creditors were invited to the table and provided with resulting opportunities to participate in the Direct Allocation and Commitment Creditors Backstop Agreement." A&P Ad Hoc Group Obj. ¶¶ 25-26. Relying on *In re Pacific Drilling S.A.* ("*Pacific Drilling*"), No. 17-13193 (MEW), 2018 Bankr. LEXIS 3024, at *6 (Bankr. S.D.N.Y. Oct. 1, 2018), the A&P Ad Hoc Group contends that "the Plan's failure to ensure equal opportunity to claimants within the same class violates section 1123(a)(4) of the Bankruptcy Code and renders the Plan unconfirmable." *Id.*

*Pacific Drilling* does not suggest that compensating the Backstop Parties through the Direct Allocation Amount and Backstop Fees implicates section 1123(a)(4). Courts approve Plans with similar provisions. *See In re TCI 2 Holdings, LLC,* 428 B.R. at 133; *In re CHC Grp, Ltd.*, 2017 WL 11093971, at *12. Moreover, this Court considered and rejected the same arguments in the Backstop Opinion. In opposing the Backstop Motion, the objecting parties (including the A&P Ad Hoc Group) contended that in pursuing the Backstop Agreements, the Debtors did not conduct arm's-length negotiations with third parties for the best financing terms possible, but, instead, settled for an unreasonable deal with the Commitment Creditors that vastly overcompensates them with special treatment, generous fees, and steep discounts to divert money to the Debtors' controlling shareholders and procure votes by the Commitment Creditors in favor of the Plan. *See* Backstop Opinion at 31. They asserted that the Debtors' intent to favor

the Commitment Creditors is evident from the fact that the Commitment Creditors hold roughly

70% of the Debtors' general unsecured claims and, as such, are collectively a key voting block

needed to approve the Plan. *Id.* They maintained that the Debtors failed to conduct a fair process

in negotiating the Backstop Agreements because they (i) limited their pool of prospective

counterparties for the Backstop Agreements to the RSA Shareholders and a handful of large

creditors; (ii) failed to respond to a competing backstop financing proposal from Ducera Partners

LLC ("Ducera"); and (iii) failed to subject the Commitment Creditors Backstop Agreement to

market competition. *Id.* They also asserted that the LATAM Parent board lacked sufficient

information to properly vet the Backstop Agreements. *Id.*

The Court found no merit to those contentions. In doing so, and as relevant, the Court

found that:

> The Plan is the "best alternative" for the Debtors to emerge from these Chapter 11
> Cases and is a product of hard-fought and lengthy mediation overseen by Judge
> Gropper, which focused in part on issues of Chilean securities law and Chilean
> shareholder rights in these Chapter 11 Cases.

> The Debtors explored a number of restructuring proposals during the pendency of
> these Chapter 11 Cases and contacted numerous investment funds and other
> entities in an effort to raise capital, and the Debtors' financial condition was open
> and obvious, suggesting that parties with workable financing offers had the
> opportunity to come forward and work with the Debtors.

> No entity sought to provide the Debtors with backstop proposals that would
> provide a framework to permit the Debtors to raise a level of capital they believe
> to be necessary to emerge from the Chapter 11 Cases.

> The Ducera Proposal fell short of a viable alternative or substitute for the
> Backstop Agreements because the proposal consists of an unsigned letter offering
> no binding commitments, and, among other things, the proposal: (i) did not
> provide sufficient committed capital; (ii) has an expansive due diligence condition
> that would allow the A&P Ad Hoc Group to withdraw its proposal at any time, at
> its sole discretion; and (iii) did not provide a secure path to confirmation.

*Id*. at 33, 36. The Court adheres to its rulings in the Backstop Opinion. The A&P Ad Hoc Group

has failed to demonstrate grounds for denying confirmation under section 1123(a)(4) of the

Bankruptcy Code.

Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be

made by the proponent, by the debtor . . . for services or for costs and expenses in or in

connection with the case, or in connection with the plan and incident to the case, has been

approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).

The A&P Ad Hoc Group contends that while payments of backstop fees under a plan to support

financing are permitted, here, the Backstop Fees are not reasonable, and the economics of the

Plan expose that the payment of the fees is nothing more than "a disguised means of giving

bigger creditors a preferential recovery." A&P Ad Hoc Group Obj. ¶ 27 (quoting *Pacific*

*Drilling*, 2018 Bankr. LEXIS 3024, at *6-7). The A&P Ad Hoc Group argues that a backstop fee

is reasonable only to the extent that it protects against the actual risk of a lack of participation in

a rights offering. *Id.* ¶ 28. It contends that the Backstop Fees fail to serve this basic function

because the Commitment Creditors have already committed themselves to approximately 85% of

the Class C Notes, and the Plan economics provide the Debtors and Commitment Creditors with

near certainty that the remaining approximately 15% of Class C Notes will be fully subscribed.

*Id.* ¶ 29. It maintains that as no reasonable creditor would choose to receive an inferior recovery,

this superior recovery virtually guarantees full participation in the Class C Notes and greatly

diminishes the purported risk to the Commitment Creditors. *Id.* Moreover, it contends that if the

Debtors and the Commitment Creditors wanted to guard against the risk that the Class C Notes

would not be fully subscribed, they could have encouraged parties entitled to subscribe to the

Class C Notes to participate without a cap limitation. It contends that doing so would provide for

an equitable pro rata backstop by all eligible Holders of Allowed General Unsecured Class 5 Claims. *Id*. ¶ 31. Finally, the A&P Ad Hoc Group asserts that in assessing the reasonableness of the Backstop Fees, the Court must consider that the Commitment Creditors allegedly leveraged their power to reject any plan proposed by the Debtors to obtain extraordinary fees and recoveries beyond that of other similarly situated creditors. *Id.* ¶ 34 (noting that the Debtors acknowledge that "throughout the negotiation process" the Commitment Creditors maintained they "could vote down any plan."); *Id.* ¶ 34 n.42 (quoting Jan 29, 2022 Alfonsín Dep. Tr. at 96:14–97:22.).

In opposing the Backstop Agreements, the A&P Ad Hoc Group and others argued that because the Debtors seek to enter into the Backstop Agreements in connection with the Plan, the agreements must meet the standards of section 1129(a)(4). *See* Backstop Opinion at 29, 83. The Court disagreed and, instead, the Court found that sections 363 and 503 governed the Backstop Motion, and that section 1129(a)(4) was not relevant to the motion. *Id*. at 84. In support of the objection to the Backstop Motion, the objecting parties argued that (i) "the Backstop [Fee] is unreasonable and unnecessary because the economics of the Plan guarantee full participation of the Class C Notes," (ii) "even if the Debtors are correct that there is a risk that the Class C Notes would not be fully subscribed, then . . . the New Convertible Notes Offering Procedures should be altered to permit oversubscription by all parties entitled to subscribe," and (iii) "the Court should assess the reasonableness of the Backstop [Fees] by measuring it against the 'uncommitted portion' of the backstopped offering." *Id.* at 46. This Court applied the standards under sections 363 and 503 of the Bankruptcy Code and rejected those arguments, finding that "the Commitment Creditors are assuming the risk that they will be called upon to purchase the entire $3.669 billion in securities," that "the Commitment Creditors are subject to meaningful

risk on the entire portion of the rights offering they are backstopping," and – on the basis of these and other findings – that "the Backstop [Fee] is reasonable." *Id*. at 48, 51, 85. The A&P Ad Hoc Group is raising the same arguments in support of this aspect of its objection to confirmation.

Whether a payment is "reasonable" depends on the "facts and circumstances of the payments," and takes account of, among other things, creditor support and whether the payments are "market." *See In re Journal Register Co.*, 407 B.R. 520, 537-38 (Bankr. S.D.N.Y. 2009). In assessing whether the Debtors have demonstrated that the Plan complies with section 1129(a)(4), the Court will apply the same standards under section 363(b) that it applied in approving the Backstop Fees as reasonable. The A&P Ad Hoc Group did not cite to a single case to support their argument that the Backstop Fees at issue should be analyzed for reasonableness under section 1129(a)(4) of the Bankruptcy Code.[77] The Court finds no basis for revisiting its findings and conclusions set forth in the Backstop Opinion. The Backstop Fees are reasonable under section 1129(a)(4) and support confirmation of the Plan.[78]

The A&P Ad Hoc Group contends that the Plan was not proposed in good faith, in violation of section 1129(a)(3) of the Bankruptcy Code, because the Debtors, under pressure from the Commitment Creditors, have engaged in "vote buying" to secure the Commitment Creditors' vote to accept the Plan. *See* A&P Ad Hoc Group Obj. ¶¶ 41-42; *see also id.* ¶¶ 1, 7,

---

[77]    *Leiman v. Guttman*, 336 U.S. 1, 69 S. Ct. 371 (1949), is clearly inapplicable here. The question at issue in *Leiman* was whether the Supreme Court of New York had jurisdiction over an action to recover for legal services that were not compensable out of the Debtor's estate. *Id.* at 4. The court held that Section 221(4) places under the control of the bankruptcy judge "all payments made or promised . . . by the debtor." *Id.* at 5 (internal quotation marks omitted). Rather than supporting the argument that the Backstop Fees should be analyzed under Section 1129(a)(4), *Leiman* only supports the narrow holding that it is the realm of the bankruptcy court, rather than a state court, to evaluate and approve any fees paid in connection with a bankruptcy proceeding – a point of law on which there is no disagreement in this case.

[78]    As part of the Backstop Opinion, the Court approved the reimbursement of fees to the Parent GUC Ad Hoc Group, the majority shareholders, and their professionals and advisors under section 503(b) of the Bankruptcy Code. *See* Backstop Opinion at 57-58. The Court will not revisit that determination herein. *See In re Adelphia Commc'ns. Corp.*, 441 B.R. 6, 12 (Bankr. S.D.N.Y. 2010) ("[T]he applicant need only satisfy section 503(b) requirements. There are no other provisions of the Code that authorize payment of fees of this character as expressly.").

26, 34.  They made the same argument in objecting to the Backstop Motion. They contended that

the Debtors "settled for an unreasonable deal with the Commitment Creditors which vastly

overcompensates them with special treatment, generous fees, and steep discounts to divert

money to the Debtors' controlling shareholders and procure votes by the Commitment Creditors

in favor of the Plan." Backstop Opinion at 31. They urged "that the Debtors blindly accepted all

of their terms in an effort to gain their support for the Plan." *Id*. at 36. The Court found no merit

to those arguments. Rather, the Court found that the Plan negotiations were conducted in "good

faith" and unfolded pursuant to a "vigorous, hard-fought and lengthy" mediation process

overseen by the Mediator. *Id.* at 33-34, 80. In sum, the Court was "satisfied that the evidence

demonstrates that the Debtors engaged in arm's-length negotiations with the Commitment

Creditors and employed a fair and reasonable process in negotiating and executing the Backstop

Agreements." *Id.* at 37; *see also id*. at 81 ("[T]he Debtors followed a fair process both internally

and externally in seeking sources of capital and, ultimately, negotiating the terms of the RSA and

Backstop Agreements, with the assistance of the Mediator."). The Court adheres to those rulings

herein.

All bankruptcy plans are the product of formal and informal settlements. In that context,

without more, a creditor's exercise of leverage to obtain concessions in plan negotiations is not

grounds for finding bad faith under section 1129(a)(3) of the Bankruptcy Code.  *See In re*

*Chemtura Corp.*, 439 B.R. 561, 609 (Bankr. S.D.N.Y. 2010) ("As all settlements require

compromise on both sides, the fact that the Debtors were willing to provide concessions to

garner support for their low-leverage plan does not preclude a finding of good faith."); *In re*

*AbitibiBowater Inc.*, No. 09–11296(KJC), 2010 WL 4823839, at *4, *8 (Bankr. D. Del. Nov. 22,

2010) (rejecting good faith objection, noting "[o]f course, plan negotiations among the various

constituencies involved the making of concessions and agreements to achieve the level of consensus likely to result in the overwhelming creditor support attained here"). Here, the Debtors engaged in good faith, arm's-length negotiations overseen by the Mediator. The A&P Ad Hoc Group has failed to demonstrate that the Debtors engaged in "vote buying" or that the Plan otherwise was filed in bad faith.

To summarize, the Court finds no merit to the A&P Ad Hoc Group's contentions that (i) the Plan fails to meet the requirements of section 1129(a)(1) because the Debtors' treatment of General Unsecured Class 5 Claims violates section 1123(a)(4) of the Bankruptcy Code; (ii) the Plan violates section 1129(a)(3) of the Bankruptcy Code because it provides economics to the Commitment Creditors that amount to impermissible "vote buying"; and (iii) the Plan calls for the payment of an excessive and unreasonable Backstop Fees to the Commitment Creditors in violation of 1129(a)(4). The Court overrules those objections to confirmation. The Court also overrules as moot, the A&P Ad Hoc Group's objection that the Plan may violate the absolute priory rule under section 1129(b)(2) of the Bankruptcy Code. Each impaired class of creditors voted to accept the Plan. Accordingly, since the Plan satisfies section 1129(a)(8) of the Bankruptcy Code, the cramdown provisions are not applicable. *See* 11 U.S.C. § 1129(b)(2). Finally, the Court will address the A&P Ad Hoc Group's contentions that the Corporate Incentive Plan established under the Plan violates section 503(c) of the Bankruptcy Code, and that the Non-Debtor Releases and Exculpation Clause in the Plan violate the Bankruptcy Code in conjunction with its discussion of the U.S. Trustee's Plan objections.

**The U.S. Trustee Objection**

The Corporate Incentive Plan

The Backstop Agreements call for the Reorganized Debtors to implement a post-

Effective Date employee incentive plan. *See* Commitment Creditors Backstop Agreement,

Schedule 3 (Terms of Corporate Incentive Plan); Backstop Shareholders Backstop Agreement,

Ex. C (Terms of Corporate Incentive Plan). Further, the RSA states that:

> The Debtors' management will be able to participate in a Management Incentive
> Plan the terms of which shall be agreed by the Debtors and the Commitment
> Parties at the time of the execution of the Backstop Agreements and which shall
> be consummated and implemented on the Effective Date.

RSA, Ex. A (Restructuring Term Sheet) at 13. It further provides that:

> At the time of the execution of the Backstop Agreements, the Debtors will seek to
> amend and assume up to approximately 40 executives' existing employment
> agreements, which amended agreements shall include management protection
> provisions (the "Management Protection Provisions") in the amount of up to
> $35mm in the aggregate.

*Id.* Through section 5.3 of the Plan, the Debtors seek to give effect to those commitments by

obtaining authorization to implement a Corporate Incentive Plan, Management Protection

Provisions and Short Term Cash Incentives, as follows:

> Certain Debtors' employees will be able to participate in the Corporate Incentive
> Plan the terms of which shall be consistent with those set forth in the term sheet
> attached as Schedule 3 to the Commitment Creditors Backstop Agreement and
> Exhibit C to the Backstop Shareholders Backstop Agreement and which shall be
> allocated and implemented post-Effective Date by the [New] Board.

> As set forth in that term sheet, the Debtors will seek to amend and assume up to
> approximately forty (40) executives' existing employment agreements, which
> amended agreements shall include management protection provisions (the
> "Management Protection Provisions") in the amount of no more than $35 million
> in the aggregate on terms acceptable to the Commitment Creditors and the
> Backstop Shareholders. The program implementing the Management Protection
> Provisions shall include a short-term cash incentive plan in the aggregate amount
> of $12 million, which shall be deemed earned as of the Effective Date. For the
> avoidance of doubt, any amounts paid pursuant to such short-term cash incentive

plan shall be credited in full against any amounts that may subsequently become due and payable pursuant to the program implementing the Management Protection Provisions.

Plan § 5.3. The Reorganized Debtors will provide those benefits to its officers and employees, after the Effective Date. The Debtors address the terms of the Corporate Incentive Plan (the "CIP"),[79] Management Protections and Short Term Cash Incentives in the Corporate Incentive Plan Term Sheet (the "CIP Term Sheet") annexed as Exhibit H to the First Plan Supplement.[80] In part, the CIP Term Sheet states:

> CIP to be equivalent to 2.5% of fully-diluted, fully-converted post-reorg shares. Number of synthetic shares granted based on fully-diluted, fully-converted post-reorg shares.
>
> CIP to be implemented post-Effective Date by the board of directors to be elected post-Effective Date in accordance with the Shareholders' Agreement (as defined in the Plan) (the "New Board").

---

[79]    Under the Plan, the term "CIP" is defined as:

> [T]he employee incentive program to be established and implemented with respect to the Reorganized Debtors post-Effective Date, on the terms provided in Schedule 3 and Exhibit C, as applicable, to the Backstop Agreements (subject to the approval of the existing board of directors of LATAM Parent) the material terms of which will be filed as an Exhibit to the Plan Supplement, as acceptable to the Debtors, the Requisite Commitment Creditors and the Backstop Shareholders.

Plan § 1.1 (definition of "CIP"). On April 12, 2022, the Debtors filed the Plan Supplement that includes the CIP Term Sheet. *See* First Plan Supplement, Ex. H (CIP Term Sheet) [ECF No. 5014]. The term sheet is consistent with the provisions contained in Schedule 3 in the Commitment Creditors Backstop Agreement. *Compare* CIP Term Sheet, *with* Commitment Creditors Backstop Agreement, Schedule 3.

[80]    As relevant, the CIP Term Sheet calls for:

> [The] Management Protection Plan to be implemented consistent with the Restructuring Plan Term Sheet (Exhibit A) to the Restructuring Support Agreement and Plan and subject to review and comment by the Backstop Parties' Advisors and good faith consideration of such comments by the Company, as provided for in the Backstop Commitment Agreement.
>
> The Management Protection Plan, as previously agreed in the Restructuring Plan Term Sheet (Exhibit A) to the Restructuring Support Agreement, shall include a short-term cash incentive plan in the aggregate amount of $12 million, which shall be deemed earned as of the Effective Date. For the avoidance of doubt, any amounts paid pursuant to such short-term cash incentive plan shall be credited in full against any amounts that may subsequently become due and payable pursuant to the Management Protection Plan.

CIP Term Sheet at 2.

Subsequent awards will be determined by the New Board, in its sole discretion.

The New Board shall determine individual grants for Effective Date awards under the CIP, consistent with the terms provided for herein.

Compensation consultant selected by and acceptable to the Backstop Shareholders and the Parent GUC Ad Hoc Group shall be retained pre-Effective Date to advise the New Board, including on performance vesting criteria.

CIP Term Sheet at 1. The term sheet identifies the following three groups as eligible to receive

awards under the CIP:

"Senior Executives" consisting of all members of the "Global Executive Meeting" (the "GEM Group"), which consists of the CEO, Vice Presidents and Directors. The Executive Committee ("ExCom") is a subset of the GEM Group and consists of all Vice Presidents and one Director, each of whom reports directly to the CEO.

"Other Executives" consisting of any Senior Managers that are not considered Senior Executives (*i.e.*, Senior Managers that do not directly report to the ExCom Members), as well as Managers and Junior Managers.

"Other Employees" consisting of current employees that (i) were employees of the company in 2020, (ii) have not been furloughed and re-hired and (iii) remain employed by the company as of the vesting date for any CIP awards.

*Id.* at 1-2. Only the awards under the CIP provided for the Senior Executives are subject to

dispute. The CIP Term Sheet describes those awards, as follows:

Awards to be in the form of phantom (synthetic) shares to be awarded pursuant to a contract and paid in cash.

Vesting dates shall occur at 8, 12, 24, 36 and 42 months post-Effective Date consistent with the terms herein.

Awards vesting at 8 months and 12 months post – Effective Date will fully cover the Management Protection Plan amount.

*Id.* at 1. The CIP Term Sheet includes a chart that discloses that for the first twelve months post-

Effective Date, payments under the CIP to Senior Executives' awards are tied only to the

retention of those executives. *Id.* After twelve months, those payments are tied to both retention

(28% of the payment) and performance (72% of the payment), based on metrics to be determined

and approved by the New Board and the compensation consultant selected by and acceptable to the Backstop Shareholders and the Parent GUC Ad Hoc Group. *Id.*

A condition to plan confirmation under section 1129(a)(1) of the Bankruptcy Code is that the Court find that the plan "complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). With certain irrelevant exceptions, chapters 1, 3 and 5 of the Bankruptcy Code apply in a case under chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 103(a). The A&P Ad Hoc Group and U.S. Trustee contend that the Plan fails to satisfy section 1129(a)(1) because the Debtors have not sought approval of the CIP under section 503(c) of the Bankruptcy Code and the CIP does not comply with section 503 of the Bankruptcy Code. U.S. Trustee Obj. at 18; *see also* A&P Ad Hoc Group Obj. ¶ 46 ("Rather than seek approval of these incentive awards through the applicable sections of the Bankruptcy Code governing these types of payments, the Debtors seek approval through confirmation of the Plan without providing the legal basis for approval thereof.")

Section 503(c)(1) prohibits the allowance and payment of sums to "an insider . . . for the purpose of inducing such person to remain" with the business "absent a finding by the court based on the evidence in the record" that (1) the payment is "essential" to the retention of the individual "because the individual has a bona fide job offer from another business at the same or greater rate of compensation;" and (2) the services of that individual are "essential to the survival of the debtor's business." 11 U.S.C. § 503(c)(1).[81] For these purposes, and as relevant herein, the

---

[81]    Section 503(c)(1) of the Bankruptcy Code states, as follows:

Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1)    a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that

term "insider" includes a director, officer, or person in control of the Debtors, or a relative of any such person. 11 U.S.C. § 101(31).[82] There is no dispute that the Senior Executives are insiders for purposes of sections 503(c) and 101(31) of the Bankruptcy Code.

---

    (A)      the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    (B)      the services provided by the person are essential to the survival of the business; and

    (C)      either –

    (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

    (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred; . . .

11 U.S.C. § 503(c)(1).

[82]    As relevant section 101(31) of the Bankruptcy Code states:

The term "insider" includes—

\*               \*               \*

    (B) if the debtor is a corporation--

    (i) director of the debtor;

    (ii) officer of the debtor;

    (iii) person in control of the debtor;

    (iv) partnership in which the debtor is a general partner;

    (v) general partner of the debtor; or

    (vi) relative of a general partner, director, officer, or person in control of the debtor

11 U.S.C. § 101(31).

Congress added section 503(c) to the Bankruptcy Code to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Global Home Prods., LLC,* 369 B.R. 778, 783–84 (Bankr. D. Del. 2007). In enacting the section, Congress sought "to limit the scope of key employee retention plans and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." *In re Borders Group, Inc*., 453 B.R. 459, 470 (Bankr. S.D.N.Y. 2011) (internal quotations and citations omitted). Section 503(c)(1) "applies to those employee retention provisions that are essentially 'pay to stay' key employee retention programs." *In re Dana Corp.,* 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006); *see also In re Dana Corp*. 351 B.R. 96, 102 (Bankr S.D.N.Y. 2006) ("Without tying this portion of the bonus to anything other than staying with the company until the Effective Date, this Court cannot categorize a bonus of this size and form as an incentive bonus. Using a familiar fowl analogy, this compensation scheme walks, talks and is a retention bonus.") (footnote omitted). In the twelve months after the Effective Date, the Senior Executives will be eligible to receive two payments under the CIP–both of which are based solely on those Senior Executives remaining in the Debtors' employ. *See* CIP Term Sheet at 1.  For that reason, the A&P Ad Hoc Group and U.S. Trustee describe the CIP as essentially a "pay to stay" program that runs afoul of section 503(c) of the Bankruptcy Code. *See* A&P Ad Hoc Group Obj. ¶ 50 ("As the awards are not tied 'to anything other than staying with the company,' the payments under the Corporate Incentive Plan are retentive."); U.S. Trustee Obj. at 18 (describing the CIP as "partially retentive"). They maintain that the Debtors have failed to demonstrate that the CIP meets the standards in section 503(c)(1) and, as such, that the Court cannot approve it.[83] *See* A&P Ad Hoc Group Obj. ¶ 44

---

[83]    As relevant, the proposed Confirmation Order states, as follows: "The documents contained in the Plan Supplement (including, without limitation, . . . the Corporate Incentive Plan Term Sheet, . . . and the Shareholders'

("The Debtors have not met their burden of demonstrating that the Corporate Incentive Plan

complies with the requirements [of section 503(c)(1)] of the Bankruptcy Code"); *see also* U.S.

Trustee Obj. at 17-18 ("[the Plan] makes no attempt to establish that the requirements of Section

503(c)(1) have been met.").

Section 503 of the Bankruptcy Code governs the allowance of administrative expense

claims. *See* 11 U.S.C. § 503. "The policy behind giving priority to administrative expenses in

chapter 11 proceedings is to encourage creditors to supply necessary resources to debtors post-

petition." *In re Climax Chem. Co.,* 167 B.R. 665, 667 (Bankr. D.N.M. 1994). Courts have

established strict criteria for determining whether a claim should be afforded an administrative

priority. *See In re Molnar Bros.,* 200 B.R. 555, 558 (Bankr. D.N.J. 1996) (noting that allowances

for administrative expenses are "narrowly construed for [the] proper protection of other

creditors."); *In re Grant Broad. of Phila., Inc*., 71 B.R. 891, 897–98 (Bankr. E.D. Pa. 1987)

("administrative claims should be narrowly construed to minimize prioritizing of a debtor's

scarce resources to certain favored creditors"). Accordingly, section 503 has "two overriding

policy objectives: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to

prevent the unjust enrichment of the estate at the expense of its creditors." *In re Journal Register

Co.,* 407 B.R. 520, 535 (Bankr.S.D.N.Y.2009) (citations omitted). "This dual objective is

embodied in the 'preserving the estate' language of the statute and requires that allowed

administrative claims arise from transactions with the estate." *Id*.

In *Journal Register,* the debtors proposed a reorganization plan that established an

incentive plan to take effect after the plan's effective date (the "JR Incentive Plan") for the

---

Agreement) are integral to the Plan and are approved by the Bankruptcy Court."  *See* Notice of Filing of Second
Revised Proposed Order (I) Confirming Debtors' Joint Plan of Reorganization of LATAM Airlines Group S.A. et al.
Under Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief, Ex. A (proposed Confirmation Order)
[ECF No. 5502].

benefit of certain employees of the reorganized debtors and pay them bonuses if they achieved

certain goals that the debtors and a group of consenting creditors agreed to in a plan support

agreement. *Id.* at 527. Certain creditors objected to plan confirmation on the grounds that the JR

Incentive Plan violated section 503(c) and, as such, the Plan failed to satisfy section 1129(a)(1)

of the Bankruptcy Code. *Id.* at 529. The court overruled the objection. It found that the Debtor

did not seek allowance of the payments under the JR Incentive Plan as administrative expenses

under section 503 of the Bankruptcy Code, and, in any event, the payment did not qualify as

administrative expenses. It reasoned that "[t]he bonuses payable under the [JR] Incentive Plan

are not being paid to preserve the value of the estate or to prevent unjust enrichment of the estate,

as they are being paid subsequent to confirmation of the Plan and as a result of the confirmation

order itself." *Id.* at 535 (citation omitted).

Like the JR Incentive Plan at issue in *Journal Register*, the CIP is a post-Effective Date

employee incentive program, which will be established pursuant to the Plan and implemented by

the New Board, for the benefit of the Reorganized Debtors. Although certain expected terms of

the CIP are set forth in the CIP Term Sheet, including the contours of the awards the New Board

(not the Debtors) would have the power to grant to certain employees (such awards, "CIP

Grants"), the terms of the CIP will be determined by the New Board.[84] *See* CIP Term Sheet at 1.

---

[84]   The U.S. Trustee explained his position on corporate incentive plans at the hearing on May 20, 2022, stating –

[W]e've made it clear to many debtors that if they wanted to–that any sort of corp [sic] incentive
plan that a debtor or the reorganized debtor would want to implement with respect to any of the
officers and directors and so forth could easily be done by the reorganized debtors' board. That
what's an issue here is the attempt to have the Bankruptcy Court approve these corporate
incentive plans . . . where payment will occur post-petition. And [the Debtors] don't want the
post-petition reorganized debtors board to have the final say on the matter. . . What's being
proposed here is somewhat of a hybrid. Rather than having specific amounts designated for
specific employees, what's being proposed under the plan . . . is essentially a carve-out or a pot . .
. So they're attempting to sort of straddle the requirements by indicating we want to lock in the
amount.

The New Board, acting for the benefit of the Reorganized Debtors, not the Debtors, will need to consider the CIP and determine all individual CIP Grants. *See id.* The CIP will not exist prior to the Effective Date, and no CIP Grants will be considered, let alone issued, until after the Effective Date. By definition, the CIP Grants cannot qualify as administrative expenses. *See In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) ("[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.") (internal quotation marks and citation omitted). Section 503 does not apply to the CIP and the CIP Grants.[85] The CIP does not violate section 503 and, as such, the Plan does not run afoul of section 1129(a)(1). The Court overrules the objections to the CIP.

---

May 20, 2022 Hr'g Tr. [ECF No. 5513] (the "May 20, 2022 Hr'g Tr. – Public Session") at 129:13-130:20 (Masumoto).

[85]    In reaching this conclusion, the Court finds that the A&P Ad Hoc Group and U.S. Trustee misplace their reliance on *In re AMR Corp.,* 497 B.R. 690 (Bankr. S.D.N.Y. 2013); *In re Dana Corp.*, 351 B.R. 96 (Bankr. S.D.N.Y. 2006) and *In re TCI 2 Holdings, L.L.C.*, 428 B.R. 117 (Bankr. D.N.J. 2010). Those cases do not involve incentive/retention programs to be implemented after the effective date of a confirmed chapter 11 plan for the benefit of the reorganized debtor. In *In re AMR Corp.*, as part of its reorganization plan, the debtor sought approval of a letter agreement by which the debtor's CEO, whose employment would be terminated on the plan's effective date, would receive a $20 million severance payment. 497 B.R. at 693. The approval of that payment by the debtor, without any action by the reorganized debtor, was a condition precedent to the plan's effectiveness. *Id.* Here, the Plan does not contain a condition precedent that the CIP will be implemented and administered by the Debtors, or the CIP Grants will be issued or paid prior to the Effective Date.

In *In re Dana Corp.*, the Debtor filed a motion pursuant to sections 105, 363(b) and 365 of the Bankruptcy Code seeking approval of a proposed compensation plan for the Debtors' President and CEO, and five other executives. 351 B.R. at 98. The compensation plan was to take effect immediately upon receipt of court approval and all of the payments called for under the plan, save one, were payable prior to the debtors' emergence from bankruptcy. *Id.* at 99. The completion bonus payable under the plan included an amount payable to the executives upon the debtors' emergence from chapter 11. *Id.* The issue before the court was whether the compensation plan was subject to the limitations of section 503(c) of the Bankruptcy Code or could be evaluated pursuant to the business judgment test under section 363(b). The court held that the plan was subject to section 503(c) and denied the motion. *Id.* at 103. *Dana* is clearly distinguishable. The CIP does not contemplate any payments prior to emergence from chapter 11. Moreover, the *Dana* court did not consider whether post-effective date awards could qualify as administrative expenses.

In *In re TCI 2 Holdings, LLC*, the plan proponents sought approval of a severance package for certain officers and directors where the obligations under the package would be incurred and paid by the reorganized debtors after

Section 1129(a)(4) of the Bankruptcy Code, states that

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). As such, it provides a mechanism for judicial review of payments made

or to be made by the debtor in connection with a reorganization plan. *See In re Future Energy*

*Corp.,* 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Section 1129(a)(4) is designed to insure

compliance with the policies of the Code that (1) the bankruptcy court should police the

awarding of fees in title 11 cases and (2) holders of claims and interests should have the benefit

of such information as might affect the claimants' decision to accept or reject the plan."). In

*Journal Register*, the Court noted that "[b]y including the [JR Incentive Plan] in their Plan of

Reorganization, the Debtors have subjected the Incentive Plan to the heightened disclosure,

notice, and hearing requirements of the Plan confirmation process, and they have given the

affected parties the opportunity to vote on it." 407 B.R. at 536–37. Judge Gropper found section

1129(a)(4) to be "directly applicable" to the post-effective date bonuses payable under the JR

Incentive Plan because they were being made pursuant to the plan and because the statute is

applicable to a "broad array of payments." *Id.* at 537 (citations omitted). In considering whether

the payments under the incentive plan were reasonable, Judge Gropper found that "the issue of

reasonableness will clearly vary from case to case and, among other things, will hinge to some

degree upon who makes the payments at issue, who receives those payments, and whether the

---

the effective date of the plan. 428 B.R. 117. The U.S. Trustee objected to the severance package on the grounds that it violated section 503(c) of the Bankruptcy Code. The plan proponents contended that the court should overrule the objection because any severance obligation would be incurred and paid by the reorganized debtors after the effective date of the plan, making section 503(c) inapplicable. *Id.* at 172-73. Without accounting for the source and timing of the severance payment, the court summarily sustained the objection. *Id.*

payments are made from assets of the estate." *Id.* (quoting *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.),* 150 F.3d 503, 517 (5th Cir.1998), *cert. denied,* 526 U.S. 1144 (1999)). In approving the payments as reasonable under section 1124(a)(4), Judge Gropper noted (i) that incentive payments were to be paid from assets owned by the secured creditors – not the Reorganized Debtors, (ii) the disclosure statement and plan fully disclosed the incentive plan, (iii) the creditors' committee endorsed the incentive plan as reasonable, and (iv) the Debtors' chief operating officer, who was an experienced restructuring professional, testified without contradiction that the incentive plan was reasonable. *Id.* at 538.

The U.S. Trustee asserts that there is insufficient information to assess whether the payments under the CIP are reasonable. U.S. Trustee Obj. at 23. The payments under the CIP will be made after the Effective Date of the Plan from assets owned by the Reorganized Debtors. The Debtors fully disclosed all aspects of the CIP in the Disclosure Statement,[86] and in the Plan

---

[86]    As relevant, the Disclosure Statement provides, as follows:

> Backstop Agreements also provide for the terms of a [CIP] that the Debtors believe are consistent with market terms for a company the size and complexity of LATAM and the markets in which it operates. A summary of the CIP terms is set forth in a term sheet attached as Exhibit H to the Plan. Under the proposed CIP currently set forth in the Backstop Agreements and which the Debtors are seeking to have approved by the Court, employees will be eligible to receive either cash or "synthetic shares"—cash awards equivalent to the value of shares in the Reorganized Debtors. The CIP will be equivalent to dilution of 2.5% of the equity of the Reorganized Debtors. For synthetic share awards made to senior executives during the first year following the Debtors' emergence from bankruptcy, 100% of the contemplated awards will be retention based. Thereafter, awards under the CIP will, if approved by the Court, become increasingly more performance based. The criteria for performance-based awards will be determined by the New Board based on advice of compensation consultants that are being engaged to advise on such criteria.

> In addition, as set forth in Exhibit H to the Plan, the Debtors will seek to amend and assume up to approximately forty (40) executives' existing employment agreements, which amended agreements shall include management protection provisions (the "Management Protection Provisions") in the amount of no more than $35 million in the aggregate on terms acceptable to the Commitment Creditors and the Backstop Shareholders. The Management Protection Provisions currently described in the Backstop Agreements include $12 million in a short-term cash incentive plan that will be deemed fully earned as of the Effective Date.

Disclosure Statement at 60-61.

and Plan Supplement.  The Holders of General Unsecured Class 5 Claims had the opportunity to

factor the CIP and the CIP Grants thereunder into their decision to accept or reject the Plan. They

voted overwhelmingly to accept the Plan. Moreover, the CIP metrics will be determined by the

New Board but subject to the condition that the board consult with a compensation consultant

selected by and acceptable to the Backstop Shareholders and the Parent GUC Ad Hoc Group.

Moreover, there is no suggestion that CIP is not in line with the market for compensation of the

Senior Executives of similar companies. The Court finds that the Debtors have complied with

section 1129(a)(4) of the Bankruptcy Code.

The Non-Debtor Releases and Exculpation Provision

The Plan provides for the release and enjoinment of certain claims and causes of action

by the Debtors (the "Debtor Releases") and by certain non-debtor third parties (the "Non-Debtor

Releases") against a group of specified individuals and entities (the "Released Parties"). *See* Plan

§ 11.3.[87] It also includes Exculpation and Limitation of Liability and Injunction clauses. *See id.*

§§ 10.6, 10.7. The Non-Debtor Releases are binding on the Holders of Claims against, and

Equity Interests in, the Debtors and the Reorganized Debtors who

> (i) are entitled to vote to Accept or Reject this Plan and (x) vote to Accept this
> Plan or (y) either Reject this Plan or abstain from voting and do not timely submit

---

[87]   For these purposes, the "Released Parties" consist of

(i) each of the Debtor Released Parties, (ii) the Committee in its capacity as such, (iii) each of the
Backstop Parties in their capacity as such, (iv) each of the DIP Secured Parties in their capacity as
such, (v) the Eblen Group and CVL, each in their capacity as a party to the RSA and each of the
Backstop Shareholders in their capacity as such, (vi) each of the Commitment Creditors in their
capacity as such, (vii) each of the Prepetition Secured Parties in their capacities as such, (viii) the
W&C Creditor Group Parties in their capacities as such, (ix) each agent, lender, or secured party
under the Revised RCF Agreement, each in its capacity as such, (x) the Local Bond Trustee, in its
capacity as such, (xi) the Joining Local Bondholders, in their capacities as such, and (xii) with
respect to each of (ii)-(xi), such Person's predecessors, successors, assigns and for each of the
foregoing, each of their present or former directors and officers, and any Person claiming by or
through them, members, partners, equity-holders, employees, representatives, advisors, attorneys,
notaries (pursuant to the laws of the United States and any other jurisdiction), auditors, agents and
professionals, in each case acting in such capacity, and any Person claiming by or through any of
them, for each of the foregoing in their capacity as such.

a Ballot indicating their refusal to grant the releases in this paragraph (subject to subparagraph (iv) hereof),

(ii) are presumed to have voted for this Plan under section 1126(f) of the Bankruptcy Code and do not timely opt out of the releases in this paragraph as provided for in the Notice of Non-Voting Status (as defined in the Disclosure Statement Order),

(iii) exercise their preemptive rights to subscribe to either the ERO New Common Stock or the New Convertible Notes and do not timely opt out of the releases set forth in this paragraph in connection with the preemptive rights subscription process or

(iv) elect to subscribe to New Convertible Notes Class C or New Local Notes (irrespective of how such Holder votes on this Plan).

*Id*. § 11.3(b). It is well settled that, as a general proposition, creditors may consent to third-party releases. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005); *see also In re Charter Commc'ns*, 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (stating that consensual releases are permissible); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (adopting the view that third-party releases where the creditor consents, is permissible); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (granting third-party releases where the creditor affirmatively

---

Plan § 11.3(b); *see also id*. § 1.1 at 26-27 (definition of "Released Parties"). The term "Debtor Released Parties" means "the Debtors and each of their Related Persons excluding members, partners or Holders of Equity Interests." *See id*. § 1.1 at 8 (definition of "Debtor Released Parties").

[87] For these purposes, a "Related Person" means

with respect to any Person, such Person's predecessors, successors, assigns and present and former subsidiaries and Affiliates (whether by operation of law or otherwise) and for each of the foregoing: each of their present or former directors and officers, and any Person claiming by or through them, members, partners, equity-holders, employees, representatives, present and former advisors and attorneys, notaries (pursuant to the laws of the United States and any other jurisdiction), auditors, agents and professionals, in each case acting in such capacity, and any Person claiming by or through any of them.

*Id*. § 1.1 at 26.

indicated their willingness to be bound by checking the box); *In re XO Commc'ns, Inc.,* 330 B.R.

394, 437 (Bankr. S.D.N.Y. 2005) (noting that consensual third-party releases are permissible).

The U.S. Trustee and the A&P Ad Hoc Group contend that to consent to such a release,

the creditors and interest holders must affirmatively opt in to the release. *See* A&P Ad Hoc

Group Obj. ¶ 57; U.S. Trustee Obj. 7-9.[88] They argue that silence on the part of a creditor or

interest holder cannot be construed as consent to a release. U.S. Trustee Obj. at 9 (citing *In re*

*SunEdison*, 576 B.R. at 458). They say that the Court should not authorize the Non-Debtor

Releases because the Plan provides that creditors and interest holders will be bound by the Non-

Debtor Release if they remain "silent" by failing to opt out of the release. *See id*. at 8. However,

courts in this district routinely approve opt out release language in cases in which creditors and

interest holders have been provided with "a clear and prominent explanation of the [opt out]

procedure." *In re Avianca Holdings, S.A.,* 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021). That is

because, "[i]naction is action under appropriate circumstances. When someone is clearly and

squarely told if you fail to act your rights will be affected, that person is then given information

that puts them on notice that they need to do something or else. That's not a trap." *Id.* at 137

---

[88]    As support for that proposition, the U.S. Trustee and A&P Ad Hoc Group rely on *In re Chassix Holdings, Inc.*,
533 B.R. 64 (Bankr. S.D.N.Y. 2015) and *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017)). In those
cases, the reorganization plans provided for non-debtor releases that would be binding on unsecured creditors unless
they took affirmative action not to grant the release. In both cases, the debtors projected that unsecured creditors
would receive *de minims* distributions on account of their claims. The courts rejected the debtors' contentions that
the non-debtor releases were consensual and enforceable. In substance, both courts reasoned that given the projected
meager recovery on account of the creditor claims under the plans, it was likely that unsecured creditors did not
focus on the fact that the plan called for them to take action not to grant the non-debtor releases and, in failing to act,
they were not consenting to the releases. For that reason, the *Chassix* court directed the debtor to modify the plan to
give unsecured creditors the right to opt into the non-debtor release, and the *SunEdison* court rejected the non-debtor
release. *See In re Chassix Holdings, Inc.,* 533 B.R at 80 (the court required opt in elections largely due to the
miniscule recovery proposed under the plan, which encouraged a "higher-than-usual degree of inattentiveness or
inaction among affected creditors."); *In re SunEdison, Inc.*, 576 B.R. at 461 (noting that the unsecured creditors
received less than a 3% recovery, leading the court to assume that such "meager recoveries . . . may explain their
inaction without regard to the Release."). Here, in contrast, releasing parties are receiving exponentially greater
recovery than those at issue in *SunEdison* and *Chassix* (indeed, full recovery for a large number of claims). *See*
Disclosure Statement § II.A. Moreover, the sufficiency of the Debtors' opt out process is apparent from the more
than 250 opt outs the Debtors received.

(quoting *In re Cumulus Media Inc.*, No. 17-13381 (Bankr. S.D.N.Y. Feb. 1, 2018) (Tr. of Hr'g at

27–28) (Chapman, J)).

The Debtors have provided very clear and prominent notice and explanation of the Opt-

Out Procedures applicable to the Non-Debtor Releases. Article XI of the Plan governs the

"Effect of Plan Confirmation," and section 11.3(b) contains the Non-Debtor Release language in

bold print. *See* Plan § 11.3(b). The Disclosure Statement includes a full discussion of the Debtor

and Non-Debtor Releases, as well as the Exculpation and Limitation of Liability and Injunction

clauses. *See* Disclosure Statement §§ I.B, I.F, XI.A-F. Moreover, in summarizing the terms of

the Plan at the outset of the document, the Disclosure Statement provides that –

> **The Plan also contains third-party releases. If you are eligible to vote on the
> Plan and you (i) vote to accept the Plan or (ii) vote to reject the Plan or
> abstain from voting on the Plan and do not affirmatively opt out of the
> release provisions in the Plan, you will be deemed, as of the Effective Date, to
> have conclusively, absolutely, unconditionally, irrevocably and forever
> released, waived and discharged all claims and all causes of action (as set
> forth in Section 11.3 the Plan and as permitted by applicable law) against the
> Released Parties (as defined in the Plan), including third parties. *See* <u>Section
> XI herein</u>. Holders of claims are urged to carefully review the release
> provisions in Section 11.3 of the Plan as well as the opt-out procedures as
> detailed in the forms of ballots.**

*Id.* § I.B. In the Disclosure Statement Order, the Court approved the Debtors' proposed

solicitation procedures, including the form of ballots (the "Ballots") and of the form of the

Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept

the Plan ("Notice of Non-Voting Status"). The Debtors conspicuously disclosed the Non-Debtor

Releases in boldface type in the Ballots and the Notice of Non-Voting Status, together with

instructions on how to opt out of the Non-Debtor Releases and expressly advised of the

consequences of not doing so. Each of the Ballots for Classes 1, 5 and 7 and the Notice of Non-

Voting Status, provided creditors an opportunity to opt out of the Non-Debtor Releases. The

Ballots and Notice of Non-Voting Status also include the exact language of the Debtor and Non-

Debtor Releases set forth in the Plan. *See, e.g.,* Disclosure Statement Order, Ex. 3 (Form of

Beneficial Owner Ballot for General Unsecured Claims against LATAM Parent) at 11-13.[89]

Moreover, the Debtors offered claim and interest holders multiple options to effectuate their opt

out, both via physical ballot and via the Solicitation Agent's online portal.[90] The voluntary "opt

out" structure is routinely applied in chapter 11 cases in this and other districts.[91] The Court

---

[89]    The Ballots also provide that,

> Pursuant to Section 11.3 of the Plan, you will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Claims and Causes of Action (as set forth in the Plan and as permitted by applicable law), against the Released Parties (as defined in the Plan) if you (a) vote to accept the Plan (whether or not you check the box in Item 3), (b) are presumed to have voted for the Plan under section 1126(f) of the Bankruptcy Code, or (c) reject the Plan or abstain from voting to 9 accept or reject the Plan without checking the box in Item 3 of the Ballot. You may check the box in Item 3 only if (a) you are entitled to opt out of the Releases in Section 11.3 of the Plan and (b) you submit the Beneficial Owner Ballot and either reject the Plan or abstain from voting to accept or reject the Plan.

*See e.g.,* Disclosure Statement Order, Ex. 3 (Form of Beneficial Owner Ballot for General Unsecured Claims against LATAM Parent) at 8-9. Each Ballot also explained, as follows:

> PURSUANT TO THE PLAN, IF YOU RETURN A BALLOT THAT VOTES TO ACCEPT THE PLAN, YOU WILL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN AND AS PERMITTED BY APPLICABLE LAW) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN). IF YOU RETURN A BALLOT THAT VOTES TO REJECT OR ABSTAINS FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASE PROVISIONS IN SECTION 11.3 OF THE PLAN, YOU WILL BE DEEMED, AS OF THE EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (AS SET FORTH IN THE PLAN AND AS PERMITTED BY APPLICABLE LAW) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE PLAN).

*See e.g., id.* at 10.

[90]    Disclosure Statement Order, Exs. 3, 4, 5 (form of the Ballots); *id.*, Ex. 6 (Notice of Non-Voting Status); Ex. 16 (Form of Beneficial Owner Ballot for LATAM 2024/2026 Bond Claims Against LATAM Finance and LATAM Parent); *see also* Order (A) Authorizing Service of Supplemental Solicitation Materials and (B) Scheduling Certain Dates and Deadlines in Connection with Confirmation of Plan of Reorganization [ECF No. 5221], Ex. C (RCF Ballots).

[91]    *See, e.g., In re China Fishery Grp. Ltd.*, Case No. 16-11895 (JLG), [ECF No. 2909] (Bankr. S.D.N.Y. Jan, 13, 2022) (confirming a plan with opt out third-party releases); *In re Philippine Airlines, Inc.*, Case No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) (same); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG), [ECF No. 2300]

overrules the A&P Ad Hoc Group's and U.S. Trustee's objection that an opt in rather than Opt-

Out Procedure must be followed for a consensual release to be effective. [92]

The U.S. Trustee asserts that, assuming *arguendo,* that the creditors and equity holders

have consented to the Non-Debtor Releases, consent alone is not sufficient support to warrant

such releases. In *Metromedia* the Second Circuit set forth several circumstances in which courts

have approved third-party releases, namely, (1) the importance of the releases to the plan, (2)

whether the affected claims would be channeled to a settlement fund, (3) whether the bankruptcy

estates would receive substantial consideration for the releases, (4) whether the released claims

would impact the reorganization via indemnity or contribution, and (5) whether the plan

otherwise provided for the full payment of the released claims. *In re Metromedia*, 416 F.3d at

141-42. The U.S. Trustee contends that the Debtors must demonstrate that application of those or

similar factors supports that Non-Debtor Release. U.S. Trustee Obj. at 12. He asserts that the

Debtors have failed to show that each Released Party is entitled to obtain a Non-Debtor Release.

*Id*. at 12-13. He maintains that the definition of Released Parties in the Plan is unusually broad,

encompassing many creditor groups and equity holders not typically included in the definition.

---

(Bankr. S.D.N.Y. Nov. 2, 2021) (same); *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC), [ECF No. 459] (Bankr. S.D.N.Y. Nov. 13, 2019) (same); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG), [ECF No. 1404] (Bankr. S.D.N.Y. Sept. 16, 2019) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), [ECF No. 1308] (Bankr. S.D.N.Y. Feb. 27, 2019) (same); *In re Tops Holding II Corp.*, Case No. 18-22279 (RDD), [ECF No. 765] (Bankr. S.D.N.Y. Nov. 9, 2018) (same); *In re Cenveo, Inc. et al.*, Case No. 18-22178 (RDD), [ECF No. 685] (Bankr. S.D.N.Y. Aug. 21, 2018) (same); *In re BCBG Max Azria Global Holdings, LLC et al.*, Case No. 17-10466 (SCC), [ECF No. 591] (Bankr. S.D.N.Y. July 26, 2017) (same); *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC), [ECF No. 769] (Bankr. S.D.N.Y. May 10, 2018) (same); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2018) (same).

[92]   The Non-Debtor Releases are consensual and apply only to those creditors and equity interest holders who affirmatively decide not to opt out of the release. As such, the U.S. Trustee misplaces his reliance on *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021) as support for his objection. There, the reorganization plan incorporated a broad, involuntary release of claims (including those predicated on fraud and willful misconduct) against non-debtors facing extensive liability stemming from the opioid crisis. *Id*. at 36. In contrast to the creditors and equity interest holders herein, the claimants in *Purdue Pharma* were afforded no opportunity to opt out of the releases. *See id*. at 81 (noting the claims at issue were "being finally disposed of pursuant to the Plan . . . without the claimants' consent and without any payment"). The holding of *Purdue Pharma* has no bearing on these Chapter 11 Cases.

He says that although certain of the Released Parties may have made a substantial financial contribution to the Plan, the Debtors have not shown that all of the Released Parties have done so. In particular, he asserts that the Debtors' officers and directors who simply performed their duties because they were paid to do so, or because they were under a fiduciary obligation to do so are not entitled to a release from claims of non-debtors. *Id*. at 13.

However, consideration of a non-debtor release is not "a matter of factors and prongs." *Metromedia*, 416 F.3d at 142. As noted, in *Metromedia* the Second Circuit identified "consent" as sufficient grounds for approving a non-debtor release. *Id.*; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. at 268 (observing that the *Metromedia* court "did not quarrel with" other courts' approval of consensual non-debtor releases). Still, and in any event, application of the factors cited in *Metromedia* show that the Debtors have met their burden of demonstrating that the Released Parties are entitled to the Non-Debtor Release. The Plan is the culmination of two years of effort by the Debtors, their management, directors and employees, and their advisors, involving extensive negotiations with various stakeholders, including certain key creditor groups and holders of Equity Interests. *See* Alfonsín Decl. ¶ 5.[93]  In connection with those negotiations, the Released Parties agreed to provide substantial consideration to the Debtors' estates and contributions to the restructuring, including by:

- providing billions of dollars in debtor-in-possession financing, providing the Debtors with critical liquidity that facilitated the administration of the Chapter 11 Cases and allowed the Debtors to continue their value-maximizing operations throughout the pendency of the cases and in the midst of an unprecedented, global pandemic, *see id*. ¶ 16;

- signing the RSA and agreeing to support the Plan, including by voting their respective claims and providing corporate approvals necessary to

---

[93]    Debtors Tr. Ex. 22 (Decl. of Ramiro Alfonsín Balza in Supp. of the Debtors' Proposed Plan of Reorganization dated April 12, 2022) (the "Alfonsín Decl.").

effectuate the issuance of the Plan Securities, *see id*. ¶¶ 9, 10, 13, 16, 20-
21;

- agreeing to backstop several billion dollars of Plan Securities, in order to ensure that the Debtors will be able to raise the capital they need to fund Plan distributions and emerge from the Chapter 11 Cases well capitalized, *see id*. ¶¶ 8-10, 13, 16, 20;

- waiving certain legal rights (including preemptive and corporate governance rights under Chilean law) and, with respect to the Prepetition Secured Parties, settling or waiving claims for default interest against the Debtors, both of which are essential to the global compromise embodied in the Plan, *see id*. ¶¶ 16, 20; and

- with respect to the Holders of RCF Claims, committing to provide a revolving credit facility to the Debtors post-emergence.

The Debtors assert and the Court agrees that these contributions were instrumental to the Debtors' ability to prosecute the Chapter 11 Cases in a manner that preserved value for their estates, and in the formation and consummation of the Plan, which provides meaningful value to the Debtors' creditors. These contributions were also made by the individuals whose labor or services furthered the Debtors' reorganization. *See* Findings of Fact at 20-21, Ex. A at 21, *In re Trident Holding Co., LLC*, Case No. 19-10384 (SHL) [ECF No. 928] (Bankr. S.D.N.Y Sept. 18, 2019) (approving third-party releases for parties who made a substantial contribution to the reorganization, including the debtors' officers, directors and employees); Findings of Fact at 20-26, *In re Millennium Lab Holdings II, LLC*, Case No. 15-12284 (LSS) [ECF No. 195] (Bankr. D. Del. Dec. 14, 2015) (same); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1079-80 (11th Cir. 2015) (same); *In re Mercedes Homes, Inc.*, 431 B.R. 869, 881 (Bankr. S.D. Fla. 2009) (same).[94]   Accordingly, the Court overrules the objections and approves the Non-Debtor Releases.

---

[94]   Additionally, certain of the Released Parties are owed indemnification and contribution by the Debtors under the Backstop Agreements or the A&R DIP Credit Agreement. *See* Plan § 3.1(f). Releasing claims against these

Section 11.6 of the Plan contains Exculpation and Limitation of Liability provisions. It

provides that on the Effective Date, the Exculpated Parties:

> shall neither have nor incur any liability to any Holder of a Claim or Equity
> Interest, the Debtors, the Reorganized Debtors, or any other party-in-interest, or
> any of their Related Persons for any prepetition act taken or omitted to be taken in
> connection with, related to or arising from authorizing, preparing for or filing the
> Chapter 11 Cases or any postpetition act or omission in connection with, relating
> to, or arising out of the Chapter 11 Cases, the formulation, negotiation, or
> implementation of the Restructuring Support Agreement, Disclosure Statement,
> the Disclosure Statement Supplement, this Plan, the solicitation of acceptances of
> this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan,
> the consummation of this Plan or the administration of this Plan, except for acts or
> omissions that are the result of willful misconduct, gross negligence, fraud or
> criminal acts . . . .

Plan § 11.6. For these purposes, the term "Exculpated Parties" means:

> (i) each of the Debtors, non-Debtor Affiliates, Reorganized Debtors, and all of
> their respective Affiliates, (ii) the Backstop Parties, in their capacity as such, (iii)
> the DIP Secured Parties, in their capacity as such, (iv) the Commitment Creditors,
> in their capacity as such, (v) the Backstop Shareholders, in their capacity as such,
> (vi) the Eblen Group and CVL, each in their capacity as a party to the
> Restructuring Support Agreement, (vii) the Prepetition Secured Parties, each in
> their capacity as such, (viii) each agent, lender and secured party under the
> Revised RCF Agreement, each in its capacity as such, (ix) the W&C Creditor
> Group Parties, each in their capacity as parties to the Restructuring Support
> Agreement, (x) the Joining Local Bondholders and the Local Bond Trustee, each
> in its capacity as such, (xi) the Committee and each of the members of the
> Committee in its capacity as such, and (xii) with respect to the foregoing Persons
> in clauses (i)—(xi), each of their respective officers, directors, employees,
> representatives, advisors, attorneys, notaries (pursuant to the laws of the United
> States and any other jurisdiction), auditors, agents and professionals, in each case
> acting in such capacity on or any time after the Petition Date, and any person
> claiming by or through any of them but excluding any other Causes of Action
> preserved by the Debtors.

*Id.*

---

Released Parties will therefore ensure the Debtors are not burdened with the costs of indemnification or
contribution, another basis for approving non-debtor releases. *See Metromedia*, 416 F.3d at 142.

Exculpation provisions in chapter 11 plans are not uncommon and "generally are permissible, so long as they are properly limited and not overly broad." *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)). Moreover, courts in this district routinely approve exculpations of prepetition conduct that are tailored to the debtor's reorganization, as the Exculpation Provision is here. *See In re Stearns Holdings, L.L.C.,* 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019). The U.S. Trustee objects to the Exculpation clause on the grounds that the definition of "Exculpated Party" is overly broad. U.S. Trustee Obj. at 13. He maintains that an exculpation clause must be limited to estate fiduciaries like estate professionals, the committees and their members, and the Debtors' directors and officers who have served during the chapter 11 case and should not be extended to cover third parties like creditors, shareholders, and their advisors. *Id.* He also asserts that in addition to excepting willful misconduct, gross negligence, fraud, or criminal acts (as it does), the Exculpation clause should except attorneys' violations of New York Rules of Professional Conduct ("NYRPC"). *Id.* He maintains that as drafted, the Plan runs afoul of the NYRPC provision that restricts attorneys from making agreements limiting their liability to a client for malpractice. *See* N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1).

It is well settled that an exculpation clause approved at confirmation may exculpate estate fiduciaries like a committee, its members, and estate professionals for their actions in the bankruptcy case except where those actions amount to willful misconduct or gross negligence. *In re PWS Holding Corp.*, 228 F.3d at 246; *see also In re Tribune Co.*, 464 B.R. at 126, 189 (Bankr. D. Del. 2011); *In re Washington Mut., Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011). The Exculpation clause meets that standard. But that does not go far enough for purposes of these cases. "Exculpation provisions are frequently included in chapter 11 plans, because stakeholders

all too often blame others for failures to get the recoveries they desire; seek vengeance against

other parties; or simply wish to second guess the decisionmakers in the chapter 11 case." *In re*

*DBSD North America, Inc.*, 419 B.R. 178, 217 (Bankr. S.D.N.Y. 2009). Accordingly, in that

light,

> a proper exculpation provision is a protection not only of court-supervised
> fiduciaries, but also of court-supervised and court-approved transactions. If this
> Court has approved a transaction as being in the best interests of the estate and
> has authorized the transaction to proceed, then the parties to those transactions
> should [] not be subject to claims that effectively seek to undermine or second-
> guess this Court's determinations. In the absence of gross negligence or
> intentional wrongdoing, parties should not be liable for doing things that the
> Court authorized them to do and that the Court decided were reasonable things to
> do.

*In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr S.D.N.Y. 2019). The

Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation

provision. They have been actively involved in all aspects of these Chapter 11 Cases and have

made significant contributions to the success of these cases. In the absence of gross negligence or

intentional wrongdoing on their parts, the Court will extend the Exculpation clause to the

Exculpated Parties who are not estate fiduciaries, to bar claims against them as set forth in the

Exculpation clause, and based on the negotiation, execution, and implementation of agreements

and transactions that were approved by the Court. To that extent, the Court overrules the U.S.

Trustee's objection to the breadth of the definition of Exculpated Parties. Finally, the Court finds

no merit to the U.S. Trustee's request that the Court should carve out attorneys' violations of

N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1). That rule prohibits a lawyer from

making an agreement prospectively limiting the lawyer's liability to a client for malpractice.

However, it has no bearing on the standard of care established in the Exculpation Provision.

Accordingly, the Court overrules the U.S. Trustee's objection.

**The U.S. Trustee Supplemental Objection**

On September 24, 2020, the Court entered an order (the "Bar Date Order") establishing

December 18, 2020 at 4:00 p.m. prevailing Eastern Time as the last date and time for each

person or entity to file proofs of claim based on prepetition claims or on section 503(b)(9) of the

Bankruptcy Code (the "General Bar Date").[95] Additionally, the Bar Date Order establishes

separate Bar Dates for claims arising from the Debtors' rejection of executory contracts and

unexpired leases and claims that Debtors have amended in their Schedules.

Beginning after the General Bar Date, the Debtors and their advisors implemented a

process to review and reconcile the many thousands of filed and scheduled claims (and

supporting materials) in these Chapter 11 Cases. *See* Reply to U.S. Trustee Suppl. Obj. ¶ 1. Part

of this process involved the Debtors and their creditors contacting each other to exchange

supporting materials and address questions or seek resolutions regarding a creditor's claims. In a

subset of these cases, where the Debtors and creditors agreed with the amounts asserted in a

proof of claim, the parties entered into claim allowance agreements (the "Claim Allowance

Agreements"). *Id.* Beginning in late December 2021–which is prior to the entry of the Disclosure

Statement Order–the Debtors began to insert a Plan Support Provision in the Claim Allowance

Agreements with the Class 5 Claim Allowance Creditors. *Id.* ¶ 3.[96] Pursuant to that provision,

among other things, the creditor committed to vote in favor of the Plan. The typical Plan Support

Provision provides that:

> **Support of the Plan.** Counterparty shall timely cast any and all votes in respect
> of the Claim to vote in favor of acceptance of the Plan. Counterparty shall not

---

[95]    *See* Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief [ECF No. 1106].

[96]    A copy of a representative Claim Allowance Agreement is annexed as Ex. A at 1-2 to the U.S. Trustee Supplemental Objection.

oppose or object to approval of the Disclosure Statement and confirmation of the Plan.  To the extent the Counterparty sells or otherwise transfers any portion of its interest in the Claim, including the right to vote on the Plan, such sale or transfer agreement (or any similar agreement) shall include a provision binding the purchaser or transferee, and any subsequent purchasers or transferees, to this Agreement.

*Id.* ¶ 5. By early January 2022, the Debtors created a Claim Allowance Agreement Template that included a Plan Support Provision, that they sent to Class 5 Claim Allowance Creditors as part of the negotiation on the allowance of their claims. *See id.* ¶ 8.[97] The U.S. Trustee contends that the Debtors aggressively sought out those agreements from the Class 5 Claim Allowance Creditors in an effort to ensure that they could satisfy the numerosity requirement under section 1126(c) of the Bankruptcy Code for Class 5's acceptance of the Plan. *See* U.S. Trustee Suppl. Obj. at 18. The Debtors obtained at least forty-one Claim Allowance Agreements (with the Plan Support Provision) from the Class 5 Claim Allowance Creditors covering ninety-five separate claims. *Id.* at 13, 15. The Debtors did not seek Court authorization to enter into the Claim Allowance Agreements or otherwise file the agreements with the Court. However, for each agreement, they separately executed a Claim Allowance Stipulation (which did not include the Plan Support Provision or mention the provision) and then sought Court approval of the stipulation. The Debtors treat the Claim Allowance Agreements as consisting of the Debtors' agreement to allow the claims, and the claimants' agreement to support the Plan. The Debtors explain that they sought Court approval of the Claim Allowance Stipulation, because under the Bankruptcy Code they must obtain such approval because they do not have the unilateral right to allow creditor claims. *See* Reply to U.S. Trustee Suppl. Obj. ¶ 11. They say that they did not believe that they needed to obtain Court authorization to enter into the Plan Support Provision because (i) they

---

[97] The prototype of the Claim Allowance Agreement Template is annexed as Ex. A at 3-4 to the U.S. Trustee Supplemental Objection.

"fully believed that these Plan Support Provision were agreed to with creditors who had every intention of supporting the Plan," and (ii) because they "never had any intention of seeking specific performance" of the Plan Support Provision. *Id*. They also contend that they did not intend to conceal the Plan Support Provision from the Committee, the U.S. Trustee, or the Court, and that they believed, and still believe, that entry into the Plan Support Provision is entirely proper, and accordingly did not think including these agreements on the docket was necessary. *Id*. ¶¶ 11-13.

The Claim Allowance Agreements do not contain confidentiality provisions and in January 2022, a third party provided a copy of one such agreement to counsel to the Committee. On January 20, 2022, the Committee's counsel sought informal discovery from the Debtors including: (1) all documents and communications between the Debtors, or their advisors, and any creditor seeking support for the Plan; (2) all documents and correspondence regarding any effort to secure a creditor's support of the plan, which the Committee referred to as the "Program"; (3) all communications regarding the Program; and (4) a list of the creditors that the Debtors had approached seeking support of the Program (the "Information Request"). *Id*. ¶ 16.[98]  The U.S. Trustee joined in the Information Request. *Id*. At a chambers conference on February 8, 2022, the Court ordered the Debtors to produce all signed agreements containing the Plan Support Provision and external communications with counterparties regarding that provision. *Id*. ¶ 17.[99]

---

[98]   *See* Supplement to the Objection of the Official Committee of Unsecured Creditors to the Debtors Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto, Exhibit B [ECF No. 4171].

[99]   The Court did not direct the Debtors to produce other categories of documents, including internal correspondence, correspondence with creditors who did sign Claim Allowance Agreements with a Plan Support Provision or a list of creditors who were approached about potentially signing an agreement. Reply to U.S. Trustee Suppl. Obj. ¶ 17. The Court indicated that, if after review of the ordered discovery, the Committee or U.S. Trustee wanted further discovery, they could renew their requests.

Over the next three months, the Debtors produced more than 2,300 documents spanning over 18,000 pages, the vast majority of which were produced by the beginning of April 2022. *Id.* ¶ 18.[100]

In the wake of the disclosure of the Claim Allowance Agreements (with the Plan Support Provision), and their receipt of the discovery requests, the Debtors, without conceding any impropriety with respect to their position, took affirmative steps to disclaim any attempt to rely on or enforce the Plan Support Provision.  They did this in three ways.

> First, the Debtors added language to the fifth revised Disclosure Statement [ECF No. 4727] in which they advised that they would not enforce or compel compliance with any provision in a Claim Allowance Agreement.[101]

> Second, the Debtors filed and served on all counterparties to agreements containing a Plan Support Provision a notice that expressly disclaimed the provision.[102]

> Third, all Claim Allowance Stipulations were entered (or re-entered) with language stating that the counterparty was not bound by the Plan Support Provision.

---

[100]    The Debtors assert that as ordered by the Court, these documents included all executed agreements with all counterparties who entered into agreements with the Plan Support Provision as well as all external correspondence with these counterparties concerning Claim Allowance Agreements. *Id.* ¶ 18. They say that they also produced extensive, invoice-by-invoice financial back-up proving that each claim that was subject to the Claim Allowance Agreements with a Plan Support Provision was reconciled in accordance with the Debtors' books and records, down to the cent. *Id*. They contend that parallel and subsequent to these productions, the Debtors continued to meet and confer with both the Committee and U.S. Trustee, where they continued to request the documents and communications that the Debtors say were the subject of the Information Request that the Court previously rejected. *Id.* ¶ 19. The Debtors say that notwithstanding their belief that these documents and communications were irrelevant to the legal issues at hand, they voluntarily produced an Excel document that served as the Debtors' informal means of tracking their outreach to claimants regarding Claim Allowance Agreements. *Id.*

[101]    *See* Disclosure Statement § IV.L ("The Debtors have agreed that they will not enforce any provision in a 'Claim Allowance Agreement' that would require a creditor to vote to accept the Plan").

[102]    *See* Notice Of Debtors' Position Regarding Certain Claim Allowance Agreements [ECF No. 4752] (the "Plan Support Notice"). The Plan Support Notice states:

> PLEASE TAKE FURTHER NOTICE that any provisions in any Claim Allowance Agreements, or any similar agreements between the Debtors and creditor counterparties, regarding a creditor counterparty's agreement to vote to accept the Plan shall not be binding on the creditor counterparty, and the Debtors expressly disclaim any attempt to enforce or compel compliance with respect thereto.

Plan Support Notice at 2.

*Id.* ¶ 20. The Debtors report that of the ninety-five Allowed General Unsecured Class 5 Claims originally subject to the Plan Support Provisions, only forty-five voted to support the Plan. *Id.*

Section 1125 of the Bankruptcy Code addresses matters relating to the solicitation of votes to accept or reject a chapter 11 plan. Section 1125(b) states, in pertinent part, as follows:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b). This section is "designed to 'discourage the undesirable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests.'" *In re Heritage Org., LLC,* 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (quoting *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999)). Section 1126 of the Bankruptcy Code governs the acceptance and rejection of chapter 11 plans. The default rule under the Bankruptcy Code is that the votes of all holders of claims or interests impaired by the plan are counted in determining whether the class of claims or interests has accepted or rejected the plan. *See* 11 U.S.C. § 1126(d). Section 1126(e) provides an exception to that rule. It authorizes the bankruptcy court to "designate" (i.e., disregard) the votes of "any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e).

In substance, the U.S. Trustee contends that in entering into the Claim Allowance Agreements, the Debtors improperly solicited the Class 5 Claim Allowance Creditors' votes for their Plan. *See* U.S. Trustee Suppl. Obj. at 1-2. He contends that the Debtors "[i]mproperly engaged in postpetition claims resolution process for the purpose of leveraging the claims resolution process in order to improperly solicit votes for the Debtors' Plan of Reorganization."

116

*Id.* at 1. To that end, he maintains that "the Debtor utilized this process to secure agreements with

certain creditors to vote in favor of the plan based on the Debtors' agreement  to allow the

creditor's respective claim." *Id.* at 1-2. Although the Debtors have waived their rights, if any, to

enforce the Plan Support Provisions in the agreements, the U.S. Trustee nonetheless contends

that the Debtors' "clear violation" of section 1125(b) of the Bankruptcy Code provides grounds

for the Court to designate the votes of the Class 5 Claim Allowance Creditors pursuant to section

1126(e), and to deny confirmation of the Plan under section 1129(a)(2) of the Bankruptcy Code.

*Id.* at 18.

The Debtors deny that in entering into the Claim Allowance Agreements, they solicited

acceptances of the Plan. They contend that sections 1125(b) and 1126(e) are not applicable to the

Claim Allowance Agreements. *See* Reply to U.S. Trustee Suppl. Obj. ¶ 22. They also contend

that in any event, the U.S. Trustee has not demonstrated grounds for designating the votes of the

Class 5 Claim Allowance Creditors. *Id.* ¶ 27. Finally, they assert that, assuming *arguendo* that

they violated section 1125(b), the sole remedy for such violation is the designation of the votes

of the Class 5 Claim Allowance Creditors under section 1126(e). They content that section

1129(a)(2) does not provide grounds to deny Plan confirmation.

The U.S. Trustee notes that as applied to section 1125(b) of the Bankruptcy Code, the

terms "solicit" and "solicitation"  "do not encompass discussions, exchanges of information,

negotiations, or tentative arrangements that may be made by the various parties in interest in a

bankruptcy case which may lead to the development of a disclosure statement or plan of

reorganization, or information to be included therein." U.S. Trustee Suppl. Obj. at 15 (quoting *In

re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985) (cited by *Century Glove, Inc. v. First Am.

Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988)). He maintains that the negotiations with the

Class 5 Claim Allowance Creditors leading up to the execution of the Claim Allowance

Agreements did not touch upon matters relating to the development of a confirmable plan of

reorganization or the adequacy of the filed Disclosure Statement. *See id.* at 16. He asserts that

instead "[t]he Debtors sole purpose in their communications with the creditors was to leverage

the claims resolution process to extract a commitment from the creditors to vote for the Plan." *Id.*

He notes that "[t]he Debtors' claims resolution communications with the creditors were

accompanied by a form agreement that bound the claim to a vote for the Plan." *Id.*

The term "solicitation" is not defined under the Bankruptcy Code. In *Century Glove, Inc.*

*v. First Am. Bank*, the Third Circuit said:

> "solicitation" must be read narrowly. A broad reading of § 1125 can seriously
> inhibit free creditor negotiations. . . . The purpose of negotiations between
> creditors is to reach a compromise over the terms of a tentative plan. The purpose
> of compromise is to win acceptance for the plan. We find no principled,
> predictable difference between negotiation and solicitation of future acceptances.
> We therefore reject any definition of solicitation which might cause creditors to
> limit their negotiations.

860 F.2d 94, 101–02 (3d Cir.1988). Moreover, as Judge Glenn noted, "[c]ase law indicates that

the term . . . should relate to the formal polling process in which the ballot and disclosure

statement are actually presented to creditors with respect to a specific plan, and the term should

not be read so broadly as to chill the debtor's postpetition negotiations with its creditors." *In re*

*Residential Capital, LLC,* Case No. 12–12020, 2013 WL 3286198 at * 19 (Bankr. S.D.N.Y. June

27, 2013) (quotations and citations omitted).

The U.S. Trustee maintains that the communications surrounding the negotiation and

execution of the Claim Allowance Agreements are "fundamentally different" from the ones

carved out from the definition of solicitation cited above in *In re Snyder*, 51 B.R. at 437.  U.S.

Trustee Suppl. Obj. at 16. He asserts that the Claim Allowance Agreements "were pre-drafted,

with no room for negotiation with the creditors; all the creditors were required to sign it." *Id.*  He
argues that even if the Court adopts "the narrowest interpretation that only sending an official
ballot constitutes solicitation," the Debtors' actions nonetheless qualify as "solicitation in
substance," because a creditor's "signing this agreement, with no ability to reconsider the vote
for the Plan, has the same effect as voting to accept the plan on a ballot." *Id.* at 16-17. He
maintains that "[i]f the creditor signs the agreement, it is ***legally bound*** to vote for the plan, as
opposed to a tentative agreement or informal promise to vote for the plan." *Id.*

The Debtors liken the Claim Allowance Agreements to post-petition plan support
agreements that were "negotiated in good faith and at arm's length, between sophisticated
commercial parties, and only after the Disclosure Statement and Plan had been filed." *See* Reply
to U.S. Trustee Suppl. Obj. ¶¶ 26-27. However, the cases that the Debtors cite in support of that
contention are inapposite and inapplicable to the Plan Support Provisions. As noted, these
provisions call for the allowance of claims by the Debtors, and promises to vote in favor of the
Debtors' reorganization plan, by the creditors. They bear no resemblance to the plan support
agreements that the Debtors cite. First, in those cases, the debtors sought court approval of the
agreements. Here, the Debtors did not seek Court approval of the Plan Support Provisions and
maintain that they were not required to do so. Moreover, in those cases, the agreements were
integral to the development of the plan and the respective debtors' path forward to exit chapter
11. That is not the case here. The only "plan support" provision in the Claim Allowance
Agreement is the subject Class 5 Claim Allowance Creditors' unconditional commitment to
support the Plan by, among other things, voting to accept the Plan. Further, while the plan
support agreements cited by the Debtors were executed prior to approval of the disclosure
statement and were executed in furtherance of a debtor formulating its plan—i.e., before the plan

was filed in court—here that is clearly not the case.[103] Moreover, the U.S. Trustee notes that

some courts have disallowed post-petition lock-up agreements. As support, he cites to *In re*

*Stations Holding Co.*, Inc., Case No. 02-10882 (Bankr. D. Del. 2020) and *In re NII Holdings,*

*Inc.*, Case No. 02-11505 (Bankr. D. Del. 2020). In those cases, the debtors and certain of their

creditors had entered into plan support agreements that included specific performance as a

remedy for breach of the agreement. In each case, the Delaware bankruptcy court found that the

remedy rendered the provisions into votes to accept the plans, in violation of section 1125(b) and

designated the votes at issue. *See In re Stations Holding Co., Inc.,* Case No. 02-10882 (Bankr. D.

Del. Sept. 30, 2002) Order Granting Motion of the United States Trustee Pursuant to Sections

1125(b) and 1126(d) and (e) of the Bankruptcy Code to Designate All Persons Who Executed

Post-Petition Lockup Agreements and to Direct that Their Ballots Not be Counted, and/or for

---

[103]    In *In re Bally Total Fitness of Greater N.Y., Inc.,* Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. July 9, 2009) the court approved a plan support agreement that required the prepetition senior secured lenders to vote in favor of the plan and not to exercise remedies under their loan documents. *Id.* Motion of Debtors for Entry of an Order Approving the Debtors' Entry into (I) A plan Support Agreement and (II) Exit Financing Commitment Letters [ECF No. 1041] ¶ 14. In exchange, the secured lenders received payment of the claim as well as common stock in the reorganized debtor. *Id.* ¶ 16. The secured lenders also agreed to provide the exit finance which includes, among other fees, a commitment fee, closing fee and payment of lenders' expenses. *Id.* ¶ 19. The debtors sought approval of the agreement under sections 105(a), 363(b), 364(c)(1), 503 and 507 of the Bankruptcy Code and claimed that these agreements were a "very critical component" of the plan. The court agreed. *Id.;* July 9, 2009 Hr'g Tr. at 5:9-6:21 [ECF No. 1248].

In *In re Almatis B.V.,* Case No. 10-12308 (MG) (Bankr. S.D.N.Y. Aug. 3, 2010) [ECF Nos. 309, 349], the court granted the debtors' motion to enter in plan support agreements with prepetition lenders and provide exit financing in exchange for full payment in cash to senior lenders as well as issuance of warrants in reorganized debtor in exchange for the lender's support of the plan. *Id.* [ECF No. 309] ¶¶ 17, 20. Thus, the plan support agreement was integral to the revised plan. *Id.* ¶ 3. The debtors sought approval of the plan support agreement under section 105(a), 363(b) and 1125(b) of the Bankruptcy Code, which the court approved. *Id.* [ECF No. 349] ¶ 2.

In *In re Lehman Bros. Holdings Inc.,* Case No. 08-13555 (JMP) Hr'g Tr. at 54:2-5 (Bankr. S.D.N.Y. Aug. 30, 2011) [ECF No. 19935] the court approved plan support agreements entered prior to the approval of the disclosure statement that resulted in "achieving a highly desirable purpose, orderliness in lieu of unnecessary litigation." The plan support agreement provided the framework for a chapter 11 plan of reorganization and specified the treatment of claims including the floating rate debt, mezzanine debt, fixed rate debt, other secured debt, general unsecured claims, intercompany claims, section 510(b) claims, deficiency claims, administrative claims as well as priority claims. *Id.* [ECF No. 10465] ¶ 26. The debtors sought approval of the plan support agreement under section 363 of the Bankruptcy Code. *Id.* at 1. The court approved the agreement. *Id.* [ECF No. 10877].

Sanctions or Other Relief [ECF No. 177], and *In re NII Holdings, Inc.,* Case No. 02-11505 (Bankr. D. Del. Oct. 25, 2002), Order dated October 25, 2002) [ECF No. 367].[104]

The Claim Allowance Agreements obligate the Debtors to file a Claim Allowance Stipulation with the Court seeking to allow the subject claim as a general unsecured claim, and simultaneously to file a notice withdrawing the objection to the subject claim. *See* Claim Allowance Agreement Template.  The Plan Support Provisions obligate the Class 5 Claim Allowance Creditors: (i) to timely cast any and all votes in respect of the Claim to vote in favor of acceptance of the Plan; (ii) to not oppose or object to approval of the Disclosure Statement and confirmation of the Plan; and (iii) to include a provision in any claim transfer document binding the purchaser or transferee, and any subsequent purchasers or transferees, to the agreement. *Id.* at 4. The Claim Allowance Agreements are not "plan support agreements" in the conventional sense. They are agreements by Class 5 Claim Allowance Creditors to vote their claims in favor of the Debtors' Plan (even as it may be amended from time to time), conditioned only on the Court's allowance of the claims as Allowed General Unsecured Class 5 Claims against the Debtors. Each agreement was entered prior to the Court's approval of the Disclosure Statement. The specific performance provision in the agreements at issue in *Stations Holdings* and *NII Holdings* appear to have been the key provision in the Delaware court's determination that, for purposes of section 1125(b), the agreements in those cases were deemed equivalent to votes in favor of the subject plans. Although the Claim Allowance Agreement does not include specific performance as a remedy for breach of the agreement, on its face it is an enforceable

---

[104]   These orders are not available on Westlaw, Lexis, or PACER. The description here relies on the summary of the orders contained in Collier. *See In re Residential Cap., LLC*, No. 12-12020, 2013 WL 3286198, at *20 n.5 (Bankr. S.D.N.Y. June 27, 2013) (same).

agreement obligating the counterparty Class 5 Claim Allowance Creditor to vote in favor of the

Debtors' Plan, that was executed prior to the Court's approval of the Disclosure Statement.

The Debtors have disclaimed any right to enforce the Plan Support Provisions and

entered into new agreements with the Class 5 Claim Allowance Creditors that did not include the

Plan Support Provisions. Moreover, it is undisputed that only forty-five of the ninety-five

Allowed General Unsecured Class 5 Claims originally subject to the Plan Support Provisions,

voted to accept the Plan. Still, the U.S. Trustee seems to contend that the Debtors cannot "un-

ring the bell" as he maintains that the Debtors nonetheless should be sanctioned for their alleged

breaches of section 1125(b) of the Bankruptcy Code. Moreover, although he acknowledges that

the remedy called for under the Bankruptcy Code for a section 1125(b) violation is the

designation of votes of the claims at issue under section 1126(e) of the Bankruptcy Code, he

maintains that the only appropriate remedy, and the one he is seeking herein, is for the Court to

deny Plan confirmation under section 1129(a)(2) of the Bankruptcy Code.

The U.S. Trustee reasons that the Debtors launched their allegedly improper bid to solicit

votes from the Class 5 Claim Allowance Creditors in violation of section 1125(b) to ensure that

Holders of Allowed General Unsecured Class 5 Claims vote to accept the Plan. He asserts that

"because the disallowance of votes would only increase the likelihood of the acceptance of Class

5, thereby imposing no penalty on the Debtors' misconduct, the only appropriate remedy is to

deny confirm of the Debtors' Plan." U.S. Trustee Suppl. Obj. at 14-15. In his view:

> [t]he problem with designating the votes needs to be considered in the context of
> the circumstances of this case. The [Class 5 Claim Allowance Creditors] are
> members of Class 5, which also includes unsecured noteholders. The Debtors no
> doubt anticipate that it has sufficient support from noteholders to satisfy the 2/3 in
> amount, quantitative requirement, for achieving acceptance by Class 5. The
> Debtors' undisclosed efforts to secure the votes of creditors appears to have been
> intended to ensure the satisfaction of the 1/2 numerosity requirement for class
> acceptance. Therefore, the usual remedy of designating votes by removing the

votes from consideration only increases the likelihood that the Debtors' goal of
obtaining the acceptance of Class 5 will be achieved. That approach rewards the
Debtors for their misconduct. A more equitable and appropriate solution is to
deny confirmation of the Plan.

*Id.* at 18.

The Court disagrees. Assuming, *arguendo,* that the Debtors violated section 1125(b) in

entering into the Claim Allowance Agreements, a denial of Plan confirmation is neither an

equitable nor appropriate resolution to the objection. By its terms, section 1126(e) provides the

exclusive remedy for violations of section 1125(b). *See In re Texaco, Inc*., 81 B.R. 813, 816

(Bankr. S.D.N.Y. 1988) (holding that in the event of improper solicitation of votes, the exclusive

relief afforded under the Code is to have improper votes disregarded for voting purposes); *In re*

*WorldCom, Inc.*, No. 02-13533 (AJG), 2003 Bankr. LEXIS 2192, *35-36 (Bankr. S.D.N.Y. May

16, 2003) (holding that even if the Debtors had improperly solicited acceptances of the plan,

appointment of a chapter 11 trustee was not an appropriate remedy because Section 1126(e) of

the Code provides an exclusive remedy for improper solicitation). Section 1126(e) "grants the

bankruptcy court discretion to sanction any conduct that taints the voting process, whether it

violates a specific provision or is in 'bad faith.'" *Century Glove, Inc.,* 860 F.2d at 97. *See also In*

*re Adelphia Commc'ns Corp.,* 359 B.R. 54, 60 (Bankr. S.D.N.Y. 2006) ("Section 1126(e) is

permissive in nature, and a bankruptcy judge has discretion in designating votes."). The statute

applies equally to actions by debtors and creditors. As relevant, "it provides a basis to designate,

without regard to the creditor's motive, where the vote is 'solicited or procured' in bad faith." *In*

*re Quigley Co., Inc.* 437 B.R. 102, 130-31 (Bankr. S.D.N.Y. 2010); *see also In re Sandia*

*Resorts, Inc.,* No. 11-15-11532 JA, 2016 WL 6879249, at *5 (Bankr. D.N.M. Nov. 4, 2016)

(noting same).  It also applies on an "entity specific" basis. Thus, on the facts of the case, if the

U.S. Trustee sought relief under section 1126(e) (which he does not) at best, only the votes of the

Claim Allowance Creditors who voted to accept the Plan could be designated under section 1126(e). The designation of those votes would have no impact on the votes cast by the remaining Class 5 creditors. It is undisputed that if the U.S. Trustee successfully designated the votes of the Claim Allowance Class 5 Creditors, and the Court disallowed their votes, Class 5 would nonetheless vote to accept the Plan by the requisite majorities called for under section 1126(c) of the Bankruptcy Code.

Section 1129(a)(2) requires that "[t]he proponent of the plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The U.S. Trustee invokes this provision to remedy the Debtors' alleged breach of section 1125(b). He maintains that for the reasons set forth above, the Debtors actions in entering into the Claim Allowance Agreements violated section 1125(b) and, so under section 1129(a)(2), the Plan is not confirmable because it does not comply with "applicable provisions" of the Bankruptcy Code. There is no merit to that position. As noted, section 1126(e) is the exclusive remedy available to the U.S. Trustee. Moreover, in any event, section 1129(a)(2) does not provide for an affirmative grant of authority. It cannot provide any relief to remedy the Debtors' alleged breach of section 1125(b), let alone relief that is greater than the relief available under section 1126(e). As the court stated in *In re Adelphi Commc'ns Corp*:

> Section 1129(a) of the Code lists requirements that need be satisfied to secure confirmation—conditions for confirmation, if you will. Section [1129(a)(2)] is one of those requirements. But like the other requirements for confirmation that appear in section 1129(a), section [1129(a)(2)] is still no more than a requirement or condition. It does not provide for an affirmative grant of authority. It does not give permission to do anything.

441 B.R. 6, 13 (Bankr. S.D.N.Y. 2010).

The Court overrules the U.S. Trustee's Supplemental Objection.

## **Conclusion**

Based on the foregoing, the Court overrules the Plan Objections and finds that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. An appropriate Confirmation order will be entered herewith.

Dated: New York, New York
      June 18, 2022

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge