UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

------------------------------------------------------- x

In re:

LATAM Airlines Group S.A., et al.,

Debtors.[1]

------------------------------------------------------- x

Case No. 20-11254 (JLG)
Chapter 11

(Jointly Administered)

**BENCH MEMORANDUM AND ORDER DENYING THE TLA CLAIMHOLDERS'
MOTION FOR (I) A STAY OF THE CONFIRMATION ORDER PENDING APPEAL
AND (II) CERTAIN INJUNCTIVE RELIEF PURSUANT TO RULE 8007[2]**

**A P P E A R A N C E S :**

PAUL HASTINGS LLP
*Counsel for the TLA Claimholders
Group*
200 Park Avenue
New York, New York 10166
By:    Daniel A. Fliman, Esq.
       Christopher M. Guhin, Esq.
       Emily L. Kuznick, Esq.
       John F. Iaffaldano, Esq.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

[2]    On July 7, 2022, the Court issued a ruling from the bench denying the TLA Claimholders' Motion. At that time, the Court advised it would docket a corrected version of the ruling. This Bench Memorandum and Order includes minor edits and revisions, but is substantially in the form of the decision issued from the bench.

1

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
*Counsel for the Debtors and Debtors
in Possession*
One Liberty Plaza
New York, New York 10006
<u>By:</u>   Jeffrey A. Rosenthal, Esq.
       Lisa M. Schweitzer, Esq.
       David H. Herrington, Esq.
       Abena A. Mainoo, Esq.

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
*Counsel to the Parent Ad Hoc
Claimant Group*
1177 Avenue of the Americas
New York, New York 10036
<u>By:</u>   Kenneth H. Eckstein, Esq.
       Rachael L. Ringer, Esq.
       David E. Blabey Jr., Esq.
       Natan Hamerman, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Counsel for Costa Verde
Aeronáutica S.A. and Lozuy S.A.*
51 West 52nd Street
New York, New York 10019
<u>By:</u>   Richard G. Mason, Esq.
       John R. Sobolewski, Esq.
       Angela K. Herring, Esq.

ALSTON & BIRD LLP
*Counsel for Qatar Airways*
90 Park Avenue
New York, New York 10016
<u>By:</u>   Gerard S. Catalanello, Esq.
       James J. Vincequerra, Esq.

DAVIS POLK & WARDWELL LLP
*Counsel for Delta Air Lines, Inc.*
450 Lexington Avenue
New York, New York 10017
<u>By:</u>   Marshall S. Huebner, Esq.
       Lara Samet Buchwald, Esq.
       Adam L. Shpeen, Esq.

PAUL HASTINGS LLP
*Counsel to Banco del Estado de Chile,*
*in its capacity as indenture trustee*
*under the Chilean Local Bonds Series*
*A through D and Series E issued by*
*LATAM Airlines Group S.A.*
200 Park Avenue
New York, New York 10166
By:    Pedro A. Jimenez, Esq.
       Andrew Tenzer, Esq.
       Nicholas Bassett, Esq.
       Douglass Barron, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[3]

The matter before the Court is the motion (the "**Motion**")[4] of the ad hoc group of holders

(the "**TLA Claimholders**") of certain claims (the "**TLA General Unsecured Claims**") against

Tam Linhas Aereas S.A. ("**TLA**" and, together with the above-captioned debtors and debtors in

possession, the "**Debtors**") for an indefinite stay of this Court's order[5] confirming the Debtor's

---

[3]    Capitalized terms used but otherwise not defined here shall have the meanings ascribed in the Motion, Opposition, Plan, Confirmation Order, Confirmation Opinion, and Memorandum Decision Granting the Debtors' Motion for Entry of an Order Authorizing and Approving the Debtors' Entry Into and Performance Under Backstop Agreements and Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations [ECF No. 4667] (the "**Backstop Opinion**"), as applicable. References here to "[ECF No.___]" are to documents filed on the electronic docket in these Chapter 11 Cases (Case No. 20-11254).

[4]    Motion for (I) Stay Pending Appeal, or Alternatively (II) Certain Injunctive Relief Pursuant to Rule 8007 [ECF No. 5787].

[5]    Order signed on 6/18/2022 Confirming Chapter 11 Plan [ECF No. 5754] (the "**Confirmation Order**" or the "**Order**").

Plan,[6] pending the TLA Claimholders' appeal from the Confirmation Order and Confirmation

Opinion.[7]

In the alternative, absent a stay, the TLA Claimholders seek: (1) an affirmative injunction

pursuant to Rule 8007(a)(1)(C) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

**Rules**"); or (2) an order under Bankruptcy Rule 8007(e)(2) requiring the Debtors to fund an

escrow account containing cash in the amount of outstanding post-petition interest ("**PPI**")

accrued through the Effective Date, calculated at the rate set forth in the Debt Instruments.

The Debtors filed an opposition to the Motion.[8] The Parent GUC Ad Hoc Group filed an

objection to the Motion.[9] Costa Verde Aeronautica S.A. and Lozuy S.A, Delta Air Lines, Inc.,

Qatar Airways, and Banco del Estado de Chile filed statements in support of the Debtors'

Opposition to the Motion.[10]  The TLA Claimholders filed an omnibus reply to the Opposition

---

[6]      Seventh Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of
the Bankruptcy Code [ECF No. 5331] (the "**Plan**").

[7]      Errata Order Signed on 7/7//2022 Re: Order Signed on 6/18/2022 Confirming Chapter 11 Plan, Ex. A
(Corrected Memorandum Decision on Confirmation of the Joint Plan of Reorganizations of LATAM Airlines
Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code) [ECF No. 5900] (the "**Confirmation Opinion**").

[8]      Opposition to the TLA Claimholders' Motion for (I) Stay Pending Appeal, or Alternatively (II) Certain
Injunctive Relief Pursuant to Rule 8007 [ECF No. 5807] (the "**Opposition**"). In support of the Opposition, the
Debtors rely on the Declaration of Brent Herlihy in Support of the Debtors' Opposition to the Motion of the TLA
Claimholders for a Stay of the Order (I) Confirming Debtors' Joint Plan of Reorganization of LATAM Airlines
Group S.A. et al. Under Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief [ECF No. 5808] (the
"**Herlihy Stay Decl.**" or "**Herlihy Stay Declaration**").

[9]      Parent Ad Hoc Claimant Group's Objection to TLA Claimholders Group's Motion for (I) Stay Pending
Appeal, or Alternatively (II) Certain Injunctive Relief Pursuant to Rule 8007 [ECF No. 5809] (the "**Parent GUC Ad
Hoc Group Objection**").

[10]      Joinder of Costa Verde Aeronautica S.A. and Lozuy S.A. in Support of Debtors' Opposition to TLA
Claimholders' Motion for (I) Stay Pending Appeal, or Alternatively (II) Certain Injunctive Relief Pursuant to Rule
8007 [ECF No. 5804] (the "**Costa Verde Joinder**"); Joinder of Qatar Airways Investments (UK) Ltd. to Debtors'
Opposition to the TLA Claimholders' Motion for (I) Stay Pending Appeal, or Alternatively (II) Certain Injunctive
Relief Pursuant to Rule 8007 [ECF No. 5805] (the "**Qatar Joinder**"); Joinder in Support of the Debtors' Opposition
to TLA Claimholders' Motion for (I) Stay Pending Appeal, or Alternatively (II) Certain Injunctive Relief Pursuant to
Rule 8007 [ECF No. 5806] (the "**Delta Joinder**"); Joinder of Banco Del Estado De Chile, in Its Capacity as
Indenture Trustee Under the Chilean Local Bonds Series A Through D and Series E, With Respect to Debtors'
Opposition to the TLA Claimholders' Motion for (I) Stay Pending Appeal, or Alternatively (II) Certain Injunctive

and Joinders.[11] The Court held a hearing on the Motion on July 5, 2022. For the reasons set forth

below, the Court denies the Motion.

## Jurisdiction

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the Amended Standing Order of Reference from the United States District Court for the

Southern District of New York, dated January 31, 2012 (Preska, C.J.). This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b).

## The Motion and Objections

The parties agree that it is in the Court's discretion whether to stay the Confirmation

Order pending the appeal of the Order, and that the factors that the Court should consider in

exercising that discretion are:

> (1) whether the applicant has illustrated a substantial possibility of success on
> appeal;
>
> (2) whether the applicant will be irreparably injured absent a stay;
>
> (3) whether issuance of the stay will substantially injure the other parties
> interested in the proceeding; and
>
> (4) where the public interest lies.

The TLA Claimholders contend in the Motion that the Court should stay the

Confirmation Order pending their appeal of the Order pursuant to Bankruptcy Rule

8007(a)(1)(A) because, on balance, application of those factors weighs in favor of providing

such relief. They contend that: (i) they face irreparable harm because their appeal may be

---

Relief Pursuant to Rule 8007 [ECF No. 5817] (the "**BancoEstado Joinder**") (collectively, and with the Parent GUC
Ad Hoc Group Objection, the "**Joinders**").

[11]    Omnibus Reply in Support of the TLA Claimholders Group's Motion for (I) Stay Pending Appeal, or
Alternatively (II) Certain Injunctive Relief Pursuant to Rule 8007 [ECF No. 5824] (the "**Reply**").

deemed equitably moot absent a stay, leaving them without the opportunity to challenge this

Court's conclusion they are not entitled to PPI, Motion ¶¶ 27-30; (ii) they have demonstrated a

substantial possibility their appeal will be successful given myriad contested legal issues, *id.* ¶¶

36-40; (iii) the balance of harms tips in their favor because, among other things, the Debtors can

continue to operate pending the resolution of the appeal, *id.* ¶¶ 31-35; and (iv) the public interest

favors a stay, *id.* ¶¶ 41-42. The TLA Claimholders also contend that the Court should not require

them to post a bond as a prerequisite to a stay because the Debtors only face "dubious" harm

from a stay. *Id.* ¶¶ 43-44.

The Debtors argue that none of those factors weighs in favor of granting a stay. Briefly,

they assert that (i) the TLA Claimholders have not, and cannot, show that there is a substantial

possibility that their appeal will be equitably moot given, among other things, the steps the

Debtors must take before transactions underpinning the Plan can occur, Opposition ¶¶ 12-13; (ii)

the TLA Claimholders are unlikely to be successful on appeal given the threshold factual

findings at issue—*i.e.*, TLA's insolvency, *id.* ¶¶ 26-32; (iii) the TLA Claimholders cannot

demonstrate they face more harm than the Debtors given that a stay risks derailing the Debtors'

exit financing, backstop commitments and, in turn, the Plan itself, *id.* ¶¶ 14-25; and (iv) the

public interest weighs against a stay, *id.* ¶¶ 33-36. The Debtors also contend that the TLA

Claimholders should be required to post a bond pursuant to Bankruptcy Rule 8007 if the Court

issues a stay because of the "massive harm that a stay threatens." *Id.* ¶¶ 37, 40.

As alternative relief, the TLA Claimholders request that the Court issue an affirmative

injunction pursuant to Bankruptcy Rule 8007(a)(1)(C), or alternatively, an order to protect the

parties' rights under Bankruptcy Rule 8007(e)(2), requiring the Debtors to place in escrow cash

in the amount of the outstanding PPI at the rate set forth in the Debt Instruments, accrued

through the Effective Date. Motion ¶ 4. The Debtors oppose this request because they contend:

(1) such relief is not authorized under Bankruptcy Rule 8007(a)(1)(C) or 8007(e)(2); (2) the Plan

cannot accommodate such a payment; (3) such payment would disrupt the Debtors' Business

Plan and financial needs; and (4) such payment is contrary to Supreme Court precedent that

prevents district courts from "issu[ing] a preliminary injunction preventing petitioners from

disposing of their assets pending adjudication of [a] contract claim for money damages." *See*

Opposition ¶¶ 42-48 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527

U.S. 308, 333 (1999) ("*Grupo Mexicano*")).

The Court considers those matters herein.

### Discussion

Bankruptcy Rule 8007(a)(1) provides that:

> In General. Ordinarily, a party must move first in the bankruptcy
> court for the following relief:
>
> (A) a stay of a judgment, order, or decree of the bankruptcy court
> pending appeal;
>
> (B) the approval of a bond or other security provided to obtain a
> stay of judgment;
>
> (C) an order suspending, modifying, restoring, or granting an
> injunction while an appeal is pending; or
>
> (D) the suspension or continuation of proceedings in a case or
> other relief permitted by subdivision (e).

Fed. R. Bankr. P. 8007(a)(1). Bankruptcy Rule 8007(e) provides that:

> Despite Rule 7062 and subject to the authority of the district court,
> BAP, or court of appeals, the bankruptcy court may: (1) suspend or
> order the continuation of other proceedings in the case; or (2) issue
> any other appropriate orders during the pendency of an appeal to
> protect the rights of all parties in interest.

Fed. R. Bankr. P. 8007(e).

7

The decision to grant a stay of an order pending appeal lies within the sound discretion of

the court. *In re General Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009) ("*General

Motors*"); *In re Overmyer*, 53 B.R. 952, 955 (Bankr. S.D.N.Y. 1985).

In exercising that discretion, the Court will consider the following four factors:

(1) whether the applicant has illustrated "a substantial possibility, although less
than a likelihood, of success on appeal";

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties
interested in the proceeding; and

(4) where the public interest lies.

*ACC Bondholder Grp. v. Adelphia Commc'ns. Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R.

337, 346 (S.D.N.Y.2007) ("*Adelphia*"); *In re Calpine Corp.*, No. 05-60200, 2008 WL 207841, at

*4 (Bankr. S.D.N.Y. Jan. 24, 2008).

Some courts have held that to prevail on a Rule 8007(a)(1) motion, the moving party

must show "'satisfactory' evidence on all four criteria," *see, e.g.*, *Turner v. Citizens Nat'l Bank

(In re Turner)*, 207 B.R. 373, 375 (B.A.P. 2d Cir. 1997) (quoting *Bijan-Sara Corp. v. Fed.

Deposit Ins. Corp. (In re Bijan-Sara Corp.)*, 203 B.R. 358, 360 (B.A.P. 2d Cir. 1996)), other

courts have held that the inquiry involves a balancing of the four factors and the lack of any one

factor is not dispositive to the success of the motion. *See General Motors*, 409 B.R. at 30;

*Adelphia*, 361 B.R. at 347. In this case, the court will adopt the latter approach and balance the

four factors. In doing so, the Court will apply the factors "somewhat like a sliding scale . . . more

of one [factor] excuses less of the other*." Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006)

(citation omitted). Still, in analyzing the four factors, the Court finds that "irreparable injury and

likelihood of success on the merits 'are the most critical.'" *Church & Dwight Co. v SPD Swiss

*Precision Diagnostics, GmbH*, No. 14-CV-585, 2015 WL 5051769, at *2 (S.D.N.Y. Aug. 26, 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

Stays pending appeal under Bankruptcy Rule 8007 "are the exception, not the rule, and are granted only in limited circumstances." *In re Brown*, No. 18-10617, 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020) (internal citation omitted). Accordingly, the party seeking a stay pending appeal "carries a heavy burden." *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005); *see also In re 473 W. End Realty Corp.*, 507 B.R. 496, 501 (Bankr. S.D.N.Y. 2014) ("*473 W. End Realty*") ("[t]he movant's burden is a heavy one") (internal quotation omitted). The burden is especially heavy where, as here, the TLA Claimholders seek to stay the Confirmation Order. *See In re MPM Silicones, LLC, et al.*, No. 14-22503 (Bankr. S.D.N.Y. Sept. 17, 2014) (Drain, J.), ECF No. 1036 at 169:6-9 ("[t]he party seeking a stay has what is described as a heavy burden, and that is particularly [] the case where it is seeking a stay of a confirmation order . . . ."). Moreover, where, as here, the movant seeks imposition of a stay without a bond, "the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement." *Triple Net Invs. IX, LP v. DJK Residential (In re DJK Residential, LLC)*, No. 08–10375, 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008).

The Court considers the four factors below.

**Whether The Movant Will Be**
**Irreparably Injured Absent A Stay**

Irreparable harm is the "principal prerequisite" for a stay under Bankruptcy Rule 8007; such harm "must be 'neither remote nor speculative, but actual and imminent.'" *Adelphia*, 361 B.R. at 347 (citation omitted). *See also In re Calpine Corp*, 2008 WL 207841, at *4; *Fox v. Mandiri (In re Perry H. Koplik & Sons, Inc.)*, No. 02–B–40648, 2007 WL 781905, at *1 (Bankr. S.D.N.Y. Mar. 13, 2007).

The gravamen of the Motion is that the TLA Claimholders' appeal of the Confirmation

Order will be equitably moot if the Court does not stay the Order pending the appeal. The TLA

Claimholders contend that once the Debtors begin to take substantial steps towards

consummation of the Plan, the Debtors will likely argue that the TLA Claimholders' appeal is

equitably moot, and thereby subject to dismissal. *See* Motion ¶ 28.  They assert that while they

are prepared to oppose such dismissal and, believe that even occurrence of the Effective Date

would not render their appeal equitably moot, there is at least the potential that the Debtors

would prevail, and the appeal would be dismissed. *Id*. They argue that, absent a stay, they would

suffer "serious and irreversible injury" through effectively losing their appellate rights and ability

to recover more than $145 million in PPI. *Id*. ¶¶ 2, 28. They claim that the possibility an

appellate court would find their appeal equitably moot demonstrates sufficient irreparable injury.

*See id*. ¶¶ 28-30.

The Debtors dispute those assertions. They contend that the Court must deny the Motion

because equitable mootness alone is insufficient to show irreparable harm. Opposition ¶¶ 10-14.

They also contend that even were equitable mootness alone legally sufficient, the TLA

Claimholders have not shown actual and imminent irreparable harm because the alleged risk of

the TLA Claimholders' appeal being deemed equitably moot before it can be decided is

speculative and remote. *Id*.

Turing to the Debtors' first argument, to be sure, some courts "have held that a risk of

mootness, standing alone, does not constitute irreparable harm." *In re Sabine Oil & Gas Corp*.,

548 B.R. 674, 682 (Bankr. S.D.N.Y. 2016). *See also In re Calpine Corp.*, 2008 WL 207841, at

*4 (noting in substance that merely invoking equitable mootness—which is a risk that is present

in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable

harm); *In re Baker*, No. CV 05-3487, 2005 WL 2105802, at *9 (E.D.N.Y. Aug. 31, 2005) ("As

other courts have noted, the possibility that an appeal will be rendered moot by a denial of stay

does not, in and of itself, constitute irreparable harm.").

However, in *Adelphia*, the district found court held that the "loss of appellate rights is a

'quintessential form of prejudice" where the denial of a stay pending appeal risks mooting *any*

appeal of *significant* claims of error. *Adelphia*, 361 B.R. at 348 (quoting *Country Squire Assocs.*

*of Carle Place, L.P. v. Rochester Comm. Sav. Bank (In re Country Squire Assocs. of Carle Place,*

*L.P.)*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996)). The court found that prejudice satisfies the

irreparable harm requirement. *Id.; see also In re St. Johnsbury Trucking Company,* 185 B.R. 687,

690, n.1 (S.D.N.Y.1995) (finding that the government would suffer irreparable injury if

distributions under a Chapter 11 plan were not stayed because those distributions would

constitute substantial consummation of the plan, and the government's appeal of certain

provisions of that plan would therefore become moot; and, further explaining that "[i]t is that

threatened loss rather than the loss of the right to appeal *vel non* that gives rise to the Court's

irreparable injury finding."). Moreover, in *General Motors*, the court "assume[d] that the threat

of equitable mootness is enough to satisfy the requirement of showing some irreparable injury –

enough to get on the scoreboard with respect to this issue." 409 B.R. at 31. The Court makes the

same assumption in this case.

However, the mere threat of equitable mootness is not grounds, per se, for granting stay

relief. The Court must further consider whether the TLA Claimholders have shown actual and

imminent irreparable harm and, if so, whether, in balancing the four factors they have met their

burden of proof that they are entitled to a stay pending appeal. *See Williams v. George Junior*

*Republic (In re Cujas)*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007) ("I am persuaded by and agree

with the *Adelphia Communications Corp.* court on this issue. Thus, in considering the Motion, I accept the proposition that the potential loss of a party's appellate rights through the mootness doctrine may constitute irreparable harm. I hasten to add, however, that the existence of such harm is no guarantee that an appellant is entitled to a stay pending appeal. It is also necessary to go one step further and consider the nature of the underlying dispute and the harm that the loss of appellate rights may have on the moving party. That harm must then be balanced against the potential harm other parties may suffer if the stay is granted. And, as stated above, the balancing of the harms analysis also affects how the court evaluates the . . . 'success on appeal' factor.").

The Plan is clear that a prerequisite to the consummation of the Plan is the issuance of the Plan Securities. *See* Plan § 10.2. More specifically, issuing these securities requires the Debtors to:

> (1)    obtain the necessary shareholders' approvals to issue the Plan Securities, *id*. § 10.2(c);
>
> (2)    register such new securities with the applicable Chilean regulator (the Comisión para el Mercado Financiero), *see id*. § 10.2(i); and
>
> (3)    comply with preemptive rights under applicable Chilean corporate law, *id*. § 10.2(g); Commitment Creditors Backstop Agreement § 7.1(g).

The Debtors concede that the steps leading up to the consummation of the Plan may become irreversible with the commencement of the preemptive rights offering called for under the Plan. *See* Plan § 10.2(g); Commitment Creditors Backstop Agreement § 7.1(g). But that process is not expected to occur until September 2022. Opposition ¶ 13. And, throughout the Plan process, the Debtors have asserted, as they do now, and no interested party has contested, that the Plan likely will not be fully consummated until October 2022, at the earliest. *See id*.

In that light, the Court finds that the TLA Claimholders' purported concern about equitable mootness is speculative and premature and will remain so at least until September

2022. The TLA Claimholders have not met their burden of demonstrating that the purported risk

of irreparable harm to them if the Court does not stay the Confirmation Order is "'neither remote

nor speculative, but actual and imminent." *In re Sabine*, 548 B.R. at 681 (quoting *Adelphia*, 361

B.R. at 347).

**Whether Issuance Of The Stay Will Substantially Injure**
**The Other Parties Interested In The Proceeding**

In December 2021, the Debtors, along with their advisors, launched a comprehensive,

competitive process to obtain exit financing ahead of a targeted emergence from bankruptcy in

the second half of 2022. Herlihy Stay Decl. ¶ 7.  During that process, the Debtors, through their

advisors, reached out to several financial institutions to solicit potential interest in providing debt

financing to fund the Debtors' emergence. *Id*. That process resulted in the Debtors securing

commitments for four new "DIP to Exit Financing" facilities (collectively the "**DTE Facilities**")

aggregating $2.75 billion.  *Id*.

In addition to the DTE Facilities, the Debtors in parallel negotiated a commitment for a

$1.173 billion Junior DIP Facility (with the DTE Facilities, the "**DTE/DIP Facilities**"), provided

by the Commitment Creditors and Facilitating Shareholders, that is intended, together with the

four DTE Facilities, to refinance the existing Amended and Restated DIP Facility (the "**A&R**

**DIP Facility**") and provide additional capital as well as a longer maturity date. *Id*.

The TLA Claimholders assert that although the Debtors and Plan Support Parties may

argue that any further delay to the Plan becoming effective will cause injury to the Debtors'

estates and their creditors by threatening the settlements achieved in the case, it is typically the

case that, once parties have expended significant time and resources in an effort to reach

settlements, they are highly unlikely to abandon those deals because of implementation delays.

Motion ¶ 31. They note that the Debtors (with the support of the Plan Support Parties) proceeded

with confirmation of the Plan in the face of substantial opposition (from four vocal objectors),

fully aware that those parties likely would appeal and seek a stay if they did not prevail.

Moreover, they contend that any potential harm to the Debtors and Plan Support Parties is

minimal at best and does not outweigh the irreparable risk of a possible loss of the TLA

Claimholders' appellate rights. *Id*.

They say that is so in part because they will ask the District Court to expedite their appeal

of the Confirmation Order and because the Debtors have ample time under their agreements with

case parties for the Plan to go effective; and the Debtors can continue to operate as they have

been during the pendency of a stay. *Id*. ¶¶ 32, 34. More specifically, the TLA Claimholders point

to the fact that:

(i)     The DIP Credit Agreement was recently modified to extend the scheduled
        maturity date thereunder from August 8, 2022 to October 14, 2022. *See*
        A&R DIP Credit Agreement;[12] and

(ii)    Under the DTE/DIP Facilities, there will be no scheduled maturity on the
        DTE/DIP Facilities until December 1, 2023. *See* DTE/DIP Motion ¶ 18.[13]

Moreover, they assert that prior to the Confirmation Hearing, the Backstop Parties

granted the Debtors the option to extend the outside date under their respective backstop

commitment agreements from October 31, 2022, to November 30, 2022 in exchange for a

payment of approximately 1.35% of the backstopped amounts. Motion ¶ 32 (citing Third

Amended Backstop Agreements § 3.1(a)). Although they concede that these are not charitable

extensions, they assert that the Plan Support Parties have demonstrated that they are willing to

---

[12]     Amended and Restated Super-Priority Debtor-in-Possession Term Loan Agreement dated as of April 8,
2022 [ECF No. 4660-3] (the "**A&R DIP Credit Agreement**").

[13]     Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Obtain DIP and DIP-to-Exit Financing
and (B) Grant Superpriority Administrative Expense Claims and (II) Granting Related Relief [Docket No. 5666] (the
"**DTE/DIP Motion**").

accommodate such additional extensions because they want to consummate transactions under

which they are receiving extremely favorable economics – and that it is doubtful they will simply

walk away from those deals because of an additional delay. *Id*. They say that the Debtors can

continue to operate as they have been during the pendency of a stay because there are no signs

that the Debtors will run out of liquidity if their emergence from these Chapter 11 Cases is

delayed. *Id*. ¶ 33. They note, in particular, given that the Court has now approved the DTE/DIP

Facilities, the Debtors have extensive additional runway to emerge from chapter 11. *Id*.

Accordingly, the TLA Claimholders contend that the irreparable harm they face, *i.e.*, the

potential loss of their appeal rights, outweighs the minimal (if any) risk to the Debtors, and

favors granting a stay pending appeal.

The Debtors dispute those contentions and maintain that the issuance of a stay of the

Confirmation Order pending appeal will substantially injure them because (i) a stay would

prevent consummation of their DTE/DIP Facilities and would jeopardize other critical financing

facilities; and (ii) a stay could lead to a loss of the backstop commitments secured by the

Debtors. In support of these assertions, the Debtors rely principally on the largely unrebutted

facts set forth in the Herlihy Stay Declaration. The Court finds merit in the Debtors' contentions.

In asserting that the DTE/DIP Facilities provide the Debtors with greater flexibility to

emerge from these Chapter 11 Cases, the TLA Claimholders overlook the fact that a stay could

prevent the Debtors from closing on the DTE/DIP Facilities.  It is undisputed that (i) the Debtors

require the DTE/DIP Facilities to provide them with the financing and certainty essential to

achieve a timely emergence from bankruptcy and execute on their Business Plan, Herlihy Stay

Decl. ¶ 8; and (ii) the absence of a stay of the Confirmation Order is a condition precedent to

closing the DTE/DIP Facilities, *id.* Thus, the issuance of a stay would prevent the Debtors from

satisfying a condition precedent to closing the DTE/DIP Facilities. *See* DTE/DIP Motion, Ex. B (Omnibus Commitment Letter) at Exhibit E § (s).

Moreover, under the DTE/DIP Facilities, if the Confirmation Order is subject to a stay, the lenders have the right to terminate their commitments as soon as September 5, 2022. Herlihy Stay Decl. ¶ 8. The lenders under the DTE/DIP Facilities include financial institutions that are not current creditors of the Debtors. It is undisputed that it is uncertain as to whether the lenders under the DTE/DIP Facilities would agree to any such waiver, and that even if they were willing to negotiate such an amendment, it is uncertain how long the negotiations around a waiver would take, and what the lenders would demand in exchange. Opposition ¶ 18; Herlihy Stay Decl. ¶¶ 9-10.

The DTE/DIP Facilities are the products of lengthy and robust negotiations. The Debtors have demonstrated that it would be extremely challenging and time-consuming to seek to negotiate replacements for these agreements, especially while a stay of the Confirmation Order is in place, given worsening market conditions, current capital market volatility, and challenges facing the airline industry. They have also demonstrated that if such a stay is imposed and the Debtors are unable to close the DTE/DIP Facilities, there is a significant risk that the Debtors would be unable to raise the necessary exit financing that is contemplated under the Plan and is required for them to emerge from these Chapter 11 Cases. *See* Herlihy Stay Decl. ¶¶ 9-10.[14]

Moreover, the Debtors have shown that their inability to close on the DTE/DIP Facilities would interfere with their plan for paying off the A&R DIP Facility that is scheduled to mature on October 14, 2022. Opposition ¶ 19; Herlihy Stay Decl. ¶¶ 11-12. The Debtors currently plan

---

[14]    The Debtors understand that if the commitments on the DTE Facilities are terminated and the Debtors are forced to find alternative exit financing to fund the Plan, the banks providing the facilities also would be owed a substantial Alternative Transaction Fee.  *See* Herlihy Stay Decl. ¶ 15.

to close the DTE/DIP Facilities by the end of September 2022, even prior to emergence from these Chapter 11 Cases, whereby they would replace the A&R DIP Facility. Herlihy Stay Decl. ¶ 11. The Court finds that the Debtors have also shown that if they cannot close on the DTE/DIP Facilities in time, they would face the challenge of attempting to extend the A&R DIP Facility or raise the necessary debtor-in-possession financing to refinance the existing A&R DIP Facility. Opposition ¶ 19. In addition, the Debtors have demonstrated there is a significant risk that replacement commitments could only be obtained on significantly worse terms or not at all in light of the current conditions in the capital markets. In addition, any such replacement facility is unlikely to be able to be drawn during the pendency of a stay. *See* Herlihy Stay Decl. ¶¶ 11-12.

Further, it is undisputed that that the harm caused by a stay would extend to the Debtors' efforts to enter into a new revolving credit facility. Opposition ¶ 20. In connection with the negotiation of the DTE Facilities, the Debtors have obtained a commitment for a new $500 million revolving credit facility to provide necessary liquidity and to enable them to meet the Minimum Liquidity Condition in the Backstop Agreements. Herlihy Stay Decl. ¶ 13. A stay would prevent the Debtors from closing the revolving credit facility that comprises one of the DTE Facilities, and there is no guarantee that the Debtors would be able to obtain commitments for a revolving credit facility in a subsequent exit financing process. *Id.*

Still further, the Debtors have demonstrated that a stay would place at risk the arrangements for the refinancing of the $600 million existing Revolving Credit Facility with an extended $600 million facility and the replacement of the $273 million Spare Engine Facility with an extended $273 million facility, both of which are important in allowing the Debtors to achieve competitive financing terms and raise the capital needed to make certain payments at emergence. Opposition ¶ 21; Herlihy Stay Decl. ¶ 20.

17

In short, the Debtors have demonstrated that the issuance of a stay of the Confirmation Order pending appeal of the Order would prevent consummation of the Debtors' DTE/DIP Facilities and would jeopardize their access to other critical financing facilities.

The Debtors also have demonstrated that the issuance of a stay may imperil the approximately $5.4 billion in new capital offerings that will be issued to enable the Debtors to emerge from these Chapter 11 Cases before the expiration of the Backstop Agreements that together provide the necessary backstopping of the Plan Securities. *See* Opposition ¶ 22; Herlihy Stay Decl. ¶¶ 16-19.

As part of the settlement of the Plan objections of the Official Committee of Unsecured Creditors and Banco del Estado del Chile, the Debtors negotiated an extension of the Backstop Commitment Agreements through October 31, 2022, with the option to obtain a further extension through November 30, 2022, at a cost of $73 million. Opposition ¶ 23; Herlihy Stay Decl. ¶ 18. If needed, the extension (with the payment of the $73 million extension fee) will ultimately decrease the overall recoveries received by the Debtors' creditors as they emerge from chapter 11. It is uncontested both that a stay significantly increases the chances that the backstop commitments would need to be extended, at least until November 30, at the cost of $73 million, Herlihy Stay Decl. ¶ 18, and that if the stay were to remain effective past November 30, the Debtors risk the loss of their backstop commitments entirely. Opposition ¶ 24; Herlihy Stay Decl. ¶¶ 18-19.

The Backstop Agreements are the products of months of hard bargaining to obtain the best terms possible for the Debtors. The TLA Claimholders have set forth no evidence demonstrating that the Backstop Parties would be willing to negotiate new agreements if these agreements expire at the end of November, particularly given the current uncertainties in the

credit markets and the Debtors' operating environment. *See* Herlihy Stay Decl. ¶¶ 18-19.

Moreover, the Debtors have shown that even if the Backstop Parties were willing to renegotiate

the agreements, market conditions have deteriorated significantly since the Backstop Agreements

were executed in January, meaning that the Debtors would be highly unlikely to obtain backstop

commitments on equally favorable terms. *Id.*

The Court finds that staying the Confirmation Order puts the Debtors at risk of losing

access to billions of dollars in capital—including $5.442 billion in capital raised under the

Backstop Agreements and $3.923 billion in debt commitments under the DTE/DIP Facilities

alone—all of which they need to effectuate the Plan. *Id.* ¶ 21. The grave consequences of this

risk are emblematic of the interrelated nature of the Plan's provisions and the compromises set

forth in it, as well as in the RSA and Backstop Agreements. As set forth in the Backstop

Opinion, for example, the Backstop Agreements are the product of hard-fought and lengthy

compromises. *See* Backstop Opinion at 34, 80-81. The Court is persuaded by the Debtors that

these agreements could not easily be renegotiated in a manner that allows the Debtors to timely

exit chapter 11. *See* Herlihy Stay Decl. ¶¶ 21-22. The TLA Claimholders do not persuasively

address the gravity of these risks and, indeed, provide no evidence to counter the evidence in the

Herlihy Stay Declaration.[15] The Court finds that the risk of harm to the Debtors from a stay

outweighs any harm to the TLA Claimholders absent a stay.[16]

**Whether the Stay Applicant Has Demonstrated A**
**<u>Substantial Possibility Of Success On Appeal</u>**

---

[15]    For example, the TLA Claimholders contend it is "purely speculative" for the Debtors to claim that a stay would prevent the DTE/DIP Facilities from closing. Reply ¶ 8. This assertion is unsupported by any evidence and is at odds with the express terms of the transaction documents behind the DTE/DIP Motion, as set forth above. *See* DTE/DIP Motion, Ex. B (Omnibus Commitment Letter) at Ex. E § (s).

[16]    In considering the balance of the harms, the Court has considered the fact that the TLA Claimholders have asked for an *indefinite* stay—a factor that the Court finds relevant in assessing the risk and magnitude of harm the Debtors face from, *inter alia*, the deadlines set forth in the Backstop Agreements.

Under the Plan, the TLA Claimholders are classified as unimpaired unsecured creditors who are being paid 100% of the amounts due and owing (with prepetition interest) as of the Petition Date. Plan § 3.2(f). As unimpaired creditors under the Plan, the Holders of Allowed Class 6 Claims (including the TLA Claimholders) were deemed to have accepted the Plan and were not afforded the right to vote to accept or reject the Plan. It is undisputed that the Debt Instruments underlying the claims of the TLA Claimholders call for the payment of default interest upon default, and that as of the Petition Date, the Debtors were in default under the agreements. In opposing confirmation, the TLA Claimholders contended that TLA is solvent and that notwithstanding the Bankruptcy Code's express disallowance of claims for unmatured interest in section 502(b)(2), to leave a class of unsecured creditors unimpaired under a plan of a solvent debtor, the plan must provide for the payment of principal in full, plus PPI at the contract rate to those creditors.

The Court rejected those contentions in the Confirmation Opinion and Order. The TLA Claimholders contend that the Court erred in doing so and set forth the following "serious concerns for any appellate court" from the Confirmation Order and Opinion:

    (i)       Finding the TLA Claimholders are unimpaired under the Plan;

    (ii)      Finding that the TLA Claimholders hold the burden of proof to show TLA is solvent;

    (iii)    Finding they did not meet their burden;

    (iv)    Finding that—assuming *arguendo* the Debtors held the burden of proof—they met their burden by affirmatively demonstrating TLA's liabilities exceeded its assets through: (a) the Liquidation Analysis; and (b) the Balance Sheet Test; and

    (v)    Rejecting the bankruptcy court's analysis in *In re Ultra Petroleum Corp.*, 624 B.R. 178 (Bankr. S.D. Tx. 2020) and finding that to the extent the solvent debtor exception survived the enactment of the Bankruptcy Code, it did so through section 1129(a)(7), not section 1124(1) as the TLA Claimholders contend.

*See* Motion ¶ 38. The TLA Claimholders contend they have a substantial possibility of

overturning the Confirmation Order and Opinion because they assume that on appeal, the District

Court will conduct *de novo* review of this Court's conclusions in the Confirmation Opinion. *Id.*[17]

In rejecting the TLA Claimholders' argument that it should apply the so-called "solvent

debtor exception" to the rule prohibiting the accrual of PPI on unsecured claims, the Court found

that they had not established the lynchpin of the claim—*i.e.*, that TLA is solvent, and found that

although it was not their burden to do so, the Debtors affirmatively demonstrated that TLA was

insolvent. Confirmation Opinion at 25, 37-42. It is well settled that to succeed on the appeal of a

factual determination, the appellant must demonstrate the trial court made a clear error. *See*

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) (findings of fact should only be

overturned if on consideration of the record as a whole, the reviewing court "is left with the

definite and firm conviction that a mistake has been committed.") (quoting *United States v. U.S.*

*Gypsum Co.*, 333 U.S. 364, 395 (1948)). This is especially true as to a bankruptcy court's

findings as to insolvency, as the Second Circuit has noted:

> The Bankruptcy Court has broad discretion when considering evidence to support
> a finding of insolvency. Insolvency is a question of fact, and the findings of the
> Bankruptcy Court in this regard will not be disturbed unless they are clearly
> erroneous.

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 35 (2d Cir. 1996) (citations

omitted).

---

[17]     The TLA Claimholders also contend that they have a substantially possibility of success on appeal because
the Debtors must show that the TLA Claimholders' appeal is frivolous in order to demonstrate this factor weighs
against a stay, as they claim the "substantial possibility of success test . . . is intended [only] to eliminate frivolous
appeals". Reply ¶ 11 (citing *473 W. End Realty*, 507 B.R. at 501). This argument is unpersuasive, in part, because it
attempts to transfer the burden of proof from the TLA Claimholders to the Debtors. Notwithstanding the language
they quoted from *473 W. End Realty*, the TLA Claimholders maintain a "heavy" burden to show they have a
substantial possibility of success on appeal—a burden the Court finds they failed to meet for the reasons set forth
herein.

The Court finds that the TLA Claimholders have not demonstrated a substantial possibility of succeeding in their effort to overturn the Court's finding that they failed to establish TLA's solvency and that, instead, the Debtors affirmatively established TLA's insolvency. Because proving that TLA is solvent is "the lynchpin of their objection to the Plan" under the so-called solvent debtor exception, Confirmation Opinion at 25, the Court finds that the TLA Claimholders have not demonstrated that there is a substantial possibility that they will succeed on appeal to overturn the Court's ruling that TLA is insolvent.

The TLA Claimholders' arguments to the contrary concerning issues on appeal—specifically, which argument is a threshold issue—are unavailing. They contend that the question of TLA's solvency—even assuming *arguendo* it is a factual issue subject to the more stringent clear error review on appeal—is not a threshold issue and, thus, does not limit their appeal by virtue of "clear error" review. They say that is so because the Confirmation Opinion first considered whether the Plan impaired the TLA Claimholders under section 1124 of the Bankruptcy Code before assessing whether TLA was solvent. *See id*. at 21-23. As such, they contend that impairment under section 1124 (*i.e.*, whether this section of the Bankruptcy Code permits unimpairment of a solvent debtor's creditor without paying contract-rate PPI) is the threshold gating issue, not whether TLA is solvent. Because they contend that impairment under section 1124 is a legal question, the TLA Claimholders appear to suggest it is subject to the less deferential *de novo* standard on appeal—a standard that, by definition, increases their possibility of success on appeal and demonstrates that this factor weighs towards granting a stay.

The Debtors disagree. They contend that even assuming *arguendo* that impairment under section 1124 is a threshold legal issue on appeal, that means, in essence, that the TLA Claimholders would be arguing to the appellate court that the solvent debtor exception operates

through section 1124(1) of the Bankruptcy Code to award a creditor PPI even when a debtor is insolvent—an impossibility given the bar on unmatured interest (*e.g.*, PPI) under section 502(b)(2). In other words, the Debtors contend that should the appellate court determine that a creditor is unimpaired under a plan only when it receives PPI, that determination necessarily assumes that the debtor is solvent because that is the only exception (in this context) that could conceivably circumvent section 502(b)(2)'s unambiguous bar on unmatured interest.

The Court agrees with the Debtors. While the Court held that the TLA Claimholders are unimpaired under the Plan before finding that TLA was insolvent, that does not alter the fact that solvency is the lynchpin of the TLA Claimholders' objection. Put differently, the crux of the objection is that the TLA Claimholders are entitled to PPI at the rate set forth in the Debt Instruments because the solvent debtor exception applies through the Bankruptcy Code in section 1124(1). If a debtor is not solvent, there is no need to consider or apply the solvent debtor exception whatsoever and, in turn, no need to assess section 1124(1).

Further, the Debtors contend and the Court agrees that the TLA Claimholders have not demonstrated a substantial possibility that they will succeed on appeal because the Court determined that it would not be equitable to allow the TLA Claimholders to receive approximately $145 million more to satisfy the TLA General Unsecured Claims given the context of the Plan, because providing the TLA Claimholders with such an additional recovery "would reduce the recoveries to impaired creditors under the Plan and risk disrupting the delicate balance set forth in it." Confirmation Opinion at 56. This determination embodies the Court's assessment of the equities based on its findings of fact, which are entitled to deference on appeal.

Finally, the Court finds that the TLA Claimholders have not demonstrated a substantial possibility of success on the other issues they seek to raise on appeal, including (a) who holds the

burden of proof in demonstrating solvency; (b) what is the proper valuation method to determine

solvency; and (c) whether the Bankruptcy Code requires payment of PPI at the contract rate or

federal judgment rate. *See* Motion ¶ 38. The Court believes that the rulings on these issues were

fully grounded in the Bankruptcy Code and relevant case law. *See* Confirmation Opinion at 19-

57.

### Where The Public Interest Lies

Courts recognize that the public interest disfavors stays because "the public interest

favors the expedient administration of the bankruptcy proceedings." *See In re Savage & Assocs.,*

*P.C.*, No. 05 CIV.2072, 2005 WL 488643, at *2 (S.D.N.Y. Feb. 28, 2005); *see also In re Health*

*Diagnostic Lab'y, Inc.,* No. 15-3219-KRH, 2015 WL 4915621, at *5 (Bankr. E.D. Va. Aug 17,

2015) (finding that "third parties and the public interest in general will be harmed by imposition

of the stay").

The TLA Claimholders assert that while there is certainly also a public interest in the

efficient administration of bankruptcy cases, this does not outweigh the interest in preserving

appellate rights here as courts have recognized that "the public interest in correcting legal errors

in the bankruptcy court outweighs the interest in the efficient administration of the estate."

*CWCapital Asset Mgmt., LLC v. Burcam Cap. II, LLC*, No. 5:13-CV-278-F, 2013 WL 3288092,

at *9 (E.D.N.C. June 28, 2013) ("*CWCapital*").

The Court agrees with the Debtors that the TLA Claimholders misplace their reliance on

*CWCapital*. First, in *CWCapital,* the court determined that the movant had a strong likelihood of

success on appeal. *See CWCapital*, 2013 WL 3288092, at *4-5. As discussed above, that is not

the case here. Second, *CWCapital* involved a regional commercial developer, not a major

international airline group, and the movant seeking a stay pending appeal was the debtors' "only

24

major creditor." *Id.* at *9. Here, the TLA Claimholders obviously are not the Debtors' "only major creditor"—they are a few of many, the vast majority of whom support the expedient administration of the Plan. Opposition ¶ 35. The Court agrees with the Debtors that a stay would deprive this multitude of other creditors of the efficient administration of the estates and the Debtors' emergence that they are waiting for and, in many cases, have worked hard to support. The Court finds that, as the Debtors contend, granting a stay will delay and potentially derail the Debtors' emergence from chapter 11, which in turn could jeopardize the Debtors' businesses, cause a loss of jobs, and weaken the airline industry more generally. That is plainly not in the public interest.

For the reasons set forth above, the Court finds that the TLA Claimholders have failed to satisfy their burden to demonstrate the Court should stay the Confirmation Order pending appeal. This holding is based on the balance of the four-factor test applied above on a sliding scale, where "more of one [factor] excuses less of [the] other[s]." *See Thapa,* 460 F.3d at 334. The Court holds as such, in part, because the TLA Claimholders grounded their claim of irreparable harm—the "principal prerequisite" for a stay under Bankruptcy Rule 8007, *Adelphia*, 361 B.R. at 347—on three distinguishable cases: *In re DAEBO Int'l Shipping Co. Ltd.*, 15-10616 (MEW), 2016 WL 447655 (Bankr. S.D.N.Y. Feb. 4, 2016) ("*DAEBO*"), *In re Degennaro*, 20-cv-7958, 2020 WL 6827936, at *1 (S.D.N.Y. Oct. 2, 2020), and *Adelphia*, 361 B.R. at 346. Their reliance on all three is misplaced given the sliding scale upon which courts apply the test for a stay pending appeal.

*In re Degennaro* addressed a debtor's appeal of the bankruptcy court's denial of his request to stay his payment of discovery sanctions pending appeal. 2020 WL 6827936, at *1. The court granted the stay, in part, because the non-movant faced no prejudice from the stay, as it

could still collect its full attorney fees (part of the discovery sanctions), albeit a few weeks later if the debtor's appeal failed. *Id*. As such, the court reasoned that lack of harm to the non-movant justified the stay pending appeal given that the proponent of the stay demonstrated its appeal would be moot absent relief. *See id*. Here, as set forth above, the TLA Claimholders cannot overcome a dubious claim of irreparable harm by a strong showing that the balance of harm weighs towards a stay, as the court found in *In re Degennaro.*

Likewise, *DAEBO* does not support granting a stay. In *DAEBO*, the court granted a stay of the bankruptcy court's order granting a foreign representative's motion to vacate maritime attachments out of a concern that his appeal would be equitably mooted. 2016 WL 447655 at *1. It did so, in part, because the foreign representative "ha[d] not alleged that [] it . . . w[ould] be prejudiced by continuing a stay pending the appeal." *Id*. at *3. In other words, the court found the balance of factors heavily weighted by the potential harm to the movant. *See id*. That is not the case here, as the Debtors have alleged—and the Court finds they have demonstrated—that they would be harmed if the court stayed the Confirmation Order, as a stay would jeopardize critical financing facilities, backstop commitments, and potentially the Plan itself.

The Court finds that *Adelphia* is similarly unavailing. As with *In re Degennaro*, the court in *Adelphia* stayed a confirmation order after weighing all four factors and finding the movant's risk of harm justified a stay given its substantial possibility of success on the merits. 361 B.R. at 368. The court rested its decision, in part, on the fact that the movant identified at least one legal question for review—an inquiry governed on appeal by the less deferential *de novo* standard. *See id*. at 357 ("Because appellants have shown a substantial possibility that there was never a settlement agreed to by all authorized litigants, there is also a substantial possibility that the

appellate court, in its de novo review, would find that the Bankruptcy Court erred in approving the Settlement.").

That is not the case here. As set forth in the Confirmation Opinion, while the TLA Claimholders objected to the Plan on some legal grounds (*e.g.*, whether and how the solvent debtor exception survived Congress' enactment of the Bankruptcy Code), that question need not be answered unless and until the TLA Claimholders establish that TLA was solvent—a factual question governed on appeal by the more stringent clear error review. *See In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570, 582 (S.D.N.Y. 2019) ("[a] bankruptcy court's findings of fact are reviewed for clear error . . . clear error exists only where a reviewing court is 'left with the definite and firm conviction that a mistake has been committed'" (quoting *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990)); *Sherman v. Rose* (*In re Sherman*), 18 Fed. Appx. 718, 720 (10th Cir. 2001) (assessing whether bankruptcy court's findings on solvency were clearly erroneous). In other words, that threshold question of fact—whether TLA's liabilities exceeded its assets at fair value under section 101(32) of the Bankruptcy Code—distinguishes these Chapter 11 Cases from *Adelphia* and, thus, demonstrates the TLA Claimholders' high burden on appeal and, in turn, heightens their need to demonstrate an irreparable injury. But, as set forth above, the Court finds they failed to demonstrate an irreparable injury. *See Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (citation omitted) ("more of one [factor] excuses less of the other").

In the alternative, the TLA Claimholders ask the Court to require the Debtors to place in escrow cash in the amount that they claim as PPI (approximately $145 million according to the TLA Claimholders). Motion ¶ 45. The TLA Claimholders contend the Court is authorized to do so under ether Bankruptcy Rule 8007(a)(1)(C), or Bankruptcy Rule 8007(e)(2). They assert that

such relief is warranted because it "strikes an appropriate balance between allowing the Plan to move forward pending appeal and protecting appellate rights." Reply ¶ 17. For the reasons set forth below, the Court declines to grant the alternative relief.

The Debtors oppose the alternative relief for four reasons. First, the Debtors contend that neither rule authorizes or contemplates such an order, and the TLA Claimholders provide no support that suggests otherwise. Opposition ¶ 43. The Court agrees. Bankruptcy Rule 8007(a)(1)(C) does not apply to the TLA Claimholders' request.[18] The Motion states that the TLA Claimholders intend to appeal the Confirmation Order itself—not any separate event that flows from the Plan ultimately going effective, which is the purview, instead, of subsection (a)(1)(C). *See* Motion ¶ 1 ("[t]he TLA Claimholders [] intend[] to appeal the Confirmation Order insofar as it overrules the Confirmation Objection."). This request falls squarely within subsection (a)(1)(A) as "a stay of a judgment, order, or decree". *See* Bankruptcy Rule 8007(a)(1)(A); *see also In re Motors Liquidation Co.,* 539 B.R. 676, 684 (Bankr. S.D.N.Y. 2015) (questioning applicability of Bankruptcy Rule 8007(a)(1)(C) because the movants "are not asking for a stay of the underlying Judgment itself [but instead of a] separate event, the fairness of proceeding with an act which could be affected by the outcome of a now ongoing appeal."). Because subsection (a)(1)(A) squarely addresses the TLA Claimholders' appeal of the Confirmation Order, the Court likewise finds subsection (e)(2) inappropriate.[19] The Court can locate no authority (and the TLA Claimholders have supplied none) supporting the use of subsection (e)(2) to require the Debtors to escrow the PPI requested by the TLA Claimholders.

---

[18]     Bankruptcy Rule 8007(a)(1)(C) states that "[o]rdinarily, a party must first move in the bankruptcy court for . . . an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."

[19]     Bankruptcy Rule 8007(e)(2) states that "[d]espite Rule 7062 and subject to the authority of the district court, BAP, or court of appeals, the bankruptcy court may: . . . issue any other appropriate orders during the pendency of an appeal to protect the rights of all parties in interest."

Second, the Debtors assert—and the Court finds they have demonstrated for the reasons set forth above—that the TLA Claimholders' proposed relief is contrary to the Plan and the underlying agreements that have been approved by the Court and executed by the Debtors and the constituencies of the Debtors' estates. *See* Opposition ¶ 44. Put differently, the Debtors contend that the TLA Claimholders cannot seek relief that would require modifying the Plan so as to require the payment they seek—a payment that cannot be accommodated under the RSA and Backstop Agreements. *See id*. ¶ 45. Moreover, the Debtors contend that even if the TLA Claimholders were to succeed on their claim, the sole effect would not be payment of $145 million of PPI, but that such payment would also cause the Debtors and their stakeholders to consider how and whether to develop and incorporate a new plan and a new set of underlying agreements that account for such an obligation. *Id*.

The TLA Claimholders dispute the Debtors' contention that paying them PPI at the rate set forth in the Debt Instruments would imperil the Plan. They assert that notwithstanding the Debtors' assertions that they would essentially have to go back to square one if an appellate court ordered the payment of PPI, *see id*., such a court order would not require changes to the Plan. Reply ¶ 3. They say that is so because the Plan approved by the Confirmation Order provides for Class 6 Treatment that includes "(x) Cash equal to the amount of such Allowed Class 6 Claim; (y) such other less favorable treatment as to which the Debtors and the Holder of such Allowed Class 6 Claim shall have agreed upon in writing or (z) *such other treatment such that the applicable Allowed Class 6 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code*." Plan § 3.2(f) (emphasis added). They contend that clause (z) would permit the payment of PPI at the rate required to unimpair the TLA General Unsecured Claims *without*

29

any revisions to the Plan, and thus the substantial consummation of the Plan would not render the TLA Claimholders' appeal moot. Reply ¶ 3.

The Court disagrees. It is not quite that simple. Among other things, the Plan, as modified, will have to be feasible in order to go effective. The Plan is a product of a series of interrelated compromises, settlements, and other agreements among the Debtors and certain of its principal unsecured creditors and certain of its equity holders. It is undisputed that if the TLA Claimholders were to succeed on their claim, the sole impact would not necessarily be payment of $145 million of PPI. Instead, the Debtors and their stakeholders would need to consider how and whether to develop and incorporate a new plan and a new set of underlying agreements that account for such an obligation. *See* Herlihy Stay Decl. ¶ 25.  The Debtors have demonstrated that if they are required to pay PPI to the TLA Claimholders, they will be required, among other things, to attempt to formulate, negotiate and execute a new restructuring support agreement, a new set of backstop agreements, a new set of financing agreements, and a new plan, and then seek Court approval of the new agreements and plan and obtain voting approval by the various constituents of the Debtors' estates. *See id*.

Third, the Debtors contend that, as a practical matter, requiring them to pay $145 million into escrow and treat those funds as unavailable during the pendency of the appeal would be contrary to the Debtors' Business Plan and financial needs and would cause them substantial harm.[20] Opposition ¶ 46. The Court agrees. There is no basis to suggest that the Debtors have a

---

[20]    Harm to the Debtors is relevant to the test for an injunction under Bankruptcy Rule 8007(a)(1)(C) just as it is under subsection (a)(1)(A). Courts analyze requests under subsection (a)(1)(C) in a substantially similar way as the four-prong test for a stay pending appeal. Instead of assessing whether the movant has a "substantial possibility of success on appeal", however, an injunction requires a showing of "either a likelihood of success or serious issues going to the merits". *In re Motors Liquidation Co.*, 539 B.R. at 684; *see also In re David X. Manners Co. Inc.*, No. 15-51490 (JJT), 2018 WL 2325758, at *1 (Bankr. D. Conn. May 22, 2018) (analyzing requests for stay and injunction pending appeal together because "[t]he comparable requirement for ordinary preliminary injunction analysis is either a likelihood of success or serious issues going to the merits").

surplus $145 million available to pay into escrow, and to force them to attempt to borrow or

draw such an amount from a credit facility would cost millions of dollars in interest and further

harm the Debtors. *See* Herlihy Stay Decl. ¶ 26. Further, the Debtors' Business Plan on which the

Plan is premised provides that, following the capital raise of approximately $5.442 billion, the

Debtors will have minimum levels of liquidity to ensure that they can navigate the substantial

volatility and uncertainty of the market. *Id*.

Finally, the Debtors contend that the TLA Claimholders' request to establish a disputed

claims reserve is contrary to the Supreme Court's holding in *Grupo Mexicano*. Opposition ¶ 47.

They say that the Supreme Court ruling prohibits district courts from "issu[ing] a preliminary

injunction preventing petitioners from disposing of their assets pending adjudication of [a]

contract claim for money damages." *Grupo Mexicano*, 527 U.S. at 333. They say that courts

have interpreted *Grupo Mexicano* to mean that "courts cannot issue preliminary injunctions

based solely on the insolvency of debtors where the plaintiffs' underlying claims primarily seek

monetary damages." *Allied Bldg. Prod Corp. v. George Parsons Roofing & Siding, Inc.*, No.

16CV4161 (JMA) (SIL), 2017 WL 2964018, at *2 (E.D.N.Y. Mar. 31, 2017); *see also Gucci*

*Am., Inc. v. Weixing Li*, 768 F.3d 122, 130 (2d Cir. 2014) ("The Court's holding was limited to

actions for money damages in which plaintiffs seek a preliminary injunction to prevent the

---

The Court is cognizant that at least one court within this circuit has reasoned that the "element of success on the merits is slightly more lenient for a request for a preliminary injunction". *In re David X. Manners Co. Inc.*, 2018 WL 2325758, at *1. Nevertheless, for the reasons set forth above, the Court finds that the TLA Claimholders have failed to demonstrate a substantial possibility of success on appeal, a likelihood of success, or any serious issues on the merits of the Confirmation Opinion. That, coupled with the substantial harm the Debtors stand to face if the Confirmation Order is stayed or enjoined, persuades the Court that an injunction is inappropriate. *See In re David X. Manners Co. Inc.*, 2018 WL 2325758, at *4 ("[w]hether the Court applies the substantial possibility or alternative tests for granting a preliminary injunction pending appeal under Fed. R. Bankr. P. 8007([a])(1)([C]), this Court further concludes, with explicit reference to the findings above, that there is neither a substantial possibility of success on appeal, nor are there serious issues going to the merits or a substantial tipping of hardships in the applicant's favor."). Accordingly, even assuming *arguendo* that Bankruptcy Rule 8007(a)(1)(C) is applicable, the Court finds that the TLA Claimholders have failed on the merits to demonstrate they are entitled to an injunction.

defendant 'from transferring assets in which no lien or equitable interest is claimed.'").  The

Debtors assert that the Court must deny the TLA Claimholders' request for a preliminary

injunction under *Grupo Mexicano* and its progeny because it would require the Debtors to set

aside $145 million in PPI that they will seek to prove is owed to them by the Debtors in their

appeal.[21] Opposition ¶ 47. Given that the Court finds the TLA Claimholders' alternative relief is

inappropriate for the reasons set forth above, the Court declines to address this argument.

### Conclusion

For the reasons set forth above, the Court denies the Motion. Because the Court declines

to stay the Confirmation Order pending appeal, the Court need not address the parties' arguments

concerning a bond.

It is SO ORDERED.

Dated: New York, New York
        July 8, 2022

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

---

[21]     The Debtors further contend that if the Court were to grant such an injunction requiring the Debtors to set aside $145 million or more, it would need to require the TLA Claimholders to post a bond in at least that amount in order to compensate the Debtors for the potential harm that would be caused by depriving them of these funds at a critical stage in their effort to emerge from chapter 11. Opposition ¶ 48.