UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

------------------------------------------------------- x

In re:

LATAM Airlines Group S.A., et al.,

Debtors.[1]

------------------------------------------------------- x

Case No. 20-11254 (JLG)

Chapter 11

(Jointly Administered)

**MEMORANDUM AND ORDER DENYING AD HOC GROUP OF UNSECURED
CLAIMANTS' MOTION FOR A STAY PENDING APPEAL PURSUANT TO RULE 8007**

**A P P E A R A N C E S :**

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
*Counsel for the Debtors and Debtors
in Possession*
One Liberty Plaza
New York, New York 10006
By:    Jeffrey A. Rosenthal, Esq.
       Lisa M. Schweitzer, Esq.
       David H. Herrington, Esq.
       Abena A. Mainoo, Esq.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

ARNOLD & PORTER KAYE
SCHOLER LLP
*Counsel to the Ad Hoc Group of*
*Unsecured Claimants*
250 West 55th Street
New York, New York 10019
<u>By:</u>    Jeffrey A. Fuisz, Esq.
        Robert T. Franciscovich, Esq.
        Madelyn Nicolini, Esq.

70 West Madison Street, Suite 4200
Chicago, Illinois 60602
<u>By:</u>    Michael D. Messersmith, Esq. (admitted *pro hac vice*)
        Sarah Gryll, Esq.

601 Massachusetts Avenue, NW
Washington, DC 20001
<u>By:</u>    William C. Perdue, Esq.

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
*Counsel to the Parent Ad Hoc*
*Claimant Group*
1177 Avenue of the Americas
New York, New York 10036
<u>By:</u>    Kenneth H. Eckstein, Esq.
        Rachael L. Ringer, Esq.
        David E. Blabey Jr., Esq.
        Natan Hamerman, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Counsel for Costa Verde*
*Aeronáutica S.A. and Lozuy S.A.*
51 West 52nd Street
New York, New York 10019
<u>By:</u>    Richard G. Mason, Esq.
        John R. Sobolewski, Esq.
        Angela K. Herring, Esq.

ALSTON & BIRD LLP
*Counsel for Qatar Airways*
90 Park Avenue
New York, New York 10016
<u>By:</u>    Gerard S. Catalanello, Esq.
        James J. Vincequerra, Esq.

DAVIS POLK & WARDWELL LLP
*Counsel for Delta Air Lines, Inc.*
450 Lexington Avenue
New York, New York 10017
<u>By:</u>    Marshall S. Huebner, Esq.
        Lara Samet Buchwald, Esq.
        Adam L. Shpeen, Esq.

PAUL HASTINGS LLP
*Counsel to Banco del Estado de Chile,*
*in its capacity as Indenture Trustee*
*under the Chilean Local Bonds Series*
*A through D and Series E issued by*
*LATAM Airlines Group S.A.*
200 Park Avenue
New York, New York 10166
<u>By:</u>    Pedro A. Jimenez, Esq.
        Andrew Tenzer, Esq.
        Nicholas Bassett, Esq.
        Douglass Barron, Esq.

**<u>HON. JAMES L. GARRITY, JR.</u>**
**<u>U.S. BANKRUPTCY JUDGE</u>**

**<u>Introduction</u>**[2]

The matter before the Court is the motion (the "**Motion**")[3] of the ad hoc group of

unsecured creditors (the "**A&P Ad Hoc Group**"), pursuant to Rules 8007 and 9013 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for a stay of this Court's

---

[2]    Capitalized terms used but otherwise not defined herein shall have the meanings ascribed in the Plan, Confirmation Opinion, Bench Memorandum and Order Denying the TLA Claimholders' Motion for (I) a Stay of the Confirmation Order Pending Appeal and (II) Certain Injunctive Relief Pursuant to Rule 8007 [ECF No. 5918] (the "**TLA Claimholders Stay Opinion**"), and Memorandum Decision Granting the Debtors' Motion for Entry of an Order Authorizing and Approving the Debtors' Entry Into and Performance Under Backstop Agreements and Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations [ECF No. 4667] (the "**Backstop Opinion**"), as applicable. References here to "[ECF No.___]" are to documents filed on the electronic docket in these Chapter 11 Cases (Case No. 20-11254), unless indicated otherwise.

[3]    Motion of the Ad Hoc Group of Unsecured Claimants for Stay Pending Appeal Pursuant to Rule 8007 [ECF No. 5797].

Confirmation Order[4] confirming the Debtor's Plan,[5] pending its appeal of the order and the

Confirmation Opinion.[6] The Debtors oppose the Motion.[7] The Parent GUC Ad Hoc Group filed

an objection to the Motion.[8] Costa Verde Aeronautica S.A. and Lozuy S.A, Delta Air Lines, Inc.,

Qatar Airways, and Banco del Estado de Chile filed statements in support of the Debtors'

Opposition to the Motion.[9] The A&P Ad Hoc Group filed an omnibus Reply to the Opposition

and Joinders.[10]

      For the reasons set forth below, the Court denies the Motion.

## Jurisdiction

---

[4]     Order (I) Confirming Debtors' Joint Plan of Reorganization of LATAM Airlines S.A. Et. Al. Under Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief [ECF No. 5754] (the "**Confirmation Order**").

[5]     Seventh Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5331] (the "**Plan**").

[6]     Errata Order Signed on 7/7//2022 Re: Order Signed on 6/18/2022 Confirming Chapter 11 Plan, Ex. A (Corrected Memorandum Decision on Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code) [ECF No. 5900] (the "**Confirmation Opinion**").

[7]     Debtors' Opposition to the Ad Hoc Group of Unsecured Claimants' Motion for a Stay Pending Appeal Pursuant to Rule 8007 [ECF No. 5894] (the "**Opposition**"). In support of the Opposition, the Debtors rely on the Declaration of Brent Herlihy in Support of the Debtors' Opposition to the Motion of the TLA Claimholders for a Stay of the Order (I) Confirming Debtors' Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief [ECF No. 5808] (the "**Herlihy Stay Decl.**" or "**Herlihy Stay Declaration**").

[8]     Parent Ad Hoc Claimant Group's Objection to the Motion of the Ad Hoc Group of Unsecured Claimants for Stay Pending Appeal Pursuant to Rule 8007 [ECF No. 5890].

[9]     Joinder of Costa Verde Aeronautica S.A. and Lozuy S.A. in Support of Debtors' Opposition to the Unsecured Claimants' Motion for a Stay Pending Appeal Pursuant to Rule 8007 [ECF No. 5888]; Joinder of Delta Airlines, Inc. in Support of the Debtors' Opposition to the Ad Hoc Group of Unsecured Claimants' Motion for Stay Pending Appeal Pursuant to Rule 8007 [ECF No. 5887]; Joinder of Qatar Airways Investments (UK) Ltd. to Debtors' Opposition to the Ad Hoc Group of Unsecured Claimants' Motion for a Say Pending Appeal Pursuant to Rule 8007 [ECF No. 5886]; and Joinder of Banco del Estado de Chile, in its Capacity as Indenture Trustee Under the Chilean Local Bonds Series A Through D and E, With Respect to Debtors' Opposition to the Ad Hoc Group of Unsecured Claimants' Motion for a Say Pending Appeal Pursuant to Rule 8007 [ECF No. 5891] (collectively with the Parent GUC Ad Hoc Group Objection, the "**Joinders**").

[10]     Omnibus Reply in Support of Motion of the Ad Hoc Group of Unsecured Claimants for Stay Pending Appeal Pursuant to Rule 8007 [ECF No. 5919] (the "**Reply**").

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Applicable Legal Principles

Stays pending appeal under Bankruptcy Rule 8007 "are the exception, not the rule, and are granted only in limited circumstances." *In re Brown*, No. 18-10617, 2020 WL 3264057, at \*5 (Bankr. S.D.N.Y. June 10, 2020) (internal citation omitted). Accordingly, the party seeking a stay pending appeal "carries a heavy burden." *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005); *see also In re 473 W. End Realty Corp.*, 507 B.R. 496, 501 (Bankr. S.D.N.Y. 2014) ("[t]he movant's burden is a heavy one") (internal quotation omitted). The burden is especially heavy where, as here, the A&P Ad Hoc Group seeks to stay the Confirmation Order. *See In re MPM Silicones, LLC, et al.*, No. 14-22503 (Bankr. S.D.N.Y. Sept. 17, 2014) (Drain, J.), ECF No. 1036 at 169:6-9 ("[t]he party seeking a stay has what is described as a heavy burden, and that is particularly [] the case where it is seeking a stay of a confirmation order . . . ."). Moreover, where, as here, the movant seeks imposition of a stay without a bond, "the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement." *Triple Net Invs. IX, LP v. DJK Residential (In re DJK Residential, LLC)*, No. 08–10375, 2008 WL 650389, at \*2 (S.D.N.Y. Mar. 7, 2008).

As relevant, Bankruptcy Rule 8007(a)(1) provides that "[o]rdinarily, a party must move first in the bankruptcy court for the following relief: (A) a stay of a judgment, order, or decree of the bankruptcy court pending appeal[.]" Fed. R. Bankr. P. 8007(a)(1). The decision to grant a stay of an order pending appeal lies within the sound discretion of the court. *In re General*

*Motors Corp*., 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009) ("***General Motors***"); *In re Overmyer*, 53

B.R. 952, 955 (Bankr. S.D.N.Y. 1985). In exercising that discretion, the Court will consider the

following four factors: "(1) whether the movant will suffer irreparable injury absent a stay, (2)

whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has

demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and

(4) the public interests that may be affected." *ACC Bondholder Grp. v. Adelphia Commc'ns.*

*Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 346 (S.D.N.Y. 2007) ("***Adelphia***")

(quoting *Hirschfeld v. Board of Elections in the City of N.Y.,* 984 F.2d 35, 39 (2d Cir.

1993) (quotation marks omitted)); *see also In re Calpine Corp.*, No. 05-60200, 2008 WL

207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).

Some courts have held that to prevail on a Rule 8007(a)(1) motion, the moving party

must show "'satisfactory' evidence on all four criteria," *see, e.g.*, *Turner v. Citizens Nat'l Bank*

*(In re Turner)*, 207 B.R. 373, 375 (B.A.P. 2d Cir. 1997) (quoting *Bijan-Sara Corp. v. Fed.*

*Deposit Ins. Corp. (In re Bijan-Sara Corp.)*, 203 B.R. 358, 360 (B.A.P. 2d Cir. 1996)), other

courts have held that the inquiry involves a balancing of the four factors and the lack of any one

factor is not dispositive to the success of the motion. *See General Motors*, 409 B.R. at 30;

*Adelphia*, 361 B.R. at 347. The Court adopted the latter approach in resolving the motion of the

TLA Claimholders for a stay pending their appeal of the Confirmation Order.[11] *See* TLA

Claimholders Stay Opinion at 8. The Court applies the same standard here, and will balance

those factors "somewhat like a sliding scale . . . more of one [factor] excuses less of the other."

*Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (citation omitted). Moreover, in analyzing

those factors, "irreparable injury and likelihood of success on the merits 'are the most critical.'"

---

[11]    Motion For (I) Stay Pending Appeal, Or Alternatively (II) Certain Injunctive Relief Pursuant To Rule 8007 [ECF No. 5787] (the "**TLA Claimholders Stay Motion**").

*Church & Dwight Co. v SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585, 2015 WL

5051769, at *2 (S.D.N.Y. Aug. 26, 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

### The Motion and the Objections

The backstop agreements between the Debtors and the Commitment Creditors (the

"Commitment Creditors Backstop Agreement") and the Debtors and the Backstop Shareholders

(the "Shareholders Backstop Agreement," and together with the Commitment Creditors

Backstop Agreement, the "Backstop Agreements") collectively provide for a "backstop" of the

nearly $5.442 billion to be raised by the Debtors through the New Convertibles Notes issuances

and the ERO Rights Offering.

The Debtors filed a motion seeking authorization to enter into and perform under the

Backstop Agreements (the "**Backstop Motion**").[12] On February 3, 2022, the A&P Ad Hoc

Group and additional interested parties filed objections to the Backstop Motion. Following fact

and expert discovery, this Court held a two-day evidentiary hearing on February 9 and 10, 2022

on the Backstop Motion. On March 15, 2022, the Court overruled the objections, issued the

Backstop Opinion, and, in doing so, authorized the Debtors to enter into the Backstop

Agreements. It entered the corresponding order on March 22, 2022.[13] In doing so, the Court

deferred judgment until confirmation on certain issues raised with respect to the backstop

arrangements.[14]  On March 25, 2022, the A&P Ad Hoc Group filed a notice of appeal of the

---

[12]    Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4056].

[13]    Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief [ECF No. 4732] (the "**Backstop Order**").

[14]    Backstop Opinion at 29 (overruling an objection based on section 1129(a)(4) of the Bankruptcy Code "without prejudice to those parties' rights to assert the objections in connection with the Plan confirmation hearing.").

Backstop Opinion and Backstop Order to the United States District Court (the "**Backstop Appeal**").[15] On May 10, 2022, the Hon. Jesse M. Furman granted the Debtors' motion to dismiss the Backstop Appeal[16] and dismissed the appeal on the grounds that the Backstop Order was not a final order under 28 U.S.C. § 158(a)(1) and the requirements for appeal of an interlocutory order under 28 U.S.C. § 1292(b) were not met.[17] On May 2, 2022, the A&P Ad Hoc Group and other interested parties filed objections to confirmation of the Plan. The Court conducted a three-day confirmation hearing on May 17, 18, and 20, 2022. On June 18, 2022, this Court issued the Confirmation Opinion, and the Confirmation Order. On June 21, 2022, the A&P Ad Hoc Group filed a Notice of Appeal of the Backstop Opinion, the Backstop Order, the Confirmation Decision, and the Confirmation Order (the "**Appeal**").[18]

The members of the A&P Ad Hoc Group are Holders of General Unsecured Class 5 Claims under the Plan. In the A&P Ad Hoc Group's view, the Backstop Agreements provide outsized and unprecedented recoveries to the Commitment Creditors (also Class 5 claimants) at the expense of other *pari passu* creditors based on their ability to provide the Debtors with sufficient votes to confirm the Plan. Motion ¶ 1. It contends that the unequal treatment of similarly situated creditors under the Plan and backstop arrangements violates the Bankruptcy Code and fundamental bankruptcy principles. *Id.* ¶ 3. The A&P Ad Hoc Group says that the Debtors are moving expeditiously to effectuate the Plan, and that the likely timeline for the Plan to go effective raises a distinct possibility that its Appeal will become equitably moot. *Id.* ¶ 1.

---

[15]    Notice of Appeal [ECF No. 4773].

[16]    Notice of LATAM Appellees' Motion to Dismiss for Lack of Appellate Jurisdiction, *In re LATAM Airlines Group S.A.*, Case No. 22-cv-2556 (S.D.N.Y. Apr. 7, 2022) [ECF No. 12].

[17]    Opinion and Order, *In re LATAM Airlines Group S.A,* Case No. 22-cv-2556 (S.D.N.Y. May 10, 2022) [ECF No. 49], at 23 (the "**District Court Backstop Opinion**").

[18]    Notice of Appeal [ECF No. 5766].

The A&P Ad Hoc Group contends that pursuant to Bankruptcy Rule 8007(a)(1)(A), the Court should stay the Confirmation Order pending the resolution of the Appeal because, on balance, application of factors set forth in *Adelphia* weighs in favor of granting such relief. In short, the A&P Ad Hoc Group argues that if the Plan goes effective, it will be irreparably harmed because it will be stripped of the right to have its Appeal adjudicated on the merits. *Id.* ¶¶ 26-29. It asserts that such harm far outweighs any harm to the Debtors because while a stay of the Confirmation Order pending appeal may slightly delay the process undertaken in Chile to consummate the Plan, the Debtors cannot show any significant effect on their operations or on their reorganization—let alone a negative effect sufficient to outweigh the harm that the A&P Ad Hoc Group faces absent such a stay. *Id.* ¶¶ 30-34. Moreover, it contends that there is a substantial possibility of success on appeal given the myriad contested issues before the District Court, *id.* ¶¶ 35-47, and that the public interest favors granting a stay, *id.* ¶¶ 48-49.

The Debtors argue that none of these factors weighs in favor staying the Confirmation Order. They contend that: (i) without a stay, the Appeal will not be equitably moot because the transactions underpinning the Plan are not likely to be effectuated before September 2022, Opposition ¶¶ 12-14; (ii) the A&P Ad Hoc Group has not demonstrated a substantial possibility of success on appeal, *id.* ¶¶ 29-35; (iii) the A&P Ad Hoc Group cannot demonstrate that the balance of harms tips in its favor since a stay jeopardizes the Debtors' exit financing, backstop commitments and, in turn, the Plan itself, *id.* ¶ 15; and (iv) the public interest weighs against a stay, *id.* ¶¶ 36-38.

The Court considers those matters below.

### Discussion

**Whether The Movant Will Be
Irreparably Injured Absent A Stay**

Irreparable harm is the "principal prerequisite" for a stay under Bankruptcy Rule 8007;

such harm "must be 'neither remote nor speculative, but actual and imminent.'" *Adelphia*, 361

B.R. at 347 (citation omitted); *see also In re Calpine Corp*, 2008 WL 207841, at *4; *Fox v.

Mandiri (In re Perry H. Koplik & Sons, Inc.)*, No. 02–B–40648, 2007 WL 781905, at *1 (Bankr.

S.D.N.Y. Mar. 13, 2007).

The Plan is premised on (i) the issuance of the New Convertible Notes, and (ii) the ERO

Rights Offering, both of which will occur in Chile and pursuant to Chilean law. To effectuate the

terms of the Plan, the Debtors must undertake certain steps in Chile including, among other

things, convening an extraordinary meeting of the Holders of Existing Equity Interests for

shareholder approval to issue securities, registering the New Convertible Notes and the ERO

Rights Offering with the Chilean securities regulator, and commencing the Preemptive Rights

Offering Period. It is undisputed that the Debtors have begun the process of consummating the

Plan. Two days after the Court entered the Confirmation Order, the Debtors filed a 6-K reporting

that they had summoned an Extraordinary Shareholders' Meeting for July 5, 2022, to approve the

issuance of the New Convertible Notes and amend the Debtors' bylaws to implement the

Confirmation Order. Motion ¶ 28. The A&P Ad Hoc Group asserts that while the Backstop

Agreements provide that the Effective Date of the Plan shall occur no later than October 31,

2022, the Plan could go effective sooner. *Id.* It maintains that it will be irreparably harmed if the

Plan goes effective before the Appeal can be fully briefed and decided because the Commitment

Creditors will receive the superior recoveries in the form of unreasonable fees and unequal

treatment, to the detriment of the A&P Ad Hoc Group and other excluded creditors, and the A&P Ad Hoc Group will lose its appellate right to challenge such an outcome. *Id.* ¶ 29.

The Debtors contend that the threat of equitable mootness, standing alone, is insufficient to demonstrate the requisite irreparable injury to obtain a stay under Rule 8007(a)(1)(A). Opposition ¶ 11. They made the same argument in contesting the TLA Claimholders Stay Motion. The Court rejected it, in part, on the grounds that "the 'loss of appellate rights is a quintessential form of prejudice' where the 'denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error.'" TLA Claimholders Stay Opinion at 11 (quoting *Adelphia*, 361 B.R. at 348). As with the TLA Claimholders Stay Motion, here, the Court "assume[s] that the threat of equitable mootness is enough to satisfy the requirement of showing some irreparable injury – enough to get on the scoreboard with respect to this issue." *Id.* (quoting *General Motors*, 409 B.R. at 31).

The Debtors concede that the steps leading up to Plan consummation may become irreversible with the commencement of the Preemptive Rights Offering Period. Opposition ¶ 13. Still, they have consistently maintained that this step is not likely to occur until September 2022, and that the Plan likely will not be fully consummated until the end of October 2022, at the earliest. *See*, *e.g.*, Herlihy Stay Decl. ¶ 18; Opposition ¶ 13. The A&P Ad Hoc Group offers no evidence to the contrary. Moreover, in seeking to expedite the Appeal in the District Court, the A&P Ad Hoc Group proposed a "briefing schedule [that] addresses the risk of equitable mootness."[19] The District Court has plainly accommodated those wishes, as Judge Cote has issued a scheduling order that calls for the Appeal to be fully briefed and submitted by August 5,

---

[19]    Letter to the Court, *Ad Hoc Grp. Of Unsecured Claimants v. LATAM Airlines Grp. S.A., et al.*, No. 22-CV-05660-GHW (S.D.N.Y. July 5, 2022) [ECF No. 7].

2022.[20] The Debtors contend, and the Court agrees, that the A&P Ad Hoc Group has not shown

actual and imminent irreparable harm because the alleged risk of the Appeal being deemed

equitably moot before it can be decided is speculative and remote. *See In re Sabine Oil & Gas*

*Corp.*, 548 B.R. 674, 681 (Bankr. S.D.N.Y. 2016) (The claimed irreparable harm "must be

'neither remote nor speculative, but actual and imminent.'") (quoting *Adelphia*, 361 B.R. at 347).

**Whether the Issuance of the Stay Will Substantially Injure**
**The Other Parties Interested in the Proceeding**

The parties agree that the Court must balance the harm to the A&P Ad Hoc Group if it

does not grant the stay against the harm to the Debtors and other interested parties if it grants the

stay. *See In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 184 (B.A.P. 2d Cir.

1996) ("In measuring whether any such injury [to the non-moving parties] would be

'substantial,' it is appropriate to compare it with the irreparable harm [the movant] will suffer if

the foreclosure sale is not stayed."); *In re Sabine Oil & Gas Corp.*, 548 B.R. at 682 ("Even if the

risk of mootness were sufficient to satisfy the requirement of some showing of irreparable injury,

however, the Court finds that any threat of harm here is insignificant when weighed against the

injury that the Debtors would suffer if the stay sought by the Committee were granted.").

The A&P Ad Hoc Group asserts that the Debtors and Backstop Parties will not suffer a

substantial injury if the Court grants the stay because the Debtors have successfully operated

their business in bankruptcy for over two years now—six months of which occurred while

confirmation of the Plan was pending—and have given no indication that they lack sufficient

liquidity to continue operating their business or that remaining in bankruptcy for a few additional

months will have a significant negative impact on their operations. Motion ¶ 31. The A&P Ad

---

[20]    Order, *Ad Hoc Grp. of Unsecured Claimants v. LATAM Airlines Grp. S.A., et al.*, No. 22-CV-05660-GHW
(S.D.N.Y. July 13, 2022) [ECF No. 35].

Hoc Group cites to the fact that the Debtors have $987.9 million in cash and that they have reported that their available seat kilometers—a measure of an airline's carrying capacity—increased in June 2022 to seventy-four percent (74.0%) of June 2019 levels, up from May 2022. *Id*. Moreover, the A&P Ad Hoc Group contends that any delay in the consummation of the Plan will be "minimal" since the District Court is expediting the Appeal. *See id.* ¶ 32. The A&P Ad Hoc Group also maintains that a stay of the Confirmation Order pending the Appeal will not threaten the existence or terms of the Backstop Agreements. It notes that the End Date under the Backstop Agreements is October 31, 2022, and that the Debtors have the option to extend the End Date to November 30, 2022, in exchange for a 1.34846% payment calculated over the Backstop Parties' respective backstopped amounts. *Id.* ¶ 33. The A&P Ad Hoc Group asserts that the members of the group and similarly situated creditors will bear the cost of the extension payment because the payment would be out of funds that would otherwise be allocated to the recovery of Holders of General Unsecured Class 5 Claims under the Plan, including the members of the A&P Ad Hoc Group. *Id.*

The Debtors assert that the A&P Ad Hoc Group has failed to satisfy its burden under this factor for at least two reasons. First, they maintain that there is a real and imminent risk of harm to them and their various creditors because a stay of the Confirmation Order would, at a minimum, require a payment of $73 million to extend the Backstop Agreements by one month, from October 31 to November 30, 2022; and beyond that date, a stay would cause the Backstop Parties to be released from their obligations with no guarantee that they would agree to enter into new backstop agreements at all, let alone agree to backstop the Debtors on favorable terms. Opposition ¶ 17; Herlihy Stay Decl. ¶¶ 16-19. They also assert that the imposition of a stay would prevent the consummation of the Debtors' DTE/DIP Facilities and in turn would

13

jeopardize the Debtors' other important financing agreements, which are required for the Debtors to successfully consummate the Plan and emerge from chapter 11. Opposition ¶ 17. The Court considers those matters below.

The Plan is based on the Debtors' Business Plan, which assumes that the Debtors will raise $5.4 billion in new capital provided under the Backstop Agreements. Herlihy Stay Decl. ¶¶ 17, 26. The Debtors contend that the issuance of a stay would threaten to prevent the Debtors from implementing the new capital offerings, and with that, could compromise the viability of the Plan. *See* Opposition ¶ 20. They explain that in resolving certain objections to the Plan, they negotiated an extension of the Backstop Agreements through October 31, 2022, with the option to obtain a further extension through November 30, 2022, at a cost of $73 million. Herlihy Stay Decl. ¶ 18. It is undisputed that a stay significantly increases the chances that the Backstop Agreements would need to be extended, at least until November 30, at this cost of $73 million. *See id.* It is also undisputed that nearly the entirety of the fee will be borne by the Holders of General Unsecured Class 5 Claims who support the Plan—not the A&P Ad Hoc Group.

Moreover, the Debtors could lose their backstop commitments entirely if the stay were to remain in effect past November 30, 2022. Herlihy Stay Decl. ¶ 18. Given the current uncertainties in the credit markets and in the Debtors' operating environment, there is no guarantee the Backstop Parties would be willing to negotiate new backstop agreements if these agreements expire at the end of November. *See id*. ¶¶ 18–19. It is undisputed that market conditions have deteriorated significantly since the Backstop Agreements were executed in January. *See id.* ¶ 19. Accordingly, even if the Backstop Parties were willing to renegotiate the agreements, it is highly unlikely that the Debtors could obtain backstop commitments on equally favorable terms. *Id.* ¶ 18.

In December 2021, with the assistance and support of their advisors, the Debtors launched a comprehensive, competitive process to obtain exit financing ahead of a targeted emergence from bankruptcy in the second half of 2022. *Id*. ¶ 7. Through that process, the Debtors obtained funding commitments for four new "DIP to Exit Financing" facilities (collectively the "**DTE Facilities**") aggregating $2.75 billion. *Id*. They also obtained a commitment for a $1.173 billion Junior DIP Facility (with the DTE Facilities, the "**DTE/DIP Facilities**"), from the Commitment Creditors and Facilitating Shareholders. *Id.* The terms of the DTE/DIP Facilities are reasonable under the circumstances, and, taken as a whole, the facilities remain the best option for financing for the Debtors, in light of the current market conditions. *Id.*

It is undisputed that the DTE/DIP Facilities provide the Debtors with the financing and certainty they require to achieve a successful and timely emergence from chapter 11 and execute their Business Plan. *See id.* ¶¶ 7-8. It is also undisputed that the absence of a stay of the Confirmation Order is a condition precedent to closing the DTE/DIP Facilities. *See id*. ¶ 8. If the Confirmation Order is subject to a stay order, the lenders have the right to terminate their commitments as early as September 5, 2022. *Id.* The lenders under the DTE/DIP Facilities include financial institutions that are not current creditors of the Debtors. It is uncertain whether they would agree to a waiver of the condition precedent. Opposition ¶ 24. Moreover, it is undisputed that even if the lenders were willing to negotiate an amendment, it is very uncertain how long the negotiation of a waiver would take, and what the lenders would demand in exchange. *Id.* The Debtors have shown that the DTE/DIP Facilities are the product of lengthy and robust negotiations, and that it would be extremely challenging and time-consuming to seek to negotiate replacements for these agreements, especially while a stay is in place, given worsening market conditions, current capital market volatility, and challenges facing the airline

industry. *Id.*; Herlihy Stay Decl. ¶¶ 9-10.  In short, the Debtors have demonstrated that if a stay is imposed and they are unable to close the DTE/DIP Facilities, there is a significant risk that the Debtors would be unable to raise the necessary exit financing that is contemplated under the Plan and is required for Plan emergence. *See* Herlihy Stay Decl. ¶¶ 9–10.[21]

The adverse impact on the Debtors' financial condition could be far-reaching. For example, the Debtors currently plan to close the DTE/DIP Facilities by the end of September 2022, even prior to emergence from these Chapter 11 Cases, whereby they would replace the existing Amended and Restated DIP Facility (the "**A&R DIP Facility**"). *Id.* ¶ 11. If the Debtors cannot close on the DTE/DIP Facilities in time, they would face the challenge of attempting to extend the A&R DIP Facility or raise the necessary debtor-in-possession financing to refinance the existing A&R DIP Facility. There is a substantial risk that replacement commitments could only be obtained on significantly worse terms, or not at all, in light of the current conditions in the capital markets. In addition, any such replacement facility is unlikely to be able to be drawn during the pendency of a stay. *Id.* ¶ 11.

In addition, in negotiating the DTE Facilities, the Debtors obtained a commitment for a new $500 million revolving credit facility to provide necessary liquidity and to enable them to meet the Minimum Liquidity Condition in the Backstop Agreements. Herlihy Stay Decl. ¶ 13. A stay would prevent the Debtors from closing the revolving credit facility that comprises one of the DTE Facilities, and there is no guarantee that the Debtors would be able to obtain replacement commitments for a revolving credit facility in a subsequent exit financing process. *Id.*

---

[21]    If the commitments on the DTE Facilities are terminated and the Debtors are forced to find alternative exit financing to fund the Plan, the banks providing the facilities also would be owed an Alternative Transaction Fee. Herlihy Stay Decl. ¶ 15 (identifying Alternative Transaction Fee amount).

Further, a stay would place at risk the arrangements for the refinancing of the $600

million existing Revolving Credit Facility with an extended $600 million facility and the

replacement of the $273 million Spare Engine Facility with an extended $273 million facility,

both of which are important in allowing the Debtors to achieve competitive financing terms and

raise the capital needed to make certain payments at emergence. *Id.* ¶ 20.

In the face of the Debtors' substantial evidence of financial hardships if the Court stays

the Confirmation Order, the A&P Ad Hoc Group contends that any potential harm to the Debtors

is "mere speculation" because their counterparties to agreements integral to the Plan could

simply waive the requisite deadlines and conditions precedent. Reply ¶¶ 9-12. Specifically, the

A&P Ad Hoc Group contends: (i) the lenders under the DTE/DIP Facilities may agree to waive

the absence of a stay condition precedent; and (ii) the Backstop Parties could waive the End Date

and thus allow the Backstop Agreements to close later than the contractual deadline of October

31, 2022 (or, November 30, 2022, subject to the $73 million extension fee). *Id.* ¶ 11. However,

the A&P Ad Hoc Group has set forth no evidence in support of these assertions and, accordingly,

the Court finds these statements unpersuasive and finds that the balance of harms does not tip in

its favor given the largely unrebutted evidence in the Herlihy Stay Declaration. Put another way,

the A&P Ad Hoc Group does not persuasively address the gravity of the risks facing the Debtors

and, indeed, provides no evidence to counter the evidence in the Herlihy Stay Declaration.

"The Plan represents a delicate, intricate, and integrated compromise of myriad claims,

arguments, and rights." Confirmation Decision at 56. Based on the foregoing, it is clear that the

issuance of a stay threatens to disrupt and destroy these carefully orchestrated agreements and

arrangements, and in doing so, risks injuring the Debtors and their estates in the sum of billions

of dollars by derailing their years-long work towards restructuring and emergence from chapter

17

11 with a complex network of creditor parties. The A&P Ad Hoc Group has failed to satisfy its

burden to demonstrate "that the non-moving party or other parties will not suffer substantial

harm if the stay is granted." *See In re Sabine Oil & Gas Corp.*, 548 B.R. at 682. The Court finds

that the risk of harm to the Debtors by imposing a stay outweighs any harm to the A&P Ad Hoc

Group absent a stay.

**Whether the Stay Applicant Has Demonstrated a**
**Substantial Possibility of Success on Appeal**

Courts recognize that "the probability of success that must be demonstrated is inversely

proportional to the amount of irreparable injury that the [applicant] will suffer absent the stay."

*Id*. at 684. Accordingly, when the proponent of a stay fails to set forth significant irreparable

injury, it must clear a higher hurdle in demonstrating its prospects on appeal. *Compare In re*

*DAEBO Int'l Shipping Co. Ltd.*, 15-10616, 2016 WL 447655, at *1 (Bankr. S.D.N.Y. Feb. 4,

2016) (granting stay after reasoning "[t]he court therefore finds that SPV has not shown

reasonable prospects of success on appeal. However, Daebo has not alleged that . . . [the

nonmovants] will be prejudiced by continuing a stay pending appeal . . ."), *with In re DJK*

*Residential, LLC*, No. 08-10375, 2008 WL 650389, at *5 (S.D.N.Y. Mar. 7, 2008) (denying stay

and reasoning that "in the absence of any showing of irreparable injury on the part of the

Debtors, the possibility that the Bankruptcy Court may have gotten it wrong is simply not

enough to merit the extraordinary relief of a stay pending appeal"). Relatedly, courts recognize

that where a stay applicant merely reargues the same contentions already before the Court on the

underlying motion subject to the appeal, it fails to demonstrate a substantial possibility of

success on appeal. *See In re Sabine Oil & Gas Corp.*, 548 B.R. at 684 (finding this factor weighs

against a stay because "the [movant] sets forth a pared-down reargument of certain of its []

claims in order to support its assertion that it has a substantial possibility of succeeding on appeal
. . . .").

In the Backstop Opinion, the Court overruled the A&P Ad Hoc Group's objection that
the Backstop Payments under the Commitment Creditors Backstop Agreement were
unreasonable and unnecessary because under the economics of the Plan, the Class C Notes were
likely to be fully subscribed. Backstop Opinion at 45.[22] It did so after conducting an evidentiary
hearing and soliciting evidence from multiple fact and expert witnesses. The A&P Ad Hoc
Group contended that the Plan unreasonably allocated approximately 85% of the Class C Notes
to the Commitment Creditors and that given the materially higher recovery provided for Class C
Notes under the Plan compared to Class A Notes, the remaining Class 5 Creditors would
undoubtedly opt into Class 5b Treatment and, thus, acquire the remaining Class C Notes. *Id.* at
46. In other words, the A&P Ad Hoc Group argued that this Backstop Payment was excessive
given that the Commitment Creditors would likely not need to "backstop" anything (or, at least
not more than the approximately 15% of the offering that was uncommitted). *Id.* at 48. The Court
found otherwise. It reasoned that the Backstop Payments were reasonable under sections 363 and
503 of the Bankruptcy Code under the All-in Backstop Fee at Plan Value methodology utilized
by the Debtors' expert, Mr. Herlihy, and recognized as a legitimate methodology for assessing
the reasonableness of a backstop payment—explicitly and implicitly[23]—by valuation experts put

---

[22]    Under the Commitment Creditors Backstop Agreement, these creditors will receive two fees: (1) a cash
payment equal to 20% of the $3.669 billion backstop commitment, or approximately $654 million, in exchange for
backstopping the Class C Notes under the Plan (the "**Backstop Payment**"); and (2) an aggregate 20% payment for
backstopping $400 million in ERO New Common Stock that is not purchased by the Eligible Equity Holders to the
extent they exercise their preemptive rights under the ERO Rights Offering (collectively, the "**Backstop
Payments**"). *See* Backstop Opinion at 15, 46-47. The A&P Ad Hoc Group primarily took issue with the former
payment—in both the Backstop Motion and its Plan objection.

[23]    The A&P Ad Hoc Group relied on Mr. Joshua Scherer to support its contention that the Backstop Payment
was unreasonably high. Mr. Scherer did not explicitly adopt the All-in Backstop Fee at Plan Value as the proper

19

forward by the A&P Ad Hoc Group and other objectors. *See id.* at 71-85. While recognizing that

the Backstop Payment exceeded the 75th percentile backstop fee from a set of comparable

transactions largely agreed upon by the experts, the Court nevertheless found the Backstop

Payments necessary and reasonable in order for the Debtors to raise the requisite capital needed,

in their judgment, to exit the Chapter 11 Cases. *Id.* at 84-85. The Court reasoned that the

Commitment Creditors assumed the risk of the full amount of the $3.269 Class C Notes

Offering—risk that could come to bear if the Debtors' business outlook soured and the

Commitment Creditors declined their right to claim their contractual Direct Allocation and pro

rata share of the Class C Notes. *See id.* at 47.

In approving the Backstop Agreements over the objections of the A&P Ad Hoc Group

and others, the Court found that *Pacific Drilling*[24] and *Momentive*[25] did not support a contrary

outcome. *See* Backstop Opinion at 49-50. In *Momentive*, Judge Drain expressed reluctance to

approve a backstop fee based on the entire commitment amount given that a high portion of the

offering was already committed. *Momentive*, at 112:13-17; Backstop Opinion at 48. But he

ultimately approved the backstop fee after the backstop parties reached an agreement with the

objectors. The fee he approved represented an even higher percentage of the unspoken for

portion of the offering than the Backstop Payment here. Backstop Opinion at 49 (citing Order

Authorizing and Approving the Debtors' (I) Entry Into, and Performance Under the Backstop

Commitment Agreement, (II) Payment of related Fees and Expenses, and (III) Incurrence of

Certain Indemnification Obligations, *In re MPM Silicones, LLC*, No. 14-22503 (Bankr. S.D.N.Y.

---

methodology through which to assess the Backstop Payment but noted that he applied it in order to review and critique Mr. Herlihy. *See* Backstop Opinion at 71 n.38.

[24]    *Pacific Drilling S.A.*, No. 17-13193 (Bankr. S.D.N.Y 2018) ("*Pacific Drilling*").

[25]    *Momentive Performance Materials Inc., v. Bank of N.Y. Mellon Tr. Co.*, No. 14-08227 (Bankr. S.D.N.Y Jun. 23, 2014) ("*Momentive*").

June 23, 2014), [ECF No. 509]). The Court likewise found that the objectors overstated the impact of *Pacific Drilling*. *Id*. There, the court questioned the size of the backstop payment, but did so in the context of a much higher discount rate extended to the backstop parties for purchasing equity than at issue here. *Id*. Accordingly, after considering these two cases, the Court in the Backstop Opinion nevertheless approved the Backstop Agreements, including the Backstop Payments, as reasonable under sections 363 and 503 of the Bankruptcy Code.

The Court rejected substantially similar arguments from the A&P Ad Hoc Group after conducting an evidentiary hearing concerning its (and others') objections to the Plan. At confirmation, the A&P Ad Hoc Group contended that the Plan violated section 1129(a)(4) of the Bankruptcy Code because it called for the payment of unreasonable backstop fees, including the $654 million Backstop Payment under the Commitment Creditors Backstop Agreement. Confirmation Opinion at 17. It contended that fee was unreasonable because the Commitment Creditors committed themselves to approximately 85% of the Class C Notes, and the Plan economics provide the Debtors and Commitment Creditors with near certainty that the remaining approximately 15% of Class C Notes will be fully subscribed. *Id*. at 85. The Court rejected this argument because it already held in the Backstop Opinion that the Backstop Payments at issue were reasonable. *Id.* at 87. It held as such because the A&P Ad Hoc Group set forth no argument as to why the reasonableness of a backstop fee should be assessed differently under section 1129(a)(4) compared to section 363(b). *Id*. ("The Court finds no basis for revisiting its findings and conclusions set forth in the Backstop Opinion").

Here, the A&P Ad Hoc Group contends that the Court erred—in effect, twice—in approving the Backstop Payments as reasonable. *See* Motion ¶¶ 43-44. It says that is so for the same reasons it twice argued: because the Backstop Payments are not commensurate with any

significant risk that the offerings at issue will be unsubscribed.[26] *Id.* ¶ 43. It reargues its

contention at the Court's backstop hearing that that the size of a backstop fee should be measured

as a percentage of the uncommitted portion of the offering and contends that the Commitment

Creditors receive a nearly 84% fee as compensation for the risk of agreeing to provide the

backstop to the Debtors. *Id.*  It relies primarily on *Pacific Drilling* and *Momentive* to support its

contentions that the Backstop Payments are unreasonable under sections 363, 503, and

1129(a)(4), *id.* ¶¶ 45-47, and does not set forth any material new case law in support of the

arguments the Court has already rejected twice.

The Debtors contend that the A&P Ad Hoc Group has no likelihood of success on

appealing the reasonableness of the Backstop Payments because the Court's conclusions were

well reasoned and fully grounded in the Bankruptcy Code and relevant case law. Opposition ¶

34. They also contend that the Appeal will likely fail because the Court's conclusions on the

reasonableness of the Backstop Payments (and the Backstop Agreements more generally) are

supported by factual findings concerning, *inter alia*, the degree of risk assumed by the

Commitment Creditors in agreeing to backstop the rights offerings underpinning the Debtors'

Plan and emergence from chapter 11. *Id.* ¶ 30. Accordingly, the Debtors argue that the A&P Ad

Hoc Group faces "clear error" review on appeal, meaning that the District Court will not

---

[26]    The A&P Ad Hoc Group also contends that the Debtors violated section 1129(a)(1) of the Bankruptcy
Code by offering the Backstop Payments exclusively to the Commitment Creditors to the exclusion of other
creditors in Class 5. *See* Motion ¶ 41. The Court rejected the same argument in the Backstop Opinion, finding that
the Debtors did not pre-select the Commitment Creditors, but rather attempted to solicit offers from multiple funds
in order to find a backstop proposal that allowed them to raise enough capital to exit chapter 11. *See* Backstop
Opinion at 36-37. In doing so, the Court found that the Debtors reasonably rejected an alternative financing
commitment letter from Ducera on behalf of the A&P Ad Hoc Group—*i.e.*, a proposal that, if accepted, would have
permitted the A&P Ad Hoc Group to obtain a backstop fee. In the Backstop Opinion, the Court held that the A&P
Ad Hoc Group "overstated the significance of the proposal" because, *inter alia*, it was: (i) non-binding; (ii) did not
support a large enough capital raise; and (iii) did not provide a backstop of the commitment offered by the Backstop
Shareholders under the Shareholders Backstop Agreement. *See id.* at 35-36. The Court reiterated these findings in
the Confirmation Opinion in response to the same arguments from the A&P Ad Hoc Group. Confirmation Opinion
at 84-85 ("The Court adheres to its rulings in the Backstop Opinion."). The Court finds these rulings are factual
findings that are fully grounded in the Bankruptcy Code.

overturn this Court's finding that the Backstop Payments are reasonable unless it is "left with the definite and firm conviction that a mistake has been made." *Id.* ¶ 32 (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) (quoting *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). They contend that the A&P Ad Hoc group cannot demonstrate its Appeal eclipses that high threshold. *Id.*

The Court finds that the A&P Ad Hoc Group has failed to demonstrate a substantial possibility of successfully arguing on appeal that the Backstop Payments are unreasonable. It finds that is so, in part, because the A&P Ad Hoc Group has failed to present any argument that the Court had not rejected at least once. *See In re Sabine Oil & Gas Corp.*, 548 B.R. at 684 (finding no substantial possibility of success on appeal when movant simply "sets forth a pared-down reargument"). The Court conducted lengthy evidentiary hearings concerning both the Backstop Agreements and Plan objections—in both of which the Court admitted documentary evidence, assessed fact and expert witness testimony, and heard argument. It grounded its conclusions on the reasonableness of the Backstop Payments on methodologies supported by the majority of the parties' valuation experts and in the relevant case law and the Bankruptcy Code. In this context—and given the fact that the Court finds the A&P Ad Hoc Group will not be irreparably injured absent a stay of the Confirmation Order and that the A&P Ad Hoc Group faces a heavy burden to obtain a stay[27]—the Court does not find that the A&P Ad Hoc Group has

---

[27] The A&P Ad Hoc Group contends that the District Court has already suggested there is a possibility it will succeed on appeal. *See* Motion ¶ 37. It says that is so based on the reasoning in the District Court Backstop Opinion. There, Judge Furman denied the Backstop Appeal for lack of jurisdiction, but reasoned, in dicta, that "[t]he arguments that Appellants raise in this appeal are far from frivolous." District Court Backstop Opinion at 23. According to the A&P Ad Hoc Group, this suggests that an appellate court has already determined that an appeal of the same arguments at issue here is meritorious and, thus, suggests it has a substantial possibility of success on appeal. *See* Motion ¶¶ 20, 35-37. The Debtors disagree. They contend that this dicta is irrelevant given that the District Court did not address the merits of the appeal and explicitly disclaimed any "views on how [those arguments] should be resolved." District Court Backstop Opinion at 23; Opposition ¶ 34. The Court agrees with the Debtors. First, movants must do more than show an appeal is not "frivolous" in order to demonstrate a substantial possibility of success on appeal. Instead, they "carr[y] a heavy burden." *In re Adelphia Commc'ns Corp.*, 333 B.R.

demonstrated it is likely to convince the District Court that the Backstop Payments were unreasonable.

The A&P Ad Hoc Group also contends that the Backstop Agreements and the Plan violate the equal treatment requirement of section 1123(a)(4) of the Bankruptcy Code by providing outsized compensation—through the Backstop Payments and the Direct Allocation— exclusively to the Commitment Creditors, and not to excluded creditors like the members of the A&P Ad Hoc Group, even though the Commitment Creditors and the excluded creditors are all classified together as Holders of General Unsecured Class 5 Claims under the Plan. Motion ¶ 40. It contends that while it is not necessary that claimants in a class receive the same amount of recovery, "all claimants in a class must have 'the same opportunity' for recovery." *Id.* (quoting *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)). The A&P Ad Hoc Group maintains that the Plan violates this principle because it provides the Direct Allocation Amount and Backstop Payments only to the Commitment Creditors. *Id.* As it did in opposing the Backstop Motion and opposing confirmation of the Plan, the A&P Ad Hoc Group argues this intraclass disparate treatment is evidenced in the fact that the plain terms of the Commitment Creditors Backstop Agreement and the Plan demonstrate the Commitment Creditors received an excess recovery not solely in exchange for their backstop commitments, but also on account of their claims and in exchange for their votes in favor of the Plan. *Id.* ¶ 41. The Debtors disagree and contend that the Confirmation Opinion's section 1123(a)(4) argument was well-reasoned and fully grounded in the Bankruptcy Code and relevant case law. Opposition ¶ 34.

The Court agrees with the Debtors. The A&P Ad Hoc Group simply contends, in effect, that the Court got it wrong. Again, however, as the Court found above concerning its arguments

---

at 659. Second, the Court agrees with the Debtors that Judge Furman's statement is immaterial given that he decided the District Court Backstop Opinion on procedural grounds and did not rule on the merits.

with respect to the reasonableness of the Backstop Payments, the A&P Ad Hoc Group has simply reargued points that the Court has already considered and rejected, without providing any additional color or argument concerning how or why the Court erred, or why there is a substantial possibility the District Court will decide differently. To wit, the Court found that the Debtors provided the Commitment Creditors with the Backstop Payments and Direct Allocation on account of their backstop commitment, not their claims, and thus held that the Plan does not run afoul of section 1123(a)(4) of the Bankruptcy Code. Confirmation Opinion at 79-80. The Court relied on substantial authority reasoning that "[t]he requirements of section 1123(a)(4) apply only to a plan's treatment on account of particular claims or interests in a specific class– not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions." *Id.* at 80 (collecting cases); *see, e.g., In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 250-51 (Bankr. S.D.N.Y. 2007). The Motion sets forth no detail why this authority is wrong or otherwise inapplicable. Accordingly, the Court finds the A&P Ad Hoc Group has failed to demonstrate a substantial possibility of success with respect to its section 1123(a)(4) argument.

Finally, the Court finds that the A&P Ad Hoc Group has not demonstrated a substantial possibility of success on the other issues it seeks to raise in the Appeal, including whether the Debtors proposed the Plan in bad faith in violation of section 1129(a)(3) of the Bankruptcy Code. Motion ¶ 39.

## **Where the Public Interest Lies**

Courts recognize that the public interest disfavors stays because "the public interest favors the expedient administration of the bankruptcy proceedings." *See In re Savage & Assocs., P.C.*, No. 05 CIV.2072, 2005 WL 488643, at *2 (S.D.N.Y. Feb. 28, 2005); *see also In re Health*

25

*Diagnostic Lab'y, Inc.,* No. 15-3219-KRH, 2015 WL 4915621, at *5 (Bankr. E.D. Va. Aug 17, 2015) (finding that "third parties and the public interest in general will be harmed by imposition of the stay").

The A&P Ad Hoc Group asserts that the public interest will be served by a stay pending its Appeal because "there is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review." Motion ¶ 48 (citing *Adelphia*, 361 B.R. at 367). It contends that absent such review, the majority lenders will continue to commit "violence" against minority lenders elsewhere, as it insinuates their members have faced in the Chapter 11 Cases. *Id.* ¶ 49. The Debtors assert that the A&P Ad Hoc Group's formulation of the public interest at stake is immaterial because it rests on an assumption that its Appeal will be equitably moot, which it disputes for the reasons set forth above. Opposition ¶ 38. The Debtors also contend, in any event, that the public interest in the expedient administration of bankruptcy proceedings—and the grave harm to the Debtors' creditors, employees and the airline industry more generally absent such expedience—outweighs the A&P Ad Hoc Group's right to appellate review, especially given that the Court has twice rejected many of its arguments. *Id.* ¶¶ 37-38.

The Court agrees with the Debtors that a stay would deprive the Debtors' creditors of the efficient administration of the Debtors' estates and potentially delay or derail the Debtors' emergence from chapter 11,[28] which, in turn, could jeopardize the Debtors' businesses, cause a loss of jobs, and further weaken the airline industry. The Court finds that is not in the public interest. *See* TLA Claimholders Stay Opinion at 24-25.

---

[28]    The A&P Ad Hoc Group contends that there is little risk that any stay would "derail" the Debtors' emergence from chapter 11 because any delay in consummating the Plan will be "brief[]." Reply ¶ 20. The Court disagrees, as the A&P Ad Hoc Group has requested an indefinite stay.

## Conclusion

For the reasons set forth above, the Court denies the Motion. Because the Court declines to stay the Confirmation Order pending appeal, the Court need not address the parties' arguments concerning a bond.

IT IS SO ORDERED.

Dated: New York, New York
       July 16, 2022

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge