UNITED STATES BANKRUPTCY COURT           NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re:                                              :
                                                    :     Case No. 20-11254 (JLG)
                                                    :     Chapter 11
LATAM Airlines Group S.A., et al.,                  :
                                                    :
                                                    :     (Jointly Administered)
                                      Debtors.[1]   :
-------------------------------------------------------- x

## MEMORANDUM DECISION AND ORDER DENYING DEBTORS' SUPPLEMENTAL APPLICATION FOR ORDER MODIFYING TERMS OF RETENTION OF PJT PARTNERS LP

A P P E A R A N C E S :

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
*Counsel for the Debtors and Debtors
in Possession*
One Liberty Plaza
New York, New York 10006
By:    Richard J. Cooper, Esq.
       Lisa M. Schweitzer, Esq.
       Luke A. Barefoot, Esq.
       Thomas S. Kessler, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
201 Varick Street, Room 1006
New York, New York 10014

---

[1]    The Debtors in these chapter 11 cases, along with each Debtor's tax identification number (as applicable), are: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014); Piquero Leasing Limited (N/A); TAM S.A. (N/A); TAM Linhas Aéreas S.A. (65-0773334); Aerolinhas Brasileiras S.A. (98-0177579); Prismah Fidelidade Ltda. (N/A); Fidelidade Viagens e Turismo S.A. (27-2563952); TP Franchising Ltda. (N/A); Holdco I S.A. (76-1530348) and Multiplus Corredora de Seguros Ltda. (N/A). For the purpose of these chapter 11 cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

By:    Brian S. Masumoto, Esq.

DECHERT LLP
*Counsel to the Official Committee*
*of Unsecured Creditors*
1095 Avenue of the Americas
New York, New York 10036
By:    Allan S. Brilliant, Esq.
       G. Eric Brunstad, Jr., Esq.
       Craig P. Druehl, Esq.
       David A. Herman, Esq.

WHITE & CASE LLP
*Counsel for the Ad Hoc Group of*
*LATAM Bondholders*
1221 Avenue of the Americas
New York, New York 10020
By:    John K. Cunningham, Esq.
       Brian D. Pfeiffer, Esq.
       Gregory M. Starner, Esq.
       Mark P. Franke, Esq.

200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:    Richard S. Kebrdle, Esq. (admitted *pro hac vice*)

WILLKIE FARR & GALLAGHER LLP
*Counsel to PJT Partners LP*
787 Seventh Avenue
New York, NY 10019
By:    Matthew A. Feldman, Esq.

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## INTRODUCTION[2]

Before the Court is the Supplemental Application of LATAM Airlines Group S.A. and

certain of its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"),[3] for entry

---

[2]    Citations to "[ECF No.__]" herein are to documents filed on the electronic docket in these Chapter 11 Cases (Case No. 20-11254). Capitalized terms shall have the meanings ascribed to them herein.

[3]    Debtors' Supplemental Application for Order Modifying Terms of Retention of PJT Partners LP, as Investment Bankers to the Debtors and Debtors-in-Possession [ECF No. 3823] (the "**Supplemental Application**"). In support of the Supplemental Application, the Debtors filed the Declaration of Timothy R. Coleman in Support of Debtors'

of an order, pursuant to sections 327(a), 328(a) and 1107(b) of title 11 of the United States Code

(the "**Bankruptcy Code**"), modifying the terms of the Debtors' retention of PJT Partners LP

("**PJT**") as investment banker for the Debtors pursuant to an engagement letter, dated May 20,

2020 (the "**Engagement Letter**").   The Debtors retained PJT under section 328 of the

Bankruptcy Code. In substance, by the Supplemental Application, the Debtors seek to raise the

Fee Cap in the Engagement Letter from $25 million to $37 million because in or about October

2021, PJT exceeded the Fee Cap under the terms of the Engagement Letter and, as such,

effectively will not be paid a Restructuring Fee for its services in this case. The Debtors propose

to modify the terms of the Engagement Letter by providing that PJT will earn a $12 million

Restructuring Fee if, and when, the Debtors' Plan becomes effective.

The U.S. Trustee (the "**UST**") and the Official Committee of Unsecured Creditors (the

"**Committee**") filed objections to the Supplemental Application.[4] The Debtors filed a Reply in

response to the Objections.[5] On February 10, 2022, the Court conducted an evidentiary hearing

---

Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-in-Possession, attached to the Supplemental Application as Exhibit A (the "**Coleman Decl.**" or "**Coleman Declaration**") and the Declaration of Ramiro Alfonsín Balza in Support of Debtors' Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-in-Possession, attached as Exhibit B to the Supplemental Application (the "**Alfonsín Decl.**" or "**Alfonsín Declaration**").

[4]     Objection of the Official Committee of Unsecured Creditors to the Debtors' Supplemental Application for Order Modifying Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-In-Possession [ECF No. 4066] (the "**Committee Objection**"); Objection of the United States Trustee to the Debtors' Supplemental Application for Order Modifying Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-in-Possession [ECF No. 3860] (the "**UST Objection**" or "**UST Obj.**") (with the Committee Objection, the "**Objections**").

The Ad Hoc Group of LATAM Bondholders responded to the Supplemental Application by filing a reservation of rights. *See* Omnibus Reservation of Rights of the Ad Hoc Group Of LATAM Bondholders Regarding (A) Debtors Motion to Approve (I) the Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto and (B) Debtors Supplemental Application for Order Modifying Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-In-Possession [ECF No. 4060].

[5]     Debtors' Reply to the United States Trustee and Official Committee of Unsecured Creditors' Objections to the Debtors' Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP [ECF No. 4211] (the "**Reply**"). In support of the Reply, the Debtors filed the Supplemental Declaration of Timothy R.

on the Supplemental Application,[6] at which the Court directed the Debtors to supplement the

record of the hearing with support for their contention that courts in and outside this district have

modified fees for services previously approved under section 328 of the Bankruptcy Code in

situations, like this one, where a professional exceeded the negotiated fee cap.[7] The Committee

filed a response to the Supplemental Materials.[8] The Court conducted an omnibus hearing in

these Chapter 11 Cases concerning unrelated matters on September 1, 2022. The Court, however,

permitted PJT to appear and be heard at that hearing concerning the Supplemental Application,

its pendency before the Court, and how it relates to PJT's upcoming final fee application.[9]

       As part of the settlement of their objections to confirmation of the Debtors' Plan, the

Committee withdrew the Committee Objection to the Supplemental Application.[10] Accordingly,

only the UST Objection remains pending. The UST asserts that the Court should deny the

---

Coleman in Support of Debtors' Reply in Connection with Debtors' Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-in-Possession, attached to the Reply as Exhibit A (the "**Supplemental Coleman Declaration**" or " **Supp. Coleman Decl.**") and the Supplemental Declaration of Ramiro Alfonsín Balza in Support of the Debtors' Reply to the United States Trustee and Official Committee of Unsecured Creditors' Objections to the Debtors' Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP (the "**Supplemental Alfonsín Declaration**").

[6]    At the evidentiary hearing, the Court admitted the Coleman Declaration, Alfonsín Declaration, Supplemental Coleman Declaration, and Supplemental Alfonsín Declaration into the record as Mr. Coleman's and Mr. Alfonsín's direct testimony. In lieu of cross examination, the parties stipulated to certain facts concerning the COVID-19 Pandemic that Mr. Alfonsín would testify to had he been cross examined by the Committee or the UST.  *See* Feb. 10, 2022 Hr'g Tr., 26:10-16 [ECF No. 4373] (the "**Hr'g Tr.**").

[7]    Debtors' Supplemental Materials in Support of Their Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP [ECF No. 4405] (the "**Supplemental Materials**").

[8]    Response of the Official Committee of Unsecured Creditors to the Debtors' Supplemental Materials in Support of their Supplemental Application for an Order Modifying the Terms of Retention of PJT Partners LP [ECF No. 4475].

[9]    Sept. 1, 2022 Hr'g Tr. [ECF No. 6547] (the "**Omnibus Hr'g Tr.**").

[10]    Notice of Withdrawal of Objection of the Official Committee of Unsecured Creditors to the Debtors' Supplemental Application for Order Modifying Terms of Retention of PJT Partners LP, as Investment Banker to the Debtors and Debtors-in-Possession [ECF No. 5602].

Supplemental Application because the Debtors have not met their burden under section 328 of demonstrating that PJT's Fee Cap under the Engagement Letter (*i.e.*, $25 million) is "improvident in light of developments not capable of being anticipated" when the Debtors applied to retain PJT on June 9, 2020. 11 U.S.C. § 328(a).

For the reasons stated herein, the Court finds that the Debtors have not met that burden. The Court sustains the UST Objection and denies the Supplemental Application with prejudice.[11]

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

The Pandemic

On March 11, 2020, the World Health Organization (the "**WHO**")[12] declared COVID-19, the disease caused by the SARS-CoV-2 virus, a global pandemic (the "**Pandemic**").[13] In doing so, the WHO remarked that the world has "never before seen a pandemic sparked by a

---

[11]    PJT has not yet filed its final application for compensation for its services in these Chapter 11 Cases. However, on the consent of all parties, the Court is addressing the Supplemental Application in advance of PJT filing its final fee application. *See* Omnibus Hr'g Tr., 24:12-16 (counsel for PJT: "just to alert the Court that as final fee applications become due, if the Court has not yet ruled on [the Supplemental Application] . . . we will file for approval just so that it's in the record at that time."); *see also id.*, 23:21-25. The Court's resolution of the Supplemental Application will fix PJT's Fee Cap for purposes of its final fee application.

[12]    The Debtors rely on statements from the WHO in arguing that they have met their burden under section 328 of the Bankruptcy Code for demonstrating grounds for raising the Fee Cap to $37 million. *See, e.g.*, Hr'g Tr., 59:4-11; Reply ¶ 5.

[13]    Tedros Adhanom Ghebreyesus, Director-General, WHO, WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (the "**March 2020 WHO Announcement**"). The Court takes judicial notice of the March 2020 WHO Announcement and the April 2020 WHO Announcement concerning the Pandemic. *See, e.g., Wandel v. Gao*, No. 1:20-CV-03259 (PAC), 2022 WL 768975, at *3 (S.D.N.Y. Mar. 14, 2022) (taking judicial notice of announcements from the WHO concerning the Pandemic); *United States v. Valenta*, No. CR 15-161, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020) (same).

coronavirus" and has "never before seen a pandemic that can be controlled." March 2020 WHO

Announcement. One month later, the WHO cited the evolving nature of the Pandemic and

cautioned that "[m]ost countries are still in the early stages of their epidemics" and that "some

[areas] that were affected early in the pandemic are now starting to see a resurgence in cases."[14]

It further discussed the global response to the Pandemic, remarking that "there are . . . many gaps

in the world's defences" to SARS-CoV-2, a virus that "will be with us for a long time." April

2020 WHO Announcement.  It pressed the need for the world to adjust to a "new normal,"

recognizing that while "[p]eople understandably want to get on with their lives," the "world will

not and cannot go back to the way things were" before the Pandemic. *Id*. By April 22, 2020, the

WHO reported nearly 2.5 million cases of COVID-19 and over 160,000 deaths worldwide. *Id*.

At the hearing on the Supplemental Application, the parties stipulated to the following

facts concerning the Pandemic as it existed when the Debtors retained PJT:

> [F]irst, a number of international borders were closed; second, there
> was no COVID vaccine; third, it was unknown how long it would
> take to develop and distribute a COVID vaccine; [fourth], it was
> possible that there would not be a COVID vaccine at all; and fifth,
> it was not clear how long COVID would continue to impact the
> [D]ebtors' businesses.

Hr'g Tr., 26:10-16.

The Chapter 11 Cases

On May 26, 2020 (the "**Initial Petition Date**"), certain of the Debtors (the "**Initial**

**Debtors**") filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "**Initial**

**Chapter 11 Cases**"). On July 7 and 9, 2020 (the "**Subsequent Petition Date**" and, together with

---

[14]    Tedros Adhanom Ghebreyesus, Director-General, WHO, WHO Director-General's Opening Remarks at the
Media Briefing on COVID-19 (Apr. 22, 2020), https://www.who.int/director-general/speeches/detail/who-director-
general-s-opening-remarks-at-the-media-briefing-on-covid-19--22-april-2020 (the "**April 2020 WHO**
**Announcement**").

the Initial Petition Date, as applicable to each Debtor, the "**Petition Date**"), additional LATAM

affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "**Subsequent**

**Chapter 11 Cases**" and together with the Initial Chapter 11 Cases, the "**Chapter 11 Cases**").

The Debtors continue to operate their businesses and manage their properties as debtors-

in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11

Cases are jointly administered for procedural purposes only. On June 5, 2020, the UST appointed

the Committee. No trustee or examiner has been appointed in any of these Chapter 11 Cases.

<u>The Debtors Retain PJT</u>

The Debtors and PJT executed the Engagement Letter on May 20, 2020.[15] It sets forth the

scope of the parties' agreement, including the scope of services to be provided by PJT to assist

the Debtors to negotiate and effectuate a restructuring. *See generally* Engagement Letter. The

Engagement Letter specifies that PJT will provide the following at the Debtors' request:

> (a) assist in the evaluation of the [Debtors'] businesses and prospects; (b) assist in
> the development of the [Debtors'] long-term business plan and related financial
> projections; (c) assist in the development of financial data and presentations to the
> [Debtors'] Board of Directors, various creditors and other third parties; (d) analyze
> the [Debtors'] financial liquidity and evaluate alternatives to improve such
> liquidity; (e) analyze various restructuring scenarios and the potential impact of
> these scenarios on the recoveries of those stakeholders impacted by the
> Restructuring; (f) provide strategic advice with regard to restructuring or
> refinancing the [Debtors'] Obligations; (g) evaluate the [Debtors'] debt capacity
> and alternative capital structures; (h) participate in negotiations among the
> [Debtors] and its creditors, suppliers, lessors and other interested parties; (i) value
> securities offered by the [Debtors] in connection with a Restructuring; (j) advise
> the [Debtors] and negotiate with lenders and/or contractual parties with respect to
> potential amendments; (k) assist in arranging financing for the [Debtors], as
> requested; (l) provide expert witness testimony concerning any of the subjects
> encompassed by the other investment banking services; and (m) provide such other
> advisory services as are customarily provided in connection with the analysis and

---

[15]    A copy of the Engagement Letter is attached as Exhibit 1 to the [Proposed] Order Modifying the Terms of
Retention of PJT Partners LP as Investment Banker to Debtors and Debtors-in-Possession (the "**Proposed Order**"),
which is attached as Exhibit C to the Supplemental Application.

negotiation of a transaction similar to a potential Restructuring, as requested and mutually agreed.

Engagement Letter at 1-2. The Engagement Letter also sets forth PJT's fee in exchange for providing these services. *Id*. at 2-3. The total fee encompasses three parts:

i. Monthly fee of $300,000 (the "**Monthly Fee**"). Starting with the seventh Monthly Fee, PJT and the Debtors agreed that 50% of all Monthly Fees shall be credited against PJT's Restructuring Fee;

ii. Capital raising fee (the "**Capital Raising Fee**"): The Debtors agreed to pay PJT a Capital Raising Fee "for any financing arranged by PJT . . . earned and payable [upon] consummation of the [capital raising] transaction[,]" subject to certain limitations, calculated as follows:

   a. 0.70% of the total issuance size for senior debt financing;

   b. 1.75% of the total issuance size for junior debt financing;

   c. 1.0% of the total issuance size for DIP Financing;

   d. 3.0% of the issuance amount for equity financing; and

iii. Restructuring fee of $17,500,000 (the "**Restructuring Fee**"). The Restructuring Fee is subject to the offset by the Monthly Fees described above. The Debtors pay PJT the Restructuring Fee only upon the consummation of a restructuring plan approved by the Court.

*Id*. at 2-3.[16] Pursuant to the Engagement Letter, the aggregate amount of PJT's Monthly Fee, Capital Raising Fee, and Restructuring Fee may not exceed $25 million (the "**Fee Cap**"). *Id*. at 3. The Engagement Letter further states that "the fees listed in this

---

[16] The Engagement Letter also calls for the Debtors to reimburse PJT for all reasonable expenses. Engagement Letter at 3.

Agreement encompass all required services to file and consummate a potential U.S. chapter 11 case." *Id*. at 4. As to the resources devoted to PJT's retention, the Engagement Letter states:

> The [Debtors] also acknowledge[] and agree[] that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of PJT Partners and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for PJT Partners and that the actual time and commitment required of PJT Partners and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating 'peak load' issues for the firm. In addition, given the numerous issues which PJT Partners may be required to address in the performance of its services hereunder, PJT Partners' commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for PJT Partners' services for engagements of this nature in an out-of-court context, the [Debtors] agree[] that the fee arrangements hereunder (including the Monthly Fees, Capital Raising Fees and the Restructuring Fee) are reasonable under the standards set forth in 11 U.S.C. Section 328(a).

*Id*.

On June 9, 2020, the Debtors filed their application to retain PJT under sections 327(a) and 328(a) of the Bankruptcy Code.[17] On June 30, 2020, the Court entered an order granting the Application.[18] Under the Retention Order, PJT was retained on the "terms and conditions set forth in the Application and the Engagement Letter." Retention Order ¶ 2. The Retention Order specifies that "all compensation . . . payable under the Engagement Letter shall be subject to review only pursuant to the standards set forth in Bankruptcy Code section 328(a)[.]" *Id.* ¶ 3.[19]

---

[17]    Application to Employ PJT Partners LP as Investment Banker to the Debtors and Debtors-in-Possession Effective as of the Petition Date [ECF No. 155] (the "**Application**").

[18]    Order Granting Application to Employ PJT Partners LP as Investment Banker to the Debtors and Debtors-in-Possession Effective as of the Petition Date [ECF No. 420] (the "**Retention Order**").

[19]    *See also* Engagement Letter at 4 ("PJT . . . acknowledges . . . that [its] fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code").

The Bankruptcy Plan

On November 26, 2021, the Debtors filed the Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, as amended (the "**Plan**")[20] and the related disclosure statement. On June 18, 2022, the Court confirmed the Debtors' Plan over the objections of various creditors.[21] The Debtors anticipate the Plan will go effective in late 2022.[22]  Under the Plan, the Debtors are offering approximately $800 million of new common stock; issuing three series of convertible notes totaling approximately $8.8 billion; and obtaining a $2.25 billion exit term loan and note facility, plus a $500 million revolving credit facility. Coleman Decl. ¶ 12; *see also* Plan §§ 6.1, 6.2. Under the Plan, the Debtors are conducting the rights offering in the Chilean capital markets and in accordance with applicable Chilean law. *See* Plan §§ 6.1, 6.2.

As detailed below, PJT helped, *inter alia*, formulate and finalize the Debtors' rights offerings under the Plan.

PJT Fees and Services to Date

PJT reached the Fee Cap in October 2021. Supp. Coleman Decl. ¶ 8. Since then, it has not been paid a Monthly Fee for its services and is not entitled to additional Capital Raising Fees should the Debtors require PJT to seek such financing. Hr'g Tr., 37:23-24; 38:23-39:2. As a consequence, under the terms of the Engagement Letter, as approved by the Retention Order,

---

[20]    Notice of Filing of Seventh Revised Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5330].

[21]    Memorandum Decision signed on 6/18/2022 on Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5752]; Order (I) Confirming Debtors' Joint Plan of Reorganization of LATAM Airlines Group S.A. Under Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief [ECF No. 5754]; Errata Order Regarding Memorandum Decision on Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code [ECF No. 5900].

[22]    *Cf.* Declaration of Brent Herlihy in Support of the Debtors' Opposition to the Motion of the TLA Claimholders for a Stay of the Order (I) Confirming Debtors' Joint Plan of Reorganization of LATAM Airlines Group S.A. et al. Under Chapter 11 of the Bankruptcy Code and (II) Granting Related Relief [ECF No. 5808] ¶¶ 7, 11.

there is no room left under the Fee Cap for the payment of a Restructuring Fee, let alone a

Restructuring Fee of $17,500,000. *See id*., 39:6-10 (counsel for PJT: "[PJT is] no longer entitled

to any additional fees between now and the end of the [Chapter 11 Cases] if the Court were to

deny [the Supplemental Application]. [PJT is] done getting paid."). This is so because of the

duration of the Monthly Fees over the more than two-year engagement and the Capital Raising

Fees PJT earned, *inter alia*, in connection with four separate DIP raises. *See* Supp. Coleman

Decl. ¶ 8.

Mr. Coleman claims that PJT reached the Fee Cap, in part, because the Chapter 11 Cases

"have proven much more complex than originally anticipated," as well as much lengthier. *Id*. ¶¶

9, 13. When the Debtors filed the Supplemental Application, the Chapter 11 Cases were already

well into their eighteenth month (as was PJT's work in connection with them). *Id.* ¶ 13.  Now,

the Chapter 11 Cases have been pending for well over two years. The lion's share of PJT's

services to date broadly fall within three buckets. First, PJT assisted in the Debtors' efforts to

secure a $2.45 billion DIP with competitive terms by conducting a robust marketing process both

prepetition and postpetition. *Id.* ¶ 10. They also assisted the Debtors' efforts to secure

competitive terms on a $750 million DIP tranche B.[23] *Id.* Second, PJT assisted the Debtors with

developing and negotiating the Plan. This entailed providing guidance around developing a long-

term business plan, identifying new sources of capital to support an exit strategy, and building

---

[23]    PJT also helped the Debtors negotiate and obtain a new DIP in March 2022 that amended and restated the
Debtors' existing DIP facilities, prevented those facilities from reaching maturity, and thus ensured the Debtors had
seamless access to the liquidity needed to operate their business and pursue a path to emerge from chapter 11. *See*
Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Enter Into the Amended and Restated Credit
Agreement, (B) Obtain Replacement Tranche C Postpetition Financing, and (C) Grant Superpriority Administrative
Expense Claims and (II) Granting Related Relief [ECF No. 4392]; *see also* Order signed on 3/18/2022 Granting
Motion to Approve Debtor in Possession Financing [ECF No. 4704]. In addition, PJT helped the Debtors obtain
DIP-to-exit facilities for the Debtors in June 2022 that provided the financing the Debtors needed to work towards
exiting chapter 11. *See* Order (I) Authorizing the Debtors to (A) Obtain DIP and DIP-To-Exit Financing and (B)
Grant Superpriority Administrative Expense Claims, and (II) Granting Related Relief [ECF No. 5791].

consensus around the structure and terms of the Plan. *Id.* ¶ 11. PJT was a key player in a plan process that involved entering into over sixty non-disclosure agreements with interested parties and their advisors, engaging in an extensive diligence process, distributing term sheets for a plan of reorganization and associated exit funding, and ultimately evaluating competing proposals from three groups of interest holders. *Id.* PJT engaged with these parties regarding potential exit financing and related matters, and it received various revised proposals. *Id.* ¶ 12. Third, PJT dedicated months of work to exploring exit financing alternatives, including the $800 million rights offering of new common stock contemplated under Plan; the issuance of three series of convertible notes totaling approximately $8.8 billion; and a $2.25 billion exit term loan and note facility, plus a $500 million revolving credit facility. *Id.* PJT also assisted the Debtors as necessary in performing other tasks in connection with exiting chapter 11, including, *inter alia*, serving as expert witnesses in connection with motions and contested matters in the Chapter 11 Cases. Supplemental Application ¶ 14; Engagement Letter at 2.

Since the Court confirmed the Plan, PJT has continued to perform services for the Debtors to consummate the Plan, including, *inter alia*, coordinating the Debtors' rights offerings under the Plan.[24]

The Supplemental Application

The Debtors seek to raise the Fee Cap from $25 million to $37 million because PJT's engagement—and corresponding Fee Cap—was based on expectations that the Chapter 11 Cases would be shorter and less contested. *See* Supplemental Application ¶ 1. The Debtors contend that they have faced several significant challenges in the Chapter 11 Cases, including a contested DIP

---

[24]    *See* Omnibus Hr'g Tr., 24:6-8 (counsel for PJT noting that "[PJT] continue[s] to work on the case as it heads towards the inevitable successful conclusion.").

process spanning five months, significant operational restructurings, and parallel recognition proceedings in Chile, Colombia and the Cayman Islands. *Id.* ¶ 2. The Debtors maintain that these challenges have occurred against the backdrop of the Pandemic, which began just weeks before they filed the Chapter 11 Cases and engaged PJT. *See id.* ¶ 29. According to the Debtors, at that time, the duration and disruption of the Pandemic was poorly understood and unanticipated. *See* Reply ¶ 3; *see also* Hr'g Tr., 59:13-16 (Debtors indicating "there [was] no indication from experts or any reason to believe that a reasoned fiduciary such as the [D]ebtors should have anticipated that the [P]andemic would go [on] for two years or more."). Among other things, the Debtors contend that the complications of the Pandemic required them, with the help of PJT, to "constantly re-evaluate and solve for a liquidity crisis," including conducting subsequent DIP financing processes that would not have been necessary but for the severity and duration of the Pandemic. *See* Supp. Coleman Decl. ¶ 6. They maintain that the Pandemic also inhibited the in-person discussion that would have produced more efficient deal making in finding support for the Plan, negotiating exit financing, and supporting the Debtors in developing a business plan through which to frame their restructuring. *See id.* ¶¶ 7-8.

The Debtors assert that these challenges required unexpected work for PJT. They maintain that these unforeseen challenges required PJT to expand its role into new areas, which necessitated input from numerous PJT professionals, including some of PJT's most senior and experienced investment bankers. Supplemental Application ¶ 3. The Debtors contend that the unanticipated complexity and length of these Chapter 11 Cases caused PJT to exceed the Fee Cap and, accordingly, it would be reasonable to increase the Fee Cap to $37 million. *Id.* ¶ 39. They contend a $37 million fee cap would reflect a market-based aggregate payment to PJT and would, in effect, result in a $12 million Restructuring Fee for PJT in the event the Debtors

consummate the Plan.[25] *Id.* ¶ 17. The Debtors contend this is reasonable, in part, because

investment bankers typically get paid with a restructuring fee, which PJT would not earn here

absent the Court granting the Supplemental Application. *See* Hr'g Tr., 39:18-20.

Under these circumstances, the Debtors contend that increasing the Fee Cap to $37

million is appropriate under section 328(a) of the Bankruptcy Code because the unforeseen

duration and complexities of the Chapter 11 Cases required unforeseen commitments from PJT.

Accordingly, they contend they have satisfied the requirement under section 328 of the

Bankruptcy Code because the Fee Cap is "improvident," since neither the Debtors nor PJT could

have anticipated these challenges in May 2020—only weeks into the Pandemic. *See* Supp.

Coleman Decl. ¶ 4; 11 U.S.C. § 328(a).

Further, the Debtors cite the equities at play should the Court deny the Supplemental

Application, which could force PJT to work without receiving any additional compensation

(noting that PJT will likely incur approximately $180.9 million in additional fees) or force the

Debtors to lose PJT's institutional knowledge and require them to find a replacement advisor

who may demand higher fees. *See* Reply ¶ 16; Supp. Coleman Decl. ¶ 8. At the hearing on the

Supplemental Application, however, PJT unequivocally stated that it would not resign from its

engagement if the Court denied the Supplemental Application. *See* Hr'g Tr., 34:8-18.

<u>The UST Objection</u>

The UST asserts, in broad strokes, that the scope of services provided by PJT was not (or

should not have been) unanticipated in light of the Engagement Letter. *See* UST Obj. at 6. It says

---

[25]    The Debtors say this is so because PJT's fees are relatively low compared to those of investment banks retained in comparable chapter 11 cases. Supplemental Application ¶ 33. For example, the Debtors contend that if PJT's compensation is limited to the original Fee Cap of $25 million, its fee equals 0.174% of the Debtors' aggregate liabilities, whereas the fee cap for the financial advisor retained by the Debtors in *In re Grupo Aeromexico, S.A.B. de C.V* ("*Aeromexico*") represented 1.062% of the debtors' total liabilities. *Id.* In support of their request, the Debtors point to the fact that even though PJT has exceeded the current Fee Cap, it is not seeking to be paid anything above the $25 million Fee Cap until a restructuring actually occurs—*i.e.*, after the Plan goes effective. *Id.*

that is so because PJT was specifically retained to provide a wide range of services related to the disputed DIP financing, extended plan negotiations, cross-border issues, exit financing analysis, and other work the Debtors now claim was unanticipated or unexpectedly time consuming. *See id*. The UST asserts that PJT and the Debtors could have anticipated the duration of the Pandemic when the Debtors retained PJT because the Court issued the Retention Order nearly three months after the Pandemic developed. *See id*. at 7; *see also* Hr'g Tr., 59:4-7.

In other words, the UST contends that the Debtors and PJT simply miscalculated how long it would take PJT to provide the myriad of services in the Engagement Letter and now impermissibly seek to renegotiate their deal. Given the high burden the Debtors face seeking to modify PJT's compensation under Section 328 of the Bankruptcy Code, *see infra*, the UST contends that the duration and complexity of the Chapter 11 cases was "capable of being anticipated" when the Debtors retained PJT. 11 U.S.C. § 328(a); *see* UST Opp. at 2, 6, ¶ 10.

## **LEGAL STANDARD**

Section 328(a) of the Bankruptcy Code authorizes the employment of professionals on any reasonable terms and conditions. 11 U.S.C. § 328(a).  It provides in pertinent part:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a). Section 1107(a) makes this section applicable to debtors-in-possession. 11 U.S.C. § 1107(a).

It is a high hurdle under section 328(a) for a movant seeking to revise the terms governing a professional's compensation. *Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. of Unsecured Creditors (In re Smart World Technologies, LLC)*, 552 F.3d 228, 234–35 (2d Cir. 2009) ("Surprisingly few cases have construed [section 328(a)'s] language, but those that have make it evident that it is a high hurdle to clear."); *see also Gibbs & Brun LLP v. Coho Energy, Inc. (In re Coho Energy Inc.)*, 395 F.3d 198, 205 (5th Cir. 2004) (commenting that section 328(a) sets a "high standard").

The party seeking to do so has the burden of proof under section 328(a). *In re Yablon,* 136 B.R. 88, 91 (Bankr. S.D.N.Y. 1992). The movant must show not merely that a compensation adjustment is appropriate in light of subsequent developments that were previously unforeseen or unanticipated by the parties; instead, the movant is tasked with the weightier burden of proving that the subsequent developments were incapable of being anticipated at the time the engagement was approved. *Daniels v. Barron (In re Barron)*, 325 F.3d 690, 693 (5th Cir. 2003) ("the intervening circumstances must have been *incapable* of anticipation, not merely unanticipated."); *Smart World*, 552 F.3d at 235 ("simply because the size and scope of a settlement had not actually been anticipated, it does not follow that it was *incapable of anticipation.*").

Before a court may revise a compensation agreement, it must explain with specificity why the subsequent developments were "incapable of being foreseen." *In re Barron,* 325 F.3d at 693; *see also* 3 Collier on Bankruptcy § 328.01 (16th ed. 2009) ("A failure by the bankruptcy court to make a record establishing that the approval was improvident and *setting out with specificity (not conclusory statements)* the development that could not have been anticipated at the time of approval will be insufficient to comply with the requirements of section 328.") (emphasis added).

16

A finding of improvidence pursuant to section 328 is a difficult determination to make and therefore, courts rarely disturb the original terms and conditions of a professional's employment. *See In re Yablon*, 136 B.R. at 92; *In re XO Communs., Inc.,* 323 B.R 330, 339 (Bankr. S.D.N.Y. 2005). "[T]he bankruptcy court must honor the plain meaning of Section 328." *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 580 (Bankr. N.D. Tex. 2004).

## <u>ANALYSIS</u>

Whether the Fee Cap was Improvident in Light of Developments
<u>Not Capable of Being Anticipated When the Court Approved the Retention Order</u>

The Supplemental Application fails on the merits and, accordingly, the Court sustains the UST Objection. The Debtors have failed to meet their burden of demonstrating that the allegedly unforeseen developments that increased the duration and amount of PJT's work in these Chapter 11 Cases were incapable of being anticipated when they executed the Engagement Letter or the Court issued the Retention Order. As such, the Debtors have failed to meet their burden under Section 328(a) of the Bankruptcy Code.

Citing the backdrop of the Pandemic, the Debtors essentially contend that PJT and the Debtors simply could not have known that these Chapter 11 Cases would have continued as long as they have, which justifies raising the Fee Cap to $37 million to fairly compensate PJT for the additional resources it devoted to the Debtors' bankruptcy. The problem with this argument, however, is that the record contains no evidence about PJT's or the Debtors' expectations when they signed the Engagement Letter. Absent such evidence, the Court must rely on the terms of the Engagement Letter itself.

The Debtors argue, in part, that the new Fee Cap is appropriate because of the expanded scope of services PJT provided. *See*, *e.g*., Supplemental Application ¶ 37. But the Debtors do not seek to pay PJT more because it has performed additional services; they only seek to pay PJT

17

more for services already called for (and performed) under the Engagement Letter. Professional

services contemplated under an engagement letter, by definition, cannot be "[in]capable of being

anticipated" at the time parties negotiated compensation for those services. 11 U.S.C. § 328(a).

The Engagement Letter sets forth thirteen categories of services PJT contracted to

provide the Debtors in the Chapter 11 Cases, as approved by the Retention Order. Engagement

Letter at 1-2. They include, *inter alia*: (i) helping the Debtors develop their business plan; (ii)

"assist[ing] in arranging financing for the [Debtors], as requested"; and (iii) "provid[ing] such

other advisory services as are customarily provided in connection with the analysis and

negotiation" of a restructuring plan. *Id*. This and other work specifically set out in the

Engagement Letter encompasses the allegedly unanticipated "complexities" the Debtors cite,

including assisting with multiple, contentious rounds of DIP financing, a protracted business

plan, an extended search for exit financing, and an eighteen-month process to formulate a

restructuring support agreement. *See* Coleman Decl. ¶¶ 10-12; *see also* Supp. Coleman Decl. ¶¶

4, 6-7. Indeed, the Debtors' argument is belied by other provisions of the Engagement Letter,

which specify, *inter alia*, that "the fees listed in this Agreement encompass ***all required services***

to file and consummate a potential U.S. chapter 11 case." *See* Engagement Letter at 4 (emphasis

added).  Simply put, the Debtors' argument is merely an attempt to shoehorn the Supplemental

Application into something it is not: a request for PJT to provide additional services not

contemplated by the Engagement Letter.[26]

---

[26]     The terms of the Debtors' Proposed Order demonstrate that the Debtors seek only to raise the Fee Cap, not
expand the scope of services to be provided by PJT. It states that the "[t]he Engagement Letter . . . and the Fee
Structure contained therein is hereby modified to increase the Fee Cap to $37,000,000." Proposed Order ¶ 2. It
provides no other modifications to the Engagement Letter and, indeed, explicitly states that "the Retention Order[]
shall remain in full force and effect except as expressly modified by th[e Proposed Order]." *Id*. ¶ 4.

The Court does not doubt that the Pandemic and the resulting lack of face-to-face

negotiation between the Debtors and stakeholders in the Chapter 11 Cases may have hindered

negotiating the Plan, obtaining financing, settling motions, and resolving other issues necessary

for the Debtors to exit chapter 11. *See* Supp. Coleman Decl. ¶ 7.  The same is true with other

aspects of the Pandemic, especially the degree to which it has impacted the Debtors' business

and altered their expectations for raising capital. But that is of no matter.[27] Section 238(a) is

clear: the movant must cite more than merely unanticipated circumstances—it must cite

circumstances "[in]capable of being anticipated." 11 U.S.C. § 328(a); *Smart World,* 552 F.3d at

235. The Debtors have failed to meet that burden.

Conclusory, vague references to the impact of the Pandemic do not suffice under section

328 of the Bankruptcy Code, especially considering that the severity and potential duration of the

Pandemic were within the realm of possible outcomes when the Debtors retained PJT. The

Debtors and PJT executed the Engagement Letter on May 20, 2020—over two months after the

WHO declared the Pandemic. *See* March 2020 WHO Announcement. The Debtors did not file

the Application to retain PJT until June 9, 2020, and the Court approved the Application on June

30, 2020—over three months after the start of the Pandemic. *See* Retention Order.

On April 22, 2020—more than two months before the Court issued the Retention

Order—the WHO cautioned that SARS-CoV-2 would challenge the world for a "long time" and

---

[27]    The same is true of Mr. Alfonsín's remark that the Debtors would be prejudiced if they had to retain a different
investment banker due to the time and expense for a new firm to familiarize itself with the Chapter 11 Cases. *See*
Alfonsín Decl. ¶ 6. That does not speak to the test under section 328(a) of the Bankruptcy Code. And even if it did,
it does not reflect the record at the hearing since PJT confirmed that it will not seek to resign from its engagement
regardless of how the Court rules on the Supplemental Application. Hr'g Tr., 34:8-9; *see also id*., 34:15-18 ("[PJT
is] a professional firm. They do not abandon clients. And they will not be abandoning this client. I want to be
perfectly clear about that, Your Honor. There should be no misunderstanding.").

necessitated a "new normal" in the face of surging caseloads and deaths.[28] *See* April 2020 WHO Announcement. As the Debtors stipulated in connection with the Supplemental Application, it was unclear at this time how long the Pandemic would impact the Debtors' business and how long it would take to develop and administer a COVID-19 vaccine (or whether one would be developed at all). *See* Hr'g Tr., 26:10-16. This uncertainty, by definition, speaks to an especially unknown and unfixed future as it relates to the Debtors' business outlook, financing needs, and, in turn, the duration and expense of the services PJT agreed to provide the Debtors under the Engagement Letter.

Given this timeline, the state of the Pandemic, the lack of evidence concerning the Debtors' and PJT's expectations in May and June 2020 about PJT's engagement, and PJT's extensive experience with advising financially distressed companies, *see* Coleman Decl. ¶¶ 3-6—experience it could have brought to bear to negotiate a different fee when it was retained—the Court finds that the Debtors have failed to meet their burden under section 328(a). While the Debtors and PJT may not have anticipated the duration of the Pandemic—and its impact on the Debtors' Chapter 11 Cases and subsequent work for PJT—the evidence does not suggest that such impact was incapable of being anticipated.[29] *See* 11 U.S.C. § 328(a).

---

[28]    The Debtors did not seek to modify the terms of the Application as the Pandemic progressed between engaging PJT and submitting the Application.

[29]    PJT tacitly acknowledged that it should have anticipated the duration and complexity of the Chapter 11 Cases and, had it done so, would have negotiated different terms for its retention. *See* Hr'g Tr., 41:17-21. Its counsel at the evidentiary hearing stated:

> The [Debtors] said here is the engagement letter, take it or leave it. And so [PJT] didn't have the foresight at that time to say – and they should have, but they did not have the foresight at that time to say we're not going to step into that and we're going to renegotiate.

*Id.*

And the latter, not the former, is the relevant standard under Section 328(a) of the

Bankruptcy Code. 11 U.S.C. § 328(a).  The Court finds that *Smart World* is instructive regarding

this standard. In this controlling authority, the Court affirmed the district court's reversal of the

bankruptcy court's order under section 328(a) modifying the terms of a law firm's retention by

the debtor to defend against an adversary proceeding. In *Smart World*, the bankruptcy court

modified the law firm's approved fee arrangement because it found, *inter alia*, two events

"incapable of being anticipated: (1) the divergence of positions between [the debtor] and its

creditors; [and] . . . [(2)] the unusually prolonged litigation[.]" 552 F.3d at 231. The Second

Circuit affirmed the district court's reversal because it found these factors are always a

possibility in any litigation. *Id*. at 235; *see also In re Home Exp., Inc.*, 213 B.R. 162, 165 (Bankr.

N.D. Cal. 1997) ("most Chapter 11 cases are filled with surprises, both good and bad, and

[professionals] . . . should build such contingencies into their flat fee.").

So too here. The Debtors have not set forth evidence demonstrating why the lengthier

timeline for these Chapter 11 Cases—a contingency present in many complex chapter 11 cases—

could not have been anticipated when they retained PJT in May 2020, even taking into account

the impact of the Pandemic.[30] *See Smart World*, 552 F.3d at 235 ("the prospect of prolonged

litigation always exists"); *see also* Hr'g Tr., 26:15-16 (Debtors' counsel: "it was not clear [when

we retained PJT] how long COVID would continue to impact the [D]ebtors' businesses.").

None of the caselaw the Debtors cite demands a different result. They claim that courts in

this jurisdiction and elsewhere have approved fee modifications for professionals retained under

section 328 in similar circumstances. Supplemental Application ¶ 38; Supplemental Materials ¶¶

1-5. They cite the following: *In re Westinghouse Electric Company, LLC,* No. 17-10751 (MEW)

---

[30]    The Debtors have cited no case law where a court has found the impact of the Pandemic was a circumstance incapable of being anticipated under section 328(a) of the Bankruptcy Code.

(Bankr. S.D.N.Y. Jan. 23, 2018) (approving amendment to PwC's retention, which increased PwC's fixed fees by $2 million); *In re Metro Affiliates, Inc.*, No. 13-13591 (SHL) (Bankr. S.D.N.Y. Jan. 27, 2014) (amending terms of PwC's retention to waive monthly fee cap); *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Nov. 17, 2016) (modifying fee structure to include M&A-related fees); and *In re UCI International, LLC*, No. 16-11354 (MFW) (Bankr. D. Del. Oct. 3, 2016) (following Moelis' retention as investment banker, approving supplemental fee for capital transactions).

The Debtors mischaracterize these cases. The court in *Westinghouse* approved an additional fee for an accounting firm when its engagement letter called for a revised fee for additional services needed to complete an audit because the debtors did not provide the firm with timely access to documents. *See* Supplemental Materials, Ex. 1 at Ex. C at 8 (engagement letter: "[w]hen and if for any reason the Company is unable to provide such schedules, information and assistance, [the firm] . . . will mutually revise the fee to reflect additional services, if any, required of us to complete the audit."). In *Peabody*, the court approved an enhanced fee because the debtor's investment banker performed merger and acquisition services that were specifically excluded from the scope of the original retention. *See id.*, Ex. 6 at Ex. B (amending the scope of services in the engagement letter to "add[] as new clause (m): (m) [a]ssisting the Company with any potential M&A Transaction"). Similarly, the terms of the investment banker's retention in *UCI International* specifically contemplated setting a capital transaction fee at a later date. *See id.*, Ex. 8 ¶ 14 (supplemental application: "[b]ecause the amount of the Capital Transaction Fee was left undecided at the time the Retention Application was filed and the Retention Order was entered, none of the fees approved by the Retention Order would compensate [the firm] for services in connection with exit financing."). And, in *Metro Affiliates*, the court approved a fee

cap waiver for an accountant at the conclusion of its employment as part of its final fee application, and where the engagement letter expressly reserved the firm's "right to seek an additional fee . . . at the end of the engagement . . . ." *See id.*, Ex. 4, n.2.

Accordingly, each case relied on by the Debtors in the Supplemental Materials is distinguishable. In those cases, courts approved fee modifications under section 328 when: (1) the professionals provided services outside the scope of the original engagement; or (2) the engagement letter called for fee modification under certain events. In contrast, here, the Engagement Letter sets forth the very same services that the Debtors now claim warrant the increased Fee Cap and, moreover, it specifically states that "the fees listed in this Agreement encompass all required services to file and consummate a potential U.S. chapter 11 case." Engagement Letter at 4. In addition, unlike in *Metro Affiliates* and *Westinghouse*, the Engagement Letter has no contingencies providing for enhanced fees above the $25 million Fee Cap. *See generally id.*

Finally, the Debtors also argue that the Fee Cap is unreasonably low and not in line with market rates for investment banks providing comparable services. Supplemental Application ¶ 33. The Debtors say this is so because PJT's fees are relatively low compared to peer firms. For example, they maintain that if PJT was awarded the original fee cap of $25 million, this would be 0.174% of the Debtors' aggregate liabilities in these Chapter 11 Cases, whereas the $25 million fee cap for the financial advisor retained in *Aeromexico* was 1.062% of the debtors' total liabilities. *Id.* However, this is not a basis for the Court to enhance fees under section 328(a). *See Smart World*, 552 F.3d at 232 ("section 328(a) permits a bankruptcy court to forgo a full post-hoc reasonableness inquiry").

Professionals must accept the tradeoff presented by section 328(a) of the Bankruptcy Code. The certainty and predictability of section 328 come at the expense of flexibility in fee structures. Once retained under section 328(a), a professional subject to a fee cap must live with the possibility that the value of its services exceeds the cap (barring the statutory exception for circumstances not capable of being anticipated). *See In re Nucentrix Broadband Networks, Inc.*, 314 B.R. at 581 ("[I]f a firm obtains the protection of Section 328, the firm and the Court must live with the conditions of that section."). Here, PJT and the Debtors agreed that PJT would be compensated under section 328(a) subject to the Fee Cap. Retention Order ¶ 2. PJT enjoyed the benefits of this bargain by, for example, obtaining pre-approval of the $25 million Fee Cap. *See In re Amberjack Interests, Inc.*, 326 B.R. 379, 387 (Bankr. S.D. Tex. 2005) ("[fee applicant who] enjoyed the benefit of Section 328(a) in protecting his fee from potential reduction . . . must also accept Section 328(a)'s rigid standard in attempting to enhance his fee."). The Debtors have failed to meet their burden under section 328 of the Bankruptcy Code of demonstrating that the Fee Cap is "improvident in light of developments not capable of being anticipated" when they retained PJT. 11 U.S.C. § 328(a).

## <u>CONCLUSION</u>

Based on the foregoing, the Court sustains the UST Objection and denies the Supplemental Application.

IT IS SO ORDERED.

Dated:  September 16, 2022
New York, NY

/s/ *James L. Garrity, Jr.*
Honorable James L. Garrity, Jr.
United States Bankruptcy Judge